# United States Court of Appeals
# for the Federal Circuit

ECOFACTOR, INC.,

*Plaintiff-Appellant,*

v.

GOOGLE LLC,

*Defendant-Cross-Appellant.*

———————

On Appeal from the United States District Court Western District of Texas
Case No. 6:20-cv-00075-ADA, Judge Alan D. Albright

———————

**NON-CONFIDENTIAL PRINCIPAL BRIEF OF PLAINTIFF-
APPELLANT ECOFACTOR, INC.**

———————

Reza Mirzaie
rmirzaie@raklaw.com
Marc A. Fenster
mfenster@raklaw.com
Kristopher R. Davis
kdavis@raklaw.com
James N. Pickens
jpickens@raklaw.com
Minna Y. Chan
mchan@raklaw.com
Russ August & Kabat
12424 Wilshire Blvd., 12th Floor
Los Angeles, CA 90025
(310) 826-7474

January 3, 2023

*Attorneys for Plaintiff-Appellant
EcoFactor, Inc.*

# RELEVANT REPRESENTATIVE CLAIMS FROM PATENTS AT ISSUE

## U.S. Patent No. 8,738,327, Claim 5 (Appx102):

1. A system for controlling the operational status of an HVAC system comprising:

at least one thermostat associated with a structure that receives temperature measurements from inside the structure, the structure conditioned by at least one HVAC system, the thermostat having at least a first setting stored therein;

one or more servers located remotely from the structure, the one or more servers configured to receive measurements of outside temperatures from at least one source other than the HVAC system,

the one or more servers are further configured to communicate with the thermostat via a network, wherein the one or more servers receive inside temperatures from the thermostat and compares the inside temperatures of the structure and the outside temperatures over time to derive an estimation for the rate of change in inside temperature of the structure in response to outside temperature,

the one or more servers are further configured to receive a demand reduction request and determine whether the structure is associated with demand rejection request, and

based on the determination that the structure is associated with the demand reduction request, the one or more servers are further configured to send a signal to the thermostat to change the setting to a second setting to reduce electricity demand by the HVAC system.

\* \* \*

5. The system as in claim 1 in which the estimation is a prediction about the future rate of change in temperature inside the structure.

1. A system for controlling an HVAC system at a user's building, the system comprising:

a memory; and

one or more processors with circuitry and code designed to execute instructions;

the one or more processors with circuitry and code designed to execute instructions to receive a first data from at least one sensor, wherein the first data from the at least one sensor includes a measurement of at least one characteristic of the building;

the one or more processors with circuitry and code designed to execute instructions to receive a second data from a network connection, wherein the second data from the network connection is collected from a source external to the building, wherein the second data from the network connection is received via the Internet;

the one or more processors with circuitry and code designed to execute instructions to receive a first temperature setpoint for the building corresponding to a desired temperature setting when the building is occupied, and a second temperature setpoint for the building corresponding to a desired temperature setting when the building is unoccupied;

the one or more processors with circuitry and code designed to execute instructions to receive commands through the Internet by way of a remote interface on a mobile, wireless device running software application code; wherein the interface is configured to allow the user to adjust temperature setpoints for the HVAC system;

the one or more processors with circuitry and code designed to execute instructions to send user-specific data through the Internet, wherein user-specific information about the building and HVAC system is generated based at least in part on the user-specific data, wherein the user-specific information is configured to be presented on a user interface on a mobile, wireless device running software application code via the Internet;

the one or more processors with circuitry and code designed to execute instructions to determine whether the building is occupied or unoccupied, and based on that determination, to control the HVAC system to provide heating or cooling to the building at an operational temperature;

wherein the one or more processors comprises a first processor with circuitry and code designed to execute instructions, which is located remotely from the memory and is not electrically connected to the memory;

the first processor with circuitry and code designed to execute instructions to communicate with the memory;

wherein the memory is configured to store historical values of the first data and second data.

* * *

2. The system of claim 1, wherein the operational temperature is the second temperature setpoint for the building corresponding to a desired temperature setting when the building is unoccupied, in the event the one or more processors with circuitry and code designed to execute instructions determines that the building is unoccupied.

* * *

12. The system of claim 1, wherein the determination of whether the building is occupied or unoccupied by is performed by the first processor.

1. A system for monitoring the operational status of an HVAC system comprising:

at least one HVAC control system associated with a first structure that receives temperature measurements from at least a first structure conditioned by at least one HVAC system;

one or more processors that receive measurements of outside temperatures from at least one source other than said HVAC system,

wherein said one or more processors compares the inside temperatures of said first structure and the outside temperature over time to derive an estimation for the rate of change in inside temperature of said first structure in response to outside temperature, and

wherein said one or more processors compare an inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature of said first structure to determine whether the first HVAC system is on or off.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2022-1974, 2023-1101 |
| **Short Case Caption** | EcoFactor, Inc. v. Google LLC |
| **Filing Party/Entity** | Plaintiff-Appellant EcoFactor, Inc. |

> **Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 01/03/2023

Signature: /s/ Reza Mirzaie

Name: Reza Mirzaie

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| EcoFactor, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☑ Additional pages attached

| | | |
|---|---|---|
| Jason M. Wietholter of Russ August & Kabat | Matthew D. Aichele of Russ August & Kabat | Adam S. Hoffman of Russ August & Kabat |
| Paul A. Kroeger of Russ August & Kabat | Brian W. Lewis, formerly of Russ August & Kabat | C. Jay Chung, formerly of Russ August & Kabat |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| EcoFactor, Inc. v. ecbee, Inc , USDC WDTX Case No. 6:20-cv-00078 | EcoFactor, Inc. v. Vivint, Inc., USDC WDTX Case No. 6:20-cv-00080 | EcoFactor, Inc. v. Pointcentral LLC, USDC Oregon, Case No. 6:22-cv-00055 |
| EcoFactor, Inc. v. Google LLC, USCA Fed Cir Case No. 2022-1971 | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ....................................................................... i

TABLE OF AUTHORITIES .......................................................................... vi

STATEMENT OF RELATED CASES ................................................................ 1

STATEMENT OF JURISDICTION ................................................................... 2

STATEMENT OF THE ISSUES FOR APPEAL .................................................. 3

I.      INTRODUCTION ......................................................................... 1

II.     STATEMENT OF THE CASE ....................................................... 2

        A.     The Parties.......................................................................... 2

        B.     Overview Of Smart Thermostat Technology And EcoFactor's
               '327, '488, And '382 Patents ............................................... 3

        C.     Google's Knowledge Of EcoFactor, Its Patents, And Its
               Infringement Allegations Against Google ........................... 4

        D.     Google's Source Code.......................................................... 9

        E.     The Claimed Invention of the '488 Patent ......................... 13

        F.     The District Court Granted Google's Summary Judgment of
               Indefiniteness as to the '488 Patent.................................... 14

III.    SUMMARY OF THE ARGUMENT ............................................. 15

IV.     STANDARDS OF REVIEW ....................................................... 18

V.      ARGUMENT ............................................................................. 20

        A.     The District Court's Grant Of No Willfulness Despite Ample
               Evidence Supporting Google's Intentional Infringement Was
               Reversible Error ................................................................. 20

        B.     The District Court's Grant Of No Induced Infringement On The
               '327 Patent Was Reversible Error....................................... 27

        C.     The District Court's Ruling That Google's Source Code
               Printouts Were Inadmissible Was Reversible Error, As Were The
               District Court's Related Instructions To The Jury ............. 29

               1.     Google's source code printouts were erroneously
                      excluded from the evidentiary record, harming
                      EcoFactor and warranting reversal. ......................... 30

2. The District Court erroneously instructed the jury regarding the Google source code, resulting in further harm to EcoFactor that warrants reversal. ................... 34

3. EcoFactor did not waive its arguments that the source code printouts should have been admitted and given to the jury. .............................................................. 41

D. The District Court Erred By Granting Summary Judgment That The Asserted Claims Of The '488 Patent Are Indefinite. ................... 43

VI. CONCLUSION AND STATEMENT OF RELIEF SOUGHT .................... 48

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

**<u>CONFIDENTIAL MATERIAL OMITTED</u>**

The material omitted on page 26 describes internal company practices of Defendant-Appellee Google LLC ("Google"). It refers to sealed testimony given by a Google witness and information designated by Google in the underlying litigation as confidential under the Protective Order entered by the District Court.

# TABLE OF AUTHORITIES

**Cases**

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
876 F.3d 1350 (Fed. Cir. 2017) ............................................................ 20, 26

*Baker v. Canadian Nat'l/Ill. Cent. R.R.*,
536 F.3d 357 (5th Cir. 2008) ...................................................................... 19

*BASF Corp. v. Johnson Matthey Inc.*,
875 F.3d 1360 (Fed. Cir. 2017) .................................................................. 46

*Burch v. Coca-Cola Co.*,
119 F.3d 305 (5th Cir. 1997) ...................................................................... 18

*Cates v. Creamer*,
431 F.3d 456 (5th Cir. 2005) ...................................................................... 19

*Compaq Comp. Corp. v. Ergonome Inc.*,
387 F.3d 403 (5th Cir. 2004) ...................................................................... 19

*Energy Transp. Grp. Inc. v. William Demant Holding A/S*,
697 F.3d 1342 (Fed. Cir. 2012) .................................................................. 18

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*,
879 F.3d 1332 (Fed. Cir. 2018) .................................................................. 21

*Global-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S (2011) .......................................................................................... 28

*Goodwall Const. Co. v. Beers Const. Co.*,
991 F.2d 751 (Fed. Cir. 1993) .................................................................... 25

*Gov't Fin. Servs. One L.P. v. Peyton Place, Inc.*,
62 F.3d 767 (5th Cir.1995) ......................................................................... 19

*i4i Ltd. P'ship v. Microsoft Corp.*,
598 F.3d 831 (Fed. Cir. 2010) ............................................................ passim

*In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*,
681 F.3d 1323 (Fed. Cir. 2012) .................................................................. 28

*Intrastate Gas Gathering Co. v. Dow Chem. Co.*,
248 F.3d 1140 (5th Cir. 2001) .................................................................... 38

*Jacuzzi, Inc. v. Kohler Co.*,
835 F.2d 870 (Fed. Cir. 1987) .................................................................... 43

*Johnson v. Thibodaux City*,
887 F.3d 726 (5th Cir. 2018) ................................................................ 19, 29

*JVW Enters., Inc. v. Interact Accessories*,
424 F.3d 1324 (Fed. Cir. 2005) .................................................................. 45

*Koch v. United States*,
857 F.3d 267 (5th Cir. 2017) ...................................................................... 19

*Nat'l Fire Ins. Co. of Hartford v. Giron*,
  573 F. App'x 322 (5th Cir. 2014) ...................................................... 18
*Nature Simulation Sys. Inc. v. Autodesk, Inc.*,
  50 F.4th 1358 (Fed. Cir. 2022) ............................................... 20, 43
*nCube Corp. v. SeaChange Int'l, Inc.*,
  436 F.3d 1317 (Fed. Cir. 2006) ........................................................ 25
*Packet Intelligence LLC v. NetScout Sys., Inc.*,
  965 F.3d 1299 (Fed. Cir. 2020) ................................... 22, 24, 25
*Polara Eng'g Inc. v. Campbell Co.*,
  894 F.3d 1339 (Fed. Cir. 2018) ........................................................ 21
*S3 Inc. v. NVIDIA Corp.*,
  259 F.3d 1364 (Fed. Cir. 2001) ........................................................ 46
*Sec. & Exch. Comm'n v. Life Partners Holdings, Inc.*,
  854 F.3d 765 (5th Cir. 2017) ............................................................ 21
*Sec. & Exch. Comm'n v. Life Partners Holdings, Inc.*,
  854 F.3d 765 (5th Cir. 2017) .................................................... 18, 26
*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*,
  844 F.3d 1370 (Fed. Cir. 2017) ........................................................ 20
*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
  14 F.4th 1323 (Fed. Cir. 2021) ................................................. 20, 23
*SSL Servs., LLC v. Citrix Sys., Inc.*,
  769 F.3d 1073 (Fed. Cir. 2014) ........................................................ 23
*United States v. Maddox*,
  492 F.2d 104 (5th Cir. 1974) ............................................................ 32
*Via Vadis, LLC v. Blizzard Ent., Inc.*,
  815 F. App'x 539 (Fed. Cir. 2020) .................................................. 47
*WCM Indus., Inc. v. IPS Corp.*,
  721 F. App'x 959 (Fed. Cir. 2018) ............................................ 21, 25
*Wi-LAN Inc. v. Sharp Elecs. Corp.*,
  992 F. 3d 1366 (Fed. Cir. 2021) ................................................ 31, 32
*Wright v. Ford Motor Co.*,
  508 F.3d 263 (5th Cir. 2007) ............................................................ 19

**Statutes**

28 U.S.C. § 1292(c)(2) ........................................................................ 2
28 U.S.C. § 1338(a) ............................................................................ 2
35 U.S.C. § 271(b) ............................................................................ 27
35 U.S.C. § 282 ................................................................................ 20

**Rules**

Fed. R. Evid. § 401 ............................................................................ 32

Fed. R. Evid. § 402 ........................................................ 32

Fed. R. Evid. 103(a)(2) .................................................. 41

Fed. R. Evid. 103(b) ...................................................... 42

# STATEMENT OF RELATED CASES

No appeal of this case in or from the district court below was previously before this or any other appellate court.

The following pending appeal from an *inter partes* review case concerns one of the same patents at issue here, U.S. Patent No. 10,534,382: *EcoFactor, Inc. v. Google LLC*, Fed. Cir. Case No. 2022-1971, which is a companion case that will be assigned to the same merits panel as the above-captioned appeals.

The following district court cases concern one or more of the three patents that are subject to this appeal, specifically U.S. Patent No. 8,738,327 (the "'327 Patent"), 8,412,488 (the "'488 Patent"), and 10,534,382 (the "'382 Patent"): *EcoFactor, Inc. v. Alarm.com Inc.*, No. 6:22-cv-00055 (D. Or.); *EcoFactor, Inc. v. ecobee, Inc.*, No. 6:20-cv-00078 (W.D. Tex.); and *EcoFactor, Inc. v. Vivint, Inc.*, 6:20-cv-00080 (W.D. Tex.).

Counsel for Plaintiff-Appellant EcoFactor, Inc. ("EcoFactor") is not aware of any other case pending in this Court or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal.

## STATEMENT OF JURISDICTION

The United States District Court for the Western District of Texas (the "District Court") had jurisdiction pursuant to 28 U.S.C. §§ 1338(a). On May 26, 2022, the District Court entered final judgment. Appx1. EcoFactor timely appealed on June 23, 2022. This Court has jurisdiction over this consolidated appeal under 28 U.S.C. § 1292(c)(2).

## STATEMENT OF THE ISSUES FOR APPEAL

1.     Did the District Court err by granting judgment as a matter of law that claim 5 of the '327 Patent is not willfully infringed, despite ample evidence demonstrating that Defendant-Appellee Google LLC's ("Google") continued willful infringement after the complaint was filed on January 31, 2020?

2.     Did the District Court err by granting judgment as a matter of law that there is no induced infringement of claim 5 of the '327 Patent, despite ample evidence demonstrating Google knowingly induced infringement of the '327 Patent?

3.     Did the District Court err by denying EcoFactor's motion for a new trial limited to the issues of infringement and damages with respect to the '382 Patent, based upon the District Court's decision to exclude source code from the evidentiary record and its erroneous jury instructions about source code, including its denial of the jury's request for specific source code during deliberations after initially instructing the jury that such requests would be granted?

4.     Did the District Court err by granting Google's motion for summary judgment that the asserted claims of the '488 Patent are indefinite?

# I.    INTRODUCTION

The jury below returned a verdict in favor of EcoFactor, finding that Google infringed claim 5 of the '327 Patent and that Google failed to prove invalidity—and awarding damages for Google's infringement of the '327 Patent. Those portions of the verdict should not be disturbed. However, the District Court erred in multiple ways that were detrimental to EcoFactor, prompting this appeal.

The first set of errors relate to the '327 Patent. The District Court erred by granting judgment as a matter of law that claim 5 of the '327 Patent is not willfully infringed, despite ample evidence of post-suit willfulness. For example, the evidence showed that Google knew of the '327 Patent, held meetings with EcoFactor personnel, and then launched the infringing product features prior to EcoFactor filing suit—further demonstrating the willfulness of Google's infringement after EcoFactor filed suit. The jury also ruled against Google on infringement and validity. The District Court also erred by granting judgment as a matter of law of no induced infringement of claim 5 of the '327 Patent, despite ample evidence demonstrating that Google knowingly induced infringement of the '327 Patent.

The second set of errors relate to the '382 Patent. The District Court erred by excluding from evidence printouts of the accused Google source code, which were unquestionably relevant and probative evidence on the issue of infringement. The District Court also erred by instructing the jury members in open court that they

would be given access to any source code printouts they requested during deliberations, denying them such access when it was requested, and indicating in this refusal that the jury could not consider source code in reaching their verdict.

Finally, the District Court erred by granting Google's motion for summary judgment that the asserted claims of the '488 Patent are indefinite. This decision was contrary to the intrinsic evidence and how one of ordinary skill in the art would understand the claimed invention. This ruling should be reversed.

## II. STATEMENT OF THE CASE

### A. The Parties

Plaintiff-Appellant EcoFactor was founded in 2006 and is a pioneer in smart thermostat technology, having earned dozens of issued U.S. patents and numerous awards for its contributions to the field. *See* Appx5744-5745 (608:17-609:8); Appx5332-5333 (196:23-197:14); Appx5336 (200:9-18). EcoFactor continues to offer software solutions for smart home energy management, with its cloud-based software being used to manage thousands of residential thermostats in the United States. Appx5332-5333 (196:25-197:4).

Appellee Google is a large technology company that entered the smart thermostat field in 2014 when it acquired Nest Labs, Inc. Google sells multiple smart thermostats that were accused of infringement in the action below.

**B.   Overview Of Smart Thermostat Technology And EcoFactor's '327, '488, And '382 Patents**

All three patents at issue in this appeal are directed to smart thermostat technologies. By connecting to a customer's home WiFi network, a smart thermostat is able to communicate with backend servers of the thermostat provider, which in turn communicate with customer mobile devices and third parties (e.g., utility providers, sources of outside weather data). This architecture enables a variety of features that are useful for reducing energy consumption, improving user comfort, and enhancing user control over their home's temperature. EcoFactor's patented technologies promote these objectives by using data from thermostats and other sources in new and beneficial ways.

For example, the claimed inventions of the '327 and '488 Patents utilize inside temperature data and outside temperature data to perform thermal modeling, deriving a rate of change in the home's inside temperature in response to outside temperature. *See, e.g.*, Appx84 (9:27-45); Appx102 (9:27-54). The claimed invention of the '327 Patent is also configured to receive demand reduction requests (e.g., from a user's utility that is attempting to reduce strain on the electricity grid during a period of expected high demand) and adjust thermostat settings accordingly to reduce the electricity consumed by the user's HVAC system. *E.g.*, Appx102 (9:46-54). The claimed invention of the '488 Patent compares recorded inside temperature data with the derived rate of change to determine whether the user's

HVAC system is on or off, which can assist with diagnosing HVAC system problems that waste energy. *E.g.*, Appx84 (9:41-45). The claimed invention of the '382 Patent also focuses on reducing energy consumption, specifically by determining whether the user's home is occupied or unoccupied and controlling the home's temperature accordingly—thus avoiding unnecessary energy usage when the user is not home. *E.g.*, Appx102 (8:12-67).

Similarly, EcoFactor offers smart thermostat technology solutions that provide demand reduction and energy efficiency features to reduce energy consumption, as well as HVAC performance monitoring to diagnose HVAC system problems that waste energy. Appx5532 (196:15-19); Appx10354.

### C. Google's Knowledge Of EcoFactor, Its Patents, And Its Infringement Allegations Against Google

EcoFactor placed Google on notice of the '327 Patent in 2015 and 2018. In 2015, EcoFactor received an offer to purchase the company and contacted others who EcoFactor believed might be interested. *See, e.g.*, Appx10890. As part of his outreach, EcoFactor's CEO spoke to Scott McGaraghan, a product manager at Google. *See, e.g.*, Appx10890; Appx5824 (688:11-15); Appx5841-5846 (705:13-710:6). Following that conversation, on December 8, 2015, Mr. McGaraghan informed Google colleagues of the opportunity and EcoFactor's belief that it has

"**strong IP**." Appx5845-5846 (709:2-710:6); Appx10890. [1] These colleagues included Mr. McGaraghan's supervisor, a person in charge of engineering, and the head of sales. Appx5843 (707:6-14). Ultimately, this opportunity reached Google's Corporate Development group, who held a call with EcoFactor's CEO. Appx5846-5848 (710:17-712:7); Appx10807-10809. While Google ultimately passed on this opportunity (*see* Appx5848 (712:8-18); Appx10807-10809), this interaction placed Google on notice of EcoFactor and its patents, including the '327 Patent (which issued in May 2014).

In 2018, EcoFactor again contacted Google, this time with EcoFactor's CEO reaching out to Abraham Yacobian, who was believed to have worked in partnerships at Google. Appx5675-5676 (539:12-540:2); Appx5849-5850 (713:21-714:11); Appx10891. Mr. Yacobian requested a corporate overview of EcoFactor and a list of patents because EcoFactor's CEO conveyed that its patents were valuable. Appx5675 (539:12-23). As requested, EcoFactor's CEO sent Mr. Yacobian an "EcoFactor Overview" presentation and an Excel list which included the '327 Patent. Appx10802-10804; Appx10350-10363; Appx10367; Appx5676-5680 (540:3-544:1). The presentation discussed EcoFactor's "[i]nnovative" "35 foundational energy management patents." Appx10352; Appx5673-5682 (541:15-20). It also highlighted teachings of the '327 Patent: HVAC performance monitoring

---

[1] All emphasis in quoted material has been added unless otherwise noted.

and Demand Response. *See* Appx10354 (under "Performance Monitoring" and "Demand Optimization"); Appx5678 (542:8-12). EcoFactor's CEO discussed the presentation and the contents of the patent list with Mr. Yacobian. Appx5677-5680 (541:15-544:1). Mr. Yacobian conveyed the opportunity to Google's Corporate Development group, who conducted diligence on the materials sent. Appx5680-5681 (544:17-545:25); Appx10891. While Google declined the opportunity (Appx5682 (546:2-11)), this interaction placed Google on further notice of EcoFactor's '327 Patent.

Google obtained knowledge of EcoFactor's products and technology through other avenues as well. Before being acquired by Google, Nest recognized EcoFactor as a competitor as of 2010. *See* Appx5866-5868 (730:23-731:25). Google's competitive relationship with EcoFactor meant that Google carefully analyzed EcoFactor's products and technologies, including during "competitive landscape discussions." *See* Appx5628-5630 (492:16-494:11). Notably, Google also hired numerous former EcoFactor employees. Appx5363 (227:14-24). Those employees included a program manager and engineers on EcoFactor's platform. Appx5363 (227:14-24). Those employees brought to Google a wealth of knowledge pertaining to EcoFactor's products and technologies.

In the meantime, at least as of 2015, EcoFactor developed a platform which featured demand response and HVAC Performance Monitoring. *See* Appx5332

(196:13-22). Prior to the filing of this lawsuit, in 2018, Google began developing features which copied the teachings of the '327 Patent. *See* Appx10894. Ultimately, in January 2020, Google launched its own HVAC monitoring feature. Appx5822-5823 (686:18-687:14). Despite the filing of the Complaint on January 31, 2020, Google continued to willfully make, use, and/or sell products infringing the '327 Patent. Appx5781 (645:3-22); Appx6157-6159 (1021:6-1023:8).

Google willfully infringed while having unreasonable arguments for non-infringement and invalidity. Indeed, the jury saw through Google's arguments and agreed with EcoFactor that Google infringed claim 5 of the '327 Patent and that claim 5 of the '327 Patent is not invalid, awarding EcoFactor approximately $20 million as a result. Appx45-47, Appx49. With respect to non-infringement, Google took the unreasonable position that the accused thermostats "do not measure ambient room temperature." Appx5321 (185:15-23). Its position defied common sense and was flatly undermined by the evidence. For example, Google's own support webpage indicated that "current ambient temperature in the room is measured by the Nest Thermostat's internal sensors." *See* Appx6154-6155 (1018:21-1019:1); *see also* Appx10429 ("Ambient temperature" is "temperature measured near the thermostat"), Appx10888 (indicating similarly). The jury did not buy Google's argument, finding in EcoFactor's favor on the issue of infringement. Appx45.

With respect to invalidity, Google presented only the Ehlers reference. Appx6388 (1252:16-24). Google and its invalidity expert took the untrue position that Ehlers' teachings were not before the Patent Office during the 14 months of prosecution for the '327 Patent. Appx6389-6390 (1253:9-1254:8). The credibility of Google and its expert, Mr. Williams, were undermined during cross-examination, when EcoFactor obtained admissions from Mr. Williams that all of the teachings from Ehlers that he relied upon were, in fact, before the Patent Office—they were simply in a different Ehlers reference listed on the face of the '327 Patent. Appx6390-6394 (1254:9-1258:2); Appx86 (listing U.S. Patent No. 7,130,719 to Ehlers among references considered during prosecution). Google's counsel attempted to keep this from the jury by objecting to EcoFactor's use of the file history—which was undeniably part of the record and was considered by Mr. Williams—and the District Court properly overruled this objection. *See* Appx6391 (1255:11-25). Especially given that Google relied upon only one prior art reference for its invalidity case, and the exact teachings of that reference had already been considered by the Patent Office during prosecution (despite Google's misleading testimony to the contrary), it came as no surprise that the jury found for EcoFactor on validity. Appx46. Despite these facts, Google moved for judgment as a matter of law on no willfulness and no induced infringement under Federal Rule of Civil

Procedure 50(a), which the District Court granted. Appx6231 (1095:12-15); Appx6378 (1242:5-8).

### D.    Google's Source Code

Google produced extensive amounts of source code for inspection during discovery, which both parties relied upon when preparing their cases for trial. Google produced more than 500 pages of source code printouts, multiple Google fact witnesses detailed the operation of the source code during deposition, and both party's experts extensively analyzed and cited Google's source code in their respective reports. EcoFactor also included Google's source code printouts in its exhibit list to support its allegations of infringement. Appx2208.

Despite both party's reliance on the source code throughout discovery and in preparation for trial—and despite EcoFactor's position in the draft pretrial order that Google's source code could be used at trial and become part of the record as an admitted exhibit consistent with the protective order entered in the case—Google argued for the first time during the pretrial process that its source code should not be included as an exhibit and "object[ed] to copies of source code materials being provided to jurors in this case." Appx2201. EcoFactor raised this with the District Court at the pretrial conference. Without hearing oral argument, the District Court ruled on the record that Google's source code could be used "as a demonstrative," rejecting EcoFactor's written position in the draft joint pretrial order that the source

code printouts be admitted as exhibits. Appx5133-5134 (118:1-119:1); Appx2200-2201; Appx2242-2243.

Google's source code was front and center during trial. It was discussed with the jury during opening statements and closing arguments, examined with Google's fact witnesses, and presented during both parties' expert witness testimony on the issue of infringement. During EcoFactor's case in chief, its technical expert, Mr. Erik de la Iglesia, testified at length about his reliance on and analysis of Google's source code demonstrating infringement. For example, Mr. de la Iglesia relied on Google's source code to demonstrate infringement of the '382 Patent, including disputed limitation 1[h]. *See, e.g.,* Appx5535-5545 (400:5-409:13); Appx5555-5558 (419:10-422:1). During Mr. de la Iglesia's examination, the District Court noted "[w]e'll figure out a way to **make sure that [the source code is] in the record** and it's protected" and further instructed "ladies and gentlemen of the jury, **we'll make sure that you have sufficient access to the source code, if you were to need it during your deliberations**." Appx5457-5459 (321:16-323:3). While still in the presence of the jury, the District Court further stated with respect to Google's source code:

> It's not in evidence, and it's not coming in evidence at this point. It can be used as a demonstrative, which means it won't be an exhibit of record, but the jury's going to be able to see it. And ***if for some reason during the jury's deliberations, they feel like they need to review the source code for some reason, we'll figure out a way to deal with it at that time and make it available to them***. It's not going to be in the record. So for Google's sake, they don't need to be worrying that it's going to be part of the record.

Appx5457-5459 (321:16-323:3). Google raised no further objection and did not request any clarification, and EcoFactor relied on the District Court's instruction that the jury would have access to the source code should they request it during deliberation.

Throughout the trial, Google acknowledged that its source code was highly relevant to the issue of infringement. As one example, during cross-examination of EcoFactor's infringement expert, Google's counsel asked "[s]o would you agree that the **source code that is run on a device would be the definitive proof** of how that device functions?" Appx5600 (464:10-13). Google presented its source code during both its fact and expert witnesses' testimony. *See* Appx5891-5942 (755:20-806:4); Appx6078-6130 (942:15-994:25). Google's non-infringement expert testified that source code was his "favorite" kind of material to review in forming his non-infringement opinions. Appx6088 (952:19-24). Attempting to distance itself from the admissions on its webpages, Google even argued in closing that "[r]eal technical experts in patent cases, they don't rely on websites, ladies and gentlemen. They **rely on hard evidence, technical evidence**." Appx6544-6545 (1408:25-1409:2).

As to the '382 Patent, Google's source code was the predominant focus of testimony at trial. Mr. de la Iglesia relied on his analysis of Google's source code to prove infringement of the disputed limitations of the '382 Patent, including by accusing specific files and specific line numbers of practicing limitation 1[h] relating

to occupancy determinations. Appx5539-5541 (403:16-405:11); Appx5556-5557 (420:8-421:5). Google's lead software engineer, Dr. Eric Burger, testified at length about the specific lines of code that Mr. de la Iglesia accused in rebuttal. Appx5934-5937 (798:22-800:8); Appx5938 (801:22-24-804:22). Dr. Turnbull also testified at length about the same lines of code in the same file. Appx6112-6116 (976:7-980:11); Appx6121-6123 (985:19-987:23); Appx6159-6161 (1023:20-1025:19). Particular attention was drawn to these lines of code when the District Court sustained a Rule 26 objection and instructed the jury to disregard a portion of Dr. Turnbull's testimony about them. Appx6121-6122 (985:19-986:7).

After six days of trial, the jury retired to deliberate, and during those deliberations, the jury sent out a note requesting access to Google's "occupancy determination source codes." Appx6569-6570 (1433:11-1434:22); Appx2262. Even with the parties' extensive reliance on Google's source code, the significant discussion of Google's source code during trial, and Google's acquiescence to the District Court's instruction that the jury would have access to source code printouts if they requested them, Google argued that the requested source code should not be provided to the jury. Appx6570 (1434:16-20). The District Court agreed with Google and responded to the jury: "Ladies and gentlemen, you have all the evidence that was admitted during the trial and you must resolve all the questions based on the evidence that you have." Appx6569-6570 (1433:11-1434:22).

Later, the jury sent out another note along with a copy of the '382 Patent on which the jury indicated (with checkmarks) that all elements of the '382 Patent's asserted claims were infringed except for possibly the specific claim element regarding occupancy determination (*i.e.*, claim element 1[h]). Appx6570-6573 (1434:23-1437:17); Appx2264; *see also* Appx120 ('382 Patent at claim 1[h] ("the one or more processors with circuitry and code designed to execute instructions to determine whether the building is occupied or unoccupied, and based on that determination, to control the HVAC system to provide heating or cooling to the building at an operational temperature"). Neither party disputes that the jury's earlier request for "occupancy determination source codes" was referring specifically to the code which was directly relevant to claim element 1[h] of the '382 Patent. *See* Appx6570-6573 (1434:24-1437:2).

The following morning, the jury returned its verdict finding that Google had not infringed the '382 Patent. Appx45. The verdict form reveals that the jury first checked "Yes" as to infringement of the '382 Patent, but later scratched out that checkmark, initialed the change, and instead checked "No." Appx45.

**E.    The Claimed Invention of the '488 Patent**

Claim element 1[d] of the '488 Patent requires that "said one or more processors compare an inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature of said first structure."

Appx84 (9:41-45). The specification discloses comparing recorded inside temperatures to estimated rates of change. *See, e.g.*, Appx81 (3:25-47); Appx83 (7:65-8:34). EcoFactor's validity expert explained in discovery that various disclosed embodiments describe comparing a predicted rate of change to the actual inside temperature, including at col. 3:25-47. *See* Appx1685-1686 (¶ 92).

### F. The District Court Granted Google's Summary Judgment of Indefiniteness as to the '488 Patent

Google filed a motion for summary judgment that the asserted claims of the '488 Patent are invalid for lack of written description and indefiniteness. Appx1645-1662. Google supported its motion with excerpts from the deposition testimony of inventor Scott Hublou (Appx1663-1673), Google's validity expert (Appx1674-1682), and expert reports and deposition transcripts of EcoFactor's technical experts, Erik de la Iglesia and John Palmer (Appx1683-1703). EcoFactor's opposition explained that there is written description support for the challenged claim language, referencing the supporting opinions of its expert, Dr. Palmer, among other evidence. *See* Appx1685-1686 (¶ 92). EcoFactor's opposition also explained that the claims convey their scope with reasonable certainty to an ordinary skill artisan and referenced supporting testimony of its experts. For example, EcoFactor relied upon Dr. Palmer's understanding of the scope of the claims' recitation of comparing a temperature with a rate of change. Appx1686-1686 (¶ 92), Appx1776 (¶ 247). EcoFactor also relied upon Mr. de la Iglesia's testimony that it "absolutely makes

sense to, as the claim requires, compare an inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature of said first structure." Appx1700 (175:2-12).

Without issuing a written opinion, the District Court denied Google's motion on written description but granted it as to indefiniteness. Appx5113 (stating only: "The Court is going to grant the motion for summary judgment on the basis of indefiniteness and deny it on the other basis. That's the '488 patent."); Appx2254.

## III. SUMMARY OF THE ARGUMENT

1. The District Court erred by granting judgment as a matter of law that claim 5 of the '327 Patent is not willfully infringed, despite ample evidence demonstrating Google continued willfully infringing after January 31, 2020. The evidence showed, for example, that Google knew of the '327 Patent and its disclosure of HVAC performance monitoring and Demand Response features years before EcoFactor filed suit. *See* Appx10354; Appx5678 (542:8-12). The evidence also showed that Google hired multiple former EcoFactor employees who brought to Google expertise in these technology areas that they developed while at EcoFactor. Appx5363 (227:14-24). Despite its familiarity with EcoFactor and its patents (including the '327 Patent specifically), Google released its own infringing product features and continued to sell products with these features after EcoFactor filed suit. Google also did so while maintaining unreasonable non-infringement and

invalidity positions that were plainly contradicted by the evidence and properly rejected by the jury. The District Court's determination of no willfulness should therefore be reversed.

2.     Similarly, the District Court erred by granting judgment as a matter of law that Google is not liable for induced infringement of claim 5 of the '327 Patent, despite ample evidence demonstrating Google knowingly induced infringement. Despite Google's knowledge of EcoFactor and its patents, including the '327 Patent specifically, Google encouraged its customers to infringe and continues to encourage such direct infringement today, despite lacking any reasonable non-infringement or invalidity positions. The District Court's determination of no inducement should be reversed.

3.     The District Court further erred by excluding printouts of Google's source code from the evidentiary record, even though Google never raised any evidentiary objection to their admission—only a concern about confidentiality that could have been addressed in other ways. Confidentiality was not a proper basis to exclude highly relevant evidence from the record. To make matters worse, the District Court instructed the jury during trial that if any jury members requested to see source code printouts during deliberations, they would be given such access. But when the jury requested printouts of the source code file relevant to claim element 1[h] of the '382 Patent, the District Court denied the request and told the jury to

decide the questions before it using only the evidence they had (by implication, the evidence with them in the deliberation room). These erroneous rulings and instructions compromised the jury's verdict on the question of infringement of the '382 Patent, undeniably harming EcoFactor. Thus, the District Court's denial of EcoFactor's motion for a new trial as to infringement and damages for the '382 Patent should be reversed.

4. Finally, the District Court erred by granting Google's motion for summary judgment that the asserted claims of U.S. Patent No. 8,412,488 are indefinite. The asserted claims require "one or more processors [that] compare an inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature of said first structure to determine whether the first HVAC system is on or off." This claim language is not indefinite, because ordinary artisans understand what it means to compare inside temperatures recorded with the thermostat with the rate of increase estimated by the processor. This is disclosed in numerous embodiments, including, *e.g.*, Appx81 (3:25-47); Appx83 (7:65-8:34). The specification discloses various ways to perform the comparison, but the claim is not indefinite simply because there are multiple ways to practice it. Further, EcoFactor's experts both testified that the claim scope was reasonably certain, agreeing that there are multiple ways to perform the claimed comparison, but that all of them involve comparing the recorded inside temperature with the processor's

estimation for the rate of change. Given this intrinsic and extrinsic record, summary judgment was inappropriate.

## IV.    STANDARDS OF REVIEW

This Court reviews decisions on Rule 50(a) motions for judgment as a matter of law under the law of the regional circuit. *Energy Transp. Grp. Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1350 (Fed. Cir. 2012). The Fifth Circuit reviews district court decisions on such motions *de novo*. *Burch v. Coca-Cola Co.*, 119 F.3d 305, 313 (5th Cir. 1997). In the Fifth Circuit, "a trial court may grant an opposing party's motion for judgment as a matter of law if there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Id*. "In such circumstances, [the Court views] the entire trial record in the light most favorable to the non-movant, drawing reasonable factual inferences in its favor." *Id*. "Courts may grant judgments as a matter of law only if the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Sec. & Exch. Comm'n v. Life Partners Holdings, Inc.*, 854 F.3d 765, 777-78 (5th Cir. 2017). "[W]e do not make credibility determinations or weigh the evidence." *Nat'l Fire Ins. Co. of Hartford v. Giron*, 573 F. App'x 322, 323 (5th Cir. 2014).

This Court reviews the denial of a motion for a new trial under the law of the regional circuit. *Energy Transp.*, 697 F.3d at 1350. The Fifth Circuit reviews district

court decisions on such motions, as well as underlying evidentiary rulings and jury instructions, for abuse of discretion. *See Cates v. Creamer*, 431 F.3d 456, 460 (5th Cir. 2005) (citing *Gov't Fin. Servs. One L.P. v. Peyton Place, Inc.*, 62 F.3d 767, 774 (5th Cir.1995)); *Koch v. United States*, 857 F.3d 267, 277 (5th Cir. 2017); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 841 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91, 131 S. Ct. 2238, 180 L. Ed. 2d 131 (2011) (citing *Baker v. Canadian Nat'l/Ill. Cent. R.R.*, 536 F.3d 357, 363-64 (5th Cir. 2008)). If an abuse of discretion is identified, "the harmless error doctrine applies unless a substantial right of the complaining party was affected." *Compaq Comp. Corp. v. Ergonome Inc.*, 387 F.3d 403, 408 (5th Cir. 2004); *Johnson v. Thibodaux City*, 887 F.3d 726, 736 (5th Cir. 2018) (same quotation). As to jury instructions, this Court "will reverse a judgment 'only if the [jury instructions] as a whole create[] a substantial doubt as to whether the jury has been properly guided in its deliberations.'" *i4i*, 598 F.3d at 841 (quoting *Baker*, 536 F.3d at 363-64). "Erroneous instructions are subject to harmless error review," and this Court "will not reverse if, considering the record as a whole, the erroneous instruction 'could not have affected the outcome of the case.'" *Id.* (quoting *Wright v. Ford Motor Co.*, 508 F.3d 263, 268 (5th Cir. 2007)).

"A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims. Indefiniteness, therefore, like claim construction, is a question of law that [this

Court] review[s] *de novo.*" *Nature Simulation Sys. Inc. v. Autodesk, Inc.*, 50 F.4th 1358, 1360 (Fed. Cir. 2022) (internal quotation marks omitted). "Claim indefiniteness is decided from the viewpoint of persons skilled in the field of the invention." *Id.* "United States patents are accompanied by a presumption of validity, 35 U.S.C. § 282, and invalidity must be established by clear and convincing evidence." *Id.* at 1361 (citing *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017)).

## V.    ARGUMENT

### A.    The District Court's Grant Of No Willfulness Despite Ample Evidence Supporting Google's Intentional Infringement Was Reversible Error

The District Court erroneously granted judgment as a matter of law that Google is not liable for willful infringement of the '327 Patent. Under the *de novo* standard of review that applies to this ruling, the District Court's decision should be reversed. "Under *Halo*, the concept of 'willfulness' requires a jury to find no more than deliberate or intentional infringement." *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 14 F.4th 1323, 1330 (Fed. Cir. 2021). Willfulness can be established with evidence "that the [accused infringer] acted despite a risk of infringement that was 'either known or so obvious that it should have been known to [it].'" *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1371 (Fed. Cir. 2017). "Willful infringement is a question of fact …." *Polara Eng'g Inc. v. Campbell Co.*,

894 F.3d 1339, 1353 (Fed. Cir. 2018). "[W]illfulness is an issue for the jury, not the district court." *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*, 879 F.3d 1332, 1353 (Fed. Cir. 2018). The answer to the question of intent "must be inferred from all the circumstances." *See WCM Indus., Inc. v. IPS Corp*., 721 F. App'x 959, 970 (Fed. Cir. 2018).

Here, the facts and inferences fail to point strongly and overwhelmingly in Google's favor such that reasonable jurors could not reach a contrary conclusion as to intentional infringement of the '327 Patent. *See Sec. & Exch. Comm'n v. Life Partners Holdings, Inc*., 854 F.3d 765, 777-78 (5th Cir. 2017). For example, as described above, in addition to the filing of the complaint, EcoFactor placed Google on direct notice of the '327 Patent in 2015 and 2018 through EcoFactor's acquisition communications with Google, where EcoFactor conveyed that it had "strong IP" and where Google conducted diligence on EcoFactor's patents, including the '327 Patent, and EcoFactor's products, including its HVAC performance monitoring and demand reduction features. *See, e.g.*, *supra* Section II.C.[2]

Given Google's competitive relationship with EcoFactor as of 2010, Google carefully analyzed EcoFactor's products and technologies, including its website and

---

[2] Citing Appx10890; Appx5824 (688:11-15); Appx5841-5846 (705:13-710:6); Appx5846-5848 (710:17-712:7); Appx10807-10809; Appx5675-5680 (539:12-544:1); Appx5849-5850 (713:21-714:11); Appx10891; Appx10802-10804; Appx10352; Appx10354; Appx10367; Appx5733 (587:3-12); Appx5680-5681 (544:17-545:25); Appx5682 (546:2-11).

energy features. *See* Appx5866-5868 (730:23-731:25); Appx5628-5630 (492:16-494:11). Google acquired EcoFactor employees, who brought to Google a wealth of knowledge pertaining to EcoFactor's products and technologies. Appx5363 (227:14-24). After acquiring knowledge of EcoFactor's '327 Patent and HVAC monitoring feature (*see, e.g.*, Appx10354), Google began developing the infringing HVAC Monitoring feature in 2018 (*see* Appx10894), and launched that feature two years later Appx5822-5823 (686:18-687:14), prompting this lawsuit.

Google did not have reasonable positions on non-infringement or invalidity. The jury agreed with EcoFactor that Google infringed claim 5 of the '327 Patent, that claim 5 of the '327 Patent is not invalid. Appx45-47. The jury proceeded to award EcoFactor with approximately $20 million on the '327 Patent. Appx49. When the entire trial record is viewed in the light most favorable to EcoFactor, with all reasonable factual inferences drawn in EcoFactor's favor, jurors could reasonably conclude that Google intentionally infringed the '327 Patent—judgment as a matter of law was inappropriate. *See, e.g.*, *Packet Intelligence LLC v. NetScout Sys., Inc.*, 965 F.3d 1299, 1315-16 (Fed. Cir. 2020) (affirming willfulness judgment).

Thus, the District Court deprived EcoFactor of the opportunity to have the jury render a verdict as to whether Google's conduct was willful despite this ample evidence in EcoFactor's favor. With no analysis provided, the District Court stated that "I'm [] finding as a matter of law that the filing of a lawsuit giving Google notice

and their continuation to manufacture and sell is not willful in a situation where they are putting up a vigorous defense." Appx6231 (1095:12-15). The District Court did not explain what it meant by "vigorous defense." Instead, the District Court stated that "if I'm wrong, I'm sure the Circuit will let me know." Appx6231 (1095:16-17). There are numerous issues with the District Court's decision.

First, the adequacy of Google's defense is fundamentally a question for the jury. Here, the jury bluntly contradicted the District Court's statement that Google mounted a "vigorous defense," when the jury rendered verdicts in EcoFactor's favor on infringement and validity. Appx45-47. Thus, the jury found that Google had no reasonable basis to believe that it did not infringe or that that the patent was invalid. *See SRI Int'l, Inc. v. Cisco Sys., Inc.*, 14 F.4th 1323, 1328 (Fed. Cir. 2021) ("[W]e presume, as we must, that consistent with the jury instructions, the jury found that Cisco had no reasonable basis to believe that it did not infringe or that it had a reasonable defense to infringement."); *SSL Servs., LLC v. Citrix Sys., Inc.*, 769 F.3d 1073, 1082 (Fed. Cir. 2014) ("We presume that the jury resolved the underlying factual disputes in favor of the verdict…."). The jury did not agree with Google's unreasonable non-infringement position that the accused thermostats "do not measure ambient room temperature," which defied common sense and was undermined by the evidence. Appx5321 (185:15-23); Appx6154-6155 (1018:21-1019:4); *see also* Appx10429; Appx10888. Google's invalidity case and credibility

were also undermined before the jury when Google took the untrue position that the teachings of the Ehlers reference were not before the Patent Office. Appx6388, Appx6389-6394 (1252:16-24; 1253:9-1254:8). Rather than refrain from making credibility determinations or weighing the evidence, the District Court improperly did just that. *See* Appx6231 (1095:12-15). Here, the strength of Google's defense is a question of fact for the jury to determine, especially in light of the totality of the willfulness evidence as discussed above.

Second, the District Court disregarded relevant evidence of willfulness. The evidence for intent must be inferred from all the circumstances. But the District Court was dismissive of EcoFactor's pre-suit evidence of Google's awareness of the '327 Patent and of Google's competitive acts in copying EcoFactor's HVAC monitoring feature. *See* Appx6225-6229 (1089:22-1093:21). The District Court repeatedly and erroneously indicated that because EcoFactor failed to explicitly accuse Google of infringement of the '327 Patent prior to filing suit, such evidence may be disregarded. *See id.* This Court has never held that there needs to be an explicit pre-suit accusation of infringement to sustain a willfulness claim. *See, e.g.*, *Packet Intelligence LLC v. NetScout Sys., Inc.*, 965 F.3d 1299, 1315-16 (Fed. Cir. 2020) (affirming willfulness judgment even where there was no pre-suit knowledge of the asserted patents (let alone notice of infringement) and where, post-suit, company executives did not review the asserted patents but continued to sell the

accused products);[3] *WCM Indus., Inc. v. IPS Corp.*, [721 F. App'x 959, 969-71](#) (Fed. Cir. Feb. 5, 2018) (rejecting argument that pre-suit knowledge of asserted patent is required to show willfulness and explaining that there is no "per se rule" but instead the "totality of the circumstances presented in the case" are considered); *Goodwall Const. Co. v. Beers Const. Co.*, [991 F.2d 751, 754](#) and 758 (Fed. Cir. 1993) (affirming willfulness judgment where pre-suit notice of the patent (not of infringement) was provided in the context of establishing business relations with the defendant); *nCube Corp. v. SeaChange Int'l, Inc.*, [436 F.3d 1317, 1324](#) (Fed. Cir. 2006) (affirming willfulness judgment even where there was no allegation of pre-suit notice of the asserted patent itself, let alone of alleged infringement). Instead, this Court has emphasized that the question of intent must be inferred from all the circumstances. *See WCM Indus., Inc. v. IPS Corp.*, [721 F. App'x 959, 970](#) (Fed. Cir. 2018). Thus, the District Court erred in failing to properly consider EcoFactor's pre-suit evidence.

Third, the District Court disregarded the standard for granting a Rule 50(a) motion. A Rule 50(a) motion should be granted only "if the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors

---

[3] *See also Packet Intelligence LLC v. NetScout Sys., Inc.*, Case No. 2:16-CV-00230-JRG, [2019 WL 2375218](#), at *8 (E.D. Tex. June 5, 2019) (underlying district court opinion making clear there was no evidence of pre-suit knowledge of the asserted patents).

could not reach a contrary conclusion." *Sec. & Exch. Comm'n v. Life Partners Holdings, Inc.*, 854 F.3d 765, 777-78 (5th Cir. 2017). This is a high bar that the District Court never acknowledged and failed to apply when it granted Google's motion in the face of such compelling facts in EcoFactor's favor.

Fourth, the District Court ignored the legal principle that willfulness may also be established through evidence "that the [accused infringer] acted despite a risk of infringement that was 'either known or so obvious that it should have been known to [it].'" *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1371 (Fed. Cir. 2017). The District Court stated, "Let's leave willful blindness aside, which I'm probably not the right judge to be arguing that in front of." Appx6225 (1089:17-20). Under the willful blindness standard, there was more than adequate evidence of post-suit willful infringement. The Google engineers who analyzed EcoFactor's competitive products and services are █ referring to internal practices █ █ of Google █. *See, e.g.*, Appx5630-5631 (494:24-495:5) (detailing the █ same █); *supra* Section II.C. The evidence shows that Google infringed despite a risk of infringement that was so obvious that it should have been known to it. EcoFactor informed Google about its patents, including the '327 Patent, in 2015 and 2018. While EcoFactor maintains that Google intentionally infringed post-suit, at minimum, Google certainly should have known that its actions presented a high risk of infringement.

Given that EcoFactor presented ample evidence of willfulness and the facts and inferences do not point strongly and overwhelmingly in Google's favor, the District Court's grant of Google's Rule 50(a) motion of no willfulness should be reversed.[4]

## B. The District Court's Grant Of No Induced Infringement On The '327 Patent Was Reversible Error[5]

The District Court erroneously granted judgment as a matter of law that Google is not liable for induced infringement of the '327 Patent. Under the *de novo* standard of review that applies to this ruling, the District Court's decision should be reversed. "Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). "Liability under § 271(b) requires knowledge that the induced acts constitute patent infringement." *In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1339 (Fed. Cir. 2012). Willful blindness also suffices. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769-71 (2011). Willful blindness requires that "(1) [t]he defendant must subjectively

---

[4] To be clear, EcoFactor reiterates its request that the underlying judgment in EcoFactor's favor for infringement of the '327 Patent remain undisturbed, and that on remand, there would only be a retrial on the willfulness issue.

[5] As noted in EcoFactor's docketing statement, EcoFactor is only requesting reversal of the District Court's indirect infringement findings only to the extent this Court is inclined to reverse the jury's verdict finding infringement of the '327 Patent, despite the substantial evidence supporting that verdict. To further streamline the issues on appeal, EcoFactor is focusing in this appeal on the inducement portion of the District Court's indirect infringement rulings, rather than the issue of contributory infringement.

believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Id.* at 769.

Here, the District Court summarily granted Google's Rule 50(a) motion with respect to no inducement infringement on the '327 Patent, without any explanation of its reasons for doing so. Appx6378 (1242:5-8). It appears the District Court in issuing its ruling, implicitly adopted Google's argument that the District Court's grant of judgment as a matter of law on no willfulness "means that induced infringement would go too" because "[i]t's the same standard" and "[i]t's the same issue." Appx6229-6230 (1093:25-1094:10); Appx6378 (1242:5-8). Even if this were the standard, because there is ample evidence that Google possessed the requisite knowledge that the induced acts constituted patent infringement, it was erroneous for the District Court to find otherwise. *See, e.g.*, *supra* Section II.C. At minimum, Google was willfully blind to such infringement. *See, e.g.*, Appx5630-5631 (494:24-495:5); *supra* Section II.C. Because the facts and inferences do not point strongly and overwhelmingly in Google's favor such that reasonable jurors could not reach a contrary conclusion, the District Court's grant of Google's Rule 50(a) motion of no induced infringement should be reversed.[6]

---

[6] In addition to the knowledge element, Plaintiff provided sufficient evidence supporting all other elements of induced infringement of the '327 Patent. *See, e.g.*, Appx5563-5569 (427:21-433:13); Appx45.

**C. The District Court's Ruling That Google's Source Code Printouts Were Inadmissible Was Reversible Error, As Were The District Court's Related Instructions To The Jury**

The District Court wrongly denied EcoFactor's motion for a new trial as to the issues of infringement and damages for the '382 Patent. That motion was based upon the District Court erroneously excluding highly relevant source code printouts from the evidentiary record and erroneously instructing the jury on issues related to this source code. These errors were extremely harmful to EcoFactor, as evidenced by the jury notes and verdict details described below. These errors warrant reversal.

Applying the law of the Fifth Circuit, the Federal Circuit reviews the District Court's denial of EcoFactor's motion for a new trial for an abuse of discretion, and if an abuse of discretion is identified, "the harmless error doctrine applies unless a substantial right of the complaining party was affected." *Johnson v. Thibodaux City*, 887 F.3d 726, 736 (5th Cir. 2018). The District Court's exclusion of source code printouts from evidence and faulty jury instructions were not harmless and demonstrably impacted the outcome of the case, warranting reversal here. *See, e.g.*, *i4i*, 598 F.3d at 841.

The District Court first erred when it excluded certain source code printouts from evidence before trial began. It compounded this error by initially instructing the jury members that they would be given access to any source code printouts they requested during deliberation and then—after receiving a request for particular

printouts—refusing to permit this promised access and instead instructing the jury that "you have all the evidence that was admitted during the trial and you must resolve all the questions based on the evidence that you have." Appx6569-6570 (1433:11-1434:22). These erroneous evidentiary rulings and instructions compromised the jury's verdict as to the '382 Patent. The verdict form reveals that the jury initially checked "Yes" as to infringement of the '382 Patent but later scratched out that checkmark, initialed the change, and instead checked "No." Appx45. For these reasons, EcoFactor requests a new trial limited to the issues of infringement and damages for the '382 Patent.[7]

### 1. Google's source code printouts were erroneously excluded from the evidentiary record, harming EcoFactor and warranting reversal.

It is undisputed that Google's source code printouts were relevant to the issue of infringement, and Google did not raise any objection to their admission under the Federal Rules of Evidence. Although the District Court allowed witnesses to testify to the substance of the source code during the trial, the District Court nonetheless excluded the source code itself from the evidentiary record and prevented the jury from reviewing the source code during their deliberations. *See supra* § II.D. This

---

[7] As noted in EcoFactor's docketing statement, EcoFactor is only requesting a new trial on the issues of infringement and damages for the '382 Patent. There were no erroneous rulings at trial that affected the jury's verdict on the other issues that were submitted to them regarding the '382 Patent.

error constituted an abuse of discretion. Further, this error was not harmless because it prevented the jury from accessing critical evidence that the jury requested during their deliberations. Google's sole concern was that it did not want the jury to have in its hands printouts of Google's confidential source code. But juries are entrusted with confidential material of this nature all the time.

Source code printouts are admissible, subject to the rules of evidence. *See, e.g.*, *Wi-LAN Inc. v. Sharp Elecs. Corp.*, 992 F. 3d 1366, 1371, 1376 (Fed. Cir. 2021). In *Wi-LAN,* this Court affirmed a trial court's ruling that a source code printout was inadmissible because it constituted unauthenticated hearsay. *Id.* However, the *Wi-LAN* decision also noted that Wi-LAN could have "obtain[ed] an ***admissible version*** of the source code" by "find[ing] custodial witnesses to authenticate the source code over the course of discovery." *Id.* This Court also acknowledged as "obviously correct" Wi-LAN's argument "that experts typically rely on material, like source code, in reaching opinions about infringement." *Id.* at 1375.

In this case, Google's source code printouts should have been admitted. The source code printouts are highly relevant to the issue of infringement, and "[r]elevant evidence is admissible." Fed. R. Evid. § 401, Fed. R. Evid. § 402. Indeed, Google never disputed the source code's probative value, and witnesses for both EcoFactor and Google spent much of the trial discussing the substance of Google's source code printouts and their relevance to EcoFactor's infringement theories. Google's own

counsel stated that "***source code is the definitive proof*** of how [a] device functions." Appx5600 (464:10-13).

The District Court had no basis in the Federal Rules of Evidence for excluding the Google source code printouts from the evidentiary record. Google never raised any objection under the Federal Rules of Evidence, such as an authenticity or hearsay objection as in *Wi-LAN. See Wi-LAN*, 992 F. 3d at 1371-76. Any objection by Google to the admissibility of the source code printouts under the Federal Rules of Evidence has therefore been waived. *United States v. Maddox,* 492 F.2d 104, 107 (5th Cir. 1974) ("A rule of evidence not invoked is waived."). The sole basis for Google's objection was to prevent a "risk of improper or inadvertent disclosure of highly confidential material." Appx5133-5134 (118:1-119:1); Appx2243. Yet, juries are routinely entrusted with highly sensitive information. And while it may be appropriate to take reasonable precautions to protect such material from unauthorized disclosure, that does not justify depriving EcoFactor of a full evidentiary record—both at trial and on appeal.

The District Court may have believed that treating the source code as a demonstrative and permitting witnesses to testify about it rendered its exclusionary ruling harmless to EcoFactor, but that is not the case. At the pretrial conference, the District Court ruled that witnesses could refer to the source code as a demonstrative, but the source code printouts would not be given to the jury or treated as admitted

exhibits at trial. Appx5133 (118:1-119:1); Appx2242-2243. The District Court remarked that the jury would not need to have the source code and would not "understand the source code," given its technical nature. Appx5133 (118:1-119:1). Of course, the jury heard testimony about and was shown excerpts from numerous technical documents throughout trial and was still given access to them during deliberations. The trial spanned more than a week and involved a wide range of testimony and topics on multiple asserted patents, making it understandable for jurors to review copies of materials presented during trial. During their deliberations, the jury was able to consult all other documents discussed and shown during trial besides source code. There was no evidentiary reason to prevent the jury from reviewing highly relevant proof of how the accused products operate, simply because Google had confidentiality concerns that could have been addressed through far less extreme measures than excluding source code from the evidentiary record.

Moreover, the jury's conduct in requesting access to the code during their deliberations specifically proves that the District Court's error was not harmless. During their deliberations, the jury requested to review a specific set of source code by name, and the District Court declined to provide the requested code to the jury. Appx6569-6570 (1433:11-1434:22). The jury's request for this evidence confirms that the jury believed that it needed to see the evidence with its own eyes to render its verdict, and that excluding it from the evidentiary record was not harmless.

The District Court's inadmissibility ruling also "affected the outcome of the case" as to the '382 Patent, warranting a new trial on infringement and damages for that patent. *See i4i*, 598 F.3d at 841. The verdict form reveals that the jury initially checked "Yes" as to infringement of the '382 Patent but later scratched out that checkmark, initialed the change, and instead checked "No." Appx45. As described above—and as discussed further below—the only source code printouts that the jury requested were the specific printouts EcoFactor relied upon to prove infringement of claim element 1[h] of the '382 Patent. Appx6569-6570 (1433:11-1434:22); Appx6570-6573 (1434:24-1437:2); Appx2262. In a copy of the '382 Patent sent out with another jury note, the jury indicated that it had found all elements of the '382 Patent's asserted claims were infringed except for possibly claim element 1[h]). Appx6570-6573 (1434:23-1437:17); Appx2264; *see also* Appx120 ('382 Patent at claim 1[h]). Together, the jury's notes and verdict form confirm that the District Court's inadmissibility ruling affected the outcome of the case as to the '382 Patent. This further demonstrates that the District Court's denial of EcoFactor's motion for a new trial should be reversed.

2. **The District Court erroneously instructed the jury regarding the Google source code, resulting in further harm to EcoFactor that warrants reversal.**

The District Court's erroneous inadmissibility ruling was further exacerbated by misleading and confusing jury instructions, which themselves warrant reversal of

the District Court's denial of EcoFactor's motion for a new trial on infringement and damages for the '382 Patent. The District Court initially instructed the jury that it would be permissible to consider the source code during its deliberations, but later instructed the jury that it must deliberate without the source code, and denied the jury's requests for specific source code. *Compare* Appx5457-5459 (321:16-323:3), *with* Appx6569-6570 (1433:11-1434:22). The District Court even acknowledged that its jury instructions on source code were mistaken. Appx6573-6574 (1437:20-1438:24); Appx6579-6580 (1443:24-1444:4) ("I'll just say on the record, if anyone made a mistake here, it was me…"); Appx6581 (1445:17-23) ("My mistake was in saying to the jury that they might have access to it and that's – I shouldn't have said that.").

During the testimony of EcoFactor's infringement expert, Mr. de la Iglesia, the District Court stated that "[w]e'll figure out a way to ***make sure that [the source code is] in the record*** and it's protected" and further instructed "ladies and gentlemen of the jury, ***we'll make sure that you have sufficient access to the source code, if you were to need it during your deliberations***." Appx5457-5459 (321:16-323:3). While still in the presence of the jury, the District Court further stated with respect to Google's source code:

> It's not in evidence, and it's not coming in evidence at this point. It can be used as a demonstrative, which means it won't be an exhibit of record, but the jury's going to be able to see it. And ***if for some reason during the jury's deliberations, they feel like they need to review the***

**source code for some reason, we'll figure out a way to deal with it at that time and make it available to them**. It's not going to be in the record. So for Google's sake, they don't need to be worrying that it's going to be part of the record.

Appx5457-5459 (321:16-323:3).

Like EcoFactor, the jury relied on that commitment from the District Court. After six days of trial, the jury began its deliberations and sent out a note specifically requesting access, by name, to Google's "occupancy determination source codes." Appx6569-6570 (1433:11-1434:22); Appx2262.[8] In other words, the jury recalled the District Court's instruction that, if any jury members requested access to source code printouts during deliberations, they would be given such access. But, contrary to its earlier promise and without any reasonable explanation, the District Court denied the jury access to the requested source code printouts. Appx6569-6570 (1433:11-1434:22). Over EcoFactor's objection, the District Court responded to the jury's note with the following statement: "Ladies and gentlemen, you have all the

---

[8] As discussed in Section II.D, *supra,* this specific source code was the primary focus of the parties' infringement dispute on the '382 Patent, and specifically limitation 1[h] which recites occupancy determination. EcoFactor's expert, Mr. de la Iglesia, identified a specific file and specific line numbers as satisfying limitation 1[h], and Google's witnesses, Dr. Eric Burger and Dr. Turnbull, specifically rebutted Mr. de la Iglesia's testimony on this code. *See supra* Section II.D. Particular attention was drawn to this portion of Google's source code when the District Court sustained a Rule 26 objection and instructed the jury to disregard a portion of Dr. Turnbull's testimony about it, which may have contributed to the jury members' interest in verifying the contents of this source code for themselves. *See* Appx6121-6122 (985:19-986:7).

evidence that was admitted during the trial and you must resolve all the questions based on the evidence that you have." Appx6569-6570 (1433:11-1434:22). This instructed the jury that it could not resolve questions of infringement based on the requested source code because that was not evidence the jury had in the deliberation room.

These instructions create "a substantial doubt as to whether the jury [was] properly guided in its deliberations," and they clearly "affected the outcome of the case." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 841 (Fed. Cir. 2010), *aff'd* 564 U.S. 91 (2011) (applying Fifth Circuit law). The jury was instructed that it could not consider the requested source code in deciding the question of infringement of the '382 Patent. EcoFactor bears the burden of proof on this issue, and EcoFactor relied on the substance of Google's source code throughout trial as critical evidence. *See supra* Section II.D. Google then elicited rebuttal testimony about the same source code. *Id.* Indeed, the jury knew how to request specific printouts of source code by name, as the jury was instructed it could do to obtain access to any desired source code printouts in deliberations. When the jury was instructed that it could not rely on the requested source code, this incurably prejudiced EcoFactor. These instructions called into question whether the jury could even rely on testimonial evidence relating to the requested source code, creating significant doubt about the proper sources of proof.

Even if it were proper for the District Court to treat the source code as a demonstrative rather than an admissible exhibit (a premise that EcoFactor disagrees with for the reasons described above), the District Court still should have provided the requested source code printouts to the jury with appropriate instructions—given the District Court's earlier commitment that it would do so. *See* Appx5457-5459 (321:16-323:3); *Intrastate Gas Gathering Co. v. Dow Chem. Co.,* 248 F.3d 1140 (5th Cir. 2001) (holding that the district court "did not commit error by submitting demonstrative aids to the jury during deliberations along with appropriate instructions"). Even if it were convinced that the requested printouts could not be provided despite the earlier promise to provide them, the District Court at least could have given the jury clearer instructions in response to its note, including an explanation as to why the requested printouts were not being provided despite the earlier representation that they would be, and an instruction that testimony and other evidence about the substance of the source code could still be considered in the jury's deliberations. Appx6581-6585 (1445:14-1449:10). But instead, the District Court effectively instructed the jury to deliberate without considering the source code, which understandably may have been interpreted by jury members as guidance not to consider testimony or other evidence about the source code—in addition to the printouts themselves. This was not proper guidance and warrants reversal of the

District Court's denial of a new trial on infringement and damages for the '382 Patent. *i4i*, 598 F.3d at 841.

Furthermore, the specific facts present here show this was not harmless error. Again, the jury specifically requested access to the "occupancy detection source codes" described during trial—and were denied such access despite it being promised by the District Court earlier during trial. *See* Appx5457-5459 (321:16-323:3); Appx6569-6570 (1433:11-1434:22). Undisputedly, this request referred to the source code presented during trial as directly relevant to claim element 1[h] of the '382 Patent. *See* Appx6570-6573 (1434:24-1437:2). After this jury note, the jury sent out another note, together with a copy of the '382 Patent on which the jury had indicated (with checkmarks) that it believed all elements of the '382 Patent's asserted claims were infringed except for possibly claim element 1[h]. Appx6570-6573 (1434:23-1437:17); Appx2264; *see also* Appx120 ('382 Patent at claim 1[h] ("the one or more processors with circuitry and code designed to execute instructions to determine whether the building is occupied or unoccupied, and based on that determination, to control the HVAC system to provide heating or cooling to the building at an operational temperature"). In other words, the specific source code that the jury requested to see was directly relevant to their deliberations on the sole claim element they had not yet found infringed. This makes especially clear how

harmful to EcoFactor it was for the District Court to deny the jury the requested code.

In fact, the jury returned its verdict the next morning that Google had not infringed the '382 Patent, and the verdict form reveals that the jury first checked "Yes" as to infringement of the '382 Patent, but later scratched out that checkmark, initialed the change, and instead checked "No." Appx45. This at least shows how close a call this infringement determination was for the jury and may well indicate that the jury members initially were inclined to find claim element 1[h] was met but reversed their thinking after the District Court refused to provide the requested source code and instructed them to decide the infringement question without considering source code.

These facts provide unique insight into the jury's deliberations and put into stark relief the degree of harm caused by the District Court's erroneous rulings and instructions. The jury found all claim elements met except for the one relating to occupancy determination and asked to see the Google source code referenced during trial as relevant to that claim element. The jury was denied such access—despite being instructed earlier that such access would be provided—and was told that it "must resolve all the questions based on the evidence that you have" (i.e., the evidence in the jury deliberation room, which did not include source code printouts or even testimony about source code). *See* Appx6569-6570 (1433:11-1434:22).

These erroneous instructions were not harmless and "affected the outcome of the case" as to the '382 Patent, warranting the new trial EcoFactor was denied. *See i4i*, 598 F.3d at 841.

### 3. EcoFactor did not waive its arguments that the source code printouts should have been admitted and given to the jury.

This Court should reject any argument that EcoFactor waived arguments or objections regarding source code admissibility. A claim of error is preserved "if the error affects a substantial right of a party" and "a party informs the court of its substance." Fed. R. Evid. 103(a)(2). Both parties identified the source code admissibility dispute in the draft joint pretrial order. Appx2200-2201. EcoFactor also included Google's source code printouts on EcoFactor's Physical Exhibit List. Appx2208. And, when EcoFactor raised the issue with the Court at the pretrial conference (Appx5133 (118:1-119:1)), the Court ruled on the admissibility question because the substance of the proposed exhibit—confidential source code detailing how Google's accused products function—was readily apparent to the Court. EcoFactor therefore "inform[ed] the court of [the] substance" of the dispute over the admissibility of the source code. Fed. R. Evid. 103(a)(2).

"Once the court rules definitively on the record — either before or at trial — a party need not renew an objection or offer of proof to preserve a claim of error for appeal." Fed. R. Evid. 103(b). Nonetheless, EcoFactor did renew its argument, and

each time it did so, the District Court maintained its pretrial ruling on the printouts' admissibility over EcoFactor's objections. For example, during trial, EcoFactor moved to admit source code printouts into evidence during the examination of its technical expert on infringement, Google objected, and the District Court maintained its pretrial inadmissibility ruling. Appx5457-5459 (321:16-323:3). And once again, during deliberations, when the jury requested a copy of specific source code printouts, EcoFactor argued for admission, Google objected, and the District Court again maintained its pretrial ruling, additionally overruling EcoFactor's request for curative instruction. Appx6569-6570 (1433:11-1434:22); Appx6572 (1436:11-21); Appx6573-6585 (1437:19-1449:11).

The District Court's erroneous evidentiary ruling plainly "affects the substantial right of [EcoFactor]." *Jacuzzi, Inc. v. Kohler Co.*, 835 F.2d 870 (Fed. Cir. 1987) ("A substantial right has been affected where the erroneously excluded or admitted evidence might have altered the jury's views."). This is particularly true here because, as detailed above, the jury was promised it would have access to source code printouts if requested, the jury then made such a request, and the only infringement issue not found in EcoFactor's favor was directly related to the specific source code requested. Appx5457-5459 (321:16-323:3); Appx6569-6570 (1433:11-1434:22); Appx6570-6573 (1434:23-1437:17). The improperly excluded code

plainly could have altered the jury's views because they explicitly asked for it in connection with the sole claim element on which they were undecided.

**D.    The District Court Erred By Granting Summary Judgment That The Asserted Claims Of The '488 Patent Are Indefinite.**

The District Court erroneously granted summary judgment that the asserted claims (i.e., claims 1, 2, 5, and 8) of the '488 Patent are indefinite—a decision that is inconsistent with the intrinsic evidence and how a person of ordinary skill in the art would understand the claimed invention. Under the *de novo* standard of review that applies to this indefiniteness finding, the District Court's grant of summary judgment should be reversed. *Nature Simulation Sys. Inc. v. Autodesk, Inc.*, 50 F.4th 1358, 1360 (Fed. Cir. 2022). Moreover, "[c]laim indefiniteness is decided from the viewpoint of persons skilled in the field of the invention." *Id.*

The claim limitation in dispute (i.e., claim element 1[d]) requires "one or more processors [that] compare an inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature of said first structure to determine whether the first HVAC system is on or off." Google argued below that an ordinary skilled artisan would not understand with reasonable certainty how to compare an inside temperature with the rate of change in inside temperatures, because the former is in units of temperature and the latter is in units of temperature divided by time. But one of ordinary skill would understand what it means to compare recorded inside temperatures with the rate of increase predicted.

For example, as disclosed in columns 7-8 of the '488 Patent, the system determines if the air conditioning shut off during a demand reduction event by comparing the recorded inside temperatures in House A to the estimated rate of change. Appx83 (7:65-8:34). The system estimates that the inside temperature in House A will rise at 7 degrees per hour during the event, from 72 degrees F at 3:00 p.m. to 79 degrees F at 4:00 p.m. *Id.* The system records the inside temperatures in House A. *Id.* If the inside temperature rises to 79 degrees F, this matches the predicted rate of increase, and the server confirms that "the A/C in house A has indeed been shut off." *Id.* But if the inside temperature only rises to 75 degrees F, for example, this is "inconsistent with the rate of increase predicted," and so the server "will conclude that the A/C has not been shut off in house A as expected." *Id.*

The '488 Patent also discloses that, in performing this comparison, the server can "compare the predicted reading with the actual reading" and determine if "the temperature inside the house is rising at the rate predicted." Appx83 (7:55-60). But the claims do not require that the comparison be performed in the exact same way as in each embodiment disclosed in the specification. *See JVW Enters., Inc. v. Interact Accessories,* 424 F.3d 1324, 1335 (Fed. Cir. 2005) (without clear and unambiguous disclaimer or lexicography—neither of which is present here—courts "do not import limitations into claims from examples or embodiments appearing only in a patent's written description, even when a specification describes very

specific embodiments of the invention or even describes only a single embodiment"). The '488 Patent claims are directed to the comparison of the actual data points recorded with the thermostat to the estimation for the rate of change calculated by the processor. The claim language does not specify whether the comparison involves predicting individual readings from the server data or generating actual rates of change from the thermostat data.

The District Court did not issue a written opinion or otherwise explain its grant of summary judgment. *See* Appx5113 (stating only: "The Court is going to grant the motion for summary judgment on the basis of indefiniteness and deny it on the other basis. That's the '488 patent."); Appx2254 (order prepared by the parties memorializing this ruling from the pretrial conference). This makes it unclear what specifically the District Court believed to be problematic about the challenged claim language. It is possible that the District Court questioned whether the claim covers embodiments in the specification that disclose comparing the recorded inside temperature to the predicted inside temperature or using the recorded inside temperatures to generate an actual rate that is compared to the estimation for the rate of change. Indeed, the claims would cover these embodiments, so long as they involve a comparison of an inside temperature recorded with the thermostat with the estimation for the rate of change generated by the processors.

For example, if the processor is analyzing the difference between the recorded inside temperatures and the estimated rate of change by comparing the actual rate shown in the recorded data to the estimated rate, then that falls within the scope of the claims because the server is comparing recorded inside temperatures to the estimated rate of change. At the same time, the claim does not require the comparison to be performed in this exact manner. Critically, though, that does not make the claim indefinite. *See, e.g.*, *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1367 (Fed. Cir. 2017) (reversing indefiniteness finding and noting long-standing precedent that "breadth is not indefiniteness"); *S3 Inc. v. NVIDIA Corp.*, 259 F.3d 1364, 1371 (Fed. Cir. 2001) (reversing indefiniteness finding and noting that "patent documents need not include subject matter that is known in the field of the invention and is in the prior art, for patents are written for persons experienced in the field of the invention").

Similarly, if the server is analyzing the difference between the recorded inside temperatures and the estimated rate of change by comparing the recorded data to the temperatures that should be reached according to the estimated rate of change, then that falls within the scope of the claims because the server is comparing recorded inside temperatures to the estimated rate of change. At the same time, the claim does not require the comparison to be performed in this exact manner. *See id.*

The District Court failed to grasp that the claims, while broad enough to cover multiple embodiments, nonetheless convey reasonable certainty. The District Court also wrongly failed to credit the testimony of EcoFactor's expert witnesses in this regard, which alone should have precluded summary judgment. For example, EcoFactor's validity expert, Dr. John Palmer, explained in his report that various embodiments describe comparing a predicted rate of change to the actual inside temperature, including at col. 3:25-47. Appx1685-1686 (¶ 92). Dr. Palmer also noted other embodiments in which the comparison of the recorded temperatures to the estimation for the rate of change additionally involves comparing the actual temperature change to the estimated rate of change, or comparing a predicted temperature based on the estimation for the rate of change to an actual reading—but specifically noted that the specification discloses "the comparison of temperature readings to a predicted rate of change" as well, which matches the claim language precisely. *Id.* Under the presumption of validity, and viewing Dr. Palmer's testimony in the light most favorable to EcoFactor, summary judgment was inappropriate.

The District Court similarly failed to credit the testimony of EcoFactor's infringement expert, Mr. Erik de la Iglesia, who explained that it "absolutely makes sense to, as the claim requires, compare an inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature of said first structure," as recited in the claims. Appx1700 (175:2-12). The District

Court provided no reason to discredit Mr. de la Iglesia's testimony. Mr. de la Iglesia also addressed the question of whether the claim's scope could cover other comparisons, such as between a temperature and an estimated temperature or a rate with an estimated rate. *Id.* He explained that those comparison could be covered, but only if the comparison involves both an inside temperature recorded inside the structure and an estimated rate of change, as recited by the claims. *Id.*

Taken together, the intrinsic evidence and the explanations thereof provided by EcoFactor's experts demonstrate that it was improper for the District Court to grant summary judgment of indefiniteness. Especially under the *de novo* standard of review applicable here, this decision should be reversed.

## VI.     CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the foregoing reasons, this Court should (1) reverse the District Court's grant of judgment as a matter of law that Google is not liable for willful infringement or induced infringement of claim 5 of the '327 Patent, (2) reverse the District Court's denial of a new trial as to infringement and damages for the '382 Patent—in light of its erroneous evidentiary rulings and jury instructions on source code evidence, and (3) reverse the District Court's grant of summary judgment that the asserted claims of the '488 Patent are indefinite.

Respectfully submitted,

January 3, 2023                          */s/ Reza Mirzaie*

Reza Mirzaie
rmirzaie@raklaw.com
Marc A. Fenster
mfenster@raklaw.com
Kristopher R. Davis
kdavis@raklaw.com
James N. Pickens
jpickens@raklaw.com
Minna Y. Chan
mchan@raklaw.com
Russ, August & Kabat
12424 Wilshire Blvd., 12th Floor
Los Angeles, CA 90025
Tel: (310) 826-7474

*Attorneys for Plaintiff-Appellant*
*EcoFactor, Inc.*

# ADDENDUM

## Addendum Table of Contents

| Page No. | Document |
|---|---|
| Appx1-Appx2 | Final Judgment, entered on May 26, 2022 at Doc244 |
| Appx3-Appx43 | Final Jury Instructions, entered on February 10, 2022 at Doc209 |
| Appx44-Appx51 | Jury Verdict, entered on February 10, 2022 at Doc215 |
| Appx52-Appx66 | U.S. Patent No. 8,180,492 |
| Appx67-Appx84 | U.S. Patent No. 8,412,488 |
| Appx85-Appx102 | U.S. Patent No. 8,738,327 |
| Appx103-Appx121 | U.S. Patent No. 10,534,382 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
―――――――――――――――――――――

MIRROR WORLDS TECHNOLOGIES, LLC,

                        Plaintiff,              17-cv-3473 (JGK)

        - against -                             OPINION AND ORDER

FACEBOOK, INC.,

                        Defendant.
―――――――――――――――――――――

JOHN G. KOELTL, District Judge:

    The plaintiff, Mirror Worlds Technologies, LLC ("Mirror

Worlds") brought this patent infringement suit against Facebook,

Inc., alleging that three systems within Facebook's social media

platform infringe three patents owned by Mirror Worlds.

    Mirror Worlds owns U.S. Patent Nos. 6,006,227, 7,865,538,

and 8,255,439, "which describe and claim systems and methods for

presenting and storing data in time-ordered streams on a

computer system." Mirror Worlds Techs., LLC v. Facebook, Inc.,

800 F. App'x 901, 902 (Fed. Cir. 2020).[1] The '227 patent issued

from an application filed in 1996. The '538 and '439 patents

claim priority to the '227 patent.

    The '227 patent states that, as of its priority date,

conventional computers used hierarchical directories to store

―――――――――――――――――
[1] Unless otherwise noted, this Opinion and Order omits all alterations,
citations, footnotes, and internal quotation marks in quoted text.

and organize data. '227 patent, col. 1, lines 21–30.[2] When
creating a new document under that conventional system, users
were required to name the document and choose a storage location
within a pre-existing directory structure. Id. The patent states
that this system had several disadvantages, including: needless
overhead, file names that were often meaningless to the user,
and requiring the user to remember a given document's name as
well as where that document was stored. See id., col. 1, lines
40–59. As an alternative system, the '227 patent describes
storing documents in a chronologically ordered "stream." Id.,
col. 1, lines 4–6.

The '227 patent defines a "stream" as "a time-ordered
sequence of documents that functions as a diary of a person or
an entity's electronic life. Every document created and every
document sen[t] to a person or entity is stored in a main
stream." Id., col. 4, lines 6–10. A stream contains documents
from the past and present, and also could contain "documents
allotted to future times and events, such as[] reminders,
calendar items, and to-do lists." Id., col. 4, lines 18–21. The
patent explains that "[a] document can contain any type of
data," including "pictures, correspondence, bills, movies, voice
mail and software programs." Id., col. 4, lines 16–18.

---

[2] As the parties did in their briefs, the Court will refer primarily to the
specification of the '227 patent. Unless otherwise noted, citations to the
'227 patent apply to all three patents at issue. See ECF No. 241, at 3 n.2;
ECF No. 288, at 5 n.3.

In addition to a "main stream," which contains every document in a given computer system, the patent describes "substreams." A substream is a "subset" of the main stream. Id., col. 5, lines 16–17. A user may create a substream by applying a filter to the documents in the main stream, for example "all emails I've sent to Schwartz." See id., col. 4, lines 50–51. Substreams are "dynamic" and "persistent" in that they will, at the user's request, collect applicable information as it is added to the main stream, and substreams will continue to exist "until destroyed by the user." See id., col. 5, lines 1–13. Each substream document is in the main stream, and the same document can exist in multiple substreams. Id., col. 5, lines 14–19.

Both the '538 and '439 patents incorporate by reference the patent application that issued as the '227 patent. '538 patent, col. 1, lines 14–16; '439 patent, col. 1, lines 15–17. The specifications of the '538 patent and the '439 patent are "nearly identical." Compl., ECF No. 1 ¶ 9.

Each of the claims asserted by Mirror Worlds contains a "main stream" or "main collection" limitation and a "substream" or "subcollection" limitation. Mirror Worlds Techs., 800 F. App'x at 903.[3] "The parties agree that the 'main stream' has two properties: first, it includes every data unit received or

---

[3] The '439 patent uses the term "main collection" instead of the term "main stream." E.g., '439 patent, claim 1. The parties dispute whether these terms are synonymous. The term "main collection" does not appear in the '227 patent or the '538 patent.

3

generated by the 'computer system'; second, it is a time-ordered sequence of data units." Id.

Mirror Worlds contends that three Facebook systems infringe the asserted claims: "News Feed," "Timeline," and "Activity Log." "News Feed provides a scrolling display (or 'feed') that provides stories that might be of interest to a viewing user, for example, if friends of the user posted comments or photos, uploaded videos, or performed other actions." ECF No. 241, at 13. Timeline "allows a user to share information such as text, images, photos, videos, and other types of data, with other users on Facebook." Tang Decl., ECF No. 250-17 ¶ 4. "'Activity Log' is similar to Timeline in that it can provide a list of actions that occurred on Facebook that pertain to a particular user." Id. ¶ 6.

Mirror Worlds contends that the following Facebook components satisfy the main stream/main collection and computer system limitations: in News Feed, Mirror Worlds alleges that the Multifeed System (the backend infrastructure for News Feed) meets the computer system limitation, and that the Multifeed Leaves (a storage system for keeping track of recent user actions) meets the main stream/main collection limitation. In both Timeline and Activity Log, Mirror Worlds alleges that the Timeline backend system meets the computer system limitation, and that the TimelineDB (Timeline database) meets the main

4

stream/main collection limitation. See Mirror Worlds Techs., 800 F. App'x at 905-06; ECF No. 288, at 4; Mirror Worlds' Response to Facebook's Statement of Material Facts ("Mirror Worlds' RTSMF"), ECF No. 288-1, at 12-13.

Mirror Worlds asserts claims 13, 14, and 17 of the '227 patent. These claims recite:

13. A method which organizes each data unit received by or generated by a computer system, comprising the steps of:

generating a main stream of data units and at least one substream, the main stream for receiving each data unit received by or generated by the computer system, and each substream for containing data units only from the main stream;

receiving data units from other computer systems;

generating data units in the computer system;

selecting a timestamp to identify each data unit;

associating each data unit with at least one chronological indicator having the respective timestamp;

including each data unit according to the timestamp in the respective chronological indicator in at least the main stream; and

maintaining at least the main stream and the substreams as persistent streams.

14. The method of claim 13, wherein each timestamp is selected from the group consisting of: past, present, and future times.

17. The method of claim 13, wherein each data unit includes textual data, video data, audio data and/or multimedia data.

5

'227 patent, col. 16.

Mirror Worlds asserts claim 1 of the '538 patent and claim 1 of the '439 patent. Claim 1 of the '538 patent recites:

1. A method of operating a computer system comprising:

providing the computer system with documents from diverse applications in respective formats unique to the respective applications;

causing the computer system to automatically, without user interaction and without requiring a user to designate directory structures or other pre-imposed document categorizations structures, store the provided documents as a time-ordered main stream of documents associated with respective automatically generated time indicators;

said time-ordered main stream being unbounded to thereby accommodate documents associated with time indicators related to past, present and future times;

said time-ordered main stream requiring no fixed beginning or end and being maintained and being selectively retrievable and searchable by the computer system;

said computer system maintaining the main stream live and responsive to subsequent events by automatically incorporating therein new documents as provided to the computer system while maintaining the thus expanded main stream time-ordered;

providing selected search criteria;

causing said computer system to search said time-ordered main stream according to said search criteria and use search results to create a time-ordered substream of documents from the main time-ordered stream;

further causing said computer system to maintain said substream live and responsive to subsequent events by automatically incorporating therein new document provided to the computer system that meet the search

6

criteria while maintaining the thus expanded substream
time-ordered;

displaying at least selected portion of the live main
stream or substream on computer display means as a
display reflecting the time-ordered nature thereof;

automatically showing on the display means a display
of a glance view of a displayed document in response
to touching with a cursor a screen area associated
with the document;

said glance view being an abbreviated version of the
document and indicative of content thereof; and

said showing of the glance view occurring essentially
instantaneously in response to said touching with the
cursor of the screen area associated with the
document.

Claim 1 of the '439 patent recites:

1. A method of operating a computer system comprising:

providing the computer system with documents in
respective formats according to respective different
applications through which the provided documents are
generated or modified, which formats differ from one
of the document to another for at least some of said
provided documents, said provided documents being
delivered to the computer system or generated by the
computer system;

storing at least some of the documents provided to the
computer system in computer storage;

said computer system being configured to automatically
generate and store in computer storage respective
representations related to the documents provided
thereto, thereby forming a main collection of document
representations;

said computer automatically generating and storing
said main collection of document representations
without requiring a user to designate a directory
structure, a physical location for storage of document
representations or corresponding documents, or another

7

pre-imposed document categorization structure for each
of said document representations or documents;

said automatically generated and stored document
representations being in a consistent format despite
differences in format from one to another of the
documents corresponding thereto;

said automatically generated and stored
representations of said documents including respective
automatically generated time indicators associated
with the documents corresponding to said
representations;

said automatically generated and stored
representations of said documents further including
respective automatically generated information
relating the document representation to the respective
documents provided to and stored in said computer
system;

said automatically generated and stored main
collection of document representations being unbounded
in time and size and being configured to include
documents associated with time indicators related to
future times as well as to past and present times;

said automatically generated and stored main
collection of document representations requiring no
fixed beginning or end and being non-transitory and
selectively searchable by the computer system;

providing selected search criteria;

causing said computer system to perform a first search
of at least said main collection of document
representations according to selected first search
criteria, to provide first search results, and to
utilize said first search results to generate a first
sub-collection of document representations related to
a respective sub-collection of the documents provided
to the computer system;

selectively causing the computer system to display on
a computer screen graphical depictions of only a first
portion of said first subcollection of document
representations generated by utilizing said first

8

search results, said first portion corresponding to only a portion of the documents provided to and stored in the computer system;

said first portion of said first document sub-collection of document representations corresponding to a multi-document portion of the documents provided to and stored in said computer system;

said computer system being configured to maintain at least one of said the main collection of document representations and said first sub-collection of document automatically responsive to events subsequent to the providing of said first search results such that additional document representations corresponding to additional documents provided to the computer system subsequent to an initial display of said first portion of the first sub-collection of document representations and meeting said selected search criteria are automatically included in a subsequent display of graphical depictions of one or more portions of said first sub-collection of document representations;

said additional document representations also including automatically generated respective time indicators associated with the documents subsequently provided to the computer system;

automatically showing on the computer screen a display of a glance view of a displayed document depiction while continuing to show on the screen plural displayed graphical depictions of respective plural document representations;

said glance view being an abbreviated version of the document corresponding to the graphical depiction and being indicative of content thereof; and

said showing of the glance view occurring in response to a user designating a displayed document representation by interacting with a screen area currently associated with the graphical depiction, without requiring the user to click on the designated screen area in order to enable such showing of the glance view.

9

In addition to the main stream/main collection limitation, the asserted claims of the '538 and '439 patents require the display of a "glance view," or a preview, of a document that the user interacts with. '538 patent, col. 16, lines 55-60; '439 patent, col. 17, lines 34-41.

### I.

Facebook previously moved for summary judgment on the issue of non-infringement before discovery was completed, and the Court granted that motion in a Memorandum Opinion and Order dated August 11, 2018. 320 F. Supp. 3d 538 (S.D.N.Y. 2018). The Court concluded that the Multifeed Leaves and the TimelineDB (the accused main streams) could not be main streams because the record established that the accused computer systems receive data from TAO (a storage system which stands for "The Associations and Objects") that does not enter the Multifeed Leaves or the TimelineDB. See id. at 547-49. The Federal Circuit Court of Appeals held that conclusion was erroneous and declined to affirm the grant of summary judgment on alternative grounds urged by Facebook. See 800 F. App'x at 909-11. Accordingly, the court of appeals reversed and remanded, noting that its ruling was "without prejudice to otherwise-appropriate consideration of non-infringement contentions on remand, especially once the record is fully developed." Id. at 910. Discovery in this case has now closed, and Facebook has filed a new motion for summary

judgment relying, in part, on additional grounds of non-infringement.

There are several motions before the Court. Facebook has brought another motion for summary judgment, making three arguments in particular: (1) the asserted claims are ineligible for patent protection under 35 U.S.C. § 101; (2) Facebook does not infringe any of the asserted claims; and (3) there was no willful infringement in this case. See ECF No. 241. Mirror Worlds has brought a motion for partial summary judgment of no invalidity based on Facebook's prior art defenses. See ECF No. 233. Both parties have brought motions to exclude certain opinions of the opposing party's experts. See ECF Nos. 223, 228, 236, 246. Finally, there are fully-briefed claim construction disputes before the Court, which the court of appeals clarified are open on remand. See 800 F. App'x at 911; ECF Nos. 103-1, 108, 110.

For the reasons explained below, Facebook's motion for summary judgment is **granted in part and denied in part**. The Court will focus primarily on Facebook's motion for summary judgment, and will discuss the other outstanding motions to the extent they are relevant in resolving Facebook's motion for summary judgment.

11

## II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The substantive law governing the case will identify which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus.

Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). With respect to the issues on which summary judgment is sought, if there is any evidence in the record from any source from which a "reasonable inference" could be drawn "in favor of the non-movant," summary judgment is improper. Roche Palo Alto LLC v. Apotex, Inc., 531 F.3d 1372, 1377 (Fed. Cir. 2008). The nonmoving party must "point to an evidentiary conflict created on the record," and may not rely only on "mere denials or conclusory statements." Armco, Inc. v. Cyclops Corp., 791 F.2d 147, 149 (Fed. Cir. 1986); see also Fed. R. Civ. P. 56(c).

### III.

Facebook argues that all the asserted claims claim ineligible subject matter under 35 U.S.C. § 101.

Section 101 of the Patent Act, which defines the subject matter eligible for patent protection, provides: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court has held that "this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." Alice Corp. Pty. Ltd. v. CLS Bank Int'l, 573 U.S. 208, 216 (2014) (quoting Ass'n for

13

Molecular Pathology v. Myriad Genetics, Inc., 569 U.S. 576, 589
(2013)).

The "concern that drives this exclusionary principle [is]
one of pre-emption." Id. "Laws of nature, natural phenomena, and
abstract ideas are 'the basic tools of scientific and
technological work.' 'Monopolization of those tools through the
grant of a patent might tend to impede innovation more than it
would tend to promote it,' thereby thwarting the primary object
of the patent laws." Id. (quoting Myriad, 569 U.S. at 589, and
Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc., 566 U.S.
66, 71 (2012)). However, courts must "tread carefully in
construing this exclusionary principle" because, "[a]t some
level, 'all inventions embody, use, reflect, rest upon, or apply
laws of nature, natural phenomena, or abstract ideas.'" Id. at
217 (quoting Mayo, 566 U.S. at 71).

In Alice, the Supreme Court reaffirmed the two-step
framework set out in Mayo for analyzing patent eligibility under
§ 101. At the first step, the court asks whether the claims at
issue are directed to a patent-ineligible concept. If so, the
court proceeds to step two and asks whether the claims provide
an "inventive concept"—that is, "an element or combination of
elements that is 'sufficient to ensure that the patent in
practice amounts to significantly more than a patent upon the

14

ineligible concept itself.'" Id. at 217-18 (quoting Mayo, 566 U.S. at 73).

### A.

Facebook argues that the asserted claims "are directed to the abstract idea of organizing information in a time-ordered manner." ECF No. 241, at 8. Facebook cites the specification of the '227 patent, which states that the claimed invention is "a new model and system for managing personal electronic information which uses a time-ordered stream as a storage model and stream filters to organize, locate, summarize and monitor incoming information." '227 patent, col. 3, lines 62-65. Facebook also cites a line of Federal Circuit cases holding that collecting, analyzing, and displaying information is an abstract idea. See, e.g., Elec. Commc'n Techs., LLC v. ShoppersChoice.com, LLC, 958 F.3d 1178, 1182 (Fed. Cir. 2020) (abstract idea of "gathering, storing, and transmitting information"); Intellectual Ventures I LLC v. Cap. One Fin. Corp., 850 F.3d 1332, 1340 (Fed. Cir. 2017) (abstract idea of "collecting, displaying, and manipulating data"); Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n, 776 F.3d 1343, 1347 (Fed. Cir. 2014) ("The concept of data collection, recognition, and storage is undisputedly well-known. Indeed, humans have always performed these functions.").

15

Mirror Worlds argues that the asserted claims are "directed to the way in which computers name, organize, and retrieve electronic documents and distinguish the way in which conventional computers had done so." ECF No. 288, at 6 (quoting Apple, Inc. v. Mirror World Techs., LLC, No. CBM2016-00019 (P.T.A.B. May 26, 2016) ("PTAB Decision"), ECF No. 289-4, at 15). Mirror Worlds argues that the asserted claims are patent-eligible and not directed to an abstract idea because they are directed to improving computer functionality. See Alice, 573 U.S. at 225; Enfish, LLC v. Microsoft Corp., 822 F.3d 1327, 1335-36 (Fed. Cir. 2016). Mirror Worlds also notes that a federal district court and the Patent Trial and Appeal Board ("PTAB") previously concluded that the claims of the '227 patent are patent-eligible under § 101. See Mirror Worlds Techs., LLC v. Apple Inc., No. 6:13-cv-419, 2015 WL 6750306, at *10 (E.D. Tex. July 7, 2015); PTAB Decision, at 17-18.

"The Supreme Court has suggested that claims purporting to improve the functioning of the computer itself, or improving an existing technological process might not succumb to the abstract idea exception." Enfish, 822 F.3d at 1335. The cases construing the "abstract idea" exception in the computer context therefore draw a distinction between (1) claims that are directed to improving computer functionality, and (2) claims that are

16

Appx16

directed to "a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." Id. at 1335–36.

Enfish made clear that the court may ask whether the asserted claims are directed to improving computer functionality at Alice step one. See id. Enfish also made clear that, while improvements to computer-related technology "such as a chip architecture, an LED display, and the like" are "undoubtedly not abstract," "[s]oftware can make non-abstract improvements to computer technology just as hardware improvements can." Id. at 1335. The court in Enfish also stated that, because there is no "definitive rule to determine what constitutes an 'abstract idea' sufficient to satisfy" Alice step one, "both [the Federal Circuit] and the Supreme Court have found it sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases." Id. at 1334.

In Enfish, the asserted claims related to a self-referential computer database structure. The self-referential database improved upon the prior art "relational" model by (1) including all data entities in a single table rather than providing each type of data in a separate table, and (2) defining a table's columns by rows in that same table. See id. at 1330–32. The patents in Enfish taught that these design improvements allowed for faster searching of data, more effective storage of certain types of data, and more flexibility

17

in configuring a database. See id. at 1333. The court concluded that the asserted patents were not directed to an abstract idea at Alice step one; rather, they were "directed to a specific improvement to the way computers operate, embodied in the self-referential table." Id. at 1336. The court emphasized the patents' disparagement of the prior art relational model. See id. at 1337. The court also found that the invention's "ability to run on a general-purpose computer" did not "doom[] the claims" because the claims were directed to improving computer functionality, unlike the claims in cases such as Alice that "can readily be understood as simply adding conventional computer components to well-known business practices." Id. at 1338.

The claims asserted in this case are similar, even though their focus is broader than the claims at issue in Enfish. The claims asserted here are also aimed at improving the storage and retrieval of data on a computer. The patents teach that conventional operating systems were cumbersome, difficult to navigate, and carried several disadvantages: users had to store new information in fixed categories, archiving was not automatic, and "the historical context of a document [was] lost because no tracking of where, why and how a document evolves [was] performed." '227 patent, col. 1, lines 42-52. The claimed invention attempts to solve these problems by storing documents

18

in a computer system in time-ordered streams. See id., col. 2,
lines 13-16. Because the claimed invention stores all data units
in a time-ordered main stream, the user is not required to store
documents in a pre-imposed directory structure, documents are
automatically archived, and the user can see how a document has
evolved over time. The claimed operating system also allows the
user to avoid the "unneeded overhead" of naming a file and
choosing a storage location whenever a file is created. See id.,
col. 1, lines 42-44; id., col. 2, lines 20-24 (under the claimed
operating system, "the storage of the files is handled
automatically and file names are only used if a user chooses to
invent such names"). This is similar to the way in which the
patents in Enfish improved upon the functionality of prior art
computer systems. See 822 F.3d at 1333 ("[W]hereas deployment of
a relational database often involves extensive modeling and
configuration of the various tables and relationships in advance
of launching the database, Enfish argues that the self-
referential database can be launched without such tasks and
instead configured on-the-fly."). The asserted claims seek to
improve upon traditional computer operating systems by storing
and retrieving data in a more efficient way. Accordingly, the
claims are directed to improving computer functionality.[4]

---

[4] The two prior decisions that considered the patent eligibility of the '227
patent reached the same conclusion. The PTAB Decision, relying on Enfish and
DDR Holdings, LLC v. Hotels.com, L.P., 773 F.3d 1245 (Fed. Cir. 2014),

Facebook argues that "[t]he asserted claims fall squarely within the oft-cited line of Federal Circuit cases repeatedly invalidating claims directed to collecting, analyzing, and displaying information." ECF No. 241, at 9. This is not so. The claims in the cases cited by Facebook used the computer as a tool to collect and analyze data for some purpose other than improving computer functionality. See, e.g., ShoppersChoice.com, 958 F.3d at 1181 ("providing advance notification of the pickup or delivery of a mobile thing"); SAP Am., Inc. v. InvestPic, LLC, 898 F.3d 1161, 1164-67 (Fed. Cir. 2018) (statistical method for analyzing financial data); Intellectual Ventures I, 850 F.3d at 1339-40 (method for editing specific type of computer documents); Electric Power Grp., LLC v. Alstom S.A., 830 F.3d 1350, 1351-53 (Fed. Cir. 2016) ("systems and methods for performing real-time performance monitoring of an electric power grid"). Those claims, like the claims in Alice, used computers to perform a process or task that itself qualified as an

---

emphasized that the '227 patent sought to solve problems "that arose specifically in the realm of computer operating systems" and "that did not exist in the pre-computer world." PTAB Decision, at 15-17. The district court in Mirror Worlds Techs. v. Apple, 2015 WL 6750306, concluded that the '227 patent was directed to an abstract idea but that the asserted claims contained a sufficient "inventive concept" at Alice step two. See id. at *8-10. However, the district court also concluded that the '227 patent was "directed to improving computer technology," id. at *8, and the district court's decision came before the Federal Circuit Court of Appeals clarified in Enfish that claims may be deemed patent-eligible at step one because they are directed to improving computer functionality. Accordingly, both decisions that have considered the patentability of the '227 patent under § 101 support the conclusion that the asserted claims are patent-eligible because they are directed to improving computer functionality.

20

abstract idea. The asserted claims in this case, by contrast, are directed to improving how computers "carry out one of their basic functions of storage and retrieval of data." Id. at 1354.

Facebook also argues that the claims are "directed at using computers to solve a human problem of storing and organizing information." ECF No. 241, at 10. But "describing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule." Enfish, 822 F.3d at 1337; see also Alice, 573 U.S. at 217 ("[W]e tread carefully in construing this exclusionary principle [of laws of nature, natural phenomena, and abstract ideas] lest it swallow all of patent law."). It is true that storing and organizing information is a human problem that exists independent of computers. But the asserted claims are directed to a specific improvement in the way that computers store and retrieve data; the patents articulate, and attempt to overcome, challenges created by traditional prior art operating systems that are specific to the computer context. See DDR Holdings, LLC v. Hotels.com, L.P., 773 F.3d 1245, 1257–59 (Fed. Cir. 2014) (concluding that the claims at issue were patent-eligible under § 101 because "the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks").

Accordingly, the asserted claims are directed to improving computer functionality. Facebook fails to distinguish <u>Enfish</u> in a meaningful way or to explain why the prior decisions holding the '227 patent patent-eligible under § 101 are mistaken. And while Facebook emphasizes the breadth of the claim language and its lack of technological details, this is due—at least in part—to the breadth of the problem that the claims aim to solve and the fact that data storage and retrieval are fundamental aspects of computer functionality. Moreover, Facebook points to no cases where claims directed to improving computer functionality were found ineligible under § 101 due to a lack of implementation details or for any other reason.[5]

Because the claims are directed to improving computer functionality, the claims are not directed to an abstract idea at <u>Alice</u> step one and the Court need not reach step two. <u>See</u> <u>Enfish</u>, <u>822 F.3d at 1339</u>.[6]

---

[5] At argument, Facebook relied on <u>Berkheimer v. HP Inc.</u>, <u>881 F.3d 1360</u> (Fed. Cir. 2018). In <u>Berkheimer</u>, the court of appeals explained that the use of a "parser" to transform a data structure from source code to object code was an abstract idea without evidence that this transformation improved computer functionality in some way. <u>See</u> <u>id.</u> at 1367. The asserted claims in this case, however, describe a stream-based operating system that is directed to improving computer functionality.

[6] The Court concludes that all the asserted claims are directed to improving the way in which computers store and retrieve data. Claims 14 and 17 of the '227 patent, which depend on independent claim 13, are substantially similar to claim 13. Claim 14 simply clarifies that past, present, and future timestamps can be selected, and claim 17 clarifies that all types of data may be included in the time-ordered streams. <u>See</u> '227 patent, col. 16, lines 26-28, 38-40. Claim 1 of the '538 patent and claim 1 of the '439 patent are also substantially similar to claim 13 of the '227 patent. While these claims recite an additional "glance view" limitation that provides an "abbreviated version of the document corresponding to the graphical depiction and being

IV.

The Court turns next to the issue of infringement and the parties' related claim construction disputes.

Infringement analysis is a two-step process: "The first step is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device accused of infringing." Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996); see also N. Am. Container, Inc. v. Plastipak Packaging, Inc., 415 F.3d 1335, 1344 (Fed. Cir. 2005).

A.

Claim construction, the first step in infringement analysis, is a matter of law. See Markman, 52 F.3d at 979. "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). "A court construing a patent claim seeks to accord a claim the meaning it would have to a person of ordinary skill in the art at the time of the invention."

---

indicative of content thereof," '538 patent, col. 16, lines 55-60; '439 patent, col. 17, lines 34-41, both claims focus on the stream-based, time-ordered storage and retrieval of data on a computer. "[B]ecause all the claims are substantially similar," addressing each claim separately for the purposes of § 101 is unnecessary. Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n, 776 F.3d 1343, 1348 (Fed. Cir. 2014). Accordingly, claim 13 of the '227 patent is representative of all the asserted claims for purposes of the § 101 analysis, and all the asserted claims are directed to improving computer functionality.

23

Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1116 (Fed. Cir. 2004) (collecting cases). "The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation." Phillips, 415 F.3d at 1313. "[T]he words of a claim are generally given their ordinary and customary meaning." Id. at 1312.

"[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." Id. at 1313. In deciding issues of claim construction, "the court looks to those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean. Those sources include the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." Id. at 1314. "[T]he context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms." Id. "[W]hile extrinsic evidence can shed useful light on the relevant art, . . . it is less significant than the intrinsic record in determining the legally operative meaning of claim language." Id. at 1317.

"Only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy." Eon Corp. IP Holdings v. Silver Spring Networks, 815 F.3d 1314, 1318-19 (Fed. Cir. 2016). The parties agree that all the asserted claims recite a main stream or main collection limitation, which requires Mirror Worlds to identify a stream that is inclusive of every data unit received or generated by the alleged computer system. There are two disputed terms, however, that must be decided in order to resolve Facebook's motion for summary judgment on non-infringement: "data unit" and "main collection."

"Data unit" is in issue because the parties' infringement dispute hinges on whether the Multifeed Leaves and the TimelineDB, the alleged main streams/main collections, include every data unit received or generated by the alleged computer systems (the Multifeed System and the Timeline backend system, respectively). To determine whether the alleged main streams/main collections include every data unit received or generated by the alleged computer systems, the Court must first clarify what is and what is not a "data unit."

Facebook contends that "data unit" means "document." First, Facebook points to the prosecution history of the '227 patent, which is "designated as part of the 'intrinsic evidence,'" Phillips, 415 F.3d at 1317. Facebook cites a 1999 amendment

25

submitted by the patentees in which the patentees sought to "clarify key terms" with express definitions. See ECF No. 109-1, at FBMW_00097563.[7] In this amendment, the patentees state: "A 'data unit' is a 'document' because a 'document can contain any type of data.'" Id.[8] The amendment went on to use the terms "documents" and "data units" interchangeably. See, e.g., id. ("a time-ordered sequence of documents (data units)"). Facebook notes that "The patentee is held to what he declares during the prosecution of his patent." Gillespie v. Dywidag Sys. Int'l, USA, 501 F.3d 1285, 1291 (Fed. Cir. 2007). Facebook also notes that, in connection with a covered business method ("CBM") review of the '227 patent, Mirror Worlds stated that "The broadest reasonable construction of 'data unit' is 'document.'" ECF No. 103-3, at 61; see also Aylus Networks, Inc. v. Apple, Inc., 856 F.3d 1353, 1359-60 (Fed. Cir. 2017) (doctrine of prosecution disclaimer applies to statements made in post-issuance proceedings).

Mirror Worlds contends that "data unit" means "an item of information that is of direct user interest." Mirror Worlds

---

[7] By its text, the 1999 amendment sought to clarify "key terms in the amended claims." ECF No. 109-1, at FBMW_00097563 (emphasis added). The asserted independent claim 13 is one of the claims that was amended, see id. at FBMW_00097555, and, in any event, the '227 patent provides no basis for defining "data unit" differently across different claims. See Phillips, 415 F.3d at 1314 ("[C]laim terms are normally used consistently throughout the patent[.]").

[8] The patentees were quoting the then-current version of the specification. This language appears in the final specification. '227 patent, col. 4, lines 16-18 ("A document can contain any type of data including but not limited to pictures, correspondence, bills, movies, voice mail and software programs.").

argues that "document," Facebook's proposed construction, has two deficiencies: (1) it fails to account for the fact that data unit only encompasses information that is of direct user interest; and (2) it fails to clarify that a data unit can include video, audio, and multimedia data as opposed to only textual data.

Mirror Worlds' first contention is without merit. First, it finds no support in the claim language or the specification. While the specification does make clear that the invention seeks to provide a system for organizing and managing "personal electronic information," '227 patent, col. 3, lines 62-63, the patent's overarching aim of displaying information that is interesting to the user cannot be crammed into the term "data unit." Displaying information that is of interest to the user is a goal of the invention writ large; it is not captured in these two words. A person of ordinary skill in the art would not understand "data unit" to refer only to those units of data that happen to interest a particular user at a particular time.[9]

Second, the doctrine of prosecution disclaimer precludes Mirror Worlds' construction. In their preliminary response filed in connection with a CBM review, the patentees disputed the petitioner's indefiniteness challenge by disclaiming the very

---

[9] Nor would a person of ordinary skill in the art interpret "data unit" to refer only to data that is of direct interest to a "user" in the generic sense, as the patentees once argued. See ECF No. 103-3, at 72.

construction that they urge this Court to adopt. See ECF No. 103-3, at 65-66 ("The definitions of 'data unit' in both the specification and prosecution history do not include the narrowing limitation that forms the basis of Petitioner's indefiniteness challenge—i.e., 'an item of information that is of direct user interest in the user's timeline.'"). This is a "clear and unmistakable" disavowal of the "direct user interest" limitation, and Aylus makes clear that the patentees cannot argue claims "one way in order to maintain their patentability and in a different way against accused infringers." 856 F.3d at 1360.[10] Even apart from the doctrine of disclaimer, the patentees persuasively argued in their preliminary response that the '227

_____

[10] While Aylus specifically held that the doctrine of prosecution disclaimer applies to statements made in inter partes review ("IPR") proceedings, the logic of Aylus and the policy behind prosecution disclaimer apply equally to CBM proceedings. Applying prosecution disclaimer in this case will "promote the public notice function of the intrinsic evidence and protect the public's reliance on definitive statements made during" CBM proceedings. Aylus, 856 F.3d at 1360. Further in support of applying the doctrine in this case is the fact that the patentees argued to the PTAB that "document" is the best interpretation of "data unit," not merely the broadest reasonable interpretation ("BRI"). See, e.g., ECF No. 103-3, at 64 ("Consistent with the implicit definition of 'data unit' in the '227 specification, the patent applicant explicitly defined 'data unit' as a 'document' during prosecution."). Mirror Worlds appears to argue that the Court should not consider Mirror Worlds' statement in its CBM preliminary response because the BRI standard governed claim construction in the CBM review. This argument is unpersuasive because the BRI standard governed claim construction in IPR proceedings until Aylus was decided in 2017. See Celgene Corp. v. Peter, 931 F.3d 1342, 1349 n.8 (Fed. Cir. 2019) (noting that the revised claim construction standard for IPR proceedings applies only to petitions filed on or after November 13, 2018). Mirror Worlds points to no cases undermining the holding of Aylus. And while counsel for Mirror Worlds states that "the patent owner's statements were always expressly made under the BRI standard, and were expressly distinguished from the Phillips standard," ECF No. 310, at 2, that is simply not true. As the quoted text from the preliminary response demonstrates, Mirror Worlds repeatedly argued in the preliminary response that the patentees—explicitly during prosecution and implicitly in the language of the '227 patent—defined "data unit" as "document" without any narrowing limitation.

<div align="center">28</div>

patent defines the term "data unit" as "document" by implication because "the patentee uses 'data unit' throughout the entire specification in a manner consistent with, and as a synonym for, 'document.'" ECF No. 103-3, at 63 (citing <u>Irdeto Access, Inc. v. Echostar Satellite Corp.</u>, <u>383 F.3d 1295</u>, 1301 (Fed. Cir. 2004)). Accordingly, the doctrine of prosecution disclaimer applies and, furthermore, the intrinsic evidence does not support Mirror Worlds' "of direct user interest" limitation.[11]

---

[11] The Court also agrees with Facebook that Mirror Worlds' proposed construction is "confusing," "subjective," and would render the term "data unit" indefinite because different users have different opinions about what information is of direct interest, and even the same user may be interested in different information at different times. See ECF No. 108, at 3. While the court in <u>Mirror Worlds Techs., LLC v. Apple Inc.</u>, No. 6:13-cv-419, <u>2015 WL 179072</u>, at *3 (E.D. Tex. <u>Jan. 14, 2015</u>) accepted the "of direct user interest" limitation, this Court disagrees with that construction. The Court does not find a basis for this limitation in the language of the patent. The district court in Texas concluded that the "of direct user interest" limitation "arose during prosecution in an examiner interview and is thus expressly supported." <u>Id.</u> (citing a January 19, 1999 interview summary by the patent examiner). But the 1999 amendment, which was made in direct response to the January 19, 1999 interview, is more important to the construction of the claim term than the interview summary prepared by the examiner. In the amendment, the patentees stated that the "primar[y]" amendment in light of the January 19, 1999 interview was to clarify that "'each data unit <u>received by or generated by</u> the computer system' is received by the 'main stream'. In other words, all the data units, without regard to whether a data unit was generated internally or externally, are of significance to the user." ECF No. 109-1, at FBMW_00097562-63. This language appears to emphasize that <u>all</u> the information contained in the computer system is included in the main stream, regardless of its source. This language does not appear to add a new "of direct user interest" limitation to the term "data unit." The amendment goes on: "[S]ubstreams allow a user to determine the events <u>of direct user interest</u> from the stream of data units <u>of significance</u> to the user (main stream)." <u>Id.</u> at FBMW_00097563 (emphasis added). This contrast between substreams and the main stream makes clear that the <u>substream</u> is the layer in which the user has the opportunity to filter information that is of direct interest. The main stream, on the other hand, contains <u>all</u> information that is received or generated by the computer system, without any selection criteria from the user. The language of the patent provides no basis for concluding that only data "of direct user interest" is included in the computer system, and a person of ordinary skill in the art would not understand "data unit" to be so limited. And, given the opportunity to amend

29

Mirror Worlds' other contention—that "document" fails to clarify that a data unit can include video, audio, and multimedia data—has more force. The specification makes clear that "A document can contain any type of data including but not limited to pictures, correspondence, bills, movies, voice mail and software programs." '227 patent, col. 4, lines 16–18. Indeed, Facebook does not dispute that "data unit" encompasses any type of data, not merely textual data. The Court agrees with Mirror Worlds that "an item of information" is clearer in this respect than "document." Accordingly, the Court construes "data unit" as "an item of information."[12]

The second disputed term is "main collection." The term "main collection" appears only in the '439 patent. Facebook argues that "main collection" means "main stream." Mirror Worlds argues that, in claim 1 of the '439 patent, "main collection" means "main collection of document representations."[13]

The Court agrees with Facebook. "Main collection" is a coined term with no established meaning in the field. See Gray Decl., ECF No. 108-1 ¶ 133. The specification of the '439 patent

---

the claim language in light of the January 19, 1999 interview, the patentees expressly defined "data unit" as "document," without any limiting language.
[12] The Court "need not accept the constructions proposed by either party." Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada (U.S.), 687 F.3d 1266, 1274 (Fed. Cir. 2012).
[13] In its claim construction brief, Mirror Worlds urges a different construction of "main collection" for claims 9, 19, and 20 of the '439 patent. However, only claim 1 of the '439 patent is at issue. Facebook's Statement of Material Facts, ECF No. 241-1 ¶ 2; Mirror Worlds' RTSMF ¶ 2. Accordingly, the Court will only consider Mirror Worlds' proposed construction for claim 1.

30

does not use the term "main collection." But, like the '227 patent, the '439 specification discusses "time-ordered streams" and a "stream-based" operating system. See '439 patent, title; id., col. 1, line 67-col. 2, line 1.[14] The '439 patent also explicitly incorporates the '227 patent application in its entirety, which discusses main streams at length. See id., col. 1, lines 15-17. And as Facebook notes, "claim drafters can [] use different terms to define the exact same subject matter." Curtiss-Wright Flow Control Corp. v. Velan, Inc., 438 F.3d 1374, 1380 (Fed. Cir. 2006). The '439 patent uses the terms "stream" and "collection" interchangeably. See '439 patent, col. 12, lines 39-42 (emphasis added) ("Top-Down streams are more permanent, generally more administrative streams or collections of information . . . ."). The '227 patent also uses these terms interchangeably. See '227 patent, col. 5, lines 16-17 ("A substream, in other words, is a 'subset' of the main stream document collection."); id., col. 6, lines 11-13 ("Each view of a stream is implemented as a client of the server and provides the user with a 'viewpoint' interface to document collections, that is, streams."). Because the patents use the terms "stream" and "collection" interchangeably, "main stream" and "main

---

[14] See also '439 patent, abstract (emphasis added) ("A st[r]eam-based document storage and retrieval system accepts documents that are in diverse formats and come from diverse application, automatically creates document model objects describing these documents in a consistent format and associating time stamps with the documents to automatically create a main stream in chronological order.").

31

collection" are synonymous. Neither the specification of the '439 patent (which does not use the term "main collection" at all) nor the claim language provides a basis for concluding otherwise.

Mirror Worlds argues that "The patentees expressly used 'main collection' when referring to documents or document representations, and a 'main stream' when referring to data units." ECF No. 103-1, at 11. But this is plainly untrue. See, e.g., '227 patent, col. 5, lines 14-19 (emphasis added) ("Although a document may belong to any number of substreams, the document also enters and remains on the main stream. A substream, in other words, is a 'subset' of the main stream document collection. In other words, a way of looking at the main stream so as to exclude certain documents temporarily."). The '439 patent's use of the word "document" instead of "data unit" is of no moment because the patentees, in the prosecution history of the '227 patent, expressly stated that these terms are synonymous. ECF No. 109-1, at FBMW_00097563.

Mirror Worlds also argues that "main collection" cannot mean "main stream" because claim 1 of the '439 patent does not require characteristics that the parties agree describe a stream, namely: (1) being time-ordered; (2) functioning "as a diary of a person or entity's electronic life" that has "three main portions: past, present, and future," and (3) including

32

"every data unit received by or generated by the computer system." ECF No. 103-1, at 11. But any construction of "main collection" that lacked these characteristics would be impermissibly untethered to the specification. Because "main collection" is a coined term with no "established meaning to one of ordinary skill in the art," it must be interpreted in light of the specification and "cannot be construed broader than the disclosure in the specification." Indacon, Inc. v. Facebook, Inc., 824 F.3d 1352, 1357 (Fed. Cir. 2016). The '439 specification clearly states that the invention incorporates the characteristics of a stream. See, e.g., '439 patent, col. 1, line 67-col. 2, line 3 ("The system is stream-based in that it creates time-ordered streams of information items or assets, beginning with the oldest and continuing through current and on to future items."); id., col. 2, line 67-col. 3, line 2 (emphasis added) ("One can search on any word or phrase, as every word in every document is indexed, on document types and metadata, and on time-related data[.]"). The patentees' use of an undefined, coined term in the claim language cannot broaden the invention described in the specification. See Retractable Techs., Inc. v. Becton, Dickinson and Co., 653 F.3d 1296, 1305 (Fed. Cir. 2011) (construction must "tether the claims to what the specifications indicate the inventor actually invented").

33

"Main collection" also cannot lack the characteristics of a stream because those characteristics are what set the invention apart from the prior art that the specification disavows. "Where the general summary or description of the invention describes a feature of the invention and criticizes other products that lack that same feature, this operates as a clear disavowal of these other products." Edwards Lifesciences LLC v. Cook Inc., 582 F.3d 1322, 1333 (Fed. Cir. 2009). The specification of the '439 patent, like the '227 specification, specifically disavows the "traditional storage and retrieval systems" that were not time-ordered. '439 patent, col. 1, lines 49-67. Mirror Worlds' construction fails because it seeks to capture, through claim construction, the non-time-ordered systems the specification specifically disavows.[15]

Accordingly, the Court construes "main collection" in claim 1 of the '439 patent as "main stream." Because the Court construes "main collection" as "main stream," the analysis below concerning the main stream limitation applies with equal force to all the patents at issue.

---

[15] Similarly, the fact that claim 1 of the '439 patent contains vague language leaving open the possibility that the "main collection" includes "at least some," but not necessarily all, of the documents in the computer system, '439 patent, col. 16, line 29, does not save Mirror Worlds' construction because "the specifications tell us otherwise." Retractable Techs., 653 F.3d at 1305; see '439 patent, col. 3, line 1 ("every word in every document is indexed"); id., abstract (emphasis added) (the system "automatically create[s] a main stream in chronological order").

34

**B.**

The second step of infringement analysis "is comparing the properly construed claims to the device accused of infringing." Markman, 52 F.3d at 976. Mirror Worlds alleges that three Facebook features infringe the asserted patents: News Feed, Timeline, and Activity Log.

Mirror Worlds pursues a theory of "literal infringement." "To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly." Advanced Steel Recovery, LLC v. X-Body Equipment, Inc., 808 F.3d 1313, 1319 (Fed. Cir. 2015). "Summary judgment of noninfringement is proper when no reasonable jury could find that every limitation recited in a properly construed claim is found in the accused device either literally or under the doctrine of equivalents." Id. at 1317. "The absence of even a single limitation of [the asserted claims] from the accused device precludes a finding of literal infringement." Kahn v. Gen. Motors Corp., 135 F.3d 1472, 1477 (Fed. Cir. 1998).

**1.**

Within News Feed, Mirror Worlds alleges that the Multifeed System (the backend infrastructure for News Feed) is the "computer system," and that the Multifeed Leaves (a storage system for keeping track of recent user actions) is the "main stream." Accordingly, to prove infringement, Mirror Worlds must

35

show that the Multifeed Leaves includes every data unit received
or generated by the Multifeed System. Facebook argues that it is
entitled to summary judgment of non-infringement because the
record conclusively establishes that the Multifeed System
contains data units that are not contained in the Multifeed
Leaves. Facebook bears the burden at this stage because it is
the party moving for summary judgment.

Facebook's theory of non-infringement with respect to News
Feed focuses primarily on the Multifeed Aggregator. The
Multifeed Aggregator is part of the Multifeed System. Mao Decl.,
ECF No. 250-16 ¶¶ 6-7. Facebook argues that the Multifeed
Aggregator receives several categories of information that are
not stored in the Multifeed Leaves. The Court will address these
categories of information in turn.

Coefficient

Facebook argues that the Multifeed Aggregator receives
information known as "coefficient scores" from the "Coefficient
service." ECF No. 241, at 15. "A coefficient score provides a
numerical weight that describes the strength of the relationship
between the user and a particular friend." Mao Decl. ¶ 12. "The
[Multifeed] Aggregator uses these coefficient scores to
potentially boost candidate stories relating to friends with
whom the user has a closer relationship." Id. Yun Mao, an

Engineering Director at Facebook who leads the Feed and Stories Infrastructure Team, unequivocally testified that coefficient scores are received by the Multifeed Aggregator, and that coefficient scores "are not stored in or received from the [Multifeed] Leaves." Id.

Mirror Worlds responds that "record evidence shows that the 'coefficient score' Facebook alleges is 'received' by the Multifeed Aggregator is not received as part of the write pathway for writing data to the Leaves." Mirror Worlds' RTSMF ¶ 44. In support of this proposition Mirror Worlds cites a broad statement from Gregory Marra, Facebook's director of product management: "I understand that leaves are where information from News Feed are stored." Id. (citing Tsuei Decl., Ex. 7, ECF No. 290-2, at 83). Because this general statement does not address coefficient scores or how data is written to the Multifeed Leaves or the Multifeed System, it is insufficient to create a dispute of material fact.

Mirror Worlds also cites Exhibits 27, 28, and 30 to the Tsuei Declaration. Id. Together, Exhibits 27 and 30 demonstrate that the "Tailer" is used to write data to the Multifeed Leaves. See Tsuei Decl., Ex. 27, ECF No. 290-19, at FBMW_00118300 ("[The Tailer] is the input data pipeline that gets user actions to the storage layer [the Leaves] in real time."); id., Ex. 30, ECF No. 290-22, at FBMW_00136009 (diagram showing "Tailers" writing into

37

"Feed Leaf"). Exhibit 28, ECF No. 290-20, at 1, does not discuss the Tailer in particular, but states that "When a user takes any action on Facebook, there are two independent pipelines that record this action (i.e. a UserAction) to the Leaves."

Mirror Worlds' argument appears to be that information cannot be in the Multifeed System (the alleged computer system) unless it is "received through the Tailer[]." ECF No. 288, at 18. This argument finds no support in the record. Facebook has offered specific evidence that the Multifeed Aggregator (part of the Multifeed System, the alleged computer system) receives data (coefficient scores) that is not contained in the Multifeed Leaves (the alleged main stream). Even if the record established that there is only one path for information to get into the Multifeed Leaves (which it does not, see Ex. 28; Balakrishnan Rpt., ECF No. 250-19 ¶ 204), it would not necessarily follow that there is only one path for information to get into the Multifeed System. Mirror Worlds points to no evidence demonstrating that the Tailer is the only pathway into the Multifeed System or the Multifeed Aggregator in particular. Accordingly, Mirror Worlds' attempt to show that there is only one data pipeline into the Multifeed Leaves, even if successful, would not create a dispute of material fact.

Mirror Worlds likewise misses the mark by arguing that "Facebook has presented no evidence that the information

38

identified in its motion . . . is user data received by the Tailer[]." ECF No. 288, at 19. Facebook does not need to show that the data it points to is received by the Tailer to prove non-infringement. Facebook need only prove that there is data in the Multifeed System that is not contained in the Multifeed Leaves. Moreover, Mirror Worlds' insistence that Facebook point specifically to "user data" that is contained in the alleged computer system but not the alleged main stream is misleading. The patents are clear that the main stream must contain <u>every data unit</u> (of whatever type) that is received or generated by the computer system. <u>See, e.g.</u>, '227 patent, col. 16, lines 9-10 ("A method which organizes each data unit received by or generated by a computer system"); <u>id.</u>, col. 4, lines 8-10 ("Every document created and every document sen[t] to a person or entity is stored in a main stream."); ECF No. 109-1, at FBMW_00097563 ("A 'data unit' is a 'document' because a 'document can contain any type of data.'").[16] As Facebook correctly notes, "That the Multifeed Leaves store user actions (<u>e.g.</u>, provided by the Tailer[]) is in no way inconsistent with the Multifeed Aggregator receiving <u>additional</u> information <u>beyond</u>

---

[16] <u>See also</u> '538 patent, claim 1 (reciting a "main stream"); '439 patent, claim 1 (reciting a "main collection," which the Court has construed as "main stream"); <u>id.</u>, abstract ("main stream"); <u>Omega Eng'g, Inc. v. Raytek Corp.</u>, <u>334 F.3d 1314, 1334</u> (Fed. Cir. 2003) ("[W]e presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning.").

39

user actions that is not stored in the Multifeed Leaves." ECF No. 300, at 4-5.[17]

Finally, Mirror Worlds argues that coefficient scores being included in the Multifeed Aggregator but not the Multifeed Leaves does not prove non-infringement because coefficient scores are "queries," and therefore not "data units" within the meaning of the asserted patents. See ECF No. 288, at 15-16, 19-20. First, Mirror Worlds has presented no evidence that coefficient scores should be considered "queries." Even if a query is involved in getting coefficient scores from the Coefficient service to the Multifeed Aggregator, the record is clear that a coefficient score is an item of information that the Multifeed Aggregator "receives and relies on." Mao Decl. ¶ 12. The coefficient score is not simply a request made to or from the Multifeed Aggregator. Moreover, Mirror Worlds' argument fails under the Court's construction of "data unit." A query is plainly "an item of information," which is also consistent with Mirror Worlds' argument that "data unit" includes any type of data.

---

[17] Mirror Worlds' "user data" argument also fails to the extent it is based on Mirror Worlds' construction of the term "data unit." First, for the reasons explained above, "data unit" does not contain an "of direct user interest" limitation. Second, Mirror Worlds explicitly argues in its claim construction brief that "data unit" should be construed to clarify that "data unit" can refer to data in any format (that is, textual or otherwise). The Court accepted that argument in construing "data unit" to mean "an item of information." Accordingly, there is no subject matter or format limitation built into the term "data unit."

40

Facebook has established that the Multifeed Aggregator (part of the Multifeed System, the alleged computer system) receives coefficient scores, which are items of information that are not contained in the Multifeed Leaves. Mirror Worlds has offered no evidence to the contrary. Accordingly, the News Feed system does not infringe the asserted patents, and Facebook is entitled to summary judgment of non-infringement with respect to News Feed.

AdFinder

Facebook also argues that the Multifeed Aggregator receives information from a system called "AdFinder," and that this information is not stored in the Multifeed Leaves. ECF No. 241, at 15-16; Mao Decl. ¶¶ 9-10, 16; Facebook's Statement of Material Facts ("Facebook's SMF"), ECF No. 241-1 ¶¶ 47-48; Balakrishnan Rpt. ¶¶ 226, 229, 544-45, 563-64.

AdFinder generates advertisements relevant to a particular user and provides those ads to the Multifeed Aggregator. Mao Decl. ¶ 16. Mr. Mao declared:

> The interactions between AdFinder and the Multifeed
> Aggregator involve the exchange of hundreds of pieces
> of information that did not come from (and were not
> stored in) the Multifeed Leaves, but other separate
> and distinct storage systems within Facebook. The
> candidate stories generated by the Multifeed
> Aggregator corresponding to these advertisements thus
> incorporate information that came from AdFinder and
> that was not stored in the Multifeed Leaves.

41

Id. Accordingly, there is unequivocal evidence in the record that the Multifeed Aggregator receives information from AdFinder that is not contained in the Multifeed Leaves.

Mirror Worlds cites no evidence to the contrary. Mirror Worlds cites deposition testimony from Facebook engineer Mainak Mandal, Mirror Worlds' RTSMF ¶ 47[18] (citing Tsuei Decl., Ex. 15, ECF No. 290-9, at 107-08), but this testimony supports Facebook. Mr. Mandal testified that there are two types of stories in a user's feed—"ad stories" and "organic stories." Tsuei Decl., Ex. 15, at 107-08. He further testified that the organic stories ("any story that is not an ad") "come from Multifeed Leaves," while the ad stories are "generated on AdFinder." Id. at 108. This testimony supports Facebook's argument that the Multifeed Aggregator contains information from AdFinder that is not stored in the Multifeed Leaves.[19]

The remainder of Mirror Worlds' response to Facebook's Statement of Material Fact regarding AdFinder is identical to Mirror Worlds' response concerning Coefficient service. Compare

---

[18] Mirror Worlds' RTSMF ¶¶ 47 and 48, which both address AdFinder, are identical in substance.
[19] Mirror Worlds next cites deposition testimony from Mr. Mao. Mirror Worlds' RTSMF ¶ 47 (citing Tsuei Decl., Ex. 48, ECF No. 290-35, at 41). This testimony supports the distinction Mr. Mandal drew between ad stories and organic stories. See Tsuei Decl., Ex. 48, at 41 ("[organic content is] actually not—not from the ads bracket"). Mirror Worlds also cites the deposition testimony of Facebook's expert, Dr. Ravin Balakrishnan. RTSMF ¶ 47 (citing Tsuei Decl., Ex. 17, ECF No. 290-11, at 197-200). This testimony does not help Mirror Worlds because Dr. Balakrishnan simply reiterates that ads are not "organic content." Tsuei Decl., Ex. 17, at 199-200.

Mirror Worlds' RTSMF ¶ 47, with id. ¶ 44. The sources that are duplicated from ¶ 44 fail to create a dispute of material fact for the same reasons explained with respect to Coefficient service: the sources do not address AdFinder in particular, and Facebook does not need to show that the information from AdFinder is "received as part of the write pathway for writing data to the Leaves," id. ¶ 47, to prove non-infringement. The thrust of Facebook's argument is that the information from AdFinder is not contained in the Leaves.

Also for the reasons explained with respect to Coefficient service, Mirror Worlds' argument that the information the Multifeed Aggregator receives from AdFinder does not consist of "data units" fails. Under the Court's construction of "data unit," there is no "of direct user interest" limitation, and it is plain that the Multifeed Aggregator receives items of information from AdFinder.[20] Accordingly, Facebook has established that the Multifeed Aggregator receives information from AdFinder that is not stored in the Multifeed Leaves.

Ego

Ego is a Facebook system that "generates recommendations, for example, identifying other Facebook users whom the current

---

[20] Mirror Worlds does not argue, as it did with respect to coefficient scores, that information from AdFinder is merely part of a query, and therefore not a data unit. See ECF No. 288, at 19.

43

user may wish to become friends ('People You May Know'), or Groups or Pages that might be of interest to the current user." Mao Decl. ¶ 17. As with information from AdFinder, Mr. Mao declares: "The recommendation information provided by Ego to the Multifeed Aggregator did not come from (and are not stored in) the Multifeed Leaves, and thus, the candidate stories generated by the Multifeed Aggregator to reflect those recommendations incorporate information that was not stored in the Multifeed Leaves." Id.; see also Facebook's SMF ¶ 49; Balakrishnan Rpt. ¶¶ 236, 540, 563, 565.

Mirror Worlds cites no evidence to the contrary. Indeed, Mirror Worlds' RTSMF ¶ 49 is identical to ¶ 47 (the response concerning AdFinder), except the words "information from Ego" replace the words "information from AdFinder." Mirror Worlds cites no record evidence to dispute that the Multifeed Aggregator receives information from Ego that is not stored in the Multifeed Leaves. For the reasons explained above, Mirror Worlds' arguments that (1) Facebook has not shown that information from Ego is received "as part of the write pathway for writing data to the Leaves," Mirror Worlds' RTSMF ¶ 49, and (2) the information from Ego is not a "data unit" (either because it is part of a query or because it is not "of direct user interest") also fail. Accordingly, Facebook has established

44

that the Multifeed Aggregator receives information from Ego that
is not stored in the Multifeed Leaves.

TAO, Recent Interactions, and ReadState

Facebook also argues that user information from TAO, as
well as recent interaction information and information called
the "ReadState," is received by the Multifeed Aggregator but not
contained in the Multifeed Leaves. However, there are issues of
fact that preclude these categories of data from being a basis
for summary judgment of non-infringement.

TAO is a "data store that provides access to objects and
their associations with other objects." Bronson Decl., ECF No.
123 ¶ 20.[21] Facebook argues that three categories of user
information that are not stored in the Multifeed Leaves are
received by the Multifeed Aggregator from TAO: "(1) a list of
'Friends' of the user for whom the News Feed is being prepared;
(2) the list of 'Pages' on Facebook that the user has liked, and
(3) the list of 'Groups' the user has joined." ECF No. 241, at
14. Mirror Worlds, however, points to a Facebook document
concerning the Multifeed System that states: "A user's friends,
pages, liked, and other actions are also stored in the leaves."

---

[21] "Generally, the content Facebook users see is an amalgamation of 'objects'
and 'associations,' which are two classes of data. Users, pictures, and
comments are types of objects, while associations describe the relationship
between objects. For example, if user 'Alice' posts a comment on Facebook, an
'authorship' association would connect Alice and the comment." Mirror Worlds
Techs., 800 F. App'x at 904.

Tsuei Decl., Ex. 27, at FBMW_00118300. The same document states that the Multifeed Leaves "indexes all user actions." Id. (emphasis added); see also id. ("all of a user's recent Actions and Objects will be indexed"). This record evidence is sufficient to create a dispute of material fact as to whether lists of the user's friends, pages liked, and groups joined are stored in the Multifeed Leaves.

Facebook also argues that the Multifeed Aggregator receives "recent interaction information" ("such as posts the user recently liked or videos the user recently watched") that is not stored in the Multifeed Leaves. ECF No. 241, at 15; Mao Decl. ¶ 15. But, as explained in the previous paragraph, Mirror Worlds cites record evidence to the effect that the Multifeed Leaves indexes "all user actions," which is sufficient to raise a dispute of material fact as to whether recent interaction information is stored in the Multifeed Leaves.

Finally, Facebook argues that the Multifeed Aggregator receives information called the "ReadState," "which informs the Aggregator which stories were already recently presented to the user." ECF No. 241, at 15; see also Mao Decl. ¶ 14. There is record evidence that ReadState indexes all stories that a user has seen along with those stories' "respective timestamps and view duration." Tsuei Decl., Ex. 30, at FBMW_00136001. What stories a user views, and for how long a user views those

46

stories, could plausibly be considered "user actions," which record evidence suggests are indexed in the Multifeed Leaves. Any ambiguity regarding whether "all user actions" includes the Readstate information must be resolved in favor of Mirror Worlds at this stage.

Accordingly, summary judgment of non-infringement cannot be granted based on (1) the data that Facebook alleges is sent to the Multifeed Aggregator by TAO, (2) recent interaction information, or (3) ReadState.

In sum, with respect to News Feed, while Facebook is not entitled to summary judgment of non-infringement based on data received from TAO, recent interaction information, or ReadState, Facebook is entitled to summary judgment of non-infringement on three independent bases: the record conclusively establishes that the Multifeed Aggregator (part of the Multifeed System, the alleged computer system) receives information from (1) Coefficient service, (2) AdFinder, and (3) Ego that is not stored in the Multifeed Leaves (the alleged main stream).

### 2.

Mirror Worlds alleges that two Facebook features in addition to News Feed infringe the asserted patents: Timeline and Activity Log. The parties treat Timeline and Activity Log together because they are supported by the same backend infrastructure. See ECF No. 241, at 16-17; ECF No. 288, at 12

47

n.6; Tang Decl. ¶ 2. The Court will likewise discuss these two features together. For purposes of Timeline and Activity Log, Mirror Worlds alleges that the Timeline backend system is the computer system, and that the TimelineDB is the alleged main stream. See Facebook's SMF ¶¶ 36-37; Mirror Worlds' RTSMF ¶¶ 36-37. Accordingly, to prove infringement, Mirror Worlds must show that the TimelineDB includes every data unit received or generated by the Timeline backend system.

The TimelineDB is "a database used within Facebook to keep track of certain types of actions taken by users on Facebook." Tang Decl. ¶ 9. The "Timeline Aggregator" is part of the Timeline backend system. Id. ¶ 7. The Timeline Aggregator, which is used by both the Timeline and Activity Log features, "deliver[s] a list of user engagements (or user actions) that pertain to a particular user." Id. ¶ 8. Similar to its argument regarding News Feed, Facebook argues that the Timeline Aggregator (part of the alleged computer system) receives information that is not contained in the TimelineDB (the alleged main stream). The Court will address each disputed set of information in turn.

Background User Information

Facebook argues that the Timeline Aggregator receives "extensive information about the user for whom the Timeline or

48

Activity Log pertains including the user's birthday, list of family members, list of children, list of places previously lived, education history, among other information," from "at least two different storage systems"—TAO and UDB (user database). ECF No. 241, at 16. The record contains unequivocal evidence that this background user information is received by the Timeline Aggregator and is not stored in the TimelineDB. Yifei Tang, an engineering manager at Facebook on the Timeline team, declared:

> The Timeline Aggregator component implements a complex process that requires the Aggregator to receive and rely on an extensive amount of information that is not stored in the TimelineDB. For example, the "front end" . . . constructs a request to the Timeline Aggregator that supplies the Aggregator with a number of pieces of information relating to the user in question, including the user's birthday, list of family members, list of children, list of places previously lived, education history, along with other information about that user. This information received by the Aggregator is not stored in the TimelineDB but was instead obtained from "TAO" and "UDB" (user database), storage systems that are separate and distinct from the TimelineDB.

Tang Decl. ¶ 10; see also Balakrishnan Rpt. ¶¶ 307–09.

Mirror Worlds attempts to create an issue of fact with respect to this clear evidence, but none of its attempts are sufficient. Mirror Worlds cites various exhibits that purportedly stand for the propositions that the TimelineDB "is a backend system that persists all actions by users and pages and indexes them chronologically" and that "everything relating to

49

[the user]" is contained in the TimelineDB. See ECF No. 288, at 4, 12-13; Koskinen Decl., ECF No. 145 ¶ 74. But the documents cited for these propositions actually refer to "Timeline" (the backend system writ large), not the TimelineDB. See Tsuei Decl., Ex. 37, ECF No. 290-29, at FBMW_00007832; id., Ex. 35, ECF No. 290-27, at FBMW_00098325. Counsel for Mirror Worlds and Mirror Worlds' expert, Dr. Eric Koskinen, simply changed the subjects of the quoted sentences.[22] Because these documents do not describe the TimelineDB, they do not stand for the proposition that the TimelineDB contains all background user information contained in the Timeline backend system.

Mirror Worlds also cites evidence that there is a path from TAO to the TimelineDB. See id., Ex. 24, ECF No. 290-16, at FBMW_00000211. But this does not establish that all data from TAO is contained in the TimelineDB; nor does it establish that background user information in particular (birthday, list of family, places lived, etc.) is stored in the TimelineDB. And while Mirror Worlds points to snippets of the testimony of

---

[22] In other portions of their papers, counsel for Mirror Worlds and Dr. Koskinen demonstrate an understanding of this distinction. See Mirror Worlds' RTSMF ¶ 36 ("Mirror Worlds contends that the 'computer system' for its theory of infringement by Facebook's Timeline and Activity Log features is the 'Timeline Backend' system."); id. ¶ 37 ("Mirror Worlds contends the TimelineDB is a 'main stream[.]'"); ECF No. 288, at 4 (arguing that "the Timeline Backend system stores in the TimelineDB all user data that may appear in Timeline or Activity Log in time-order"); Koskinen Decl. ¶ 26 ("The Timeline backend system includes the "TimelineDB"). This distinction was also made clear by the court of appeals. See Mirror Worlds Techs., 800 F. App'x at 904 ("The Timeline back-end system includes the TimelineDB database and an Aggregator.").

50

Jeffrey Huang, Director of Engineering at Facebook, none of those snippets contradict the clear testimony of Mr. Tang that the Timeline Aggregator receives background user information that is not contained in the TimelineDB. Tang Decl. ¶ 10.

For example, Mirror Worlds cites testimony from Mr. Huang that casts some doubt as to whether TAO is properly referred to as a storage system. E.g., Huang Depo., ECF No. 290-4, at 37 (TAO is "an interface to fetch data, but I wouldn't necessarily say that it is a way to store the data."). However, whether TAO is properly referred to as a storage system is not a material fact. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. Facebook has adduced clear evidence that the Timeline Aggregator receives background user information that is not stored in the TimelineDB. Mirror Worlds points to no evidence to the contrary. It is not material whether TAO (1) stores the background user information and delivers that information to the Timeline Aggregator, or (2) is an interface that is responsible for sending the background user information to the Timeline Aggregator.[23] Accordingly, this dispute is one of terminology and does not affect the outcome of the non-infringement dispute.

---

[23] Nathan Bronson, a Facebook engineer who helped implement TAO, explained that, "when News Feed, Timeline, Activity Log [and other features] seek to retrieve objects such as photos and comments from Facebook's data store, it

Mirror Worlds also cites a diagram illustrating a portion of the accused system, and emphasizes that the diagram "show[s] no interaction between UDB, TAO or Coefficient with the Aggregator." ECF No. 288, at 14 (citing Tsuei Decl., Ex. 26, ECF No. 290-18, at FBMW_00014972). But this diagram does not appear to depict TAO at all. It is undisputed that TAO exists, and the record is clear that the Timeline and Activity Log features could not function without TAO. See, e.g., Huang Depo. at 128 ("[S]o in any form of rendering Timeline or Activity Log you have to have TAO."). Moreover, when counsel for Mirror Worlds confronted Mr. Huang at his deposition with diagrams such as this one that do not explicitly reference TAO, Mr. Huang explained (1) that references to data sources that TAO can fetch from, such as UDB, could be understood as references to TAO; and (2) that the diagrams alluded to focus on specific aspects of the Timeline service that do not include the role of TAO, see id. at 128 ("[TAO is] not part of this diagram because these are very infra, very backend heavy documents and diagrams. . . . just because it's not there doesn't mean it doesn't exist."); id. at 130 (A: "The diagrams that we've been looking at, again,

---

is TAO that retrieves and delivers an up-to-date version of those objects to the features." "In cases where the data associated with an object is very large, such as for photos and videos, an object is stored in TAO that contains enough information to fetch the full contents from a separate system specially optimized for that data type. For most objects, TAO stores all of the data directly . . . ." Bronson Decl. ¶¶ 4, 21-22. This description confirms that TAO acts both as a storage system and as a go-between that fetches data for the accused features from elsewhere.

are very zoomed in on a specific piece of --" Q: "Mr. Huang, it's a 'yes' or 'no' question."). Accordingly, the lack of interaction between the Timeline Aggregator and UDB or TAO in any particular diagram does not create a dispute of material fact.

Mirror Worlds also relies on statements by its expert, Dr. Koskinen. But those conclusions are not supported by the evidence in the record. See, e.g., Koskinen Rpt., ECF No. 279-1 ¶ 114 (stating without citing any evidence that the TimelineDB is a "main stream"). Moreover, Dr. Koskinen's statements rely on documents where Dr. Koskinen has simply changed the subject of the quoted sentence from "Timeline" to "the TimelineDB." Compare, e.g., id. ¶ 115 ("TimelineDB is a 'time-ordered index for all time[.]'"), with Tsuei Decl., Ex. 54, ECF No. 290-37, at slide 5 ("Timeline: Time-ordered index for all time"). Dr. Koskinen's conclusory statements are not supported by the underlying documents and are therefore not entitled to any weight.

Mirror Worlds appears to argue that data cannot enter the Timeline backend system (the accused computer system) unless that data goes through what Mirror Worlds asserts is the designated path for writing data into the TimelineDB (the

accused main stream).[24] This argument, like Mirror Worlds'
argument concerning the Tailer and the Multifeed System, finds
no support in the record. Facebook has presented evidence that
data is received by the Timeline Aggregator that is not
contained in the TimelineDB. E.g., Tang Decl. ¶ 10. The
testimony of Mr. Huang (and other sources relied on by Mirror
Worlds) only speak to how data is written into the TimelineDB.
But even if Mirror Worlds could demonstrate that there is only
one pathway for writing data into the TimelineDB, Mirror Worlds
has presented no evidence that there is only one pathway for
writing data into the Timeline backend system or the Timeline
Aggregator in particular. To prove non-infringement, Facebook
does not need to show that the data that is included in the
Timeline Aggregator is received as part of the pathway for
writing data into the TimelineDB. Rather, Facebook need only
show that data received by the Timeline Aggregator is not
included in the TimelineDB, and Facebook has done so.
Accordingly, Mirror Worlds' argument concerning the write
pathway to the TimelineDB fails to create a dispute of material
fact.

---

[24] See ECF No. 288, at 14 ("Timeline utilizes a write path to store 'user
data'—to 'persist activities'—in the TimelineDB, and a separate read path to
'get activities.' Writing user data to the backend requires specific function
calls. Facebook has presented no evidence that any of its newly-identified
information is subject to any such function call . . . ."); Mirror Worlds'
RTSMF ¶ 51 (emphasis added) ("[R]ecord evidence shows that the information .
. . Facebook alleges is 'received' by the Timeline Aggregator is not received
at all, or received as part of the write pathway for writing data to the
TimelineDB.").

The court of appeals found that summary judgment was not warranted on the record of the first summary judgment motion with respect to TAO and the Timeline and Activity Log features. See 800 F. App'x at 908-09. Most of the court of appeals' discussion of this issue focused on Facebook's failure to provide definitive evidence that the Timeline Aggregator receives the asserted evidence from TAO. That defect in Facebook's argument has been cured because there is now unequivocal evidence that the Timeline Aggregator receives background user information from TAO. See Tang Decl. ¶ 10; Balakrishnan Rpt. ¶¶ 307-09.

The court of appeals also highlighted evidence suggesting that the frontend, rather than the Timeline Aggregator, receives the data from TAO referenced by Facebook. See 800 F. App'x at 909. The court of appeals cited Mr. Huang's testimony that "it's really the web tier that I consider the frontend that then, you know, needs to go to TAO to actually fetch any of the content." Id. (quoting Huang Depo., at 29-30). In light of the fully-developed record, this testimony does not create a dispute of material fact. That the frontend queries TAO, and that the frontend receives data from TAO, is not inconsistent with the Timeline Aggregator receiving background user information from TAO. Mr. Huang did not testify that the frontend is the only destination to which TAO sends data. Moreover, there is record

55

evidence specifically establishing that TAO sends background user information to the Timeline Aggregator. See Tang Decl. ¶ 10; Balakrishnan Rpt. ¶¶ 307-09. Finally, this testimony does not reflect at all on the relationship between UDB and the Timeline Aggregator. Because Facebook has provided evidence that background user information that is not stored in the TimelineDB is received by the Timeline Aggregator from both TAO and UDB, this testimony does not create a dispute of material fact as to whether the Timeline Aggregator receives background user information that is not contained in the TimelineDB.

As it argued with respect to the News Feed feature, Mirror Worlds argues that, even if the Timeline Aggregator receives background user information that is not contained in the TimelineDB, that would not establish non-infringement because background user information does not consist of "data units." Mirror Worlds' RTSMF ¶ 51. This argument fails. The background user information consists of items of information.

Accordingly, the record establishes that the Timeline Aggregator receives background user information that is not contained in the TimelineDB. Facebook is entitled to summary judgment of non-infringement with respect to the Timeline and Activity Log features on this basis.

Major Life Events

Facebook also argues that the Timeline Aggregator receives a list of a user's major life events, such as graduations, marriages, or moving to a new city. See ECF No. 241, at 17; Facebook's SMF ¶ 52. Facebook points to unequivocal evidence that this major life event information is received by the Timeline Aggregator from TAO or UDB, and that this data is not stored in the TimelineDB. Tang Decl. ¶ 11; see also Balakrishnan Rpt. ¶¶ 254, 256-57, 307, 317, 337.

Mirror Worlds' RTSMF ¶ 52 is identical to its RTSMF ¶ 51, other than replacing background user information with "major life events." Accordingly, for all the reasons explained in connection with background user information, Mirror Worlds has failed to create a dispute of material fact as to whether the Timeline Aggregator receives major life event information that is not contained in the TimelineDB. None of the sources cited by Mirror Worlds in its RTSMF ¶ 52, on their own or taken together, establish either that the TimelineDB contains major life event information, or that the Timeline Aggregator does not receive major life event information. Mirror Worlds' argument that this information does not consist of "data units" also fails because this information meets the Court's construction of "data unit."

Therefore, Facebook is entitled to summary judgment of non-infringement with respect to Timeline and Activity Log for the

independent reason that it has proven beyond reasonable dispute that the Timeline Aggregator receives major life event information that is not contained in the TimelineDB.

Coefficient

Finally, Facebook argues that the Timeline Aggregator receives information from the Coefficient service (discussed above with respect to News Feed) that is not contained in the TimelineDB. See ECF No. 241, at 16–17; Facebook's SMF ¶ 53. Facebook again points to unequivocal testimony that this information, which is used by the Timeline Aggregator to identify a user's degree of engagement with other users, is not stored in the TimelineDB. Tang Decl. ¶ 12; see also Balakrishnan Rpt. ¶¶ 246, 300-01, 307-09, 313.

Mirror Worlds' RTSMF ¶ 53 is identical to its RTSMF ¶¶ 51–52, except for inserting the phrase "coefficient score" in place of background user information or major life events. Accordingly, for all the reasons explained in connection with background user information, Mirror Worlds has failed to create a dispute of material fact as to whether the Timeline Aggregator receives data from the Coefficient service that is not contained in the TimelineDB. Mirror Worlds' argument that this information does not consist of "data units" fails here as well.

Therefore, Facebook is entitled to summary judgment of non-infringement with respect to Timeline and Activity Log on the independent basis that the Timeline Aggregator receives data from the Coefficient service that is not contained in the TimelineDB.

To sum up regarding Timeline and Activity Log: Facebook is entitled to summary judgment of non-infringement with respect to these two features because Facebook has proven that the Timeline Aggregator receives the following data that is not contained in the TimelineDB: (1) background user information; (2) major life event information; and (3) coefficient data. Each of these sets of information constitutes an independent basis entitling Facebook to summary judgment of non-infringement with respect to Timeline and Activity Log.

## 3.

The absence of a "main stream" and "main collection"[25] in the accused features means that Facebook is entitled to summary judgment of non-infringement with respect to all the asserted claims. Facebook also urges an additional ground of non-infringement with respect to the asserted claims of the '538 and '439 patents: namely, that none of the accused Facebook features contain a "glance view" limitation.

---

[25] The '227 patent and the '538 patent explicitly recite a main stream limitation, see '227 patent, claim 13; '538 patent, claim 1. The '439 patent contains a "main collection" limitation, which the Court has construed to be equivalent to a main stream limitation. See '439 patent, claim 1.

59

Claim 1 of the '538 patent and claim 1 of the '439 patent each contain a "glance view" limitation. See '538 patent, col. 16, lines 55-60; '439 patent, col. 17, lines 34-41. The patents explain that the glance view is intended to "make searching for and working with a document more intuitive." '538 patent, col. 3, lines 44-45; see also '439 patent, col. 3, lines 46-47. The glance view provides a preview of a document to a user who is scrolling through a stream of documents, "such as a thumbnail image of the first page of the document, a WAV or MP3 preview of an audio file, [] an animated GIF preview of a video file," or "text summaries." '538 patent, col. 7, lines 20-26; see also id., col. 2, lines 62-63; '439 patent, col. 7, lines 23-29. Claim 1 of both patents requires the glance view to be "an abbreviated version of the document" being depicted and "indicative of content thereof." '538 patent, col. 16, lines 59-60; '439 patent, col. 17, lines 39-41.[26] The patents also explain that the glance view appears in response to "touching with a cursor a screen area associated with the document." '538 patent, col. 16, lines 57-58; see also '439 patent, col. 17, lines 42-47.

Mirror Worlds contends that the glance view limitation of the asserted claims of the '538 and '439 patents is satisfied by

---

[26] Mirror Worlds says this "summary" limitation only appears in the specification, ECF No. 288, at 22, but that is plainly not true. Mirror Worlds simply ignores the claim language that says the glance view must be "an abbreviated version of the document" and "indicative of content thereof."

60

a Facebook functionality in which the user can "hover" the
user's cursor over a profile link (such as a link associated
with a Page on Facebook). Facebook's SMF ¶ 61; Mirror Worlds'
RTSMF ¶ 61. Facebook has offered evidence demonstrating that
this hover functionality does not meet the glance view
limitation. See Tang Decl. ¶¶ 15-19. Specifically, Facebook has
shown that its hover functionality (or the "contextual dialog
box," id. ¶ 14) provides only information about the source or
author of the selected link, not information about the content
of any underlying document. See id. ¶ 16. Facebook illustrates
that two stories from the same author relating to completely
different topics will yield the same contextual dialog box. See
id. ¶¶ 17-18. Moreover, Mr. Tang declares that the content of
the underlying story or document is not even provided to the
source code responsible for creating the contextual dialog box.
Id. ¶ 19. Accordingly, the contextual dialog box does not
display—or even take into account—the content of the underlying
document, and so it is not "an abbreviated version of the
document" or "indicative of content thereof," '538 patent, col.
16, lines 59-60; '439 patent, col. 17, lines 39-41.

    Mirror Worlds points to screenshots that allegedly
illustrate that the contextual dialog box does provide
information about the content of the underlying document. See
ECF No. 288, at 23; Koskinen Rpt. ¶¶ 179, 184, 189, 194, 199,

361, 366, 371, 378, 384 (reproducing same three screenshots).
Dr. Koskinen copied these screenshots from the Complaint. Id. ¶
179. The Complaint alleges that these three screenshots came
from third-party websites. Compl., at 30-32.

Facebook argues that all of Dr. Koskinen's testimony
relying on these third-party materials should be excluded. The
Court agrees. One of the screenshots was taken from a YouTube
video that no longer exists and was never produced. See
Balakrishnan Rpt. ¶ 443. Dr. Koskinen admits that he was not
involved in creating any of the screenshots, and he testified
that he could not tell when the images were taken, when they
were archived, whether they had been cropped, or even what user
action prompted the creation of the asserted glance view. See
Koskinen Depo., ECF No. 227-4, at 116, 119-20, 127, 129, 131.

These screenshots are not independently admissible because
they cannot be authenticated. See Fed. R. Evid. 901. Mirror
Worlds offers no evidence to support a finding that these
screenshots are what they purport to be. Instead, Mirror Worlds
invokes Federal Rule of Evidence 703, which allows an expert to
rely on inadmissible facts or data "[i]f experts in the
particular field would reasonably rely on those kinds of facts
or data in forming an opinion on the subject." It is plainly
unreasonable for a technical expert to rely on unauthenticated,
undated screenshots in forming an opinion. See Bd. of Trustees

of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A., No. 09-cv-686, 2011 WL 6288415, at *9-10 (S.D.N.Y. Dec. 15, 2011) (screenshot unreliable basis for expert opinion "where the expert does not know the source of the documents and cannot guarantee its reliability"). Relying on the screenshots in this case is especially unreasonable because Dr. Koskinen cannot verify what user action produced the asserted glance view, and Dr. Koskinen had access to the source code for the accused feature.[27]

Accordingly, Facebook's motion to exclude the opinions of Dr. Koskinen that rely on unauthenticated screenshots purporting to demonstrate the accused glance view functionality is **granted**. Mirror Worlds presents no admissible evidence to create a dispute of material fact as to whether Facebook's contextual dialog box indicates the content of the underlying story or document. Facebook's evidence establishes that its hover functionality does not meet the glance view limitation. Therefore, summary judgment of non-infringement as to the asserted claims of the '538 and '439 patents is appropriate on this basis as well.

---

[27] The cases cited by Mirror Worlds are not to the contrary. RMail Ltd. v. Amazon.com, Inc., No. 2:10-cv-258, 2019 WL 10375642, at *2 (E.D. Tex. June 12, 2019) involved a screenshot offered to prove notice of infringement, not a screenshot relied on by an expert to show infringement. The screenshots in ICON Internet Competence Network B.V. v. Travelocity.com LP, No. 3:11-cv-1131, 2013 WL 655024, *4 (N.D. Tex. Feb. 22, 2013) were offered to show prior disclosure of an expert's theory. The screenshots in DE Techs., Inc. v. Dell, Inc., No. 7:04-cv-628, 2007 WL 1112406, at *29 (W.D. Va. Apr. 9, 2007) were offered to illustrate the functionality of a prior art system. None of these cases involve a challenge to an expert's use of unauthenticated screenshots to demonstrate infringement.

63

**V.**

The Court need not reach the remainder of the parties'
disputes. Because the Court concludes that there was no
infringement of the asserted patents as a matter of law, this
was necessarily not an "egregious" case of willful infringement
warranting enhanced damages. See Halo Elecs., Inc. v. Pulse
Elecs., Inc., 579 U.S. 93, 104 (2016). The Court need not reach
the remainder of Facebook's motion to exclude certain opinions
of Dr. Koskinen, ECF No. 223 (that is, all of the motion except
the section regarding "glance view") because the remaining
opinions are not relevant to the Court's summary judgment
ruling. The Court does not need to reach Facebook's motion to
exclude the opinions of Mr. Bergman, ECF No. 228, because those
opinions relate only to damages. The Court need not reach Mirror
Worlds' motion for partial summary judgment of no invalidity
based on Facebook's prior art defenses, ECF No. 233, because the
Court grants Facebook's motion for summary judgment of non-
infringement. The Court need not reach Mirror Worlds' motion to
exclude certain opinions of Facebook's expert witnesses, ECF No.
236, because the Court did not need to consider (1) Facebook's
invalidity theories based on prior art, or (2) Dr.
Balakrishnan's opinions regarding the summary of Mirror Worlds'
prior infringement accusations in deciding Facebook's motion for
summary judgment. Finally, the Court need not reach Mirror

64

Worlds' motion to strike certain opinions of Mr. Bokhart, ECF No. 246, because those opinions relate only to damages.

## CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed above, the arguments are either moot or without merit. For the reasons explained above, Facebook's motion for summary judgment is **granted in part and denied in part.** The Court concludes that the asserted claims are patent-eligible under § 101, and that there was no infringement in this case as a matter of law. The evidence establishes that no reasonable juror could find that Facebook infringed the patents at issue.

The Clerk is directed to enter judgment dismissing this case. The Clerk is also directed to close all pending motions and to close this case.

**SO ORDERED.**

Dated:     New York, New York
           March 2, 2022

                                  _____
                                    John G. Koeltl
                              United States District Judge

65

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
MIRROR WORLDS TECHNOLOGIES, LLC,

                         Plaintiff,

        -against-                                    17 **CIVIL** 3473 (JGK)

                                                    **JUDGMENT**

FACEBOOK, INC.,

                         Defendant.
-------------------------------------------------------------X

        It is hereby **ORDERED, ADJUDGED AND DECREED:**  That for the reasons

stated in the Court's Opinion and Order dated March 8, 2022, the Court has considered all of the

arguments raised by the parties. To the extent not specifically addressed, the arguments are either

moot or without merit. Facebook's motion for summary judgment is granted in part and denied in

part. The Court has concluded that the asserted claims are patent-eligible under § 101, and that

there was no infringement in this case as a matter of law. The evidence establishes that no

reasonable juror could find that Facebook infringed the patents at issue. Judgment is entered

dismissing this case; accordingly, the case is closed.

**Dated:**  New York, New York

        March 8, 2022

                                            **RUBY J. KRAJICK**
                                    _____
                                          **Clerk of Court**
                            **BY:**    K. Mango
                                    _____
                                          **Deputy Clerk**



US006006227A

# United States Patent [19]

## Freeman et al.

[11] **Patent Number:** **6,006,227**

[45] **Date of Patent:** *****Dec. 21, 1999**

[54] **DOCUMENT STREAM OPERATING SYSTEM**

[75] Inventors: **Eric Freeman**, Branford; **David H. Gelernter**, Woodbridge, both of Conn.

[73] Assignee: **Yale University**, New Haven, Conn.

[ * ] Notice: This patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2).

[21] Appl. No.: **08/673,255**

[22] Filed: **Jun. 28, 1996**

[51] Int. Cl.⁶ ................................................. **G06F 17/30**

[52] U.S. Cl. ................................. **707/7**; 707/2; 707/102

[58] Field of Search ................................. 395/611, 616; 707/100, 102, 200, 2, 7

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,063,495 | 11/1991 | MacPhail | 395/761 |
| 5,140,676 | 8/1992 | Langelaan | 395/775 |
| 5,159,669 | 10/1992 | Trigg et al. | 395/357 |
| 5,402,526 | 3/1995 | Bauman et al. | 706/49 |
| 5,448,729 | 9/1995 | Murdock | 395/615 |
| 5,530,859 | 6/1996 | Tobias, II et al. | 395/551 |
| 5,535,063 | 7/1996 | Lamming | 360/4 |
| 5,625,818 | 4/1997 | Zarmer et al. | 395/615 |
| 5,649,182 | 7/1997 | Reitz | 707/7 |
| 5,835,129 | 11/1998 | Kumar | 348/15 |
| 5,890,177 | 3/1999 | Moody et al. | 707/511 |

### OTHER PUBLICATIONS

Cowart, Mastering Windows 3.1, 1992, chapter 12, pp. 396–417, Jan. 1, 1992.

Gelernter, The Cyber–Road Not Taken, The Washington Post, Apr. 3, 1994, 9 pages.

Freeman, Lifestreams Project Home Page, 3 pages, 1994–1996, Jan. 1, 1994.

Freeman, Lifestreams for the Newton, Steve Mann's Developers Corner, Oct. 31, 1995, 5 pages.

Steinberg, Lifestreams, Wired 5.02, Feb. 28, 1997, 11 pages.

Freeman et al, Lifestreams: Organizing your Electronic Life, AAAI Fall Symposium, Al Applications in Knowledge Navigation and Retrieval, Nov. 30, 1995, Cambridge MA, 6 pages.

Getting Results with Microsoft Outlook, copyright Microsoft Corporation 1995–1996, pp. 28–29, Jan. 1, 1995.

Nelson, Theodor H., The Right Way to Think About Software Design, In The Art of Human–Computer Interface Design, Brenda Laurel, (Ed.), (1990): pp. 235–243.

Landsdale, M., The Psychology of Personal Information Management, Applied Ergonomics, (Mar. 1988): pp. 55–66.

Malone, Thomas W., How Do People Organize Their Desks? Implications For The Design Of Office Information Systems., ACM Transactions On Office Systems, vol. 1, No. 1 (Jan. 1983): pp. 99–112.

*Primary Examiner*—Wayne Amsbury
*Attorney, Agent, or Firm*—Cooper & Dunham LLP

[57] **ABSTRACT**

A document stream operating system and method is disclosed in which: (1) documents are stored in one or more chronologically ordered streams; (2) the location and nature of file storage is transparent to the user; (3) information is organized as needed instead of at the time the document is created; (4) sophisticated logic is provided for summarizing a large group of related documents at the time a user wants a concise overview; and (5) archiving is automatic. The documents can include text, pictures, animations, software programs or any other type of data.

**33 Claims, 6 Drawing Sheets**



Appx68



FIG. I



120
190
200
Substreams Summarize Personal Agents
Archive
Remove
Rename
View Filter
Ne
130
Your Lifestream
160
lifestreams and david
lifestreams and david
140
weights
newton or pda
scenarios
scott and fertig and not beth
ben
scenarios
170
netscape
scott
180
test
AAAI
scott
150
card
acadia

FIG. 2

Streams Substreams Summarize Personal Agents
by Phone Call
by Portfolio
by Document Size

FIG. 3



_190_

Thursday, Feb 22  11:27 AM  1996  EST

Set Time to the Present (Now)

Set Time to the Future or the Past

**Freeze**   **Xfer**   **Print**

## FIG. 4

| Calendar |
| --- |

◀ December  1995 ▶

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|-----|-----|-----|-----|-----|-----|-----|
|     |     |     |     |     | 1   | 2   |
| 3   | 4   | 5   | 6   | 7   | 8   | 9   |
| 10  | 11  | 12  | 13  | 14  | 15  | 16  |
| 17  | 18  | 19  | 20  | 21  | 22  | 23  |
| 24  | 25  | 26  | 27  | 28  | 29  | 30  |
| 31  |     |     |     |     |     |     |

**12** : **00**   ◆ AM   ◇ PM

Set Date/Time          Cancel

## FIG. 5



**FIG. 6A**

| WHO | ON | | | | | AT | ABOUT |
|---|---|---|---|---|---|---|---|
| Scott Fertig | Tue | Aug | 1 | 12:05 | EDT 1995 | 432-6433 | Port to PPC |
| Ward Mullins | Tue | Aug | 1 | 11:57 | EDT 1995 | 415 224-1912 | Tcl/Java discussion |
| Beth Freeman | Tue | Aug | 1 | 10:22 | EDT 1995 | 432-1287 | insurance |

**FIG. 6B**



**FIG. 7**

Quote-O-Matic Stock Service for 5/16/95

| | |
|---|---|
| GVIL | 14.00 |
| LMASX | 20.84 |
| ODWA | 18.50 |
| SPLS | 27.12 |
| TSA | 19.25 |
| lavtx | 21.41 |

**FIG. 8A**



Close
Hardcopy
About
Portfolio Summary for 8/12/95
Closing Price
38.00
36.00
34.00
32.00
30.00
28.00
26.00
24.00
22.00
20.00
18.00
16.00
14.00
12.00
10.00
8.00
6.00
4.00
-200.00
-150.00
-100.00
-50.00
Days
GVIL
KAUD
LMASS
COWA
SPLS
TSA
lmvtx
phstx
popcx
temfx

FIG. 8B

# DOCUMENT STREAM OPERATING SYSTEM

## FIELD OF THE INVENTION

The present invention relates to an operating system in which documents are stored in a chronologically ordered "stream". In other words, that is, as each document is presented to the operating system, the document is placed according to a time indicator in the sequence of documents already stored relative to the time indicators of the stored documents.

Within this application several publications are referenced by arabic numerals within parentheses. Full citations for these and other references may be found at the end of the specification immediately preceding the claims. The disclosures of all of these publications in their entireties are hereby incorporated by reference into this application in order to more fully describe the state of the art to which this invention pertains.

## BACKGROUND OF THE INVENTION

Conventional operating systems frequently confuse inexperienced users because conventional operating systems are not well suited to the needs of most users. For example, conventional operating systems utilize separate applications which require file and format translations. In addition, conventional operating systems require the user to invent pointless names for files and to construct organizational hierarchies that quickly become obsolete. Named files are an invention of the 1950's and the hierarchical directories are an invention of 1960's.

Some conventional operating systems employ a "desktop metaphor" which attempts to simplify common file operations by presenting the operations in the familiar language of the paper-based world, that is, paper documents as files, folders as directories, a trashcan for deletion, etc. Also, the paper-based model is a rather poor basis for organizing information where the state of the art is still a messy desktop and where one's choices in creating new information paradigms is constrained [1].

Thus, conventional operating systems suffer from at least the following disadvantages: (1) a file must be "named" when created and often a location in which to store the file must be indicated resulting in unneeded overhead; (2) users are required to store new information in fixed categories, that is directories or subdirectories, which are often an inadequate organizing device; (3) archiving is not automatic; (4) little support for "reminding" functions are provided; (5) accessibility and compatibility across data platforms is not provided and (6) the historical context of a document is lost because no tracking of where, why and how a document evolves is performed. "Naming" a file when created and choosing a location in which to place the file is unneeded overhead: when a person grabs a piece of paper and starts writing, no one demands that a name be bestowed on the sheet or that a storage location be found. Online, many filenames are not only pointless but useless for retrieval purposes. Storage locations are effective only as long as the user remembers them.

Data archiving is an area where conventional electronic systems perform poorly compared to paper-based systems. Paper-based systems are first and foremost archiving systems, yet data archiving is difficult in conventional desktop systems. Often, users throw out old data rather than undertaking the task of archiving and remembering how to get the data back. If archiving and retrieval of documents is convenient, old information could be reused more often.

Reminding is a critical function of computer-based systems [2] [3], yet current systems supply little or no support for this function. Users are forced either to use location on their graphical desktops as reminding cues or to use add-on applications such as calendar managers.

A solution to these disadvantages is to use a document stream operating system. One such system is outlined in a 1994 article [4]. However, this article fails to address many of the disadvantages of conventional operating systems.

## SUMMARY OF THE INVENTION

One object of the present invention is to provide a document stream operating system and method which solves many, if not all, of the disadvantages of conventional operating systems.

Another object of the present invention is to provide a document stream operating system in which documents are stored in one or more chronologically ordered streams.

An additional object of the present invention is to provide an operating system in which the location and nature of file storage is transparent to the user, for example, the storage of the files is handled automatically and file names are only used if a user chooses to invent such names.

A further object of the present invention is to provide an operating system which takes advantage of the nature of electronic documents. For example, a conventional paper document can only be accessed in one place, but electronic documents can be accessed from multiple locations.

Another object of the present invention is to organize information as needed instead of at the time the document is created. For example, streams may be created on demand and documents may belong to as many streams as seems reasonable or to none.

An additional object of the present invention is to provide an operating system in which archiving is automatic.

A further object of the present invention is to provide an operating system with sophisticated logic for summarizing or compressing a large group of related documents when the user wants a concise overview. In addition, this summarizing can include pictures, sounds and/or animations. Also, no matter how many documents fall into a given category, the operating system is capable of presenting an overview in a form so that all the documents are accessible from a single screen.

Also, an object of the present operating system is to make "reminding" convenient.

Another object of the present invention is to provide an operating system in which personal data is widely accessible anywhere and compatibility across platforms is automatic. Accordingly, this invention provides that computers using the operating system of the present invention need not be independent data storage devices, but also act as "viewpoints" to data stored and maintained on external systems such as the INTERNET. Thus, in accordance with the present invention users can access their personal document streams from any available platform such as a UNIX machine, a Macintosh or IBM-compatible personal computer, a personal digital assistant (PDA), or a set-top box via cable.

According to one embodiment of the invention a computer program for organizing one or more data units is provided. The computer program includes: (1) means for receiving one or more of the data units, each of which is associated with one or more chronological indicators; and (2) means for linking each of the data units according to the

3

chronological indicators to generate one or more streams of data units. Other embodiments of the invention also provide: (1) chronological indicators including past, present, and future times; and (2) means for displaying the streams, wherein respective indicia representing the data units are displayed and each data unit includes textual data, video data, audio data and/or multimedia data. The means for displaying the streams may further include displaying selected segments of the streams corresponding to selected intervals of time. The means for receiving may further include means for receiving data units from the Word Wide Web or from a client computer.

According to another embodiment of the invention, a method of organizing one or more data units is provided including the steps of: (1) receiving one or more data units, each of which is associated with one or more chronological indicators; and (2) linking each of the data units according to the chronological indicators to generate one or more streams of data units. In other embodiments, the chronological indicators may include past, present, and future times. The method may further include the steps of: (1) displaying the streams, wherein respective indicia represent each data unit and each of the data units may be textual data, video data, audio data and/or multimedia data. The step of displaying the streams may further include the steps of: (1) receiving from a user one or more values indicative of one or more selected segments of the streams corresponding to selected intervals of time; and (2) displaying the segments of the streams corresponding to the selected intervals of time.

These and other advantages of the present invention will become apparent from the detailed description accompanying the claims and the attached figures.

## DESCRIPTION OF THE DRAWINGS

FIG. **1** shows a viewport in one embodiment of the present invention;

FIG. **2** shows a substream menu in one embodiment of the present invention;

FIG. **3** shows a list of summary types for the substream chosen in

FIG. **2** of the present invention;

FIG. **4** shows the time display in one embodiment of the present invention;

FIG. **5** shows a calendar-based dialog box in one embodiment of the present invention;

FIG. **6***a* shows a dialog box in connection with a phone call in one embodiment of the present invention;

FIG. **6***b* shows a summary of phone calls in one embodiment of the present invention;

FIG. **7** shows a phone call record dialog box in one embodiment of the present invention;

FIG. **8***a* shows text data used by one embodiment of the present invention; and

FIG. **8***b* shows the result of a summarize operation in one embodiment of the present invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

This invention is a new model and system for managing personal electronic information which uses a time-ordered stream as a storage model and stream filters to organize, locate, summarize and monitor incoming information. Together, streams and filters provide a unified framework that subsumes many separate desktop applications to accom-

4

plish and handle personal communication, scheduling, and search and retrieval tasks. One embodiment of the present invention utilizes a machine-independent, client/server open architecture so that users can continue to use the same conventional document types, viewers and editors.

A "stream" according to the present invention is a time-ordered sequence of documents that functions as a diary of a person or an entity's electronic life. Every document created and every document send to a person or entity is stored in a main stream. The tail of a stream contains documents from the past, for example starting with an electronic birth certificate or articles of incorporation. Moving away from the tail and toward the present and future, that is, toward head of the stream more recent documents are found including papers in progress or new electronic mail. A document can contain any type of data including but not limited to pictures, correspondence, bills, movies, voice mail and software programs. Moving beyond the present and into the future, the stream contains documents allotted to future times and events, such as, reminders, calendar items and to-do lists. Time-based ordering is a natural guide to experience. Time is the attribute that comes closest to a universal skeleton-key for stored experience. Accordingly, streams add historical context to a document collection with all documents eventually becoming read-only, analogously as history becomes "set in stone". The stream preserves the order and method of document creation. Also, like a diary, a stream records evolving work, correspondence and transactions because historical context can be crucial in an organizational setting.

One embodiment of this invention allows for basic operations to be perform on a stream: new, clone, transfer, find and summarize.

Users create documents by means of the new and clone operations. New creates a new, empty document and adds the document to the main stream. Clone duplicates an existing document and adds the duplicate to the main stream at a new time point. Documents can also be created indirectly through the transfer operation. The transfer operation copies a document from one stream to another stream. Creation of a document if "transparent" because documents, by default, are added to the at the present time point. Internally, the document is identified by a time indication so no name is required from the user for the document. Nevertheless, a user can optionally name a document is desired.

Some streams can be organized on the fly with the find operation. Find prompts for a search query, such as "all E-mail I haven't responded to," or "all faxes I've sent to Schwartz" and creates a substream. Substreams, unlike conventional, virtual or fixed directories which only list filenames, present the user with a stream "view" of a document collection. This view, according to the present invention contains all documents that are relevant to the search query. Also, unlike searches of conventional fixed directories, the substream is generated by default from all the documents in the main stream. Accordingly, individual substreams may overlap, that is, contain some documents that are the same and can be created and destroyed on the fly without affecting the main stream or other substreams.

The find operation creates a substream of the main stream or of another substream based on, for example, a boolean attribute-and-keyword expression or a 'chronological expression', for example, "my last letter to Schwartz". Also, substreams may point to the future, for example, "my next appointment".

Once created, substreams operate dynamically, that is, if a user allows a substream to persist, the substream will collect new documents that match the search criteria as documents arrive from outside the operating system or as the user creates the document. This dynamic operation provides automatic monitoring of information because the substream not only organizes the documents as received but also filters for incoming information. For example, a substream created with the query "find all documents created by other people" would subsume a user's mailbox and automatically collect all arriving mail from other users. A substream remains in existence until destroyed by the user and acts as a filter by examining each new document that enters the main stream.

Although a document may belong to any number of substreams, the document also enters and remains on the main stream. A substream, in other words, is a "subset" of the main stream document collection. In other words, a way of looking at the main stream so as to exclude certain documents temporarily.

The summarize operation "compresses" or "squish" a stream to generate one or more overview documents. The content of an overview document depends on the type of documents in the stream. For instance, if the stream contains the daily closing prices of all the stocks and mutual funds in a user's investment portfolio, the overview documents may contain a chart displaying the historical performance of particular securities and the user's net worth. As another example, if the substream contains a list of tasks a user needs to complete, the overview document might display a prioritized "to-do" list. Thus, the summarize operation collapses a stream into a summary document. This summary document is a "live" document which is updated as additional documents are added to the main stream.

The type of summary depends on the type of documents in the substream. In one embodiment of the present invention at least one general "squish" function is provided no matter which stream is to be squished. Typically, however, the user will have a number of different squishers to choose from, for example, one squisher might produce a summary in words, while another squisher might produce a graph. Also "custom squishers" may be supplied by third parties or created by the user.

Another aspect of the invention is that applications execute "inside" a stream document leaving any output in that document. Thus, running an application is a variant of the new operation. For example, to run a spreadsheet application such as Lotus 1-2-3, a user creates a new document at the head of the main stream, specifically, a "live" spreadsheet document. The application itself is stored on the main stream, or located by means of a calling card that points to another stream containing the application.

A stream has three main portions: past, present, and future. The "present" portion of the stream holds "working documents", which also includes the timepoint in the stream where new documents are created and where incoming documents are placed. As documents age and newer documents are added, older documents pass from the user's view and enter the "past portion" where the documents are eventually "archived". By disappearing from view old information is automatically cleared away so the old information will not clutter up the workspace. At some future point if documents in the past portion are needed, such documents can be located with the find operation even if the past document has already been archived.

The "future" portion of the stream allows documents to be created in the future. Future creation is a natural method of

posting reminders, for example, meeting dates and scheduling information. The system allows users to dial to the future by selecting a future timepoint for a document. The present invention keeps the document until that future time occurs. When the time of documents timepoint arrives the reminder document is brought into view and the document enters the present portion of the stream.

One embodiment of the present invention is implemented in a client/server architecture running over the Internet. The server is the workhorse of this embodiment handling one or more streams by storing all main stream and substream documents. Each view of a stream is implemented as a client of the server and provides the user with a "viewpoint" interface to document collections, that is, streams. The "look and feel" of the viewport may be different for different computing platforms but each viewport should support the basic operations.

One embodiment of the present invention implements a client viewport using graphically based X Windows, another embodiment implement a client viewport solely with text in standard ASCII (American Standard Characters for Information Interchange) and yet another embodiment implements a client viewport for the NEWTON personal digital assistant (PDA). The X Windows viewport provides the full range of functionalities including picture and movie display. In contrast the text-only viewport has a mail-like interface although all the basic operations are available. Also, because the NEWTON PDA lacks substantial internal memory and relies on slow external communications, that is low bandwidth, a minimal stream-access method is provided.

The X Windows viewport embodiment is shown in FIG. 1. The interface is based on a visual representation of the stream metaphor 5. Users can slide the mouse pointer 10 over the document representations to "glance" at each document, or use the scroll bar 20 in the lower left-hand corner to move through time, either into the past or into the future portion of the stream.

Color and animation indicate important document features. A red border in one embodiment means "unseen" and a blue border means "writable". Open documents may be offset to the side to indicate when the document is being edited. In this embodiment incoming documents slide in from the left side and newly created documents pop down from the top and push the steam backwards by one document into the past.

External applications are used to view and edit documents which the user can select by clicking on the documents graphical representation. The external applications speed the learning process significantly because new users can continue to use familiar applications for example, conventional UNIX application such as emacs, xv, and ghostview, to create and view documents while using streams to organize and communicate the documents.

The X Windows interface prominently displays the basic operations, that is, New 30, Clone 40, Xfer 50 (that is, transfer), Find 60, and Summarize 70 as buttons and/or menus. As discussed previously the New button creates a new document and adds the document to the stream at the "present" timepoint. The Clone button duplicates an existing document and places the copy in the stream. The Xfer button first prompts the user for one or more mail addresses and then forwards the selected document. The find operation is supported through a text entry box 60 that allows the user to enter a boolean search query which results in a new substream being created and displayed. The summarize menu 70 generates a new document which displays information from documents in a stream in a desired format, for example, a graph.

The X Windows interface of this document also provides additional buttons. The Print button **80** copies a selected document to a printer where documents may be either printed conventionally or moved to a printer stream. A software agent which can be associated with the stream forwards each new document to an appropriate printer. The Freeze button **90** makes a document read-only.

Pulldown menus are used to select documents from streams or existing substreams, create summaries, initiate personal agents and change the clock.

The Streams menu **110** allows the user to select from a list of locally available streams.

FIG. **2** shows the Substreams menu **120** of one embodiment of the present invention. This menu is divided into three sections. The first section **130** contains a list of operations that can be performed on substreams, for example, remove. The second section **140** contains one menu entry labeled "Your Lifestream", and causes the viewport to display a user's main stream. The third section **150** lists all of the user's substreams. As indicated by this third section, substreams can be created in an incremental fashion, that is, one substream generated from another resulting in a nested set of menus. In this example the nested menus were created by first creating a substream "lifestreams and david" **160** from the main stream and then creating two substreams from this substream, "scenarios" and "ben" **170**. Substream "scott" **180** was created from the "scenarios" substream. Semantically this incremental sub-streaming amounts to a boolean 'and' of each new query with the previous substream's query.

FIG. **3** shows the summarize menu **190** which lists the possible summary types. Choosing any of these menu options creates a substream summary and a new document containing the summary is placed on the stream.

The Personal Agents menu **200** lists a number of available software agent types. Personal software agents can be added to the user interface in order to automate common tasks.

The embodiment illustrated in FIG. **4** always displays the time in the upper right hand corner of the viewport interface. This time display also acts as a "time" pull-down menu **190** that allows the user to set the viewport time to the future or past via a calendar-based dialog box as illustrated in FIG. **5**. Setting the viewport time causes the cursor to point to that timepoint position in the stream such that all documents forward of that timepoint, that is, towards the head of the stream have a future timestamp and all documents behind that timepoint, that is, towards the tail, have a past time-stamp. As time progresses, this cursor moves forward towards the head of the stream. When the cursor slips in front of the present timepoint "future" documents are added to the visible part of the stream in the viewpoint, just like new mail arrives.

The effect of setting the time to the future or past is to reset the time-cursor temporarily to a fixed position designated by the user. Normally the user interface displays all documents from the past up to the time-cursor. Setting the time-cursor to the future allows the user to see documents in the future part of the stream. Creating a document in the future results in a document with a future timestamp. Once the user is finished time-tripping, the user can reset to the present time by selecting the "Set time to present" menu option in the time menu.

In one embodiment of the present invention "browse cards" **100** are employed so that when the user touches a document in the stream-display with the cursor, a browse card appears. The purpose of the browse card is to help the user identify a document by providing the user some idea of the document's contents in a small window. The content of browse cards is an abbreviated version of a document which as been compressed into an micro-document like an index card. In one embodiment, the browse card creation operation does header stripping so that the browse card displays the first non-trivial words in a document. In another embodiment, complex analysis is performed on the document contents so that 'most important' words, pictures and/or sounds are presented.

Another embodiment of the present invention provides "calling cards" which represent or point to a stream or substream Every stream has a calling card and the only way to reference a stream is via this calling card. In this embodiment the find operation performs as follows: (1) the user provides a search query; (2) an appropriate substream is generated; (3) the substream's calling card is generated; and (4) the new calling card is deposited as a new document at the head of the main stream. Every duplicated calling card bears on the face text, an icon or both. In the case of the find operation, the new calling card is marked with the argument supplied by the user for the search query, for example "from: Schwartz and Lifestreams" or "last letter from Piffel". As a default in this embodiment, the interface will automatically display the new substream.

Another embodiment of the present invention allows documents to be grouped explicitly into a substream. With this feature the user marks, that is, selects all documents to be included in the substream and groups the selected documents into a substream by creating a new calling card. The new calling card comes equipped with a system-created icon which is marked on all documents that are part of the new stream and the user may add any other notation to the face of the new calling card, for example, "these should be merged together to produce the Zeppelin report."

In the embodiments with calling cards the "transfer" operation takes two arguments: a document and a calling card so that the document is copied onto the stream designated by the calling card. The document may itself be a calling card and depending on instructions from the user, either the calling card itself or the stream designated by the calling card is copied onto the new stream.

Each main stream in this embodiment has a calling card which allows 'inter-main stream' communication. To communicate a user includes on the face of the calling card for the user's main stream whatever information the user is willing to make public. Other users wanting to send that electronic mail will need a copy of that user's calling card, which might be, for example, "Rock Q. Public, Blimp Mechanic, Passaic N.J."

To give only limited access to user's stream, a user provides a copy of the calling card customized to provide the desired access. Minimal access gives other users append-only privileges, that is, user B can send user A mail, but cannot view anything on user A's stream. Access restrictions beyond "minimal" are stated in terms of substreams. In other words, a calling card gives access to all documents contained in the specified substream unless that document is also contained on one of specified excluded substreams.

The present invention allows a stream document to contain another stream, that is a 'stream envelope'. A stream envelope is equivalent to a 'value' calling card versus the 'reference' calling cards discussed above. In other words, rather than point to another stream with a calling card, the stream envelope contains a copy all the documents from the other stream. For example, user A transfers to user B a

substream consisting of all Zeppelin-manual correspondence which contains many documents. However, a single new document appears on user B's stream: a stream envelope. The stream envelope may be opened yielding the many documents of the forwarded stream.

According to the present invention, a text-editor designed specifically for stream A can treat a document as a stream of bytes so that software agents designed to 'ride' streams could ride documents as well. Also, the stream find operation can scan the streamed document and synchronization based on stream properties can be applied to the streamed document.

Streams can be copied and combined into new streams, that is, streams can be merged. For example, if a user acquires stream segments from ten electronic newspapers and magazines all covering the same one-month period, the segments can be merged in a sorted order into a single combined stream.

Another feature of the present invention is a card gallery which consists of some reasonable number of microdocuments, for example twelve, arranged in such a way that each is always fully visible on the viewport for example, in two columns of 6 each at the right of the display. Each micro-document is a calling card or a micro-browse-card (MBC) to a "regular" document on the stream or in a squish. The micro browse card in the card gallery represent documents a user has been working on. Whenever a user opens a document or creates a substream or squish, the corresponding micro browse card is added to the card gallery. A user can re-open the document, squish or have the viewport display the substream, by clicking on, or otherwise selecting, the corresponding micro browse card.

The micro browse card is administered as a least-recently-used cache, that is, new cards are dealt on top of the least-recently-used existing card, however, users can override this mechanism and place or lock a card in the gallery. For example, a live squish can act as weather-station, appointment calendar, stock ticker or other current-status reporter if the user locks the micro browse card for the squish in the gallery.

Because a users' card gallery includes by default the calling cards of streams the user has recently opened, the card gallery acts, to the extent streams are used as Web sites, as a World Wide Web "hot list."

In one embodiment of the present invention at least some part of the stream is in the form of a receding stack of upright rectangles, framed in such a way that only the top line of each document is visible. A foreshortened viewing angle yields a view that is approximately a right triangle, the bottom edge aligned with the bottom of the display and the left edge aligned with the display's left border.

In another embodiment of the inventive operating system a 'slide rule' bar display is provided which is labelled with the endpoints of the stream, that is, the dates of the farthest-past and farthest-future documents. The document density can be illustrated, for example, by the amount of color saturation of the bar at any point. This type of display aids the user because some days, weeks, months or other time period have more associated documents, some have fewer. The slide rule has a magnifier that the user can slide via a mouse, for example up and down the bar. The magnifier obscures the portion of the sliderule that lies beneath, but the obscured segment is replaced by an enlarged view of the small part of the stream starting at the point touched by the upper edge of the magnifier or, some similar protocol for defining the starting point of the magnified segment. By

sliding the magnifier, you change the part of the stream currently displayed in the main perspective view.

In another embodiment of the present invention at least some part of the stream is in the form of a conventional calendar month display. With this display, the stream-segment associated with day n appears as a list of document headers in n's calendar box.

To contemplate the future instead of the past, according to one embodiment of the present invention, a user can reverse the stream so that the head of the stream now appears in front, with the nearest-future document immediately behind that document, next-nearest behind that and so forth. The user then looks from the present into the future so that furthest-away document in the display equals furthest-away in future time.

All documents older than some date d may be moved by the server from immediately-accessible storage to cheaper, long-term storage. When a document is archived in this way, however, the browse card of that document may remain available in immediately-accessible storage, so that the archived document appears in the regular way in the viewport. When a user opens an archived document, the user may incur some delay as the server locates and reloads the body of the document.

Automatic archiving is a feature of the standalone embodiment and user-managed web site embodiment. In either embodiment, the streams operating system monitors remaining disk space and when available space is low, the operating system asks the user to pop in some diskettes or other storage media. Similarly when an archived document needs to be reloaded, the operating system tells the user which diskettes or other storage media to insert. In another embodiment of the present invention a chat feature is provided. If two users want to chat online in UNIX TALK style; the user creates a new stream and each user focusses the viewport on that new stream. To make a comment, a user pops a new document on the stream head with the comment contained as text inside the document. The stream synchronization properties allow many users to manipulate a stream concurrently, and allow a user to block at the end waiting for the arrival of a new document which would mean in this case awaiting the next comment.

A chat stream by its nature provides: (1) permanent record and (2) support for multiple parties to a conversation. A chat stream is in this sense is a real-time bulletin board. In this regard a network bulletin board may be stored in a stream providing: (1) archived comments that can be searched and retrieved using the standard streams operations; (2) synchronization characteristics like a chat stream; and (3) a bulletin board that can be located via the find operation.

In another embodiment of the present invention any software agent with the necessary access can ride your stream. Therefore streams can be the basis of groupware systems implemented for example as a flock of agents. For example, when user A's wants to schedule a meeting, a software agent departs from user A's stream to visit the streams of each of the other intended participants. Each user's stream lists the current appointments in the stream's future portion, and each user also includes a document giving the user's general availability in pre-arranged terms so that the meeting-maker software agent can understand. When the software agent finds an appropriate meeting time, the software agent posts a document to each stream's future and creates a new stream for the meeting itself. The software agent forwards the calling card of the meeting stream to each participant. This new stream serves as a chat stream on

11

which the participants can discuss the meeting beforehand, accumulate any material developed during the meeting itself and persists when the meeting is over as a record and a vehicle for post-meeting discussions.

In the following embodiments a stream naturally provides a structure for storing technical an electronic versions of a newspaper or magazine.

In addition, a mail-order firm might store its catalog in a stream with each document describing one item. A top page can embed calling cards as hyperlinks so that the streams pointed-to are updated automatically by the persistent sub-stream mechanism. Each user can also reformat the catalog to taste by creating a substream containing descriptions of whatever sort of object interests the user.

In another embodiment of the present invention a phone conversation is stored as a time-ordered sequence of spoken sounds or as electronic representations. When two users want to have a phone conversation, the users can use software such as a software agent, that creates a new stream and hands each user the calling card. Each user's 'phone agent' tosses digitized representations of speech frames onto the stream and grabs each new frame that appears, turning each speech frame into sound. In this scheme, phone and voicemail are integrated in the all-purpose stream context and can be manipulated using the standard stream operations.

Additionally, in another embodiment of the present invention a television source can be stored as a time-ordered sequence of sound-and-image frames. Such television information is an archive as well as a realtime source and can be searched and substreamed. A television set is merely a viewport. Also, scheduling information can be stored in the television stream's future and tuning into a television station only requires double-clicking on the appropriate calling card. Similar embodiments can provide for radio stations, music sources, etc.

A stream according to the present invention can be controlled by a voice-interface as well as a computer and thereby be accessed via a conventional phone. The voice interface would allow: (1) the stream to be searched and manipulated; (2) new objects to be installed; (3) objects to be transferred; and (4) other capability.

The following embodiment discusses how the present invention is used for electronic mail. To send a message, the user creates a new document, for example by clicking on the New button and composes the message using a favorite editor. After composition, the message document is sent with a push of the Xfer button. Similarly, existing documents are easily forwarded to other users, or can be cloned and replied to. While all mail messages, both incoming and outgoing, are intermixed with other documents in the stream, the user can create a mailbox by substreaming on documents created by other users. A user can also create substreams that contain a subset of the mailbox substream, such as "all mail from Bob", or "all mail I haven't responded to".

With the present invention, a reminder can be generated as future electronic mail, that is a user can send mail that will arrive in the future. If the user dials to the future before writing a message document, when the message document is transferred the message document will not appear on recipient's stream until either that time arrives or the recipient happens to dial the recipient's viewport to the set creation date. In the present, the document will be in the stream data structure but the viewport will not show the document. By appearing just-in-time and not requiring the user to switch to yet another application, these reminders are more effective

12

than those included in a separate calendar or scheduling utility program.

One embodiment of the present invention supports an electronic business cards document type as well as a 'phone call record' document for noting the date and time of phone contacts. In addition, the task of creating a phone call record is automated through a personal agent. The personal software agent is automatically attached to the personal agent menu so that anytime a user wants to make a call the use chooses "Make Phonecall" from the personal agent menu. The agent is spawned and the dialog box in FIG. 6a appears. The user types in the name of the callee and the agent searches the current stream for a business card with that name. If the name is found, the software agent creates and fills in the appropriate entries of the phone call record as seen in FIG. 7. This functionality is similar to the use of the personal assistant on the Newton personal digital assistant. The user can later use the streams summarize operation to summarize the phone calls made. This results in a report as shown in FIG. 6b.

In another embodiment of the present invention this functionality is extended to include the functions of a time manager. Time managers generally track the billable hours a professional spends on one or more projects. In streams this is easily accomplished by creating a timecard that marks the starting and ending time of each task. Then, before each billing period, the stream is summarized by the timecards, resulting in a detailed billing statement for each contract.

Another embodiment of the present invention organizes a user's personal finance. Large number of users already track their checking accounts, savings, investments, and budgets with applications such as QUICKEN. The types of records and documents used in these applications such as electronic checks, deposits, securities transactions, reports are conveniently stored and generated by streams.

For example, a stock quote service may forward the daily closing prices of a given portfolio to a user's stream at the end of every business day. These documents are as shown in FIG. 8a. Such documents can list each stock and mutual fund along with its closing price, giving the user a method of calculating the value of the user's assets on a specific day. But if the user wants higher-level view of the portfolio over time the summarize operation can be used. For example, the user first selects a substream containing the stock quote documents and selects the "summarize by portfolio" menu item. This operation compresses the data into a single chart of historical data which summarize the portfolio documents in the substream. This result is illustrated in FIG. 8b.

Another embodiment of present invention provides a stream-based checking account. Each check written creates a record on the users stream. Some of these checks are electronic checks sent to companies with an online presence; other checks are transcribed from written checks. The user, in this embodiment, employs a personal software agent to help balance his checkbook. At year's end the user runs a tax summary which squishes the financial information in the users stream onto income tax forms which can be sent electronically to the Internal Revenue Service.

Streams can also be used for budgeting, tracking expenditures, etc. Streams contain everything a user deals with in the user's electronic life in a convenient and searchable location.

As discussed previously, every user can send out custom calling cards that grant access to a user's stream. Thus, the particular user's stream can function as a personal World

Wide Web site such that the web site is merely a subset of the user's main stream or a substream. For the convenience of external users, a user can generate a "guide to this stream" document that functions as a top page. In the context of the present invention, a hyperlink, or a bookmark is just a calling card. By double clicking, or some comparable mechanism, on a calling card the viewport displays the specified stream. Embedding a link from one document to another document means to embed calling cards.

The present invention's personal web site provides more features than a conventional worldwide user side because: (1) the web site and personal information site are unified and maintained simultaneously with the same toolset; (2) visitors to the site use the same interface as for the visitor's own stream, that is, the visitor can browse, create substreams and squish; (3) visitors can be given customized access levels so that friendly visitors get to see more; and (4) the personal web site can filter incoming documents.

Streams of the present invention are designed to work with conventional World Wide Web browsers, thus opening a document of type web bookmark causes the appropriate browser to fire-up as an application the way a text editor fires up when the user opens a text document. However, streams also provide an indigenous web-browsing model. Key features such as calling cards and find provide this functionality so that the viewport itself functions as the browser.

Streams may also be quite useful for managing information outside of the system. For example, keeping track of web bookmarks is difficult and bookmarks are inconvenient to pass to other users. Conventional systems accomplish those transactions by copying a Web address from a web browser to an electronic mail message which the recipient then copies from electronic mail back to recipient's browser and adds this web address as a bookmark. Streams solve both of these problems.

In one embodiment, an agent watches each user's bookmark file for each time a new bookmark is added and then adds the same bookmark to a stream as a new Web address document. The effect of opening a Web address document in a stream is that the web browser comes to the foreground and attempts to connect to the Web address. In this way streams create a bookmark substream while at the same time making the data in the bookmarks readily available to any other search a user may make.

Passing Web addresses around is trivial, the user merely copies the Web address document to another user's stream (a one-step process) and the Web address is automatically included in the recipient bookmark substream.

A stream is a data structure that can be examined and to the extent possible manipulated by many processes simultaneously. Also a process may block the end of a stream, that is, suspend the stream operation, until awakened when a new document appears on the stream head. Streams need to support the block-at-the-end operation so that a software agent or what amounts to the same thing, that is, a substream or a live squish document can examine each new document arriving at the stream.

A stream must support simultaneous access because: (1) a user creates many software agents which may need to examine the stream concurrently; and (2) a user may have granted other users limited access to the user's stream, and the user will want access to this stream even while the other users access the stream.

One embodiment of the present invention is configured such that each server may support three to four simultaneous users with stream sizes on the order of 100,000 documents

(perhaps a year or two of documents for the average user). In another embodiment, the operating system is configured such that lifestreams may have millions of documents or more. The substreaming aspect of one embodiment of the present invention is efficiently implemented using an inverse index of the document collection maintained by the server. No real performance problems with respect to retrieval have occurred. Given the very large indices that are being used on the Internet the retrieval scheme is expected to scale to large document collections.

Since a user is unlikely look at 10,000 documents at once and discern any usable information, the present invention does not provide the user with an entire document collection at once. Instead "cursors" are used to allow the user to view segments of the document collection and to load in more segments as needed.

One embodiment of the invention provides a single-threaded server which allows a single point of access. Other embodiments of the present invention utilize a multi-server and multi-threaded approach which provides a more scalable architecture.

Regarding the term "agent" used in this application, it is noted that this term refers one of three kinds of embedded computations: personal agents, document agents, and stream agents. Personal agents are typically attached to the user interface and can automate tasks or can learn from the user's interactions with streams. Document agents live on documents and are spawned by various events, for example, the first time that a document is accessed. Stream agents are attached to streams and execute whenever the stream changes in some way, for example, a new document appears on the stream.

Further, regarding the term "document", it is noted that this term includes traditional text based files, electronic mail files, binary files, audio data, video data, and multimedia data.

Additionally, this document stream operating system can be implemented as an independent operating system with all required subsystems such as: a storage subsystems in software and/or hardware for writing documents to disc drive, tape drives and the like; interrupt handling subsystems; and input/output subsystems. However, the present invention also encompasses implementations which utilize subsystems from other operating systems such as the Disk Operating System (DOS), WINDOWS, and OPERATING SYSTEM 7. In such implementations, the graphic user interface (GUI) of the other operating system can be replaced by the present invention viewports. Alternatively, the present invention can operate as a document stream utility for the other operating system.

It must be noted that although the present invention is described by reference to particular embodiments thereof, many changes and modifications of the invention may become apparent to those skilled in the art without departing from the spirit and scope of the invention, which is only limited by the appended claims. For documents may have associated attributes used to locate the document during a search, for example, a special code word selected by the user.

References

[1] Theodor Nelson. The right way to think about software design. In The Art of Human-Computer Interface Sesign (Ed.) Brenda Laurel, 1990.
[2] Thomas W. Malone. How do people organize their desks?Implications for the design of office information

systems. ACM Transactions on Office Systems, 1(1):99–112, January 1983.

[3] M. Lansdale. The psychology of personal information management. Applied Ergonomics, March 1988.

[4] David Gelernter. The cyber-road not taken. The Washington Post, April 1994.

What is claimed is:

**1**. A computer system which organizes each data unit received by or generated by the computer system, comprising:

> means for generating a main stream of data units and at least one substream, the main stream for receiving each data unit received by or generated by the computer system, and each substream for containing data units only from the main stream;
>
> means for receiving data units from other computer systems;
>
> means for generating data units by the computer system;
>
> means for selecting a timestamp to identify each data unit;
>
> means for associating each data unit with at least one chronological indicator having the respective timestamp;
>
> means for including each data unit according to the timestamp in the respective chronological indicator in the main stream; and
>
> means for maintaining the main stream and the substreams as persistent streams.

**2**. The computer system of claim **1**, wherein each timestamp is selected from the group consisting of: past, present, and future times.

**3**. The computer system of claim **1**, wherein each data unit includes textual data, video data, audio data and/or multimedia data.

**4**. The computer system of claim **1**, wherein the means for receiving further comprises means for receiving data units from the World Wide Web.

**5**. The computer system of claim **1**, wherein said means for receiving further comprises means for receiving data units from a client computer.

**6**. The computer system according to claim **1**, further comprising:

> means for displaying alternative versions of the content of the data units.

**7**. A computer system according to claim **1** further comprising:

> means for summarizing the contents of data units in one of the streams to generate one or more overview data units and for including the overview data unit in one of the streams.

**8**. A computer system according to claim **7**, wherein the means for summarizing further comprises means for continuously updating the overview data units to include changes in the contents of data units in the stream being summarized.

**9**. A computer system according to claim **1** further comprising:

> means for archiving a data unit associated with a timestamp older than a specified time point while retaining the respective chronological indicator and/or a data unit having a respective alternative version of the content of the archived data unit.

**10**. The computer system of claim **1**, wherein the computer program further comprises:

> means for operating on any of the streams using a set of operations selected by a user.

**11**. The computer system of claim **1** further comprising: means to generate substreams from existing substreams.

**12**. A computer system as in claim **1**, further comprising:

> means for generating a data unit comprising an alternative version of the content of another data unit; and
>
> means for associating the alternative version data unit with the chronological indicator of the another data unit.

**13**. A method which organizes each data unit received by or generated by a computer system, comprising the steps of:

> generating a main stream of data units and at least one substream, the main stream for receiving each data unit received by or generated by the computer system, and each substream for containing data units only from the main stream;
>
> receiving data units from other computer systems;
>
> generating data units in the computer system;
>
> selecting a timestamp to identify each data unit;
>
> associating each data unit with at least one chronological indicator having the respective timestamp;
>
> including each data unit according to the timestamp in the respective chronological indicator in at least the main stream; and
>
> maintaining at least the main stream and the substreams as persistent streams.

**14**. The method of claim **13**, wherein each timestamp is selected from the group consisting of: past, present, and future times.

**15**. The method of claim **13**, further comprising the step of displaying the streams on a display device as visual streams.

**16**. The method of claim **15**, wherein the step of displaying the streams further comprises the steps of:

> a) receiving from a user one or more indications of one or more selected segments of the streams corresponding to one or more selected intervals of time, and
>
> b) displaying the selected segments.

**17**. The method of claim **13**, wherein each data unit includes textual data, video data, audio data and/or multimedia data.

**18**. The method of claim **13**, further comprising the step of:

> providing access to a first stream from a second stream by generating a data unit indicating the first stream.

**19**. The method of claim **13**, further comprising the steps of:

> selecting access privileges to provide to a first stream from a second stream; and
>
> providing access to the first stream from the second stream according to the access privileges.

**20**. The method of claim **13**, further comprising the step of:

> displaying data from one of the data units in abbreviated form.

**21**. The method of claim **13**, further comprising the step of:

> summarizing the contents of data units in a stream to generate one or more overview data units and including the overview data unit in one of the streams.

**22**. The method of claim **13**, further comprising the step of:

> archiving data units having timestamps older than a specified time point.

**23**. A computer system for organizing each data unit received by or generated by the computer system, comprising:

means for generating a main stream of data units and at least one substream, the main stream for receiving each data unit received by or generated by the computer system, and each substream for containing data units only from the main stream; means for associating each data unit with at least one chronological indicator having a respective timestamp which identifies the data unit; means for including each data unit according to the timestamp in a respective chronological indicator in the main stream; means for maintaining the main stream and substreams as persistent streams;

means for generating a data unit having indicia to allow access to a first stream from a second stream;

means for including the data unit having the indicia in the second stream; and

means for providing access to the first stream from the second stream in accordance with the indicia.

**24.** A computer system according to claim **23** further comprising:

means for providing limited access to the first stream from the second stream by generating a data unit indicating access privileges to the first stream.

**25.** A computer system for organizing each data unit received by or generated by the computer system, comprising:

means for generating a main stream of data units and at least one substream, the main stream for receiving each data unit received by or generated by the computer system, and each substream for containing data units only from the main stream; means for associating each data unit with at least one chronological indicator having a respective timestamp which identifies the data unit; means for including each data unit according to the timestamp in a respective chronological indicator in the main stream; means for maintaining the main stream and the substreams as a persistent streams;

means for representing one or more data units of a selected stream on a display device as document representations, each document representation including the timestamp of the respective data unit and the

order of appearance of each data representation on the display device determined by the timestamp of the respective data unit;

means for selecting which data units are represented on the display device by selecting one of the document representations and displaying document representations corresponding to data units having timestamps within a range of a timepoint; and

means for selecting one or more of the document representations with a pointing device so that the data units represented by the selected document representations are further displayed with a second document representation comprising an alternative version of the content of the respective data unit.

**26.** A computer system as in claim **25**, wherein the document representations form a visual stream having a three-dimensional effect.

**27.** A computer system as in claim **26**, wherein the three-dimensional effect further comprises a perspective view.

**28.** A computer system as in claim **25**, wherein each document representation comprises a polygon and the polygons overlap to form a visual stream of polygons.

**29.** A computer system as in claim **25**, wherein the alternative version is an abbreviated version.

**30.** A computer system as in claim **25**, wherein the alternative version is a caption version.

**31.** A computer system as in claim **25**, wherein the alternative version is an expanded version.

**32.** A computer system as in claim **25**, further comprising:

means for selecting one or more alternative versions of the content of a respective data unit to display another alternative version of the content of the data unit.

**33.** A computer system as in claim **25**, further comprising:

means for updating the display device to provide a document representation for data units associated with chronological indicators having timestamps which become the present time.

\* \* \* \* \*



(12) **EX PARTE REEXAMINATION CERTIFICATE** (8298th)

# United States Patent
### Freeman et al.

(10) **Number:** US 6,006,227 C1

(45) **Certificate Issued:** Jun. 7, 2011

(54) **DOCUMENT STREAM OPERATING SYSTEM**

(75) Inventors: **Eric Freeman**, Branford, CT (US); **David H. Gelernter**, Woodbridge, CT (US)

(73) Assignee: **Mirror Worlds, LLC**, Tyler, TX (US)

**Reexamination Request:**
No. 90/010,506, Apr. 23, 2009

**Reexamination Certificate for:**
| | |
|---|---|
| Patent No.: | **6,006,227** |
| Issued: | **Dec. 21, 1999** |
| Appl. No.: | **08/673,255** |
| Filed: | **Jun. 28, 1996** |

(51) **Int. Cl.**
*G06F 17/30* (2006.01)

(52) **U.S. Cl.** ..................... **707/695**; 707/752; 707/783; 707/914; 707/916; 707/917; 707/999.002; 707/999.007; 707/999.102; 707/E17.008; 707/E17.058

(58) **Field of Classification Search** .................. 709/232
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,586,035 A | 4/1986 | Baker et al. |
| 4,831,758 A | 5/1989 | Williams et al. |
| 5,031,346 A | 7/1991 | Herring et al. |
| 5,060,135 A | 10/1991 | Levine et al. |
| 5,063,495 A | 11/1991 | MacPhail |
| 5,140,676 A | 8/1992 | Langelaan |
| 5,150,410 A | 9/1992 | Bertrand |
| 5,159,669 A | 10/1992 | Trigg et al. |
| 5,241,671 A | 8/1993 | Reed et al. |
| 5,247,437 A | 9/1993 | Vale et al. |
| 5,283,864 A | 2/1994 | Knowlton |
| 5,287,448 A | 2/1994 | Nicol et al. |
| 5,297,032 A | 3/1994 | Trojan et al. |
| 5,299,122 A | 3/1994 | Wang et al. |
| 5,303,361 A | 4/1994 | Colwell et al. |
| 5,355,602 A | 10/1994 | Menke et al. |
| 5,402,526 A | 3/1995 | Bauman et al. |
| 5,430,710 A | 7/1995 | Mueller et al. |
| 5,448,729 A | 9/1995 | Murdock |
| 5,479,602 A | 12/1995 | Baecker et al. |
| 5,499,330 A | 3/1996 | Lucas et al. |
| 5,504,852 A | 4/1996 | Thompson-Rohrlich |
| 5,528,739 A | 6/1996 | Lucas et al. |
| 5,530,859 A | 6/1996 | Tobias, II et al. |
| 5,535,063 A | 7/1996 | Lamming |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 6-180661 | 6/1994 |
| WO | WO 2003/001345 A1 | 1/2003 |

OTHER PUBLICATIONS

Carriero et al.. "The Lifestreams' Approach to Reorganize the Information World" Apr. 1995. (TR–1070v1").
Carriero et al.. "The Lifestreams' Approach to Reorganize the Information World" Apr. 1995. (TR–1070v2").
Freeman, Lifestreams Project Home Page, 3 pages, 1994–1996, Jan. 1, 1994.
W3C: A Little History of the World Wide Web, http://www.w3.org/History.html, (Accessed Jul. 15, 2010).

(Continued)

*Primary Examiner*—Christopher E Lee

(57) **ABSTRACT**

A document stream operating system and method is disclosed in which: (1) documents are stored in one or more chronologically ordered streams; (2) the location and nature of file storage is transparent to the user; (3) information is organized as needed instead of at the time the document is created; (4) sophisticated logic is provided for summarizing a large group of related documents at the time a user wants a concise overview; and (5) archiving is automatic. The documents can include text, pictures, animations, software programs or any other type of data.



### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,542,086 | A | 7/1996 | Andrew et al. |
| 5,543,088 | A | 8/1996 | Halbirt |
| 5,586,237 | A | 12/1996 | Baecker et al. |
| 5,589,892 | A | 12/1996 | Knee et al. |
| 5,600,833 | A | 2/1997 | Senn et al. |
| 5,603,025 | A | 2/1997 | Tabb et al. |
| 5,613,134 | A | 3/1997 | Lucus et al. |
| 5,616,876 | A | 4/1997 | Cluts |
| 5,621,874 | A | 4/1997 | Lucas et al. |
| 5,621,906 | A | 4/1997 | O'Neill et al. |
| 5,625,818 | A | 4/1997 | Zarmer et al. |
| 5,649,182 | A | 7/1997 | Reitz |
| 5,649,188 | A | 7/1997 | Nomura et al. |
| 5,701,582 | A | 12/1997 | DeBey |
| 5,724,567 | A | 3/1998 | Rose et al. |
| 5,729,730 | A | 3/1998 | Wlaschin et al. |
| 5,737,737 | A | 4/1998 | Hikida et al. |
| 5,758,324 | A | 5/1998 | Hartman et al. |
| D395,297 | S | 6/1998 | Cheng et al. |
| 5,764,972 | A | 6/1998 | Crouse et al. |
| 5,771,355 | A | * 6/1998 | Kuzma ........................ 709/232 |
| 5,778,364 | A | 7/1998 | Nelson |
| 5,784,620 | A | 7/1998 | Isham |
| D398,299 | S | 9/1998 | Ballay et al. |
| 5,835,129 | A | 11/1998 | Kumar |
| 5,835,789 | A | 11/1998 | Ueda et al. |
| 5,890,177 | A | 3/1999 | Moody et al. |
| 5,905,992 | A | 5/1999 | Lucas et al. |
| 5,912,668 | A | 6/1999 | Sciammarella et al. |
| 5,937,417 | A | 8/1999 | Nielsen |
| 6,006,227 | A | 12/1999 | Freeman et al. |
| 6,012,072 | A | 1/2000 | Lucas et al. |
| 6,012,074 | A | 1/2000 | Lucas et al. |
| 6,151,610 | A | 11/2000 | Senn et al. |
| 6,178,409 | B1 | 1/2001 | Weber et al. |
| 6,199,082 | B1 | 3/2001 | Ferrel et al. |
| 6,202,058 | B1 | 3/2001 | Rose et al. |
| 6,243,724 | B1 | * 6/2001 | Mander et al. |
| 6,262,732 | B1 | 7/2001 | Coleman et al. |
| 6,396,513 | B1 | 5/2002 | Helfman et al. |
| 6,401,097 | B1 | 6/2002 | McCotter et al. |
| 6,457,017 | B2 | * 9/2002 | Watkins et al. |
| 6,466,237 | B1 | * 10/2002 | Miyao et al. |
| 6,496,857 | B1 | * 12/2002 | Dustin et al. |
| 6,523,048 | B2 | * 2/2003 | DeStefano |
| 6,638,313 | B1 | * 10/2003 | Freeman et al. |
| 6,639,876 | B2 | 10/2003 | Kalis et al. |
| 6,714,489 | B2 | 3/2004 | Kalis et al. |
| 6,725,427 | B2 | * 4/2004 | Freeman et al. |
| 6,768,999 | B2 | * 7/2004 | Prager et al. |

### OTHER PUBLICATIONS

Gelernter, David, "The Cyber–Road Not Taken", The Washington Post, Apr. 3, 1994.

Bolt, Richard A., "Spatial Data–Management", Massachusetts Institute of Technology, 1979.

Lansadale, M. W., et al., "Memoirs: A personal Multimedia Information System", The Proceedings of the Fifth Conference of the British Computer Society Human Computer Interaction Specialist Group University of Nottingham, Sep. 1989.

Pemberton, Steven, "Not With A Whimper", SIGCHI, Apr. 1998.

Miller, James R., "The Apple Advanced Technology Group—An Introduction to the Special SIGCHI Bulletin Issue", SIGCHI, Apr. 1998.

Russell, Daniel M., "The ATG Knowledge Management Technologies Laboratory", SIGCHI, Apr. 1998.

Miller, James R., "An Overview of the ATG Intelligent Systems Program", SIGCHI, Apr. 1998.

Miller, James R., et al., "From Documents to Objects: An Overview of LiveDoc", SIGCHI, Apr. 1998.

Bonura, Thomas, et al., "Drop Zones: An Extension to Live-Doc", SIGCHI, Apr. 1998.

Boguraev, Branimir, et al., "An Architecture for Content Analysis of Documents and Its Use in Information and Knowledge Tasks", SIGCHI, Apr. 1998.

Boguraev, Branimir, et al., "Dynamic Document Presentation", SIGCHI, Apr. 1998.

Nardi, Bonnie, et al., "An Online Digital Photography Course for High School Teachers", SIGCHI, Apr. 1998.

Shulka, Shilpa V., "Hit Squads & Bug Meisters", SIGCHI, Apr. 1998.

Rose, Daniel E., "Beyond Search: The Information Access Research Group at Apple", SIGCHI, Apr. 1998.

Russell, Daniel M., "User Experience Research Group", SIGCHI, Apr. 1998.

Walker, William F., Rapid Prototyping of Awareness Services Using a Shared Information Server, SIGCHI, Apr. 1998.

Bellegarda, Jerome R., "Interaction–Driven Speech Input", SIGCHI, Apr. 1998.

Machiraju, N. Rao, "The ATG Learning Communities Laboratory: An Overview", SIGCHI, Apr. 1998.

Bellamy, Rachel, et al., "Learning Conservations", SIGCHI, Apr. 1998.

Houde, Stephanie, et al., "In Search of Design Principles for Tools and Practices to Support Communication Within a Learning Community", SIGCHI, Apr. 1998.

Roddy, Brian J., et al., "Interface Issues in Text Based Chat Rooms", SIGCHI, Apr. 1998.

Spohrer, Jim, "ATG Education Research: The Authoring Tools Thread", SIGCHI, Apr. 1998.

Graves, Mike, et al., "Unfamiliar Ground: Designing Technology to Support Rural Healthcare in India",SIGCHI, Apr. 1998.

Mountford, S. Joy, "A History of the Apple Human Interface Group", SIGCHI, Apr. 1998.

Harris, Jed, et al., "Discourse Architecture", SIGCHI, Apr. 1998.

Singer, Samuel Weller, "Researches into the History of Playing Cards", Printed by T. Bensley and Son, 1816.

"Playing Poker at Egan's" (image), http://www.orww.org/ Harney_Cattle/Student_Reports/Images/11–Poker_1882.jpg(ca. 1882).

"Commercial America", Philadelphia Commercial Museum, Jul. 1911.

"Eleventh Annual Report of the Trustees of the Boston State Hospital", Published by Wright & Potter Printing Co., 1920.

"System—The Magazine of Business", A. W. Shaw Company, 1921.

Ibberson, J.R., MD, "The Business Side of General Practice", Canad. M.A.J., vol. 72, Apr. 15, 1955.

Carlbom, Ingrid, et al., "Planar Geometric Projections and Viewing Transformations", Computing Surveys, vol. 10, No. 4, pp. 465–502, Dec. 1978.

Schmandt, Christopher Martin, "Pages Without Paper", Bachelor of Science Thesis at the Massachusetts Institute of Technology, Dec. 1978.

Donelson, William C., "Spatial Management of Information", Architecture Machine Group, Massachusetts Institute of Technology, Proceedings of the 5th Annual Conference on Computer Graphics and Interactive Techniques, 1978.

Bolt, Richard A., "Put–That–There": Voice and Gesture at the Graphics Interface, Architecture Machine Group, Massachusetts Institute of Technology, ACM, 1980.

Halasz, Frank, et al., "Analogy Considered Harmful", Association for Computing Machinery, 1981.

Bolt, Richard A., "Gaze–Orchestrated Dynamic Windows", Architecture Machine Group, Massachusetts Institute of Technology,, Cambridge Massachusetts, ACM, Computer Graphics, vol. 15, No. 3, Aug. 1981.

Williams, Gregg, "The Lisa Computer System", BYTE Publications, Inc., Feb. 1983.

Williams, Gregg, "The Apple Macintosh Computer ", BYTE Publications, Inc., Feb. 1984.

Anderson, John J., "Atari 520ST: A Reborn Atari Once Again Points the Way to the Next Generation", Creative Computing, vol. 11, No. 10, Oct. 1985.

Greenberg, Saul, et al., "Issues and Experiences in the Design of a Window Management System", Canadian Information Processing Society—Edmonton Conference, 1986.

Henderson, D. Austin, Jr., et al., "Rooms: The Use of Multiple Virtual Workspaces to Reduce Space Contention in a Window–Based Graphical User Interface", ACM Trans. On Graphics, vol. 5, No. 3, pp. 211–243, Jul. 1986.

Robek, Mary F., et al., "Information and Records Management", 3rd ed., Glencoe Publishing Co., pp. 160–163, 179–181, 192–193, 224–229, 248–251, (1987).

Lynch, Vincent, "American Jukebox—The Classic Years", Chronicle Books, pp. 36, 74–75, (1990).

Robertson, G. G., et al., "Cone Trees: Animated 3D Visualizations of Hierarchical Information", UIR–R–1991–06, (1991).

Card, S. K., et al., "The Information Visualizer: An Information Workspace", UIR–R–1991–01, (1991).

MacKinlay, Jock D., et al., "The Perspective Wall: Detail and Context Smoothly Integrated", UIR–R–1991–03, (1991).

Kay, Alan C., "The Early History of Smalltalk", ACM SIG-PLAN Notices, vol. 28, No. 3, ~~Mar. 1993~~.

Adams, Michael, et al., "Jukeboxes", Schiffer Publishing, Ltd., pp. 85–86, 103–104, 105, (1996).

Card, Stuart K., et al., "The WebBook and the Web Forager: An Information Workplace for the World–Wide Web", CHI '96 Conference on Human Factors in Computing Systems, Apr. 13–18, 1996.

Meyers, Brad A., "A Brief History of Human–Computer Interaction Technology", Interactions, pp. 44–54, 1998.

Bardini, Thierry, "Bootstrapping", Stanford University Press, Chapter 6, pp. 143–181, (2000).

Sutherland, Ivan ~~Edward, "Sketchpad:~~ A Man–Machine Graphical Communication System", PhD Dissertation at the Massachusetts Institute of Technology, Jan. 1963.

Engelbart, Doug, "The Click Heard Round the World", Wired Magazine, 2004.

Reimer, Jeremy, "A History of the GUI", arstechnica.com, May 5, 2005.

"The Library of Congress Classification System", Aug. 2006.

Barnes, Susan B, "Alan Kay: Transforming the Computer into a Communication Medium", IEEE Annals of the History of Computing, 2007.

Calamar, Gary et al., "Record Store Days: From Vinyl to Digital and Back Again", Sterling Publishing Co., 2009.

Masinter, Larry, "Document Management, Digital Libraries and the Web", Jun. 9, 1995.

Herot, Christopher F., "Spatial Management of Data", Computer Corporation of America, ACM Trans. On Database Systems, vol. 5, No. 4, pp. 493–514, Dec. 1980.

Newman, William M., "A System for Interactive Graphical Programming", Harvard University, ACM Spring Joint Computer Conference, 1968.

Schultz, Jan R., et al., "An Initial Operational Problem Oriented Medical Record System—for Storage, Manipulation and Retrieval of Medical Data", University of Vermont, ACM Spring Joint Computer Conference, 1971.

Donelson, William C., "Spatial Management of Data", Massachusetts Institute of Technology, 1977.

"Lotus Magellan Explorer's Guide", Lotus Development Corp., 1989.

Factor, Michael, et al., "Real–Time Data Fusion in the Intensive Care Unit", Yale University, Nov. 1991.

Gelernter, David, et al., "Graphics Interfaces & Sensor Activator Extensions for the Process Trellis Software", Yale University, Oct. 31, 1995.

Harrison, Beverly L., et al., "Timelines: An Interactive System for the Collection and Visualization of Temporal Data", Proceedings of Graphic Interface '94, pp. 141–148, (1994).

Gerlenter, David, "Applications and Systems for Large Scale Adaptive Parallelism", ~~Mar. 22~~, 1997.

Date, C. J., "An Introduction to Database Systems, 3rd ed., The Systems Programming Series, vol. 1", IBM Corporation, Addison–Wesley Publishing Company, 1981.

"The Billboard" (magazine), ~~Jan. 26, 1946~~

"Billboard" (magazine), Jul. 4, 1992.

Swineheart, Daniel C., et al., "A Structural View of the Cedar Programming Environment", ACM Trans. On Programming Languages and Systems, vol. 8, No. 4, Oct. 1986.

Lucas, Peter, et al., "Workscape: A Scriptable Document Management Environment", Maya Design Group, Conference Companion CHI '94, Apr. ~~1994.~~

Bailay, Joseph M., "Designing ~~Workscape~~ : An Interdisciplinary Experience", Maya Design Group, Conference Companion CHI '94, Apr. 1994.

Perkins, Roderick, et al., "Inventing the Lisa User Interface", Interactions, pp. 40–53, (1997).

Feiner, Steven, et al., "An Experimental System for Creating and Presenting Interactive Graphical Documents", ACM Trans. On Graphics, vol. 1, No. 1, pp. 59–77, ~~Jan. 1982~~.

Houde, Stephanie, "Iterative Design of an Interface for Easy 3–D Direct Manipulation", CHI '92, May 1992.

"Announcing Retrospect and Retrospect Remote 3.0", Business Wire, Aug. 8, 1995.

"Dantz Delivers Retrospect Archives", MacWEEK, Inc., Jun. 10, 1989.

"Archiving Easy on Retrospect: Uniform Interface to Storage Devices", MacWEEK, Inc., Feb. 21, 1989.

"Mac the Knife, GmbH Rumors", MacWEEK, Inc., ~~Jan. 31, 1989.~~

"Dantz, ChrisMac drive over to CD–R", MacWEEK, Inc., Dec. 11, 1995.

"System 7.5.2 Fixes", MacWORLD, Oct. 1, 1995.

"Danz to Waltz in with Friendlier Retrospect", MacWEEK, Inc., Jul. 31, 1995.

"Dantz Eases Network Backup", InfoWorld, ~~Jan. 11, 1993.~~

"Retrospect User's Guide", 1st Ed., Dantz Development Corporation, 1989.

"Retrospect User's Guide", 2nd Ed., Dantz Development Corporation, 1993.

Spence, Robert, et al., "Data Base Navigation: An Office Environment for the Professional", Behavior and Information Technology, vol. 1, No. 1, pp. 43–54, (1982).

Johnson, Jeff, et al., "The Xerox Star: A Retrospective", IEEE Computer, Sep. 1989.

Shneiderman, Ben, "The Eyes Have It: A Task by Data Type Taxonomy for Information Visualizations", University of Maryland, Proc. Visual Languages, Sep. 1996.

Plaisant, Catherine et al., Lifelines: Visualizing Personal Histories", ACM CHI '96 Conference Proc., pp. 221–227, color plate 518, Apr. 1996.

Musthaler, Linda, "A Tall Order for Document Managers", Network World, pp. 35–40, Jul. 18, 1994.

Seiden, Peggy, et al., "Information Retrieval Systems for Microcomputers", Library Hi Tech, vol. 3, Issue 1, pp. 41–54, (1985).

"Zylab Includes Auto–Indexing in Zyindex 3.0", InfoWorld, vol. 10, Issue 18, p. 16, May 2, 1988.

Kappes, Sandra, et al., "Document Management for the Knowledge Worker System", US Army Corps of Engineers, USACERL ADP Report 95/38, Nov. 15, 1995.

"Verity K2 Toolkit Search System Administration Guide V2.2", Verity Incorporated, Jul. 20, 2000.

Cleveland, Gary, "Overview of Document Management Technology", International Federation of Library Associations and Institutions Universal Dataflow and Telecommunications Core Programme, Jun. 1995.

Factor, Michael, et al., "The Trellis Architecture for Intelligent Monitors", Department of Computer Science, Yale University, 1990.

Bush, Vannevar, "As We May Think", Life Magazine, Sep. 10, 1945.

Lansadale, M. W., et al., "Memoirs: A personal Multimedia Information System", Elseiver Science Publishers B. V., 1989.

Lansadale, M. W., et al., "Memoirs: A personal Multimedia Information System", 1995.

Bush, Vannevar, "As We May Think", The Atlantic Monthly, Jul. 1945.

"On Location Manual, v. 1.0", On Technology, Inc., 1990.

Coolidge, C. M., "Dogs Playing Poker (His Station and Four Aces)" (image), 1903.

Musthaler, Linda, "DMS's getting mix–and–match wardrobe," Network World, pp. 38–41, Jan. 8, 1996.

Kullberg, Robin Lee, "Dynamic Timelines: Visualizing Historical Information in Three Dimensions", Massachusetts Institute of Technology, 1995.

Cowart, Mastering Windows 3.1, 1992, chapter 12, pp. 396–417, Jan. 1, 1992.

Freeman, Lifestreams for the Newton, Steve Mann's Developers Corner, Oct. 31, 1995, 5 pages.

Freeman et al., Lifestreams: Organizing your Electronic Life, AAAI Fall Symposium, AI Applications in Knowledge Navigation and Retrieval, Nov. 30, 1995, Cambridge, MA, 6 pages.

Landsdale, M., The psychology of Personal Information Management, Applied Ergonomics, (Mar. 1988): pp. 55–66.

Malone, Thomas W., How Do People Organize Their Desks? Implications For The Design Of Office Information Systems, ACM Transaction On Office Systems, vol. 1, No. 1 (Jan. 1983): pp. 99–112.

Nelson, Theodor H., The Right Way to Think About Software Design. In The Art of Human–Computer Interface Design, Brenda Laurel, (Ed.), (1990): pp. 235–243.

Steinberg, Lifestreams, Wired 5.02, Feb. 28, 1997, 11 pages.

Getting Results with Microsoft Outlook, copyright Microsoft Corporation 1995–1996, pp. 28–29, Jan. 1, 1995.

Gobel, David P., Using Lotus Magellan, Que Corporation (1989).

Retrospect User's Guide, version 3, first edition, Dantz Development Corporation (1989–1995).

Rose, Daniel E., et al., "Content Awareness in a File System Interface: Implementing the 'Pile' Metaphor for Organizing Information", ACM–SIGIR '93 (1993).

Mander, Richard, et al., "A 'Pile' Metaphor for Supporting Casual Organization of Information", ACM–CHI '92 (May 3–7, 1992).

HyperCard Basics and HyperCard Stack Design Guidelines, Apple Computer, Inc. (1990).

"The 'Lifestreams' Approach to Reorganizing the Information World", Yaleu/DSC/TR–1070 (1995).

Gifford, David K., et al., "Semantic File Systems", ACM–SFS '91 (1991).

"On Location 2.0.01" by ON Technology (1990–1991).

Bolour, A., et al., "The Role of Time in Information Processing: A Survey", ACM–SIGART Bulletin, Issue 80 (Apr. 1982).

Rahm, Erhard, "Recovery Concepts for Data Sharing Systems" IEEE (1991).

Inside Macintosh, Addison–Wesley Publishing Company (Aug. 1992).

O'Toole, James W., et al., "Names should mean What, not Where" (1992).

Staples, Loretta, "Representation in Virtual Space: Visual Convention in the Graphical User Interface", ACM–Interchi '93 (Apr. 24–29, 1993).

Goldberg, David., et al., "Using collaborative filtering to weave an information Tapestry", Association for Computing Machinery, Inc. (1992).*

Gelernter, David, "The Cyber–Road Not Taken", The Washington Post (Apr. 3, 1994).*

Retrospect User's Guide, version 3 first edition, Dantz Development Corp., Orinda, CA, 1989–1995.

Lotus Magellan Explorer's Guide, Lotus Development Corporation, Cambridge, MA, 1989.

David P. Gobel, Using Lotus Magellan, Que Corporation, Carmel, IN, 1989.

Inside Macintosh, Addision–Wesley Publishing Company, Reading, Massachusetts, Aug. 1992.

* cited by examiner

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

The patentability of claims **1-6, 9-17, 20, 22** and **25-29** is confirmed.

New claims **34-47** are added and determined to be patentable.

Claims **7, 8, 18, 19, 21, 23, 24** and **30-33** were not reexamined.

*34. A method as in claim 13 including displaying on a display device only the data units that are within a segment of a stream selected from the main stream and the at least one substream, without at the same time displaying data units that are within the selected stream but not within said segment, wherein the displayed data units maintain a time order of the data units as in the selected stream, and the segment corresponds to a selected interval of time shorter than the time interval of time-ordered data units in the entire selected stream, said displaying taking place while the entire selected stream persists, and said segment moving toward an earlier or a later time in response to an input from a user interface to thereby change the set of data units being displayed.*

*35. The method as in claim 34 wherein said input from the user interface comprises a manipulation of a cursor relative to a scroll bar or slide on the display device to thereby move the selected segment toward an earlier or later time in the selected stream and thus display on the display device a different set of data units from the selected stream.*

*36. The method as in claim 35 in which said displaying comprises displaying on the display device a time-based identification of the time interval corresponding to the chronological indicators of the concurrently displayed data units that are within said segment.*

*37. The method of claim 36 in which said displaying comprises displaying said data units as representations thereof in a stack of partly overlapping representations using perspective to create an illusion of increasing distance from a viewpoint implied by the displaying representations, wherein the representations at one place in the stack appear further away than the representations at another place in the stack.*

*38. The method of claim 37 in which said displaying comprises including in the displayed data units at least one data unit associated with a future time.*

*39. The method as in claim 34 in which said displaying comprises displaying on the display device a time-based identification of the time interval corresponding to the chronological indicators of the concurrently displayed data units that are within said segment.*

*40. The method of claim 39 in which said displaying comprises displaying said data units as representations thereof in a stack of partly overlapping representations using perspective to create an illusion of increasing distance from a viewpoint implied by the displaying representations, wherein the representations at one place in the stack appear further away than the representations at another place in the stack.*

*41. The method of claim 40 in which said displaying comprises including in the displayed data units at least one data unit associated with a future time.*

*42. The method of claim 13 including displaying on a display device at least some of the data units of a stream selected from one of said main stream and said at least one substream as data unit representations in a stack of partly overlapping representations using perspective to create an illusion of increasing distance from a viewpoint implied by the displayed representations, wherein the representations at one place in the stack appear further away than the representations at another place in the stack.*

*43. The method of claim 42 in which said displaying comprises including in the displayed data units at least one data unit associated with a future time .*

*44. The method of claim 13 including selectively displaying on a display device at least some of said data units as a receding, foreshortened stack of partly overlapping data unit representations so that only a part of each of said representations in the displayed stack, after the first document in the stack, is visible to a user.*

*45. A method as in claim 44 in which said displaying comprises displaying only the data units that are within a segment of a stream selected from the main stream and the at least one substream, without at the same time displaying data units that are within the selected stream but not within said segment, wherein the displayed data units maintain a time order of the data units as in the selected stream, and the segment corresponds to a selected interval of time shorter than the time interval of time-ordered data units in the entire selected stream, said displaying taking place while the entire selected stream persists, and said segment moving toward an earlier or a later time in response to an input from a user interface to thereby change the set of data units being displayed.*

*46. A system as in claim 1 in which the means for generating a main stream of data units and at least one substream, receiving data units from other computer systems, gernerating data units, selecting a timestamp, including each data unit in the main stream, and maintaining comprise a programmed computing platform including at least one of a personal computer and a server.*

*47. A system as in claim 25 in which the means for generating a main stream of data units and at least one substream, allocating, including, maintaining, representing, selecting which data units are represented on the display device, and selecting one or more of the document representations comprise a programmed computing platform including at least one of a personal computer and a server.*

\* \* \* \* \*



US006006227C2

## (12) EX PARTE REEXAMINATION CERTIFICATE (8770th)

# United States Patent
Freeman et al.

(10) **Number:** US 6,006,227 C2
(45) **Certificate Issued:** Dec. 20, 2011

(54) **DOCUMENT STREAM OPERATING SYSTEM**

(75) Inventors: **Eric Freeman**, Branford, CT (US);
**David H. Gelernter**, Woodbridge, CT
(US)

(73) Assignee: **Mirror Worlds, LLC**, Tyler, TX (US)

**Reexamination Request:**
No. 90/011,605, Mar. 29, 2011

**Reexamination Certificate for:**
Patent No.: **6,006,227**
Issued: **Dec. 21, 1999**
Appl. No.: **08/673,255**
Filed: **Jun. 28, 1996**

Reexamination Certificate C1 6,006,227 issued Jun. 7, 2011

(51) **Int. Cl.**
*G06F 17/30* (2006.01)

(52) **U.S. Cl.** ........................ **707/695**; 707/752; 707/783;
707/914; 707/916; 707/917; 707/999.002;
707/999.007; 707/999.102; 707/E17.008;
707/E17.058

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited
during the proceeding for Reexamination Control Number
90/011,605, please refer to the USPTO's public Patent
Application Information Retrieval (PAIR) system under the
Display References tab.

*Primary Examiner*—Christopher E Lee

(57) **ABSTRACT**

A document stream operating system and method is dis-
closed in which: (1) documents are stored in one or more
chronologically ordered streams; (2) the location and nature
of file storage is transparent to the user; (3) information is
organized as needed instead of at the time document is cre-
ated; (4) sophisticated logic is provided for summarizing a
large group of related documents at the time a user wants a
concise overview; and (5) archiving is automatic. The docu-
ments can include text, pictures, animations, software pro-
grams or any other type of data.



**1**

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

The patentability of claims **13** and **22** is confirmed.

New claims **48-55** are added and determined to be patentable.

Claims **1-12**, **14-21** and **23-47** were not reexamined.

*48. The method of claim 13, further comprising displaying only document representations that are within a selected segment of said at least one substream, without at the same time displaying document representations of data units that also are within the substream but are not within the selected segment, wherein the displayed document representations maintain a time order according to said chronological indicators, and the displayed segment corresponds to a selected interval of time shorter than the time interval of the substream, said displaying of the segment taking place while the entire substream persists, and said displaying comprises moving said displayed segment toward an earlier or a later time in response to an input from a user interface to thereby change the set of data units that are being displayed as document representations.*

**2**

*49. The method as in claim 48 wherein said input from the user comprises a sliding motion by the user communicated by the user to said computer system.*

*50. The method of claim 49 wherein said sliding motion comprises a motion relative to a scroll bar on a computer screen.*

*51. The method of claim 50 wherein said motion relative to a scroll bar comprises moving a cursor relative to the scroll bar.*

*52. The method of claim 49 further including displaying on a display device a time-based identification of the time interval corresponding to the concurrently displayed segment.*

*53. The method of claim 48 wherein said displaying comprises displaying the document representations as partly overlapping document representations using perspective to create an illusion of increasing distance from a viewpoint implied by the displayed document representations, wherein the document representations at one place in the stack appear further away than the document representations toward another place in the stack.*

*54. The method of claim 48, further comprising displaying a glance view of a data item in response to user interaction by touching the displayed document representation that corresponds to said data item.*

*55. The method of claim 13 further comprising:*

*identifying a set of data units from said main stream or at least one substream based on search criteria provided by a user;*

*displaying document representations for some, but not all, of the set of data units identified in the preceding step; and*

*displaying at different times different plural document representations of the data units in the set in response to a user selecting through a user interface element said different document representations.*

\* \* \* \* \*



US007865538B2

(12) **United States Patent**
Prager et al.

(10) Patent No.: **US 7,865,538 B2**
(45) Date of Patent: **Jan. 4, 2011**

(54) **DESKTOP, STREAM-BASED, INFORMATION MANAGEMENT SYSTEM**

(75) Inventors: **Randy Prager**, New York, NY (US); **Peter Sparago**, Cheshire, CT (US); **Stephen MarcAurele**, Meriden, CT (US); **David Gelernter**, Woodbridge, CT (US); **Eric Freeman**, Branford, CT (US)

(73) Assignee: **Mirror Worlds, LLC**, Tyler, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 671 days.

(21) Appl. No.: **11/528,070**

(22) Filed: **Sep. 26, 2006**

(65) **Prior Publication Data**

US 2008/0228714 A1 Sep. 18, 2008

**Related U.S. Application Data**

(63) Continuation of application No. 09/892,385, filed on Jun. 26, 2001, now abandoned, and a continuation-in-part of application No. 09/398,611, filed on Sep. 17, 1999, now Pat. No. 6,638,313, which is a continuation of application No. 08/673,255, filed on Jun. 28, 1996, now Pat. No. 6,006,227.

(60) Provisional application No. 60/274,575, filed on Mar. 9, 2001, provisional application No. 60/240,480, filed on Oct. 13, 2000.

(51) Int. Cl.
*G06F 17/30* (2006.01)
*G06F 12/00* (2006.01)

(52) U.S. Cl. ..................................... **707/828**; 707/822

(58) Field of Classification Search ................. 715/526; 707/205, 10, 822, 828
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,586,035 A | * | 4/1986 | Baker et al. | ................. 345/157 |
| 4,831,758 A | | 5/1989 | Williams et al. | |
| 5,031,346 A | | 7/1991 | Herring et al. | |
| 5,060,135 A | | 10/1991 | Levine et al. | |
| 5,063,495 A | | 11/1991 | MacPhail | |
| 5,140,676 A | | 8/1992 | Langelaan | |
| 5,150,410 A | | 9/1992 | Bertrand | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 6-180661 | 6/1994 |

(Continued)

OTHER PUBLICATIONS

User Guide; Mirror Worlds Technologies, Inc. (New Haven, Connecticut).

(Continued)

*Primary Examiner*—Kuen S Lu
(74) *Attorney, Agent, or Firm*—Cooper & Dunham LLP

(57) **ABSTRACT**

A steam-based document storage and retrieval system accepts documents that are in diverse formats and come from diverse application, automatically creates document model objects describing these documents in a consistent format and associating time stamps with the documents to automatically create a main stream in chronological order. The stream, or sub-streams making selected search criteria, are displayed in a variety of forms, including a receding, partly overlapping stack with aids that facilitate user interaction.

**27 Claims, 11 Drawing Sheets**



### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,159,669 A | | 10/1992 | Trigg et al. |
| 5,241,671 A | | 8/1993 | Reed et al. |
| 5,247,437 A | | 9/1993 | Vale et al. |
| 5,283,864 A | | 2/1994 | Knowlton |
| 5,287,448 A | | 2/1994 | Nicol et al. |
| 5,297,032 A | | 3/1994 | Trojan et al. |
| 5,299,122 A | * | 3/1994 | Wang et al. .................... 707/1 |
| 5,303,361 A | | 4/1994 | Colwell et al. |
| 5,355,602 A | | 10/1994 | Menke et al. |
| 5,402,526 A | | 3/1995 | Bauman et al. |
| 5,430,710 A | | 7/1995 | Mueller et al. |
| 5,448,729 A | | 9/1995 | Murdock |
| 5,479,602 A | | 12/1995 | Baecker et al. |
| 5,499,330 A | | 3/1996 | Lucas et al. |
| 5,504,852 A | | 4/1996 | Thompson-Rohrlich |
| 5,528,739 A | | 6/1996 | Lucas et al. |
| 5,530,859 A | | 6/1996 | Tobias, II et al. |
| 5,535,063 A | | 7/1996 | Lamming |
| 5,542,086 A | * | 7/1996 | Andrew et al. ................ 707/6 |
| 5,543,088 A | | 8/1996 | Hilbert |
| 5,586,237 A | * | 12/1996 | Baecker et al. .............. 345/670 |
| 5,589,892 A | | 12/1996 | Knee et al. |
| 5,600,833 A | | 2/1997 | Senn et al. |
| 5,603,025 A | * | 2/1997 | Tabb et al. .................... 707/2 |
| 5,613,134 A | | 3/1997 | Lucas et al. |
| 5,616,876 A | | 4/1997 | Cluts |
| 5,621,874 A | | 4/1997 | Lucas et al. |
| 5,621,906 A | | 4/1997 | O'Neill et al. |
| 5,625,818 A | | 4/1997 | Zarmer et al. |
| 5,649,182 A | | 7/1997 | Reitz |
| 5,649,188 A | | 7/1997 | Nomura et al. |
| 5,701,582 A | | 12/1997 | DeBey |
| 5,724,567 A | | 3/1998 | Rose et al. |
| 5,729,730 A | | 3/1998 | Wlaschin et al. |
| 5,737,737 A | * | 4/1998 | Hikida et al. ............ 707/104.1 |
| 5,758,324 A | | 5/1998 | Hartman et al. |
| D395,297 S | | 6/1998 | Cheng et al. |
| 5,764,972 A | | 6/1998 | Crouse et al. |
| 5,778,364 A | | 7/1998 | Nelson |
| 5,784,620 A | * | 7/1998 | Isham ........................ 719/316 |
| D398,299 S | | 9/1998 | Ballay et al. |
| 5,835,129 A | | 11/1998 | Kumar |
| 5,835,789 A | * | 11/1998 | Ueda et al. .................... 710/33 |
| 5,890,177 A | | 3/1999 | Moody et al. |
| 5,905,992 A | | 5/1999 | Lucas et al. |
| 5,912,668 A | | 6/1999 | Sciammarella et al. |
| 5,937,417 A | * | 8/1999 | Nielsen ...................... 715/207 |
| 6,006,227 A | * | 12/1999 | Freeman et al. ............... 707/7 |
| 6,012,072 A | | 1/2000 | Lucas et al. |
| 6,012,074 A | | 1/2000 | Lucas et al. |
| 6,151,610 A | | 11/2000 | Senn et al. |
| 6,178,409 B1 | * | 1/2001 | Weber et al. ................ 705/79 |
| 6,199,082 B1 | * | 3/2001 | Ferrel et al. ................ 715/205 |
| 6,202,058 B1 | | 3/2001 | Rose et al. |
| 6,639,876 B2 | | 3/2001 | Kalis et al. |
| 6,243,724 B1 | * | 6/2001 | Mander et al. ............. 715/273 |
| 6,262,732 B1 | | 7/2001 | Coleman et al. |
| 6,396,513 B1 | | 5/2002 | Helfman et al. |
| 6,401,097 B1 | | 6/2002 | McCotter et al. |
| 6,457,017 B2 | | 9/2002 | Watkins et al. |
| 6,466,237 B1 | | 10/2002 | Miyao et al. |
| 6,496,857 B1 | | 12/2002 | Dustin et al. |
| 6,523,048 B2 | | 2/2003 | DeStefano |
| 6,638,313 B1 | | 10/2003 | Freeman et al. |
| 6,714,489 B2 | | 3/2004 | Kalis et al. |
| 6,725,427 B2 | | 4/2004 | Freeman et al. |
| 6,768,999 B2 | | 7/2004 | Prager et al. |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO2003/001345 A1 | 1/2003 |

### OTHER PUBLICATIONS

Cowart, Mastering Windows 3.1, 1992, chapter 12, pp. 396-417, Jan. 1, 1992.

Freeman, Lifestreams Project Home Page 3 pages, 1994-1996, Jan. 1, 1994 (not available).

Freeman, Lifestreams for the Newton, Steve Mann's Developers Corner, Oct. 31, 1995, 5 pages.

Freeman, et al., Lifestreams: Organizing your Electronic Life, AAAI Fall Symposium, AI Applications in Knowledge Navigation and Retrieval, Nov. 30, 1995, Cambridge, MA, 6 pages.

Landsdale, M., The psychology of Personal Information Management, Applied Ergonomics, (Mar. 1988): pp. 55-66.

Malone, Thomas W., How Do People Organize Their Desks? Implications For The Design Of Office Information Systems, ACM Transaction On Office Systems, vol. 1, No. 1 (Jan. 1983): pp. 99-112.

Nelson, Theodor H., The Right Way to Think About Software Design, In The Art of Human-Computer Interface Design, Brenda Laurel, (Ed.), (1990): pp. 235-243.

Steinberg, Lifestreams, WIRED 5.02, Feb. 28, 1997, 11 pages.

Getting Results with Microsoft Outlook, copyright Microsoft Corporation 1995-1996, pp. 28-29, Jan. 1, 1995.

User Guide; Mirror Worlds Technologies, Inc. (New Haven, Connecticut) (not available).

Gobel, David P., Using Lotus Magellan, Que Corporation (1989).

Retrospect User's Guide, version 3, first edition, Dantz Development Corporation (1989-1995).

Rose, Daniel E., et al., "Content Awareness in a File System Interface: Implementing the 'Pile' Metaphor for Organizing Information", ACM-SIGIR '93 (1993).

Mander, Richard, et al., "A 'Pile' Metaphor for Supporting Casual Organization of Information", ACM-CHI '92 (May 3-7, 1992).

HyperCard Basics and HyperCard Stack Design Guidelines, Apple Computer, Inc. (1990).

"The 'Lifestreams' Approach to Reorganizing the Information World", YALEU/DCS/TR-1070 (1995).

Gifford, David K., et al., "Semantic File Systems", ACM-SFS '91 (1991).

"On Location 2.0.01" by ON Technology (1990-1991).

Bolour, A., et al., "The Role of Time in Information Processing: A Survey", ACM-SIGART Bulletin, Issue 80 (Apr. 1982).

Rahm, Erhard, "Recovery Concepts for Data Sharing Systems" IEEE (1991).

Inside Macintosh, Addison-Wesley Publishing Company (Aug. 1992).

O'Toole, James W., et al., "Names should mean What, not Where" (1992).

Staples, Loretta, "Representation in Virtual Space: Visual Convention in the Graphical User Interface", ACM-Interchi '93 (Apr. 24-29, 1993).

Goldberg, David., et al., "Using collaborative filtering to weave an information Tapestry", Assocation for Computing Machinery, Inc. (1992).

Gelernter, David, "The Cyber-Road Not Taken", The Washington Post (Apr. 3, 1994).

Solomon, Gitta, "Piles Metaphor ATG" (video), Apple Computer, Inc., Mar. 1992.

"Spatial Data Management System" (video), MIT, Jan. 1980.

Milash, Brett, et al., "Lifelines: Visualizing Personal Histories" (video), University of Maryland, Apr. 1995.

Lucas, Peter, "CHI '94 Video" (video), MAYA Design Group, CHI '94, 1994.

Lucas, Peter, "Workscape Video" (video), http://www.youtube.com/watch?v=H5-T_S50Sr4 (screen capture video), (1993).

"200 Points of Light" (video), http://www.youtube.com/watch?v=H9F17JrG-SE (screen capture video), (1990).

W3C: A Little History of the World Wide Web, http://www.w3.org/History.html, (Accessed Jul. 15, 2010).

Gelernter, David, "The Cyber-Road Not Taken", The Washington Post, Apr. 3, 1994.

Bolt, Richard A., "Spatial Data-Management", Massachusetts Institute of Technology, 1979.

Lansdale, M.W., et al., "Memoirs: A personal Multimedia Information System", The Proceedings of the Fifth Conference of the British Computer Society Human Computer Interaction Specialist Group University of Nottingham, Sep. 1989.

Pemberton, Steven, "Not With a Whimper", SIGCHI, Apr. 1998.

Miller, James R., "The Apple Advanced Technology Group - An Introduction to the Special SIGCHI Bulletin Issue", SIGCHI, Apr. 1998.

Russell, Daniel M., "The ATG Knowledge Management Technologies Laboratory", SIGCHI, Apr. 1998.

Miller, James R., "An Overview of the ATG Intelligent Systems Program", SIGCHI,' Apr. 1998.

Miller, James R., et al., "Drop Zones: An Extension to LiveDoc", SIGCHI, Apr. 1998.

Bonura, Thomas, et al., "From Documents to Objects: An Overview of LiveDoc", SIGCHI, Apr. 1998.

Boguraev, Branimir, et al., "An Architecture for Content Analysis of Documents and Its Use in Information and Knowledge Tasks", SIGCHI, Apr. 1998.

Boguraev, Branimir, et al., "Dynamic Document Presentation", SIGCHI, Apr. 1998.

Nardi, Bonnie, et al., "An Online Digital Photography Course for High School Teachers", SIGCHI, Apr. 1998.

Shulka, Shilpa V., "Hit Squads & Bug Meisters", SIGCHI, Apr. 1998.

Rose, Daniel E., "Beyond Search: The Information Access Research Group at Apple", SIGCHI, Apr. 1998.

Russell, Daniel M., "User Experience Research Group", SIGCHI, Apr. 1998.

Walker, William F., Rapid Prototyping of Awareness Services Using a Shared Information Server, SIGCHI, Apr. 1998.

Bellegarda, Jerome R., "Interaction-Driven Speech Input", SIGCHI, Apr. 1998.

Machiraju, N. Rao, "The ATG Learning Communities Laboratory: An Overview", SIGCHI, Apr. 1998.

Bellamy, Rachel, et al., "Learning Conversations", SIGCHI, Apr. 1998.

Houde, Stephanie, et al., "In Search of Design Principles for Tools and Practices to Support Communication Within a Learning Community", SIGCHI, Apr. 1998.

Roddy, Brian J., et al., "Interface Issues in Text Based Chat Rooms", SIGCHI, Apr. 1998.

Spohrer, Jim, "ATG Education Research: The Authoring Tools Thread", SIGCHI, Apr. 1998.

Graves, Mike, et al., "Unfamiliar Ground: Designing Technology to Support Rural Healthcare in India", SIGCHI, Apr. 1998.

Mountford, S. Joy, "A History of the Apple Human Interface Group", SIGCHI, Apr. 1998.

Harris, Jed, et al., "Discourse Architecture", SIGCHI, Apr. 1998.

Singer, Samuel Weller, "Researches into the History of Playing Cards", Printed by T. Bensley and Son, 1816.

"Playing Poker at Egan's" (image), http://www.orvw.org/Harney_Cattle/Student_Reports/Images/11-Poker_1882.jpg (ca. 1882).

"Commercial America", Philadelphia Commercial Museum, Jul. 1911.

"Eleventh Annual Report of the Trustees of the Boston State Hospital", Published by Wright & Potter Printing Co., 1920.

"System - The Magazine of Business", A.W. Shaw Company, 1921.

Ibberson, J.R., Md, "The Business Side of General Practice", Canad. M.A.J., vol. 72, Apr. 15, 1955.

Carlbom, Ingrid, et al., "Planar Geometric Projections and Viewing Transformations", Computing Surveys, vol. 10, No. 4, pp. 465-502, Dec. 1978.

Schmandt, Christopher Martin, "Pages Without Paper", Bachelor of Science Thesis at the Massachusetts Institute of Technology, Dec. 1978.

Donelson, William C., "Spatial Management of Information", Architecture Machine Group, Massachusetts Institute of Technology, Proceedings of the 5th Annual Conference on Computer Graphics and Interactive Techniques, 1978.

Bolt, Richard A., "Put-That-There": Voice and Gesture at the Graphics Interface, Architecture Machine Group, Massachusetts Institute of Technology, ACM, 1980.

Halasz, Frank, et al., "Analogy Considered Harmful", Association for Computing Machinery, 1981.

Bolt, Richard A., "Gaze-Orchestrated Dynamic Windows", Architecture Machine Group, Massachusetts Institute of Technology, Cambridge Massachusetts, ACM, Computer Graphics, vol. 15, No. 3, Aug. 1981.

Williams, Gregg, "The Lisa Computer System", BYTE Publications, Inc., Feb. 1983.

Williams, Gregg, "The Apple Macintosh Computer", BYTE Publications, Inc., Feb. 1984.

Anderson, John J., "Atari 520ST: A Reborn Atari Once Again Points the Way to the Next Generation", Creative Computing, vol. 11, No. 10, Oct. 1985.

Greenberg, Saul, et at, "Issues and Experiences in the Design of a Window Management System", Canadian Information Processing Society - Edmonton Conference, 1986.

Henderson, D. Austin, Jr., et al., "Rooms: The Use of Multiple Virtual Workspaces to Reduce Space Contention in a Window-Based Graphical User Interface", ACM Trans. On Graphics, vol. 5, No. 3, pp. 211-243, Jul. 1986.

Robek, Mary F., et al., "Information and Records Management", 3rd ed., Glencoe Publishing Co., pp. 160-163, 179-181, 192-193, 224-229, 248-251, (1987).

Lynch, Vincent, "American Jukebox - The Classic Years", Chronicle Books, pp. 36, 74-75, (1990).

Robertson, G. G., et al., "Cone Trees: Animated 3D Visualizations of Hierarchical Information", UIR-R-1991-06, (1991).

Card, S. K., et al., "The Information Visualizer: An Information Workspace", UIR- R-1991-01, (1991).

MacKinlay, Jock D., et al., "The Perspective Wall: Detail and Context Smoothly Integrated", UIR-R-1991-03, (1991).

Kay, Alan C., "The Early History of Smalltalk", ACM SIGPLAN Notices, vol. 28, No. 3, Mar. 1993.

Adams, Michael, et al., "Jukeboxes", Schiffer Publishing, Ltd., pp. 85-86, 103-104, 105, (1996).

Card, Stuart K., et al., "The WebBook and the Web Forager: An Information Workspace for the World-Wide Web", CHI '96 Conference on Human Factors in Computing Systems, Apr. 13-18, 1996.

Meyers, Brad A., "A Brief History of Human-Computer Interaction Technology", Interactions, pp. 44-54, 1998.

Bardini, Thierry, "Bootstrapping", Stanford University Press, Chapter 6, pp. 143-181, (2000).

Sutherland, Ivan Edward, "Sketchpad: A Man-Machine Graphical Communication System", PhD Dissertation at the Massachusetts Institute of Technology, Jan. 1963.

Engelbart, Doug, "The Click Heard Round the World", Wired Magazine, 2004.

Reimer, Jeremy, "A History of the GUI", arstechnica.com, May 5, 2005.

"The Library of Congress Classification System", Aug. 2006.

Barnes, Susan B, "Alan Kay: Transforming the Computer into a Communication Medium", IEEE Annals of the History of Computing, 2007.

Calamar, Gary et al., "Record Store Days: From Vinyl to Digital and Back Again", Sterling Publishinj Co., 2009.

Masinter, Larry, "Document Management, Digital Libraries and the Web", Jun. 9, 1995.

Herot, Christopher F., "Spatial Management of Data", Computer Corporation of America, ACM Trans. On Database Systems, vol. 5, No. 4, pp. 493-514, Dec. 1980.

Newman, William M., "A System for Interactive Graphical Programming", Harvard University, ACM Spring Joint Computer Conference, 1968.

Schultz, Jan R., et al., "An Initial Operational Problem Oriented Medical Record System - for Storage, Manipulation and Retrieval of Medical Data", University of Vermont, ACM Spring Joint Computer Conference, 1971.

Apple Macintosh (screenshot image).

Carriero, Nicholas, et al., "Bauhaus Linda", Department of Computer Science, Yale University.

"Small Talk on the Alto" (image).

Donelson, William C., "Spatial Management of Data", Massachusetts Institute of Technology, 1977.

"Lotus Magellan Explorer's Guide", Lotus Development Corp., 1989.

Factor, Michael, et al., "Real-Time Data Fusion in the Intensive Care Unit", Yale University, Nov. 1991.

Gelernter, David, et al., "Graphics Interfaces & Sensor Activator Extensions for the Process Trellis Software", Yale University, Oct. 31, 1995.

"Lifestream" (image), 1995.

Harrison, Beverly L., et al., "Timelines: An Interactive System for the Collection and Visualization of Temporal Data", Proceedings of Graphic Interface '94, pp. 141-148, (1994).

"IBM OS2" (screenshot image).

Gerlenter, David, "Applications and Systems for Large Scale Adaptive Parallelism", May 22, 1997.

Date, C. J., "An Introduction to Database Systems, 3rd ed., The Systems Programming Series, vol. 1", IBM Corporation, Addison-Wesley Publishing Company, 1981.

"The Billboard" (magazine), Jan. 26, 1946.

"Billboard" (magazine), Jul. 4, 1992.

"Library of Congress Classification" (accessed May 6, 2010).

Swineheart, Daniel C., et al., "A Structural View of the Cedar Programming Environment", ACM Trans. On Programming Languages and Systems, vol. 8, No. 4, Oct. 1986.

"Commodore Amiga 1000 Computer" (screenshot image).

"Atari 520ST Computer" (screenshot image).

Lucas, Peter, et al., "Workscape: A Scriptable Document Management Environment", Maya Design Group, Conference Companion CHI '94, Apr. 1994.

Bailay, Joseph M., "Designing Workscape: An Interdisciplinary Experience", Maya Design Group, Conference Companion CHI '94, Apr. 1994.

Perkins, Roderick, et al., "Inventing the Lisa User Interface", Interactions, pp. 40-53, (1997).

Feiner, Steven, et al., "An Experimental System for Creating and Presenting Interactive Graphical Documents", ACM Trans. On Graphics, vol. 1, No. 1, pp. 59-77, Jan. 1982.

Houde, Stephanie, "Iterative Design of an Interface for Easy 3-D Direct Manipulation", CHI '92, May 1992.

"Announcing Retrospect and Retrospect Remote 3.0", Business Wire, Aug. 8, 1995.

"Dantz Delivers Retrospect Archives", MacWEEK, Inc., Jun. 10, 1989.

"Archiving Easy on Retrospect: Uniform Interface to Storage Devices", MacWEEK, Inc., Feb. 21, 1989.

"Mac the Knife, GMBH Rumors", MacWEEK, Inc., Jan. 31, 1989.

"Dantz, ChrisMac drive over to CD-R", MacWEEK, Inc., Dec. 11, 1995.

"System 7.5.2 Fixes", MacWORLD, Oct. 1, 1995.

"Dantz to Waltz in with Friendlier Retrospect", MacWEEK, Inc., Jul. 31, 1995.

"Dantz Eases Network Backup", InfoWorld, Jan. 11, 1993.

"Retrospect User's Guide", 1st Ed., Dantz Development Corporation, 1989.

"Retrospect User's Guide", 2nd Ed., Dantz Development Corporation, 1993.

"Rowe CD100b Jukebox" (image).

Spence, Robert, et al., "Data Base Navigation: An Office Environment for the Professional", Behavior and Infotutation Technology, vol. 1, No. 1, pp. 43-54, (1982).

Johnson, Jeff, et al., "The Xerox Star: A Retrospective", IEEE Computer, Sep. 1989.

Shneiderman, Ben, "The Eyes Have It: A Task by Data Type Taxonomy for Information Visualizations", University of Maryland, Proc. Visual Languages, Sep. 1996.

Rittsteiger, Andreas, "AMI Jukeboxes" (images).

*Apple Computer Inc. v. Microsoft Corporation*, 35 F.3d 1435 (9th Cir. 1994).

Windows 1.0 (screenshot image).

Windows 2.0 (screenshot image).

Windows 3.0 (screenshot image).

Windows 95 (screenshot image).

Windows NT3.1 (screenshot image).

Plaisant, Catherine et al. "Lifelines: Visualizing Personal Histories", ACM CHI '96 Conference Proc., pp. 221-227, color plate 518, Apr. 1996.

Musthaler, Linda, "A Tall Order for Document Managers", Network World, pp. 35- 40, Jul. 18, 1994.

Seiden, Peggy, et al., "Information Retrieval Systems for Microcomputers", Library Hi Tech, vol. 3, Issue 1, pp. 41-54, (1985).

"Zylab Includes Auto-Indexing in Zyindex 3.0", InfoWorld, vol. 10, Issue 18, p. 16, May 2, 1988.

Kappes, Sandra, et al., "Document Management for the Knowledge Worker System", US Army Corps of Engineers, USACERL ADP Report 95/38, Nov. 15, 1995.

"Verity K2 Toolkit Search System Administration Guide V2.2", Verity Incorporated, Jul. 20, 2000.

Cleveland, Gary, "Overview of Document Management Technology", International Federation of Library Associations and Institutions Universal Dataflow and Telecommunications Core Programme, Jun. 1995.

Factor, Michael, et al., "The Trellis Architecture for Intelligent Monitors", Department of Computer Science, Yale University, 1990.

Bush, Vannevar, "As We May Think", Life Magazine, Sep. 10, 1945.

Lansadale, M.W., et al., "MEMOIRS: A personal Multimedia Information System", Elsevier Science Publishers B.V., 1989.

Lansadale, M.W., et al., "MEMOIRS: A personal Multimedia Information System", 1995.

Bush, Vannevar, "As We May Think", The Atlantic Monthly, Jul. 1945.

"On Location Manual, v. 1.0", On Technology, Inc., 1990.

Coolidge, C. M., "Dogs Playing Poker (His Station and Four Aces)" (image), 1903.

Musthaler, Linda, "DMS's getting mix-and-match wardrobe," Network World, pp. 38-41, Jan. 8, 1996.

Kullberg, Robin Lee, "Dynamic Timelines: Visualizing Historical Information in Three Dimensions", Massachusetts Institute of Technology, 1995.

USDC - EDTX 6:08-cv-88 *Led Mirror Worlds v. Apple Inc.*; Dkt# 221 Apple Inc's Motion for Summary Judgement (partially redacted).

USDC - EDTX 6:08-cv-88 *Led Mirror Worlds v. Apple Inc.*; Dkt# 221-25 Expert Rebuttal Report of John Levy, Ph.D. (partially redacted).

USDC - EDTX 6:08-cv-88 *Led Mirror Worlds v. Apple Inc.*; Expert Report of Steven K. Feiner, PhD. (confidential).

*Mirror Worlds, LLC v. Apple, Inc.* Memorandum Opinion and Order Docket Entry No. 302 dated Aug. 11, 2010.

*Mirror Worlds, LLC v. Apple, Inc.* Mirror Worlds, LLC Notice of Dismissal with Prejudice of Certain Infringement Claims Docket Entry No. 359 dated Sep. 1, 2010.

*Mirror Worlds, LLC v. Apple, Inc.* Mirror Worlds, LLC Defendant and Counterclaim Plaintiff Apple Inc's Notice of Asserted Prior Art for Trial Docket Entry No. 365 dated Sep. 6, 2010.

*Mirror Worlds, LLC v. Apple, Inc.* Memorandum Opinion and Order Docket Entry No. 385 dated Sep. 16, 2010.

*Mirror Worlds, LLC v. Apple, Inc.* Verdict form dated Oct. 1, 2010.

* cited by examiner

F I G. 1

Search Field

Main Menu

Header

Ice cream
Code1
Pets
Reminder: Staff Meeting 10 AM
Dinner Idea
Company Meeting
Mirror-World Technologies
Lunch 1
User's Guide TOC
Importing address book
Lunch Anyone?
Lifestreams Admin Improvements
Sep. 27, 2000
Polar contacts
Sales & Marketing
Power Point test
September 28, 2000
January 19

Welcome, *Isabel*: January 23, 2001
Power Search|Save Stream|Default

View
Stream

48 Documents found for  (*feeds*: main), sorted by time, descending
My Streams                    New

View|Prefs|Tools|Help|Log Out

Lunch Anyone?
Copy|Delete|Edit|Forward|Properties
Ready|Thread|View
*Date*: 9/27/2000 3:23; *Owner*: Isabel

*memo*

Is anyone interested in lunch tomorrow?
Let me know by 11 am tomorrow.
Close

Document Glance

Document Operations

Type glyphs identity doc type

Thumbnails

Options

Stream View Options

Documents 1 - 15 of 48

Navigation Buttons

◆ **scopeware**
Information in perspective

## Universal Data Model Translation

5201 — User uploads information Asset through Browser or client software application

5202 — Software application agent, like Doc Feeder, uploads information Asset

5203 — Content type determined whether it is a Scoopware recognized content type or unknown content type

5204 — Text extracted from the information asset

5205 — Text associated with the information asset is extracted

5206 — A thumbnail picture of the information asset is created

5209 — Keywords are assigned either as defined by the user or through the Doc Feeder or Crawling agent

5210 — A Globally Unique Document ID is generated using a64-bit code and assigned to the information asset

5211 — Document operations are determined based on automatic assignment, content-type specific, solution specific, user specific, or other criteria

F I G. 2A

SEE FIG. 2B

SEE FIG. 2A

5207

An automatic summary of the information asset is created from the first 500 words, 10 sentences, or other criteria

5208

Permission list is created defining owner, read list, and write list. Permission defined by user, DOC Feeder or Crawling agent, programmatic mapping, or default

5212

Optional operations are assigned for example OCR functions

5213

The DOM is submitted to the indexing engine to index all text fields in the DOM

5214

Dom is submitted to the storage service

5215

Universal Document Object Model

Flowchart Shape Key

Process

Document Object

F I G. 2B

Scopeware Agents are Translators into Scopeware Document Object Models



Information Assets in a File-System

New information Asset — 301

Modified information Asset — 302

Deleted information Asset — 303

Information Assets stored In a file-system — 304

Scopeware agents translate new information Asset Into a new DOM — 5305

Scopeware agents translate information Asset modifications to update DOM and time stamp the change — 5306

Scopeware agents execute action and remove information Asset from Scopeware repository — 5307

Information Asset appears in Scopeware view

Information Asset is updated in Scopeware view

Information Asset is removed from Scopeware view

Flowchart Shape Key

Document Object

Stored Data

Process

Display

F I G. 3



Information Assets in a Programmatic information System

New information Asset

Modified information Asset

Deleted information Asset

5401

Programmatic information System receives Information Asset

Scopeware agents translate new information Asset Into a new DOM

Scopeware agents translate information Asset modifications to update DOM and time stamp the change

Scopeware agents execute action and remove information Asset from Scopeware repository

Information Asset appears in Scopeware view

Information Asset is updated in Scopeware view

Information Asset is deleted from Scopeware view

Flowchart Shape Key

Document Object

Process

Display

F I G. 4

### Instantaneously Dynamic, Tailored, and Interactive Document Glance Views



F I G. 5



Granular Permissions
A specific information Asset
601
5602
Permissions automatically assigned by Doc Feeder or other Scopeware application agent
5603
Permissions automatically assigned by programmatic system, such as LDAP, Active Directory, Access Control List, NT DS, or other method
5604
Permissions are manually assigned by the Scopeware user
5605
Information Asset permission granted to all public Scopeware user
5606
Information Asset permission granted to public to local groups through selected VIPs, pop-up list from LDAP or Scopeware group service, parent server, or add-hoc group
5607
Information Asset permission granted to specific groups and users within Scopeware through either a pop-up list from Scopeware or LDAP
5608
Information Asset permission is frozen not allowing changes by any user
5609
The Information Asset is available to all public Scopeware user
5610
The Information Asset is available to select users from public to local groups
5611
Only specific groups and users within Scopeware can access Information Asset
5612
Permissions are frozen and do not allow changes to the Information Asset
Flowchart Shape Key
Process
Document Object
Display

FIG. 6

Integrated Results Sets From Distributed Searches
User at Source computer selects peer computers (peers) across which the distributed search will be performed
5701
Central Registry with peer lookup?
5703
NO
User specified IP addresses of peers?
5704
NO
YES
5705
YES
Source computer sends out a search request to each selected peer in the network
Each peer that receives the search request queries its index for documents that match the search criteria
5706
Flowchart Shape Key
Display
Process
Manual Operation
Decision
5707
The peer computer sends its results set back to the Source computer
5708
Source computer takes results from each peer and builds a single collective results set
5709
Source computer continues to expand this collective results set in real time as it receives additional results until all peers have responded
5710
A collective results set is displayed preferably in a time-ordered stream

F I G. 7



Tri-State Selection Tree

F I G. 8

## Top-Down Stream Architecture



Scopeware

Scopeware

Document

1

Scopeware

Scopeware

Scopeware

Scopeware

○┄┄┄┄○  Shuttle Interface Point-to-Point Connection XML-HTTP or SOAP

○─────○  Shuttle Interface Polling Connection XML-HTTP

⚡  Server-Server Shuttle Interface XML-SOAP

1 ──►  Scopeware clients form an ad-hoc group, connecting directly to other Scopeware clients, using any parent Scopeware server for basic address look-up and resolution. Documents are replicated to each connected group member.

F I G. 9



Top-Down Stream Architecture

| | | |
|---|---|---|
| ○——○ | Shuttle Interface Polling Connection XML-HTTP | |
| ⚡ | Server-Server Shuttle Interface XML-SOAP | |
| →1→ | A client creates a document that is sent via the shuttle interface | |
| →2→ | Locally connected Scopeware clients that are polling the parent server will receive a document shell notification of new document matching the selected query | |
| →3→ | Scopeware server transmits the document to any known Scopeware server peers | |
| →4→ | Locally connected Scopeware clients that are polling the peer server will receive a document shell notification of new document matching the selected query | |

FIG. 10

1

# DESKTOP, STREAM-BASED, INFORMATION MANAGEMENT SYSTEM

## CROSS-REFERENCE TO RELATED APPLICATIONS

The application is a continuation of Ser. No. 09/892,385, filed Jun. 26, 2001 now abandoned, which (1) claims the benefit of provisional applications 60/274,575 filed Mar. 9, 2001 and 60/240,480 filed Oct. 13, 2000, (2) is a continuation-in-part of patent application Ser. No. 09/398,611 filed Sep. 17, 1999 now U.S. Pat. No. 6,638,313, which in turn is a continuation of patent application Ser. No. 08/673,255 filed Jun. 28, 1996 and now U.S. Pat. No. 6,006,227, and (3) hereby incorporates by reference said prior applications in their entireties, as though fully set forth herein.

## INCORPORATION BY REFERENCE OF MATERIAL ON COMPACT DISC

This patent specification incorporates by reference the contents of the compact disc attached hereto in duplicate (Copy 1 and Copy 2). Each disc is labeled in accordance with Rule 1.53(e)(6), with the collective names Scopeware 2.0 and Vision 1.0. The date of creation of the files on the disc is Jun. 25, 2001. The computer code on the compact disc was generated from correspondingly named source code. The names of individuals files on the disc within these collective names, as well as the size of he individual files, are identified in the list of files attached as an appendix to this specification. The contents of the compact disc submitted herewith in duplicate and the contents of the list of files attached as an appendix to this specification are hereby incorporated by reference in this application as thought fully set forth herein.

## FIELD

This patent specification is in the field of systems for handling information by computer and more specifically relates to an enhanced system for handling heterogeneous items of information to store, manage, customize, organize and/or deliver such information regardless of its source and type in particularly efficient, easy-to-use, and intuitively understood.

## BACKGROUND AND SUMMARY

Traditional information management systems store and retrieve documents on the basis of attributes such as the name and storage location of a document. This, however, can get very unwieldly in typical usage, as more and more names and locations of documents become a part of the storage and retrieval scheme. Although it is possible in some cases to search or order documents by other attributes, such as content and time of creation or revision, it may still be necessary to specify which file folders, directories, or storage devices to search. If a user no longer remembers how a particular item of information was stored in a traditional system, it may be difficult or impractical to retrieve it efficiently.

In an effort to alleviate these and other concerns with traditional storage and retrieval systems, and to provide a more effective and natural approach that better fits the way people tend to work with and think of items of information, a new system described herein uses approaches that rely primarily on an intuitive, time-associated way of dealing with information. The system is stream-based in that it creates time-ordered streams of information items or assets, beginning with the oldest and continuing through current and on to

2

future items. An information item or asset in this system can be any type—a file, an email message, bookmark, IRL, memo, draft, scanned image, calendar note, photo, shopping list, voicemail, rolodex or business card, a video clip, etc. When a user tunes in a stream, ordinarily a receding parade of documents appears on the screen. The closest are nearest in time. When a new document arrives, for example when a new email message comes in, it appears at the head of the stream, at the front of the parade. (When a newer message arrives, it steps in front of the parade.) Further-away documents are older.

Ordinarily, a user stands at the line current in time and looks into the past, but the stream also extends into the future. If the user has a meeting next Tuesday at 10 AM, a note to that effect goes into the stream's future, and a note about a meeting Wednesday goes in the stream in front of the note about next Tuesday. Documents in the stream flow steadily onward, as time does. Documents in the future part of the stream flow toward the present; documents in the present flow toward the past. Newly arriving documents push older documents further into the past.

The receding parade of documents is an efficient way to present information on a computer screen. The display uses foreshortening for a perspective effect to pack more information into limited space. For easy browsing, when the user touches a document on the screen with the cursor, a summary of that document with a thumbnail vies appears immediately, without requiring clicking or other user action, as a browse card—a dedicated small window besides the receding parade of time ordered documents. The user controls the displayed stream with VCR-type controls, to move forward or back, to go toward or to the beginning or the end of time in the stream, to now, or to any date or time, past or future.

An item of information in a stream need not be given a name, or a designation of storage location. In a traditional system, a requirement that all documents have names can have implications beyond the necessity of inventing and remembering names. For example, emails may not have names of their own but may need to be stashed inside some other file; to search for an email that user may need to go to this special mail file and search that file. In the system disclosed here, items of information such as emails do not need to be named and can be searched along with any other types of information items.

Searches in the disclosed system can be by a combination of three methods, search, browse, and time-order.

Time-order in itself often makes it possible to locate documents. Often the user needs a document that showed up recently, this morning, or two days ago, or at some time that can be pinned down with some degree of accuracy. Time-order together with browsing through the stream (and its glance views) makes it possible to glance quickly through the documents that are from the approximate time of interest and quickly pull out the right one. (While traditional systems can time-order documents it often is difficult to intersperse in the list all recent emails, news updates, bulletin-board postings, URLs and other documents, let alone voicemail messages. Without a browse feature for a stream as disclosed herein, such a list can be of little value, whereas with browse and an all-encompassing stream that gets updated promptly with new material, one can sweep over large numbers of documents, get instance glances (summary, thumbnail, etc.) of each and find the right one fast.)

When searching in a stream in the disclosed system, the user gets a new stream—a substream. One can search on any word or phrase, as every word in every document is indexed, on document types and metadata, and on time-related data

(e.g., show me all email from last March). If the user searches for an entity called Schwartz Bottling, the new substream will the narrative or documentary history of all dealings with that entity—first contacts, subsequent internal documents or communications, reports, calendar items, and so on.

A substream in the disclosed system is in some ways similar to a folder or directory in a traditional system. Instead of a "Schwartz Bottling" folder in which the user has put documents by so naming them, he/she has created a substream with those document, and can save it for later use or create it again as needed. The substream can do all a folder can but is much more powerful than a folder. A substream collects documents automatically; the use r has to put documents in a folder by hand, one by one. A substream can persist in that it continues to trap newly created or received documents that match it. If a user looks at the "Schwartz Bottling" substream tomorrow, she/he may find it has grown to include a new email or other documents that were interspersed automatically. A substream can tell a story, and include the future. A substream is non-exclusive, in that a document can belong to many substreams. A folder in a traditional system imposes on computers many of the obsolete, irrelevant limitations of a physical filing cabinet drawer or folder. A substream is an organizational tool that can make more efficient use of computer characteristics than an analog of filing an retrieving physical documents.

One reason for the efficiency of the disclosed system is that it handles all types of different documents, or items of information, in essentially the same way, even if the document is of a type or format unknown to the system. Each document when created, received or otherwise encountered is treated consistently according to a universal Document Object Model (DOM). As described below in more detail, the system processes the document to create its Document Object Modes that includes various aids such as significant information about the document including items such as summary, type of document, thumbnail of the document, who is the document owner, who has permission to access the document, keywords, command options, time stamp, index, etc. This creation of a document's DOM is done automatically, although the user can aid the process. It can be done by a translator agent or programmatically.

The system creates a glance view or browse card of each document that has the same overall format to make searching for and working with a document more intuitive but also is specific to the documents in many ways. One important difference from traditional systems is that the browse card has command buttons that match the type of documents. While the command set for traditional systems may use the same command button set for different types of documents, in the disclosed system the command set that shows in the displayed browse card is specific to the document—it has the unique combination of command buttons that make sense for that document. The command buttons unique to the browse card can be shown on the card itself or separately.

The browse card comes on the screen automatically when the cursor is over the corresponding document in the displayed stream; the user need not take any other action such as clicking on the document or taking an action calling a program that can open or work with the document.

The universal DOM of a document is created automatically as a new document of any type is added to the basic stream of information items. It is done for any existing, legacy documents, when the system is first installed on a computer, and is done as any additional documents are created or otherwise come in. Metadata such as owner, date, access permission and keywords are created as part of this automatic process.

Access permission is a part of a document's metadata, so permission levels need have the constraints of traditional information handling systems where a group or an individual typically has access to all documents in a particular folder or directory, or has a particular type of access to a folder.

Search results are integrated into a substream, at the right place, when and as they become available. The user can start using an incomplete substream and watch it build up. If the search must extend over a number of computers or even servers, and some are unavailable at the time, the results that come in when any become available are integrated into the substream at the right places.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** illustrates a screen that can serve as a default view when a software product according to a preferred embodiment is opened on a computer; the labels that are added are not normally a part of the displayed screen.

FIGS. **2-8** are flowcharts illustrating processes in an example of a preferred embodiment.

FIGS. **9** and **10** are examples of configurations in a preferred embodiment.

## DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

FIG. **1** illustrates a default screen seen on a PC or other equipment working with the disclosed system. It can show up upon turning on the computer, or upon calling the disclosed system. As seen in FIG. **1**, the screen illustrates a receding stream of documents, with the most recent documents at the front. Passing the cursor over a document in the stream causes that document's "glance view" or "browse card" to appear on the screen. The glance view of a document is so labeled in FIG. **1**. The screen also includes the following features appropriately labeled in FIG. **1**: (a) the Search Field is an area in which the user can type one or more words for which the system will search in documents (information assets) in the displayed part of the stream and/or in additional information assets that might not be displayed; (b) the Main Menu is where the user sets preferences, finds help information, logs out, and/or performs other operations; (c) the Header contains information such as links, command buttons and choice boxes used to navigate; (d) the Stream View Options allow the user to configure the presentation of the stream of information assets; (e) the Document Glance allows quick scanning of information assets that are visible on the screen, and presentation of more detailed information on the selected information asset; (f) the Type Glyphs identify the nature of an information asset at a glance (e.g., a Word document); and (g) the Thumbnails is a graphic representation of the type of document (e.g., an audio file, an email, an event, etc.). The User Guide published by the assignee hereof (a copy is submitted concurrently with the filing of this application with an IDS form) further describes the operation of a relevant example and, together with the programs contained in the compact disc submitted herewith, provides a more detailed disclosure of a preferred embodiment.

Certain particularly novel features of the disclosed system are described below by reference to flowcharts and block diagrams. More detailed information on a particular example of implementation of these and other features of the system are evident from the software on the attached compact disc, which is the best mode known to the inventors at the time of filing this patent application.

FIG. **2** illustrates creation of a universal data object model of a documents in accordance with a preferred embodiment. This is an important part of the disclosed system that helps make possible the efficient handling of heterogeneous document types in a manner that users find easy and intuitive. A document object model (DOM) can be thought of as a document shell of the information asset (IA) that contains, anon other items, a thumbnails of the information asset, permission rights, and metadata. The DOM is created from the IA and is stored in a desktop computer and/or a server, either independently of the IA itself or with a replica (copy) of the IA. From there, the system makes the DOM (with a pointer to its IA or replicated IA) to the desktop user or to users that have access to the document through some computer connection.

As seen in FIG. **2**, the process of creating a DOM starts with the uploading at step S**201** of information assets (documents) through a browser or a client software application, or step S**202** with uploading using a software application agent called Doc Feeder in a specific embodiment of the disclosed system. At the following steps, which need not be performed in the order of their description below, a DOM of the IA is created. The IA uploaded at step S**201** or S**202** can comprise structured or unstructured data. At step S**203** the process determines the content type of the IA, e.g., if it is a type that the system recognizes. If it is, the system includes content-type specific metadata in the document's DOM: MIME/content type information, a glyph of the application that creates/views the information asset, and/or the system assigns other content-type data to the DOM shell. If step S**203** determines that the IA is an unknown content type, it assigns to the DOM a content-type for "unknown content-type.". Step S**204** extracts text from the information asset, for example, in a text document, this step extracts the text of the document. Step S**205** extracts text that may not be within but may be associated with the information asset, for example, the time stamp of the document, the owner of the document, and possibly other textual information that is or can be associated with the document. Other possible examples are attributes of the IA such as file reference path, database/repository path, file metrics such as size, encryption, other identification information, etc. Step S**206** generates a thumbnail picture of the IA. The thumbnail can be a reduced-size picture of the document, for example of the first page, and can be converted to a graphic image format. Other examples of thumbnails are JPEG, MPEG, BMP, GIF, AVI, or other still or moving image files representative of some aspect of the IA. Step S**207** produces an automatic summary of the IA, e.g., a replica of its first 500 words, or first 10 sentences, or some other information copied or otherwise derived from the IA. Step S**208** creates a permission list unique to the IA that defines the owner of the IA (e.g., its creator), and lists of people or entities and groups that can access the IA or the DOM of that IA for reading and/or writing purposes. This permission list can be defined by the user for the particular IA or for a class of IAs, or can be created automatically, e.g., by software agents called Doc Feeder or Crawling agent in a particular embodiment of the described system, or by programmatic mapping such as LDAP, Active Directory, NTDS or some other mapping. Alternatively, at least for some documents, the permission list can be default setting.

Step S**209** assigns keywords to the information asset. The software agents Doc Feeder or Crawler can assign keywords, and the user can manually assign or add keywords. Step S**210** generates and assigns to the IA a Globally Unique Document ID, e.g. as 64 bit code unique to the IA. Step S**211** determines and assigns to the IA document operations that are unique to the IA. Depending on the IA, these operations or command

buttons can be basic, such as "View" and "Reply." They can be content-specific, such as "Play" for multimedia information assets. They can be solution-specific, such as "Fax" of Purchase." They can be user-specific, such as "Delete" allowed to only certain users. An important point is that the operations or command buttons assigned to a particular IA match the IA and need not be the same for different information assets, as is the typical case with traditional information management systems. Step S**212** assigns optional operations or command buttons to the IA. They include, for example, commands to send the IA to an optical character recognition (OCR) service that can be a separate service, IP, HTTP-based or an asynchronous operation. Alternatively, the optional operation can be another OCR operation that can perform OCR on a selected part of the IA, or on digital graphic portions or can involve multi-part associations. At step S**213**, the information asset is submitted to an indexing engine (asynchronous service) Again, this can be a separate service, IP, HTTP-based. This step can index all or selected fields of the IA, including but not limited to the IA summary, title, permissions, IA text, keywords, time, metadata, and content-type. At step S**214** the DOM created as described above is submitted to a storage service. This can be a database that is a file reference with a pointer to the actual location of the IA on a network or a local file system, or it can be a database that contains the actual IA in a repository such as a user's computer or a centralized repository. The document object model so generated is made available for use in step S**215**.

FIGS. **3** and **4** illustrate methods of creating document object models from information assets. As seen in FIG. **3**, three type of information assets are involved—new information assets **301**, modified information assets **301**, and deleted information assets **303**. All come to a file system **304**. At step S**305**, agents specific to the disclosed embodiment of the system known as Scopeware 2.0 translate the IA into a DOM, i.e., create a DOM shell for the IA, with attributes as discussed in connection with FIG. **2**. At step S**306**, Scopeware agents translate the IA modifications into an updated DOM and time-stamp the change so the new time-stamp becomes a part of the DOM and the modified IA can be places in the stream of documents at a place reflecting the new time-stamp. At step S**307**, Scopeware agents execute actions for removing the deleted IA from the repository of documents. The display, such as that seen in FIG. **1** reflects the actions takes at steps S**305**, S**306** and S**307**. As a result of step S**305**, the stream on the display shows at **308** the new IA (provided the time period where the new IA fits is being displayed). As a result of step S**306**, the modified IA appears at **309** in its correct place in the displayed receding stream of documents. As a result of step S**307**, the deleted documents is removed at **310** from the displayed stream, and the remaining In FIG. **4**, a programmatic information system received new, modified and deleted information assets for storage and distribution to appropriate translation agents as illustrated. In other respects, the FIG. **4** arrangement corresponds to that of FIG. **3**, so the description of corresponding portions will not be repeated.

At least some of the document object model created as described above becomes a part of a glance view or browse card of the type illustrated in FIG. **1**. An important feature of the system disclosed here is to conveniently display such a glance view in a natural and intuitively accepted way to facilitate operations.

Traditional user interfaces for computers typically present lists or graphical icons of "documents" (including but not limited to computer files, emails, web pages, images and other types of electronic information). These lists and icon displays provide only a limited amount of information about

the document—typically, title and application type only, although additional information as well in some cases. This can make it difficult for users to identify the document without downloading and/or opening the document with its associated application. For example, in Windows 2000, the user interface displays a small temporary pop-up window of the document's title, application type, author and size when the user hovers his cursor on the document icon; however, the pop-up window appears only after a brief delay, usually 1-2 seconds and is for documents that are on the screen at the time, which tend to be a small part of the many documents typically stored in or accessible through a user's computer.

In contrast, the disclosed system creates a pop-up window for heterogeneous documents of known and unknown application types that appears instantly, as perceived by the user, as he/she hovers the cursor over the document's representation in the user interface. In the example of FIG. **1**, this representation is an index card in a cascading flow of overlapping index cards (called "browse cards"), and the pop-up window is called a "glance view". This glance view not only contains the document's title, application type and owner, but also may contain rich multimedia cues (such as a thumbnail image of the first page of the document, a WAV or MP3 preview of an audio file, or an animated GIF preview of a video file), text summaries and document operations specific to the document's application type and access permissions. For example, if the user has write permission for a document, the "Edit" operation will be visible and available; however, if not, the Edit operation will not be visible or available. These document operations are interactive, allowing users to select available operations directly.

Referring to FIG. **5** for an illustration of the instantaneously dynamic, tailored, and interactive document glance view feature of the disclosed system, at step S501 a user hovers his or her computer cursor over a document's browse card. Essentially instantly, at least as perceived by the user, and without any mouse clicking or other action on the part of the user, step S502 processes the information needed for a glance view to appear on the screen, and at S503 the glance view appears next to the browse card, using a technology such as Dynamic HTML. If the user clicks on a document's browse card, as detected by the test at step S504, and as executed by the user at S505, step S506 causes the glance view to become fixed and step S507 causes it to remain in the display. The glance view does not change until the user clicks on another document's browse card. If the user does not click on any browse card, as determined by the test of step S504, the glance view will instantly change as the user moves his cursor over other browse cards, to reflect the glance view of the underlying browse card. If the user has clicked on a browse card to fix the glance view as a stationary window, the user can then select any of the visible and available document operations, by taking the "yes" branch of step S508 and selecting at S509 an available operation (as earlier described, the operations or command buttons that show are specific to the document). At step S510 the system executes the selected operation (command) and the display reflects this at S511. If at step S508 the user takes the "no" branch, she can continue to hover the cursor over the stream of browse cards and repeat the process, at step S512. If at S504 the system determines that the user has not clicked to fix a glance view, the glance view information essentially instantly changes at S513 as the user moves the cursor over other browse cards, and the new glance views appear on the screen at S514.

FIG. **6** illustrates a process involving another important feature of the disclosed system—granular permissions for access to information assets that allows clients to receive

seamless and uniform access to contents without necessitating changes to existing network security and access rights. In traditional systems, a network administrators typically would grant access to specific network drives and file folders. The permission typically would allow a user to access the entire folder or drive, or would deny access to an entire folder or drive, rather than to a particular information asset or document.

In the disclosed system, each information asset is accessible through specific access permission for each client or designated group of clients. Examples of access stage permissions are read, write, and aware. Read permissions allow a client to view the full information asset. Write permissions allow the client to view and edit the document. Aware permission alerts the client that an information asset exists, for example by providing a document shell in the client's stream of documents, but does not allow the client to view or edit the document. A group of clients who want to collaborate on a project or event can establish a designated group that can be assigned permissions to relevant documents for the project or event. Thus, each member can receive real-time additions to his or her stream of documents and information assets are posted. The clients can assign permission to the other group members themselves, by so designating the appropriate documents to be shared, without involving a network administrator. Some documents, such as personal to-do lists, can be accessible only to a specified user, but the user can change this at any time to allow access, full or partial, to other designated persons. Assignments of permissions for access can be done as granularly as an individual client level or individual document, or as diffuse as a departmental or enterprise level.

As seen in FIG. **6**, an information asset **601** can have permission levels assigned to it in several ways. At step S602, a software agent such as Doc Feeder can automatically assign permissions; at step S603 a programmatic system such as SDAP, Active Directory, Access Control Lists, NT DS, of some other system assigns permissions to the document; and/or at step S604 the user manually assigns permissions to the document. Examples of processes relevant to different types of permissions are: step S605 grants access to all public users of the system; step S606 assigns permissions to groups as illustrated; step S607 assigns permissions to specific groups as illustrated, and step S608 freezes permissions and does not allow the document to be changed. The display, of the type illustrated in FIG. **1**, can provide information representative of the permissions, as illustrated at steps S609 through S612 in FIG. **6**.

Another important feature of the disclosed system is illustrated in FIG. **7** and pertains to integrating search results from distributed searches. In traditional systems, search requests in a client/server model with a central index usually return a single, well-defined results set. In a peer-to-peer network, however, search results may come back to the "Source" computer (the computer that issues the search query) in a haphazard manner because of network latency (variable traffic speed and bandwidth across a distributed network) and variable peer presence (peer computers can be turned on and off, or removed from network at times).

The disclosed system asynchronous responses to a distributed query across a peer-to-peer network of computers to integrate the results from diverse sources, arriving at different times, and comprising diverse types of documents, into a single unified results set. One preferred embodiment leverages the time-ordered presentation interface earlier described in so that search results are integrated into a time-ordered stream according to each document's original time-stamp,

9           10

regardless of when the document's search results set was received by the Source computer.

As seen in FIG. 7, at step **701** a user at a Source computer selects peer computers ("Peers") across which the distributed search will be performed. If the test at **S703** determines that there is no central registry with peer hookup, and the test at **S704** determines there is no user-specified IP address of peers, the process returns to **S701**, where the user can specify addresses or they can be provided in some other way. The central registry with lookup of Peers can involve Online/ offline status, IP/DNS resolution service and Optional public/ private key authentication. When the test at **S703** or at **S704** leads to the "yes" branch, at step **S705** the Source computer sends out a search request that travels to each selected Peer in the network. At **S706**, each Peer that receives the search request queries its index for documents that match the search criteria, and at **S707** the peer computer then sends its results set back to the Source computer. The response can be XML-based, a binary byte stream, or an in-band and out-of-band transfer. At **S708** the Source computer takes the results set from each Peer and builds a single collective results set. In a preferred embodiment, this collective results set is organized as a time-ordered stream of documents, as seen in FIG. **1**. This can involves an on-the-fly browser combination with XML & XSL with time-sort algorithm, XML to presentation layer with time-sort algorithm, and in-band and out-of-band transfer. Importantly, at **S709**, the Source computer continues to expand this collective results set, essentially in real time as it receives additional results sets from Peers until all Peers have responded or some other relevant event has taken place. At **S710**, the collective results are displayed as soon as results have come in at the Source computer, and the display is updated as additional results come in, even when a Peer that was off-line comes on line and sends results at a later time.

Yet another feature of the disclosed system is a particularly convenient tri-state tree. In a single scrolling tree directory of the contents of a hard drive (or hard drives in a network), a user may want to select "Parent Folders" (folders containing subfolders) and "Child Folders" (subfolders contained within a folder) that can be further operated on. This feature allows users to select folders in one or more of the following combinations:

1. All Parent Folders and all Child Folders
2. Some Parent Folders and all their Child Folders
3. Some Parent Folders and some of their Child Folders
4. No Parent Folders and no Child Folders (the do nothing option)

This selection tree has useful application beyond the particular example of information handling disclosed here; it can be used to select folders for any computer operation. For example, it can enable users to discretely select software application or operating system components to install or remove.

A single scrolling tree directory of Parent and Child Folders that can expand and contract to show the contents of Parent and Child Folders is known—Microsoft Windows Explorer is an example of one. A Tri-State Selection mechanism also is known—Microsoft Add/Remove Windows Components is an example of another way of selecting various Parent and Child Folders. However, the Microsoft Add/ Remove Windows Components feature does not display all Parent and Child Folders within a single scrolling tree directory; Child Folder and other contents of a Parent Folder are displayed in a separate window only after the user clicks on a Details button. In addition, only the contents of one Parent Folder can be displayed at a time.

The Tri-State Selection Tree described here combines the elements of a single scrolling tree directory with a tri-state selection mechanism in a new and unique way to enable users to discretely select specific Parent and/or Child Folders all in one single view.

Referring to FIG. **8** for an illustration, at step **S801** a user is first presented with a tree directory of the highest level of Parent Folders on a hard drive or network. At **S802** the user can expand the tree directory to show Child Folders by clicking on a plus/minus sign next to each Parent Folder, and the directory so expands at **S803**. At **S804**, the display shows a check box next to each Parent Folder (e.g., to the right of the plus/minus sign). By default, all check boxes are empty, indicating that no Parent or Child Folders are selected. If at step **S805** the user clicks on a check box once, the process at step **S806** selects the marked "/" Parent Folder but none of its Child Folders are selected, and step **S807** shows this on the display. If at step **S808** the user clicks the check box a second time, the slash mark is replaced by an "X" and all the Child Folders' check boxes are then selected and grayed out at **S809**, indicating that all Child Folders are selected for that Parent Folder, and this is displayed at **S810**.

Thus, by expanding the tree and clicking on check boxes, the user can systematically and efficiently select a discrete number of folders on which to perform an operation.

Yet another feature of the disclosed system is an arrangement of a redundant array of inexpensive servers (RAIS). Processing of a large set of information or document requires benefits of a centralized architecture—reliability and scalability, and RAIS is a novel approach to provide benefits of a centralized architecture—namely reliability and scalability with numerous inexpensive computers. Thus, RAIS can deliver essentially infinite scalability, can allow inexpensive smaller computers to be used to solve enterprise computational problems rather then expensive larger platforms, cheaper/faster.

For example, consider:

Set of Information, D, with specific documents D**1**, D**2**, D**3**; D{D**1**,D**2**,D**3**}

RAIS of N×N size here with N=3; RowN,ColN

Replication factor is number of columns

Scalability factor is number of rows

1. Here N=3, with 9 computers

| | Col1 | Col2 | Col3 |
|---|---|---|---|
| Row1 | A | A | A |
| Row2 | B | B | B |
| Row3 | C | C | C |

2. To post a Document, Dn, one copy is sent to a sub-server in each ColN, so

| | Col1 | Col2 | Col3 |
|---|---|---|---|
| Row1 | A(Dn) | A(Dn) | A(Dn) |
| Row2 | B | B | B |
| Row3 | C | C | C |

3. Thus Dn is replicated N times (N=3) and thus if Col**1**: Row**1** computer is unavailable there are two other computers with the same Dn. This is RAIS replication.

      

4. To post a universe, or set of documents, D{D1,D2,D3}, can use simple (round-robin) or complex (latency, closest path, spanning tree) routing, sending each document to a different RowN.

| | Col1 | Col2 | Col3 |
|---|---|---|---|
| Row1 | A(D1) | A(D1) | A(D1) |
| Row2 | B(D2) | B(D2) | B(D2) |
| Row3 | C(D3) | C(D3) | C(D3) |

5. Thus to reassemble the entire universe or set of documents, D, need to send a request to each RowN. To reconstruct, D, for an NxN RAIS requires N request/responses.

6. Multiple smaller requests can be used instead of one mammoth request. This reduces latency, bandwidth and process constraints. This is RAIS scalability.

7. Note that any one of the computers in Row1 can be used to re-construct the total set D found in Col1. For example, if Row1:Col1 computer is unavailable, then Row1:Col3 computer has a copy of the data. In fact, D is can be constructed from any arrangement that completes a ColN.

8. To increase either replication or scalability simply increase N.

Scopeware Software Agents, either desktops or servers, can be installed on each computer in a RAIS matrix to achieve this functionality.

The disclosed system can be implemented in a variety of ways in terms of physical information storage—for example, physical information storage can be centralized or decentralized. Decentralized storage, physical storage of information with multiple servers and/or clients, is possible through network agents called Doc Feeders, which may be located at a server or client level. The Doc Feeder allows a storage location of a client, for example a file folder on a desktop hard drive, to be included in the system level data repository for use throughout an organization or enterprise. Depending upon implementation, the Doc Feeders can replicate the information asset (IA) to a server or maintain a constant pointer to the physical storage location while populating the system with the document object model (DOM). As earlier described, a DOM is a document shell of the IA that contains, among other items, a thumbnail of the IA, permission rights, and metadata. A DOM is created from the IA and placed on the Scopeware server, either independent of the IA or with a replication of the IA. From there, the Scopeware server will share the DOM (with constant pointer to the IA or replicated IA) with other connected system servers and clients in order to make the IA available to all clients connected to the network. Thus, the system servers and network agents (Doc Feeders) act as document proxies for both storage and retrieval of IAs.

In addition, the system servers within the network need not be physically close in proximity. For example, a client in a truly global organization with locations and system servers on several continents can query and retrieve sales results across all system servers and clients through a federated search. In essence, the disclosed system creates a virtual store from all documents accessible to any system server or client either centralized or decentralized.

The physical information storage of the disclosed system follows three models: duplication, replication, and document reference. The duplication model physically stores a duplicate IA on the parent Scopeware server that was created by the client. Other clients polling the parent Scopeware server have full access to the IA, depending upon permissions, whether or not the original document is available from its native storage location (i.e. client PC is turned off). The replication model replicates the IA from the parent Scopeware server to the peer Scopeware servers within a federated network. All clients within the federated network have full access to the IA, depending upon permissions, whether or not the original document is available from its native storage location (i.e. client PC is turned off). An example of the replication model is the concept of a redundant array of inexpensive servers. This concept, which is described in detail in the distributed enterprise model, utilizes client machines in place of a single server. The document reference model "parks" only a DOM of the IA on all Scopeware servers and maintains a constant pointer to the actual physical location of the IA rather than storing a full copy of the IA on the Scopeware server. Other clients will only be able to gain access to the IA when the physical location of the IA is connected to the network (i.e. client PC is turned on).

There are to primary types of streams in accordance with the disclosed system: Bottom-Up and Top-Down. Through the use of both Bottom-Up and Top-Down methodologies, Scopeware creates a living stream for the client with new DOMs appearing automatically as content arrives. The Scopeware distributed enterprise model can make use of both server-based resources and client-based resources where appropriate. Both types of streams can be used simultaneously and interchangeably.

Bottom-Up streams are comprised of information collaboration formed by ad-hoc groups of Scopeware clients. A bottom-up stream is composed of information created by the clients of a transitory group. Information shared and created by this group is be replicated via point-to-point connections (i.e. from client PC to client PC). In this way, bottom-up groups can form and disperse frequently, and without notification, while its members will still have access to the shared information. FIG. 9 illustrates this configuration.

Top-Down streams are more permanent, generally more administrative streams or collections of information, such as company-wide distribution lists, or groups like 'Accounting' and 'Development'. In these groups, information is "parked" to the server from the desktop. The server then sends the information to other known servers. Each client maintains a polling connection to the server to retrieve "parked" documents that have recently arrived from other remote servers or from local clients. FIG. 10 illustrates this configuration.

As earlier described, the user interface within the Scopeware product portfolio has unique characteristics. The DOM provides certain information that allows quick perusal of the information retrieval results via a proprietary "browse card" or "glance view" which is similar to an index card that contains data on the underlying IA. A unique "browse card" or "glance view" is created for each IA. The "browse card" or "glance view" includes metadata for the document, which is comprised of a title, identification number unique to Scopeware document referencing, date/time stamp, and owner information. The "browse card" or "glance view" also presents a thumbnail image of the IA and a summary of the IA contents. Finally, the "browse card" or "glance view" contains a list of operations appropriate for the IA's application that include, but are not limited to, copy, forward, reply, view, and properties.

The "browse card" or "glance view" arrives in the stream of those clients that have permission to view the IA. The owner can grant access to other clients or groups by granting read, write, or aware permissions through the properties of the

"browse card" or "glance view." Permission can be granted as granular as an individual-by-individual basis from the DOM, or through predetermined administrative groups via the Scopeware server.

The "browse card" or "glance view" is presented in a time-ordered sequence starting in the present going back into the past. The "browse card" or "glance view" is available in a number of views. The primary view is the stream. Other formats include a grid, Q, list, and thumbnails. The various views address the client's personal preferences for accessing time-ordered content in their most logical way. These views all contain the information presented in a "browse card" or "glance view" but are organized in a different method. Other specialized views include the address book and calendar.

An advantage of the "browse card" or "glance view" approach is the ease of browsing, searching, and retrieving IAs. In the stream view, the "browse card" or "glance view" of each IA are aligned much like cards in a recipe box. For each item, the title and application icon are viewable on the "browse card" or "glance view" in the stream. When the client passes over the "browse card" or "glance view" in the stream with the mouse pointer, the full "browse card" or "glance view" is presented to the client for easy viewing. From the "browse card" or "glance view," the client can perform any of the aforementioned actions available to the IA, subject to permission access.

The disclosed system is suitable for a number of computing models servicing multiple clients including a single departmental server model, an enterprise server model, a distributed enterprise model, and a peer-to-peer model (absent a dedicated Scopeware server or common server). In addition, the software enables wireless computing independent of or in conjunction with any or all of the aforementioned models. Wireless clients include WAP enabled phones, PDAs, Pocket PCs, and other similarly capable devices capable of receiving and transmitting data across a network. All of the Scopeware Implementation Models make use of the components previously discussed, providing consistent interface available across different computing topologies, from monolithic single servers to peer-to-peer collaboration.

Access to the IA contained in the Scopeware repository can be achieved through two methods. The first method of access is through the thin-client method. The thin-client method utilizes a web browser, such as Microsoft's Internet Explorer or Netscape's Navigator, on the client device to gain access to the Scopeware repository residing on the Scopeware server. The second method of access is the desktop-client method. The desktop-client method involves a local installation of Scopeware on the client device. The client device is then capable of performing the storage, retrieval, extraction, and processing of IAs as they are introduced to the Scopeware repository. All the models below can utilize either method of access to the Scopeware repository, however the distributed enterprise and peer-to-peer models are optimized with the desktop-client method.

Single Server Model. A single server model makes content on one Scopeware server available to any client connected to the departmental server. The Scopeware software creates a unique DOM that represents to the user interface the relevant details of the IA physically stored by the server or client. Thus, when a client connected to the network requests access to and retrieval of IAs through scopeware, the client can view all documents contained within the network that satisfy the query parameters and access restrictions regardless of the document's native application. The documents available include those stored locally by the client, those saved to a

central storage location, and those stored by peer clients with Doc Feeders connected to the shared server

Enterprise Server Model. In an enterprise server model, where multiple Scopeware servers are installed, federated access to and retrieval of IAs across the network is enabled. In federated information sharing, a client asks one Scopeware server for IAs that may reside on it or one of many connected peer Scopeware servers. In this model, the actual IA may reside on any network-connected client, the Scopeware server, or a centralized data storage location. Transparent to the client, the Scopeware servers shuffle the retrieval request and access restrictions to present a single, coherent stream to the client via the presentation architecture previously discussed (within the original patent document).

Distributed Enterprise Model. A distributed enterprise model utilizes the clients for storage, retrieval, and processing of IAs. Through the use of directory monitoring agents, similar to network agents, the physical location of an IA need not be on the Scopeware server, but rather can reside with any client. The Scopeware servers take on a secondary role as administration servers and content parking lots. This model pushes the processing tasks to the clients while using the servers to shuttle IAs throughout the enterprise. The indexing engine, thumbnailing engine, lightweight storage database will be based at the clients.

Taking Scopeware beyond distributed networking and the federated architecture—into a more distributed approach will be straightforward, given the way that the system has been designed. Key elements of the next stage of deployment are distributed document processing and scalable server arrays.

Distributed document processing consists of two different approaches. First, when information was created physically on a desktop machine, but was part of a larger application and intended for storage on a server (rather than on the desktop), the Desktop facilities could do the document extraction, indexing, thumbnailing, etc., and post the results to the Scopeware Server. Second, a Scopeware Server that was handed a document (perhaps from an OCR process or from a central email application) could hand the document off to an available Scopeware Desktop for the same processing. These strategies relieve the processing load on the Scopeware Server and leave it free to focus on handling searches and stream integration, allowing a given Scopeware Server to handle a much larger user load.

When an organization needs to support central processing of large document bases—and needs the reliability, accessibility and security of a centralized architecture—Scopeware Servers will support deployment in a novel architecture we have named RAIS—a redundant array of inexpensive servers.

In this architecture, imagine a square array of desktop machines—call each one a "sub-server." The array as a whole comprises the Scopeware Server. (This does not require wiring together an actual array or cluster; any interconnect such as a Ethernet sub-net or even HTTP over a broader network will work.) In these arrays, columns of servers provide redundancy for storage, while rows (within columns) provide redundant points of distribution.

To post document D, one copy of D is sent to a sub-server in each column of the array. To replicate everything five times such that losing any data requires the loss of five sub-servers, five columns are used. The number of columns in the array is managed to support exactly the degree of replication (and redundancy) desired. The write processes can be managed in a number of ways to ensure that the different rows in the columns are balanced.

To send a polling message or search request ("give me all the latest stuff"), a request is sent to each sub-server in one

column (note that the means to do this transparently to the user is an extension of the federated search technology). Each column of sub-servers absorbs one copy of every posting (because any write has gone into at least one row of the column); therefore, all the sub-servers in any one column collectively have copies of everything. Just a "replication factor," is chosen for data redundancy, a "distribution factor" is chosen for responsiveness and for data management, representing the number of rows in any column. To get ten small responses to a search request instead of one big response, or to distribute the total data-storage burden over ten machines instead of one, the array is implemented with ten sub-servers in every column.

The entire "Server" can be run with only one row (resulting in replication, but no distribution) or with only one column (resulting in distribution but no replication). In the limit, row size=column size=1, and the effect is to have a single conventional server.

This approach to distributed processing, scalability and reliability for large applications allows arbitrary sets of "smaller" computers (single/dual processor, inexpensive memory and disk storage) to be used in place of very large, expensive machines. This allows the application platform to be designed to the reliability and access requirements of the particular application, and then scaled incrementally (by adding more small machines into the array) as the actual application grows in terms of users served or information managed.

Distributed document processing and server arrays will give Scopeware almost infinite scalability while maintaining compatibility with early solutions or architectures. In addition to adding greater reliability, this architecture will support very large information processing applications. This will allow enterprise-scale, top-down applications—inbound support/sales email handling, customer service or even IRS-scale tax document processing.

Distributed document processing (with Scopeware Desktop) could be combined with either a "conventional" (1 processor array) Scopeware Server or with a more powerful array. This will allow organizations to create departmental or workgroup level solutions that can grow into enterprise applications if necessary.

At the same time, the system will allow users themselves to create self-organizing applications based on their specific and current needs. Ad hoc teams can create collaborative spaces that cross organizational boundaries if necessary. These applications can leverage either Scopeware Desktops or departmental-level Scopeware Servers.

Because the system has the architecture and capacity to support any level of centralization or decentralization concurrently, applications and their platforms can be engineered centrally or grown organically, and they can be tailored to the needs of their users and the organization on an ongoing basis.

Peer-to-Peer Model. The peer-to-peer (P2P) model allows multiple clients to share IA directly without the use of a dedicated Scopeware server. The P2P model allows for pure ad hoc collaboration among Scopeware clients. For example, a client can share IA via the Internet with identified Scopeware clients that have permission to access IA from the client, and vice versa. This is similar to the distributed enterprise environment except the dedicated Scopeware server has been removed as a storage, retrieval, and connection mechanism. Instead, Scopeware clients will connect point-to-point with other Scopeware clients through a general network connection such as the Internet.

Using P2P, a client can create a virtual shared stream that looks as though it is stored on a server but is in fact stored only

by many clients. Historically, all clients would need access to a shared file folder on a common server in order to share information. With Scopeware, clients can share information that is located on each other's device and are not restricted to a common server or single physical storage location. To illustrate, five clients of Scopeware want to create a shared virtual stream to support a project. They call their group "Team One." Then, when any member of "Team One" posts a document to his or her stream, and marks it "readable by Team One," the system automatically sends a copy to every Scopeware client on the "Team One" list. Each Scopeware client receiving this document pops it into its client's local stream. Thus information created by a client who is a member of "Team One" (and flagged for Team One by the owner) winds up in the local stream of every member of Team One, whether the post is a document, an event (team meeting), task, or contact. It's as if he had sent his posting to a "client" server, and then everyone had polled the server, but in fact there's no server.

The invention claimed is:

**1**. A method of operating a computer system comprising:

providing the computer system with documents from diverse applications in respective formats unique to the respective applications;

causing the computer system to automatically, without user interaction and without requiring a user to designate directory structures or other pre-imposed document categorizations structures, store the provided documents as a time-ordered main stream of documents associated with respective automatically generated time indicators;

said time-ordered main stream being unbounded to thereby accommodate documents associated with time indicators related to past, present and future times;

said time-ordered main stream requiring no fixed beginning or end and being maintained and being selectively retrievable and searchable by the computer system;

said computer system maintaining the main stream live and responsive to subsequent events by automatically incorporating therein new documents as provided to the computer system while maintaining the thus expanded main stream time-ordered;

providing selected search criteria;

causing said computer system to search said time-ordered main stream according to said search criteria and use search results to create a time-ordered substream of documents from the main time-ordered stream;

further causing said computer system to maintain said substream live and responsive to subsequent events by automatically incorporating therein new document provided to the computer system that meet the search criteria while maintaining the thus expanded substream time-ordered;

displaying at least selected portion of the live main stream or substream on computer display means as a display reflecting the time-ordered nature thereof;

automatically showing on the display means a display of a glance view of a displayed document in response to touching with a cursor a screen area associated with the document;

said glance view being an abbreviated version of the document and indicative of content thereof; and

said showing of the glance view occurring essentially instantaneously in response to said touching with the cursor of the screen area associated with the document.

**2**. A method of operating a computer system as in claim **1** in which said displaying comprises displaying respective representations showing content of at least some of the documents in the substream.

**3**. A method of operating a computer system as in claim **2** in which said displaying comprises displaying, as said representations, abbreviated versions of the respective documents.

**4**. A method of operating a computer system as in claim **3** in which said displaying comprises displaying said representations as a receding, foreshortened stack of representations of documents.

**5**. A method of operating a computer system as in claim **1** in which said displaying comprises displaying at least some of the documents in the substream in the form of a card gallery of document representations showing document content.

**6**. A method of operating a computer system as in claim **1** in which the displayed glance view of a displayed document comprises buttons for operations unique to the type of the displayed document, said buttons when touched by a cursor initiating computer system operations related to said document.

**7**. A method of operating a computer system as in claim **1** including utilizing subsystems from another operating system in carrying out at least some of the steps of the method.

**8**. A method of operating a computer system as in claim **7** in which the another operating system comprises one of a Windows operating system and an Apple operating system.

**9**. A method of operating a computer system as in claim **1** wherein said documents reside as respective time ordered streams in at least one server and in a number of personal computers selectively communicating with each other and with the server, and said method comprises using one of the personal computers to search a number of said respective streams in order to create a time-ordered substream.

**10**. A computer readable medium tangibly embodying a program of instructions executable by a computer system to cause the computer system to perform a method comprising:

providing the computer system with documents from diverse applications in respective formats unique to the respective applications;

causing the computer system to automatically, without user interaction and without requiring a user to designate directory structures or other pre-imposed document categorizations structures, store the provided documents as a time-ordered main stream of documents associated with respective automatically generated time indicators;

said time-ordered main stream being unbounded to thereby accommodate documents associated with time indicators related to past, present and future times;

said time-ordered main stream requiring no fixed beginning or end and being maintained and being selectively retrievable and searchable by the computer system;

said computer system maintaining the main stream live and responsive to subsequent events by automatically incorporating therein new documents as provided to the computer system while maintaining the thus expanded main stream time-ordered;

providing selected search criteria;

causing said computer system to search said time-ordered main stream according to said search criteria and use search results to create a time-ordered substream of documents from the main time-ordered stream;

further causing said computer system to maintain said substream live and responsive to subsequent events by automatically incorporating therein new document provided to the computer system that meet the search criteria while maintaining the thus expanded substream time-ordered;

displaying at least selected portion of the live main stream or substream on computer display means as a display reflecting the time-ordered nature thereof;

automatically showing on the display means a display of a glance view of a displayed document in response to touching with a cursor a screen area associated with the document;

said glance view being an abbreviated version of the document and indicative of content thereof; and

said showing of the glance view occurring essentially instantaneously in response to said touching with the cursor of the screen area associated with the document.

**11**. A computer readable medium tangibly embodying a program of instructions executable by a computer system to cause the computer system to perform a method as in claim **10** in which said displaying comprises displaying respective representations showing content of at least some of the documents in the substream.

**12**. A computer readable medium tangibly embodying a program of instructions executable by a computer system to cause the computer system to perform a method as in claim **11** in which said displaying comprises displaying, as said representations, abbreviated versions of the respective documents.

**13**. A computer readable medium tangibly embodying a program of instructions executable by a computer system to cause the computer system to perform a method as in claim **12** in which said displaying comprises displaying said representations as a receding, foreshortened stack of representations of documents.

**14**. A computer readable medium tangibly embodying a program of instructions executable by a computer system to cause the computer system to perform a method as in claim **10** in which said displaying comprises displaying at least some of the documents in the substream in the form of a card gallery of document representations showing document content.

**15**. A computer readable medium tangibly embodying a program of instructions executable by a computer system to cause the computer system to perform a method as in claim **10** in which the displayed glance view of a displayed document comprises buttons for operations unique to the type of the displayed document, said buttons when touched by a cursor initiating computer system operations related to said document.

**16**. A computer readable medium tangibly embodying a program of instructions executable by a computer system to cause the computer system to perform a method as in claim **10** including utilizing subsystems from another operating system in carrying out at least some of the steps of the method.

**17**. A computer readable medium tangibly embodying a program of instructions executable by a computer system to cause the computer system to perform a method as in claim **16** in which the another operating system comprises one of a Windows operating system and an Apple operating system.

**18**. A computer readable medium tangibly embodying a program of instructions executable by a computer system to perform a method as in claim **17** wherein said documents reside as respective time ordered streams in at least one server and a number of personal computers selectively communicating with each other and with the server, and said method comprises using one of the personal computers to search a number of said respective streams in order to create a time-ordered substream.

**19**. A computer system comprising:

inputs providing the computer system with documents from diverse applications in respective formats unique to the respective applications;

a processing system causing the computer system to automatically, without user interaction and without requiring a user to designate directory structures or other pre-

imposed document categorizations structures, store the provided documents as a time-ordered main stream of documents associated with respective automatically generated time indicators;

said time-ordered main stream being unbounded to thereby accommodate documents associated with time indicators related to past, present and future times;

said time-ordered main stream requiring no fixed beginning or end and being maintained and being selectively retrievable and searchable by the computer system;

said computer system maintaining the main stream live and responsive to subsequent events by automatically incorporating therein new documents as provided to the computer system while maintaining the thus expanded main stream time-ordered;

a source providing selected search criteria;

said processing system causing said computer system to search said time-ordered main stream according to said search criteria and use search results to create a time-ordered substream of documents from the main time-ordered stream;

said processing system further causing said computer system to maintain said substream live and responsive to subsequent events by automatically incorporating therein new document provided to the computer system that meet the search criteria while maintaining the thus expanded substream time-ordered;

said computer system:

    displaying at least selected portion of the live main stream or substream on computer display means as a display reflecting the time-ordered nature thereof;

    automatically showing on the display means a display of a glance view of a displayed document in response to touching with a cursor a screen area associated with the document;

    said glance view being an abbreviated version of the document and indicative of content thereof; and

    said showing of the glance view occurring essentially instantaneously in response to said touching with the cursor of the screen area associated with the document.

**20**. A computer system as in claim **19** in which said displaying comprises displaying respective representations showing content of at least some of the documents in the substream.

**21**. A computer system as in claim **20** in which said displaying comprises displaying, as said representations, abbreviated versions of the respective documents.

**22**. A computer system as in claim **21** in which said displaying comprises displaying said representations as a receding, foreshortened stack of representations of documents.

**23**. A computer system as in claim **19** in which said displaying comprises displaying at least some of the documents in the substream in the form of a card gallery of document representations showing document content.

**24**. A computer system as in claim **19** in which the displayed glance view of a displayed document comprises buttons for operations unique to the type of the displayed document, said buttons when touched by a cursor initiating computer system operations related to said document.

**25**. A computer system as in claim **19** in which said processing system utilizes subsystems from another operating system.

**26**. A computer system as in claim **25** in which the another operating system comprises one of a Windows operating system and an Apple operating system.

**27**. A computer as in claim **26** in which said documents reside as respective time ordered streams in at least one server and a number of personal computers selectively communicating with each other and with the server, and said processing system causes one of the personal computers to search a number of said respective streams in order to create a time-ordered substream.

\* \* \* \* \*



US008255439B2

(12) **United States Patent**　(10) **Patent No.:** **US 8,255,439 B2**
Prager et al.　(45) **Date of Patent:** **Aug. 28, 2012**

(54) **DESK-TOP, STREAM-BASED, INFORMATION MANAGEMENT SYSTEM**

(75) Inventors: **Randy Prager**, New York, NY (US);
**Peter Sparago**, Cheshire, CT (US);
**Stephen Marcaurele**, Meriden, CT
(US); **David Gelernter**, Woodbridge, CT
(US); **Eric Freeman**, Bainbridge Island,
WA (US)

(73) Assignee: **Mirror Worlds, LLC**, Tyler, TX (US)

(*) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 67 days.

(21) Appl. No.: **12/966,809**

(22) Filed: **Dec. 13, 2010**

(65) **Prior Publication Data**

US 2011/0145246 A1　Jun. 16, 2011

**Related U.S. Application Data**

(63) Continuation of application No. 11/528,070, filed on
Sep. 26, 2006, now Pat. No. 7,865,538, which is a
continuation of application No. 09/892,258, filed on
Jun. 26, 2001, now Pat. No. 6,768,999, which is a
continuation-in-part of application No. 09/398,611,
filed on Sep. 17, 1999, now Pat. No. 6,638,313, which
is a continuation of application No. 08/673,255, filed
on Jan. 28, 1996, now Pat. No. 6,006,227.

(51) **Int. Cl.**
*G06F 17/30* (2006.01)
*G06F 12/00* (2006.01)

(52) **U.S. Cl.** ...................... **707/828**; 707/822

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,586,035 | A | * | 4/1986 | Baker et al. .................... 345/157 |
| 4,831,758 | A | | 5/1989 | Williams et al. |
| 5,031,346 | A | | 7/1991 | Herring et al. |
| 5,060,135 | A | | 10/1991 | Levine et al. |
| 5,063,495 | A | | 11/1991 | MacPhail |
| 5,140,676 | A | | 8/1992 | Langelaan |
| 5,150,410 | A | | 9/1992 | Bertrand |
| 5,159,669 | A | | 10/1992 | Trigg et al. |
| 5,241,671 | A | | 8/1993 | Reed et al. |
| 5,247,437 | A | | 9/1993 | Vale et al. |
| 5,283,864 | A | | 2/1994 | Knowlton |

(Continued)

FOREIGN PATENT DOCUMENTS

JP　6-180661　6/1994

(Continued)

OTHER PUBLICATIONS

Cowart, Mastering Windows 3.1, 1992, chapter 12, pp. 396-417, Jan.
1, 1992.

(Continued)

*Primary Examiner* — Kuen Lu
(74) *Attorney, Agent, or Firm* — Cooper & Dunham, LLP

(57) **ABSTRACT**

A steam-based document storage and retrieval system accepts
documents that are in diverse formats and come from diverse
application, automatically creates document model objects
describing these documents in a consistent format and asso-
ciating time stamps with the documents to automatically cre-
ate a main stream in chronological order. The stream, or
sub-streams meeting selected search criteria, are displayed in
a variety of forms, including a receding, partly overlapping
stack with aids that facilitate user interaction.

**33 Claims, 11 Drawing Sheets**



U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,287,448 A | 2/1994 | Nicol et al. | |
| 5,297,032 A | 3/1994 | Trojan et al. | |
| 5,299,122 A * | 3/1994 | Wang et al. | 707/1 |
| 5,303,361 A | 4/1994 | Colwell et al. | |
| 5,355,602 A | 10/1994 | Menke et al. | |
| 5,402,526 A | 3/1995 | Bauman et al. | |
| 5,430,710 A | 7/1995 | Mueller et al. | |
| 5,448,729 A | 9/1995 | Murdock | |
| 5,479,602 A | 12/1995 | Baecker et al. | |
| 5,499,330 A | 3/1996 | Lucas et al. | |
| 5,504,852 A | 4/1996 | Thompson-Rohrlich | |
| 5,528,739 A | 6/1996 | Lucas et al. | |
| 5,530,859 A | 6/1996 | Tobias, II et al. | |
| 5,535,063 A | 7/1996 | Lamming | |
| 5,542,086 A * | 7/1996 | Andrew et al. | 707/6 |
| 5,543,088 A | 8/1996 | Halbirt | |
| 5,586,237 A * | 12/1996 | Baecker et al. | 345/670 |
| 5,589,892 A | 12/1996 | Knee et al. | |
| 5,600,833 A | 2/1997 | Senn et al. | |
| 5,603,025 A * | 2/1997 | Tabb et al. | 707/2 |
| 5,613,134 A | 3/1997 | Lucas et al. | |
| 5,616,876 A | 4/1997 | Cluts | |
| 5,621,874 A | 4/1997 | Lucas et al. | |
| 5,621,906 A | 4/1997 | O'Neill et al. | |
| 5,625,818 A | 4/1997 | Zarmer et al. | |
| 5,649,182 A | 7/1997 | Reitz | |
| 5,649,188 A | 7/1997 | Nomura et al. | |
| 5,701,582 A | 12/1997 | DeBey | |
| 5,724,567 A | 3/1998 | Rose et al. | |
| 5,729,730 A | 3/1998 | Wlaschin et al. | |
| 5,737,737 A * | 4/1998 | Hikida et al. | 707/104.1 |
| 5,758,324 A | 5/1998 | Hartman et al. | |
| D395,297 S | 6/1998 | Cheng et al. | |
| 5,764,972 A | 6/1998 | Crouse et al. | |
| 5,778,364 A | 7/1998 | Nelson | |
| 5,784,620 A * | 7/1998 | Isham | 719/316 |
| D398,299 S | 9/1998 | Ballay et al. | |
| 5,835,129 A | 11/1998 | Kumar | |
| 5,835,789 A * | 11/1998 | Ueda et al. | 710/33 |
| 5,890,177 A | 3/1999 | Moody et al. | |
| 5,905,992 A | 5/1999 | Lucas et al. | |
| 5,912,668 A | 6/1999 | Sciammarella et al. | |
| 5,937,417 A * | 8/1999 | Nielsen | 715/207 |
| 6,006,227 A * | 12/1999 | Freeman et al. | 707/7 |
| 6,012,072 A | 1/2000 | Lucas et al. | |
| 6,012,074 A | 1/2000 | Lucas et al. | |
| 6,151,610 A | 11/2000 | Senn et al. | |
| 6,178,409 B1 * | 1/2001 | Weber et al. | 705/79 |
| 6,199,082 B1 * | 3/2001 | Ferrel et al. | 715/205 |
| 6,202,058 B1 | 3/2001 | Rose et al. | |
| 6,243,724 B1 * | 6/2001 | Mander et al. | 715/273 |
| 6,262,732 B1 | 7/2001 | Coleman et al. | |
| 6,396,513 B1 | 5/2002 | Helfman et al. | |
| 6,401,097 B1 | 6/2002 | McCotter et al. | |
| 6,457,017 B2 | 9/2002 | Watkins et al. | |
| 6,466,237 B1 | 10/2002 | Miyao et al. | |
| 6,496,857 B1 | 12/2002 | Dustin et al. | |
| 6,523,048 B2 | 2/2003 | DeStefano | |
| 6,638,313 B1 | 10/2003 | Freeman et al. | |
| 6,639,876 B2 | 10/2003 | Kalis et al. | |
| 6,714,489 B2 | 3/2004 | Kalis et al. | |
| 6,725,427 B2 | 4/2004 | Freeman et al. | |
| 6,768,999 B2 | 7/2004 | Prager et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | 03/001345 A1 | 1/2003 |

OTHER PUBLICATIONS

Freeman, Lifestreams Project Home Page, 3 pages, 1994-1996, Jan. 1, 1994.
Freeman, Lifestreams for the Newton, Steve Mann's Developers Corner, Oct. 31, 1995, 5 pages.
Freeman et al., Lifestreams: Organizing your Electronic Life, AAAI Fall Symposium, AI Applications in Knowledge Navigation and Retrieval, Nov. 30, 1995, Cambridge, MA, 6 pages.
Landsdale, M., The psychology of Personal Information Manage-ment, Applied Ergonomics, (Mar. 1988): pp. 55-66.
Malone, Thomas W., How Do People Organize Their Desks? Impli-cations For The Design Of Office Information Systems, ACM Trans-action On Office Systems, vol. 1, No. 1 (Jan. 1983): pp. 99-112.
Nelson, Theodor H., The Right Way to Think About Software Design, In The Art of Human-Computer Interface Design, Brenda Laurel, (Ed.), (1990): pp. 235-243.
Steinberg, Lifestreams, WIRED 5.02, Feb. 28, 1997, 11 pages.
Getting Results with Microsoft Outlook, copyright Microsoft Cor-poration 1995-1996, pp. 28-29, Jan. 1, 1995.
User Guide; Mirror Worlds Technologies, Inc. (New Haven, Con-necticut).
Gobel, David P., Using Lotus Magellan, Que Corporation (1989).
Retrospect User's Guide, version 3, first edition, Dantz Development Corporation (1989-1995).
Rose, Daniel E., et al., "Content Awareness in a File System Interface: Implementing the 'Pile' Metaphor for Organizing Information", ACM-SIGIR '93 (1993).
Mander, Richard, et al., "A 'Pile' Metaphor for Supporting Casual Organization of Information", ACM-CHI '92 (May 3-7, 1992).
HyperCard Basics and HyperCard Stack Design Guidelines, Apple Computer, Inc. (1990).
Carriero et al. "The 'Lifestreams' Approach to Reorganizing the Information World", YALEU/DCS/TR-1070 (1995).
Gifford, David K., et al., "Semantic File Systems", ACM-SFS '91 (1991).
"On Location 2,0.01" by ON Technology (1990-1991).
Bolour, A., et al., "The Role of Time in Information Processing: A Survey", ACM-SIGART Bulletin, Issue 80 (Apr. 1982).
Rahm, Erhard, "Recovery Concepts for Data Sharing Systems" IEEE (1991).
Inside Macintosh, Addison-Wesley Publishing Company (Aug. 1992).
O'Toole, James W., et al., "Names should mean What, not Where" (1992).
Staples, Loretta, "Representation in Virtual Space: Visual Conven-tion in the Graphical User Interface", ACM-Interchi '93 (Apr. 24-29, 1993).
Goldberg, David., et al., "Using collaborative filtering to weave an information Tapestry", Assocation for Computing Machinery, Inc. (1992).
Gelernter, David, "The Cyber-Road Not Taken", The Washington Post (Apr. 3, 1994).
W3C: A Little History of the World Wide Web, http://www.w3.org/History.html, (Accessed Jul. 15, 2010).
Gelernter, David, "The Cyber-Road Not Taken", The Washington Post, Apr. 3, 1994.
Bolt, Richard A., "Spatial Data-Management", Massachusetts Insti-tute of Technology, 1979.
Lansadale, M.W., et al., "MEMOIRS: A personal Multimedia Infor-mation System", The Proceedings of the Fifth Conference of the British Computer Society Human Computer Interaction Specialist Group University of Nottingham, Sep. 1989.
Pemberton, Steven, "Not With a Whimper", SIGCHI, Apr. 1998.
Miller, James R., "The Apple Advanced Technology Group—An Introduction to the Special SIGCHI Bulletin Issue", SIGCHI, Apr. 1998.
Russell, Daniel M., "The ATG Knowledge Management Technolo-gies Laboratory", SIGCHI, Apr. 1998.
Miller, James R., "An Overview of the ATG Intelligent Systems Program", SIGCHI, Apr. 1998.
Miller, James R., et al., "From Documents to Objects: An Overview of LiveDoc", SIGCHI, Apr. 1998.
Bonura, Thomas, et al., "Drop Zones: An Extension to LiveDoc", SIGCHI, Apr. 1998.
Boguraev, Branimir, et al., "An Architecture for Content Analysis of Documents and Its Use in Information and Knowledge Tasks", SIGCHI, Apr. 1998.
Boguraev, Branimir, et al., "Dynamic Document Presentation", SIGCHI, Apr. 1998.
Nardi, Bonnie, et al., "An Online Digital Photography Course for High School Teachers", SIGCHI, Apr. 1998.
Shulka, Shilpa V., "Hit Squads & Bug Meisters", SIGCHI, Apr. 1998.

Rose, Daniel E., "Beyond Search: the Information Access Research Group at Apple", SIGCHI, Apr. 1998.

Russell, Daniel M., "User Experience Research Group", SIGCHI, Apr. 1998.

Walker, William F., Rapid Prototyping of Awareness Services Using a Shared Information Server, SIGCHI, Apr. 1998.

Bellegarda, Jerome R., "Interaction-Driven Speech Input", SIGCHI, Apr. 1998.

Machiraju, N. Rao, "The ATG Learning Communities Laboratory: An Overview", SIGCHI, Apr. 1998.

Bellamy, Rachel, et al., "Learning Conversations", SIGCHI, Apr. 1998.

Houde, Stephanie, et al., "In Search of Design Principles for Tools and Practices to Support Communication Within a Learning Community", SIGCHI, Apr. 1998.

Roddy, Brian J., et al., "Interface Issues in Text Based Chat Rooms", SIGCHI, Apr. 1998.

Spohrer, Jim, "ATG Education Research: The Authoring Tools Thread", SIGCHI, Apr. 1998.

Graves, Mike, et al., "Unfamiliar Ground: Designing Technology to Support Rural Healthcare in India", SIGCHI, Apr. 1998.

Mountford, S. Joy, "A History of the Apple Human Interface Group", SIGCHI, Apr. 1998.

Harris, Jed, et al., "Discourse Architecture", SIGCHI, Apr. 1998.

Singer, Samuel Weller, "Researches into the History of Playing Cards", Printed by T. Bensley and Son, 1816.

"Playing Poker at Egan's" (image), http://www.orww.org/Hamey_Cattle/Student_Reports/Images/11-Poker_1882jpg (ca. 1882).

"Commercial America", Philadelphia Commercial Museum, Jul. 1911.

"Eleventh Annual Report of the Trustees of the Boston State Hospital", Published by Wright & Potter Printing Co., 1920.

"System—The Magazine of Business", A.W. Shaw Company, 1921.

Ibberson, J.R., MD, "The Business Side of General Practice", Canad. M.A.J., vol. 72, Jan. 15, 1955.

Carlbom, Ingrid, et al., "Planar Geometric Projections and Viewing Transformations", Computing Surveys, vol. 10, No. 4, pp. 465-502, Dec. 1978.

Schmandt, Christopher Martin, "Pages Without Paper", Bachelor of Science Thesis at the Massachusetts Institute of Technology, Dec. 1978.

Donelson, William C., "Spatial Management of Information", Architecture Machine Group, Massachusetts Institute of Technology, Proceedings of the 5th Annual Conference on Computer Graphics and Interactive Techniques, 1978.

Bolt, Richard A., "Put-That-There": Voice and Gesture at the Graphics Interface, Architecture Machine Group, Massachusetts Institute of Technology, ACM, 1980.

Halasz, Frank, et al., "Analogy Considered Harmful", Association for Computing Machinery, 1981.

Bolt, Richard A., "Gaze-Orchestrated Dynamic Windows", Architecture Machine Group, Massachusetts Institute of Technology Cambridge Massachusetts, ACM, Computer Graphics, vol. 15, No. 3, Aug. 1981.

Williams, Gregg, "The Lisa Computer System", BYTE Publications, Inc., Feb. 1983.

Williams, Gregg, "The Apple Macintosh Computer", BYTE Publications, Inc., Feb. 1984.

Anderson, John J., "Atari 520ST: A Reborn Atari Once Again Points the Way to the Next Generation", Creative Computing, vol. 11, No. 10, Oct. 1985.

Greenberg, Saul, et al., "Issues and Experiences in the Design of a Window Management System", Canadian Information Processing Society—Edmonton Conference, 1986.

Henderson, D. Austin, Jr., et al., "Rooms: The Use of Multiple Virtual Workspaces to Reduce Space Contention in a Window-Based Graphical User Interface", ACM Trans. On Graphics, vol. 5, No. 3, pp. 211-243, Jul. 1986.

Robek Mary F., et al., "Information and Records Management", 3rd ed., Glencoe Publishing Co., pp. 160-163, 179-181, 192-193, 224-229, 248-251, (1987).

Lynch, Vincent, "American Jukebox—The Classic Years", Chronicle Books, pp. 36, 74-75, (1990).

Robertson, G. G., et al., "Cone Trees: Animated 3D Visualizations of Hierarchical Information", UIR-R-1991-06, (1991).

Card, S. K., et al., "The Information Visualizer: An Information Workspace", UIR-R1991-01, (1991).

Mackinlay, Jock D., et al., "The Perspective Wall: Detail and Context Smoothly Integrated", UIR-R-1991-03, (1991).

Kay, Alan C., "The Early History of Smalltalk", ACM SIGPLAN Notices, vol. 28, No. 3, Mar. 1993.

Adams, Michael, et al., "Jukeboxes", Schiffer Publishing, Ltd., pp. 85-86, 103-104, 105, (1996).

Card, Stuart K., et al., "The WebBook and the Web Forager: An Information Workspace for the World-Wide Web", CHI '96 Conference on Human Factors in Computing Systems, Apr. 13-18, 1996.

Meyers, Brad A., "A Brief History of Human-Computer Interaction Technology", Interactions, pp. 44-54, 1998.

Bardini, Thierry, "Bootstrapping", Stanford University Press, Chapter 6, pp. 143-181, (2000).

Sutherland, Ivan Edward, "Sketchpad: A Man-Machine Graphical Communication System", PhD Dissertation at the Massachusetts Institute of Technology, Jan. 1963.

Engelbart, Doug, "The Click Heard Round the World", Wired Magazine, 2004.

Reimer, Jeremy, "A History of the GUI", arstechnica.com, May 5, 2005.

"The Library of Congress Classification System", Aug. 2006.

Barnes, Susan B, "Alan Kay: Transforming the Computer into a Communication Medium", IEEE Annals of the History of Computing, 2007.

Calamar, Gary et al., "Record Store Days: From Vinyl to Digital and Back Again", Sterling Publishing Co., 2009.

Masinter, Larry, "Document Management, Digital Libraries and the Web", Jun. 9, 1995.

Herot, Christopher F., "Spatial Management of Data", Computer Corporation of America, ACM Trans. On Database Systems, vol. 5, No. 4, pp. 493-514, Dec. 1980.

Newman, William M., "A System for Interactive Graphical Programming", Harvard University, ACM Spring Joint Computer Conference, 1968.

Schultz, Jan R., et al., "An Initial Operational Problem Oriented Medical Record System—for Storage, Manipulation and Retrieval of Medical Data", University of Vermont, ACM Spring Joint Computer Conference, 1971.

Apple Macintosh (screenshot image).

Carriero, Nicholas, et al., "Bauhaus Linda", Department of Computer Science, Yale University.

"Small Talk on the Alto" (image).

Donelson, William C., "Spatial Management of Data", Massachusetts Institute of Technology, 1977.

"Lotus Magellan Explorer's Guide", Lotus Development Corp., 1989.

Factor, Michael, et al., "Real-Time Data Fusion in the Intensive Care Unit", Yale University, Nov. 1991.

Gelernter, David, et al., "Graphics Interfaces & Sensor Activator Extensions for the Process Trellis Software", Yale University, Oct. 31, 1995.

"Lifestream" (image), 1995.

Harrison, Beverly L., et al., "Timelines: An Interactive System for the Collection and Visualization of Temporal Data", Proceedings of Graphic Interface '94, pp. 141-148, (1994).

"IBM OS2" (screenshot image).

Gerlenter, David, "Applications and Systems for Large Scale Adaptive Parallelism", Mar. 22, 1997.

Date, C. J., "An Introduction to Database Systems, 3rd ed., The Systems Programming Series, vol. 1", IBM Corporation, Addison-Wesley Publishing Company, 1981.

"The Billboard" (magazine), Jan. 26, 1946.

"Billboard" (magazine), Jul. 4, 1992.

"Library of Congress Classification" (accessed May 6, 2010).

Swineheart, Daniel C., et al., "A Structural View of the Cedar Programming Environment", ACM Trans. On Programming Languages and Systems, vol. 8, No. 4, Oct. 1986.

"Commodore Amiga 1000 Computer" (screenshot image).

"Atari 520ST Computer" (screenshot image).

Lucas, Peter, et al., "Workspace: A Scriptable Document Management Environment", Maya Design Group, Conference Companion CHI '94, Apr. 1994.

Bailay, Joseph M., "Designing Workscape: An Interdisciplinary Experience", Maya Design Group, Conference Companion CHI '94, Apr. 1994.

Perkins, Roderick, et al., "Inventing the Lisa User Interface", Interactions, pp. 40-53, (1997).

Feiner, Steven, et al., "An Experimental System for Creating and Presenting Interactive Graphical Documents", ACM Trans. On Graphics, vol. 1, No. 1, pp. 59-77, Jan. 1982.

Houde, Stephanie, "Iterative Design of an Interface for Easy 3-D Direct Manipulation", CHI '92, May 1992.

"Announcing Retrospect and Retrospect Remote 3.0", Business Wise, Aug. 8, 1995.

"Dantz Delivers Retrospect Archives", MacWEEK, Inc., Jun. 10, 1989.

"Archiving Easy on Retrospect: Uniform Interface to Storage Devices", MacWEEK, Inc., Feb. 21, 1989.

"Mac the Knife, GmbH Rumors", MacWEEK, Inc., Jan. 31, 1989.

"Dantz, ChrisMac drive over to CD-R", MacWEEK, Inc., Dec. 11, 1995.

"System 7.5.2 Fixes", MacWORLD, Oct. 1, 1995.

"Dantz to Waltz in with Friendlier Retrospect", MacWEEK, Inc., Jul. 31, 1995.

"Dantz Eases Network Backup", InfoWorld, Jan. 11, 1993.

"Retrospect User's Guide", 1st Ed., Dantz Development Corporation, 1989.

"Retrospect User's Guide", 2nd Ed., Dantz Development Corporation, 1993.

"Rowe CD100b Jukebox" (image).

Spence, Robert, et al., "Data Base Navigation: An Office Environment for the Professional", Behavior and Information Technology, vol. 1, No. 1, pp. 43-54, (1982).

Johnson, Jeff, et al., "The Xerox Star: A Retrospective", IEEE Computer, Sep. 1989.

Shneiderman, Ben, "The Eyes Have It: A Task by Data Type Taxonomy for Information Visualizations", University of Maryland, Proc. Visual Languages, Sep. 1996.

Rittsteiger, Andreas, "AMI Jukeboxes" (images).

Apple Computer Inc. v. Microsoft Corporation, 35 F.3d 1435 (9th Cir. 1994).

Windows 1.0 (screenshot image).

Windows 2.0 (screenshot image).

Windows 3.0 (screenshot image).

Windows 95 (screenshot image).

Windows NT3.1 (screenshot image).

Plaisant, Catherine et al. "Lifelines: Visualizing Personal Histories", ACM CHI '96 Conference Proc., pp. 221-227, color plate 518, Apr. 1996.

Musthaler, Linda, "A Tall Order for Document Managers", Network World, pp. 3540, Jul. 18, 1994.

Seiden, Peggy, et al., "Information Retrieval Systems for Microcomputers", Library Hi Tech, vol. 3, Issue 1, pp. 41-54, (1985).

"Zylab Includes Auto-Indexing in Zyindex 3.0", InfoWorld, vol. 10, Issue 18, p. 16, May 2, 1988.

Kappes, Sandra, et al., "Document Management for the Knowledge Worker System", US Army Corps of Engineers, USACERL ADP Report 95/38, Nov. 15, 1995.

"Verity K2 Toolkit Search System Administration Guide V2.2", Verity Incorporated, Jul. 20, 2000.

Cleveland, Gary, "Overview of Document Management Technology", International Federation of Library Associations and Institutions Universal Dataflow and Telecommunications Core Programme, Jun. 1995.

Factor, Michael, et al., "The Trellis Architecture for Intelligent Monitors", Department of Computer Science, Yale University, 1990.

Bush, Vannevar, "As We May Think", Life Magazine, Sep. 10, 1945.

Lansadale, M.W., et al., "Memoirs: A personal Multimedia Information System", Elseiver Science Publishers B.V., 1989.

Lansadale, M.W., et al., "Memoirs: A personal Multimedia Information System", 1995.

Bush, Vannevar, "As We May Think", The Atlantic Monthly, Jul. 1945.

"On Location Manual, v. 1.0", On Technology, Inc., 1990.

Coolidge, C. M., "Dogs Playing Poker (His Station and Four Aces)" (image), 1903.

Musthaler, Linda, "DMS's getting mix-and-match wardrobe," Network World, pp. 38-41, Jan. 8, 1996.

Kullberg, Robin Lee, "Dynamic Timelines: Visualizing Historical Information in Three Dimensions", Massachusetts Institute of Technology, 1995.

USDC-EDTX 6:08-cv-88 LED *Mirror Worlds v. Apple Inc.*; Apple Inc's Motion for Summary Judgement (partially redacted).

USDC-EDTX 6:08-cv-88 LED *Mirror Worlds v. Apple Inc.*; Expert Rebuttal Report of John Levy, Ph.D. (partially redacted).

USDC-EDTX 6:08-cv-88 LED *Mirror Worlds v. Apple Inc.*; Expert Report of Steven K. Feiner, Ph.D. (confidential).

Solomon, Gitta, "Piles Metaphor ATG" (video), Apple Computer, Inc., Mar. 1992.

"Spatial Data Management System" (video), MIT, Jan. 1980.

Milash, Brett, et al., "Lifelines: Visualizing Personal Histories" (video), University of Maryland, Apr. 1995.

Lucas, Peter, "CHI '94 Video" (video), Maya Design Group, CHI '94, 1994.

Lucas, Peter, "Workscape Video" (video), http://www.youtube.com/watch?v=H5-T_S50Sr4 (screen capture video), (1993).

"200 Points of Light" (video) http://vvww.youtube.com/watch?v=H9F17JrG-SE (screen capture video), (1990).

*Mirror Worlds, LLC v. Apple, Inc.* Memorandum Opinion and Orderdated Aug. 11, 2010.

*Mirror Worlds, LLC v. Apple, Inc.* Mirror Worlds, LLC Notice of Dismissal with Prejudice of Certain Infringement Claims dated Sep. 1, 2010.

*Mirror Worlds, LLC v. Apple, Inc.* Mirror Worlds, LLC Defendant and Counterclaim Plaintiff Apple Inc's Notice of Asserted Prior Art for Trial dated Sep. 6, 2010.

*Mirror Worlds, LLC v. Apple, Inc.* Memorandum Opinion and Order dated Sep. 16, 2010.

*Mirror Worlds, LLC v. Apple, Inc.* Verdict form dated Oct. 1, 2010.

*Mirror Worlds, LLC v. Apple, Inc.* Memorandum Opinion and Order dated Apr. 4, 2011.

Carriero et al. "The 'Lifestreams' Approach to Reorganizing the Information World", YALEU/DCS/TR-1070v2 (Apr. 1995).

* cited by examiner



Search Field
Main Menu
Ice cream
Code1
Pets
Reminder:
Staff Meeting 10 AM
Dinner Idea
Company Meeting
Mirror World
Technologies
Lunch 1
User's Guide TOC
Importing address book
Lunch Anyone?
Lifestreams Admin
Improvements
Sep. 27, 2000
Polar contacts
Sales & Marketing
Power Point test
September 28, 2000
January 19
applications
Documents 1 - 15 of 48
Options
Welcome, Isabel: January 23, 2001
View|Prefs|Tools|Help|Log Out
Power Search|Save Stream|Default
View
Stream
48 Documents found for (feeds: main), sorted by time, descending
My Streams
New
Header
Lunch Anyone?
Copy|Delete|Edit|Forward|Properties
Ready|Thread|View
Date: 9/27/2000 3:23; Owner: Isabel
memo
Is anyone interested in lunch tomorrow?
Let me know by 11 am tomorrow.
Close
Document Operations
Document Glance
scopeware
Information in perspective
Type glyphs identity doc type
Thumbnails
Stream View Options
Navigation Buttons

FIG. 1

Universal Data Model Translation



S201
User uploads information Asset through Browser or client software application

S202
Software application agent, like Doc Feeder, uploads information Asset

S203
Content type determined whether it is a Scoopware recognized content type or unknown content type

S204
Text extracted from the information asset

S205
Text associated with the information asset is extracted

S206
A thumbnail picture of the information asset is created

S209
Keywords are assigned either as defined by the user or through the Doc Feeder or Crawling agent

S210
A Globally Unique Document ID is generated using a 64-bit code and assigned to the information asset

S211
Document operations are determined based on automatic assignment, content-type specific, solution specific, user specific, or other criteria

SEE FIG. 2B

F I G. 2A

SEE FIG. 2A



S207

An automatic summary of the information asset is created from the first 500 words, 10 sentences, or other criteria

S208

Permission list is created defining owner, read list, and write list. Permission defined by user, DOC Feeder or Crawling agent, programmatic mapping, or default

S212

Optional operations are assigned for example OCR functions

S213

The DOM is submitted to the indexing engine to index all text fields in the DOM

S214

Dom is submitted to the storage service

S215

Universal Document Object Model

Flowchart Shape Key

Process

Document Object

F I G. 2B

Scopeware Agents are Translators into Scopeware Document Object Models



Information Assets in a File-System

New information Asset — 301

Modified information Asset — 302

Deleted information Asset — 303

Information Assets stored In a file-system — 304

S305 — Scopeware agents translate new information Asset Into a new DOM

S306 — Scopeware agents translate information Asset modifications to update DOM and time stamp the change

S307 — Scopeware agents execute action and remove information Asset from Scopeware repository

Information Asset appears in Scopeware view

Information Asset is updated in Scopeware view

Information Asset is removed from Scopeware view

Flowchart Shape Key

Document Object

Stored Data

Process

Display

F I G. 3

Information Assets in a Programmatic information System
New information Asset
Modified information Asset
Deleted information Asset
S401
Programmatic information System receives Information Asset
Scopeware agents translate new information Asset Into a new DOM
Scopeware agents translate information Asset modifications to update DOM and time stamp the change
Scopeware agents execute action and remove information Asset from Scopeware repository
Information Asset appears in Scopeware view
Information Asset is updated in Scopeware view
Information Asset is deleted from Scopeware view
Flowchart Shape Key
Document Object
Process
Display

FIG. 4

Instantaneously Dynamic, Tailored, and Interactive
Document Glance Views
S501
A user hovers the computer cursor over a document's browse card
S502
A glance view appears on screen using a technology such as Dynamic HTML
S503
Glance view appears on screen
S504
Does user click on a browse card?
YES
NO
S505
User Clicks
S506
Scopeware fixes the glance view for the browse card selected
S507
Glance view remains in display
S508
Does the user select any of the visible and available document operations ?
YES
NO
S509
User selects any of the visible and available document operations
S510
Scopeware executes the selected operation
S511
Operation is confirmed or performed on screen
S512
User continues to hover the computer cursor over the stream of browse cards and repeat the process
S513
The glance view instantly changes as the user moves over other browse cards
S514
Glance view appears on screen
Flowchart Shape Key
Display
Process
Manual Operation
Decision

FIG. 5



**Granular Permissions**

601 — A specific information Asset

S602 — Permissions automatically assigned by Doc Feeder or other Scopeware application agent

S603 — Permissions automatically assigned by programmatic system, such as LDAP, Active Directory, Access Control List, NT DS, or other method

S604 — Permissions are manually assigned by the Scopeware user

Flowchart Shape Key
- Process
- Document Object
- Display

S605 — Information Asset permission granted to all public Scopeware user

Information Asset permission granted to public to local groups through selected VIPs, pop-up list from LDAP or Scopeware group service, parent server, or add-hoc group

Information Asset permission granted to specific groups and users within Scopeware through either a pop-up list from Scopeware or LDAP

S608 — Information Asset permission is frozen not allowing changes by any user

S609 / S606 — The Information Asset is available to all public Scopeware user

S610 — The Information Asset is available to select users from public to local groups

S611 — Only specific groups and users within Scopeware can access Information Asset

S607 / S612 — Permissions are frozen and do not allow changes to the Information Asset

F I G. 6

Integrated Results Sets From Distributed Searches
User at Source computer selects peer computers (peers) across which the distributed search will be performed
S701
S703
Central Registry with peer lookup?
NO
S704
User specified IP addresses of peers?
NO
YES
S705
YES
Source computer sends out a search request to each selected peer in the network
Flowchart Shape Key
Display
Process
Manual Operation
Decision
S706
Each peer that receives the search request queries its index for documents that match the search criteria
S707
The peer computer sends its results set back to the Source computer
S708
Source computer takes results from each peer and builds a single collective results set
S709
Source computer continues to expand this collective results set in real time as it receives additional results until all peers have responded
S710
A collective results set is displayed preferably in a time-ordered stream

FIG. 7

Tri-State Selection Tree



F I G. 8

Top-Down Stream Architecture





⊙┄┄┄┄⊙ Shuttle Interface Point-to-Point Connection XML-HTTP or SOAP

⊙————⊙ Shuttle Interface Polling Connection XML-HTTP

⚡ Server-Server Shuttle Interface XML-SOAP

1 Scopeware clients form an ad-hoc group, connecting directly to other Scopeware clients, using any parent Scopeware server for basic address look-up and resolution. Documents are replicated to each connected group member.

F I G. 9



Top-Down Stream Architecture
Document
Scopeware
Scopeware
Scopeware
Scopeware
1
2
3
4
Scopeware
Scopeware
Shuttle Interface Polling Connection XML-HTTP
Server-Server Shuttle Interface XML-SOAP
1 A client creates a document that is sent via the shuttle interface
2 Locally connected Scopeware clients that are polling the parent server will receive a document shell notification of new document matching the selected query
3 Scopeware server transmits the document to any known Scopeware server peers
4 Locally connected Scopeware clients that are polling the peer server will receive a document shell notification of new document matching the selected query

FIG. 10

1

# DESK-TOP, STREAM-BASED, INFORMATION MANAGEMENT SYSTEM

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a Rule 1.53 (b) continuation of U.S. patent application Ser. No. 11/528,070 filed Sep. 26, 2006, which in turn is a Rule 1.53 (b) continuation application of U.S. patent application Ser. No. 09/892,385 filed Jun. 26, 2001, which in turn is a continuation-in-part of U.S. patent application Ser. No. 09/398,611 filed Sep. 17, 1999 and now U.S. Pat. No. 6,638,313, which in turn is a Rule 1.53 continuation of U.S. patent application Ser. No. 08/673,255 filed Jun. 28, 1996 and now U.S. Pat. No. 6,006,227, and hereby incorporates by reference said prior applications in their entireties, as though fully set forth herein.

## INCORPORATION BY REFERENCE OF MATERIAL ON COMPACT DISC

This patent specification incorporates by reference the contents of the compact disc attached hereto in duplicate (Copy 1 and Copy 2). Each disc is labeled in accordance with Rule 1.53(e)(6), with the collective names Scopeware 2.0 and Vision 1.0. The date of creation of the files on the disc is Jun. 25, 2001. The computer code on the compact disc was generated from correspondingly named source code. The names of individual files on the disc within these collective names, as well as the size of the individual files, are identified in the list of files attached to the Transmission Letter In Accordance with 37 C.F.R. §1.52(e)(ii). The contents of the compact disc submitted herewith in duplicate and the contents of the list of files attached to said Transmission Letter are hereby incorporated by reference in this application as though fully set forth herein.

## FIELD

This patent specification is in the field of systems for handling information by computer and more specifically relates to an enhanced system for handling heterogeneous items of information to store, manage, customize, organize and/or deliver such information regardless of its source and type in particularly efficient, easy-to-use, and intuitively understood.

## BACKGROUND AND SUMMARY

Traditional information management systems store and retrieve documents on the basis of attributes such as the name and storage location of a document. This, however, can get very unwieldy in typical usage, as more and more names and locations of documents become a part of the storage and retrieval scheme. Although it is possible in some cases to search or order documents by other attributes, such as content and time of creation or revision, it may still be necessary to specify which file folders, directories, or storage devices to search. If a user no longer remembers how a particular item of information was stored in a traditional system, it may be difficult or impractical to retrieve it efficiently.

In an effort to alleviate these and other concerns with traditional storage and retrieval systems, and to provide a more effective and natural approach that better fits the way people tend to work with and think of items of information, a new system described herein uses approaches that rely primarily on an intuitive, time-associated way of dealing with information. The system is stream-based in that it creates

2

time-ordered streams of information items or assets, beginning with the oldest and continuing through current and on to future items. An information item or asset in this system can be any type—a file, an email message, bookmark, IRL, memo, draft, scanned image, calendar note, photo, shopping list, voicemail, rolodex or business card, a video clip, etc. When a user tunes in a stream, ordinarily a receding parade of documents appears on the screen. The closest are nearest in time. When a new document arrives, for example when a new email message comes in, it appears at the head of the stream, at the front of the parade. (When a newer message arrives, it steps in front of the parade.) Further-away documents are older.

Ordinarily, a user stands at the line current in time and looks into the past, but the stream also extends into the future. If the user has a meeting next Tuesday at 10 AM, a note to that effect goes into the stream's future, and a note about a meeting Wednesday goes in the stream in front of the note about next Tuesday. Documents in the stream flow steadily onward, as time does. Documents in the future part of the stream flow toward the present; documents in the present flow toward the past. Newly arriving documents push older documents further into the past.

The receding parade of documents is an efficient way to present information on a computer screen. The display uses foreshortening for a perspective effect to pack more information into limited space. For easy browsing, when the user touches a document on the screen with the cursor, a summary of that document with a thumbnail vies appears immediately, without requiring clicking or other user action, as a browse card—a dedicated small window besides the receding parade of time ordered documents. The user controls the displayed stream with VCR-type controls, to move forward or back, to go toward or to the beginning or the end of time in the stream, to now, or to any date or time, past or future.

An item of information in a stream need not be given a name, or a designation of storage location. In a traditional system, a requirement that all documents have names can have implications beyond the necessity of inventing and remembering names. For example, emails may not have names of their own but may need to be stashed inside some other file; to search for an email the user may need to go to this special mail file and search that file. In the system disclosed here, items of information such as emails do not need to be named and can be searched along with any other types of information items.

Searches in the disclosed system can be by a combination of three methods, search, browse, and time-order.

Time-order in itself often makes it possible to locate documents. Often the user needs a document that showed up recently, this morning, or two days ago, or at some time that can be pinned down with some degree of accuracy. Time-order together with browsing through the stream (and its glance views) makes it possible to glance quickly through the documents that are from the approximate time of interest and quickly pull out the right one. (While traditional systems can time-order documents it often is difficult to intersperse in the list all recent emails, news updates, bulletin-board postings, URLs and other documents, let alone voicemail messages. Without a browse feature for a stream as disclosed herein, such a list can be of little value, whereas with browse and an all-encompassing stream that gets updated promptly with new material, one can sweep over large numbers of documents, get instance glances (summary, thumbnail, etc.) of each and find the right one fast.)

When searching in a stream in the disclosed system, the user gets a new stream—a substream. One can search on any

word or phrase, as every word in every document is indexed, on document types and metadata, and on time-related data (e.g., show me all email from last March). If the user searches for an entity called Schwartz Bottling, the new substream will the narrative or documentary history of all dealings with that entity—first contacts, subsequent internal documents or communications, reports, calendar items, and so on.

A substream in the disclosed system is in some ways similar to a folder or directory in a traditional system. Instead of a "Schwartz Bottling" folder in which the user has put documents by so naming them, he/she has created a substream with those document, and can save it for later use or create it again as needed. The substream can do all a folder can but is much more powerful than a folder. A substream collects documents automatically; the user has to put documents in a folder by hand, one by one. A substream can persist in that it continues to trap newly created or received documents that match it. If a user looks at the "Schwartz Bottling" substream tomorrow, she/he may find it has grown to include a new email or other documents that were interspersed automatically. A substream can tell a story, and include the future. A substream is non-exclusive, in that a document can belong to many substreams. A folder in a traditional system imposes on computers many of the obsolete, irrelevant limitations of a physical filing cabinet drawer or folder. A substream is an organizational tool that can make more efficient use of computer characteristics than an analog of filing an retrieving physical documents.

One reason for the efficiency of the disclosed system is that it handles all types of different documents, or items of information, in essentially the same way, even if the document is of a type or format unknown to the system. Each document when created, received or otherwise encountered is treated consistently according to a universal Document Object Model (DOM). As described below in more detail, the system processes the document to create its Document Object Modes that includes various aids such as significant information about the document including items such as summary, type of document, thumbnail of the document, who is the document' owner, who has permission to access the document, keywords, command options, time stamp, index, etc. This creation of a document's DOM is done automatically, although the user can aid the process. It can be done by a translator agent or programmatically.

The system creates a glance view or browse card of each document that has the same overall format to make searching for and working with a document more intuitive but also is specific to the documents in many ways. One important difference from traditional systems is that the browse card has command buttons that match the type of documents. While the command set for traditional systems may use the same command button set for different types of documents, in the disclosed system the command set that shows in the displayed browse card is specific to the document—it has the unique combination of command buttons that make sense for that document. The command buttons unique to the browse card can be shown on the card itself or separately.

The browse card comes on the screen automatically when the cursor is over the corresponding document in the displayed stream; the user need not take any other action such as clicking on the document or taking an action calling a program that can open or work with the document.

The universal DOM of a document is created automatically as a new document of any type is added to the basic stream of information items. It is done for any existing, legacy documents, when the system is first installed on a computer, and is done as any additional documents are created or otherwise

come in. Metadata such as owner, date, access permission and keywords are created as part of this automatic process.

Access permission is a part of a document's metadata, so permission levels need have the constraints of traditional information handling systems where a group or an individual typically has access to all documents in a particular folder or directory, or has a particular type of access to a folder.

Search results are integrated into a substream, at the right place, when and as they become available. The user can start using an incomplete substream and watch it build up. If the search must extend over a number of computers or even servers, and some are unavailable at the time, the results that come in when any become available are integrated into the substream at the right places.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 illustrates a screen that can serve as a default view when a software product according to a preferred embodiment is opened on a computer; the labels that are added are not normally a part of the displayed screen.

FIGS. 2-8 are flowcharts illustrating processes in an example of a preferred embodiment.

FIGS. 9 and 10 are examples of configurations in a preferred embodiment.

DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

FIG. 1 illustrates a default screen seen on a PC or other equipment working with the disclosed system. It can show up upon turning on the computer, or upon calling the disclosed system. As seen in FIG. 1, the screen illustrates a receding stream of documents, with the most recent documents at the front. Passing the cursor over a document in the stream causes that document's "glance view" or "browse card" to appear on the screen. The glance view of a document is so labeled in FIG. 1. The screen also includes the following features appropriately labeled in FIG. 1: (a) the Search Field is an area in which the user can type one or more words for which the system will search in documents (information assets) in the displayed part of the stream and/or in additional information assets that might not be displayed; (b) the Main Menu is where the user sets preferences, finds help information, logs out, and/or performs other operations; (c) the Header contains information such as links, command buttons and choice boxes used to navigate; (d) the Stream View Options allow the user to configure the presentation of the stream of information assets; (e) the Document Glance allows quick scanning of information assets that are visible on the screen, and presentation of more detailed information on the selected information asset; (f) the Type Glyphs identify the nature of an information asset at a glance (e.g., a Word document); and (g) the Thumbnails is a graphic representation of the type of document (e.g., an audio file, an email, an event, etc.). The User Guide published by the assignee hereof (a copy is submitted concurrently with the filing of this application with an IDS form) further describes the operation of a relevant example and, together with the programs contained in the compact disc submitted herewith, provides a more detailed disclosure of a preferred embodiment.

Certain particularly novel features of the disclosed system are described below by reference to flowcharts and block diagrams. More detailed information on a particular example of implementation of these and other features of the system

are evident from the software on the attached compact disc, which is the best mode known to the inventors at the time of filing this patent application.

FIG. **2** illustrates creation of a universal data object model of a documents in accordance with a preferred embodiment. This is an important part of the disclosed system that helps make possible the efficient handling of heterogeneous document types in a manner that users find easy and intuitive. A document object model (DOM) can be thought of as a document shell of the information asset (IA) that contains, anon other items, a thumbnails of the information asset, permission rights, and metadata. The DOM is created from the IA and is stored in a desktop computer and/or a server, either independently of the IA itself or with a replica (copy) of the IA. From there, the system makes the DOM (with a pointer to its IA or replicated IA) to the desktop user or to users that have access to the document through some computer connection.

As seen in FIG. **2**, the process of creating a DOM starts with the uploading at step S**201** of information assets (documents) through a browser or a client software application, or step S**202** with uploading using a software application agent called Doc Feeder in a specific embodiment of the disclosed system. At the following steps, which need not be performed in the order of their description below, a DOM of the IA is created. The IA uploaded at step S**201** or S**202** can comprise structured or unstructured data. At step S**203** the process determines the content type of the IA, e.g., if it is a type that the system recognizes. If it is, the system includes content-type specific metadata in the document's DOM: MIME/content type information, a glyph of the application that creates/ views the content-type, and/or the system assigns other content-type data to the DOM shell. If step S**203** determines that the IA is an unknown content type, it assigns to the DOM a content-type for "unknown content-type.". Step S**204** extracts text from the information asset, for example, in a text document, this step extracts the text of the document. Step S**205** extracts text that may not be within but may be associated with the information asset, for example, the time stamp of the document, the owner of the document, and possibly other textual information that is or can be associated with the document. Other possible examples are attributes of the IA such as file reference path, database/repository path, file metrics such as size, encryption, other identification information, etc. Step S**206** generates a thumbnail picture of the IA. The thumbnail can be a reduced-size picture of the document, for example of the first page, and can be converted to a graphic image format. Other examples of thumbnails are JPEG, MPEG, BMP, GIF, AVI, or other still or moving image files representative of some aspect of the IA. Step S**207** produces an automatic summary of the IA, e.g., a replica of its first 500 words, or first 10 sentences, or some other information copied or otherwise derived from the IA. Step S**208** creates a permission list unique to the IA that defines the owner of the IA (e.g., its creator), and lists of people or entities and groups that can access the IA or the DOM of that IA for reading and/or writing purposes. This permission list can be defined by the user for the particular IA or for a class of IAs, or can be created automatically, e.g. by software agents called Doc Feeder or Crawling agent in a particular embodiment of the described system, or by programmatic mapping such as LDAP, Active Directory, NTDS or some other mapping. Alternatively, at least for some documents, the permission list can be default setting.

Step S**209** assigns keywords to the information asset. The software agents Doc Feeder or Crawler can assign keywords, and the user can manually assign or add keywords. Step S**210** generates and assigns to the IA a Globally Unique Document ID, e.g. 64 bit code unique to the IA. Step S**211** determines and assigns to the IA document operations that are unique to the IA. Depending on this IA, these operations or command buttons can be basic, such as "View" and "Reply." They can be content-specific, such as "Play" for multimedia information assets. They can be solution-specific, such as "Fax of Purchase." They can be user-specific, such as "Delete" allowed to only certain users. An important point is that the operations or command buttons assigned to a particular IA match the IA and need not be the same for different information assets, as is the typical case with traditional information management systems. Step S**212** assigns optional operations or command buttons to the IA. They include, for example, commands to send the IA to an optical character recognition (OCR) service that can be a separate service, IP, HTTP-based or an asynchronous operation. Alternatively, the optional operation can be another OCR operation that can perform OCR on a selected part of the IA, or on digital graphic portions or can involve multi-part associations. At step S**213**, the information asset is submitted to an indexing engine (asynchronous service) Again, this can be a separate service, IP, HTTP-based. This step can index all or selected fields of the IA, including but not limited to the IA summary, title, permissions, IA text, keywords, time, metadata, and content-type. At step S**214** the DOM created as described above is submitted to a storage service. This can be a database that is a file reference with a pointer to the actual location of the IA on a network or a local file system, or it can be a database that contains the actual IA in a repository such as a user's computer or a centralized repository. The document object model so generated is made available for use in step S**215**.

FIGS. **3** and **4** illustrate methods of creating document object models from information assets. As seen in FIG. **3**, three type of information assets are involved—new information assets **301**, modified information assets **301**, and deleted information assets **303**. All come to a file system **304**. At step S**305**, agents specific to the disclosed embodiment of the system known as Scopeware 2.0 translate the IA into a DOM, i.e., create a DOM shell for the IA, with attributes as discussed in connection with FIG. **2**. At step S**306**, Scopeware agents translate the IA modifications into an updated DOM and time-stamp the change so the new time-stamp becomes a part of the DOM and the modified IA can be places in the stream of documents at a place reflecting the new time-stamp. At step S**307**, Scopeware agents execute actions for removing the deleted IA from the repository of documents. The display, such as that seen in FIG. **1** reflects the actions takes at steps S**305**, S**306** and S**307**. As a result of step S**305**, the stream on the display shows at **308** the new IA (provided the time period where the new IA fits is being displayed). As a result of step S**306**, the modified IA appears at **309** in its correct place in the displayed receding stream of documents. As a result of step S**307**, the deleted documents is removed at **310** from the displayed stream, and the remaining In FIG. **4**, a programmatic information system received new, modified and deleted information assets for storage and distribution to appropriate translation agents as illustrated. In other respects, the FIG. **4** arrangement corresponds to that of FIG. **3**, so the description of corresponding portions will not be repeated.

At least some of the document object model created as described above becomes a part of a glance view or browse card of the type illustrated in FIG. **1**. An important feature of the system disclosed here is to conveniently display such a glance view in a natural and intuitively accepted way to facilitate operations.

Traditional user interfaces for computers typically present lists or graphical icons of "documents" (including but not

limited to computer files, emails, web pages, images and other types of electronic information). These lists and icon displays provide only a limited amount of information about the document—typically, title and application type only, although additional information as well in some cases. This can make it difficult for users to identify the document without downloading and/or opening the document with its associated application. For example, in Windows 2000, the user interface displays a small temporary pop-up window of the document's title, application type, author and size when the user hovers his cursor on the document icon; however, the pop-up window appears only after a brief delay, usually 1-2 seconds and is for documents that are on the screen at the time, which tend to be a small part of the many documents typically stored in or accessible through a user's computer.

In contrast, the disclosed system creates a pop-up window for heterogeneous documents of known and unknown application types that appears instantly, as perceived by the user, as he/she hovers the cursor over the document's representation in the user interface. In the example of FIG. 1, this representation is an index card in a cascading flow of overlapping index cards (called "browse cards"), and the pop-up window is called a "glance view". This glance view not only contains the document's title, application type and owner, but also may contain rich multimedia cues (such as a thumbnail image of the first page of the document, a WAV or MP3 preview of an audio file, or an animated GIF preview of a video file), text summaries and document operations specific to the document's application type and access permissions. For example, if the user has write permission for a document, the "Edit" operation will be visible and available; however, if not, the Edit operation will not be visible or available. These document operations are interactive, allowing users to select available operations directly.

Referring to FIG. 5 for an illustration of the instantaneously dynamic, tailored, and interactive document glance view feature of the disclosed system, at S501 a user hovers his or her computer cursor over a document's browse card. Essentially instantly, at least as perceived by the user, and without any mouse clicking or other action on the part of the user, step S502 processes the information needed for a glance view to appear on the screen, and at S503 the glance view appears next to the browse card, using a technology such as Dynamic HTML. If the user clicks on a document's browse card, as detected by the test at step S504, and as executed by the user at S505, step S506 causes the glance view to become fixed and step S507 causes it to remain in the display. The glance view does not change until the user clicks on another document's browse card. If the user does not click on any browse card, as determined by the test of step S504, the glance view will instantly change as the user moves his cursor over other browse cards, to reflect the glance view of the underlying browse card. If the user has clicked on a browse card to fix the glance view as a stationary window, the user can then select any of the visible and available document operations, by taking the "yes" branch of step S508 and selecting at S509 an available operation (as earlier described, the operations or command buttons that show are specific to the document). At step S510 the system executes the selected operation (command) and the display reflects this at S511. If at step S508 the user takes the "no" branch, she can continue to hover the cursor over the stream of browse cards and repeat the process, at step S512. If at S504 the system determines that the user has not clicked to fix a glance view, the glance view information essentially instantly changes at S513 as the user moves the cursor over other browse cards, and the new glance views appear on the screen at S514.

FIG. 6 illustrates a process involving another important feature of the disclosed system—granular permissions for access to information assets that allows clients to receive seamless and uniform access to contents without necessitating changes to existing network security and access rights. In traditional systems, a network administrators typically would grant access to specific network drives and file folders. The permission typically would allow a user to access the entire folder or drive, or would deny access to an entire folder or drive, rather than to a particular information asset or document.

In the disclosed system, each information asset is accessible through specific access permission for each client or designated group of clients. Examples of access stage permissions are read, write, and aware. Read permissions allow a client to view the full information asset. Write permissions allow the client to view and edit the document. Aware permission alerts the client that an information asset exists, for example by providing a document shell in the client's stream of documents, but does not allow the client to view or edit the document. A group of clients who want to collaborate on a project or event can establish a designated group that can be assigned permissions to relevant documents for the project or event. Thus, each member can receive real-time additions to his or her stream of documents and information assets are posted. The clients can assign permission to the other group members themselves, by so designating the appropriate documents to be shared, without involving a network administrator. Some documents, such as personal to-do lists, can be accessible only to a specified user, but the user can change this at any time to allow access, full or partial, to other designated persons. Assignments of permissions for access can be done as granularly as an individual client level or individual document, or as diffuse as a departmental or enterprise level.

As seen in FIG. 6, an information asset 601 can have permission levels assigned to it in several ways. At step S602, a software agent such as Doc Feeder can automatically assign permissions; at step S603 a programmatic system such as SDAP, Active Directory, Access Control Lists, NT DS, of some other system assigns permissions to the document; and/ or at step S604 the user manually assigns permissions to the document. Examples of processes relevant to different types of permissions are: step S605 grants access to all public users of the system; step S606 assigns permissions to groups as illustrated; step S607 assigns permissions to specific groups as illustrated, and step S608 freezes permissions and does not allow the document to be changed. The display, of the type illustrated in FIG. 1, can provide information representative of the permissions, as illustrated at steps S609 thorugh S612 in FIG. 6.

Another important feature of the disclosed system is illustrated in FIG. 7 and pertains to integrating search results from distributed searches. In traditional systems, search requests in a client/server model with a central index usually return a single, well-defined results set. In a peer-to-peer network, however, search results may come back to the "Source" computer (the computer that issues the search query) in a haphazard manner because of network latency (variable traffic speed and bandwidth across a distributed network) and variable peer presence (peer computers can be turned on and off, or removed from network at times).

The disclosed system asynchronous responses to a distributed query across a peer-to-peer network of computers to integrate the results from diverse sources, arriving at different times, and comprising diverse types of documents, into a single unified results set. One preferred embodiment leverages the time-ordered presentation interface earlier described

in so that search results are integrated into a time-ordered stream according to each document's original time-stamp, regardless of when the document's search results set was received by the Source computer.

As seen in FIG. 7, at step **701** a user at a Source computer selects peer computers ("Peers") across which the distributed search will be performed. If the test at **S703** determines that there is no central registry with peer hookup, and the test at **S704** determines there is no user-specified IP address of peers, the process returns to **S701**, where the user can specify addresses or they can be provided in some other way. The central registry with lookup of Peers can involve Online/offline status, IP/DNS resolution servicejjand Optional public/private key authentication. When the test at **S703** or at **S704** leads to the "yes" branch, at step **S705** the Source computer sends out a search request that travels to each selected Peer in the network. At **S706**, each Peer that receives the search request queries its index for documents that match the search criteria, and at **S707** the peer computer then sends its results set back to the Source computer. The response can be XML-based, a binary byte stream, or an in-band and out-of-band transfer. At **S708** the Source computer takes the results set from each Peer and builds a single collective results set. In a preferred embodiment, this collective results set is organized as a time-ordered stream of documents, as seen in FIG. 1. This can involves an on-the-fly browser combination with XML & XSL with time-sort algorithm, XML to presentation layer with time-sort algorithm, and in-band and out-of-band transfer. Importantly, at S709, the Source computer continues to expand this collective results set, essentially in real time as it receives additional results sets from Peers until all Peers have responded or some other relevant event has taken place. At **S710**, the collective results are displayed as soon as results have come in at the Source computer, and the display is updated as additional results come in, even when a Peer that was off-line comes on line and sends results at a later time.

Yet another feature of the disclosed system is a particularly convenient tri-state tree. In a single scrolling tree directory of the contents of a hard drive (or hard drives in a network), a user may want to select "Parent Folders" (folders containing subfolders) and "Child Folders" (subfolders that within a folder) that can be further operated on. This feature allows users to select folders in one or more of the following combinations:

1. All Parent Folders and all Child Folders
2. Some Parent Folders and all their Child Folders
3. Some Parent Folders and some of their Child Folders
4. No Parent Folders and no Child Folders (the do nothing option)

This selection tree has useful application beyond the particular example of information handling disclosed here; it can be used to select folders for any computer operation. For example, it can enable users to discretely select software application or operating system components to install or remove.

A single scrolling tree directory of Parent and Child Folders that can expand and contract to show the contents of Parent and Child Folders is known—Microsoft Windows Explorer is an example of one. A Tri-State Selection mechanism also is known—Microsoft Add/Remove Windows Components is an example of another way of selecting various Parent and Child Folders. However, the Microsoft Add/Remove Windows Components feature does not display all Parent and Child Folders within a single scrolling tree directory; Child Folder and other contents of a Parent Folder are displayed in a separate window only after the user clicks on a

Details button. In addition, only the contents of one Parent Folder can be displayed at a time.

The Tri-State Selection Tree described here combines the elements of a single scrolling tree directory with a tri-state selection mechanism in a new and unique way to enable users to discretely select specific Parent and/or Child Folders all in one single view.

Referring to FIG. **8** for an illustration, at step **S801** a user is first presented with a tree directory of the highest level of Parent Folders on a hard drive or network. At **S802** the user can expand the tree directory to show Child Folders by clicking on a plus/minus sign next to each Parent Folder, and the directory so expands at **S803**. At **S804**, the display shows a check box next to each Parent Folder (e.g., to the right of the plus/minus sign). By default, all check boxes are empty, indicating that no Parent or Child Folders are selected. If at step **S805** the user clicks on a check box once, the process at step **S806** selects the marked"/" Parent Folder but none of its Child Folders are selected, and step **S807** shows this on the display. If at step **S808** the user clicks the check box a second time, the slash mark is replaced by an "X" and all the Child Folders' check boxes are then selected and grayed out at **S809**, indicating that all Child Folders are selected for that Parent Folder, and this is displayed at **S810**.

Thus, by expanding the tree and clicking on check boxes, the user can systematically and efficiently select a discrete number of folders on which to perform an operation.

Yet another feature of the disclosed system is an arrangement of a redundant array of inexpensive servers (RAIS). Processing of a large set of information or document requires benefits of a centralized architecture—reliability and scalability, and RAIS is a novel approach to provide benefits of a centralized architecture—namely reliability and scalability with numerous inexpensive computers. Thus, RAIS can deliver essentially infinite scalability, can allow inexpensive smaller computers to be used to solve enterprise computational problems rather then expensive larger platforms, cheaper/faster.

For example, consider:

Set of Information, D, with specific documents D1, D2, D3; D{D1,D2,D3}

RAIS of N×N size here with N=3; RowN,ColN

Replication factor is number of columns

Scalability factor is number of rows

1. Here N=3, with 9 computers

|      | Col1 | Col2 | Col3 |
| ---- | ---- | ---- | ---- |
| Row1 | A    | A    | A    |
| Row2 | B    | B    | B    |
| Row3 | C    | C    | C    |

2. To post a Document, Dn, one copy is sent to a sub-server in each ColN, so

|      | Col1  | Col2  | Col3  |
| ---- | ----- | ----- | ----- |
| Row1 | A(Dn) | A(Dn) | A(Dn) |
| Row2 | B     | B     | B     |
| Row3 | C     | C     | C     |

3. Thus Dn is replicated N times (N=3) and thus if Col1: Row1 computer is unavailable there are two other computers with the same Dn. This is RAIS replication.

4. To post a universe, or set of documents, D{D1,D2,D3}, can use simple (round-robin) or complex (latency, closest path, spanning tree) routing, sending each document to a different RowN.

|  | Col1 | Col2 | Col3 |
|---|---|---|---|
| Row1 | A(D1) | A(D1) | A(D1) |
| Row2 | B(D2) | B(D2) | B(D2) |
| Row3 | C(D3) | C(D3) | C(D3) |

5. Thus to reassemble the entire universe or set of documents, D, need to send a request to each RowN. To reconstruct, D, for an N×N RAIS requires N request/ responses.

6. Multiple smaller requests can be used instead of one mammoth request. This reduces latency, bandwidth and process constraints. This is RAIS scalability.

7. Note that any one of the computers in Row1 can be used to re-construct the total set D found in Col1. For example, if Row1:Col1 computer is unavailable, then Row1:Col3 computer has a copy of the data. In fact, D is can be constructed from any arrangement that completes a COIN.

8. To increase either replication or scalability simply increase N.

Scopeware Software Agents, either desktops or servers, can be installed on each computer in a RAIS matrix to achieve this functionality.

The disclosed system can be implemented in a variety of ways in terms of physical information storage—for example, physical information storage can be centralized or decentralized. Decentralized storage, physical storage of information with multiple servers and/or clients, is possible through network agents called Doc Feeders, which may be located at a server or client level. The Doc Feeder allows a storage location of a client, for example a file folder on a desktop hard drive, to be included in the system level data repository for use throughout an organization or enterprise. Depending upon implementation, the Doc Feeders can replicate the information asset (IA) to a server or maintain a constant pointer to the physical storage location while populating the system with the document object model (DOM). As earlier described, a DOM is a document shell of the IA that contains, among other items, a thumbnail of the IA, permission rights, and metadata. A DOM is created from the IA and placed on the Scopeware server, either independent of the IA or with a replication of the IA. From there, the Scopeware server will share the DOM (with constant pointer to the IA or replicated IA) with other connected system servers and clients in order to make the IA available to all clients connected to the network. Thus, the system servers and network agents (Doc Feeders) act as document proxies for both storage and retrieval of IAs.

In addition, the system servers within the network need not be physically close in proximity. For example, a client in a truly global organization with locations and system servers on several continents can query and retrieve sales results across all system servers and clients through a federated search. In essence, the disclosed system creates a virtual store from all documents accessible to any system server or client either centralized or decentralized.

The physical information storage of the disclosed system follows three models: duplication, replication, and document reference. The duplication model physically stores a duplicate IA on the parent Scopeware server that was created by the client. Other clients polling the parent Scopeware server have full access to the IA, depending upon permissions, whether or not the original document is available from its native storage location (i.e. client PC is turned off). The replication model replicates the IA from the parent Scopeware server to the peer Scopeware servers within a federated network. All clients within the federated network have full access to the IA, depending upon permissions, whether or not the original document is available from its native storage location (i.e. client PC is turned off). An example of the replication model is the concept of a redundant array of inexpensive servers. This concept, which is described in detail in the distributed enterprise model, utilizes client machines in place of a singe server. The document reference model "parks" only a DOM of the IA on all Scopeware servers and maintains a constant pointer to the actual physical location of the IA rather than storing a full copy of the IA on the Scopeware server. Other clients will only be able to gain access to the IA when the physical location of the IA is connected to the network (i.e. client PC is turned on).

There are to primary types of streams in accordance with the disclosed system: Bottom-Up and Top-Down. Through the use of both Bottom-Up and Top-Down methodologies, Scopeware creates a living stream for the client with new DOMs appearing automatically as content arrives. The Scopeware distributed enterprise model can make use of both server-based resources and client-based resources where appropriate. Both types of streams can be used simultaneously and interchangeably.

Bottom-Up streams are comprised of information collaboration formed by ad-hoc groups of Scopeware clients. A bottom-up stream is composed of information created by the clients of a transitory group. Information shared and created by this group is be replicated via point-to-point connections (i.e. from client PC to client PC). In this way, bottom-up groups can form and disperse frequently, and without notification, while its members will still have access to the shared information. FIG. 9 illustrates this configuration.

Top-Down streams are more permanent, generally more administrative streams or collections of information, such as company-wide distribution lists, or groups like 'Accounting' and 'Development'. In these groups, information is "parked" to the server from the desktop. The server then sends the information to other known servers. Each client maintains a polling connection to the server to retrieve "parked" documents that have recently arrived from other remote servers or from local clients. FIG. 10 illustrates this configuration.

As earlier described, the user interface within the Scopeware product portfolio has unique characteristics. The DOM provides certain information that allows quick perusal of the information retrieval results via a proprietary "browse card" or "glance view" which is similar to an index card that contains data on the underlying IA. A unique "browse card" or "glance view" is created for each IA. The "browse card" or "glance view" includes metadata for the document, which is comprised of a title, identification number unique to Scopeware document referencing, date/time stamp, and owner information. The "browse card" or "glance view" also presents a thumbnail image of the IA and a summary of the IA contents. Finally, the "browse card" or "glance view" contains a list of operations appropriate for the IA's application that include, but are not limited to, copy, forward, reply, view, and properties.

The "browse card" or "glance view" arrives in the stream of those clients that have permission to view the IA. The owner can grant access to other clients or groups by granting read, write, or aware permissions through the properties of the

"browse card" or "glance view." Permission can be granted as granular as an individual-by-individual basis from the DOM, or through predetermined administrative groups via the Scopeware server.

The "browse card" or "glance view" is presented in a time-ordered sequence starting in the present going back into the past. The "browse card" or "glance view" is available in a number of views. The primary view is the stream. Other formats include a grid, Q, list, and thumbnails. The various views address the client's personal preferences for accessing time-ordered content in their most logical way. These views all contain the information presented in a "browse card" or "glance view" but are organized in a different method. Other specialized views include the address book and calendar.

An advantage of the "browse card" or "glance view" approach is the ease of browsing, searching, and retrieving IAs. In the stream view, the "browse card" or "glance view" of each IA are aligned much like cards in a recipe box. For each item, the title and application icon are viewable on the "browse card" or "glance view" in the stream. When the client passes over the "browse card" or "glance view" in the stream with the mouse pointer, the full "browse card" or "glance view" is presented to the client for easy viewing. From the "browse card" or "glance view," the client can perform any of the aforementioned actions available to the IA, subject to permission access.

The disclosed system is suitable for a number of computing models servicing multiple clients including a single departmental server model, an enterprise server model, a distributed enterprise model, and a peer-to-peer model (absent a dedicated Scopeware server or common server). In addition, the software enables wireless computing independent of or in conjunction with any or all of the aforementioned models. Wireless clients include WAP enabled phones, PDAs, Pocket PCs, and other similarly capable devices capable of receiving and transmitting data across a network. All of the Scopeware Implementation Models make use of the components previously discussed, providing consistent interface available across different computing topologies, from monolithic single servers to peer-to-peer collaboration.

Access to the IA contained in the Scopeware repository can be achieved through two methods. The first method of access is through the thin-client method. The thin-client method utilizes a web browser, such as Microsoft's Internet Explorer or Netscape's Navigator, on the client device to gain access to the Scopeware repository residing on the Scopeware server. The second method of access is the desktop-client method. The desktop-client method involves a local installation of Scopeware on the client device. The client device is then capable of performing the storage, retrieval, extraction, and processing of IAs as they are introduced to the Scopeware repository. All the models below can utilize either method of access to the Scopeware repository, however the distributed enterprise and peer-to-peer models are optimized with the desktop-client method.

Single Server Model. A single server model makes content on one Scopeware server available to any client connected to the departmental server. The Scopeware software creates a unique DOM that represents to the user interface the relevant details of the IA physically stored by the server or client. Thus, when a client connected to the network requests access to and retrieval of IAs through Scopeware, the client can view all documents contained within the network that satisfy the query parameters and access restrictions regardless of the document's native application. The documents available include those stored locally by the client, those saved to a

central storage location, and those stored by peer clients with Doc Feeders connected to the shared server.

Enterprise Server Model. In an enterprise server model, where multiple Scopeware servers are installed, federated access to and retrieval of IAs across the network is enabled. In federated information sharing, a client asks one Scopeware server for IAs that may reside on it or one of many connected peer Scopeware servers. In this model, the actual IA may reside on any network-connected client, the Scopeware server, or a centralized data storage location. Transparent to the client, the Scopeware servers shuffle the retrieval request and access restrictions to present a single, coherent stream to the client via the presentation architecture previously discussed (within the original patent document).

Distributed Enterprise Model. A distributed enterprise model utilizes the clients for storage, retrieval, and processing of IAs. Through the use of directory monitoring agents, similar to network agents, the physical location of an IA need not be on the Scopeware server, but rather can reside with any client. The Scopeware servers take on a secondary role as administration servers and content parking lots. This model pushes the processing tasks to the clients while using the servers to shuttle IAs throughout the enterprise. The indexing engine, thumbnailing engine, lightweight storage database will be based at the clients.

Taking Scopeware beyond distributed networking and the federated architecture—into a more distributed approach will be straightforward, given the way that the system has been designed. Key elements of the next stage of deployment are distributed document processing and scalable server arrays.

Distributed document processing consists of two different approaches. First, when information was created physically on a desktop machine, but was part of a larger application and intended for storage on a server (rather than on the desktop), the Desktop facilities could do the document extraction, indexing, thumbnailing, etc., and post the results to the Scopeware Server. Second, a Scopeware Server that was handed a document (perhaps from an OCR process or from a central email application) could hand the document off to an available Scopeware Desktop for the same processing. These strategies relieve the processing load on the Scopeware Server and leave it free to focus on handling searches and stream integration, allowing a given Scopeware Server to handle a much larger user load.

When an organization needs to support central processing of large document bases—and needs the reliability, accessibility and security of a centralized architecture—Scopeware Servers will support deployment in a novel architecture we have named RAIS—a redundant array of inexpensive servers.

In this architecture, imagine a square array of desktop machines—call each one a "sub-server." The array as a whole comprises the Scopeware Server. (This does not require wiring together an actual array or cluster; any interconnect such as a Ethernet sub-net or even HTTP over a broader network will work.) In these arrays, columns of servers provide redundancy for storage, while rows (within columns) provide redundant points of distribution.

To post document D, one copy of D is sent to a sub-server in each column of the array. To replicate everything five times such that losing any data requires the loss of five sub-servers, five columns are used. The number of columns in the array is managed to support exactly the degree of replication (and redundancy) desired. The write processes can be managed in a number of ways to ensure that the different rows in the columns are balanced.

To send a polling message or search request ("give me all the latest stuff"), a request is sent to each sub-server in one

column (note that the means to do this transparently to the user is an extension of the federated search technology). Each column of sub-servers absorbs one copy of every posting (because any write has gone into at least one row of the column); therefore, all the sub-servers in any one column collectively have copies of everything. Just a "replication factor," is chosen for data redundancy, a "distribution factor" is chosen for responsiveness and for data management, representing the number of rows in any column. To get ten small responses to a search request instead of one big response, or to distribute the total data-storage burden over ten machines instead of one, the array is implemented with ten sub-servers in every column.

The entire "Server" can be run with only one row (resulting in replication, but no distribution) or with only one column (resulting in distribution but no replication). In the limit, row size=column size=1, and the effect is to have a single conventional server.

This approach to distributed processing, scalability and reliability for large applications allows arbitrary sets of "smaller" computers (single/dual processor, inexpensive memory and disk storage) to be used in place of very large, expensive machines. This allows the application platform to be designed to the reliability and access requirements of the particular application, and then scaled incrementally (by adding more small machines into the array) as the actual application grows in terms of users served or information managed.

Distributed document processing and server arrays will give Scopeware almost infinite scalability while maintaining compatibility with early solutions or architectures. In addition to adding greater reliability, this architecture will support very large information processing applications. This will allow enterprise-scale, top-down applications—inbound support/sales email handling, customer service or even IRS-scale tax document processing.

Distributed document processing (with Scopeware Desktop) could be combined with either a "conventional" (1 processor array) Scopeware Server or with a more powerful array. This will allow organizations to create departmental or workgroup level solutions that can grow into enterprise applications if necessary.

At the same time, the system will allow users themselves to create self-organizing applications based on their specific and current needs. Ad hoc teams can create collaborative spaces that cross organizational boundaries if necessary. These applications can leverage either Scopeware Desktops or departmental-level Scopeware Servers.

Because the system has the architecture and capacity to support any level of centralization or decentralization concurrently, applications and their platforms can be engineered centrally or grown organically, and they can be tailored to the needs of their users and the organization on an ongoing basis.

Peer-to-Peer Model. The peer-to-peer (P2P) model allows multiple clients to share IA directly without the use of a dedicated Scopeware server. The P2P model allows for pure ad hoc collaboration among Scopeware clients. For example, a client can share IA via the Internet with identified Scopeware clients that have permission to access IA from the client, and vice versa. This is similar to the distributed enterprise environment except the dedicated Scopeware server has been removed as a storage, retrieval, and connection mechanism. Instead, Scopeware clients will connect point-to-point with other Scopeware clients through a general network connection such as the Internet.

Using P2P, a client can create a virtual shared stream that looks as though it is stored on a server but is in fact stored only

by many clients. Historically, all clients would need access to a shared file folder on a common server in order to share information. With Scopeware, clients can share information that is located on each other's device and are not restricted to a common server or single physical storage location. To illustrate, five clients of Scopeware want to create a shared virtual stream to support a project. They call their group "Team One." Then, when any member of "Team One" posts a document to his or her stream, and marks it "readable by Team One," the system automatically sends a copy to every Scopeware client on the "Team One" list. Each Scopeware client receiving this document pops it into its client's local stream. Thus information created by a client who is a member of "Team One" (and flagged for Team One by the owner) winds up in the local stream of every member of Team One, whether the post is a document, an event (team meeting), task, or contact. It's as if he had sent his posting to a "client" server, and then everyone had polled the server, but in fact there's no server.

The invention claimed is:

1. A method of operating a computer system comprising:

providing the computer system with documents in respective formats according to respective different applications through which the provided documents are generated or modified, which formats differ from one of the document to another for at least some of said provided documents, said provided documents being delivered to the computer system or generated by the computer system;

storing at least some of the documents provided to the computer system in computer storage;

said computer system being configured to automatically generate and store in computer storage respective representations related to the documents provided thereto, thereby forming a main collection of document representations;

said computer automatically generating and storing said main collection of document representations without requiring a user to designate a directory structure, a physical location for storage of document representations or corresponding documents, or another pre-imposed document categorization structure for each of said document representations or documents;

said automatically generated and stored document representations being in a consistent format despite differences in format from one to another of the documents corresponding thereto;

said automatically generated and stored representations of said documents including respective automatically generated time indicators associated with the documents corresponding to said representations;

said automatically generated and stored representations of said documents further including respective automatically generated information relating the document representation to the respective documents provided to and stored in said computer system;

said automatically generated and stored main collection of document representations being unbounded in time and size and being configured to include documents associated with time indicators related to future times as well as to past and present times;

said automatically generated and stored main collection of document representations requiring no fixed beginning or end and being non-transitory and selectively searchable by the computer system;

providing selected search criteria;

causing said computer system to perform a first search of at least said main collection of document representations

according to selected first search criteria, to provide first search results, and to utilize said first search results to generate a first sub-collection of document representations related to a respective sub-collection of the documents provided to the computer system;

selectively causing the computer system to display on a computer screen graphical depictions of only a first portion of said first sub-collection of document representations generated by utilizing said first search results, said first portion corresponding to only a portion of the documents provided to and stored in the computer system;

said first portion of said first document sub-collection of document representations corresponding to a multi-document portion of the documents provided to and stored in said computer system;

said computer system being configured to maintain at least one of said the main collection of document representations and said first sub-collection of document automatically responsive to events subsequent to the providing of said first search results such that additional document representations corresponding to additional documents provided to the computer system subsequent to an initial display of said first portion of the first sub-collection of document representations and meeting said selected search criteria are automatically included in a subsequent display of graphical depictions of one or more portions of said first sub-collection of document representations;

said additional document representations also including automatically generated respective time indicators associated with the documents subsequently provided to the computer system;

automatically showing on the computer screen a display of a glance view of a displayed document depiction while continuing to show on the screen plural displayed graphical depictions of respective plural document representations;

said glance view being an abbreviated version of the document corresponding to the graphical depiction and being indicative of content thereof; and

said showing of the glance view occurring in response to a user designating a displayed document representation by interacting with a screen area currently associated with the graphical depiction, without requiring the user to click on the designated screen area in order to enable such showing of the glance view.

**2.** The method of claim **1**, in which said interacting with a screen area comprises user interaction with a scroll bar user interface.

**3.** The method of claim **2**, in which said user interaction with a scroll bar interface causes a selection of which document representations.

**4.** The method of claim **1**, in which the step of causing the computer system to display on a computer screen graphical depictions of said first portion of document representation comprises displaying said graphical depictions using perspective to create the illusion of increasing distance from a viewpoint implied by the displayed depictions.

**5.** The method of claim **4**, in which said step of causing the computer system to display said graphical depictions comprises displaying the graphical depictions as a partly overlapping stack of document depictions creating the illusions that the depictions gradually recede from the viewpoint.

**6.** The method of claim **5**, in which said step of causing the computer system to display said graphical depictions com-

prises displaying the graphical depictions as a foreshortened and receding stack of document representations.

**7.** The method of claim **1**, in which said step of causing the computer system to display said graphical depictions comprises displaying at least one graphical depiction of a document representations associated with a future time.

**8.** The method of claim **1**, in which said representations of said documents further include an index of the content of said documents for use in performing said first search.

**9.** A process of providing a computer system with document management facilities, comprising:

providing the computer system with a collection facility configured to collect a multiplicity of documents from diverse applications, said documents being in respective different formats unique to the respective applications;

providing the computer system with an indicator generating facility configured to automatically generate respective identifying indicators that are associated with said documents and comprise time information;

providing the computer system with a maintaining facility configured to maintain in non-transitory form a main collection of the documents collected by the collection facility and the indicators associated therewith;

said maintaining facility being configured to maintain said main collection of documents unbounded in practical terms consistent with the computer system extent to thereby accommodate many documents and the respective indicators associated therewith in a form that is selectively searchable and retrievable by the computer system;

providing the computer system with a search facility configured to respond to search criteria provided to the computer system by generating, from said main collection of documents, a subcollection of a multiplicity of documents that are a subset of the main collection documents;

providing said computer system with a display facility configured to display on a computer display at one time representations of plural documents that comprise only a segment rather than all of the documents of one of the main collection or the subcollection of documents;

said display facility being further configured to display said representations in an arrangement consistent with the indicators associated with the documents corresponding to the representations that are displayed at the time, wherein at least some of the displayed representations show at least some information indicative of a content of the respective documents, which content-indicative information is in addition to any display of hierarchical data structure or time of creation of modification of documents;

said display facility being further configured to display an enhanced representation of at least one of the documents of the displayed segment while continuing to display other representation of the documents in the segment;

providing the computer system with a live main collection updating facility configured to maintain live main collection of documents by automatically responding to subsequent events to include new documents in the main collection in response to said new documents being collected by the collection facility in response to said subsequent events, and to include in said indicators stored in the maintaining facility new indicators associated with said new data units;

providing the computer system with an automatic subcollection updating facility configured to respond to said search criteria by automatically including in a subcol-

lection generated in response to said search criteria or new search criteria those of said new documents that meet said criteria; and

providing said computer system with a display updating facility configured to cause said display facility to display a segment that includes representations of at least some of said new documents.

**10**. The process of claim **9** in which said computer system comprises plural computer platforms at different locations, at least some of said platforms being configured to serve as viewpoints through which to access said main collection of documents through the Internet and to provide the computer system with said search criteria.

**11**. The process of claim **10** including providing the computer system with an access restriction facility configured to cause the collection or at least some of the subcollections to be accessible to different extents in response to respective different sources of request for access.

**12**. The process of claim **9** in which said search facility is further configured to generate two or more subcollections of documents in response to respective search criteria, wherein the same document may be included in two or more of said subcollections.

**13**. The process of claim **9** including providing said display facility with a segment moving facility responsive to inputs to the computer system to change a time span related to the selection of the documents to include in the displayed segment.

**14**. The process of claim **13** in which said segment moving facility is configured to respond to user input provided through a scrolling arrangement.

**15**. The process of claim **9** in which said display facility is configured to respond to touching a displayed document representation through a user input by highlighting the representation and providing a glance view of the documents corresponding to the representation.

**16**. The process of claim **9** further comprising providing the computer system with a summarize or compress facility configured to automatically summarize or compress at least some of the documents in said subcollection into a single document included in the subcollection or into several documents that are less in number that the documents in the subcollection.

**17**. The process of claim **9** in which said collection or subcollection of documents comprises respective image frames of video.

**18**. The process of claim **9** in which said display facility is configured to display said document representations as upright rectangles that partly overlap and give the illusion of receding from a selected viewpoint.

**19**. An article of manufacture comprising a storage device storing a computer program in a computer-readable, nontransitory form, said program when executed by a computer system causing the computer system to carry out a process comprising:

collecting a multiplicity of documents from diverse applications, said documents being in respective different formats unique to the respective applications;

automatically generating respective identifying indicators that are associated with said documents and comprise time information;

maintaining in non-transitory form a main collection of the collected documents and the indicators associated therewith;

said main collection of documents unbounded in practical terms consistent with the computer system extent to thereby accommodate many documents and the respec-

tive indicators associated therewith in a form that is selectively searchable and retrievable by the computer system;

causing the computer system to respond to search criteria provided to the computer system by generating, from said main collection of documents, a subcollection of a multiplicity of documents that are a subset of the main collection documents;

causing the computer system to display on a computer display at one time representations of plural documents that comprise only a segment rather than all of the documents of one of the main collection or the subcollection of documents;

said displaying comprising displaying the representations in an arrangement consistent with the indicators associated with the documents corresponding to the representations that are displayed at the time, wherein at least some of the displayed representations show at least some information indicative of a content of the respective documents, which content-indicative information is in addition to any display of hierarchical data structure or time of creation of modification of documents;

said display further including a display an enhanced representation of at least one of the documents of the displayed segment while continuing to display other representation of the documents in the segment;

maintaining live at least the main collection of documents by automatically responding to subsequent events to include new documents in the main collection in response to said new documents being collected in the collected step in response to said subsequent events, and automatically generating and storing new indicators associated with said new data units;

causing the computer system to respond to said search criteria by automatically including in a subcollection generated in response to said search criteria or new search criteria those of said new documents that meet said criteria; and

causing said display facility to display a segment that includes representations of at least some of said new documents.

**20**. The article of manufacture of claim **19** in which said main collection of documents is in the form of a stream comprising a time-ordered collection of documents that functions as a diary of a person or an entity's electronic live.

**21**. The article of manufacture of claim **19** in which said main collection of documents comprises a catalog of data items and said subcollection comprises at least a subset of the data items re-formatted for a particular user.

**22**. The article of manufacture of claim **19** in which said indicators are chronological indicators.

**23**. The article of manufacture of claim **19** in which said search criteria are provided to the computer system through a voice interface.

**24**. The article of manufacture of claim **19** in which said segment is related to a time interval.

**25**. The article of manufacture of claim **19** in which said causing said display facility to display representations of the document in a segment that includes representations of at least some of the new documents comprises causing the display to so include new documents by updating a current display of at least some of the representations of the documents in said segment.

**26**. The article of manufacture of claim **19** in which said computer system comprises plural computer platforms, and wherein said computer system is configured to provide access

to some but not all of the documents in a collection or subcollection in response to requests to access by selected ones of said computer platforms.

**27**. The article of manufacture of claim **19** in which said program is executed in plural computer platforms connected via the Internet.

**28**. The article of manufacture of claim **19** in which said collection of documents comprises at least one software agent in a groupware system, said software agent visiting other collections or subcollections of documents to set up a new collection or subcollection related to a group event.

**29**. The article of manufacture of claim **19** in which said display facility displays said representations of the documents in a segment in time order without requiring a designation from a user for time-ordering the specific display of the representations.

**30**. A computer system with document management facilities, comprising:

a collection facility configured to collect a multiplicity of documents from diverse applications, said documents being in respective different formats unique to the respective applications;

an indicator generating facility configured to automatically generate respective identifying indicators that are associated with said documents and comprise time information;

a maintaining facility configured to maintain in non-transitory form a main collection of the documents collected by the collection facility and the indicators associated therewith;

said maintaining facility being configured to maintain said main collection of documents unbounded in practical terms consistent with the computer system extent to thereby accommodate many documents and the respective indicators associated therewith in a form that is selectively searchable and retrievable by the computer system;

a search facility configured to respond to search criteria provided to the computer system by generating, from said main collection of documents, a subcollection of a multiplicity of documents that are a subset of the main collection documents;

a display facility configured to display on a computer display at one time representations of plural documents that

comprise only a segment rather than all of the documents of one of the main collection or the subcollection of documents;

said display facility being further configured to display said representations in an arrangement consistent with the indicators associated with the documents corresponding to the representations that are displayed at the time, wherein at least some of the displayed representations show at least some information indicative of a content of the respective documents, which content-indicative information is in addition to any display of hierarchical data structure or time of creation of modification of documents;

said display facility being further configured to display an enhanced representation of at least one of the documents of the displayed segment while continuing to display other representation of the documents in the segment;

a live main collection updating facility configured to maintain live the main collection of documents by automatically responding to subsequent events to include new documents in the main collection in response to said new documents being collected by the collection facility in response to said subsequent events, and to include in said indicators stored in the maintaining facility new indicators associated with said new data units;

an automatic subcollection updating facility configured to respond to said search criteria by automatically including in a subcollection generated in response to said search criteria or new search criteria those of said new documents that meet said criteria; and

a display updating facility configured to cause said display facility to display a segment that includes representations of at least some of said new documents.

**31**. The computer system of claim **30** in which said identifying indicators comprise time information associated with the respective documents.

**32**. The computer system of claim **30** in which said display facility is further configured to display the representations of documents in a segment in time order without requiring a command from a user for time-ordering each display.

**33**. The computer system of claim **30** in which said display updating facility is configured to include said representations of at least some of the new documents during a continuing current display of representations of at least some of the documents in a segment.

\* \* \* \* \*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

The undersigned hereby certifies that the foregoing brief complies with the relevant type-volume limitations of the Federal Rules of Appellate Procedure and Federal Circuit Rules because the brief has been prepared using a proportionally spaced typeface using Microsoft Word in 14-point or larger Times New Roman Font or another proportionally spaced typeface with serifs and includes 11,382 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), Federal Circuit Rule 32(b)(2), and Federal Circuit Rule 28(a)(12).

January 3, 2023

*/s/ Reza Mirzaie*
Reza Mirzaie
rmirzaie@raklaw.com
Marc A. Fenster
mfenster@raklaw.com
Kristopher R. Davis
kdavis@raklaw.com
James N. Pickens
jpickens@raklaw.com
Minna Y. Chan
mchan@raklaw.com
Russ, August & Kabat
12424 Wilshire Blvd., 12th Floor
Los Angeles, CA 90025
Tel: (310) 826-7474

*Attorneys for Plaintiff-Appellant*
*EcoFactor, Inc.*