Nos. 2022-1974, 2023-1101

# United States Court of Appeals for the Federal Circuit

ECOFACTOR, INC.,

*Plaintiff-Appellant,*

v.

GOOGLE LLC,

*Defendant-Cross-Appellant.*

––––––––––––

On Appeal from the United States District Court Western District of Texas
Case No. 6:20-cv-00075-ADA, Judge Alan D. Albright

––––––––––––

**NON-CONFIDENTIAL RESPONSE AND REPLY BRIEF OF PLAINTIFF-APPELLANT ECOFACTOR, INC.**

––––––––––––

Reza Mirzaie
rmirzaie@raklaw.com
Marc A. Fenster
mfenster@raklaw.com
Kristopher R. Davis
kdavis@raklaw.com
James N. Pickens
jpickens@raklaw.com
Minna Y. Chan
mchan@raklaw.com
Russ August & Kabat
12424 Wilshire Blvd., 12th Floor
Los Angeles, CA 90025
(310) 826-7474

March 30, 2023

*Attorneys for Plaintiff-Appellant EcoFactor, Inc.*

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2022-1974, 2023-1101

**Short Case Caption** EcoFactor, Inc. v. Google LLC

**Filing Party/Entity** Plaintiff-Appellant EcoFactor, Inc.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 03/30/2023

Signature: /s/ Reza Mirzaie

Name: Reza Mirzaie

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| EcoFactor, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐　Additional pages attached

FORM 9. Certificate of Interest

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable      ☐   Additional pages attached

| | | |
|---|---|---|
| Jason M. Wietholter of Russ August & Kabat | Matthew D. Aichele of Russ August & Kabat | Adam S. Hoffman of Russ August & Kabat |
| Paul A. Kroeger of Russ August & Kabat | Brian W. Lewis, formerly of Russ August & Kaba | C. Jay Chung, formerly of Russ August & Kabat |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)   ☐   No   ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable      ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

Save for Filing

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................ 1

II.   STATEMENT OF THE CASE ................................................. 2

      A.   EcoFactor's Damages Theory ........................................... 2

           1.   EcoFactor's smart thermostat licenses ...................... 3

           2.   Mr. Kennedy's Factor 1 analysis of EcoFactor's
                licenses ..................................................................... 4

           3.   Mr. Kennedy's profit apportionment analysis .......... 7

      B.   EcoFactor's '327 Infringement Theory ............................ 9

      C.   The Jury's §101 Findings ................................................ 12

      D.   Prior Rulings Upholding the Eligibility of EcoFactor's Patents ....... 13

III.  ARGUMENT IN RESPONSE TO GOOGLE'S APPEAL ISSUES ........... 14

      A.   The District Court Was Right to Deny Google's Motion for a
           New Trial on Damages ................................................... 14

           1.   Mr. Kennedy's damages model was based on
                contractual representations that describe how the
                parties calculated the lump sum, as well as evidence
                corroborating those representations, and was
                therefore reliable. ................................................. 15

           2.   EcoFactor's experts performed apportionment
                analyses that permitted the jury to account for
                differences between the '327 Patent and the other
                licensed patents. .................................................. 20

      B.   The Jury's Finding of Infringement Was Supported by
           Substantial Evidence and Should Be Affirmed ................ 24

           1.   The Nest thermostats receive temperature
                measurements from inside the structure using their
                internal temperature sensor. .................................. 24

           2.   Temperature compensation of the sensor
                measurement yields a more accurate measurement. ....... 28

           3.   Google's proposed construction of "measurement"
                was rejected by the district court, has not been

appealed by Google, and would not exclude the accused Nest thermostats even if it had been adopted. ................................................................. 30

    4.    Google cannot avoid infringement merely by compensating its temperature measurements for improved accuracy. ................................. 33

    5.    The jury's verdict also was supported by Mr. de la Iglesia's opinion under the doctrine of equivalents. ................ 34

C.    The Findings Below on Patent Eligibility Under §101 Should Be Affirmed ............................................................ 36

    1.    The district court properly denied Google's motion for summary judgment under §101 and submitted the question of whether the claimed inventions were well-understood, routine, or conventional—a disputed question of fact—to the jury. ..................................... 37

    2.    As confirmed by the jury, the claimed inventions are not well-understood, routine, or conventional and thus provide inventive concept under *Alice* step two. ........................................................... 50

IV.    ARGUMENT SUPPORTING ECOFACTOR'S APPEAL ISSUES ........... 57

A.    The District Court's Grant of No Willfulness and No Inducement Was Reversible Error ........................................................ 58

B.    EcoFactor Should Receive a New Trial on the '382 Patent ............... 60

    1.    Google's newest inadmissibility theory is untimely and meritless. ........................................................... 60

    2.    EcoFactor preserved its right to appeal. ................................. 62

    3.    The district court's jury instructions were improper. ........................................................... 63

    4.    Google applies the wrong standard of review. ......................... 64

C.    The District Court Wrongly Found the '488 Patent Claims Indefinite ............................................................ 65

V.    CONCLUSION ............................................................ 65

## **CONFIDENTIAL MATERIAL OMITTED**

The material omitted on pages 2, 3, 6, 8, 14-21, and 23 consists of a royalty rate ("RR") included in confidential license agreements.

The material omitted on page 5 consists of market share ("MS") information set forth in confidential Google business documentation.

The material omitted on pages 6 and 18 consists of a modified royalty rate ("MRR") derived from a confidential license agreement.

The material omitted on pages 6, 17, and 22 consists of language quoted from confidential licensing negotiations correspondence.

The material omitted on pages 7, 8, and 23 consists of confidential Google survey data ("SD") regarding reasons for customer purchasing decisions.

The material omitted on pages 3, 8, and 23 consists of confidential financial information regarding Google's profits.

The material omitted on pages 9, 10, 12, 27-30, and 36 consists of confidential technical information ("TECH") regarding the operation of the accused products.

The material omitted on page 15 consists of an amount of alleged damages ("AD") presented to the jury, based on confidential Google sales information.

The foregoing material comes from documents marked as confidential under the Protective Order entered by the district court and/or material presented during sealed witness testimony.

# TABLE OF AUTHORITIES

## Cases

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
  890 F.3d 1354 (Fed. Cir. 2018) .............................................................. 51

*Alice Corp. Pty. v. CLS Bank Int'l*,
  573 U.S. 208 (2014) ................................................................. passim

*Ancora Techs., Inc. v. HTC Am., Inc.*,
  908 F.3d 1343, 1347 (Fed. Cir. 2018) .............................................. 37

*Apple Inc. v. Wi-LAN, Inc.*,
  25 F.4th 960 (Fed. Cir. 2022) ................................................................ 22

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
  876 F.3d 1350 (Fed. Cir. 2017) ............................................................ 58

*Berkheimer v. HP Inc.*,
  881 F.3d 1360 (Fed. Cir. 2018) ............................................................ 37

*Bio-Rad Labs. Inc. v. Int'l Trade Comm'n*,
  996 F.3d 1301 (Fed. Cir. 2021) ...................................................... 20, 30

*Bio-Rad Labs., Inc. v. 10X Genomics Inc.*,
  967 F.3d 1353 (Fed. Cir. 2020) ............................................................ 20

*California Inst. of Tech. v. Hughes Commc'ns Inc.*,
  59 F. Supp. 3d 974 (C.D. Cal. 2014) .................................................... 47

*CardioNet, LLC v. InfoBionic, Inc.*,
  955 F.3d 1358 (Fed. Cir. 2020) ............................................................ 44

*ChargePoint, Inc. v. SemaConnect, Inc.*,
  920 F.3d 759 (Fed. Cir. 2019) .............................................................. 43

*Chiron Corp. v. Genentech, Inc.*,
  363 F.3d 1247 (Fed. Cir. 2004) ............................................................ 64

*Clarilogic, Inc. v. FormFree Holdings Corp.*,
  681 F. App'x 950 (Fed. Cir. 2017) ........................................................ 48

*Communications Test Design, Inc. v. Contec, LLC*,
  952 F.3d 1356 (Fed. Cir. 2020) ............................................................ 30

*CyberSource Corp. v. Retail Decisions, Inc.*,
  654 F.3d 1366, 1373 (Fed. Cir. 2011) ...................................... 44, 45, 47

*Diamond v. Diehr*,
    450 U.S. 175 (1981) ......................................................................... 41

*Enfish, LLC v. Microsoft Corp.*,
    822 F.3d 1327 (Fed. Cir. 2016) ....................................................... 43

*Function Media, L.L.C. v. Google, Inc.*,
    708 F.3d 1310 (Fed. Cir. 2013) ....................................................... 36

*Google LLC v. EcoFactor, Inc.*,
    602 F. Supp. 3d 1265 (N.D. Cal. 2022) .................................. 14, 42,43

*Jon-T Chems., Inc. v. Freeport Chem. Co.*,
    704 F.2d 1412 (5th Cir. 1983) ......................................................... 61

*Kaufman v. Microsoft Corp.*,
    34 F.4th 1360 (Fed. Cir. 2022) ....................................................... 33

*Koninklijke KPN N.V. v. Gemalto M2M GmbH*,
    942 F.3d 1143 (Fed. Cir. 2019) ................................................. 44, 50

*Lane v. R.A. Sims, Jr., Inc.*,
    241 F.3d 439 (5th Cir. 2001) ........................................................... 52

*League of United Latin Am. Citizens Inc v. Nat'l League of Latin Am. Citizens*,
    No. 13-CV-04725-JSC, 2014 WL 4477335 (N.D. Cal. Sept. 11, 2014) ........... 26

*Nat'l Fire Ins. Co. of Hartford v. Giron*,
    573 F. App'x 322 (5th Cir. 2014) .................................................... 59

*Northern Telecom Ltd. v. Samsung Electronics Co., Ltd.*,
    215 F.3d 1281 (Fed. Cir. 2000) ....................................................... 34

*Omega Pats., LLC v. CalAmp Corp.*,
    13 F.4th 1361 (Fed. Cir. 2021) ....................................................... 21

*Ortiz v. Jordan*,
    562 U.S. 180 (2011) ......................................................................... 36

*Pavo Sols. LLC v. Kingston Tech. Co., Inc.*,
    35 F.4th 1367 (Fed. Cir. 2022 ......................................... 1, 16, 18, 19

*Realtime Data LLC v. Reduxio Sys., Inc.*,
    831 F. App'x 492 (Fed. Cir. 2020) .................................................. 46

*Sec. & Exch. Comm'n v. Life Partners Holdings, Inc.*,
    854 F.3d 765 (5th Cir. 2017) ........................................................... 59

*Smith v. Transworld Drilling Co.*,
    773 F.2d 610 (5th Cir. 1985) ........................................................... 64

*SunTiger, Inc. v. Scientific Research Funding Group*,
 189 F.3d 1327 (Fed. Cir. 1999) ................................................................ 33

*Syngenta Crop Prot., LLC v. Willowood, LLC*,
 944 F.3d 1344 (Fed. Cir. 2019) ................................................................ 36

*Thales Visionix, Inc. v. United States*,
 850 F.3d 1343 (Fed. Cir. 2017) ........................................ 41, 42, 43, 46

*United States v. Colomb*,
 419 F.3d 292 (5th Cir. 2005) ................................................................ 61

*United States v. Garcia*,
 334 F. App'x 609 (5th Cir. 2009) .......................................................... 61

*Vectura Ltd. v. Glaxosmithkline LLC*,
 981 F.3d 1030 (Fed. Cir. 2020) ............................................................ 20

*Wellogix, Inc. v. Accenture, L.L.P.*,
 716 F.3d 867 (5th Cir. 2013) ................................................................ 20

*Wordtech Sys., Inc. v. Integrated Networks Sols., Inc.*,
 609 F.3d 1308 (Fed. Cir. 2010) ...................................................... 16, 18

*Z4 Techs., Inc. v. Microsoft Corp.*,
 507 F.3d 1340 (Fed. Cir. 2007) ...................................................... 51, 52

**Statutes**

35 U.S.C. §101 ........................................................................................ 12

**Rules**

Fed. R. Civ. P. 50(a)(1) .......................................................................... 48

Fed. R. Evid. 103(a)(1) ........................................................................... 59

Fed. R. Evid. 103(a)(2) ........................................................................... 59

Fed. R. Evid. 402 .................................................................................... 59

Fed. R. Evid. 801(d)(2)(A) ..................................................................... 26

## I.    INTRODUCTION

Google's appeal should be rejected. As to damages, EcoFactor's expert, Mr. David Kennedy, relied on representations within highly comparable licenses describing the per-unit royalty rate used to calculate the lump sum payments therein. This was proper, as confirmed in *Pavo Sols. LLC v. Kingston Tech. Co., Inc.*, 35 F.4th 1367, 1379 (Fed. Cir. 2022), especially as these representations are corroborated by a contemporaneous negotiation document.  Further, Mr. Kennedy explained the per-unit rate in the licenses would apply at a negotiation concerning only the '327 Patent because the licenses were for technology of comparable scope, as confirmed by a technical comparability analysis Google did not challenge. In fact, Google entirely ignores that EcoFactor's technical expert, Mr. Erik de la Iglesia, opined on each license, establishing the close comparability of the key patents highlighted in each license to those asserted here and the close comparability of the licensees' products and features to those of Google.

