Nos. 22-1974, 23-1101

# United States Court of Appeals for the Federal Circuit

---

ECOFACTOR, INC.,

*Plaintiff-Appellant,*

v.

GOOGLE LLC,

*Defendant-Cross-Appellant.*

---

On Appeal from the United States District Court
for the Western District of Texas
Case No. 6:20-cv-00075-ADA
Hon. Alan D. Albright

---

**NON-CONFIDENTIAL REPLY BRIEF OF DEFENDANT-CROSS-APPELLANT GOOGLE LLC**

---

ROBERT A. VAN NEST
LEO L. LAM
EUGENE M. PAIGE
R. ADAM LAURIDSEN
KRISTIN E. HUCEK
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile:  415 397 7188
E-mail: rvannest@keker.com

Counsel for Defendant-Cross-Appellant GOOGLE LLC

May 2, 2023

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, counsel for Defendant-Cross-Appellant Google LLC certifies the following:

1.    Full name of Party Represented by me:

Google LLC

2.    Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me:

None

3.    Parent corporations and publicly held companies that own 10% or more stock in the party:

XXVI Holdings Inc. and Alphabet Inc.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case):

Keker, Van Nest & Peters LLP:
  - Eric B. Hanson

i

- Jennifer A. Huber (now with the San Francisco City Attorney's Office)
- Matthias Andreas Kamber (now with Paul Hastings LLP)
- Patrick E. Murray (now with Gibson, Dunn & Crutcher LLP)
- Anna Porto
- Gregory D. Washington (now with Jenner & Block LLP)

Potter Minton PC:
- Michael E. Jones
- Shaun William Hassett

Allen & Overy LLP:
- Shamita D. Etienne-Cummings
- James P. Gagen
- Eric Lancaster
- James Reed
- Bijal V. Vakil

White & Case LLP:
- Henry Yee-Der Huang
- Michael J. Songer

5.    The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

- *EcoFactor, Inc. v. Google LLC*, 22-1971 (Fed. Cir. June 24, 2022)

- *EcoFactor, Inc. v. Amazon.com, Inc.*, 6:22-cv-00068 (W.D. Tex. Jan. 18, 2022)

- *EcoFactor, Inc. v. Resideo Technologies, Inc.*, 6:22-cv-00069 (W.D. Tex. Jan. 18, 2022)

- *EcoFactor, Inc. v. Pointcentral, LLC et al.*, 6:22-cv-00055 (D. Or. Jan. 10, 2022)

- In re *Ex Parte* Reexamination of U.S. Patent No. 8,412,488, 90/014,916 (U.S. PTO Dec. 3, 2021)

- In re *Ex Parte* Reexamination of U.S. Patent No. 8,738,327, 90/014,915 (U.S. PTO Dec. 3, 2021)

- In re *Ex Parte* Reexamination of U.S. Patent No. 10,534,382, 90/014,679 (U.S. PTO Feb. 12, 2021)

- *ecobee, Inc. v. EcoFactor, Inc.*, IPR2021-01052 (PTAB Jun. 10, 2021)

- *EcoFactor, Inc. v. Vivint, Inc.*, 6:20-cv-00080 (W.D. Tex. Jan. 31, 2020)

- *EcoFactor, Inc. v. ecobee, Inc.*, 6:20-cv-00078 (W.D. Tex. Jan. 31, 2020)

6.     Organizational Victims and Bankruptcy Cases.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

None

Date:  May 2, 2023                    */s/Robert A. Van Nest*
                                      Robert A. Van Nest

**CONFIDENTIAL MATERIAL OMITTED**

# TABLE OF CONTENTS

<u>Page</u>

CERTIFICATE OF INTEREST ................................................................ i

TABLE OF AUTHORITIES .................................................................vi

INTRODUCTION ..........................................................................1

I.    The district court erred in denying Google's motion for a new trial on damages. ...................3

    A.    Mr. Kennedy performed no calculation to reach a $▮ per-unit royalty................................. 4

    B.    Mr. Kennedy failed to isolate the value of the only patent found infringed. .............................. 9

II.    The district court erred in denying JMOL of non-infringement because the jury's finding of infringement of the '327 patent was not supported by substantial evidence..................................13

    A.    The way in which Nest thermostats derive an estimate of inside temperature differs significantly from taking or receiving a measurement. ......................................... 13

    B.    EcoFactor's Response confirms that its infringement verdict rests on insubstantial evidence................................................... 17

    C.    EcoFactor conspicuously avoids claim language requiring "temperature measurements from inside the structure . . . conditioned by [the] HVAC system." ................... 23

    D.    Google's non-infringement position rests on the plain and ordinary meaning of the claim language....................................... 24

iv

III.  The asserted claims of the '488, '327, and '382 patents are patent ineligible. ...........................................26

A.  EcoFactor's Step One argument rests on purported advancements that do not appear in the asserted claims. .............................. 27

B.  Saying the invention is "computer networked" also does not save the claims at Step One.................................................................. 28

C.  EcoFactor has not identified anything specific about the supposed "ordered combination of elements" that would render the claims patent-eligible at Step Two. ........................................................................ 31

D.  EcoFactor's reliance on findings from administrative bodies and other courts on different patents and claims should be ignored. ................................................................. 33

CONCLUSION ......................................................................................35

CERTIFICATE OF COMPLIANCE .....................................................37

**CONFIDENTIAL MATERIAL OMITTED**

The material omitted on pages iv, 1-7, 11 and 12 consists of a numerical royalty rate ("NRR") that EcoFactor advanced in confidential settlement agreements with third-party licensees, which was presented during sealed testimony at trial.  The material omitted on page 5 consists of lump sum settlement amounts ("SUM"), which was presented during sealed testimony at trial.  The material on page 5-6, and 11 consists of references to statements by the third-party licensees, which is contained in sealed documents and was presented in sealed testimony ("Licensee Statement").  The material omitted on pages 19 and 21 consists of a Google confidential document that was produced under the Protective Order and which was discussed during sealed trial testimony ("TECH").

