Nos. 2022-1974, 2023-1101

# United States Court of Appeals for the Federal Circuit

ECOFACTOR, INC.,
*Plaintiff-Appellant,*

v.

GOOGLE LLC,
*Defendant-Cross-Appellant.*

_____

On Appeal from the United States District Court Western District of Texas
Case No. 6:20-cv-00075-ADA, Judge Alan D. Albright

_____

## NON-CONFIDENTIAL JOINT APPENDIX

_____

Reza Mirzaie
rmirzaie@raklaw.com
Marc A. Fenster
mfenster@raklaw.com
James N. Pickens
jpickens@raklaw.com
Minna Y. Chan
mchan@raklaw.com
Kristopher R. Davis
kdavis@raklaw.com
RUSS AUGUST & KABAT
12424 Wilshire Blvd.,12th Floor
Los Angeles, CA 90025
Tel: (310) 826-7474
Fax: (310) 826-6991

*Attorneys for Plaintiff-Appellant
EcoFactor, Inc.*

Robert A. Van Nest
rvannest@keker.com
Leo L. Lam
llam@keker.com
Eugene M. Paige
epaige@keker.com
R. Adam Lauridsen
alauridsen@keker.com
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111
Tel: (415) 391-5400

*Attorneys for Defendant-Cross-
Appellant Google LLC*

May 9, 2023

**APPENDIX TABLE OF CONTENTS**

*EcoFactor, Inc. v. Google LLC*
**Nos. 2022-1974, 2023-1101**

**Materials Required Pursuant to Fed. Cir. R. 25.1(e)(1)(b)**

| Docket No. | Description | Appx |
|---|---|---|
| 244 | Final Judgment, entered on May 26, 2022 | Appx1-Appx2 |
| 209 | Final Jury Instructions, entered on February 10, 2022 | Appx3-Appx43 |
| 215 | Jury Verdict, entered on February 10, 2022 | Appx44-Appx51 |
| N/A | U.S. Patent No. 8,180,492 | Appx52-Appx66 |
| N/A | U.S. Patent No. 8,412,488 | Appx67-Appx84 |
| N/A | U.S. Patent No. 8,738,327 | Appx85-Appx102 |
| N/A | U.S. Patent No. 10,534,382 | Appx103-Appx121 |
| N/A | Docket Sheet | Appx122-Appx161 |

**Record**

| | | |
|---|---|---|
| 111 | Excerpts from Defendants' Joint Motion for Summary Judgment of Subject Matter Ineligibility Under 35 U.S.C § 101 | Appx1134; Appx1140; Appx1142-Appx1144; Appx1151; Appx1154; |
| 111-5 | Excerpts from Exhibit 4 to Defendants' Joint Motion for Summary Judgment of Subject Matter Ineligibility Under 35 U.S.C § 101 – Scott Hublou Deposition Excerpts, August 10, 2021 | Appx1161-Appx1168; Appx1170-Appx1176 |

i

| 111-6 | Exhibit 5 to Defendants' Joint Motion for Summary Judgment of Subject Matter Ineligibility Under 35 U.S.C § 101 – John A. Palmer Deposition Excerpts, November 8, 2021 | Appx1177-Appx1183 |
|---|---|---|
| 111-8 | Exhibit 7 to Defendants' Joint Motion for Summary Judgment of Subject Matter Ineligibility Under 35 U.S.C § 101 – Excerpts from Expert Report of Erik de la Iglesia regarding Infringement by Google, September 27, 2021 | Appx1189-Appx1193 |
| 114-2 | [Sealed] Excerpts of Exhibit 1 to Google LLC's Opposed Motion to Exclude Expert Testimony of David Kennedy Corrected Expert Report of Mr. David Kennedy, November 1, 2021 | Appx1194-Appx1201; Appx1244-Appx1248; Appx1258-Appx1259; Appx1275-Appx1279 |
| 114-8 | [Sealed] Exhibit 7 to Google LLC's Opposed Motion to Exclude Expert Testimony of David Kennedy – Shayan Habib Deposition Excerpts, September 16, 2021 | Appx1604-Appx1608 |
| 114-11 | [Sealed] Exhibit 10 to Google LLC's Opposed Motion to Exclude Expert Testimony of David Kennedy Email from Reza Mirzaie to Max Grant, April 12, 2020 (ECODCT_0029377-378) | Appx1617-Appx1619 |
| 115 | [Sealed] Google's Motion for Summary Judgment of Invalidity of U.S. Patent No. 8,412,488, filed on November 19, 2021 | Appx1645-Appx1662 |
| 115-2 | [Sealed] Exhibit A to Google's Motion for Summary Judgment of Invalidity of U.S. Patent No. 8,412,488-Scott Hublou Deposition Excerpts, Inv. No. 337-TA-125, August 10, 2021 | Appx1663-Appx1673 |
| 115-3 | [Sealed] Exhibit B to Google's Motion for Summary Judgment of Invalidity of U.S. Patent No. 8,412,488 – Excerpts from Opening Expert Report of David H. Willaims regarding Invalidity of U.S. Patent Nos. 8,412,488, 8,738,327, and 10,534,382, September 27, 2021 | Appx1674-Appx1682 |

| 115-4 | [Sealed] Exhibit C to Google's Motion for Summary Judgment of Invalidity of U.S. Patent No. 8,412,488– Excerpts from the Expert Report of John A. Palmer, Ph.D. Regarding Invalidity, October 22, 2021 | Appx1683-Appx1690 |
|---|---|---|
| 115-5 | [Sealed] Exhibit D to Google's Motion for Summary Judgment of Invalidity of U.S. Patent No. 8,412,488– John Palmer Deposition Excerpts, November 8, 2021 | Appx1691-Appx1696 |
| 115-6 | [Sealed] Exhibit E to Google's Motion for Summary Judgment of Invalidity of U.S. Patent No. 8,412,488 – Erik de la Igelsia Deposition Excerpts, October 29, 2021 | Appx1697-Appx1703 |
|  | Excerpt from [Sealed] Exhibit 5 – Palmer Report Excerpt | Appx1771-Appx1772; Appx1776-Appx1777 |
|  | Excerpt from [Sealed] Exhibit 6 – Hublou Transcript Excerpts | Appx1778-Appx1782; Appx1800-Appx1802; Appx1804 |
| 134 | Excerpt from [Sealed] Plaintiff's Opposition to Defendant's Joint Motion for Summary Judgment of Subject Matter Ineligibility Under 35 U.S.C. § 101 | Appx1876; Appx1881-Appx1898 |
| 134-2 | Excerpt from Exhibit A to Plaintiff's Opposition to Defendant's Joint Motion for Summary Judgment of Subject Matter Ineligibility Under 35 U.S.C. § 101 – ITC Inv. No. 337-TA-1185 Public Initial Determination | Appx1901-Appx1902; Appx1916-Appx1926 |
| 169 | Proposed Joint Pre-Trial Order, filed on January 7, 2022 | Appx2168; Appx2200-Appx2201 |
|  | [Sealed] Exhibit A-4 – EcoFactor Physical Exhibit List | Appx2208-Appx2209 |
| 177 | Excerpt from Pre-Trial Order, entered on January 14, 2022 | Appx2210; Appx2242-Appx2243 |

| | | |
|---|---|---|
| 186 | Joint Statement Regarding Claim Construction, January 26, 2022 | Appx2250-Appx2253 |
| 192 | Excerpt from [Sealed] Omnibus Order Regarding Pretrial Motions (Dkts. 109, 111, 113, 114, 115, 116, 117, 151, and 153) | Appx2254 |
| 211 | Excerpt from [Sealed] Jury Note 2 | Appx2262 |
| 212 | Excerpt from [Sealed] Jury Note 3 | Appx2264 |
| 281 | Google's Notice of Cross-Appeal of Final Judgment, filed on October 21, 2022 | Appx2280-Appx2281 |
| | Excerpts from [Sealed] Pre-Trial Conference Transcript, dated January 25, 2022 | Appx5016-Appx5017; Appx5029-Appx5047; Appx5112-Appx5114; Appx5132-Appx5136 |
| | Excerpts from [Sealed] Trial Transcript, Day 1, dated January 31, 2022 | Appx5137-Appx5138; Appx5320-Appx5322; Appx5331-Appx5337; Appx5344-Appx5347; Appx5349-Appx5354; Appx5357-Appx5364; Appx5389-Appx5392; Appx5395-Appx5399; Appx5401-Appx5404; Appx5410 |
| | Excerpts from [Sealed] Trial Transcript, Day 2, dated February 1, 2022 | Appx5411-Appx5412; Appx5453-Appx5469; Appx5531-Appx5546; Appx5554-Appx5559; Appx5561-Appx5583; Appx5595-Appx5601; Appx5618-Appx5621; Appx5627-Appx5632; Appx5639-Appx5642; Appx5644 |

| | Excerpts from [Sealed] Trial Transcript, Day 3, dated February 2, 2022 | Appx5645-Appx5646; Appx5656-Appx5658; Appx5666-Appx5683; Appx5690-Appx5692; Appx5694-Appx5699; Appx5709-Appx5721; Appx5732-Appx5734; Appx5739-Appx5741; Appx5743-Appx5747; Appx5754-Appx5783; Appx5793-Appx5799; Appx5801-Appx5807; Appx5809-Appx5814; Appx5816-Appx5825; Appx5830-Appx5833; Appx5840-Appx5851; Appx5865-Appx5869; Appx5890-Appx5954; Appx5957-Appx5959; Appx5963 |
|---|---|---|
| | Excerpts from [Sealed] Trial Transcript, Day 4, dated February 7, 2022 | Appx5964-Appx5965; Appx5999-Appx6002; Appx6004-Appx6007; Appx6053-Appx6059; Appx6077-Appx6131; Appx6148-Appx6162; Appx6166-Appx6169; Appx6217-Appx6232; Appx6234 |

| | Excerpts from [Sealed] Trial Transcript, Day 5, dated February 8, 2022 | Appx6235-Appx6236; Appx6250-Appx6259; Appx6265-Appx6266 Appx6267-Appx6271; Appx6275-Appx6281; Appx6284-Appx6287; Appx6309-Appx6311; Appx6343-Appx6345; Appx6372-Appx6379; Appx6387-Appx6395; Appx6415-Appx6418; Appx6424-Appx6437; Appx6448-Appx6452; Appx6471-Appx6475; Appx6512 |
|---|---|---|
| | Excerpts from [Sealed] Trial Transcript, Day 6, dated February 9, 2022 | Appx6513-Appx6514; Appx6519-Appx6521; Appx6524-Appx6527; Appx6531-Appx6533; Appx6543-Appx6546; Appx6568-Appx6586; Appx6589 |
| | Excerpts from [Sealed] Motion Hearing Transcript, dated September 27, 2022 | Appx6599; Appx6661-Appx6663; Appx6687-Appx6689; Appx6691 |
| 36 | Defendants' Responsive Claim Construction Brief, filed on October 27, 2020 | Appx6721; Appx6732; Appx6734-Appx6735 |
| 40 | Joint Claim Construction Statement | Appx6750; Appx6752 |
| | DTX-0219 – U.S. Patent Application Publication 2004/0117330 ("Ehlers") (DC_PRIOR_ART_0000403) | Appx10106-Appx10155 |
| | [Sealed] DTX-0665 – Energy Intelligence (GOOG-ITC1258-00162068) | Appx10181-Appx10272 |

| | | |
|---|---|---|
| | DPX-1 – Photo of Nest Thermostat | Appx10273 |
| | DPX-2 – Photo of Nest Learning Thermostat | Appx10274 |
| | DPX-3 – Photo of Nest Thermostat E | Appx10275 |
| | Excerpt from [Sealed] PTX-0083 - – Google Utility Zirconium Conjoint Findings (GOOG-ECOF-WDTX-00170017) | Appx10279-Appx10281; Appx10291-Appx10295 |
| | [Sealed] PTX-0096 – EcoFactor PowerPoint Presentation (GOOG-ECOF-WDTX1-00000004) | Appx10350-Appx10363 |
| | Excerpt from [Sealed] PTX-0097 – EcoFactor Intellectual Property (GOOG-ECOF-WDTX1-00000085) | Appx10364; Appx10367 |
| | [Sealed] PTX-0256 – ECODCT_0001217 | Appx10389-Appx10399 |
| | [Sealed] PTX-0257 – ECODCT_0001228 | Appx10400-Appx10410 |
| | [Sealed] PTX-0258 – ECODCT_0001239 | Appx10411-Appx10419 |
| | PTX-0281 – Nest Thermostat Guide (EF_0895825) | Appx10420-Appx10434 |
| | Excerpt from [Sealed] PTX-0298 – Nest State of Business (GOOG-ECOF-WDTX-00111086) | Appx10439; Appx10467 |
| | Excerpt from [Sealed] PTX-0315 – Zirconium Functional Spec – HVAC Features dated April 25, 2020 (GOOG-ITC1258-00117926) | Appx10760; Appx10765 |
| | Excerpt from [Sealed] PTX-0594 – Email from Indranil (Indy) Mukerji to Reza Mirzaie (ECODCT_0229453) | Appx10797-Appx10799 |
| | [Sealed] PTX-0915 – Habib Emails (EF_0663676) | Appx10802-Appx10804 |

vii

| | | |
|---|---|---|
| | [Sealed] PTX-0919 – Emails Re EcoFactor (GOOG-ECOF-WDTX1-00000177) | Appx10807-Appx10809 |
| | [Sealed] PTX-0928 -- Remote Optimization of HVAC for Efficiency and Demand Response: 2007-2008 Global Field Trial Results of EcoFactor's Integrated Demand Side Management solution | Appx10819-Appx10881 |
| | Excerpt from PTX-0929 – Sensors in Google Nest devices | Appx10882; Appx10888 |
| | [Sealed] DTX-0171—Redacted email from Scott McGaraghan | Appx10890 |
| | [Sealed] DTX-0287--Email from Danel Dayan to Nik Sathe re: EcoFactor M&A Opportunity | Appx10891 |
| | Excerpt from PTX-0263 – Behind the scenes with the new Nest Thermostat | Appx10892; Appx10894 |

**CONFIDENTIAL MATERIAL OMITTED**

Pursuant to Federal Circuit Rule 25.1(e)(1)(B), the material redacted from this Joint Appendix is subject to a protective order. The following pages contain confidential information relating to the technical operation of Google's accused products and confidential financial and licensing information of Google, EcoFactor, and third parties. These materials have been designated as confidential under the Protective Order entered in the litigation below.

Appx1194-Appx1201; Appx1244-Appx1248; Appx1258-Appx1259; Appx1275-Appx1279; Appx1604-Appx1608; Appx1617-Appx1619; Appx1645-Appx1662; Appx1663-Appx1673; Appx1674-Appx1682; Appx1683-Appx1690; Appx1691-Appx1696; Appx1697-Appx1703; Appx1771-Appx1772; Appx1776-Appx1777; Appx1778-Appx1782; Appx1800-Appx1802; Appx1804; Appx1876; Appx1881-Appx1898; Appx2262; Appx2264; Appx5016-Appx5017; Appx5029-Appx5047; Appx5112-Appx5114; Appx5132-Appx5136; Appx5137-Appx5138; Appx5320-Appx5322; Appx5331-Appx5337; Appx5344-Appx5347; Appx5349-Appx5354; Appx5357-Appx5364; Appx5389-Appx5392; Appx5395-Appx5399; Appx5401-

Appx5404; Appx5410; Appx5411-Appx5412; Appx5453-Appx5469; Appx5531-Appx5546; Appx5554-Appx5559; Appx5561-Appx5583; Appx5595-Appx5601; Appx5618-Appx5621; Appx5627-Appx5632; Appx5639-Appx5642; Appx5644; Appx5645-Appx5646; Appx5656-Appx5658; Appx5666-Appx5683; Appx5690-Appx5692; Appx5694-Appx5699; Appx5709-Appx5721; Appx5732-Appx5734; Appx5739-Appx5741; Appx5743-Appx5747; Appx5754-Appx5783; Appx5793-Appx5799; Appx5801-Appx5807; Appx5809-Appx5814; Appx5816-Appx5825; Appx5830-Appx5833; Appx5840-Appx5851; Appx5865-Appx5869; Appx5890-Appx5954; Appx5957-Appx5959; Appx5963; Appx5964-Appx5965; Appx5999-Appx6002; Appx6004-Appx6007; Appx6053-Appx6059; Appx6077-Appx6131; Appx6148-Appx6162; Appx6166-Appx6169; Appx6217-Appx6232; Appx6234; Appx6235-Appx6236; Appx6250-Appx6259; Appx6265-Appx6266; Appx6267-Appx6271; Appx6275-Appx6281; Appx6284-Appx6287; Appx6309-Appx6311; Appx6343-Appx6345; Appx6372-Appx6379; Appx6387-Appx6395; Appx6415-Appx6418; Appx6424-Appx6437; Appx6448-Appx6452; Appx6471-Appx6475; Appx6512; Appx6513-Appx6514; Appx6519-Appx6521; Appx6524-Appx6527; Appx6531-Appx6533; Appx6543-Appx6546; Appx6568-Appx6586; Appx6589; Appx6599; Appx6661-Appx6663; Appx6687-Appx6689; Appx6691; Appx10181-Appx10272; Appx10279-Appx10281; Appx10291-Appx10295; Appx10350-Appx10363; Appx10364; Appx10367; Appx10389-Appx10399; Appx10400-Appx10410; Appx10411-Appx10419; Appx10439; Appx10467; Appx10760; Appx10765; Appx10797-Appx10799; Appx10802-Appx10804; Appx10807-Appx10809; Appx10819-Appx10881; Appx10890; and Appx10891.

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| ECOFACTOR, INC., | |
| Plaintiff, | Case No. 6:20-cv-00075-ADA |
| v. | JURY TRIAL DEMANDED |
| GOOGLE LLC, | |
| Defendant. | |
| ECOFACTOR, INC., | |
| Plaintiff, | Case No. 6:20-cv-00078-ADA |
| v. | JURY TRIAL DEMANDED |
| ECOBEE, INC., | |
| Defendant. | |
| ECOFACTOR, INC., | |
| Plaintiff, | Case No. 6:20-cv-00080-ADA |
| v. | JURY TRIAL DEMANDED |
| VIVINT, INC., | |
| Defendant. | |

**PROTECTIVE ORDER**

WHEREAS, documents and information may be sought, produced or exhibited by and among the parties to the above captioned proceeding, which materials relate to trade secrets or other confidential research, development or commercial information;

IT IS HEREBY ORDERED THAT:

1

i

1.      Confidential business information is information which has not been made public and which concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the production, sales, shipments, purchases, transfers, identification of customers, inventories, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or other organization, the disclosure of which information is likely to have the effect of either (i) impairing the Court's ability to obtain such information as is necessary to perform its functions; or (ii) causing substantial harm to the competitive position of the person, firm, partnership, corporation, or other organization from which the information was obtained, unless the Court is required by law to disclose such information.

2.      (a) Any information submitted, in pretrial discovery or in a pleading, motion, or response to a motion either voluntarily or pursuant to order, in this litigation, which is asserted by a supplier to contain or constitute confidential business information shall be so designated by such supplier in writing, or orally at a deposition, conference or hearing, and shall be segregated from other information being submitted.  Documents shall be clearly and prominently marked on their face with the legends: "CONFIDENTIAL," "RESTRICTED – ATTORNEYS' EYES ONLY," or "RESTRICTED – CONFIDENTIAL SOURCE CODE."  Except for paragraph 3, every provision of the Protective Order shall apply equally to the designations of "CONFIDENTIAL" and "RESTRICTED – ATTORNEYS' EYES ONLY."  For avoidance of doubt, any paragraph (except paragraph 3) discussing or referring to "RESTRICTED – ATTORNEYS' EYES ONLY" is expressly incorporated by reference to apply to the "CONFIDENTIAL" designation.  With regards to paragraph 3, paragraph 3(a) shall apply to the designation of "RESTRICTED – ATTORNEYS' EYES ONLY" and paragraph 3(b) shall apply to the paragraph of "CONFIDENTIAL" (collectively referred to herein as "Protected Material").

2

ii

(b) The Court may determine that information alleged to be confidential is not confidential, or that its disclosure is necessary for the proper disposition of the proceeding, before, during, or after the close of a trial herein. If such a determination is made by the Court, opportunity shall be provided to the supplier of such information to argue its confidentiality prior to the time of such ruling.

3. (a) In the absence of written permission from the supplier or an order by the Court, any confidential documents or business information designated "RESTRICTED – ATTORNEYS' EYES ONLY" submitted in accordance with the provisions of paragraph 2 above shall not be disclosed to any person other than:

(i) outside counsel for parties to this litigation, including necessary secretarial and support personnel assisting such counsel;

(ii) qualified persons taking testimony involving such documents or information and necessary stenographic and clerical personnel thereof;

(iii) technical experts and their staff who are employed for the purposes of this litigation to the extent that the technical experts and their staff have agreed to be bound by the provisions of the Protective Order by signing a copy of Attachment A;

(iv) independent litigation support services, including persons working for or as: court reporters; graphics or design services; jury or trial consulting services; and photocopy; document imaging; and litigation support or database services retained by counsel and reasonably necessary to assist counsel with the litigation of this Action; and

(iv) the Court, the Court staff, and personnel of the Court.

(b) In the absence of written permission from the supplier or an order by the Court, any confidential documents or business information designated "CONFIDENTIAL" submitted in

3

iii

accordance with the provisions of paragraph 2 above shall not be disclosed to any person other than:

(i) all persons identified in paragraph 3(a); and

(ii) up to three (3) in-house counsel for the opposing receiving party, to whom disclosure is reasonably necessary for the management, supervision, and oversight of the litigation, provided that each such person (1) is employed by the opposing receiving party and/or a parent corporation thereof that has been disclosed in this litigation under Federal Rule of Civil Procedure 7.1 and (2) has agreed to be bound by the provisions of the Protective Order by signing a copy of Attachment A; (3) is not involved in any other licensing negotiations or legal proceedings against any defendant; and (4) agrees not to participate in any other licensing negotiations or legal proceedings against any Defendant for five (5) years from the first date on which the person receives confidential documents or business information designated as CONFIDENTIAL.  These provisions for in-house counsel shall not restrict or apply to disclosures between Defendants.

4.     If the Court orders, or if the supplier and all parties to the litigation agree, that access to, or dissemination of information submitted as confidential business information shall be made to persons not included in paragraph 3 above, such matter shall only be accessible to, or disseminated to, such persons based upon the conditions pertaining to, and obligations arising from this order, and such persons shall be considered subject to it, unless the Court finds that the information is not confidential business information as defined in paragraph 1 hereof.

5.     To the extent that any one Defendant in these above-captioned cases provides Protected Material under the terms of this Order to Plaintiff, Plaintiff shall not share that material with the other Defendants in this litigation, absent express written permission from the producing Defendant, excepting instances where there is a reasonable belief that such other Defendant

previously possessed or had access to such information in the ordinary course of business. This Order does not confer any right to any one Defendant to access the Protected Material of any other Defendant.

6. No Defendant is required to produce its Protected Material to any other Defendant or Defendants in these above-captioned cases, but nothing in this Order shall preclude such production. Notwithstanding the provisions of this Order, Plaintiff shall not disclose one Defendant's Protected Material to any other Defendant or Defendants through Court filings, oral argument in Court, expert reports, deposition, discovery requests, discovery responses, or any other means, without the express prior written consent of the Defendant that produced the Protected Material, excepting instances where there is a reasonable belief that such other Defendant previously possessed or had access to such information.

7. Any confidential business information submitted to the Court in connection with a motion or other proceeding within the purview of this litigation shall be filed under seal pursuant to paragraph 2 above.

8. The restrictions upon, and obligations accruing to, persons who become subject to this order shall not apply to any information submitted in accordance with paragraph 2 above to which the person asserting the confidential status thereof agrees in writing, or the Court rules, after an opportunity for hearing, was publicly known at the time it was supplied to the receiving party or has since become publicly known through no fault of the receiving party.

9. (a) Whenever a deposition taken on behalf of any party involves a disclosure of confidential business information of any party, the deposition or portions of the deposition must be designated as containing confidential business information subject to the provisions of this Order. Such designation must be made on the record whenever possible, but a party may designate

5

v

portions of depositions as containing confidential business information after transcription of the proceedings. A party will have up to twenty-one (21) days after receipt of the deposition transcript to inform the other party or parties to the action of the portions of the transcript to be designated "CONFIDENTIAL" or "RESTRICTED – ATTORNEYS' EYES ONLY." Any transcript that is prepared before the expiration of the 21-day period for designation shall be treated during that period as if it had been designated "RESTRICTED – ATTORNEYS' EYES ONLY" in its entirety unless otherwise agreed. After the expiration of that period, the transcript shall be treated only as actually designated.

(b) a party will have the right to exclude from attendance at the deposition, during such time as the confidential business information is to be disclosed, any person other than the deponent and those entitled to receive confidential business information provided in paragraph 3.

(c) the originals of the deposition transcripts and all copies of the deposition must bear the legend "CONFIDENTIAL" or "RESTRICTED – ATTORNEYS' EYES ONLY," as appropriate, and the original or any copy ultimately presented to a court for filing must not be filed unless it can be accomplished under seal, identified as being subject to this Order, and protected from being opened except by order of this Court.

10.     If while the litigation is before the Court, a party to this order who is to be a recipient of any business information designated as confidential and submitted in accordance with paragraph 2, disagrees with respect to such a designation, in full or in part, it shall notify the supplier in writing, and they will thereupon confer as to the status of the subject information proffered within the context of this order.  If prior to, or at the time of such a conference, the supplier withdraws its designation of such information as being subject to this order, but nonetheless submits such information for purposes of the litigation, such supplier shall express the withdrawal, in writing,

and serve such withdrawal upon all parties and the Court.  If the recipient and supplier are unable to concur upon the status of the subject information submitted as confidential business information within ten days from the date of notification of such disagreement, any party to this order may raise the issue of the designation of such a status to the Court who will rule upon the matter.  The Court may *sua sponte* question the designation of the confidential status of any information and, after opportunity for hearing, may remove the confidentiality designation.

11.     No less than 10 days (or any other period of time designated by the Court) prior to the initial disclosure to a proposed expert of any confidential information submitted in accordance with paragraph 2, the party proposing to use such expert shall submit in writing: (1) the general categories of confidential business information submitted in accordance with paragraph 2 that the party seeks permission to disclose to the proposed expert; (2) the full name of such proposed expert; (3) a copy of the proposed expert's current resume; (4) identification of the proposed expert's current employer(s); (5) each person or entity from whom the expert has received compensation or funding for work in his or her areas of expertise or to whom the expert has provided professional services, including in connection with a litigation, at any time during the preceding five years; and (6) any litigation(s) in which the proposed expert has offered expert testimony, including through a declaration, report, or testimony at a deposition or trial, during the preceding five years. If the supplier objects to the disclosure of such confidential business information to such proposed expert as inconsistent with the language or intent of this order or on other grounds, it shall within seven (7) days notify the recipient in writing of its objection and the grounds therefor. If the dispute is not resolved on an informal basis within ten days of receipt of such notice of objection, the supplier shall submit immediately the objection(s) to the Court for a

7

ruling.  No Protected Material shall be provided to the proposed expert pending the ruling of the Court.

12.     If confidential business information submitted in accordance with paragraph 2 is disclosed to any person other than in the manner authorized by this protective order, the party responsible for the disclosure must immediately bring all pertinent facts relating to such disclosure to the attention of the supplier and the Court and, without prejudice to other rights and remedies of the supplier, make every effort to prevent further disclosure by it or by the person who was the recipient of such information.

13.     Nothing in this order shall abridge the right of any person to seek judicial review or to pursue other appropriate judicial action with respect to any ruling made by the Court concerning the issue of the status of confidential business information.

14.     If a supplier, through inadvertence, produces any confidential business information without labeling or marking or otherwise designating it as such in accordance with this Order, the supplier may give written notice to the receiving party that the document or thing produced is deemed confidential business information, and that the document or thing produced should be treated as such in accordance with that designation under this Order. Such inadvertent or unintentional production shall not be deemed a waiver in whole or in part of a claim for confidential treatment. The receiving party must treat the materials as confidential, once the supplier so notifies the receiving party. If the receiving party has disclosed the materials before receiving the designation, the receiving party must notify the supplier in writing of each such disclosure. Counsel for the parties will agree on a mutually acceptable manner of labeling or marking the inadvertently produced materials as "RESTRICTED – ATTORNEYS' EYES ONLY," "CONFIDENTIAL," or "RESTRICTED – CONFIDENTIAL SOURCE CODE." Any

8

supplier that inadvertently or unintentionally produces any confidential business information without labeling or marking or otherwise designating it as such may request destruction of the produced materials by notifying the receiving party(s), as soon as reasonably possible after the supplier becomes aware of the inadvertent or unintentional disclosure, and providing replacement Protected Material that is properly designated. The receiving party(s) shall then destroy all copies of the inadvertently or unintentionally produced Protected Materials and any documents, information or material derived from or based thereon.

15. When a supplier gives notice to a receiving party that certain inadvertently produced material is subject to a claim of privilege or other protection, the obligations of the receiving party are those set forth in Federal Rule of Civil Procedure 26(b)(5)(B). This provision is not intended to modify whatever procedure may be established in an e-discovery order that provides for production without prior privilege review. Pursuant to Federal Rule of Evidence 502(d) and (e), insofar as the parties reach an agreement on the effect of disclosure of a communication or information covered by the attorney-client privilege or work product protection, the parties may incorporate their agreement in the stipulated protective order submitted to the court.

16. Upon final termination of this litigation, each party that is subject to this order shall within thirty (30) days assemble and return to the supplier all items containing confidential business information submitted in accordance with paragraph 2 above, including all copies of such matter which may have been made. Alternatively, the parties subject to this order may, with the written consent of the supplier, destroy all items containing confidential business information and certify to the supplier (or his counsel) that such destruction has taken place. This paragraph shall not apply to the Court, which shall retain such material pursuant to statutory requirements and for

9

other recordkeeping purposes, but may destroy such material (including electronic media containing such information) in its possession which it regards as surplusage. Notwithstanding, outside counsel of record may retain one copy of all pleadings, filings, and deposition transcripts as part of its internal records. Nothing in this paragraph requires any party or entity to delete or destroy data from emergency backup systems so long as those systems recycle and/or update their data on a revolving basis.

17. If any confidential business information which is supplied in accordance with paragraph 2 above is supplied by a nonparty to this litigation, such a nonparty shall be considered a "supplier" as that term is used in the context of this order.

18. Each nonparty supplier shall be provided a copy of this order by the party seeking information from said supplier.

19. **<u>Source Code.</u>** A supplier may designate documents, information, or things as "RESTRICTED – CONFIDENTIAL SOURCE CODE," which shall mean litigation material of a supplier or of any non-parties that a supplier is permitted to produce in this litigation that constitutes or contains non-public Source Code.

A. "Source Code" shall mean source code, object code (*i.e.*, computer instructions and data definitions expressed in a form suitable for input to an assembler, compiler, or other translator), microcode, register transfer language ("RTL"), firmware, and hardware description language ("HDL"), as well as any and all programmer notes, annotations, and other comments of any type related thereto and accompanying the code. For avoidance of doubt, this includes source files, make files, intermediate output files, executable files, header files, resource

10

x

files, library files, module definition files, map files, object files, linker files, browse info files, and debug files.

B. Materials designated as "RESTRICTED – CONFIDENTIAL SOURCE CODE," shall only be reviewable by SOURCE CODE QUALIFIED PERSONS. SOURCE CODE QUALIFIED PERSONS include the following: (1) outside litigation counsel as necessarily incident to this litigation; (2) personnel at document duplication, coding, imaging, or scanning service establishments retained by, but not regularly employed by, outside litigation counsel as necessarily incident to this litigation; (3) personnel at interpretation/translation service establishments retained by, but not regularly employed by, outside litigation counsel as necessarily incident to this litigation, including without limitation oral interpreters and document translators; (4) the Court, Court personnel and contract personnel who are acting in the capacity of Court employees as indicated in paragraph 3 of this Protective Order; (5) court reporters, stenographers and videographers transcribing or recording testimony at depositions, hearings or trial in this litigation; and (6) qualified consultants and/or qualified experts in this litigation (under paragraph 11 of the Protective Order in this litigation). Qualified consultants and/or qualified experts may only review RESTRICTED – CONFIDENTIAL SOURCE CODE after being expressly identified to the supplier as seeking access to RESTRICTED – CONFIDENTIAL SOURCE CODE. If the receiving party wishes an already identified qualified consultant or qualified expert to receive RESTRICTED – CONFIDENTIAL SOURCE CODE, it must re-comply with the provisions of paragraph 10 of this Protective Order in this litigation, including allowing the supplier an opportunity to object to this qualified consultant or qualified expert receiving RESTRICTED –

11

xi

CONFIDENTIAL SOURCE CODE, and identifying the proposed qualified consultant or qualified expert as seeking access to RESTRICTED – CONFIDENTIAL SOURCE CODE.

        C.      Source Code shall be provided with the following additional protections:

        (i)      Nothing in this Protective Order shall obligate the parties to produce any Source Code, nor act as an admission that any particular Source Code is discoverable.

        (ii)      Access to Source Code will be given only to SOURCE CODE QUALIFIED PERSONS.

        (iii)      Access to Source Code shall be provided on no more than two "stand-alone" computer(s) (i.e., the computer(s) may not be linked to any network, including a local area network ("LAN"), an intranet, or the Internet, and may not be connected to any printer or storage device other than the internal hard disk drive of the computer). The stand-alone computer(s) shall be kept in a secure location at the offices of the supplier's outside litigation counsel, or at such other location as the supplier and receiving party mutually agree. The standalone secure computer(s) may be password protected and shall have the Source Code stored on a hard drive contained inside the computer(s). The supplier shall produce Source Code in computer searchable format on the stand-alone computer(s). The stand-alone computer(s) shall, at the receiving party's request, include reasonable analysis tools appropriate for the type of Source Code. The receiving party shall be responsible for providing the tools or licenses to the tools that it wishes to use to the supplier so that the supplier may install such tools on the standalone computer. To the extent that such tools record local working files or other records reflecting the work performed by the receiving party, such files and records shall not be reviewed, altered, or deleted by the supplier. Notwithstanding the foregoing, supplying and receiving parties may, at a

later date, agree to remote source code inspection as appropriate including, for example, by providing source code through a VPN or software solution.

(iv)     The receiving party shall provide at least five (5) business days' notice to access the source code and make reasonable efforts to restrict its requests for access to the stand-alone secure computer to normal business hours, which for purposes of this paragraph shall be 9:00 a.m. through 5:30 p.m. local time at the reviewing location. The parties are to cooperate in good faith such that maintaining the Source Code at the offices of the supplier's outside litigation counsel shall not unreasonably hinder the receiving party's ability to efficiently conduct the prosecution or defense in this litigation. It is expected that access to the Source Code shall be provided at the site of any hearing or trial. Proper identification of all SOURCE CODE QUALIFIED PERSONS shall be provided prior to any access to the stand alone secure computer.

(v)     All SOURCE CODE QUALIFIED PERSONS who will review Source Code on behalf of a receiving party shall be identified in writing to the supplier at least two (2) business days in advance of the first time that such person reviews such Source Code. Such identification shall be in addition to any disclosure required under paragraph 19(B) of this Protective Order. The supplier shall provide these individuals with information explaining how to start, log on to, and operate the stand-alone computer in order to access the produced Source Code on the stand-alone secure computer. For subsequent reviews by SOURCE CODE QUALIFIED PERSONS, the receiving party shall give at least one business day (and at least 24 hours') notice to the supplier of such review.

(vi)     No person other than the supplier may alter, dismantle, disassemble or modify the stand-alone computer in any way, or attempt to circumvent any security feature of the computer.

13

xiii

(vii)     No copies shall be made of Source Code, whether physical, electronic, or otherwise, other than volatile copies necessarily made in the normal course of accessing the Source Code on the stand-alone computer, except for: (1) print outs of reasonable portions of the Source Code in accordance with the provisions of paragraphs 19(C)(ix)-(x) of this Protective Order; and (2) such other uses to which the parties may agree or that the Court may order. The receiving party shall not use any outside electronic device to copy, record, photograph, or otherwise reproduce Source Code.  "Reasonable portions of the Source Code" shall be limited to the portions that are necessary to understand a relevant feature of an accused product in this litigation. The supplier shall not unreasonably withhold approval and the parties shall meet and confer in good faith to resolve any disputes. The receiving party may take notes on a laptop or other personal electronic device, provided such device does not have a camera, and such notes are treated as RESTRICTED – CONFIDENTIAL SOURCE CODE under the Protective Order. The supplier may exercise personal supervision from outside the review room over the receiving party when the receiving party is in the Source Code review room. Such supervision, however, shall not entail review of attorney work product generated by the receiving party, *e.g.*, monitoring the screen of the stand-alone computer, monitoring any surface reflecting any notes or work product of the receiving party, or monitoring the key strokes of the receiving party. There will be no video supervision by any supplier.

1)     To enable electronic note taking during Source Code reviews, the Supplier of Source Code shall also provide an additional "note-taking" computer loaded with at least Microsoft One Note and Microsoft Word software, unless otherwise agreed by the Supplier and the Receiving Party.  The note-taking computer shall either be a portable laptop or be located in close proximity to the Source Code Computer to facilitate electronic note taking.

14

xiv

2)      At the beginning of a Source Code review session, the Supplier shall, when requested by the reviewer, upload to the note-taking computer an encrypted notes file (*e.g.*, uploading an encrypted notes file from a USB memory stick provided by the reviewer to the note-taking computer).

3)      The reviewer may then decrypt and open the notes file using the note-taking computer for the purpose of taking notes during the Source Code review session. During the source Code review session, the Supplier may disable any input and/or output devices on the note-taking computer (*e.g.*, disable any USB ports, Wi-Fi or Ethernet connectivity, and/or optical disc drives) except as necessary to enable to reviewer to take notes (*e.g.*, enable mouse and keyboard). Use or possession of any input/output device (*e.g.*, USB memory stick, mobile phone or tablet, camera or any camera-enabled device, CD, floppy disk, portable hard drive, laptop/computer, or any device that can access the Internet or any other network or external system, etc.) is prohibited while accessing the note-taking computer.

4)      At the end of a Source Code review session, the reviewer may save any notes in the same encrypted notes file. The Supplier shall, when requested by the reviewer, download from the note-taking computer the encrypted notes file and provide an electronic copy to the reviewer (*e.g.*, downloading the encrypted notes file from the note-taking computer to a USB memory stick provided by the reviewer).

5)      Notwithstanding this stipulation, no reviewer may at any time copy or include in electronic notes any portions or sections of the Source Code. Reviewers using electronic note-taking will be directed by undersigned counsel not to copy or include in electronic notes any portions or sections of the Source Code.

15

xv

6)       If requested by the Supplier, a copy of the encrypted notes file shall remain on the note-taking computer, so long as it remains encrypted.

7)       If requested by the Supplier, a representative for the Supplier may oversee the transfer of the encrypted notes file from the secure data storage device to the note-taking computer, and vice-versa, without reviewing the substance of the electronic notes.

8)       The reviewer shall not take notes electronically on the Source Code Computer itself or any other computer or electronic device (besides the note-taking computer) while conducting a review.

(viii)   Nothing may be removed from the stand-alone computer, either by the receiving party or at the request of the receiving party, except for (1) print outs of reasonable portions of the Source Code in accordance with the provisions of paragraphs 19(C)(ix)-(x) of this Protective Order; and (2) such other uses to which the parties may agree or that the Court may order.

(ix)     At the request of the receiving party, the supplier shall within three (3) business days provide one (1) hard copy print out of the specific lines, pages, or files of the Source Code that the receiving party believes in good faith are necessary to understand a relevant feature of an accused product. If the supplier objects in any manner to the production of the requested source code (e.g., the request is too voluminous), it shall state its objection within the allotted two (2) business days pursuant to this paragraph. In the event of a dispute, the parties will meet and confer within five (5) business days of the objection being raised and if they cannot resolve it the parties will raise it with the Court.

(x)      Hard copy print outs of Source Code shall be provided on Bates numbered and watermarked or colored paper clearly labeled RESTRICTED – CONFIDENTIAL

16

xvi

SOURCE CODE on each page and shall be maintained by the receiving party's outside litigation counsel or SOURCE CODE QUALIFIED PERSONS in a secured locked area. The receiving party may also temporarily keep the print outs at: (1) the Court for any proceedings(s) relating to the Source Code, for the dates associated with the proceeding(s); (2) the sites where any deposition(s) relating to the Source Code are taken, for the dates associated with the deposition(s); and (3) any intermediate location reasonably necessary to transport the print outs *(e.g.,* a hotel prior to a Court proceeding or deposition). For avoidance of doubt, an access-restricted location within the facilities of outside litigation counsel or a qualified expert, such as a conference room within an access restricted office or a locked drawer or cabinet, shall constitute a secured locked area. The receiving party shall exercise due care in maintaining the security of the print outs at these temporary locations. No further hard copies of such Source Code shall be made and the Source Code shall not be transferred into any electronic format or onto any electronic media except that:

1. The receiving party is permitted to make up to five (5) additional hard copies for use at a deposition. One hard copy of the source code may be marked as an exhibit for the deposition, and then maintained by counsel for the party presenting the exhibit during the deposition in a secured locked area. All other copies shall be destroyed immediately after the deposition is concluded. In the case of remote or video depositions, the parties should indicate beforehand that use of hard copy source code will be utilized at the deposition to ensure all counsel and the witness have a hard copy of the source code at the time of the deposition. Electronic copies of source code shall not be made or used for purposes of remote depositions.

2. The receiving party is permitted to make up to five (5) additional hard copies for the Court in connection with a Court filing, hearing, or trial, and of only the specific pages directly relevant to and necessary for deciding the issue for which the portions of the Source Code are being filed or offered. To the extent portions of Source Code are quoted in a Court filing, either (1) the entire document will be stamped and treated as RESTRICTED – CONFIDENTIAL SOURCE CODE; or (2) those pages containing quoted Source Code will be separately stamped and treated as RESTRICTED – CONFIDENTIAL SOURCE CODE.

3. Electronic copies of Source Code may be made to be included in documents which, pursuant to the Court's rules, procedures, and order(s), may be filed or served electronically. Only the necessary amount of electronic copies to effectuate such filing or service may be stored on any receiving party server, hard drive, thumb drive, or other electronic storage device at any given time. After any such electronic filing or service, the receiving party may maintain reasonable copies of such filings, but shall delete all other electronic copies of Source Code from all receiving party electronic storage devices.

18

xviii

4.      The receiving party is permitted to possess up to seven (7) additional paper copies of the hard copy print-outs of Source Code provided by the supplier. The receiving party may provide these paper copies to qualified consultants or qualified experts, who may use such paper copies solely for active review of the source code. The receiving party is also permitted to make temporary copies necessarily made in the production of these paper copies provided any such copies are immediately deleted once the temporary copies are no longer required for the production of the paper copies. The paper copies shall not be copied in whole or in part under any other circumstances. A receiving party may destroy one or more of the seven (7) previously created paper copies and create one or more new paper copies provided that the total number in possession of the receiving party does not exceed seven (7). Absent further agreement, all paper copies shall be destroyed after the completion of the litigation or the supplying party's exit from the litigation, whichever occurs first. The receiving party shall keep and maintain a log of all custodians for all of the paper copies as well as the destruction of all paper copies.

5.      The supplier shall, on request, make a searchable electronic copy of the Source Code available on a stand-alone computer during depositions of witnesses who would otherwise be permitted access to such Source Code. The receiving party shall make such request at the time of the notice for deposition.

(xi)      Nothing in this Protective Order shall be construed to limit how a supplier may maintain material designated as "RESTRICTED – CONFIDENTIAL SOURCE CODE."

(xii)      Outside litigation counsel for the receiving party with custody of "RESTRICTED – CONFIDENTIAL SOURCE CODE" shall maintain a source code log containing the following information: (1) the identity of each person granted access to the

19

xix

"RESTRICTED – CONFIDENTIAL SOURCE CODE"; and (2) the first date on which such access was granted. Outside litigation counsel for the receiving party will produce, upon request, each such source code log to the supplier within twenty (20) days of the final determination of the litigation.

(xiii)   Any print request that consists of more than 40 pages of a continuous block of source code shall be presumed to be excessive, and the burden shall be on the receiving party to demonstrate the need for such a printed copy.  The receiving party may request printed source code of up to 800 pages total from each producing party.  Each print request shall be made in writing to the producing party and shall include the complete path, file name, and line numbers of the source code to be printed.  The parties acknowledge that they produced source code printouts in connection with U.S. ITC Investigation No. 337-TA-1185 ("the 1185 Investigation"), with the same page limits.  A receiving party may request that printouts from the 1185 Investigation be deemed produced in the instant action (or re-produced with new Bates numbers, if the producing party prefers).  Such a request will count toward the above page limitations.  Any request for source code printouts exceeding the 800- and 40-page limits shall be made only if the requesting party has good cause to make such a request.  The parties agree to negotiate, in good faith and in a timely fashion, any request exceeding these limits in order to avoid burdening the Court unnecessarily. The burden shall be on the receiving party to demonstrate the need for exceeding these limits.

20.   **No prejudice.** Paragraph 19 above is without prejudice to any party's rights to propose, request, or otherwise move for different provisions relating to source code production in this litigation.

21.   **Prosecution Bar**.  Any person (i) who prosecutes patents or patent applications at any time between the date on which such person subscribes to the Protective Order and the date

20

xx

on which the termination of this litigation, and any appeals thereto, is final and (ii) who reviews any supplier's Confidential Business Information or RESTRICTED – CONFIDENTIAL SOURCE CODE, but excluding financial data or non-technical business information, (all of which shall also be automatically designated as 'PROSECUTION BAR MATERIALS") shall not, for a period commencing upon receipt of such information and ending two years following the absolute final termination of this litigation, prosecute patents or patent applications relating to smart thermostats or smart HVAC systems ("Prosecution Activity").  Prosecution includes, for example, original prosecution, reissue, reexamination, and any other post-grant proceedings that may affect the scope of the claims of a patent or patent application.  Prosecution does not include representing a party challenging or defending a patent before an agency (including, but not limited to, a reissue protest, *ex parte* reexamination, post-grant review, or *inter partes* review), provided that there is no participation in or assistance with any claim drafting or amendment of claims in such proceedings.  Nothing in this paragraph shall prevent any attorney from sending non-confidential prior art to an attorney involved in patent prosecution for purposes of ensuring that such prior art is submitted to the U.S. Patent and Trademark Office (or any similar agency of a foreign government) to assist a patent applicant in complying with its duty of candor.  Nothing in this provision shall prohibit any attorney of record in this litigation from discussing any aspect of this case that is reasonably necessary for the prosecution or defense of any claim or counterclaim in this Investigation with his/her client.  The parties expressly agree that the Prosecution Bar set forth herein shall be personal to any attorney who reviews PROSECUTION BAR MATERIALS and shall not be imputed to any other persons or attorneys at the attorneys' law firm.  It is expressly agreed that attorneys who work on this matter without reviewing PROSECUTION BAR

MATERIALS shall not be restricted from engaging in Prosecution Activity on matters that fall within the Prosecution Bar.

22. As used herein, the term "final termination" means the availability of appeal has been exhausted, and the time for a petition of certiorari has elapsed or a petition for certiorari is denied.

23. Production of Protected Material by each of the Parties shall not be deemed a publication of the documents, information, or material (or the contents thereof) produced so as to void or make voidable whatever claim the Parties may have as to the proprietary and confidential nature of the documents, information, or other material or its contents.

24. Nothing in this Order shall be construed to effect an abrogation, waiver, or limitation of any kind on the rights of each of the Parties to assert any applicable discovery or trial privilege.

25. Documents, information or material produced in this case, including but not limited to Protected Material, shall be used by the Parties only in this case and shall not be used for any other purpose. Any person or entity who obtains access to Protected Material or the contents thereof pursuant to this Order shall not make any copies, duplicates, extracts, summaries or descriptions of such Protected Material or any portion thereof except as may be reasonably necessary in the litigation of this Action. Any such copies, duplicates, extracts, summaries or descriptions shall be classified Protected Material and subject to all of the terms and conditions of this Order. Nothing herein modifies or permits violation of a protective order in any other action, nor does it authorize the parties to use discovery from any other action to the extent it is not properly discoverable under the Federal Rules of Civil Procedure or is not otherwise consistent with the rules of any other relevant court, agency, or tribunal.

22

26.     Each of the Parties shall also retain the right to file a motion with the Court (a) to modify this Order to allow disclosure of Protected Material to additional persons or entities if reasonably necessary to prepare and present this Action and (b) to apply for additional protection of Protected Material.

Dated: _____June 9_____, 2021

Alan D Albright
United States District Judge

24

xiv

**Attachment A**

## NONDISCLOSURE AGREEMENT FOR
## REPORTER/STENOGRAPHER/TRANSLATOR

I, _____, do solemnly swear or affirm that I will not divulge any information communicated to me in any confidential portion of the investigation or hearing in *EcoFactor, Inc. v. Google LLC*, No. 6:20-cv-00075-ADA; *EcoFactor, Inc. v. Ecobee, Inc.*, No. 6:20-cv-00078-ADA; and *EcoFactor, Inc. v. Vivint, Inc.*, No. 6:20-cv-00080-ADA, except as permitted in the protective order issued in this case. I will not directly or indirectly use, or allow the use of such information for any purpose other than that directly associated with my official duties in this case.

Further, I will not by direct action, discussion, recommendation, or suggestion to any person reveal the nature or content of any information communicated during any confidential portion of the investigation or hearing in this case.

I also affirm that I do not hold any position or official relationship with any of the participants in said investigation.

I am aware that the unauthorized use or conveyance of information as specified above is a violation of the Federal Criminal Code and punishable by a fine of up to $10,000, imprisonment of up to ten (10) years, or both.

Signed _____

Dated _____

Firm or affiliation _____

25

xxv

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

ECOFACTOR, INC.

*Plaintiff,*

v.

GOOGLE LLC,

*Defendant.*

Case No. 6:20-cv-00075-ADA

## FINAL JUDGMENT

In accordance with the jury verdict and pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, it is hereby ORDERED and ADJUDGED that:

1. Claim 5 of U.S. Patent No. 8,738,327 ("the '327 patent") is infringed by Google;

2. Claim 5 of the '327 patent is not willfully infringed by Google;

3. Claims 2 and 12 of U.S. Patent No. 10,534,382 ("the '382 patent") are not infringed by Google;

4. Claim 5 of the '327 patent and claims 2 and 12 of the '382 patent are not invalid;

5. Claims 1, 2, 5, and 8 of U.S. Patent No. 8,412,488 are invalid for indefiniteness under 35 U.S.C. § 112;

6. Judgment is hereby entered in favor of EcoFactor and against Google in the lump sum of $20,019,300.00;

7. EcoFactor is further awarded prejudgment interest at the one-year Treasury Bill constant maturity rate, compounded annually, in the amount of $127,971;

8. EcoFactor is awarded post-judgment interest pursuant to 28 U.S.C. § 1961; and

9. EcoFactor shall be entitled to recover costs of court.

1

Appx1

Appx2

10. This FINAL JUDGMENT starts the time for filing any post-trial motions or appeal.


Signed this 26th day of May, 2022.

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE

2
Appx2

**FILED**

February 10, 2022

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____Jennifer Clark_____
DEPUTY

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| ECOFACTOR, INC.,<br><br>             Plaintiff,<br><br>    v.<br><br>GOOGLE LLC,<br><br>             Defendant. | Civil Action No. 6:20-cv-00075 (ADA) |

**<u>FINAL JURY INSTRUCTIONS
TO BE GIVEN AFTER THE CLOSE OF EVIDENCE</u>**

1

## JURY INSTRUCTION NO. 14:  JURY CHARGE

MEMBERS OF THE JURY:

It is my duty and responsibility to instruct you on the law you are to apply in this case. The law contained in these instructions is the only law you may follow. It is your duty to follow what I instruct you the law is, regardless of any opinion that you might have as to what the law ought to be.

Each of you is going to have your own printed copy of these final jury instructions that I am giving you now, so there is really no need for you to take notes unless you want to.

If I have given you the impression during the trial that I favor either party, you must disregard that impression. If I have given you the impression during the trial that I have an opinion about the facts of this case, you must disregard that impression. You are the sole judges of the facts of this case. Other than my instructions to you on the law, you should disregard anything I may have said or done during the trial in arriving at your verdict.

You should consider all of the instructions about the law as a whole and regard each instruction in light of the others, without isolating a particular statement or paragraph.

The testimony of the witnesses and other exhibits introduced by the parties constitute the evidence. The statements of counsel are not evidence; they are only arguments. It is important for you to distinguish between the arguments of counsel and the evidence on which those arguments rest. What the lawyers say or do is not evidence. You may, however, consider their arguments in light of the evidence that has been admitted and determine whether the evidence admitted in this trial supports the arguments. You must determine the facts from all the testimony that you have heard and the other evidence submitted. You are the judges of the facts, but in finding those facts, you must apply the law as I instruct you.

You are required by law to decide the case in a fair, impartial, and unbiased manner, based entirely on the law and on the evidence presented to you in the courtroom. You may not be influenced by passion, prejudice, or sympathy you might have for EcoFactor or Google in arriving at your verdict.

After the remainder of these instructions, you will hear closing arguments from the attorneys. Statements and arguments of the attorneys, I remind you, are not evidence, and they are not instructions on the law. They are intended only to assist the jury in understanding the evidence and the parties' contentions.

A verdict form has been prepared for you. You are to take this verdict form with you to the jury room; and when you have reached a unanimous decision or agreement as to the verdict, you are to have your foreperson fill in the blanks in the verdict form, date it, and sign it. Answer each

2

Appx4

Appx5

question in the verdict form from the facts as you find them to be. Do not decide who you think should win the case and then answer the questions to reach that result.

Again, your answers and your verdict must be unanimous.

3

## JURY INSTRUCTION NO. 15:  EVIDENCE

The evidence you are to consider consists of the testimony of the witnesses, the documents and other exhibits admitted into evidence, the stipulations to which the lawyers agreed, and any fair inferences and reasonable conclusions you can draw from the facts and circumstances that have been proven.  Nothing else is evidence.

Generally speaking, there are two types of evidence.  One is direct evidence, such as testimony of an eyewitness.  The other is indirect or circumstantial evidence.  Circumstantial evidence is evidence that proves a fact from which you can logically conclude another fact exists.  As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that you determine the facts from all the evidence that you hear in this case, whether direct, circumstantial, or any combination.

As I instructed you before the trial began, in judging the facts, you must consider all the evidence, both direct and circumstantial.  That does not mean you have to believe all of the evidence.  It is entirely up to you to give the evidence you receive in this case whatever weight you individually believe it deserves.  It will be up to you to decide which witnesses to believe, which witnesses not to believe, the weight you give any testimony you hear, and how much of any witness's testimony you choose to accept or reject.

You should never be influenced by my ruling on any objection.  If I sustained an objection, then just pretend the question was never asked.  If there was an answer given, ignore it.  If I overruled the objection, act like the objection was never made.  If I gave you instructions that some item of evidence was received for a limited purpose, you must follow my instruction.  If I gave any limiting instruction during trial, you must follow it.  Any testimony I tell you to exclude or disregard is not evidence and may not be considered.

You must not conduct any independent research or investigation. You must make your decision based only on the evidence here, and nothing else.

4

Appx6

**JURY INSTRUCTION NO. 16:  WITNESSES**

You alone are to determine the questions of credibility or truthfulness of the witnesses.  In weighing the testimony of the witnesses, you may consider the witness's manner and demeanor on the witness stand, any feelings or interest in the case, or any prejudice or bias about the case, that he or she may have, and the consistency or inconsistency of his or her testimony considered in the light of the circumstances.  Has the witness been contradicted by other credible evidence?  Has he or she made statements at other times and places contrary to those made here on the witness stand?  You must give the testimony of each witness the credibility that you think it deserves.

In determining the weight to give to the testimony of a witness, consider whether there was evidence at some other time the witness said or did something or failed to say or do something, that was different from the testimony given by that witness at trial.

A simple mistake by a witness does not necessarily mean that the witness did not tell the truth as he or she remembers it.  We are people.  People may forget some things or remember other things inaccurately.  If a witness made a misstatement, consider whether that misstatement was an intentional falsehood or just a mistake.  The significance of that may depend on whether it has to do with an important fact or with only an unimportant detail.  That being said, it is exclusively in your province to believe every word that any witness says, or to disregard anything they say or do, because you all are the exclusive judges of the facts in this case.

Even though a witness may be a party to the action and therefore interested in its outcome, the testimony may be accepted if it is not contradicted by direct evidence or by any inference that may be drawn from the evidence, if you believe the testimony.

You are not to decide this case by counting the number of witnesses who have testified on the opposing sides.  Witness testimony is weighed; witnesses are not counted.  The test is not the relative number of witnesses, but the relative convincing force of the evidence.  The testimony of a single witness is sufficient to prove any fact, even if a greater number of witnesses testified to the contrary, if after considering all of the other evidence, you believe that witness.

Appx7

**JURY INSTRUCTION NO. 17: DEPOSITION TESTIMONY**

Certain testimony has been presented to you through a deposition. A deposition is the sworn, recorded answers to questions a witness was asked in advance of the trial. Under some circumstances, if a witness cannot be present to testify from the witness stand, that witness's testimony may be presented, under oath, in the form of a deposition. Sometime before this trial, attorneys representing the parties in this case questioned this witness under oath. A court reporter was present and recorded the testimony. The questions and answers have been shown to you. This deposition testimony is entitled to the same consideration and weighed and otherwise considered by you in the same way as if the witness had been present and had testified from the witness stand in court.

Appx8

**JURY INSTRUCTION NO. 18:  REMOTE LIVE TESTIMONY**

In addition, certain testimony has been presented to you through a remote live video.  These witnesses have been permitted to testify by remote live video due to travel restrictions.  This remote live video testimony is entitled to the same consideration and weighed and otherwise considered by you in the same way as if the witness had been present and had testified from the witness stand in court.

Some of the video recordings and live remote video of witnesses you have seen may have been of lower quality because the witnesses testified from home.  This was due to travel restrictions in place at the time and in the location where the witness was located.  You should not hold the quality of the video, the location of the witness, or any other circumstances arising from travel restrictions against either party.

Regardless of whether presented by deposition or live remote video, this testimony is entitled to the same consideration and is to be weighed and otherwise considered by you in the same way as if the witness had been present and had testified from the witness stand in court.

## JURY INSTRUCTION NO. 19:  EXPERT TESTIMONY

Expert testimony is testimony from a person who has a special skill or knowledge in some science, profession, or business.  This skill or knowledge is not common to the average person but has been acquired by the expert through special study or experience.

In weighing expert testimony, you may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as the factors I have previously mentioned for weighing testimony of any other witness.

Expert testimony should receive whatever weight and credit you think appropriate, given all the other evidence in the case.  You are not required to accept the opinion of any expert, rather, you are free to accept or reject the testimony of experts, just as with any other witness.

Appx10

## JURY INSTRUCTION NO. 20:  NO INFERENCE FROM FILING SUIT

The fact that a person brought a lawsuit and is in court seeking damages creates no inference that the person is entitled to a judgment.  Anyone may make a claim and file a lawsuit.  The act of making a claim in a lawsuit, by itself, does not in any way tend to establish that claim and is not evidence.

9

Appx11

## JURY INSTRUCTION NO. 21:  STIPULATIONS OF FACT

A "stipulation" is an agreement. When there is no dispute about certain facts, the parties may agree or "stipulate" to those facts. You must accept a stipulated fact as evidence and treat that fact as having been proven here in court.

10

Appx12

## JURY INSTRUCTION NO. 22:  LIMITING INSTRUCTION

When testimony or an exhibit is admitted for a limited purpose, you may consider that testimony or exhibit only for the specific limited purpose for which it was admitted.

11

**JURY INSTRUCTION NO. 23:  CHARTS AND SUMMARIES**

Certain charts and summaries have been shown to you solely to help explain or summarize the facts disclosed by the books, records, and other documents that are in evidence.  These charts and summaries are not evidence or proof of any facts.  You should determine the facts from the evidence.

12

**JURY INSTRUCTION NO. 24:  DEMONSTRATIVE EXHIBITS**

Certain exhibits shown to you, such as PowerPoint presentations, posters, or models, are illustrations of the evidence, but are not themselves evidence.  It is a party's description, picture, or model used to describe something involved in this trial.  If your recollection of the evidence differs from the exhibit, rely on your recollection.

13

**JURY INSTRUCTION NO. 25:  BIAS – CORPORATE PARTY INVOLVED**

Do not let bias, prejudice, or sympathy play any part in your deliberations. A corporation and all other persons are equal before the law and must be treated as equals in a court of justice.

**JURY INSTRUCTION NO. 26:  PREPONDERANCE OF THE EVIDENCE**

In any legal action, facts must be proved by a required amount of evidence known as the "burden of proof."

EcoFactor has the burden of proving patent infringement and damages by a preponderance of the evidence. A preponderance of the evidence means evidence that persuades you that a claim is more probably true than not true. Sometimes this is talked about as being the greater weight and degree of credible testimony.

If you find that EcoFactor has failed to prove any element of its claim by a preponderance of the evidence, then it may not recover on that claim.

15

Appx17

**JURY INSTRUCTION NO. 27:  CLEAR AND CONVINCING EVIDENCE**

Google has the burden of proving patent invalidity by clear and convincing evidence.

Clear and convincing evidence is evidence that produces in your mind a firm belief or conviction as to the truth of the matter sought to be established.  It is evidence so clear, direct, weighty and convincing as to enable you to come to a clear conviction without hesitancy.

The "clear and convincing evidence" standard is different from what you have heard about in criminal proceedings, where a fact must be proven beyond a reasonable doubt.  On a scale of the various standards of proof, as you move from preponderance of the evidence where proof needs to be sufficient to tip the scales in favor of the party proving the fact, to at the other end, beyond a reasonable doubt, where the fact must be proven to a very high degree of certainty, you can think of clear and convincing evidence as being between these two ends of the spectrum or these two different standards.

16

Appx18

**JURY INSTRUCTION NO. 28:  SUMMARY OF CONTENTIONS**

As I did at the start of the case, I will first give you a summary of each side's contentions in this case.  I will then provide you with detailed instructions on what each side must prove to win on each of its contentions.

As I previously told you, EcoFactor filed suit in this court seeking money damages from Google for allegedly infringing the '327 and '382 patents by making, using, selling, and/or offering for sale within the United States products that EcoFactor argues are covered by claim 5 of the '327 patent, and claims 2 and 12 of the '382 patent. These are known as the "Asserted Claims."

The products that are alleged to infringe are smart thermostats made, used, offered for sale, or sold by Google, including the Nest Learning Thermostat Third Generation product, the Nest Thermostat E product, and the Nest Thermostat product. The infringement contentions extend to systems where the products are combined with Google servers or Nest servers and Google's mobile applications including the Google Home App and the Nest App. I will collectively refer to these individual products and the systems as the "Accused Products."

Google denies that it has infringed any of the Asserted Claims of the Asserted Patents.  Google also argues that the Asserted Claims are invalid.

Your job is to decide whether or not Google has infringed any Asserted Claims, and whether or not those claims are invalid.  If you decide that any Asserted Claims both have been infringed and are valid, you will then need to decide any money damages to be awarded to EcoFactor to compensate it for the infringement.

17

Appx19

**JURY INSTRUCTION NO. 29:  PATENT CLAIMS**

Before you can decide many of the issues in this case, you will need to understand the role of patent "claims."

The patent claims are the numbered sentences at the end of each patent.  The claims are important because it is the words of the claims that define what a patent covers.  The figures and text in the rest of the patent provide a description and/or examples of the invention and provide a context for the claims, but it is the claims that define the breadth of the patent's coverage.  Therefore, what a patent covers depends, in turn, on what each of its claims covers.

To know what a claim covers, a claim sets forth—in words—a set of requirements.  Each claim sets forth its requirements in a single sentence.  The requirements of a claim are often referred to as "claim elements" or "claim limitations."  The coverage of a patent is assessed claim by claim. When a thing (such as a product or a process) meets all of the requirements of a claim, the claim is said to "cover" that thing, and that thing is said to "fall" within the scope of that claim.  In other words, a claim covers a product or process where each of the claim elements or limitations is present in that product or process.

You will first need to understand what each claim covers in order to decide whether or not there is infringement of the claim and to decide whether or not the claim is invalid.  The first step is to understand the meaning of the words used in the patent claim.

The law says that it is my role to define the terms of the claims and it is your role to apply my definitions of the terms I have construed to the issues that you are asked to decide in this case. Therefore, as I explained to you at the start of the case, I have determined the meaning of certain claim terms and I have provided to you my definitions of certain claim terms.  You must accept my definitions of these words in the claims as being correct.  It is your job to take these definitions and apply them to the issues that you are deciding, including the issues of infringement and validity.

The beginning portion of a claim, also known as the preamble, of a claim often uses the word "comprising."  The word "comprising," when used in the preamble, means "including but not limited to" or "containing but not limited to."  When "comprising" is used in the preamble, if you decide that an accused product includes all of the requirements of that claim, the claim is infringed. This is true even if the accused product contains additional elements.

For any words in the claim for which I have not provided you with a definition, you should apply the ordinary meaning of those terms in the field of the patent.  You should not take my definition of the language of the claims as an indication that I have a view regarding how you should decide the issues that you are being asked to decide, such as infringement and invalidity.  These issues are yours to decide.

My claim constructions are as follows:

| Claim Term | Construction |
| --- | --- |
| "rate of change in inside temperature" ('327 patent claim 1); "rate ofchange in temperature inside the [said] structure" ('327 patent claim 5) | "the difference between inside temperature measurements divided by the span of time between the measurements" |
| "measurement of the current outdoor temperature" | "measurement of the outdoor temperature at the present time" |
| "setpoint" | "a temperature setting for a thermostat to achieve or maintain" |
| "compares" | "analyze to determine one or more similarities or differences between" |

Appx21

**JURY INSTRUCTION NO. 30: INDEPENDENT AND DEPENDENT CLAIMS**

This case involves two types of patent claims: independent claims and dependent claims.

An "independent claim" sets forth all of the requirements that must be met in order to be covered by that claim. Thus, it is not necessary to look at any other claim to determine what an independent claim covers. In this case the following claims are independent claims:

- Claim 1 of the '327 Patent is an independent claim; and

- Claim 1 of the '382 Patent is an independent claim.

The Asserted Claims in the Asserted Patents are "dependent claims." A dependent claim does not itself recite all of the requirements of the claim but refers to another claim for some of its requirements. In this way, the claim "depends" on another claim. A dependent claim incorporates all of the requirements of the claim(s) to which it refers. The dependent claim then adds its own additional requirements.

To determine what a dependent claim covers, it is necessary to look at both the dependent claim and any other claim(s) to which it refers. A product that meets all of the requirements of both the dependent claim and the claim(s) to which it refers is covered by that dependent claim.

If any requirement of a dependent claim is not met, or if any requirement of a claim from which the dependent claim depends is not met, then the product is not covered by that dependent claim.

Appx22

**JURY INSTRUCTION NO. 31:  INFRINGEMENT GENERALLY**

I will now instruct you how to decide whether or not EcoFactor has proven that Google has infringed the Asserted Claims of the Asserted Patents.  Infringement is assessed on a claim-by-claim basis.  Therefore, there may be infringement as to one claim but no infringement as to another.

In this case, EcoFactor has alleged that Google directly infringes the Asserted Patents.

In order to prove infringement, EcoFactor must prove that the requirements for infringement are met by a preponderance of the evidence, that is, that it is more likely than not that all of the requirements of infringement have been proved.

In reaching your decision on infringement, keep in mind that only the claims of a patent can be infringed. You must compare the asserted patent claims, as I have defined each of them, to the accused system or process, and determine whether or not there is infringement. You should not compare the accused system or process with any specific example set out in the patent or with the prior art in reaching your decision on the issue of infringement. The only correct comparison is with the language of a claim itself, as I have explained its meaning to you. You must reach your decision as to each assertion of infringement based on my instructions about the meaning and scope of the claims, the legal requirements for infringement, and the evidence presented to you by the parties.

I will now explain infringement in more detail.

21

Appx23

**JURY INSTRUCTION NO. 32:  DIRECT INFRINGEMENT**

In order to prove direct infringement, EcoFactor must prove by a preponderance of the evidence, i.e., that it is more likely than not, that Google made, used, sold, offered for sale within the United States a product that meets all of the requirements of a claim and did so without the permission of EcoFactor during the time the Asserted Patents were in force.  You must compare the product with each and every one of the requirements of a claim to determine whether all of the requirements of that claim are met.

A party can directly infringe a patent without knowing of the patent or without knowing that what the party is doing is patent infringement. Even if the party independently creates the accused product or method, it can still infringe.

You must determine, separately for each asserted claim, whether or not there is infringement. For dependent claims, if you find that a claim to which a dependent claim refers is not infringed, there cannot be infringement of that dependent claim.  On the other hand, if you find that an independent claim has been infringed, you must still decide, separately, whether the product meets the additional requirement(s) of any claims that depend from the independent claim to determine whether those dependent claims have also been infringed.  A dependent claim includes all the requirements of any of the claims to which it refers plus additional requirement(s) of its own.

Appx24

## JURY INSTRUCTION NO. 33: INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS

If a company makes, uses, sells, or offers to sell within the United States a product or method that does not literally meet all of the elements of a claim and thus does not literally infringe that claim, there can still be direct infringement if that product or method satisfies the claim elements "under the doctrine of equivalents."

Under the doctrine of equivalents, a product or method infringes a claim if they contain elements that literally meet or are equivalent to each and every element of the claim. You may find that an element is equivalent to an element of a claim that is not met literally if a person having ordinary skill in the field of technology of the patent would have considered the differences between them to be "insubstantial" or would have found that the structure: (1) performs substantially the same function and (2) works in substantially the same way (3) to achieve substantially the same result as the element of the claim. In order to prove infringement by "equivalents," EcoFactor must prove the equivalency of the structure to the claim element by a preponderance of the evidence. Thus, each element of a claim must be met by the accused productor method either literally or under the doctrine of equivalents for you to find infringement.

23

Appx25

## JURY INSTRUCTION NO. 34:  INVALIDITY—GENERALLY

I will now instruct you on the rules you must follow in deciding whether or not Google has proven that the Asserted Claims of the Asserted Patents are invalid. To prove that any claim of a patent is invalid, Google must persuade you by clear and convincing evidence, that is, you must be left with a clear conviction that the claim is invalid.

An issued United States patent is accorded a presumption of validity based on the presumption that the Patent Office, which you've heard referred to throughout this trial as the PTO or sometimes just the Patent Office, acted correctly in issuing the patent. This presumption of validity extends to all issued United States patents. To prove that any claim of a patent is invalid, Google must persuade you by clear and convincing evidence, that is, you must be left with a clear conviction that the claim is invalid. In order to overcome this presumption, Google must establish by clear and convincing evidence that the Plaintiffs' patents or any claim in the patent is not valid.

The fact that the PTO grants a patent does not necessarily mean that any invention claimed in the patent, in fact, deserves the protection of a patent. For example, the PTO may not have had available to it all other prior art that will be presented to you.  In addition, there is the possibility that mistakes were made or that information was overlooked.  Examiners have a lot of work to do and no process is perfect. Also, unlike a court proceeding, patent prosecution takes place without input from those who are later alleged to infringe the patent.

In making your determination as to invalidity, you should consider each claim separately.

Even though one or more Patent Office examiners have allowed the asserted claims as valid, you have the responsibility for deciding whether Google has met its burden of proving by clear and convincing evidence that the asserted claims are invalid.

24

**JURY INSTRUCTION NO. 35: PRIOR ART**

In order for someone to be entitled to a patent, the invention must actually be "new" and not obvious over what came before, which is referred to as the prior art. Prior art is considered in determining whether the Asserted Claims are anticipated or obvious. Prior art may include items that were publicly known or that have been used or offered for sale, or references, such as publications or patents, that disclose the claimed invention or elements of the claimed invention.

Google asserts the following prior art against the '327 Patent:

- U.S. Patent Application No. 2004/0117330 ("Ehlers '330).

Google asserts the following prior art against the '382 Patent:

- U.S. Patent Application Publication No. 2009/0302994 ("Rhee").

25

**JURY INSTRUCTION NO. 36: ANTICIPATION**

In order for someone to be entitled to a patent, the invention must actually be "new." Google contends that the Asserted Claims of the '327 and '382 patents are not new and are invalid because the claimed invention(s) is anticipated. Google must convince you of this by clear and convincing evidence, i.e., that the evidence highly probably demonstrates that the claims are invalid.

Specifically, Google contends that U.S. Patent Application No. 2004/0117330 ("Ehlers '330) anticipates the Asserted Claim of the '327 Patent.

Google also contends that U.S. Patent Application Publication No. 2009/0302994 ("Rhee") anticipates certain of the Asserted Claims of the '382 Patent.

Anticipation must be determined on a claim-by-claim basis. Google must prove by clear and convincing evidence that all of the requirements of a claim are present in a single piece of prior art. To anticipate the invention, the prior art does not have to use the same words as the claim, but all of the requirements of the claim must have been disclosed and arranged as in the claim. The claim requirements may either be disclosed expressly or inherently—that is, necessarily implied—such that a person having ordinary skill in the art in the technology of the invention, looking at that one reference, could make and use the claimed invention.

Where Google is relying on prior art that was not considered by the PTO during examination, you may consider whether that prior art is significantly different and more relevant than the prior art that the PTO did consider. If you decide it is different and more relevant, you may weigh that prior art more heavily when considering whether the challenger has carried its clear-and-convincing burden of proving invalidity.

If a dependent claim is anticipated by the prior art, then the claims from which it depends are necessarily anticipated as well.

26

Appx28

**JURY INSTRUCTION NO. 37: OBVIOUSNESS**

Even though an invention may not have been identically disclosed or described before it was made by an inventor, in order to be patentable, the invention must not have been obvious to a person of ordinary skill in the field of technology of the patent at the time the invention was made.

Even if a patent claim is not anticipated, Google may establish that the claim is invalid by proving that the claimed invention would have been obvious to persons having ordinary skill in the art in the field of the invention at the time the invention was made.

Google bears the burden of establishing obviousness by clear and convincing evidence. Specifically, Google contends that U.S. Patent Application No. 2004/0117330 ("Ehlers '330) renders obvious the Asserted Claim of the '327 Patent.

In determining whether a claimed invention is obvious, you must consider:

1. the level of ordinary skill in the field of the invention that someone would have had at the time the invention was made;

2. the scope and content of the prior art;

3. any differences between the prior art and the claimed invention; and,

4. and, if present, so-called objective evidence or secondary considerations, which I will describe shortly.

Do not use hindsight; consider only what was known at the time of the invention.

Keep in mind that the existence of each and every element of the claimed invention in the prior art does not necessarily prove obviousness. Most, if not all, inventions rely on building blocks of prior art.

In considering whether a claimed invention is obvious, you should consider whether, at the time of the claimed invention, there was a reason that would have prompted a person having ordinary skill in the field of the invention to combine the known elements in the prior art in the way the claimed invention does, taking into account such factors as:

1. whether the claimed invention was merely the predictable result of using prior art elements according to their known function(s);

2. whether the claimed invention provides an obvious solution to a known problem in the relevant field;

27

Appx29

3. whether the prior art teaches or suggests the desirability of combining elements claimed in the invention;

4. whether the prior art teaches away from combining elements in the claimed invention;

5. whether it would have been obvious to try the combinations of elements, such as when there is a design incentive or market pressure to solve a problem and there are a finite number of identified, predictable solutions.

To find that prior art rendered the claimed invention obvious, you must find that the prior art provided a reasonable expectation of success. Obvious to try is not sufficient in unpredictable technologies.

In determining whether the claimed invention is obvious, you should take into account any objective evidence (sometimes called "secondary considerations") that may shed light on whether or not the claimed invention is obvious, such as:

(1)   Whether the claimed invention was commercially successful as a result of the merits of the claimed invention (rather than the result of design needs or market- pressure advertising or similar activities);

(2)   Whether the claimed invention satisfied a long-felt need;

(3)   Whether others had tried and failed to make the claimed invention;

(4)   Whether others invented the claimed invention at roughly the same time;

(5)   Whether others copied the claimed invention;

(6)   Whether there were changes or related technologies or market needs contemporaneous with the claimed invention;

(7)   Whether the claimed invention achieved unexpected results;

(8)   Whether others in the field praised the claimed invention;

(9)   Whether persons having ordinary skill in the art of the invention expressed surpriseor disbelief regarding the claimed invention;

(10)  Whether others sought or obtained rights to the patent from the patent holder; and

(11)  Whether the inventor proceeded contrary to accepted wisdom in the field.

In determining whether the claimed invention was obvious, consider each claim separately, but understand that if a dependent claim is obvious, then the claims from which it depends are necessarily obvious as well.

Appx31

**JURY INSTRUCTION NO. 38:  LEVEL OF ORDINARY SKILL**

In deciding what the level of ordinary skill in the field of invention is, you should consider all the evidence introduced at trial, including but not limited to: (1) the levels of education and experience of the inventor and other persons actively working in the field; (2) the types of problems encountered in the field; (3) prior art solutions to those problems; (4) the rapidity with which innovations are made; and (5) the sophistication of the technology.

30

Appx32

**JURY INSTRUCTION NO. 39:  PATENT ELIGIBILITY**

Google contends that the Asserted Patents are invalid for failure to claim patent-eligible subject matter. To succeed on its claim for invalidity for failure to claim patent-eligible subject matter, Google must show by clear and convincing evidence that the elements of the asserted claims, when taken individually and when taken as an ordered combination, involve only technology which a person of ordinary skill in the art would have considered to be well-understood, routine, and conventional as of the date of invention. In determining whether a patent claim involves well-understood, routine, and conventional technology to a person of ordinary skill in the art, you may consider statements made in the patent's specification, as well as evidence of the prior art.

Whether a particular technology was well-understood, routine, and conventional goes beyond what was known in the prior art.  The mere fact that something is disclosed in a piece of prior art does not mean that it was well-understood, routine, and conventional.  At the same time, the specification of the asserted patent may be such evidence, if you find that the specification shows that the elements of the asserted claims involve only technology which a person of ordinary skill in the art would have considered as well-understood, routine, and conventional.

**JURY INSTRUCTION NO. 40:  DAMAGES—INTRODUCTION**

I will now instruct you about the measure of damages.  By instructing you on damages, I am not suggesting which party should win this case, on any issue. If you find that Google infringed any Asserted Claim of the Asserted Patents, and you do not find that that same claim is invalid, you must then consider what amount of damages to award to EcoFactor. If you find that Google has not infringed any valid claim of any patent, then EcoFactor is not entitled to any damages.

If you award damages, they must be adequate to compensate EcoFactor for any infringement you find.  They are not meant to punish an infringer.  Your damages award, if you reach this issue, should put EcoFactor in approximately the same financial position that it would have been in had the infringement not occurred.

EcoFactor has the burden to establish the amount of its damages by a preponderance of the evidence.  In other words, you should award only those damages that EcoFactor establishes that it more likely than not has suffered.  While EcoFactor is not required to prove the amount of its damages with mathematical precision, it must prove them with reasonable certainty.  You may not award damages that are speculative, damages that are only possible, or damages that are based on guesswork.

In this case, EcoFactor seeks a reasonable royalty.  A reasonable royalty is defined as the money amount EcoFactor and Google would have agreed upon as a fee for use of the invention at the time just prior to when infringement began. You must be careful to ensure that award is no more and no less than the value of the patented invention.

I will give more detailed instructions regarding damages shortly. Note, however, that EcoFactor is entitled to recover no less than a reasonable royalty for each act of infringement.

The court expresses no opinion on whether EcoFactor is entitled or not entitled to any damages.

**JURY INSTRUCTION NO. 41: REASONABLE ROYALTY—DEFINITION**

A royalty is a payment made to a patent holder in exchange for the right to make, use, or sell the claimed invention.

A reasonable royalty is the amount of royalty payment that a patent holder and the alleged infringer would have agreed to in a hypothetical negotiation taking place at a time prior to when the infringement first began.

In considering this hypothetical negotiation, you should focus on what the expectations of the patent holder and the alleged infringer would have been had they entered into an agreement at that time, and had they acted reasonably in their negotiations. In determining this, you must assume that both parties believed the patent was valid and infringed and that both parties were willing to enter into an agreement. The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation, and not simply a royalty either party would have preferred. Evidence of things that happened after the infringement first began can be considered in evaluating the reasonable royalty only to the extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation just prior to the first infringement.

33

## JURY INSTRUCTION NO. 42: REASONABLE ROYALTY—RELEVANT FACTORS

In determining the reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began. Some of the kinds of factors that you may consider in making your determination are:

(1) The value that the claimed invention contributes to the accused product.

(2) The value that factors other than the claimed invention contribute to the accused product.

(3) Comparable license agreements or other transactions, such as those covering the use of the claimed invention or similar technology.

No one factor is dispositive and you can and should consider the evidence that has been presented to you in this case on each of these factors. You may also consider any other factors which in your mind would have increased or decreased the royalty the alleged infringer would have been willing to pay and the patent holder would have been willing to accept, acting as normally prudent business people.

The so-called "*Georgia-Pacific*" factors, which can be considered to inform the hypothetical negotiation, include the following:

(1) The royalties received by the patentee for the licensing of the patent-in-suit, proving or tending to prove an established royalty

(2) The rates paid by the licensee for the use of other patents comparable to the patent-in- suit.

(3) The nature and scope of the license, as exclusive or nonexclusive, or as restricted or nonrestricted in terms of territory or with respect to whom the manufactured product may be sold.

(4) The licensor's established policy and marketing program to maintain his or her patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

(5) The commercial relationship between the licensor and licensee, such as whether they are competitors in the same territory in the same line of business, or whether they are inventor and promoter.

(6) The effect of selling the patented specialty in promoting sales of other products of the licensee, the existing value of the invention to the licensor as a generator of

34

Appx36

sales of his nonpatented items, and the extent of such derivative or convoyed sales.

(7)     The duration of the patent and the term of the license.

(8)     The established profitability of the product made under the patents, its commercial success, and its current popularity.

(9)     The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results.

(10)    The nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor, and the benefits to those who have used the invention.

(11)    The extent to which the infringer has made use of the invention and any evidence probative of the value of that use.

(12)    The portion of the profit or of the selling price that may be customary in the particular business or in comparable business to allow for the use of the invention or analogous inventions.

(13)    The portion of the realizable profits that should be credited to the invention as distinguished from nonpatented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

(14)    The opinion and testimony of qualified experts.

(15)    The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

**JURY INSTRUCTION NO. 43:  DAMAGES – COMPARABLE AGREEMENTS**

Comparable license agreements are one factor that may inform your decision as to the proper amount and form of the reasonable royalty award, similar to the way in which the value of a house is determined relative to comparable houses sold in the same neighborhood.

Whether a license agreement is comparable to the license under the hypothetical license scenario depends on many factors, such as whether they involve comparable technologies, comparable economic circumstances, comparable structure, and comparable scope.  If there are differences between a license agreement and the hypothetical license, you must take those into account when you make your reasonable royalty determination.

The hypothetical license is deemed to be a voluntary agreement.  When determining if a license agreement is comparable to the hypothetical license, you may consider whether the license agreement is between parties to a lawsuit and whether the license agreement was a settlement influenced by a desire to avoid further litigation.

36

Appx38

**JURY INSTRUCTION NO. 44:  DAMAGES – LUMP SUM VS. RUNNING ROYALTY**

A reasonable royalty can be paid either in the form of a one-time lump sum payment or as a "running royalty." Either method is designed to compensate the patent holder based on the infringer's use of the patented technology. It is up to you, based on the evidence, to decide what type of royalty, if any, is appropriate in this case.

Reasonable royalty awards may take the form of a lump sum payment. A lump sum payment is equal to an amount that the alleged infringer would have paid at the time of a hypothetical negotiation for a license covering all sales of the licensed product, both past and future. When a lump sum is paid, the infringer pays a single price for a license covering both past and future infringing sales.

Reasonable royalty awards may also take the form of a running royalty based on the volume of sales of licensed products. A running royalty can be calculated, for example, by multiplying a royalty base by a royalty rate, or by multiplying the number of infringing products or product units sold by a royalty amount per unit.

37

Appx39

**JURY INSTRUCTION NO. 45:  DAMAGES - APPORTIONMENT**

Any amount you find as of damages must be based on the value attributable to the patented invention, as distinct from unpatented features of the accused product or other factors such as marketing or advertising, or Google's size or market position.  A royalty compensating EcoFactor for damages must reflect the value attributable to the infringing features of the product, and no more.  The process of separating the value of the allegedly infringing features from the value of all other features and aspects of the product is called apportionment.

Apportionment can be addressed in a variety of ways, including by careful selection of the royalty base to reflect the value added by the patented feature or by adjustment of the royalty rate so as to discount the value of a product's non-patented features; or by a combination thereof.

When the accused infringing products have both patented and unpatented features, your award must be apportioned so that it is based only on the value of the patented features, and no more.

38

Appx40

**JURY INSTRUCTION NO. 46: DATE OF COMMENCEMENT OF DAMAGES—PRODUCTS**

In determining the amount of damages, you must consider when any alleged damages began. Here, the Parties agree that date is January 31, 2020.

39

Appx41

**JURY INSTRUCTION NO. 47: DUTY TO DELIBERATE**

It is now your duty to deliberate and to consult with one another in an effort to reach a verdict. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors. During your deliberations, do not hesitate to reexamine your own opinions and change your mind if you are convinced that you were wrong. But do not give up on your honest beliefs because the other jurors think differently, or just to finish the case.

Remember at all times, you are the judges of the facts. You have been allowed to take notes during this trial. Any notes that you took during this trial are only aids to memory. If your memory differs from your notes, you should rely on your memory and not on the notes. The notes are not evidence. If you did not take notes, rely on your independent recollection of the evidence and do not be unduly influenced by the notes of other jurors. Notes are not entitled to greater weight than the recollection or impression of each juror about the testimony.

When you go into the jury room to deliberate, you may take with you a copy of this charge, the exhibits that I have admitted into evidence, and your notes. You must select a jury foreperson to guide you in your deliberations and to speak for you here in the courtroom.

Your verdict must be unanimous. After you have reached a unanimous verdict, your jury foreperson must fill out the answers to the written questions on the verdict form and sign and date it. Answer each question in the verdict form from the facts as you find them. Do not decide who you think should win and then answer the questions to reach that result. After you have concluded your service and I have discharged the jury, you are not required to talk with anyone about the case.

If you need to communicate with me during your deliberations, the jury foreperson should write the inquiry and give it to the court security officer. After consulting with the attorneys, I will respond either in writing or by meeting with you in the courtroom. Keep in mind, however, that you must never disclose to anyone, not even to me, your numerical division on any question.

40

Appx42

Appx43

## JURY INSTRUCTION NO. 48:  SOCIAL MEDIA INSTRUCTION

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case.  You may not use any electronic device or media, such as the telephone, a cell phone, smartphone, tablet or computer, the Internet, any Internet service, any text or instant messaging service, any Internet chat room, blog or website such as Facebook, LinkedIn, YouTube, Snapchat, Instagram, WhatsApp or Twitter or any other way to communicate.  You may not communicate to anyone any information about this case or to conduct any research about this case until this case is over and I accept your verdict.

In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case.  You can only discuss the case in the jury room with your fellow jurors during deliberations.

You may now proceed to the jury room to begin your deliberations.

41

Appx43

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

**FILED**

February 10, 2022

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____Jennifer Clark_____

DEPUTY

ECOFACTOR, INC.

Plaintiff,

v.

GOOGLE LLC,

Defendant.

Case No. 6:20-cv-00075-ADA

## VERDICT FORM

When answering the following questions and filling out this Verdict Form, you are to follow the instructions I have given you in the Court's Jury Instructions charge and follow the directions provided throughout this form. Your answers to each question must be unanimous. Some of the questions contain legal terms that are defined and explained in detail in the Jury Instructions. Please refer to the Jury Instructions if you are unsure about the meaning or usage of any legal term that appears in the questions below.

As used herein, the following terms have the following meanings:

- "EcoFactor" refers to EcoFactor, Inc.
- "Google" refers to Google LLC.
- The "'327 Patent" refers to U.S. Patent No. 8,738,327.
- The "'382 Patent" refers to U.S. Patent No. 10,534,382.

We, the jury, unanimously agree to the answers to the following questions and return them as our verdict in this case:

1

Appx44

**Begin by first answering Question No. 1.**

**QUESTION NO. 1:**

Did EcoFactor, Inc. ("EcoFactor") prove, by a preponderance of the evidence, that Google LLC ("Google") infringed one or more of the following claims of the Asserted Patents?

*Check "Yes" or "No" for each Asserted Claim of each Asserted Patent.*

*"Yes" is a finding for **EcoFactor**. "No" is a finding for **Google**.*

| '327 Patent | | | | |
|-------------|-----|-----|-----|-----|
| Claim 5 | YES | ✓ | NO | |
| '382 Patent | | | | |
| Claim 2 | YES | | NO | ✓ |
| Claim 12 | YES | | NO | ✓ |

**If you answered "No" to all parts of Question No. 1, then skip the remaining Question Nos. 2-5 and proceed to the Final Page of the Verdict Form and follow the instructions given there.**

**If you answered "Yes" to any part of Question No. 1, please proceed to Question Nos. 2 and 3.**

2

**QUESTION NO. 2:**

Did Google prove by clear and convincing evidence that the following Asserted Claims are invalid?

"Yes" is in favor of Google, and "No" is in favor of EcoFactor.

Check either "Yes" or "No" for each Asserted Claim for which you answered "Yes" in Question 1:

Claim 5 of the '327 Patent        Yes: _____        No: __✓_____

Claim 2 of the '382 Patent        Yes: _____        No: __✓_____

Claim 12 of the '382 Patent       Yes: _____        No: __✓_____

3

Appx46

**QUESTION NO. 3:**

Did Google prove by clear and convincing evidence that the elements of the Asserted Claims, when taken individually and when taken as an ordered combination, involve only activities or technology which a person of ordinary skill in the art would have considered to be well-understood, routine, and conventional as of the priority date of the invention?

"Yes" is in favor of Google, and "No" is in favor of EcoFactor.

Check "Yes" or "No" for each Asserted Claim for which you answered "Yes" in Question 1.

| '327 Patent | | | | |
|---|---|---|---|---|
| Claim 5 | YES | _____ | NO | ✓ |
| '382 Patent | | | | |
| Claim 2 | YES | _____ | NO | ✓ |
| Claim 12 | YES | _____ | NO | ✓ |

4

Appx47

If you have reached this point in the verdict form, you should have answered Question Nos. 1-3. If you have not answered Questions Nos. 1-3 please go back and answer them before proceeding.

If you answered "No" to all parts of Question 1, then skip Question No. 4-5. Proceed to the Final Page of the Verdict Form and follow the instructions given there.

If you answered "Yes" to all parts of Question 2, then skip Question No. 4-5. Proceed to the Final Page of the Verdict Form and follow the instructions given there.

You should only answer Question Nos. 4-5 if you answered "YES" in Question No. 1 for at least one claim that you also answered "NO" to in Question No. 2. In other words, answer Question Nos. 4-5 only if at least one claim is infringed (Question No. 1) and is not invalid (Question No. 2).

Otherwise, proceed to the Final Page of the Verdict Form and follow the instructions given there.

5

## QUESTION NO. 4:

What sum of money, if paid now in cash, has EcoFactor proven by a preponderance of the evidence would compensate EcoFactor for its damages resulting from Google's infringement?

Amount: _$20,019,300.00_

Appx49

**QUESTION NO. 5:**

Is the amount you found in Question No. 4 meant to compensate only for infringement through the date of trial (a running royalty), or include all future infringing sales through the expiration of the patent(s) (a lump sum)?

        **Check one of the following:**

                        1) Amount based on running royalty for damages through trial _____

                        **- OR -**

                        2) Amount based on lump sum for all damages, including future infringing sales __✓__

7

Appx50

## FINAL PAGE OF JURY VERDICT FORM

You have now reached the end of the Verdict Form and should review it to ensure it accurately reflects your unanimous determinations. After you are satisfied that your unanimous answers are correctly reflected above, your Jury Foreperson should then sign and date this Verdict Form in the spaces below. Once this is done, notify the Court Security Officer that you have reached a verdict. The jury foreperson should retain possession of the verdict form and bring it when the jury is brought back into the courtroom.

I certify that the jury unanimously concurs in every element of the above verdict.

SIGNED this _10_ day of February, 2022.

JURY FOREPERSON

8

Appx51



US008180492B2

(12) **United States Patent**
Steinberg

(10) **Patent No.:** **US 8,180,492 B2**
(45) **Date of Patent:** **May 15, 2012**

(54) **SYSTEM AND METHOD FOR USING A NETWORKED ELECTRONIC DEVICE AS AN OCCUPANCY SENSOR FOR AN ENERGY MANAGEMENT SYSTEM**

(75) Inventor: **John Douglas Steinberg**, Millbrae, CA (US)

(73) Assignee: **EcoFactor, Inc.**, Millbrae, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **12/502,064**

(22) Filed: **Jul. 13, 2009**

(65) **Prior Publication Data**

US 2010/0280667 A1      Nov. 4, 2010

**Related U.S. Application Data**

(60) Provisional application No. 61/134,714, filed on Jul. 14, 2008.

(51) **Int. Cl.**
*G05B 15/00* (2006.01)
*G05D 23/00* (2006.01)

(52) **U.S. Cl.** ........................ **700/276**; 700/299; 236/46 R

(58) **Field of Classification Search** .................. 700/276, 700/278, 295, 296; 62/176.6; 236/46 R
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,136,732 A | 1/1979 | Demaray et al. | |
| 4,341,345 A | 7/1982 | Hammer et al. | |
| 4,403,644 A | 9/1983 | Hebert | |
| 4,655,279 A | 4/1987 | Harmon | |
| 4,674,027 A | 6/1987 | Beckey | |
| 5,244,146 A | 9/1993 | Jefferson et al. | |

| | | | | |
|---|---|---|---|---|
| 5,261,481 A | * | 11/1993 | Baldwin et al. | ............... 165/237 |
| 5,270,952 A | | 12/1993 | Adams et al. | |
| 5,314,004 A | | 5/1994 | Strand et al. | |
| 5,462,225 A | | 10/1995 | Massara et al. | |
| 5,544,036 A | | 8/1996 | Brown et al. | |
| 5,555,927 A | | 9/1996 | Shah | |
| 5,572,438 A | | 11/1996 | Ehlers et al. | |
| 5,682,949 A | * | 11/1997 | Ratcliffe et al. | .............. 165/209 |
| 5,717,609 A | | 2/1998 | Packa et al. | |
| 5,761,083 A | * | 6/1998 | Brown et al. | ................. 700/296 |
| 5,818,347 A | | 10/1998 | Dolan et al. | |
| 5,977,964 A | * | 11/1999 | Williams et al. | .............. 715/721 |
| 6,145,751 A | | 11/2000 | Ahmed | |
| 6,178,362 B1 | | 1/2001 | Woolard et al. | |
| 6,260,765 B1 | | 7/2001 | Natale et al. | |

(Continued)

OTHER PUBLICATIONS

Wang, D.; Arens, E.; Federspiel, C., Opportunities to Save Energy and Improve Comfort by Using Wireless Sensor Networks in Buildings. Energy Systems Laboratory (http://esl.tamu.edu), 2003 [Retrieved Sep. 1, 2011] Downloaded from http://repository.tamu.edu//handle/1969.1/5210].*

(Continued)

*Primary Examiner* — Dave Robertson

(74) *Attorney, Agent, or Firm* — Knobbe, Martens, Olson & Bear, LLP

(57) **ABSTRACT**

The invention comprises systems and methods for detecting the use of networked consumer electronics devices as indications of occupancy of a structure for purposes of automatically adjusting the temperature setpoint on a thermostatic HVAC control. At least one thermostat is located inside a structure and is used to control an HVAC system in the structure. At least one networked electronic device is used to indicate the state of occupancy of the structure. The state of occupancy is used to alter the setpoint on the thermostatic HVAC control to reduce unneeded conditioning of unoccupied spaces.

**18 Claims, 8 Drawing Sheets**



US 8,180,492 B2

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,351,693 B1 | 2/2002 | Monie | |
| 6,400,996 B1 | 6/2002 | Hoffberg et al. | |
| 6,437,692 B1 | 8/2002 | Petite et al. | |
| 6,478,233 B1 | 11/2002 | Shah | |
| 6,480,803 B1 | 11/2002 | Pierret et al. | |
| 6,483,906 B1 | 11/2002 | Iggulden et al. | |
| 6,536,675 B1 | 3/2003 | Pesko et al. | |
| 6,542,076 B1 | 4/2003 | Joao | |
| 6,549,130 B1 | 4/2003 | Joao | |
| 6,574,537 B2 | 6/2003 | Kipersztok et al. | |
| 6,580,950 B1 | 6/2003 | Johnson | |
| 6,594,825 B1 | 7/2003 | Goldschmidlki et al. | |
| 6,595,430 B1 | 7/2003 | Shah | |
| 6,598,056 B1 | 7/2003 | Hull et al. | |
| 6,619,555 B2 | 9/2003 | Rosen | |
| 6,622,097 B2 | 9/2003 | Hunter | |
| 6,622,115 B1 | 9/2003 | Brown et al. | |
| 6,622,925 B2 | 9/2003 | Carner et al. | |
| 6,622,926 B1 | 9/2003 | Sartain et al. | |
| 6,628,997 B1 | 9/2003 | Fox et al. | |
| 6,633,823 B2 | 10/2003 | Bartone et al. | |
| 6,643,567 B2 | 11/2003 | Kolk et al. | |
| 6,671,586 B2 | 12/2003 | Davis et al. | |
| 6,695,218 B2 | 2/2004 | Fleckenstein | |
| 6,726,113 B2 | 4/2004 | Guo | |
| 6,731,992 B1 | 5/2004 | Ziegler | |
| 6,734,806 B1 | 5/2004 | Cratsley | |
| 6,772,052 B1 | 8/2004 | Amundsen | |
| 6,785,592 B1 | 8/2004 | Smith | |
| 6,785,630 B2 | 8/2004 | Kolk | |
| 6,789,739 B2 | 9/2004 | Rosen | |
| 6,853,959 B2 | 2/2005 | Ikeda et al. | |
| 6,868,293 B1 | 3/2005 | Schurr | |
| 6,868,319 B2 | 3/2005 | Kipersztok et al. | |
| 6,882,712 B1 | 4/2005 | Iggulden et al. | |
| 6,889,908 B2 | 5/2005 | Crippen et al. | |
| 6,891,838 B1 | 5/2005 | Petite et al. | |
| 6,912,429 B1 * | 6/2005 | Bilger | 700/19 |
| 6,991,029 B1 | 1/2006 | Orfield et al. | |
| 7,009,493 B2 | 3/2006 | Howard | |
| 7,031,880 B1 | 4/2006 | Seem et al. | |
| 7,039,532 B2 | 5/2006 | Hunter | |
| 7,055,759 B2 * | 6/2006 | Wacker et al. | 236/51 |
| 7,061,393 B2 * | 6/2006 | Buckingham et al. | 340/693.3 |
| 7,089,088 B2 | 8/2006 | Terry et al. | |
| 7,130,719 B2 | 10/2006 | Ehlers et al. | |
| 7,130,832 B2 | 10/2006 | Bannai et al. | |
| H2176 H * | 12/2006 | Meyer et al. | 236/51 |
| 7,167,079 B2 | 1/2007 | Smyth et al. | |
| 7,187,986 B2 | 3/2007 | Johnson et al. | |
| 7,205,892 B2 | 4/2007 | Luebke et al. | |
| 7,215,746 B2 | 5/2007 | Iggulden et al. | |
| 7,216,015 B2 | 5/2007 | Poth | |
| 7,231,424 B2 | 6/2007 | Bodin et al. | |
| 7,232,075 B1 | 6/2007 | Rosen | |
| 7,242,988 B1 * | 7/2007 | Hoffberg et al. | 700/28 |
| 7,260,823 B2 * | 8/2007 | Schlack et al. | 725/9 |
| 7,354,005 B2 * | 4/2008 | Carey et al. | 236/46 R |
| 7,356,384 B2 | 4/2008 | Gull et al. | |
| 7,483,964 B1 * | 1/2009 | Jackson et al. | 709/221 |
| 7,565,225 B2 * | 7/2009 | Dushane et al. | 700/276 |
| 7,644,869 B2 | 1/2010 | Hoglund et al. | |
| 7,784,704 B2 | 8/2010 | Harter | |
| 7,802,618 B2 * | 9/2010 | Simon et al. | 165/254 |
| 7,848,900 B2 | 12/2010 | Steinberg et al. | |
| 7,894,943 B2 | 2/2011 | Sloup et al. | |
| 2003/0040934 A1 | 2/2003 | Skidmore et al. | |
| 2005/0222889 A1 | 10/2005 | Lai et al. | |
| 2005/0288822 A1 | 12/2005 | Rayburn | |

| | | | |
|---|---|---|---|
| 2006/0045105 A1 * | 3/2006 | Dobosz et al. | 370/401 |
| 2007/0043477 A1 | 2/2007 | Elhers et al. | |
| 2007/0045431 A1 * | 3/2007 | Chapman et al. | 236/46 C |
| 2007/0146126 A1 * | 6/2007 | Wang | 340/517 |
| 2008/0083234 A1 | 4/2008 | Krebs et al. | |
| 2008/0281472 A1 * | 11/2008 | Podgorny et al. | 700/276 |
| 2008/0283621 A1 * | 11/2008 | Quirino et al. | 236/1 C |
| 2009/0052859 A1 * | 2/2009 | Greenberger et al. | 386/46 |
| 2009/0099699 A1 | 4/2009 | Steinberg et al. | |
| 2009/0125151 A1 | 5/2009 | Steinberg et al. | |
| 2009/0240381 A1 | 9/2009 | Lane | |
| 2009/0281667 A1 | 11/2009 | Masui et al. | |
| 2010/0019051 A1 * | 1/2010 | Rosen | 236/46 R |
| 2010/0019052 A1 | 1/2010 | Yip | |
| 2010/0070086 A1 | 3/2010 | Harrod et al. | |
| 2010/0070089 A1 | 3/2010 | Harrod et al. | |
| 2010/0070093 A1 | 3/2010 | Harrod et al. | |
| 2010/0156608 A1 * | 6/2010 | Bae et al. | 340/10.5 |
| 2010/0162285 A1 * | 6/2010 | Cohen et al. | 725/12 |
| 2010/0211224 A1 | 8/2010 | Keeling et al. | |
| 2010/0235004 A1 | 9/2010 | Thind | |
| 2010/0289643 A1 | 11/2010 | Trundle et al. | |
| 2011/0031323 A1 | 2/2011 | Nold et al. | |

## OTHER PUBLICATIONS

Johnson Controls T600HCx-3 Single-Stage Thermostats Installation Instructions T600HCN-3, T600HCP-3 Part No. 24-9890-560, Rev.—Issued Sep. 20, 2006.*

Emerson Climate Technologies. Network Thermostat for E2 Building Controller Installation and Operation Manual. 026-1721 Rev 0 Oct. 30, 2007.*

Honeywell Programmable Thermostat Owner's Guide, www.honeywell.com/yourhome.

Honeywell Programmable Thermostat Owner's Guide, www.honeywell.com/yourhome, 2004.

Honeywell, W7600/W7620 Controller Reference Manual, HW0021207, Oct. 1992.

Arnes, Federspeil, Wang, Huizenga, How Ambient Intelligence Will Improve Habitability and Energy Efficiency in Buildings, 2005, research paper,, Center for the Built Environment. Controls and Information Technology.

Comverge SuperStat Flyer.

Control4 Wireless Thermostat Brochure.

Cooper Power Systems Web Page.

Enernoc Web Page.

Enerwise Website.

Johnson Contorls, Touch4 building automation system brochure, 2007.

Kilicotte, Piette, Watson, , Dynamic Controls for Energy Efficiency and Demand Response: Framework Concepts and a New Construction Study Case in New York, Proceedings of the 2006 ACEEE Summer Study of Energy Efficiency in Buildings, Pacific Grove, CA,, Aug. 13-18, 2006.

Lin, Auslander and Federspeil, "Multi-Sensor Single-Actuator Control of HVAC Systems", 2002.

Pier, Southern California Edision,, Deman Responsive Control of Air Conditioning via Programmable Communicating Thermostats Draft Report.

Proliphix Thermostat Brochure.

Wang, Arens, Federspeil, "Opportunities to Save Energy and Improve Comfort by Using Wireless Sensor networks in Buildings," (2003), Center for Environmental Design Research.

Wetter, Wright, A comparision of deterministic and probabilistic optimization algorithms for nonsmooth simulation-based optimization., Building and Environment 39, 2004, pp. 989-999.

* cited by examiner



FIG. 1





FIGURE 3



Figure 4

FIGURE 5





Fig 6

Case: 23-1101    Document: 15    Page: 95    Filed: 05/09/2023

Fig 7



Fig 8



US 8,180,492 B2

**1**

# SYSTEM AND METHOD FOR USING A NETWORKED ELECTRONIC DEVICE AS AN OCCUPANCY SENSOR FOR AN ENERGY MANAGEMENT SYSTEM

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims priority to U.S. Provisional Application No. 61/134,714, filed Jul. 14, 2008, the entirety of which is incorporated herein by reference and is to be considered part of this specification.

## BACKGROUND OF THE INVENTION

### Field of the Invention

This invention relates to the use of thermostatic HVAC and other energy management controls that are connected to a computer network. More specifically, the present invention pertains to the use of user interactions with an interface such as a personal computer or an Internet-enabled television as signal related to occupancy to inform an energy management system.

Heating and cooling systems for buildings (heating, ventilation and cooling, or HVAC systems) have been controlled for decades by thermostats. At the most basic level, a thermostat includes a means to allow a user to set a desired temperature, a means to sense actual temperature, and a means to signal the heating and/or cooling devices to turn on or off in order to try to change the actual temperature to equal the desired temperature. The most basic versions of thermostats use components such as a coiled bi-metallic spring to measure actual temperature and a mercury switch that opens or completes a circuit when the spring coils or uncoils with temperature changes. More recently, electronic digital thermostats have become prevalent. These thermostats use solid-state devices such as thermistors or thermal diodes to measure temperature, and microprocessor-based circuitry to control the switch and to store and operate based upon user-determined protocols for temperature vs. time.

These programmable thermostats generally offer a very restrictive user interface, limited by the cost of the devices, the limited real estate of the small wall-mounted boxes, and the inability to take into account more than two variables: the desired temperature set by the user, and the ambient temperature sensed by the thermostat. Users can generally only set one series of commands per day, and in order to change one parameter (e.g., to change the late-night temperature) the user often has to cycle through several other parameters by repeatedly pressing one or two buttons.

Because the interface of programmable thermostats is so poor, the significant theoretical savings that are possible with them (sometimes cited as 25% of heating and cooling costs) are rarely realized. In practice, studies have found that more than 50% of users never program their thermostats at all. Significant percentages of the thermostats that are programmed are programmed sub-optimally, in part because, once programmed, people tend to not to re-invest the time needed to change the settings very often.

A second problem with standard programmable thermostats is that they represent only a small evolutionary step beyond the first, purely mechanical thermostats. Like the first thermostats, they only have two input signals—ambient temperature and the preset desired temperature. The entire advance with programmable thermostats is that they can shift

**2**

between multiple present temperatures at different times without real-time involvement of a human being.

Because most thermostats control HVAC systems that do not offer infinitely variable output, traditional thermostats are designed to permit the temperature as seen by the thermostat to vary above and below the setpoint to prevent the HVAC system from constantly and rapidly cycling on and off, which is inefficient and harmful to the HVAC system. The temperature range in which the thermostat allows the controlled environment to drift is known as both the dead zone and, more formally, the hysteresis zone. The hysteresis zone is frequently set at +/−1 degree Fahrenheit. Thus if the setpoint is 68 degrees, in the heating context the thermostat will allow the inside temperature to fall to 67 degrees before turning the heating system on, and will allow it to rise to 69 degrees before turning it off again.

As energy prices rise, more attention is being paid to ways of reducing energy consumption. Because energy consumption is directly proportional to setpoint—that is, the further a given setpoint diverges from the balance point (the inside temperature assuming no HVAC activity) in a given house under given conditions, the higher energy consumption will be to maintain temperature at that setpoint), energy will be saved by virtually any strategy that over a given time frame lowers the average heating setpoint or raises the cooling setpoint. Conventional programmable thermostats allow homeowners to save money and energy by pre-programming setpoint changes based upon comfort or schedule. For example, in the summer, allowing the setpoint to rise by several degrees (or even shutting off the air conditioner) when the home is unoccupied will generally save significantly on energy. But such thermostats have proven to be only minimally effective in practice. Because they have such primitive user interfaces, they are difficult to program, and so many users never bother at all, or set them up once and do not alter the programming even if their schedules change.

In the hotel industry, the heating and cooling decisions made in hundred or even thousands of individual rooms with independently controlled HVAC systems are aggregated into a single energy bill, so hotel owners and managers are sensitive to energy consumption by those systems. Hotel guests often turn the air conditioner to a low temperature setting and then leave the room for hours at a time, thereby wasting considerable energy. An approach commonly used outside of the United States to combat this problem is to use a keycard to control the HVAC system, such that guests place the keycard into a slot mounted on the wall near the door of the room which then triggers the lights and HVAC system to power up, and turn them off when the guest removes the card upon leaving the room. However, because most hotels give each guest two cards, it is easy to simply leave the extra card in the slot, thus defeating the purpose of the system. Recently, systems have been introduced in which a motion sensor is connected to the control circuitry for the HVAC system. If no motion is detected in the room for some predetermined interval, the system concludes that the room is unoccupied, and turns off or alters the setpoint of the HVAC system to a more economical level. When the motion sensor detects motion (which is assumed to coincide with the return of the guest), the HVAC system resets to the guest's chosen setting.

Adding occupancy detection capability to residential HVAC systems could also add considerable value in the form of energy savings without significant tradeoff in terms of comfort. But the systems used in hotels do not easily transfer to the single-family residential context. Hotel rooms tend to be small enough that a single motion sensor is sufficient to determine with a high degree of accuracy whether or not the

US 8,180,492 B2

3

room is occupied. A single motion sensor in the average home today would have limited value because there are likely to be many places one or more people could be home and active yet invisible to the motion sensor. The most economical way to include a motion sensor in a traditional programmable thermostat would be to build it into the thermostat itself. But thermostats are generally located in hallways, and thus are unlikely to be exposed to the areas where people tend to spend their time. Wiring a home with multiple motion sensors in order to maximize the chances of detecting occupants would involve considerable expense, both for the sensors themselves and for the considerable cost of installation, especially in the retrofit market. Yet if control is ceded to a single-sensor system that cannot reliably detect presence, the resulting errors would likely lead the homeowner to reject the system.

It would thus be desirable to provide a system that could detect occupancy without requiring the installation of additional hardware; that could accurately detect occupancy regardless of which room in the house is occupied, and could optimize energy consumption based upon dynamic and individually configurable heuristics.

### SUMMARY OF THE INVENTION

In one embodiment, the invention comprises a thermostat attached to an HVAC system, a local network connecting the thermostat to a larger network such as the Internet, and one or more computers attached to the network, and a server in bi-directional communication with a plurality of such thermostats and computers. The server pairs each thermostat with one or more computers or other consumer electronic devices which are determined to be associated with the home in which the thermostat is located. The server logs the ambient temperature sensed by each thermostat vs. time and the signals sent by the thermostats to their HVAC systems. The server also monitors and logs activity on the computers or other consumer electronic devices associated with each thermostat. Based on the activity patterns evidenced by keystrokes, cursor movement or other inputs, or lack thereof, the server instructs the thermostat to change temperature settings between those optimized for occupied and unoccupied states.

At least one embodiment of the invention comprises the steps of determining whether one or more networked electronic devices inside a structure are in use; determining whether said use of said networked electronic devices indicates occupancy of said structure; and adjusting the temperature setpoint on a thermostatic controller for an HVAC system for said structure based upon whether or not said structure is deemed to be occupied.

At least one embodiment of the invention comprises at least one said thermostat having at least one temperature setting associated with the presence of one or more occupants in said structure, and at least one temperature setting associated with the absence of occupants in said structure; one or more electronic devices having at least a user interface; where said electronic devices and said thermostat are connected to a network; where said setpoint on said thermostat is adjusted between said temperature setting associated with the presence of one or more occupants in said structure and said temperature setting associated with the absence of occupants in said structure based upon the use of said user interface for said electronic device.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** shows an example of an overall environment in which an embodiment of the invention may be used.

4

FIG. **2** shows a high-level illustration of the architecture of a network showing the relationship between the major elements of one embodiment of the subject invention.

FIG. **3** shows an embodiment of the website to be used as part of the subject invention.

FIG. **4** shows a high-level schematic of the thermostat used as part of the subject invention.

FIG. **5** shows one embodiment of the database structure used as part of the subject invention.

FIG. **6** shows the browser as seen on the display of the computer used as part of the subject invention.

FIG. **7** is a flowchart showing the steps involved in the operation of one embodiment of the subject invention.

FIG. **8** is a flowchart that shows how the invention can be used to select different HVAC settings based upon its ability to identify which of multiple potential occupants is using the computer attached to the system.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

FIG. **1** shows an example of an overall environment **100** in which an embodiment of the invention may be used. The environment **100** includes an interactive communication network **102** with computers **104** connected thereto. Also connected to network **102** are one or more server computers **106**, which store information and make the information available to computers **104**. The network **102** allows communication between and among the computers **104** and **106**.

Presently preferred network **102** comprises a collection of interconnected public and/or private networks that are linked to together by a set of standard protocols to form a distributed network. While network **102** is intended to refer to what is now commonly referred to as the Internet, it is also intended to encompass variations which may be made in the future, including changes additions to existing standard protocols.

When a user of the subject invention wishes to access information on network **102**, the buyer initiates connection from his computer **104**. For example, the user invokes a browser, which executes on computer **104**. The browser, in turn, establishes a communication link with network **102**. Once connected to network **102**, the user can direct the browser to access information on server **106**.

One popular part of the Internet is the World Wide Web. The World Wide Web contains a large number of computers **104** and servers **106**, which store HyperText Markup Language (HTML) documents capable of displaying graphical and textual information. HTML is a standard coding convention and set of codes for attaching presentation and linking attributes to informational content within documents.

The servers **106** that provide offerings on the World Wide Web are typically called websites. A website is often defined by an Internet address that has an associated electronic page. Generally, an electronic page is a document that organizes the presentation of text graphical images, audio and video.

In addition to the Internet, the network **102** can comprise a wide variety of interactive communication media. For example, network **102** can include local area networks, interactive television networks, telephone networks, wireless data systems, two-way cable systems, and the like.

In one embodiment, computers **104** and servers **106** are conventional computers that are equipped with communications hardware such as modem or a network interface card. The computers include processors such as those sold by Intel and AMD. Other processors may also be used, including general-purpose processors, multi-chip processors, embedded processors and the like.

US 8,180,492 B2

Computers **104** can also be handheld and wireless devices such as personal digital assistants (PDAs), cellular telephones and other devices capable of accessing the network. Computers **104** can also be microprocessor-controlled home entertainment equipment including advanced televisions, televisions paired with home entertainment/media centers, and wireless remote controls.

Computers **104** may utilize a browser configured to interact with the World Wide Web. Such browsers may include Microsoft Explorer, Mozilla, Firefox, Opera or Safari. They may also include browsers or similar software used on handheld, home entertainment and wireless devices. The storage medium may comprise any method of storing information. It may comprise random access memory (RAM), electronically erasable programmable read only memory (EEPROM), read only memory (ROM), hard disk, floppy disk, CD-ROM, optical memory, or other method of storing data. Computers **104** and **106** may use an operating system such as Microsoft Windows, Apple Mac OS, Linux, Unix or the like. Computers **106** may include a range of devices that provide information, sound, graphics and text, and may use a variety of operating systems and software optimized for distribution of content via networks.

FIG. **2** illustrates in further detail the architecture of the specific components connected to network **102** showing the relationship between the major elements of one embodiment of the subject invention. Attached to the network are thermostats **108** and computers **104** of various users. Connected to thermostats **108** are HVAC units **110**. The HVAC units may be conventional air conditioners, heat pumps, or other devices for transferring heat into or out of a building. Each user is connected to the server **106** via wired or wireless connection such as Ethernet or a wireless protocol such as IEEE 802.11, a gateway **110** that connects the computer and thermostat to the Internet via a broadband connection such as a digital subscriber line (DSL) or other form of broadband connection to the World Wide Web. Server **106** contains the content to be served as web pages and viewed by computers **104**, as well as databases containing information used by the servers.

In the currently preferred embodiment, the website **200** includes a number of components accessible to the user, as shown in FIG. **3**. Those components may include a means to enter temperature settings **202**, a means to enter information about the user's home **204**, a means to enter the user's electricity bills **206**, means to calculate energy savings that could result from various thermostat-setting strategies **208**, and means to enable and choose between various arrangements **210** for demand reduction with their electric utility provider as intermediated by the demand reduction service provider.

FIG. **4** shows a high-level block diagram of thermostat **108** used as part of the subject invention. Thermostat **108** includes temperature sensing means **252**, which may be a thermistor, thermal diode or other means commonly used in the design of electronic thermostats. It includes a microprocessor **254**, memory **256**, a display **258**, a power source **260**, a relay **262**, which turns the HVAC system on an and off in response to a signal from the microprocessor, and contacts by which the relay is connected to the wires that lead to the HVAC system. To allow the thermostat to communicate bi-directionally with the computer network, the thermostat also includes means **264** to connect the thermostat to a local computer or to a wireless network. Such means could be in the form of Ethernet, wireless protocols such as IEEE 802.11, IEEE 802.15.4, Bluetooth, cellular systems such as CDMA, GSM and GPRS, or other wireless protocols. The thermostat **250** may also include controls **266** allowing users to change settings

directly at the thermostat, but such controls are not necessary to allow the thermostat to function.

The data used to generate the content delivered in the form of the website is stored on one or more servers **106** within one or more databases. As shown in FIG. **5**, the overall database structure **300** may include temperature database **400**, thermostat settings database **500**, energy bill database **600**, HVAC hardware database **700**, weather database **800**, user database **900**, transaction database **1000**, product and service database **1100** and such other databases as may be needed to support these and additional features.

The website **200** will allow users of connected thermostats **250** to create personal accounts. Each user's account will store information in database **900**, which tracks various attributes relative to users of the site. Such attributes may include the make and model of the specific HVAC equipment in the user's home; the age and square footage of the home, the solar orientation of the home, the location of the thermostat in the home, the user's preferred temperature settings, whether the user is a participant in a demand reduction program, etc.

As shown in FIG. **3**, the website **200** will permit thermostat users to perform through the web browser substantially all of the programming functions traditionally performed directly at the physical thermostat, such as temperature set points, the time at which the thermostat should be at each set point, etc. Preferably the website will also allow users to accomplish more advanced tasks such as allow users to program in vacation settings for times when the HVAC system may be turned off or run at more economical settings, and set macros that will allow changing the settings of the temperature for all periods with a single gesture such as a mouse click.

FIG. **6** represents the screen of a computer or other device **104** using a graphical user interface connected to the Internet. The screen shows that a browser **1200** is displayed on computer **104**. In one embodiment, a background application installed on computer **104** detects activity by a user of the computer, such as cursor movement, keystrokes or otherwise, and signals the application running on server **106** that activity has been detected. Server **106** may then, depending on context, (a) transmit a signal to thermostat **108** changing setpoint because occupancy has been detected at a time when the system did not expect occupancy; (b) signal the background application running on computer **104** to trigger a software routine that instantiates a pop-up window **1202** that asks the user if the server should change the current setpoint, alter the overall programming of the system based upon a new occupancy pattern, etc. The user can respond by clicking the cursor on "yes" button **1204** or "No" button **1206**. Equivlalent means of signalling activity may be employed with interactive television programming, gaming systems, etc.

FIG. **7** represents a flowchart showing the steps involved in the operation of one embodiment of the subject invention. In step **1302**, computer **104** transmits a message to server **106** via the Internet indicating that there is user activity on computer **104**. This activity can be in the form of keystrokes, cursor movement, input via a television remote control, etc. In step **1304** the application queries database **300** to retrieve setting information for the HVAC system. In step **1306** the application determines whether the current HVAC program is intended to apply when the home is occupied or unoccupied. If the HVAC settings then in effect are intended to apply for an occupied home, then the application terminates for a specified interval. If the HVAC settings then in effect are intended to apply when the home is unoccupied, then in step **1308** the application will retrieve from database **300** the user's specific preferences for how to handle this situation. If the user has

US 8,180,492 B2

7

previously specified (at the time that the program was initially set up or subsequently modified) that the user prefers that the system automatically change settings under such circumstances, the application then proceeds to step **1316**, in which it changes the programmed setpoint for the thermostat to the setting intended for the house when occupied. If the user has previously specified that the application should not make such changes without further user input, then in step **1310** the application transmits a command to computer **104** directing the browser to display a message informing the user that the current setting assumes an unoccupied house and asking the user in step **1312** to choose whether to either keep the current settings or revert to the pre-selected setting for an occupied home. If the user selects to retain the current setting, then in step **1314** the application will write to database **300** the fact that the users has so elected and terminate. If the user elects to change the setting, then in step **1316** the application transmits the revised setpoint to the thermostat. In step **1314** the application writes the updated setting information to database **300**.

FIG. **8** is a flowchart that shows how the invention can be used to select different HVAC settings based upon its ability to identify which of multiple potential occupants is using the computer attached to the system. In step **1402** computer **104** transmits to server **106** information regarding the type of activity detected on computer **104**. Such information could include the specific program or channel being watched if, for example, computer **104** is used to watch television. The information matching, for example, TV channel 7 at 4:00 PM on a given date to specific content may be made by referring to Internet-based or other widely available scheduling sources for such content. In step **1404** server **106** retrieves from database **300** previously logged data regarding viewed programs. In step **1406** server **106** retrieves previously stored data regarding the residents of the house. For example, upon initiating the service, one or more users may have filled out online questionnaires sharing their age, gender, schedules, viewing preferences, etc. In step **1408**, server **106** compares the received information about user activity to previously stored information retrieved from database **300** about the occupants and their viewing preferences. For example, if computer **104** indicates to server **106** that the computer is being used to watch golf, the server may conclude that an adult male is watching; if computer **104** indicates that it is being used to watch children's programming, server **106** may conclude that a child is watching. In step **1410** the server transmits a query to the user in order to verify the match, asking, in effect, "Is that you. Bob?" In step **1412**, based upon the user's response, the application determines whether the correct user has been identified. If the answer is no, then the application proceeds to step **1416**. If the answer is yes, then in step **1414** the application retrieves the temperature settings for the identified occupant. In step **1416** the application writes to database **300** the programming information and information regarding matching of users to that programming.

In an alternative embodiment, the application running on computer **104** may respond to general user inputs (that is, inputs not specifically intended to instantiate communication with the remote server) by querying the user whether a given action should be taken. For example, in a system in which the computer **104** is a web-enabled television or web-enabled set-top device connected to a television as a display, software running on computer **104** detects user activity, and transmits a message indicating such activity to server **106**. The trigger for this signal may be general, such as changing channels or adjusting volume with the remote control or a power-on event. Upon receipt by server **104** of this trigger, server **104**

8

transmits instructions to computer **104** causing it to display a dialog box asking the user whether the user wishes to change HVAC settings.

What is claimed is:
1. A method for varying temperature setpoints for an HVAC system comprising:
   storing at least a first HVAC temperature setpoint associated with a structure that is deemed to be non-occupied and at least a second HVAC temperature setpoint associated with said structure deemed to be occupied;
   determining whether one or more networked electronic devices inside said structure are in use, wherein said networked electronic devices comprise a graphic user interface comprising a display, wherein said networked electronic devices receive input from one or more users and wherein use of said networked electronic devices comprises at least one of cursor movement, keystrokes or other user interface actions intended to alter a state of one or more of said networked electronic devices by one or more users;
   in response to use of said one or more networked devices, determining that said HVAC system is set to said first HVAC temperature setpoint indicating that said structure is deemed to be non occupied;
   determining that said one or more users has previously indicated a preference that said user's input be obtained before automatically changing said first HVAC temperature setpoint to said second HVAC temperature setpoint indicating that said structure is deemed to be occupied;
   prompting said one or more users based on said determining that said one or more of said user's input should be obtained, wherein said prompting sends a message to at least one of said networked electronic devices that said first HVAC system is set for a non-occupied structure and whether to change said first HVAC temperature setpoint to said second HVAC temperature setpoint associated with occupancy of said structure;
   in response to said prompting, receiving input from said one or more users to keep said first HVAC temperature setpoint; and
   keeping said first HVAC temperature setpoint based upon said input from said one or more users.
2. The method of claim **1** in which at least one of said networked electronic devices is a television.
3. The method of claim **1** in which at least one of said networked electronic devices is a personal computer.
4. The method of claim **1** in which at least one of said networked electronic devices is connected to the Internet.
5. The method of claim **1** in which programming being watched or listened to using at least one of said networked electronic devices is used to determine which occupant of said structure is likely to be present, and the second HVAC temperature setpoint for said thermostatic controller is selected based upon the preferences of the occupant, determined to be using said at least one networked electronic device.
6. The method of claim **1** in which at least one of said networked electronic devices is a game console.
7. The method of claim **1** in which at least one of said networked electronic devices communicates with a remote server.
8. The method of claim **1** further comprising adjusting said temperature setpoint with a remote computer.
9. The method of claim **1** in which said first HVAC temperature setpoint is varied automatically based on said input from said one or more users.

US 8,180,492 B2

9

10. A system for altering the setpoint on a thermostat for space conditioning of a structure comprising:

at least one thermostat having at least a first temperature setpoint associated with a non-occupied structure, and at least a second temperature setpoint associated with the existence of occupants in said structure;

one or more electronic devices having at least a graphic user interface comprising a display wherein said electronic devices receive input from one or more users and wherein use of said electronic devices comprises at least one of cursor movement, keystrokes or other user interface actions intended to alter a state of one or more of said electronic devices by one or more users wherein activity of one or more networked electronic devices indicates whether said thermostat should be changed from said first temperature setpoint to said second temperature setpoint;

wherein said electronic devices and said thermostat are connected to a network;

an application comprising one or more computer processors in communication with said network, wherein said application determines whether said one or more electronic devices are in use and in response, whether said thermostat is set to said first temperature setpoint that indicates said structure is not occupied,

said application determining that said one or more users has previously indicated a preference that said user's input be obtained before automatically changing said first HVAC temperature setpoint to said second HVAC temperature setpoint indicating that said structure is deemed to be occupied;

said application prompting said one or more users based on said determining that said one or more of said user's input should be obtained,

10

wherein said application provides electronic notice to one or more of said users of said electronic devices that said thermostat is set for a non-occupied structure and whether to keep said first temperature setpoint or change to said second temperature setpoint; and

wherein said application in response to said prompting, receives input from said one or more users to keep said first HVAC temperature setpoint; and

wherein said thermostat is kept at said first temperature setpoint based upon said input from said one or more users.

11. The system of claim 10 in which at least one of said electronic devices is a television.

12. The system of claim 10 in which at least one of said electronic devices is a personal computer.

13. The system of claim 10 in which at least one of said electronic devices is connected to the Internet.

14. The system of claim 10 in which the programming being watched or listened to using said electronic devices is used to determine which occupant of said structure is likely to be using at least one of said electronic devices, and the setpoint for said thermostatic controller is selected based upon the preferences of the occupant determined to be using said at least one electronic device.

15. The system of claim 10 in which at least one of said electronic devices is a game console.

16. The system of claim 10 in which at least one of said electronic devices communicates with a remote server.

17. The system of claim 10 further comprising a remote computer that varies said first temperature setpoint.

18. The system of claim 10 in which said first temperature setpoint is varied automatically based on said input from said one or more users.

*   *   *   *   *

# Exhibit 2



US008412488B2

## (12) United States Patent
### Steinberg et al.

(10) Patent No.: **US 8,412,488 B2**
(45) Date of Patent: ***Apr. 2, 2013**

(54) **SYSTEM AND METHOD FOR USING A NETWORK OF THERMOSTATS AS TOOL TO VERIFY PEAK DEMAND REDUCTION**

(75) Inventors: **John Douglas Steinberg**, Millbrae, CA (US); **Scott Douglas Hublou**, Redwood City, CA (US)

(73) Assignee: **EcoFactor, Inc.**, Millbrae, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/409,697**

(22) Filed: **Mar. 1, 2012**

(65) **Prior Publication Data**

US 2012/0221294 A1    Aug. 30, 2012

**Related U.S. Application Data**

(63) Continuation of application No. 13/037,162, filed on Feb. 28, 2011, now Pat. No. 8,131,506, which is a continuation of application No. 12/183,949, filed on Jul. 31, 2008, now Pat. No. 7,908,116.

(60) Provisional application No. 60/963,183, filed on Aug. 3, 2007, provisional application No. 60/994,011, filed on Sep. 17, 2007.

(51) **Int. Cl.**
  *G01B 15/00*    (2006.01)

(52) **U.S. Cl.** ........ **702/182**; 702/176; 702/183; 702/184; 700/276; 700/278; 236/1 C; 236/46 A; 236/46 R; 165/238; 165/239

(58) **Field of Classification Search** .................. 702/176, 702/182–184; 700/276, 278; 236/1 C, 46 A, 236/46 R; 165/236, 239
  See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,136,732 A    1/1979   Demaray et al.

| 4,341,345 A | 7/1982 | Hammer et al. |
| 4,403,644 A | 9/1983 | Hebert |
| 4,475,685 A | 10/1984 | Grimado et al. |
| 4,655,279 A | 4/1987 | Harmon |
| 4,674,027 A | 6/1987 | Beckey |
| 5,244,146 A | 9/1993 | Jefferson et al. |
| 5,270,952 A | 12/1993 | Adams et al. |
| 5,314,004 A | 5/1994 | Strand et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| EP | 0415747 | 3/1991 |
| KR | 10-1994-0011902 | 6/1994 |
| KR | 10-2000-0059532 | 10/2000 |

OTHER PUBLICATIONS

Arens, et al., "How Ambient Intelligence Will Improve Habitability and Energy Efficiency in Buildings", 2005, research paper, Center for the Built Environment, Controls and Information Technology.
Bourhan, et al., "Cynamic model of an HVAC system for control analysis", Elsevier 2004.
Comverge SuperStat Flyer.

(Continued)

*Primary Examiner* — Sujoy Kundu

(74) *Attorney, Agent, or Firm* — Knobbe, Martens, Olson & Bear, LLP

(57) **ABSTRACT**

The invention comprises systems and methods for estimating the rate of change in temperature inside a structure. At least one thermostat located is inside the structure and is used to control an climate control system in the structure. At least one remote processor is in communication with said thermostat and at least one database stores data reported by the thermostat. At least one processor compares the outside temperature at least one location and at least one point in time to information reported to the remote processor from the thermostat. The processor uses the relationship between the inside temperature and the outside temperature to determine whether the climate control system is "on" or "off".

**16 Claims, 10 Drawing Sheets**



## US 8,412,488 B2

Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,462,225 | A | 10/1995 | Massara et al. |
| 5,544,036 | A | 8/1996 | Brown et al. |
| 5,555,927 | A | 9/1996 | Shah |
| 5,572,438 | A | 11/1996 | Ehlers et al. |
| 5,682,949 | A | 11/1997 | Ratcliffe et al. |
| 5,717,609 | A | 2/1998 | Packa et al. |
| 5,818,347 | A | 10/1998 | Dolan et al. |
| 5,977,964 | A | 11/1999 | Williams et al. |
| 6,115,713 | A | 9/2000 | Pascucci et al. |
| 6,145,751 | A | 11/2000 | Ahmed |
| 6,178,362 | B1 | 1/2001 | Woolard et al. |
| 6,260,765 | B1 | 7/2001 | Natale et al. |
| 6,351,693 | B1 | 2/2002 | Monie |
| 6,400,996 | B1 | 6/2002 | Hoffberg et al. |
| 6,437,692 | B1 | 8/2002 | Petite et al. |
| 6,478,233 | B1 | 11/2002 | Shah |
| 6,480,803 | B1 | 11/2002 | Pierret et al. |
| 6,483,906 | B1 | 11/2002 | Lggulden et al. |
| 6,536,675 | B1 | 3/2003 | Pesko et al. |
| 6,542,076 | B1 | 4/2003 | Joao |
| 6,549,130 | B1 | 4/2003 | Joao |
| 6,574,537 | B2 | 6/2003 | Kipersztok et al. |
| 6,580,950 | B1 | 6/2003 | Johnson |
| 6,594,825 | B1 | 7/2003 | Goldschmidt et al. |
| 6,595,430 | B1 | 7/2003 | Shah |
| 6,598,056 | B1 | 7/2003 | Hull et al. |
| 6,619,555 | B2 | 9/2003 | Rosen |
| 6,622,097 | B2 | 9/2003 | Hunter |
| 6,622,115 | B1 | 9/2003 | Brown et al. |
| 6,622,925 | B2 | 9/2003 | Carner et al. |
| 6,622,926 | B1 | 9/2003 | Sartain et al. |
| 6,628,997 | B1 | 9/2003 | Fox et al. |
| 6,633,823 | B2 | 10/2003 | Bartone et al. |
| 6,643,567 | B2 | 11/2003 | Kolk et al. |
| 6,671,586 | B2 | 12/2003 | Davis et al. |
| 6,695,218 | B2 | 2/2004 | Fleckenstein |
| 6,726,113 | B2 | 4/2004 | Guo |
| 6,731,992 | B1 | 5/2004 | Ziegler |
| 6,734,806 | B1 | 5/2004 | Cratsley |
| 6,772,052 | B1 | 8/2004 | Amundsen |
| 6,785,592 | B1 | 8/2004 | Smith |
| 6,785,630 | B2 | 8/2004 | Kolk |
| 6,789,739 | B2 | 9/2004 | Rosen |
| 6,853,959 | B2 | 2/2005 | Ikeda et al. |
| 6,868,293 | B1 | 3/2005 | Schurr |
| 6,868,319 | B2 | 3/2005 | Kipersztok et al. |
| 6,882,712 | B1 | 4/2005 | Iggulden et al. |
| 6,889,908 | B2 | 5/2005 | Crippen et al. |
| 6,891,838 | B1 | 5/2005 | Petite et al. |
| 6,912,429 | B1 | 6/2005 | Bilger |
| 6,991,029 | B2 | 1/2006 | Orfield et al. |
| 7,009,493 | B2 | 3/2006 | Howard et al. |
| 7,031,880 | B1 | 4/2006 | Seem et al. |
| 7,039,532 | B2 | 5/2006 | Hunter |
| 7,061,393 | B2 | 6/2006 | Buckingham et al. |
| 7,089,088 | B2 | 8/2006 | Terry et al. |
| 7,130,719 | B2 | 10/2006 | Ehlers et al. |
| 7,130,832 | B2 | 10/2006 | Bannai et al. |
| H2176 | H | 12/2006 | Meyer et al. |
| 7,167,079 | B2 | 1/2007 | Smyth et al. |
| 7,187,986 | B2 | 3/2007 | Johnson et al. |
| 7,205,892 | B2 | 4/2007 | Luebke et al. |
| 7,215,746 | B2 | 5/2007 | Iggulden et al. |
| 7,216,015 | B2 | 5/2007 | Poth |
| 7,231,424 | B2 | 6/2007 | Bodin et al. |
| 7,232,075 | B1 | 6/2007 | Rosen |
| 7,242,988 | B2 | 7/2007 | Hoffberg et al. |
| 7,260,823 | B2 | 8/2007 | Schlack et al. |
| 7,356,384 | B2 | 4/2008 | Gull et al. |
| 7,483,964 | B1 | 1/2009 | Jackson et al. |
| 7,644,869 | B2 | 1/2010 | Hoglund et al. |
| 7,784,704 | B2 | 8/2010 | Harter |
| 7,848,900 | B2 | 12/2010 | Steinberg et al. |
| 7,894,943 | B2 | 2/2011 | Sloup et al. |
| 7,908,116 | B2 | 3/2011 | Steinberg et al. |
| 7,908,117 | B2 | 3/2011 | Steinberg et al. |
| 8,010,237 | B2 | 8/2011 | Cheung et al. |
| 8,019,567 | B2 | 9/2011 | Steinberg et al. |
| 8,090,477 | B1 | 1/2012 | Steinberg |
| 8,131,497 | B2 | 3/2012 | Steinberg et al. |
| 8,131,506 | B2 * | 3/2012 | Steinberg et al. ............. 702/182 |
| 8,180,492 | B2 | 5/2012 | Steinberg |
| 2003/0040934 | A1 | 2/2003 | Skidmore et al. |
| 2004/0176880 | A1 | 9/2004 | Obradovich et al. |
| 2005/0222889 | A1 | 10/2005 | Lai et al. |
| 2005/0288822 | A1 | 12/2005 | Rayburn |
| 2006/0045105 | A1 | 3/2006 | Dobosz et al. |
| 2006/0214014 | A1 | 9/2006 | Bash et al. |
| 2007/0043477 | A1 | 2/2007 | Ehlers et al. |
| 2007/0045431 | A1 | 3/2007 | Chapman et al. |
| 2007/0146126 | A1 | 6/2007 | Wang |
| 2008/0083234 | A1 | 4/2008 | Krebs et al. |
| 2008/0198549 | A1 | 8/2008 | Rasmussen et al. |
| 2008/0281472 | A1 | 11/2008 | Podgorny et al. |
| 2009/0052859 | A1 | 2/2009 | Greenberger et al. |
| 2009/0099699 | A1 | 4/2009 | Steinberg et al. |
| 2009/0125151 | A1 | 5/2009 | Steinberg et al. |
| 2009/0240381 | A1 | 9/2009 | Lane |
| 2009/0281667 | A1 | 11/2009 | Masui et al. |
| 2010/0019052 | A1 | 1/2010 | Yip |
| 2010/0070086 | A1 | 3/2010 | Harrod et al. |
| 2010/0070089 | A1 | 3/2010 | Harrod et al. |
| 2010/0070093 | A1 | 3/2010 | Harrod et al. |
| 2010/0156608 | A1 | 6/2010 | Bae et al. |
| 2010/0162285 | A1 | 6/2010 | Cohen et al. |
| 2010/0211224 | A1 | 8/2010 | Keeling et al. |
| 2010/0235004 | A1 | 9/2010 | Thind |
| 2010/0282857 | A1 | 11/2010 | Steinberg |
| 2010/0289643 | A1 | 11/2010 | Trundle et al. |
| 2010/0308119 | A1 | 12/2010 | Steinberg et al. |
| 2010/0318227 | A1 | 12/2010 | Steinberg et al. |
| 2011/0031323 | A1 | 2/2011 | Nold et al. |
| 2011/0290893 | A1 | 12/2011 | Steinberg |
| 2011/0307103 | A1 | 12/2011 | Cheung et al. |
| 2012/0065935 | A1 | 3/2012 | Steinberg et al. |
| 2012/0086562 | A1 | 4/2012 | Steinberg |
| 2012/0158350 | A1 | 6/2012 | Steinberg et al. |
| 2012/0221151 | A1 | 8/2012 | Steinberg |
| 2012/0221294 | A1 | 8/2012 | Steinberg et al. |

OTHER PUBLICATIONS

Control4 Wireless Thermostat Brochure.
Cooper Power Systems Web Page.
Emerson Climate Technologies, "Network Thermostat for E2 Building Controller Installation and Operation Manual", 2007.
Enernoc Web Page.
Enerwise Website.
Honeywell Programmable Thermostat Owner's Guide, www.honeywell.com/yourhome.
Honeywell, W7600/W7620 Controller Reference Manual, HW0021207, Oct. 1992.
Johnson Controls, "T600HCx-3 Single-Stage Thermostats", 2006.
Johnson Controls, Touch4 building automation system brochure, 2007.
Kilicotte, et al., "Dynamic Controls for Energy Efficiency and Demand Response: Framework Concepts and a New Construction Study Case in New York", Proceedings of the 2006 ACEEE Summer Study of Energy Efficiency in Buildings, Pacific Grove. CA, Aug. 13-18, 2006.
Lin, et al., "Multi-Sensor Single-Actuator Control of HVAC Systems", 2002.
Pier, Southern California Edison, Demand Responsive Control of Air Conditioning via Programmable Communicating Thermostats Draft Report.
Proliphix Thermostat Brochure.
Wang, et al., "Opportunities to Save Energy and Improve Comfort by Using Wireless Sensor Networks in Buildings," (2003), Center for Environmental Design Research.
Wetter, et al., A comparison of deterministic and probabilistic optimization algorithms for nonsmooth simulation-based optimization., Building and Environment 39, 2004, pp. 989-999.
Written Opinion and Search Report for PCT/US2011/032537, dated Dec. 12, 2011.

* cited by examiner



*FIG. 1*



*FIG. 2*



FIG. 3



*FIG. 4*



## FIG. 5



*FIG. 6A*



*FIG. 6B*



*FIG. 7*



*FIG. 8*



FIG. 9

US 8,412,488 B2

**1**

## SYSTEM AND METHOD FOR USING A NETWORK OF THERMOSTATS AS TOOL TO VERIFY PEAK DEMAND REDUCTION

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 13/037,162, filed Feb. 28, 2011, now U.S. Pat. No. 8,131,506 which is a continuation of U.S. patent application Ser. No. 12/183,949, filed Jul. 31, 2008, now U.S. Pat. No. 7,908,116, issued on Mar. 15, 2011, which claims the benefit of priority under 35 U.S.C. §119(e) to both U.S. Provisional Application 60/963,183, filed Aug. 3, 2007; and U.S. Provisional Application No. 60/994,011, filed Sep. 17, 2007, the entireties of which are incorporated herein by reference and are to be considered part of this specification.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates to the use of thermostatic HVAC controls that are connected to a computer network as a part of a system for offering peak demand reduction to electric utilities. More specifically, the present invention pertains to use of communicating thermostat combined with a computer network to verify that demand reduction has occurred.

2. Background

Climate control systems such as heating and cooling systems for buildings (heating, ventilation and cooling, or HVAC systems) have been controlled for decades by thermostats. At the most basic level, a thermostat includes a means to allow a user to set a desired temperature, a means to sense actual temperature, and a means to signal the heating and/or cooling devices to turn on or off in order to try to change the actual temperature to equal the desired temperature. The most basic versions of thermostats use components such as a coiled bi-metallic spring to measure actual temperature and a mercury switch that opens or completes a circuit when the spring coils or uncoils with temperature changes. More recently, electronic digital thermostats have become prevalent. These thermostats use solid-state devices such as thermistors or thermal diodes to measure temperature, and microprocessor-based circuitry to control the switch and to store and operate based upon user-determined protocols for temperature vs. time.

These programmable thermostats generally offer a very restrictive user interface, limited by the cost of the devices, the limited real estate of the small wall-mounted boxes, and the inability to take into account more than two variables: the desired temperature set by the user, and the ambient temperature sensed by the thermostat. Users can generally only set one series of commands per day, and to change one parameter (e.g., to change the late-night temperature) the user often has to cycle through several other parameters by repeatedly pressing one or two buttons.

As both the cost of energy and the demand for electricity have increased, utilities supplying electricity increasingly face unpleasant choices. The demand for electricity is not smooth over time. In so-called "summer peaking" locations, on the hottest days of the year, peak loads may be twice as high as average loads. During such peak load periods (generally in the late afternoon), air conditioning can be the largest single element of demand.

Utilities and their customers generally see reductions of supply (brownouts and blackouts) as an unacceptable outcome. But their other options can be almost as distasteful. In

**2**

the long term, they can build additional generating capacity, but that approach is very expensive given the fact that such capacity may be needed for only a few hours a year. And this option is of course unavailable in the short term. When confronted with an immediate potential shortfall, a utility may have reserve capacity it can choose to bring online. But because utilities are assumed to try to operate as efficiently as possible, the reserve capacity is likely to be the least efficient and most expensive and/or more polluting plants to operate. Alternatively, the utility may seek to purchase additional power on the open market. But the spot market for electricity, which cannot efficiently be stored, is extremely volatile, which means that spot prices during peak events may be as much as 10× the average price.

More recently, many utilities have begun to enter into agreements with certain customers to reduce demand, as opposed to increasing supply. In essence, these customers agree to reduce usage during a few critical periods in exchange for incentives from the utility. Those incentives may take the form of a fixed contract payment in exchange for the right to cut the amount of power supplied at specified times, or a reduced overall price per kilowatt-hour, or a rebate each time power is reduced, or some other method.

The bulk of these peak demand reduction (PDR) contracts have been entered into with large commercial and industrial customers. This bias is in large part due to the fact that transaction costs are much lower today for a single contract with a factory that can offer demand reduction of 50 megawatts than they would be for the equivalent from residential customers—it could take 25,000 or more homes to equal that reduction if these homes went without air conditioning.

But residential air conditioning is the largest single component of peak demand in California, and is a large percentage in many other places. There are numerous reasons why it would be economically advantageous to deploy PDR in the residential market. Whereas cutting energy consumption at a large factory could require shutting down or curtailing production, which has direct economic costs, cutting consumption for a couple of hours in residences is likely to have no economic cost, and may only result in minor discomfort—or none at all if no one is at home at the time.

Residential PDR has been attempted. But there have been numerous command and control issues with these implementations. The standard approach to residential PDR has been to attach a radio-controlled switch to the control circuitry located outside the dwelling. These switches are designed to receive a signal from a transmitter that signals the compressor to shut off during a PDR call.

There are a number of technical complications with this approach. There is some evidence that "hard cycling" the compressor in this manner can damage the air conditioning system. There are also serious issues resulting from the fact that the communication system is unidirectional. When utilities contract for PDR, they expect verification of compliance. One-way pagers allow the utility to send a signal that will shut of the A/C, but the pager cannot confirm to the utility that the NC unit has in fact been shut off. If a consumer tampers with the system so that the A/C can be used anyway, the utility will not be able to detect it, absent additional verification systems.

One way in which some utilities are seeking to address this issue is to combine the pager-controlled thermostat with so-called advanced metering infrastructure (AMI). This approach relies on the deployment of "smart meters"—electric meters that are more sophisticated than the traditional meter with its mechanical odometer mechanism for logging only cumulative energy use. Smart meters generally include a means for communicating instantaneous readings. That com-

US 8,412,488 B2

3

munication may in the form of a signal sent over the power lines themselves, or a wireless communication over a data network arranged by the utility. These meters allow utilities to accomplish a number of goals, including offering pricing that varies by time of day in order to encourage customers to move consumption away from peak demand hours. These smart meters can cost hundreds of dollars, however, and require both a "truck roll"—a visit from a trained service person—and most likely the scheduling of an appointment with the occupants, because swapping the meter will require turning off power to the house.

If the utility installs a smart meter at each house that contracts to participate in a PDR program, it may be possible to verify that the A/C is in fact switched off. But this approach requires two separate pieces of hardware, two separate communications systems, and the ability to match them for verification purposes.

It would be desirable to have a system that could both implement and verify residential peak demand reduction with reduced expenses.

### SUMMARY OF THE INVENTION

At least one embodiment of the invention that includes system for predicting the rate of change in temperature inside a structure comprising at least one thermostat located inside the structure and controlling an HVAC system in said structure; at least one remote processor that is in communication with said thermostat; at least one database for storing data reported by said thermostat; at least one processor that compares outside temperature at least location and at least one point in time to information reported to said remote processor from said thermostat, and wherein said processor uses the relationship between the inside temperature and the outside temperature over time to derive a first prediction for the rate of change in inside temperature assuming that the operating status of the HVAC system is "on"; and said processor uses the relationship between the inside temperature and the outside temperature over time to derive a second prediction for the rate of change in inside temperature assuming that the operating status of the HVAC system is "off"; and said processor compares at least one of the first prediction and the second prediction to the actual inside temperature recorded inside the structure to determine whether the actual inside temperature is closer to the first prediction or the second prediction.

In one embodiment, the invention comprises a thermostat attached to an HVAC system, a local network connecting the thermostat to a larger network such as the Internet, one or more additional thermostats attached to the network and to other HVAC systems, and a server in bi-directional communication with the thermostats. The server logs the ambient temperature sensed by each thermostat vs. time and the signals sent by the thermostats to the HVAC systems to which they are attached. The server preferably also logs outside temperature and humidity data for the geographic locations for the buildings served by the connected HVAC systems. Such information is widely available from various sources that publish detailed weather information based on geographic areas such as by ZIP code. The server also stores other data affecting the load upon the system, such as specific model of HVAC system, occupancy, building characteristics, etc. Some of this data may be supplied by the individual users of the system, while other data may come from commercial sources such as the electric and other utilities who supply energy to those users.

4

By using these multiple data streams to compare the performance of one system versus another, and one system versus the same system at other times, the server is able to estimate the effective thermal mass of the structure, and thereby predict the expected thermal performance of a given structure in response to changes in outside temperature. Thus, for example, if the air conditioning is shut off on a hot afternoon, given a known outside temperature, it will be possible to predict how quickly the temperature in the house should rise. If the actual temperature change is significantly different from the predicted rate of change, or does not change at all, it is possible to infer that the air conditioning has not, in fact, been shut off.

This and other advantages of the present invention are explained in the detailed description and claims that make reference to the accompanying diagrams and flowcharts.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows an example of an overall environment in which an embodiment of the invention may be used.

FIG. 2 shows a high-level illustration of the architecture of a network showing the relationship between the major elements of one embodiment of the subject invention.

FIG. 3 shows an embodiment of the website to be used as part of the subject invention.

FIG. 4 shows a high-level schematic of the thermostat used as part of the subject invention.

FIG. 5 shows one embodiment of the database structure used as part of the subject invention

FIGS. 6A and 6B show a graphical representation of the manner in which the subject invention may be used to verify that a demand reduction event has occurred.

FIG. 7 is a flow chart illustrating the steps involved in generating a demand reduction event for a given subscriber.

FIG. 8 is a flow chart illustrating the steps involved in confirming that a demand reduction event has taken place.

FIG. 9 is a representation of the movement of messages and information between the components of the subject invention.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

FIG. 1 shows an example of an overall environment 100 in which an embodiment of the invention may be used. The environment 100 includes an interactive communication network 102 with computers 104 connected thereto. Also connected to network 102 are one or more server computers 106, which store information and make the information available to computers 104. The network 102 allows communication between and among the computers 104 and 106.

Presently preferred network 102 comprises a collection of interconnected public and/or private networks that are linked to together by a set of standard protocols to form a distributed network. While network 102 is intended to refer to what is now commonly referred to as the Internet, it is also intended to encompass variations which may be made in the future, including changes additions to existing standard protocols.

When a user of the subject invention wishes to access information on network 102, the buyer initiates connection from his computer 104. For example, the user invokes a browser, which executes on computer 104. The browser, in turn, establishes a communication link with network 102. Once connected to network 102, the user can direct the browser to access information on server 106.

US 8,412,488 B2

| 5 | 6 |

One popular part of the Internet is the World Wide Web. The World Wide Web contains a large number of computers **104** and servers **106**, which store HyperText Markup Language (HTML) documents capable of displaying graphical and textual information. HTML is a standard coding convention and set of codes for attaching presentation and linking attributes to informational content within documents.

The servers **106** that provide offerings on the World Wide Web are typically called websites. A website is often defined by an Internet address that has an associated electronic page. Generally, an electronic page is a document that organizes the presentation of text graphical images, audio and video.

In addition to the Internet, the network **102** can comprise a wide variety of interactive communication media. For example, network **102** can include local area networks, interactive television networks, telephone networks, wireless data systems, two-way cable systems, and the like.

In one embodiment, computers **104** and servers **106** are conventional computers that are equipped with communications hardware such as modem or a network interface card. The computers include processors such as those sold by Intel and AMD. Other processors may also be used, including general-purpose processors, multi-chip processors, embedded processors and the like.

Computers **104** can also be handheld and wireless devices such as personal digital assistants (PDAs), cellular telephones and other devices capable of accessing the network.

Computers **104** utilize a browser configured to interact with the World Wide Web. Such browsers may include Microsoft Explorer, Mozilla, Firefox, Opera or Safari. They may also include browsers used on handheld and wireless devices.

The storage medium may comprise any method of storing information. It may comprise random access memory (RAM), electronically erasable programmable read only memory (EEPROM), read only memory (ROM), hard disk, floppy disk, CD-ROM, optical memory, or other method of storing data.

Computers **104** and **106** may use an operating system such as Microsoft Windows, Apple Mac OS, Linux, Unix or the like.

Computers **106** may include a range of devices that provide information, sound, graphics and text, and may use a variety of operating systems and software optimized for distribution of content via networks.

FIG. **2** illustrates in further detail the architecture of the specific components connected to network **102** showing the relationship between the major elements of one embodiment of the subject invention. Attached to the network are thermostats **108** and computers **104** of various users. Connected to thermostats **108** are HVAC units **110**. The HVAC units may be conventional air conditioners, heat pumps, or other devices for transferring heat into or out of a building. Each user is connected to the servers **106***a* via wired or wireless connection such as Ethernet or a wireless protocol such as IEEE 802.11, a gateway **110** that connects the computer and thermostat to the Internet via a broadband connection such as a digital subscriber line (DSL) or other form of broadband connection to the World Wide Web. In one embodiment, electric utility server **106***a* and demand reduction service server **106***b* are in communication with the network **102**. Servers **106***a* and **106***b* contain the content to be served as web pages and viewed by computers **104**, as well as databases containing information used by the servers. Also connected to the servers **106***a* via the Internet are computers located at one or more electrical utilities **106***b*.

In the currently preferred embodiment, the website **200** includes a number of components accessible to the user, as shown in FIG. **3**. Those components may include a means to store temperature settings **202**, a means to enter information about the user's home **204**, a means to enter the user's electricity bills **206**, means to calculate energy savings that could result from various thermostat-setting strategies **208**, and means to enable and choose between various arrangements **210** for demand reduction with their electric utility provider as intermediated by the demand reduction service provider.

FIG. **4** shows a high-level block diagram of thermostat **108** used as part of the subject invention. Thermostat **108** includes temperature sensing means **252**, which may be a thermistor, thermal diode or other means commonly used in the design of electronic thermostats. It includes a microprocessor **254**, memory **256**, a display **258**, a power source **260**, a relay **262**, which turns the HVAC system on and off in response to a signal from the microprocessor, and contacts by which the relay is connected to the wires that lead to the HVAC system. To allow the thermostat to communicate bi-directionally with the computer network, the thermostat also includes means **264** to connect the thermostat to a local computer or to a wireless network. Such means could be in the form of Ethernet, wireless protocols such as IEEE 802.11, IEEE 802.15.4, Bluetooth, or other wireless protocols. (Other components as needed) The thermostat **250** may also include controls **266** allowing users to change settings directly at the thermostat, but such controls are not necessary to allow the thermostat to function.

The data used to generate the content delivered in the form of the website is stored on one or more servers **106** within one or more databases. As shown in FIG. **5**, the overall database structure **300** may include temperature database **400**, thermostat settings database **500**, energy bill database **600**, HVAC hardware database **700**, weather database **800**, user database **900**, transaction database **1000**, product and service database **1100** and such other databases as may be needed to support these and additional features.

The website will allow users of connected thermostats **250** to create personal accounts. Each user's account will store information in database **900**, which tracks various attributes relative to users of the site. Such attributes may include the make and model of the specific HVAC equipment in the user's home; the age and square footage of the home, the solar orientation of the home, the location of the thermostat in the home, the user's preferred temperature settings, whether the user is a participant in a demand reduction program, etc.

As shown in FIG. **3**, the website **200** will permit thermostat users to perform through the web browser substantially all of the programming functions traditionally performed directly at the physical thermostat, such as temperature set points, the time at which the thermostat should be at each set point, etc. Preferably the website will also allow users to accomplish more advanced tasks such as allow users to program in vacation settings for times when the HVAC system may be turned off or run at more economical settings, and set macros that will allow changing the settings of the temperature for all periods with a single gesture such as a mouse click.

In addition to using the system to allow better signaling and control of the HVAC system, which relies primarily on communication running from the server to the thermostat, the bi-directional communication will also allow the thermostat **108** to regularly measure and send to the server information about the temperature in the building. By comparing outside temperature, inside temperature, thermostat settings, cycling behavior of the HVAC system, and other variables, the system

US 8,412,488 B2

7

will be capable of numerous diagnostic and controlling functions beyond those of a standard thermostat.

For example, FIG. **6***a* shows a graph of inside temperature, outside temperature and HVAC activity for a 24 hour period. When outside temperature **302** increases, inside temperature **304** follows, but with some delay because of the thermal mass of the building, unless the air conditioning **306** operates to counteract this effect. When the air conditioning turns on, the inside temperature stays constant (or rises at a much lower rate) despite the rising outside temperature. In this example, frequent and heavy use of the air conditioning results in only a very slight temperature increase inside o the house of 4 degrees, from 72 to 76 degrees, despite the increase in outside temperature from 80 to 100 degrees.

FIG. **6***b* shows a graph of the same house on the same day, but assumes that the air conditioning is turned off from noon to 7 PM. As expected, the inside temperature **304***a* rises with increasing outside temperatures **302** for most of that period, reaching 88 degrees at 7 PM.

Because server **106***a* logs the temperature readings from inside each house (whether once per minute or over some other interval), as well as the timing and duration of air conditioning cycles, database **300** will contain a history of the thermal performance of each house. That performance data will allow the server **106***a* to calculate an effective thermal mass for each such structure—that is, the speed with the temperature inside a given building will change in response to changes in outside temperature. Because the server will also log these inputs against other inputs including time of day, humidity, etc. the server will be able to predict, at any given time on any given day, the rate at which inside temperature should change for given inside and outside temperatures.

As shown in FIG. **3**, website **200** will allow the users to opt **210** into a plan that offers incentives such as cash or rebates in exchange for reduced air conditioning use during peak load periods.

FIG. **7** shows the steps followed in order to initiate air conditioner shutoff. When a summer peak demand situation occurs, the utility will transmit an email **402** or other signal to server **106***a* requesting a reduction in load. Server **106***a* will determine **404** if the user's house is served by the utility seeking reduction; determine **406** if a given user has agreed to reduce peak demand; and determine **408** if a reduction of consumption by the user is required or desirable in order to achieve the reduction in demand requested by the utility. The server will transmit **410** a signal to the user's thermostat **108** signaling the thermostat to shut off the air conditioner **110**.

FIG. **8** shows the steps followed in order to verify that the air conditioner has in fact been shut off. Server **106***a* will receive and monitor **502** the temperature readings sent by the user's thermostat **108**. The server then calculates **504** the temperature reading to be expected for that thermostat given inputs such as current and recent outside temperature, recent inside temperature readings, the calculated thermal mass of the structure, temperature readings in other houses, etc. The server will compare **506** the predicted reading with the actual reading. If the server determines that the temperature inside the house is rising at the rate predicted if the air conditioning is shut off, then the server confirms **508** that the air conditioning has been shut off. If the temperature reading from the thermostat shows no increase, or significantly less increase than predicted by the model, then the server concludes **510** that the air conditioning was not switched off, and that no contribution to the demand response request was made.

For example, assume that on at 3 PM on date Y utility X wishes to trigger a demand reduction event. A server at utility X transmits a message to the server at demand reduction

8

service provider Z requesting W megawatts of demand reduction. Demand reduction service provider server determines that it will turn off the air conditioner at house A in order to achieve the required demand reduction. At the time the event is triggered, the inside temperature as reported by the thermostat in house A is 72 degrees F. The outside temperature near house A is 96 degrees Fahrenheit. The inside temperature at House B, which is not part of the demand reduction program, but is both connected to the demand reduction service server and located geographically proximate to House A, is 74 F. Because the A/C in house A has been turned off, the temperature inside House A begins to rise, so that at 4 PM it has increased to 79 F. Because the server is aware of the outside temperature, which remains at 96 F, and of the rate of temperature rise inside house A on previous days on which temperatures have been at or near 96 F, and the temperature in house B, which has risen only to 75 F because the air conditioning in house B continues to operate normally, the server is able to confirm with a high degree of certainty that the A/C in house A has indeed been shut off.

In contrast, if the HVAC system at house A has been tampered with, so that a demand reduction signal from the server does not actually result in shutting off the A/C in house A, when the server compares the rate of temperature change at house A against the other data points, the server will receive data inconsistent with the rate of increase predicted. As a result, it will conclude that the A/C has not been shut off in house A as expected, and will not credit house A with the financial credit that would be associated with demand reduction compliance, or may trigger a business process that could result in termination of house A's participation in the demand reduction program.

FIG. **9** illustrates the movement of signals and information between the components of the subject invention to trigger and verify a demand reduction response. In step **602** the electric utility server **106***b* transmits a message to demand reduction service server **106***a* requesting a demand reduction of a specified duration and size. Demand reduction service server **106***a* uses database **300** to determine which subscribers should be included in the demand reduction event. For each included subscriber, the server then sends a signal **604** to the subscriber's thermostat instructing it (a) to shut down at the appropriate time or (b) to allow the temperature as measured by the thermostat to increase to a certain temperature at the specified time, depending upon the agreement between the homeowner and the demand reduction aggregator. The server then receives **606** temperature signals from the subscriber's thermostat. At the conclusion of the demand reduction event, the server transmits a signal **608** to the thermostat permitting the thermostat to signal its attached HVAC system to resume cooling, if the system has been shut off, or to reduce the target temperature to its pre-demand reduction setting, if the target temperature was merely increased. After determining the total number of subscribers actually participating in the DR event, the server then calculates the total demand reduction achieved and sends a message **610** to the electric utility confirming such reduction.

Additional steps may be included in the process. For example, if the subscriber has previously requested that notice be provided when a peak demand reduction event occurs, the server will also send an alert, which may be in the form of an email message or an update to the personalized web page for that user, or both. If the server determines that a given home has (or has not) complied with the terms of its demand reduction agreement, the server will send a message to the subscriber confirming that fact.

US 8,412,488 B2

9 | 10

It should also be noted that in some climate zones, peak demand events occur during extreme cold weather rather than (or in addition to) during hot weather. The same process as discussed above could be employed to reduce demand by shutting off electric heaters and monitoring the rate at which temperatures fall.

It should also be noted that the peak demand reduction service can be performed directly by a power utility, so that the functions of server **106***a* can be combined with the functions of server **106***b*.

The system installed in a subscriber's home may optionally include additional temperature sensors at different locations within the building. These additional sensors may we connected to the rest of the system via a wireless system such as 802.11 or 802.15.4, or may be connected via wires. Additional temperature and/or humidity sensors may allow increased accuracy of the system, which can in turn increase user comfort, energy savings or both.

While particular embodiments of the present invention have been shown and described, it is apparent that changes and modifications may be made without departing from the invention in its broader aspects and, therefore, the invention may carried out in other ways without departing from the true spirit and scope. These and other equivalents are intended to be covered by the following claims:

What is claimed is:

**1**. A system for monitoring the operational status of an HVAC system comprising:

at least one HVAC control system associated with a first structure that receives temperature measurements from at least a first structure conditioned by at least one HVAC system;

one or more processors that receive measurements of outside temperatures from at least one source other than said HVAC system,

wherein said one or more processors compares the inside temperature of said first structure and the outside temperature over time to derive an estimation for the rate of change in inside temperature of said first structure in response to outside temperature, and

wherein said one or more processors compare an inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature of said first structure to determine whether the first HVAC system is on or off.

**2**. A system as in claim **1** in which said one or more processors receive measurements of outside temperatures for geographic regions such as ZIP codes from sources other than said HVAC system.

**3**. A system as in claim **1** in which said HVAC system is located within a single family dwelling.

**4**. A system as in claim **1** in which said HVAC system comprises a programmable thermostat.

**5**. A system as in claim **1** in which said HVAC system comprises a programmable thermostat that communicates with a mesh networking protocol.

**6**. A system as in claim **1** in which said HVAC system comprises a programmable thermostat that communicates with a network.

**7**. A system as in claim **1** in which said one or more processors communicate with said HVAC system using a network that includes an electricity meter.

**8**. A system as in claim **1** in which said estimation is a prediction about the future rate of change in temperature inside said structure.

**9**. A method for monitoring the operation of an HVAC system comprising:

receiving temperature measurements from at least one HVAC control system associated with a first structure conditioned by at least one HVAC system;

receiving at one or more processors, measurements of outside temperatures from at least one source other than said HVAC system;

comparing with said one or more processors the inside temperature of said first structure and the outside temperature over time to derive an estimation for the rate of change in inside temperature of said first structure in response to outside temperature, and

comparing with said one or more processors, an inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature of said first structure to determine whether the first HVAC system is on or off.

**10**. A method as in claim **9** in which said one or more processors receive measurements of outside temperatures for geographic regions such as ZIP codes from sources other than said HVAC system.

**11**. A method as in claim **9** in which said HVAC system is located within a single family dwelling.

**12**. A method as in claim **9** in which said HVAC system comprises a programmable thermostat.

**13**. A method as in claim **9** in which said HVAC system comprises a programmable thermostat that communicates with a mesh networking protocol.

**14**. A method as in claim **9** in which said HVAC system comprises a programmable thermostat that communicates with a network.

**15**. A method as in claim **9** in which said one or more processors communicate with said HVAC system using a network that includes an electricity meter.

**16**. A method as in claim **9** in which said estimation is a prediction about the future rate of change in temperature inside said structure.

\*   \*   \*   \*   \*



US008738327B2

(12) **United States Patent**
Steinberg et al.

(10) **Patent No.:** **US 8,738,327 B2**
(45) **Date of Patent:** *May 27, 2014

(54) **SYSTEM AND METHOD FOR USING A NETWORK OF THERMOSTATS AS TOOL TO VERIFY PEAK DEMAND REDUCTION**

(71) Applicant: **EcoFactor, Inc.**, Millbrae, CA (US)

(72) Inventors: **John Douglas Steinberg**, Millbrae, CA (US); **Scott Douglas Hublou**, Redwood City, CA (US)

(73) Assignee: **EcoFactor, Inc.**, Mlllbrae, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/852,577**

(22) Filed: **Mar. 28, 2013**

(65) **Prior Publication Data**

US 2013/0238143 A1    Sep. 12, 2013

**Related U.S. Application Data**

(63) Continuation of application No. 13/409,697, filed on Mar. 1, 2012, now Pat. No. 8,412,488, which is a continuation of application No. 13/037,162, filed on Feb. 28, 2011, now Pat. No. 8,131,506, which is a continuation of application No. 12/183,949, filed on Jul. 31, 2008, now Pat. No. 7,908,116.

(60) Provisional application No. 60/963,183, filed on Aug. 3, 2007, provisional application No. 60/994,011, filed on Sep. 17, 2007.

(51) **Int. Cl.**

| | |
|---|---|
| G06F 11/30 | (2006.01) |
| G21C 17/00 | (2006.01) |
| G01M 1/38 | (2006.01) |
| G05B 13/00 | (2006.01) |
| G05B 15/00 | (2006.01) |
| G05D 23/00 | (2006.01) |
| F24F 11/053 | (2006.01) |
| G05D 23/12 | (2006.01) |
| G05D 23/185 | (2006.01) |
| G05D 23/19 | (2006.01) |

(52) **U.S. Cl.**
USPC ............ **702/182**; 700/276; 700/278; 236/1 C; 165/238; 165/239

(58) **Field of Classification Search**
USPC .................. 702/176, 182–184; 700/276, 278; 236/1 C, 46 A, 46 R; 165/238, 239
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,136,732 A | | 1/1979 | Demaray et al. |
| 4,341,345 A | | 7/1982 | Hammer et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0415747 | 3/1991 |
| JP | 05-189659 | 7/1993 |

(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 13/523,697, filed Jun. 14, 2012, Hublou, Scott Douglas et al.

(Continued)

*Primary Examiner* — John Breene
*Assistant Examiner* — Manuel Rivera Vargas
(74) *Attorney, Agent, or Firm* — Knobbe, Martens, Olson & Bear, LLP

(57) **ABSTRACT**

The invention comprises systems and methods for estimating the rate of change in temperature inside a structure. At least one thermostat located is inside the structure and is used to control an climate control system in the structure. At least one remote processor is in communication with said thermostat and at least one database stores data reported by the thermostat. At least one processor compares the outside temperature at at least one location and at least one point in time to information reported to the remote processor from the thermostat. The processor uses the relationship between the inside temperature and the outside temperature to determine whether the climate control system is "on" or "off".

**19 Claims, 10 Drawing Sheets**



**US 8,738,327 B2**

Page 2

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,403,644 | A | 9/1983 | Hebert |
| 4,475,685 | A | 10/1984 | Grimado et al. |
| 4,655,279 | A | 4/1987 | Harmon |
| 4,674,027 | A | 6/1987 | Beckey |
| 5,244,146 | A | 9/1993 | Jefferson et al. |
| 5,270,952 | A | 12/1993 | Adams et al. |
| 5,314,004 | A | 5/1994 | Strand et al. |
| 5,462,225 | A | 10/1995 | Massara et al. |
| 5,544,036 | A | 8/1996 | Brown et al. |
| 5,555,927 | A | 9/1996 | Shah |
| 5,572,438 | A | 11/1996 | Ehlers et al. |
| 5,682,949 | A | 11/1997 | Ratcliffe et al. |
| 5,717,609 | A | 2/1998 | Packa et al. |
| 5,729,474 | A | 3/1998 | Hildebrand et al. |
| 5,818,347 | A | 10/1998 | Dolan et al. |
| 5,977,964 | A | 11/1999 | Williams et al. |
| 6,115,713 | A | 9/2000 | Pascucci et al. |
| 6,145,751 | A | 11/2000 | Ahmed |
| 6,178,362 | B1 | 1/2001 | Woolard et al. |
| 6,241,156 | B1 | 6/2001 | Kline et al. |
| 6,260,765 | B1 | 7/2001 | Natale et al. |
| 6,351,693 | B1 | 2/2002 | Monie |
| 6,400,956 | B1 | 6/2002 | Richton |
| 6,400,996 | B1 | 6/2002 | Hoffberg et al. |
| 6,437,692 | B1 | 8/2002 | Petite et al. |
| 6,478,233 | B1 | 11/2002 | Shah |
| 6,480,803 | B1 | 11/2002 | Pierret et al. |
| 6,483,906 | B1 | 11/2002 | Iggulden et al. |
| 6,536,675 | B1 | 3/2003 | Pesko et al. |
| 6,542,076 | B1 | 4/2003 | Joao |
| 6,549,130 | B1 | 4/2003 | Joao |
| 6,574,537 | B2 | 6/2003 | Kipersztok et al. |
| 6,580,950 | B1 | 6/2003 | Johnson |
| 6,594,825 | B1 | 7/2003 | Goldschmidt Iki et al. |
| 6,595,430 | B1 | 7/2003 | Shah |
| 6,598,056 | B1 | 7/2003 | Hull et al. |
| 6,619,555 | B2 | 9/2003 | Rosen |
| 6,622,097 | B2 | 9/2003 | Hunter |
| 6,622,115 | B1 | 9/2003 | Brown et al. |
| 6,622,925 | B2 | 9/2003 | Carner et al. |
| 6,622,926 | B1 | 9/2003 | Sartain et al. |
| 6,628,997 | B1 | 9/2003 | Fox et al. |
| 6,633,823 | B2 | 10/2003 | Bartone et al. |
| 6,643,567 | B2 | 11/2003 | Kolk et al. |
| 6,671,586 | B2 | 12/2003 | Davis et al. |
| 6,695,218 | B2 | 2/2004 | Fleckenstein |
| 6,726,113 | B2 | 4/2004 | Guo |
| 6,731,992 | B1 | 5/2004 | Ziegler |
| 6,734,806 | B1 | 5/2004 | Cratsley |
| 6,772,052 | B1 | 8/2004 | Amundsen |
| 6,785,592 | B1 | 8/2004 | Smith |
| 6,785,630 | B2 | 8/2004 | Kolk |
| 6,789,739 | B2 | 9/2004 | Rosen |
| 6,853,959 | B2 | 2/2005 | Ikeda et al. |
| 6,868,293 | B1 | 3/2005 | Schurr |
| 6,868,319 | B2 | 3/2005 | Kipersztok et al. |
| 6,882,712 | B1 | 4/2005 | Iggulden et al. |
| 6,889,908 | B2 | 5/2005 | Crippen et al. |
| 6,891,838 | B1 | 5/2005 | Petite et al. |
| 6,912,429 | B1 | 6/2005 | Bilger |
| 6,991,029 | B2 | 1/2006 | Orfield et al. |
| 7,009,493 | B2 | 3/2006 | Howard |
| 7,031,880 | B1 | 4/2006 | Seem et al. |
| 7,039,532 | B2 | 5/2006 | Hunter |
| 7,061,393 | B2 | 6/2006 | Buckingham et al. |
| 7,089,088 | B2 | 8/2006 | Terry et al. |
| 7,130,719 | B2 | 10/2006 | Ehlers et al. |
| 7,130,832 | B2 | 10/2006 | Bannai et al. |
| H2176 | H | 12/2006 | Meyer et al. |
| 7,167,079 | B2 | 1/2007 | Smyth et al. |
| 7,187,986 | B2 | 3/2007 | Johnson et al. |
| 7,205,892 | B2 | 4/2007 | Luebke et al. |
| 7,215,746 | B2 | 5/2007 | Iggulden et al. |
| 7,216,015 | B2 | 5/2007 | Poth |
| 7,231,424 | B2 | 6/2007 | Bodin et al. |
| 7,232,075 | B1 | 6/2007 | Rosen |
| 7,242,988 | B1 | 7/2007 | Hoffberg et al. |
| 7,260,823 | B2 | 8/2007 | Schlack et al. |
| 7,356,384 | B2 | 4/2008 | Gull et al. |
| 7,483,964 | B1 | 1/2009 | Jackson et al. |
| 7,644,869 | B2 | 1/2010 | Hoglund et al. |
| 7,784,704 | B2 | 8/2010 | Harter |
| 7,848,900 | B2 | 12/2010 | Steinberg et al. |
| 7,894,943 | B2 | 2/2011 | Sloup et al. |
| 7,908,116 | B2 | 3/2011 | Steinberg et al. |
| 7,908,117 | B2 | 3/2011 | Steinberg et al. |
| 8,010,237 | B2 | 8/2011 | Cheung et al. |
| 8,019,567 | B2 | 9/2011 | Steinberg et al. |
| 8,090,477 | B1 | 1/2012 | Steinberg |
| 8,131,497 | B2 | 3/2012 | Steinberg et al. |
| 8,131,506 | B2 | 3/2012 | Steinberg et al. |
| 8,180,492 | B2 | 5/2012 | Steinberg |
| 8,340,826 | B2 | 12/2012 | Steinberg |
| 8,412,488 | B2 | 4/2013 | Steinberg et al. |
| 8,423,322 | B2 | 4/2013 | Steinberg et al. |
| 8,457,797 | B2 | 6/2013 | Imes et al. |
| 2003/0040934 | A1 | 2/2003 | Skidmore et al. |
| 2004/0176880 | A1 | 9/2004 | Obradovich et al. |
| 2005/0222889 | A1 | 10/2005 | Lai et al. |
| 2005/0288822 | A1* | 12/2005 | Rayburn ........................ 700/276 |
| 2006/0045105 | A1 | 3/2006 | Dobosz et al. |
| 2006/0214014 | A1 | 9/2006 | Bash et al. |
| 2007/0043477 | A1 | 2/2007 | Elhers et al. |
| 2007/0045431 | A1 | 3/2007 | Chapman et al. |
| 2007/0146126 | A1 | 6/2007 | Wang |
| 2008/0083234 | A1 | 4/2008 | Krebs et al. |
| 2008/0198549 | A1 | 8/2008 | Rasmussen et al. |
| 2008/0281472 | A1 | 11/2008 | Podgorny et al. |
| 2009/0052859 | A1 | 2/2009 | Greenberger et al. |
| 2009/0099699 | A1 | 4/2009 | Steinberg et al. |
| 2009/0125151 | A1 | 5/2009 | Steinberg et al. |
| 2009/0240381 | A1 | 9/2009 | Lane |
| 2009/0281667 | A1 | 11/2009 | Masui et al. |
| 2010/0019052 | A1 | 1/2010 | Yip |
| 2010/0070086 | A1 | 3/2010 | Harrod et al. |
| 2010/0070089 | A1 | 3/2010 | Harrod et al. |
| 2010/0070093 | A1 | 3/2010 | Harrod et al. |
| 2010/0156608 | A1 | 6/2010 | Bae et al. |
| 2010/0162285 | A1 | 6/2010 | Cohen et al. |
| 2010/0211224 | A1 | 8/2010 | Keeling et al. |
| 2010/0235004 | A1 | 9/2010 | Thind |
| 2010/0282857 | A1 | 11/2010 | Steinberg |
| 2010/0289643 | A1 | 11/2010 | Trundle et al. |
| 2010/0308119 | A1 | 12/2010 | Steinberg et al. |
| 2010/0318227 | A1 | 12/2010 | Steinberg et al. |
| 2011/0031323 | A1 | 2/2011 | Nold et al. |
| 2011/0046792 | A1 | 2/2011 | Imes et al. |
| 2011/0046798 | A1 | 2/2011 | Imes et al. |
| 2011/0046799 | A1 | 2/2011 | Imes et al. |
| 2011/0046800 | A1 | 2/2011 | Imes et al. |
| 2011/0046801 | A1 | 2/2011 | Imes et al. |
| 2011/0051823 | A1 | 3/2011 | Imes et al. |
| 2011/0054699 | A1 | 3/2011 | Imes et al. |
| 2011/0054710 | A1 | 3/2011 | Imes et al. |
| 2011/0173542 | A1 | 7/2011 | Imes et al. |
| 2011/0202185 | A1 | 8/2011 | Imes et al. |
| 2011/0214060 | A1 | 9/2011 | Imes et al. |
| 2011/0224838 | A1 | 9/2011 | Imes et al. |
| 2011/0246898 | A1 | 10/2011 | Imes et al. |
| 2011/0290893 | A1 | 12/2011 | Steinberg |
| 2011/0307101 | A1 | 12/2011 | Imes et al. |
| 2011/0307103 | A1 | 12/2011 | Cheung et al. |
| 2012/0023225 | A1 | 1/2012 | Imes et al. |
| 2012/0046859 | A1 | 2/2012 | Imes et al. |
| 2012/0064923 | A1 | 3/2012 | Imes et al. |
| 2012/0065935 | A1 | 3/2012 | Steinberg et al. |
| 2012/0072033 | A1 | 3/2012 | Imes et al. |
| 2012/0086562 | A1 | 4/2012 | Steinberg |
| 2012/0093141 | A1 | 4/2012 | Imes et al. |
| 2012/0101637 | A1 | 4/2012 | Imes et al. |
| 2012/0135759 | A1 | 5/2012 | Imes et al. |
| 2012/0158350 | A1 | 6/2012 | Steinberg et al. |
| 2012/0215725 | A1 | 8/2012 | Imes et al. |
| 2012/0221151 | A1 | 8/2012 | Steinberg |

**US 8,738,327 B2**

Page 3

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2012/0221718 A1 | 8/2012 | Imes et al. |
| 2012/0252430 A1 | 10/2012 | Imes et al. |
| 2012/0324119 A1 | 12/2012 | Imes et al. |
| 2013/0053054 A1 | 2/2013 | Lovitt et al. |
| 2013/0054758 A1 | 2/2013 | Imes et al. |
| 2013/0054863 A1 | 2/2013 | Imes et al. |
| 2013/0060387 A1 | 3/2013 | Imes et al. |
| 2013/0144445 A1 | 6/2013 | Steinberg |
| 2013/0144453 A1 | 6/2013 | Subbloie |
| 2013/0167035 A1 | 6/2013 | Imes et al. |
| 2013/0231785 A1 | 9/2013 | Steinberg et al. |
| 2013/0310989 A1 | 11/2013 | Steinberg et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 2010-038377 | 2/2010 |
| JP | 2010-286218 | 12/2010 |
| KR | 10-1994-0011902 | 6/1994 |
| KR | 10-1999-0070368 | 9/1999 |
| KR | 10-2000-0059532 | 10/2000 |
| WO | WO 2011/149600 | 12/2011 |
| WO | WO 2012/024534 | 2/2012 |

OTHER PUBLICATIONS

U.S. Appl. No. 13/861,189, filed Apr. 11, 2013, Steinberg, John Douglas et al.

Arens, et al., "How Ambient Intelligence Will Improve Habitability and Energy Efficiency in Buildings", 2005, research paper, Center for the Built Environment, Controls and Information Technology.

Bourhan, et al., "Cynamic model of an HVAC system for control analysis", Elsevier 2004.

Brush, et al., Preheat—Controlling Home Heating with Occupancy Prediction, 2013.

Comverge SuperStat Flyer, prior to Jun. 28, 2007.

Control4 Wireless Thermostat Brochure, 2006.

Cooper Power Systems Web Page, 2000-2009.

Emerson Climate Technologies, "Network Thermostat for E2 Building Controller Installation and Operation Manual", 2007.

Enernoc Web Page, 2004-2009.

Enerwise Website, 1999-2009.

Gupta, Adding GPS-Control to Traditional Thermostats: An Exploration of Potential Energy Savings and Design Challenges, MIT, 2009.

Gupta, et al., A Persuasive GPS-Controlled Thermostat System, MIT, 2008.

Honeywell Programmable Thermostat Owner's Guide, www.honeywell.com/yourhome, 2004.

Honeywell, W7600/W7620 Controller Reference Manual, HW0021207, Oct. 1992.

Johnson Controls, "T600HCx-3 Single-Stage Thermostats", 2006.

Johnson Controls, Touch4 building automation system brochure, 2007.

Kilicotte, et al., "Dynamic Controls for Energy Efficiency and Demand Response: Framework Concepts and a New Construction Study Case in New York", Proceedings of the 2006 ACEEE Summer Study of Energy Efficiency in Buildings, Pacific Grove. CA, Aug. 13-18, 2006.

Krumm, et al., Learning Time-Based Presence Probabilities, Jun. 2011.

Lin, et al., "Multi-Sensor Single-Actuator Control of HVAC Systems", 2002.

Pier, Southern California Edison, Demand Responsive Control of Air Conditioning via Programmable Communicating Thermostats Draft Report, 2006.

Proliphix Thermostat Brochure, prior to Jun. 2007.

Raji, "Smart Networks for Control", IEEE Spectrum, Jun. 1994.

Scott, et al., Home Heating Using GPS-Based Arrival Prediction, 2010.

Wang, et al., "Opportunities to Save Energy and Improve Comfort by Using Wireless Sensor Networks in Buildings," (2003), Center for Environmental Design Research.

Wetter, et al., A comparison of deterministic and probabilistic optimization algorithms for nonsmooth simulation-based optimization., Building and Environment 39, 2004, pp. 989-999.

Written Opinion and Search Report for PCT/US2011/032537, dated Dec. 12, 2011.

U.S. Appl. No. 13/470,074, filed Aug. 30, 2012, Steinberg.

U.S. Appl. No. 13/725,447, filed Jun. 6, 2013, Steinberg.

U.S. Appl. No. 13/852,577, filed Mar. 28, 2013, Steinberg et al.

U.S. Appl. No. 13/858,710, filed Sep. 5, 2013, Steinberg et al.

International Search Report and Written Opinion for PCT/US2013/035726, dated Aug. 6, 2013.

* cited by examiner



*FIG. 1*

Appx88



FIG. 2

Appx89



FIG. 3

Appx90



*FIG. 4*



*FIG. 5*



*FIG. 6A*



*FIG. 6B*



*FIG.  7*



FIG. 8



*FIG. 9*

US 8,738,327 B2

**1**

## SYSTEM AND METHOD FOR USING A NETWORK OF THERMOSTATS AS TOOL TO VERIFY PEAK DEMAND REDUCTION

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 13/409,697, filed Mar. 1, 2012, which is a continuation of U.S. patent application Ser. No. 13/037,162, filed Feb. 28, 2011, which is a continuation of U.S. patent application Ser. No. 12/183,949, filed Jul. 31, 2008, which claims the benefit of priority under 35 U.S.C. §119(e) to both U.S. Provisional Application 60/963,183, filed Aug. 3, 2007; and U.S. Provisional Application No. 60/994,011, filed Sep. 17, 2007, the entireties of which are incorporated herein by reference and are to be considered part of this specification.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates to the use of thermostatic HVAC controls that are connected to a computer network as a part of a system for offering peak demand reduction to electric utilities. More specifically, the present invention pertains to use of communicating thermostat combined with a computer network to verify that demand reduction has occurred.

2. Background

Climate control systems such as heating and cooling systems for buildings (heating, ventilation and cooling, or HVAC systems) have been controlled for decades by thermostats. At the most basic level, a thermostat includes a means to allow a user to set a desired temperature, a means to sense actual temperature, and a means to signal the heating and/or cooling devices to turn on or off in order to try to change the actual temperature to equal the desired temperature. The most basic versions of thermostats use components such as a coiled bi-metallic spring to measure actual temperature and a mercury switch that opens or completes a circuit when the spring coils or uncoils with temperature changes. More recently, electronic digital thermostats have become prevalent. These thermostats use solid-state devices such as thermistors or thermal diodes to measure temperature, and microprocessor-based circuitry to control the switch and to store and operate based upon user-determined protocols for temperature vs. time.

These programmable thermostats generally offer a very restrictive user interface, limited by the cost of the devices, the limited real estate of the small wall-mounted boxes, and the inability to take into account more than two variables: the desired temperature set by the user, and the ambient temperature sensed by the thermostat. Users can generally only set one series of commands per day, and to change one parameter (e.g., to change the late-night temperature) the user often has to cycle through several other parameters by repeatedly pressing one or two buttons.

As both the cost of energy and the demand for electricity have increased, utilities supplying electricity increasingly face unpleasant choices. The demand for electricity is not smooth over time. In so-called "summer peaking" locations, on the hottest days of the year, peak loads may be twice as high as average loads. During such peak load periods (generally in the late afternoon), air conditioning can be the largest single element of demand.

Utilities and their customers generally see reductions of supply (brownouts and blackouts) as an unacceptable outcome. But their other options can be almost as distasteful. In

**2**

the long term, they can build additional generating capacity, but that approach is very expensive given the fact that such capacity may be needed for only a few hours a year. And this option is of course unavailable in the short term. When confronted with an immediate potential shortfall, a utility may have reserve capacity it can choose to bring online. But because utilities are assumed to try to operate as efficiently as possible, the reserve capacity is likely to be the least efficient and most expensive and/or more polluting plants to operate. Alternatively, the utility may seek to purchase additional power on the open market. But the spot market for electricity, which cannot efficiently be stored, is extremely volatile, which means that spot prices during peak events may be as much as 10× the average price.

More recently, many utilities have begun to enter into agreements with certain customers to reduce demand, as opposed to increasing supply. In essence, these customers agree to reduce usage during a few critical periods in exchange for incentives from the utility. Those incentives may take the form of a fixed contract payment in exchange for the right to cut the amount of power supplied at specified times, or a reduced overall price per kilowatt-hour, or a rebate each time power is reduced, or some other method.

The bulk of these peak demand reduction (PDR) contracts have been entered into with large commercial and industrial customers. This bias is in large part due to the fact that transaction costs are much lower today for a single contract with a factory that can offer demand reduction of 50 megawatts than they would be for the equivalent from residential customers—it could take 25,000 or more homes to equal that reduction if these homes went without air conditioning.

But residential air conditioning is the largest single component of peak demand in California, and is a large percentage in many other places. There are numerous reasons why it would be economically advantageous to deploy PDR in the residential market. Whereas cutting energy consumption at a large factory could require shutting down or curtailing production, which has direct economic costs, cutting consumption for a couple of hours in residences is likely to have no economic cost, and may only result in minor discomfort—or none at all if no one is at home at the time.

Residential PDR has been attempted. But there have been numerous command and control issues with these implementations. The standard approach to residential PDR has been to attach a radio-controlled switch to the control circuitry located outside the dwelling. These switches are designed to receive a signal from a transmitter that signals the compressor to shut off during a PDR call.

There are a number of technical complications with this approach. There is some evidence that "hard cycling" the compressor in this manner can damage the air conditioning system. There are also serious issues resulting from the fact that the communication system is unidirectional. When utilities contract for PDR, they expect verification of compliance. One-way pagers allow the utility to send a signal that will shut of the NC, but the pager cannot confirm to the utility that the NC unit has in fact been shut off. If a consumer tampers with the system so that the NC can be used anyway, the utility will not be able to detect it, absent additional verification systems.

One way in which some utilities are seeking to address this issue is to combine the pager-controlled thermostat with so-called advanced metering infrastructure (AMI). This approach relies on the deployment of "smart meters"—electric meters that are more sophisticated than the traditional meter with its mechanical odometer mechanism for logging only cumulative energy use. Smart meters generally include a means for communicating instantaneous readings. That com-

US 8,738,327 B2

**3**

munication may in the form of a signal sent over the power lines themselves, or a wireless communication over a data network arranged by the utility. These meters allow utilities to accomplish a number of goals, including offering pricing that varies by time of day in order to encourage customers to move consumption away from peak demand hours. These smart meters can cost hundreds of dollars, however, and require both a "truck roll"—a visit from a trained service person— and most likely the scheduling of an appointment with the occupants, because swapping the meter will require turning off power to the house.

If the utility installs a smart meter at each house that contracts to participate in a PDR program, it may be possible to verify that the NC is in fact switched off. But this approach requires two separate pieces of hardware, two separate communications systems, and the ability to match them for verification purposes.

It would be desirable to have a system that could both implement and verify residential peak demand reduction with reduced expenses.

## SUMMARY OF THE INVENTION

At least one embodiment of the invention that includes system for predicting the rate of change in temperature inside a structure comprising at least one thermostat located inside the structure and controlling an HVAC system in said structure; at least one remote processor that is in communication with said thermostat; at least one database for storing data reported by said thermostat; at least one processor that compares outside temperature at at least location and at least one point in time to information reported to said remote processor from said thermostat, and wherein said processor uses the relationship between the inside temperature and the outside temperature over time to derive a first prediction for the rate of change in inside temperature assuming that the operating status of the HVAC system is "on"; and said processor uses the relationship between the inside temperature and the outside temperature over time to derive a second prediction for the rate of change in inside temperature assuming that the operating status of the HVAC system is "off"; and said processor compares at least one of the first prediction and the second prediction to the actual inside temperature recorded inside the structure to determine whether the actual inside temperature is closer to the first prediction or the second prediction.

In one embodiment, the invention comprises a thermostat attached to an HVAC system, a local network connecting the thermostat to a larger network such as the Internet, one or more additional thermostats attached to the network and to other HVAC systems, and a server in bi-directional communication with the thermostats. The server logs the ambient temperature sensed by each thermostat vs. time and the signals sent by the thermostats to the HVAC systems to which they are attached. The server preferably also logs outside temperature and humidity data for the geographic locations for the buildings served by the connected HVAC systems. Such information is widely available from various sources that publish detailed weather information based on geographic areas such as by ZIP code. The server also stores other data affecting the load upon the system, such as specific model of HVAC system, occupancy, building characteristics, etc. Some of this data may be supplied by the individual users of the system, while other data may come from commercial sources such as the electric and other utilities who supply energy to those users.

**4**

By using these multiple data streams to compare the performance of one system versus another, and one system versus the same system at other times, the server is able to estimate the effective thermal mass of the structure, and thereby predict the expected thermal performance of a given structure in response to changes in outside temperature. Thus, for example, if the air conditioning is shut off on a hot afternoon, given a known outside temperature, it will be possible to predict how quickly the temperature in the house should rise. If the actual temperature change is significantly different from the predicted rate of change, or does not change at all, it is possible to infer that the air conditioning has not, in fact, been shut off.

This and other advantages of the present invention are explained in the detailed description and claims that make reference to the accompanying diagrams and flowcharts.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** shows an example of an overall environment in which an embodiment of the invention may be used.

FIG. **2** shows a high-level illustration of the architecture of a network showing the relationship between the major elements of one embodiment of the subject invention.

FIG. **3** shows an embodiment of the website to be used as part of the subject invention.

FIG. **4** shows a high-level schematic of the thermostat used as part of the subject invention.

FIG. **5** shows one embodiment of the database structure used as part of the subject invention

FIGS. **6**A and **6**B show a graphical representation of the manner in which the subject invention may be used to verify that a demand reduction event has occurred.

FIG. **7** is a flow chart illustrating the steps involved in generating a demand reduction event for a given subscriber.

FIG. **8** is a flow chart illustrating the steps involved in confirming that a demand reduction event has taken place.

FIG. **9** is a representation of the movement of messages and information between the components of the subject invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

FIG. **1** shows an example of an overall environment **100** in which an embodiment of the invention may be used. The environment **100** includes an interactive communication network **102** with computers **104** connected thereto. Also connected to network **102** are one or more server computers **106**, which store information and make the information available to computers **104**. The network **102** allows communication between and among the computers **104** and **106**.

Presently preferred network **102** comprises a collection of interconnected public and/or private networks that are linked to together by a set of standard protocols to form a distributed network. While network **102** is intended to refer to what is now commonly referred to as the Internet, it is also intended to encompass variations which may be made in the future, including changes additions to existing standard protocols.

When a user of the subject invention wishes to access information on network **102**, the buyer initiates connection from his computer **104**. For example, the user invokes a browser, which executes on computer **104**. The browser, in turn, establishes a communication link with network **102**. Once connected to network **102**, the user can direct the browser to access information on server **106**.

US 8,738,327 B2

One popular part of the Internet is the World Wide Web. The World Wide Web contains a large number of computers **104** and servers **106**, which store HyperText Markup Language (HTML) documents capable of displaying graphical and textual information. HTML is a standard coding convention and set of codes for attaching presentation and linking attributes to informational content within documents.

The servers **106** that provide offerings on the World Wide Web are typically called websites. A website is often defined by an Internet address that has an associated electronic page. Generally, an electronic page is a document that organizes the presentation of text graphical images, audio and video.

In addition to the Internet, the network **102** can comprise a wide variety of interactive communication media. For example, network **102** can include local area networks, interactive television networks, telephone networks, wireless data systems, two-way cable systems, and the like.

In one embodiment, computers **104** and servers **106** are conventional computers that are equipped with communications hardware such as modem or a network interface card. The computers include processors such as those sold by Intel and AMD. Other processors may also be used, including general-purpose processors, multi-chip processors, embedded processors and the like.

Computers **104** can also be handheld and wireless devices such as personal digital assistants (PDAs), cellular telephones and other devices capable of accessing the network.

Computers **104** utilize a browser configured to interact with the World Wide Web. Such browsers may include Microsoft Explorer, Mozilla, Firefox, Opera or Safari. They may also include browsers used on handheld and wireless devices.

The storage medium may comprise any method of storing information. It may comprise random access memory (RAM), electronically erasable programmable read only memory (EEPROM), read only memory (ROM), hard disk, floppy disk, CD-ROM, optical memory, or other method of storing data.

Computers **104** and **106** may use an operating system such as Microsoft Windows, Apple Mac OS, Linux, Unix or the like.

Computers **106** may include a range of devices that provide information, sound, graphics and text, and may use a variety of operating systems and software optimized for distribution of content via networks.

FIG. **2** illustrates in further detail the architecture of the specific components connected to network **102** showing the relationship between the major elements of one embodiment of the subject invention. Attached to the network are thermostats **108** and computers **104** of various users. Connected to thermostats **108** are HVAC units **110**. The HVAC units may be conventional air conditioners, heat pumps, or other devices for transferring heat into or out of a building. Each user is connected to the servers **106***a* via wired or wireless connection such as Ethernet or a wireless protocol such as IEEE 802.11, a gateway **110** that connects the computer and thermostat to the Internet via a broadband connection such as a digital subscriber line (DSL) or other form of broadband connection to the World Wide Web. In one embodiment, electric utility server **106***a* and demand reduction service server **106***b* are in communication with the network **102**. Servers **106***a* and **106***b* contain the content to be served as web pages and viewed by computers **104**, as well as databases containing information used by the servers. Also connected to the servers **106***a* via the Internet are computers located at one or more electrical utilities **106***b*.

In the currently preferred embodiment, the website **200** includes a number of components accessible to the user, as shown in FIG. **3**. Those components may include a means to store temperature settings **202**, a means to enter information about the user's home **204**, a means to enter the user's electricity bills **206**, means to calculate energy savings that could result from various thermostat-setting strategies **208**, and means to enable and choose between various arrangements **210** for demand reduction with their electric utility provider as intermediated by the demand reduction service provider.

FIG. **4** shows a high-level block diagram of thermostat **108** used as part of the subject invention. Thermostat **108** includes temperature sensing means **252**, which may be a thermistor, thermal diode or other means commonly used in the design of electronic thermostats. It includes a microprocessor **254**, memory **256**, a display **258**, a power source **260**, a relay **262**, which turns the HVAC system on and off in response to a signal from the microprocessor, and contacts by which the relay is connected to the wires that lead to the HVAC system. To allow the thermostat to communicate bi-directionally with the computer network, the thermostat also includes means **264** to connect the thermostat to a local computer or to a wireless network. Such means could be in the form of Ethernet, wireless protocols such as IEEE 802.11, IEEE 802.15.4, Bluetooth, or other wireless protocols. (Other components as needed) The thermostat **250** may also include controls **266** allowing users to change settings directly at the thermostat, but such controls are not necessary to allow the thermostat to function.

The data used to generate the content delivered in the form of the website is stored on one or more servers **106** within one or more databases. As shown in FIG. **5**, the overall database structure **300** may include temperature database **400**, thermostat settings database **500**, energy bill database **600**, HVAC hardware database **700**, weather database **800**, user database **900**, transaction database **1000**, product and service database **1100** and such other databases as may be needed to support these and additional features.

The website will allow users of connected thermostats **250** to create personal accounts. Each user's account will store information in database **900**, which tracks various attributes relative to users of the site. Such attributes may include the make and model of the specific HVAC equipment in the user's home; the age and square footage of the home, the solar orientation of the home, the location of the thermostat in the home, the user's preferred temperature settings, whether the user is a participant in a demand reduction program, etc.

As shown in FIG. **3**, the website **200** will permit thermostat users to perform through the web browser substantially all of the programming functions traditionally performed directly at the physical thermostat, such as temperature set points, the time at which the thermostat should be at each set point, etc. Preferably the website will also allow users to accomplish more advanced tasks such as allow users to program in vacation settings for times when the HVAC system may be turned off or run at more economical settings, and set macros that will allow changing the settings of the temperature for all periods with a single gesture such as a mouse click.

In addition to using the system to allow better signaling and control of the HVAC system, which relies primarily on communication running from the server to the thermostat, the bi-directional communication will also allow the thermostat **108** to regularly measure and send to the server information about the temperature in the building. By comparing outside temperature, inside temperature, thermostat settings, cycling behavior of the HVAC system, and other variables, the system

US 8,738,327 B2

7

will be capable of numerous diagnostic and controlling functions beyond those of a standard thermostat.

For example, FIG. **6a** shows a graph of inside temperature, outside temperature and HVAC activity for a 24 hour period. When outside temperature **302** increases, inside temperature **304** follows, but with some delay because of the thermal mass of the building, unless the air conditioning **306** operates to counteract this effect. When the air conditioning turns on, the inside temperature stays constant (or rises at a much lower rate) despite the rising outside temperature. In this example, frequent and heavy use of the air conditioning results in only a very slight temperature increase inside o the house of 4 degrees, from 72 to 76 degrees, despite the increase in outside temperature from 80 to 100 degrees.

FIG. **6b** shows a graph of the same house on the same day, but assumes that the air conditioning is turned off from noon to 7 PM. As expected, the inside temperature **304a** rises with increasing outside temperatures **302** for most of that period, reaching 88 degrees at 7 PM.

Because server **106a** logs the temperature readings from inside each house (whether once per minute or over some other interval), as well as the timing and duration of air conditioning cycles, database **300** will contain a history of the thermal performance of each house. That performance data will allow the server **106a** to calculate an effective thermal mass for each such structure—that is, the speed with the temperature inside a given building will change in response to changes in outside temperature. Because the server will also log these inputs against other inputs including time of day, humidity, etc. the server will be able to predict, at any given time on any given day, the rate at which inside temperature should change for given inside and outside temperatures.

As shown in FIG. **3**, website **200** will allow the users to opt **210** into a plan that offers incentives such as cash or rebates in exchange for reduced air conditioning use during peak load periods.

FIG. **7** shows the steps followed in order to initiate air conditioner shutoff. When a summer peak demand situation occurs, the utility will transmit an email **402** or other signal to server **106a** requesting a reduction in load. Server **106a** will determine **404** if the user's house is served by the utility seeking reduction; determine **406** if a given user has agreed to reduce peak demand; and determine **408** if a reduction of consumption by the user is required or desirable in order to achieve the reduction in demand requested by the utility. The server will transmit **410** a signal to the user's thermostat **108** signaling the thermostat to shut off the air conditioner **110**.

FIG. **8** shows the steps followed in order to verify that the air conditioner has in fact been shut off. Server **106a** will receive and monitor **502** the temperature readings sent by the user's thermostat **108**. The server then calculates **504** the temperature reading to be expected for that thermostat given inputs such as current and recent outside temperature, recent inside temperature readings, the calculated thermal mass of the structure, temperature readings in other houses, etc. The server will compare **506** the predicted reading with the actual reading. If the server determines that the temperature inside the house is rising at the rate predicted if the air conditioning is shut off, then the server confirms **508** that the air conditioning has been shut off. If the temperature reading from the thermostat shows no increase, or significantly less increase than predicted by the model, then the server concludes **510** that the air conditioning was not switched off, and that no contribution to the demand response request was made.

For example, assume that on at 3 PM on date Y utility X wishes to trigger a demand reduction event. A server at utility X transmits a message to the server at demand reduction

8

service provider Z requesting W megawatts of demand reduction. Demand reduction service provider server determines that it will turn off the air conditioner at house A in order to achieve the required demand reduction. At the time the event is triggered, the inside temperature as reported by the thermostat in house A is 72 degrees F. The outside temperature near house A is 96 degrees Fahrenheit. The inside temperature at House B, which is not part of the demand reduction program, but is both connected to the demand reduction service server and located geographically proximate to House A, is 74 F. Because the A/C in house A has been turned off, the temperature inside House A begins to rise, so that at 4 PM it has increased to 79 F. Because the server is aware of the outside temperature, which remains at 96 F., and of the rate of temperature rise inside house A on previous days on which temperatures have been at or near 96 F., and the temperature in house B, which has risen only to 75 F. because the air conditioning in house B continues to operate normally, the server is able to confirm with a high degree of certainty that the A/C in house A has indeed been shut off.

In contrast, if the HVAC system at house A has been tampered with, so that a demand reduction signal from the server does not actually result in shutting off the A/C in house A, when the server compares the rate of temperature change at house A against the other data points, the server will receive data inconsistent with the rate of increase predicted. As a result, it will conclude that the A/C has not been shut off in house A as expected, and will not credit house A with the financial credit that would be associated with demand reduction compliance, or may trigger a business process that could result in termination of house A's participation in the demand reduction program.

FIG. **9** illustrates the movement of signals and information between the components of the subject invention to trigger and verify a demand reduction response. In step **602** the electric utility server **106b** transmits a message to demand reduction service server **106a** requesting a demand reduction of a specified duration and size. Demand reduction service server **106a** uses database **300** to determine which subscribers should be included in the demand reduction event. For each included subscriber, the server then sends a signal **604** to the subscriber's thermostat instructing it (a) to shut down at the appropriate time or (b) to allow the temperature as measured by the thermostat to increase to a certain temperature at the specified time, depending upon the agreement between the homeowner and the demand reduction aggregator. The server then receives **606** temperature signals from the subscriber's thermostat. At the conclusion of the demand reduction event, the server transmits a signal **608** to the thermostat permitting the thermostat to signal its attached HVAC system to resume cooling, if the system has been shut off, or to reduce the target temperature to its pre-demand reduction setting, if the target temperature was merely increased. After determining the total number of subscribers actually participating in the DR event, the server then calculates the total demand reduction achieved and sends a message **610** to the electric utility confirming such reduction.

Additional steps may be included in the process. For example, if the subscriber has previously requested that notice be provided when a peak demand reduction event occurs, the server will also send an alert, which may be in the form of an email message or an update to the personalized web page for that user, or both. If the server determines that a given home has (or has not) complied with the terms of its demand reduction agreement, the server will send a message to the subscriber confirming that fact.

US 8,738,327 B2

9

It should also be noted that in some climate zones, peak demand events occur during extreme cold weather rather than (or in addition to) during hot weather. The same process as discussed above could be employed to reduce demand by shutting off electric heaters and monitoring the rate at which temperatures fall.

It should also be noted that the peak demand reduction service can be performed directly by a power utility, so that the functions of server **106***a* can be combined with the functions of server **106***b*.

The system installed in a subscriber's home may optionally include additional temperature sensors at different locations within the building. These additional sensors may we connected to the rest of the system via a wireless system such as 802.11 or 802.15.4, or may be connected via wires. Additional temperature and/or humidity sensors may allow increased accuracy of the system, which can in turn increase user comfort, energy savings or both.

While particular embodiments of the present invention have been shown and described, it is apparent that changes and modifications may be made without departing from the invention in its broader aspects and, therefore, the invention may carried out in other ways without departing from the true spirit and scope. These and other equivalents are intended to be covered by the following claims:

What is claimed is:

**1**. A system for controlling the operational status of an HVAC system comprising:

    at least one thermostat associated with a structure that receives temperature measurements from inside the structure, the structure conditioned by at least one HVAC system, the thermostat having at least a first setting stored therein;

    one or more servers located remotely from the structure, the one or more servers configured to receive measurements of outside temperatures from at least one source other than the HVAC system,

    the one or more servers are further configured to communicate with the thermostat via a network, wherein the one or more servers receive inside temperatures from the thermostat and compares the inside temperatures of the structure and the outside temperatures over time to derive an estimation for the rate of change in inside temperature of the structure in response to outside temperature,

    the one or more servers are further configured to receive a demand reduction request and determine whether the structure is associated with demand rejection request, and

    based on the determination that the structure is associated with the demand reduction request, the one or more servers are further configured to send a signal to the thermostat to change the setting to a second setting to reduce electricity demand by the HVAC system.

**2**. The system as in claim **1** in which the one or more servers receive measurements of outside temperatures for geographic regions such as ZIP codes from sources other than the HVAC system.

**3**. The system as in claim **1** in which the thermostat comprises a programmable thermostat that communicates with a mesh networking protocol.

**4**. The system as in claim **1** in which the one or more servers communicate with the HVAC system using a network that includes an electricity meter.

**5**. The system as in claim **1** in which the estimation is a prediction about the future rate of change in temperature inside the structure.

10

**6**. The system as in claim **1** wherein the signal sent by the one or more servers directs the thermostat to shut down the HVAC system.

**7**. The system as in claim **1** wherein the signal identifies a time.

**8**. The system as in claim **1** wherein the second setting allows the inside temperature of the structure to increase to a certain temperature during a specified time interval.

**9**. The system as in claim **1** wherein the second setting is based on an agreement between a homeowner and a demand reduction aggregator.

**10**. The system as in claim **1** wherein the one or more servers are further configured to send an alert to a user associated with the structure.

**11**. A method for controlling the operation of an HVAC system comprising:

    receiving temperature measurements inside a structure from at least one thermostat, the structure conditioned by at least one HVAC system, the thermostat having at least a first setting stored therein;

    receiving at one or more servers located remotely from the structure, measurements of outside temperatures from at least one source other than the HVAC system;

    the one or more servers communicating with the thermostat via a network;

    receiving at the one or more servers, inside temperatures from the thermostat;

    comparing with the one or more servers, the inside temperatures of the structure and the outside temperatures over time to derive an estimation for the rate of change in inside temperature of the structure in response to outside temperature;

    receiving a demand reduction request and determining whether the structure is associated with demand rejection request; and

    based on the determination that the structure is associated with the demand reduction request, sending with the one or more servers a signal to the thermostat to change the first setting to a second setting to reduce electricity demand by the HVAC system.

**12**. The method as in claim **11** in which the one or more processors receive measurements of outside temperatures for geographic regions such as ZIP codes from sources other than the HVAC system.

**13**. The method as in claim **11** in which the thermostat comprises a programmable thermostat that communicates with a mesh networking protocol.

**14**. The method as in claim **11** in which the one or more servers communicate with the HVAC system using a network that includes an electricity meter.

**15**. The method as in claim **11** in which the estimation is a prediction about the future rate of change in temperature inside the structure.

**16**. The method as in claim **11** wherein the signal sent by the one or more servers directs the thermostat to shut down the HVAC system.

**17**. The method as in claim **11** wherein the signal identifies a time.

**18**. The method as in claim **11** wherein the second setting allows the inside temperature of the structure to increase to a certain temperature during a specified time interval.

**19**. The method as in claim **11** wherein the second setting is based on an agreement between a homeowner and a demand reduction aggregator.

\* \* \* \* \*

# Exhibit 4



US010534382B2

(12) **United States Patent**
Steinberg

(10) **Patent No.:**    **US 10,534,382 B2**
(45) **Date of Patent:**    *Jan. 14, 2020

(54) **SYSTEM AND METHOD FOR USING A WIRELESS DEVICE AS A SENSOR FOR AN ENERGY MANAGEMENT SYSTEM**

(71) Applicant: **EcoFactor, Inc.**, Redwood City, CA (US)

(72) Inventor: **John Douglas Steinberg**, Millbrae, CA (US)

(73) Assignee: **EcoFactor, Inc.**, Palo Alto, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/374,085**

(22) Filed: **Apr. 3, 2019**

(65) **Prior Publication Data**

US 2019/0227582 A1     Jul. 25, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 15/002,791, filed on Jan. 21, 2016, now Pat. No. 10,289,131, which is a
(Continued)

(51) **Int. Cl.**
**G05D 23/00**      (2006.01)
**G08B 1/08**      (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC .............. **G05D 23/00** (2013.01); **F24F 11/30** (2018.01); **F24F 11/62** (2018.01); **F24F 11/70** (2018.01);
(Continued)

(58) **Field of Classification Search**
CPC .......... F24F 11/006; F24F 11/70; F24F 11/62; F24F 11/30; F24F 11/56; F24F 2120/12;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,136,732 A      1/1979  Demaray et al.
4,270,693 A      6/1981  Hayes
(Continued)

FOREIGN PATENT DOCUMENTS

EP          0415747 A2      3/1991
EP          1102500 A2      5/2001
(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 12/805,705, filed Jun. 10, 2010, Crabtree.
(Continued)

*Primary Examiner* — Ajay Ojha
(74) *Attorney, Agent, or Firm* — Knobbe, Martens, Olson & Bear, LLP

(57)          **ABSTRACT**

The invention comprises systems and methods for detecting the use of networked consumer electronics devices as indications of occupancy of a structure for purposes of automatically adjusting the temperature setpoint on a thermostatic HVAC control. At least one thermostat is located inside a structure and is used to control an HVAC system in the structure. At least one networked electronic device is used to indicate the state of occupancy of the structure. The state of occupancy is used to alter the setpoint on the thermostatic HVAC control to reduce unneeded conditioning of unoccupied spaces.

**20 Claims, 8 Drawing Sheets**



Appx104

**US 10,534,382 B2**

Page 2

### Related U.S. Application Data

continuation of application No. 13/470,074, filed on May 11, 2012, now Pat. No. 9,244,470, which is a continuation of application No. 12/502,064, filed on Jul. 13, 2009, now Pat. No. 8,180,492.

(60) Provisional application No. 61/134,714, filed on Jul. 14, 2008.

(51) **Int. Cl.**

| | |
|---|---|
| *G05D 23/19* | (2006.01) |
| *G05B 15/02* | (2006.01) |
| *G06N 7/00* | (2006.01) |
| *F24F 11/30* | (2018.01) |
| *F24F 11/62* | (2018.01) |
| *F24F 11/70* | (2018.01) |
| *F24F 120/10* | (2018.01) |
| *F24F 120/12* | (2018.01) |
| *F24F 120/14* | (2018.01) |
| *F24F 140/60* | (2018.01) |
| *F24F 120/20* | (2018.01) |
| *F24F 11/63* | (2018.01) |
| *F24F 11/56* | (2018.01) |
| *F24F 11/46* | (2018.01) |

(52) **U.S. Cl.**
CPC ......... *G05B 15/02* (2013.01); *G05D 23/1902* (2013.01); *G06N 7/005* (2013.01); *G08B 1/08* (2013.01); *F24F 11/46* (2018.01); *F24F 11/56* (2018.01); *F24F 11/63* (2018.01); *F24F 2120/10* (2018.01); *F24F 2120/12* (2018.01); *F24F 2120/14* (2018.01); *F24F 2120/20* (2018.01); *F24F 2140/60* (2018.01)

(58) **Field of Classification Search**
CPC ........ F24F 2120/10; F24F 11/63; F24F 11/46; F24F 2120/20; F24F 2140/60; F24F 2120/14; G05B 15/02; G06N 7/005; G05D 23/1902
See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,341,345 A | 7/1982 | Hammer et al. |
| 4,403,644 A | 9/1983 | Hebert |
| 4,451,879 A | 5/1984 | Welch et al. |
| 4,475,685 A | 10/1984 | Grimado et al. |
| 4,655,279 A | 4/1987 | Harmon |
| 4,674,027 A | 6/1987 | Beckey |
| 4,675,828 A | 6/1987 | Winston |
| 4,702,305 A | 10/1987 | Beckey et al. |
| 4,702,413 A | 10/1987 | Beckey et al. |
| 4,897,798 A | 1/1990 | Cler |
| 5,124,502 A | 6/1992 | Nelson et al. |
| 5,244,146 A | 9/1993 | Jefferson et al. |
| 5,261,481 A | 11/1993 | Baldwin et al. |
| 5,270,952 A | 12/1993 | Adams et al. |
| 5,279,458 A | 1/1994 | Dewolf et al. |
| 5,297,838 A | 3/1994 | Juravich |
| 5,314,004 A | 5/1994 | Strand et al. |
| 5,348,078 A | 9/1994 | Dushane et al. |
| 5,454,511 A | 10/1995 | Van Ostrand et al. |
| 5,462,225 A | 10/1995 | Massara et al. |
| 5,544,036 A | 8/1996 | Brown et al. |
| 5,555,927 A | 9/1996 | Shah |
| 5,572,438 A | 11/1996 | Ehlers et al. |
| 5,682,949 A | 11/1997 | Ratcliffe et al. |
| 5,706,190 A | 1/1998 | Russ et al. |
| 5,717,609 A | 2/1998 | Packa et al. |
| 5,725,148 A | 3/1998 | Hartman |
| 5,729,474 A | 3/1998 | Hildebrand et al. |

| | | | |
|---|---|---|---|
| 5,761,083 A | 6/1998 | Brown, Jr. et al. |
| 5,818,347 A | 10/1998 | Dolan et al. |
| 5,839,654 A | 11/1998 | Weber |
| 5,924,486 A | 7/1999 | Ehlers et al. |
| 5,977,964 A | 11/1999 | Williams et al. |
| 6,079,626 A | 6/2000 | Hartman |
| 6,115,713 A | 9/2000 | Pascucci et al. |
| 6,145,751 A | 11/2000 | Ahmed |
| 6,178,362 B1 | 1/2001 | Woolard et al. |
| 6,216,956 B1 | 4/2001 | Ehlers et al. |
| 6,223,544 B1 | 5/2001 | Seem |
| 6,241,156 B1 | 6/2001 | Kline et al. |
| 6,260,765 B1 | 7/2001 | Natale et al. |
| 6,351,693 B1 | 2/2002 | Monie |
| 6,400,956 B1 | 6/2002 | Richton |
| 6,400,996 B1 | 6/2002 | Hoffberg et al. |
| 6,437,692 B1 | 8/2002 | Petite et al. |
| 6,449,534 B1 | 9/2002 | Stewart |
| 6,454,177 B1 | 9/2002 | Sasao et al. |
| 6,478,233 B1 | 11/2002 | Shah |
| 6,480,803 B1 | 11/2002 | Pierret et al. |
| 6,483,906 B1 | 11/2002 | Lggulden et al. |
| 6,536,675 B1 | 3/2003 | Pesko et al. |
| 6,542,076 B1 | 4/2003 | Joao |
| 6,549,130 B1 | 4/2003 | Joao |
| 6,574,537 B2 | 6/2003 | Kipersztok et al. |
| 6,580,950 B1 | 6/2003 | Johnson |
| 6,594,825 B1 | 7/2003 | Goldschmidtlki et al. |
| 6,595,430 B1 | 7/2003 | Shah |
| 6,598,056 B1 | 7/2003 | Hull et al. |
| 6,619,555 B2 | 9/2003 | Rosen |
| 6,622,097 B2 | 9/2003 | Hunter |
| 6,622,115 B1 | 9/2003 | Brown et al. |
| 6,622,925 B2 | 9/2003 | Carner et al. |
| 6,622,926 B1 | 9/2003 | Sartain et al. |
| 6,628,997 B1 | 9/2003 | Fox et al. |
| 6,633,823 B2 | 10/2003 | Bartone et al. |
| 6,643,567 B2 | 11/2003 | Kolk et al. |
| 6,644,098 B2 | 11/2003 | Cardinale et al. |
| 6,671,586 B2 | 12/2003 | Davis et al. |
| 6,695,218 B2 | 2/2004 | Fleckenstein |
| 6,700,224 B2 | 3/2004 | Biskup, Sr. |
| 6,726,113 B2 | 4/2004 | Guo |
| 6,731,992 B1 | 5/2004 | Ziegler |
| 6,734,806 B1 | 5/2004 | Cratsley |
| 6,772,052 B1 | 8/2004 | Amundsen |
| 6,785,592 B1 | 8/2004 | Smith |
| 6,785,630 B2 | 8/2004 | Kolk |
| 6,786,421 B2 | 9/2004 | Rosen |
| 6,789,739 B2 | 9/2004 | Rosen |
| 6,845,918 B2 | 1/2005 | Rotondo |
| 6,853,959 B2 | 2/2005 | Ikeda et al. |
| 6,868,293 B1 | 3/2005 | Schurr |
| 6,868,319 B2 | 3/2005 | Kipersztok et al. |
| 6,882,712 B1 | 4/2005 | Iggulden et al. |
| 6,889,908 B2 | 5/2005 | Crippen et al. |
| 6,891,838 B1 | 5/2005 | Petite et al. |
| 6,912,429 B1 | 6/2005 | Bilger |
| 6,981,383 B2 | 1/2006 | Shah et al. |
| 6,991,029 B2 | 1/2006 | Orfield et al. |
| 7,009,493 B2 | 3/2006 | Howard |
| 7,031,880 B1 | 4/2006 | Seem et al. |
| 7,039,532 B2 | 5/2006 | Hunter |
| 7,055,759 B2 | 6/2006 | Wacker et al. |
| 7,061,393 B2 | 6/2006 | Buckingham et al. |
| 7,089,088 B2 | 8/2006 | Terry et al. |
| 7,130,719 B2 | 10/2006 | Ehlers et al. |
| 7,130,832 B2 | 10/2006 | Bannai et al. |
| H2176 H | 12/2006 | Meyer et al. |
| 7,167,079 B2 | 1/2007 | Smyth et al. |
| 7,187,986 B2 | 3/2007 | Johnson et al. |
| 7,205,892 B2 | 4/2007 | Luebke et al. |
| 7,206,670 B2 | 4/2007 | Pimputkar et al. |
| 7,215,746 B2 | 5/2007 | Iggulden et al. |
| 7,216,015 B2 | 5/2007 | Poth |
| 7,231,424 B2 | 6/2007 | Bodin et al. |
| 7,232,075 B1 | 6/2007 | Rosen |
| 7,242,988 B1 | 7/2007 | Hoffberg et al. |
| 7,260,823 B2 | 8/2007 | Schlack et al. |

**US 10,534,382 B2**

Page 3

(56)    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,354,005 | B2 | 4/2008 | Carey et al. |
| 7,356,384 | B2 | 4/2008 | Gull et al. |
| 7,476,020 | B2 | 1/2009 | Zufferey et al. |
| 7,483,964 | B1 | 1/2009 | Jackson et al. |
| 7,565,225 | B2 | 7/2009 | Dushane et al. |
| 7,590,469 | B2 | 9/2009 | Grohman |
| 7,644,869 | B2 | 1/2010 | Hoglund et al. |
| 7,702,424 | B2 | 4/2010 | Cannon et al. |
| 7,758,729 | B1 | 7/2010 | DeWhitt |
| 7,784,704 | B2 | 8/2010 | Harter |
| 7,802,618 | B2 | 9/2010 | Simon et al. |
| 7,848,900 | B2 | 12/2010 | Steinberg et al. |
| 7,869,904 | B2 | 1/2011 | Cannon et al. |
| 7,894,943 | B2 | 2/2011 | Sloup et al. |
| 7,908,116 | B2 | 3/2011 | Steinberg et al. |
| 7,908,117 | B2 | 3/2011 | Steinberg et al. |
| 7,983,795 | B2 | 7/2011 | Josephson et al. |
| 8,010,237 | B2 | 8/2011 | Cheung et al. |
| 8,019,567 | B2 | 9/2011 | Steinberg et al. |
| D646,990 | S | 10/2011 | Rhodes |
| 8,090,477 | B1 | 1/2012 | Steinberg |
| 8,131,497 | B2 | 3/2012 | Steinberg et al. |
| 8,131,506 | B2 | 3/2012 | Steinberg et al. |
| D659,560 | S | 5/2012 | Rhodes |
| 8,180,492 | B2 | 5/2012 | Steinberg |
| 8,340,826 | B2 | 12/2012 | Steinberg et al. |
| D673,467 | S | 1/2013 | Lee et al. |
| 8,386,082 | B2 | 2/2013 | Oswald |
| 8,412,488 | B2 | 4/2013 | Steinberg et al. |
| 8,423,322 | B2 | 4/2013 | Steinberg et al. |
| 8,428,782 | B2 | 4/2013 | Imes |
| 8,428,785 | B2 | 4/2013 | Boucher et al. |
| 8,457,797 | B2 | 6/2013 | Imes et al. |
| 8,498,753 | B2 | 7/2013 | Steinberg et al. |
| 8,556,188 | B2 | 10/2013 | Steinberg |
| 8,583,288 | B1 | 11/2013 | Rossi et al. |
| 8,596,550 | B2 | 12/2013 | Steinberg et al. |
| 8,712,590 | B2 | 4/2014 | Steinberg |
| D705,095 | S | 5/2014 | Steinberg et al. |
| 8,738,327 | B2 | 5/2014 | Steinberg et al. |
| 8,740,100 | B2 | 6/2014 | Steinberg |
| 8,751,186 | B2 | 6/2014 | Steinberg et al. |
| 8,840,033 | B2 | 9/2014 | Steinberg |
| 8,850,348 | B2 | 9/2014 | Fadell et al. |
| 8,880,231 | B2 | 11/2014 | Boucher et al. |
| 8,886,488 | B2 | 11/2014 | Steinberg et al. |
| 9,057,649 | B2 | 6/2015 | Steinberg et al. |
| 9,134,710 | B2 | 9/2015 | Cheung et al. |
| 9,188,994 | B2 | 11/2015 | Steinberg |
| 9,194,597 | B2 | 11/2015 | Steinberg et al. |
| 9,244,470 | B2 | 1/2016 | Steinberg |
| 9,279,594 | B2 | 3/2016 | Steinberg |
| 9,353,965 | B1 | 5/2016 | Goyal et al. |
| 9,534,805 | B2 | 1/2017 | Matsuoka et al. |
| 9,709,292 | B2 | 7/2017 | Steinberg |
| 9,791,839 | B2 | 10/2017 | Matsuoka et al. |
| 9,939,333 | B2 | 4/2018 | Steinberg et al. |
| 9,982,905 | B2 | 5/2018 | Steinberg |
| 2001/0025349 | A1 | 9/2001 | Sharood et al. |
| 2003/0040934 | A1 | 2/2003 | Skidmore et al. |
| 2003/0131623 | A1 | 7/2003 | Suppes |
| 2004/0065095 | A1 | 4/2004 | Osborne et al. |
| 2004/0117330 | A1 | 6/2004 | Ehlers et al. |
| 2004/0133314 | A1 | 7/2004 | Ehlers et al. |
| 2004/0176880 | A1 | 9/2004 | Obradovich et al. |
| 2005/0222889 | A1 | 10/2005 | Lai et al. |
| 2005/0270151 | A1* | 12/2005 | Winick .................. G08B 17/00 340/539.1 |
| 2005/0288822 | A1 | 12/2005 | Rayburn |
| 2006/0045105 | A1 | 3/2006 | Dobosz et al. |
| 2006/0214014 | A1 | 9/2006 | Bash et al. |
| 2006/0283965 | A1 | 12/2006 | Mueller et al. |
| 2007/0043477 | A1 | 2/2007 | Elhers et al. |
| 2007/0044501 | A1 | 3/2007 | Schnell et al. |
| 2007/0045431 | A1 | 3/2007 | Chapman et al. |
| 2007/0107450 | A1 | 5/2007 | Sasao et al. |
| 2007/0146126 | A1 | 6/2007 | Wang |
| 2008/0083234 | A1 | 4/2008 | Krebs et al. |
| 2008/0083834 | A1 | 4/2008 | Krebs et al. |
| 2008/0198549 | A1 | 8/2008 | Rasmussen et al. |
| 2008/0281472 | A1 | 11/2008 | Podgorny et al. |
| 2008/0283621 | A1 | 11/2008 | Quirino et al. |
| 2009/0005070 | A1 | 1/2009 | Forstall et al. |
| 2009/0013703 | A1 | 1/2009 | Werner |
| 2009/0018673 | A1 | 1/2009 | Dushane et al. |
| 2009/0052859 | A1 | 2/2009 | Greenberger et al. |
| 2009/0057426 | A1 | 3/2009 | Sullivan et al. |
| 2009/0062970 | A1 | 3/2009 | Forbes et al. |
| 2009/0065596 | A1 | 3/2009 | Seem et al. |
| 2009/0099699 | A1 | 4/2009 | Steinberg et al. |
| 2009/0125151 | A1 | 5/2009 | Steinberg et al. |
| 2009/0188985 | A1 | 7/2009 | Scharing et al. |
| 2009/0216382 | A1 | 8/2009 | Ng |
| 2009/0240381 | A1 | 9/2009 | Lane |
| 2009/0271013 | A1 | 10/2009 | Chen |
| 2009/0281667 | A1 | 11/2009 | Masui et al. |
| 2010/0019051 | A1 | 1/2010 | Rosen |
| 2010/0019052 | A1 | 1/2010 | Yip |
| 2010/0070086 | A1 | 3/2010 | Harrod et al. |
| 2010/0070089 | A1 | 3/2010 | Harrod et al. |
| 2010/0070093 | A1 | 3/2010 | Harrod et al. |
| 2010/0070234 | A1 | 3/2010 | Steinberg et al. |
| 2010/0156608 | A1 | 6/2010 | Bae et al. |
| 2010/0162285 | A1 | 6/2010 | Cohen et al. |
| 2010/0211224 | A1 | 8/2010 | Keeling et al. |
| 2010/0235004 | A1 | 9/2010 | Thind |
| 2010/0289643 | A1 | 11/2010 | Trundle et al. |
| 2010/0318227 | A1 | 12/2010 | Steinberg et al. |
| 2011/0031323 | A1 | 2/2011 | Nold et al. |
| 2011/0046792 | A1 | 2/2011 | Imes et al. |
| 2011/0046798 | A1 | 2/2011 | Imes et al. |
| 2011/0046799 | A1 | 2/2011 | Imes et al. |
| 2011/0046800 | A1 | 2/2011 | Imes et al. |
| 2011/0046801 | A1 | 2/2011 | Imes et al. |
| 2011/0051823 | A1 | 3/2011 | Imes et al. |
| 2011/0054699 | A1 | 3/2011 | Imes et al. |
| 2011/0054710 | A1 | 3/2011 | Imes et al. |
| 2011/0118857 | A1 | 5/2011 | Bodnar |
| 2011/0173542 | A1 | 7/2011 | Imes et al. |
| 2011/0202181 | A1 | 8/2011 | Lee et al. |
| 2011/0202185 | A1 | 8/2011 | Imes et al. |
| 2011/0214060 | A1 | 9/2011 | Imes et al. |
| 2011/0224838 | A1 | 9/2011 | Imes et al. |
| 2011/0246898 | A1 | 10/2011 | Imes et al. |
| 2011/0253796 | A1 | 10/2011 | Posa et al. |
| 2011/0290893 | A1 | 12/2011 | Steinberg |
| 2011/0307101 | A1 | 12/2011 | Imes et al. |
| 2012/0023225 | A1 | 1/2012 | Imes et al. |
| 2012/0046859 | A1 | 2/2012 | Imes et al. |
| 2012/0064923 | A1 | 3/2012 | Imes et al. |
| 2012/0065935 | A1 | 3/2012 | Steinberg et al. |
| 2012/0066168 | A1 | 3/2012 | Fadell et al. |
| 2012/0072033 | A1 | 3/2012 | Imes et al. |
| 2012/0086562 | A1 | 4/2012 | Steinberg |
| 2012/0093141 | A1 | 4/2012 | Imes et al. |
| 2012/0101637 | A1 | 4/2012 | Imes et al. |
| 2012/0125592 | A1 | 5/2012 | Fadell et al. |
| 2012/0135759 | A1 | 5/2012 | Imes et al. |
| 2012/0186774 | A1 | 7/2012 | Matsuoka et al. |
| 2012/0215725 | A1 | 8/2012 | Imes et al. |
| 2012/0221718 | A1 | 8/2012 | Imes et al. |
| 2012/0252430 | A1 | 10/2012 | Imes et al. |
| 2012/0324119 | A1 | 12/2012 | Imes et al. |
| 2013/0053054 | A1 | 2/2013 | Lovitt et al. |
| 2013/0054758 | A1 | 2/2013 | Imes et al. |
| 2013/0054863 | A1 | 2/2013 | Imes et al. |
| 2013/0060387 | A1 | 3/2013 | Imes et al. |
| 2013/0073094 | A1 | 3/2013 | Knapton et al. |
| 2013/0144453 | A1 | 6/2013 | Subbloie |
| 2013/0167035 | A1 | 6/2013 | Imes et al. |
| 2013/0173064 | A1 | 7/2013 | Fadell et al. |
| 2013/0178985 | A1 | 7/2013 | Lombard et al. |
| 2013/0226502 | A1 | 8/2013 | Steinberg et al. |
| 2013/0310989 | A1 | 11/2013 | Steinberg et al. |

Appx106

US 10,534,382 B2

Page 4

(56)        **References Cited**

U.S. PATENT DOCUMENTS

| 2014/0039690 A1 | 2/2014 | Steinberg |
| 2014/0058567 A1 | 2/2014 | Matsuoka et al. |
| 2014/0074300 A1 | 3/2014 | Shilts et al. |
| 2014/0207292 A1 | 7/2014 | Ramagem |
| 2014/0229018 A1 | 8/2014 | Steinberg |
| 2014/0316581 A1 | 10/2014 | Fadell et al. |
| 2014/0352340 A1 | 12/2014 | Berg et al. |
| 2015/0025691 A1 | 1/2015 | Fadell et al. |
| 2015/0043615 A1 | 2/2015 | Steinberg et al. |
| 2015/0120235 A1 | 4/2015 | Steinberg et al. |
| 2015/0142180 A1 | 5/2015 | Matsuoka et al. |
| 2015/0227846 A1 | 8/2015 | Mercer et al. |
| 2015/0300892 A1 | 10/2015 | Malhotra et al. |
| 2015/0378373 A1 | 12/2015 | Sprinkle et al. |
| 2016/0047565 A1 | 2/2016 | Robinson |
| 2016/0061474 A1 | 3/2016 | Cheung et al. |
| 2016/0097557 A1 | 4/2016 | Steinberg |
| 2016/0138822 A1 | 5/2016 | Steinberg |
| 2016/0241538 A1 | 8/2016 | Khurana et al. |
| 2016/0258822 A1 | 9/2016 | Steinberg et al. |
| 2016/0290672 A1 | 10/2016 | Arensmeier |
| 2016/0363337 A1 | 12/2016 | Steinberg et al. |
| 2017/0123391 A1 | 5/2017 | Sinha et al. |
| 2017/0234562 A1 | 8/2017 | Ribbich et al. |
| 2017/0241662 A1 | 8/2017 | Steinberg et al. |
| 2017/0268797 A1 | 9/2017 | Mowris et al. |
| 2017/0322530 A1 | 11/2017 | Al-Mohssen et al. |
| 2017/0328777 A1 | 11/2017 | Zeckendorf et al. |
| 2017/0336090 A1 | 11/2017 | Steinberg |
| 2018/0058711 A1 | 3/2018 | Taplin |
| 2018/0087793 A1 | 3/2018 | Okita et al. |
| 2018/0087795 A1 | 3/2018 | Okita et al. |
| 2018/0216841 A1 | 8/2018 | Steinberg |
| 2018/0245810 A1 | 8/2018 | Berka et al. |
| 2018/0259400 A1 | 9/2018 | Steinberg et al. |
| 2018/0313567 A1 | 11/2018 | Steinberg |
| 2018/0321093 A1 | 11/2018 | Steinberg et al. |
| 2019/0086106 A1 | 3/2019 | Okita et al. |
| 2019/0086108 A1 | 3/2019 | Okita et al. |
| 2019/0086109 A1 | 3/2019 | Okita et al. |
| 2019/0086110 A1 | 3/2019 | Okita et al. |
| 2019/0086882 A1 | 3/2019 | Okita et al. |
| 2019/0089194 A1 | 3/2019 | Okita et al. |
| 2019/0137133 A1 | 5/2019 | Steinberg et al. |
| 2019/0186771 A1 | 6/2019 | Steinberg et al. |
| 2019/0187005 A1 | 6/2019 | Steinberg et al. |

FOREIGN PATENT DOCUMENTS

| EP | 2372263 A2 | 5/2011 |
| GB | 2408592 A | 6/2005 |
| JP | 05-189659 | 7/1993 |
| JP | 2010-038377 | 2/2010 |
| JP | 2010-286218 | 12/2010 |
| KR | 10-1994-0011902 | 6/1994 |
| KR | 10-1999-0070368 | 9/1999 |
| KR | 10-2000-0059532 | 10/2000 |
| WO | WO 2005/098331 A1 | 10/2005 |
| WO | WO 2009/036764 A2 | 3/2009 |
| WO | WO 2011/011404 A1 | 1/2011 |
| WO | WO 2011/100427 A2 | 8/2011 |
| WO | WO 2011/149600 | 12/2011 |
| WO | WO 2012/024534 | 2/2012 |
| WO | WO 2013/187996 | 12/2013 |

OTHER PUBLICATIONS

U.S. Appl. No. 13/470,074, filed Aug. 30, 2012, Steinberg.
U.S. Appl. No. 13/523,697, filed Jun. 14, 2012, Hublou et al.
U.S. Appl. No. 13/725,447, filed Jun. 6, 2013, Steinberg.
U.S. Appl. No. 13/729,401, filed Dec. 28, 2012, Sloop.
U.S. Appl. No. 13/852,577, filed Mar. 28, 2013, Steinberg et al.
U.S. Appl. No. 13/858,710, filed Sep. 5, 2013, Steinberg et al.
U.S. Appl. No. 13/861,189, filed Apr. 11, 2013, Steinberg et al.

U.S. Appl. No. 14/082,675, filed Nov. 18, 2003, Steinberg et al.
U.S. Appl. No. 14/263,762, filed Apr. 28, 2014, Steinberg.
U.S. Appl. No. 14/285,384, filed May 22, 2014, Steinberg et al.
U.S. Appl. No. 14/292,377, filed May 30, 2014, Steinberg.
U.S. Appl. No. 14/491,554, filed Sep. 19, 2014, Steinberg.
U.S. Appl. No. 14/527,433, filed Oct. 29, 2014, Steinberg et al.
U.S. Appl. No. 14/731,221, filed Jun. 4, 2015, Steinberg et al.
U.S. Appl. No. 15/616,719, filed Jun. 7, 2017, Steinberg et al.
U.S. Appl. No. 10/018,371, filed Jul. 10, 2018, Steinberg et al.
U.S. Appl. No. 10/048,706, filed Aug. 14, 2018, Hublou et al.
Anonymous: "Process Control", Garfixia Software Architectures, Aug. 31, 2008, Retrieved from the Internet: URL:http://www.dossier-andreas. neVsoftware architecture/ process_control. Html pp. 1-1.
Arens, et al., "How Ambient Intelligence Will Improve Habitability and Energy Efficiency in Buildings", 2005, research paper, Center for the Built Environment, Controls and Information Technology.
Bourhan, et al., "Cynamic model of an HVAC system for control analysis", Elsevier 2004.
Brush, et al., Preheat—Controlling Home Heating with Occupancy Prediction, 2013.
Cheng et al., "Smart Sensors Enable Smart Air Conditioning Control", Sensors 2014, ISSN 1424-8220, Jun. 24, 2014, 25 pages.
Comverge SuperStat Flyer, prior to Jun. 28, 2007.
Control4 Wireless Thermostat Brochure, 2006.
Cooper Power Systems Web Page, 2000-2009.
Emerson Climate Technologies, "Network Thermostat for E2 Building Controller Installation and Operation Manual", 2007.
Enernoc Web Page, 2004-2009.
Enerwise Website, 1999-2009.
Gupta, et al., Adding GPS-Control to Traditional Thermostats: An xploration of Potential Energy Savings and Design Challenges, House_n, Massachusetts Institute of Technology, pp. 95-114, 2009.
Gunes et al., "Improving Energy Efficiency and Thermal Comfort of Smart Buildings with HVAC Systems in the Presence of Sensor Faults", IEEE, Aug. 24-26, 2015, 6 pages.
Gupta, et al., A Persuasive GPS-Controlled Thermostat System, MIT, 2008.
Honeywell Programmable Thermostat Owner's Guide, www.honeywell.com/yourhome, 2004.
Honeywell, W7600/W7620 Controller Reference Manual, HW0021207, Oct. 1992.
Johnson Controls, "T600HCx-3 Single-Stage Thermostats", 2006.
Johnson Controls, Touch4 building automation system brochure, 2007.
Kilicotte, et al., "Dynamic Controls for Energy Efficiency and Demand Response: Framework Concepts and a New Construction Study Case in New York", Proceedings of the 2006 ACEEE Summer Study of Energy Efficiency in Buildings, Pacific Grove. CA, Aug. 13-18, 2006.
Krumm, et al., Learning Time-Based Presence Probabilities, Jun. 2011.
Lin, et al., "Multi-Sensor Single-Actuator Control of HVAC Systems", 2002.
Pier, Southern California Edison, Demand Responsive Control of Air Conditioning via Programmable Communicating Thermostats Draft Report, Feb. 14, 2006.
Proliphix Thermostat Brochure, prior to Jun. 2007.
Raji, "Smart Networks for Control", IEEE Spectrum, Jun. 1994.
Scott, et al., Home Heating Using GPS-Based Arrival Prediction, 2010.
Simmini et al., Energy Efficient Control and Fault Detection for HVAC Systems, Univ. of Padova, XXVI Series, 2014, 144 pages.
Sklavounos, "Detection of Abnormal Situations and Energy Efficiency Control in Heating Ventilation and Air Conditioning (HVAC) Systems", Brunel University thesis, Sep. 2015,151 pages.
Wang, et al., "Opportunities to Save Energy and Improve Comfort by Using Wireless Sensor Networks in Buildings," (2003), Center for Environmental Design Research.
Wetter, et al., A comparison of deterministic and probabilistic optimization algorithms for non-smooth simulation-based optimization, Building and Environment 39, 2004, pp. 989-999.
Written Opinion and Search Report for PCT/US2011/032537, dated Dec. 12, 2011.

**US 10,534,382 B2**

Page 5

(56)     **References Cited**

OTHER PUBLICATIONS

Office Action in Canadian Application No. 2800491 dated Dec. 7, 2016.
Search Report in European Application No. 11787067.5 dated Aug. 14, 2017.
Extended Search Report for European Application No. 11818805.1 dated Jun. 9, 2017.
Search Report in European Application No. 11818805.1 dated Oct. 11, 2018.
International Search Report and Written Opinion for PCT/US2013/035726, dated Aug. 6, 2013.
International Preliminary Report on Patentability in PCT/US2013/035726 dated Dec. 16, 2014.
Extended Search Report for European Application No. 13804057.1 dated Jun. 1, 2016.
Examination Report in Australian Application No. 2013274827 dated Apr. 11, 2017.
U.S. Appl No. 10/254,775, filed Apr. 9, 2019, Cheung et al.
U.S. Appl. No. 10/289,131, filed May 14, 2019, Steinberg.
Examination Report No. 2 in Australian Application No. 2013274827, dated May 22, 2017.

* cited by examiner

Case: 23-1101    Document: 15    Page: 144    Filed: 05/09/2023



*FIG. 1*



*FIG. 2*

**U.S. Patent**    Jan. 14, 2020    **Sheet 3 of 8**    US 10,534,382 B2



*FIG. 3*



*FIG. 4*

Appx112



*FIG. 5*



*FIG. 6*



*FIG. 7*



*FIG. 8*

US 10,534,382 B2

**1**

## SYSTEM AND METHOD FOR USING A WIRELESS DEVICE AS A SENSOR FOR AN ENERGY MANAGEMENT SYSTEM

### RELATED APPLICATIONS

Any and all applications for which a foreign or domestic priority claim is identified in the Application Data Sheet, or any correction thereto, are hereby incorporated by reference into this application under 37 CFR 1.57.

### BACKGROUND OF THE INVENTION

#### Field of the Invention

This invention relates to the use of thermostatic HVAC and other energy management controls that are connected to a computer network. More specifically, the present invention pertains to the use of user interactions with an interface such as a personal computer or an Internet-enabled television as signal related to occupancy to inform an energy management system.

Heating and cooling systems for buildings (heating, ventilation and cooling, or HVAC systems) have been controlled for decades by thermostats. At the most basic level, a thermostat includes a means to allow a user to set a desired temperature, a means to sense actual temperature, and a means to signal the heating and/or cooling devices to turn on or off in order to try to change the actual temperature to equal the desired temperature. The most basic versions of thermostats use components such as a coiled bi-metallic spring to measure actual temperature and a mercury switch that opens or completes a circuit when the spring coils or uncoils with temperature changes. More recently, electronic digital thermostats have become prevalent. These thermostats use solid-state devices such as thermistors or thermal diodes to measure temperature, and microprocessor-based circuitry to control the switch and to store and operate based upon user-determined protocols for temperature vs. time.

These programmable thermostats generally offer a very restrictive user interface, limited by the cost of the devices, the limited real estate of the small wall-mounted boxes, and the inability to take into account more than two variables: the desired temperature set by the user, and the ambient temperature sensed by the thermostat. Users can generally only set one series of commands per day, and in order to change one parameter (e.g., to change the late-night temperature) the user often has to cycle through several other parameters by repeatedly pressing one or two buttons.

Because the interface of programmable thermostats is so poor, the significant theoretical savings that are possible with them (sometimes cited as 25% of heating and cooling costs) are rarely realized. In practice, studies have found that more than 50% of users never program their thermostats at all. Significant percentages of the thermostats that are programmed are programmed sub-optimally, in part because, once programmed, people tend to not to re-invest the time needed to change the settings very often.

A second problem with standard programmable thermostats is that they represent only a small evolutionary step beyond the first, purely mechanical thermostats. Like the first thermostats, they only have two input signals—ambient temperature and the preset desired temperature. The entire advance with programmable thermostats is that they can shift between multiple present temperatures at different times without real-time involvement of a human being.

**2**

Because most thermostats control HVAC systems that do not offer infinitely variable output, traditional thermostats are designed to permit the temperature as seen by the thermostat to vary above and below the setpoint to prevent the HVAC system from constantly and rapidly cycling on and off, which is inefficient and harmful to the HVAC system. The temperature range in which the thermostat allows the controlled environment to drift is known as both the dead zone and, more formally, the hysteresis zone. The hysteresis zone is frequently set at +/−1 degree Fahrenheit. Thus if the setpoint is 68 degrees, in the heating context the thermostat will allow the inside temperature to fall to 67 degrees before turning the heating system on, and will allow it to rise to 69 degrees before turning it off again.

As energy prices rise, more attention is being paid to ways of reducing energy consumption. Because energy consumption is directly proportional to setpoint—that is, the further a given setpoint diverges from the balance point (the inside temperature assuming no HVAC activity) in a given house under given conditions, the higher energy consumption will be to maintain temperature at that setpoint), energy will be saved by virtually any strategy that over a given time frame lowers the average heating setpoint or raises the cooling setpoint. Conventional programmable thermostats allow homeowners to save money and energy by pre-programming setpoint changes based upon comfort or schedule. For example, in the summer, allowing the setpoint to rise by several degrees (or even shutting off the air conditioner) when the home is unoccupied will generally save significantly on energy. But such thermostats have proven to be only minimally effective in practice. Because they have such primitive user interfaces, they are difficult to program, and so many users never bother at all, or set them up once and do not alter the programming even if their schedules change.

In the hotel industry, the heating and cooling decisions made in hundred or even thousands of individual rooms with independently controlled HVAC systems are aggregated into a single energy bill, so hotel owners and managers are sensitive to energy consumption by those systems. Hotel guests often turn the air conditioner to a low temperature setting and then leave the room for hours at a time, thereby wasting considerable energy. An approach commonly used outside of the United States to combat this problem is to use a keycard to control the HVAC system, such that guests place the keycard into a slot mounted on the wall near the door of the room which then triggers the lights and HVAC system to power up, and turn them off when the guest removes the card upon leaving the room. However, because most hotels give each guest two cards, it is easy to simply leave the extra card in the slot, thus defeating the purpose of the system. Recently, systems have been introduced in which a motion sensor is connected to the control circuitry for the HVAC system. If no motion is detected in the room for some predetermined interval, the system concludes that the room is unoccupied, and turns off or alters the setpoint of the HVAC system to a more economical level. When the motion sensor detects motion (which is assumed to coincide with the return of the guest), the HVAC system resets to the guest's chosen setting.

Adding occupancy detection capability to residential HVAC systems could also add considerable value in the form of energy savings without significant tradeoff in terms of comfort. But the systems used in hotels do not easily transfer to the single-family residential context. Hotel rooms tend to be small enough that a single motion sensor is sufficient to determine with a high degree of accuracy whether or not the room is occupied. A single motion sensor

US 10,534,382 B2

3

in the average home today would have limited value because there are likely to be many places one or more people could be home and active yet invisible to the motion sensor. The most economical way to include a motion sensor in a traditional programmable thermostat would be to build it into the thermostat itself. But thermostats are generally located in hallways, and thus are unlikely to be exposed to the areas where people tend to spend their time. Wiring a home with multiple motion sensors in order to maximize the chances of detecting occupants would involve considerable expense, both for the sensors themselves and for the considerable cost of installation, especially in the retrofit market. Yet if control is ceded to a single-sensor system that cannot reliably detect presence, the resulting errors would likely lead the homeowner to reject the system.

It would thus be desirable to provide a system that could detect occupancy without requiring the installation of additional hardware; that could accurately detect occupancy regardless of which room in the house is occupied, and could optimize energy consumption based upon dynamic and individually configurable heuristics.

## SUMMARY OF THE INVENTION

In one embodiment, the invention comprises a thermostat attached to an HVAC system, a local network connecting the thermostat to a larger network such as the Internet, and one or more computers attached to the network, and a server in bi-directional communication with a plurality of such thermostats and computers. The server pairs each thermostat with one or more computers or other consumer electronic devices which are determined to be associated with the home in which the thermostat is located. The server logs the ambient temperature sensed by each thermostat vs. time and the signals sent by the thermostats to their HVAC systems. The server also monitors and logs activity on the computers or other consumer electronic devices associated with each thermostat. Based on the activity patterns evidenced by keystrokes, cursor movement or other inputs, or lack thereof, the server instructs the thermostat to change temperature settings between those optimized for occupied and unoccupied states.

At least one embodiment of the invention comprises the steps of determining whether one or more networked electronic devices inside a structure are in use; determining whether said use of said networked electronic devices indicates occupancy of said structure; and adjusting the temperature setpoint on a thermostatic controller for an HVAC system for said structure based upon whether or not said structure is deemed to be occupied.

At least one embodiment of the invention comprises at least one said thermostat having at least one temperature setting associated with the presence of one or more occupants in said structure, and at least one temperature setting associated with the absence of occupants in said structure; one or more electronic devices having at least a user interface; where said electronic devices and said thermostat are connected to a network; where said setpoint on said thermostat is adjusted between said temperature setting associated with the presence of one or more occupants in said structure and said temperature setting associated with the absence of occupants in said structure based upon the use of said user interface for said electronic device.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** shows an example of an overall environment in which an embodiment of the invention may be used.

4

FIG. **2** shows a high-level illustration of the architecture of a network showing the relationship between the major elements of one embodiment of the subject invention.

FIG. **3** shows an embodiment of the website to be used as part of the subject invention.

FIG. **4** shows a high-level schematic of the thermostat used as part of the subject invention.

FIG. **5** shows one embodiment of the database structure used as part of the subject invention.

FIG. **6** shows the browser as seen on the display of the computer used as part of the subject invention.

FIG. **7** is a flowchart showing the steps involved in the operation of one embodiment of the subject invention.

FIG. **8** is a flowchart that shows how the invention can be used to select different HVAC settings based upon its ability to identify which of multiple potential occupants is using the computer attached to the system.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

FIG. **1** shows an example of an overall environment **100** in which an embodiment of the invention may be used. The environment **100** includes an interactive communication network **102** with computers **104** connected thereto. Also connected to network **102** are one or more server computers **106**, which store information and make the information available to computers **104**. The network **102** allows communication between and among the computers **104** and **106**.

Presently preferred network **102** comprises a collection of interconnected public and/or private networks that are linked to together by a set of standard protocols to form a distributed network. While network **102** is intended to refer to what is now commonly referred to as the Internet, it is also intended to encompass variations which may be made in the future, including changes additions to existing standard protocols.

When a user of the subject invention wishes to access information on network **102**, the buyer initiates connection from his computer **104**. For example, the user invokes a browser, which executes on computer **104**. The browser, in turn, establishes a communication link with network **102**. Once connected to network **102**, the user can direct the browser to access information on server **106**.

One popular part of the Internet is the World Wide Web. The World Wide Web contains a large number of computers **104** and servers **106**, which store HyperText Markup Language (HTML) documents capable of displaying graphical and textual information. HTML is a standard coding convention and set of codes for attaching presentation and linking attributes to informational content within documents.

The servers **106** that provide offerings on the World Wide Web are typically called websites. A website is often defined by an Internet address that has an associated electronic page. Generally, an electronic page is a document that organizes the presentation of text graphical images, audio and video.

In addition to the Internet, the network **102** can comprise a wide variety of interactive communication media. For example, network **102** can include local area networks, interactive television networks, telephone networks, wireless data systems, two-way cable systems, and the like.

In one embodiment, computers **104** and servers **106** are conventional computers that are equipped with communications hardware such as modem or a network interface card. The computers include processors such as those sold by Intel and AMD. Other processors may also be used,

US 10,534,382 B2

5 6

including general-purpose processors, multi-chip processors, embedded processors and the like.

Computers **104** can also be handheld and wireless devices such as personal digital assistants (PDAs), cellular telephones and other devices capable of accessing the network. Computers **104** can also be microprocessor-controlled home entertainment equipment including advanced televisions, televisions paired with home entertainment/media centers, and wireless remote controls.

Computers **104** may utilize a browser configured to interact with the World Wide Web. Such browsers may include Microsoft Explorer, Mozilla, Firefox, Opera or Safari. They may also include browsers or similar software used on handheld, home entertainment and wireless devices. The storage medium may comprise any method of storing information. It may comprise random access memory (RAM), electronically erasable programmable read only memory (EEPROM), read only memory (ROM), hard disk, floppy disk, CD-ROM, optical memory, or other method of storing data. Computers **104** and **106** may use an operating system such as Microsoft Windows, Apple Mac OS, Linux, Unix or the like. Computers **106** may include a range of devices that provide information, sound, graphics and text, and may use a variety of operating systems and software optimized for distribution of content via networks.

FIG. **2** illustrates in further detail the architecture of the specific components connected to network **102** showing the relationship between the major elements of one embodiment of the subject invention. Attached to the network are thermostats **108** and computers **104** of various users. Connected to thermostats **108** are HVAC units **110**. The HVAC units may be conventional air conditioners, heat pumps, or other devices for transferring heat into or out of a building. Each user is connected to the server **106** via wired or wireless connection such as Ethernet or a wireless protocol such as IEEE 802.11, a gateway **112** that connects the computer and thermostat to the Internet via a broadband connection such as a digital subscriber line (DSL) or other form of broadband connection to the World Wide Web. Server **106** contains the content to be served as web pages and viewed by computers **104**, as well as databases containing information used by the servers.

In the currently preferred embodiment, the website **200** includes a number of components accessible to the user, as shown in FIG. **3**. Those components may include a means to enter temperature settings **202**, a means to enter information about the user's home **204**, a means to enter the user's electricity bills **206**, means to calculate energy savings that could result from various thermostat-setting strategies **208**, and means to enable and choose between various arrangements **210** for demand reduction with their electric utility provider as intermediated by the demand reduction service provider.

FIG. **4** shows a high-level block diagram of thermostat **108** used as part of the subject invention. Thermostat **108** includes temperature sensing means **252**, which may be a thermistor, thermal diode or other means commonly used in the design of electronic thermostats. It includes a microprocessor **254**, memory **256**, a display **258**, a power source **260**, a relay **262**, which turns the HVAC system on an and off in response to a signal from the microprocessor, and contacts by which the relay is connected to the wires that lead to the HVAC system. To allow the thermostat to communicate bi-directionally with the computer network, the thermostat also includes means **264** to connect the thermostat to a local computer or to a wireless network. Such means could be in the form of Ethernet, wireless protocols such as IEEE

802.11, IEEE 802.15.4, Bluetooth, cellular systems such as CDMA, GSM and GPRS, or other wireless protocols. The thermostat **250** may also include controls **266** allowing users to change settings directly at the thermostat, but such controls are not necessary to allow the thermostat to function.

The data used to generate the content delivered in the form of the website is stored on one or more servers **106** within one or more databases. As shown in FIG. **5**, the overall database structure **300** may include temperature database **400**, thermostat settings database **500**, energy bill database **600**, HVAC hardware database **700**, weather database **800**, user database **900**, transaction database **1000**, product and service database **1100** and such other databases as may be needed to support these and additional features.

The website **200** will allow users of connected thermostats **250** to create personal accounts. Each user's account will store information in database **900**, which tracks various attributes relative to users of the site. Such attributes may include the make and model of the specific HVAC equipment in the user's home; the age and square footage of the home, the solar orientation of the home, the location of the thermostat in the home, the user's preferred temperature settings, whether the user is a participant in a demand reduction program, etc.

As shown in FIG. **3**, the website **200** will permit thermostat users to perform through the web browser substantially all of the programming functions traditionally performed directly at the physical thermostat, such as temperature set points, the time at which the thermostat should be at each set point, etc. Preferably the website will also allow users to accomplish more advanced tasks such as allow users to program in vacation settings for times when the HVAC system may be turned off or run at more economical settings, and set macros that will allow changing the settings of the temperature for all periods with a single gesture such as a mouse click.

FIG. **6** represents the screen of a computer or other device **104** using a graphical user interface connected to the Internet. The screen shows that a browser **1200** is displayed on computer **104**. In one embodiment, a background application installed on computer **104** detects activity by a user of the computer, such as cursor movement, keystrokes or otherwise, and signals the application running on server **106** that activity has been detected. Server **106** may then, depending on context, (a) transmit a signal to thermostat **108** changing setpoint because occupancy has been detected at a time when the system did not expect occupancy; (b) signal the background application running on computer **104** to trigger a software routine that instantiates a pop-up window **1202** that asks the user if the server should change the current setpoint, alter the overall programming of the system based upon a new occupancy pattern, etc. The user can respond by clicking the cursor on "yes" button **1204** or "No" button **1206**. Equilvalent means of signalling activity may be employed with interactive television programming, gaming systems, etc.

FIG. **7** represents a flowchart showing the steps involved in the operation of one embodiment of the subject invention. In step **1302**, computer **104** transmits a message to server **106** via the Internet indicating that there is user activity on computer **104**. This activity can be in the form of keystrokes, cursor movement, input via a television remote control, etc. In step **1304** the application queries database **300** to retrieve setting information for the HVAC system. In step **1306** the application determines whether the current HVAC program is intended to apply when the home is occupied or unoccu-

US 10,534,382 B2

7

pied. If the HVAC settings then in effect are intended to apply for an occupied home, then the application terminates for a specified interval. If the HVAC settings then in effect are intended to apply when the home is unoccupied, then in step **1308** the application will retrieve from database **300** the user's specific preferences for how to handle this situation. If the user has previously specified (at the time that the program was initially set up or subsequently modified) that the user prefers that the system automatically change settings under such circumstances, the application then proceeds to step **1316**, in which it changes the programmed setpoint for the thermostat to the setting intended for the house when occupied. If the user has previously specified that the application should not make such changes without further user input, then in step **1310** the application transmits a command to computer **104** directing the browser to display a message informing the user that the current setting assumes an unoccupied house and asking the user in step **1312** to choose whether to either keep the current settings or revert to the pre-selected setting for an occupied home. If the user selects to retain the current setting, then in step **1314** the application will write to database **300** the fact that the users has so elected and terminate. If the user elects to change the setting, then in step **1316** the application transmits the revised setpoint to the thermostat. In step **1314** the application writes the updated setting information to database **300**.

FIG. **8** is a flowchart that shows how the invention can be used to select different HVAC settings based upon its ability to identify which of multiple potential occupants is using the computer attached to the system. In step **1402** computer **104** transmits to server **106** information regarding the type of activity detected on computer **104**. Such information could include the specific program or channel being watched if, for example, computer **104** is used to watch television. The information matching, for example, TV channel 7 at 4:00 PM on a given date to specific content may be made by referring to Internet-based or other widely available scheduling sources for such content. In step **1404** server **106** retrieves from database **300** previously logged data regarding viewed programs. In step **1406** server **106** retrieves previously stored data regarding the residents of the house. For example, upon initiating the service, one or more users may have filled out online questionnaires sharing their age, gender, schedules, viewing preferences, etc. In step **1408**, server **106** compares the received information about user activity to previously stored information retrieved from database **300** about the occupants and their viewing preferences. For example, if computer **104** indicates to server **106** that the computer is being used to watch golf, the server may conclude that an adult male is watching; if computer **104** indicates that it is being used to watch children's programming, server **106** may conclude that a child is watching. In step **1410** the server transmits a query to the user in order to verify the match, asking, in effect, "Is that you. Bob?" In step **1412**, based upon the user's response, the application determines whether the correct user has been identified. If the answer is no, then the application proceeds to step **1416**. If the answer is yes, then in step **1414** the application retrieves the temperature settings for the identified occupant. In step **1416** the application writes to database **300** the programming information and information regarding matching of users to that programming.

In an alternative embodiment, the application running on computer **104** may respond to general user inputs (that is, inputs not specifically intended to instantiate communication with the remote server) by querying the user whether a given action should be taken. For example, in a system in

8

which the computer **104** is a web-enabled television or web-enabled set-top device connected to a television as a display, software running on computer **104** detects user activity, and transmits a message indicating such activity to server **106**. The trigger for this signal may be general, such as changing channels or adjusting volume with the remote control or a power-on event. Upon receipt by server **104** of this trigger, server **104** transmits instructions to computer **104** causing it to display a dialog box asking the user whether the user wishes to change HVAC settings.

What is claimed is:

1. A system for controlling an HVAC system at a user's building, the system comprising:

a memory; and

one or more processors with circuitry and code designed to execute instructions;

the one or more processors with circuitry and code designed to execute instructions to receive a first data from at least one sensor, wherein the first data from the at least one sensor includes a measurement of at least one characteristic of the building;

the one or more processors with circuitry and code designed to execute instructions to receive a second data from a network connection, wherein the second data from the network connection is collected from a source external to the building, wherein the second data from the network connection is received via the Internet;

the one or more processors with circuitry and code designed to execute instructions to receive a first temperature setpoint for the building corresponding to a desired temperature setting when the building is occupied, and a second temperature setpoint for the building corresponding to a desired temperature setting when the building is unoccupied;

the one or more processors with circuitry and code designed to execute instructions to receive commands through the Internet by way of a remote interface on a mobile, wireless device running software application code; wherein the interface is configured to allow the user to adjust temperature setpoints for the HVAC system;

the one or more processors with circuitry and code designed to execute instructions to send user-specific data through the Internet, wherein user-specific information about the building and HVAC system is generated based at least in part on the user-specific data, wherein the user-specific information is configured to be presented on a user interface on a mobile, wireless device running software application code via the Internet;

the one or more processors with circuitry and code designed to execute instructions to determine whether the building is occupied or unoccupied, and based on that determination, to control the HVAC system to provide heating or cooling to the building at an operational temperature;

wherein the one or more processors comprises a first processor with circuitry and code designed to execute instructions, which is located remotely from the memory and is not electrically connected to the memory;

the first processor with circuitry and code designed to execute instructions to communicate with the memory;

wherein the memory is configured to store historical values of the first data and second data.

US 10,534,382 B2

9

**2**. The system of claim **1**, wherein the operational temperature is the second temperature setpoint for the building corresponding to a desired temperature setting when the building is unoccupied, in the event the one or more processors with circuitry and code designed to execute instructions determines that the building is unoccupied.

**3**. The system of claim **1**, wherein the operational temperature is the first temperature setpoint for the building corresponding to a desired temperature setting when the building is occupied, in the event the one or more processors with circuitry and code designed to execute instructions determines that the building is occupied.

**4**. The system of claim **2**, wherein the first data from the at least one sensor comprises a measurement of the current temperature of the building by the sensor.

**5**. The system of claim **4**, wherein the second data from the network connection comprises a measurement of the current outdoor temperature.

**6**. The system of claim **4**, wherein the one or more processors with circuitry and code designed to execute instructions queries the user to confirm whether to change to a different temperature setpoint after determining whether the building is occupied or unoccupied.

**7**. The system of claim **1**, wherein the one or more processors with circuitry and code designed to execute instructions receives at least one setting of the HVAC system.

**8**. The system of claim **7**, wherein the at least one setting of the HVAC system comprises whether the HVAC system is currently on or off.

**9**. The system of claim **7**, wherein the at least one setting of the HVAC system comprises whether the HVAC system is operating in a cooling mode or a heating mode.

**10**. The system of claim **4**, wherein the determination of whether the building is occupied or unoccupied by the one or more processors is based on a third data received from a motion sensor.

**11**. The system of claim **1**, wherein the network connection is based on the IEEE 802.11 wireless protocol.

**12**. The system of claim **1**, wherein the determination of whether the building is occupied or unoccupied by is performed by the first processor.

**13**. The system of claim **1**, wherein the controlling of the HVAC system to provide heating or cooling to the building at an operational temperature is performed by the first processor.

**14**. The system of claim **1**, wherein the first data from the at least one sensor is provided by a sensor that is not electrically connected to the first processor.

**15**. The system of claim **7**, wherein the interface is configured to allow the user to turn the HVAC system on or off.

**16**. The system of claim **7**, wherein the interface is configured to allow the user to input that the building is currently unoccupied.

**17**. A system for controlling an HVAC system at a user's building, the system comprising:

a memory; and

one or more processors with circuitry and code designed to execute instructions;

the one or more processors with circuitry and code designed to execute instructions to receive a first data from at least one sensor, wherein the first data from the at least one sensor includes a measurement of the current temperature of the building by the sensor;

the one or more processors with circuitry and code designed to execute instructions to receive a second

10

data from a network connection, wherein the second data from the network connection is collected from a source external to the building and comprises outdoor temperature, wherein the second data from the network connection is received via the Internet;

the one or more processors with circuitry and code designed to execute instructions to receive a first temperature setpoint for the building corresponding to a desired temperature setting when the building is occupied, and a second temperature setpoint for the building corresponding to a desired temperature setting when the building is unoccupied;

the one or more processors with circuitry and code designed to execute instructions to receive commands through the Internet by way of a remote interface on a mobile, wireless device running software application code; wherein the interface is configured to allow the user to adjust temperature setpoints for the HVAC system;

the one or more processors with circuitry and code designed to execute instructions to send user-specific data through the Internet, wherein user-specific information about the building and HVAC system is generated based at least in part on the user-specific data, wherein the user-specific information is configured to be presented on a user interface via on mobile, wireless device running software application code via the Internet;

the one or more processors with circuitry and code designed to execute instructions to receive a third data from a motion sensor, and is further configured to determine whether the building is occupied or unoccupied based at least in part on the third data;

the one or more processors with circuitry and code designed to execute instructions to control the HVAC system based on the determination that the building is occupied to provide heating or cooling to the building effective to reach the first temperature setpoint for the building corresponding to a desired temperature setting when the building is occupied;

wherein the one or more processors comprises a first processor with circuitry and code designed to execute instructions, which is located remotely from the memory and is not electrically connected to the memory;

the first processor with circuitry and code designed to execute instructions to communicate with the memory;

wherein the memory is configured to store historical values of the first data and second data.

**18**. The system of claim **17**, wherein the first data from the at least one sensor is provided by a sensor that is not electrically connected to the first processor.

**19**. The system of claim **1**, wherein the one or more processors with circuitry and code designed to execute instructions controls the HVAC system to provide heating or cooling to the building at an operational temperature based at least in part on the historical values of the first and second data.

**20**. The system of claim **17**, wherein the one or more processors with circuitry and code designed to execute instructions controls the HVAC system to provide heating or cooling to the building at an operational temperature based at least in part on the historical values of the first and second data.

* * * * *

**Query    Reports ⏷    Utilities ⏷    Help    Log Out**

# U.S. District Court [LIVE]
# Western District of Texas (Waco)
# CIVIL DOCKET FOR CASE #: 6:20-cv-00075-ADA

EcoFactor, Inc. v. Google LLC
Assigned to: Judge Alan D Albright
Related Case: 6:21-cv-00244-ADA
Case in other court:  USCA Federal Circuit, 23-01101-ED
                      USCA Federal Circuit, 21-00144
                      USCA Federal Circuit, 22-01974-ED
Cause: 35:271 Patent Infringement

Date Filed: 01/31/2020
Date Terminated: 05/26/2022
Jury Demand: Both
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**

**EcoFactor, Inc.**                          represented by **Brian W. Lewis**
                                             Latham & Watkins LLP
                                             505 Montgomery Street, Suite 2000
                                             San Francisco, CA 94111
                                             (415) 391-0600
                                             Fax: (415) 395-8095
                                             Email: brian.lewis@lw.com
                                             *TERMINATED: 11/03/2021*
                                             *LEAD ATTORNEY*
                                             *ATTORNEY TO BE NOTICED*

                                             **C. Jay Chung**
                                             Russ August & Kabat
                                             12424 Wilshire Blvd., 12th Floor
                                             Los Angeles, CA 90025
                                             310-826-7474
                                             Fax: 310-826-6991
                                             Email: jchung@raklaw.com
                                             *TERMINATED: 11/03/2021*
                                             *LEAD ATTORNEY*
                                             *ATTORNEY TO BE NOTICED*

                                             **James N. Pickens**
                                             Russ August & Kabat
                                             12424 Wilshire Blvd, 12th Floor
                                             Los Angeles, CA 90025
                                             (310)826-7474

Fax: (310)826-6991
Email: jpickens@raklaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jason M Wietholter**
Russ August & Kabat
12424 Wilshire Boulevard, 12th Floor
Los Angeles, CA 90025
(310) 826-7474
Fax: (310) 826-6991
Email: jwietholter@raklaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Marc A. Fenster**
Russ August & Kabat
12424 Wilshire Blvd., 12th Floor
Los Angeles, CA 90025
(310) 826-7474
Fax: (310) 826-6991
Email: mafenster@raklaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul A. Kroeger**
Russ August & Kabat
12424 Wilshire Blvd., 12th Floor
Los Angeles, CA 90025
(310) 826-7474
Fax: (310) 826-6991
Email: pkroeger@raklaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam Hoffman**
Russ August & Kabat
12424 Wilshire Blvd, 12th Floor
Los Angeles, CA 90025
(310)826-7474
Fax: (310)826-6991
Email: ahoffman@raklaw.com
*ATTORNEY TO BE NOTICED*

**Kristopher R. Davis**
Russ August & Kabat
12424 Wilshire Blvd., 12th Floor

Appx123

Los Angeles, CA 90025
310-826-7474
Fax: 310-826-6991
Email: kdavis@raklaw.com
*ATTORNEY TO BE NOTICED*

**Matthew Aichele**
Russ August & Kabat
915 E St NW, Suite 405
Washington, DC 20004
310-826-7474
Fax: 310-826-6991
Email: maichele@raklaw.com
*ATTORNEY TO BE NOTICED*

**Minna Y. Chan**
Russ August & Kabat
12424 Wilshire Blvd, 12th Floor
Los Angeles, CA 90025
(310) 826-7474
Fax: (310) 826-6991
Email: mchan@raklaw.com
*ATTORNEY TO BE NOTICED*

**Reza Mirzaie**
Russ August & Kabat
12424 Wilshire Blvd., 12th Floor
Los Angeles, CA 90025
310-826-7474
Fax: 310-826-6991
Email: rmirzaie@raklaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Google LLC**                                            represented by  **Bijal V. Vakil**
Allen & Overy LLP
550 High Street
Ste 2nd Floor
Palo Alto, CA 94301
650-388-1703
Email: bijal.vakil@allenovery.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric B. Hanson**

Appx124

Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111
(415) 391-5400
Fax: (415) 397-7188
Email: ehanson@keker.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric Lancaster**
Allen & Overy LLP
500 High Street
Palo Alto, CA 94301
(650) 388-1700
Fax: (650) 388-1699
Email: eric.lancaster@allenovery.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gregory D. Washington**
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111
(415) 391-5400
Fax: (415) 397-7188
Email: gwashington@keker.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Henry Yee-Der Huang**
White & Case LLP
3000 El Camino Real, 2 Palo Alto Square,
Suite 900
Palo Alto, CA 94306
(650) 213-0300
Fax: (650) 213-8158
Email: henry.huang@whitecase.com
*TERMINATED: 11/03/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James P. Gagen**
Allen & Overy LLP
1101 New York Avenue Nw
Washington, DC 20005
(202) 683-3896
Fax: (202) 683-3999

Appx125

Email: james.gagen@allenovery.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Reed**
Allen & Overy LLP
1221 Avenue of the Americas
New York, NY 10020
(646) 344-6719
Fax: (212) 610-6399
Email: james.reed@allenovery.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael E. Jones**
Potter Minton PC
110 N College
Suite 500
Tyler, TX 75702
903-597-8311
Fax: 903-531-3939
Email: mikejones@potterminton.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael J. Songer**
White & Case LLP
701 13th Street, Nw
Washington, DC 20005-3807
(202) 626-3200
Fax: (202) 639-9355
Email: michael.songer@whitecase.com
*TERMINATED: 11/03/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**R. Adam Lauridsen**
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111
(415) 391-5400
Fax: (415) 397-7188
Email: alauridsen@keker.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shamita D. Etienne-Cummings**
Allen & Overy LLP
1101 New York Ave
11th Floor
Washington, DC 20005
202-683-3810
Email: shamita.etienne@allenovery.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anna Porto**
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111
(415) 391-5400
Fax: (415) 397-7188
Email: aporto@keker.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eugene M. Paige**
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111
(415) 391-5400
Fax: (415) 397-7188
Email: epaige@keker.com
*ATTORNEY TO BE NOTICED*

**Jennifer A. Huber**
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111
(415) 391-5400
Fax: (415) 397-7188
Email: jhuber@keker.com
*TERMINATED: 05/27/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kristin E. Hucek**
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
(415) 391-5400
Fax: (415) 397-7188
Email: khucek@keker.com

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Leo Lam**
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111
(415) 391-5400
Fax: (415) 397-7188
Email: llam@keker.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthias Andreas Kamber**
Paul Hastings LLP
101 California Street, 48th Floor
San Francisco, CA 94111
(415) 856-7000
Fax: (415) 856-7100
Email: matthiaskamber@paulhastings.com
*TERMINATED: 01/27/2022*
*ATTORNEY TO BE NOTICED*

**Patrick E. Murray**
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111
(415) 391-5400
Fax: (415) 397-7188
Email: pmurray@keker.com
*TERMINATED: 03/02/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert A. Van Nest**
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
(415) 391-5400
Fax: (415) 397-7188
Email: rvannest@keker.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shaun William Hassett**
Potter Minton PC
110 North College, Suite 500

Tyler, TX 75702
903-525-2272
Fax: 903-593-0846
Email: shaunhassett@potterminton.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/31/2020 | 1 | COMPLAINT ( Filing fee $ 400 receipt number 0542-13152928), filed by EcoFactor, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Civil Cover Sheet)(Mirzaie, Reza) (Entered: 01/31/2020) |
| 01/31/2020 | 2 | RULE 7 DISCLOSURE STATEMENT filed by EcoFactor, Inc.. (Mirzaie, Reza) (Entered: 01/31/2020) |
| 01/31/2020 | 3 | NOTICE *of AO 120 Patent Report Form* by EcoFactor, Inc. (Mirzaie, Reza) (Entered: 01/31/2020) |
| 01/31/2020 | 4 | REQUEST FOR ISSUANCE OF SUMMONS by EcoFactor, Inc.. (Mirzaie, Reza) (Entered: 01/31/2020) |
| 01/31/2020 | | Case assigned to Judge Alan D Albright. CM WILL NOW REFLECT THE JUDGE INITIALS AS PART OF THE CASE NUMBER. PLEASE APPEND THESE JUDGE INITIALS TO THE CASE NUMBER ON EACH DOCUMENT THAT YOU FILE IN THIS CASE. (bw) (Entered: 02/03/2020) |
| 01/31/2020 | 7 | Summons Issued as to Google LLC. (bw) (Entered: 02/03/2020) |
| 02/03/2020 | 5 | Pursuant to the Standing Order Regarding Patent Trademark Cases effective 12/9/19, Attorneys filing Patent/Trademark cases in TXWD Waco division must prepare the attached form AO120 and e-file upon opening of the case using the event NOTICE OF FILING OF PATENT/TRADEMARK FORM. (Attachments: # 1 Blank AO120) (bw) (Entered: 02/03/2020) |
| 02/03/2020 | 6 | Notice of Filing of Patent/Trademark Form (AO 120). AO 120 forwarded to the Director of the U.S. Patent and Trademark Office. (Mirzaie, Reza) (Entered: 02/03/2020) |
| 03/03/2020 | 8 | Unopposed MOTION for Extension of Time to File Answer re 1 Complaint by Google LLC. (Attachments: # 1 Proposed Order)(Jones, Michael) (Entered: 03/03/2020) |
| 03/04/2020 | 9 | Amended MOTION for Extension of Time to File Answer re 1 Complaint by Google LLC. (Attachments: # 1 Proposed Order)(Jones, Michael) (Entered: 03/04/2020) |
| 03/04/2020 | | Text Order GRANTING 9 Motion for Extension of Time to Answer entered by Judge Alan D Albright. Before the Court is Defendant's Unopposed Amended Motion to Extend Time to Move, Answer, or Otherwise Respond to First Amended Complaint. The Court GRANTS the motion. It is therefore ORDERED that Defendant shall have until and through April 6, 2020 to answer, plead, move, or otherwise respond, in any manner whatsoever, included but not limited to Rule 12 motion(s), to Plaintiff's |

| | | |
|---|---|---|
| | | Complaint. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jy) (Entered: 03/04/2020) |
| 03/04/2020 | | Text Order MOOTING 8 Motion for Extension of Time to Answer entered by Judge Alan D Albright. In light of the filing of ECF No. 9, the Court MOOTS this motion. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jy) (Entered: 03/04/2020) |
| 03/04/2020 | | Reset Answer Deadlines: Google LLC answer due 4/6/2020. (bw) (Entered: 03/04/2020) |
| 03/24/2020 | 10 | STANDING ORDER from U.S. District Judge Alan D. Albright regarding scheduled civil hearings. (tada) (Entered: 03/25/2020) |
| 03/27/2020 | 11 | MOTION to Appear Pro Hac Vice by Michael E. Jones *for Eric Lancaster* ( Filing fee $ 100 receipt number 0542-13396337) by on behalf of Google LLC. (Attachments: # 1 Proposed Order)(Jones, Michael) (Entered: 03/27/2020) |
| 03/28/2020 | | Text Order GRANTING 11 Motion to Appear Pro Hac Vice. Before the Court is the Motion for Admission Pro Hac Vice. The Court, having reviewed the Motion, finds it should be GRANTED and therefore orders as follows: IT IS ORDERED the Motion for Admission Pro Hac Vice is GRANTED. IT IS FURTHER ORDERED that Applicant, if he/she has not already done so, shall immediately tender the amount of $100.00, made payable to: Clerk, U.S. District Court, in compliance with Local Rule AT-I (f)(2). Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jy) (Entered: 03/28/2020) |
| 03/30/2020 | 12 | Second MOTION for Extension of Time to File Answer re 1 Complaint *or Otherwise Respond* by Google LLC. (Attachments: # 1 Proposed Order)(Jones, Michael) (Entered: 03/30/2020) |
| 03/31/2020 | | Text Order GRANTING 12 Motion for Extension of Time to Answer entered by Judge Alan D Albright. Came on for consideration is Defendant's Motion. Noting that it is unopposed, the Court GRANTS the Motion. Defendant shall have up to and including May 27, 2020 to answer or otherwise respond to Plaintiff's Complaint. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jy) (Entered: 03/31/2020) |
| 03/31/2020 | | Reset Answer Deadlines: Google LLC answer due 5/27/2020. (bw) (Entered: 03/31/2020) |
| 04/01/2020 | 13 | NOTICE of Attorney Appearance by Bijal V. Vakil on behalf of Google LLC. Attorney Bijal V. Vakil added to party Google LLC(pty:dft) (Vakil, Bijal) (Entered: 04/01/2020) |
| 04/01/2020 | 14 | NOTICE of Attorney Appearance by Shamita D. Etienne-Cummings on behalf of Google LLC. Attorney Shamita D. Etienne-Cummings added to party Google LLC(pty:dft) (Etienne-Cummings, Shamita) (Entered: 04/01/2020) |

Appx130

| 04/23/2020 | 15 | MOTION to Appear Pro Hac Vice by Michael E. Jones *Michael J. Songer* ( Filing fee $ 100 receipt number 0542-13493184) by on behalf of Google LLC. (Jones, Michael) (Entered: 04/23/2020) |
|---|---|---|
| 04/24/2020 | | Text Order GRANTING 15 Motion to Appear Pro Hac Vice. Before the Court is the Motion for Admission Pro Hac Vice. The Court, having reviewed the Motion, finds it should be GRANTED and therefore orders as follows: IT IS ORDERED the Motion for Admission Pro Hac Vice is GRANTED. IT IS FURTHER ORDERED that Applicant, if he/she has not already done so, shall immediately tender the amount of $100.00, made payable to: Clerk, U.S. District Court, in compliance with Local Rule AT-I (f)(2). Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jy) (Entered: 04/24/2020) |
| 05/27/2020 | 16 | ANSWER to 1 Complaint by Google LLC.(Jones, Michael) (Entered: 05/27/2020) |
| 05/27/2020 | 17 | RULE 7 DISCLOSURE STATEMENT filed by Google LLC. (Jones, Michael) (Entered: 05/27/2020) |
| 05/27/2020 | 18 | Opposed Motion for leave to File Sealed Document (Attachments: # 1 Sealed Document, # 2 Sealed Document, # 3 Sealed Document, # 4 Sealed Document, # 5 Sealed Document, # 6 Sealed Document, # 7 Proposed Order) (Jones, Michael) (Entered: 05/27/2020) |
| 05/27/2020 | 19 | Opposed MOTION to Change Venue by Google LLC. (Attachments: # 1 Affidavit Sealed, # 2 Affidavit Sealed, # 3 Exhibit 1 Lexis Advance search, # 4 Exhibit 2 EcoFactor SEC Form D, # 5 Exhibit 3 PAIR attorneys, # 6 Exhibit Sealed, # 7 Exhibit Sealed, # 8 Exhibit Sealed, # 9 Exhibit 7 Steinberg LinkedIn, # 10 Exhibit 8 Steinberg CA Bar, # 11 Exhibit 9 EcoFactor Field Trial Results, # 12 Exhibit 10 CIEE report, # 13 Exhibit 11 Arens, # 14 Exhibit 12 Ota thesis, # 15 Exhibit 13 ITC complaint - public, # 16 Exhibit 14 Docket Navigator, # 17 Proposed Order)(Jones, Michael) (Entered: 05/27/2020) |
| 05/27/2020 | 20 | Unopposed Motion for leave to File Sealed Document (Attachments: # 1 Sealed Document, # 2 Sealed Document, # 3 Sealed Document, # 4 Sealed Document, # 5 Sealed Document, # 6 Sealed Document, # 7 Proposed Order) (Jones, Michael) (Entered: 05/27/2020) |
| 05/29/2020 | | Text Order MOOTING 18 Motion for Leave to File Sealed Document entered by Judge Alan D Albright. In light of ECF No. 20, the Court MOOTS this motion. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jy) (Entered: 05/29/2020) |
| 05/29/2020 | | Text Order GRANTING 20 Motion for Leave to File Sealed Document entered by Judge Alan D Albright. Before the Court is Defendant Google LLC's Unopposed Motion for Leave to File Under Seal. The Court GRANTS the motion. The Clerk's Office is directed to file under seal Defendant Google LLCs Opposed Motion to Transfer Venue to the Northern District of California, the Declaration of Shannon |

| | | |
|---|---|---|
| | | Shaper, and Exhibits 4-6 to the Declaration of Bijal Vakil. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jy) (Entered: 05/29/2020) |
| 05/29/2020 | 21 | Sealed Motion filed: Google LLCs Opposed Motion to Transfer Venue to the Northern District of California (Attachments: # 1 DECLARATION OF SHANNON SHAPER, # 2 DECLARATION OF BIJAL VAKIL, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit) (lad) (Entered: 05/29/2020) |
| 06/03/2020 | 22 | Unopposed Motion for leave to File Sealed Document (Attachments: # 1 Sealed Document Opposition, # 2 Proposed Order) (Chung, C.) (Entered: 06/03/2020) |
| 06/03/2020 | 23 | Response in Opposition to Motion, filed by EcoFactor, Inc., re 19 Opposed MOTION to Change Venue filed by Defendant Google LLC (Attachments: # 1 Affidavit of Shayan Habib, # 2 Affidavit of C. Jay Chung, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 10, # 13 Proposed Order)(Chung, C.) (Entered: 06/03/2020) |
| 06/05/2020 | | Text Order GRANTING 22 Motion for Leave to File Sealed Document entered by Judge Alan D Albright. Before the Court is Plaintiff EcoFactor, Inc.'s Unopposed Motion to Seal Its Opposition to Google's Motion to Transfer Venue to the Northern District of California. The Court GRANTS the motion. The Clerk's Office is directed to file EcoFactor's Opposition to Google's Motion to Transfer Venue to the Northern District of California shall be filed under seal. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jy) (Entered: 06/05/2020) |
| 06/05/2020 | 24 | Sealed Document filed. (bw) (Entered: 06/08/2020) |
| 06/10/2020 | 25 | Unopposed Motion for leave to File Sealed Document (Attachments: # 1 Exhibit 1 - Reply filed under seal, # 2 Exhibit 2 - Declaration filed under seal, # 3 Proposed Order) (Jones, Michael) (Entered: 06/10/2020) |
| 06/11/2020 | | Text Order GRANTING 25 Motion for Leave to File Sealed Document entered by Judge Alan D Albright. Before the Court is Defendant Google LLC's Unopposed Motion for Leave to File Under Seal. The Court GRANTS the motion. The Clerk's Office is directed to file under seal Defendant Google LLCs Reply in Support of its Motion to Transfer Venue to the Northern District of California and the Supplemental Declaration of Shannon Shaper.(This is a text-only entry generated by the court. There is no document associated with this entry.) (jy) (Entered: 06/11/2020) |
| 06/11/2020 | 26 | ORDER GOVERNING PROCEEDINGS PATENT CASE. This case is SET for a telephonic Rule 16 Case Management Conference on Friday, June 26, 2020 at 2:00 p.m before Judge Alan D Albright. Signed by Judge Alan D Albright. (bw) (Entered: 06/11/2020) |
| 06/11/2020 | 27 | Sealed Document filed. GOOGLE LLCS REPLY IN SUPPORT OF ITS MOTION TO TRANSFER VENUE TO THE NORTHERN DISTRICT OF CALIFORNIA. (Attachments: # 1 Exhibit) (bw) (Entered: 06/11/2020) |
| 06/17/2020 | 28 | AMENDED COMPLAINT *FOR PATENT INFRINGEMENT* against Google LLC amending 1 Complaint., filed by EcoFactor, Inc.. (Attachments: # 1 Exhibit 1, # 2 |

| | | Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Mirzaie, Reza) (Entered: 06/17/2020) |
|---|---|---|
| 06/26/2020 | 29 | ORDER setting Telephone Conference for 6/29/2020 02:30 PM before Judge Alan D Albright. Signed by Judge Alan D Albright. (lad) (Entered: 06/26/2020) |
| 06/29/2020 | 30 | ORDER CANCELLING TELEPHONIC SCHEDULING CONFERENCE. TELEPHONIC SCHEDULING CONFERENCE on Monday, June 29, 2020 at 02:30 PM is hereby CANCELLED until further order of the court. Signed by Judge Alan D Albright. (bw) (Entered: 06/29/2020) |
| 07/01/2020 | 31 | ANSWER to 28 Amended Complaint with Jury Demand by Google LLC.(Jones, Michael) (Entered: 07/01/2020) |
| 07/14/2020 | 32 | CORRECTED MOTION *for Agreed Scheduling Order* by EcoFactor, Inc.. (Attachments: # 1 Exhibit A)(Mirzaie, Reza) (Entered: 07/14/2020) |
| 07/16/2020 | | Text Order GRANTING 32 Motion entered by Judge Alan D Albright. Before the Court is the Parties' Joint Motion for Entry of the Scheduling Order. The Court GRANTS the motion. The Clerk's Office is directed to enter Exhibit A attached hereto as the scheduling order for this case. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jy) (Entered: 07/16/2020) |
| 07/16/2020 | 33 | AGREED SCHEDULING ORDER: Markman Hearing set for 12/9/2020 01:30 PM before Judge Alan D Albright. Joinder of Parties due by 1/20/2021. Amended Pleadings due by 3/3/2021. Dispositive Motions due by 9/15/2021. Pretrial Conference set for 11/17/2021 09:00 AM before Judge Alan D Albright. Jury Selection and Trial set for 12/6/2021 09:00AM before Judge Alan D Albright. (bw) (Entered: 07/16/2020) |
| 10/06/2020 | 34 | BRIEF by Google LLC. (Attachments: # 1 Declaration of D. Turnbull, # 2 Declaration of B. Vakil, # 3 Ex. 1 US8180492 file history, # 4 Ex. 2 US8180492 file history, # 5 Ex. 3 US8180492 file history, # 6 Ex. 4 US8180492 file history, # 7 Ex. 5 WDTX-DF-EE_0000001, # 8 Ex. 6 WDTX-DF-EE_0000013, # 9 Ex. 7 WDTX-DF-EE_0000019, # 10 Ex. 8 WDTX-DF-EE_0000029, # 11 Ex. 9 WDTX-DF-EE_0000006, # 12 Ex. 10 WDTX-DF-EE_0000003, # 13 Ex. 11 WDTX-DF-EE_0000005, # 14 Ex. 12 WDTX-DF-EE_0000050, # 15 Ex. 13 WDTX-DF-EE_0000056)(Jones, Michael) (Entered: 10/06/2020) |
| 10/06/2020 | 35 | BRIEF by EcoFactor, Inc.. (Attachments: # 1 Affidavit of Robert Zeidman, # 2 Affidavit of Reza Mirzaie, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 10, # 13 Exhibit 11)(Mirzaie, Reza) (Entered: 10/06/2020) |
| 10/27/2020 | 36 | BRIEF regarding 35 Brief, by Google LLC. (Attachments: # 1 Turnbull Declaration) (Jones, Michael) (Entered: 10/27/2020) |
| 10/27/2020 | 37 | BRIEF regarding 34 Brief,, by EcoFactor, Inc.. (Attachments: # 1 Affidavit of Robert Zeidman)(Mirzaie, Reza) (Entered: 10/27/2020) |
| 11/10/2020 | 38 | BRIEF regarding 35 Brief, by EcoFactor, Inc.. (Mirzaie, Reza) (Entered: 11/10/2020) |
| 11/10/2020 | 39 | BRIEF regarding 35 Brief, by Google LLC. (Jones, Michael) (Entered: 11/10/2020) |

| | | |
|---|---|---|
| 11/17/2020 | 40 | NOTICE *Joint Claim Construction Statement* by Google LLC (Jones, Michael) (Entered: 11/17/2020) |
| 11/24/2020 | 41 | Opposed MOTION to Stay Case *Pending Transfer* by Google LLC. (Attachments: # 1 Proposed Order)(Jones, Michael) (Entered: 11/24/2020) |
| 11/30/2020 | 42 | NOTICE of Attorney Appearance by Kristopher R. Davis on behalf of EcoFactor, Inc.. Attorney Kristopher R. Davis added to party EcoFactor, Inc.(pty:pla) (Davis, Kristopher) (Entered: 11/30/2020) |
| 11/30/2020 | 43 | MOTION to Appear Pro Hac Vice by C. Jay Chung *for Brian W. Lewis* ( Filing fee $ 100 receipt number 0542-14230640) by on behalf of EcoFactor, Inc.. (Chung, C.) (Entered: 11/30/2020) |
| 12/01/2020 | 44 | MOTION to Appear Pro Hac Vice by C. Jay Chung *for James N. Pickens* ( Filing fee $ 100 receipt number 0542-14235456) by on behalf of EcoFactor, Inc.. (Chung, C.) (Entered: 12/01/2020) |
| 12/01/2020 | 45 | Response in Opposition to Motion, filed by EcoFactor, Inc., re 41 Opposed MOTION to Stay Case *Pending Transfer* filed by Defendant Google LLC (Chung, C.) (Entered: 12/01/2020) |
| 12/02/2020 | 46 | NOTICE *of Waiver of Reply* by Google LLC re 41 Opposed MOTION to Stay Case *Pending Transfer* (Jones, Michael) (Entered: 12/02/2020) |
| 12/03/2020 | | Text Order GRANTING 43 Motion to Appear Pro Hac Vice for Attorney Brian W. Lewis for EcoFactor, Inc. Before the Court is the Motion for Admission Pro Hac Vice. The Court, having reviewed the Motion, finds it should be GRANTED and therefore orders as follows: IT IS ORDERED the Motion for Admission Pro Hac Vice is GRANTED. IT IS FURTHER ORDERED that Applicant, if he/she has not already done so, shall immediately tender the amount of $100.00, made payable to: Clerk, U.S. District Court, in compliance with Local Rule AT-I (f)(2). Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (mm6) (Entered: 12/03/2020) |
| 12/03/2020 | | Text Order GRANTING 44 Motion to Appear Pro Hac Vice for Attorney James N. Pickens for EcoFactor, Inc. Before the Court is the Motion for Admission Pro Hac Vice. The Court, having reviewed the Motion, finds it should be GRANTED and therefore orders as follows: IT IS ORDERED the Motion for Admission Pro Hac Vice is GRANTED. IT IS FURTHER ORDERED that Applicant, if he/she has not already done so, shall immediately tender the amount of $100.00, made payable to: Clerk, U.S. District Court, in compliance with Local Rule AT-I (f)(2). Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (mm6) (Entered: 12/03/2020) |

| 12/08/2020 | 47 | MOTION to Appear Pro Hac Vice by Michael E. Jones ( Filing fee $ 100 receipt number 0542-14258465) by on behalf of Google LLC. (Jones, Michael) (Entered: 12/08/2020) |
|---|---|---|
| 12/08/2020 | 48 | NOTICE of Attorney Appearance by Brian W. Lewis on behalf of EcoFactor, Inc. (Lewis, Brian) (Entered: 12/08/2020) |
| 12/08/2020 | 49 | NOTICE of Attorney Appearance by James N. Pickens on behalf of EcoFactor, Inc. (Pickens, James) (Entered: 12/08/2020) |
| 12/09/2020 | | Text Order GRANTING 47 Motion to Appear Pro Hac Vice for Attorney Henry Huang for Google LLC. Before the Court is the Motion for Admission Pro Hac Vice. The Court, having reviewed the Motion, finds it should be GRANTED and therefore orders as follows: IT IS ORDERED the Motion for Admission Pro Hac Vice is GRANTED. IT IS FURTHER ORDERED that Applicant, if he/she has not already done so, shall immediately tender the amount of $100.00, made payable to: Clerk, U.S. District Court, in compliance with Local Rule AT-I (f)(2). Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (mm6) (Entered: 12/09/2020) |
| 12/09/2020 | 50 | Minute Entry for proceedings held before Judge Alan D Albright: Markman Hearing held on 12/9/2020. Case called for Markman Hearing for this and 2 companion cases. The Court heard argument regarding one claim term. After hearing argument the Court determined that he will adopt the defendant's alternative proposed construction. The Court swore Todd Lanis into the TXWD. The Court states that December 6, 2021 is the jury trial date with the voir dire being handled either Thursday or Friday before that by the magistrate judge. There will be 7 jurors, 4 strikes on each side. The Court will determine the number of hours allowed at the pretrial conference. (Minute entry documents are not available electronically.). (Court Reporter Kristie Davis.)(am) (Entered: 12/09/2020) |
| 12/09/2020 | 51 | TRANSCRIPT REQUEST by Google LLC for proceedings held on 12/9/20. Proceedings Transcribed: Markman Hearing. Court Reporter: Kristie Davis. (Jones, Michael) (Main Document 51 replaced on 12/9/2020) (am). (Entered: 12/09/2020) |
| 12/09/2020 | 52 | TRANSCRIPT REQUEST by EcoFactor, Inc. for proceedings held on 12/9/20. Proceedings Transcribed: Markman Hearing. Court Reporter: Kristie Davis. (Chung, C.) (Entered: 12/09/2020) |
| 12/11/2020 | 53 | Transcript filed of Proceedings held on 12-9-20, Proceedings Transcribed: Markman hearing. Court Reporter/Transcriber: Kristie Davis, Telephone number: 254-340-6114. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction |

| | | |
|---|---|---|
| | | Request due 1/1/2021, Redacted Transcript Deadline set for 1/11/2021, Release of Transcript Restriction set for 3/11/2021, (kd) (Entered: 12/11/2020) |
| 02/09/2021 | 54 | Opposed MOTION for Hearing re 41 Opposed MOTION to Stay Case *Pending Transfer* by Google LLC. (Attachments: # 1 Proposed Order)(Jones, Michael) (Entered: 02/09/2021) |
| 02/12/2021 | 55 | Standing Order Regarding Filing Documents Under Seal and Redacted Pleadings in Patent Cases. Signed by Judge Alan D Albright. as of 2/12/2021. (bot1) (Entered: 02/24/2021) |
| 02/26/2021 | 56 | ORDER Setting Zoom Motion Hearing for 3/8/2021 01:30 PM before Judge Alan D Albright. Signed by Judge Alan D Albright. (bot1) (Entered: 02/26/2021) |
| 03/04/2021 | 57 | Joint MOTION to Stay Case by Google LLC. (Attachments: # 1 Proposed Order)(Jones, Michael) (Entered: 03/04/2021) |
| 03/05/2021 | 58 | ORDER GRANTING 57 Motion to Stay Case Signed by Judge Alan D Albright. (lad) (Entered: 03/05/2021) |
| 03/05/2021 | 59 | ORDER CANCELLING Motion Hearing. Signed by Judge Alan D Albright. (bot1) (Entered: 03/05/2021) |
| 03/12/2021 | 60 | MOTION to Withdraw as Attorney *Brian Lewis* by EcoFactor, Inc.. (Attachments: # 1 Proposed Order)(Mirzaie, Reza) (Entered: 03/12/2021) |
| 03/14/2021 | 61 | ORDER GRANTING 41 Motion to Stay Case. Signed by Judge Alan D Albright. (bw) (Entered: 03/12/2021) |
| 04/16/2021 | 62 | ORDER DENYING 19 Motion to Change Venue. Having considered the Section 1404 (a) factors, the Court finds that Google has not met its significant burden to demonstrate that the NDCA is clearly more convenient than this District. Therefore, the Court DENIES Googles Motion to Transfer. Signed by Judge Alan D Albright. (bw) (Entered: 04/18/2021) |
| 04/16/2021 | | Case No Longer Stayed. (jc5) (Entered: 01/24/2022) |
| 04/20/2021 | 63 | Agreed MOTION *for Entry of Protective Order and Stipulated Discovery Order* by EcoFactor, Inc.. (Attachments: # 1 Proposed Order Protective Order, # 2 Proposed Order Discovery Order)(Mirzaie, Reza) (Entered: 04/20/2021) |
| 04/29/2021 | 64 | Opposed MOTION to Amend/Correct *for Leave to Amend Invalidity Contentions* by Google LLC. (Attachments: # 1 Vakil Declaration, # 2 Ex. 1 90014679 file history-compressed, # 3 Ex. 2 2021-02-03 Final Invalidity Contentions, # 4 Ex. 3 2021-04-27 Email, # 5 Proposed Order)(Jones, Michael) (Entered: 04/29/2021) |
| 05/06/2021 | 65 | Joint MOTION *to Modify* re 33 Scheduling Order,, Set Hearings, by Google LLC. (Attachments: # 1 Proposed Order)(Jones, Michael) (Entered: 05/06/2021) |
| 05/06/2021 | 66 | Response in Opposition to Motion, filed by EcoFactor, Inc., re 64 Opposed MOTION to Amend/Correct *for Leave to Amend Invalidity Contentions* filed by Defendant Google LLC (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Chung, C.) (Entered: 05/06/2021) |

| 05/13/2021 | 67 | REPLY to Response to Motion, filed by Google LLC, re 64 Opposed MOTION to Amend/Correct *for Leave to Amend Invalidity Contentions* filed by Defendant Google LLC (Jones, Michael) (Entered: 05/13/2021) |
| 06/01/2021 | 68 | ORDER GRANTING 65 Motion Amend Scheduling Order Signed by Judge Alan D Albright. (lad) (Entered: 06/01/2021) |
| 06/01/2021 | | Set Deadlines/Hearings: Dispositive/Daubert Motions due by 11/10/2021, Pretrial Conference set for 1/12/2022 before Judge Alan D Albright, Jury Trial set for 1/31/2022 before Judge Alan D Albright. (lad) (Entered: 06/01/2021) |
| 06/09/2021 | 69 | ORDER GRANTING 63 Motion for Entry of Protective Order and Stipulated Discovery Order Signed by Judge Alan D Albright. (ab4) (Entered: 06/15/2021) |
| 06/09/2021 | 70 | MOTION for Discovery. (ab4) (Entered: 06/15/2021) |
| 06/16/2021 | 71 | Standing Order regarding Scheduling Order. Signed by Judge Alan D Albright. (Entered: 06/17/2021) |
| 06/16/2021 | 72 | Standing Order regarding Scheduling Order. Signed by Judge Alan D Albright. (Entered: 06/17/2021) |
| 07/14/2021 | 73 | NOTICE of Attorney Appearance by Matthew Aichele on behalf of EcoFactor, Inc.. Attorney Matthew Aichele added to party EcoFactor, Inc.(pty:pla) (Aichele, Matthew) (Entered: 07/14/2021) |
| 07/27/2021 | 74 | MOTION to Withdraw as Attorney *C. Jay Chung* by EcoFactor, Inc.. (Attachments: # 1 Proposed Order)(Mirzaie, Reza) (Entered: 07/27/2021) |
| 07/29/2021 | 75 | MOTION to Appear Pro Hac Vice by Michael E. Jones *for Robert Van Nest* ( Filing fee $ 100 receipt number 0542-15064371) by on behalf of Google LLC. (Jones, Michael) (Entered: 07/29/2021) |
| 07/29/2021 | 76 | MOTION to Appear Pro Hac Vice by Michael E. Jones *for Leo Lam* ( Filing fee $ 100 receipt number 0542-15064381) by on behalf of Google LLC. (Jones, Michael) (Entered: 07/29/2021) |
| 07/29/2021 | 77 | MOTION to Appear Pro Hac Vice by Michael E. Jones *for Eugene Paige* ( Filing fee $ 100 receipt number 0542-15064401) by on behalf of Google LLC. (Jones, Michael) (Entered: 07/29/2021) |
| 07/29/2021 | 78 | MOTION to Appear Pro Hac Vice by Michael E. Jones *for Matthias Kamber* ( Filing fee $ 100 receipt number 0542-15064408) by on behalf of Google LLC. (Jones, Michael) (Entered: 07/29/2021) |
| 07/29/2021 | 79 | MOTION to Appear Pro Hac Vice by Michael E. Jones *for Jennifer A. Huber* ( Filing fee $ 100 receipt number 0542-15064413) by on behalf of Google LLC. (Jones, Michael) (Entered: 07/29/2021) |
| 07/29/2021 | 80 | MOTION to Appear Pro Hac Vice by Michael E. Jones *for Kristin Hucek* ( Filing fee $ 100 receipt number 0542-15064419) by on behalf of Google LLC. (Jones, Michael) (Entered: 07/29/2021) |

| 07/29/2021 | 81 | MOTION to Appear Pro Hac Vice by Michael E. Jones *for Anna Porto* ( Filing fee $ 100 receipt number 0542-15064434) by on behalf of Google LLC. (Jones, Michael) (Entered: 07/29/2021) |
| 07/29/2021 | 82 | MOTION to Appear Pro Hac Vice by Michael E. Jones *for Patrick E. Murray* ( Filing fee $ 100 receipt number 0542-15064449) by on behalf of Google LLC. (Jones, Michael) (Entered: 07/29/2021) |
| 07/29/2021 | 83 | ATTACHMENT *Signature Page for Matthias Kamber* to 78 MOTION to Appear Pro Hac Vice by Michael E. Jones *for Matthias Kamber* ( Filing fee $ 100 receipt number 0542-15064408) by Google LLC. (Jones, Michael) (Entered: 07/29/2021) |
| 07/29/2021 | 84 | ATTACHMENT *Signature Page for Kristin Hucek* to 80 MOTION to Appear Pro Hac Vice by Michael E. Jones *for Kristin Hucek* ( Filing fee $ 100 receipt number 0542-15064419) by Google LLC. (Jones, Michael) (Entered: 07/29/2021) |
| 07/29/2021 |  | Text Order GRANTING 75 Motion to Appear Pro Hac Vice for Attorney Robert A. Van Nest for Google LLC. Before the Court is the Motion for Admission Pro Hac Vice. The Court, having reviewed the Motion, finds it should be GRANTED and therefore orders as follows: IT IS ORDERED the Motion for Admission Pro Hac Vice is GRANTED. IT IS FURTHER ORDERED that Applicant, if he/she has not already done so, shall immediately tender the amount of $100.00, made payable to: Clerk, U.S. District Court, in compliance with Local Rule AT-I (f)(2). Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jc5) (Entered: 07/30/2021) |
| 07/29/2021 |  | Text Order GRANTING 77 Motion to Appear Pro Hac Vice for Attorney Eugene M. Paige for Google LLC. Before the Court is the Motion for Admission Pro Hac Vice. The Court, having reviewed the Motion, finds it should be GRANTED and therefore orders as follows: IT IS ORDERED the Motion for Admission Pro Hac Vice is GRANTED. IT IS FURTHER ORDERED that Applicant, if he/she has not already done so, shall immediately tender the amount of $100.00, made payable to: Clerk, U.S. District Court, in compliance with Local Rule AT-I (f)(2). Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jc5) (Entered: 07/30/2021) |
| 07/29/2021 |  | Text Order GRANTING 80 Motion to Appear Pro Hac Vice for Attorney Kristin E. Hucek for Google LLC. Before the Court is the Motion for Admission Pro Hac Vice. The Court, having reviewed the Motion, finds it should be GRANTED and therefore orders as follows: IT IS ORDERED the Motion for Admission Pro Hac Vice is GRANTED. IT IS FURTHER ORDERED that Applicant, if he/she has not already done so, shall immediately tender the amount of $100.00, made payable to: Clerk, U.S. District Court, in compliance with Local Rule AT-I (f)(2). Pursuant to our |

| | | |
|---|---|---|
| | | Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jc5) (Entered: 07/30/2021) |
| 07/29/2021 | | Text Order GRANTING 76 Motion to Appear Pro Hac Vice for Attorney Leo Lam for Google LLC. Before the Court is the Motion for Admission Pro Hac Vice. The Court, having reviewed the Motion, finds it should be GRANTED and therefore orders as follows: IT IS ORDERED the Motion for Admission Pro Hac Vice is GRANTED. IT IS FURTHER ORDERED that Applicant, if he/she has not already done so, shall immediately tender the amount of $100.00, made payable to: Clerk, U.S. District Court, in compliance with Local Rule AT-I (f)(2). Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jc5) (Entered: 07/30/2021) |
| 07/29/2021 | | Text Order GRANTING 78 Motion to Appear Pro Hac Vice for Attorney Matthias Kamber for Google LLC. Before the Court is the Motion for Admission Pro Hac Vice. The Court, having reviewed the Motion, finds it should be GRANTED and therefore orders as follows: IT IS ORDERED the Motion for Admission Pro Hac Vice is GRANTED. IT IS FURTHER ORDERED that Applicant, if he/she has not already done so, shall immediately tender the amount of $100.00, made payable to: Clerk, U.S. District Court, in compliance with Local Rule AT-I (f)(2). Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jc5) (Entered: 07/30/2021) |
| 07/29/2021 | | Text Order GRANTING 79 Motion to Appear Pro Hac Vice for Attorney Jennifer A. Huber for Google LLC. Before the Court is the Motion for Admission Pro Hac Vice. The Court, having reviewed the Motion, finds it should be GRANTED and therefore orders as follows: IT IS ORDERED the Motion for Admission Pro Hac Vice is GRANTED. IT IS FURTHER ORDERED that Applicant, if he/she has not already done so, shall immediately tender the amount of $100.00, made payable to: Clerk, U.S. District Court, in compliance with Local Rule AT-I (f)(2). Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jc5) (Entered: 07/30/2021) |
| 07/29/2021 | | Text Order GRANTING 81 Motion to Appear Pro Hac Vice for Attorney Anna Porto for Google LLC. Before the Court is the Motion for Admission Pro Hac Vice. The Court, having reviewed the Motion, finds it should be GRANTED and therefore orders as follows: IT IS ORDERED the Motion for Admission Pro Hac Vice is GRANTED. |

| | | |
|---|---|---|
| | | IT IS FURTHER ORDERED that Applicant, if he/she has not already done so, shall immediately tender the amount of $100.00, made payable to: Clerk, U.S. District Court, in compliance with Local Rule AT-I (f)(2). Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jc5) (Entered: 07/30/2021) |
| 07/29/2021 | | Text Order GRANTING 82 Motion to Appear Pro Hac Vice for Attorney Patrick E. Murray for Google LLC. Before the Court is the Motion for Admission Pro Hac Vice. The Court, having reviewed the Motion, finds it should be GRANTED and therefore orders as follows: IT IS ORDERED the Motion for Admission Pro Hac Vice is GRANTED. IT IS FURTHER ORDERED that Applicant, if he/she has not already done so, shall immediately tender the amount of $100.00, made payable to: Clerk, U.S. District Court, in compliance with Local Rule AT-I (f)(2). Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jc5) (Entered: 07/30/2021) |
| 08/04/2021 | 85 | Federal Circuit ORDER filed denying Petition for Writ of Mandamus filed by Google LLC. Signed by Judge Unassigned. (bw) (Entered: 08/04/2021) |
| 08/16/2021 | 86 | NOTICE of Attorney Appearance by Adam Hoffman on behalf of EcoFactor, Inc.. Attorney Adam Hoffman added to party EcoFactor, Inc.(pty:pla) (Hoffman, Adam) (Entered: 08/16/2021) |
| 08/17/2021 | 87 | NOTICE of Change of Address by Shamita D. Etienne-Cummings (Etienne-Cummings, Shamita) (Entered: 08/17/2021) |
| 08/17/2021 | 88 | NOTICE of Change of Address by Bijal V. Vakil (Vakil, Bijal) (Entered: 08/17/2021) |
| 08/30/2021 | 89 | MOTION to Appear Pro Hac Vice by Michael E. Jones *for Gregory Washington* ( Filing fee $ 100 receipt number 0542-15167262) by on behalf of Google LLC. (Jones, Michael) (Entered: 08/30/2021) |
| 09/01/2021 | 90 | ORDER GRANTING 89 Motion to Appear Pro Hac Vice for Attorney Gregory D. Washington. Attorney added for Google LLC. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order, **if he/she has not previously done so for a prior case in this District**. Signed by Judge Alan D Albright. (jkda) (Entered: 09/02/2021) |
| 09/14/2021 | 91 | Unopposed MOTION to Withdraw as Attorney *on behalf of Michael Songer and Henry Yee-Der Huang* by Google LLC. (Attachments: # 1 Proposed Order)(Jones, Michael) (Entered: 09/14/2021) |
| 09/16/2021 | 92 | STIPULATION *to Change Certain Discovery Deadlines* by Google LLC. |

| | | (Attachments: # 1 Proposed Order)(Vakil, Bijal) (Entered: 09/16/2021) |
|---|---|---|
| 10/08/2021 | 93 | Standing Order Regarding Order Governing Proceedings Patent Cases. Signed by Judge Alan D Albright. (Entered: 10/13/2021) |
| 10/18/2021 | 94 | ORDER setting Discovery Hearing by Zoom for 10/18/2021 02:00 PM before Judge Alan D Albright. Signed by Judge Alan D Albright. (klw) (Entered: 10/18/2021) |
| 10/18/2021 | 95 | Minute Entry for proceedings held before Judge Alan D Albright: Discovery Hearing held on 10/18/2021. Case called for Discovery Hearing. Plaintiff is requesting that the defendants (specifically Ecobee) provide the calculation of royalty rate. Deft represents to the court that they have produced everything to the plaintiff that they are going to rely on for trial. Court directs that the plaintiffs provide information supporting the 5.16 royalty rate to the Defendants by Friday. No other pending matters. Hearing concluded. (Minute entry documents are not available electronically.) (Court Reporter Shelly Holmes.)(jc5) (Entered: 10/18/2021) |
| 10/18/2021 | 96 | TRANSCRIPT REQUEST by Google LLC for proceedings held on 10/18/2021. Proceedings Transcribed: Discovery Hearing. Court Reporter: Shelly Holmes. (Jones, Michael) (Entered: 10/18/2021) |
| 10/19/2021 | 97 | TRANSCRIPT REQUEST by EcoFactor, Inc. for proceedings held on 10/18/2021. Proceedings Transcribed: Discovery Hearing. Court Reporter: Shelly Holmes. (Davis, Kristopher) (Entered: 10/19/2021) |
| 10/29/2021 | 98 | MOTION to Appear Pro Hac Vice by Michael E. Jones *for R. Adam Lauridsen* ( Filing fee $ 100 receipt number 0542-15388080) by on behalf of Google LLC. (Jones, Michael) (Entered: 10/29/2021) |
| 11/03/2021 | | Text Order GRANTING 60 Motion to Withdraw Brian Lewis as Attorney, entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (JZ) (Entered: 11/03/2021) |
| 11/03/2021 | | Text Order GRANTING 74 Motion to Withdraw C. Jay Chung as Attorney, entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (JZ) (Entered: 11/03/2021) |
| 11/03/2021 | | Text Order GRANTING 91 Motion to Withdraw as Attorney, entered by Judge Alan D Albright. IT IS HEREBY ORDERED that Michael Songer and Henry Yee-DerHuang are hereby withdrawn as counsel of record for Defendant Google LLC and that they be removed from the Clerks service list.(This is a text-only entry generated by the court. There is no document associated with this entry.) (JZ) (Entered: 11/03/2021) |
| 11/04/2021 | 99 | MOTION to Appear Pro Hac Vice by Michael E. Jones *for Eric B. Hanson* ( Filing fee $ 100 receipt number 0542-15406206) by on behalf of Google LLC. (Jones, Michael) (Entered: 11/04/2021) |
| 11/04/2021 | 100 | NOTICE of Attorney Appearance by Jason M Wietholter on behalf of EcoFactor, Inc.. Attorney Jason M Wietholter added to party EcoFactor, Inc.(pty:pla) (Wietholter, Jason) (Entered: 11/04/2021) |
| 11/05/2021 | 101 | ORDER GRANTING 98 Motion to Appear Pro Hac Vice for Attorney R. Adam |

|  |  |  |
|---|---|---|
|  |  | Lauridsen. Attorney added for Google LLC. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order, **if he/she has not previously done so for a prior case in this District**. Signed by Judge Alan D Albright. (jkda) (Entered: 11/05/2021) |
| 11/05/2021 | 102 | Joint MOTION to Amend/Correct 68 Order on Motion for Miscellaneous Relief *Scheduling Order* by Google LLC. (Attachments: # 1 Amended Scheduling Order) (Jones, Michael) (Entered: 11/05/2021) |
| 11/09/2021 | 103 | ORDER GRANTING 99 Motion to Appear Pro Hac Vice for Attorney Eric B. Hanson. Attorney added for Google LLC. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order, **if he/she has not previously done so for a prior case in this District**. Signed by Judge Alan D Albright. (jkda) (Entered: 11/09/2021) |
| 11/10/2021 | 104 | STATUS REPORT *JOINT REPORT ON NARROWING OF ASSERTED CLAIMS AND PRIOR ART REFERENCES* by EcoFactor, Inc.. (Mirzaie, Reza) (Entered: 11/10/2021) |
| 11/16/2021 | 105 | Joint MOTION to Amend/Correct 68 Order on Motion for Miscellaneous Relief *Amend Scheduling Order* by Google LLC. (Attachments: # 1 Proposed Order)(Jones, Michael) (Entered: 11/16/2021) |
| 11/16/2021 | 106 | DEFICIENCY NOTICE: re 105 Joint MOTION to Amend/Correct 68 Order on Motion for Miscellaneous Relief *Amend Scheduling Order* (jc5) (Entered: 11/16/2021) |
| 11/16/2021 | 107 | STIPULATION *Joint Notice of Stipulation to Amend Scheduling Order [Dkt. 68]* by Google LLC. (Jones, Michael) (Entered: 11/16/2021) |
| 11/19/2021 | 108 | Sealed Motion Defendants' Joint Daubert Motion to Exclude Certain Testimony of Dr. Palmer by Google LLC (Attachments: # 1 Declaration of Bijal Vakil, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Proposed Order) (Vakil, Bijal) (Entered: 11/19/2021) |
| 11/19/2021 | 109 | Opposed Sealed Motion TO STRIKE EXPERT OPINIONS ON NON-INFRINGING ALTERNATIVES by EcoFactor, Inc. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit Exhibit 12) (Mirzaie, Reza) (Entered: 11/19/2021) |
| 11/19/2021 | 110 | Opposed MOTION to Strike *EXPERT OPINIONS ON NON-INFRINGING ALTERNATIVES* by EcoFactor, Inc.. (Attachments: # 1 Affidavit of Reza Mirzaie, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Proposed Order)(Mirzaie, Reza) (Entered: 11/19/2021) |
| 11/19/2021 | 111 | Joint MOTION for Summary Judgment *of Subject Matter Ineligibility Under 35 U.S.C. Sec. 101* by Google LLC. (Attachments: # 1 Hucek Decl ISO Section 101 MSJ, # 2 Ex 1 - '488 Patent, # 3 Ex 2 - '327 Patent, # 4 Ex 3 - '382 Patent, # 5 Ex 4 - 081021 Hublou depo excerpts, # 6 Ex 5 - 110821 Palmer depo excerpts, # 7 Ex 6 - 102921 Iglesia depo excerpts, # 8 Ex 7 - Iglesia Report excerpts, # 9 Proposed Order)(Jones, Michael) (Entered: 11/19/2021) |

| 11/19/2021 | 112 | Opposed MOTION to Exclude *PRINTED PUBLICATION OPINIONS AND SUMMARY JUDGMENT AS TO PUBLIC AVAILABILITY OF REFERENCES* by EcoFactor, Inc.. (Attachments: # 1 Affidavit of Reza Mirzaie, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Proposed Order)(Mirzaie, Reza) (Entered: 11/19/2021) |
|---|---|---|
| 11/19/2021 | 113 | CORRECTED Sealed Motion Defendants' Joint Daubert Motion to Exclude Certain Testimony of Dr. Palmer by Google LLC (Attachments: # 1 Declaration of Bijal Vakil, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Proposed Order) (Vakil, Bijal) (Entered: 11/19/2021) |
| 11/19/2021 | 114 | Sealed Motion Opposed Motion to Exclude the Expert Testimony of David Kennedy by Google LLC (Attachments: # 1 Porto Declaration, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Proposed Order) (Jones, Michael) (Entered: 11/19/2021) |
| 11/19/2021 | 115 | Sealed Motion Google LLC's Motion for Summary Judgment by Google LLC (Attachments: # 1 Declaration of Bijal Vakil, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Proposed Order) (Vakil, Bijal) (Entered: 11/19/2021) |
| 11/19/2021 | 116 | Sealed Motion --PLAINTIFFS MOTION FOR SUMMARY JUDGMENT OF DEFENDANT'S AFFIRMATIVE DEFENSES by EcoFactor, Inc. (Attachments: # 1 Affidavit of Reza Mirzaie, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Proposed Order) (Mirzaie, Reza) (Entered: 11/19/2021) |
| 11/19/2021 | 117 | Sealed Motion MOTION TO EXCLUDE EXPERT OPINIONS OF TODD SCHOETTELKOTTE by EcoFactor, Inc. (Attachments: # 1 Affidavit of Reza Mirzaie, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M, # 15 Exhibit N, # 16 Exhibit O, # 17 Proposed Order) (Mirzaie, Reza) (Entered: 11/20/2021) |
| 11/24/2021 | 118 | Joint MOTION to Extend Scheduling Order Deadlines by Google LLC. (Attachments: # 1 Proposed Order Amended Scheduling Order)(Van Nest, Robert) (Entered: 11/24/2021) |
| 11/24/2021 | 119 | Redacted Copy of 114 Sealed Motion Opposed Motion to Exclude the Expert Testimony of David Kennedy by Google LLC by Google LLC. (Jones, Michael) (Entered: 11/24/2021) |
| 11/24/2021 | 120 | Redacted Copy of 117 Sealed Motion MOTION TO EXCLUDE EXPERT OPINIONS OF TODD SCHOETTELKOTTE by EcoFactor, Inc. by EcoFactor, Inc.. (Attachments: # 1 Affidavit of Reza Mirzaie, # 2 Exhibit F, # 3 Exhibit G, # 4 Exhibit J, # 5 Exhibit K, # 6 Exhibit N, # 7 Exhibit O, # 8 Proposed Order)(Mirzaie, Reza) (Entered: 11/24/2021) |
| 11/24/2021 | 121 | Redacted Copy of 116 Sealed Motion --PLAINTIFFS MOTION FOR SUMMARY |

| | | |
|---|---|---|
| | | JUDGMENT OF DEFENDANT'S AFFIRMATIVE DEFENSES by EcoFactor, Inc. by EcoFactor, Inc.. (Attachments: # 1 Affidavit of Reza Mirzaie, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit D, # 5 Exhibit G, # 6 Exhibit I, # 7 Proposed Order)(Mirzaie, Reza) (Entered: 11/24/2021) |
| 11/26/2021 | 122 | Redacted Copy of 108 Sealed Motion Defendants' Joint Daubert Motion to Exclude Certain Testimony of Dr. Palmer by Google LLC by Google LLC. (Attachments: # 1 Affidavit of Bijal Vakil, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Vakil, Bijal) (Entered: 11/26/2021) |
| 11/26/2021 | 123 | Redacted Copy of 115 Sealed Motion Google LLC's Motion for Summary Judgment by Google LLC by Google LLC. (Attachments: # 1 Affidavit of Bijal Vakil, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit D, # 5 Exhibit G)(Vakil, Bijal) (Entered: 11/26/2021) |
| 12/03/2021 | 124 | Sealed Document: *Response to* of 116 Sealed Motion --PLAINTIFFS MOTION FOR SUMMARY JUDGMENT OF DEFENDANT'S AFFIRMATIVE DEFENSES by EcoFactor, Inc. by Google LLC (Attachments: # 1 Declaration of G. Washington, # 2 Ex. 1 GOOG-ECOF-WDTX1-00000519 at 533, # 3 Ex. 2 GOOG-ECOF-WDTX-00099022, # 4 Ex. 3 GOOG-ECOF-WDTX1-00000694) (Jones, Michael) (Entered: 12/03/2021) |
| 12/03/2021 | 125 | Redacted Copy *Response to 116 Motion for Summary Judgment* of 124 Sealed Document, by Google LLC. (Jones, Michael) (Entered: 12/03/2021) |
| 12/03/2021 | 126 | RESPONSE to Motion, filed by Google LLC, re 112 Opposed MOTION to Exclude *PRINTED PUBLICATION OPINIONS AND SUMMARY JUDGMENT AS TO PUBLIC AVAILABILITY OF REFERENCES* filed by Plaintiff EcoFactor, Inc. (Attachments: # 1 Declaration of K. Hucek, # 2 Ex A, # 3 Ex B, # 4 Ex C, # 5 Ex D, # 6 Ex E)(Jones, Michael) (Entered: 12/03/2021) |
| 12/03/2021 | 127 | Sealed Document: Response in Opposition of 117 Sealed Motion MOTION TO EXCLUDE EXPERT OPINIONS OF TODD SCHOETTELKOTTE by EcoFactor, Inc. by Google LLC (Attachments: # 1 List of Publicly Filed Documents, # 2 Sealed Document Ex 1, # 3 Sealed Document Ex 2, # 4 Sealed Document Ex 3, # 5 Sealed Document Ex 4, # 6 Sealed Document Ex 5, # 7 Sealed Document Ex 8, # 8 Sealed Document Ex 9, # 9 Sealed Document Ex 10, # 10 Sealed Document Ex 12, # 11 Sealed Document Ex 13, # 12 Sealed Document Ex15, # 13 Sealed Document Ex 16) (Jones, Michael) (Entered: 12/03/2021) |
| 12/03/2021 | 128 | Response in Opposition to Motion, filed by Google LLC, re 117 Sealed Motion MOTION TO EXCLUDE EXPERT OPINIONS OF TODD SCHOETTELKOTTE by EcoFactor, Inc. filed by Plaintiff EcoFactor, Inc. (Attachments: # 1 Porto Declaration, # 2 Ex 6, # 3 Ex 7, # 4 Ex 11, # 5 Ex 14)(Jones, Michael) (Entered: 12/03/2021) |
| 12/03/2021 | 129 | Sealed Document: PLAINTIFF'S OPPOSITION TO GOOGLE'S MOTION FOR SUMMARY JUDGEMENT of 115 Sealed Motion Google LLC's Motion for Summary Judgment by Google LLC by EcoFactor, Inc. (Attachments: # 1 Affidavit of Reza Mirzaie, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6) (Mirzaie, Reza) (Entered: 12/03/2021) |

| | | |
|---|---|---|
| 12/03/2021 | 130 | Sealed Document: PLAINTIFFS OPPOSITION TO DEFENDANTS CORRECTED JOINT MOTION TO EXCLUDE CERTAIN TESTIMONY OF DR. PALMER of 113 CORRECTED Sealed Motion Defendants' Joint Daubert Motion to Exclude Certain Testimony of Dr. Palmer by Google LLC by EcoFactor, Inc. (Attachments: # 1 Affidavit of Reza Mirzaie, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6) (Mirzaie, Reza) (Entered: 12/03/2021) |
| 12/03/2021 | 131 | RESPONSE to Motion, filed by Google LLC, re 110 Opposed MOTION to Strike *EXPERT OPINIONS ON NON-INFRINGING ALTERNATIVES* filed by Plaintiff EcoFactor, Inc., 109 Opposed Sealed Motion TO STRIKE EXPERT OPINIONS ON NON-INFRINGING ALTERNATIVES by EcoFactor, Inc. filed by Plaintiff EcoFactor, Inc. *GOOGLE LLC'S STATEMENT REGARDING MOOTNESS OF PLAINTIFF'S MOTION TO STRIKE EXPERT OPINIONS OF NON-INFRINGING ALTERNATIVES* (Attachments: # 1 Affidavit of Bijal Vakil, # 2 Exhibit A)(Vakil, Bijal) (Entered: 12/03/2021) |
| 12/03/2021 | 132 | Sealed Document: *OPPOSITION TO DEFENDANT GOOGLE LLCS MOTION TO EXCLUDE EXPERT TESTIMONY OF DAVID KENNEDY* of 114 Sealed Motion Opposed Motion to Exclude the Expert Testimony of David Kennedy by Google LLC by EcoFactor, Inc. (Attachments: # 1 Declaration of Reza Mirzaie, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G) (Mirzaie, Reza) (Entered: 12/03/2021) |
| 12/03/2021 | 133 | Transcript filed of Proceedings held on 10/18/21, Proceedings Transcribed: Discovery Hearing. Court Reporter/Transcriber: Shelly Holmes, CSR, TCRR, Telephone number: (903) 720-6009 (shellyholmes@hotmail.com). Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 12/27/2021, Redacted Transcript Deadline set for 1/3/2022, Release of Transcript Restriction set for 3/3/2022, (kd) (Entered: 12/03/2021) |
| 12/04/2021 | 134 | Sealed Document: PLAINTIFFS OPPOSITION TO DEFENDANTS JOINT MOTION FOR SUMMARY JUDGMENT OF SUBJECT MATTER INELIGIBILITY of 111 Joint MOTION for Summary Judgment *of Subject Matter Ineligibility Under 35 U.S.C. Sec. 101* by EcoFactor, Inc. (Attachments: # 1 Affidavit of Reza Mirzaie, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E) (Mirzaie, Reza) (Entered: 12/04/2021) |
| 12/04/2021 | 135 | ATTACHMENT to 130 Sealed Document, by EcoFactor, Inc.. (Attachments: # 1 Certificate of Service)(Mirzaie, Reza) (Entered: 12/04/2021) |
| 12/10/2021 | 136 | Redacted Copy *of OPPOSITION TO DEFENDANTS JOINT MOTION FOR SUMMARY JUDGMENT OF SUBJECT MATTER INELIGIBILITY UNDER 35 U.S.C. § 101* of 134 Sealed Document, by EcoFactor, Inc.. (Attachments: # 1 Declaration of Reza Mirzaie, # 2 Exhibit A, # 3 Exhibit C, # 4 Exhibit D)(Mirzaie, Reza) (Entered: |

| | | |
|---|---|---|
| | | 12/10/2021) |
| 12/10/2021 | 137 | Redacted Copy *of OPPOSITION TO DEFENDANT GOOGLE LLCS MOTION TO EXCLUDE EXPERT TESTIMONY OF DAVID KENNEDY* of 132 Sealed Document, by EcoFactor, Inc.. (Attachments: # 1 Declaration of Reza Mirzaie, # 2 Exhibit D) (Mirzaie, Reza) (Entered: 12/10/2021) |
| 12/10/2021 | 138 | Redacted Copy *OPPOSITION TO DEFENDANTS CORRECTED JOINT MOTION TO EXCLUDE CERTAIN TESTIMONY OF DR. PALMER [DKT. NO. 113]* of 130 Sealed Document, by EcoFactor, Inc.. (Attachments: # 1 Declaration of Reza Mirzaie, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 5, # 6 Exhibit 6)(Mirzaie, Reza) (Entered: 12/10/2021) |
| 12/10/2021 | 139 | Redacted Copy of 129 Sealed Document, by EcoFactor, Inc.. (Attachments: # 1 Affidavit of Reza Mirzaie, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 5, # 6 Exhibit 6)(Mirzaie, Reza) (Entered: 12/10/2021) |
| 12/10/2021 | 140 | REPLY to Response to Motion, filed by Google LLC, re 111 Joint MOTION for Summary Judgment *of Subject Matter Ineligibility Under 35 U.S.C. Sec. 101* filed by Defendant Google LLC (Jones, Michael) (Entered: 12/10/2021) |
| 12/10/2021 | 141 | Redacted Copy *Response to Schoettelkotte Daubert Motion* of 127 Sealed Document,, by Google LLC. (Jones, Michael) (Entered: 12/10/2021) |
| 12/10/2021 | 142 | Sealed Document: Reply in Support of Motion to Exclude Testimony of Expert Testimony of David Kennedy of 114 Sealed Motion Opposed Motion to Exclude the Expert Testimony of David Kennedy by Google LLC by Google LLC (Attachments: # 1 Porto Declaration, # 2 Sealed Ex. 16, # 3 Sealed Ex. 17, # 4 Sealed Ex. 18, # 5 Sealed E. 19) (Jones, Michael) (Entered: 12/10/2021) |
| 12/10/2021 | 143 | Sealed Document: PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OF DEFENDANT'S AFFIRMATIVE DEFENSES of 116 Sealed Motion --PLAINTIFFS MOTION FOR SUMMARY JUDGMENT OF DEFENDANT'S AFFIRMATIVE DEFENSES by EcoFactor, Inc. by EcoFactor, Inc. (Attachments: # 1 Affidavit of Reza Mirzaie, # 2 Exhibit 1) (Mirzaie, Reza) (Entered: 12/10/2021) |
| 12/10/2021 | 144 | REPLY to Response to Motion, filed by Google LLC, re 115 Sealed Motion Google LLC's Motion for Summary Judgment by Google LLC filed by Defendant Google LLC *Motion for Summary Judgment of Invalidity Under 35 U.S.C. § 112* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Vakil, Bijal) (Entered: 12/10/2021) |
| 12/10/2021 | 145 | Sealed Document: Defendants' Joint Reply in support of Daubert Motion to Exclude Certain Testimony of Dr. Palmer of 113 CORRECTED Sealed Motion Defendants' Joint Daubert Motion to Exclude Certain Testimony of Dr. Palmer by Google LLC by Google LLC (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D) (Vakil, Bijal) (Entered: 12/10/2021) |
| 12/10/2021 | 146 | Sealed Document: *REPLY IN SUPPORT* of 117 Sealed Motion MOTION TO EXCLUDE EXPERT OPINIONS OF TODD SCHOETTELKOTTE by EcoFactor, |

| | | |
|---|---|---|
| | | Inc. by EcoFactor, Inc. (Attachments: # 1 Declaration of Adam S. Hoffman, # 2 Exhibit P) (Mirzaie, Reza) (Entered: 12/10/2021) |
| 12/10/2021 | 147 | Redacted Copy *Defendants' Joint Reply in support of Daubert Motion to Exclude Certain Testimony of Dr. Palmer* of 145 Sealed Document, by Google LLC. (Attachments: # 1 Exhibit A - [Redacted in its entirety], # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Vakil, Bijal) (Entered: 12/10/2021) |
| 12/17/2021 | 148 | Redacted Copy *Reply In support of Motion to Exclude Testimony of Kennedy* of 142 Sealed Document, by Google LLC. (Jones, Michael) (Entered: 12/17/2021) |
| 12/20/2021 | 149 | Redacted Copy of 146 Sealed Document, by EcoFactor, Inc.. (Attachments: # 1 Exhibit P)(Mirzaie, Reza) (Entered: 12/20/2021) |
| 12/20/2021 | 150 | Redacted Copy of 143 Sealed Document, by EcoFactor, Inc.. (Attachments: # 1 Affidavit of Reza Mirzaie)(Mirzaie, Reza) (Entered: 12/20/2021) |
| 12/22/2021 | 151 | Sealed Motion Omnibus Motion in Limine by Google LLC (Attachments: # 1 Porto Declaration, # 2 Ex. 1 - SEALED, # 3 Ex. 2 - SEALED, # 4 Ex. 3 - SEALED, # 5 Ex. 5 - SEALED, # 6 Ex. 6 - SEALED, # 7 Ex. 7 - SEALED, # 8 Ex. 8 - SEALED, # 9 Ex. 9 - SEALED, # 10 Ex. 10 - SEALED) (Jones, Michael) (Entered: 12/22/2021) |
| 12/22/2021 | 152 | ATTACHMENT *Index of Non-Confidential Attachments* to 151 Sealed Motion Omnibus Motion in Limine by Google LLC by Google LLC. (Attachments: # 1 Ex. 4 - PTX0384, # 2 Proposed Order)(Jones, Michael) (Entered: 12/22/2021) |
| 12/22/2021 | 153 | Sealed Motion: *PLAINTIFF ECOFACTOR, INC.S OPPOSED MOTIONS IN LIMINE* by EcoFactor, Inc. (Attachments: # 1 Declaration of Reza Mirzaie, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Proposed Order) (Mirzaie, Reza) Modified to Motion on 1/31/2022 (lad). (Entered: 12/22/2021) |
| 12/23/2021 | 154 | ATTACHMENT to 151 Sealed Motion Omnibus Motion in Limine by Google LLC by Google LLC. (Attachments: # 1 Ex. A - Certificate of Conference)(Jones, Michael) (Entered: 12/23/2021) |
| 12/29/2021 | 155 | NOTICE *of Request for Daily Transcript and Real Time Reporting of Trial and Pretrial Proceedings* by Google LLC (Jones, Michael) (Entered: 12/29/2021) |
| 12/29/2021 | 156 | Sealed Document: Google's Response to Plaintiff's Opposed Motions in Limine of 153 Sealed Document, by Google LLC (Attachments: # 1 Murray Declaration, # 2 Ex. 1 - Sealed, # 3 Ex. 2 - Sealed, # 4 Ex. 3 - Sealed, # 5 Ex. 4 - Sealed, # 6 Ex. 5 - Sealed, # 7 Ex. 6 - Sealed, # 8 Ex. 7 - Sealed, # 9 Ex. 8 - Sealed, # 10 Ex. 9 - Sealed, # 11 Ex. 10 - Sealed, # 12 Ex. 11 - Sealed, # 13 Ex. 12 - Sealed, # 14 Ex. 13 - Sealed) (Jones, Michael) (Entered: 12/29/2021) |
| 12/29/2021 | 157 | NOTICE --*PLAINTIFF'S NOTICE OF REQUEST FOR DAILY TRANSCRIPT AND REAL TIME REPORTING OF TRIAL AND PRETRIAL PROCEEDINGS* by EcoFactor, Inc. re 93 Order (Mirzaie, Reza) (Entered: 12/29/2021) |
| 12/29/2021 | 158 | Sealed Document: PLAINTIFF ECOFACTOR, INC.S OPPOSITION TO DEFENDANT GOOGLE LLCS OMNIBUS MOTIONS IN LIMINE of 151 Sealed |

Appx147

| | | |
|---|---|---|
| | | Motion Omnibus Motion in Limine by Google LLC by EcoFactor, Inc. (Attachments: # 1 Affidavit of Reza Mirzaie, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D) (Mirzaie, Reza) (Entered: 12/29/2021) |
| 12/29/2021 | 159 | Redacted Copy *EcoFactor's Opposed Motions in Limine* of 153 Sealed Document, by EcoFactor, Inc.. (Attachments: # 1 Affidavit of Reza Mirzaie, # 2 Exhibit A, # 3 Exhibit C, # 4 Exhibit D, # 5 Proposed Order)(Mirzaie, Reza) (Entered: 12/29/2021) |
| 12/30/2021 | 160 | Redacted Copy of 151 Sealed Motion Omnibus Motion in Limine by Google LLC by Google LLC. (Jones, Michael) (Entered: 12/30/2021) |
| 01/04/2022 | 161 | ORDER, (Pretrial Conference RESET for 1/25/2022 01:30 PM before Judge Alan D Albright). Signed by Judge Alan D Albright. (bot1) (Entered: 01/04/2022) |
| 01/04/2022 | 162 | Sealed Document: PLAINTIFF ECOFACTOR, INC.S CORRECTED OPPOSITION TO DEFENDANT GOOGLE LLCS OMNIBUS MOTIONS IN LIMINE of 151 Sealed Motion Omnibus Motion in Limine by Google LLC by EcoFactor, Inc. (Mirzaie, Reza) (Entered: 01/04/2022) |
| 01/04/2022 | 163 | AFFIDAVIT in Support of 162 Sealed Document by EcoFactor, Inc.. (Attachments: # 1 Exhibit C)(Mirzaie, Reza) (Entered: 01/04/2022) |
| 01/05/2022 | 164 | Redacted Copy of 156 Sealed Document, by Google LLC. (Jones, Michael) (Entered: 01/05/2022) |
| 01/06/2022 | 165 | NOTICE of Change of Address by Eric Lancaster (Lancaster, Eric) (Entered: 01/06/2022) |
| 01/06/2022 | 166 | MOTION to Appear Pro Hac Vice by Bijal V. Vakil *PHV Application of James Reed* ( Filing fee $ 100 receipt number 0542-15587972) by on behalf of Google LLC. (Vakil, Bijal) (Entered: 01/06/2022) |
| 01/07/2022 | 167 | Redacted Copy of 162 Sealed Document by EcoFactor, Inc.. (Mirzaie, Reza) (Entered: 01/07/2022) |
| 01/07/2022 | 168 | ORDER GRANTING 166 Motion to Appear Pro Hac Vice for Attorney James Reed. Attorney added for Google LLC. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order, **if he/she has not previously done so for a prior case in this District**. Signed by Judge Alan D Albright. (jkda) (Entered: 01/07/2022) |
| 01/07/2022 | 169 | Pretrial Disclosures *Joint Pretrial Order* by EcoFactor, Inc.. (Attachments: # 1 Exhibit A-1, # 2 Exhibit A-5, # 3 Exhibit B-1, # 4 Exhibit B-2, # 5 Exhibit C-1, # 6 Exhibit C-2, # 7 Exhibit E-1, # 8 Exhibit E-2, # 9 Exhibit F-1, # 10 Exhibit F-2, # 11 Exhibit F-3, # 12 Exhibit G-1, # 13 Exhibit G-2, # 14 Exhibit G-3, # 15 Exhibit G-4)(Mirzaie, Reza) (Entered: 01/07/2022) |
| 01/07/2022 | 170 | Sealed Document: INDEX OF CONFIDENTIAL EXHIBITS TO DKT NO. 169 JOINT PRETRIAL ORDER of 169 Pretrial Disclosures, by EcoFactor, Inc. (Attachments: # 1 Exhibit A-2, # 2 Exhibit A-3, # 3 Exhibit A-4, # 4 Exhibit D-1, # 5 Exhibit D-2) (Mirzaie, Reza) (Entered: 01/07/2022) |

Appx148

| 01/10/2022 | 171 | ORDER SETTING VOIR DIRE AND PRE-VOIR DIRE CONFERENCE - Jury Selection set for 1/27/2022 09:30AM before Judge Jeffrey C. Manske. Signed by Judge Jeffrey C. Manske. (jc5) (Entered: 01/10/2022) |
|---|---|---|
| 01/10/2022 | 172 | Joint MOTION to Amend/Correct 68 Order on Motion for Miscellaneous Relief *Joint Motion to Amend Scheduling Order* by Google LLC. (Attachments: # 1 Proposed Order)(Jones, Michael) (Entered: 01/10/2022) |
| 01/11/2022 | 173 | NOTICE to Attorneys regarding Jury Evidence Recording System (JERS) Instructions. (ir) (Entered: 01/11/2022) |
| 01/11/2022 | 174 | Unopposed MOTION to Continue *Trial* by Google LLC. (Attachments: # 1 Declaration of R. Van Nest, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Proposed Order)(Jones, Michael) (Entered: 01/11/2022) |
| 01/11/2022 | 175 | Response in Opposition to Motion, filed by EcoFactor, Inc., re 174 Unopposed MOTION to Continue *Trial* filed by Defendant Google LLC (Mirzaie, Reza) (Entered: 01/11/2022) |
| 01/12/2022 | 176 | ORDER DENYING 174 Motion to Continue. Signed by Judge Alan D Albright. (jc5) (Entered: 01/12/2022) |
| 01/14/2022 | 177 | JOINT PRETRIAL ORDER. Signed by Judge Alan D Albright. (ir) (Entered: 01/14/2022) |
| 01/17/2022 | 178 | MOTION to Appear Pro Hac Vice by Bijal V. Vakil *Pro Hac Vice Application of James Gagen* ( Filing fee $ 100 receipt number 0542-15619783) by on behalf of Google LLC. (Vakil, Bijal) (Entered: 01/17/2022) |
| 01/18/2022 | 179 | ORDER GRANTING 178 Motion to Appear Pro Hac Vice for Attorney James P. Gagen. Attorney added for Google LLC. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order, **if he/she has not previously done so for a prior case in this District**. Signed by Judge Alan D Albright. (sjda) (Main Document 179 replaced on 1/25/2022) (sv). (Entered: 01/18/2022) |
| 01/20/2022 | 180 | Sealed Document: Notice of Errata and Corrected Exhibit of 127 Sealed Document,, by Google LLC (Attachments: # 1 Sealed Document) (Jones, Michael) (Entered: 01/20/2022) |
| 01/20/2022 | 181 | NOTICE -- *JOINT NOTICE IDENTIFYING REMAINING OBJECTIONS TO PRETRIAL DISCLOSURES AND DISPUTES ON MOTIONS IN LIMINE* by EcoFactor, Inc. re 172 Joint MOTION to Amend/Correct 68 Order on Motion for Miscellaneous Relief *Joint Motion to Amend Scheduling Order*, 169 Pretrial Disclosures, (Mirzaie, Reza) (Entered: 01/20/2022) |
| 01/20/2022 | 182 | JURY PARTIAL SEQUESTRATION ORDER. Signed by Judge Alan D Albright. (jc5) (Entered: 01/21/2022) |
| 01/24/2022 | | Text Order GRANTING 172 Motion to Amend/Correct entered by Judge Alan D |

| | | |
|---|---|---|
| | | Albright. It is therefore ORDERED that the deadline for the parties to file a joint notice identifying remaining objections to pretrial disclosures and disputes on motions in limine is January 20, 2022.(This is a text-only entry generated by the court. There is no document associated with this entry.) (PTlc) (Entered: 01/24/2022) |
| 01/24/2022 | 183 | AMENDED ORDER SETTING VOIR DIRE AND PRE-VOIR DIRE CONFERENCE. Voir Dire set for 1/31/2022 09:00AM before Judge Jeffrey C. Manske. VIDEO Conference: Voire Dire Protocol Conference set for 1/27/2022 01:30 PM before Judge Jeffrey C. Manske via Zoom. Signed by Judge Jeffrey C. Manske. (jc5) (Entered: 01/24/2022) |
| 01/25/2022 | 184 | Minute Entry for proceedings held before Judge Alan D Albright: Pretrial Conference held on 1/25/2022. Case called for Final Pretrial Conference in person. The Court heard argument and made rulings onpending motions - an Order should be forthcoming. The Court also explained his normal trial procedures. There will be 4 strikes for each side. Charge conference will probably be Wednesday evening. Not on the record. There will be 7 jurors seated. Judge Albright will be handling the voir dire. Judge wants each party to have 30 minutes for opening and closing arguments. There will be live remote witnesses. The Court will allow 12 hours per side not including opening and closing. Thursday at 1:30 is the time for parties to have technical people to confirm everything works and they can bring in whateverthey wish to the courtroom. Parties should submit yes or no prospective jurors to the Court who will read them. Parties can question individual parties but not whole panel. (Minute entry documents are not available electronically.). (Court Reporter Kristie Davis.) (jc5) (Entered: 01/25/2022) |
| 01/26/2022 | 185 | Unopposed MOTION to Withdraw as Attorney *on behalf of Matthias Kamber* by Google LLC. (Attachments: # 1 Proposed Order)(Jones, Michael) (Entered: 01/26/2022) |
| 01/26/2022 | | Text Order GRANTING 185 Motion to Withdraw as Attorney entered by Judge Alan D Albright. IT IS HEREBY ORDERED that Matthias Kamber is hereby withdrawn as counsel of record for Defendant Google LLC and that he be removed from the Clerks service list.(This is a text-only entry generated by the court. There is no document associated with this entry.) (PTlc) (Entered: 01/26/2022) |
| 01/26/2022 | 186 | BRIEF *JOINT STATEMENT REGARDING CLAIM CONSTRUCTION* regarding 50 Markman Hearing,,,, by EcoFactor, Inc.. (Mirzaie, Reza) (Entered: 01/26/2022) |
| 01/26/2022 | 187 | ORDER CANCELING PRE-VOIR DIRE CONFERENCE. Signed by Judge Jeffrey C. Manske. (mc5) (Entered: 01/27/2022) |
| 01/28/2022 | 188 | Sealed Document: Google's Trial Exhibit List by Google LLC (Attachments: # 1 Sealed Document) (Jones, Michael) (Entered: 01/28/2022) |
| 01/28/2022 | 189 | ATTACHMENT to 188 Sealed Document by Google LLC. (Attachments: # 1 Ex. B - Physical Ex. List, # 2 Ex. C - Joint Ex. List)(Jones, Michael) (Entered: 01/28/2022) |
| 01/28/2022 | 190 | BRIEF *JOINT PROPOSED OMNIBUS ORDER REGARDING PRETRIAL MOTIONS (DKTS. 109, 111, 113, 114, 115, 116, 117, 151, and 153)* regarding 184 Pretrial |

| | | Conference,,,, by EcoFactor, Inc.. (Mirzaie, Reza) (Entered: 01/28/2022) |
|---|---|---|
| 01/29/2022 | 191 | Sealed Document: Plaintiff EcoFactor, Inc.'s Updated Trial Exhibit List by EcoFactor, Inc. (Mirzaie, Reza) (Entered: 01/29/2022) |
| 01/31/2022 | 192 | Sealed Order. Signed by Judge Alan D Albright. (jc5) (Entered: 01/31/2022) |
| 01/31/2022 | 193 | Minute Entry for proceedings held before Judge Alan D Albright: Hearing Out of Jury Presence held on 1/31/2022 (Minute entry documents are not available electronically.). (Court Reporter Kristie Davis.) (jc5) (Entered: 01/31/2022) |
| 01/31/2022 | 194 | Minute Entry for proceedings held before Judge Alan D Albright: Jury Selection held on 1/31/2022. VOIR DIRE BEGINS. JURY SELECTION HELD - 9:09 - 11:45. JURORS SWORN - 11:45. Jury Trial begun on 1/31/2022. TRIAL BEGINS - 11:48. TRIAL HELD. OPENING STATEMENTS OF COUNSEL FOR PLA/DEFT HEARD. EVIDENCE PRESENTED ON BEHALF OF PLA/DEFT. TRIAL CONT./RECESSED TO: Jury Trial set for 2/1/2022 08:30 AM before Judge Alan D Albright. (Minute entry documents are not available electronically.) (Court Reporter Kristie Davis.) (jc5) (Entered: 02/01/2022) |
| 02/01/2022 | 195 | Minute Entry for proceedings held before Judge Alan D Albright: Hearing Out of Jury Presence held on 2/1/2022 (Minute entry documents are not available electronically.). (Court Reporter Kristie Davis.)(jc5) (Entered: 02/01/2022) |
| 02/01/2022 | 196 | Minute Entry for proceedings held before Judge Alan D Albright: Jury Trial held on 2/1/2022. EVIDENCE PRESENTED ON BEHALF OF PLA/DEFT. Jury Trial set for 2/2/2022 09:30 AM before Judge Alan D Albright. Minute entry documents are not available electronically. (Court Reporter Kristie Davis.) (jc5) (Entered: 02/02/2022) |
| 02/02/2022 | 197 | Minute Entry for proceedings held before Judge Alan D Albright: Hearing Out of Jury Presence held on 2/2/2022. (Minute entry documents are not available electronically.) (Court Reporter Kristie Davis.) (jc5) (Entered: 02/02/2022) |
| 02/02/2022 | 198 | Minute Entry for proceedings held before Judge Alan D Albright: Jury Trial held on 2/2/2022. EVIDENCE PRESENTED ON BEHALF OF PLA/DEFT. PLAINTIFF REST - 2:33. TRIAL CONT./RECESSED TO: Possible Friday, February 4 to be determined due to inclement weather, when resumed, will be before Judge Alan D Albright. (Minute entry documents are not available electronically.) (Court Reporter Kristie Davis.)(jc5) (Entered: 02/03/2022) |
| 02/07/2022 | 199 | Minute Entry for proceedings held before Judge Alan D Albright: Hearing Out of Jury Presence held on 2/7/2022 (Minute entry documents are not available electronically.). (Court Reporter Kristie Davis.) (jc5) (Entered: 02/07/2022) |
| 02/07/2022 | 201 | Minute Entry for proceedings held before Judge Alan D Albright: Jury Trial held on 2/7/2022. EVIDENCE PRESENTED ON BEHALF OF PLA/DEFT. DEF'S MOTION (ORAL) FOR JUDGMENT AS A MATTER OF LAW - CT GRANTED AS TO THEMATTER OF WILLFULNESS. Jury Trial cont./recessed to 2/8/2022 08:30 AM before Judge Alan D Albright. (Minute entry documents are not available electronically.) (Court Reporter Kristie Davis.) (jc5) (Entered: 02/08/2022) |

| 02/08/2022 | 200 | Sealed Document: PLAINTIFF ECOFACTOR, INC.S TRIAL BRIEF REGARDING DEFENDANT GOOGLE, INC.S MOTION FOR JUDGMENT AS A MATTER OF LAW by EcoFactor, Inc. (Mirzaie, Reza) (Entered: 02/08/2022) |
|---|---|---|
| 02/08/2022 | 202 | Minute Entry for proceedings held before Judge Alan D Albright: Hearing Out of Jury Presence held on 2/8/2022. Case called for pretrail hearing outside the presence of the jury. At issue are slides to be used duringexpert witness (Williams) slides 83, 35, 87 - 92 and in patent 382 slides 46, 66, 68, 76, 79, 83 and 84. The Court made ruling on each and determined that if the information is not in the expert report the Court will not allow it into the trial. (Minute entry documents are not available electronically.) (Court Reporter Kristie Davis.) (jc5) (Entered: 02/08/2022) |
| 02/08/2022 | 203 | Sealed Motion Rule 50(A) Motion for Judgment as a Matter of Law by Google LLC (Jones, Michael) (Entered: 02/08/2022) |
| 02/08/2022 | 204 | Minute Entry for proceedings held before Judge Alan D Albright: Jury Trial held on 2/8/2022. EVIDENCE PRESENTED ON BEHALF OF PLA/DEFT. PLAINTIFF REST(Rebuttal) - 3:17 p.m. DEFENDANT REST- 2:50 p.m. PLAINTIFF'S MOTION (ORAL) FOR JUDGMENT AS A MATTER OF LAW. DEFENDANT'S MOTION (ORAL) FOR JUDGMENT AS A MATTER OF LAW. COURT CHARGES JURY 3:50 - 4:43. Jury Trial recessed to 2/9/2022 08:30 AM before Judge Alan D Albright. (Minute entry documents are not available electronically.) (Court Reporter Kristie Davis.)(jc5) (Entered: 02/08/2022) |
| 02/09/2022 | 206 | Minute Entry for proceedings held before Judge Alan D Albright: Jury Trial held on 2/9/2022. CLOSING ARGUMENTS OF COUNSEL FOR PLA/DEFT. JURY NOTES #1, 2, 3 and 4 TENDERED TO THE COURT. JURY RETIRES TO DELIBERATE. Jury Trial CONT./RECESSED to 2/10/2022 09:00 AM to continue deliberations before Judge Alan D Albright. (Minute entry documents are not available electronically.). (Court Reporter Kristie Davis.) (jc5) (Entered: 02/10/2022) |
| 02/10/2022 | | Text Order DENYING 203 Sealed Motion entered by Judge Alan D Albright. Willfulness separately ruled on in court and is not a part of this motion. (This is a text-only entry generated by the court. There is no document associated with this entry.) (PTlc) (Entered: 02/10/2022) |
| 02/10/2022 | 205 | ORDER - all exhibits introduced into evidence during the trial of said cause bereturned to the party introducing them. Signed by Judge Alan D Albright. (jc5) (Entered: 02/10/2022) |
| 02/10/2022 | 207 | Minute Entry for proceedings held before Judge Alan D Albright: JURY NOTE #5 TENDERED TO THE COURT. JURY POLLED/DISCHARGED.Jury Trial completed on 2/10/2022. (Minute entry documents are not available electronically.). (Court Reporter Kristie Davis.) (jc5) (Entered: 02/10/2022) |
| 02/10/2022 | 208 | Exhibit List. (jc5) (Main Document 208 replaced on 2/10/2022) (jc5). (Entered: 02/10/2022) |
| 02/10/2022 | 209 | Court's Charge/Instructions to Jury. (jc5) (Entered: 02/10/2022) |

| 02/10/2022 | 210 | JURY NOTE 1 SEALED pursuant to E-Government Act of 2002. (jc5) (Entered: 02/10/2022) |
| --- | --- | --- |
| 02/10/2022 | 211 | JURY NOTE 2 SEALED pursuant to E-Government Act of 2002. (jc5) (Entered: 02/10/2022) |
| 02/10/2022 | 212 | JURY NOTE 3 SEALED pursuant to E-Government Act of 2002. (jc5) (Entered: 02/10/2022) |
| 02/10/2022 | 213 | JURY NOTE 4 SEALED pursuant to E-Government Act of 2002. (jc5) (Entered: 02/10/2022) |
| 02/10/2022 | 214 | JURY NOTE 5 SEALED pursuant to E-Government Act of 2002. (jc5) (Entered: 02/10/2022) |
| 02/10/2022 | 215 | JURY VERDICT (Redacted Version) for EcoFactor, Inc. filed. Unredacted Jury Verdict Sealed pursuant to E-Government Act of 2002. (jc5) (Entered: 02/10/2022) |
| 02/10/2022 | 217 | EXHIBIT RECEIPT by EcoFactor, Inc. (jc5) (Entered: 02/10/2022) |
| 02/10/2022 | 218 | EXHIBIT RECEIPT by Google LLC. (jc5) (Entered: 02/10/2022) |
| 02/11/2022 | 219 | Witness List. (jc5) (Entered: 02/11/2022) |
| 02/16/2022 | 220 | Redacted Copy of 203 Sealed Motion Rule 50(A) Motion for Judgment as a Matter of Law by Google LLC by Google LLC. (Jones, Michael) (Entered: 02/16/2022) |
| 02/25/2022 | 221 | Unopposed MOTION to Withdraw as Attorney *on behalf of Patrick Murray* by Google LLC. (Attachments: # 1 Proposed Order)(Jones, Michael) (Entered: 02/25/2022) |
| 03/02/2022 | 222 | ORDER GRANTING 221 Motion to Withdraw as Attorney PATRICK MURRAY. Signed by Judge Alan D Albright. (sv) (Entered: 03/02/2022) |
| 03/10/2022 | | Parties shall comply with Judge Albright's updated standing orders and COVID-19 standing order available by clicking the included hyperlinks.<br><br>The updated orders are as follows:<br>1. Standing Order Regarding Notice of Readiness for Patent Cases 030722,<br>2. Standing Order on Pretrial Procedures and Requirements in Civil Cases 030722,<br>3. Standing Order Governing Proceedings 4.0 - Patent Cases 030722,<br>4. Amended Standing Order Regarding Coronavirus (COVID-19) and Court Proceedings,<br>5. Amended Standing Order Regarding Joint Or Unopposed Request To Change Deadlines 030722,<br>6. Amended Standing Order Regarding Filing Documents Under Seal and Redacted Public Versions 030722. (jkda) (Entered: 03/10/2022) |
| 03/25/2022 | 223 | Opposed MOTION *TO APPROVE FORM AND FOR ENTRY OF FINAL JUDGMENT* re 215 Jury Verdict by EcoFactor, Inc.. (Attachments: # 1 Affidavit of Kristopher Davis, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C)(Mirzaie, Reza) (Entered: 03/25/2022) |

| 03/26/2022 | 224 | 1-25-22 Pretrial Conference Sealed Transcript filed (This transcript is not available electronically) (kd) (Entered: 03/26/2022) |
|---|---|---|
| 03/26/2022 | 225 | 1-31-22 Trial Proceedings Sealed Transcript filed (This transcript is not available electronically) (kd) (Entered: 03/26/2022) |
| 03/26/2022 | 226 | 2-1-22 Trial Proceedings Sealed Transcript filed (This transcript is not available electronically) (kd) (Entered: 03/26/2022) |
| 03/26/2022 | 227 | 2-2-22 Trial Proceedings Sealed Transcript filed (This transcript is not available electronically) (kd) (Entered: 03/26/2022) |
| 03/26/2022 | 228 | 2-7-22 Trial Proceedings Sealed Transcript filed (This transcript is not available electronically) (kd) (Entered: 03/26/2022) |
| 03/26/2022 | 229 | 2-8-22 Jury Trial Proceedings Sealed Transcript filed (This transcript is not available electronically) (kd) (Entered: 03/26/2022) |
| 03/26/2022 | 230 | 2-9-22 Jury Trial Proceedings Sealed Transcript filed (This transcript is not available electronically) (kd) (Entered: 03/26/2022) |
| 03/26/2022 | 231 | 2-10-22 Jury Trial Proceedings Sealed Transcript filed (This transcript is not available electronically) (kd) (Entered: 03/26/2022) |
| 03/26/2022 | 232 | Transcript filed of Proceedings held on 1-25-22, Proceedings Transcribed: Pretrial Conference. Court Reporter/Transcriber: Kristie Davis (kmdaviscsr@yahoo.com), Telephone number: 254-340-6114. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 4/18/2022, Redacted Transcript Deadline set for 4/26/2022, Release of Transcript Restriction set for 6/24/2022, (kd) (Entered: 03/26/2022) |
| 03/26/2022 | 233 | Transcript filed of Proceedings held on 1-31-22, Proceedings Transcribed: Jury Trial Volume 1. Court Reporter/Transcriber: Kristie Davis (kmdaviscsr@yahoo.com), Telephone number: 254-340-6114. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 4/18/2022, Redacted Transcript Deadline set for 4/26/2022, Release of Transcript Restriction set for 6/24/2022, (kd) (Entered: 03/26/2022) |
| 03/26/2022 | 234 | Transcript filed of Proceedings held on 2-1-22, Proceedings Transcribed: Jury Trial Volume 2. Court Reporter/Transcriber: Kristie Davis (kmdaviscsr@yahoo.com), Telephone number: 254-340-6114. Parties are notified of their duty to review the |

Appx154

| | | |
|---|---|---|
| | | transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 4/18/2022, Redacted Transcript Deadline set for 4/26/2022, Release of Transcript Restriction set for 6/24/2022, (kd) (Entered: 03/26/2022) |
| 03/26/2022 | 235 | Transcript filed of Proceedings held on 2-2-22, Proceedings Transcribed: Jury Trial Volume 3. Court Reporter/Transcriber: Kristie Davis (kmdaviscsr@yahoo.com), Telephone number: 254-340-6114. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 4/18/2022, Redacted Transcript Deadline set for 4/26/2022, Release of Transcript Restriction set for 6/24/2022, (kd) (Entered: 03/26/2022) |
| 03/26/2022 | 236 | Transcript filed of Proceedings held on 2-7-22, Proceedings Transcribed: Jury Trial Volume 4. Court Reporter/Transcriber: Kristie Davis (kmdaviscsr@yahoo.com), Telephone number: 254-340-6114. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 4/18/2022, Redacted Transcript Deadline set for 4/26/2022, Release of Transcript Restriction set for 6/24/2022, (kd) (Entered: 03/26/2022) |
| 03/26/2022 | 237 | Transcript filed of Proceedings held on 2-8-22, Proceedings Transcribed: Jury Trial Volume 5. Court Reporter/Transcriber: Kristie Davis (kmdaviscsr@yahoo.com), Telephone number: 254-340-6114. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 4/18/2022, Redacted Transcript Deadline set for 4/26/2022, Release of Transcript Restriction set for 6/24/2022, (kd) (Entered: 03/26/2022) |
| 03/26/2022 | 238 | Transcript filed of Proceedings held on 2-9-22, Proceedings Transcribed: Jury Trial Volume 6. Court Reporter/Transcriber: Kristie Davis (kmdaviscsr@yahoo.com), Telephone number: 254-340-6114. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be |

Appx155

| | | |
|---|---|---|
| | | purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 4/18/2022, Redacted Transcript Deadline set for 4/26/2022, Release of Transcript Restriction set for 6/24/2022, (kd) (Entered: 03/26/2022) |
| 03/26/2022 | 239 | Transcript filed of Proceedings held on 2-10-22, Proceedings Transcribed: Jury Trial Volume 7. Court Reporter/Transcriber: Kristie Davis (kmdaviscsr@yahoo.com), Telephone number: 254-340-6114. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 4/18/2022, Redacted Transcript Deadline set for 4/26/2022, Release of Transcript Restriction set for 6/24/2022, (kd) (Entered: 03/26/2022) |
| 04/08/2022 | 240 | Response in Opposition to Motion, filed by Google LLC, re 223 Opposed MOTION *TO APPROVE FORM AND FOR ENTRY OF FINAL JUDGMENT* re 215 Jury Verdict filed by Plaintiff EcoFactor, Inc. (Attachments: # 1 Decl of Hucek ISO Opp to Mtn for Entry of Judgment, # 2 Ex. 1 - Final Judgment, # 3 Ex. 2 - Pretrial Conf Tr (excerpts), # 4 Ex. 3 - EcoFactor v. Google - Declaration of W. Todd Schoettelkotte - 04.08.2022 - FINAL)(Jones, Michael) (Entered: 04/08/2022) |
| 04/11/2022 | 241 | NOTICE of Attorney Appearance by Shaun William Hassett on behalf of Google LLC (Hassett, Shaun) (Entered: 04/11/2022) |
| 04/14/2022 | 242 | Standing Order Regarding Order Governing Proceedings Patent Cases. Signed by Judge Alan D Albright. (Entered: 04/14/2022) |
| 04/14/2022 | | Text Order MOOTING 102 Motion to Amend/Correct entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (JGlc) (Entered: 04/14/2022) |
| 04/14/2022 | | Text Order GRANTING 105 Motion to Amend/Correct entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (JGlc) (Entered: 04/14/2022) |
| 04/14/2022 | | Text Order GRANTING 118 Motion to Extend Scheduling Order Deadlines entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (JGlc) (Entered: 04/14/2022) |
| 04/15/2022 | 243 | Sealed Document: PLAINTIFF ECOFACTOR, INC.S REPLY IN SUPPORT OF ITS MOTION TO APPROVE FORM AND FOR ENTRY OF FINAL JUDGMENT of 223 Opposed MOTION *TO APPROVE FORM AND FOR ENTRY OF FINAL JUDGMENT* re 215 Jury Verdict by EcoFactor, Inc. (Attachments: # 1 Affidavit of Kristopher Davis, # 2 Exhibit D, # 3 Exhibit E) (Mirzaie, Reza) (Entered: 04/15/2022) |

| | | |
|---|---|---|
| 05/26/2022 | 244 | FINAL JUDGMENT in favor of EcoFactor against Google. Judgment is hereby entered in favor of EcoFactor and against Google in the lump sum of $20,019,300.00; EcoFactor is further awarded prejudgment interest. EcoFactor is awarded post-judgment interest. Signed by Judge Alan D Albright. (sv) (Entered: 05/27/2022) |
| 05/27/2022 | 245 | Report on Patent/Trademark sent to U.S. Patent and Trademark Office. (bot1) (Entered: 05/27/2022) |
| 05/27/2022 | 246 | NOTICE *of Withdrawal of Counsel* by Google LLC (Van Nest, Robert) (Entered: 05/27/2022) |
| 06/09/2022 | 247 | BILL OF COSTS by EcoFactor, Inc.. (Attachments: # 1 Exhibit B, # 2 Exhibit C, # 3 Exhibit D, # 4 Exhibit E, # 5 Exhibit F, # 6 Exhibit G)(Mirzaie, Reza) (Entered: 06/09/2022) |
| 06/09/2022 | 248 | Memorandum in Support of 247 Bill of Costs by EcoFactor, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Mirzaie, Reza) (Entered: 06/09/2022) |
| 06/23/2022 | 249 | Sealed Motion For New Trial by EcoFactor, Inc. (Attachments: # 1 Proposed Order) (Mirzaie, Reza) (Entered: 06/23/2022) |
| 06/23/2022 | 250 | Appeal of Final Judgment 244 by EcoFactor, Inc.. ( Filing fee $ 505 receipt number 0542-16178858) (Mirzaie, Reza) (Entered: 06/23/2022) |
| 06/23/2022 | 251 | Sealed Motion Rule 50(B) Motion for Judgment as a Matter of Law by Google LLC (Attachments: # 1 Washington Declaration, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Proposed Order) (Jones, Michael) (Entered: 06/23/2022) |
| 06/23/2022 | 252 | Sealed Motion Rule 59 Motion for a New Trial by Google LLC (Attachments: # 1 Washington Declaration, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Proposed Order) (Jones, Michael) (Entered: 06/23/2022) |
| 06/23/2022 | | Notice of Appeal to the Federal Circuit following 250 Notice of Appeal (E-Filed) by EcoFactor, Inc.. Record sent to Federal Circuit via email. (lad) (Entered: 06/24/2022) |
| 06/27/2022 | 253 | Memorandum in Support of an *UNOPPOSED AMENDED BILL OF COSTS* by EcoFactor, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Mirzaie, Reza) Amending 247 and 248 (lad). (Entered: 06/27/2022) |
| 06/30/2022 | 254 | Redacted Copy of 251 Sealed Motion Rule 50(B) Motion for Judgment as a Matter of Law by Google LLC by Google LLC. (Jones, Michael) (Entered: 06/30/2022) |
| 06/30/2022 | 255 | Redacted Copy of 249 Sealed Motion For New Trial by EcoFactor, Inc. by EcoFactor, Inc.. (Mirzaie, Reza) (Entered: 06/30/2022) |
| 06/30/2022 | 256 | Redacted Copy of 252 Sealed Motion Rule 59 Motion for a New Trial by Google LLC by Google LLC. (Jones, Michael) (Entered: 06/30/2022) |
| 06/30/2022 | 258 | CAFC Order regarding outstanding motions filed under FRAP 4(a)4. **DC is to transmit a certified copy of the docket sheet upon final disposition of motions 249** |

| | | |
|---|---|---|
| | | **, 251 and 252** . (zv) Modified on 7/18/2022 (lad). (Entered: 07/11/2022) |
| 06/30/2022 | 259 | CAFC Order regarding notice of appeal filed on June 23, 2022. A motion under FRAP 4(a)(4) has been filed in the United States District Court rendering the notice of appeal ineffective. It is ORDERED that the appeal be deactivated. The appeal will be reactivated upon entry of the order disposing of the last such outstanding motion and filing of an updated docket sheet to USCA Fed Circuit. (zv) Modified on 7/18/2022 (lad). (Entered: 07/11/2022) |
| 07/01/2022 | 257 | BILL OF COSTS. (bw) (Entered: 07/05/2022) |
| 07/21/2022 | 260 | Sealed Document: Opposition to Motion for New Trial of 249 Sealed Motion For New Trial by EcoFactor, Inc. by Google LLC (Jones, Michael) (Entered: 07/21/2022) |
| 07/21/2022 | 261 | ATTACHMENT *Non-Confidential Exhibits* to 260 Sealed Document by Google LLC. (Attachments: # 1 Washington Declaration, # 2 Ex. A - Email re exhibits)(Jones, Michael) (Entered: 07/21/2022) |
| 07/21/2022 | 262 | Sealed Document: PLAINTIFF ECOFACTOR, INC.S OPPOSITION TO GOOGLES RULE 50(B) MOTION FOR JUDGMENT AS A MATTER OF LAW of 254 Redacted Copy, 251 Sealed Motion Rule 50(B) Motion for Judgment as a Matter of Law by Google LLC by EcoFactor, Inc. (Mirzaie, Reza) (Entered: 07/21/2022) |
| 07/21/2022 | 263 | Sealed Document: PLAINTIFF ECOFACTOR, INC.S OPPOSITION TO DEFENDANT GOOGLE LLCS RULE 59 MOTION FOR A NEW TRIAL of 252 Sealed Motion Rule 59 Motion for a New Trial by Google LLC by EcoFactor, Inc. (Mirzaie, Reza) (Entered: 07/21/2022) |
| 07/28/2022 | 264 | Redacted Copy of 260 Sealed Document by Google LLC. (Jones, Michael) (Entered: 07/28/2022) |
| 08/11/2022 | 265 | Sealed Document: Reply in Support of 251 Sealed Motion Rule 50(B) Motion for Judgment as a Matter of Law by Google LLC by Google LLC (Jones, Michael) (Entered: 08/11/2022) |
| 08/11/2022 | 266 | Sealed Document: Reply to EcoFactor's Opposition of 252 Sealed Motion Rule 59 Motion for a New Trial by Google LLC by Google LLC (Jones, Michael) (Entered: 08/11/2022) |
| 08/11/2022 | 267 | Sealed Document: PLAINTIFF ECOFACTOR, INC.S REPLY IN SUPPORT OF ITS MOTION FOR NEW TRIAL of 249 Sealed Motion For New Trial by EcoFactor, Inc. by EcoFactor, Inc. (Mirzaie, Reza) (Entered: 08/11/2022) |
| 08/15/2022 | 268 | Sealed Document: PLAINTIFF ECOFACTOR, INC.S CORRECTED OPPOSITION TO 251 GOOGLES RULE 50(B) MOTION FOR JUDGMENT AS A MATTER OF LAW, CORRECTING 262 Sealed Document by EcoFactor, Inc. (Mirzaie, Reza) Modified on 8/15/2022 to change document link as requested by filing party (kc). (Entered: 08/15/2022) |
| 08/18/2022 | 269 | Redacted Copy *Google's Reply to Rule 59 Motion for New Trial* of 266 Sealed Document by Google LLC. (Jones, Michael) (Entered: 08/18/2022) |

| 08/18/2022 | 270 | Redacted Copy *Google's Reply in Support of its Rule 50(B) Motion for Judgment as a Matter of Law* of 265 Sealed Document by Google LLC. (Jones, Michael) (Entered: 08/18/2022) |
|---|---|---|
| 08/19/2022 | 271 | Redacted Copy *PLAINTIFF ECOFACTOR, INC.'S CORRECTED OPPOSITION TO GOOGLE'S RULE 50(B) MOTION FOR JUDGMENT AS A MATTER OF LAW* of 268 Sealed Document, by EcoFactor, Inc.. (Mirzaie, Reza) (Entered: 08/19/2022) |
| 08/19/2022 | 272 | Redacted Copy *PLAINTIFF ECOFACTOR, INC.S OPPOSITION TO DEFENDANT GOOGLE LLCS RULE 59 MOTION FOR A NEW TRIAL* of 263 Sealed Document by EcoFactor, Inc.. (Mirzaie, Reza) (Entered: 08/19/2022) |
| 08/22/2022 | 273 | Sealed Document: *Response to Corrected Opposition* of 268 Sealed Document, by Google LLC (Attachments: # 1 Hucek Declaration, # 2 Exhibit 1) (Jones, Michael) (Entered: 08/22/2022) |
| 08/24/2022 | 274 | Redacted Copy *PLAINTIFF ECOFACTOR, INC.S REPLY IN SUPPORT OF ITS MOTION FOR NEW TRIAL* of 267 Sealed Document by EcoFactor, Inc.. (Mirzaie, Reza) (Entered: 08/24/2022) |
| 08/29/2022 | 275 | Redacted Copy of 273 Sealed Document by Google LLC. (Jones, Michael) (Entered: 08/29/2022) |
| 09/19/2022 | 276 | ORDER Setting Motion Hearing for 9/27/2022 09:00 AM before Judge Alan D Albright. Signed by Judge Alan D Albright. (bot2) (Entered: 09/19/2022) |
| 09/26/2022 | 277 | ORDER RESETTING MOTIONS HEARING for 9/27/2022 10:30 AM before Judge Alan D Albright. Signed by Judge Alan D Albright. (lad) (Entered: 09/26/2022) |
| 09/27/2022 | 278 | Minute Entry for proceedings held before Judge Alan D Albright: Motion Hearing held on 9/27/2022 re 251 Sealed Motion Rule 50(B) Motion for Judgment as a Matter of Law by Google LLC filed by Google LLC, 249 Sealed Motion For New Trial by EcoFactor, Inc. filed by EcoFactor, Inc., 252 Sealed Motion Rule 59 Motion for a New Trial by Google LLC filed by Google LLC (Minute entry documents are not available electronically). (Court Reporter Kristie Davis)(sv) (Entered: 09/27/2022) |
| 09/28/2022 | 279 | TRANSCRIPT REQUEST by Google LLC for proceedings held on 9/27/2022. Proceedings Transcribed: Post Trial Motions Hearing. Court Reporter: Kristie Davis. (Jones, Michael) (Entered: 09/28/2022) |
| 09/28/2022 | 280 | TRANSCRIPT REQUEST by EcoFactor, Inc. for proceedings held on 9/27/22. Proceedings Transcribed: Post Trial Motions Hearing. Court Reporter: Kristie Davis. (Davis, Kristopher) (Entered: 09/28/2022) |
| 10/05/2022 | | Text Order DENYING 249 Sealed Motion. Consistent with rulings from the bench in the September 27, 2022 hearing, the Motion is DENIED. A written order is forthcoming. Entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (EKlc) (Entered: 10/05/2022) |
| 10/05/2022 | | Text Order DENYING 251 Sealed Motion. Consistent with rulings from the bench in the September 27, 2022 hearing, the Motion is DENIED. A written order is |

| | | |
|---|---|---|
| | | forthcoming. Entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (EKlc) (Entered: 10/05/2022) |
| 10/05/2022 | | Text Order DENYING 252 Sealed Motion. Consistent with rulings from the bench in the September 27, 2022 hearing, the Motion is DENIED. A written order is forthcoming. Entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (EKlc) (Entered: 10/05/2022) |
| 10/21/2022 | 281 | Appeal of Final Judgment 244 , by Google LLC.*Google's Rule 50(B) Motion for Judgment as a Matter of Law 251 and Google's rule 59 Motion for New Trial 252* ( Filing fee $ 505 receipt number BTXWDC-16664444) (Jones, Michael) (Entered: 10/21/2022) |
| 10/21/2022 | | Notice of Appeal to the Federal Circuit following 281 Notice of Appeal (E-Filed) by Google LLC. Appeal Record sent to Fed Circuit via email. (lad) (Entered: 10/21/2022) |
| 11/03/2022 | 282 | 9-27-22 Motion Hearing Sealed Transcript filed (This transcript is not available electronically) (kd) (Entered: 11/03/2022) |
| 11/03/2022 | 283 | Transcript filed of Proceedings held on 9-27-22, Proceedings Transcribed: Motion Hearing. Court Reporter/Transcriber: Kristie Davis (kmdaviscsr@yahoo.com), Telephone number: 2546660904. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 11/28/2022, Redacted Transcript Deadline set for 12/5/2022, Release of Transcript Restriction set for 2/1/2023, (kd) (Entered: 11/03/2022) |
| 11/09/2022 | 284 | Opposed MOTION to Stay *Execution of Judgment Pursuant to Rule 62(B) and for Waiver of Bond* by Google LLC. (Attachments: # 1 Declaration of K. Hucek, # 2 Ex. A 2022 09 27 Post Trial Motions, # 3 Ex. B 20220202_alphabet_10K, # 4 Ex. C Rating Action - Moodys-affirms-Alphabets-Aa2-rating-outlook-is-stable - 10Dec21)(Jones, Michael) (Entered: 11/09/2022) |
| 11/23/2022 | 285 | Response in Opposition to Motion, filed by EcoFactor, Inc., re 284 Opposed MOTION to Stay *Execution of Judgment Pursuant to Rule 62(B) and for Waiver of Bond* filed by Defendant Google LLC (Attachments: # 1 Affidavit of Kristopher Davis, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D)(Mirzaie, Reza) (Entered: 11/23/2022) |
| 11/30/2022 | 286 | REPLY to Response to Motion, filed by Google LLC, re 284 Opposed MOTION to Stay *Execution of Judgment Pursuant to Rule 62(B) and for Waiver of Bond* filed by Defendant Google LLC (Jones, Michael) (Entered: 11/30/2022) |

Appx160

## PACER Service Center

### Transaction Receipt

| 12/01/2022 18:52:50 | | | |
|---|---|---|---|
| **PACER Login:** | rak12424. | **Client Code:** | 4047-4 |
| **Description:** | Docket Report | **Search Criteria:** | 6:20-cv-00075-ADA |
| **Billable Pages:** | 29 | **Cost:** | 2.90 |

Appx161

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| ECOFACTOR, INC., <br><br> Plaintiff, <br><br> v. <br><br> GOOGLE LLC, <br><br> Defendant. | Civil Action No. 6:20-cv-00075 (ADA) <br><br> JURY TRIAL DEMANDED |
| ECOFACTOR, INC., <br><br> Plaintiff, <br><br> v. <br><br> ECOBEE, INC., <br><br> Defendant. | Civil Action No. 6:20-cv-00078-ADA <br><br> JURY TRIAL DEMANDED |
| ECOFACTOR, INC., <br><br> Plaintiff, <br><br> v. <br><br> VIVINT, INC., <br><br> Defendant. | Civil Action No. 6:20-cv-00080-ADA <br><br> JURY TRIAL DEMANDED |

**DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT OF
SUBJECT MATTER INELIGIBILITY UNDER 35 U.S.C. § 101**

Appx1134

- the "World Wide Web" (*id.* at 5:1–2);

- "HTML" (*id.* at 5:5);

- "websites" (*id.* at 5:9–12);

- "local area networks, interactive television networks, telephone networks, wireless data systems, two-way cable systems, and the like" (*id.* at 5:16–18);

- "conventional computers" (*id.* at 5:20);

- "processors such as those sold by Intel and AMD" (*id.* at 5:22–23);

- "general-purpose processors, multi-chip processors, embedded processors and the like" (*id.* at 5:24–25);

- "handheld and wireless devices such as personal digital assistants (PDAs), cellular telephones and other devices capable of accessing the network" (*id.* at 5:26–28);

- "browser[s] configured to interact with the World Wide Web," such as "Microsoft Explorer, Mozilla, Firefox, Opera or Safari" (*id.* at 5:29–31);

- "random access memory (RAM), electronically erasable programmable read only memory (EEPROM), read only memory (ROM), hard disk, floppy disk, CD-ROM, optical memory, or other method of storing data" (*id.* at 5:35–39);

- "operating system such as Microsoft Windows, Apple Mac OS, Linux, Unix or the like" (*id.* at 5:40–42); and

- "Ethernet, wireless protocols such as IEEE 802.11, IEEE 802.15.4, Bluetooth, or other wireless protocols" (*id.* at 6:24–26).

6.      EcoFactor asserts independent claim 1 and dependent claims 2, 5, and 8 of the '488 patent, and independent claim 1 and dependent claims 2, 5, and 8-10 of the '327 patent.

7.      Claim 1 of the '488 patent recites the following functions of a "system for monitoring the operational status of an HVAC system" that comprises an "HVAC control system" and "one or more processors":

(a)   receive temperature measurements from a structure conditioned by an HVAC system;

(b)   receive outside temperature measurements from a source other than the HVAC system;

(c)   compare the inside temperature of the structure and the outside temperature over time to derive an estimation for the rate of change in the inside temperature in response to

3

<u>Appx1140</u>

inside said structure.  *See* Ex. 1, claim 8; Ex. 2, claim 5.

- The second setting in claim 1 allows the inside temperature of the structure to increase to a certain temperature during a specified time interval.  *See* Ex. 2, claim 8.

- The second setting in claim 1 is based on an agreement between a homeowner and a demand reduction aggregator.  *See* Ex. 2, claim 9.

- The servers of claim 1 are further configured to send an alert to a user associated with the structure.  *See* Ex. 2, claim 10.

10.　　The '488 and '327 patent claims above refer to physical componentry such as an HVAC system, processors, servers, and a programmable thermostat, but only recite such componentry in the context of performing the functions above.

**B.　　Summary of the '382 patent**

11.　　The '382 patent also relates generally to HVAC systems and how to achieve energy savings by turning them off when a building is unoccupied.  Ex. 3 at Abstract, 1:17-25, 2:35-59.  Although the prior art disclosed ways to accomplish such savings, the '382 patent purports to provide a system to detect occupancy "without requiring the installation of additional hardware" by observing activity on a user's "computer or other consumer electronic devices." *Id.* at 3:15-41.  Such activity may indicate that the building is occupied and the temperature setpoint should be changed.  *Id.* at Fig. 7, 7:13-26, 8:7-10.

12.　　Like the '488 and '327 patents, the claims of the '382 patent recite generic componentry like "HVAC system," "memory," "processors with circuitry and code," "sensors," and "network."  *See* Ex. 3, claims 1-20.  The '382 specification makes clear that only conventional components were required to practice the claimed invention.  *See, e.g., id.* at 4:63-64, 5:31-32.  The specification's "Detailed Description of Preferred Embodiments" discloses the same generic, routine, and/or well-known technology as listed in paragraph 5, *supra*.  *See, e.g., id.* at 4:24-7:2.

13.     EcoFactor asserts the following claims of the '382 patent, with the independent claims underlined: claims <u>1</u>, 2, 6, 12, 15, 16, <u>17</u>, and 19.

14.     Claims 1 and 17 recite the following sequence of largely identical functions:

(a)  receive "first data" including a measured characteristic (claim 1) or current temperature (claim 17) of the building;

(b)  receive "second data" from outside the building (claim 1) or including the outdoor temperature (claim 17);

(c)  store historical values of the first and second data;

(d)  receive non-occupancy and occupancy temperature setpoints;

(e)  receive user commands regarding HVAC temperature setpoints;

(f)  send user-specific data about the building and HVAC system; and

(g)  control the HVAC system based on determining whether the building is occupied.[4]

15.     The asserted dependent claims of the '382 patent add the following limitations:

- The operational temperature is the second temperature setpoint corresponding to non-occupancy when the system determines the building is unoccupied.  *See* Ex. 3, claim 2.

- A user is queried to confirm whether to change to a different setpoint after determining whether the building is occupied.  *See* Ex. 3, claim 6.

- Whether the building is occupied is determined by the first processor.  *See* Ex. 3, claim 12.

- The interface allows the user to turn the HVAC system on or off.  *See* Ex. 3, claim 15.

- The interface allows the user to input that the building is unoccupied.  *See* Ex. 3, claim 16.

- The instructions to control the HVAC system to provide heating or cooling are based in part upon historical values of the first and second data in claim 1.  *See* Ex. 3, claim 19.

**C.     The asserted patents' use of conventional components and calculations**

16.     The asserted patents acknowledge that the claimed inventions are carried out with

---

[4] Claim 17 refers to receiving "third data" (not recited in claim 1) that informs whether the building is occupied.

6

"conventional" components. *See, e.g.*, Ex. 1 at 5:19-33, 5:51-53; Ex. 3 at 4:63-66, 5:31-33. Scott Hublou, a named inventor on the '488 and '327 patents, also confirmed that he did not invent any of the hardware components recited in the patents, including the HVAC unit, the thermostat, the gateway, the computer, the laptop, a network, a utility server, a database, the hardware behind the demand reduction service server, and the hardware behind a database connected to the demand reduction server. *See* Ex. 4 at 126:13-22, 136:1-138:1.

17. Mr. Hublou further confirmed that he could perform the "rate of change" calculation recited in the '488 and '327 patents "in his head." Ex. 4 at 130:18-131:3. EcoFactor's validity expert, John Palmer, likewise confirmed that the "rate of change" calculation being described in the '488 and '327 patent claims would be the equivalent of the slope between two different points on a graph. *See* Ex. 5 at 81:19-82:16 ("if you have a graph, then . . . a typical way of determining the slope of that graph is by looking at the temperature difference between two points divided by the time difference between the two points"), 93:12-17.

18. EcoFactor's infringement expert, Erik de la Iglesia, described the material in column 7 of the '488 and '327 patents as being an application of Newton's law of heating and cooling. *See* Ex. 6 at 78:18-20. As described by Mr. de la Iglesia in his expert report, "Newton's laws of heating and cooling[] dat[e] back to approximately the year 1700" and "describe the rate of change of temperature as a function of time as being proportional to the difference between an object's temperature and the temperature of its surroundings." *See* Ex. 7 at 14. He goes on to say that Newton's law "can easily be modified" to add "a heating or cooling device such as an HVAC system." *Id.* at 15.

19. Mr. Hublou also confirmed that the data and calculations in the provisional

that include "processors such as those sold by Intel and AMD"), 5:51-53 ("The HVAC units may be conventional air conditioners").  Additionally, one of the patent inventors disavowed having made any inventive contribution to such components, thereby confirming their conventional nature.  Ex. 4 at 126:13-22; 136:1-138:1.

By only reciting generic components performing conventional functions, the claims fail to specify *how* any of claimed elements, such as the processor, programmable thermostat, or HVAC system, actually achieve the desired results.  Instead, the claims use only "generic functional language to achieve the[] purported solutions."  *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1339 (Fed. Cir. 2017).  Here, "[n]othing in the claims . . . requires anything other than conventional computer and network components operating according to their ordinary functions," and thus they fail to pass muster at *Alice* step two.  *Id.* See also *In re TLI Commc'ns Patent Litig.*, 823 F.3d 607, 615 (Fed. Cir. 2016) (claims ineligible where "the recited physical components behave exactly as expected according to their ordinary use").

B.    **All asserted claims of the '327 patent are patent ineligible.** [5]

1.    *Alice* **Step One: the '327 claims are directed to the abstract idea of changing the thermostat setting in response to a request to reduce energy usage.**

The asserted claims of the '327 patent recite functions that reflect nothing more than the abstract idea of telling the thermostat to turn off the HVAC system in response to a request from a utility to reduce energy usage.  After removing extraneous verbiage,[6] independent claim 1 of

---

[5] As discussed above, the '488 and '327 patents share a specification and have many overlapping claim elements.  To the extent that the claim elements are overlapping, the arguments above with respect to the '488 patent are incorporated by reference here.  Defendants will only separately address in this section the '327 claim elements that differ from those of the '488 patent.

[6] The first several limitations of '327 claim 1 track those of '488 claim 1.  But then '327 claim 1 proceeds to recite limitations relating to demand reduction request verification that diverge from

C.      **All asserted claims of the '382 patent are patent ineligible.**

1.      *Alice* **Step One: the '382 claims are directed to the abstract idea of changing the thermostat setting based on a building's occupancy.**

The asserted claims of the '382 patent are directed to the abstract idea of changing the temperature setpoint on a thermostat based on whether a building is occupied.  When stripped of extraneous verbiage, the independent claims ('382 claims 1, 17) each recite the following sequence of identical steps or functions: (a) receive "first data" including a measured characteristic (claim 1) or current temperature (claim 17) of the building; (b) receive "second data" from outside the building (claim 1) or including the outdoor temperature (claim 17); (c) store historical values of the first and second data; (d) receive non-occupancy and occupancy temperature setpoints; (e) receive user commands regarding HVAC temperature setpoints; (f) send user-specific data about the building and HVAC system; and (g) control the HVAC system based on determining whether the building is occupied.

The asserted dependent claims do not add anything substantive to the core idea above, reciting only generic components used in ways that would be ordinarily understood by one of skill in the art.  For example, claim 2 describes setting a different temperature setpoint if the building is unoccupied, claim 6 describes sending a query to a user to confirm a change in temperature in response to an occupancy determination, claim 15 describes an interface configured to allow a user to turn the HVAC system on or off or, as in claim 16, to allow the user to input that the building is currently unoccupied, and claim 19 allows the processors controlling the HVAC system to set the operational temperature based on historical values.

These claims are directed to the same core, abstract idea of changing the temperature setpoint of a building based on a determination of occupancy in which "computers are invoked merely as a tool." *Enfish*, 822 F.3d at 1335-36.  The claims recite conventional mechanical and

17

Appx1154

Case 6:20-cv-00075-ADA   Document 111-5   Filed 11/19/21   Page 1 of 16

# EXHIBIT 4

UNITED STATES INTERNATIONAL TRADE COMMISSION

WASHINGTON, D.C.

_____
                                )
IN THE MATTER OF                )   INV. NO. 337-TA-1258
                                )
                                )
CERTAIN SMART THERMOSTAT        )
SYSTEMS, SMART HVAC SYSTEMS,    )
SMART HVAC CONTROL SYSTEMS,     )
AND COMPONENTS THEREOF          )
                                )
_____)


(AND RELATED MATTERS ON FOLLOWING PAGE)




REMOTE PROCEEDINGS OF THE

VIDEOTAPED DEPOSITION OF SCOTT HUBLOU

TUESDAY, AUGUST 10, 2021



JOB NO.  4749721

REPORTED BY KIMBERLY EDELEN,

CSR. NO. 9042, CRR, RPR.

PAGES 1 - 211


Page 1

(AND RELATED MATTER ON PREVIOUS PAGE)

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

ECOFACTOR, INC.,                    )
                                    )
          PLAINTIFF,                )
                                    )
               VS.                  ) CASE NO.
                                    ) 6:20-cv-00075-ADA
GOOGLE LLC,                         )
                                    )
          DEFENDANT.                )
_____)

* * * AND * * *

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

ECOFACTOR, INC.,                    )
                                    )
          PLAINTIFF,                )
                                    )
               VS.                  ) CASE NO.
                                    ) 6:20-cv-00078-ADA
ECOBEE, INC.,                       )
                                    )
          DEFENDANT.                )
_____)

Page 2

actual calculations, we never -- we never published.   14:01:18

BY MS. WANG:   14:01:27

Q   So would you agree with me that EcoFactor   14:01:27
kept its algorithms and calculations confidential?   14:01:33

MR. MIRZAIE:  Objection.  Form.   14:01:41

THE WITNESS:  I think that the final   14:01:42
calculations that we ended up using in our   14:01:43
production system, yes, were never published.   14:01:45

(Deposition Exhibit 10   14:01:48
was marked for identification.)   14:01:48

BY MS. WANG:   14:01:55

Q   Let's go to Exhibit 10, please.  Let me   14:01:56
know when you have it open.   14:02:11

A   I got it.   14:02:12

Q   Sorry.  Bear with me.   14:02:23

Do you recognize this document as U.S.   14:02:39
Patent No. 8,738,327?   14:02:41

A   Yes.   14:02:46

Q   Sorry for going back, but a couple of   14:02:55
questions ago, or a couple of answers ago, you said   14:02:58
that "the final calculations that we ended up using   14:03:00
in our production system were never published"; is   14:03:04
that right?   14:03:09

A   Yes.   14:03:10

Q   Were any calculations ever published?   14:03:12

Page 118

Q    Okay.  So let's go to the last page,    14:14:11

Claim 1.    14:14:19

Do you see it?    14:14:20

A    Okay.  I'm there.    14:14:25

Q    So Claim 1 starts at Line 27 of Column 9 of    14:14:27

the '4- -- of the Texas '488 patent.    14:14:32

And do you see kind of -- the same    14:14:35

components that we discussed in relation to the    14:14:38

ITC '488 patent, which include the HVAC control    14:14:40

system, the HVAC system, one or more processors and    14:14:45

one or more databases?    14:14:48

A    Yeah.    14:14:52

Q    Now, can you please jump to Figure 2 of the    14:14:53

Texas '488 patent.    14:14:55

Do you recognize that it's identical to    14:15:02

Figure 2 of the ITC '488 patent that you marked up    14:15:04

earlier today?    14:15:07

A    Yes.    14:15:11

Q    And so your answers in relation to Figure 2    14:15:13

of the ITC '488 patent would also apply to the Texas    14:15:15

'488 patent; is that correct?    14:15:19

A    Correct.    14:15:22

Q    Okay.  Going back to Claim 1 of the Texas    14:15:25

'488 patent, do you see, starting at Line 36,    14:15:30

"compares the inside temperature of said first    14:15:40

Page 126

could work.   14:20:26

So, again, it was very much a, you know,   14:20:27
hypothesis that we had in very much kind of an   14:20:31
academic kind of exercise to be able to figure out   14:20:34
is there any substance to this -- to our hypotheses.   14:20:36

And then once we determined that there was   14:20:39
substance to it, we were able to get our -- we   14:20:43
submitted in our patents.   14:20:46

Once our patents were kind of accepted, and   14:20:48
then we reached out to Berkeley to be able to prove   14:20:51
this out on a more academic level, to be able to   14:20:55
prove what happened.   14:21:01

Once they were completed, we then -- and we   14:21:01
affirmed that everything was working, we then went   14:21:05
and we were able to raise funding.  And from that,   14:21:08
we actually built out our own production level   14:21:13
algorithms which we kept proprietary.   14:21:16

Q   So is it fair to say then that before   14:21:24
EcoFactor reached out to Berkeley, EcoFactor had no   14:21:26
working prototype that would perform a calculation   14:21:31
of an operational efficiency of an HVAC system?   14:21:38

MR. MIRZAIE:  Objection.  Form.   14:21:41

THE WITNESS:  Other than inside of my head   14:21:43
as to how it actually would work, no.  There was   14:21:45
no -- there was no system that was actually put into   14:21:49

Page 130

place.  There was no operational software, but in my   14:21:52
head, I was able to do that on a   14:21:55
one-house-by-one-house basis.   14:21:57
BY MS. WANG:   14:22:09
    Q    You mentioned you made modifications to the   14:22:10
off-the-shelf hardware to collect data; is that   14:22:14
correct?   14:22:20
    A    Yes.   14:22:21
    Q    Is that the only modification you made to   14:22:22
the hardware?   14:22:24
    A    Yeah.  I mean, it wasn't a modification to   14:22:26
the hardware.  It was a modification to the software   14:22:29
that was actually running on the hardware.   14:22:31
    Q    So there was no modification to the   14:22:33
hardware itself?   14:22:35
    A    No.  No modification to the hardware   14:22:35
itself.   14:22:40
    Q    Okay.  I understand from your testimony in   14:22:40
the 1185 investigation that your main hypothesis   14:22:53
behind a lot of these patents, behind the   14:22:59
ITC '488 patent, behind the '567 patent, behind the   14:23:02
'983 patent, behind the '550 patent, behind the   14:23:06
'327 patent and behind the Texas '488 patent, was   14:23:10
that the data that is used to perform the various   14:23:15
calculations in the claims, that it's limited to   14:23:21

Page 131

Q    Did you or John Steinberg invent the HVAC    14:30:07
unit?    14:30:11

A    I cannot speak for what John did or did not    14:30:12
do.  I can say I did not invent the HVAC unit.    14:30:15

Q    Did you invent the thermostat?    14:30:18

A    I did not invent the thermostat.    14:30:21

Q    Did you invent the gateway?    14:30:24

A    I did not invent the gateway.    14:30:26

Q    Did you invent a computer?    14:30:28

A    No.    14:30:30

Q    Did you invent a laptop?    14:30:31

A    No.    14:30:33

Q    Did you invent a network?    14:30:34

A    No.    14:30:36

Q    Did you invent a utility server?    14:30:37

A    No.    14:30:40

Q    Did you invent a database on or attached to    14:30:41
the utility server?    14:30:44

A    What, the software itself or the database    14:30:46
itself?    14:30:49

Q    Database.    14:30:52

A    So meaning that did I actually program and    14:30:54
build out a Oracle-based Oracle system?  Did I    14:30:57
invent Oracle?  No.    14:31:02

Q    Did you invent --    14:31:04

Page 136

A    No.                                                    14:32:21

MS. WANG:  Okay.  We've been going for an                  14:32:23
hour.  Maybe we take a ten-minute break.                   14:32:25

MR. MIRZAIE:  Sounds good to me.                           14:32:30

THE WITNESS:  Okay.                                        14:32:32

THE VIDEOGRAPHER:  Okay.  Off the record.                  14:32:33
The time is 2:32 p.m.                                      14:32:34

(Off the record from 2:32 - 2:43 p.m.)                     14:32:36

THE VIDEOGRAPHER:  Back on the record.  The                14:43:31
time is 2:43 p.m.                                          14:43:33

MS. WANG:  Mr. Hublou, I really appreciate                 14:43:37
your time today.  I am passing the witness to             14:43:39
Ms. Woodworth.                                             14:43:43

MS. WOODWORTH:  Thanks.  And can you guys                  14:43:51
see and hear me?                                           14:43:53

                                                           14:43:54

                       EXAMINATION                         14:43:47

BY MS. WOODWORTH:

    Q    Mr. Hublou, can you see me, hear me okay?

    A    Yes.                                              14:43:57

    Q    Great.  Thanks.                                   14:43:57

         My name, again, is Megan Woodworth.  I'm          14:43:58
one of the counsel on for ecobee in the ITC                14:44:01
investigation.  So again, I will try not to tread          14:44:04
over ground that we've already covered, but I do

                                                           Page 138

Q    Okay.  So nothing in the provisional
applications was ever derived by
Professor Auslander, fair?                                    15:10:31

A    Correct.                                                 15:10:44

Q    Or Professor Auslander's --                             15:10:44

MS. WOODWORTH:  Objection.  Objection.
Calls for a legal conclusion.

BY MR. MIRZAIE:

Q    Nothing in the provisional applications in
2007 was given to you by Professor Auslander or
Professor Auslander's students at UC Berkeley, fair?

A    That is correct.

Q    And if Google or ecobee or any of those
people says otherwise, that -- your belief is that
they would be wrong, fair?

A    That would be correct.

Q    And that would be correct, you mean those
people would be wrong, right?

A    Yes, those people would be wrong.  We
addressed -- we did all of our homework, if you
will, all of our theories, our hypotheses, our
rudimentary math on Excel spreadsheets and graphing,
data collection, little trials, everything was done
prior to ever approaching UC Berkeley.  Patents were
actually already filed.

Page 158

that fair?   15:24:21

A   No.   15:24:23

MS. WOODWORTH:  Objection to form.   15:24:24

THE WITNESS:  No.  It was never -- it was   15:24:25

never about what was in the patents themselves.   15:24:27

BY MR. MIRZAIE:   15:24:31

Q   Thank you.   15:24:31

And, in fact, I believe previously today   15:24:33

you used the phrase informal calculations versus   15:24:37

formal or final calculations.   15:24:41

Do you recall that testimony?   15:24:43

A   Yes.  Yes.   15:24:45

Q   And if I -- just to make sure that I   15:24:46

understood that testimony, the informal calculations   15:24:49

were the ones that you were already able to do   15:24:52

before ever meeting UC Berkeley, and the final   15:24:57

calculations were the final calculations in which --   15:24:59

that UC Berkeley employed very advanced math, fair?   15:25:03

A   So, actually, I would throw that there's an   15:25:07

intermediary in there.  So the -- what I was   15:25:09

referring to, the informal was just me with my Excel   15:25:11

spreadsheets and my -- you know, my crude types of   15:25:14

calculations and graphing capabilities.   15:25:16

The formal calculations would be the ones   15:25:19

that were done by the UC Berkeley team.  And then   15:25:21

Page 169

Do you recall that?                          15:28:45

A    Well, they appear to be kind of hand-drawn.    15:28:47

Q    Right.                                    15:28:50

A    I mean, that's just -- that's anecdotal,    15:28:50
you know, kind of reference to the fact that they    15:28:52
don't seem like they're -- these -- all of these    15:28:55
graphs were graphs in which I generated within an    15:28:58
Excel environment based upon real data that I was    15:29:01
actually seeing, you know, kind of in our various    15:29:05
different trials.                            15:29:08

     And all of our hypotheses were based upon    15:29:09
seeing these various different kinds of thermal    15:29:13
envelope kind of profiles.  How does -- how did    15:29:16
homes heat or cool themselves based upon outside    15:29:19
temperature?  You know, what happens when there is    15:29:22
temperature fluctuation?                     15:29:24

     I think that John then took all of those    15:29:25
and hand-drew many of these to -- you know, into its    15:29:27
current form.  I'm not positive that's what he did,    15:29:33
but these don't appear to be any of my graphs from    15:29:36
any of my -- any of my Excel files.          15:29:38

Q    Got it.                                  15:29:42

     But in any event, it's your understanding    15:29:43
that all of those figures, just as one example or    15:29:46
several examples, were your work and not          15:29:51

Page 172

UC Berkeley's work, correct?   15:29:55

A   No.  All of these are my work.   15:29:56

Q   And you referred a moment ago to them being   15:30:00
derived from the Excel tools that you were using   15:30:05
before you ever approached UC Berkeley.   15:30:09

Do you recall that?   15:30:11

A   Yes.   15:30:12

Q   And if you could just describe a little bit   15:30:13
more how they were derived, including what type of   15:30:15
system you -- you and John and others at EcoFactor   15:30:19
built before ever meeting the UC Berkeley folks or   15:30:23
hiring the UC Berkeley folks.   15:30:29

A   So we recruited friends and family to be   15:30:31
able to install these systems into people in various   15:30:33
different geographic locations and different types   15:30:38
of heat loads.   15:30:40

So, you know, all the way to my mom's house   15:30:42
was outfitted with a -- with a thermostat that was   15:30:44
actually generating data.  And so from those -- from   15:30:49
those different test houses of friends and family,   15:30:53
we were able to derive various different types of   15:30:57
profiles in which house systems were actually   15:30:59
heating and cooling themselves, respectively.   15:31:01

We then were able to -- from those graphs,   15:31:06
we were able to kind of derive our hypotheses, which   15:31:09

Page 173

would be if I changed something, this is what we believed the change would actually implement.  And it was -- those were the theories that were kind of behind these patents, and these were also the same graphs that we actually brought to UC Berkeley to be able to say here is what we believe to be proof that our theories on data sets, why these need to be true, is that if these happen, we predict that this is going to happen over here.

And so that's the way it kind of came in and said you're only using -- you know, I think we were at five data sets at that point.  They said no, no, no, you need to have at least a hundred data sets in order for you to be able to do the prediction that you're asking us to be able to do.

And it wasn't until we actually spent quite a bit of time with them and showed them the graphs, you know, that, you know, we had before and afters that we actually proved to them that it is actually viable to actually -- with the limited data set coming from a commercially available thermostat, we could actually achieve these kinds of results.

Q    Thank you.

And so if you look at Claim 1 as an example of the '567 patent -- and I think Google's lawyers

Page 174

STATE OF CALIFORNIA          )

COUNTY OF LOS ANGELES        )    ss.


     I, Kimberly A. Edelen, C.S.R. No. 9042, in and for the State of California, do hereby certify:

     That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify the truth, the whole truth and nothing but the truth;

     That said deposition was taken down by me in shorthand at the time and place therein named, and thereafter reduced to typewriting under my direction, and the same is a true, correct and complete transcript of said proceedings;

     That if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript { } was {X} was not requested.

     I further certify that I am not interested in the event of the action.

     Witness my hand this 16th day of August, 2021.


          KIMBERLY A. EDELEN, C.S.R. NO. 9042


                                        Page 208

# EXHIBIT 5

```
                    UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
                         WACO DIVISION
ECOFACTOR, INC.,                         )
                                         )
               Plaintiff,                )
                                         )Case No.
        vs.                              )6:20-cv-00075-ADA
                                         )
GOOGLE LLC,                              )
                                         )
               Defendant.                )
_____)
ECOFACTOR, INC.,                         )
                                         )
               Plaintiff,                )
                                         )Case No.
        vs.                              )6:20-cv-00078-ADA
                                         )
ECOBEE, INC.                             )
                                         )
               Defendant.                )
_____)
ECOFACTOR, INC.,                         )
                                         )
               Plaintiff,                )
                                         )Case No.
        vs.                              )6:20-cv-00080-ADA
                                         )
VIVINT, INC.,                            )
                                         )
               Defendant.                )
_____)
```

VIDEOTAPED ZOOM DEPOSITION OF JOHN A. PALMER, Ph.D.

North Salt Lake, Utah

Monday, November 8, 2021

VOLUME I

Remotely and Stenographically Reported by:

RENEE D. ZEPEZAUER, CSR No. 6275, RPR, CRR

JOB No. 4884150

PAGES 1 - 214

Page 1

deriving an estimation for rate of change.                    1:02:21PM

          MR. LINK:  Objection.  Asked and answered.

          THE WITNESS:  Not specifically in isolation,

no.

BY MS. HUCEK:                                                 1:02:39PM

     Q    If we look at paragraph 99 of your report, on

page 41.  In the middle of that paragraph, you say [as

read]:

          "A PHOSITA could readily derive a rate

          of change from a plotted curve, which          1:02:59PM

          would be indicated by a slope.  The

          specification need not spell out every

          detail of how to read and understand a

          graph, for example, as a PHOSITA is

          presumed to have relevant technical            1:03:10PM

          knowledge and experience."

          Do you see that?

     A    Yes.

     Q    Is it your opinion that the term "rate of

change" as used in the '488 patent claims is the slope   1:03:21PM

of the curves represented in Figure 6A and 6B of

the '488 patent?

     A    It's certainly very similar.  Obviously under

the construction, the claim construction as well as a

PHOSITA would have to perform it on the -- in the        1:03:47PM

Page 81

context of looking at a graph, yes, you would look at    1:03:51PM

what the temperature is at one -- what the time and

temperature are of one point on the graph and the time

and temperature of another point on the graph and then

you would take the difference between the temperatures    1:04:07PM

and take -- divided by the differences between the times

to get the rate of change which is mathematically a

slope of the graph.

    Q    So the rate of change as used in the '488

patent is mathematically equivalent to calculating the    1:04:37PM

slope of two points?

    A    For -- if -- yeah, if you have a graph, then,

yes, it would be -- that would be a typical way of

determining the slope of that graph is by looking at the

temperature difference between two points divided by the    1:04:58PM

time difference between the two points.

    Q    I'd like to turn next to paragraph 133 of your

report.  That's on page 54.  Let me know when you're

there.

    A    I'm on page 54.  Which paragraph did you say?    1:05:30PM

    Q    133.

    A    Sorry.  I went to the pdf page number as

opposed to the document page number.  I'm there now.

133.  Okay.  Go ahead.

    Q    And this paragraph is under the heading 9.1,    1:05:50PM

Page 82

A    Well, the human being is not a sensor so the   1:26:17PM
human being would not be able to measure the
temperature.  The human being would be challenged to
collect that data over time, although theoretically they
could sit there with a pencil and paper and write down a   1:26:37PM
whole bunch of temperatures and times, although then
taking that data and analyzing it, comparing inside and
outside temperatures over time and developing from that
an estimated rate of change of temperature would be --
it would be a -- a process that would be difficult to do   1:27:01PM
without computational aid.

Q    Well, didn't we -- didn't you just testify
earlier that the rate-of-change calculation is just the
slope between two different points on a graph?

A    Well, if it happens that the slope of the graph   1:27:24PM
is a -- is singularly defined, then, certainly that rate
of change can be calculated that way.  But what we're
talking about is a large amount of data because the
inside temperature and outside temperature are going to
be changing over time and so it's not just a calculation   1:27:46PM
of two individual points.  It's a conglomeration of a
large amount of data that then needs to be analyzed and
evaluated.  It would not be -- it's not something that
would be practical for a person with a pencil and paper
to do.                                                    1:28:13PM

Page 93

Q    I guess I asked a separate question of whether    1:28:15PM

it was practical versus whether it's possible.  Couldn't

someone, you know, sit -- sit down with a thermometer,

take a temperature reading every minute, and then use

that to calculate a rate of change over time?    1:28:30PM

A    From a practical standpoint what you're

suggesting is really kind of silly.  Would a -- would it

be theoretically possible for a person to collect a

large amount of data?  Yes.  Would it be theoretically

possible without any computational aid for that person    1:28:58PM

to evaluate that large quantity of data in such a way as

to provide a reasonable estimate of the rate of change

over time in the context of a particular set of

conditions?  That -- I mean, theoretically, without

computational aid, there are a few people that could.  I    1:29:26PM

don't deny that there are people who would be able to

process huge amounts of -- a lot of numbers.  Certainly

we can look for examples to the times there were before

computers, but from a practical standpoint, from a

realistic standpoint, the embodiment as described would    1:29:45PM

require an analysis that's beyond a typical human.

Q    I'd like to direct your attention to paragraph

136 of your report.  It's on page 56.  Let me know when

you're there.

A    I'm at paragraph 136.    1:30:31PM

Page 94

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given; that if the foregoing proceedings were reported stenographically remote from the witness and parties, the transcript of the proceedings reflects the record that I could hear and understand to the best of my ability.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [  ] was [  ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: 11/11/21

_____

RENEE DiMENNO ZEPEZAUER

CSR #214, RPR, CRR

Page 214

Veritext Legal Solutions
866 299-5127

Appx1183

# EXHIBIT 7

RESTRICTED – CONFIDENTIAL SOURCE CODE

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

| | |
|---|---|
| ECOFACTOR, INC., <br><br> Plaintiff, <br><br> v. <br><br> GOOGLE LLC, <br><br> Defendant. | Case No. 6:20-cv-00075-ADA |

**EXPERT REPORT OF ERIK DE LA IGLESIA**
**REGARDING INFRINGEMENT BY GOOGLE**

Appx1190

RESTRICTED – CONFIDENTIAL SOURCE CODE

36.     Thermal modeling is the mathematical description of temperature within a physical system, and, specifically, how the temperature changes over time and under different operating conditions. Thermal models use equations that describe the behavior of a system. Thermal models are often derived from physical systems (*e.g.,* models based on physics). An example of such a model is based on Newton's laws of heating and cooling, dating back to approximately the year 1700. Newton's laws describe the rate of change of temperature as a function of time as being proportional to the difference between an object's temperature and the temperature of its surroundings. An example of this law is shown at http://web.math.ucsb.edu/~myoshi/cooling.pdf reproduced below:

### NEWTON'S LAW OF COOLING OR HEATING

Let
$T$ = temperature of an object,
$M$ = temperature of its surroundings, and
$t$ = time.

If the rate of change of the temperature $T$ of the object is directly proportional to the difference in temperature between the object and its surroundings, then we get the following equation where $k$ is a proportionality constant.

$$\frac{dT}{dt} = k(M - T), k > 0.$$

As the differential equation is separable, we can separate the equation to have one side solely dependent on $T$, and the other side solely dependent on $t$:

$$\frac{dT}{M - T} = kdt$$

Integrating both sides then gives the following:

14

RESTRICTED – CONFIDENTIAL SOURCE CODE

$$\int \frac{dT}{M-T} = \int kdt$$
$$-\ln|M-T| = kt + C$$
$$\ln|M-T| = -kt - C$$
$$e^{\ln|M-T|} = e^{-kt-C}$$
$$|M-T| = e^{-kt-C}$$

Now here is where we need to be careful. We want to drop the absolute value signs to solve for $T$. To do so, we need to figure out whether $M - T$ is positive or negative. This depends on whether the object is cooling down to the surrounding temperature (in which case $T > M$ and $M - T$ is negative) or is warming up to the surrounding temperature ($T < M$ and $M - T$ is positive).

For *cooling*, as $M - T$ is negative, $|M - T| = -(M - T)$. So we get

$$|M-T| = e^{-kt-C}$$
$$-(M-T) = e^{-kt-C}$$
$$M-T = -e^{-kt-C}$$
$$T = M + e^{-kt-C}$$
$$T = M + Ae^{-kt}, A = e^{-C}$$

2                    NEWTON'S LAW OF COOLING OR HEATING

Since the object is cooling down to the surrounding temperature, $T$ will always be greater than $M$ so $A$ will be a positive value. This agrees with the fact that $A = e^{-C}$ must be a positive value.

For *heating*, $M - T$ is positive, and so $|M - T| = (M - T)$ and we get

$$|M-T| = e^{-kt-C}$$
$$M-T = e^{-kt-C}$$
$$T = M - e^{-kt-C}$$
$$T = M - Ae^{-kt}, A = e^{-C}$$

This time, as the object is warming up to the surrounding temperature, $T$ is always less than $M$ so $A$ is again a positive value.

37.     When the proportionality constants of this equation are solved (using, for example, historical data), temperature can be predicted as a function of time or time can be predicted as a function of temperature. Note that Newton's law does not in its simplest form comprise a heating or cooling device such as an HVAC system, and thus it models the system with no active energy devices. But the equation can easily be modified by adding those factors.

RESTRICTED – CONFIDENTIAL SOURCE CODE

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

September 27, 2021

Erik de la Iglesia

Pages Appx1194-Appx1201;
Appx1244-Appx1248;
Appx1258-Appx1259;
Appx1275-Appx1279
Removed Due to Confidential Material

Pages APPX1604-APPX1608
Removed Due to Confidential Material

Pages <u>APPX1617</u>-<u>APPX1619</u>
Removed Due to Confidential Material

Pages APPX1645-APPX1662
Removed Due to Confidential Material

Pages APPX1663-APPX1673
Removed Due to Confidential Material

Pages APPX1674-APPX1682
Removed Due to Confidential Material

Pages APPX1683-APPX1690
Removed Due to Confidential Material

Pages APPX1691-APPX1696
Removed Due to Confidential Material

Pages APPX1697-APPX1703
Removed Due to Confidential Material

Pages APPX1771-APPX1772;
APPX1776-APPX1777
Removed Due to Confidential Material

Pages APPX1778-APPX1782;
APPX1800-APPX1802;
APPX1804
Removed Due to Confidential Material

Pages APPX1876;
APPX1881-APPX1898
Removed Due to Confidential Material

# EXHIBIT A

PUBLIC VERSION

███████████████████████████████

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C. 20436**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN SMART THERMOSTATS,**<br>**SMART HVAC SYSTEMS, AND**<br>**COMPONENTS THEREOF** | **Inv. No. 337-TA-1185** |

**INITIAL DETERMINATION**
**Administrative Law Judge David P. Shaw**

Pursuant to the notice of investigation, 84 Fed. Reg. 65421 (Nov. 27, 2019), this is the

initial determination in *Certain Smart Thermostats, Smart HVAC Systems, and Components*

*Thereof*, United States International Trade Commission Investigation No. 337-TA-1185.

It is held that no violation of section 337 of the Tariff Act, as amended, has occurred in

the importation into the United States, the sale for importation, or the sale within the United

States after importation, of certain smart thermostats, smart HVAC systems, and components

thereof, with respect to asserted claims 1, 2, and 5 of U.S. Patent No. 8,131,497, asserted claims

1, 2, and 5 of U.S. Patent No. 8,423,322, and asserted claim 9 of U.S. Patent No. 10,018,371.

████████████████████████████████████
███████████████████████

users. *See* RX-0159C (Hutz DWS) at Q/A 37-40. None of the customers that bought their ADC-T2000 or ADC-T3000 through an Alarm.com security dealer rather than a Building 36 dealer have access to HVAC Analytics or CFH/CFC. *See id.* at 109-10, 161-62; RX-0160C (Goodman DWS) at Q/A 58-59, 69-70. The thermostats were not specifically engineered to work with HVAC Analytics or CFH/CFC. *See* RX-0160C (Goodman DWS) at 65-66, 73, 76-77; RX-0161C (Hagins RWS) at Q/A 208.

## X.      Invalidity

### A.      Validity Under <u>35 U.S.C. § 101</u>

#### 1.      The '497 and '322 Patents

##### a.      *Alice* Step One

Respondents argue, in part:

> The asserted claims of the '497 patent are directed to nothing more than the abstract idea of using temperature measurements to calculate the efficiency of an HVAC system. Hearing Tr. 237:20-24 (Gomez); Hearing Tr. 949:18-950:14 (Palmer). Even EcoFactor does not dispute that the claims of the '497 patent are directed to ordinary human activity: storing and comparing temperature measurements. Compl. ¶ 40. EcoFactor's own expert Mr. Gomez even confirmed that all of the limitations of the asserted claims of the '497 patent could be done with pen and paper because they merely require (1) reading temperatures from a thermometer, (2) starting and stopping a stopwatch while the HVAC is on and off, and (3) applying "high school algebra" to calculate the rates of change. Hearing Tr. 238:8-242:21 (Gomez).

> Moreover, as Mr. Gomez and EcoFactor's validity expert Dr. Palmer testified, the claims of the '497 patent do not involve "improving the efficiency of an HVAC system," nor do they require or involve "the management or changes to the management of the HVAC system," "the shifting of the on-and-off time of the HVAC system," or any "modifications or operational changes to the HVAC system." Hearing Tr. 237:25-238:7 (Gomez); Hearing Tr. 960:3-961:7 (Palmer).

> The prosecution history for the '497 patent confirms that it claims performing an abstract idea on a generic computer system. To overcome a § 101 rejection in which the Examiner characterized the claims as "abstract" (*see* CX-0005 ('497 FH) at 355-56)[], EcoFactor argued that performing the claims on a conventional processor was sufficient to be patent-eligible. Because this claim was

420

<u>Appx1916</u>

██████████████████████████████
██████████████

> prosecuted before *Alice*, the Examiner allowed the claims. But the Supreme Court in *Alice* held "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 223 (2014).
>
> \*    \*    \*
>
> The asserted claims of the '322 patent are directed to the abstract idea of using temperature measurements to evaluate changes in the efficiency of an HVAC system. Hearing Tr. 268:22-269:1 (Gomez); Hearing Tr. 951:13-16 (Palmer). Specifically, as Dr. Palmer conceded, the asserted claims of the '322 patent merely "involve ways of collecting and analyzing data about the operational efficiency of HVAC systems . . ." Hearing Tr. 959:6–10 (Palmer). As explained above in relation to Section 112, neither the specification nor the claims explain how to evaluate changes in operational efficiency, nor do they limit such an evaluation to a particular technical environment. Supra, §VI.A-B. The asserted claims provide no meaningful limitations to preclude a person from using a pen and paper to record temperature measurements inside and outside a building and compare them to determine whether the operational efficiency of the HVAC system has decreased over time. As further admitted by Dr. Palmer, the claims of the '322 patent do not require any changes to the management of the HVAC system, any shifting of the on-and-off times of the HVAC system, or any operational changes to the HVAC system. Hearing Tr. 960:3-961:7 (Palmer). Moreover, the claims are directed toward routine information retrieval and analysis, and do not disclose any improvement in how the claimed generic processors perform those standard functions. *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016).

Resps. Br. at 248-50.

EcoFactor argues that the claims of the '497 and '322 patents are not directed to abstract ideas, but rather to technical improvements in HVAC systems. *See* Compl. Br. at 276-78.

The Staff argues, in part:

> The evidence does not show that the asserted claims of the '497 and '322 patents are patent ineligible under 35 U.S.C § 101.
>
> \*    \*    \*
>
> **First step:** Claim 1 of the '497 and '322 patents are directed to calculating and/or evaluating changes in the operational efficiency of an HVAC system. *See* Staff Ex. 1 (preamble and elements 1[d] of each patent). The specifications disclose calculating the operational efficiency of an HVAC system by calculating the "***effective thermal mass***" of the structure, even though that term is not recited in

████████████████████████████████████
████████████████████████████

the claims. *See* JX-1, at 8:31-9:9. The specification further makes clear that this claimed system and method is a significant departure and improvement over the existing electronic thermostat and HVAC control system.

Staff Br. at 79-80.

The administrative law judge finds that respondents have not shown that the asserted claims of the of the '497 and '322 patents are directed to an abstract idea, devoid of a concrete or tangible application. Rather, these claims are directed to technical improvements in HVAC systems. *See Alice Corp., v. CLS Bank Int'l*, 573 U.S. 208, 223 (2014) ("[T]he claims in [*Diamond v. Diehr*, 450 U.S. 175, 188 (1981)] were patent eligible because they improved an existing technological process, not because they were implemented on a computer.").

Respondents argue that the asserted claims of the '497 patent are directed to nothing more than the abstract idea of using temperature measurements to calculate the efficiency of an HVAC system, and that the asserted claims of the '322 patent are directed to the abstract idea of using temperature measurements to evaluate changes in the efficiency of an HVAC system. *See* Resps. Br. at 248-50. However, the claimed electronic HVAC control system of the '497 patent is configured with a database for storing inside temperature measurements and processors to determine rates of change of those measurements when the HVAC status is "off" and "on", and correlating those rates of change to outside temperature measurements received from a source other than the HVAC. Moreover, the claimed electronic HVAC control system of the '322 patent is configured to determine a decrease in operational energy efficiency over time by using one or more computer processors that are configured to receive electronic measurements of outside temperatures from a non-HVAC system, compare inside temperature with outside temperature over time, and compare a plurality of stored historical inside temperature measurements obtained from an electronic database.

422

PUBLIC VERSION

These claims are expressly directed to technical improvements to then-existing technology, namely those associated with electronically programmable thermostats and other HVAC controls. *See Alice*, 573 U.S. at 217 (claims patent-eligible as a matter of law if "they improve an existing technological process"). Therefore, the administrative law judge finds that the asserted claims are patent-eligible as a matter of law. *Id.*

Moreover, the specification provides further evidence that this claimed system and method is a significant departure and improvement over the existing electronic thermostat and HVAC control system. For example, "conventional" electronic thermostats and other HVAC controls had "no mechanism by which it might take the thermal mass of the structure into account, but thermal mass significantly affects many parameters relating to energy efficiency." JX-0001 ('497 patent) & JX-0002 ('322 patent) at col. 3, lns. 1-4; col. 2, lns. 52-67. The claims of the '322 and '497 patents purport to overcome the limitations in the conventional electronic thermostat HVAC control system at the time. For instance, the inventions use a networked thermostat HVAC control system to "measure[] temperature" in a building and "reporting said temperature measurements as well as the status of an HVAC control system over the Internet." *Id.* at col. 3, ln. 62 – col. 4, ln. 14, col. 6, lns. 14-59, Fig. 1.

The administrative law judge thus finds that respondents have not shown that the asserted claims of the of the '497 and '322 patents are directed to an abstract idea, devoid of a concrete or tangible application.

### b.    *Alice* Step Two

Respondents argue, in part:

> None of the claims of either the '497 or '322 patent provide any inventive concept under step two of *Alice*. As EcoFactor's own experts and the named inventor admit, the claimed components of the asserted claims of the '497 and '322

423

PUBLIC VERSION

patents are conventional and generic: one or more processors, one or more databases, and an HVAC control system. EcoFactor did not invent any of these components. Hearing Tr. 248:2-25 (Gomez) (testifying that EcoFactor did not invent the Internet, web browsers, servers, databases, or HVAC units). Nor did EcoFactor invent the programmable communicating thermostat (PCT). RX-0001C, Auslander QA55, 65; Hearing Tr. 961:21-962:1 (Palmer) (admitting that PCTs were "well-known" in 2007). Despite testifying that the patents teach nothing unconventional about the thermostat (RX-0001C, Auslander QA55, 65), Dr. Palmer admits the conventional PCT can be "an element of the inventions of the '322 and '497 patents." Hearing Tr. 961:17-20 (Palmer). Mr. Hublou's testimony confirmed this by admitting that EcoFactor used only "off-the-shelf" components including a conventional PCT to implement the '497 patent. Hearing Tr. 246:11-17 (Gomez); RX-0004C (Hublou Dep.) 71:7-16, 77:1-10, 54:21-55:3. In addition, the asserted claims of the '497 and '322 patents do not limit the collection and analysis of data relating to HVAC systems. to a technical means for performing the functions that constitute an advance over conventional computer and network technology. *See* Hearing Tr. 961:4–7 (Palmer) (asserted claims do not require modifications or operational changes to the HVAC system itself).

Moreover, the specification does not identify the construct of the claimed "HVAC control system." Rather, claim 1 requires that the HVAC control system simply "receive[] temperature measurements from at least a first location conditioned by at least one HVAC system." CX-0001C ('497 patent) 13:34–36. The specification further discloses that the ability to sense temperature is a "basic" component of any thermostat and does not require any specialized hardware. *See id.* 1:26–31. The specification further describes databases as containing information, which is stored using "any method of storing information." *Id*. 7:1–6, 7:26–29. Finally, the specification describes processors as any "general-purpose processors, multi-chip processors, embedded processors and the like." *Id*. 6:57–59. Each of the claimed components, an HVAC control system that receives temperature measurements, a database that stores information, and a processor, are conventional general-purpose hardware performing their ordinary functions.

Thus, none of the claim limitations, either individually, or as an ordered combination, provide an inventive concept sufficient to turn the abstract idea into a patent-eligible invention. Simply disclosing an abstract idea and adding the words, "apply it with a computer" is not sufficient under step two of *Alice* as a matter of law. *Alice*, 573 U.S. at 223.

Resps. Br. at 250-51.

EcoFactor argues, in part:

Because Respondents fail at Step 1, the ALJ need not consider Step 2. But Step 2 also exposes Respondents' legal and factual flaws, as they likewise cannot meet their burden, e.g., because the claims recite an undoubtedly *unconventional*

424

Appx1920

electronic HVAC control system. *See, e.g., Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306-07 (Fed. Cir. 2019) (Step 2 considers "whether the claimed elements—individually and as an ordered combination—recite an inventive concept."); *Diamond v. Diehr*, 450 U.S. 175, 188 (1981) ("In determining the eligibility of respondents' claimed process for patent protection under § 101, their claims must be considered as a whole. It is inappropriate to dissect the claims into old and new elements"). To argue otherwise, Respondents parse out each of the elements of the claim and argue—without support—that "*each and every limitation*" may be performed by a generic computer and memory. But that analysis runs contrary to precedent, which requires considering the entire claim as an *ordered combination*. Even worse, their statements on the claim elements they parse and dissect are based on nothing more than conclusory attorney argument. Indeed, Respondents' invalidity expert ***Dr. Auslander (or any other expert in this Investigation) has never argued (not even in his expert report) that any patents are ineligible under §101***, even after he reviewed EcoFactor expert Dr. Palmer's declarations in support of EcoFactor's oppositions to Respondents' §101 MSDs.

*     *     *

And though the intrinsic record alone is enough soundly defeat Respondents' arguments, EcoFactor's extrinsic evidence only takes all this one step further and makes it even clearer. *See, e.g.,* CX-0699C.0034-.0037. But there is even more: *Respondents' own documents and witnesses* also confirm that aspects of the ordered combination of elements were not "conventional"—even as late as the mid-2010s. *See, e.g.,* CX-0063C at GOOG-ITC1185-00001749; CX-0088C at 313-314; CX-0590C at GOOG-ITC1185-00035845; CX-0103C at 120-121; CX-0194C; CX-0195C; CX-0196C; CX-0228C; CX-0217C. The asserted claims are not directed to abstract idea.

Compl. Br. at 278-80.

The Staff argues, in part:

Even if the claims are found to be directed to an abstract idea, pursuant to the second step of the § 101 analysis, the details provided in the invention of claim 1 of each patent amount to more than just the abstract idea. *See Content Extraction*, 776 F.3d at 1347. That is, as discussed above, the inventive concept of the claims are ***not*** simply applying conventional and well-understood techniques to an abstract idea. *See BSG Tech.*, 899 F.3d at 1290–91.

Staff Br. at 82.

The administrative law judge finds that respondents have not met their burden of showing that the asserted claims of the '497 and '322 patents lack an inventive concept, insofar as the

425

particular arrangement of claimed elements purports to provide unconventional electronic HVAC control systems. In particular, the administrative law judge finds that the asserted claims of the '497 and '322 patents are directed toward improvements in energy-efficient HVAC systems that may correct for the distortion caused by thermal mass. *See Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016) (the patent-eligible inventive concept identified was "the installation of a filtering tool at a specific location, remote from the end-users, with customizable filtering features specific to each end user. This design gives the filtering tool both the benefits of a filter on a local computer and the benefits of a filter on the ISP server.").

As the patents themselves confirm, conventional electronic thermostats and other HVAC controls had "no mechanism by which it might take the thermal mass of the structure into account, but thermal mass significantly affects many parameters relating to energy efficiency." JX-0001 ('497 patent) and JX-0002 ('322 patent) at col. 3, lns. 1-4. Yet, the claims are purportedly directed to a specific system and method designed to improve/evaluate the operational efficiency of an HVAC system using an alleged new and non-conventional technique, which includes calculating the effective thermal mass of the structure set forth by the limitations set forth in elements 1[d] of each patent. *See* JX-0002 ('322 patent) at col. 3, ln. 35 – col. 4, ln. 40; col. 4, lns. 38-54; col. 5, lns. 4-30; col. 11, ln. 20 – col. 12, ln. 23; col. 13, lns. 50-53.

Accordingly, the administrative law judge has determined that respondents have not demonstrated that the asserted claims of the '497 and '322 patents are directed toward ineligible subject matter.

426

████████████████████████████

### 2.    The '371 Patent

#### a.    *Alice* Step One

Respondents argue, in part:

> The asserted claim of the '371 patent is directed to nothing more than the abstract mental process of detecting and interpreting manual changes to HVAC temperature settings.  The claims provide no meaningful limitations to preclude a person from using a pen and paper to collect and analyze setpoint data to detect and interpret a manual change.  The '371 patent specification acknowledges that the claimed analysis is performed by a "server," which is nothing more than "a conventional computer[]" and simply proposes using a generic processor to perform the claimed analysis.  *See* '371 patent, at 3:25–27, 5:66–6:43.

Resps. Br. at 276.

EcoFactor argues that the asserted claim of the '371 patent does not merely recite computer components to perform any "abstract idea" untethered to any technological problem or process.  *See* Compl. Br. at 278.

The Staff argues, in part:

> Respondents argue that claim 9 of the '371 patent is not patent eligible under Section 101.  RPreHBr. at 182.  The Staff disagrees.  First, with respect to step one of *Alice*, Respondents offer no expert testimony for their conclusion that the claim provides no meaningful limitations to preclude a person from using a pen and paper to collect and analyze setpoint data to detect and interpret a manual change.  *Id*.  In Staff's view, at least elements 1[a] and 1[c] cannot be performed using a pen and paper.

Staff Br. at 103.

The administrative law judge finds that respondents have not shown that claim 9 of the '371 patent is directed to an abstract idea, devoid of a concrete or tangible application.  Rather, claim 9 is directed to a technical improvement in HVAC systems.  *See Alice*, 573 U.S. at 223 ("[T]he claims in [*Diamond v. Diehr*, 450 U.S. 175, 188 (1981)] were patent eligible because they improved an existing technological process, not because they were implemented on a computer.").

427

Appx1923

PUBLIC VERSION

███████████████████████████████
███████████████████████████████

Appx1924

The '371 patent recognized the problems associated with frequent "manual overrides" in conventional HVAC control systems. *See* JX-0004 ('371 patent) at col. 1, ln. 65 – col. 2, ln. 19. The '371 patent discloses a method for implementing a smart thermostat utilizing automated setpoint (computer-calculated temperature setting) with rules for interpretation of manual change to setpoint. *See, e.g., id.* at col. 5, ln. 66 – col. 6, ln. 19; col. 7, lns. 17-28; claim 9. These disclosures show that the claims recite technical solutions to the existing technical problems.

The administrative law judge thus finds that claim 9 of the '371 patent is patent-eligible. The claimed method electronically detects a manual change to an automated setpoint, generating an electronic difference value by comparing an actual versus automated temperature setpoint to detect and log a manual change to that setpoint, and electronically logging the detected change to a database.

### b.    *Alice* Step Two

Respondents argue, in part:

> The asserted claim of the '371 patent fails to provide an inventive concept under step two of *Alice*. The claim recites two components that perform the steps of the abstract idea: (1) a thermostatic controller; and (2) at least one computer. As EcoFactor's own expert admits, programmable thermostats were conventional well before the priority date of the '371 patent. RDX-0001C-015; Hearing Tr. 961:21-962:1 (Palmer) (admitting that PCTs were "well-known" in 2007); RX-0001C, Auslander QA55, 65. Both of the claimed components, a thermostatic controller and a computer, are conventional general-purpose hardware performing their ordinary functions. Thus, none of the claim limitations, either individually, or as an ordered combination, provide an inventive concept sufficient to turn the abstract idea into a patent-eligible invention.

Resps. Br. at 276-77.

EcoFactor argues, in part:

> As another example, the '371 patent confirms that it describes "novel methods and systems" that use "automated setpoints" and "rules for interpretating manual overrides," and that address problems associated with conventional HVAC control

428

<u>Appx1924</u>

██████████████████████████████████
████████████████████

systems. *E.g.,* JX-0004 ('371 patent) at 5:66-6:19, 7:17-28, 8:11-19. Indeed, there were no conventional HVAC system that implemented these novel elements before the '371 patent.

Compl. Br. at 280.

The Staff argues, in part:

Second, with respect to step two of *Alice,* even if found to be directed to an abstract idea, the inventive concept of claim 1 is ***not*** simply applying conventional and well-understood techniques to the claims to an abstract idea. *Content Extraction and Transmission LLC v. Wells Fargo Bank Nat. Ass'n.,* 776 F.3d 1343, 1347 (Fed. Cir. 2014) (citing *Alice,* 134 S. Ct. at 2355 (quoting *Mayo,* 132 S.Ct. at 1294)).

Staff Br. at 103.

The administrative law judge finds that respondents have not met their burden of showing that claim 9 lacks an inventive concept, insofar as the particular arrangement of claimed elements purports to provide an unconventional method for incorporating manual changes to a thermostatic controller. In particular, the administrative law judge finds that claim 9 is directed toward a new and specific method for incorporating manual changes to setpoints for a thermostatic controller. *See Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016) (the patent-eligible inventive concept identified was "the installation of a filtering tool at a specific location, remote from the end-users, with customizable filtering features specific to each end user. This design gives the filtering tool both the benefits of a filter on a local computer and the benefits of a filter on the ISP server.").

The '371 patent describes "novel methods and systems" that use "automated setpoints" and "rules for interpretating manual overrides," and that address problems associated with conventional HVAC control systems. *See, e.g.,* JX-0004 ('371 patent) at col. 5, ln. 66 – col. 6, ln. 19, col. 7, lns. 17-28, col. 8, lns. 11-19. The '371 patent discloses a method for implementing a smart thermostat utilizing automated setpoint (computer-calculated temperature setting) with

429

PUBLIC VERSION

rules for interpretation of manual change to setpoint. *See, e.g., id.* at col. 5, ln. 66 – col. 6, ln. 19, col. 7, lns. 17-28; claim 9.

Accordingly, the administrative law judge has determined that respondents have not demonstrated that the asserted claim of the '371 patent is directed toward ineligible subject matter.

### B.    Validity Under <u>35 U.S.C. §§ 102</u> and <u>103</u>

#### 1.    The '497 Patent

##### a.    Anticipation – Ehlers

Ehlers was published on April 17, 2001, and therefore qualifies as prior art to the '497 patent. *See* RX-0022 (Ehlers).

Respondents argue, in part:

> Ehlers anticipates claim 1 of the '497 patent because it discloses each of the limitations of that claim ([1Pre] to [1d]). RDX-0001C-064 to 70, 72 to 76, 78, 80 to 083 (RX-0022 (Ehlers) 1:6-18, 1:26-36, 7:11-36, 8:16-17, 9:50-63, 10:14-19, 10:30-11:18, 12:45-13:2, 14:9-15, 17:56-64, 20:4-7, 21:5-25, 27:62-63, 26:55-58, 26:53-55, 29:4-13, 30:65-31:6, 32:48-51, 34:32-67, 35:46-50, 35:65-36:1, 36:11-38, 36:61-37:3, 37:17-50, 38:14-26, 38:33-40:58, Figs. 4, 6, Title, Abstract); RX-0001C, Auslander QA103-14; RDX-0012 (Appendix A-1 Invalidity Claim Chart). EcoFactor does not dispute that Ehlers discloses limitations [1a], [1b], and parts of [1d]. PHB at 70-72; CX-0702C, Palmer QA37; RX-0001C, Auslander QA110, 112-13. Only the claim limitations that EcoFactor alleges are not anticipated by Ehlers are described in detail here.
>
> *Limitation 1Pre*: Ehlers calculates "[t]he operational efficiency factor of each appliance being monitored." RX-0022 (Ehlers) 39:21-23, 38:33-41; RDX-0001C-066 (RX-0022 (Ehlers) at 39:21-23, 34:32-33, 38:33-41, 40:45-47, 20:4-7, 21:19-22, Fig. 4); RX-0001C, Auslander QA105. EcoFactor's sole argument regarding Ehlers's disclosure of this limitation is that the "operational efficiency factor" in Ehlers is for generic appliances, not an HVAC system. PHB at 72. However, in Ehlers, an example of a monitored appliance is an HVAC unit, which is the claimed HVAC system. RX-0022 (Ehlers) at 34:42-43, Fig. G. 4; RX-0001C, Auslander QA105. The operational efficiency factor in Ehlers is the claimed operational efficiency under any party's construction. RX-0001C, Auslander QA105-106.

430

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

WACO DIVISION

| | |
|---|---|
| ECOFACTOR, INC., | |
|                 Plaintiff, | Case No. 6:20-cv-00075-ADA |
|       v. | |
| GOOGLE LLC, | |
|                 Defendant. | |

**JOINT PRETRIAL ORDER**

Plaintiff EcoFactor, Inc. ("EcoFactor") and Defendant Google LLC ("Google") hereby

submit the following proposed Joint Pre-Trial Order pursuant to the Court's Order (Dkt. No. 68),

the Court's Standing Order on Pre-Trial Procedures and Requirements in Civil Cases, the Federal

Rules of Civil Procedure, and Local Rules of this Court. The parties have stipulated to various

matters identified herein and have identified exhibits, witnesses, factual contentions and triable

issues.

It is hereby ORDERED as follows:

**I.      APPEARANCES OF COUNSEL**

      **A.      Attorneys for EcoFactor**

Reza Mirzaie
Marc A. Fenster
Paul A. Kroeger
James N. Pickens
Kristopher R. Davis
Minna Y. Chan
Matthew Aichele
Adam S. Hoffman
Jason M. Wietholter
RUSS AUGUST & KABAT

1

1791811

14.     The parties shall not offer evidence or argument relating to legal proceedings involving Google that have no relationship to EcoFactor or licenses considered by the parties' damages experts.

15.     The parties shall not offer evidence or argument regarding damages or royalties owed to EcoFactor by Vivint, Inc. or ecobee, Inc.

16.     The parties shall not offer evidence or argument regarding labor issues or working conditions at Google.

17.     The parties shall not offer evidence or argument using the terms "monopoly," "antitrust," or Big Tech" to describe Google.

18.     The parties shall not offer evidence or argument regarding the number of times a fact witness has been deposed in other cases not involving the parties or regarding the number of times a party has been accused of infringing intellectual property where such accusation did not involve the parties.

19.      The parties shall not offer evidence or argument regarding the impact of a potential damages award on Google's customers, manufacturers, partners, or job losses. Google shall not be precluded from offering evidence related to the cost of goods sold or its profits and operating costs, including, for example, as set forth in Google's expert's report.

**I.      Handling of Source Code and Confidential Material**

The parties agree to request that the courtroom be sealed when a party's confidential information, including source code or evidence concerning highly sensitive business documents, testimony, or information is expected to be presented.

**EcoFactor's Position**: Regarding source code, the Protective Order allows the "receiving party . . . to make up to five (5) additional hard copies for the Court in connection with a Court

33

1791811

filing, hearing, or trial" and "Electronic copies of Source Code may be made to be included in documents which, pursuant to the Court's rules, procedures, and order(s), may be filed or served electronically." Dkt. No. 72, para. 19(c)(x)(2)-(3). For purposes of trial this includes creating an electronic image of the entirety of EcoFactor's and Google's printed hard copy source code in order to pre-mark the electronic copy as an exhibit. Only the specific code files or source code pages discussed at trial may be offered into evidence to become part of the record, not the entirety of the printed source code hard copies during fact discovery or their electronic image.

**Google's Position**: Google agrees that its source code may be displayed in a closed courtroom only. Google also agrees that the parties may include references to Google's source code in their argument and may elicit testimony from witnesses permitted to view this source code pursuant to the Protective Order in this case. Google objects to its source code being included as an exhibit and objects to copies of source code materials being provided to jurors in this case as it will serve no useful purpose and creates a greater risk of improper or inadvertent disclosure of highly confidential material. Once the trial is complete, EcoFactor must delete and/or destroy any copies of source code material in its possession, whether they be hard copies or digital copies. EcoFactor must confirm deletion/destruction of any source code material no later than 60 days following the entry of judgment. For the avoidance of any doubt, any presentation of the parties' source code in electronic or paper form in open court requires sealing of the court room.

## XI.    PROPOSED JURY INSTRUCTIONS
The parties' joint and disputed proposed preliminary jury instructions are attached as **Exhibit E-1** and the joint and disputed proposed charge instructions are attached as **Exhibit E-2**.

## XII.    LIST OF PENDING MOTIONS

The following motions remain pending:

34

1791811

# Exhibit A-4
# Filed Under Seal

EcoFactor, Inc. v. Google LLC
6:20-cv-00075-ADA
Plaintiff's Physical Exhibit List

| Ex. No. | Description | Bates BEG | Bates END | Date Withdrawn | Objections | Date Identified | Date Admitted |
|---------|-------------|-----------|-----------|----------------|------------|-----------------|---------------|
| PX-001 | Nest Thermostat | | | | | | |
| PX-002 | Nest Learning Thermostat Third Generation | | | | | | |
| PX-003 | Nest Thermostat E | | | | | | |
| PX-004 | Nest Temperature Sensor | | | | Relevance, 403 | | |
| PX-005 | Google Source Code | GOOG-SC-TX20-75_00001 | GOOG-SC-TX20-75_00537 | | Protective Order | | |

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

WACO DIVISION

| | |
|---|---|
| ECOFACTOR, INC., <br><br> Plaintiff, <br><br> v. <br><br> GOOGLE LLC, <br><br> Defendant. | Case No. 6:20-cv-00075-ADA |

**JOINT PRETRIAL ORDER**

The Court considers EcoFactor, Inc.'s ("EcoFactor") and Defendant Google LLC's ("Google") proposed Joint Pre-Trial Order pursuant to the Court's Order (Dkt. No. 68) pursuant to the Court's Standing Order on Pre-Trial Procedures and Requirements in Civil Cases, the Federal Rules of Civil Procedure, and Local Rules of this Court. The parties have stipulated to various matters identified herein and have identified exhibits, witnesses, factual contentions and triable issues.

It is hereby ORDERED as follows:

I.     APPEARANCES OF COUNSEL

A.     Attorneys for EcoFactor

Reza Mirzaie
Marc A. Fenster
Paul A. Kroeger
James N. Pickens
Kristopher R. Davis
Minna Y. Chan
Matthew Aichele
Adam S. Hoffman
Jason M. Wietholter
RUSS AUGUST & KABAT

1

1791811

14.     The parties shall not offer evidence or argument relating to legal proceedings involving Google that have no relationship to EcoFactor or licenses considered by the parties' damages experts.

15.     The parties shall not offer evidence or argument regarding damages or royalties owed to EcoFactor by Vivint, Inc. or ecobee, Inc.

16.     The parties shall not offer evidence or argument regarding labor issues or working conditions at Google.

17.     The parties shall not offer evidence or argument using the terms "monopoly," "antitrust," or Big Tech" to describe Google.

18.     The parties shall not offer evidence or argument regarding the number of times a fact witness has been deposed in other cases not involving the parties or regarding the number of times a party has been accused of infringing intellectual property where such accusation did not involve the parties.

19.      The parties shall not offer evidence or argument regarding the impact of a potential damages award on Google's customers, manufacturers, partners, or job losses. Google shall not be precluded from offering evidence related to the cost of goods sold or its profits and operating costs, including, for example, as set forth in Google's expert's report.

**I.      Handling of Source Code and Confidential Material**

The parties agree to request that the courtroom be sealed when a party's confidential information, including source code or evidence concerning highly sensitive business documents, testimony, or information is expected to be presented.

**EcoFactor's Position**: Regarding source code, the Protective Order allows the "receiving party . . . to make up to five (5) additional hard copies for the Court in connection with a Court

33

1791811

<u>Appx2242</u>

filing, hearing, or trial" and "Electronic copies of Source Code may be made to be included in documents which, pursuant to the Court's rules, procedures, and order(s), may be filed or served electronically." Dkt. No. 72, para. 19(c)(x)(2)-(3). For purposes of trial this includes creating an electronic image of the entirety of EcoFactor's and Google's printed hard copy source code in order to pre-mark the electronic copy as an exhibit. Only the specific code files or source code pages discussed at trial may be offered into evidence to become part of the record, not the entirety of the printed source code hard copies during fact discovery or their electronic image.

**Google's Position**:  Google agrees that its source code may be displayed in a closed courtroom only. Google also agrees that the parties may include references to Google's source code in their argument and may elicit testimony from witnesses permitted to view this source code pursuant to the Protective Order in this case. Google objects to its source code being included as an exhibit and objects to copies of source code materials being provided to jurors in this case as it will serve no useful purpose and creates a greater risk of improper or inadvertent disclosure of highly confidential material. Once the trial is complete, EcoFactor must delete and/or destroy any copies of source code material in its possession, whether they be hard copies or digital copies. EcoFactor must confirm deletion/destruction of any source code material no later than 60 days following the entry of judgment. For the avoidance of any doubt, any presentation of the parties' source code in electronic or paper form in open court requires sealing of the court room.

## XI.   PROPOSED JURY INSTRUCTIONS

The parties' joint and disputed proposed preliminary jury instructions are attached as **Exhibit E-1** and the joint and disputed proposed charge instructions are attached as **Exhibit E-2**.

## XII.   LIST OF PENDING MOTIONS

The following motions remain pending:

34

1791811

<u>Appx2243</u>

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

ECOFACTOR, INC.,

                  Plaintiff,

    v.

GOOGLE LLC,

                  Defendant.

Civil Action No. 6:20-cv-00075 (ADA)

**JOINT STATEMENT REGARDING CLAIM CONSTRUCTION**

In preparation for trial, the parties respectfully submit this Joint Statement Regarding Claim Construction to memorialize their understanding of the parties' agreed constructions and the Court's constructions of disputed terms. For clarity, this submission only includes constructions for terms within claims that are presently asserted.

The parties' agreed construction is as follows:

| Claim Term | Agreed Construction |
|---|---|
| "compares" ('327 patent, claim 1) | "analyze to determine one or more similarities or differences between" |

On December 8, 2020, the Court issued preliminary constructions addressing the parties' disputed constructions, all but one of which were accepted by the parties and formally adopted by the Court. *See* Email from R. Earle to Parties Regarding Preliminary Constructions (dated Dec. 9, 2020 and timestamped 12:40 pm CT). On December 9, 2020, the Court held oral argument regarding the remaining disputed term ("programmable thermostat"), which is no longer at issue because it appears only in claims that are no longer asserted. *See* Markman Hearing Tr. (Dec. 9, 2020). The Court's constructions of the disputed terms are as follows:

Appx2250

| Claim Term | Court's Construction |
|---|---|
| "rate of change in inside temperature" ('327 patent, claim 1); "rate of change in temperature inside the structure" ('327 patent, claim 5) | "the difference between inside temperature measurements divided by the span of time between the measurements" |
| "measurement[s]" ["measurement[s]"; "measurement of outside temperatures"; "temperature measurement inside a structure"; "temperature measurements from inside the structure"; "measurement of at least one characteristic of the building"; "measurement of the current outdoor temperature"] ('327 and '382 patents, all claims) | Plain and ordinary meaning |
| "outside temperature" ('327 patent, claim 1) | Plain and ordinary meaning |

Dated:  January 26, 2022

By: */s/ Reza Mirzaie*
RUSS AUGUST & KABAT
Reza Mirzaie
Marc A. Fenster
Paul A. Kroeger
Kristopher Davis
Adam Hoffman
James Pickens
Minna Chan
Jason Wietholter
12424 Wilshire Boulevard 12th Floor
Los Angeles, California 90025
Tel: 310-826-7474
Fax: 310-826-6991
rak_ecofactor@raklaw.com

**Attorneys for Plaintiff EcoFactor, Inc.**

Respectfully submitted,
Dated:  January 26, 2022

By: */s/  Robert A. Van Nest*
KEKER, VAN NEST & PETERS LLP
Robert A. Van Nest
Leo L. Lam
Jennifer A. Huber
Kristin Hucek
Patrick E. Murray
Anna Porto
Gregory Washington
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:  415 397 7188
econest-kvp@keker.com

POTTER MINTON
Michael E. Jones (TX Bar No. 10929400)
mikejones@potterminton.com
Patrick C. Clutter (TX Bar No. 24036374)
patrickclutter@potterminton.com
110 N. College, Suite 500
Tyler, Texas 75702
Tel: 903-597-8311
Fax: 903-593-0846

ALLEN & OVERY LLP
Shamita Etienne-Cummings
(*admitted to the Western District of Texas*)
1101 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 683-3810
GoogleEcofactorWDTX@AllenOvery.com

Bijal V. Vakil
(*admitted to the Western District of Texas*)
Eric Lancaster (admitted *Pro Hac Vice*)
530 Lytton Avenue, 2nd Floor
Palo Alto, CA 94301
Telephone: (650) 388-1703
GoogleEcofactorWDTX@AllenOvery.com

**Attorneys for Defendant Google LLC**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on January 26, 2022, the foregoing was served on all counsel of record by e-mail.

*/s/  Reza Mirzaie*

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| ECOFACTOR, INC., <br><br>               Plaintiff, <br><br>     v. <br><br> GOOGLE LLC, <br><br>               Defendant. | Civil Action No. 6:20-cv-00075 (ADA) |

## <u>OMNIBUS ORDER REGARDING PRETRIAL MOTIONS</u>
### <u>(DKTS. 109, 111, 113, 114, 115, 116, 117, 151, and 153)</u>

Consistent with the January 25, 2022 Final Pretrial Conference in this matter (Dkt. 184), the Court enters this Joint Proposed Omnibus Order regarding the the parties' pretrial motions (Dkts. 109, 111, 113, 114, 115, 116, 117, 151, and 153):

| <u>**Motion**</u> | <u>**Ruling**</u> |
|---|---|
| Defendants' Joint Motion for Summary Judgment of Subject Matter Ineligibility under <u>35 U.S.C. §101</u> (Dkt. 111) | Denied, but the Court intends to submit second part of section 101 test to the jury. |
| Defendants' Joint Daubert Motion to Exclude Certain Testimony of Dr. Palmer (Dkt. 113) | Denied |
| Google's Motion to Exclude Expert Testimony of David Kennedy (Dkt. 114) | Denied |
| Google's Motion for Summary Judgment that the Asserted Claims (1, 2, 5, and 8) of U.S. Patent No. 8,412,488 Are Invalid Under <u>35 U.S.C. §112</u> (Dkt. 115) | Granted |
| EcoFactor's Motion for Summary Judgment of Google's Affirmative Defenses (Dkt. 116) | Granted as to defenses of prosecution history estoppel, prosecution history disclaimer, and |

Page APPX2262
Removed Due to Confidential Material

Page APPX2264
Removed Due to Confidential Material

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| ECOFACTOR, INC., | Civil Action No. 6:20-cv-00075 (ADA) |
| Plaintiff, | |
| v. | |
| GOOGLE LLC, | |
| Defendant. | |

**<u>GOOGLE LLC'S NOTICE OF CROSS-APPEAL</u>**

Notice is hereby given that Defendant Google LLC ("Google") hereby appeals to the U.S. Court of Appeals for the Federal Circuit from (i) the denial at the September 27, 2022 motion hearing of Google's Rule 50(b) motion for judgment as a matter of law; (ii) the denial at the September 27, 2022 motion hearing of Google's Rule 59 motion for a new trial; (iii) the Final Judgment entered May 26, 2022 (ECF No. 244); and (iv) any and all underlying and/or interlocutory decisions, orders, claim constructions, rulings, findings, instructions, opinions, holdings, and/or conclusions of the District Court relating to, pertinent to, or ancillary to the September 27, 2022 denial of Google's Rule 50(b) and 59 motions or Final Judgment or leading thereto or merged therein.

In accordance with <u>28 U.S.C. §§ 1913</u>, <u>1917</u>, <u>Federal Rule of Appellate Procedure 3(e)</u>, Federal Circuit Rule 52(a)(2), and the United States District Court for the Western District of Texas's Court Fee Schedule, included herewith is payment of the $505 notice and docketing fees.

1

Respectfully submitted,

KEKER, VAN NEST & PETERS LLP

Dated:  October 21, 2022

Shamita Etienne-Cummings
(*admitted to the Western District of Texas*)
Allen & Overy LLP
1101 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 683-3810
GoogleEcofactorWDTX@AllenOvery.com

Bijal V. Vakil
(*admitted to the Western District of Texas*)
Eric Lancaster (admitted *Pro Hac Vice*)
Allen & Overy LLP
530 Lytton Avenue, 2nd Floor
Palo Alto, CA 94301
Telephone: (650) 388-1703
GoogleEcofactorWDTX@AllenOvery.com

By: */s/ Robert A. Van Nest, with permission by
Michael E. Jones*
ROBERT A. VAN NEST
LEO L. LAM
EUGENE M. PAIGE
R. ADAM LAURIDSEN
KRISTIN HUCEK
ANNA PORTO
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:  415 397 7188
econest-kvp@keker.com

POTTER MINTON
Michael E. Jones (TX Bar No. 10929400)
mikejones@potterminton.com
Shaun W. Hassett (TX Bar No. 24074372)
shaunhassett@potterminton.com
110 N. College Ave., Suite 500
Tyler, Texas 75702
Tel: 903-597-8311
Fax: 903-593-0846

Attorneys for Defendant GOOGLE LLC

Pages Appx5016-Appx5017;
Appx5029-Appx5047;
Appx5112-Appx5114;
Appx5132-Appx5136
Removed Due to Confidential Material

Pages Appx5137-Appx5138;
Appx5320-Appx5322;
Appx5331-Appx5337;
Appx5344-Appx5347;
Appx5349-Appx5354;
Appx5357-Appx5364;
Appx5389-Appx5392;
Appx5395-Appx5399;
Appx5401-Appx5404;
Appx5410

Removed Due to Confidential Material

Pages Appx5411-Appx5412;
Appx5453-Appx5469;
Appx5531-Appx5546;
Appx5554-Appx5559;
Appx5561-Appx5583;
Appx5595-Appx5601;
Appx5618-Appx5621;
Appx5627-Appx5632;
Appx5639-Appx5642;
Appx5644
Removed Due to Confidential Material

Pages  Appx5645-Appx5646;
Appx5656-Appx5658;
Appx5666-Appx5683;
Appx5690-Appx5692;
Appx5694-Appx5699;
Appx5709-Appx5721;
Appx5732-Appx5734;
Appx5739-Appx5741;
Appx5743-Appx5747;
Appx5754-Appx5783;
Appx5793-Appx5799;
Appx5801-Appx5807;
Appx5809-Appx5814;
Appx5816-Appx5825;
Appx5830-Appx5833;
Appx5840-Appx5851;
Appx5865-Appx5869;
Appx5890-Appx5954;
Appx5957-Appx5959;
Appx5963

Removed Due to Confidential Material

Pages Appx5964-Appx5965;
Appx5999-Appx6002;
Appx6004-Appx6007;
Appx6053-Appx6059;
Appx6077-Appx6131;
Appx6148-Appx6162;
Appx6166-Appx6169;
Appx6217-Appx6232;
Appx6234

Removed Due to Confidential Material

Pages Appx6235-Appx6236;
Appx6250-Appx6259;
Appx6265-Appx6266
Appx6267-Appx6271;
Appx6275-Appx6281;
Appx6284-Appx6287;
Appx6309-Appx6311;
Appx6343-Appx6345;
Appx6372-Appx6379;
Appx6387-Appx6395;
Appx6415-Appx6418;
Appx6424-Appx6437;
Appx6448-Appx6452;
Appx6471-Appx6475;
Appx6512
Removed Due to Confidential Material

Pages <u>Appx6513</u>-<u>Appx6514</u>;
<u>Appx6519</u>-<u>Appx6521</u>;
<u>Appx6524</u>-<u>Appx6527</u>;
<u>Appx6531</u>-<u>Appx6533</u>;
<u>Appx6543</u>-<u>Appx6546</u>;
<u>Appx6568</u>-<u>Appx6586</u>;
<u>Appx6589</u>
Removed Due to Confidential Material

Pages [APPX6599](#);
[APPX6661](#)-[APPX6663](#);
[APPX6687](#)-[APPX6689](#);
[APPX6691](#)

Removed Due to Confidential Material

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

| | |
|---|---|
| ECOFACTOR, INC.,<br><br>    Plaintiff,<br><br>  v.<br><br>GOOGLE LLC,<br><br>    Defendant. | Case No. 6:20-cv-00075-ADA<br><br>JURY TRIAL DEMANDED |
| ECOFACTOR, INC.,<br><br>    Plaintiff,<br><br>  v.<br><br>ECOBEE, INC.,<br><br>    Defendant. | Case No. 6:20-cv-00078-ADA<br><br>JURY TRIAL DEMANDED |
| ECOFACTOR, INC.,<br><br>    Plaintiff,<br><br>  v.<br><br>VIVINT, INC.,<br><br>    Defendant. | Case No. 6:20-cv-00080-ADA<br><br>JURY TRIAL DEMANDED |

**DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF**

As noted above, claim construction is required when there is an actual dispute between the parties as to the meaning of a claim term, and in such circumstances, it is not an "obligatory exercise in redundancy" as argued by EcoFactor. *See O2 Micro*, 521 F.3d at 1360 ("When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute.); *see also* Pl.'s Opening Br. at 7 (quoting *US Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997)). Defendants' construction is not only needed, but also consistent with the actual plain and ordinary meaning of the word "measurement" in the context of the asserted claims. None of EcoFactor's arguments changes this conclusion.

This dispute exists for one reason—EcoFactor has and will argue that "measurement" includes such things as forecasts, values generated from algorithms, and similar concepts. If EcoFactor were to agree these things are *not* included in the meaning of "measurement," then the dispute between the parties narrows significantly. But EcoFactor refuses to make such a concession. Thus, this presents a material dispute as to the scope of the "measurement" claim terms for the Court to resolve.

EcoFactor espouses a familiar refrain—Defendants' proposal "replaces th[e] single plain and ordinary word used in the patent claim with *twelve other words* of their choosing." *Id.* at 7. But Defendants' proposal provides the necessary context for defining the term measurement as used in the asserted claims. Defendants' proposal acknowledges that the claims are using "measurement" to measure something and accounts for that fact. *See, e.g.*, '488 cl. 1 ("measurements of outside temperatures"); '327 cl. 11 ("temperature measurement inside a structure"); *id.* cl. 1 ("temperature measurements from inside the structure"); '382 cl. 1 ("measurement of at least one characteristic of the building"); *id.* cl. 5 ("measurement of the current outdoor temperature"). The bracketed "[of the claimed property]" in Defendants' proposal

Appx6732

(Cambridge English Dictionary) ("measurement … a value, discovered by measuring, that corresponds to the size, shape, quality, etc. of something").

*See* Pl.'s Opening Br. at 8; Zeidman Decl. ¶ 17.

The first problem is that none of EcoFactor's cited definitions actually defines "measurement" or the act of measuring.  EcoFactor also cherry-picked a few words for its parentheticals and ignored the portions of its exhibits that definitively support Defendants' construction.  For example, the definitions EcoFactor cited from Exhibit 5 are followed by ***four pages of <u>units</u>*** for typical measurements.  Pl.'s Ex. 5 at 2-5.[7]  Plaintiff also selectively chooses one of many definitions for "measure" in Exhibit 6.  *See* Pl.'s Ex. 6 at 1.  Not only does EcoFactor omit the final words of the cited definition that show the definition is for the noun "measure," but EcoFactor also omits the content of the next several definitions which ***all refer to instruments or standard units for measurement***.  *See* Pl.'s Ex. 6 at 1 ("2a: an instrument (such as a yardstick) or utensil (such as a graduated cup) for measuring;" "b(1) a standard or  unit of measurement;" "(2) a system of standard units of measure").   The same is true for uncited definitions in Plaintiff's Exhibit 7 ("1.2 A unit or system of measuring.").  *See* Pl.'s Ex. 7 at 1.

Even the intrinsic evidence cited by EcoFactor supports Defendants' proposal.  EcoFactor cites to parts of the intrinsic record referencing "measure actual temperature," "allow the thermostat to regularly measure," "receive measurements of outside temperature . . . from sources other than said HVAC system," and the like.   None of these references defines what "measurement" means.  In contrast, each supports Defendants' proposal because they show something must be measured.   And taking measurements of those properties requires a

---

[7]    In addition to the tables for "metric and U.S. customary units," and "temperature conversion between celsius and fahrenheit," Plaintiff's Exhibit 5 also states, [t]he key features of the International System are decimalization, a system of prefixes, and a standard defined in terms of an invariable physical measure."  *See* Pl.'s Ex. 5 at 3-4 (preceding a description of "base units" for measurement "from which all others in the system are derived").

9

determination by an instrument using standardized units.  For all its complaints, neither EcoFactor nor Mr. Zeidman have ever stated or opined what the plain and ordinary meaning of the term "measurement" is, or how measurements can be made other than by a determination using standardized units.

Finally, EcoFactor is off base when it contends Defendants' proposal is somehow "limited to a mechanically obtained determination" that would exclude "measurements by digital means." Pl. Opening Br. at 8.  Defendants' construction is "determination [of the claimed property] ***by an instrument*** by using standardized units."  Defendants have not limited "instrument" to a mechanical instrument.  Indeed, Defendants do not dispute that digital thermostats are capable of taking temperature measurements, but this is because digital thermostats are instruments that determine a temperature value based on standardized units of temperature.  Defendants do not dispute this because any instrument that determines a property using standardized units is an instrument that takes a measurement.  This comports precisely with Defendants' proposal for "measurement."

### C.   '488 Patent Claims 1 and 9 – Indefiniteness

| Plaintiff's Proposal | Defendants' Proposal |
|---|---|
| Plain and ordinary meaning; no construction necessary. | Indefinite due to lack of essential structural connections, under *In re Collier*, 397 F.2d 1003 (C.C.P.A. 1968), and its progeny. |

Defendants and their expert Dr. Turnbull explained how the '488 patent's claims lack sufficient structural connections, and are therefore indefinite under *Collier*.  Defs.' Opening Br. at 8-10.  Instead of trying to identify structural connections in the claims, or attempting to draw the boundaries of the claimed "HVAC control system," "one or more processors," and "HVAC system," EcoFactor mistakenly attacks the validity of *Collier* and controlling law, and simply

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| ECOFACTOR, INC., <br><br>      Plaintiff, <br><br>     v. <br><br> GOOGLE LLC, <br><br>      Defendant. | Case No. 6:20-cv-00075-ADA <br><br> JURY TRIAL DEMANDED |
| ECOFACTOR, INC., <br><br>      Plaintiff, <br><br>     v. <br><br> ECOBEE, INC., <br><br>      Defendant. | Case No. 6:20-cv-00078-ADA <br><br> JURY TRIAL DEMANDED |
| ECOFACTOR, INC., <br><br>      Plaintiff, <br><br>     v. <br><br> VIVINT, INC., <br><br>      Defendant. | Case No. 6:20-cv-00080-ADA <br><br> JURY TRIAL DEMANDED |

**JOINT CLAIM CONSTRUCTION STATEMENT**

1

## II.     Disputed Constructions

| Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "rate of change in inside temperature" ('488 patent claims 1, 9; '327 patent claims 1, 11); "rate of change in temperature inside the [said] structure" ('488 patent claims 8, 16; '327 patent claims 5, 15) | "the difference between two inside temperature measurements over a particular span of time between the measurements" | "the difference between inside temperature measurements divided by the span of time between the measurements (*i.e.*, $\Delta T/\Delta t$)" |
| "measurement[s]" ["measurement[s]"; "measurement of outside temperatures"; "temperature measurement inside a structure"; "temperature measurements from inside the structure"; "measurement of at least one characteristic of the building"; "measurement of the current outdoor temperature"] ('488, '327, and '382 patents, all claims) | Plain and ordinary meaning; no construction necessary. | "determination [of the claimed property] by an instrument by using standardized units" |
| '488 Patent Claims 1 and 9 – Indefiniteness | Plain and ordinary meaning; no construction necessary. | Indefinite due to lack of essential structural connections, under *In re Collier*, 397 F.2d 1003 (C.C.P.A. 1968), and its progeny. |
| "user interface actions intended to alter a state of one or more of said [networked] electronic devices" ('492 patent claims 1, 10) | Plain and ordinary meaning; no construction necessary. | "a user intentionally interacting with the device's graphic user interface to alter the device's state and indicate whether the structure is occupied" |
| "receiving [receives] input from said one or more users" ('492 patent claims 1, 10); "said input from said one or more users" ('492 patent claims 1, 9, 10, 18) | Plain and ordinary meaning; no construction necessary. | "a user inputting a response to a prompt on the graphic user interface [display] of the one or more networked electronic devices" |
| "outside temperature" ('488 patent claims 1, 2, 9, 10; '327 patent claims 1, 2, 11, 12) | "the temperature at a location outside (or external to) [the structure]" | "the actual temperature at a location outside (or external to) [the structure]" |

2

Appx6752

US 20040117330A1

(19) **United States**
(12) **Patent Application Publication** (10) Pub. No.: **US 2004/0117330 A1**
Ehlers et al.                                    (43) **Pub. Date:** **Jun. 17, 2004**

(54) **SYSTEM AND METHOD FOR CONTROLLING USAGE OF A COMMODITY**

(76) Inventors: **Gregory A. Ehlers**, Bradenton, FL (US); **James H. Turner**, Chesterfield, VA (US); **Joseph Beaudet**, Prince George, VA (US); **Ronald Strich**, Pueblo West, CO (US); **George Loughmiller**, Scottsdale, AZ (US)

Correspondence Address:
**HOWARD & HOWARD ATTORNEYS, P.C.**
**THE PINEHURST OFFICE CENTER, SUITE #101**
**39400 WOODWARD AVENUE**
**BLOOMFIELD HILLS, MI 48304-5151 (US)**

(21) Appl. No.: **10/628,644**

(22) Filed: **Jul. 28, 2003**

**Related U.S. Application Data**

(63) Continuation of application No. 10/402,370, filed on Mar. 28, 2003, now abandoned.

(60) Provisional application No. 60/368,963, filed on Mar. 28, 2002. Provisional application No. 60/383,027, filed on May 24, 2002.

**Publication Classification**

(51) Int. Cl.$^7$ .................................................. G06F 17/00
(52) U.S. Cl. ............................................................ 705/412

(57) **ABSTRACT**

A system and method manage delivery of energy from a distribution network to one or more sites. Each site has at least one device coupled to the distribution network. The at least one device controllably consumes energy. The system includes a node and a control system. The node is coupled to the at least one device for sensing and controlling energy delivered to the device. A control system is coupled to the node and distribution network for delivering to the node at least one characteristic of the distribution network. The node for controls the supply of energy to the device as a function of the at least one characteristic.



Defendant's Exhibit

**0219**

Case No. 20-cv-00075

DC_PRIOR_ART_0000403

Patent Application Publication    Jun. 17, 2004  Sheet 1 of 18    US 2004/0117330 A1



*Figure 1A*

*Figure 1C*

DC_PRIOR_ART_0000404



*Figure 1B*

DC_PRIOR_ART_0000405

Patent Application Publication    Jun. 17, 2004  Sheet 3 of 18      US 2004/0117330 A1



*Figure 2A*



*Figure 2B*

DC_PRIOR_ART_0000406

**DTX0219,  Page 4 of 50**

Appx10109

Patent Application Publication    Jun. 17, 2004    Sheet 4 of 18    US 2004/0117330 A1



*Figure 2C*



*Figure 2D*

DC_PRIOR_ART_0000407



*Figure 2E*



*Figure 3A*



*Figure 3B*



*Figure 3C*

DC_PRIOR_ART_0000409



Figure 3D



Figure 3E

DC_PRIOR_ART_0000410

DTX0219,  Page 8 of 50

Appx10113

ECONOMIC AND COMFORT MANAGEMENT & CONTROL EXAMPLE



*Figure 3F*

ECONOMIC AND COMFORT MANAGEMENT & CONTROL EXAMPLE



*Figure 3G*

DC_PRIOR_ART_0000411

**DTX0219, Page 9 of 50**

Appx10114



**Figure 4A**

**Figure 4B**

**Figure 4C**

DC_PRIOR_ART_0000412

DTX0219,  Page 10 of 50

Appx10115

4.24 — ┐          **4.10**

**Occupancy Modes**

| Home | Away | Sleep | Vacant | User1 | User2 | User3 | User4 | ← ～2.26 |

When my home is in Home Mode    ☑ Active

Use the following settings for the areas controlled by the Heating / AC thermostat

Cooling setpoint: 80 °F    use: [Economical Comfo ⌄] Economy Profile — **4.32**

Heating setpoint: 68 °F    ☑ My home is normally OCCUPIED during Home mode

[ Defaults ]    [ Apply ]

4.28 ┘              ┕4.30

***Figure 4D***

**Occupancy Modes**

| Home | Away | Sleep | Vacant | User1 | User2 | User3 | User4 | ← ～2.26 |

When my home is in Home Mode    ☐ Active

Use the following settings for the areas controlled by the Heating / AC thermostat

Cooling setpoint: 85 °F    use: [Economical Comfo ⌄] Economy Profile — **4.32**

Heating setpoint: 58 °F    My home is normally OCCUPIED during Away mode

[ Defaults ]    [ Apply ]

4.28 ┘              ┕4.30

***Figure 4E***

**Occupancy Modes**

| Home | Away | Sleep | Vacant | User1 | User2 | User3 | User4 | ← ～2.26 |

When my home is in Home Mode    ☐ Active

Use the following settings for the areas controlled by the Heating / AC thermostat

Cooling setpoint: 90 °F    use: [Economical Comfo ⌄] Economy Profile — **4.32**

Heating setpoint: 45 °F    Maximum Comfort

Balanced Comfort    OCCUPIED during Vacant mode

Economical Comfort    Apply

***Figure 4F***

DC_PRIOR_ART_0000413



*Figure 4G*



*Figure 4H*



*Figure 4I*

DC_PRIOR_ART_0000414



**Configure Alert**

| Alert Description | Destination | Channel Primary email | Channel Web Page | Configurable | Priority | Single/Aggregate |
|---|---|---|---|---|---|---|
| Temperature out of Range | Home Occupant ▼ | ☑ | ☐ | ☑ | 1 | Single ▼ |
| Temperature out of Range | Service Provider ▼ | ☑ | ☐ | ☐ | 1 | Single ▼ |
| Gateway Not Responding | Service Provider ▼ | ☑ | ☐ | ☐ | 1 | Single ▼ |
| Temperature out of Range | Energy Provider ▼ | ☑ | ☐ | ☐ | 1 | Single ▼ |
| Gateway Not Responding | Energy Provider ▼ | ☑ | ☐ | ☐ | 1 | Single ▼ |
| Budget Limit Alarm | Home Occupant ▼ | ☐ | ☐ | ☐ | 2 | Single ▼ |
| Device is Malfunctioning | Home Occupant ▼ | ☐ | ☐ | ☐ | 2 | Single ▼ |
| Communication Failure | Home Occupant ▼ | ☐ | ☐ | ☐ | 3 | Single ▼ |
| Ramping Recovery Failure | Home Occupant ▼ | ☐ | ☐ | ☐ | 12 | Single ▼ |
| Duplicate IP address | Service Provider ▼ | ☑ | ☐ | ☐ | 12 | Single ▼ |
| Temperature out of Range | Energy Provider ▼ | ☑ | ☐ | ☐ | 12 | Single ▼ |

User Name: E. Minem
Primary email: eminem@aol.com
AccountID: 555
Phone#: 5555555555

Note: You may add the secondary email as another channel by updating personal data, Click here to update account personal data

[ Submit ]  [ Reset ]

*Figure 4J*

**Reports**



| Temperature Reports | Electricity Usage | Cost & Consumption |
|---|---|---|
| Daily Temperature | Daily Electrical | Yearly Graph |
| Monthly Temperature | | Monthly Consumption |
| | | Daily Profile |

*Figure 4K*

DC_PRIOR_ART_0000415

Patent Application Publication    Jun. 17, 2004   Sheet 13 of 18    US 2004/0117330 A1



*Figure 4L*



*Figure 4M*

DC_PRIOR_ART_0000416

Case: 23-1101    Document: 15    Page: 301    Filed: 05/09/2023



*Figure 4N*



*Figure 4O*



*Figure 4P*

*Figure 4Q*

DC_PRIOR_ART_0000417

**Program Participation** ⌐4.96

| Program Listing | | | | |
|---|---|---|---|---|

| Participate | Product Name | Supply Type | Effective Dates<br>From    To | Effective Daily<br>From    To |
|---|---|---|---|---|
| ☑ | Emergency AC Curtailment | On Demand | 01/01 – 12/31 | 12:00am – 11:59pm |
| ☑ | A Group | On Demand | 01/01 – 12/31 | 12:00am – 11:59pm |
| ☐ | B Group | On Demand | 01/01 – 12/31 | 12:00am – 11:59pm |
| ☐ | Emergency HVAC Curtailment | On Demand | 01/01 – 12/31 | 12:00am – 11:59pm |
| ☐ | Emergency Hot Tub/Spa Curtailment | On Demand | 01/01 – 12/31 | 12:00am – 11:59pm |
| ☐ | Emergency Pool Pump Curtailment | On Demand | 01/01 – 12/31 | 12:00am – 11:59pm |
| ☐ | Emergency Shut Off | On Demand | 01/01 – 12/31 | 12:00am – 11:59pm |
| ☐ | Emergency Water Heater Curtailment | On Demand | 01/01 – 12/31 | 12:00am – 11:59pm |
| ☐ | AfternoonPeaker | Scheduled | 04/01 – 10/01 | 12:00am – 6:00pm |
| ☐ | MorningPeaker | Scheduled | 01/01 – 12/31 | 6:00am – 12:00pm |

Apply

4.100    4.98

## *Figure 4R*



## *Figure 5A*

DC_PRIOR_ART_0000418



_Figure 5B_



_Figure 5C_

Case: 23-1101    Document: 15    Page: 304    Filed: 05/09/2023



*Figure 5D*



*Figure 5E*



*Figure 5F*

DC_PRIOR_ART_0000420

**DTX0219, Page 18 of 50**

Appx10123

**Program Definitions**



*Figure 5G*



*Figure 5H*



*Figure 5I*

DC_PRIOR_ART_0000421

**DTX0219,  Page 19 of 50**

Appx10124

US 2004/0117330 A1

1

Jun. 17, 2004

# SYSTEM AND METHOD FOR CONTROLLING USAGE OF A COMMODITY

## RELATED APPLICATIONS

[0001]  The present application claims priority to U.S. patent application Ser. No. 10/402,370 filed Mar. 28, 2003, which claims priority to U.S. Provisional Patent Application Serial No. 60/368,963 filed Mar. 28, 2002 and to U.S. Provisional Patent Application Serial No. 60/383,027 filed on May 24, 2002, all of which are hereby incorporated by reference.

## FIELD OF THE INVENTION

[0002]  The present invention relates generally to the delivery of a commodity, and more particularly, to a system and method for managing the delivery and usage of a commodity such as electricity, natural gas, steam, water, chilled or heated water, or potable or recycled water.

## BACKGROUND OF THE INVENTION

[0003]  Traditionally, utilities have done an excellent job of providing a reliable source of power to their customers. Utilities do this by accurately predicting consumer demand and then ensuring that they have adequate generation resources available to meet that demand. Historically, demand for power increases each year during peak heating and cooling months, resulting in a need for ever increasing amounts of generation capacity. A review of the peak period demand clearly show that the need for a substantial amount of new generation assets could be eliminated if there was a way to shift some of the demand from peak to off peak times.

[0004]  The deregulation of the electric industry has heightened concerns over power outages, price volatility and how the eventual outcome will impact the economy and our way of life.

[0005]  For example, recent events in California have captured the headlines and amplify these concerns. California suffers from 10 years of load growth with no new generation facilities being built to meet the demand. Internet data centers like the one in San Jose represent unanticipated new demands for power 24 hours a day equal to that of 60,000 homes. State mandated deregulation activities forced the major utilities to sell off their generation assets resulting in them having to buy the power they used to self generate from others.

[0006]  Demand reduction programs and more advanced controls have been proposed to assist in reducing demand during peak times.

[0007]  Currently, utilities do offer demand reduction programs to their customers. These programs are designed to shift loads out of peak periods by providing a financial incentive for consumers to move loads to a time when it is less expensive for the utility to produce or obtain power. Time of day rate is an example of such a program.

[0008]  Another type of program offered by utilities is the traditional Demand Side Management (DSM) program. This type of program provides the customer a monthly credit for allowing the utility to interrupt power to major loads in their home during peaks or emergencies.

[0009]  While both of these programs have been shown to work, they each have their problems. Time of day rate programs may be difficult for customers to understand. Therefore these programs have a very low participation rate among the customer base. DSM programs, on the other hand, have a much higher participation rate. However, DSM load sheds are seldom exercised by the utility. And, when the utility does exercise a load shed, the resulting interruption of power tends to affect customer comfort, thereby causing large numbers of customers to drop out of the program. In addition, current DSM programs cannot differentiate between those consumers that contribute to a load control, and those that don't, while providing incentive credits to all who sign up.

[0010]  While both time of day rates and DSM programs can be effective, each have challenges in the area of customer satisfaction that erode their usefulness. In addition, utilities earn little revenue from these types of offerings and therefore look to new generation as a more economically viable option.

[0011]  Thermostats, thermostatic control devices and environmental control systems have been designed, manufactured and placed in use for many years. These devices are primarily designed to sense the temperature inside a site 1.04 and based on occupant designated setting, activate the heating and/or air conditioning system or systems to maintain a comfort level based on the occupants designated level of comfort. There are two main types of design for these devices: a standard single control device or a dual control system.

[0012]  The standard single control device can be set to activate a heating or cooling system based upon a manual switch to select either system and a degree setting mechanism to select the desired temperature to heat or cool to if the temperature falls or rises below or above the occupant designated set point. A dual control system is attached to both a heating and cooling system which has two set points, one for the heating system activation and one for the cooling system activation. With this type of a control, the user sets a desired minimum temperature, below which the heating system will be activated to raise the temperature during winter seasons, and a maximum temperature, above which the cooling system will be activated to drop the temperature during summer seasons.

[0013]  This type of temperature control device provides the occupant the convenience of not having to manually select either the heating or cooling system, as is the case of the standard single control device, and allows the occupant to define a temperature range between which they are comfortable. Using these two main types of design as a base line, there are many variations, which have been developed over time. Over the years, these sensing and control devices have moved from traditional bi-metal contractors to more sophisticated electronic devices over the years, and have incorporated the ability to be programmed with multiple set points for both heating and cooling as well as having the ability to activate these different set points based on time of day, day of week, and/or externally generated control signals from utility companies indicating a fixed cost tier that is in effect, e.g., low, medium, high & critical, and to interface with an infra-red motion sensor that automatically sets back the temperature to a predetermined point based on the

DC_PRIOR_ART_0000422

US 2004/0117330 A1

Jun. 17, 2004

2

presence of a person in the area. However, most end use consumers do not have the time, experience, and/or access to data to monitor, track, and use these devices.

[0014] The present invention is aimed at one or more of the problems set forth above.

## SUMMARY OF THE INVENTION

[0015] In one aspect of the present invention, a system and method manage delivery of energy from a distribution network to one or more sites. Each site has at least one device coupled to the distribution network. The at least one device controllably consumes energy. The system includes a node and a control system. The node is coupled to the at least one device for sensing and controlling energy delivered to the device. A control system is coupled to the node and distribution network for delivering to the node at least one characteristic of the distribution network. The node for controls the supply of energy to the device as a function of the at least one characteristic.

[0016] In another aspect of the present invention, a method of shifting energy requirements from a first period of time is provided. The method includes the steps of measuring energy usage of a controlled device operated by a customer, cutting off energy to the controlled device during the first time period, and providing a rebate to the customer based on actual energy savings as a function of the first time period, the measured energy usage, and known power requirements.

[0017] In still another aspect of the present invention, a thermostat device for controlling a heating and/or cooling system through interaction with a user is provided. The heating and/or cooling system are supplied with energy through a power distribution network. The thermostat includes a control panel for receiving input from the user and a display coupled to the control panel for visually presenting information to the user. The thermostat device is adapted to receive a characteristic of the energy being supplied and for displaying the characteristic on the display.

## BRIEF DESCRIPTION OF THE DRAWINGS

[0018] Other advantages of the present invention will be readily appreciated as the same becomes better understood by reference to the following detailed description when considered in connection with the accompanying drawings wherein:

[0019] FIG. 1A is a block diagram of an energy management system, according to an embodiment of the present invention;

[0020] FIG. 1B is a diagrammatic illustration of one implementation of the energy management system of FIG. 1A;

[0021] FIG. 1C is a flow diagram of a process for managing energy delivery according to an embodiment of the present invention;

[0022] FIG. 2A is a block diagram of a gateway node used in the energy management system of FIG. 1A;

[0023] FIG. 2B is a block diagram of a metering node used in the energy management system of FIG. 1A;

[0024] FIG. 2C is a block diagram of a control node used in the energy management system of FIG. 1A;

[0025] FIG. 2D is a block diagram of a load control node used in the energy management system of FIG. 1A;

[0026] FIG. 2E is a block diagram of an implementation of the energy system of FIG. 1A at a customer site;

[0027] FIG. 3A is an illustration of an advanced thermostat device, according to an embodiment of the present invention;

[0028] FIG. 3B is a block diagram of the advanced thermostat device of FIG. 3A;

[0029] FIGS. 3C-3G are graphs illustrating an exemplary economic and comfort management control strategy, according to an embodiment of the present invention;

[0030] FIG. 4A is a graphical illustration of a customer GUI, according to an embodiment of the present invention;

[0031] FIG. 4B is a graphical illustration of a control panel of the GUI of FIG. 4A;

[0032] FIG. 4C is a graphical illustration of a virtual thermostat of the GUI of FIG. 4A;

[0033] FIG. 4D is a graphical illustration of an occupancy mode screen of the GUI of FIG. 4A;

[0034] FIG. 4E is a second graphical illustration of the occupancy mode screen of FIG. 4D;

[0035] FIG. 4F is a third graphical illustration of the occupancy mode screen of the GUI of FIG. 4D;

[0036] FIG. 4G is a graphical illustration of a thermostat scheduling calendar of the GUI of FIG. 4A;

[0037] FIG. 4H is a graphical illustration of a thermostat scheduling panel of the GUI of FIG. 4A;

[0038] FIG. 4I is a graphical illustration of a select day type drop down list of the GUI of FIG. 4A;

[0039] FIG. 4J is a graphical illustration of a config alert screen of the GUI of FIG. 4A;

[0040] FIG. 4K is a graphical illustration of a report screen of the GUI of FIG. 4A;

[0041] FIG. 4L is a graphical illustration of a daily temperature report pop up screen of the GUI of FIG. 4A;

[0042] FIG. 4M is a graphical illustration of a daily electrical report pop up screen of the GUI of FIG. 4A;

[0043] FIG. 4N is a graphical illustration of a configuration data screen of the GUI of FIG. 4A;

[0044] FIG. 4O is a graphical illustration of a thermostat data screen of the GUI of FIG. 4A;

[0045] FIG. 4P is a graphical illustration of a heating drop down list of the GUI of FIG. 4A;

[0046] FIG. 4Q is a graphical illustration of a cooling drop down list of the GUI of FIG. 4A;

[0047] FIG. 4R is a graphical illustration of a program participation screen of the GUI of FIG. 4A;

[0048] FIG. 5A is a graphical illustration of a utility GUI, according to an embodiment of the present invention;

DC_PRIOR_ART_0000423

US 2004/0117330 A1

3

Jun. 17, 2004

[0049] **FIG. 5B** is a graphical illustration of an immediate supply screen of the GUI of **FIG. 5A**;

[0050] **FIG. 5C** is a graphical illustration of an available program capacity pop-up of the GUI of **FIG. 5A**;

[0051] **FIG. 5D** is a graphical illustration of a scheduled supply screen of the GUI of **FIG. 5A**;

[0052] **FIG. 5E** is a graphical illustration of a find eligible program dialog of the GUI of **FIG. 5A**;

[0053] **FIG. 5F** is a graphical illustration of program summery table of the GUI of **FIG. 5A**;

[0054] **FIG. 5G** is a graphical illustration of a program definition screen of the GUI of **FIG. 5A**;

[0055] **FIG. 5H** is a graphical illustration of a reports screen of the GUI of **FIG. 5A**; and,

[0056] **FIG. 5I** is a graphical illustration of a portion of the reports screen of **FIG. 5H**.

### DETAILED DESCRIPTION OF THE INVENTION

[0057]    1. Energy Management System and Methods—Overview

[0058]    With reference to the drawings, and in operation, the present invention relates generally to a system **1.02** and method for managing the delivery and usage of a commodity, such as electricity, natural gas, steam, water, chilled or heated water, or potable or recycled water. More specifically, the system **1.02** is adaptable to manage the delivery and usage of energy, e.g., electricity and natural gas. While the below discussion focuses on the management of the delivery and/or usage of electricity, the present invention is not limited to such the delivery and/or usage of electricity.

[0059]    In general, the system **1.02** allows at least one customer (or user) located at a customer site (indicated by reference number **1.04**) and/or a utility (indicated by reference number **1.06**) to manage delivery or usage of the electricity to the customer's site **1.06**. The utility **1.06** may include both the generation of the electricity, e.g., via power plants, and/or the transmission of electricity to the customer sites **1.04**.

[0060]    The customer site **1.04** includes at least one device **1.08** which uses electricity and at least one node **1.10**. In the illustrated embodiment, the customer site **1.04** includes three devices: a metered device **1.08A**, a controlled device **1.08B**, and a metered and controlled device **1.08C**. Each device **1.08** may have an associated node **1.10**.

[0061]    As discussed in more detail below, in the illustrated embodiment, there are four different types of nodes **1.10**: a load metering node **1.10A**, a control node **1.10B**, a load control node **1.10C**, and a gateway node **1.10D**.

[0062]    The gateway node **1.10D** provides two way communication between the gateway **1.10D** and each other node **1.10A**, **1.10B**, **1.10C** and between the gateway node **1.10D** and a utility control system **1.12**. It should be noted that although there are only one of each the devices **1.08A**, **1.08B**, **1.08C**, shown, there may be any number of each type of device **1.08A**, **1.08B**, **1.08C** (including zero).

[0063]    The load metering node **1.10A**, in general, measures the instantaneous power being delivered (typically, in kWh) to the associated metered device **1.08A**. The load metering node **1.10A** may also determine the total power delivered to the metered device **1.08A** over a predetermined period of time, e.g., every 15 or 20 minutes. Information related to the instantaneous power being delivered and the accumulated power is delivered to utility **1.06** via the gateway control node **1.10D**. For example, the metered device **1.08A** may be an electricity meter which measures all power being supplied to the customer site **1.04**.

[0064]    The control node **1.10B**, in general, is used to control the controlled device **1.08B**. In the simplest form the control node **1.10B** may controllably cut off and supply power to the controlled device **1.08B**. For example, if the controlled device **1.08B** is a pool pump used to filter a pool (not shown), the control node **1.10B** may simply turn power to the pool pump on and off. Alternatively, the control node **1.10B** may have control over features of the controlled device **1.08B**, e.g., start time, end time, duration, etc.

[0065]    The load control node **1.10C**, in general, is used to both measure the instantaneous power being delivered to the controlled and metered device **1.08C** and controls the device **1.08C**. The load control node **1.10C** may also determine the total power delivered to the metered and controlled device **1.08C** over a predetermined period of time, e.g., every 15 or 20 minutes.

[0066]    Nodes **1.10** may be utilized with any type of device **1.08** for which it is desirable to control and/or measure its power usage. For example, nodes **1.10** may be associated with the entire customer site **1.04**, a pool pump, an HVAC system, a water heater, any appliance, such as a refrigerator, dishwasher, hot tubs, irrigation and well pumps, spas, coffer maker, etc., or other electrical or electronic device, e.g., televisions, stereos, etc.

[0067]    The type of node **1.10** which is used with a device **1.08** is dependent upon the device and whether it is desirable to measure the device's power usage, control the device or both. In one aspect of the present invention a node **1.10** may be separate from the device **1.08**. For example, in each device **1.08** it may be desirable to measure the energy usage of the entire customer site **1.04**. Thus, a load metering node **1.10A** may be associated with the site's electric meter.

[0068]    Nodes **1.10** may either be integrated with the corresponding device **1.08** or be separate. For example, a load metering node **1.10A** may be a separate device which is coupled to an electric meter (for retro-fit purposes). Alternatively, nodes **1.08** may be designed and manufactured to be integral with the devices **1.10**.

[0069]    The customer may access and control the system **1.02** through a user interface **1.14** (see below). The user interface **1.14** may be incorporated into another device, such as a thermostat (see below). Additionally, the customer may be given access to the system **1.02** through external devices, such as, mobile phones, personal digital assistants (PDA), laptop computers, desktop computers, or other suitable devices. Such devices may be linked to the system **1.02** via the internet, a wireless data network, or other suitable system.

[0070]    The system **1.02** may be further accessed and controlled at the utility **1.06** via a utility interface **1.16** (see below).

DC_PRIOR_ART_0000424

US 2004/0117330 A1

Jun. 17, 2004

4

[0071] In one aspect of the present invention, the load metering node **1.10**A, the control node **1.10**B, and the load control node **1.10**C communicate with the gateway node **1.10**D. In another aspect of the present invention, the load metering node **1.10**A, the control node **1.10**B, the load control node **1.10**C, and the gateway node **1.10**D may all communicate with each other. In the illustrated embodiment, the nodes **1.10** are interconnected by a network **1.18**. The network **1.18** may be a wired network, such as an ethernet network, or a wireless network.

[0072] An exemplary implementation of the system **1.02** is shown in **FIG. 1B**. In this illustrated embodiment, the gateway node **1.10**D communicates to the utility control system **1.12** via an "always on", secured wired or wireless network **1.20** through a cable modem, DSL modem, or other suitable means (not shown). The utility control system **1.12** may be implemented in software which is stored and executed on a back-end server **1.22** (see below).

[0073] In one aspect of the present invention, utility control system **1.12** and the back-end server **1.22** may be provided by and/or serviced and/or maintained by a third party, i.e., a service provider, **1.24**.

[0074] Access to the utility control system **1.12** may be provided at the utility **1.06** through a secure network **1.26** such as a virtual private network (VPN).

[0075] Remote access to the system **1.02** may be provided to the customer through the back-end server **1.22** via the internet **1.28**.

[0076] In the illustrated embodiment, the customer site **1.04** includes a metered device **1.30**A, shown as an electric meter, a controlled device **1.30**B, shown as a pool pump (illustrated graphically as a pool), and a metered and controlled device **1.30**C, shown as a water heater. It should be noted, however, that any particular site may include zero, one or more of each type of device. In the illustrated embodiment, the system **1.02** also includes an advanced thermostat device **1.30**D. Each device **1.30**A, **1.30**B, **1.30**C, **1.30**D communicates with the gateway node or gateway **1.10**D.

[0077] As discussed more fully below, the customer has access to the system **1.02** and is able to monitor and control the nodes **1.10** and/or the devices **1.08** through the user interface **1.14**.

[0078] The utility **1.06** may also monitor and control the usage of electricity by controlling the nodes **1.10** and/or the devices **1.08**. More specifically, the utility **1.06** may define, modify, implement, and engage one or more Power Supply Program (hereinafter PSP or PROGRAM or PROGRAMS) which are designed to alleviate or reduce energy demand during peak periods. A PROGRAM may either be mandatory or optional. The user, through the user interface **1.14**, may be able to subscribe or sign up for one or more optional PROGRAMS. A PROGRAM may be either automatically implemented when a predetermined set of conditions occur, such as time of day, or may be engaged, by the utility **1.06**, as electricity demands require.

[0079] For example, a PROGRAM may automatically shift discretionary residential loads out of peak demand periods and credit consumers who participate with KWH rebates based on their actual (measured & verified) contri-

butions. In one embodiment, the rebates would be directly related to the cost of the fuel or electricity during the shifted period. This PROGRAM delivers the same results Time Of Day rates were designed to deliver without a variable KWH cost component. Rebates for shifting demand provide the consumer incentive versus higher rates in peak periods. Further, the PROGRAM provides a variable rebate based on a customers actual contribution, instead of a fixed rebate.

[0080] With reference to **FIG. 1C**, in one embodiment of the present invention, a method of shifting energy requirements from a first period of time, is provided. The method includes the step of measuring energy usage of a device **1.08** operated by a customer (first step **1.32**A). The device **1.08** has a known power rating. In a second step **1.32**B, energy to the device **1.08** is cut off during the first time period. In a third step **1.32**C, a rebate is provided to the customer based on actual energy savings as a function of the first time period, the measured energy usage, and the known power requirements.

[0081] For example, returning to **FIG. 1B, a** PROGRAM may be defined to include all pool pumps for a given set of customers, e.g., in a geographic location. The PROGRAM may be further defined by not allowing the pool pumps to run during a set period of the day. Customers having a pool pump may sign up or "subscribe" to the PROGRAM. The power rating for a customer's pool pump must be known and is stored within the system **1.02**. A load control node **1.10**C is either integral with or separate and coupled to the pool pump. The load control node **1.10**C receives a signal from the utility control system **1.12** to disable the pool pump during the first time period. The load control node **1.10**C further measures energy usage of the pool pump during the first time period to confirm that the pool pump is not running.

[0082] Another PROGRAM may also perform soft load control (control of comfort levels) on HVAC systems by modifying thermostat set points, use of temperature ramping and restricting the use of heat strips and secondary stages of compressors (see below).

[0083] In one aspect of the present invention, the system **1.02** is designed to operate like a power plant, in that it would be dispatched every working day to shift peak loads but would not operate on weekends or holidays. Further, the energy saved through engagement of a PROGRAM may be viewed as capacity in the same manner as the capacity of a power plant.

[0084] In one aspect of the present invention, the system **1.02** records actual interval data for a given entity or customer, and for each device **1.08** within that entity, or subsets thereof, as desired. In the case where the entity is a home, for example, actual energy interval data can be collected for each appliance, and/or selected appliances. Communications between the gateway node **1.10**D and the other nodes **1.10**A,**1.10**B, **1.10**C can be via wired or wireless means, including microwave, infrared, Radio Frequency (RF), or other wireless communications method. The actual interval data can be a basis for computing a customer's rebate. The gateway node **1.10**D can additionally collect information regarding the health and maintenance of the energy devices to which it communicates. Accordingly, the gateway node **1.10**D and the other nodes **1.10**A,**1.10**B, **1.10**C, can be equipped to communicate based on the wired

DC_PRIOR_ART_0000425

US 2004/0117330 A1

Jun. 17, 2004

5

or wireless communications channel. Furthermore, the communications can be bi-directional, and can be encoded. The gateway node **1.10**D can further communicate with the at least one server, and vice-versa. The gateway node **1.10**D can thus include a processor and an Ethernet connection. Communications to the server can be via cable modem, DSL, power line carrier modem, or another bi-directional wired or wireless secured communications link.

[0085] In one embodiment, the gateway node **1.10**D may include memory (see below) for storing pricing and scheduling information. For example, a gateway node **1.10**D may store fifteen days of data when ninety-six readings from devices **1.08** are made per day.

[0086] Rebates can be provided based on, for example, overall usage. In one illustration, if a water heater is "on" for ⅓ of the time, historically, a consumer can get a ⅓ rebate for a non-peak period water heater usage based on the water heater being "off" for the entire peak interval.

[0087] The system **1.02** may also be adapted to receive from the customer a budget goal for a specified time period, e.g., one month. The system **1.02** may then monitor the customer's usage and send an email or other notification to the customer if it is determined that the specified budget goal will be exceeded during the specified time period.

[0088] As explained above and more fully described below, the system **1.02** may also include an advanced thermostat device **1.30**D. The system **1.02** may have the ability to sense the current indoor temperature and could be enhanced to include at a minimum, humidity sensing, outside temperature, UV intensity, wind direction and speed, relative humidity, wet bulb thermometer, dew point and local weather forecast data or encoded signals as well as other analog or digital inputs used in the calculation of and maintenance of occupant comfort. In its basic form, the system **1.02** will manage the indoor air temperature. Using the optional enhanced system inputs, the system **1.02** may also manage the air quality and humidity at the site by controlling the operation of the appropriate heating, filtration, conditioning and cooling equipment in conjunction with damper and fresh air input ducts, electrostatic filters and ionization devices to maximize comfort and indoor air quality. The system **1.02** may manage its operation of the available environmental conditioning resources to maintain the optimum temperature, humidity and air quality conditions based on user defined minimum and maximum values for comfort indices and price of energy indices. In a more elaborate implementation, the system **1.02** may also have the ability to switch energy types e.g., electric versus gas for environment heating and would also have the ability to switch suppliers based on the asking price of the energy supplier serving the location if the services of an energy broker are utilized.

[0089] In one aspect of the present invention, the system **1.02** balances two primary factors. First, the system **1.02** maintains the environment within occupant defined acceptable minimum and maximum values at least for temperature and could be expanded to handle humidity and air quality. Second, the system **1.02** may vary these acceptable parameters based, on at a minimum, user defined preferences, price points and historical data (the gathering and retention of which is described later) to achieve the optimum environmental conditions. To provide feedback to the customer, the

system **1.02** may also record the number of energy units (energy units as used here include for examples: kilowatt hours, BTU's, Therms, and Jules but is not so limited) used as a function of time for each of the loads monitored and/or controlled by the system **1.02** and would have the ability to report back detailed consumption data as a function of time and summarize these details to provide, at a minimum, daily averages for any defined period, monthly totals, as will as track the costs of each energy unit consumed per period and provide detailed and average daily cost for any user defined period as well as monthly totals. The system **1.02** may permit the entry of daily, weekly and monthly budget amounts for energy. The system **1.02** may monitor usage and provide visual and audible alerts if these amounts are being exceeded, thereby providing the opportunity to make corrections to system settings to achieve desired economic results. The system **1.02** may be capable of controlling loads beyond its primary management function of the environmental air management systems using the same economic modeling techniques and controls that it uses to manage its primary functions. It may also manage, report and track total site **1.04** energy unit usage and interface with energy unit suppliers via a communications channel. The system controls will be located at the site **1.04**, while the processors for modeling and managing the sources and types of energy units to be utilized and committed to will be distributed (at energy brokers, ESP's and utilities) and operate over a communications network without regard to the actual location of or distance from the site **1.04**.

[0090] In summary, and as explained in detail below, the system **1.02** supports and provides a wide array of monitoring and control points including:

[0091] Whole house interval metering;

[0092] HVAC thermostat monitoring and control;

[0093] Sub-metering and control of other major loads (such as pumps and electric water heaters); and,

[0094] Net metering for effective management of distributed generation assets.

[0095] In one embodiment, the system **1.02** is designed to provide monitoring and control of major loads, e.g., total electric load, HVAC systems, water heater, and pool pump (if existent). In another embodiment, the system **1.02** provides monitoring of most, if not all, devices which require energy, e.g., electricity or gas.

[0096] The system **1.02** is "always on", connecting the nodes **1.10** to the utility control system **1.02**. This allows the system **1.02** to provide much higher levels of monitoring and management of loads. The 'always on' connectivity allows the utility **1.06** to know exactly how much load is available from each participating end use device **1.08** at a customer site **1.04** and allows the utility **1.06** to aggregate that load up to a circuit, sub station or to any other desired combined total. The utility **1.06** may target specific loads or geographic areas and manage demand more closely by getting verification of control requests as curtailment commands are initiated. The utility **1.06** can then pass detailed load curtailment data on to the back-office billing programs at the utility where credits can be applied to consumer bills commensurate with their contributions.

[0097] In another aspect of the present invention, the system **1.02** has the ability to monitor and control remote

DC_PRIOR_ART_0000426

US 2004/0117330 A1
Jun. 17, 2004
6

generating capacity such as photovoltaic systems (not shown) which may be located at a consumer site **1.04**. Just as the system can monitor and verify load control reductions, it is equally capable of monitoring, dispatching and verifying remote generation capacity.

[0098] In still another aspect of the present invention, the system **1.02** allows the utility **1.06** to respond to requests for additional electrical supply. For example, when the utility **1.06** requires an increase in electrical supply, the utility **1.06** will be able to review current capacity and call upon some or all of that capacity in an Immediate Supply Request. Using the system **1.02**, the utility **1.06** may command one or more customer sites **1.04** that meet the specified criteria, e.g., or enrolled in a specific PROGRAM, to provide their power contribution to the system's power generation supply. The gateway nodes **1.10D** will continuously update the system **1.02** with current demand information in the form of available messages. That information, along with profile data, can be presented to a system operator to help them locate the best supply to call upon.

[0099] In one embodiment of the present invention, the utility interface **1.16** and the user interface **1.14** may be provided through a web browser (see below), such as Internet Explorer, available from Microsoft Corp. of Redmond, Wash.

[0100] The utility interface **1.16** may display the capability to define Power Supply Programs (PSP or PROGRAMS) in the system **1.02** and selectively apply substations and circuits that will participate in the PROGRAM when activated. The system **1.02** through the utility interface **1.16** may include the following capabilities.

[0101] The system **1.02** may allow an operator at the utility **1.06** to selectively assign devices **1.08** that apply to a specific PROGRAM. One or more substations and/or circuits may be included within the PROGRAM.

[0102] The system **1.02** may receive or generate an Immediate Supply Request (ISR) when additional electrical supply is needed. The Immediate Supply Request may include a start time and the supply request duration.

[0103] An operator, using the utility interface **1.16**, activates one or more PROGRAMS in response to the ISR. Activation of the one or more PROGRAMS may be immediate or scheduled at a future time. To activate a PROGRAM, a PROGRAM schedule is downloaded to each of the gateway nodes **1.10D** or nodes **1.10** affected. In one embodiment, the PROGRAM schedule may be downloaded to the appropriate gateway nodes **1.10D** or other node **1.10** in advance of the scheduled time of operation.

[0104] In another aspect of the present invention, the system **1.02** can track, record, store, compute, etc. which customers actually participate in a PSP and how much demand was reduced in the home for the PROGRAM period.

[0105] The utility interface **1.16** may also display the current load generation available from the existing system **1.02**. For example, a view of the current Power Distribution Network for a utility company including Transmission Substations (TSS), Distribution Substations (DSS), and circuits may be provided. The view may be appropriately annotated with identification information for each branch of the net-

work (TSS, DSS and circuit). The view may display an aggregated capacity for a branch of the network currently available. The view may also indicate whether a PROGRAM is currently active on a branch of the system **1.02**. For an active power supply program, the scheduled completion time may also be indicated.

[0106] The system **1.02** may also continually aggregate capacity and the current status of the distribution network and provides the updated information for display on the utility interface **1.16**.

[0107] In a further aspect of the present invention, the utility interface **1.16** may allow the operator to analyze profiles of homes and individual load types. This data can allow the utility **1.06** to assess which loads should be curtailed to achieve the needed demand reduction. The system **1.02** may calculate home load profiles based upon information received from the load metering nodes **1.10A** and/or load control nodes **1.10C**. This may include HVAC profiling. Using this data, site load profile data can be aggregated for the electrical distribution network topology.

[0108] The network topology load profile may be displayed as a snapshot to the operator. The operator may also review load profiles available in the system **1.02** at a specified time of day.

[0109] Configuration data is downloaded from the system **1.02** to each of the gateway nodes **1.10D**. For example, this may be done at one or more of the following: at predetermined times, when requested by a gateway node **1.10D**, and/or when a change, such as activation of a PROGRAM, has occurred.

[0110] For example, configuration data may include, but is not limited to the following: communication parameters for system components, schedules and power supply programs. In one embodiment, each device **1.08** has a unique identifier, such as a MAC address or an RF logical address. The intended device **1.08** for a given message may be included in the message received from the system **1.02**.

[0111] In one aspect of the present invention, communications to and from the gateway nodes **1.10D** or other nodes **1.10** are secured. For example, the communications may be secured using Secure Sockets Layer (SSL).

[0112] In another aspect of the present invention, if the system **1.02** loses communications with a gateway node **1.10D** for a predetermined time, the system **1.02** may generate a Service Report.

[0113] In one aspect of the present invention, a gateway **1.10D** may generate a message when a controlled device **1.08** has a change of state that alters its contributable supply by more than a predetermined range, i.e., a real-time demand range. The system **1.02** may use these updates to keep a live running total of available supply for the entire electrical distribution network and make these values available at the utility interface **1.16**. In another aspect of the present invention, the system maintains a history of the consumption rates as a function fo time to create historical usage by device type and program to aid in planning and forecasting demand by device type. These values are available at the utility interface **1.16**. In one embodiment, the system **1.02** may ignore supply values from a gateway node **1.10D** that are older than a predetermined period of time, such as 30 minutes old.

US 2004/0117330 A1

Jun. 17, 2004

7

[0114] The system may also receive messages from a gateway node **1.10**D at predetermined time intervals, such as 15 minutes, whether a load changes or not. These messages can include the (a) demands generated for a device **1.08** in a PROGRAM and (b) the total demand generated for devices **1.08** in a PROGRAM. In one embodiment these messages may also include a gateway ID, a utility ID string, time/date stamp, current power draw of every controllable device **1.08**, and whole house demand.

[0115] Through the user interface **1.14**, the customer may have local and remote access to a rich set of functions and features. Some or all of these functions and features may be accessible through the thermostat **1.30**D and/or through the internet **1.28** (via a web browser).

[0116] Using the user interface **1.14**, the customer may directly access and control in-home devices **1.08**. For example, with regard to the thermostat **1.30**D, the customer may view current temperature, view current heating or cooling setpoint(s), override heating or cooling setpoint(s), resume scheduled heating or cooling setpoint(s), view heat/cool/auto mode, change the heat/cool/auto mode.

[0117] With regard to the electric meter **1.30**A, the customer may view current electric meter accumulated consumption (kWh), view current electric meter demand (kW), view historical meter data.

[0118] With regard to a metered controlled device **1.08**C, such as the water heater **1.30**C, the customer may view current equipment load status (on/off data), control the state of output relays (on/off), view and override curtailment conditions of the device **1.08**C, and/or view current demand and consumption data of the device **1.08**C.

[0119] In one aspect of the present invention, the user interface **1.14** includes a scheduling feature. The scheduling feature allows the customer to customize the devices **1.08** to operate according to personal preferences (rather than a default configuration).

[0120] In one embodiment, the following scheduling features are accessible through the user interface **1.14**.

[0121] With regard to the thermostat, the customer may define up to a plurality of occupancy modes, e.g., **8**, for use in daily schedules, define daily schedules using an unlimited number of day-types, assign day-types using monthly calendars.

[0122] With regard to a controlled and metered device **1.08**C, the customer may, for example, define a run-time operation and/or a desired start time.

[0123] Using the user interface **1.14**, the customer may view or generate a variety of reports to view historical information about their homes and the devices **1.08** within. For example, some of the reports which may be available include:

[0124] Daily temperature reports displaying temperature and setpoints in, e.g, 15-minute intervals.

[0125] Monthly temperature reports displaying daily low, high and average temperatures.

[0126] Daily electrical reports displaying electrical consumption hourly and electrical costs in e.g., 15-minute intervals.

[0127] Monthly electrical reports displaying daily low, high and average energy consumption.

[0128] Monthly cost reports displaying daily low, high and average energy costs.

[0129] Monthly consumption reports displaying daily energy consumption and costs.

[0130] Yearly consumption and cost reports displaying monthly energy consumption and cost.

[0131] In another aspect of the present invention, the customer may also view information related to Power Supply Programs. For example, the customer may generate or view a report detailing the PROGRAMS offered by the utility **1.06**. Additionally, the customer may select the PROGRAMS in which they choose to participate.

[0132] Using the user interface **1.14**, the customer may have access to their account and home attributes. For example, the customer may be able to view and modify various parameters associated with their user profile. Such parameters may include name, address, home, work and mobile phone numbers, primary and secondary E-mail addresses, password (modify only) and password reminder, and/or budget thresholds. Furthermore, the customer may be able to view and modify various parameters associated with the thermostat **1.30**D and HVAC system. Such parameters may include thermostat name, heating type and stages, cooling type and stages, and Safety, alarm, heat and cool limits.

[0133] Using the user interface **1.14**, the customer may also be able to view and modify various parameters associated with any metered and controlled devices. Such parameters may include, e.g., the device name and description.

[0134] Using the user interface **1.14**, the customer may also be able to view and modify various parameters associated with their home. Such parameters may include age and size, construction characteristics, water heater capacity and type(s), and energy related home accessories.

[0135] When the system **1.02** activates a PROGRAM (either automatically or via manual activation), a supply request is broadcast. The supply request may include a Curtailment ID, a Utility ID sub-string, Device Type Identifiers of the devices that are to contribute, a transaction identifier, and time elements indicating start time and duration. In one embodiment, the supply request is sent to all gateway nodes **1.10**D and other nodes **1.10** and may be repeated to ensure that all of the gateways **1.10**D and other nodes **1.10** will receive the request. Each gateway **1.10**D and other nodes **1.10** receive the request and when the start time occurs, begin a Supply Request transaction.

[0136] In one embodiment, the gateway node **1.10**D takes a whole-house meter reading (demand and consumption) and reports back to the system **1.02** that it has received the request and is participating. In the illustrated embodiment, every message includes the Curtailment ID so that the system **1.02** can collect all of the responses to the supply request and provide accurate analysis and billing/crediting information for the activated PROGRAM.

[0137] The gateway node **1.10**D and other nodes **1.10** then proceeds to control the specified devices **1.08** and report the status of each device **1.08** back to the system **1.02** as they are processed.

DC_PRIOR_ART_0000428

US 2004/0117330 A1

Jun. 17, 2004

8

[0138]   Devices **1.08** that are currently drawing power report the total watts contributed and then proceed to open the relay for controlled devices **1.08**B and/or controlled and metered device **1.08**C. If a controlled device **1.08**B is being used, an associated power rating may be used for the contributed power value. A controlled device **1.08** may be either shut-off, i.e., power cut off, or controlled to some predetermined state, e.g., a heating/cooling offset may be set to a maximum value for a HVAC system (see below).

[0139]   Devices **1.08** that are not currently drawing power will report zero watts contributed and leave the relay closed. With the relay closed, once the device **1.08** starts to draw power, the gateway node **1.10**D will measure its demand and then open the relay and then measure and report its contribution.

[0140]   In one embodiment, a device's **1.08** contribution is equal to the power consumption rate prior to activation of the program for the time period of the PROGRAM, i.e., the amount of energy being saved.

[0141]   If the device **1.08** is an HVAC system, adjusting the setpoint may not guarantee that the system may not run at all. If the HVAC is not running, its supply contribution message is reported as zero. The setpoints are offset and the temperature is monitored. When the temperature exceeds the appropriate heating or cooling original setpoint (prior to the offset change), the gateway node **1.10**D may indicate what the contribution is. This represents when the equipment would have come on without the curtailment. By adjusting the setpoint of the thermostat **1.30**D, the actual consumption of the HVAC system should reduce as a result of a higher setpoint for heating or cooling being established. The actual usage for a particular setpoint for a site **1.04** may, over time, be known and/or sampled and the offsets can then be computed and verified as needed to ensure that the reductions that are calculated are correct. The system **1.02** can thus measure the shorter and less frequent cycling of the HVAC system to create an overall energy savings amount. For example, if the unit consumes 5 kwh set at 72 and used **4.6** kwh set at 76 then the savings is **0.4** kwh per hour.

[0142]   At the end of the Supply Request period, the gateway node **1.10**D will re-enable the devices **1.08** and report a completion message to the system **1.02** that includes the whole house demand data and total consumption data. For the thermostat or thermostat devices, a reverse ramp can initiate to reduce the potential of creating a peak demand at the end of a curtailment or control period. This reverse ramp could include the restriction of secondary compressor stages as well as heat strips depending on the mode (heating or cooling) that the thermostat is in.

[0143]   The system **1.02** may also send a supply request cancel message to abort the PROGRAM. When a supply request cancel message is received, the gateway node **1.10**D will perform as if the time has expired and performed all necessary clean-up, wrap-up and reporting as described above.

[0144]   In addition to reporting individual demand contributed by each device **1.08** during the PROGRAM, the gateway node **1.10**D may also send the total demand generated for all devices **1.08** for the PROGRAM to the system **1.02**.

[0145]   In another aspect of the present invention, the gateway node **1.10**D may receive a utility generated sched-uled supply request. The gateway node **1.10**D may be responsible for administering the PROGRAM within customer site **1.04**. For example, the gateway node **1.10**D may accept or download scheduled PROGRAMS from the system **1.02** in advance of the scheduled operation. The gateway node **1.10**D may then monitor and control the affected devices **1.08** to carry out the PROGRAM.

[0146]   During the PROGRAM, the gateway node **1.08**D may report the electrical demand generated by each device **1.08** in the PROGRAM.

[0147]   The gateway node **1.10**D may also receive occupant device schedules from the system. Device schedules apply to customer devices **1.08** such as water heater, pool pump, hot tub and spas. The gateway node **1.10**D may then be responsible for administering the device schedules within the customer site. The device schedules may be received by the gateway node **1.10**D in advance of the scheduled operation. Then the gateway node **1.10**D may monitor and control the affected devices **1.08** per the downloaded device schedules.

[0148]   In another aspect of the present invention, if the gateway node **1.10**D loses communications with the system **1.02** for a predetermined time, the gateway node **1.10**D can re-enable devices **1.08** (water heater, pool pump, hot tub and spa). Note that the gateway node may have multiple days, e.g., three days, of schedules available. Water heaters can fall back to an operational mode, however, pool pump, spas, hot tubs and irrigation and well pumps may not. These latter devices may have to be cycled based on some programmed interval like, for example, 8 hours a day. Other devices **1.08** like an irrigation pump could not simply default to "on" or it may start and never stop. The ability to receive and run schedules is not limited to the gateway node **1.10**D. Depending on the system implementation requirements, schedules, cycle run times and other operational commands may be downloaded to the control nodes **1.10** which will operate independently their individual schedules. This capability is designed to permit normal operation of the site **1.04** should the gateway node **1.10**D fail or communications are lost between the gateway node **1.10**D and the control node **1.10**.

[0149]   With reference to **FIG. 3**A, the thermostat **1.30**D in one embodiment, is a wall mounted device which has a control panel **3.02** with a display screen **3.04** and a plurality of input buttons **3.06**. In the illustrated embodiment, the input buttons **3.06** includes a system button **3.06**A, a fan button **3.06**B, an occupancy button **3.06**C, and a hold/resume button **3.06**D. The input buttons **3.06** further include an first control button **3.06**E and a second control button **30.6**F.

[0150]   Using the input buttons, the customer can control the HVAC system and other parts of the system **1.02** (see below). The thermostat **1.30**D is in communication with the gateway node **1.10**D (see above) and the gateway node **1.10**D can query the current temperature and setpoint values of the thermostat **1.30**D. Further, the gateway node **1.10**D can change the heating and cooling setpoint(s) and offset values of the thermostat **1.30**D (see below).

[0151]   In one aspect of the present invention, the thermostat **1.30**D may inform the gateway node **1.10**D when its relay outputs or contact inputs change state, or the gateway node **1.10**D can poll for this status. When this occurs, the

DC_PRIOR_ART_0000429

US 2004/0117330 A1                                                                                 Jun. 17, 2004

9

gateway node **1.10**D can query the thermostat **1.30**D and send the current temperature and corresponding input or output status to the system **1.02**.

[0152]  The thermostat **1.30**D may operate in a fallback mode upon loss of communication with the gateway node **1.10**D. When communication resumes, the gateway node **1.10**D can ascertain the state of the thermostat **1.30**D and restore the desired functionality.

[0153]  All changes made at the thermostat **1.30**D can be communicated to the gateway node **1.10**D or be received during a poll of the thermostat **1.30**D. In one embodiment, the following functions can be accessible directly from the thermostat **1.30**D:

[0154]  View current temperature.

[0155]  View current heating or cooling setpoint.

[0156]  Override heating and cooling setpoints.

[0157]  Resume scheduled heating and cooling setpoints.

[0158]  View Heat/Cool/Auto mode.

[0159]  Change Heat/Cool/Auto mode.

[0160]  Activate/deactivate the fan.

[0161]  As discussed above, load control nodes **1.10**C provide two primary functions: 1) measure power consumption and instantaneous demand of an attached load and 2) control the load. In one embodiment, the load control node **1.10**C includes a means, e.g., one or more means (see below) to allow the attached load to be connected or disconnected from main power. Alternatively, the load control node **1.10**C may be integrated and/or coupled to a controller of the load for control of its functions.

[0162]  In one embodiment, the load control node **1.10**C may disconnect the load when a supply request command is received from the gateway node **1.10**D and reconnect the load when a cancel supply request command is received from the gateway node **1.10**D. The load control node **1.10**C may further provide status information, e.g., state of load control means, when a status request command is received from the gateway.

[0163]  In one aspect of the present invention, a load metering node **1.10**A is coupled to a site's electric meter **1.30**A. The load metering node **1.10**A may accumulate time stamped cumulative consumption (kWh) data over a predetermined period, e.g., 15 or 20 minute time periods and be capable of storing up to a predetermined period of time's worth of data, e.g., 10 days.

[0164]  The load metering node **1.10**A is in communication with the gateway node **1.10**D. The gateway **1.10**D may query current accumulated consumption (kWh) from the meter **1.30**A and/or "instantaneous" load measurement (kW) from the meter on request. "Instantaneous" can be determined by the capabilities of the meter. The gateway node **1.10**D can query the 15-minute interval data. Data values can be returned with a timestamp.

[0165]  2. Nodes

[0166]  With specific reference to **FIGS. 2A, 2B, 2**C and 2D, the interaction with the devices **1.08** located at the customer site **1.04** is the node **1.10**. The nodes **1.10** permit

the system **1.02** to focus on the entire supply chain, from well head production and generation to the end consumption point. The nodes **1.10** are designed to give every energy-consuming device **1.08** the ability to intercommunicate with the entire supply chain if necessary and utilizes supply and demand balancing control logic, to improve the operational efficiency of end point devices **1.08**, groups of end-point devices and the entire supply chain. This is accomplished by giving each end-point knowledge about the current demand on the entire supply chain coupled with the ability to alter its operation to assist in managing and balancing the overall demand on the delivery system. This information exchange is accomplished over an always on broadband, high-speed, point-to-point, point to multipoint or mesh network (see above).

[0167]  Energy consuming devices **1.08** within a customer site **1.04** may have varying levels of operational intelligence. Appliances and other utility consuming devices **1.08** range from super energy efficient refrigeration units with embedded micro processor controls to dumb devices like water heaters and pool pumps which simply operate in an on or off state using sensors or timers to control their operational state. The nodes **1.10** provide an entirely new level of intelligence to each end device **1.08** and are designed to be modular in nature so as not to burden the end point control with more features or functions than it needs.

[0168]  Nodes **1.10** may be designed to retrofit existing devices **1.08**, as well as be fully integrated into the end point at the time of manufacture of a device **1.08**.

[0169]  In one embodiment, there are three types of nodes **1.10**: a load metering node **1.10**A, a control node **1.10**B, and a load control node **1.10**C, as well as the gateway node **1.10**D. Each type of node **1.10** has common basic features as well as optional sub modules such as Interfaces, Metering or Control modules (see below).

[0170]  The nodes **1.10** are designed to increase the operational efficiency of even the most intelligent end use device **1.08** by giving it knowledge of the entire "utility" supply chain that it is connected to, making it possible for the end use device **1.08** to perform its given function more efficiently and economically.

[0171]  As shown, each node **1.10** includes a node processor **2.02**. In one embodiment, the node processor **2.02** is a microprocessor. The node **1.10** also includes a memory device **2.04**, such as non-volatile memory, for storing program and other data, as needed. Each node **1.10** also includes a two-way communications **2.06** channel for communicating with other components in the system **1.02**. The communications channel **2.06** may be either a hardwired or a wireless system. Any suitable communications means may be used to communicate with the intended device. For example, the two way communications channel **2.06** may provide a means to communicate with other nodes **1.10** or a programming device **2.08**. The programming device **2.08** may be used either at the site of manufacturing of the node **1.10** or onsite to configure and/or program the node **1.10**. In one embodiment, the programming device **2.08** is coupled to the node **1.10** through a communications port (not shown). The two way communications channel **2.06** may also provide communication to the gateway node **1.10**D and/or the other nodes **1.10**A,**1.10**B,**1.10**C. The nodes **1.10** may be

DC_PRIOR_ART_0000430

US 2004/0117330 A1

Jun. 17, 2004

10

connected in a network by the two way communications channel **2.06**. The network may either be a wired, wireless, or a combined network.

[0172] In one aspect of the present invention, the nodes **1.10** provide the system **1.02** with the ability to monitor and control the operation of on site distributed generation resources, such as a photovoltaic system (not shown). This permits the system **1.02** to dispatch on site capacity when the demand and economics are favorable or the demand exceeds the supply creating an energy shortage. The system **1.02** may do this in conjunction with any other utility resource such as natural gas or propane that might be used to power the a device **1.08**. This ability is further enhanced by a node's **1.10** ability to communicate with a plurality of other similar nodes **1.10** or any other control, monitoring, configuration or management node attached directly or indirectly to the system **1.02** making it possible for individual nodes **1.10** to jointly share the energy management process among many devices **1.08** using a unique set of decision criteria to maintain the operation integrity of the customer site **1.04** or any other sphere of control, e.g., a plurality of nodes **1.10** across multiple sites, while managing total demand, the economics of the operation and the end use devices.

[0173] In another aspect of the present invention, the system **1.02** permits communications outside the customer site **1.04**, permitting individual nodes **1.10** or a plurality of nodes **1.10** in aggregation to intercommunicate with other control points which might include, but are not limited to, utility companies, energy suppliers, other sites or groups of sites, other sites or points of operation under the same ownership, energy and utility brokers, energy and utility service providers, independent power and utility producers, distribution sub stations, transmission sub stations, Gas and Water well operator and any other point of control or management or service organization associated with the site **1.04**, the end point device or the "utility" delivery network servicing it.

[0174] As discussed above, each node **1.10** includes a two way communications channel **2.06**, which permits the node **1.10** to intercommunicate with any other point or points within the system **1.02**. This intercommunication may occur with any other point within the system **1.02** and may be, but is not limited to, another associated Node **1.10**, a control aggregation point or an outside point like an energy or utility supply point associated with the customer site **1.03** or a control configuration, monitoring or management point. The system **1.02** interconnects either directly or indirectly a plurality of nodes **1.10** and related supply, monitoring, configuration and management points to create a secure ubiquitous communications channel over which broadcast, point to point, mesh and point to multipoint communications can occur as well as any other communications necessary to perform the energy management function. Because of the plurality of communications protocols and physical media over which data communications can occur, nodes **1.10** may have multiple Two Way Communications Channels, permitting the best media and protocols to be implemented to achieve the desired end result.

[0175] With specific reference to **FIG. 2**B, an exemplary load metering node **1.10**A is shown. As discussed above, the load metering node **1.10**A measures the instantaneous power being delivered to the metered device **1.08**A and may also

determine the total power delivered to the metered device **1.08**A over a predetermined time period, e.g., 15 or 20 minutes. The load metering node **1.10**A includes a metering module **2.10** which is coupled to the metered device **1.08**A for measuring power delivered to the metered device **1.08**A. This information is relayed through the gateway node **1.10**D over the two way communications channel **2.06** to the utility control system **1.12**. In one embodiment, the metering module **2.10** includes a metering processor and memory for calculating and storing power data, such as accumulated power consumption.

[0176] In one embodiment, the metering module **2.10** includes means, such as one or more current transformers, for measuring power delivered to (or from) the associated device **1.08**.

[0177] With specific reference to **FIG. 2**C, an exemplary control node **1.10**B is shown. As discussed above, the control node **1.10**B is used to control the controlled device **1.08**. In the illustrated embodiment, the control node **1.10**B is coupled to the controlled device **1.08**B by a controlled device communications channel **2.12**. In one embodiment, the control node **1.10** includes one or more relays (not shown) for connecting and disconnecting the controlled device **1.08**B from power. In another embodiment, the control node **1.10** is interconnected to the controlled device's **1.08**B onboard controls. In this embodiment, the control node **1.10**B directly controls the operation of the controlled device **1.08**B.

[0178] With specific reference to **FIG. 2**D, an exemplary load control node **1.10**C is shown. As discussed above, the load control node **1.10**C performs both the metering function of the load metering node **1.10**A and the control node **1.10**B. Thus, the load control node **1.10**C includes both the metering module **2.10** and the controlled device communications channel **2.12**.

[0179] As discussed above, each node **1.10**, in its simplest form includes a processor **2.20** and a memory device **2.04** within which control logic resides and runs. This control logic, processor **2.02** and memory **2.04** provide the node **1.10** with the necessary control intelligence to manage its associated load or generation resource as a stand-alone point or in conjunction with a plurality of other nodes **1.10** locations as well as manage communications over the controlled device communications channel **2.12** (for control and load control nodes **1.10**B, **1.10**C) and over the two way communications channel **2.06**.

[0180] In one aspect of the present invention, the gateway node **1.10**D acts as a central control node, providing intercommunications between the other nodes **1.10** at the customer site **1.04**.

[0181] In another aspect of the present invention, a plurality of nodes **1.10**, which may be located at a single customer site **1.04** or across multiple sites **1.04**, may be grouped for a specific purpose, e.g., control of all pool pumps in a defined geographic region or all pool pumps in a PROGRAM in a defined geographic region. For the plurality of nodes **1.10**, a single node, which may be a gateway node **1.10**D, may be chosen as the central control node.

[0182] In one embodiment of the present invention, the processor **2.02** and control logic provide the node **1.10** with

DC_PRIOR_ART_0000431

US 2004/0117330 A1

11

Jun. 17, 2004

the ability to sense what its current state of operation should be, based on commands received from the central control node or gateway node **1.10**D, either within the customer site **1.04** or within the aggregation control sphere of the central control Node, and would manage the associated devices **1.08** based on this control state. Each node **1.10** may also report back the status of the associated device **1.08**, their energy usage or other utility consumption rate (based on measurement from the metering module **2.10**), to the assigned central control node **1.10**.

[0183] Under this configuration, the nodes **1.10** may be cascaded from the central master control point down to the lowest level of control at an end point within the system **1.02** using, but not limited to, a tree and branch or star network, however deep the architecture dictates, to achieve the level of control desired. Each sub level of control would receive control parameters or commands from its subsequent higher level node **1.10** and would either directly control loads attached to it or command nodes **1.10** subordinate to it, to achieve the desired control or management state. Through cascading control functions into a chain of command, higher level nodes **1.10** can more effectively manage a plurality of devices **1.08** without encountering scaling limitations usually associated with automation control systems managing a plurality of loads from a central processor. By the nature of its design, the node **1.10** operating in a cascading control network as described above would not be limited or fixed in its structure and nodes **1.10** could migrate dynamically from one "group" to another or move up or down in the cascade structure to permit different control spheres and algorithms. This unique architecture permits each node **1.10** to have a customized process control program and data collection criteria allowing its level of control and interaction with its associated load or generation capacity to be designed to meet the management control program objectives.

[0184] In addition, the process is further enhanced if the load or generation point under the control of the control or load control node **1.10**B, **1.10**C has its own operational control processor (not shown) which is interconnected with the node **1.10**B,**1.10**C over the controlled device communications channel **2.12** to provide operational state and control commands, run diagnostics and tests, operational health and performance data, and alarm conditions. Data from the controlled or controlled and metered device **1.08**B, **1.08**C being accessible to other nodes **1.10** or control or monitoring or measurement nodes associated with the system **1.02** for either direct use or transfer to nodes external to the network, through whatever data transfer means are most suitable for the data type and priority level.

[0185] With reference to **FIGS. 2C and 2D**, to manage the operation of basic consumption points like pumps, motors or heating elements that are typically thermostatic, valve or relay controlled, the control node or load control node **1.10**B, **1.10**C may include a mains coupler **2.14** which permits the control node **1.10**B or load control node **1.10**C to attach or disconnect the load or generation capacity to the mains or distribution network for the "utility" product used or generated by the end device **1.08**B, **1.08**C.

[0186] In another embodiment of the present invention, the node control logic or program would be capable of receiving and processing data independent of specific controls from a central control point and at a minimum would

monitor and control the operation of its associated load or generation capacity based on, but not limited to: the demand for the utility product, cost of the utility product, congestion levels on the delivery system and/or their associated cost, for electricity it would at a minimum, but not be limited to, monitoring demand, usage, sign wave frequency, voltage, and for other utilities such as, but not limited to, gas, steam or water, it would, but not be limited to, measuring line pressure, ambient temperature and any other factors and determine the best operating mode for its associated load or generation resource. Using parameters from a plurality of measurement, monitoring and control points associated with the utility delivery system, available to all nodes on the network, the node **1.10** would manage its associated consumption or generation demand and load on the "utility" delivery system in accordance with control parameters governing its operation, supplied to it through a control point configuration interface **2.16** and report any and all operational data, status and conditions back to one or multiple associated measurement, monitoring and control points as configured through the control point configuration interface **2.16**. One example of a control point configuration interface **2.16** is an input touch screen located on a device **1.08**.

[0187] In both the simplest form or the enhanced implementation above or any other combination of nodes **1.10** and control points, the individual nodes **1.10** are capable of controlling the operation of the associated load or generation capacity to shift, reduce or cap demand on the delivery system or in the case of generation to dispatch the available capacity to help meet the demand and ensure the integrity and reliability of the delivery system. Based on triggering parameters, which include but are not limited to: the time of day, the total demand on the delivery system, the real time cost of the utility, the full weighted cost of delivery including congestion charges, the minimum operating characteristics of the associated load or generation source, the total demand for the site **1.04**, the total demand for the individual nodes **1.10** within an aggregate group, externalities like weather factors and the historical usage and demand patterns of the individual node **1.10** and/or its aggregate group of nodes **1.10**, individual nodes **1.10** will determine their optimum operating characteristics and will operate their associated load or generation resource to improve those operational and performance characteristics.

[0188] As discussed above in one embodiment of the present invention, the load metering, control and load control nodes **1.10**A, **1.10**B, **1.10**C communicate with the gateway node **1.10**D through a wireless or radio frequency communications link. With reference to **FIG. 1D**, when a node **1.10**A, **1.10**B, **1.10**C comes online or powers up, including initial power up when the node **1.10**A, **1.10**B, **1.10**C is being added to the system **1.02**, an initialization process **1.32** must be performed. In first step **1.32**A, the gateway node **1.10**D emits a beaconing signal. Generally, the gateway node **1.10**D continually emits the beaconing signal. In a second step **1.32**B, the node **1.10**A,**1.10**B,**1.10**C receives the beaconing signal and responsively generates a response signal. In a third step **1.32**C, the node being initialized **1.10**A, **1.10**B, **1.10**C joins the network of nodes **1.10**A,**1.10**B,**1.10**C through a handshaking routine between the gateway node **1.10**D and the node being initialized **1.10**A, **1.10**B, **1.10**C.

DC_PRIOR_ART_0000432

[0189] In another aspect of the present invention, the control and load control nodes **1.10**B, **1.10**C are connected to the whole distribution channel up to the utility **1.06**. The control and load control nodes **1.10**B, **1.10**C may receive data, control parameters, and PROGRAM schedules through and/or from the gateway node **1.10**D. Based on the received data, control parameters and/or schedules, the control and load control nodes **1.10**B, **1.10**C may control operation of the associated device **1.08**.

[0190] With reference to **FIG. 2**E, an example of the system **1.02** applied to a specific customer site, i.e., a residence or home **2.18** will be used to illustrate several functions of the system **1.02**. In the illustrated embodiment, the home **2.18** includes eight nodes **2.20** coupled to eight devices **2.22**.

[0191] A load metering node **2.20**A is coupled to a whole house meter **2.22**A. The whole house meter **2.22**A could be associated with revenue grade power (electricity), gas or water. However for purposes of illustration, the whole house meter **2.22**A is associated with electricity delivered to the home **2.18**. The load metering node **2.20**A monitors and reports the total house consumption of electricity. The load metering node **2.20**A measures and reports total consumption as well as instantaneous demand and records and report consumption in total. Furthermore, the load metering node **2.20**A may store interval data in non-volatile memory (see above) in accordance with industry standards and system management requirements for the entire home to other control nodes **2.20** within the home **2.18** and/or any other node associated with its aggregation group, the delivery supply chain or any other node needing or authorized to receive or access it.

[0192] In addition, the home **2.18** has first and second load control nodes **2.20**B, **2.20**C associated with its heating and air conditioning systems one controlling the main living space, i.e., the 1st floor HVAC system **2.22**B and the other controlling the second floor bedroom space, i.e., the 2nd floor HVAC system **2.22**C.

[0193] Third, fourth and fifth load control nodes **2.20**D, **2.20**E, **2.20**F are associated with a refrigerator/freezer **2.22**D, an electric water heater **2.22**E, and a well pump (for yard irrigation) **2.22**F, respectively. Sixth and seventh load control nodes **2.20**G, **2.20**H are associated with a roof mounted photovoltaic system **2.22**G (comprised of a storage battery bank and inverter capable of generating 2500 watts of 240 v 60 hz A/C power for up to 12 hours) and a dishwasher **2.22**H.

[0194] While the system **1.02** will work with any "utility" provided product such as, but not limited to, gas, water, electric or steam, for ease of illustration electricity is the only utility product being used in this example. Each node **2.20** in this example has control parameters stored in its associated memory, which the control program for the node **2.20** uses to determine the optimum operating characteristics for the management of its associated load or generation capacity.

[0195] In one embodiment of the present invention, a gateway node **2.24** may be utilized to aggregate the premise nodes **2.20** and consolidate the communications process and/or control processes with upper level nodes **2.20** or any other nodes directly or indirectly in the system **1.02**.

[0196] The nodes are connected in a network (as described above), but may operate autonomously or require direct commands to change their operational state. In one embodiment, the nodes **2.20** include basic logic so that if the node **2.20** is severed from the network either intentionally or by accident, the node **2.20** will continue to perform their management and monitoring functions to optimize their attached loads performance based on the last known condition of their associated utility supply chain.

[0197] In its simplest form, the home **2.18**, may participate in any number of conservation or demand limiting programs, i.e., Power Saving Programs or PROGRAMS. The following illustrated how the nodes **2.20** may support these PROGRAMS. However, the following should not be interpreted to limit the present invention to any such PROGRAM.

[0198] By its nature of having a processor **2.02**, memory **2.04**, metering module **2.10**, mains coupler **2.14**, controlled device communications channel **2.12**, two way communications channels **2.06**, control point configuration interface **2.16** and the ability to communicate with and coordinate operational and load management processes among a plurality of end points, the node **2.20** may be programmed and configured to perform a plurality of control and interface functions and is not limited or constrained in its ability.

[0199] For example, the nodes **2.20** may be configured in a Load Limit or Load Cap Program. The term load limit or load cap may be interpreted in this example to mean a limit or cap on either the KW demand or the total cost of operation making this example either a physical energy usage or economic control process. Because of the optional metering capability of each node **2.20** and its ability to receive economic data from the supply chain serving it, the node **2.20** is capable of making decisions based on its rate of consumption as well as the cost it is incurring at any point in time.

[0200] Under a Load Limit or Load Cap Program, the customer would commit to maintain their total demand for any "utility" supplied product to a maximum demand level under an agreement with the supplier. Under such a Program the customer would be subject to a billing rate, which increases as the total demand for the product, increases. As a result, the customer that manages to maintain their demand in a flat pattern would have a much lower overall rate per unit of "utility" product consumed than one that had erratic usage patterns of peaks and valleys. The reasoning for such a program is that suppliers of "utility" products must commit to meet all demands on their system and therefore they reward consumers with consistent, managed consumption patterns with lower rates, because to meet their needs they do not have to have maintain large reserve margins. On the opposite side of the scale, they charge higher "demand charges" to those who do not manage their loads. As a result, customers can lower their costs by maintaining a consistent and flat load profile.

[0201] In our example, it will be assumed that the customer has agreed upon a maximum demand of 5,000 watts or 5 kw with its supplier, the utility. As mentioned earlier, this demand could just as easily have been a financial limit based on the fully loaded cost of delivering the utility product to the point of consumption and may be set by the

DC_PRIOR_ART_0000433

owner, customer or any other entity associated with the site **1.04** wishing to maintain cost control over the utility product.

[0202] The gateway node **2.24** acts as the gatekeeper for usage and monitors and reports on the consumption and demand for energy at the whole premise level. The gateway node **2.24** could be, but is not limited to, a single point node dedicated to just this site **1.04** as part of a tree and branch control configuration or it could be a node which is part of an aggregate group of homes in a star network. By its nature, the gateway node **2.24** will monitor and store consumption and demand information and report it to other nodes **2.20** in the network within the home **2.18**, as well as nodes outside the home **2.18** such as a central control node for the home **2.18** or aggregation group, energy providers, energy brokers, energy service providers, ISO's and other authorized agents. As the total demand for the home **2.18** approaches the agreed upon energy consumption limit of 5 kw, the rate of consumption data flowing from the gateway node **2.24** over the two way communications channels **2.06** would be received at a minimum by either the individual nodes **2.20** within the home **2.18** or by a central aggregation node in more elaborate implementations. Based on parameters provided to each node **2.20** through the control point configuration interface **2.16** or master control node parameters provided to an aggregation control node through the control point configuration interface **2.16** the load reduction, shifting and management process would be initiated. Based on the amount of load reduction needed, different levels of action may be taken to reduce the total demand utilizing priority shedding parameters which would result in the least important load in the group to perform a reduction function if operating and report the results followed by the subsequently higher levels within the group until the total demand for the site **1.04** was reduced to an acceptable level. The reverse process may initiate as the total load of the site **1.04** dropped below known levels of individual load consumption rates permitting previously shed or reduced loads to resume normal operation without exceeding the agreed upon demand cap. In addition, any device **2.22** which was shed due to its low priority in the demand prioritization scheme could increase its priority based on its minimum operating control parameters and cause its priority to be increase to a point that it will force a once higher priority load to become subordinate to it and thus swap its shed status with a device **2.22** of equal or greater load value to meet its minimum operational requirements.

[0203] This simplistic example is only to illustrate how a simple load reduction might be accomplished using the node **2.20**. In this example, the stored energy available in the photovoltaic system's **2.22G** storage batteries would most likely be dispatched first to offset the use of grid provided energy to meet the site's **1.04** energy needs versus shedding load if sufficient stored energy was available. To complete this example, the actions performed at each of the nodes **2.20** in the home **2.18** will now be examined individually. It should be noted that control can exist at the individual node level as illustrated by this example or could exist at the aggregation node level or at any high level in the overall node cascade depending on the deployment architecture and node processor control programming and control parameters chosen by the implementer.

[0204] The first and second load control nodes **2.20**B, **2.20**C for the HVAC systems **2.22**B,**2.22**C monitor and control the operation of compressors and resistive heating elements to maintain the indoor temperature. It also has the ability to intercommunicate with the HVAC systems **2.22**B, **2.22**C directly and control the temperature settings as well as have direct control over multi speed compressors and emergency heat strip operations using the controlled device communications channel **2.12** if the thermostatic control unit of the home **2.18** has a communications interface. This communications channel **2.12** also permits it to report on the systems' **2.22**B, **2.22**C operational characteristics and contact the customer, outside service providers or the manufacturer if any segment of the HVAC systems **2.22**B, **2.22**C malfunction using the two way communications channels **2.06** either directly or through a cascade of nodes **2.20**. The load control nodes **2.20**B, **2.20**C for the HVAC systems **2.22**B, **2.22**C would utilize the metering modules **2.10** to monitor and report on the systems **2.22**B, **2.22**C rate of consumption of utility energy units but would not need the mains coupler **2.14** if it was managing the systems **2.22**B, **2.22**C operation through the controlled device communications channel **2.12**. Depending on the total demand for energy units of the home **2.18**, the node **2.20** may have the ability to manage the temperature within the home **2.18** based on customer's supplied parameters supplied through the control point configuration interface **2.16** to cause the HVAC systems **2.22**B, **2.22**C to reduce total demand and could based on a priority setting maintain separate control parameter for each HVAC system **2.22**B, **2.22**C depending on the time of day and occupancy status. To further enhance its operation efficiency, the load control node **2.20**B, **2.20**C associated with each HVAC system **2.22**B, **2.22**C may suppress the operation of secondary compressor operating stages and restrict the use of emergency resistive heat strips provided that the temperature recovery within the site **1.04** was progressing at a satisfactory rate. This capability permits the system **1.02** to operate at standard efficiency when the supply and associated cost of energy is low while greatly improving the operational efficiency of the system **2.22**B, **2.22**C when the supply and associated cost of energy is high. Using a plurality of optional parameters supplied by the customer, the energy provider and the gateway node **2.24**, the system **2.22**B, **2.22**C would be capable of determining which mode of operation it should be implementing and control the overall consumption of the HVAC system **2.22**B, **2.22**C to achieve the desired consumption goal. By varying the operational parameter for the control of the system, the load control node **2.20**B, **2.20**C may choose, but not be limited to, selecting a higher level on comfort over cost; vary the rate of temperature change differently based on cost and occupancy status; totally restrict the operation of secondary states of compressor operation or emergency heat strips based on energy supplier critical load level signals or total premise consumption cap level attainment; modify the temperature setting or suspend the systems' **2.22**B, **2.22**C operation for a specified period of time under energy supplier critical load situations or total premise consumption cap level attainment; alternately cycle multiple units in a site **1.04** to avoid multiple units operating simultaneously; perform pre-cooling or pre-heating prior to higher pricing or demand periods being in effect; perform smooth and gradual temperature change setting in periods of moderate increased demand or price and more radical temperature change

DC_PRIOR_ART_0000434

US 2004/0117330 A1

Jun. 17, 2004

14

setting in periods of rapid increased demand or price; over-ride all controls and operate as normal causing other nodes 2.20 to carry the full burden of any load reductions necessary; cease operation until the indoor environmental condition reaches a parameter set maximum critical level or any other action programmed into the node 2.20B, 2.20C. This and other combinations of load curtailment and control negotiated between the nodes 2.20 in the home 2.18 or aggregation control group are monitored and reported by the central control point or the gateway node 2.24 to alert nodes within the home 2.18 or aggregation group of the total load level, demand, cost of energy and delivery, congestion costs and other related control parameter triggers.

[0205] The third load control node 2.20D for the refrigerator/freezer 2.22D monitors consumption of the refrigerator/freezer 2.22D using the metering module 2.10 and also communicates directly with the processor controls of the refrigerator/freezer 2.22D using the controlled device communications channel 2.12 to determine the operational status of the refrigerator/freezer 2.22D and to provide over-ride controls for normal default functions like defrost cycles when they might be delayed to reduce overall demand. This communications channel 2.12 also permits the third load control node 2.20D to report on the refrigerator/freezer's 2.22D operational characteristics and contact outside service providers or the manufacturer if it malfunctions using the two way communications channels.

[0206] The fourth load control node 2.20E for the water heater 2.22E monitors and reports on consumption and demand for the water heater 2.22E using the metering module 2.10 and also has the ability to directly control when the water heater 2.22E is connected to the utility supply chain or not through the use of the mains coupler 2.14 which permits the fourth load control node 2.20E to connect or disconnect it from the utility supply. In more elaborate implementations the fourth load control node 2.20E may use the controlled device communications channel 2.12 and the metering module 2.10 to monitor the rate of water usage, the input water temperature and the stored water temperature available within the water heater 2.22E. These advanced features add intelligence to the process of water heating improving the operational efficiency of the water heating process and improving the energy demand pattern for the water heater 2.22E. If so equipped, the water heater 2.22E may be interconnected to a heat recovery system of the HVAC system 2.22B, 2.22C and if demand for heating water can be accomplished through the heat recovery system versus energizing the heating elements within the water heater directly, the nodes 2.20 of these devices 2.22 or a central control node for the home 2.18 would coordinate and execute that collaborative action thus reducing the total demand for the home 2.18

[0207] At this point it should be noted that water heaters can be recharged in multiple ways using either waste heat from a heat or fuel cell or other on site generation unit. More advanced water heating systems in the south would benefit from using solar panels in conjunction with other forms of regeneration to eliminate any load on the energy delivery system. It is important to note that in the case of solar panels and propane the supply chain is limited to the premise geography but would be effected by the weather in the case of solar and by the market price for propane. In the case of propane other factors like the quantity on hand and the lead time to schedule a refill by the provider balanced against the projected quantity of propone the site 1.04 will consume between the current time and predicted refill schedule time all must be factored into alternative fuel usage as part of the supply chain balancing logic.

[0208] The fifth load control node 2.20F for the well pump 2.22F has direct control over the operation of the well pump 2.22F and operates the well pump 2.22F based on parameters supplied to it through the control point configuration interface 2.16. The parameters may include the run time requirements and preferred times of operation, established by the customer as well as network node updates, which could include weather information relating to local precipitation. Sensor input could be present using the local communications channel (controlled device communications channel 2.12), which could provide precipitation input or ground moisture content. It is important to note at this point that the controlled device communications channel 2.12 may be used to not only communicate with other node processor 2.02 embedded into associated loads or generation, but also has the ability to interface with analog to digital processors or devices or any other form of communicating sensor or node to supply inputs to the node 2.20F. This channel 2.12 enhances the operational control logic for items like pumps that have no embedded process controllers or sensors. In a similar fashion however, this communications channel and communicating sensors can be used in conjunction with embedded process controllers to enhance their operation and performance to even greater levels where practical.

[0209] On site generation, while not prevalent today, is being promoted by State and Federal regulatory agencies, utilities, DOE and others concerned with maintaining a high level of reliability and integrity in the electric delivery systems. In particular, renewable generation resources are being promoted, as they have no environmental impact and do not consume any natural resources. Solar and wind generation are the most common of these power generation resources. Due to the relatively low capacity output of solar and wind generation systems, to be effective in offsetting peak demands for power, they must have an associated storage system into which they can stockpile power in relatively low input quantities and then retrieve it in bulk when necessary. The most common form of bulk power storage today are wet cell, deep cycle, active glass mat, lead acid batteries, which can be connected in parallel and series to create an electric storage facility of virtually any capacity and voltage. Great improvements have been made over the years in battery and inverter/charger technology. Companies like Hart, Signwave, Balmar and Trace are leaders in the battery charger/inverter market. By using embedded processors, sensors and solid state power converters, these companies have systems which can store DC power into battery storage systems at 12, 24, 36 and 48 volts and then retrieve it on demand and convert it to 120 v or 240$v$ AC power at 60 hz with utility quality and reliability. Companies like Trace already manufacture and market Inverter systems that manage photovoltaic arrays attached to battery storage systems that not only can be used to supply or supplement the needs of a residential home, but can safely sync and connect to the utility grid and sell power back to the utility at levels and for time periods specified by the owner.

[0210] While photovoltaic systems have come a long way in the past 15 years, they are limited in their energy

DC_PRIOR_ART_0000435

US 2004/0117330 A1

15

Jun. 17, 2004

management capability and need the addition of the invention to manage the storage and conversion process from DC to AC to make them part of a fully integrated energy management system. The load control node 2.20G with its ability to communicate with other nodes 2.20, sharing load and control data and managing demand within a site 1.04 or other group permits on site generation resources like the Trace power inverter to provide maximum benefit to the customer, the energy industry and the environment.

[0211] The seventh load control node 2.20H for the dishwasher 2.22H meters and monitors the dishwasher 2.22H and communicate with its embedded control processor through the controlled device communications channel however in most cases would not require the mains coupler 2.14. With the addition of the load control node 2.20H, the dishwasher 2.22H may be capable of performing its designated function at the best time and in the most efficient manner to meet the needs of the customer while interacting with all of the other nodes 2.20 in the home 2.18 to meet the contractual obligations of the energy demand cap under which it must operate. In this example, the node 2.20G may be a retrofit device attached to the embedded controller of the dishwasher 2.22H or may be fully integrated into the embedded processor thus reducing the overall cost of the combined systems by sharing processor and memory components.

[0212] The system, as described above, is designed to integrate all "utility" consuming and generating resources over a plurality of network media and designs to create dynamically defined and reconfigurable groups of any size and provide them with the ability to collaborate and intercommunicate to manage the demand on the delivery system and supply chain of "utility" providers and their products.

[0213] As discussed more fully below, alerts or message may be sent to the utility 1.06 and/or the customer (via email or the customer interface 1.14) and/or the service provider and/or a maintenance provider.

[0214] In one aspect of the present invention the control and/or load control node 1.10B, 1.10C receives information related to a characteristic of the commodity supplied by the utility 1.02, i.e., electricity, and controls operation of the controlled or controlled and metered device 1.08B, 1.08C. In one embodiment, the characteristic is related to the availability of electricity. In another embodiment, the characteristic is related to the cost or relative cost of electricity.

[0215] For example, using the exemplary home 2.18 discussed above, if the refrigerator 2.22D was scheduled or otherwise needed to initiate or perform a defrost cycle, the onboard refrigerator controls may query the associated load control node 2.20D to determine the cost or relative cost of electricity. The cost may be expressed as an actual value, i.e., dollars per unit electricity, or as an relative classification, e.g., high or low or peak vs. non-peak time periods. Based on the received cost or relative cost, the onboard controller of the refrigerator 2.22D may decide to either whether to perform the defrost cycle or to postpone the defrost cycle. In one embodiment, this decision may be based on a simple comparison between the actual cost and a predetermined value which may have been input by the customer. In other words, if the actual cost were above the predetermined value, then the scheduled action would be postponed.

[0216] In one embodiment of the present invention, each device 1.08 has an integrate node 1.10. By virtue of the node

1.10 being fed information directly from the supply chain, i.e., the utility, regarding the availability and/or cost of energy, the device 1.08 may make decisions based upon this information. For example, functions of the device 1.08 may be delayed and re-scheduled for another time. Or a different more energy efficient mode may be chosen.

[0217] In another aspect of the present invention, energy consumption for a device 1.08 may be trended or otherwise compared with predetermined threshold to detect and/or predict a failure or need for maintenance. For example, if the door of the refrigerator 2.22D was left open, energy consumption would increase. If energy consumption was increasing, the rate of increase could be compared with a predetermined value and an alert or message generated if the rate met or exceeded a predetermined value. Alternatively, the rate of consumption could be directly compared with a predetermined value to determine if an error or malfunction existed. In another example, if the filter of the pool pump 1.30B becomes clogged, the pool pump 1.30B will begin to work harder. This may also be seen through analysis of the energy consumption of the pool pump 1.30B.

[0218] In still another aspect of the present invention, a control node 1.10B or load control node 1.10C may be linked to one or more sensors (not shown) which sense parameters of the corresponding device 1.08B, 1.08C. The sensors may currently exist or be a part of the device 1.08B, 1.08C or be added to the device 1.08B, 1.08C. For example, the water heater 1.30C of the above example may have a water temperature sensor. Readings from the water temperature sensor may be received by the control node 1.10B or the load control node 1.10C and used in determined how to control the water heater 1.30C. For example, if the water heater's 1.30C control is instructing the water heater 1.30D to heat the water contained therein (based, at least in part, on the water temperature), the water heater 1.30C may first check with the associated load control node 1.10C to determine if it should proceed. The load control node 1.10C may approve or not approve based on a number of factors, including as indicated above, a characteristic of the electricity supply and/or cost or relative cost of electricity, as well as the energy requirements of other devices 1.08 within the home 2.18 (or devices 1.08 at other sites).

[0219] In another aspect of the present invention, a device 1.08 may be a storage system or an inverter system. For example, the device 1.08 could include one or more batteries (not shown) coupled to the power transmission network by a load control node 1.10C. When energy is relatively less costly or more available, e.g., during non-peak hours, the load control node 1.10C could control a mains coupler 2.14 to provide energy to the batteries. During peak periods, the load control node 1.10C may then control the mains coupler 2.14 to reverse and direct energy from the batteries to other devices 1.08.

[0220] In another aspect of the present invention, the system 1.02 allows the devices 1.08 working with their associated nodes 1.10 to make joint decisions based upon the information received from the supply chain. For example, if a curtailment PROGRAM affects a group of pool pumps within a certain geographic region, limiting each pump's run time to 15 minutes per every hour. Each pump and/or corresponding load control nodes 1.10C may determine which pumps will run during each 15 minute segment of each hour.

DC_PRIOR_ART_0000436

US 2004/0117330 A1                                                                                                           Jun. 17, 2004

16

[0221] In still another aspect of the present invention, the customer may set a limit for the total power demand for the home **2.18** during any given period, e.g., 5000 Watts. The gateway node **1.10**D receives the total current demand, i.e., power being used, on a real-time basis. Thus, if another device **1.08** in the home **2.18** wanted to perform a function, the device **1.08** (through the associated node **1.10**) may query the gateway node **1.10**D for permission. If the requested function would cause total demand to exceed this amount (or come within a predetermined threshold), the gateway node **1.10**D may not allow the device **1.08** to perform that function.

[0222] In a further aspect of the present invention, the customer or system **1.12** may set up a desired operating parameter for a particular device **1.08**. For example, the customer may indicate that he wants the pool pump **1.30**B to operate for a given period of time each day, e.g., eight hours. In one embodiment, the system **1.12** will schedule the operation of the pool pump **1.30**B based on the information received from the supply chain, e.g., the cost or availability of electricity.

[0223] 3. Advanced Thermostatic Control Device

[0224] As discussed, in one aspect of the present invention the thermostat **1.30**D is an advanced thermostatic control device linked to the power distribution network. The thermostat **1.30**D is also linked to the nodes **1.10** within the customer site **1.04** either directly or through the gateway node **1.10**D and receives information from and regarding the power distribution network and the devices **1.08**. As a result of the availability of information from up and down the supply chain, the thermostat **1.30**D may more efficiently manage and offer additional functionality to the user.

[0225] In one aspect of the present invention, the thermostat device **1.30**D receives information related to a characteristic of the energy being supplied and displays the characteristic on the display **3.04**. In one embodiment, the characteristic is related to the availability of the energy. For example, the characteristic could be either "peak" or "non-peak" hours. If the power distribution network was operating during peak hours, "PEAK" could be displayed on the display **3.04**. Or if the power distribution network was operating during non-peak hours, "NON-PEAK" could be displayed on the display **3.04**.

[0226] In another embodiment, the present invention, the characteristic may be related to the cost of the energy or electrical power being supplied. For example, the characteristic could be the actual cost of a specified unit of energy. The actual cost could be displayed on the display **3.04**. Alternatively, the characteristic could be a relative cost, i.e., is the actual cost near or about a baseline cost, or above or below the baseline cost.

[0227] With specific reference to **FIG. 3**A, in the illustrated embodiment, the cost or relative cost may be displayed to the user graphically. In other words, the cost could be displayed using a one or more symbols (shown as "$"). The number of symbols are related to the cost, i.e., the more symbols displayed the greater the actual or relative cost. For example, the thermostat **1.30**D may use a scale from 1 to X symbols. X could be any number, e.g., 4 or 10.

[0228] The user, in viewing this information, could make an informed decision on where to set the desired temperature (or setpoints) using the control panel **3.02**.

[0229] With particular reference to **FIG. 3**B, in another aspect of the present invention the thermostat **1.30**D forms part of a temperature and environmental sensing and control system **3.08**. In this aspect of the present invention, the thermostat **1.30**D is a node having a node processor **2.02**, memory **2.04** and two-way communications channel **2.06**. As shown, in the illustrated embodiment, the thermostat **1.30**D is coupled to the nodes **1.10** at the customer site **1.04** through the gateway node **1.10**D. The thermostat **1.30**D is also coupled to one more sensors **3.10** which are adapted to sense one or more parameters related to indoor or outdoor air quality. Based on the sensed data, the thermostat **1.30**D controls other devices **1.08** to manage air quality. The managed devices may include one or more HVAC systems, air cleaners or electro-static filters, fans, humidifiers, de-humidifiers, damper and fresh air input ducts, and ionization devices or at type of device **1.08** which may affect air quality.

[0230] In one embodiment the sensors **3.10** include an indoor air temperature sensor **3.10**A and a humidity sensor **3.10**B. In another embodiment, the thermostat **1.30**D may also include sensors **3.10**C for measuring and/or sensing one or more of the following: outside temperature, UV intensity, wind direction and speed, relative humidity, wet bulb thermometer, dew point. In still another embodiment, the thermostat **1.30**D may receive external information through the gateway node **1.10**D, such as information related to the local weather forecast.

[0231] In a first embodiment of the present invention, the temperature and environmental sensing and control system **3.08** will manage indoor air temperature. In a second embodiment, using the sensor data and/or external information, the temperature and environmental sensing and control system **3.08** will manage the air quality and humidity in the site **1.04** by controlling the operation of the appropriate heating, filtration, conditioning and cooling equipment in conjunction with damper and fresh air input ducts, electro-static filters and ionization devices to maximize comfort and indoor air quality.

[0232] In one aspect of the invention, the system **3.08** will manage the available environmental conditioning devices **1.08** to maintain the optimum temperature, humidity and air quality conditions based on user defined minimum and maximum values for comfort indices and price of energy indices.

[0233] In another aspect of the present invention, the system would be able to switch between energy types, e.g., electric versus gas for environment heating and would also have the ability to switch suppliers based on the asking price of the energy suppliers or brokers serving the location.

[0234] In still another aspect of the present invention, the system **3.08** would balance two primary factors. First, the system **3.08** would maintain the environment within user defined acceptable minimum and maximum values for one or more air quality parameters, for example, air temperature and/or humidity. Second, the system **3.08** also vary these acceptable parameters based on user defined preferences and/or price points and and/or historical data (see below) to achieve the optimum environmental conditions.

[0235] To provide feedback to the user, the system **3.08** may also record the number of energy units (energy units as

US 2004/0117330 A1

Jun. 17, 2004

17

used here include for examples: kilowatt hours, BTU's, Therms, and Jules but is not so limited) used as a function of time for each of the devices **1.08** monitored and/or controlled by the system **3.08**. Furthermore, the system **3.08** may report back detailed consumption data as a function of time and summarize these details to provide at a minimum, daily averages for any user defined period, monthly totals, as will as track the costs of each energy unit consumed per period and provide detailed and average daily cost for any user defined period as well as monthly totals.

[0236] In one aspect of the present invention, the system **3.08** may be capable of communicating with the devices **1.08** which have associated control or load control nodes **1.10**B, **1.10**C, beyond its primary management function of the environmental air management systems permitting each control node point within the site **1.04** or other sphere of control up to and including the entire utility supply chain, to use the same economic modeling techniques and controls that it uses to manage their primary functions.

[0237] The thermostat **1.30**D is the customer or user's primary interface with the system **3.08**. As discussed above, the thermostat **1.30**D will be capable of displaying to the user the current cost of energy as well as its relative cost as a graphical or numeric value (1-10) or ($$$$$$$$$) where 1 is low and 10 is high or $ is low and $$$$$$$ is high.

[0238] In another aspect of the present invention, the system **3.08** may also display on the display screen **3.04**, energy efficiency data. The energy efficiency data may used to indicate, based on control parameters set in the system **3.08**, how energy efficient the management protocol and control parameters capabilities are. This relative efficiency data may relate to the site's **1.04** performance on a standa-lone basis or may be tied to a comparison group against which relative efficiency can be determined or both. This data indicating the relative and actual cost of energy and effiency can also be communicated to other remote devices **1.08** like TV screens, or other display devices (at the site **1.04** or remote) which are capable of communicating and displaying information. These devices **1.08** may includes but are not limited to appliances with displays or indicator lights to reflect the cost of energy or any other means available at points of consumption or stand along means to inform the customer of the relative and actual cost of energy and their relative energy efficiency level. The system **3.08** may also manage, report and track its energy unit usage and interface with energy unit suppliers via a communications channel. In one embodiment, the system **3.08** controls will be located at the site **1.04**, while the processors for modeling and man-aging the sources and types of energy units to be utilized and committed to can be local or distributed and operate over a communications network without regard to the actual loca-tion of or distance from the site **1.04**.

[0239] In one aspect of the invention, the user may set a temperature setpoint, i.e., a desired temperature and the system **3.08** based on the temperature setpoint, sensed data, as well as the user's historical use of the system **3.08** may determine an effective setpoint. The system **3.08** may then control the devices **1.08** as a function of the effective setpoint.

[0240] The temperature setpoint may have an associated "deadband". For example, a temperature setpoint of 72 degrees may have a deadband of +/−5 degrees. In this

example, the system **3.08** would not initiate cooling until the actual temperature reached 77 degrees or would not initiate heating until the actual temperature reached 67 degrees.

[0241] In another aspect of the present invention, the variable dead band of operation of the system **3.08** may be directly tied to the cost of energy and the customer's willingness to pay. For example, a fixed set point to a cost of energy may be set and an optimal ramp rate based on a time and temperature differential to achieve savings. Alter-natively a user defined ramping rate such as 1 degree per 30 minutes to modify the temperature set point of the site **1.04** to reduce the operation of the heating or cooling system during periods of high energy prices may be defined.

[0242] In one aspect of the invention, the system **3.08** manages comfort for the customer site **1.04** by learning from the user's inputs or adjustments to the system **3.08** to change or modify indoor air temperature. This learning process alters the operation of the system **3.08**, freeing the customer from having to make changes to manage the indoor envi-ronmental condition. To accomplish this, the system **3.08** must actively monitor and control not only the temperature setting in the home **2.18** but may also monitor and actively control the humidity levels.

[0243] In one embodiment, the system **3.08** determines the effective temperature to accommodate changes in the indoor humidity settings. For example, if the customer initially sets the thermostat at 72 degrees F., the system **3.08** senses the indoor humidity level and maintains a relationship between the temperature and humidity level sensed. As the humidity level of the home **2.18** rises in summer, the set point would remain at 72 degree F., however, the effective setpoint that the system **3.08** must maintain is automatically lowered to maintain a consistent level of comfort. As a default param-eter, the system **2.18** may have to lower the effective set point from that established by the customer by 3 degrees F. for every 10% of relative humidity that is sensed to retain the comfort level in the site **1.04**. On the opposite side of the control algorithm, as a default parameter, the effective set point would be raised by 3 degrees F. for every 10% reduction in sensed humidity within the home **2.18** to maintain the desired comfort level in winter. The ratio of 3 degrees F. + or − is a default setting and would be modified as needed based on the user's changes to the set point at the thermostat **1.30**D. Changes to the effective set point as it relates to the sensed humidity therefore may be increased of decreased from the default ratios permitting the control algorithm to learn the user's individual preferences and over time, eliminate the need for the site **1.04** occupant to make any changes.

[0244] In another aspect of the present invention, the system **3.08** allows one or more occupancy modes to be defined and/or modified and/or utilized by the user. The use of different occupancy modes would assist in achieving a reduced level of demand on the energy delivery system as well as reduce the total cost of operation site **1.04**. In one embodiment, the occupancy modes may be defined or modi-fied through the user interface **1.14** (see below) and activated through the thermostat **1.30**D and/or the user interface **1.14**. Examples of possible occupancy modes include: home, away, weekend, weekday, holiday. Specific modes may also be defined for different users.

[0245] The system's **3.08** performance and energy reduc-tion capabilities are further enhanced during all periods by

DC_PRIOR_ART_0000438

US 2004/0117330 A1

Jun. 17, 2004

18

applying the most energy effective set point or its related off set if the occupancy mode is "vacant" and applying the comfort management off set if the occupancy mode is "home". This occupancy sensitive control is further enhanced by the addition of occupancy sensing devices that communicate with the system **3**.**08**.

[0246]    In still another aspect of the present invention, the system **3**.**08** may determine the time necessary to recover from a one occupancy mode to another mode. In another words, this recovery time at which a transition or recovery process is to be initiated if the system **3**.**08** is set to a "recover by" time versus the default of "start recovery at" time.

[0247]    The system **3**.**08** may be enhanced by having access to energy pricing data. Energy price information is used by the system **3**.**08** to predict the total cost of operation at the site **1**.**04** for maintaining the environmental comfort. Forward projection of pricing enables the system **3**.**08** to determine the optimal humidity and temperature settings that can be achieved for the site **1**.**04** and perform humidity level increases in the case of heating or humidity level decreases in the case of cooling so that the effective set point can be either lowered in the case of heating or raised in the case of cooling, permitting the heating or cooling system to run less during periods of higher prices. This ability to precondition the site in anticipation of increased pricing on average will reduce the total energy bill for the site **1**.**04**.

[0248]    Energy pricing information may be entered by the customer, be pre-established as part of an energy supplier program or be set to a default value designed to create a balance of comfort and savings.

[0249]    With reference to FIGS. **3**C-**3**G, one implementation of the above described system **3**.**08** will now be explained. The graph of **FIG. 3**C, depicts how, as energy prices rise, the ability of the system **3**.**08** to manage the indoor air temperature may be managed. In the graph of **FIG. 3**C, three scenarios are presented, however the present invention is not limited in the number or type of scenarios that might be offered or exist with any given implementation. In the illustrated embodiment, the three scenarios are maximum savings, balanced savings and comfort, and maximum comfort. For each user selected scenario, the system **3**.**08** has a predetermined default offset (which defines the deadband). Additionally, the offset may vary as a function of a characteristic of the supplied energy, e.g., availability and/or price. In the illustrated embodiment, different offsets are defined for energy supply classifications of low, medium, high, and critical.

[0250]    Because some energy suppliers offer what is known as time-of-day pricing in their tariffs, the illustrated price points could be tied directly to the tariff structure for the energy supplier. If real time pricing is offered by the energy supplier serving the site **1**.**04**, this same temperature allowed variance could be utilized to generate savings and reduce supply chain demand. Another load management program offered by energy supplier utilizes price tiers which the utility manages dynamically to reflect the total cost of energy delivery to its customers. These tiers provide the customer a relative indicator of the price of energy and are usually defined as being LOW, MEDIUM, HIGH and CRITICAL. These 4 tiers are superimposed in the graph of

**FIG. 3**C to illustrate how the tiers would be used by a energy supplier to signal the customer and the system about the relative cost of energy.

[0251]    This feature is applicable to the systems **3**.**08** described above when either a fixed set point is used or can further improve the ability of the system that utilizes the programmable set point feature to expand the operating efficiency of the heating and/or cooling systems while reducing the total demand on the energy delivery system. By combining the price data with preconditioning of the site temperature and humidity levels and further applying the occupancy mode of the site, additional savings as described above can be achieved. As a direct result, if deployed in sufficient quantities in a geographic area, price volatility in energy prices can be reduced.

[0252]    In one aspect, the system **3**.**08** manages comfort by balancing humidity and temperature based on its learned preference setting using customer inputs or using system defaults. This ability to manage temperatures is enhanced by including a economic management system built into the system **3**.**08** which will direct the operation of the devices **1**.**08** system to achieve customer desired economic goals. This example of how the system can manage costs and comfort should not be construed as limiting or constraining the ability of the system **3**.**08** to deliver additional benefits of comfort or cost management.

[0253]    To begin the process the system **3**.**08** tracks and learns about the thermal gain characteristics of the home **2**.**18**. To do this, the system **3**.**08** tracks the thermal gain rate of the home **2**.**18** for each set point selected over time by the customer. With reference to **FIG. 3D, a** thermal gain table for two set points is illustrated. **FIG. 3**d shows two set points for the home **2**.**18** that the thermostat **1**.**30**D has recorded. The first set point for which data is available is 72 degrees F. The three trends illustrated as lines **3**.**12**A, **3**.**12**B, and **3**.**12**C plot the thermal rate of gain in the site **1**.**04** for different outside temperatures. On the day represented by line **3**.**12**A the outside temperature was 99 degrees F. On the day represented by line **3**.**12**B, the outside temperature was 90 degrees F. On the day represented by line **3**.**12**C, the outside temperature was 77 degrees F. The next set point for which data is illustrated is the set point of 76 degrees F. The three trends shown as lines **3**.**14**A, **3**.**14**B, and **3**.**14**C illustrate the thermal rate of gain in the home **2**.**18** for the same outside temperatures plotted in the **3**.**12**A, **3**.**12**B, **3**.**12**C data points. This illustration is used to show the impact the set point versus outside temperature differential has over the thermal gain rate in the home **2**.**18**. While these graphs are drawn to illustrate the rate of thermal gain, they do not depict the rapid initial gain when the differential is large and the slower rate of thermal gain, which occurs as the indoor temperature reaches the outside temperature. This rate if thermal gain change is illustrated in **FIG. 3D** as plot line **3**.**16** which shows the thermal gain for a set point of 74 degree F. and an outside temperature of 90 degrees F.

[0254]    The second step is to learn the operational run characteristics of the HVAC system as a function of the thermal gain. Since the outside temperature varies continuously during a typical day, the rate of thermal gain and the HVAC run times also vary in accordance with these changes. **FIG. 1E** illustrates a typical day showing plot lines for the thermal gain rate and the associated HVAC run time. It

DC_PRIOR_ART_0000439

19

should be noted here that the set point of the system **3**.**08** was set at a fixed point for the entire day and the use of humidity sensing and control of humidity levels were not introduced into the illustration so that the graphical plots depict a normal home with a normal HVAC control thermostat. Here again, the illustration depicts that as the outside temperature rises and the differential between the indoor set point and the outside temperature increase, the thermal gain causes the HVAC system to cycle more frequently. At some point, in extremely hot weather or more importantly in periods of high humidity, with the set point at a low setting, the thermal gain would exceed the HVAC units' ability to recover the indoor air temperature to the set point. When this occurs, the HVAC run time plot would plateau at 100% of operation and the indoor air temperature would rise above the set point, until the outside temperature dropped to a level where the thermal gain did not exceed the HVAC units ability to recover the indoor temperature setting or the indoor humidity level dropped to the point where the occupant began to feel cold and adjusted the set point higher, permitting the unit to resume a more normal cyclical pattern.

[0255]   The third step is for the user to pick from a plurality of economic options offered by the system **3**.**08**. These options range from 100% comfort management without any regard for cost to 100% economic management without any regard to comfort. This choice at a high level, for example, would be but is not limited to a selection scheme from 1 to 10 which the user would select from, where 1 is pure comfort management and 10 is pure economic management. While this example would in its simplest from provide a selection of 10 options, the underlying control options used by the system **3**.**08** could be modified and expanded to provide an infinite number of options. To illustrate how the options in this example would drive the control logic we will now review the control parameters effected and illustrate the resulting controls. The primary control parameter would be tied to the number of degrees from the set point that the customer would make available to the system **3**.**08** to achieve economic benefits. This parameter would start with the set point established by the CUSTOMER (for this example 72 degrees F.) and at the maximum comfort setting would not move off of this set point (see **FIG. 3F**). In the maximum savings setting, the set point offset would be 4 degrees F. which would permit the system in this example to vary the temperature in the home form the normal set point of 72 F by the 4 degree offset making the acceptable temperature range 72 F to 76 F within which the system **3**.**08** would manage the environment. The next parameter that would be used to achieve economic goals would be the ramping rate at which the system **3**.**08** would permit the temperature to rise within the site **1**.**04** as it moved from one set point to a higher or lower one to achieve economic benefit. Here again, for the maximum comfort setting, since the allowable offset is zero, the ramping rate has no effect. In this case however, another parameter that regulates the offset from the set point used by the system **3**.**08** to trigger recovery back to the set point (the dead band of operation) would be an alternative control parameter. In this case, if the normal dead band was 2 degrees F., for the maximum comfort range this might be lowered to 1 degree. In the maximum savings setting where the allowable temperature range has a 4 degree variable, the ramping rate would be capable of being controlled through a combination of varying the dead band range and the thermal gain rate in the site

**1**.**04**. For the maximum savings setting, the dead band in this example would be raised to 3 degrees F. and the rate of thermal gain per hour would be set at 3 degrees F. per hour. The results of this example are illustrated in **FIG. 3F**. The examples here are only used to illustrate how the system **3**.**08** using the inputs from the customer would vary the operation of individual parameters as described to either maintain an optimum comfort or optimum savings control algorithm and are not meant to limit the number of control parameters that the system **3**.**08** might use of the way in which these different levels of comfort or savings are achieved. Additional parameters and controls could also be in more elaborate implementations of the system. The following paragraphs disclose these additional control parameters and control modes but should not be construed as limiting the system's capabilities to these examples.

[0256]   In another aspect of the present invention, the system **3**.**08** uses the learned thermal gain characteristics of the site **1**.**04** along with the customer selected allowable temperature variation range to maintain a flat level of demand and consumption. Under this control program, the system **3**.**08** uses the thermal gain rate of the home **2**.**18** and its associated HVAC system run time to produce a base line of consumption. Using this base line the system **3**.**08** can be instructed to manage the demand and consumption rate at either a flat level or at some reduced level by varying the indoor air temperature within the allowable range. The following illustrates how this control program works, but should not be construed to limit the capabilities of the system **3**.**08** to perform these functions using different control logic or additional sensing devices to improve the process. For this example, the set point of the thermostat is 72 degrees F. and the allowed variation selected by the customer is 4 degrees F. making the acceptable range for indoor temperature from 72 degrees F. to 76 degrees F. Since the time, when the base line is set can be triggered by a plurality of conditions, such as a user or program defined time of day, percentage level of operating run time, energy consumption rate for a give period of time or any other measurable on sensed event, for this example it is assumed that the customer has set the base line trigger to be set when the HVAC units run time reaches 33%. In the early morning when it is cool, the system **3**.**08** in this example will be operating at a cycle rate of 10%. As the outside temperature rises, the thermal gain on the home **2**.**18** is monitored along with the HVAC cycle rate on a continuous basis. The rise in the outside temperature causes the HVAC cycle time to increase as illustrated in **FIG. 3E**. As the system **3**.**08** reaches the trigger level of 33% cycle run time, the base line is established and the system **3**.**08** using its computed thermal gain rate and the corresponding HVAC cycle run time projections, computes the required effective set point offset needed to keep the HVAC cycle run time at the specified trigger level of 33%. By adjusting the effective set point upward, the system **3**.**08** is able to maintain the HVAC run time at the predetermined trigger level up to the point that the thermal gain rise rate exhausts the allowed temperature variant allowed for the site **1**.**04**. At this point, the system will have the option, based on control parameters set in the system by the customer or user or any other controlling entity, to exceed the cycle run time trigger level or exceed the allowed temperature depending on whether comfort or economic requirements are the primary drivers for the site **1**.**04**, the energy supply chain or a combination of both.

DC_PRIOR_ART_0000440

20

**FIG. 3G** illustrates this scenario, assuming that the thermal gain of the site **1**.04 does not exhaust the allowed temperature variant for the site **1**.04.

[0257] It should be noted that the setting of this trigger point and the control of the system **3**.08 may be for this example, or for any example, or for the entire system, under the control of a party other than the customer and therefore is not be limited in its scope as a residential or commercial control system. In a large-scale deployment, the system **3**.08 can be under the control of an energy supplier and can be used to manage a plurality of environmental control devices attached to the energy supply chain. It should also be noted that the control of the system **3**.08 may be shared by a plurality of sources each having a defined level of authority and control over an individual control point or group of points as needed to manage, monitor and balance the demand of the delivery supply chain.

[0258] As discussed above, another feature of the system **3**.08 is its ability to receive the cost of energy from the energy supply chain. Price signals could take the form of tiers or actual prices. In either case, the customer would be capable of specifying to the system **3**.08 their willingness to pay for comfort or their desire to save by inputting into the system **3**.08 a plurality of offsets from the set point that the system **3**.08 could use to manage the environmental air comfort range. In **FIG. 3C** several scenarios are illustrated. In the first scenario, the customer can specify using levels of comfort or savings their willingness to provide additional temperature variants based on the cost of energy from the supply chain. Three lines are depicted, one be for maximum comfort, one for balance comfort and savings and the third for maximum savings. In the maximum comfort setting the customer is indicating that they will not give up anything based on the price of energy and therefore will not generate any savings. In the balanced comfort and savings setting, the customer is willing to give up 4 degrees of comfort to achieve savings. In the maximum savings setting the customer is indicating that they will give up 8 degrees of comfort to achieve savings over comfort. These setting are specified as being set by the customer, however they may be controlled by other means such as the energy supplier or other outside management entities. An example of this might be a utility or other energy services company that offers a customer a flat rate per month for energy but under that agreement the customer would relinquish control of their heating and cooling system to the provide.

[0259] Under this example the entity managing the system **3**.08 would provide pricing commensurate with their ability to control the home and the premise occupant or customer would pay less for their energy as that level of control by the supplier increased. In this example as in all other examples it should be noted that these features of the system **3**.08 are not separate and can be used in a plurality of combinations to create control systems capable of delivering benefits to all parties associated with the generation, delivery and consumption of energy. In our example above, where the customer wanted to achieve maximum savings to was willing to give up 8 degrees of comfort to achieve that goal, if the site **1**.04 as equipped to manage humidity levels, and the humidity level could be managed so as to reduce it by 20%, the actual temperature variant available to the system **3**.08 to

achieve the customers goals would increase from 8 degrees to 14 degrees giving the system **3**.08 a lot of latitude to manage within.

[0260] Another feature of the system **3**.08 that improves both comfort and energy efficiency is its ability to determine the optimal fan extended run time that can be applied to forced air HVAC systems to gain additional cooling and heating benefit from residual cooling and heating absorbed into the duct system during the thermal recovery process. Traditionally, heating and cooling systems upon reaching the desired set point shut down the heating or cooling generation unit and enter a state of non-operation. In the case of heating, a sensor in the plenum unit will force the fan to continue to operate, for safety reasons, until the plenum temperature drops to a safe level. At this point the fan and system cease to operate. When in cooling mode, the entire system **3**.08, including the fan, typically cease operation as soon as the set point is achieved. In both of these cases, there is residual thermal benefit stored in the ductwork that is lost to the site **1**.04. The system **3**.08, using sensors, will continue to operate the fan to extract this residual thermal benefit from the duct system and transfer it into the conditioned space of the site **1**.04. In the case of heating, the fan will continue to operate until the duct temperature lowers to the point of being equal to that of the sensed temperature of the conditioned space. In the case of cooling, the fan will continue to operate until the duct temperature rises to the point of being equal to or some offset greater than that of the sensed temperature of the conditioned space.

[0261] In a more elaborate implementation of the system **3**.08, the environmental control system would utilize additional sensors, controls and in some cases ancillary humidity control devices to maximize savings for the customer and reduce the impacts on the environment. This is accomplished by making the system **3**.08 overall more energy efficient, thus permitting power generators to reduce the operation of their power generation facilities, resulting in a reduction in air pollution and the consumption of our limited natural resources. Energy efficiency improvements through a combination of balancing thermal gain and sensed humidity can be performed in a plurality of ways. For illustration purposes, several will be discussed here but should not be considered as limiting the ways that improvements in energy consumption rates and comfort can be achieved.

[0262] The two primary factors effecting comfort in conditioned air space are temperature and humidity. As stated earlier, humidity plays a large factor in comfort and by controlling humidity levels, temperatures can be raised and traditional HVAC systems will run less thus saving energy. Traditional HVAC systems, by their design, remove humidity in the air as a function of moving air through a cooling coil. This humidity remove creates a more comfortable environment but typically, the removal of the humidity is purely a byproduct of the cooling process and is not controlled. The system **3**.08 may offer the ability to modify existing HVAC systems to make them humidity control systems by the addition of humidity sensing communicating nodes. These nodes sense humidity levels in the conditioned space and provide the input to the system **3**.08 so that it can manage not only the temperature but the humidity levels in the site **1**.04. Sensors alone however cannot perform the humidity control process. In addition, the system **3**.08 supports a plurality of communicating control switching, moni-

DC_PRIOR_ART_0000441

toring and metering sensors to complete the process. The following example of humidity control, that can be incorporated into new HVAC systems or as a modification to existing HVAC systems, is designed to illustrate how the system 3.08 can significantly improve on the operating efficiency and the associated cost of operation of HVAC units. Through improved operating efficiency the systems will reduce the total energy they consume, improving the economy, reducing emissions and preserving natural energy resources.

[0263] A traditional HVAC forced air system consists of a heating unit, a cooling unit, a fan and air filtration system. Air is drawn from the conditioned space through a return air duct system and is filtered and them passes through the fan chamber where it is then directed through a heating chamber followed by a cooling chamber. In the case of a heat pump, the heating and cooling are performed by the same chamber using a common coil, and may be supplemented by a resistive heating strip chamber in climates where heat pump operation may be marginal during periods of extreme cold weather. Air them is passed into the supply duct system where it is transported back to the conditioned space through a series of ducts and registers. In a cooling scenario, the heating chamber is inoperative and only the cooling process is active. As air passes through the cooling coil, the cooling coil reducing the ambient air temperature by absorbing heat. At the same time, moisture in the air condenses on the cooling coil and flows down the coil as a result of gravitational forces and is collected into a drip pan at the bottom of the chamber from there the moisture is piped to a suitable point of disposal. By default, as mentioned earlier, this process removes humidity from the air. Another important point is that traditional HVAC units have a multi speed fan. This fan is designed to operate a several speeds depending on its design and operates at a low speed setting when the heating process is active and at a high speed when the cooling process is active. It does this because heated air is lighter and moves easily through the duct system requiring less force to move sufficient air into the conditioned space to recover the temperature to the designated set point. Cooled air because it is denser requires greater force to move it through the duct system and therefore requires a higher fan speed to move an equivalent amount of air through the system 3.08. As a result, traditional HVAC systems have multi speed fans built in but are solely used to compensate for the air density. The system 3.08 takes advantage of this capability to utilize the lower speed fan settings to reduce the humidity levels in the home. It accomplishes this task by using a two-way communicating control node capable of modifying the fan speed settings to operate it in its normal high setting when recovery of the ambient air temperature is required and in the low speed setting to reduce the humidity levels in the home. To dehumidify the home 2.18, the system 3.08 would operate the air conditioning compressor to cause the cooling coil to drop in temperature and would operate the fan at a low speed causing more humidity to be removed from the air as it passes through the cooling coil at a slower rate allowing more moisture to be removed. The cooled air would follow its normal path through the supply duct system and would pass the dryer and colder air into the conditioned space. Through a learning process, the system 3.08 would be able to determine and record in its memory, the rate of dehumidification its associated HVAC unit is capable of delivering. HVAC units equipped with multi speed com-

pressors would operate more efficiently in this scenario than standard single speed compressor units. For dehumidification in a home with a multi speed compressor, the low speed compressor setting would be used to reduce the amount of energy the system 3.08 uses. To complete the dehumidification control process, one of two additional two way communicating sensors or a combination of both would be needed. Because the cooling coil as it removes humidity from the air might become over loaded with condensation and begin to freeze up, sensors to detect either airflow or the presence of icing of the compressor coil would be needed. The system 3.08 is capable of utilizing inputs from these sensors to either increase the fan speed to cause the coil to defrost or cycle the compressor while operating the fan in either a low or high speed to force warm air through it thus defrosting the coil. In heating season, as the outside temperature drops so do the humidity levels, resulting in low relative humidity levels. Just as humidity removal in summer makes the air feel colder, removal of humidity in winter has the same effect. The major difference is that in winter, the resulting cold feeling creates an indoor air comfort level that is undesirable and customers raise the temperature as the humidity levels drop to maintain a more comfortable environment. This condition dries out wood doors and floors as well as human sinuses resulting in shrinking of wood products and bloody noses. By increasing the humidity levels in the site 1.04, the temperature can be maintained at a lower level while retaining the same relative level of comfort. In addition, by increase the humidity level, wood products will not tend to shrink as much and sinus conditions will not plague the customer. To accomplish humidity control during the heating season, the addition of a humidifier in the supply air duct system 3.08, boosts the humidity levels of the conditioned air space allowing a lower temperature setting to be maintained thus reducing the amount of energy required to maintain a satisfactory comfort level. The system 3.08 is capable of managing the humidity levels using the humidity-sensing node described earlier in the cooling section but does not require the additional freeze and defrost sensors. Unfortunately, traditional humidification systems are designed to only work when the heating process is active. This is because they depend on the heated air exiting the heating chamber to pass through a series of mesh grids or membrane that is soaked with water. As the heater air passes through these grids or membranes, they pickup moisture through the process of evaporation and transport it through the supply duct system into the conditioned air space. To improve on this process, the system 3.08 incorporates a modified duct humidification process which heats this grid or membrane to permit unheated air passing through it to transport moisture into the conditioned space, not requiring the main heating process to be active to accomplish its task. In addition, the system 3.08 is capable of controlling remote, distributed humidification units throughout the site 1.04, like the units available for sale today in a number of retail stores, which are specially equipped with a two way communications node controller integrated into them. A less elaborate adaptation of this fully integrated solution that the system 3.08 supports, is a wall plug adapter with an integrated two way communicating control node, relay contactor and optional humidity sensor. This unit can be used to adapt traditional humidification units or vaporizers and make them an integral part of the humidity control system. An additional sensor device is used

US 2004/0117330 A1

Jun. 17, 2004

to measure moisture content on surfaces, which are exposed directly to the outside like glass windows. As the humidity level rises in the site **1.04**, excess moisture may gather on these cold surfaces resulting in condensation accumulation. To manage this condition, optional communicating sensors to detect moisture accumulation are included with the system **3.08**.

[0264] Another method of controlling humidity levels in the site **1.04** during the cooling season which the system **3.08** supports is the modification of the cooling chamber coil to incorporate heat pipe technology to increase the units dehumidification capabilities on average by 2 times. Communicating sensors as described above would still be needed if low speed fan operation was used, however with heat pipe cooling coil retrofit devices, often times humidity levels can be maintained without the need to perform additional dehumidification. The amount of humidity reduction and the ability of the system **3.08** to perform the process efficiently all must be balanced to achieve savings and comfort. Cooling coil heat pipe retrofit devices are available from numerous companies throughout the world like Heat Pipe Technology Inc. of Gainesville, Fla. Companies like Heat Pipe Technology also make stand alone retrofit dehumidification units that can tied directly into the existing residential HVAC system, permitting the dehumidification process to use the existing duct work in the home to distributed dehumidified air without the need to operate the existing air conditioning compressor. This process is much more energy efficient as the compressor used in the retrofit add-on dehumidification unit uses considerably less energy than the whole house compressor but does require a capital investment on the from front end which might make it less appealing to some customers. The system **3.08** also supports other forms of dehumidification like desiccant systems and other forms of humidity absorption technology.

[0265] Dehumidification control in more elaborate implementations of the system **3.08** can be used to precondition the site **1.04** in anticipation of events that would call for or require demand reductions on the energy supply chain. An example would be a simply energy supplier program where time of day rates are used to encourage the reduction of system demand during peak periods. In anticipation of such events, the system **3.08** is capable of preconditioning the home to reduce the humidity levels in summer or increase them in winter thus permitting comfort levels to be maintained while raising the ambient air temperature to reduce demand and total consumption. This preconditioning process while described here and supported by the system **3.08** as a "on demand" or "on request" type of program, could be used as the system default, resulting in a permanent reduction of demand on the system **3.08** and a total reduction in energy usage. The capital investment to manage humidity levels in the site **1.04**, represent about 20% of the annual energy bill but can be easily recovered by managing humidity, which in topical climate conditions would result in an annual energy usage decrease of up to 14%. On the reverse side of this scenario, is the heating load reduction, which would impact a number of different energy supply chains and natural resources. Here again, the equipment to humidify the site **1.04** to increase humidity levels during heating seasons would be capable of being recovered within 18 to 24 months assuming that they were managed by the system **3.08** to achieve lower heating set points as a function of relative humidity levels.

[0266] Additional two-way communicating sensors will also improve the operational capabilities of the system **3.08** by providing additional input data. Occupancy sensors as an example would provide the system **3.08** with knowledge of if there are people present in the site **1.04**. The system **3.08** is capable of receiving authorization from any authorized entity to perform items like ramping, set point modifications or dehumidification differently depending on the presence or absence of the occupant. If unoccupied, the system **3.08** can be directed to take more savings related actions and defer comfort control options. This ability increases its ability to deliver savings and reduce demand on the supply chain without affecting the occupants' level of comfort.

[0267] Additional two-way communicating sensors are supported by the system **3.08** to support indoor air quality as well. Examples of such sensors are $CO_2$, NOX, Radon, Gas, Formaldehyde and CO detectors. These sensors would supply input to the system **3.08** and if so equipped, would trigger the operation of air exchange systems to lower levels of such gases in the site **1.04** or trigger and alarm condition. Other communicating sensors to detect smoke or fire are also supported and permit the system **3.08** to perform emergency shut down of the air handler and other equipment should such a condition be detected. With such safety and security features, the system **3.08**, as a direct result of its communications capabilities, has the ability to interface with and report alarm conditions to a plurality of end points. Examples of such points include but are not limited to cell phones, pagers, monitoring centers, local and remote alarm horns, bells and lights as well as digital display devices like PC's, in premise kiosks, TV screens and personal radios with digital display screen capabilities like XM Radio and Sirius Radio. The system **3.08** also supports traditional air filtration filter monitoring as well as more sophisticated electro static filtration systems and UVG bacteria and virus air cleansing systems. In all cases the system **3.08** uses its two-way communicating senor node technology to control and monitor the performance of these units.

[0268] In one aspect of the invention data various data elements are stored within the system **1.02**. In one embodiment, the data may be stored in gateway node **1.10**D. However, each node **1.10** in the system **1.02** includes a node processor **2.02** and memory **2.04**. Therefore, any node **1.10** in the system may assume the processing and/or the control of one or more devices and/or the storage of system data **1.02** in the event the gateway node **1.10**D becomes disabled. In one embodiment, the following data may be maintained or stored by the system **1.02**.

[0269] 1. The current supplier of energy units, the current price per energy unit including delivery.

[0270] 2. The current operating cost per hour based on the rate and cost of energy units being used.

[0271] 3. The total energy units used and their cost for today, this week, and this billing period and the past 14 billing periods by supplier and energy type if multiple types are available.

[0272] 4. The total energy units used by type and their associated cost for the day, week and billing period for the past 14 billing periods.

[0273] 5. The balance of available credit per energy unit supplier and an estimate of the available hours and days of

23

energy unit purchases that represents if a debit system **3**.08 for prepaid energy is being used.

[0274]  6. A computed average cost per energy unit by supplier and a percentage of the total energy unit requirement being purchased from that supplier including delivery costs.

[0275]  7. A breakdown of energy units consumed and their cost and supplier by individual appliances if multiple appliance control and metering is activated.

[0276]  8. A projected total billing period cost for each energy type and source.

[0277]  9. An aggregated total by type and source of energy unit.

[0278]  10. A history of temperature set points for the day.

[0279]  11. An average of temperature set points for the week and billing period

[0280]  12. Historical totals of energy units usage and cost for this month, last 14 months and year to date.

[0281]  13. The current temperature set point both user set and fixed.

[0282]  14. The current dead-band high and low degree spread both user set and fixed.

[0283]  15. The average temperature maintained for the day, week and billing period.

[0284]  16. The average thermal degree gain or loss per unit of time for the site **1**.04 for a rolling 30, 60 and 90 day period by hour of the day.

[0285]  17. The average thermal recovery time per degree when heating and cooling systems are operational for a rolling 30, 60, and 90 day period by hour of the day.

[0286]  18. The projected annual cost of operation for each of the appliances being monitored.

[0287]  19. The operational efficiency factor of each appliance being monitored based on historical consumption patterns and current operating statistics.

[0288]  20. The current and historical settings for minimum and maximum dead-band temperature and cost settings.

[0289]  21. Warning indicators of operational irregularities in monitored appliance consumption patterns.

[0290]  22. Warning indicators for low balances in debit accounts if prepaid energy unit accounts are present.

[0291]  23. Average daily cost of operation of whole site **1**.04 and individual appliances on a 30, 60 and 90 day rolling average and same period last year.

[0292]  24. Data, text and billing messages from energy unit suppliers and information sources.

[0293]  25. Weather information and history data including at a minimum outside temperature lows and highs, humidity, chance of precipitation wind speed and direction, solar exposure time and angle and UV indexes by day, by week, by billing period.

[0294]  26. Total heating and cooling degree days and other statistical data needed to normalize consumption and usage data.

[0295]  27. Computed thermal recovery time for heating and cooling adjusted to compensate for the external temperature, wind speed, direction, UV index, humidity and cooling or heating degree day factors. This computed factor is used to more accurately compute the recovery time for thermal gain or loss when combined with the average normalized thermal gain or loss for the site **1**.04. This factor may also be computed centrally and transmitted, frequently enough to permit adequate factoring of recovery times to maximize efficiency and reduce operating costs. Transmitting centrally computer factors will eliminate the need for external sensors at each location thus lowering the cost of installation and ongoing maintenance.

[0296]  28. A Table of available energy suppliers and user defined preference indicators by supplier and type of energy units provided to be used in choosing the supplier of choice if price points and terms of sale are equal during a given time period.

[0297]  29. A table used to compute supplier parity when option 28 above is not entered which contains at a minimum, the available suppliers, the type of energy units available and the number and cost of energy units purchase this billing period.

[0298]  30. An optional user supplied preferred energy unit type indicator.

[0299]  31. User selected temperature ramping option indicator with default 1 degree per hour ramping and optional user defined ramping time frames and degree settings.

[0300]  32. Low and high temperature alarm settings to protect against heating and cooling system failures. This alarm trigger point is user defined, and if not entered, defaults to + or –5 degrees above and below the maximum dead-band comfort range entered by the user. This feature is defeated if the system **3**.08 is placed in the off position, but will be overridden if the user elects to activate the temperature alarm mode capability of the system **3**.08.

[0301]  33. Alarm activation indicator which is user selected to permit the automatic alarming and notification of a monitoring service if one is available and subscribed to by the occupant, owner or system provider. Alarm points and settings are user defined or can be allowed to default to system **3**.08 defined default points based on the users, owners or operators preference.

[0302]  34. Communications channel interface parameters and data including types and routing information necessary to perform communications activities on the attached network or networks available. These parameters include all information required to perform password verification and encryption as needed or deemed necessary by the owner, operator or communications system provider. These parameters also include the necessary routing and identification data for alarm trigger reporting points and services used by or subscribed for or available to the site **1**.04.

[0303]  35. Consumption rates and consumption signature and weather related normalization factors for major appliances in the site **1**.04 under the control of the system **3**.08 for which a direct form of metering consumption is not available. Estimated consumption rates for major appliances in the site **1**.04 under the control of the system **3**.08 for which a direct form of metering consumption is not available.

DC_PRIOR_ART_0000444

US 2004/0117330 A1                                                    Jun. 17, 2004

24

[0304]    36. Centralized load aggregation and computational service providers interface information.

[0305]    37. Computed normalization factor for the site **1.04** based on historical consumption and external factors.

[0306]    38. Energy efficiency factors derived from modeling the site **1.04** using a model such as the DOE-2.1 modeling system for comparison of operational efficiency.

[0307]    39. Minimum requirements dead-band range definitions to be used when the site **1.04** if vacant or unoccupied.

[0308]    40. Set point pattern change tracking tables to reflect specific day, time and day type setting changes to be used with "follow my lead" artificial intelligence learning and execution routines.

[0309]    41. Set point pattern change tracking tables to reflect specific outside weather conditions in relationship to set point changes initiated by the occupant for use with the "follow my lead" artificial intelligence learning and execution routines.

[0310]    4. Customer Control Node Management System and Methods

[0311]    With references to **FIGS. 4A through 4R**, the user interface **1.14** may be implemented as a web page or graphical user interface ("GUI") **4.02**. The GUI **4.02** may be accessible from remote locations, as discussed above. In one embodiment, the customer may access the GUI **4.02** through a web browser or other display device like a television. In another embodiment, the customer may access the GUI **4.02** through a remote device, such as a mobile phone and/or personal digital assistant. By entering a user I.D. and password, the customer may access his or her account.

[0312]    With reference to **FIG. 4A**, after the customer logs on to the system **3.08**, a system home page **4.04** may be displayed. The system home page **4.04**, includes an information section **4.05**, a plurality of navigation buttons **4.06**, a navigation menu **4.08**, and a control panel **4.10**.

[0313]    In the illustrated embodiment, the information section **4.05** for an exemplary customer, Earl Minem is shown. The information section **4.05** includes a greeting, the time and date, as well as several links. Actuation of the links may, for example, redirect the customer to the home page, the help screen, an e-mail contact section, frequently asked questions, or may log the customer off of the web site.

[0314]    The plurality of navigation buttons **4.06** includes a device management button **4.06A**, a configure alerts button **4.06B**, a systems data button **4.06C**, a cancel curtailment button **4.06D** and a device status button **4.06E**. The navigation menu **4.08** includes links to several areas of the GUI **4.02** as described below.

[0315]    When initialized, the GUI **4.02** displays a homeowner control center **4.12** in the control panel. In the illustrated embodiment, the homeowner control center **4.12** includes a plurality of hyperlinked icons **4.14**. In the illustrated embodiment, the hyperlinked icons **4.14** include a direct access icon **4.14A**, a scheduling icon **4.14B**, a my reports icon **4.14C**, an alerts icon **4.14D**, a configuration data icon **4.14E** and a user help icon **4.14F**. Selection of a home link within the information section **4.05** will return the GUI **4.02** to the homeowner control center **4.12**.

[0316]    With reference to **FIG. 4B**, when the customer selects the direct access icon **4.14Aa**, a plurality of direct access icons **4.16** will be displayed in the control panel **4.10**. In the illustrated embodiment, the customer has direct access of the HVAC system and the whole house meter. Correspondingly, a heating/AC icon **4.16a** and a whole house meter **4.16B** are displayed within the control panel **4.10**. In another embodiment, all devices **1.08** to which the customer may have access are accessible here, e.g., a second thermostat or the water heater. With reference to **FIG. 4C**, selection of the heating/AC icon **4.16A**, displays a virtual thermostat **4.18** within the control panel **4.10**. The virtual thermostat **4.18** contains an information section or display **4.20** and a plurality of thermostat buttons **4.22**. The display section **4.20** includes information related to the actual or real time conditions at the site **1.04**. In the illustrated embodiment as shown, the current temperature within the customer site **1.04** is 67° Fahrenheit. The heating and cooling set points are set to 58° and 85°, respectively. The system **3.08** is in an automatic mode and the heating and cooling systems are in an off condition. Furthermore, as indicated, the occupancy mode is set to "Away". As discussed below, the system **3.08** allows the customer to program the HVAC systems use the virtual thermostat **4.18** and according to occupancy modes using heating and cooling set points. By using the thermostat buttons **4.22**, the customer can change the current operating parameters of the thermostat. For example, selection of a change system mode thermostat button **4.22A** allows the customer to select between automatic and a manual modes. Selection of a change fan mode button **4.22B** allows the customer to change the fan mode from "on" to "automatic". Furthermore, selection of an override temperature button **4.22C** or an override occupancy button **4.22D** allow the customer to override the current temperature and occupancy schedules as defined below. Selection of a cancel override button **4.22E** allows the customer to cancel a temperature or occupancy change which was input using the override temperature button **4.22C** or the override occupancy button **4.22D**. A cancel curtailment button **4.22F** allows a customer to cancel any curtailment program (where permissible).

[0317]    Returning to **FIG. 4B**, selection of the whole house meter icon **4.16B** displays information within the control panel **4.10** related to the current power being delivered or utilized by the customer site **1.04**. Additionally, information related to the accumulated power draw over a predetermined period of time may also be displayed. This information may be displayed graphically and/or numerically.

[0318]    Returning to **FIG. 4A**, selection of some of the menu items within the navigation menu **4.08** are redundant with the icons **4.14** in the homeowner control center **4.12**. For example, selection of a direct access button **4.08A** displays the direct access icons **4.16** within the control panel **4.10**.

[0319]    Selection of the scheduling icon **4.14B** or a scheduling menu item **4.08B**, displays icons for each thermostat within the customer site **1.04** or an occupancy mode icon (not shown). With reference to **FIGS. 4D, 4E,** and **4F**, selection of the thermostat scheduling icon or the thermostat menu item underneath the scheduling menu item **4.08B**, displays an occupancy mode screen **4.24** within the control panel **4.10**. In one embodiment, the system **3.08** allows the customer to define one or more occupancy modes (see above). Within each occupancy mode, the customer may set

DC_PRIOR_ART_0000445

US 2004/0117330 A1

Jun. 17, 2004

25

one or more parameters which control one or more devices **1.08**, such as the HVAC system(s) while the occupancy mode is active.

[0320] For example, in one embodiment, the customer may set a cooling set point, a heating set point, and may also set an economy profile.

[0321] In the illustrated embodiment, the customer has eight occupancy modes. For example, the system **3.08** may include a home occupancy mode, an away occupancy mode, a sleep occupancy mode, and a vacant occupancy mode, as well as four user-defined occupancy modes. Each of these modes is indicated with a respective tab **2.26** along the top of the occupancy mode screen **4.24**. As shown in **FIG. 4**D, selection of a tab **2.26** allows the customer to set the parameters for each mode.

[0322] For example, in the illustrated embodiment under the home occupancy mode, the cooling set point is set to 80° Fahrenheit, the heating set point is set to 68° Fahrenheit, and the economy profile is set to economical comfort. The economy profile may be used to control the HVAC system and/or other devices **1.08** based on characteristics of the supply chain, e.g., cost or availability of power. In one embodiment, each profile has an associated setpoint offset, e.g., +/–5 degrees. The parameters for each mode may be set to a set of default parameters by selection of a default button. Any changes made within the occupancy mode screen may be applied to the respective mode through selection of an apply button **4.30**. In a further example, with reference to **FIG. 4**E in the away mode, the cooling set point is set to 85°, and the heating set point is set to 58° Fahrenheit.

[0323] In the illustrated embodiment, the economy profile is set through an economy profile drop down list **4.32**. With reference to **FIG. 4**F, in the illustrated embodiment, the economy profile may be set to one of three profiles: maximum comfort, balance comfort, and economical comfort.

[0324] With reference to **FIG. 4**G, selection of the thermostat scheduling icon or the thermostat menu item under the scheduling menu **4.08**B, displays a thermostat scheduling calendar **4.34** within the control panel **4.10**. In the illustrated embodiment, the thermostat scheduling calendar **4.34** displays the month corresponding to the current date. However, the thermostat scheduling calendar **4.34** may be navigated using a navigation bar **4.36**. Each day on the calendar **4.34** may be defined as a type of day, for example, any day may be defined as a weekday, a weekend, or a holiday. In the illustrated embodiment, all Saturdays and Sundays have been defined as weekends, and all Mondays, Tuesdays, Wednesdays, Thursdays and Fridays have been defined as weekdays. However, it should be noted that any day may be defined as any type of day. Each day within the calendar **4.34** is a hyperlink. Selection of the hyperlink for any particular day on the calendar **4.34** displays a thermostat scheduling panel **4.36** as shown in **FIG. 4**H. The thermostat scheduling panel **4.36** includes a thermostat dropdown list **4.38** and a select date drop down list **4.40**. The thermostat drop down list **4.38** allows the customer to select between one or more thermostats which may be present within the customer site **1.04**. The select day type drop down list **4.40** allows the customer to select between various pre-defined day types as well as to define a new day type.

[0325] The thermostat scheduling panel **4.36** permits the customer to select the occupancy mode which will be used for various time periods during the day.

[0326] For example, in the illustrated embodiment, at midnight of the selected day, the thermostat will be in the sleep occupancy mode. Beginning at 4:30 a.m., the thermostat will be in the user 1 occupancy mode and so forth as shown. The thermostat scheduling panel **4.36** also includes an apply button **4.42**, an apply to current day button **4.42**, an apply to all button **4.44**, and a back to calendar button **4.46**. Selection of the apply to current day button **4.42** will apply the start times and defined occupancy modes in the thermostat scheduling panel **4.36** to the selected day in the thermostat scheduling calendar **4.34**. Selection of the apply to all button **4.44** will apply the scheduled start times and occupancy modes defined in the thermostat scheduling panel **4.36** to all of the day types which are selected in the select day type drop down list **4.40**. As shown in **FIG. 4**I, the select day type drop down list **4.40** may include a number of pre-defined day types such as weekday, weekend, or holiday as well as the number of user-defined day types.

[0327] With reference to **FIGS. 4A and 4J**, selection of the alerts menu item **4.08**D displays a configure alert screen **4.48** within the control panel **4.10**. The system **3.08** includes a number of pre-defined alerts, for example, thermostat temperature out of range control, gateway node not responding, budget limit alarm, device malfunctioning, communication failure, ramping recovery failure, or duplicate IP address. For each alert, the customer may select or designate the destination, i.e., who gets notified for each alert, and how they are notified. In the illustrated embodiment, the configure alert screen **4.48** includes a destination drop down list **4.50** for each alert. The destination drop down list **4.50** allows the customer to select who gets notified when the alert occurs. For example, in the illustrated embodiment, the drop down list may include the home occupant, the service provider or the energy provider. The configure alert screen **4.48** also includes one or more check boxes **4.52** to indicate how the communication of the alert is to occur, for example, whether or not it is to occur by e-mail or through the customer or utility interfaces **1.14, 1.16**. The configure alert screen **4.48** may also include a check box **4.54** for each alert to indicate whether or not the alert is configurable. The configure alert screen **4.48** may also include an entry box **4.56** for each alert which allows the customer to indicate what priority the alert should have. However in the another embodiment, the priority may be used to, e.g., provide a different delivery system based on the priority. In the illustrated embodiment, this is primarily for information purposes. Furthermore, the configure alert screen **4.48** may also include an alert type drop down list **4.58** which allows the customer to indicate whether or not a single alert should be sent or whether an alert should be sent each time an alert condition occurs. For example, if over a pre-determined amount of time, for example an hour, a thermostat temperature is out of range, the system **3.08** may be set to deliver a single alert or to send an alert each time the temperature is out of bounds.

[0328] The configure alert screen **4.48** also includes a submit button **4.60** and a reset button **4.62** for updating the system **3.08** with any input changes or resetting the alerts to default values.

[0329] The configure alert screen **4.48** may also include a personal data update link **4.64**. Activation of the personal data update link **4.64** will display a personal data screen (not shown) within the control panel **4.10** which allows the

DC_PRIOR_ART_0000446

US 2004/0117330 A1

26

Jun. 17, 2004

customer to update its personal information such as address, telephone and e-mail information as well as user name and passwords. The personal data screen may also allow the customer to enter or update a budget threshold, e.g., a monthly budget threshold. As discussed above, the system **3.08** may be set to send an alert when the monthly budget threshold has been reached and/or is likely to be reached based on current usage.

[0330] With reference to **FIGS. 4A and 4K** through 4M, selection of the my reports icon **4.14**C or the reports menu item **4.08**C, will display a report screen **4.66** in the control panel **4.10**. The report screen **4.66** includes a plurality of reports icons **4.68**. Selection of a reports icon **4.68** will display a pop-up screen within the control panel **4.10**. For example, selection of a daily temperature icon **4.68**A will display a daily temperature report pop-up screen **4.70** as shown in **FIG. 4L**. Likewise, selection of a monthly temperature icon **4.68**B will display a monthly temperature report pop-up screen (not shown). The daily temperature report pop-up screen **4.70** may allow the customer to select between multiple thermostats using a thermostat drop down list **4.72**. The daily temperature report pop-up screen **4.70** may also include a plurality of drop down lists and/or buttons **4.74** which allow the customer to change the date or dates of the information being displayed in the report screen **4.70**. For example, the customer may designate a specific date or navigate through the calendar by days or months.

[0331] The report screen **4.66** may also include a daily electrical usage icon **4.68**C. With refence to **FIG. 4M**, selection of the daily electrical usage icon **4.68**C will display a daily electrical report pop up screen **4.72**. As with the temperature report pop up screen **4.70**, the daily electrical report pop up screen **4.76** includes a service device drop down list **4.78**, which allows the customer to select the device **1.08** for which data is being displayed. The daily electrical report pop up screen **4.76** also includes a plurality of navigation buttons **4.80** which allow the customer to navigate through the calendar as well as to display electrical usage information on a monthly or a yearly basis. A refresh button **4.82** updates the electrical report pop up screen **4.76** based on any changes made within the service device drop down list **4.78** or the navigation buttons **4.80**. Selection of a close button **4.84** closes the daily electrical report pop up report **4.76**.

[0332] With reference to **FIG. 4N**, selection of a config data menu item **4.08**E displays a configuration data screen **4.86** within the control panel **4.10**. The configuration data screen **4.86** includes a number of configuration data icons **4.88**. Selection of a personal data icon **4.88**A displays a personal data screen described above. Selection of a thermostat data icon **4.88**C displays a list of the thermostats within the customer site **1.04**. Each thermostat may be selected and a thermostat data screen **4.90** will be displayed within the control panel **4.10**, as shown in **FIG. 4O**. The thermostat data screen includes a first section for defining the heating section of the corresponding HVAC system and a cooling section for defining the corresponding cooling section of the HVAC system. The heating section includes a heating drop down list **4.92** which allows the customer to select the type of heating which corresponds to the current thermostat as shown in **FIG. 4P**. A cooling drop down list **4.94** allows the customer to set the type of cooling corresponding to the current thermostat as shown in **FIG. 4Q**. As

shown in **FIG. 4P**, the thermostat data screen **4.90** allows the customer to set a plurality of high and low limits. For example, in the illustrated embodiment, the customer may set safety, alert, heat, and cool high and low limits. These limits may be used in controlling the corresponding HVAC system, as well as setting or delivering alert messages.

[0333] Selection of a home data icon **4.88**C on the configuration data screen **4.86** displays a home data screen (not shown) within the control panel **4.10**. The home data screen allows the customer to define various parameters regarding their home or the customer site **1.04** including details about the construction as well as defining water heaters and other devices which may be found at the customer site such as swimming pools, whirlpool baths, hot tubs, heated ponds, saunas, fountains, decorative lighting systems, auxiliary heat systems, and/or irrigation systems.

[0334] Selection of an energy switch icon **4.88**D on the configuration data screen **4.86** displays information and allows the customer to modify parameters related to any energy management switches at the customer site **1.04**.

[0335] With reference to **FIGS. 4N and 4R**, selection of the program icon **4.88**E on the configuration data screen **4.86** displays a program participation screen **4.96** in the control panel **4.10**. The program participation screen **4.96** provides a list **4.98** of all available power supply programs ("PSP") or PROGRAMS. The program participation screen **4.96** also includes a plurality of corresponding check boxes **4.100** which allow the customer to designate which PROGRAMS the customer desires to participate. The program participation screen **4.96** may also include other information regarding the listed PROGRAMS, including supply type, effective dates, and effective times. Each PROGRAM listed on the program participation screen **4.96** may be a hyperlink which, when selected, displays additional information related to the selected PROGRAM.

[0336] As discussed above, the customer GUI **4.02** allows the customer to view, configure and/or modify various parameters of the system **3.08**. Generally, the type and nature of parameters which may be viewed or modified will be defined by the utility **1.06**. As shown above, some of these parameters may be configured and/or modified using various drop down boxes, check boxes and/or entry boxes. However, it should be noted that some of these entry boxes, drop down lists and/or check boxes may be used to display certain parameters; however the utility may designate that the customer cannot modify these parameters.

[0337] 5. Utility Control Node Management System and Method

[0338] With reference to **FIGS. 5A through 5I**, as discussed above, the utility interface **1.16** may be accessible through a web browser. With specific reference to **FIG. 5A**, after an authorized user at the utility **1.06** logs onto the system **1.02**, a utility graphic user interface **5.02** is displayed. The utility GUI **5.02** includes a plurality of navigation links **5.04** on a utility display panel **5.06**.

[0339] In the illustrated embodiment, the navigation links **5.04** include an immediate supply link, a scheduled supply link, a program definitions link, an active supply link, a supply history link, and a reports link. The navigation links also include a link to the utility GUI **5.02** home page and a

DC_PRIOR_ART_0000447

US 2004/0117330 A1

Jun. 17, 2004

27

link to log off the system. The utility display panel **5.08** includes a plurality of utility icons **5.08**.

[0340]  In the illustrated embodiment, the utility icons include an immediate supply icon **5.08**A, a scheduled supply icon **5.08**B, a program definitions icon **5.08**C, and active supply icon **5.08**D, a supply history icon **5.08**E and a reports icon **5.08**F. As discussed above, the utility interface **1.16** may be used to define or modify PROGRAMS, to display information regarding the current active supply of electricity over an electrical distribution network, provide information relating to the capacity of electricity available through implementation of one or more of the PROGRAMS, to supply historical data related to the distribution of electricity and to generate one or more reports.

[0341]  With reference to **FIG. 5**B, when the immediate supply icon **5.08**A is selected, an immediate supply screen **5.10** is displayed within the utility display panel **5.06**. The immediate supply screen **5.10** includes a power distribution network section **5.12** and an information section **5.14**. In the illustrated embodiment, the power distribution network section **5.12** includes a meter **5.16** which provides an indication of the immediate capacity in watts (in real time) for the power distribution network.

[0342]  In the illustrated embodiment, the power distribution network includes a single transmission substation, designated tss**1**, and a single distribution substation, designated dss**1**. Under the distribution substation, the following nodes are available: Phoenix, Richmond, Philadelphia and Philly non-curtailed, as shown. Within the system **1.02**, one or more PROGRAMS may be defined which when activated may curtail one or more devices **1.08** across one or more customer sites **1.04** (see above). The meter **5.16** gives a graphical indication of the immediate power supply which is available from the PROGRAMS defined in the power distribution network.

[0343]  Underneath the meter **5.16**, a collapsible/expandable tree **5.18** is displayed. Each of the levels in the tree **5.18** are selectable. When a particular level within the tree **5.18** is selected, information regarding that level and the power distribution network above it are displayed within the information section **5.14**. For example, as shown in **FIG. 5**B, when the distribution substation dss**1** is selected, information regarding the station tss**1** and the distribution substation dss**1** are displayed.

[0344]  In the information section **5.14** for each level of the distribution network, the immediate capacity and the total capacity are displayed. Immediate capacity is the real time instantaneous capacity available for the given level based on the defined PROGRAMS and the current status of all devices within those PROGRAMS. For example, for substation dss**1** for all devices currently in a defined PROGRAM, those devices are drawing 1,040 watts. If the defined PROGRAMS were implemented, those devices would make available or supply 1,040 watts. The total capacity is the average for the current hour over a predetermined period, for example, the last seven weeks.

[0345]  The information section **5.14** also includes a refresh button **5.20** which, when activated, refreshes or updates the information within the information section **5.14**. Information related to each node, i.e., Phoenix, Richmond, Philadelphia or Philly non-curtail, may also be displayed in

the information section by selection of the corresponding level within the power distribution network section **5.12**. The information section **5.14** may also include a review/request supply link **5.22** for each component listed in the information section **5.14**.

[0346]  With reference to **FIG. 5**C, selection of the review request link **5.22** for a given node or station displays an available program capacity pop-up **5.24**. The available program capacity pop-up **5.24** lists all defined PROGRAMS that are available for the given node at the current time. Each PROGRAM includes a corresponding checkbox **5.26** which enables the utility to activate a given PROGRAM. For each PROGRAM listed, the instantaneous, real time available power is listed in a box **5.28** for each PROGRAM. The total capacity **5.30** is also listed for each PROGRAM, i.e., if all defined devices **1.08** within a given PROGRAM were currently drawing power. The available power refers to the instantaneous power which would be available if the respective or corresponding PROGRAM were activated. The available program capacity pop-up **5.24** also includes a duration drop-down list **5.32**. The available program capacity pop-up **5.24** may be utilized to immediately activate one or more PROGRAMS to free up capacity for selected duration. For example, in the illustrated embodiment if the emergency HVAC curtailment program and the emergency shut-off program were activated, the instantaneous available power would be 1200 watts. The available program capacity pop-up **5.24** also includes a submit button **5.34**, a closed button **5.36** and a refresh button **5.38**. If one or more of the checkboxes **5.26** were activated, and the submit button **5.34** were selected, the utility control system **1.12** would broadcast a curtailment signal to the gateway nodes **1.10**D to shut down the affected devices **1.08** or otherwise curtail those devices **1.08**. Activation of the closed button **5.36** closes the available program capacity pop-up **5.24**. Activation of the refresh button **5.38** updates the available power available for each PROGRAM.

[0347]  With reference to **FIG. 5**D, selection of the scheduled supply button **5.08**B displays a scheduled supply screen **5.40** in the utility display panel **5.06**. The scheduled supply screen **5.40** includes a power distribution network tree **5.42** and an information section **5.44**. As in the immediate supply screen **5.10**, the tree **5.42** displays the stations, substations and nodes within the power distribution network. Each of the stations, substations and/or nodes may be selectable within the tree **5.42**. Information related to the capacity available at the selected level within the tree **5.42** is displayed within the information section **5.44**. In the illustrated embodiment, the power available at the given level during predetermined time periods of the current day are shown. This information is reflective of the capacity or power available from the scheduled PROGRAMS. For example, based on the activated programs, between military time 0000 and 0600, the scheduled programs in Philadelphia have a capacity of 832 watts. For each station, substation or node within the network, the utility **1.06** may review scheduled programs or create a new schedule for programs. The scheduled supply screen **5.40** also includes a refresh button **5.46** which when actuated updates the information in the information section **5.44**.

[0348]  Within the create schedules section of the GUI **5.02**, a find eligible programs pop-up dialog **5.48** as shown in **FIG. 5**E is available. This dialog **5.48** allows the user at

DC_PRIOR_ART_0000448

US 2004/0117330 A1

28

Jun. 17, 2004

the utility to enter some or all information regarding a desired program or criteria for a program and search for any available program that fits the input criteria.

[0349] With reference to **FIG. 5**F, activation of the program definition button **5.08**C displays a program summary table **5.50** in the utility display panel **5.10**. The program summary table **5.50** lists and describes all available PROGRAMS. In the illustrated embodiment, each listed program may include a link **5.52** which leads to additional specific PROGRAM details. The program summary table **5.50** may also include a new button **5.54**.

[0350] With reference to **FIG. 5**G, selection of the new button **5.54** displays a program definition screen **5.56** in the utility control panel **5.10**. The program definition screen **5.56** creates a new PROGRAM (see below). In one embodiment, the new PROGRAM may be broadcast to the gateway node **1.10**D at each customer site **1.04**. The customer may view the new PROGRAM along with the other available PROGRAM and subscribe to the new PROGRAM or any other available PROGRAM (see above).

[0351] In the illustrated embodiment, the program definition screen **5.56** includes a program name entry box **5.58** and a description entry box **5.60**, both of which allow the user to enter appropriate text information.

[0352] The program definition screen **5.56** further includes a set of mutually exclusive supply type buttons **5.62** which allow the user to define a type associated with the PROGRAM. In the illustrated embodiment, the type may be one of "on demand" or "scheduled". An on demand PROGRAM can be implemented at any time, as needed, by the utility. However, an on demand PROGRAM may be limited to specific time periods. A scheduled PROGRAM is generally scheduled for specific days during specific time periods.

[0353] The program definition screen **5.56** also includes a set of drop down lists **5.64** which may be used to set PROGRAM available dates and times.

[0354] The PROGRAM may also be identified as "optional" or "overrideable" using one or more checkboxes **5.66**. An optional PROGRAM may be opted into or subscribed to by the user. An overrideable PROGRAM means that once subscribed, the user may override the PROGRAM while it is running.

[0355] The program definition screen **5.56** may also include a plurality of checkboxes to **5.68** which is used to identify the types of devices **1.08** which may be included in the PROGRAM. In the illustrated embodiment, the system **3.08** includes HVAC systems, water heaters, pool pump and hot tubs/spas. A PROGRAM may be defined to include all devices **1.08** or one or more types of devices **1.08**. The program definition screen **5.56** includes back button **5.70**, a save button **5.72**, and a reset button **5.74**. Activation of the back button **5.70** returns the GUI **5.02** to the previous screen without saving the PROGRAM. Activation of the save button **5.72** save the current PROGRAM and returns the GUI **5.02** to the previous screen. Activation of the reset button **5.74** sets the values in the program definition screen **5.56** to default values.

[0356] Selection of the active supply button **5.08**D displays a screen within the utility display panel **5.06** which provides detail regarding any active PROGRAMS. This

screen may include a tree similar to the trees described above which details the power distribution network. The screen will also provide information related to all of the active PROGRAMS for any selected station, substation or node within the power distribution network. For example, for a given active PROGRAM, the following information may be provided: based on real time data received from the nodes **1.10**, how many customers have signed up for the given program, how many customers are actively contributing to the given PROGRAM, and how many customers have opted out of the program. Furthermore, each device which may be affected by the program may be viewed.

[0357] Selection of the supply history button **5.08**E displays a screen within the utility display panel **5.06** which provides historical data regarding any active program. The same type of information available for the active PROGRAMS (see above) may be available for any past time or time period.

[0358] With reference to **FIGS. 5H and 5I**, selection of the report button **5.08**F displays a reports screen **5.76** within the utility display panel **5.06** which provides a graph of energy consumption for a given period of time for a given device or set of devices. In the illustrated reports screen **5.76**, the total hourly energy consumption for Mar. 18, 2003 (as measured by the electric meters) is shown. The reports screen **5.76** includes an input section **5.78** which allows the user to select the device, e.g., electric meter, thermostat, water heater, pool pump or hut tub/spa, or the time period, e.g., daily, hourly, or monthly. The input section **5.78** also allows the user to change the time and/or date for which data is shown. The reports screen **5.76** also includes a refresh chart button **5.80** which may be used to update the graph to show updated real-time data and/or to reflect any changes made in the input section **5.78**.

[0359] Obviously, many modifications and variations of the present invention are possible in light of the above teachings. The invention may be practiced otherwise than as specifically described within the scope of the appended claims.

1. A method for providing at least one program to a customer of a utility of a commodity, the program aimed at managing demand for the commodity, the utility delivering the commodity to at least one customer site, the customer site having a plurality of devices which use the commodity, including the steps of:

defining a program having a subset of the plurality of devices for which usage of the commodity may be managed by activating the program;

allowing the customer to subscribe to the program;

delivering the commodity to the subset of devices;

measuring the instantaneous rate at which the commodity is being delivered to the subset of the devices;

sending the instantaneous rate for each device within the subset to the utility.

2. A method, as set forth in claim 1, including the steps of:

activating the program; and,

subsequently measuring at least one of a rate and a change in a rate at which the commodity is being delivered to the subset of the devices.

DC_PRIOR_ART_0000449

US 2004/0117330 A1                                                Jun. 17, 2004

29

**3**. A method, as set forth in claim 2, including the step of determining an actual change in a rate of consumption of the commodity and recording the rate of change in a memory.

**4**. A method, as set forth in claim 3, including the step of providing at least one of an alternative rate and a billing adjustment to the customer as a function of the actual capacity saved at the related customer site by the program.

**5**. A method, as set forth in claim 4, wherein the at least one of an alternative rate and a billing adjustment is also a function of historical usage information.

**6**. A method, as set forth in claim 4, wherein the at least one of an alternative rate and a billing adjustment is a function of an actual cost related to the commodity while the program is activated.

**7**. A method, as set forth in claim 2, including the step of verifying management of the devices within the subset of the devices.

**8**. A method, as set forth in claim 1, including the step of providing a user interface for interaction with the customer.

**9**. A method, as set forth in claim 8, wherein the user interface is accessible through a web browser.

**10**. A method, as set forth in claim 1, wherein each device has an associated node, and the method includes the step of allowing the customer to control one or more of the devices through the associated node.

**11**. A method, as set forth in claim 1, wherein the utility delivers the commodity to a plurality of customer sites, each customer site having a plurality of devices and the step of defining the program includes the step of including within the program all devices of a similar type at each customer site.

**12**. A method, as set forth in claim 1, wherein the utility delivers the commodity to a plurality of customer sites, each customer site having a plurality of devices and the step of defining at least one program includes the step of defining a plurality of programs, each program having a respective subset of the devices.

**13**. A method, as set forth in claim 1, including the steps of:

activating the program; and,

allowing the customer to cancel the program when activated.

**14**. A method, as set forth in claim 1, including the steps of:

setting a budget goal; and,

monitoring an aspect of usage of the commodity related to the budget goal.

**15**. A method, as set forth in claim 14, wherein the budget goal is defined in terms of usage of the commodity.

**16**. A method, as set forth in claim 14, wherein the budget goal is defined in terms of cost of actual amount of the commodity used.

**17**. A method, as set forth in claim 14, wherein the budget goal is defined relative to a predetermined time period and the method includes the step of generating an alert if actual usage will exceed the budget goal in the predetermined time period.

**18**. A method, as set forth in claim 17, wherein the alert is sent to the customer.

**19**. A method, as set forth in claim 17, wherein the alert is sent to the utility.

**20**. A method, as set forth in claim 1, wherein the commodity is electrical power.

**21**. A method, as set forth in claim 1, wherein the commodity is water.

**22**. A method, as set forth in claim 1, wherein the commodity is gas.

**23**. A method, as set forth in claim 1, including the step of automatically activating the program under a predetermined set of conditions.

**24**. A method, as set forth in claim 23, wherein the predetermined set of conditions includes at least one of a time of day and a day.

**25**. A method, as set forth in claim 1, including the step of manually activating the program as a function of an actual demand of the commodity.

**26**. A method, as set forth in claim 1, wherein the program at least one of shifts demand away from a first time period and eliminates demand for the first period.

**27**. A method, as set forth in claim 1, including the step of controlling the subset of devices in response to activation of the program.

**28**. A method, as set forth in claim 27, wherein the step of controlling the subset of devices includes the step of at least one of preventing and limiting usage of the commodity during a predetermined period of time.

**29**. A method, as set forth in claim 27, wherein at least one of the devices has an operating setpoint, and wherein the step of controlling the subset of devices includes the step of modifying the setpoint.

**30**. A method, as set forth in claim 1, wherein each device has an associated node, and the method includes the step of downloading to each node, a program schedule containing scheduling information for the program.

**31**. A method for providing at least one program to a customer of a utility of a commodity, the program aimed at managing demand for the commodity, the utility delivering the commodity to at least one customer site, the customer site having a plurality of devices which use the commodity, including the steps of:

defining a program having a subset of the plurality of devices for which usage of the commodity may be managed by activating the program;

allowing the customer to subscribe to the program;

delivering the commodity to the subset of devices;

measuring the instantaneous rate at which the commodity is being delivered to the subset of the devices;

sending the instantaneous rate for each device within the subset to the utility;

activating the program;

determining an actual rate of change in consumption of the commodity induced by activating of the program; and,

providing a at least one of an alternative rate and billing adjustment to at least one customer as a function of the actual capacity saved at the related customer site by the program.

**32**. A method for providing at least one program to a customer of a utility of a commodity, the program aimed at managing demand for the commodity, the utility delivering

DC_PRIOR_ART_0000450

the commodity to at least one customer site, the customer site having a plurality of devices which use the commodity, including the steps of:

defining a program having a subset of the plurality of devices for which usage of the commodity may be managed by activating the program;

allowing the customer to subscribe to the program;

delivering the commodity to the subset of devices;

measuring the instantaneous rate at which the commodity is being delivered to the subset of the devices;

sending the instantaneous rate for each device within the subset to the utility;

activating the program; and,

verifying management of the devices within the subset of the devices.

33. A system for providing a program to a customer of a utility of a commodity, the utility delivering the commodity to at least one customer site, the customer site having a plurality of devices which use the commodity, the program aimed at managing demand for the commodity and having a subset of the plurality of devices for which usage of the commodity may be managed by activating the program, comprising:

a user interface for allowing the customer to subscribe to the program;

a distribution network coupled to the subset of devices for delivering the commodity to the subset of devices; and,

at least one node coupled to the subset of devices for measuring the instantaneous rate at which the commodity is being delivered to the subset of the devices and for sending the instantaneous rate for each device within the subset to the utility.

34. A system, as set forth in claim 33, further comprising a control system coupled to the distribution network for controlling delivery of the commodity and activating the program, the at least one node adapted to subsequently measure the rate at which the commodity is being delivered to the subset of the devices.

35. A system, as set forth in claim 34, wherein the control system determines an actual rate of change in the rate of consumption induced by activating the program.

36. A system, as set forth in claim 35, wherein the control system determines at least one of an alternative rate and billing adjustment to the customer as a function of the actual capacity saved at the related customer site by the program.

37. A system, as set forth in claim 36, wherein the at least one of an alternative rate and billing adjustment is also a function of historical usage information.

38. A system, as set forth in claim 36, wherein the at least one of an alternative rate and billing adjustment is a function of an actual cost related to the commodity while the program is activated.

39. A system, as set forth in claim 34, wherein the control system including verifies curtailment of the devices within the subset of the devices.

40. A system, as set forth in claim 33, wherein the user interface is accessible through a web browser.

41. A system, as set forth in claim 33, wherein each device has an associated node for allowing the customer to control one or more of the devices through the associated node.

42. A system, as set forth in claim 33, wherein the utility delivers the commodity to a plurality of customer sites, each customer site having a plurality of devices and the program includes all devices of a similar type at each customer site.

43. A system, as set forth in claim 33, wherein the utility delivers the commodity to a plurality of customer sites, each customer site having a plurality of devices, wherein a plurality of programs are defined, each program having a respective subset of the devices.

44. A system, as set forth in claim 33, wherein the user interface allows the customer to cancel the program after it has been activated.

45. A system, as set forth in claim 33, wherein the user interface allows the customer to set a budget goal and the at least one node monitors an aspect of usage of the commodity related to the budget goal.

46. A system, as set forth in claim 45, wherein the budget goal is defined in terms of usage of the commodity.

47. A system, as set forth in claim 45, wherein the budget goal is defined in terms of cost of actual amount of the commodity used.

48. A system, as set forth in claim 45, wherein the budget goal is defined relative to a predetermined time period and the at least one node generates an alert if actual usage will exceed the budget goal in the predetermined time period.

49. A system, as set forth in claim 48, wherein the alert is sent to the customer.

50. A system, as set forth in claim 48, wherein the alert is sent to the utility.

51. A system, as set forth in claim 33, wherein the commodity is electrical power.

52. A system, as set forth in claim 33, wherein the commodity is water.

53. A system, as set forth in claim 33, wherein the commodity is gas.

54. A system, as set forth in claim 34, wherein the control system automatically activates the program under a predetermined set of conditions.

55. A system, as set forth in claim 54, wherein the predetermined set of conditions includes at least one of a time of day and a day.

56. A system, as set forth in claim 34, wherein the control system allows the program to be manually activated as a function of an actual demand of the commodity.

57. A system, as set forth in claim 33, wherein the program at least one of shifts demand away from a first time period and eliminates demand from the first time period

58. A system, as set forth in claim 34, wherein the control system controls the subset of devices in response to activation of the program.

59. A system, as set forth in claim 58, wherein the control system at least one of prevents and limits usage of the commodity during a predetermined period of time.

60. A system, as set forth in claim 34, wherein at least one of the devices has an operating setpoint, and wherein control system the subset of devices by modifying the setpoint.

61. A system, as set forth in claim 34, wherein the control system downloads a program schedule containing scheduling information for the program to the at least one node.

62. A system for providing at least one program to a customer of a utility of a commodity, the utility delivering

DC_PRIOR_ART_0000451

US 2004/0117330 A1

Jun. 17, 2004

31

the commodity to at least one customer site, the customer site having a plurality of devices which use the commodity, the program aimed at managing reducing demand for the commodity and having a subset of the plurality of devices for which usage of the commodity may be managed by activating the program, comprising:

a user interface for allowing the customer to subscribe to the program;

a distribution network coupled to the subset of devices for delivering the commodity to the subset of devices;

at least one node coupled to the subset of the devices for measuring the instantaneous rate at which the commodity is being delivered to the subset of the devices and for sending the instantaneous rate for each device within the subset to the utility;

a control system coupled to the user interface, the distribution network and the at least one node for controlling delivery of the commodity, for activating the program, for determining at least one of an actual rate of consumption of the commodity and a change in the rate of consumption by activating of the program, and for providing at least one of an alternative rate and a billing adjustment to at least one customer as a function of the actual rate of consumption saved at the related customer site by the program.

**63**. A system for providing at least one program to a customer of a utility of a commodity, the utility delivering the commodity to at least one customer site, the customer site having a plurality of devices which use the commodity, the program aimed at managing demand for the commodity and having a subset of the plurality of devices for which usage of the commodity may be managed by activating the program, comprising:

a user interface for allowing the customer to subscribe to the program;

a distribution network coupled to the subset of devices for delivering the commodity to the subset of devices;

at least one node coupled to the subset of devices for measuring the instantaneous rate at which the commodity is being delivered to the subset of the devices and for sending the instantaneous rate for each device within the subset to the utility; and,

a control system for activating the program and verifying management of the devices within the subset of the devices.

\*   \*   \*   \*   \*

DC_PRIOR_ART_0000452

Pages APPX10181-APPX10272
Removed Due to Confidential Material



Defendant's Physical
Exhibit

**DPX 1**

Case No. 20-cv-00075



Appx10274



Pages APPX10279-APPX10281;
APPX10291-APPX10295
Removed Due to Confidential Material

Pages APPX10350-APPX10363
Removed Due to Confidential Material

Pages APPX10364;
APPX10367
Removed Due to Confidential Material

Pages APPX10389-APPX10399
Removed Due to Confidential Material

Pages <u>APPX10400</u>-<u>APPX10410</u>
Removed Due to Confidential Material

Pages APPX10411-APPX10419
Removed Due to Confidential Material

**Google is committed to advancing racial equity for Black communities. <u>See how.</u>** (https://google.com/racialequity)

# Thermostat

The <u>Thermostat E with Heat Link for the EU</u> (https://nest.com/uk/thermostats/nest-thermostat-e/overview/) i upported in the Nest API, and will not appear in the JSON returned from the API. All other Thermostat models rted.



The <u>Nest Learning Thermostat</u>™ (https://nest.com/thermostat/life-with-nest-thermostat) is an Internet-connected device that is intuitive and easy to use, continuously learning about usage patterns in the home to optimize comfort and save energy. Users can control their heating and cooling anywhere they have access to an Internet connection.

Supporting these features requires a sophisticated control system that goes above and beyond simple setpoint-based programs. Nest provides a wide range of algorithms (like <u>Early On</u> (http://support.nest.com/article/What-is-Early-On), <u>True Radiant</u> (http://support.nest.com/article/What-is-True-Radiant), <u>Airwave</u>™ (http://support.nest.com/article/What-is-Airwave)) that require a significant amount of

**Plaintiff's Exhibit**
**PTX-0281**
ECOFACTOR, INC. vs. GOOGLE LLC
No. WA:20-CV-00075-ADA

1/15

**EF_0895825**

PTX-0281-0001

<u>Appx10420</u>

computational power compared to most thermostats. The Nest Thermostat has the power needed to provide these advanced features.

The Nest API (/reference/api-thermostat) is designed to allow products to control the HVAC system without disrupting Nest algorithms or surprising the user with unexpected behaviors. They provide access to the following data for the Nest Thermostat:

- Structure name and device "where name" (location in the home)

- Custom thermostat label

- Online status and last connection information

- Current and target temperatures

- Temperature mode

- Eco Temperatures
  (https://nest.com/support/article/Learn-how-Eco-Temperatures-work-on-the-Nest-Thermostat)

- Time-to-Temperature (https://nest.com/support/article/What-is-Time-to-Temperature)

- Temperature scale (set F/C)

- Temperature Lock
  (https://nest.com/support/article/How-can-I-lock-Nest-so-that-it-can-only-be-adjusted-within-a-certain-temperature-range)
  status, and if locked, the min/max locked temperature values

- Fan timer duration and HVAC mode

- Humidity

- Sunblock (https://nest.com/support/article/What-is-Sunblock)

## Thermostat permissions

For read access to all Thermostat API data values, select the Thermostat read (/reference/permissions#thermostat_read) permission for your client.

For read access to all Thermostat API data values and additional write access to select values, select the Thermostat read/write (/reference/permissions#thermostat_readwrite) permission for your client. This permission level allows you to update the following:

**EF_0895826**

PTX-0281-0002

Appx10421

- Target temperature

- HVAC mode

- Fan timers

Starting with Thermostat read/write v5, you can also update the following:

- Temperature scale

- Thermostat label

# Thermostat identifiers

## Device

Nest devices are listed by type as an array of IDs, which can be used to uniquely identify a device via the device path. So a thermostat ID of `"peyiJNo..."` means that you can load the thermostat device model at `devices/thermostats/peyiJNo...` via the API.

When a device is connected to multiple products, each developer will see a different ID for that device. For a device that has installed multiple products from the same developer, the developer will see the same ID.

## Name

Two name attributes are provided. The shorter `name` attribute is displayed in user interface labels, while `name_long` is used in long form text.

`name`

In these examples, `name` is "Hallway" or "Hallway (West)".

**EF_0895827**

PTX-0281-0003

Appx10422





`name_long`

In this example, `name_long` is "Office (Upstairs)".



Label

**EF_0895828**

PTX-0281-0004

Appx10423

3/24/2021                                          Thermostat | Nest Developers



Beginning with permissions version v5 (/reference/permissions#permissions_version), you can add a custom thermostat label through the API. In the Nest app, label appears in parentheses, after the where name.

Beginning with permissions version v6 (/reference/permissions#permissions_version), you can also read the Thermostat label.

## Where

`where_id`

- A unique, Nest-generated identifier that represents `name`

- `where_id` is read-only, and is created automatically in the call to create a custom where `name`

Learn more about where names for Nest Thermostats
 (https://nest.com/support/article/How-do-I-change-the-name-of-my-Nest-Learning-Thermostat), Nest Protects (https://nest.com/support/article/Learn-more-about-Nest-Protect-locations-names-and-labels) and Nest Cams (https://nest.com/support/article/How-do-I-change-the-name-of-my-Nest-Cam).

EF_0895829

PTX-0281-0005

Appx10424

`where_name`

When you choose any of the <u>Thermostat permissions</u> (/reference/permissions#thermostat_read), you can access the device `where_name` from the device object (`devices/thermostats`).

## Other metadata

All data values are read only, unless otherwise specified.

| Data Value | Description |
|---|---|
| `locale` | The language and country code assigned to this device |
| `software_version` | A string that represents the firmware currently installed on the device |
| `structure_id` | A string that uniquely represents this structure; this is the structure that the device is paired with |
| `last_connection` | The timestamp of the last successful connection to the Nest service |
| `is_online` | Online status. This is determined by Nest using the `last_connection` time and an expected reconnection window that is device-specific. |

# Thermostat features

## Thermostat modes

HVAC systems have four "on" states (`heat`, `cool`, `heat-cool`, `eco`) and one "off" state (`off`). We use these states to manage comfort and energy savings through `hvac_mode` and temperature data values.

- When Heat or Cool mode (`heat`, `cool`) is selected, the Thermostat adjusts the home to the target temperature.

- When Heat • Cool mode (`heat-cool`) is selected, the Thermostat will keep the home comfortable, within a preferred temperature range.

EF_0895830

PTX-0281-0006

<u>Appx10425</u>

- When Eco Temperatures
  (https://nest.com/support/article/Learn-how-Eco-Temperatures-work-on-the-Nest-Thermostat) (eco)
  is selected, the Thermostat will apply energy-saving algorithms to keep the house
  comfortable and reduce energy usage. Thermostats in this mode display ECO.

Structures have two states related to presence: Home or Away. When no motion is sensed in
the house, the structure will change from Home to Away, and the Thermostats in the home will
enable Eco Temperatures automatically.

## How `hvac_mode` and temperature values work together

Depending on the value of `hvac_mode`, only certain temperature data values can be accessed in
the API:

| HVAC mode | Temperature data values you can access |
|---|---|
| `heat` or `cool` | `target_temperature_f` or `target_temperature_c` |
| `heat-cool` | `target_temperature_low_f` and `target_temperature_high_f` or `target_temperature_low_c` and `target_temperature_high_c` |
| `eco` | `eco_temperature_low_f` and `eco_temperature_high_f` or `eco_temperature_low_c` and `eco_temperature_high_c` |
| `off` | none |

In some scenarios, there are special rules around changing `hvac_mode`:

| Scenario | Can `hvac_mode` be changed? |
|---|---|
| Temperature Lock (#temperature_lock) is enabled | Yes |
| Emergency Shutoff (https://nest.com/support/article/How-the-Nest-Thermostat-and-Nest-Protect-work-together-in-a-carbon-monoxide-emergency) is active | No |

**EF_0895831**

PTX-0281-0007

Appx10426

| Scenario | Can `hvac_mode` be changed? |
|---|---|
| <u>Emergency Heat</u> (https://nest.com/support/article/What-s-Emergency-Heat-and-does-Nest-support-it) is enabled | No |
| `can_cool` or `can_heat` value is `false` | No |

## Eco Temperatures

Eco Temperatures allow the user to save energy, whether they are home or not. Consider switching the `hvac_mode` to `eco` when implementing energy-saving behaviors in your product.

**n:** Eco Temperatures should not be coupled with occupancy.

<u>Eco Temperature endpoints</u> (/reference/api-thermostat#eco_temperature_high_f) are available in the Nest API beginning with Thermostat read and read/write v6 permissions.

## Switching between eco and non-eco modes

Your product should not need to manage target temperatures directly in Eco mode. When the home is set to away, the target temp is not displayed, but is internally set, based on user selection. When the thermostat is set to OFF, then no target temperatures are observed.

If you absolutely must change target temperatures directly, be sure to make the change in two separate calls:

1. Change `hvac_mode` to any other value except `eco`

2. Modify the appropriate `target_temperature` data values

Beginning with Thermostat read and read/write v6 permissions, you can access `previous_hvac_mode` through the API to assist with HVAC mode transitions. `previous_hvac_mode` is used to store the `hvac_mode` of the device before it transitioned to "eco".

Use `previous_hvac_mode` to transition from `hvac_mode` = `"eco"` back to the previous HVAC mode. Be sure t n the `hvac_mode` change, prior to modifying the target temperature.

**EF_0895832**

PTX-0281-0008

<u>Appx10427</u>

For example, if the Nest Thermostat is using Eco Temperatures (`hvac_mode = "eco"`), `previous_hvac_mode` is available, and you want your product to set `target_temperature`, then you must first:

1. get `previous_hvac_mode`

2. set `hvac_mode` to the `previous_hvac_mode` value

3. confirm `hvac_mode` is no longer set to "eco"

After these steps, set the target temperatures as appropriate.

Depending on the `hvac_mode` value, this is how `previous_hvac_mode` changes:

| When `hvac_mode` state is... | Then, `previous_hvac_mode` can be... |
| --- | --- |
| `eco` | `heat`, `cool`, `heat-cool` or `off` |
| `heat`, `cool`, `heat-cool` or `off` | blank/empty |

## Target temperature

Target temperature is the most important value for the HVAC system - it's the desired temperature, typically set by the user. Most actions and decisions are based on it. From the API, Works with Nest products can write the target temperature as part of a larger process.

There is always a target temperature set when the system is on.

- When Heat or Cool mode (`heat`, `cool`) is selected, a single `target_temperature` is set

- When Heat • Cool mode (`heat-cool`) is selected, two `target_temperature` values are set, denoting a target range, a higher one for cooling and a lower one for heating

- When Eco mode (`eco`) is selected, the target temperature range is internally set

There are also safety temperatures that are a backstop to prevent freezing pipes or excessively high temperatures in the home.

When the Thermostat is OFF, no target temperatures are set.

EF_0895833

PTX-0281-0009

Appx10428

If the structure is in the middle of an energy rush hour
://nest.com/support/article/What-happens-during-a-Summer-or-Winter-Rush-Hour) event and the user has no
out, the target temperatures cannot be modified by products.

## Time-to-Temperature

Time-to-Temperature (https://nest.com/support/article/What-is-Time-to-Temperature) gives you
access to these data values for the HVAC system:

- `time_to_target` (/reference/api-thermostat#time_to_target) - The time, in minutes, that it will
  take for the structure to reach the target temperature

- `time_to_target_training` (/reference/api-thermostat#time_to_target_training)

  - Training status

  - As the Thermostat learns how the HVAC system responds, it adjusts the estimate
    for reaching the target temperature

  - When the Thermostat is reasonably sure of the time estimate to reach the target
    temperature, status will change from `training` to `ready`

## Ambient temperature

The temperature measured near the thermostat. Display the value that corresponds with the
user's preferred temperature scale.

## Temperature scale

The ambient and target temperature variables are organized by Celsius or Fahrenheit scale.
The `temperature_scale` attribute will be either "F" or "C", depending on user preference. This
property is set by each thermostat, so it is possible that in a single structure a user might have
two thermostats, one in each temperature scale. Keep user preferences
 (https://nest.com/support/article/About-SETTINGS) in mind when displaying temperature values.

Beginning with permissions version v5 (/reference/permissions#permissions_version), you can
change the temperature scale through the API.

EF_0895834

PTX-0281-0010

Appx10429

Target and Ambient Temperature fields have `_f` and `_c` variants to accommodate consistent rounding when displaying temperatures.

## Temperature display



Hallway

When you display target temperature information, consider these three dependent values: `temperature_scale`, `hvac_mode`, and the structure's `away` state.

Many data values work together to determine what's shown on the Nest Thermostat display, and how it behaves.

- When `hvac_mode` is set to `heat-cool`, the Nest Thermostat displays the low and high setpoints separated by a bullet character (•), otherwise the Nest Thermostat displays just the target temperature

- When `hvac_mode` is set to `off`, the word "OFF" is displayed on the Nest Thermostat, in the user's preferred language

- When `hvac_mode` is set to `eco`, the word "ECO" is displayed on the Nest Thermostat, in the user's preferred language

The display temperature format also depends on the selected temperature scale (F/C).

Fahrenheit temperatures are displayed as whole numbers:

- Target temperature: 55°F

EF_0895835

PTX-0281-0011

Appx10430

- Ambient temperature: 62°F

Celsius temperatures are displayed as a whole number or a decimal value, with the last digit set to ".5":

- Target temperature: 12°C

- Ambient temperature: 16.5°C

## Leaf

When the leaf icon is showing on the front of the thermostat, the thermostat is set to an energy-saving temperature, and `has_leaf = true`.



## Temperature Lock

Users can lock a Nest Thermostat so that it can only be adjusted within a limited temperature range. Beginning with permissions version v5 (/reference/permissions#permissions_version), you can see if Temperature Lock
 (https://nest.com/support/article/How-can-I-lock-Nest-so-that-it-can-only-be-adjusted-within-a-certain-temperature-range)
is enabled by checking `is_locked` (/reference/api-thermostat#is_locked), and if it is, read Temperature Lock min/max values through the API:

- `locked_temp_min_f` (/reference/api-thermostat#locked_temp_min_f)

- `locked_temp_max_f` (/reference/api-thermostat#locked_temp_max_f)

- `locked_temp_min_c` (/reference/api-thermostat#locked_temp_min_c)

- `locked_temp_max_c` (/reference/api-thermostat#locked_temp_max_c)

Lock temperatures must be specified in pairs, as maximum and minimum values, and can only be written if `is_locked = true`.

## Humidity

Humidity, in percent (%) format, measured at the device, rounded to the nearest 5%.

EF_0895836

PTX-0281-0012

Appx10431

## Sunblock

<u>Sunblock</u> (https://nest.com/support/article/What-is-Sunblock) technology automatically adjusts the temperature on the Nest Thermostat to compensate for heat spikes that occur from direct sunlight on the unit.

These data values will tell you if Sunblock is enabled and/or actively correcting the temperature.

- <u>`sunlight_correction_enabled`</u> (/reference/api-thermostat#sunlight_correction_enabled)

  - boolean, returns `true` if Sunblock is enabled

- <u>`sunlight_correction_active`</u> (/reference/api-thermostat#sunlight_correction_active) - boolean, returns `true` if Sunblock is active, indicating that the Thermostat is located in direct sunlight

## Fan

Many HVAC systems have integrated fans, which means that the <u>fan cannot be controlled independently</u>
 (http://support.nest.com/article/How-do-I-use-Nest-to-turn-on-my-fan-without-heating-or-cooling). There is no off mode for integrated fans, because the fan needs to run when the heating or cooling is on.

However, if the HVAC system is compatible, the fan can be explicitly turned on via the API, in order to make occupants more comfortable, without engaging the full HVAC system.

If the fan can be controlled independently, `has_fan` will be set to `true`, and the following data values can be set with Thermostat read/write permissions:

- <u>`fan_timer_active`</u> (/reference/api-thermostat#fan_timer_active) - boolean, returns `true` if fan timer is engaged for a pre-programmed duration

- <u>`fan_timer_duration`</u> (/reference/api-thermostat#fan_timer_duration) - int, the length of time (in minutes) that the fan is set to run

Use these values together to initiate the fan timer (turn the fan on) for a specific period of time. You can also use the <u>`fan_timer_timeout`</u> (/reference/api-thermostat#fan_timer_timeout) value to determine the timestamp of when the fan is set to stop running.

**EF_0895837**

PTX-0281-0013

<u>Appx10432</u>

Note that you can always change `fan_timer_duration` - it is independent of `hvac_mode` or structure occupancy state (away).

You can expect these responses on success or fail:

- 200 OK

- 400 Bad Request

If the command to turn the fan on doesn't produce the expected result, it may be because the fan is already engaged (either manually by the user, or on a schedule, or because of an HVAC heat/cool cycle).

We'll do our best to honor each call to turn the fan on or off, but some fan behaviors cannot be overridden via

## Rate limiting

We apply rate limiting to protect against excessive calls to devices, which may affect system or battery performance. Under normal conditions, Nest devices charge the battery from the low voltage wires on the heating and cooling system. But if excessive calls are made in a short period of time and the battery level gets low, the Nest Thermostat will turn off Wi-Fi to conserve power.

In practice, this means that we limit the number of calls that can be made to a device within a defined time period. If you exceed this limit, you'll receive an error response and a message indicating you've exceeded your limit.

For more information, see Data Rate Limits (/guides/api/data-rate-limits).

## Power constraints

In some cases the Thermostat may not have enough battery power to service a modification request. In this case you will receive an error response and a message indicating the device can't service the request at this time. If this happens, give the battery some time to recharge before trying again.

EF_0895838

Learn more about <u>low battery conditions in the Nest Learning Thermostat</u> (http://support.nest.com/article/A-low-battery-level-will-cause-Nest-to-disconnect-from-the-Internet).

# Error messages

Some states render certain functions unavailable. These rules are in place to conserve energy or provide comfort and safety.

For information on what API call errors mean and how to handle them, see <u>Error Messages</u> (/reference/error-messages).

## Wi-Fi / connection issue

If a device is offline, modifications are not allowed. You can observe the online state of the device in the data model and display UI appropriately.

Except as otherwise noted, the content of this page is licensed under the <u>Creative Commons Attribution 4.0 License</u> (https://creativecommons.org/licenses/by/4.0/), and code samples are licensed under the <u>Apache 2.0 License</u> (https://www.apache.org/licenses/LICENSE-2.0). For details, see the <u>Google Developers Site Policies</u> (https://developers.google.com/site-policies). Java is a registered trademark of Oracle and/or its affiliates.

Last updated 2020-05-12 UTC.

EF_0895839

PTX-0281-0015

<u>Appx10434</u>

Pages APPX10439;
APPX10467
Removed Due to Confidential Material

Pages APPX10760;
APPX10765
Removed Due to Confidential Material

Pages APPX10797-APPX10799
Removed Due to Confidential Material

Pages APPX10802-APPX10804
Removed Due to Confidential Material

Pages APPX10807-APPX10809
Removed Due to Confidential Material

Pages APPX10819-APPX10881
Removed Due to Confidential Material

# Sensors in Google Nest devices

Last updated: October 5, 2021

Google's connected home devices and services rely on cameras, microphones and other sensors to provide helpful features and services. These sensors can detect things like motion, sound and temperature to protect your home and loved ones and make your lives more convenient and comfortable. And while they make our connected home devices more useful, we understand that you, your family and your friends need to trust that we'll handle your data responsibly.

We've published our commitment to privacy in the home ⬈ where we've committed to the following:

- When our connected home devices include cameras, microphones, or environmental or activity sensors that detect information about your home environment, we'll list these hardware features in the device's technical specifications — whether or not they're enabled.
- We'll also more clearly explain what types of information these sensors send to Google, as well as examples of how we use that information, to help you better understand their purpose.

We have published this sensors guide as part of these commitments. We will continue to periodically update this sensors guide to add new devices, features and services, reflect changes to our existing offerings, or where applicable, provide additional details and information.

The current sensors in Google's connected home devices and services generally fall into the following categories:

- **Cameras** that record video footage and still images and detect what's happening in the home.
- **Microphones** that record audio and can detect specific sounds or motion nearby.
- **Activity sensors** that detect activity or changes to the physical state of the device, such as a door sensor that detects when a door opens, or an accelerometer that detects when a device is moved. Some activity sensors may also detect the presence or movement of people in your home.
- **Environmental sensors** that detect external properties of the surrounding environment — such as temperature, humidity, light, or smoke — and that can help monitor the conditions inside or around your home.
- **Control sensors** that enable control of a device, such as a touch-sensitive button, or a magnetic sensor to detect the position of the ring on the Nest Learning Thermostat.

Google's connected home devices may also contain additional sensors that monitor device operation. For example, internal device sensors can detect when a device's battery is running low, when it's overheating, or other conditions that can affect the ability of the device to operate as intended. We've excluded sensors that collect only such diagnostic data from this sensors guide. In addition to enabling the features and services described, the data from the sensors listed below may also be used to perform device performance and diagnostic functions.

## Types of sensors, what they measure, and examples of uses

| Type of Sensor | What it Measures | Examples of Uses* |
|---|---|---|
| Cameras and Microphones | | |



**Plaintiff's Exhibit**
**PTX-0929**
ECOFACTOR, INC. vs. GOOGLE LLC
No. WA:20-CV-00075-ADA

PTX-0929-0001

Appx10882

1/28/22, 8:37 PM                                                    Sensors in Google Nest devices - Google Nest Help

| Type of Sensor | What it Measures | Examples of Uses* |
|---|---|---|
| Humidity | Humidity sensors measure the amount of water (relative humidity) in the air. | **Nest Learning Thermostat, Nest Thermostat E, Nest Thermostat**<br><br>Detect ambient humidity for comfort optimization and control of whole-home humidifiers.<br><br>**Nest Protect**<br><br>Enables the Steam Check feature to reduce nuisance alarms caused by things like steam from your shower.<br><br>**Nest Guard**<br><br>Currently unused. Included for potential future feature enhancements.<br><br>**Nest Detect**<br><br>Included for potential future feature enhancements. Currently only used for monitoring device operation. |
| Smoke (photoelectric sensor) | Detects the presence of smoke in the air by detecting when smoke particles pass in front of an infrared light source. | **Nest Protect (1st generation)**<br><br>Fire/smoke detection |
| Smoke (Split-Spectrum sensor) | Detects the presence of smoke in the air using two wavelengths of light to look for smoke. An infrared light is used to detect larger particles generated by slow, smoldering fires, while a blue light detects smaller particles created by fast fires. | **Nest Protect (2nd generation)**<br><br>Fire/smoke detection |
| Temperature | Temperature sensors measure the current temperature. This can be the ambient temperature in a room, or the temperature inside a device. | **Nest Hub (2nd gen)**<br><br>Measures ambient room temperature with Sleep Sensing to help you understand sleep environmental disturbances.<br><br>**Nest Learning Thermostat, Nest Thermostat E, Nest Heat Link E, Nest Temperature Sensor, Nest Thermostat**<br><br>Detect ambient room temperature for comfort optimization.<br><br>**Nest Protect**<br><br>Detect sudden rises in room temperature.<br><br>**Nest Guard**<br><br>Currently unused. Included for potential future feature enhancements.<br><br>**Nest Detect**<br><br>Included for potential future feature enhancements. Currently only used for monitoring device operation. |
| **Control Sensors** | | |

PTX-0929-0007

Appx10888

Page APPX10890
Removed Due to Confidential Material

Page APPX10891
Removed Due to Confidential Material



GOOGLE NEST

# Behind the scenes with the new Nest Thermostat

Oct 30, 2020  ·  2 min read

**Laura Breen**
Nest Team



**EF_0895723**

PTX-0263-0001

Appx10892

we're taking steps to make that possible for most systems in Canada and the U.S. with HVAC monitoring, which is rolling out today to all Nest thermostats in those regions.

**Where did the idea for the HVAC monitoring feature come from?**

Marco: It started two years ago, as a side project. The first question was "is this going to be valuable for people?" and the answer was "yes." When our customers had an HVAC issue, they would call us assuming there was something wrong. We were trying to help them troubleshoot and connect them to a Nest Pro, but we wanted to do it more proactively. That led us to the second question, "can we do this?" and the answer was also, "yes, we can do this." Moving forward, we should be able to provide even more context, so it will help people, and pros, even more. We already saw improvements since we launched the beta earlier this year, so we're really encouraged to provide more proactive help to customers.

**What made this possible?**

Ramya: Cloud computing advancements, definitely. We used to run a lot of algorithms on the device, that's what got Nest started. Now, with cloud computing, we can aggregate data anonymously from Nest thermostats to inform what sort of actions we take and what we can suggest to owners. This helps inform features like Savings Finder and HVAC monitoring.

Originally, each thermostat operated on its own, but now we have the power to make intelligent decisions based on anonymized data, which might not have been possible if we were just looking at each individual device.

**How does a smart thermostat find possible HVAC issues?**

Marco: We monitor the estimated ambient and target temperature and predict time to temperature. We have predicted the expected behavior and then look for anomalies which may be potential performance issues with the HVAC system.

ⓘ Temperature decline while the heat was on

March 6

70°F

EF_0895725

PTX-0263-0003

Appx10894