2023-1101

# United States Court of Appeals for the Federal Circuit

---

ECOFACTOR, INC.,

*Plaintiff-Appellee,*

v.

GOOGLE LLC,

*Defendant-Appellant.*

---

On Appeal from the United States District Court
for the Western District of Texas
Case No. 6:20-cv-00075-ADA
Hon. Alan D Albright

---

**DEFENDANT-APPELLANT GOOGLE LLC'S CORRECTED
NON-CONFIDENTIAL PETITION FOR REHEARING EN BANC**

---

ROBERT A. VAN NEST
LEO L. LAM
EUGENE M. PAIGE
R. ADAM LAURIDSEN
KRISTIN E. HUCEK
STEPHANIE J. GOLDBERG
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188
E-mail: rvannest@keker.com

Counsel for Defendant-Appellant GOOGLE LLC

July 22, 2024

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, counsel for

Defendant-Appellant Google LLC certifies the following:

1.    Full name of Party Represented by me:

      Google LLC

2.    Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me:

      None

3.    Parent corporations and publicly held companies that own 10% or more stock in the party:

      XXVI Holdings Inc. and Alphabet Inc.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case):

      Keker, Van Nest & Peters LLP:
- Eric B. Hanson

2740284

- Jennifer A. Huber (now with the San Francisco City Attorney's Office)
- Matthias Andreas Kamber (now with Paul Hastings LLP)
- Patrick E. Murray (now with Gibson, Dunn & Crutcher LLP)
- Anna Porto (now in-house counsel with Mercury)
- Gregory D. Washington (now with Jenner & Block LLP)

Potter Minton PC:
- Michael E. Jones
- Shaun William Hassett

Allen & Overy LLP:
- Shamita D. Etienne-Cummings
- James P. Gagen
- Eric Lancaster
- James Reed
- Bijal V. Vakil

White & Case LLP:
- Henry Yee-Der Huang
- Michael J. Songer

5.    The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

- *EcoFactor, Inc. v. Google LLC*, 22-1971 (Fed. Cir. June 24, 2022)

- *EcoFactor, Inc. v. Amazon.com, Inc.*, 6:22-cv-00068 (W.D. Tex. Jan. 18, 2022)

- *EcoFactor, Inc. v. Resideo Technologies, Inc.*, 6:22-cv-00069 (W.D. Tex. Jan. 18, 2022)

- *EcoFactor, Inc. v. Pointcentral, LLC et al.*, 6:22-cv-00055 (D. Or. Jan. 10, 2022)

- In re *Ex Parte* Reexamination of U.S. Patent No. 8,412,488, 90/014,916 (U.S. PTO Dec. 3, 2021)

- In re *Ex Parte* Reexamination of U.S. Patent No. 8,738,327, 90/014,915 (U.S. PTO Dec. 3, 2021)

- In re *Ex Parte* Reexamination of U.S. Patent No. 10,534,382, 90/014,679 (U.S. PTO Feb. 12, 2021)

- *ecobee, Inc. v. EcoFactor, Inc.*, IPR2021-01052 (PTAB Jun. 10, 2021)

- *EcoFactor, Inc. v. Vivint, Inc.*, 6:20-cv-00080 (W.D. Tex. Jan. 31, 2020)

- *EcoFactor, Inc. v. ecobee, Inc.*, 6:20-cv-00078 (W.D. Tex. Jan. 31, 2020)

6. **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

None

Date: July 22, 2024          */s/ Robert A. Van Nest*
                             Robert A. Van Nest

2740284

# TABLE OF CONTENTS

STATEMENT OF COUNSEL UNDER FEDERAL CIRCUIT
    RULE 35(b)(2) ................................................... 1

PRELIMINARY STATEMENT ............................................... 1

BRIEF SUMMARY OF DISTRICT COURT PROCEEDINGS ............... 3

SUMMARY OF PANEL DECISION ......................................... 4

ARGUMENT ................................................................. 6

    I.    Apportionment to the Value of the Patented
        Technology Must be Performed Even When Relying
        on Supposedly Comparable Licenses. ..................... 6

        A.    Mr. Kennedy's generalized statements cannot
            satisfy the requirements of economic
            comparability. ............................................ 8

        B.    Mr. Kennedy's one-size-fits-all royalty
            contravenes settled law on apportionment. ............... 12

    II.    Mr. Kennedy's Opinion Converting Lump-Sum
        License Rates into a Per-Unit Royalty Rate was
        Untethered from the Facts of the Case. ................... 16

CONCLUSION ............................................................. 21

**CONFIDENTIAL MATERIAL OMITTED**

The material omitted on pages 4, 9, 13, 15, and 17-20 consists of a numerical royalty rate ("NRR") that EcoFactor advanced in confidential settlement agreements with third-party licensees, which was presented during sealed testimony at trial. The material omitted on page 20 consists of lump sum settlement amounts ("SUM"), which was presented during sealed testimony at trial.

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Apple Inc. v. Wi-LAN Inc.*,
  25 F.4th 960 (Fed. Cir. 2022)................................... 1, 7, 8, 11

*Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*,
  809 F.3d 1295 (Fed. Cir. 2015) ....................................... 2, 8

*Garretson v. Clark*,
  111 U.S. 120 (1884)..................................................... 1, 11

*Kumho Tire Co. Ltd. v. Carmichael*,
  526 U.S. 137 (1999)........................................................ 12

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
  694 F.3d 51 (Fed. Cir. 2012) ........................................ 6, 10

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009) ..................................... 7, 17

*MLC Intell. Prop., LLC v. Micron Tech., Inc.*,
  10 F.4th 1358 (Fed. Cir. 2021).................................. 1, 17, 18

*Omega Pats., LLC v. CalAmp Corp.*,
  13 F.4th 1361 (Fed. Cir. 2021)........................... 1, 8, 13, 15

*Seymour v. McCormick*,
  57 U.S. 480 (1853) ........................................................... 6

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011) .............................. 7, 12, 15

*Virnetx, Inc. v. Cisco Sys., Inc.*,
  767 F.3d 1308 (Fed. Cir. 2014) ......................................... 7

*Whitserve, LLC v. Comput. Packages, Inc.*,
  694 F.3d 10 (Fed. Cir. 2012) ............................................ 19

*Wordtech Sys., Inc v. Integrated Networks Sols., Inc.,*
  609 F.3d 1308 (Fed. Cir. 2010) ..................................................... 11, 19

**Federal Statutes**

35 U.S.C. § 284 ........................................................................................ 1

**Other Authorities**

Lee, William and Lemley, Mark A., The Broken Balance: How
'Built-In Apportionment' and the Failure to Apply Daubert Have
Distorted Patent Infringement Damages (September 6, 2023),
Stanford Law and Economics Olin Working Paper No. 587,
available at https://ssrn.com/abstract=4564279. ...................................... 6

# STATEMENT OF COUNSEL UNDER FEDERAL CIRCUIT RULE 35(b)(2)

Based on my professional judgment, I believe the panel decision is contrary to the following decisions of the Supreme Court of the United States or the precedents of this court: *Garretson v. Clark*, 111 U.S. 120 (1884); *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960 (Fed. Cir. 2022); *Omega Pats., LLC v. CalAmp Corp.*, 13 F.4th 1361 (Fed. Cir. 2021); and *MLC Intell. Prop., LLC v. Micron Tech., Inc.*, 10 F.4th 1358 (Fed. Cir. 2021).

Date: July 22, 2024

/s/ *Robert A. Van N*est

Robert A. Van Nest

# PRELIMINARY STATEMENT[1]

Upon a finding of infringement, damages should be awarded for no "less than a reasonable royalty for the use made of *the invention* by the infringer." 35 U.S.C. § 284 (emphasis added). The Supreme Court and this Court have consistently interpreted this statute as requiring damages to reflect only the value of the claimed invention. Patent damages must be apportioned between patented and unpatented

---

[1] Throughout this brief, "Dissent" refers to the dissenting opinion in ECF No. 18 and "Op." refers to the majority opinion in ECF No. 18; "Appx" refers to the Joint Appendix.

features.

When rigorously policed, the use of comparable licenses "may be the most effective method of estimating [an] asserted patent's value." *Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1303–04 (Fed. Cir. 2015). Because a comparable license reflects the "market's actual valuation of the patent," it has what this Court has called "built[-]in apportionment." *Id.* at 1303.

This case demonstrates the danger of courts failing to rigorously scrutinize a patentee's reliance on supposedly comparable licenses: an artificially inflated damages award that is divorced from market realities and devoid of connection to the patent's incremental improvement to the art. Indeed, the panel majority finds no error in EcoFactor's scheme, one easily repeatable by future patentees: First, EcoFactor picked and inserted a self-serving, non-agreed royalty rate in a lump-sum settlement via a non-binding provision (*e.g.*, a "whereas" clause), while omitting facts (*e.g.*, total unit sales) that could be used to confirm or rebut that rate; and, second, EcoFactor then had its expert later pseudo-justify the rate to apply in this case by opining that there would be both upward and downward adjustments to the rate at the hypothetical negotiation, but

those adjustments would result only in a net zero (or relatively minimal) downward adjustment. EcoFactor's scheme provides a roadmap for patentees to manufacture a royalty rate through portfolio-wide settlement licenses and then present backward-reasoning expert testimony to justify that rate in subsequent cases involving any patent(s) in that portfolio.

The panel decision blows a hole through the Court's efforts to require apportionment. Rehearing en banc is necessary to clarify that this kind of methodology—full of generic sweeping statements of comparability and conclusions untethered from the facts of the case— cannot withstand scrutiny. Judge Prost's dissent highlights this concern:

> In recent years, our court has made some progress in clarifying important questions related to damages for patent infringement. Such clarifications relate to deriving a reasonable royalty from a lump-sum license and requiring the patentee to confine its damages to the value of the patented technology. Unfortunately, the majority opinion here at best muddles our precedent and at worst contradicts it.

