No. 23-1101

IN THE

# United States Court of Appeals for the Federal Circuit

EcoFactor, Inc.,

*Plaintiff-Appellee,*

*v.*

Google LLC,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of Texas
No. 6:20-cv-00075-ADA
Hon. Alan D. Albright

## BRIEF OF CISCO SYSTEMS, INC. AS AMICUS CURIAE IN SUPPORT OF APPELLANT'S PETITION FOR REHEARING

E. Joshua Rosenkranz
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019

Elizabeth R. Moulton
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105
(415) 773-5700

Edward H. Williams II
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
2100 Pennsylvania Ave. NW
Washington, DC 20037

*Counsel for Amicus Curiae*

July 31, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---:|:---|
| **Case Number** | 23-1101 |
| **Short Case Caption** | EcoFactor, Inc. v. Google LLC |
| **Filing Party/Entity** | Cisco Systems, Inc. / Amicus Curiae |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/31/2024

Signature: /s/ Elizabeth R. Moulton

Name: Elizabeth R. Moulton

**i**

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Cisco Systems, Inc. | None | None |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑    None/Not Applicable          ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)   ☐   No   ☑   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF AUTHORITIES ................................................................... v

INTRODUCTION AND STATEMENT OF INTEREST OF *AMICUS CURIAE* ........................................................... 1

ARGUMENT ......................................................................................... 3

I.    The Majority's Damages Rule Ignores How Portfolio Licensees And Licensors Address Apportionment In Real-World Negotiations And Conflicts With Prior Precedent .............. 3

II.   The Majority's Damages Rule Creates A Perverse Incentive For Patentees To Attempt To Recover Multiples Of The Portfolio Rate By Asserting Patents In Subsets .......................... 11

CONCLUSION ..................................................................................... 14

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple Inc. v. Wi-LAN Inc.,*
    25 F.4th 960 (Fed. Cir. 2022) ....................................... 2, 6, 10

*Asetek Danmark A/S v. CMI USA Inc.,*
    852 F.3d 1352 (Fed. Cir. 2017) .......................................... 3

*Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.,*
    967 F.3d 1353 (Fed. Cir. 2020) ..................................... 2, 10

*Brumfield, Tr. for Ascent Tr. v. IBG LLC,*
    97 F.4th 854 (Fed. Cir. 2024) ........................................... 3

*Ecobee, Inc. v. EcoFactor, Inc.,*
    D. Del. No. 21-cv-00323-MN (Aug. 7, 2023), Doc. No. 216 ................ 13

*Ericsson, Inc. v. D-Link Sys., Inc.,*
    773 F.3d 1201 (Fed. Cir. 2014) ........................................... 1

*Garretson v. Clark,*
    111 U.S. 120 (1884) ................................................... 4, 7

*Integra Lifesciences I, Ltd. v. Merck KGaA,*
    331 F.3d 860 (Fed. Cir. 2003) ........................................... 13

*Lionra Techs. Ltd. v. Cisco Sys. Inc.,*
    No. 22-cv-305 (E.D. Tex. Aug. 8, 2022) ................................. 12

*Lionra Techs. Ltd. v. Cisco Sys. Inc.,*
    No. 24-cv-97 (E.D. Tex. Feb. 13, 2024) ................................. 12

*Lucent Techs., Inc. v. Gateway, Inc.,*
    580 F.3d 1301 (Fed. Cir. 2009) ........................................ 3, 9

*MLC Intell. Prop., LLC v. Micron Tech, Inc.,*
    10 F.4th 1358 (Fed. Cir. 2021) ........................................... 9

*Omega Patents, LLC v. Calamp Corp.*,
    13 F.4th 1361 (Fed. Cir. 2021) .................................................. 2, 4, 10

*Vectura Ltd. v. Glaxosmithkline LLC*,
    981 F.3d 1030 (Fed. Cir. 2020) ..................................................... 2, 10

**Rules**

Fed. R. App. P. 29(a)(4)(E) ......................................................... 1

**Other Authorities**

Alan Devlin, *Antitrust Limits on Targeted Patent
    Aggregation*, 67 Fla. L. Rev. 775 (2015) ............................................ 13

Jonathan Stroud, *Pulling Back the Curtain on Complex
    Funding of Patent Assertion Entities*, 12 Landslide 20
    (2019) ............................................................................. 13

## INTRODUCTION AND STATEMENT OF INTEREST
## OF *AMICUS CURIAE*[1]

*Amicus Curiae* Cisco Systems, Inc. is a leading innovator in the networking, communications, computer hardware and software industries, spending $7.5 billion a year inventing new ways to connect the world and protect the safety of the internet. Cisco owns tens of thousands of patents and relies on a strong but balanced intellectual property system to protect its own inventions and investments in new products. The majority's decision here deepens a conflict in the Court's precedent on how to apportion portfolio licenses and adopts an unrealistic damages rule that permits patentees to recover damages that are unconnected to the "incremental value that the patented invention adds to the end product." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).