Substantial evidence also supported the jury's verdict that the accused thermostats receive temperature measurements. Google recognizes that its thermostats have internal sensors that receive temperature measurements, that its thermostats are installed inside homes, and that its thermostats know the ambient room temperature. Google nonetheless argued its thermostats are incapable of measuring inside temperature, but the jury correctly rejected this argument.

**CONFIDENTIAL MATERIAL OMITTED**

As to patent eligibility, the asserted claims do not recite abstract concepts, and the jury agreed with EcoFactor that the claims do not recite well-understood, routine, or conventional systems. Conventional thermostats lacked solutions for developing energy efficient schedules and diagnosing HVAC performance issues. The '327 and '488 Patents improve upon conventional thermostats by using thermal mass calculations and predicted rates of change to implement pre-cooling while reducing electricity demand, or to perform HVAC system diagnostics. The '382 Patent improves upon conventional thermostats by determining building occupancy with the aid of networked electronic devices to reduce energy consumption automatically. The claims are non-abstract, and substantial evidence supports the jury's verdict that their ordered combination is not well-understood, routine, or conventional.

Finally, EcoFactor's appellate arguments set forth in its principal brief should be accepted, as further discussed below.

## II.     STATEMENT OF THE CASE

### A.     EcoFactor's Damages Theory

Mr. Kennedy performed a *Georgia-Pacific* analysis of EcoFactor's licenses under Factor 1 and an apportioned profit analysis using Google's conjoint surveys and its internal profit data under Factor 13. He relied on built-in apportionment in the ▉▉ per-unit provisions in EcoFactor's comparable licenses to opine that

**CONFIDENTIAL MATERIAL OMITTED**

EcoFactor and Google would agree to ▮RR▮ per-unit as a reasonable royalty on Google's ▮Profits▮ in apportioned profits. Appx5778-5780.

### 1.    EcoFactor's smart thermostat licenses

EcoFactor entered into three licenses with smart thermostat manufacturers who compete with Google/Nest: Schneider in June 2020, Daikin in April 2020, and Johnson in July 2021. Appx10389-10399, Appx10400-10410, Appx10411-10419. Each agreement says how the lump sum payment therein was calculated. For example, the Schneider agreement states: "EcoFactor represents that it has agreed to the payment set forth in this Agreement based on what EcoFactor believes is a reasonable royalty calculation of ▮RR▮ per-unit for what it has estimated is past and [] projected future sales of products accused of infringement in the Litigation." Appx10389. There are nearly identical representations in the Johnson and Daikin agreements. Appx10400, Appx10411. The Schneider agreement adds "nothing in this clause should be interpreted as agreement by Schneider that ▮RR▮ per unit is a reasonable royalty," but does not dispute the preceding statement that the lump sum payment was based on a ▮RR▮ per unit rate. Appx10400. While each agreement is a portfolio license, each calls out the subset of EcoFactor's patents asserted against the licensee. The Daikin and Schneider licenses identify the "Litigation" and the seven "Asserted Patents" on Exhibit A, including the '327 Patent. Appx10389,

Appx10398, Appx10400, Appx10409. The Johnson agreement calls out four patents covering comparable features to the '327 Patent. Appx10411.

### 2.    Mr. Kennedy's Factor 1 analysis of EcoFactor's licenses

Mr. Kennedy's analysis relied on EcoFactor's technical expert opinion that the licensed patents called out in the agreements have comparable scope to the patents-in-suit, and that the licensed smart thermostats are comparable to the accused Nest thermostats. Appx5759 (623:18-21), Appx5763 (627:7-23), Appx5768 (632:7-19), Appx5772 (636:4-9), Appx5773 (637:8-19). EcoFactor's technical expert, Erik de la Iglesia, testified that the seven patents EcoFactor asserted against Daikin and Schneider (including the '327 Patent), and the four patents asserted against Johnson, are all comparable to the patents-in-suit because they cover the same smart thermostat technologies of HVAC modeling, smart scheduling, and demand reduction. Appx5578-5582 (442:14-446:10). He also opined that the smart thermostats made by Google, Daikin, Schneider, and Johnson are technically comparable because each has HVAC modeling, smart scheduling, and demand reduction features. *Id.* He also opined that EcoFactor's infringement allegations against all four are comparable. *Id.* Google did not rebut these comparability opinions. Appx6269-6270 (1133:16-1134:5).

Mr. Kennedy then analyzed economic comparability, opining that the focus of the settlements was on the '327 Patent and the other patents asserted in litigation

**CONFIDENTIAL MATERIAL OMITTED**

against the licensees. Appx5764-5768 (628:21-632:19). This opinion is supported by express statements in each license calling out these patents. Appx10389, Appx10398, Appx10400, Appx10409, Appx10411. Nonetheless, because the licenses are portfolio-wide, Mr. Kennedy testified this would place downward pressure on the agreeable rate at the hypothetical negotiation. Appx5765-5768 (631:16-632:19), Appx5771-5772 (635:19-636:3). But this would be offset by the upward pressure from the assumption of infringement and validity that applies at the hypothetical negotiation but that did not apply in the real-world. Appx5779-5780.

Mr. Kennedy also analyzed the close similarity of the licensed products and features and the accused products and features. Appx5768-5769 (632:20-633:6), Appx5772 (636:10-18), Appx5773 (637:8-24). Google's damages expert did not dispute the products' comparability or that the licensees are Google's competitors. Appx6268-6269 (1132:4-1133:14).

Mr. Kennedy also analyzed the licensees' market share in comparison to Google's. Mr. Kennedy explained that using the lump sums in the agreements as comparable rates was inappropriate because Google has a far larger share of the relevant market. Appx5819 (683:8-19). He showed the jury a 2016 Google document listing MS as Google's share of the smart thermostat market, with EcoFactor listed as one of its smaller competitors, and with none of EcoFactor's licensees even big enough to be listed. Appx5745-5746 (609:20-610:20), Appx5775

**CONFIDENTIAL MATERIAL OMITTED**

(639:4-13), Appx10467 (PTX-0298.0029). Mr. Kennedy confirmed he had seen similar data from 2021. *Id.* Google conceded there was no contrary evidence of market share and agreed that its market share is many times larger than the licensees'. Appx6251-6253 (1115:8-1117:10), Appx6255-6258 (1119:5-1122:13). The jury also heard testimony from Google witnesses that Google's own comparable smart HVAC control patent license expressly includes royalty rates that, if applied to this case, would reach nearly ▮MRR▮ per unit. Appx6054-6058 (918:25-922:23); Appx6285-6286 (1149:10-1150:2).

The record corroborated the representations in the agreements that the lump sum payments were derived from a "reasonable royalty calculation of ▮RR▮ per-unit on estimated past and projected future sales of [licensee's] products accused of infringement in the Litigation." Appx10411. For example, in negotiation correspondence between one licensee and EcoFactor, EcoFactor proposed a ▮RR▮ per unit rate, and the licensee replied that it was "▮License Negotiations▮." Appx6276-6277 (1140:21-1141:17), Appx6279-6280 (1143:16-1144:19), Appx10797-10799 (PTX-594).

EcoFactor's CEO, Shayan Habib, testified that each license's lump sum payment was derived by taking the past and anticipated future sales of each entity and multiplying it by the ▮RR▮ per unit royalty rate. Appx5667 (531:5-23); Appx5668 (532:20-24); Appx5669 (533:23-25). Mr. Habib explained he personally

**CONFIDENTIAL MATERIAL OMITTED**

(as opposed to EcoFactor's counsel) was not permitted to see the underlying sales information because the licensees were EcoFactor's competitors. Appx5670 (534:1-8). But he believed the lump sums reflected the licensee's sales because, while the companies were "pretty large" overall, in the "smart thermostat and the smart HVAC control space" the companies were "relatively new or more recent. And there are high barriers to entry … There's large players, such as Nest and others. And so it makes sense that their sales numbers would be low since they'd recently started." Appx5672 (536:9-25).

### 3.    Mr. Kennedy's profit apportionment analysis

Mr. de la Iglesia analyzed a conjoint survey analysis by Google[1] that quantified the relative importance of seven features important to a customer's decision to purchase a Nest Thermostat. Appx5572-5573 (436:8-437:12), Appx5575-5578 (439:14-442:13); Appx10295 (PTX-83-0017). Mr. de la Iglesia testified that the '327 infringing features are the "HVAC Monitoring Alerts," "Rebates," and "Energy Savings" features in the survey, which totaled **SD** of the product purchasing decision. *Id*. He also explained that the '382 Patent benefits Energy Savings, but not the other categories. *Id*. Accordingly, only **SD** of the

---

[1] Google's Nest product manager testified that Google relied on the conjoint survey findings (PTX-83) to inform strategy. Appx6429-6430.

**CONFIDENTIAL MATERIAL OMITTED**

product purchasing decision was attributable to the asserted patents, while **SD** was attributable to other factors such as brand and price. *Id.*

Mr. Kennedy relied on Mr. de la Iglesia's analysis of the conjoint survey to apportion Google's profits. Appx5755-5758 (619:16-622:13). Mr. Kennedy first calculated Google's gross profits from the sale of an accused thermostat as **Profits** per unit. *Id.* This excluded revenues attributable to manufacturing and other costs of goods sold. *Id.*; *see also* Appx5813 (677:1-10), Appx5820 (684:2-12). Then, using Mr. de la Iglesia's conclusion that the '327 Patent is responsible for the three surveyed attributes representing **SD** of the product purchasing decision, Mr. Kennedy attributed **SD** of Nest's profits, or **Profits** out of **Profits** per unit, to the features covered by the '327 Patent. Appx5755-5758 (619:16-622:13), Appx5775-5777 (639:22-641:7). He also explained which attributes only correspond to the '382 Patent. *Id.*

Finally, Mr. Kennedy opined that EcoFactor and Google would have negotiated how to split the **Profits** in apportioned profits attributable to the '327 patented features. He concluded that allocating **RR** of this infringing profit to EcoFactor would be a reasonable way to split the profits, as that is the rate used in all three comparable licenses in the record, and it is well below Google's **Profits** in profit attributable to the '327 Patent. Appx5778-5780.

**CONFIDENTIAL MATERIAL OMITTED**

### B.    EcoFactor's '327 Infringement Theory

For the '327 Patent, Google only disputed limitation 1[a]'s requirement for a thermostat that "receives temperature measurements from inside the structure." Appx102 (9:29-31).

EcoFactor's infringement expert, Erik de la Iglesia, opined that each Nest thermostat is a "thermostat" that "receives temperature measurements from inside the structure." Appx5455-5456, Appx5459-5463. He explained that each Nest thermostat contains a temperature sensor that measures the temperature and showed where the thermostat "hold[s] the latest temperature reading from the local sensor," stating "that is a temperature measurement." Appx5460.