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l,*
   573 U.S. 208 (2014) ................................................. 29, 31, 32

*Altoona Publix Theatres, Inc. v. Am. Tri-Ergon Corp.,*
   294 U.S. 477 (1935) ....................................................... 27, 34

*Apple Inc. v. Wi-LAN Inc.,*
   25 F.4th 960 (Fed. Cir. 2022) ..................................... 9, 10, 11

*Applied Med. Res. Corp. v. U.S. Surgical Corp.,*
   448 F.3d 1324 (Fed. Cir. 2006) ........................................... 26

*BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC,*
   827 F.3d 1341 (Fed. Cir. 2016) ........................................... 31

*In re Cygnus Telecomms. Tech., LLC, Patent Litig.,*
   536 F.3d 1343 (Fed. Cir. 2008) ........................................... 34

*Diamond v. Chakrabarty,*
   447 U.S. 303 (1980) .............................................................. 28

*Diamond v. Diehr,*
   450 U.S. 175 (1981) .............................................................. 30

*Elec. Power Grp. v. Alstom S.A.,*
   830 F.3d 1350 (Fed. Cir. 2016) ........................................... 30

*Great Plains Equip., Inc. v. Koch Gathering Sys., Inc.,*
   45 F.3d 962 (5th Cir. 1995) .................................................. 22

*Johnson Controls, Inc. v. EcoFactor Inc.,*
   2023-0442-LWW (Apr. 20, 2023) ......................................... 7

*Northern Telecom Ltd. v. Samsung Electronics Co., Ltd.,*
   215 F.3d 1281 (Fed. Cir. 2000) ........................................... 16

vi

*Omega Pats., LLC v. CalAmp Corp.*,
  13 F.4th 1361 (Fed. Cir. 2021) ................................................ 4, 9, 10, 11

*Pavo Sols. LLC v. Kingston Tech. Co., Inc.*,
  2019 WL 8138163 (C.D. Cal. Nov. 20, 2019), *aff'd*, 35
  F.4th 1367 (Fed. Cir. 2022) ..................................................................... 7

*Pavo Sols. LLC v. Kingston Tech. Co., Inc.*,
  35 F.4th 1367 (Fed. Cir. 2022) ........................................................... 5, 8

*SimpleAir, Inc. v. Google LLC*,
  884 F.3d 1160 (Fed. Cir. 2018) ............................................................ 35

*SunTiger, Inc. v. Scientific Research Funding Group*,
  189 F.3d 1327 (Fed. Cir. 1999) ............................................................ 16

*Trading Techs. Int'l, Inc. v. IBG, LLC*,
  921 F.3d 1084 (Fed. Cir. 2019) ...................................................... 27, 35

*U.S. v. City of Brookhaven*,
  134 F.2d 442 (5th Cir. 1943) ............................................................... 34

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011) .................................................. 2, 12, 13

*Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*,
  520 U.S. 17 (1997) ............................................................................... 16

*Wordtech Sys., Inc. v. Integrated Networks Sols., Inc.*,
  609 F.3d 1308 (Fed. Cir. 2010) ........................................................ 4, 8

## Other Authorities

Nguyen Hai Chau, Estimation of air temperature using
  smartphones in different contexts, 3 J. of Info. and
  Telecomm. 494 (2019),
  https://www.tandfonline.com/doi/epdf/10.1080/24751839.2
  019.1634869?needAccess=true&role=button ...................................... 15

**CONFIDENTIAL MATERIAL OMITTED**

## INTRODUCTION[1]

EcoFactor's Response and Reply Brief ("Response") provides no reason why this Court should not correct the three significant errors by the district court that Google identified in its Principal Brief.

First, EcoFactor offers no support for Mr. Kennedy's lack of a damages methodology. Mr. Kennedy simply offered the $███ per-unit royalty rate that EcoFactor's counsel inserted into settlement agreements negotiated after this litigation began. Contrary to EcoFactor's argument, none of the agreements explains whether or how such a rate was calculated, nor is there evidence that such rate was ever applied to the number of units sold by any licensee to calculate its settlement lump sum. Furthermore, EcoFactor fails to justify Mr. Kennedy's opinion that $███ per-unit applies no matter the number of patents found infringed, despite the inclusion of other asserted patents in the portfolio licenses he relied upon at trial. EcoFactor tries to save

---

[1] Throughout this brief, "Resp." refers to EcoFactor's Response and Reply Brief, "Appx" refers to the Joint Appendix, "Google Principal Br." refers to Google's Principal and Response Brief. Unless otherwise noted, all internal quotation marks and citations have been omitted, and all emphases have been added.

**CONFIDENTIAL MATERIAL OMITTED**

Mr. Kennedy's opinion by referring to other information, including his reliance on an outdated and irrelevant survey. But as this Court has made clear, "[b]eginning from a fundamentally flawed premise," even if later "adjust[ed] . . . based on legitimate considerations specific to the facts of the case nevertheless results in a fundamentally flawed conclusion." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011). Mr. Kennedy's premise of $ NRR as a per-unit royalty rate is fundamentally flawed and must be rejected.

Second, EcoFactor's Response confirms that EcoFactor's infringement verdict lacks substantial evidentiary support and relies on a clear misinterpretation of the claim's language. Despite the voluminous trial record, EcoFactor only points to two documents that purportedly support its infringement verdict and conclusory expert testimony that either improperly equates "measurement" with "estimate" or does not support EcoFactor's position. Taken together, this does not amount to the substantial evidence required to support the jury's verdict of infringement of the '327 patent, which this Court should reverse.Third, no matter how many times EcoFactor says so, its repeated assertions that the claimed inventions are directed to specific

**CONFIDENTIAL MATERIAL OMITTED**

and unconventional improvements to programmable thermostats in the prior art does not make them so.  EcoFactor offers no supporting evidence, only conclusory assertions, to rebut Google's showing that the claimed inventions are abstract concepts using conventional, general-purpose computers.  While EcoFactor accuses Google of oversimplifying the claims, EcoFactor's attempts to specify any concrete inventions— including attempts to inject concepts absent from the claims themselves or relying on decisions by other tribunals on different patents—come up empty.  In reality, the asserted claims are directed to abstract ideas and lack any inventive concept, making them patent ineligible under Section 101.