Dissent at 1.

## BRIEF SUMMARY OF DISTRICT COURT PROCEEDINGS

EcoFactor's contention that Google infringed three claims of two of its patents was tried to a jury in early 2022. At trial, Mr. Kennedy,

EcoFactor's damages expert, testified that EcoFactor was entitled to a royalty of ███ per unit. His testimony was primarily based on unilateral "whereas" recitals in three license and settlement agreements between EcoFactor and other companies—Schneider, Daikin, and Johnson. Each license was for a lump sum, not a royalty, to EcoFactor's entire portfolio. The district court denied Google's *Daubert* motion to exclude this testimony. The jury subsequently found infringement of one patent claim and awarded $20,019,300 to EcoFactor. Google moved for a new trial on the ground that the court should have excluded Mr. Kennedy's damages opinion sponsoring the ███ per-unit royalty rate. The court denied the motion; Google then appealed.

## SUMMARY OF PANEL DECISION

Google's damages-related appeal centered on the district court's failure to exclude Mr. Kennedy's unreliable testimony based on two fatal flaws: (1) Mr. Kennedy's per-unit royalty rate could not be supported by the lump-sum licenses; and (2) Mr. Kennedy failed to apportion the royalty rate in his comparable-license analysis.[2]

---

[2] Google's petition for rehearing is limited to the damages issues and does not include the liability issues raised before the panel.

The panel majority upheld the damages verdict. Op. at 14. On the first issue, the panel majority concluded that Mr. Kennedy's opinion purporting to convert the lump-sum license rates into a royalty rate was supported by the "whereas" recitals themselves, the testimony of EcoFactor's CEO about the licenses, and an email introduced at trial regarding one of the three licenses. Op. at 11. On the second issue, the panel majority reasoned that Mr. Kennedy had sufficiently demonstrated economic comparability of the license agreements and apportioned for the value of the only patent claim found infringed, claim 5 of the '327 patent. Op. at 17–18.

The panel dissent disagreed on both points. The dissent first explained that Mr. Kennedy's royalty rate opinion was untethered from the realities reflected in the lump-sum licenses. Dissent at 3. And on the issue of apportionment, the dissent concluded that Mr. Kennedy's royalty rate improperly included the value of other licensed patents. Dissent at 6.

**ARGUMENT**

## I.  Apportionment to the Value of the Patented Technology Must be Performed Even When Relying on Supposedly Comparable Licenses.

In *Seymour v. McCormick*, the Supreme Court expounded: "[O]ne who invents some improvement … [cannot] claim that the profits of the whole … should be the measure of damages for the use of his improvement." 57 U.S. 480, 489 (1853).  This principle is fundamental to patent law and the patent system.  Apportionment ensures the right balance to incentivize innovation.  *See* Lee, William and Lemley, Mark A., The Broken Balance: How 'Built-In Apportionment' and the Failure to Apply Daubert Have Distorted Patent Infringement Damages (September 6, 2023).[3]

The same principle underlies this Court's application of the "entire market value rule" or "EMVR."  The EMVR is "a narrow exception" to the general rule that a royalty rate should not be calculated based on an entire multi-component product when just small elements of the product are accused of infringement.  *LaserDynamics, Inc. v. Quanta Comput.,*

---

[3] Stanford Law and Economics Olin Working Paper No. 587, available at https://ssrn.com/abstract=4564279.

*Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012). Patentees may avail themselves of the EMVR only if they can "prove that the patent-related feature is the basis for customer demand" for the broader product. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1336 (Fed. Cir. 2009) (internal quotation marks omitted). This exception applies sparingly. *See, e.g.*, *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011) ("The Supreme Court and this court's precedents do not allow consideration of the entire market value of accused products for minor patent improvements simply by asserting a low enough royalty rate.").

This Court has applied a similarly exacting standard for patentees advancing damages theories utilizing supposedly comparable licenses as part of a hypothetical negotiation analysis. "[L]icenses relied on by the patentee in proving damages must be sufficiently comparable to the hypothetical license at issue." *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014). To demonstrate sufficient comparability, a party must "account for differences in the technologies and economic circumstances of the contracting parties." *Apple*, 25 F.4th at 971. Even if a license is sufficiently comparable, the patentee still needs to account for "distinguishing facts when invoking [a] license[]" to satisfy

apportionment. *Omega Pats.*, 13 F.4th at 1380. Only in the circumstance where the license's royalty rate and royalty base combination effectively "embody the value of the asserted patent" can apportionment be "effectively baked into" the licensed rate. *Id.* at 1377.

When apportionment is based solely on the theory that a license is comparable, the validity of the apportionment analysis turns entirely on comparability. It is therefore critical that courts engage in rigorous gatekeeping with respect to comparability. *See, e.g.*, *Commonwealth Sci.*, 809 F.3d at 1303 n.2. If they do not, the risk of improper (or no) apportionment is too high. Until now, this Court has rejected attempts to further expand "baked-in[]" apportionment beyond narrow applications. *See Omega Pats.*, 13 F.4th at 1380; *Apple*, 25 F.4th at 971. But the deference shown by the panel here cannot be reconciled with those decisions. The panel majority has untenably shifted the admissibility line for comparable license apportionment beyond the bounds of accepted precedent—from "sufficiently comparable" to conclusory assertions of comparability.

### A. Mr. Kennedy's generalized statements cannot satisfy the requirements of economic comparability.

The panel majority concluded that Mr. Kennedy "relied on

sufficiently comparable licenses and his opinion sufficiently apportioned the value of the '327 patent." Op. at 18. That was error.

Mr. Kennedy's comparable license analysis rests on three settlement agreements, executed after this litigation commenced, licensing EcoFactor's entire portfolio of over thirty patents to each of Schneider, Daikin, and Johnson. Each license settled ongoing patent litigation between EcoFactor and the licensee:

- The Schneider and Daikin settlement agreements specifically listed seven asserted patents, including the '327 patent. *See* Appx10400-10410, Appx10389-10399.
- The Johnson settlement agreement specifically listed four asserted patents, *none* of which were the '327 patent. *See* Appx10411-10419.

Mr. Kennedy opined that EcoFactor and Google would have agreed in a hypothetical negotiation to the same NRR per-unit royalty for a license to the *one* infringed patent as the royalty he asserts was agreed upon in these portfolio licenses for more than *thirty* patents.

The majority concludes that Mr. Kennedy's methodology was sufficiently reliable for admissibility because he "acknowledged that

these three licenses also covered patents in EcoFactor's portfolio that were not asserted" and "accounted for such differences." Op. at 16. The majority explained that Mr. Kennedy testified that the presence of the non-asserted patents would simply place "downward pressure on the royalty rate" in the hypothetical negotiation. Op. at 16-17; Appx5765-5768, Appx5771-5772. And the majority credited Mr. Kennedy's testimony that upward pressure would apply to the license royalty rates because the parties assume validity and infringement in the hypothetical negotiation, ending exactly where he began. Op. at 16–17.

This was the extent of Mr. Kennedy's "account[ing]"—nothing more than generic statements that do not address the *specific* non-asserted patents included in the licenses.

If all that is needed to show built-in apportionment are such broad-brush statements, this Court will have shifted the standard for expert admissibility. Previously, "[w]hen relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses d[id] not suffice." *LaserDynamics*, 694 F.3d at 79. Under the majority's reasoning, however, as long as an expert nods toward economic comparability by providing broad statements—

offering an opinion that "the royalty rate would likely be less," for example—the expert's opinion would be admissible under the cloak of built-in apportionment (assuming the license is technically comparable). The majority effectively endorses the admissibility of inflated royalty rates in contravention of blackletter law that the patentee "must in every case give evidence tending to separate or apportion … between the patented feature and the unpatented features." *Garretson v. Clark*, 111 U.S. 120, 121 (1884).

In other words, if it stands, the majority opinion threatens to substantially lower the bar for admissibility of expert opinions based on comparable portfolio licenses. Instead of demanding experts "address the extent to which these other patents contributed to the royalty rate in the [supposedly comparable] license," *Apple*, 25 F.4th at 973, experts' generic assertions as to effects on the royalty rate now suffice. Such "[s]peculation or guesswork" cannot reliably support a damages award. *Wordtech Sys., Inc v. Integrated Networks Sols., Inc.*, 609 F.3d 1308, 1319 (Fed. Cir. 2010).

The majority's error is only compounded by the risk that a large portfolio rate will prejudice the jury towards a high damages number.

This Court's decision in *Uniloc* recognized the problem with placing artificially inflated damages numbers before the jury: it risks "skew[ing] the damages horizon for the jury, regardless of the contribution of the patented component to this [number]." 632 F.3d at 1320. As the Court aptly explained, this "cat [can] never [be] put back into the bag," even with cross-examination. *Id.*

The majority rests its reasoning on a concern that the Court will tread on the role of the jury. But in so doing, the Court entirely side-steps the judge's obligation to ensure the jury weighs only "reliable and relevant" expert testimony. *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999). As the dissent aptly observes:

> Our damages law ensures that an expert asks the right questions. Many admissible answers to these questions are possible, and it is those answers that are subject to the crucible of cross-examination. Mr. Kennedy failed to ask the right questions at multiple junctures. The majority's decision to overlook the prejudicial impact of his unreliable testimony abdicates its responsibility as a gatekeeper and contradicts our precedent.

Dissent at 10–11.