Whether as a patentee or alleged infringer, Cisco carefully evaluates the technological value of any patent or license. As a part of that evaluation, Cisco considers the Federal Circuit's damages

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), amicus states that no party's counsel authored this brief in whole or in part. No party, party's counsel, or any person other than amicus and its members or its counsel contributed money intended to fund preparing or submitting this brief.

precedent and relies on established rules to determine what is a fair price to pay (or demand) for a patent.

This Court's cases now irreconcilably conflict in how portfolio licenses must be apportioned. In some cases, like *Omega Patents, LLC v. Calamp Corp.*, 13 F.4th 1361 (Fed. Cir. 2021), and *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960 (Fed. Cir. 2022), the Court required reliable evidence apportioning a portfolio rate to the specific asserted patents. Here, and in cases like *Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353 (Fed. Cir. 2020) and *Vectura Ltd. v. Glaxosmithkline LLC*, 981 F.3d 1030 (Fed. Cir. 2020), the Court permitted patentees to invoke "built-in" apportionment for a portfolio license. En banc review is needed to clarify the standards for apportioning damages. Given Cisco's reliance on a reasonable and predictable patent infringement damages regime, Cisco submits this brief in support of Google's Petition for Rehearing En Banc and asks the Court to clarify that apportionment of portfolio licenses is required.

Google consents to the filing of this brief. Ecofactor does not.

## ARGUMENT

**I.** **The Majority's Damages Rule Ignores How Portfolio Licensees And Licensors Address Apportionment In Real-World Negotiations And Conflicts With Prior Precedent.**

**A.** The damages theory here is the "common hypothetical-negotiation approach to calculating a reasonable royalty, under which the finder of fact 'attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began.'" *Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352, 1362 (Fed. Cir. 2017) (quoting *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009)). The hypothetical negotiation "at its core is a process for identifying the incremental value of the claimed technology over noninfringing alternatives and determining how that gain would be shared." *Brumfield, Tr. for Ascent Tr. v. IBG LLC*, 97 F.4th 854, 876 (Fed. Cir. 2024). While an approximation, the analysis must be realistic. *Lucent Techs., Inc.*, 580 F.3d at 1325.

Comparable licenses—licenses to similar technology under similar economic circumstances—are a common input into a hypothetical negotiation analysis. Even when relying on comparable licenses to

inform the hypothetical negotiation, apportionment to the value of the patent is required.  *See Omega*, 13 F.4th at 1379 (requiring apportionment of portfolio licenses); *Garretson v. Clark*, 111 U.S. 120, 121 (1884) (A patentee "'must in every case give evidence tending to separate or apportion … between the patented feature and the unpatented features.'").

**B.**  The majority approved of a damages theory that is not realistic and does not apportion to the value of the asserted patents.  No reasonable party would pay the entire portfolio rate for a license to a single patent, and attributing the value of the entire portfolio to a single patent is not apportionment.

EcoFactor's damages expert, Mr. Kennedy, relied on three licenses to EcoFactor's entire patent portfolio to support his damages opinion.  Op. 11.  All three licenses were lump-sum portfolio-wide licenses that settled ongoing litigation.  Each included a self-serving statement that the lump sum was "based on what EcoFactor believes is a reasonable royalty calculation of [$X] per-unit for … estimated past and [] projected future sales of products."  Appx10389.  Kennedy opined that Google

would have paid the same amount for one or two patents as three other parties paid for the *entire* portfolio.  Op. 15.

The majority accepted Kennedy's opinion that EcoFactor would ask for the portfolio-wide rate in the hypothetical negotiation and found that rate "apportioned" based on: (1) application of downward and upward pressure under the *Georgia-Pacific* factors, Op. 16-17; (2) internal profit and survey data from the accused products as a "check" on the reasonableness of his license-derived $X rate, Op. 17; and (3) recitals in the licenses and testimony from EcoFactor's CEO about the rate purportedly reflected in the lump-sum licenses, Op. 10-14.

While every license or purchase negotiation involves unique circumstances, in Cisco's experience, none of that testimony or evidence would result in a party accepting a license to just one or two patents at the same rate that other parties paid to receive a portfolio-wide license.

As an initial matter, Cisco would not look to EcoFactor's litigation settlements with much smaller companies, for portfolio-wide lump-sum amounts, as a starting point for a running royalty for one or two patents asserted in litigation.  In Cisco's experience, the economic differences between the settlement licenses and the hypothetical negotiation are

too great.  *See Apple*, 25 F.4th at 971 (licenses must be economically comparable to the hypothetical negotiation).  Even setting that issue aside, Kennedy still failed to apportion his running royalty to the asserted patents.