Mr. de la Iglesia also explained that each Nest thermostat applies what is called "temperature compensation" to the temperature sensor readings to receive a more accurate measurement of ambient temperature. Appx5455-5456, Appx5459-5463. He explained that this temperature compensation process adjusts the sensor reading by using other sensors in the device to refine the temperature measurement. *Id.* As he testified, "what it's actually doing is taking readings from sensors and improving the accuracy of those readings such that the measurement that is going up to the server will be of the highest accuracy possible." Appx5461. This temperature compensation process generates measurements that are ▮ percent accurate to within ▮ degrees Celsius. Appx5462.

**CONFIDENTIAL MATERIAL OMITTED**

Mr. de la Iglesia also explained why, from his perspective as an ordinary artisan, the output from temperature compensation is a temperature measurement. Appx5461-5462. He testified temperature compensation is a "known mathematical method to generate accurate measurements from measurements which might be less accurate." Appx5461-5462. Google introduced no contrary evidence.

Much of the trial centered on Google's argument that the Nest thermostat is incapable of measuring room temperature. But evidence from Google told a different story. For example, Google's "Nest Developer" website for software engineers who develop applications for use with Nest thermostats states that the Nest thermostat measures the "ambient temperature," defined as the "temperature measured near the thermostat." Appx10429 (PTX-281-0010); Appx6155-6156.

As another example, deposition testimony from Google's software lead, Dr. Eric Burger, confirmed that temperature compensation produces "temperature measurements" every ▮TECH▮, and those measurements are stored for over ▮TECH▮ days. Appx5466.

Dr. Burger also testified at trial. He agreed each Nest thermostat has a temperature sensor that measures temperature, and that each is installed inside the home. Appx5945. Dr. Burger testified that the temperature measurement by the sensor is in standard units of measurement, specifically degrees Celsius. Appx5946. Dr. Burger agreed the output from temperature compensation is also in units of

degrees Celsius. Appx5947. And he confirmed that Nest's website uses plain language stating the thermostat's temperature screen displays the "current temperature measured by your thermostat's sensors." Appx5950-5951.

Google's non-infringement expert, Dr. Don Turnbull, argued the temperature sensors are not measuring ambient temperature, but his opinion was contradicted by Google's technical documentation. For example, he agreed that, in sections titled "Nest Technical Information" and "Sensors," Google's website says "[t]he current ambient temperature in the room [is] measured by the Nest thermostat's internal sensors." Appx6154-6155.

Dr. Turnbull also agreed that Google's website for "What you'll see on a Nest thermostat" states "The temperature screen will show you the current temperature in your home" and "The small number near the edge of the screen is the current temperature measured by your thermostat's sensors. If you have a Nest temperature sensor that's currently active, you'll see the temperature measured by the sensor, which is typically located in a different room from the one your thermostat is in." Appx6152-6153.

Dr. Turnbull also agreed that, according to Google's internal testing data for the Nest thermostat, the internal temperature sensor measurement will always rise and fall in lockstep with the ambient temperature. Appx6149-6151. Google confirmed this by attaching an external sensor for testing purposes and comparing

CONFIDENTIAL MATERIAL OMITTED

the external sensor reading to the internal sensor reading. *Id.* Even extremely small variations in the ambient temperature are tracked precisely by the internal temperature sensor. *Id.* Further, the internal sensor reading remains within ▮ degrees Celsius of the ambient room temperature. *Id.*; Appx10204.

### C.    The Jury's §101 Findings

Defendants moved for summary judgment that the asserted claims of the '488, '327, and '382 Patents are invalid under 35 U.S.C. §101. Appx1134. EcoFactor opposed, identifying specific intrinsic and extrinsic evidence, including inventor deposition testimony and excerpts from Google's own documents, supporting that the claimed HVAC control systems were anything but conventional and were aimed at solving technical problems of prior art systems. Appx1881-1898.

At the pretrial conference, the district court denied Defendants' motion and stated that it "intends to submit the second part of the [101] test to the jury." Appx5046.

At trial, the verdict form expressly asked whether Google met its burden to prove by clear and convincing evidence that claim 5 of the '327 patent and claims 2 and 12 of the '382 patent, when taken individually and as an ordered combination, recite activities that were well-understood, routine, or conventional at the time of the invention. Appx47. The jury answered "no" for all asserted claims, confirming the

claims are patent-eligible under §101. *Id.* Google's JMOL motion was properly denied. *See* Appx6662.

### D.    Prior Rulings Upholding the Eligibility of EcoFactor's Patents

The eligibility of EcoFactor's patents has also been upheld by multiple judges in multiple forums. For example, in ITC Investigation No. 337-TA-1185 ("1185 Investigation"), Administrative Law Judge (ALJ) Shaw rejected similar arguments made by Google and other respondents that the claims of U.S. Patent Nos. 8,131,497 ("'497 patent") and 8,423,322 ("'322 patent") were directed to the abstract idea of using temperature measurements to calculate the efficiency of an HVAC system, and found that the claims are "directed to *technical improvements* in HVAC systems" and their respective controls systems. Appx1916-1919. Under *Alice* step two, ALJ Shaw found that the claims recite a "specific system and method designed to improve/evaluate the operational efficiency of an HVAC system using an alleged new and non-conventional technique, which includes calculating the effective thermal mass of the structure." Appx1919-1922. ALJ Shaw also found that the asserted claims of U.S. Patent No. 10,018,371 are patent-eligible under §101. Appx1923-1926.

And in May 2022, the Northern District of California ("NDCA") issued a detailed order denying Google's motion for judgment on the pleadings that four other EcoFactor patents are invalid under §101. *Google LLC v. EcoFactor, Inc.*, 602

**CONFIDENTIAL MATERIAL OMITTED**

F. Supp. 3d 1265 (N.D. Cal. 2022). The NDCA separately analyzed each patent and held that all asserted claims are directed to specific improvements in HVAC system operation and thus patent-eligible under §101. *Id.*[2]

## III.    ARGUMENT IN RESPONSE TO GOOGLE'S APPEAL ISSUES

### A. The District Court Was Right to Deny Google's Motion for a New Trial on Damages

The district court did not abuse its discretion in denying Google's Rule 59 motion.

*First*, Mr. Kennedy's ▆▆ opinion was supported by per-unit royalty rate provisions in each of EcoFactor's license agreements with Daikin, Schneider, and Johnson. Each contains a representation that EcoFactor agreed to the payment because it believed that the lump sum was calculated using a reasonable royalty calculation of ▆▆ per unit for estimated past and projected future sales. It was not an abuse of discretion to decline to exclude this testimony. Moreover, there was evidence corroborating the ▆▆ per-unit provisions in the licenses, including the testimony of EcoFactor's CEO who signed the licenses, market share evidence, and the negotiation documents that preceded the licenses. Given this context, the jury was entitled to hear the expert testimony and decide for itself what to accept or reject,

---

[2] While upholding the eligibility of some claims, another ALJ found (incorrectly) that certain claims in two other EcoFactor patents were patent-ineligible in ITC Investigation No. 337-TA-1258. That decision predates the detailed opinion issued by the NDCA court upholding the patent eligibility of all claims at issue there.

CONFIDENTIAL MATERIAL OMITTED

and that is what it did, as the jury's $20,019,300 verdict represents significantly less than the **AD** million that would have resulted from applying a **RR** per-unit rate to past sales.

***Second***, Mr. Kennedy established the royalty rate from the comparable licenses reflects built-in apportionment to the patents and technologies in this case. He relied on unrebutted technical analyses establishing the close comparability of the handful of patents called out in the licenses to the patents-in-suit, and the close comparability of the licensed products and technologies to the accused products. Mr. Kennedy also used Google's conjoint surveys to apportion its profits attributable to the patented technology, and to compare Google's apportioned profits to the apportioned rate from the licenses. This confirmed the **RR** per-unit royalty rate represents a reasonable fraction of Google's apportioned profits.

1. **Mr. Kennedy's damages model was based on contractual representations that describe how the parties calculated the lump sum, as well as evidence corroborating those representations, and was therefore reliable.**

Google argues that EcoFactor offered "no evidence" of "whether the licensees actually applied a **RR** per-unit royalty in arriving at the agreed-upon lump sums," such as the "licensees' past or projected sales figures." RB32. But there was evidence that the parties applied a **RR** per-unit rate. Appx10389, Appx10400, Appx10411, Appx5667-5670, Appx6276-6277 (1140:21-1141:17), Appx6279-6280 (1143:16-1144:19), Appx10797-10799 (PTX-594); *supra* Section II.A.2. For example, the

**CONFIDENTIAL MATERIAL OMITTED**

RR per-unit provision in each license "describe[s] how the parties calculated each lump sum" and "the licensee's intended products." *Wordtech Sys., Inc. v. Integrated Networks Sols., Inc.,* 609 F.3d 1308, 1320 (Fed. Cir. 2010). It was not an abuse of discretion to allow a damages methodology that relies on representations in a license explaining how the royalty was calculated. *Pavo Sols. LLC v. Kingston Tech. Co., Inc.,* 35 F.4th 1367, 1379 (Fed. Cir. 2022).

Google criticizes Mr. Kennedy's methodology because "it relies not on what [EcoFactor] actually received but, instead, on what [Google] characterizes as a non-binding non-payment term, i.e., the [RR -per-unit] representation." *Pavo*, 35 F.4th at 1379. This Court rejected this argument in *Pavo* because an expert opinion is not "speculative" when it rests on a representation in a comparable agreement that provides context for the royalty. *Id.* Here, Mr. Kennedy relied on representations in each license explaining how the royalty was calculated to understand why EcoFactor agreed to the payment. There is no analytical gap between the RR per-unit representations in each license and Mr. Kennedy's reliance on those provisions.

Google seeks to manufacture doubt by pointing to the Schneider agreement, where EcoFactor's representation that the payment was calculated using what "EcoFactor believes is a reasonable royalty calculation of RR per unit" is followed by "nothing in this clause should be interpreted as agreement by Schneider that RR per unit is a reasonable royalty." Appx10400. But this language does not contradict

**CONFIDENTIAL MATERIAL OMITTED**

that the payment was determined using a ▮▮ per unit calculation. *Id.*; Appx5817 (681:7-20). Indeed, if ▮▮ per-unit was not used to calculate the payment, then there would have been no reason for Schneider to add this language to hedge against future litigation. Appx5817 (681:7-20). Regardless, neither the Daikin nor Johnson agreements have any such qualifying statement. Its presence in the Schneider license does not defeat the relevance of the ▮▮ per-unit provision in all three licenses.

Google also complains about the "not based upon sales" language in the Schneider agreement. The Schneider agreement (but not the Johnson agreement) states in the Section titled "Royalties" that the lump sum payment is "not based upon sales and does not reflect or constitute a royalty." Appx10402. But again, this does not contradict that the payment was determined using a ▮▮ per unit calculation on "estimated past and projected future sales" as opposed to actual past sales alone. Appx10400. The jury considered all the statements in all three licenses and was free to draw its own conclusions.

Further, there was substantial evidence corroborating the ▮▮ per-unit representations in the agreements, including evidence that the ▮▮ rate was applied during negotiations, and that the lump sums were reasonable given each licensee's small market share. *Supra* Section II.A.2. For example, in negotiation correspondence with one licensee, EcoFactor proposed a ▮▮ per unit rate, and the licensee replied that it was " ▮License Negotiations▮ ." Appx6276-6277 (1140:21-1141:17),

**CONFIDENTIAL MATERIAL OMITTED**

Appx6279-6280 (1143:16-1144:19), Appx10797-10799 (PTX-594). "Based on that context, the jury was entitled to hear the expert testimony and decide for itself what to accept or reject, and that is exactly what it did." *Pavo*, 35 F.4th at 1379.[3] As additional evidentiary support for its verdict, the jury also heard testimony from Google witnesses that Google's own comparable smart HVAC control patent license expressly sets forth royalty rates that, if applied to the accused products here, would go as high as almost ▮MRR▮ per unit. Appx6054-6058 (918:25-922:23); Appx6285-6286 (1149:10-1150:2).