## I.   The district court erred in denying Google's motion for a new trial on damages.

Google's motion for a new trial on damages should have been granted.  First, EcoFactor's Response confirms Mr. Kennedy simply plucked $▮ as a per-unit royalty from three settlement agreements in which EcoFactor's counsel had inserted that number in "whereas" clauses after this litigation began.  Contrary to EcoFactor's argument, the agreements themselves nowhere demonstrate "how" the lump sums were calculated.  Thus Mr. Kennedy lacked competent evidence to

CONFIDENTIAL MATERIAL OMITTED

support the conversion of any of the lump sums into a $ NRR per-unit royalty rate. Second, Mr. Kennedy made no effort to show that those agreements encompassing EcoFactor's entire portfolio were sufficiently comparable to the license resulting from the hypothetical negotiation such that apportionment was "baked in[]." *Omega Pats., LLC v. CalAmp Corp.*, 13 F.4th 1361, 1377 (Fed. Cir. 2021). Instead, he insisted that the $ NRR per-unit royalty provided by EcoFactor's counsel applied regardless of the number of patents found infringed.

### A. Mr. Kennedy performed no calculation to reach a $ NRR per-unit royalty.

EcoFactor attempts to justify Mr. Kennedy's $ NRR royalty through what it calls "contractual representations" in settlement agreements that supposedly "describe ***how*** the parties calculated the lump sum[s]." Resp. at 15-16. But those agreements never explain ***how*** the lump sums were determined. *See* Appx10389-10399, Appx10411-10419, Appx10400-10410. The whereas clauses EcoFactor relies on simply state EcoFactor's alleged "belief" that $ NRR represents a per-unit royalty. *See e.g.*, Appx10389. A lawyer-created statement about a unilateral alleged "belief" does not show ***how*** a lump sum was calculated using a per-unit royalty rate. *Wordtech Sys., Inc. v.*

CONFIDENTIAL MATERIAL OMITTED

*Integrated Networks Sols., Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010) (refusing to uphold damages award based on licenses that failed to describe "how the parties calculated each lump sum").[2]

Furthermore, Mr. Kennedy performed no analysis to verify EcoFactor's purported "belief" that $ ██ represented the per-unit royalty paid by the licensees. Indeed, it beggars belief that $ ██ multiplied by any number of units sold somehow resulted in the round lump sums of $ ██ , $ ██ , and $ ██ . *See* Appx10391, Appx10413, Appx10402. Rather than verify that the licensees paid $ ██ per-unit, Mr. Kennedy simply adopted that number inserted by EcoFactor's counsel into the whereas clauses in the settlement agreements.

Mr. Kennedy also ignored the licensees' disagreements that ██

---

[2] Contrary to EcoFactor's argument, Mr. Kennedy's opinion is not like the one this Court approved in *Pavo Sols. LLC v. Kingston Tech. Co., Inc.*, 35 F.4th 1367, 1379 (Fed. Cir. 2022). In *Pavo*, "both parties' experts agreed that the [relevant] license was a comparable license." Furthermore, the relevant term included a representation by the licensee that the royalty rate was "approximately equal to Twenty Five Percent (25%) of [the licensee's] profits recognized from the sale of a Covered Product." *Id.* Here, there are no representations in the licenses connecting the lump sums to any of the licensees' sales or profits–and the licensees have explicitly stated that $ ██ ██ ██

CONFIDENTIAL MATERIAL OMITTED

was a reasonable royalty. EcoFactor's Response incorrectly states that only one licensee, Schneider, disagreed that $██ was a per-unit royalty. *See* Resp. at 17. Both Schneider ***and*** Daikin disagreed with $██ as a per-unit royalty. *See* Appx10391; Appx10400-10410; Appx10402.

These clear, explicit statements disavowing $██ as a per-unit royalty disprove EcoFactor's assertion that "the parties" had in fact applied $██ to arrive at the lump sums. Resp. at 15. Contrary to EcoFactor's Response, there is no evidence that Schneider's statements disavowing $██ were "to hedge against future litigation." Resp. at 17. EcoFactor's strained explanation of the language "[s]uch amount is not based upon sales" is not convincing, either. Appx10391, Appx10402; *see* Resp. at 17 (claiming that "[such amount is] not based [on] sales" refers only to "actual past sales"). In any event, Mr. Kennedy never offered the explanations that EcoFactor's counsel advances now.

A single email between counsel for Johnson and counsel for EcoFactor that includes the phrase "██" does not save Mr. Kennedy's opinion. Resp. at 17. EcoFactor ignores that in the same email, Johnson challenged $██ as a per-unit royalty rate,

6

CONFIDENTIAL MATERIAL OMITTED

questioning how EcoFactor determined its proposed rates and whether anyone else paid such rates.  Appx6310, Appx6532.[3]  In any event, regardless of Johnson's position, whether or not a licensee disagreed with $ NRR  does not relieve Mr. Kennedy from independently calculating and confirming that rate.

Finally, EcoFactor has not distinguished the caselaw rejecting similar damages opinions.  Mr. Kennedy's opinion here is worse than the opinion rejected by the district court in *Pavo Sols. LLC v. Kingston Tech. Co., Inc.*, 2019 WL 8138163, at *5 (C.D. Cal. Nov. 20, 2019), *aff'd*, 35 F.4th 1367 (Fed. Cir. 2022).  There, the expert similarly had "no knowledge" "of sales figures under [the license] agreement," and her attempt to use "the number of [] stores" and "worldwide sales as a stand-in for actual sales" was rejected as unreliable.  *Id.* at *5.

---

[3] Johnson recently filed a breach-of-contract complaint seeking to enjoin EcoFactor from using the Johnson settlement agreement to support its damages theories in other actions.  Google respectfully requests that the Court take judicial notice of Johnson's complaint.  *See* Verified Compl., *Johnson Controls, Inc. v. EcoFactor Inc.*, 2023-0442-LWW (Apr. 20, 2023).  Confirming that EcoFactor misrepresented that Johnson agreed to $ NRR  as a per-unit royalty, Johnson's complaint avers that EcoFactor's whereas clause was "***not*** joined by [Johnson] in the text of the Agreement," and that Johnson "***never agreed*** that the payment set forth in the agreement was based on unit sales or a specific royalty rate."  *Id.* ¶ 28.