## B. Mr. Kennedy's one-size-fits-all royalty contravenes settled law on apportionment.

A patent-agnostic royalty rate, like the one Mr. Kennedy offered, is

facially unreliable. Under Mr. Kennedy's opinion, each of the supposedly comparable licenses applied a NRR per-unit royalty in exchange for a license to the entire portfolio of asserted and unasserted patents. At trial, Mr. Kennedy testified that the entirety of this NRR per-unit royalty from the licenses was attributable to the two remaining patents asserted against Google—the '327 patent, one claim of which the jury ultimately found infringed, and another patent, two claims of which were found not infringed. Appx5767-5768, Appx5810. This was so, in his opinion, even though EcoFactor's technical expert opined that the two patents cover *different* technologies. *See* Appx5580. Even more remarkably, Mr. Kennedy further opined that this NRR per-unit royalty would apply regardless of the number of patents or claims found infringed. Appx5767-5768, Appx5810. In other words, Mr. Kennedy claimed that in each scenario—a license to 30+ different patents or a license to any subset of the 30 (perhaps seven, two, or even just one patent)—a party would pay the same NRR per-unit rate to EcoFactor. As the dissent recognized, this is exactly the kind of "patent/claim-independent approach" this Court has previously rejected as inadequate for apportionment. *Omega Pats.*, 13 F.4th at 1379 (rejecting expert's opinion that "[Defendant]

should pay the same rate no matter how many claims or how many of the patents it infringes."). Apportionment requires accounting for each patent's incremental contribution. This Court should clarify that an opinion like Mr. Kennedy's—where the same royalty rate applies to a license for all or any subset of patents and claims covering different contributions to the art—should be considered as presumptively not apportioned to the value of each specific claimed invention.

Mr. Kennedy's methodology amounts to a baseline royalty-rate opinion under the guise of a comparable license theory. This is unsurprising—EcoFactor's CEO testified that it wishes to follow a baseline royalty rate approach in negotiating patent licenses. Appx5671. But setting aside the CEO's testimony, Mr. Kennedy's own testimony exposes his bottom-line opinion: On the one hand, Mr. Kennedy testified that "settlements of litigation generally always focus on the asserted patents and don't look at the rest of the portfolio." Appx5771-5772. So he claimed, for example, that the parties to the Daikin license would have focused on the '327 patent and the six other asserted patents, and then the other patents in the portfolio, "when the agreement is done," would be "thrown in usually either for nothing or very little additional value."

Appx5767-5768. Kennedy then opined that this same reasoning applied to the Johnson license. Appx5772-5773. But under Kennedy's own reasoning, the '327 patent drives the value in the Daikin license as an asserted patent, yet it is simultaneously of little-to-no value in the Johnson license because it was not asserted. That is, Kennedy's methodology results in the same rate regardless of which patents are asserted or what technological improvement is at issue. Until now, this Court has rejected this sort of patent-agnostic approach as insufficient for apportionment. *See Omega*, 13 F.4th at 1379–80.

The majority suggests Mr. Kennedy's failure to apportion is excused by a supposed analysis of Google's per-unit profits. Not so. That method, which EcoFactor has described as part of a "dual approach to apportionment," ECF No. 11 at 20, had *no bearing* on the NRR per-unit rate Mr. Kennedy offered. Instead, Mr. Kennedy started where he ended—with the flawed NRR rate—and compared it against purported per-unit profits as a rough "reasonableness check." Contrary to the majority's view, Mr. Kennedy's failure to apportion cannot be saved when it begins and ends with the same faulty premise. *See Uniloc*, 632 F.3d at 1317 ("Beginning from a fundamentally flawed premise and adjusting it

based on legitimate considerations specific to the facts of the case nevertheless results in a fundamentally flawed conclusion.").

In short, Mr. Kennedy's choose-your-asserted-patents-to-arrive- at-the-same-royalty methodology cannot survive the scrutiny typically applied by this Court and district courts at the *Daubert*/admissibility stage. Simply put, "there must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case." *Uniloc*, 632 F.3d at 1317. Here, Mr. Kennedy's opinions lack a basis in fact. The Court must ensure the district court does not abdicate its role as gatekeeper; it should exclude unreliable testimony of this kind.

## II. Mr. Kennedy's Opinion Converting Lump-Sum License Rates into a Per-Unit Royalty Rate was Untethered from the Facts of the Case.

The majority also erred for a second, independent reason: Mr. Kennedy cannot reasonably rely on the lump-sum portfolio licenses to support the per-unit royalty rate he advanced. Mr. Kennedy's per-unit royalty opinion is based solely on self-serving recitals and an understanding that runs contrary to the plain language of the agreements.

16

Under this Court's precedent, an expert must have some basis in the record to convert a lump-sum license to a per-unit royalty. *See, e.g.*, *MLC Intell. Prop.*, 10 F.4th at 1368 (explaining that an expert must "offer[] testimony as to how those lump-sum payments could be converted to any royalty rate"); *see also Lucent Techs.*, 580 F.3d at 1330 (requiring that "some basis for comparison must exist in the evidence presented to the jury"). This opinion must be "sufficiently tethered to the evidence presented" and compatible with the license agreement as a whole. *MLC Intell. Prop.*, 10 F.4th at 1368. Mr. Kennedy's opinion flouts these requirements. Yet the majority again overlooks these deficiencies.

The record reflects that each of the three license agreements involved a small, one-time, lump-sum payment to settle litigation. *See* Appx10402, Appx10391, Appx10413. So from what did Mr. Kennedy calculate his per-unit royalty opinion? He relies on a "whereas" clause recital in each license that he claims clarifies that each lump-sum amount is *based on* a reasonable royalty of ███. But Mr. Kennedy (as well as EcoFactor's CEO) had no unit-sales number (to use as a divisor) to actually calculate from any lump sum (dividend) the ███ rate (quotient). In other words, Mr. Kennedy did not perform any calculation

whatsoever. Without any unit-sales number, nor could Google challenge the propriety of the self-serving rate. The majority nevertheless blesses this approach, effectively giving patentees a tool to insulate their own preferred rates from scrutiny. Just as the dissent emphasizes: "The self-serving recitals reflect only EcoFactor's transparent attempt to manufacture a royalty rate using its 'belief.'" Dissent at 4–5. This Court should reject that attempt.

The unilateral "whereas" recitals underpinning Mr. Kennedy's opinion cannot suffice to support his view that the licenses employed a **NRR** per-unit royalty because that understanding is "incompatible with the … agreement[s] as a whole." *MLC Intell. Prop.*, 10 F.4th at 1368. Indeed, as the dissent observes, both the Schneider and Daikin licenses include expressly contradictory provisions reflecting the agreement of *both* parties that the lump-sum payments are "*not based upon sales and do not reflect or constitute a royalty*." Appx10391 (emphasis added), Appx10402. In the face of this evidence, the majority holds that the Johnson agreement—which lacks the same express refutation[4]—can

---

[4] The '327 patent was not identified as an asserted patent in the Johnson license. *See supra* at 9.

therefore be understood as supporting Mr. Kennedy's per-unit royalty.[5]
But if one contract recital in a lump sum license agreement about what
one party unilaterally believes is a reasonable royalty is adequate to
support an expert's opinion on a per-unit royalty, then this Court has
strayed far from the stringent baseline it once applied. *Whitserve, LLC
v. Comput. Packages, Inc.*, 694 F.3d 10, 30 (Fed. Cir. 2012) ("[L]ump sum
payments similarly should not support running royalty rates without
testimony explaining how they apply to the facts of the case."); *see also
Wordtech Sys.*, 609 F.3d at 1320 (determining that lump sum licenses
could not support the royalty rate because "[n]either license describes
how the parties calculated each lump sum, the licensees' intended
products, or how many products each licensee expected to produce.").

The "whereas" clauses cannot as a matter of law provide support
for Mr. Kennedy's proposition that the lump sum licenses were calculated
using the NRR royalty rate. Both EcoFactor's CEO and Mr. Kennedy
admitted that they had never seen the licensees' sales numbers. *See*

---

[5] Johnson recently sought to enjoin EcoFactor from making
misrepresentations about its settlement agreement, including regarding
the royalty rate being based on unit sales. *See* ECF 13 at 7 n. 3 (citing
Verified Compl., *Johnson Controls, Inc. v. EcoFactor Inc.*, 2023-0442-
LWW (Apr. 20, 2023)).

Appx5691, Appx5695, Appx5697-5698, Appx5804, Appx5794, Appx5797, Appx5806. Mr. Kennedy even admitted that it was not possible to calculate a per-unit royalty from the lump-sum licenses "without having that information." Appx5802.[6] If Mr. Kennedy and EcoFactor's CEO lacked the evidence necessary to perform such a calculation, a jury should not be told that is what the licenses amounted to. And while the majority points to an email between EcoFactor and Johnson, even assuming it supports Mr. Kennedy's view, it cannot transform Mr. Kennedy's per-unit royalty opinion into a reliable one, when he did not rely on the email in his testimony.

A straightforward application of this Court's precedent tells us that Mr. Kennedy's royalty rate is unsupported and should have been excluded. Mr. Kennedy provided no basis in the record showing how the settlement lump sums can be converted to a royalty rate. The majority's conclusion to the contrary—that Mr. Kennedy's opinion was sufficiently reliable and tethered to the facts of the case—cannot survive scrutiny.

---

[6] It would be surprising to learn that **NRR** multiplied by some number of units sold had resulted in each of the three round lump-sum amounts agreed upon in each of the licensees— **SUM** , **SUM** , and **SUM** . *See* Appx10391, Appx10413, Appx10402.

Admitting this kind of unsupported expert conjecture represents a significant departure from this Court's established standards.

## CONCLUSION

For the foregoing reasons, Google requests that the Court vacate the panel opinion and grant en banc review to clarify the standards for admissibility of damages expert opinions involving comparable licenses.