First, Kennedy began with the portfolio rate from the three licenses and opined that the number of patents in the portfolio versus the hypothetical negotiation would push the rate downwards, while the assumptions of infringement and validity would push the rate upwards, and those pressures would cancel each other out.  *See* Dissent 9; Op. 16. That does not reflect how parties in the real world negotiate patent licenses.

Cisco's due diligence in a negotiation for a license to a single patent from within a portfolio does not begin with the portfolio rate.  To determine the potential value of a patent, Cisco first looks to the functionality and revenues of the accused product.  Cisco then drills down to the specific component or feature implicated by the asserted patent.  The revenues associated with that component or feature serve as the starting point for Cisco's evaluation of a license to the asserted patent.

Cisco then isolates the value of "the patented feature [from] the unpatented features." *Garretson*, 111 U.S. at 121. Whether other parties obtained licenses with different terms (like the number of patents obtained) or at different stages of a litigation would not drive Cisco's evaluation of the price it would pay for a license covering Cisco's products. While Cisco would expect parity with similarly situated competitors, it would not simply accept the rates paid by others as a starting point and then look for ways to justify that rate. In sum, Cisco's due diligence involves far more than assessing whether the *Georgia-Pacific* factors exert "upward" or "downward" pressure relative to the rates paid in other licenses.

Second, Cisco does not use internal profit data as a check for overall reasonableness of a royalty rate. Kennedy purported to estimate "the amount of profit per unit that could be attributed to the [asserted] patent" and concluded that because the per-unit profit was less than the $X rate from the licenses, $X was reasonable. Op. 17. So instead of using profit-per-unit information to actually quantify the contribution of the patent, as apportionment requires, Kennedy used the information only to justify applying the portfolio license rate. That

is inconsistent with how Cisco would evaluate a license proposal in a hypothetical negotiation.

In practice, Cisco does use internal financial metrics to inform its negotiations. But Cisco uses those metrics to determine a reasonable payment for the technological contribution of a patent to Cisco's products—not as a way to justify a licensee's preferred demand. And using per-unit profits to justify a license to an individual patent or subset of patents from within a larger portfolio is especially suspect given the risk of royalty stacking. *Infra* § II.

Third, Cisco has not and would not rely on statements purporting to establish a running, per-unit royalty embedded in a lump-sum license without reliable evidence of the number of units expected to be sold by the licensee. Here, Kennedy relied on one-sided "whereas" clauses in the licenses, supposedly backed up by testimony from EcoFactor's CEO, that the lump sum amount reflected a per-unit royalty of $X. Pet. 17. But neither Kennedy nor EcoFactor had the information needed to check whether the $X per-unit royalty actually reflected the lump sum amount of the licenses. Pet. 20 (citing Appx5802). Indeed, two of the licenses expressly stated that the lump-

sum payments are "not based upon sales and do not reflect or constitute a royalty." Appx10391, Appx10402.

If Cisco were negotiating for a per-unit royalty and the licensor claimed that prior licensees accepted a similar per-unit royalty but then presented only lump-sum licenses, Cisco would insist upon information that would confirm the lump sum actually reflects the demanded per-unit rate. *See also* Dissent at 4-5. For example, Cisco would ask for the number of units sold, projections for future sales and any discounts (such as volume discounts). That is especially true when the licenses themselves state the lump sums are "not based upon sales." Appx10391, Appx10402. Otherwise, Cisco would essentially be taking the patentee at its word without proper due diligence. Cisco's approach is consistent with this Court's precedent, requiring evidence of how "lump-sum payments could be converted to any royalty rate." *MLC Intell. Prop., LLC v. Micron Tech, Inc.*, 10 F.4th 1358, 1368 (Fed. Cir. 2021); *see also Lucent Techs.*, 580 F.3d at 1330.

**C.** The majority's ruling conflicts with prior decisions and deepens a conflict over how experts must apportion portfolio licenses. Sometimes the Court enforces the requirement that experts must offer

an opinion that apportions to the value of the asserted patents, not simply regurgitate the rates included in a "'comparable'" portfolio license. *Omega*, 13 F.4th at 1380-81. In both *Apple* and *Omega*, the Court rejected opinions that tried to apply a portfolio rate to a hypothetical negotiation, explaining that such opinions "failed to address the extent to which [unasserted] patents contributed to the royalty rate," *Apple*, 25 F.4th at 973, or "failed to show the incremental value that its patented improvement added" to accused component, *Omega*,13 F.4th at 1377.