Google relies on *Wordtech Systems, Inc. v. Integrated Network Solutions, Inc.,* 609 F.3d 1308 (Fed. Cir. 2010) to argue that experts may not use non-payment terms in comparable licenses in lieu of the licensee's confidential sales figures. But *Wordtech* did not so hold. In *Wordtech*, lump sum licenses did not "describe how the parties calculated each lump sum, the licensee's intended products, or how many products each licensee expected to produce," and the record supplied no other information. *Wordtech*, 609 F.3d at 1320. *Wordtech* is inapplicable here, where each

---

[3] To the extent Google is arguing not that the evidence at trial was insufficient, but with the denial of Google's *Daubert* motion to exclude Mr. Kennedy's opinions, the evidence on which Mr. Kennedy relied in his report was consistent with that offered at trial. For example, Mr. Kennedy's report cited negotiation documents in which EcoFactor proposed a ▮RR▮ per unit rate on future sales, as well as Mr. Habib's testimony that although he personally had not been given access to the sales data, his attorneys did access such data in calculating the lump sums. *See, e.g.*, Appx1245 (citing Appx1617-1619), Appx1247, Appx1258-1259.

**CONFIDENTIAL MATERIAL OMITTED**

EcoFactor license "describes how the parties calculated each lump sum" and "the licensee's intended products." *Id*.

The district court's ruling in *Pavo* excluding the defendant's damages expert's opinion, in which the expert "had no knowledge or evidence of sales figures under [the] agreement," is also distinguishable. *Pavo Solutions LLC v. Kingston Tech. Co., Inc*., 2019 WL 8138163, at *5 (C.D. Cal. Nov. 20, 2019), *aff'd*, 35 F.4th 1367 (Fed. Cir. 2022). That expert's opinion was excluded because the licenses she relied on "lack critical information bearing on their comparability," and because she "compensated for this lack of information with largely unsubstantiated use of Staples number of stores as a stand-in for actual sales figures under the Staples License and use of worldwide sales as a stand-in for actual sales covered under the Ennova Settlement." *Id*. But Mr. Kennedy's opinion is supported by the ▮▮ per-unit provisions as well as evidence of negotiations and market share. He did not compensate for a lack of information with guesswork.

Finally, Google conducted extensive cross-examination on Mr. Kennedy's lack of access to the licensee's sales information and the "not a royalty" language in the Schneider license. Appx5794-5795 (658:8-659:4), Appx5797-5798 (661:15-662:5), Appx5802 (666:4-23), Appx5804-5805 (668:6-670:20), Appx5811-5812 (675:22-676:2), Appx5796 (660:3-6), Appx5796-5797 (660:23-661:10). Accordingly, a new trial is not warranted. *Wellogix, Inc. v. Accenture, L.L.P*., 716

**CONFIDENTIAL MATERIAL OMITTED**

F.3d 867, 883 (5th Cir. 2013) (district court did not abuse its discretion by denying Rule 59 motion where movant "had the chance to highlight and dispute these errors through 'vigorous cross-examination' and the 'presentation of contrary evidence'").

      2.      **EcoFactor's experts performed apportionment analyses that permitted the jury to account for differences between the '327 Patent and the other licensed patents.**

Google argues that Mr. Kennedy failed to apportion the ▮▮ per-unit royalty rate to reflect a single-patent license to the '327 Patent. RB37.[4] But Mr. Kennedy established that the ▮▮ per-unit royalty rate would apply to a single-patent license to the '327 Patent, both because the rate reflects built-in apportionment to the '327 Patent, and because it is reasonable when applied to Google's apportioned profits. Mr. Kennedy's dual approach to apportionment was more than adequate. *Vectura Ltd. v. Glaxosmithkline LLC,* 981 F.3d 1030 (Fed. Cir. 2020); *Bio-Rad Labs., Inc. v. 10X Genomics Inc.,* 967 F.3d 1353 (Fed. Cir. 2020).

Mr. Kennedy established that apportionment to the '327 Patent is built into the ▮▮ per-unit rate in the agreements. Appx5763-5773; *supra* Section II.A.2. The Daikin and Schneider licenses call out the '327 Patent as one of a handful of specific patents that mattered. Appx10398, Appx10409. The licenses only list the patents that EcoFactor asserted in preceding litigation, and they state that the ▮▮ per-unit royalty rate was applied to "past and projected sales of products accused of

---

[4] "RB" citations refer to pages of Google's Red Brief.

infringement in the Litigation." Appx10389, Appx10400, Appx10411. Thus, Mr. Kennedy reasonably opined that the ▉RR▉ per-unit rate reflects the value of the handful of patents that were called out in the licenses as asserted in the Litigation.

Further, as to this handful of patents, EcoFactor's technical expert established the close comparability of the scope of these patents to the patents in this case. Appx5578-5582. He also established the close comparability of the licensed products and features to those at issue here. *Id.* Mr. Kennedy relied on this unrebutted technical analysis in opining that the ▉RR▉ per-unit rate was applicable here, as even the single patent the jury found infringed (the '327 patent) has a comparable scope to the handful that are called out in the licenses, and indeed, covers the same smart thermostat technologies that were important to the licensees. Appx5578-5582, Appx5763, Appx5768. Google's experts did not rebut these comparability opinions at trial. Appx6268-6270 (1132:4-1134:5).

These facts distinguish this case from *Omega Pats., LLC v. CalAmp Corp.*, 13 F.4th 1361, 1379-80 (Fed. Cir. 2021). The expert in *Omega* relied on a licensing policy of five dollars per unit regardless of the number of patents licensed, "whether it's one patent or 50 patents." *Id.* By contrast, Mr. Kennedy relied on licenses settling infringement allegations involving comparable patents against specific smart thermostat features. And unlike Mr. Kennedy, the expert in *Omega* did not rely on an unrebutted technical comparability opinion correlating the scope of the patent in

**CONFIDENTIAL MATERIAL OMITTED**

suit and the accused features to those licensed patents and products. *Id.* Indeed, the expert in *Omega* had no basis to conclude that the Omega policy was applicable to a specific patent, technology, or product. *Id.*

The facts here are also the reverse of *Apple v. Wi-LAN*, where there was no evidence that the patents-in-suit were important to the licensee of a portfolio of hundreds of patents. *Apple Inc. v. Wi-LAN, Inc.,* 25 F.4th 960, 971-73 (Fed. Cir. 2022). In contrast, EcoFactor's licenses are settlements that focused on specific asserted patents. The '327 patent is expressly called out in the Daikin and Schneider agreements. Appx10398, Appx10409. Johnson likewise calls out only a handful of comparable patents to the '327. Appx10411. The terms of EcoFactor's licenses also repeatedly refer to the "Asserted Patents" and the "accused products" in the preceding "Litigation." Appx10389, Appx10400, Appx10411. And during negotiations, a licensee stated that it was "█License Negotiations█" proposed by EcoFactor to the products and time period defined by the litigation. Appx10797-10799 (PTX-594).

Moreover, in *Wi-LAN*, Mr. Kennedy was not relying on a technical expert's opinion that specifically addressed the comparability of the patents-in-suit to the key patents in a license. The *Wi-LAN* Court faulted Mr. Kennedy for "silence on these equally situated patents." 25 F.4th at 974. But Mr. de la Iglesia's unrebutted

**CONFIDENTIAL MATERIAL OMITTED**

comparability opinions on this issue, and Mr. Kennedy's express reliance thereon, filled any such silence in this case.

Finally, further distancing his opinion from that of *Apple v. Wi-LAN*, in this case Mr. Kennedy applied the apportioned royalty rate from EcoFactor's comparable licenses to Google's apportioned profits attributable to the '327 Patent. EcoFactor's unrebutted analysis of Google's conjoint survey proved that the '327 Patent is responsible for three attributes (Energy Savings, Rebates, and HVAC Monitoring) representing ██ of a customer's purchasing decision. *Supra* Section II.A.3. Mr. Kennedy therefore attributed ██ of Nest's profits, or ████ out of ████ per unit, to the '327 Patent. Appx5755-5758 (619:16-622:13); Appx5775-5778 (639:22-642:17); Appx6265-6266 (1129:20-1130:25) (Google expert admitting EcoFactor's experts' unrebutted analysis of the survey credited brand, price, and other surveyed features to Google's side of the hypothetical table). Mr. Kennedy allocated ██ (i.e., less than one third) of this apportioned profit to EcoFactor. *Id.* This is nothing like *Omega* or *Apple v. Wi-LAN*, where there was no survey-based profit apportionment and no built-in rate apportionment. Rather, Mr. Kennedy's dual approach to apportionment allowed the jury to assess the value of the '327 Patent to Google's profits, and to compare the technology covered by the '327 to the technology that was the focus of EcoFactor's license agreements.

B.     **The Jury's Finding of Infringement Was Supported by Substantial Evidence and Should Be Affirmed**

1.     **The Nest thermostats receive temperature measurements from inside the structure using their internal temperature sensor.**

A thermostat's job is to control the temperature inside your home. This requires an accurate measurement of temperature. Appx98 (1:29-52). Without one, the thermostat would not know whether to turn on the heating or the cooling.

EcoFactor's '327 Patent harnesses a thermostat's ability to receive temperature measurements. It claims a "thermostat" that "receives temperature measurements from inside the structure" and reports them to a "server" that performs calculations with the temperature data. Appx102 (9:26-45). The thermostat "regularly measure[s] and send[s] to the server information about the temperature in the building" to enable "diagnostic and controlling functions beyond those of a standard thermostat." Appx100 (6:60-7:2).

The '327 Patent imposes no restrictions on *how* the thermostat obtains the temperature measurements. The system can include thermostats with an internal component for measuring the temperature, such as a "coiled bi-metallic spring" or a "thermistor or thermal diode, or other means commonly used in the design of electronic thermostats." Appx98 (1:21-46), Appx100 (6:11-16). It even applies to thermostats that use "temperature sensors at different locations within the building,"

which "may allow increased accuracy of the system, which can in turn increase user comfort, energy savings or both." Appx102 (9:11-18).

The Nest thermostats follow the recommended approach in the patent to use an internal temperature sensor to "receive temperature measurements from inside the structure." Google agrees that the Nest thermostat includes an internal temperature sensor that receives temperature measurements. *See* RB13, 43-44 (the "accused thermostats contain multiple sensors," including a temperature sensor that receives "measurements of internal temperature"); Appx5945-5946 (809:4-809:17, Google's Dr. Burger confirming that Nest thermostats contain temperature sensors that very precisely measure temperature inside the thermostat, and that thermostats are installed in customer homes). And because the Nest thermostat (with its sensor) is installed inside the home, it "receives temperature measurements from inside the structure." Appx102 (9:29-31). This satisfies the plain language of "receives temperature measurements from inside the structure."

While Google does not dispute that the temperature sensors inside its thermostats measure temperature, Google argues it does not infringe because the sensor is contained within the thermostat housing. RB43-44. Google insists the sensor's "measurements of internal temperature" describe the temperature within the housing, which can differ from the room temperature. *Id*.

But there was substantial evidence that a Nest thermostat "receives temperature measurements from inside the structure" even though the temperature sensor is within the thermostat housing. For example, Google maintains a "Nest Developer" website for software engineers who develop applications for use with Nest thermostats. This website states that the Nest thermostat measures the "ambient temperature," defined as the "temperature measured near the thermostat." Appx10429 (PTX-281-0010); Appx6155-6156. As another example, Google's non-infringement expert, Dr. Turnbull, agreed that according to Google's website, "[t]he current ambient temperature in the room [is] measured by the Nest thermostat's internal sensors."[5] Appx6154-6155. This is Google's statement confirming the Nest thermostat's internal sensors are measuring the "current ambient temperature in the room." *Id.*

Google dismisses its webpages as providing only "high-level, non-technical statements" that are "not legally sufficient to support the jury's infringement

---

[5] Google argues that Dr. Turnbull's admissions on cross-examination should not be considered because they supposedly reference hearsay statements from Google webpages. *See* RB45-46. But those underlying webpage statements are non-hearsay party admissions. *See* Fed. R. Evid. 801(d)(2); *League of United Latin Am. Citizens Inc v. Nat'l League of Latin Am. Citizens*, No. 13-CV-04725-JSC, 2014 WL 4477335, at *4 (N.D. Cal. Sept. 11, 2014) (finding party's underlying statement on blog webpage was admissible as party admission under Fed. R. Evid. 801(d)(2)(A), regardless of whether a printout of the webpage was admissible). And while Google did object to the admission of the webpages themselves (for not being listed on EcoFactor's exhibit list), Google did not object to Dr. Turnbull testifying about the non-hearsay statements on the webpages during cross-examination.