Contrary to EcoFactor's argument, the fact that Mr. Kennedy did not even attempt to approximate sales is not a basis to distinguish *Pavo*. Resp. at 16. Like the expert in *Pavo*, Mr. Kennedy failed to show "how the lump sums . . . could be accurately converted to a royalty rate," and he was "incapable of doing so" given his lack of sales data. *Pavo* at *5. And as in *Wordtech*, here, none of the licenses describe "how the parties calculated each lump sum," nor is there any data about "the volume of sales or projected sales" in the record. *Wordtech*, 609 F.3d at 1320. "[W]ithout additional data, the licenses offered the jury 'little more than a recitation of royalty numbers.'" *Id.*[4]

---

[4] EcoFactor argues that Mr. Kennedy's opinion is reliable given testimony from **Google's** witnesses about third parties' sales. But testimony about sales other than those by Daikin, Schneider, or Johnson has no bearing on Mr. Kennedy's opinion. And there was no testimony that a "comparable" patent license set forth rates that "would go as high as almost $5.00 per unit." *See* Resp. at 18. The portion of the transcript EcoFactor cites amounts to Google's damages expert acknowledging assertions by EcoFactor's counsel. *See e.g.*, Appx6285-6286 ("Q. The average is $210 per unit? A. I haven't seen [the] calculation. But if you want to tell that to the jury, that's fine. Q. Okay. And so if we apply 0.5 percent to 2 percent, that gives us $1.05 per unit to $4.20 per unit for these price points, fair? A. Again, I'll take your word on the math. I don't agree with the theory.").

**B. Mr. Kennedy failed to isolate the value of the only patent found infringed.**

Separate from his failure to connect the lump sums to any per-unit royalty rate, Mr. Kennedy failed to establish that the settlement agreements were economically comparable to a license resulting from a hypothetical negotiation. As this Court explained in rejecting the expert's opinion in *Omega*, 13 F.4th at 1377, and in rejecting Mr. Kennedy's own opinion in *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960 (Fed. Cir. 2022), applying the same per-unit royalty rate regardless of the number of patents found infringed is improper. Here, Mr. Kennedy failed to account for the fact that all three purportedly comparable agreements encompassed EcoFactor's entire portfolio, not just the '327 patent. Mr. Kennedy's "patent/claim-independent approach" therefore never should have been presented to the jury. *Omega*, 13 F.4th at 1379.

Ignoring Mr. Kennedy's failure to account for the value of the other patents in EcoFactor's portfolio, EcoFactor points to Mr. Kennedy's reliance on EcoFactor's technical expert. But technical comparability is irrelevant here, just as it was in *Omega* and *Apple*. As in those cases, the patent in the hypothetical negotiation here was also asserted against some of the licensees. *See Omega*, 13 F.4th at 1380;

*Apple*, 25 F.4th at 972. Technical comparability, however, does not relieve Mr. Kennedy from analyzing economic comparability, which requires that he account for the value of the other patents included in the portfolio licenses. *See Omega*, 13 F.4th at 1380; *Apple*, 25 F.4th at 973-974 ("Mr. Kennedy's silence on these equally situated patents [in the purportedly comparable licenses] . . . makes his opinion unreliable."). Thus Mr. Kennedy's reliance on EcoFactor's technical expert provides no basis for distinction from *Apple* or *Omega*.

EcoFactor also mischaracterizes Mr. Kennedy's opinion here as the "reverse" of his rejected *Apple* opinion. But just like in *Apple*, here, the patents that Mr. Kennedy concluded were the "focus" of the negotiations included more than just the '327 patent. Indeed, the Schneider and Daikin licenses, which included the '327 patent, also specified ***six*** other asserted patents. But Mr. Kennedy did nothing to address "the extent to which those other patents contributed" to the amounts paid by Schneider or Daikin. *Id.* at 973.

And as in *Apple*, one of the licenses does not "list [the '327] patent at all." *See* Appx10411 (Johnson license). As in *Apple*, there is no "evidence that the ['327 patent] was discussed in negotiations" of the

10

**CONFIDENTIAL MATERIAL OMITTED**

Johnson license. *Apple*, 25 F.4th at 973. EcoFactor's argument that

Johnson's counsel said it was "████████" ████ during negotiations is

irrelevant; that statement has no bearing on how or whether Johnson

valued the '327 patent. "There is, therefore, no basis upon which to

conclude based upon the evidence presented that [the Johnson] license

is a meaningful proxy for the royalty rate of the ['327] patent." *Id.* at

973. Indeed, based on EcoFactor's reasoning, the '327 patent would

have **no** value to the Johnson license, as any value was entirely driven

by the patents actually asserted against Johnson. *See* Appx5767-5768

(Mr. Kennedy's testifying that "in the real world what the focus is[,] is

on the asserted patents. . . [with] the rest of the patents [] thrown in").

EcoFactor also attempts to distinguish this case from *Omega* and

*Apple* by referring to Mr. Kennedy's consideration of Google's per-unit

profits. Resp. at 23. But that method, which EcoFactor describes as

part of a "dual approach to apportionment," *id.*, had no bearing on the

$████ per-unit rate. Mr. Kennedy relied on a 2019 survey of prospective

buyers of smart thermostats that weighed the relative importance of

product features.[5] He then applied those weights to Nest's gross profits

---

[5] For the reasons explained in Google's opening brief, the survey was

**CONFIDENTIAL MATERIAL OMITTED**

and opined that because the per-unit profits he attributed to accused features were higher than \$█, his proposed royalty rate was "conservative." Appx5757, Appx5821. Mr. Kennedy's reliance on per-unit profits as a coarse "reasonableness check" on the \$█ he had already adopted does not redress his failure to show that the agreements attributed a \$█ per-unit royalty to the value of the '327 patent. *See Uniloc USA*, 632 F.3d at 1317 ("Beginning from a fundamentally flawed premise and adjusting it based on legitimate considerations specific to the facts of the case nevertheless results in a fundamentally flawed conclusion.").

Finally, the jury's award of an amount lower than what EcoFactor sought does not save Mr. Kennedy's unreliable opinion. Allowing the jury's deviation from the number offered in an unreliable damages opinion to excuse admitting the opinion in the first place would nullify *Daubert*'s requirement that a district court "exercise its 'gatekeeper' function." *Id.* at 1306. Because Mr. Kennedy failed to present to the

---

unreliable as a basis for apportionment both because of its age, and because there was no connection between the surveyed attributes and the accused patents. *See* Google Principal Br. at 19 n.4.

jury "a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in this case," his opinion should have never been allowed. *Id.* at 1318.

## II. The district court erred in denying JMOL of non-infringement because the jury's finding of infringement of the '327 patent was not supported by substantial evidence.