Respectfully submitted,


/s/ *Robert A. Van Nest*

ROBERT A. VAN NEST
LEO L. LAM
EUGENE M. PAIGE
R. ADAM LAURIDSEN
KRISTIN E. HUCEK
STEPHANIE J. GOLDBERG
KEKER, VAN NEST & PETERS
LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188
Counsel for Defendant-Cross-
Appellant GOOGLE LLC

July 22, 2024

# ADDENDUM

# United States Court of Appeals for the Federal Circuit

---

**ECOFACTOR, INC.,**
*Plaintiff-Appellee*

**v.**

**GOOGLE LLC,**
*Defendant-Appellant*

---

2023-1101

---

Appeal from the United States District Court for the Western District of Texas in No. 6:20-cv-00075-ADA, Judge Alan D. Albright.

---

Decided:  June 03, 2024

---

BRIAN DAVID LEDAHL, Russ August & Kabat, Los Angeles, CA, argued for plaintiff-appellee.  Also represented by MINNA CHAN, KRISTOPHER DAVIS, MARC A. FENSTER, REZA MIRZAIE, JAMES PICKENS.

ROBERT A. VAN NEST, Keker, Van Nest & Peters LLP, San Francisco, CA, argued for defendant-appellant.  Also represented by KRISTIN ELIZABETH HUCEK, LEO L. LAM, ROBERT ADAM LAURIDSEN, EUGENE M. PAIGE.

---

Before LOURIE, PROST, and REYNA, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* REYNA.

Opinion dissenting-in-part filed by *Circuit Judge* PROST.

REYNA, *Circuit Judge.*

EcoFactor sued Google in the Western District of Texas alleging patent infringement of U.S. Patent No. 8,738,327. After discovery and resolution of various motions, the case was heard by a jury. The jury found that Google infringed the asserted claim 5 of the '327 patent and awarded damages to EcoFactor. Google appeals three of the district court's orders: the denial of Google's motion for summary judgment that claim 5 of the '327 patent was invalid under 35 U.S.C. § 101; the denial of Google's motion for judgment as a matter of law of non-infringement of the '327 patent; and the denial of Google's motion for a new trial on damages. For the following reasons, we affirm.

BACKGROUND

A.  U.S. Patent No. 8,738,327

U.S. Patent No. 8,738,327 ("'327 patent") relates generally to the operation of smart thermostats in computer-networked heating and cooling systems ("HVAC systems"). The primary recited purpose of the patent is to reduce strain on the electricity grid during a period of expected high demand through adjustments to the user's thermostat settings that reduce the electricity consumed by the user's HVAC system. '327 patent at 1:21–27, 9:46–54. Claim 1 of the '327 patent recites a system "for controlling the operational status of an HVAC system" where "at least one thermostat [is] associated with a structure that receives temperature measurements from inside the structure." *Id.* at 9:26–31. Claim 1 includes an "estimation" limitation where "one or more servers receive inside temperatures from the thermostat and compare[] the inside temperatures of the structure and the outside temperatures over time *to derive an estimation for the rate of change* in inside temperature of the structure in response to outside

temperature." *Id.* at 9:38–45 (emphasis added). Claim 5 adds that "the estimation [limitation in claim 1] is a prediction about the future rate of change in temperature inside the structure." *Id.* at 9:65–67.

B. Procedural History

EcoFactor, owner of the '327 patent, sued Google for patent infringement over Google's smart thermostat products, particularly several Nest thermostats.[1] After discovery, Google moved for summary judgment that certain claims of the '327 patent (including claim 5) were invalid because they were directed to patent ineligible subject matter, an abstract idea, under 35 U.S.C. § 101. The district court denied the motion. J.A. 5046.

The district court also denied Google's *Daubert* motion to exclude the opinion of EcoFactor's damages expert, Mr. Kennedy, rejecting Google's argument that Mr. Kennedy's opinion was unreliable and therefore prejudicial. J.A. 2254.

Following a six-day jury trial, the jury found that Google infringed claim 5 of the '327 patent and awarded EcoFactor damages. J.A. 45–49. Google renewed its motion for judgment as a matter of law ("JMOL") of non-infringement of the '327 patent, arguing that the accused products do not measure, but rather, estimate the temperature inside the structure and therefore cannot infringe. Google also moved for a new trial on damages, arguing that the opinion of EcoFactor's damages expert, Mr. Kennedy, was speculative and unreliable such that it should have been excluded from trial. The district court denied both motions from the bench. J.A. 6662; J.A. 6688.

---

[1] Google acquired Nest Labs, Inc. prior to the underlying lawsuit.

Google appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

## DISCUSSION

Google raises three issues on appeal.[2] First, Google contends the district court erred in denying Google's motion for summary judgment that claim 5 of the '327 patent was directed to patent ineligible subject matter under § 101. Second, Google asserts the district court erred in denying Google's JMOL motion for non-infringement of the '327 patent. Third, Google contends the district court erred in denying Google's motion for a new trial on damages because Mr. Kennedy's damages opinion was based on unreliable methodology. We address each issue in turn.

### I. Patent Eligibility

Google appeals the district court's denial of summary judgment that claim 5 of the '327 patent was patent ineligible under § 101.

Section 101 of the Patent Act provides that: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court has articulated a two-step test, commonly referred to as the "*Alice*" test, for examining whether a patent claims patent-ineligible subject matter. *Alice Corp. Pty. Ltd. v. CLS Bank Intern.*, 573 U.S.

---

[2]    This appeal was originally consolidated and included an original appeal by EcoFactor and cross-appeal by Google. The consolidated appeal contained other patents and issues. Prior to oral argument, the parties stipulated to the dismissal of the original appeal by EcoFactor, Appeal No. 22–1974, leaving only Google's cross-appeal involving the '327 patent. *See* Appeal No. 22–1974, ECF No. 59 at 7.

208, 217–18 (2014). At *Alice* step one, we review whether a claim is directed to a patent-ineligible concept, such as an abstract idea. *Id.* At *Alice* step two, we review whether the claim recites elements sufficient to transform the abstract idea into a patent-eligible application. *Id.* at 217–18, 221.

Prior to trial, Google filed a motion for summary judgment, arguing that claim 5 of the '327 patent (among others) was invalid as directed to patent ineligible subject matter under § 101. The district court reviewed the motion, relying on the *Alice* inquiry. The district court denied the motion and submitted step two of the *Alice* inquiry to the jury. J.A. 5046.

At trial, the verdict form asked whether Google met its burden to prove by clear and convincing evidence that the elements of claim 5 of the '327 patent, when taken individually and as an ordered combination, involved activities or technology that were well-understood, routine, or conventional to a skilled artisan at the time of the invention. J.A. 47. After hearing testimony and receiving evidence from both parties, the jury answered "no" for claim 5 of the '327 patent. J.A. 47. Google filed a post-trial JMOL motion repeating its § 101 arguments, which the district court denied.

Google now appeals the district court's denial of summary judgment regarding patent ineligibility of claim 5 of the '327 patent, but we have held that a district court's denial of summary judgment is not appealable after a trial on the merits. *Syngenta Crop Prot., LLC v. Willowood, LLC,* 944 F.3d 1344, 1364 n.7 (Fed. Cir. 2019) (citing *Ortiz v. Jordan,* 562 U.S. 180, 183–84 (2011)); *see also* 10 Wright and Miller*, Federal Practice and Procedure* § 2715 (4th ed.) (explaining a denial from summary judgment is an order "from which no immediate appeal is available"). We have explained that an order denying summary judgment is "not a judgment" and "does not foreclose trial on the issues on which summary judgment was sought;" rather, it is

"merely a judge's determination that genuine issues of material fact exist." *Glaros v. H.H. Robertson Co.*, 797 F.2d 1564, 1573 (Fed. Cir. 1986) (reasoning that a denial of summary judgment "does not settle or even tentatively decide anything about the merits of the claim" (citation omitted)). Denial of summary judgment decides only one thing—that the case should go to trial. *Id.*

At trial, the jury heard testimony from various witnesses on whether the elements of claim 5 were well-understood, routine, or conventional. *See, e.g.*, J.A. 5345–5346 (209:20–210:6); J.A. 6373–6374 (1237:15–1238:19); J.A. 6415–6416 (1279:1–1280:20); J.A. 6449–6451 (1313:17–1315:11). Google, however, appeals the order denying summary judgment but not the jury verdict of ineligibility. As the Supreme Court has explained, "the full record developed in court supersedes the record existing at the time of the summary-judgment motion." *Ortiz*, 562 U.S. at 184. Because trial on the merits of the § 101 issue was held, the court's denial of summary judgment is not appealable.

## II. Infringement

For infringement, the only limitation at issue is claim 1's recitation of a system for controlling the HVAC system that includes a thermostat "that receives temperature measurements from inside the structure." '327 patent at 9:26–31. Google alleges that because the accused thermostat products are designed to be completely enclosed in metal, plastic, and/or glass housings, they cannot directly measure the surrounding ambient temperature "inside the structure" like other thermostats.[3] Appellant Br. 41–44.

---

[3] The parties agree that the term "ambient temperature" refers to the temperature surrounding a particular thermostat, *i.e.*, the temperature of the room or structure

Google argues that its thermostats can only derive an estimate of the ambient temperature by measuring only the temperature within the thermostat housing itself, which is not "inside the structure." *See id.* As a result, Google argues that the jury's verdict of infringement is unsupported by substantial evidence.

We review the disposition of motions for JMOL under the law of the regional circuit, here the Fifth Circuit. *See Energy Transp. Grp. Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1350 (Fed. Cir. 2012). The Fifth Circuit reviews de novo the grant or denial of a JMOL motion. *ClearValue, Inc. v. Pearl River Polymers, Inc.*, 668 F.3d 1340, 1343 (Fed. Cir. 2012). Under Fifth Circuit law, a jury's verdict is upheld if supported by substantial evidence. *Med. Care Am., Inc. v. Nat'l Union Fire Ins. Co.*, 341 F.3d 415, 420 (5th Cir. 2003).