But in other cases, including here, the Court has accepted testimony that unmodified portfolio rates apply to a hypothetical negotiation. In *Bio-Rad*, the Court accepted that "looking at comparable license agreements between competitors for similar technologies and assessing whether the importance of that technology to the particular license was similar to the hypothetical negotiation" constituted apportionment. 967 F.3d at 1377. And in *Vectura,* the Court allowed "a party relying on a sufficiently comparable license [to] adopt the comparable license's royalty rate and royalty base without further apportionment." 981 F.3d at 1041. This case likewise allowed a

party to assert a portfolio-wide rate "without further apportionment" to the asserted patents.

This conflict demands en banc review and reaffirmation of the apportionment requirement.

## II. The Majority's Damages Rule Creates A Perverse Incentive For Patentees To Attempt To Recover Multiples Of The Portfolio Rate By Asserting Patents In Subsets.

The majority's opinion has a second problem: By failing to require patentees to isolate the incremental value of the asserted patent from the overall value of the portfolio, the majority's damages rule creates a perverse incentive for a patentee to assert patents against an alleged infringer in multiple, successive actions. Under the majority's reasoning, it is permissible for a patentee's damages expert to conclude that the same portfolio rate applies regardless of which patents in a portfolio are asserted.

Kennedy's testimony illustrates this problem. He opined that the three portfolio licenses, each purportedly representing the same $X royalty rate for at least 30 patents, supported the same $X rate for a license to just one patent. Specifically, Kennedy opined that an accused infringer will negotiate for a royalty rate based on the value of the

patents asserted in the litigation and then the remainder of the portfolio is thrown in for free.  *See* Pet. 14-15 (citing Appx5767-5768); Dissent 7.  But one of the licenses arose from litigation that *did not* assert the same patents as were asserted against Google.  Op. 16.  So the takeaway is that the patents asserted here support an $X rate, and other patents in the same portfolio independently support an $X rate.  Under the majority's rule, a patentee may continue to partition its portfolio into whatever subsets it wishes, asserting those subsets in infringement suits against the same defendant, and exacting the entire portfolio rate in damages in each suit.  That is an irrational damages regime and further illustrates the lack of apportionment in the majority's analysis.

This is not a hypothetical problem.  Cisco itself has faced serial suits from the same patentees; Atlantic IP and its affiliates have sued Cisco no less than half a dozen times within just a few years, including cases in which patents from the same portfolio were split up and asserted in two separate district court cases.  *See Lionra Techs. Ltd. v. Cisco Sys. Inc.*, No. 22-cv-305 (E.D. Tex. Aug. 8, 2022); *Lionra Techs. Ltd. v. Cisco Sys. Inc.*, No. 24-cv-97 (E.D. Tex. Feb. 13, 2024).  And

EcoFactor has asserted subsets of its patent portfolio against the same defendant in multiple suits—and asked for the full portfolio rate multiple times. *See Ecobee, Inc. v. EcoFactor, Inc.*, D. Del. No. 21-cv-00323-MN (Aug. 7, 2023), Doc. No. 216 at 13; No. 21-cv-00428 (W.D. Tex. No. Apr. 28, 2021); No. 20-cv-78 (W.D. Tex. Jan. 31, 2020).

Legal scholars have documented the same phenomenon of a single entity (or commonly funded entities) filing multiple suits against the same company. *See, e.g.*, Jonathan Stroud, *Pulling Back the Curtain on Complex Funding of Patent Assertion Entities*, 12 Landslide 20, 21-23 (2019); Alan Devlin, *Antitrust Limits on Targeted Patent Aggregation*, 67 Fla. L. Rev. 775, 819 (2015) (litigants "threaten … targets with serial litigation and catastrophic damages unless they pay exorbitant amounts, typically many multiples of the sums … spent to acquire the asserted" patents). And in a slightly different context, this Court has recognized the harms that can result from permitting multiple damages recoveries through royalty stacking. *See Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 871 (Fed. Cir. 2003) ("the number of patent licenses needed to develop a drug may also affect the value placed on any single technology used in the development process. The cumulative

effect of such stacking royalties can be substantial … ”), *reversed on other grounds,* 545 U.S. 193 (2005).  While royalty stacking typically involves multiple royalties owed to multiple parties, the rule here compounds this problem by requiring multiple payments to a single party.

Under the majority's damages rule, Cisco and others face piecemeal infringement suits seeking multiples of the damages that should be available under a sane damages regime.

## CONCLUSION

This Court should grant Google's Petition for Rehearing En Banc.

July 31, 2024

Respectfully submitted,

*/s/ Elizabeth R. Moulton*

E. Joshua Rosenkranz
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019

Elizabeth R. Moulton
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105
(415) 773-5700

Edward H. Williams II
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
2100 Pennsylvania Ave. NW
Washington, DC 20037

*Counsel for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. Cir. R. 35(g), because this brief contains 2,586 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Century Schoolbook 14-point font.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Elizabeth R. Moulton*
Elizabeth R. Moulton
*Counsel for Amicus Curiae*