**CONFIDENTIAL MATERIAL OMITTED**

verdict." RB45, 48-49. Google is wrong and cites no authority for this incorrect assumption. Again, as one example, the "Nest Developer" webpage admitted as PTX-281 is a Nest *developer webpage written for software engineers* who develop software that works with Nest thermostats. Appx10429; Appx6155-6156. And as another example, the webpage that Dr. Turnbull agreed says that the "current ambient temperature in the room [is] measured by the Nest thermostat's internal sensors" includes the heading "Thermostat Technical Information." Appx6154. Google cannot disavow its public-facing statements about the technical operation of the accused products and certainly cannot argue that they somehow lack credibility when such material is explicitly identified as technical information and directed to engineers.

Notably, Dr. Turnbull also agreed that, according to Google's internal testing data, the internal temperature sensor measurement rises and falls in lockstep with the ambient temperature. Appx6149-6151. Google confirmed this by attaching an external sensor for testing purposes and comparing the external sensor reading to the internal sensor reading. *Id.* Even extremely small variations in the ambient temperature are tracked precisely by the internal temperature sensor. *Id.* Further, the internal sensor reading remains within █ degrees Celsius of the ambient room temperature:

**CONFIDENTIAL MATERIAL OMITTED**



*Id.*; Appx5907-5908 (Dr. Burger further explaining the graph); Appx10204.

> ### 2. Temperature compensation of the sensor measurement yields a more accurate measurement.

Google agrees that the Nest Thermostat knows the "surrounding ambient temperature of the structure." RB13. EcoFactor's infringement expert explained that the Nest thermostat applies "temperature compensation" to the temperature sensor reading to receive a more accurate measurement of ambient temperature. Appx5455-5456, Appx5459-5463. He showed where the thermostat "hold[s] the latest temperature reading from the local sensor. And that is a temperature measurement." Appx5460. He then explained how temperature compensation adjusts the sensor reading by using other sensors in the device to refine the temperature measurement. As he testified, "what it's actually doing is taking readings from sensors and improving the accuracy of those readings such that the measurement that is going up

**CONFIDENTIAL MATERIAL OMITTED**

to the server will be of the highest accuracy possible." Appx5461. This process generates measurements that are ▮TECH▮ percent accurate to within ▮TECH▮ degrees Celsius. Appx5462.

Google does not dispute that the input to temperature compensation is a measurement, but it argues that the output is, at most, an estimate and not a measurement—as if applying compensation to what is undisputedly a temperature measurement would somehow convert that measurement into a non-measurement. *See* RB46. But the jury was entitled to credit Mr. de la Iglesia's opinion that the output from temperature compensation is a measurement. Mr. de la Iglesia explained that, from his perspective as an ordinary artisan, temperature compensation is a "known mathematical method to generate accurate measurements from measurements which might be less accurate." Appx5461-5462. Mr. de la Iglesia also relied on testimony from Google that temperature compensation outputs "temperature measurements" every ▮TECH▮, and that these measurements are stored for ▮ days. Appx5466.

Notably, Google introduced no evidence to contradict Mr. de la Iglesia's opinion that temperature compensation is a well-known method to generate temperature measurements. This opinion was further supported by Dr. Burger's deposition testimony that compensation outputs "temperature measurements" every

**CONFIDENTIAL MATERIAL OMITTED**

TECH    (Appx5466), and his trial testimony that the output from temperature

compensation is in units of degrees Celsius. Appx5946-5947.

> **3.    Google's proposed construction of "measurement" was
> rejected by the district court, has not been appealed by
> Google, and would not exclude the accused Nest thermostats
> even if it had been adopted.**

The district court gave the term "temperature measurements from inside the

structure" its plain and ordinary meaning, rejecting Google's proposal and its

argument that "values generated from algorithms" fall outside the scope of the claim.

Appx6732 (Google arguing that its proposed construction was needed to prevent

EcoFactor from asserting that "values generated from algorithms" constitute

"measurements from inside the structure"), Appx2252. Google did not appeal that

claim construction decision here (*see* RB2-3) and has thus waived any argument that

the construction was incorrect. *See, e.g.*, *Bio-Rad Labs. Inc. v. Int'l Trade Comm'n*,

996 F.3d 1301, 1315 (Fed. Cir. 2021); *Communications Test Design, Inc. v. Contec,*

*LLC*, 952 F.3d 1356, 1363 n.4 (Fed. Cir. 2020).[6]

To the extent Google asserts that intrinsic evidence supports its non-

infringement position, Google is wrong. The district court rejected Google's

proposed construction for good reason, because it was not supported by intrinsic

---

[6] Because the district court rejected Google's proposal to exclude "values generated
from algorithms" from the construction of this term, it makes no sense for Google
to suggest there is an *O2 Micro* issue that this Court must resolve (RB48 n.9). Google
made its argument and lost, which resolved the dispute.

evidence. Google identified no intrinsic evidence indicating that a temperature measurement could not be the result of a temperature compensation algorithm that processes a temperature sensor measurement. Appx6734-6735. Indeed, the specification describes using a thermal diode as an exemplary way to measure temperature. Appx81 (6:13-16). A thermal diode provides temperature measurements by using mathematics to translate the voltage across an electrical diode into a temperature value. Similarly, the specification describes using a thermistor to obtain a temperature measurement, the electrical resistance of which can be mathematically correlated to temperature. *Id*. Google's argument that "values generated from algorithms" must be excluded from the scope of "measurement" was inconsistent with the intrinsic evidence and was properly rejected by the district court.

Moreover, such examples from the specification also illustrate why Google's proposed construction could not have excluded the Nest thermostats, even if it had been adopted. It cannot be disputed that each accused thermostat makes a "determination [of temperature] by an instrument by using standardized units." Appx6752; Appx6735. As with the disclosed thermal diode and thermistor, each Nest thermostat determines temperature by sensing information that is mathematically translated into a numerical value of degrees Fahrenheit or Celsius (i.e., standardized units). Thus, even if Google's proposal had been adopted, the

accused thermostats plainly still would have met that construction. EcoFactor has never contended otherwise, in this or any other proceeding.[7]

Ignoring this record, Google now argues that the plain meaning adopted by the district court necessarily excludes values generated from Google's temperature compensation algorithm, based on "estimation" language in limitation 1[c] and the specification's distinction between a server's predictions and a thermostat's readings. *See* RB42. But these portions of the intrinsic record have nothing to do with whether the thermostat uses temperature compensation to improve the accuracy of its readings. Indeed, the preferred embodiments for temperature sensing means

---

[7] Google cites EcoFactor's statements in IPR2022-00473 about the Ehlers prior art reference and EcoFactor's '186 Patent claims as though they were relevant here, but they are not. The '186 Patent claims databases that "store" temperature measurements "over time," and to show this in prior art, Petitioners relied on Ehlers' disclosure of storing "average temperature maintained for the day, week and billing period" (*see* Appx10146-10147 (Ehlers ¶¶268, 283)). However, these same portions of Ehlers do not describe storing individual measurements for different points in time. Accordingly, EcoFactor argued that Ehlers' disclosure for storing the average temperature maintained for the entire day, week, etc. is not sufficient to show a database that stores individual measurements over time. Pointing out that storing an average temperature maintained over a full day (or more) differs from storing temperature measurements for different times (a claim limitation not even at issue here) has nothing to do with temperature compensation, in which a sensor measurement is compensated to make it more accurate. EcoFactor did not make any pronouncement about what constitutes a "measurement" generally in every EcoFactor patent claim, and certainly did not make any statement about temperature compensation. Google does not even attempt to argue (nor could it) that EcoFactor's statements constitute a clear and unmistakable disavowal of claim scope that would place temperature compensation beyond the reach of the '327 Patent.

252 (*see* Appx81 (6:1-16)) feature various tools that use mathematical algorithms and estimations to measure temperature with sufficient accuracy.

Finally, to the extent Google argues that Mr. de la Iglesia's opinions about "estimates" created a new claim construction dispute under *O2 Micro* that was not already resolved by the district court, Google waived *that* argument by failing to raise the dispute or provide the district court with a way to resolve it. *Kaufman v. Microsoft Corp.,* 34 F.4th 1360, 1369-71 (Fed. Cir. 2022). Google never told the district court that a construction beyond plain and ordinary meaning was needed to specify whether "derived estimates" could be "measurements," and Google never offered the district court a formulation of a construction resolving that issue, such that the argument has been waived. *Id.*

### 4. Google cannot avoid infringement merely by compensating its temperature measurements for improved accuracy.

In any event, Google cannot avoid infringement by adding temperature compensation to its internal temperature sensor. Google's measurement technique may involve additional refinement beyond what the claim language requires, but that addition does not render the accused products non-infringing. *See SunTiger, Inc. v. Scientific Research Funding Group,* 189 F.3d 1327, 1336 (Fed. Cir. 1999) ("It is fundamental that one cannot avoid infringement merely by adding elements if each element recited in the claims is found in the accused device.").

For example, in *Northern Telecom Ltd. v. Samsung Electronics Co., Ltd.*, 215 F.3d 1281, 1296-97 (Fed. Cir. 2000), the accused infringer argued non-infringement of a claim that required "plasma etching" because the accused process carried out both plasma etching and ion bombardment. But the plasma etching process still infringed, despite the addition of ion bombardment, because the accused infringer could not show that the claim required that no ion bombardment be present. *Id.*

Similarly, Google argues non-infringement of a claim that requires "receiving temperature measurements" because the accused process adds the element of temperature compensation to the temperature measurements received with temperature sensors. But Google cannot show that the '327 Patent requires that no temperature compensation be present, and Google did not introduce evidence contradicting Mr. de la Iglesia's testimony that temperature compensation is a "known mathematical method to generate accurate measurements from measurements which might be less accurate." Appx5461-5462. Accordingly, Google's addition of temperature compensation cannot be used to avoid literal infringement. *Northern Telecom*, 215 F.3d at 1296-97.

> **5.    The jury's verdict also was supported by Mr. de la Iglesia's opinion under the doctrine of equivalents.**

Furthermore, the jury's verdict was also supported by Mr. de la Iglesia's opinions under the doctrine of equivalents. Appx5463-5468. Mr. de la Iglesia described the thermostat sensor reading as "an internal temperature measurement

that is received from inside the structure." Appx5465. He testified that this is "done in the same way" as the claim, because "[y]ou're using a local sensor within the thermostat generating a measurement and – or, you know, receiving that measurement and sending it out." Appx5465. And he testified that the result of temperature compensation with additional sensors is to "get a higher-accuracy measurement," which is "substantially the same result." Appx5465. Mr. de la Iglesia also indicated that his equivalents analysis was consistent with the intrinsic record's disclosure of the use of "additional temperature and/or humidity sensors [which] may allow increased accuracy of the system." Appx5465-5466; Appx102 (9:10-18).

Google argues this testimony is conclusory and that it is contradicted by Dr. Burger's testimony. RB50. That is wrong. Mr. de la Iglesia's testimony was not conclusory and instead specifically addressed the function-way-result test and intrinsic evidence supporting his conclusions. *See* Appx5463-5468. Mr. de la Iglesia's testimony on the doctrine of equivalents also followed his detailed description of temperature compensation and the software that implements it. Appx5459-5463. He then explained that this process is insubstantially different from receiving measurements, because it uses a temperature sensor and achieves higher accuracy measurements. Appx5465-5466. He also drew a parallel between temperature compensation's use of multiple sensors to the specification's disclosure of additional sensors to allow for increased measurement accuracy. Appx5465-5466.

**CONFIDENTIAL MATERIAL OMITTED**

This was more than adequate to explain the application of the doctrine of equivalents to the facts here.