EcoFactor's Response confirms what Google laid out in its principal brief: that EcoFactor's infringement verdict hinges on scant evidence and a clear misinterpretation of the claim language. From the voluminous trial record, EcoFactor only points to two documents that purportedly support its infringement verdict and conclusory expert testimony that either improperly equates "measurement" with "estimate" or does not support EcoFactor's position. And even these two documents and the conclusory expert testimony do not actually provide sufficient support for the jury's verdict.

### A. The way in which Nest thermostats derive an estimate of inside temperature differs significantly from taking or receiving a measurement.

To estimate ambient room temperature, Nest thermostats rely on complex algorithms—using multiple inputs of temperature and power taken from inside the enclosed device. This is fundamentally different

13

from the way that traditional thermostats directly measure ambient room temperature. EcoFactor postulates that in order to control the temperature inside your home, a thermostat must have "an accurate measurement of temperature." Resp. at 24. EcoFactor cites the '327 patent's specification, which describes thermostats "[a]t the most basic level" as including "a means to sense actual temperature, and a means to signal the heating and/or cooling devices to turn on or off in order to try to change the actual temperature to equal the desired temperature." *See* Resp. at 24.

But it is undisputed that Nest thermostats do not measure the actual temperature of the HVAC-conditioned structure and differ significantly from conventional thermostats with sensors that measure ambient temperature. Due to Nest's deliberate choice to prioritize its ventless "industrial design" above all else, *see* Google Principal Br. at 43-44, the accused thermostats do not (and cannot) receive measurements of the HVAC-conditioned, inside temperature as plainly required by the '327 patent claims. To support Nest's design choice, a team of Nest engineers has spent years continuing to develop complex temperature compensation algorithms ("TCAs")—a different algorithm

14

for each model of accused thermostat—that take inputs from multiple sensors inside the thermostat devices that measure internal-device temperature and power consumption, and use those inputs to derive an estimate of the ambient temperature surrounding the device. *See* Google Principal Br. at 42-43.[6]

The way the accused thermostats derive estimates of ambient temperature is entirely different from what is described in the patent and does not, contrary to EcoFactor's mischaracterizations, represent mere "refinement" or "improved accuracy." *See* Resp. at 33-36. Each TCA represents a completely different approach, created to address obstacles presented by the unique enclosed design of Nest thermostats, and does not satisfy the claim language requiring that the thermostat receive temperature measurements of the HVAC-conditioned space. The TCA's usage of various internal-device readings as inputs to derive

---

[6] Researchers in other contexts have tried to use internal-device sensors, like battery temperature readings from enclosed smartphones, to create statistical models to estimate air temperature. *See* Nguyen Hai Chau, Estimation of air temperature using smartphones in different contexts, 3 J. of Info. and Telecomm. 494 (2019), https://www.tandfonline.com/doi/epdf/10.1080/24751839.2019.1634869?needAccess=true&role=button.

estimates of the surrounding ambient temperature fundamentally does not satisfy this "receiv[ing] measurements" claim limitation. Such an estimation also is not, as EcoFactor asserts, merely an "additional element" on top of a process that otherwise satisfies all claim limitations. Therefore, its cited cases, *SunTiger, Inc. v. Scientific Research Funding Group*, 189 F.3d 1327, 1336 (Fed. Cir. 1999) and *Northern Telecom Ltd. v. Samsung Electronics Co., Ltd.*, 215 F.3d 1281, 1296-97 (Fed. Cir. 2000), are inapplicable.

The same argument applies to EcoFactor's doctrine of equivalents theory. The way in which the accused thermostats derive estimates of ambient temperature is substantially different from, and therefore not equivalent to, the way the claimed thermostats receive temperature measurements. *See Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997) (in the context of the function-way-result test, court must analyze "the role played by each element in the context of the specific patent claim" to inquire "whether a substitute element matches the function, way, and result of the claimed element" or instead "plays a [] substantially different [role]").

EcoFactor and its expert Mr. de la Iglesia try to minimize the

16

differences between the operation of the accused thermostats and the way in which the claimed thermostats receive inside temperature measurements by resorting to word games, such as refusing to call the TCA an algorithm, *see, e.g.*, Resp. at 9, 10, 28, 29, 35 (repeatedly referring to "temperature compensation" and omitting "algorithm"), or calling the algorithm's output a "more accurate measurement" instead of a calculated or derived estimate, *see, e.g.*, Resp. at 9, 28, 29, 35 (citing to trial testimony of Mr. de la Iglesia).

EcoFactor's linguistic game of simply labeling an estimate derived by the TCA as a "measurement" does not make it so.  Nor does it give credit to the substantial engineering efforts Dr. Burger and his team continue to undertake to develop a technique (i.e., the TCA) to use internal-device readings that Nest thermostats actually can measure, like temperature and power sensed inside the enclosed device, to derive an accurate estimate of ambient temperature.  *See* Appx5900-5905.

**B.    EcoFactor's Response confirms that its infringement verdict rests on insubstantial evidence.**

Aside from unsupportive citations to the patent specification itself, EcoFactor relies on two documents from the trial record in support of its

17

infringement verdict: (1) a Nest website with high-level descriptions of the accused thermostats that EcoFactor mines for soundbites, and (2) less than half of one slide that EcoFactor spins out of context from a 92-slide PowerPoint deck for only one of the accused products, the Nest Thermostat.  *See* Appx10420-10434, Appx10181-10272.

With respect to the PowerPoint, EcoFactor ignores the reality that the entire presentation only confirms the indisputable fact that, rather than measure ambient temperature, Nest uses an algorithm, the TCA, to derive estimates thereof.  Instead, EcoFactor relies on part of one slide that it believes supports infringement while ignoring the rest of the same slide and other slides explaining in detail how the TCA works and why the accused thermostats do not measure ambient temperature.

Specifically, EcoFactor relies on just one of the two graphs on Appx10204 (reproduced below), omitting any reference to the second graph or the slide's text.  *See* Resp. at 28.  The omitted portion highlights the contrast between how the TCA "***estimates*** the device's thermal response to internal heat dissipation," with a "measured internal temperature" taken during device testing.  Appx10204.