We conclude that the jury's infringement verdict is supported by substantial evidence. EcoFactor's infringement expert testified that the accused thermostat products meet the claimed limitation because the thermostats measured temperature of the structure and not just the temperature within the thermostat housing. J.A. 5462–63 (326:20–327:6). EcoFactor's expert supported his conclusion with several forms of evidence. EcoFactor's expert relied on website guides maintained by Google for the benefit of software engineers who develop applications for use with Nest thermostats. One website page states that the Nest thermostats measure the "[a]mbient temperature," defined as the "temperature measured *near the thermostat*"—not just within the thermostat. J.A. 10429 (emphasis added). Another website page explains that the temperature sensors of certain Nest products measure ambient room temperature. J.A. 10888. EcoFactor's expert testified that this

---

in which the thermostat is placed. Appellant Br. 13, 43; Appellee Br. 1, 9–10.

evidence shows that the Nest thermostat "devices have temperature measurements near the thermostat" that measures the "inside temperature" of the structure and are not limited to measuring temperature inside the thermostat housing. J.A. 5453–55 (317:17–319:14). EcoFactor's expert cited Google's source code for the accused products and demonstrated where it described the function of the accused products to measure the surrounding temperature. J.A. 5456–60 (320:18–324:14).

Google's experts conceded the substance of EcoFactor's evidence on cross-examination. Google's non-infringement expert agreed that, according to Google's website pages, the current ambient temperature in the room is measured by the Nest thermostat's internal sensors. J.A. 6154–55 (1018:9–1020:13). Another Google expert witness agreed that the accused thermostat products contain temperature sensors that measure the temperature inside customer homes. J.A. 5945–46 (809:4–809:17).

The expert testimony from both parties, documentary evidence, and source code information demonstrating that the accused products measure temperature of the surrounding structure (and not just the housing) is substantial evidence. *See In re Mouttet*, 686 F.3d 1322, 1331 (Fed. Cir. 2012) (explaining substantial evidence is "relevant evidence as a reasonable mind might accept as adequate to support a conclusion").

In conclusion, the jury's infringement verdict that the accused Nest thermostat products satisfy the claim language of "receives temperature measurements from inside the structure" is supported by substantial evidence.

## III. Damages

Google argues that the district court abused its discretion in denying its Rule 59 motion for a new trial on damages. Appellant Br. 30. According to Google, a new trial on damages was warranted because the initial trial was

unfair or marred by prejudicial error. *Id.* at 25; J.A. 6689 (91:4–8). The alleged error was the district court's evidentiary ruling that the opinion of EcoFactor's damages expert, Mr. Kennedy, was admissible. Appellant Br. 25, 30. Google argues that Mr. Kennedy's damages opinion should have been excluded from trial because it lacked any reliable methodology or underlying calculations. *Id.* at 30. Google also argues that Mr. Kennedy's opinion should have been excluded for lack of comparability and apportionment. *Id.* at 34. We address each argument in turn.

We review the denial of a motion for a new trial under regional circuit law. *Wordtech Sys., Inc. v. Integrated Networks Sols., Inc.*, 609 F.3d 1308, 1312 (Fed. Cir. 2010). The Fifth Circuit reviews a district court's denial of a motion for a new trial for an abuse of discretion. *Fornesa v. Fifth Third Mortg. Co.*, 897 F.3d 624, 627 (5th Cir. 2018). A new trial may be granted if the district court finds that "the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed." *Seidman v. Am. Airlines, Inc.*, 923 F.2d 1134, 1140 (5th Cir. 1991) (citation omitted); Fed. R. Civ. P. 59. "Courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking the new trial." *Jordan v. Maxfield & Oberton Holdings, L.L.C.*, 977 F.3d 412, 417 (5th Cir. 2020) (citation omitted).

Here, Mr. Kennedy used the hypothetical negotiation approach for calculating reasonable royalty damages under 35 U.S.C. § 284. This approach "necessarily involves an element of approximation and uncertainty." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009) (citation omitted); *see also generally* 2 Janice M. Mueller, *Mueller on Patent Enforcement* § 20.04(a) at 869–70 (rev. ed. 2019). According to Mr. Kennedy, EcoFactor would have entered the hypothetical negotiation with the

expectation of receiving a royalty in the amount of $X[4] per unit and would have requested that from Google. J.A. 1277. Based on this $X rate, Mr. Kennedy calculated his proposed damages amount of $Y[5]. J.A. 5740 (604:14–17).

### A.

Google argues that Mr. Kennedy's damages model was speculative and conclusory. Appellant Br. 31. Specifically, Google argues that Mr. Kennedy's proposed $X royalty rate was "plucked . . . out of nowhere." *Id.* at 34 (citation omitted). We disagree.

"[W]hile all [damages] approximations involve some degree of uncertainty, the admissibility inquiry centers on whether the methodology employed is reliable." *Summit 6, LLC v. Samsung Elecs. Co.,* 802 F.3d 1283, 1296 (Fed. Cir. 2015). This includes whether a damages expert's testimony is tied to the particular facts of the case. *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1333–34 (Fed. Cir. 2014); *Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 30 (Fed. Cir. 2012); *Lucent Techs.*, 580 F.3d at 1330. Testimony is inadmissible when it is based only on speculation or guesswork, such that the jury is left to fill in the gaps when calculating a damages award. *Whitserve*, 694 F.3d at 30–33 (holding that testimony was conclusory and speculative when expert did not explain how lump sum amounts could be converted to a reasonable royalty rate); *Wordtech*, 609 F.3d at 1320 (holding that expert's reliance on two

---

[4]    The amount of the per-unit royalty rate is confidential business information subject to a protective order, and as such, is not recited in this opinion.

[5]    The amount of EcoFactor's proposed damages award is confidential business information subject to a protective order, and as such, is not recited in this opinion.

lump licenses was inappropriate when neither explained how the lump-sum amounts were calculated).

Far from plucking the $X royalty rate from nowhere, Mr. Kennedy based this rate on the following admissible evidence: three license agreements and the testimony of EcoFactor's CEO, Mr. Habib. Turning first to the agreements, Mr. Kennedy relied on three license agreements EcoFactor entered into with third-party smart thermostat manufacturers—the Schneider and Daikin licenses in 2020, and the Johnson license in 2021. J.A. 10389–399; J.A. 10400–410; J.A. 10411–419. Each of these agreements included the same $X royalty rate at issue here. Each license agreement provided in a whereas clause that the licensee would pay EcoFactor a lump sum amount "set forth in this Agreement *based on* what EcoFactor believes is a reasonable royalty calculation of *[$X] per-unit* for . . . estimated past and [] projected future sales of products accused of infringement in the Litigation." J.A. 10389 (emphasis added); J.A 10400; J.A. 10411. Thus, as Mr. Kennedy testified at trial, the $X royalty rate was "specifically spelled out in the license agreement[s]." J.A. 5764 (628:2–3).

Mr. Kennedy then relied on the testimony of EcoFactor's CEO, Mr. Habib, who signed the three license agreements on behalf of EcoFactor. J.A. 5794 (658:17–18); J.A. 5666 (530:23–25); J.A. 5669 (533:6–8). Mr. Habib testified that he had seven years in the industry, an understanding of the market, and "what is reasonable for the technologies that [EcoFactor] ha[s]." J.A. 5670 (534:22–25). He then testified that the lump sums contained in each of the three license agreements were based on the $X royalty rate. J.A. 5672, 536:17–18 ("[M]y understanding was that all of it is based on [$X] per infringing unit."). He testified that while he was shielded from the licensees' confidential sales information, he understood that EcoFactor calculated each of the three licenses' lump sums using the $X royalty rate and the past and future

projected sales for each licensee. J.A. 5798 (662:2–5); J.A. 5670 (534:4–10). He also testified that despite being shielded from the licensees' confidential sales numbers, he believed, based on his understanding of the market, that the lump sums reasonably reflected the licensees' sales. J.A. 5672 (536:14–24). According to Mr. Habib, there were "large players" and high barriers to entry in the smart thermostat and smart HVAC control industry, and the licensees were "relatively new or more recent." J.A. 5672 (536:19–24). Thus, "it ma[de] sense that their sale numbers would be low since they'd recently started." J.A. 5672 (536:23–24). He testified that the $X royalty rate in each of the three license agreements was accepted by the parties. J.A. 5671 (535:5–11) ("So, you know, if three companies were willing to accept it, then yeah. That further made it clear to me that it was a reasonable royalty rate that was being accepted by counterparties.").

Finally, in support of Mr. Kennedy's proposed $X royalty rate, EcoFactor introduced at trial an email chain between EcoFactor and Johnson concerning the $X royalty rate. J.A. 10797–99; J.A. 6278 (1142:3–10). In the chain, which was dated a few months before the parties signed the license agreement, the parties discuss the $X royalty rate. J.A. 10797–99. Johnson notes that "[w]e are applying the [$X rate] to the time period" identified by EcoFactor. J.A. 10798.

In light of the three license agreements, Mr. Habib's testimony, and the EcoFactor-Johnson email chain, we determine that Mr. Kennedy's damages opinion concerning the $X royalty rate was sufficiently tied to the facts of the case and thus admissible. *See Finjan, Inc.* v. *Secure Computing Corp.*, 626 F.3d 1197, 1212 (Fed. Cir. 2010); *C & F Packing Co., v. IBP, Inc.*, 224 F.3d 1296, 1304–05 (Fed. Cir. 2000). And based on this context, the "jury was entitled to hear the expert testimony" from Mr. Kennedy concerning the $X royalty rate and "decide for itself what to accept or reject." *Pavo Sols. LLC v. Kingston Tech. Co.,* 35 F.4th

1367, 1379 (Fed. Cir. 2022) (citation omitted).  That is exactly what the jury did in this case.  The jury heard Mr. Kennedy's testimony and Google's extensive cross-examination concerning Mr. Kennedy's understanding of the three license agreements, his reliance on Mr. Habib's testimony, and testimony concerning the emails between EcoFactor and Johnson about the $X royalty rate.    J.A. 5793–5812 (657:4–676:2); J.A. 5794 (658:17–18); J.A. 5667 (531:8–25); J.A. 5668–5670 (532:3–534:3); J.A. 6278–6280 (1142:6–1144:19).  Ultimately, the jury returned a verdict of $20,019,300, which represents significantly less than Mr. Kennedy's proposed damages amount of $Y that would have resulted from applying the $X royalty rate to Google's past sales.