Moreover, Dr. Burger's testimony did not contradict Mr. de la Iglesia—it confirmed he was right. Dr. Burger's deposition testimony established that temperature compensation produces "temperature measurements" every TECH . Appx5466. And his trial testimony was that temperature compensation determines the "ambient temperature in the room that the product is installed" in degrees Celsius. Appx5947-5948.

Finally, Google made its case to the jury that temperature compensation is substantially different from receiving measurements. Appx5901-5902, Appx5906-5914. The jury simply disagreed with Google and agreed with Mr. de la Iglesia's opinion, consistent with the evidence and testimony provided by Mr. de la Iglesia. The jury's verdict was supported by substantial evidence and should be upheld.

### C. The Findings Below on Patent Eligibility Under §101 Should Be Affirmed

As an initial matter, Google's §101 appeal should be rejected as improper because it seeks a reversal on the grounds that "the district court erred in denying summary judgment of patent ineligibility." RB2. But "[a] district court's denial of summary judgment is not appealable after a trial on the merits." *Syngenta Crop Prot., LLC v. Willowood, LLC*, 944 F.3d 1344, 1364 n.7 (Fed. Cir. 2019) (citing *Ortiz v. Jordan*, 562 U.S. 180, 183-84 (2011)); *see also Function Media, L.L.C. v.*

*Google, Inc.*, 708 F.3d 1310, 1322 (Fed. Cir. 2013). Google's appeal is especially improper here because, under this Court's precedent, this was not a purely legal issue—and Google cannot sidestep the jury's factual findings on *Alice* step two.

In any event, no matter how Google states the issue on appeal and regardless of whether Google gives proper weight to the jury's factual findings, Google's appeal fails on the merits, at both *Alice* steps.

> **1.   The district court properly denied Google's motion for summary judgment under §101 and submitted the question of whether the claimed inventions were well-understood, routine, or conventional—a disputed question of fact—to the jury.**

The asserted claims are directed to specific improvements to conventional programmable thermostats and are not abstract under *Alice* step one, which ends the patent-eligibility inquiry. *Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1347, 1349 (Fed. Cir. 2018). The claimed inventions "solve a technological problem in 'conventional industry practice'" and are thus patent-eligible. *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 223 (2014). And while §101 eligibility is an issue of law, the underlying question of "whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact," which "must be proven by clear and convincing evidence." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018).

### a.    The '327 claims are not abstract.

The '327 Patent claims are not directed to an abstract idea. The claimed inventions improved existing electronic thermostat and HVAC control systems in the mid-to-late 2000s by solving unique problems in that technology area. The '327 Patent makes clear that conventional electronic thermostats and other HVAC controls could not account for the "thermal mass" of the structure. *See, e.g.*, Appx98 (1:20-56), Appx100-101 (6:60-7:32). The inventors realized thermostats did not have a suitable way to account for thermal differences between homes and generally had limited input signals, usually just "ambient temperature" and the "desired temperature." Appx98 (1:2-52). Faced with those shortcomings, the inventors derived a solution: an unconventional electronic HVAC control system with a networked thermostat that intelligently reduces electricity usage using sensors and weather databases to implement features that are customized to the "thermal mass" of the home. Appx99 (3:02-4:54), Appx100-101 (6:60-7:32), Appx 88-94 (Figs. 1-6B). Below are exemplary figures from the specification illustrating aspects of the claimed system, the second of which was annotated in EcoFactor's summary judgment briefing:







Appx89, Appx91-92; Appx1883.

The '327 Patent claims reflect this unconventionality, being directed to *computer-networked* HVAC control systems configured to compare inside temperatures to outside temperatures received *from a source other than the HVAC system*, estimate a *rate of change* in inside temperature in response to the outside temperature and *provide a signal to reduce electricity demand* based on a determined *demand reduction request*. Appx102. Thus, the claims are directed to patent-eligible improvements to existing electronically programmable thermostats and HVAC controls. *See Alice*, 573 U.S. at 217.

The Supreme Court's decision in *Diamond v. Diehr* is instructive. There, the Supreme Court confirmed the eligibility of a claim that used the "well-known Arrhenius equation to calculate the optimal cure time [of rubber] using, among other variables, the internal temperature of [a rubber] mold." *Thales Visionix, Inc. v. United States*, 850 F.3d 1343, 1347 (Fed. Cir. 2017) (discussing *Diamond v. Diehr*, 450 U.S. 175 (1981)). As the Court explained, the invention "improved upon prior art molding methods by constantly measuring the actual temperature inside the mold, recalculating the ideal cure time, and automatically opening the press when the ideal cure time equaled the actual time elapsed." *Id.*; *see also Thales*, 850 F.3d at 1346-50 (claims "using sensors to more efficiently track an object on a moving platform"

were not abstract despite requiring a "mathematical equation" to determine the orientation of the object).

The *Diehr* Court contrasted the case with *Parker v. Flook*, where claims using a specific equation were held unpatentable because they simply used a computer to provide a better "method for *calculating* alarm limit values," itself an abstract idea, and were not directed to solving any technical problems specific to any technology field. *See Diehr*, 450 U.S. at 186.[8] As in *Diehr* and *Thales*—and unlike in *Flook*— the asserted claims of the '327 Patent provide technical solutions to shortcomings specific to programmable HVAC thermostats and thus are not abstract.

Google erroneously argues that the '327 Patent claims are directed to "changing the thermostat setting in response to a request to reduce energy usage." RB27, 60. This oversimplifies the claims and ignores critical claim limitations directed to the patent's claimed advance, including the use of inside temperature measurements and outside measurements to derive an estimation of the rate of change in the inside temperature and provide a signal to reduce electricity demand based on a determined demand reduction request. Google freely admits that it ignored (improperly) the claim language in its step one analysis, just as it did in its summary judgment motion. *See* RB60 ("Stripped of excess verbiage …"); Appx1151 ("After removing extraneous verbiage …"), Appx1154 ("When stripped

---

[8] All emphasis in quoted material has been added unless otherwise indicated.

of extraneous verbiage …"). This Court has repeatedly held that "it is not enough to merely identify a patent-ineligible concept underlying the claim." *Thales*, 850 F.3d at 1349; *see also Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016). Google attempts to justify this by "stripping" down the claims, disregarding the specification, and arguing that the claims are ineligible because Google's characterization of them *involves* a purported abstract idea. Under Google's logic, virtually all patents that involve HVAC and thermostat systems would be invalid.

Google's citation to *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759 (Fed. Cir. 2019) is unavailing, as that case involved the abstract idea of "communication over a network for interacting with a device." Notably, the NDCA expressly rejected Google's reliance on this case in another EcoFactor matter, finding that the claims of EcoFactor's '186 Patent, which is substantially similar to the '327 Patent, are not abstract. *See Google*, 602 F. Supp. 3d at 1270-71. As the NDCA explained, the *ChargePoint* claims were held abstract because they covered the idea of "add[ing] networking capabilities to existing charging stations to facilitate various business interactions." *Id.* at 1271 (quoting *ChargePoint*, 920 F.3d at 770). The "specification never indicated that charging stations were improved from a technical perspective." *Id.* "By contrast, claim 1 of the '186 patent recites a device that receives and stores inside temperature measurements, calculates a predicted rate of change based on the stored temperature, status of the HVAC

system, and outside temperature (the '186 patent describes this analysis as calculating 'thermal mass'), then determines whether to direct the HVAC to pre-cool the structure before the HVAC reduces electricity." *Id.* The NDCA thus concluded that the '186 claims were more analogous to the eligible claims in *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143 (Fed. Cir. 2019) and *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358 (Fed. Cir. 2020), which were directed to specific implementations of improved devices and systems. *Google*, 602 F. Supp. 3d at 1271.

The same reasoning applies here. The '327 claims recite a specific, non-abstract implementation of energy demand reduction that improves the operation of the technological HVAC system process. The '327 specification, which is nearly identical to the '186 specification and details the limitations in existing electronic thermostats and the inventors' solution, further supports that the claims are not abstract. *See, e.g.*, Appx98 (1:02-56), Appx99 (3:02-4:54), Appx100-101 (6:60-7:32).

Google's assertion that "the essential claimed functions of the '327 patent can be performed by humans" (RB61) fails as a matter of fact and law. This Court has made clear that the problem lies with "computational methods which can be performed *entirely* in the human mind." *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1373 & n.3 (Fed. Cir. 2011). But Google admits that the claims

44

cannot be performed *entirely* in the human mind, and instead directs its argument to only certain functions it calls "essential." RB61.

A human clearly cannot perform all the steps recited in claims 1 and 5 of the '327 Patent using only their mind or pen and paper. Each claim requires, *inter alia*, a *networked* HVAC control system, various temperature or other *sensors*, and a networked *server or processors* configured to receive outside temperatures or other digital data from a source other than the HVAC in order derive an estimate rate of change of inside temperature to outside temperature and ultimately send a signal to the thermostat to change the setting. Even merely changing the setting on a thermostat requires a physical thermostat. Thus, the '327 claims are not the "types of methods that embody the 'basic tools of scientific and technological work' that are free to all men and reserved exclusively to none." *CyberSource*, 654 F.3d at 1373.

### b.    The '488 claims are not abstract.

The '488 Patent shares the same specification as the '327 Patent. Google's arguments regarding the '488 claims thus fail for similar reasons. The specification describes the limitations in conventional electronic thermostat and HVAC control systems and proposes solutions in the form of an unconventional electronic HVAC control system with a networked thermostat with a temperature sensor and storage. *See, e.g.*, Appx80-81 (1:20-4:54), Appx82-83 (6:14-7:32), Appx70-76 (Figs. 1-6B).

Further, the '488 asserted claims are directed to specific, technological improvements in conventional HVAC systems, including a *computer-networked HVAC control systems configured to compare inside temperatures to outside temperatures received from a source other than the HVAC* to estimate a *rate of change* in inside temperature in response to outside temperature and compare an inside temperature with that *rate of change to determine whether the HVAC is on*. Appx84. These claimed improvements to existing technological processes are analogous to the patent-eligible inventions in *Diehr* and *Thales*.

Google wrongly argues that the '488 claims are directed to the "idea of using changes in indoor temperature to determine whether an HVAC system is on or off." *See* RB53. Google again oversimplifies the claims and ignores critical limitations directed to the claimed advance—as illustrated by Google's suggestion that the claims are too "wordy." *Id.* Google ignores that the claimed system operates with a networked sensor, estimates a rate of change, and includes other key elements— while simultaneously criticizing that the claims fail to recite "how" to achieve the results. *See* RB54. This Court has repeatedly cautioned against such "sweeping generalizations" and held that it is improper to "equate[] the presence of an abstract idea with a conclusion that the claims are directed to such an idea." *Realtime Data LLC v. Reduxio Sys., Inc.*, 831 F. App'x 492, 497 (Fed. Cir. 2020).

Google's assertion that the "basic functions" of the claims can be "performed by a human with pen and paper" (*see* RB53-54) also fails for the same reasons discussed above. Google does not even attempt to argue that the claims can be performed *entirely* in the human mind, as receiving inside and outside temperature measurements with only one's mind is absurd. *See CyberSource*, <u>654 F.3d at 1373</u> & n.3.

None of the purported admissions relied on by Google (RB54) support that the claims can be performed entirely in the human mind. The excerpted deposition testimony is either taken out of context and irrelevant, or at best confirms the obvious fact that humans can perform rudimentary math calculations. But as observed by one court, "a human cannot always achieve the same results as a computer," and claims do "not become conventional simply because humans can do math." *California Inst. of Tech. v. Hughes Commc'ns Inc.*, <u>59 F. Supp. 3d 974, 994-95</u> (C.D. Cal. 2014). Google's cited testimony actually shows that the inventors utilized *computers* in developing the claimed inventions, directly contradicting Google's assertion that the claims can be performed using only pen and paper. *See, e.g.*, <u>Appx1173-1175</u>, <u>Appx1181-1182</u> (explaining that a "human being is not a sensor so human being would not be able to measure the temperature," and that collecting and analyzing huge amounts of temperature data over time to derive an estimated rate of change "would require an analysis that's beyond a typical human").