18

**CONFIDENTIAL MATERIAL OMITTED**



Even the graph that EcoFactor ***does*** point to supports Google's
argument and the trial testimony of its witnesses.[7]  That graph displays
three lines: (1) "Sensor," in red, representing an internal-device reading
taken from inside the accused thermostat; (2) "HOBO," in green,
representing the ambient temperature measured by an external device
that Google engineers used only for testing purposes; and (3) an
"Estimate," in blue, representing the estimate derived by the TCA.  *See*
Appx5907-5908 (Dr. Burger describing use of HOBO logger for testing),

---

[7] And in any event, this graph applies to only one of the three accused
devices, the Nest Thermostat, and not to the Nest Learning Thermostat
or the Nest Thermostat E.

Appx5912-5914 (Dr. Burger describing development of the algorithm involving testing "a dozen different versions" and describing how the thermostat's internal sensor readings can "get up to 10 degrees Fahrenheit" hotter than the ambient room temperature).

As seen from the graph, the internal temperature sensed within the accused thermostat device is hotter than both the actual ambient temperature measured by the HOBO logger and the estimated temperature derived by the TCA.  *See* Appx10204.  That the sensed internal-device temperature may vary depending on changes in the actual ambient temperature does not change the fact that each accused Nest thermostat runs a TCA to derive an estimate of ambient temperature.  And as Dr. Burger testified, in addition to the sensed internal-device temperature, the internal power measurements are "one of the most important factors" used by the TCA to derive the estimated ambient temperature.  *See* Appx5914-5915.  Indeed, this is confirmed by the bottom graph on Appx10204, which EcoFactor ignores, showing how internal power measurements align with fluctuations in internal-device temperature over time.  Ultimately, the notion that internal-device temperature may vary due to surrounding ambient temperature does

**CONFIDENTIAL MATERIAL OMITTED**

not reflect that Nest thermostats measure ambient temperature any more than an Apple iPhone does by virtue of sensing internal-device temperature.

EcoFactor also ignores the other slides from this same deck, which explain how the TCA works and demonstrate, with a color-coded heat map, how temperatures measured by sensors enclosed in the device differs significantly from ambient temperature. *See* Appx10201 (depicted below) (noting that "Nest thermostats ***do not measure*** the ambient room temperature"); *see also* Appx5904-5905 (trial testimony from Dr. Burger regarding same):



With respect to the Nest website that EcoFactor relies on and the

related testimony of Google's non-infringement expert Dr. Turnbull, EcoFactor's counsel never asked Dr. Turnbull about the substance of the website or its meaning—he was only asked to read aloud a two-sentence excerpt from a 15-page document.  *See* Appx6155-6156.  And the excerpt that Dr. Turnbull read—defining ambient temperature as "[t]he temperature measured ***near*** the thermostat"—is consistent with how Google's internal documentation and witnesses described the development and design of the accused thermostats.  Appx10429.  This document does not equate ambient temperature with temperatures measured by or internal to the thermostat; instead, it states that if one were to measure the temperature ***near*** the device, as with an external HOBO logger shown in the graph above, that measurement would be of actual ambient temperature.[8]

---

[8] EcoFactor also cites part of Mr. de la Iglesia's trial testimony during which he presented a demonstrative and purported to rely on Dr. Burger's deposition testimony.  *See* Resp. at 10, 29.  Neither the deposition testimony nor the demonstrative was introduced into evidence, and thus they cannot support EcoFactor's infringement verdict.  *See Great Plains Equip., Inc. v. Koch Gathering Sys., Inc.*, 45 F.3d 962, 965-66 (5th Cir. 1995).

**C.    EcoFactor conspicuously avoids claim language requiring "temperature measurements from inside the structure . . . conditioned by [the] HVAC system."**

In addition to its repeated refusal to acknowledge Nest's estimation ***algorithm***, EcoFactor plays another verbal trick with the claim language itself.  Conspicuously absent from its Response is any acknowledgement that the claim language requires the thermostat to receive a temperature measurement of the "structure ***conditioned by at least one HVAC system***."  Appx102 at 9:29-32.  *See* Resp. at 9, 24, 25, 26, 30 (quoting the claim language "temperature measurements from inside the structure" 9 times, but omitting the phrase "conditioned by at least one HVAC system").

Without the substantial evidence necessary to support the jury's infringement verdict, *see* Section II.B *supra*, EcoFactor attempts to refashion the claim language to expand its reach beyond its plain meaning.  Throughout its brief, EcoFactor truncates the limitation at issue to just "receive temperature measurements from inside the structure." *See, e.g.*, *id*.  But EcoFactor's steadfast effort to ignore the rest of the claim language, which requires the temperature measurement to be from "inside the structure . . . conditioned by [the]

23

HVAC system," Appx102 at 9:29-32, invites legal error.

EcoFactor's truncation of the claim limitation at issue is also at odds with the patent specification itself. As EcoFactor points out in its own brief, per the specification, a thermostat "requires an accurate measurement of temperature" to do its job of "control[ling] the temperature inside your home." *See* Resp. at 24. If EcoFactor's truncation were accepted, then any temperature measurement taken from within the structure and received by the thermostat—even including any internal measurement within an enclosed device like the accused thermostats or even an oven or a freezer—could literally satisfy the claim limitation. But both the specification and claim language make clear that the temperature measurement being received by the thermostat must be that of the HVAC-conditioned space. And the evidence presented at trial clearly demonstrated that the accused thermostats do not and cannot satisfy this limitation.

### D.    Google's non-infringement position rests on the plain and ordinary meaning of the claim language.

Implicitly acknowledging that its own infringement arguments require deviating from the claim's plain and ordinary meaning,

EcoFactor sets up and then attacks a strawman argument that Google never advanced. Contrary to EcoFactor's assertion, Google is neither appealing the district court's claim construction order nor advancing an alternative construction. Instead, Google's non-infringement position rests solely on the plain and ordinary meaning of "receiv[ing] temperature measurements from inside the structure . . . conditioned by at least one HVAC system." Appx102 at 9:30-32.