Google argues that Mr. Kennedy's testimony is unreliable because there is no evidence that the parties to the three license agreements actually applied the $X royalty rate.  To the contrary.  First, the three admissible license agreements each disclose that EcoFactor believed that the lump sums in each license was "based on" the $X royalty rate.  Additionally, in its whereas clause, the Schneider license agreement, unlike the Johnson and Daikin agreements, states that "nothing in this clause should be interpreted as agreement by Schneider that [$X] per unit is a reasonable royalty." J.A. 10400.  This clause, *included by Schneider*, speaks to its belief that $X may *not have been reasonable* but it does not speak to whether $X was actually applied in arriving at the lump sum.  Arguably, this provision, when read in context, could also mean that the $X royalty rate was applied by EcoFactor and Schneider.  If Schneider did not believe that the $X royalty rate was actually being applied, it could have said such in the agreement.  But Schneider did not.  Finally, as noted above, Johnson noted in an email chain with EcoFactor that it was "applying" the $X royalty rate.  How much weight should be given to the provisions in the license agreements, including whether they are "self-serving" as Google claims, and

the EcoFactor-Johnson email is a question for the jury.  *See Pavo,* 35 F.4th at 1379; *Finjan,* 626 F.3d at 1212; *C & F Packing,* 224 F.3d at 1304.[6]

To conclude, we determine that Mr. Kennedy's opinion concerning the $X royalty rate was sufficiently reliable for admissibility purposes.  For this reason, we hold that the district court did not abuse its discretion in denying Google's motion for a new trial on damages.

### B.

Google argues that Mr. Kennedy's damages testimony should have also been excluded from trial for a lack of comparability and apportionment.  Appellant Br. 34.  Google does not dispute the technical comparability between the three licenses and Mr. Kennedy's hypothetically negotiated agreement.  Nor could it.  Mr. Kennedy relied on the testimony of EcoFactor's technical expert, Mr. De la Iglesia, for his opinion that the three license agreements were

---

[6]    The dissent relies on a statement in the body of the of the Schneider and Daikin license agreements to support its position that the parties *did not apply* the $X royalty rate contained in these two license agreements' whereas clauses.  *See* Dissent 3–6.  This statement provides that the agreed to lump sum "does not reflect or constitute a royalty."  J.A. 10391; J.A. 10402.  That the *lump sum amount* is not *a royalty* does not mean the parties did not use the $X royalty rate discussed in the agreements to arrive at the lump sum amount.  But even if we were to set aside these two license agreements, the Johnson license agreement alone would suffice.  As Google's own expert agreed at trial, "just one" license agreement can be sufficient to support a damages opinion.  J.A. 6269 (1133:10–14).  This assertion comports with our damages precedent, which does not demand "absolute precision" but may involve some degree of approximation and uncertainty.  *Virnetx,* 767 F.3d at 1328.

technically comparable to the hypothetically negotiated license.   J.A.   5578–5583   (442:22–447:2);   J.A.   5763 (627:7–23); J.A. 5768 (632:7–19).  Google's experts did not rebut Mr. De la Iglesia's opinion on this issue at trial.  J.A. 6268–6270 (1132:4–1134:5).

Rather, Google challenges Mr. Kennedy's economic comparability analysis of the three licenses and the hypothetically negotiated agreement.  Appellant Br. 36–37; Reply Br. 9.   According to Google, the three license agreements were for EcoFactor's entire patent portfolio and Mr. Kennedy failed to account for the value of the '327 patent within that portfolio.  Appellant Br. 36.  We disagree.

Damages owed to the patentee must reflect the value of only the patented improvement—called apportionment. *Omega Pats., LLC v. CalAmp Corp.*, 13 F.4th 1361, 1376 (Fed. Cir. 2021).  If a sufficiently comparable license is used for determining the appropriate reasonable royalty rate, further apportionment may not be required because the comparable license has built-in apportionment.   *Id.* at 1377.  "Built-in apportionment effectively assumes that the negotiators of a comparable license settled on a royalty rate and royalty base combination embodying the value of the asserted patent."  *Id.* (citation omitted).  "For built-in apportionment to apply, the license must be sufficiently comparable in that principles of apportionment were effectively baked into the purportedly comparable license."  *Id.* (citation omitted).  Part of this comparability analysis requires an expert to account "for differences in the technologies and economic circumstances of the contracting parties" to the past licenses and to the hypothetical negotiation at issue. *Finjan*, 626 F.3d at 1211–12.

The degree of comparability of license agreements is a "factual issue[] best addressed by cross examination and not by exclusion."  *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012); *Bio-*

*Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1373 (Fed. Cir. 2020); *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014); *Finjan*, 626 F.3d at 1211. For example, in *Bio-Rad*, we concluded that there was no abuse of discretion in allowing an expert to testify about three licenses, even though one of the licenses was ultimately not proven to be technically comparable to the hypothetically negotiated license. 967 F.3d at 1374 (holding that the "'degree of comparability' was appropriately left for the jury to decide").

Here, Mr. Kennedy sufficiently showed, for purposes of admissibility, that the three license agreements were economically comparable to the hypothetically negotiated agreement. Mr. Kennedy acknowledged that, based on Mr. De la Iglesia's unrebutted testimony, the Schneider and Daikin licenses list seven technically comparable asserted patents, including the '327 patent at issue in the hypothetically negotiated agreement. *See* J.A. 10398; J.A. 10409. He also noted that the Johnson license did not list the '327 patent as an asserted patent but listed four others that covered the same interrelated smart thermostat technologies. J.A. 10411; J.A. 1276. Finally, Mr. Kennedy acknowledged that the three licenses also covered patents in EcoFactor's portfolio that were not asserted in the underlying litigation facing Johnson, Schneider, and Daikin. J.A. 10398; J.A. 10409; J.A. 10411; J.A. 1275–76.

Mr. Kennedy accounted for such differences. Mr. Kennedy testified that in arriving at the $X royalty rate in a hypothetical negotiation, Google would argue that the three license agreements included EcoFactor's portfolio, not just the '327 patent, and thus the $X royalty rate should be decreased. J.A. 5767 (631:19–23). Mr. Kennedy then provided that the three license agreements reflect a settlement and thus the $X royalty rate reflects a risk that that EcoFactor's patents would be found not infringed or invalid. J.A. 1276. According to Mr. Kennedy, this consideration would not be present at the hypothetical

negotiation between EcoFactor and Google, since the assumption is that the '327 patent was infringed and valid. J.A. 1276. As a result, this point would place upward pressure on the negotiated rate.

The three licenses aside, Mr. Kennedy separately grounded his apportionment opinion on underlying internal profit and survey data from Google. Mr. Kennedy testified that, based on underlying customer surveys from Google and based on EcoFactor's technical expert's testimony, the infringed technology at issue in this case attributed to Z%[7] of the profits for the infringed products. J.A. 5755–5758 (619:16–622:13); J.A. 5775–5777 (639:22–641:7). Based on this data, Mr. Kennedy calculated the amount of profit per unit that could be attributed to the '327 patent, which was more than double the $X royalty rate. J.A. 5755–5758 (619:16–622:13). According to Mr. Kennedy, this would also place upward pressure on the negotiated rate at the hypothetical negotiation. J.A. 5780 (644:6–7) ("And that's EcoFactor's response, saying it should actually be a lot higher."). Mr. Kennedy thus concluded that the $X royalty rate "would be a very reasonable and conservative first offer." J.A. 5779 (643: 17–18). This testimony is additional evidence for the jury to consider and weigh when calculating a damages award. *C & F Packing,* 224 F.3d at 1304; *ResQNet.com, Inc., v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) ("At all times, the damages inquiry must concentrate on compensation for the economic harm caused by infringement of the claimed invention.").

Based on this evidence, we conclude that the district court did not abuse its discretion in declining to grant a new trial on damages. Mr. Kennedy's damages opinion

---

[7]     The percentage amount is confidential business information subject to a protective order, and as such, is not recited in this opinion.

relied on sufficiently comparable licenses and his opinion sufficiently apportioned the value of the '327 patent for the issue to be presented to the jury.

Supporting our conclusion is *ActiveVideo*. There, the damages expert relied on an agreement that included the patents at issue and other software services without any alleged attempt to "disaggregate the value of the patent license from the value of the services." 694 F.3d at 1333 (citation omitted). We held that there was no error in failing to exclude the expert's testimony because the degree of comparability and "any failure on the part of [the] expert to control for certain variables are factual issues best addressed by cross examination and not by exclusion." *Id.* Here, Mr. Kennedy went further than the *ActiveVideo* expert by sufficiently accounting for the economic differences between the patents in the three license agreements (asserted and non-asserted) and the hypothetically negotiated agreement. And like in *ActiveVideo*, if there were any failures to control for certain variables in comparability, these factual issues were for the jury to decide. *Id.*

Contrary to Google's position, our case law does not compel a contrary result. In *Omega*, we remanded for a new trial where the expert "merely *identified . . .* differences" between the patents in the licenses and the patents in the hypothetical negotiation and did not distinguish such facts. 13 F.4th at 1380–81. In *Apple*, two of the three license agreements relied on by the expert did not list the subject patent all, and the third license listed the subject patent as a non-asserted patent in a long list of "hundreds of Non-Asserted patents." *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 973 (Fed. Cir. 2022). We determined that there was no record evidence supporting the expert's *assumption* that the subject patent was a "key patent" in these three licenses. *Id.*

Unlike in *Omega* and *Apple,* here we have two of the three licenses at issue explicitly listing the '327 patent as

an "asserted patent." J.A. 10398; J.A. 10409. Additionally, Mr. Kennedy addressed and distinguished the remaining patents discussed in the license agreements. He testified that at the hypothetical negotiation, Google would emphasize the downward pressure that these patents would have on the $X royalty rate. Mr. Kennedy then testified that EcoFactor would note upward pressure on the $X royalty rate by assuming that the '327 patent was valid and infringed. And, unlike in these cases, Mr. Kennedy separately rooted his apportionment analysis on underlying internal profit and survey data from Google. As previously noted, based on this data, Mr. Kennedy was able to determine that the $X royalty rate was a conservative amount attributable to the '327 patent.