As discussed above, the cases cited by Google are easily distinguishable, as none concerned specific improvements to existing technological processes. For example, in *Clarilogic, Inc. v. FormFree Holdings Corp.*, 681 F. App'x 950, 954 (Fed. Cir. 2017), the claims were directed to "gathering financial information of potential borrowers." Here, despite Google's oversimplification, the '488 claims are directed to specific, non-abstract improvements in existing HVAC system processes and are thus patent-eligible under §101.

### c.    The '382 claims are not abstract.

The '382 Patent claims are also directed to specific improvements in HVAC control systems and thus are not abstract. Similar to the '327 and '488 Patents, the '382 specification identified limitations with prior art systems and addressed such problems with an "occupancy detection capability to residential HVAC systems [which] could also add considerable value in the form of energy savings without significant tradeoff in terms of comfort." Appx117-118 (1:41-46, 2:51-3:20). The specification further identified problems with conventional systems that utilized only motion sensors and provided a solution of using networked consumer electronics devices as indications of occupancy for automatically adjusting the temperature setpoint on a thermostat. Appx117-118 (2:60-3:20), Appx109-113 (Figs. 1-5).

Even in its most basic form, the '382 claims are directed to *computer-networked* HVAC control systems configured to receive first data *from a sensor* and second data *collected from an external source* and use processors *located remotely from a memory and not electrically connected to the memory* to *determine whether the building is occupied and control the HVAC* based on that determination. Appx120-121.

Google's erroneously asserts that the '382 claims are directed to the "abstract idea of automatically changing thermostat settings based on whether a building is occupied." RB62. This improper oversimplification ignores the networked-centric character of the claimed inventions, and how the claimed system processors are configured to achieve the claimed advance, including that the processors are located remotely from and not electrically connected to a memory. Regardless, even Google's characterization demonstrates that the claims are not abstract. Automatically changing thermostat settings based on whether a building is occupied is not a law of nature, fundamental economic practice, method of organizing human activity, or other ineligible concept. *See Alice*, 573 U.S. at 219-20.

Google's assertion that the "the claimed functions can be performed by a human" (RB63) fails for the reasons discussed above, as a human cannot perform the claims using only pen and paper. And Google misses the point in asserting that the claims do not recite "how" to receive or send any of the data or "how" to

determine building occupancy or control the HVAC system. *See* RB64. The NDCA rejected a similar argument in considering other EcoFactor patents, recognizing that a "claim that is directed to improving the functionality of one tool … that is part of an existing system … does not necessarily need to recite how that tool is applied in the overall system … in order to constitute a technological improvement that is patent-eligible." *Google*, 602 F. Supp. 3d at 1272 (citing *Koninklijke*, 942 F.3d at 1151). Rather, "the more relevant inquiry is 'whether the claims in this patent focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke processes and machinery." *Id.* Here, the '382 claims focus on specific methods and systems for detecting the use of networked consumer electronics devices as indications of occupancy of a structure, thus providing improved control of HVAC equipment. This is not abstract.

### 2.    As confirmed by the jury, the claimed inventions are not well-understood, routine, or conventional and thus provide inventive concept under *Alice* step two.

None of the three asserted patents are directed to abstract ideas. Thus, the patent-eligibility inquiry ends, and the Court need not consider *Alice* step two. But even if the claims were directed to abstract ideas, the claims are still eligible because they provide unconventional solutions to problems in the prior art.

50

Here, the jury was presented with substantial evidence of unconventionality for both the '327 and '382 Patents and concluded on the verdict form that the asserted claims of both patents satisfy *Alice* step two. The same verdict have been reached for the '488 Patent if it had been presented at trial, as that patent likewise meets the unconventionality standard.

"[W]hether a claim element or combination of elements would have been well-understood, routine, and conventional to a skilled artisan in the relevant field at a particular point in time is a question of fact" and may require 'weigh[ing] evidence,' 'mak[ing] credibility judgments,' and addressing 'narrow facts that utterly resist generalization.'" *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 890 F.3d 1354, 1355 (Fed. Cir. 2018). The jury's verdict should be affirmed unless "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [winning] party." *Z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1346 (Fed. Cir. 2007) (quoting Fed. R. Civ. P. 50(a)(1)). "The United States Court of Appeals for the Fifth Circuit describes appellate review of a JMOL denial as a determination whether the facts and inferences point so strongly and overwhelmingly in favor of one party that the court concludes that reasonable jurors could not arrive at a contrary verdict." *Id.* (internal quotation marks omitted). And "[i]n reviewing the sufficiency of the evidence … [this Court] must affirm unless there is no legally sufficient evidentiary basis for the jury's verdict," where "the evidence, as well as all

reasonable inferences from it, are viewed in the light most favorable to the verdict." *Id.* (quoting *Lane v. R.A. Sims, Jr., Inc.*, 241 F.3d 439, 445 (5th Cir. 2001)).

Here, the jury was explicitly asked to determine whether the claims of the '327 and '382 Patents meet the requirements of *Alice* step two, the underlying facts of which were not disputed by Google. Appx2254. The jury concluded that Google did not show that the asserted claims of the '327 and '382 Patents failed to meet *Alice* step two. Appx47. The jury's conclusions were supported by substantial evidence, and all underlying factual considerations implicitly decided in EcoFactor's favor are now presumed correct for these two patents. *Z4 Techs.*, 507 F.3d at 1346. For example, Google's invalidity expert, Dr. Williams, gave conclusory testimony regarding how elements in isolation were supposedly conventional. But he admitted on cross-examination for the '382 Patent that he provided no evidence on the actual question on the verdict form, namely whether the *ordered combination* of elements for each patent was conventional. Appx6416-6417 (1280:25-1281:13, acknowledging he did not "show the jury any evidence that every word as an ordered combination was conventional altogether"). Mr. Williams similarly provided no such evidence for the '327 Patent. Appx6415-6416 (1279:1-1280:20). This alone is fatal to Google's arguments for the '327 and '382 Patents. But in addition, Mr. Williams also admitted that there was unrebutted evidence demonstrating that there were no commercially available wireless HVAC controls even available around the

priority date of the patent. Appx6416 (1280:6-17). This is also fatal to Google's arguments.

Google improperly attempts to shift the burden, arguing that "EcoFactor presented no facts, which if taken as true, would have raised a question as to whether the asserted claims include an inventive concept to make them patent eligible." RB65. But this ignores the substantial evidence presented that contradicts Google's flawed arguments on *Alice* step two and supports the jury's verdict on that step, for both patents presented at trial (i.e., the '327 and '382 Patents).

For example, as Dr. Palmer summarized, Mr. Hublou testified "that the *wireless connected thermostat was not available*" in 2007, *the time of the invention*. Appx6449-6451 (1313:15-1315:11); Appx5402-5403 (266:25-267:6) (confirming that, in 2007, "[i]t was very much an anomaly to have any sort of internet-connected device inside of your home, or inside of a building"). And even a wireless connected thermostat would still be a far cry from the claimed system—which further requires, among other things, that the thermostat communicate with a remote server that receives outside temperatures and compares them to inside temperatures, to derive an estimation for the rate of change in inside temperature in response to outside temperature. Appx84, Appx102. Notably, Mr. Hublou also testified that "he was met with a significant degree of skepticism when he went to a university to seek their assistance in developing a commercializable form of the patent." Appx6449-6451

53

(1313:15-1315:11); *see also* Appx5397 (261:3-262:15) (describing skepticism directed toward inventors). There would be no such skepticism if the inventions covered merely "automating" functions that had long been conventional. The jury was entitled to base its step two determination on all this evidence.

Furthermore, Google ignores the testimony of EcoFactor's VP of Engineering, Glen Okita, regarding the skepticism initially encountered by the inventors. *E.g.*, Appx5345-5346 (209:20-210:6). As he explained, the inventors conducted a "Field Study" as a "proof of concept," described in a detailed report (Appx10819-10881, PTX-928) demonstrating that "even though some may have been skeptical, it proved out all the ideas," including "[t]hat you can *do this dynamic signature thermal model, with just one thermostat,* and do it over -- prove it out over many houses in many conditions." Appx5346 (210:7-211:6), Appx5350-5353 (214:2-217:10), Appx5358 (222:18-224:11). The Field Study further explains that EcoFactor's approach stood in contrast to "conventional unconnected devices" at the time. Appx10823; *see also* Appx10830 (distinguishing EcoFactor's approach from "conventional" demand reduction methods). The jury also heard unrebutted testimony that this novel system could be accomplished as claimed, without "hundreds of thermostats and tens of thousands of dollars of equipment." Appx5398 (262:7-15).

Google further ignores testimony by Dr. John Palmer, EcoFactor's validity expert, that the ordered combination of elements is not conventional, and the claims in their ordered combination are much different than, and cannot be reduced to, the individual components of the claimed systems. Appx6449-6451 (1313:17-1315:11).

This is substantial evidence supporting the jury's finding on *Alice* step two, thus supporting affirmance here. All this documentary evidence was also before the district court on summary judgment.

This and other evidence raised by EcoFactor during summary judgment briefing was also more than sufficient to raise a triable issue of fact, making it appropriate for the district court to deny Google's summary judgment motion and submit the *Alice* step two factual question to the jury. *See, e.g.*, Appx1895-1898. Indeed, the jury's finding in EcoFactor's favor on that question only further demonstrates that Google is wrong to argue the asserted patents should have been invalidated under §101 at the summary judgment stage. *See* RB68-69.

In the face of such evidence, Google offers only unavailing and misplaced criticisms on *Alice* step two. For example, with respect to the '327 and '488 Patents, Google alleges that EcoFactor "relied on the specification's reference to thermal mass, asserting that prior to the claimed invention, an HVAC system had 'no mechanism by which it might take the thermal mass of the structure into account, but thermal mass significantly affects many parameters relating to energy

efficiency.'" RB66-67 (citing Appx1895, which quotes '488 Patent at 3:1-4, 2:52-67). Google argues that this is irrelevant because "thermal mass is not in any of the asserted claims." RB67. But this ignores that the asserted claims both recite "deriv[ing] an estimation for the rate of change in inside temperature of the structure in response to outside temperature," which accounts for the thermal mass of the structure. Appx84 (9:38-40); Appx102 (9:43-45). Google also ignores EcoFactor's further arguments regarding the limitations of conventional "electronic digital" programmable thermostats and how the "significant theoretical savings" they could one day achieve were "rarely realized." Appx1895 (quoting '488 Patent at 1:3-46). Moreover, the '488 Patent was not presented at trial (*see* Appx2254) and thus not addressed in the jury's verdict. Thus, any question as to whether the '488 Patent claims meet *Alice* step two—which they do—should be remanded to the district court for a factual determination.

With respect to the '382 Patent, Google argues that EcoFactor's analysis "merely rehashes and repackages the same abstract ideas." RB67. But the '382 Patent recognized difficulties with conventional thermostats that "generally offer a very restrictive user interface [and are unable] to take into account more than two variables," and prior art occupancy detection systems required a motion sensor electrically connected to HVAC system's control circuitry. Appx117 (1:41-46, 2:51-56).

Google never substantively addresses this and instead merely dismisses not only these disclosures but also EcoFactor's supporting citations to its field study. *See* Appx1896; RB68. And while Google also criticizes EcoFactor's citations to Google's own documents as further evidence (*see* RB68), such evidence only further confirms that aspects of the ordered combination of claim elements in all three patents were not "conventional"—even as late as the mid-2010s. Appx1897-1898.

The district court properly denied Google's summary judgment motion and submitted the disputed factual question of *Alice* step two to the jury. The jury weighed the evidence presented on the '327 and '382 Patents and found that it supported EcoFactor's position. There is no reason to disturb that verdict now. And just as the jury concluded with respect to the '327 and '382 Patents, the facts and evidence also show conclusively that the asserted claims of the '488 Patent likewise meet *Alice* step two.

## IV.    ARGUMENT SUPPORTING ECOFACTOR'S APPEAL ISSUES

EcoFactor's principal brief identified rulings below that should be reviewed and reversed. BB20-48.[9] Google's responsive arguments are unpersuasive.