Google maintains, as laid out in its Principal Brief, that the infringement verdict rests on EcoFactor's own advancement of an improper construction that is contrary to plain meaning and violates fundamental canons of claim construction by conflating the limitation at issue with other, expressly different language recited elsewhere in the same claim.[9] Particularly, EcoFactor's infringement expert repeatedly conflated "measurement" with "estimate," *see* Google Principal Br. at 45-47, despite the claim language distinguishing between these two things. *Compare* Appx102, cl. 1[a] at 9:27-33 ("receiv[ing] measurements") *with* cl. 1[c] at 9:43-45 ("deriv[ing] an

---

[9] As discussed in Google's Principal Brief, EcoFactor's improper construction also contradicts its later IPR representations. *See* Google Principal Br. at 46-47 & n.8.

estimation"). *See also Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006).[10]

## III. The asserted claims of the '488, '327, and '382 patents are patent ineligible.

At the summary judgment stage,[11] at trial, and again in post-trial briefing on Google's renewed motion for JMOL, EcoFactor repeatedly and in a conclusory fashion argued that the asserted patents were

---

[10] In an attempt to refute this argument, EcoFactor purports to point to a portion of the specification that it claims shows that "the preferred embodiments for temperature sensing means . . . feature various tools that use mathematical algorithms and estimations to measure temperature," but this citation (to the '488 patent) only mentions thermostats capable of directly sensing ambient temperature, such as those that include thermistors and thermal diodes, unlike the accused Nest thermostats. *See* Resp. at 32-33.

[11] EcoFactor argues that Google's appeal of the denial of its section 101 motion is somehow improper because Google argued, in part, that the district court erred in denying summary judgment of patent ineligibility, citing cases that stand for the proposition that a summary judgment decision is not appealable after a trial on the merits. *See* Resp. at 36-37. But the '488 patent was eliminated from the case pre-trial, so any appeal of the district court's decision with respect to the '488 patent necessarily must be of its denial of Google's summary judgment motion. And with respect to the '327 and '382 patents, given that the district court only stated that it was submitting Step Two to the jury without stating how it ruled as to Step One, it is not clear that Google had a full trial on the merits as to the legal issue it is now appealing. Regardless, Google preserved the issue for appeal in its motion for JMOL and renewed motion for JMOL.

directed to specific improvements to programmable thermostats and provide unconventional solutions to problems in the prior art, without ever specifying what those specific improvements or solutions might be. *See, e.g.*, Resp. at 42 (stating that "the asserted claims of the '327 Patent provide technical solutions to shortcomings specific to programmable HVAC thermostats and thus are not abstract," without identifying any "technical solutions"). Lacking an inventive concept and being directed to abstract ideas, the asserted claims are patent ineligible under Section 101.

## A. EcoFactor's Step One argument rests on purported advancements that do not appear in the asserted claims.

In an effort to obscure the abstract nature of the asserted claims, EcoFactor relies on concepts like "thermal mass" and "pre-cooling," which do not appear in the claim language. *See, e.g.*, Resp. at 2, 38. The Section 101 eligibility inquiry "depends on what is claimed, not all that is disclosed in the specification." *Trading Techs. Int'l, Inc. v. IBG, LLC*, 921 F.3d 1084, 1095 (Fed. Cir. 2019); *see also Altoona Publix Theatres, Inc. v. Am. Tri-Ergon Corp.*, 294 U.S. 477, 487 (1935) ("it is the claims of the patent which define the invention").

27

And even if the concept of "thermal mass," for example, appeared in any of the asserted claims—which it does not—such discovery of a "manifestation[] of . . . nature," i.e., the ability of a material to absorb, store, and release heat, is not patentable subject matter. *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980).

Stripped of these concepts, EcoFactor pivots to argue that Google oversimplifies and "ignores critical claim limitations." *See* Resp. at 42-43. But rather than identify the claimed advances and "critical claim limitations," EcoFactor's Response merely reproduces entire claims, emphasizing multiple phrases in the hopes that this Court will seize upon any of them as the necessary inventive concept to save the asserted claims from abstractness. *See, e.g.*, Resp. at 45, 46, 49. That EcoFactor is unable to articulate the purported inventive concept of the asserted claims after years of litigation is telling.

**B.    Saying the invention is "computer networked" also does not save the claims at Step One.**

Setting aside EcoFactor's attempts to cloak the asserted claims in concepts that they do not recite, EcoFactor's core argument about the supposed "claimed advance" of the patents-in-suit amounts to no more

than that the invention is a network-connected thermostat. *See, e.g.*, Resp. at 38 ('327 patent claims directed to a "networked thermostat"), Resp. at 45-46 ('488 patent claims directed to "networked thermostat" and "computer-networked HVAC control systems"), Resp. at 49 ('382 patent claims directed to "computer-networked HVAC control systems"). In support of its argument, EcoFactor reproduces several figures from the '327 and '488 patents, *see* Resp. at 39-40, without ever offering an explanation how any of the depicted components were unconventional or represented a technical improvement. In fact, as explained in Google's Principal Brief, the specification states unequivocally that conventional versions of such components could be used to implement the claimed invention. *See* Google Principal Br. at 8-12.

As the Supreme Court in *Alice* and this Court's subsequent cases have repeatedly made clear, merely placing abstract ideas in the realm of computers and networks does not transform the claimed subject matter into something patent-eligible. *See Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 225 (2014) (claims that do not "purport to improve the functioning of the computer itself" or incorporate "improved

computer technology" are patent ineligible); *see also* Google Principal

Br. at 55-57 (citing cases).

Here, the asserted claims merely invoke the use of conventional

computers and components as tools to perform well-known functions

such as measuring temperatures, deriving an estimated rate of change

(using a known mathematical formula based on Newton's law of heating

and cooling, *see* Google Principal Br. at 57 n.11), sending and receiving

instructions, and determining building occupancy. All these functions

are abstract. *See Elec. Power Grp. v. Alstom S.A.*, 830 F.3d 1350, 1353

(Fed. Cir. 2016) (concluding that asserted claims were directed to an

abstract idea because they involved "collecting information, analyzing

it, and displaying certain results").[12] Carrying out the recited functions

on conventional computers does not save the claims from abstractness if

the functions "can be performed in the human mind," as EcoFactor's

own expert and one of the named inventors admitted they can. *Elec.*

*Power Grp.*, 830 F.3d at 1353; *see also* Google Principal Br. at 10-11.

---

[12] As Google explained in its Principal Brief, the instant claims are thus
easily distinguished from *Diamond v. Diehr*, 450 U.S. 175 (1981), the
40-year-old, pre-*Alice* case upon which EcoFactor relies. *See* Google
Principal Br. at 57-59.

## C.    EcoFactor has not identified anything specific about the supposed "ordered combination of elements" that would render the claims patent-eligible at Step Two.