Google loses sight of the issue on appeal and the applicable standard of review. Our focus is on the *admissibility* of Mr. Kennedy's damages testimony, and we assess the district court's determination of this issue under the highly deferential abuse of discretion standard. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" are jury functions, not those of a trial judge, and certainly not of an appellate judge. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citation omitted). If the standard for admissibility is raised too high, then the trial judge no longer acts as a gatekeeper but assumes the role of the jury.

Based on the record before us, we conclude that the district court did not abuse its discretion when it denied Google's motion for a new trial. Google has not shown that the district court's decision to admit Mr. Kennedy's damages opinion resulted in prejudicial error or a substantial injustice requiring a new trial on damages.

## CONCLUSION

We have considered Google's remaining arguments and find them unpersuasive. We reject Google's attempt to

appeal the district court's denial of summary judgment. We affirm the district court's post-trial denials of Google's motion for JMOL of non-infringement and Google's motion for a new trial on damages.

## AFFIRMED

### Costs

No costs.

# United States Court of Appeals for the Federal Circuit

————————————

**ECOFACTOR, INC.,**
*Plaintiff-Appellee*

**v.**

**GOOGLE LLC,**
*Defendant-Appellant*

————————————

2023-1101

————————————

Appeal from the United States District Court for the Western District of Texas in No. 6:20-cv-00075-ADA, Judge Alan D. Albright.

————————————

PROST, *Circuit Judge*, dissenting-in-part.

In recent years, our court has made some progress in clarifying important questions related to damages for patent infringement. Such clarifications relate to deriving a reasonable royalty from a lump-sum license and requiring the patentee to confine its damages to the value of the patented technology. Unfortunately, the majority opinion here at best muddles our precedent and at worst contradicts it. I therefore respectfully dissent from the decision

to affirm the district court's denial of Google's motion for a new trial.[1]

Google argues that (1) Mr. Kennedy, EcoFactor's damages expert, calculated an $X royalty rate[2] from the Schneider, Daikin, and Johnson lump-sum licenses in an unreliable way; and (2) the $X rate in any event did not reflect the value of the '327 patent (as distinct from that of other patents covered by those licenses). Google is right on both counts. The district court therefore, in my view, abused its discretion by not granting a new damages trial given Mr. Kennedy's flawed testimony.[3]

## I

Mr. Kennedy's $X rate rests on EcoFactor's self-serving, unilateral "recitals" of its "beliefs" in the license agreements. These recitals are not only directly refuted by two of those same agreements; they also have no other support (e.g., sales data or other background testimony) to back them up. Our law does not allow damages to be so easily manufactured.

When deriving reasonable royalties from lump-sum licenses, we have emphasized that "lump sum payments . . . should not support running royalty rates without testimony explaining how they apply to the facts of the case."

---

[1]    I join the other aspects of the majority's decision.

[2]    Because the specific per-unit royalty rate that Mr. Kennedy uses has been designated confidential, I use $X to refer to his rate.

[3]    When reviewing a district court's exercise of discretion on a critical, often-complicated evidentiary decision such as a damages-expert *Daubert*, it usually helps to see the court's explanation for its decision. Here, at both the *Daubert* stage and in the context of Google's new-trial motion, the district court gave no explanation. J.A. 2254, 6687–89.

*Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 30 (Fed. Cir. 2012); *see also Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1330 (Fed. Cir. 2009) (requiring that "some basis for comparison must exist in the evidence presented to the jury"). We have vacated damages awards where the derivation of a reasonable royalty from a lump sum was "incompatible with the . . . agreement as a whole," *MLC Intell. Prop., LLC v. Micron Tech., Inc.*, 10 F.4th 1358, 1368 (Fed. Cir. 2021), where there was no testimony explaining how lump-sum "payments could be converted to a royalty rate," *Whitserve*, 694 F.3d at 30, and where "[n]either license describe[d] how the parties calculated each lump sum," *Wordtech Sys., Inc. v. Integrated Network Sols., Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010). Mr. Kennedy's $X rate repeats the same fatal errors we identified in *MLC*, *Whitserve*, and *Wordtech*. As in those cases, the licenses here are for a lump-sum amount with no record evidence supporting a calculation of a royalty rate.

Consider what these licenses do (and do not) say. Starting with the Schneider license, one preliminary recital states: "WHEREAS EcoFactor represents that it has agreed to the payment set forth in this Agreement based on *what [it] believes* is a reasonable royalty calculation of [$X] per-unit for what it has estimated is past and projected future sales of products accused of infringement in this Litigation." J.A. 10400 (emphasis added). Yet the body of the license (i.e., its substantive and agreed upon terms and conditions)—which, unlike the recitals, reflects the view of *both* parties—says that its lump-sum payment "*is not based upon sales and does not reflect or constitute a royalty*." J.A. 10402 (emphasis added).

The Daikin and Johnson licenses both contain nearly identical preliminary recitals about the $X rate. J.A. 10389; J.A. 10411. As in the Schneider license, the body of the Daikin license—which, again, reflects the view of *both* parties—says that its lump-sum payment "*is not based upon sales and does not reflect or constitute a*

*royalty*." J.A. 10391 (emphasis added). And while the Johnson license lacks a similar refutation of the recital's "belief" (a belief that, again, was EcoFactor's alone), it still offers nothing more than the recital itself to support any royalty rate.

These recitals became Mr. Kennedy's $X rate. J.A. 5764 (628:10–17); J.A. 5769 (633:9–18); J.A. 5772–73 (636:22–637:4). Mr. Kennedy also relied on the testimony of EcoFactor's CEO, Mr. Habib, as support for this rate. J.A. 5794 (658:17–18). But Mr. Habib's testimony does not establish anything beyond his unsupported "understanding" that these licenses used the $X royalty rate. *See* J.A. 5668–69 (532:23–533:2). When asked during direct examination about the basis for his "understanding," Mr. Habib testified that he was not allowed to see any underlying financial information or sales data. J.A. 5670 (534:4–14). Mr. Habib also explained his basis for believing that the $X rate was a reasonable rate based on his understanding of the market, J.A. 5672 (536:14–24), but his market-based testimony provided no explanation for converting from the lump-sum payments in these licenses to any royalty rate, let alone the $X royalty rate.[4]

On this record, it's impossible to establish that these lump-sum payments were calculated using any royalty rate, let alone the specific $X rate. The self-serving recitals reflect only EcoFactor's transparent attempt to

---

[4]    The only other basis Mr. Habib offers is that the $X royalty rate was EcoFactor's baseline policy for licensing, regardless of the number of patents. J.A. 5671 (535:12–24). Understandably, neither the majority nor EcoFactor rely on the baseline policy as a valid basis for Mr. Habib's understanding that the $X rate was used. *See Omega Pats., LLC v. CalAmp Corp.*, 13 F.4th 1361, 1379–80 (Fed. Cir. 2021) (concluding that a comparable license analysis using a baseline royalty rate policy is unreliable).

manufacture a royalty rate using its "belief." EcoFactor even had to refute its "belief" by agreeing, in the Schneider and Daikin licenses, that the lump-sum payment is *not* a royalty. Mr. Kennedy's assertion that the Schneider and Daikin licenses used the $X rate is "incompatible with the . . . agreement[s] as a whole." *MLC Intell. Prop.*, 10 F.4th at 1368. And the Johnson license does not "describe how the parties calculated [the] lump sum." *Wordtech Sys.*, 609 F.3d at 1320.

Mr. Kennedy cited nothing else showing that the $X rate was actually used. He cited no documents, records, sales data, or testimony showing any calculation of the lump-sum payments or otherwise establishing that these licenses used the $X rate. Mr. Habib's testimony, relying on no underlying data, likewise offers no support. EcoFactor offered no testimony explaining how the lump-sum "payments could be converted to a royalty rate." *Whitserve*, 694 F.3d at 30.

At bottom, all we have are the recitals of one party's "beliefs" contradicted by mutually agreed upon contractual language by both parties. That's not enough under our law.

None of the majority's responses on this issue withstand scrutiny. The majority first insists that the Schneider and Daikin licenses do not disclaim the $X royalty rate. It reasons, "[t]hat the *lump sum amount* is not *a royalty* does not mean [that] the parties did not use the $X royalty rate discussed in the agreements to arrive at the lump sum amount." Maj. 14 n.6 (emphasis in original). If the majority's point is that a lump sum is not *itself* a royalty, then fair enough—no one disputes that truism. The issue here, however, is whether the lump sum in these licenses *reflects* the application of the $X royalty rate (or, in the majority's words, whether it was used "to arrive at the lump sum amount"). And the majority cannot credibly claim that was the case when the licenses themselves say that each lump-sum payment "*is not based upon sales and does not reflect*

*or constitute a royalty.*"   J.A. 10391, 10402 (emphasis added).  I'm not sure how these licenses could more clearly establish that the lump sums were not calculated using royalties.

The majority next asserts that "the Johnson license agreement alone would suffice." Maj. 14 n.6.  But the Johnson license contains no language describing how its lump-sum payment was calculated, *see Wordtech Sys.*, 609 F.3d at 1320, and Mr. Kennedy offered no other basis from which he could conclude that the Johnson license used the $X rate.