---

[9] "BB" citations refer to pages of EcoFactor's Blue Brief.

## A.    The District Court's Grant of No Willfulness and No Inducement Was Reversible Error

The district court erroneously granted JMOL that Google is not liable for post-suit willful infringement of the '327 Patent. The facts and inferences therefrom did not point so strongly and overwhelmingly in Google's favor that reasonable jurors could not reach a contrary conclusion as to intentional infringement.

Google wrongly contends there is no evidence of specific intent to infringe. *See* RB72. The issue on appeal is ***post-suit*** willful infringement. Google ignores that EcoFactor's "primary" evidence for notice of infringement is the filing of the complaint itself, not the acquisition correspondence Google identifies. RB70-74. To be clear, the acquisition correspondence further shows that Google's post-suit acts constituted deliberate or intentional infringement under the totality of circumstances. That correspondence and other pre-suit evidence discussed in EcoFactor's principal brief (e.g., Google's competitive actions against EcoFactor) collectively show that Google failed to act in accordance with industry standards, copied EcoFactor's ideas, and failed to make a good-faith effort to avoid infringement. Moreover, willfulness can also be established when the defendant acted despite a risk of infringement that was "either known or so obvious that it should have been known to [it]." *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1371 (Fed. Cir. 2017). Google does not address this and ignores evidence of its intent to infringe that made the grant of JMOL improper.

The district court's conclusory statement that Google set forth a "vigorous defense" fails to justify its grant of JMOL. Google does not substantively dispute that: (1) the jury agreed with EcoFactor that Google infringed the '327 Patent and found the '327 Patent valid; (2) it took the (incredible) position that its thermostats "do not measure ambient room temperature," when its own documents indicated the opposite; and (3) Google falsely presented its only '327 prior art reference (Ehlers) as offering new teachings not considered during original prosecution, which undermined its credibility. *See* RB70-74. None of Google's case citations indicate that JMOL would be appropriate despite such compelling evidence.[10]

Google's supposedly countervailing evidence (RB72-73), to the extent it is admissible, merely goes to the ***weight*** of the evidence and should have been left for the jury to determine. Google does not identify "facts and inferences [which] point so strongly and overwhelmingly in [Google's favor] that reasonable jurors could not reach a contrary conclusion." *Sec. & Exch. Comm'n v. Life Partners Holdings, Inc*., 854 F.3d 765, 777-78 (5th Cir. 2017); *see also Nat'l Fire Ins. Co. of Hartford v. Giron*, 573 F. App'x 322, 323 (5th Cir. 2014). Substantively, Google's contentions disputing the jury's finding of infringement are unreasonable, for the reasons described above. *Supra* Section III.B. The jury's verdict on non-infringement and

---

[10] While Google suggests EcoFactor categorically distinguished temperature compensation as beyond the scope of temperature measurements in an IPR involving another patent, Google is wrong for the reasons described above. *Supra* n.7.

indefiniteness as to other patents-in-suit is irrelevant. And the Patent Office's statements in the belatedly filed *ex parte* reexamination of the '327 Patent are also irrelevant. Nothing in that reexamination was part of the record in district court, and it is premature to draw conclusions from it because the reexamination is still ongoing.[11]

For the reasons above and as previously explained (*see* BB20-28), the district court's grant of JMOL of no post-suit willfulness and no inducement should be reversed.

### B.    EcoFactor Should Receive a New Trial on the '382 Patent

#### 1.    Google's newest inadmissibility theory is untimely and meritless.

Google sought to exclude its source code from evidence for reasons not based on the Federal Rules of Evidence ("FRE"). Despite failing to raise any FRE-based argument before, Google now asks this Court to uphold the district court's exclusion using FRE 611. That argument is wrong and untimely.

Google does not dispute that it never raised any FRE-based objection at trial. BB32; RB80-81. Instead, Google argues for the first time that the "district court had

---

[11] It is unclear why Google claims EcoFactor is raising the reasonableness of Google's defenses for the first time on appeal. *See* RB72. The district court understood that the reasonableness of Google's positions was at issue, when it erroneously and without basis stated Google's defense was "vigorous." Appx6231 (1095:12-15).

the inherent authority to [exclude Google's otherwise-admissible source code] under Rule 611." RB75. However, the very authority Google quotes explicitly states that "[u]nlike the vast majority of the other Evidence Rules, Rule 611 *does not purport to regulate the admissibility of evidence*." *United States v. Garcia*, 334 F. App'x 609, n.18 (5th Cir. 2009) (quoting *United States v. Colomb*, 419 F.3d 292, 297 (5th Cir. 2005) (stating "Rule [611] *does not provide an independent ground for excluding otherwise-admissible evidence*."). Rule 611 is not a proper basis for excluding Google's source code from evidence.

Additionally, Google's reliance on *Jon-T* (RB75) is misplaced because it had nothing to do with demonstratives, source code, or managing the presentation of evidence under Rule 611. Instead, the admissibility issues there hinged upon Rule 403. *Jon-T Chems., Inc. v. Freeport Chem. Co.*, 704 F.2d 1412, 1417-18 (5th Cir. 1983) (per curiam). Yet, Google never raised Rule 403, nor any other FRE-based objection. None of Google's cited authority supports the exclusion of source code.

Google does not dispute that its source code is relevant to the issue of '327 infringement (BB30; RB74-83), relying on that very code even now in its Red Brief. But the jury was denied access to the code that EcoFactor relied on to prove '382 infringement, despite requesting it. Google cannot have it both ways—relying upon its source code as purportedly proving '327 non-infringement while at the same time arguing that the source code for the '382 Patent was properly excluded from the jury.

Google identifies no rule that would preclude admissibility of its undisputedly relevant source code and has waived any evidentiary objection. Its source code should have been admitted. Fed. R. Evid. 402. The district court's ruling—premised on Google's baseless objection—was an abuse of discretion warranting a new trial.

### 2.    EcoFactor preserved its right to appeal.

Google attempts to misdirect by arguing that EcoFactor waived its arguments based on Rule 103(a). RB79-81. Google is wrong and misquotes relevant law. Specifically, Google quotes subsection (1) of Rule 103(a), which applies only when "the ruling *admits* evidence." Fed. R. Evid. 103(a)(1). However, the dispute here is over the *exclusion* of evidence, addressed by subsection (2). EcoFactor properly preserved these issues for appeal. *See* Fed. R. Evid. 103(a)(2) ("if the ruling excludes evidence, a party informs the court of its substance by an offer of proof, unless the substance was apparent from the context"). EcoFactor identified its position on admissibility in both the draft joint pretrial order and on EcoFactor's Physical Exhibit List. *See* BB41-43. The district court excluded the source code from evidence at the pretrial conference, and the substance of the code was readily apparent to the district court. *Id.* at 41 (citing Appx5133 (118:1-119:1)). Thus, EcoFactor was not required to renew its objection to preserve the issue for appeal.

### 3.      The district court's jury instructions were improper.

Google does not dispute that—in the district court's own words—it was a "mistake" to tell the jury members they would have access to Google's source code if requested. BB34-36; RB76. While Google characterizes this as merely a "stray comment," the jury undeniably requested source code during deliberations in accordance with the court's instruction. *Id.*

That "mistake[n]" instruction caused irreparable confusion when the jury was later denied access to the code and given further instructions during deliberations—*after* the district court's jury charge. BB34-41. Contrary to Google's argument that "EcoFactor fails to satisfy any of [the *Advanced Display*] factors," EcoFactor timely objected to the instructions provided to the jury *during their deliberations*. BB36-38. EcoFactor demonstrated that those instructions given *after* the jury charge were legally erroneous. *Id.* The instructions undeniably had a prejudicial effect because the jury was confused, checking "Yes" on the verdict form as to infringement, crossing it out, and later checking "No." BB36-38. Finally, EcoFactor proposed an alternative to the instruction given during deliberations, which was rejected. Appx6582-6585. These erroneous instructions warrant a new trial on the '382 Patent.

### 4.    Google applies the wrong standard of review.

Finally, Google argues a new trial can be granted only if the verdict was against the great weight of the evidence. RB81-83. Google again misrepresents the law and does not address any of EcoFactor's arguments under the appropriate standard. The "great weight of the evidence" standard is only one of numerous grounds for granting a new trial. A "trial court should grant a motion for a new trial if (1) the jury instructions were erroneous or inadequate, (2) the court made incorrect and prejudicial admissibility rulings, **_or_** (3) the verdict is contrary to the great weight of the evidence." *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1258 (Fed. Cir. 2004); *see also Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612-13 (5th Cir. 1985) (identifying similar independent bases).

Here, EcoFactor has identified (1) erroneous jury instructions, and (2) prejudicial admissibility rulings. Either independent basis warrants a new trial. And while each standard is subject to "harmless error" review (BB19), Google does not address, much less dispute, that each basis resulted in harmful error. BB30-33 (harm from improperly excluding evidence); BB39-41 (harm from improper instructions). If this Court finds that **_either_** the jury instructions were erroneous, **_or_** that the admissibility ruling was prejudicial, EcoFactor is entitled to a new trial because EcoFactor has established—and Google does not dispute—that neither error was harmless.

64

## C.     The District Court Wrongly Found the '488 Patent Claims Indefinite

The comparison of the '488 patent requires determining whether recorded temperatures from the thermostat are rising at the rate predicted, or not. Appx83 (7:55-64). This is not ambiguous even though the comparison can be made in multiple ways. The patent discloses that one way to "determine that the temperature inside the house is rising at the rate predicted" is to compare the "predicted reading" based on the server's estimation for the rate of change with the "actual reading." Appx83 (7:50-55). Another disclosed way is to compare the rate of change in the recorded temperature data to the rate of increase predicted. Appx83 (8:20-34). The patentee could have drafted the claim to require that the comparison be done in only one of these ways, but because the specification discloses both comparison examples, an ordinary artisan has reasonable certainty that both fall within the claim's scope.

EcoFactor's technical experts agreed that the claimed comparison could be performed either way. Appx1685-1686 (¶¶92-93); Appx1700-1701. Their observation that there are at least two ways to perform the claimed comparison is directly supported by the specification, which discloses both. Appx83 (7:55-8:34).

## V.     CONCLUSION

For the foregoing reasons, this Court should reject Google's appeal arguments and grant only the relief requested in EcoFactor's principal brief.

Respectfully submitted,

March 30, 2023                    */s/ Reza Mirzaie*
                                 Reza Mirzaie
                                 rmirzaie@raklaw.com
                                 Marc A. Fenster
                                 mfenster@raklaw.com
                                 Kristopher R. Davis
                                 kdavis@raklaw.com
                                 James N. Pickens
                                 jpickens@raklaw.com
                                 Minna Y. Chan
                                 mchan@raklaw.com
                                 Russ, August & Kabat
                                 12424 Wilshire Blvd., 12th Floor
                                 Los Angeles, CA 90025
                                 Tel: (310) 826-7474

                                 *Attorneys for Plaintiff-Appellant*
                                 *EcoFactor, Inc.*

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION</u>

The undersigned hereby certifies that the foregoing brief complies with the relevant type-volume limitations of the Federal Rules of Appellate Procedure and Federal Circuit Rules because the brief has been prepared using a proportionally spaced typeface using Microsoft Word in 14-point or larger Times New Roman Font or another proportionally spaced typeface with serifs and includes 13,996 words, excluding the parts of the brief exempted by <u>Federal Rule of Appellate Procedure 32(f)</u>, Federal Circuit Rule 32(b)(2), and Federal Circuit Rule 28(a)(12).

March 30, 2023

*/s/ Reza Mirzaie*
Reza Mirzaie
rmirzaie@raklaw.com
Marc A. Fenster
mfenster@raklaw.com
Kristopher R. Davis
kdavis@raklaw.com
James N. Pickens
jpickens@raklaw.com
Minna Y. Chan
mchan@raklaw.com
Russ, August & Kabat
12424 Wilshire Blvd., 12th Floor
Los Angeles, CA 90025
Tel: (310) 826-7474

*Attorneys for Plaintiff-Appellant*
*EcoFactor, Inc.*