EcoFactor's argument under *Alice* Step Two is just a rehash of its Step One argument and fails for the same reasons—the necessary "inventive concept" must be present in the claims and not merely plucked from the specification; recasting the same abstract idea as something "new" does not make the idea patent-eligible. *See BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016) ("An inventive concept that transforms the abstract idea into a patent-eligible invention must be significantly more than the abstract idea itself and cannot simply be an instruction to implement or apply the abstract idea on a computer."). Here, as it did at trial and at summary judgment, EcoFactor fails to articulate any inventive concept beyond the abstract idea of a "computer-networked HVAC control system." *See, e.g.*, Resp. at 38, 45-46, 49.

Lacking an inventive concept, EcoFactor leans on the argument that there is something unique about the "ordered combination" of elements in the asserted claims that save them under Step Two. The use of conventional components alone is not necessarily a bar to finding

31

an inventive concept.  However, if conventional components are claimed, their arrangement must "improve the functioning of the computer itself . . . [or] effect an improvement in any other technology or technical field." *Alice*, 573 U.S. at 225.  But at trial, EcoFactor's "ordered combination" argument consisted solely of highlighting in green *all* the claim limitations and then arguing that "every word as an ordered combination" was not conventional.  *See* Appx6417 (asking Google's invalidity expert whether he showed the jury that "every word" of the asserted claim from the '382 patent was conventional when taken "altogether").  EcoFactor's "ordered combination" incantation does not save the claims at Step Two.  Not once has EcoFactor actually specified what about the "ordered combination" in the asserted claims was inventive and patent-eligible, either at summary judgment or at trial.  *See* Appx6449-6451 (EcoFactor's validity expert concluding at trial that the ordered combination of elements is not conventional, without providing any reasons explaining why this is so).

The closest EcoFactor comes in its Response is to point to the general "skepticism" in the industry of EcoFactor's purported inventions, as referenced by co-named inventor of the '488 and '327

patents, Mr. Hublou. But even this general skepticism is not enough to support the jury's finding as to Step Two. The purported "skepticism" described by Mr. Hublou concerned the commercial viability of a product in a residential setting given the amount of computing required, not to the feasibility of the claimed "ordered combination." *See* Appx6449-6451 (Mr. Hublou reportedly met with skepticism in seeking "assistance in developing a ***commercializable*** form of the patent"). The testimony of EcoFactor's VP of Engineering, Glen Okita, also confirms that any "skepticism" about the purported "novelty" of EcoFactor's system was about the cost of the equipment used, and not any specific technical improvements to computer functionality. *See* Appx5398. Further, there is nothing in the claims themselves that limited the purported invention to any particular environment or equipment; nor did EcoFactor put on any evidence at trial that EcoFactor's commercial system in fact embodied the asserted claims.

> **D. EcoFactor's reliance on findings from administrative bodies and other courts on different patents and claims should be ignored.**

Detouring from the question of how the asserted claims are patent-eligible under Section 101, EcoFactor devotes substantial space

in its brief to decisions of other administrative and judicial bodies on different patents. *See, e.g.*, Resp. at 13-14, 43-44. This Court should not give any weight to these arguments.

First, they are not properly before this Court because they are not in evidence in the case and were never considered by the district court or the jury.[13] *See In re Cygnus Telecomms. Tech., LLC, Patent Litig.*, 536 F.3d 1343, 1353 (Fed. Cir. 2008) (in reviewing district court decision, this Court "will not consider any part of the record that was not presented to or cited to the district judge"); *U.S. v. City of Brookhaven*, 134 F.2d 442, 447 (5th Cir. 1943) (concluding that "[u]nless someone offered it in evidence on the trial it was not evidence in the case").

Second, because claims define the invention, the other decisions are irrelevant because there is no evidence that the claims at issue in those cases were the same in relevant respects as those asserted here. *See Altoona*, 294 U.S. at 487. Thus, EcoFactor's citations to decisions made by an administrative law judge and a district court judge in other

---

[13] One decision post-dates the jury's verdict altogether. *See* Resp. at 13 (citing May 2022 NDCA order).

cases on different patents, without citing any claim language from them, are irrelevant to the instant question of ineligibility. *See SimpleAir, Inc. v. Google LLC*, 884 F.3d 1160, 1166-68 (Fed. Cir. 2018); *see also Trading Techs.*, 921 F.3d at 1095 (this Court is "not bound by non-precedential decisions [], much less ones to different patents, different specifications, or different claims" and "[e]ach panel must evaluate the claims presented to it"). The reason why EcoFactor does not compare the claims in the other proceedings with those asserted here is that such comparison would only highlight the abstractness of the asserted claims here and their lack of any inventive concept. For example, EcoFactor implies that the claims in the referenced ITC investigation do in fact recite "thermal mass"-related limitations, *see* Resp. at 13, but such limitations appear nowhere in the asserted claims here. Thus, the decisions of the ALJ and NDCA judge have no bearing here.

## CONCLUSION

For the reasons stated herein and in Google's Principal Brief, this Court should reverse the district court's denial of summary judgment of patent ineligibility; and if not, then this Court should reverse the

judgment of infringement of claim 5 of the '327 patent.  If any liability issues remain live, this Court should remand for a new trial on damages.

Respectfully submitted,

*/s/ Robert A. Van Nest*
ROBERT A. VAN NEST
LEO L. LAM
EUGENE M. PAIGE
R. ADAM LAURIDSEN
KRISTIN E. HUCEK
KEKER, VAN NEST & PETERS
LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188
Counsel for Defendant-Cross-
Appellant GOOGLE LLC

May 2, 2023

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of <u>Fed. Cir. R. 32(b)(1)</u>.  Excluding the portions exempted by <u>Fed. R. App. P. 32(f)</u> and <u>Fed. Cir. R. 32(b)(2)</u> the brief contains 6,799 words.

2.      This brief complies with the typeface requirements of <u>Fed. R. App. P. 32(a)(5)</u> and the type style requirements of <u>Fed. R. App. P. 32(a)(6)</u>. The brief has been prepared in a proportionally spaced typeface using Microsoft Word and 14-point Century Schoolbook type.

Dated: May 2, 2023

<u>/s/ *Robert A. Van Nest*    </u>
Robert A. Van Nest
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile:  415 397 7188