The majority also cites an email chain that purportedly concerns the use of the $X rate in the Johnson license.  But Mr. Kennedy never discussed this email; EcoFactor introduced this email during the cross-examination of *Google's expert.*  J.A. 6278 (1142:3–10).  The question here is not whether any document in the record supports the jury's damages award.  We are instead asking whether Mr. Kennedy's testimony was so unreliable that it requires a new trial.  I can't see how an email Mr. Kennedy never addressed supports the reliability of his analysis.

In the end, Mr. Kennedy conjured the $X rate from nothing, and the majority's treatment of his analysis cannot be squared with our law or the facts.

## II

Even if these licenses used the $X rate, Mr. Kennedy's analysis has another significant problem: the $X rate does not reflect the '327 patent's value; rather, it includes the value of other patents.  Our law is clear that this basic failure requires a new trial.

"When relying on comparable licenses to prove a reasonable royalty, we require a party to account for differences in the technologies and economic circumstances of the contracting parties." *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 971 (Fed. Cir. 2022) (cleaned up).  This

accounting, although not overly rigid and involving approximation, requires apportioning to just the value of patent(s) in the hypothetical negotiation. *Omega Pats., LLC v. CalAmp Corp.*, 13 F.4th 1361, 1380–81 (Fed. Cir. 2021). This apportionment must be tied to the facts of each case. *Id.* at 1379–80.

The licenses here have a broad scope. Each license is to "all patents and patent applications (along with patents issuing thereon) . . . that are now, or ever come to be, assigned to, owned by, or controlled by EcoFactor." J.A. 10390; J.A. 10401; J.A. 10412. Because each license reflects a settlement, they also list the patents asserted in each underlying litigation. The Schneider and Daikin licenses list seven asserted patents, including the '327 patent. J.A. 10398, 10409. The Johnson license lists four asserted patents; *none* are the '327 patent. J.A. 10411.

When calculating the '327 patent's value, Mr. Kennedy relied on EcoFactor's technical expert, Mr. de la Iglesia, who compared the asserted patents in each license to the '327 patent and concluded that the asserted patents and the '327 patent were technologically comparable. J.A. 5578–82 (442:14–446:10). But EcoFactor's technical expert didn't discuss the remaining patents in each license—the non-asserted patents in EcoFactor's portfolio.[5] Rather, Mr. Kennedy explained that since, "in the real world," "the rest of the patents are thrown in usually either for nothing or very little additional value," the presence of these non-asserted patents would place "downward pressure on the royalty rate" in a hypothetical negotiation over the '327

---

[5] Although we don't know the exact size of EcoFactor's portfolio, at least one document suggests that EcoFactor's portfolio is over three times larger than the seven asserted patents in the Schneider and Daikin licenses.

patent.  J.A. 5767–68 (631:22–632:2); *see also* J.A. 5771–72 (635:19–636:3).

Mr. Kennedy's opinion is "untethered to the facts of this case." *Apple*, 25 F.4th at 973.  His generic testimony about "the real world," general industry practice, and "downward pressure" does not account for the impact of EcoFactor's specific non-asserted patents, and we don't know whether any non-asserted patent in EcoFactor's portfolio covers the same technological areas as the asserted patents.  Mr. Kennedy did not ask the necessary question under our law—what effect the *specific* non-asserted patents in EcoFactor's portfolio would have on the hypothetical negotiation.[6]  Even worse, other evidence in the record indicates that the specific non-asserted patents were not considered *at all*.  Mr. Habib testified that the remaining patents in EcoFactor's portfolio had no effect on the rate used in these licenses because the $X rate was EcoFactor's baseline policy.  J.A. 5671 (535:12–24).

In the end, Mr. Kennedy's circumstance-agnostic analysis is insufficient under our law.  *Apple*, 25 F.4th at 973 (vacating a verdict where the same expert as in this case, Mr. Kennedy, testified that excluding the non-asserted patents in a portfolio license would reduce the royalty rate by 25 percent as a matter of industry practice); *Omega Pats.*, 13 F.4th at 1379 (vacating a verdict where the proposed $5.00 royalty rate was the same for any number of patents); *MLC Intell. Prop.*, 10 F.4th at 1375 (vacating a verdict

---

[6]  It would not be difficult for EcoFactor to offer an answer.  For example, Mr. de la Iglesia could have determined that the non-asserted patents in the Schneider, Daikin, and Johnson licenses have no technological overlap with the '327 patent and concluded that the non-asserted patents added only nominal value to the license.

where no evidence or explanation supported using the royalty rate in a forty-one-patent license for a single patent).

The majority, in excusing Mr. Kennedy's failure to properly apportion, ignores our law's requirements. It merely states that Mr. Kennedy "acknowledged that the three licenses also covered patents not in EcoFactor's portfolio." Maj. 16. But the majority ignores the key failure—Mr. Kennedy failed to account for the impact of the *specific* remaining patents in EcoFactor's portfolio, other than by referencing a generic "downward pressure." Neither Mr. Kennedy nor Mr. de la Iglesia tied this "downward pressure" to the specific non-asserted patents, and Mr. Habib affirmatively testified that EcoFactor's practice was to use the same $X rate *regardless* of the number of patents. In these circumstances, I "fail to see how this patent/claim-independent approach accounts for apportionment." *Omega Pats.*, 13 F.4th at 1379.

The majority also relies on *ActiveVideo Networks, Inc. v. Verizon Communications, Inc.*, 694 F.3d 1312 (Fed. Cir. 2012), for its conclusion. But in *ActiveVideo*, we concluded that "disagreements . . . with the conclusions reached by ActiveVideo's experts and the factual assumptions and considerations underlying those conclusions" were "factual issues best addressed by cross examination and not exclusion." *Id.* at 1333. Our conclusion presupposed that "the methodology is sound" and that "the evidence relied upon [is] sufficiently related to the case at hand." *i4i Ltd. P'Ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011). As I explained above, that's far from the case here. And to the extent the majority relies on one party's characterization in *ActiveVideo* of the expert's opinion as failing to "disaggregate the value of the patent license from the value of the services," Maj. 18, we did not adopt that characterization of the expert's opinion, *see ActiveVideo*, 694 F.3d at 1333. Additionally, any suggestion that disaggregating the value of the patented technology from the overall value of a license is not

required is flatly inconsistent with our law and 140 years of Supreme Court precedent. *See VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014) ("[A] patentee 'must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features.'" (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884))).

To establish a purportedly independent basis for Mr. Kennedy's conclusion, the majority asserts that he demonstrated the reasonableness of his $X rate by analyzing Google's profits. Maj. 17. Mr. Kennedy determined what profits on Google's accused Nest thermostats came from features that he maintained were attributable to the '327 patent. He then split the profits between Google and EcoFactor, using the $X rate as a reasonable basis. *See* J.A. 5778 (642:13–17). His methodology isn't reasonable. Rather than offering a cross-check, Mr. Kennedy's circular profit analysis begins and ends with the same "fundamentally flawed premise"—the $X rate. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011).

Ultimately, the majority's real concern is that, "[i]f the standard for admissibility is raised too high, then the trial judge no longer acts as the gatekeeper but assumes the role of the jury." Maj. 19. But we must pay close attention to the reliability of the methodology underlying expert testimony to ensure that the jury can fulfill its proper role as the factfinder. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997) (emphasizing the district court's "gatekeeper" role in "screening" expert testimony). As the Supreme Court has recognized, "the expert's testimony often will rest upon an experience confessedly foreign in kind to the jury's own." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (cleaned up). Thus, an "effort to assure that the specialized testimony is reliable and relevant can help the jury evaluate that foreign experience." *Id.* Our damages law ensures that an expert asks the right *questions*. Many

admissible *answers* to these questions are possible, and it is those answers that are subject to the crucible of cross-examination.  Mr. Kennedy failed to ask the right questions at multiple junctures. The majority's decision to overlook the prejudicial impact of his unreliable testimony abdicates its responsibility as a gatekeeper and contradicts our precedent.

### III

Mr. Kennedy's analysis is unreliable.  His $X rate has no basis in the record, and his $X rate does not reflect the '327 patent's value alone but instead includes the value of other patents.  Mr. Kennedy's testimony did not meet the baseline standards of admissibility, and therefore the district court abused its discretion by not granting a new trial on damages.  The majority's conclusion otherwise departs from our law.  I respectfully dissent.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 23-1101

**Short Case Caption:** ECOFACTOR, INC. V. GOOGLE LLC

---

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).

- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

---

The foregoing document contains ___4___ number of unique words (including numbers) marked confidential.

☑ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☐ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 07/22/2024

Signature: /s/ Robert A. Van Nest

Name: Robert A. Van Nest

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:**   23-1101

**Short Case Caption:**   ECOFACTOR, INC. V. GOOGLE LLC

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑   the filing has been prepared using a proportionally-spaced typeface and includes   3,876   words.

☐   the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐   the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 07/22/2024          Signature:   /s/ Robert A. Van Nest

                          Name:   Robert A. Van Nest

**CERTIFICATE OF SERVICE**

I hereby certify that I served a copy of Defendant-Appellant Google LLC's Corrected Confidential Petition for Rehearing En Banc on July 22, 2024, by email on the following who consented to email service:

Reza Mirzaie
Marc A. Fenster
Kristopher R. Davis
James N. Pickens
Minna Y. Chan
Russ August & Kabat
12424 Wilshire Blvd., 12th Floor
Los Angeles, CA 90025
(310) 826-7474
rmirzaie@raklaw.com
rak_ecofactor@raklaw.com

*Attorneys for Plaintiff-Appellee EcoFactor, Inc.*

Dated: July 22, 2024          /s/ *Robert A. Van Nest*

Robert A. Van Nest
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:      415 391 5400
Facsimile:      415 397 7188