**No. 2023-1101**

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

ECOFACTOR, INC.,

*Plaintiff-Appellee*,

*v.*

GOOGLE LLC,

*Defendant-Appellant.*

On Appeal from the United States District Court for the Western District of Texas, No. 6:20-cv-00075-ADA, Judge Alan D. Albright

## BRIEF FOR *AMICUS CURIAE* APPLE INC. IN SUPPORT OF DEFENDANT-APPELLANT AND EN BANC REHEARING

WILLIAM F. LEE
LAUREN B. FLETCHER
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

ARTHUR W. COVIELLO
WILMER CUTLER PICKERING
HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
(650) 858-6000

*Attorneys for Amicus Curiae Apple Inc.*

July 31, 2024

## CERTIFICATE OF INTEREST

Counsel for amicus curiae Apple Inc. certifies the following:

**1. Represented Entities**. Fed. Cir. R. 47.4(a)(1). Provide the full names of all entities represented by undersigned counsel in this case.

Apple Inc.

**2. Real Party in Interest**. Fed. Cir. R. 47.4(a)(2). Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

None.

**3. Parent Corporations and Stockholders**. Fed. Cir. R. 47.4(a)(3). Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

None.

**4. Legal Representatives**. List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

None.

**5. Related Cases**. Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☐ No ☒ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). Please do not duplicate information. This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

None.

Dated: July 31, 2024

/s/ William F. Lee
WILLIAM F. LEE
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ........................................................................i

TABLE OF AUTHORITIES ........................................................................iv

INTEREST OF *AMICUS CURIAE* ........................................................................1

INTRODUCTION ........................................................................1

ARGUMENT ........................................................................3

I. ROBUST ENFORCEMENT OF *DAUBERT* IS NEEDED FOR PATENT DAMAGES OPINIONS. ........................................................................3

II. EXPERTS MUST RELIABLY EXPLAIN HOW THEIR DAMAGES THEORIES SATISFY THE COMPARABILITY AND APPORTIONMENT REQUIREMENTS. ........................................................................6

A. Comparable Licenses Covering Multiple Patents Must Be Apportioned When Valuing Fewer Patents........................................................................7

B. Experts Must Apply Reliable Methods When Converting Between Lump Sums And Running Royalties. ........................................................................9

CONCLUSION ........................................................................13

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Apple Inc. v. Wi-LAN Inc.*,
25 F.4th 960 (Fed. Cir. 2022) ....................3, 5, 6, 8

*California Institute of Technology v. Broadcom Corp.*,
25 F.4th 976 (Fed. Cir. 2022) ....................3, 5

*Certain Underwriters at Lloyd's, London v. Axon Pressure Products Inc.*,
951 F.3d 248 (5th Cir. 2020) ....................6

*Commonwealth Scientific & Industrial Research Organisation v. Cisco Systems, Inc.*,
809 F.3d 1295 (Fed. Cir. 2015) ....................5

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)....................3

*Finalrod IP, LLC v. John Crane, Inc.*,
838 F. App'x 562 (Fed. Cir. 2021) ....................6

*Lucent Technologies, Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009) ....................10

*MLC Intellectual Property, LLC v. Micron Technology, Inc.*,
10 F.4th 1358 (Fed. Cir. 2021) ....................11

*Multimedia Patent Trust v. Apple Inc.*,
2012 WL 5873711 (S.D. Cal. Nov. 20, 2012)....................8

*Omega Patents, LLC v. CalAmp Corp.*,
13 F.4th 1361 (Fed. Cir. 2021) ....................8

*Smartflash LLC v. Apple Inc.*,
No. 6:13-CV-447-JRG, 2015 WL 5840237 (E.D. Tex. Sept. 2, 2015) ....................3

*Whitserve, LLC v. Computer Packages, Inc.*,
694 F.3d 10 (Fed. Cir. 2012) ....................10

## CASE FILINGS

Corrected Non-Confidential Joint Appendix (Vol. I of II), *Apple Inc. v. Wi-LAN Inc.*, No. 2020-2011 (Fed. Cir. June 18, 2021), Dkt. 44-1 ....................................5

Opening Brief and Nonconfidential Addendum of Appellant Apple Inc., *Apple Inc. v. Wi-LAN Inc.*, No. 2020-2011 (Fed. Cir. Nov. 20, 2020), Dkt. 17 ......................................12

Corrected Non-Confidential Brief for Defendant-Appellants, *California Institute of Technology v. Broadcom Ltd.*, No. 2020-2222 (Fed. Cir. Feb. 17, 2021), Dkt. 30 .......................................11

Corrected Non-Confidential Brief for Appellant Apple Inc., *VirnetX Inc. v. Apple Inc.*, No 2021-1672 (Fed. Cir. June 3, 2021), Dkt. 23......................................8, 12

## OTHER AUTHORITIES

Graham, Stuart, Peter Menell, Carl Shapiro & Tim Simcoe, *Final Report of the Berkeley Center for Law & Technology Patent Damages Workshop*, 25 Tex. Intell. Prop. L.J. 115 (2017)............................7

Hovenkamp, Eric & Jonathan Masur, *How Patent Damages Skew Licensing Markets*, 36 Rev. Litig. 379 (2017) .............................................12

Lee, William F. & Mark A. Lemley, *The Broken Balance: How 'Built-In Apportionment' and the Failure to Apply* Daubert *Have Distorted Patent Infringement Damages*, 37 Harv. J.L. & Tech. (forthcoming Sept. 2024), https://ssrn.com/abstract=4564279 ............................................................4, 7

Reinecke, Jason D., *Does Patent Law Allow Plaintiffs Too Many Bites at the Apple?*, 99 J. Pat. & Trademark Off. Soc'y 360 (2017).......................4

Storm, Christopher S., *Measuring the Inventor's Contribution*, 21 U.N.H. L. Rev. 167 (2022).....................................................................4, 7

Zeng, Bo, Lucent v. Gateway*: Putting the "Reasonable" Back into Reasonable Royalties*, 26 Berkeley Tech. L.J. 329 (2011) ............................5

## INTEREST OF *AMICUS CURIAE*[1]

Apple is a leading U.S. innovator that has revolutionized computing and mobile communications, invests significantly in research and development, and owns thousands of patents. As a significant participant in the U.S. IP ecosystem, Apple has a robust interest in ensuring that patent damages experts present fair, reliable testimony to focus their opinions on the patented technology's actual footprint in an accused device.

## INTRODUCTION

As products increase in complexity, apportionment of patent damages has become more important than ever. Technology advances allow companies to continually integrate more functionality into a single device to benefit consumers. For example, Apple's original iPod played music, and in subsequent generations features like cameras and Wi-Fi were added. Similarly, iPhone began as a combination iPod, phone, and internet communicator, and subsequently hundreds of features were added, including Siri, Touch ID, Face ID, and Apple Pay. Apple's iPad and Apple Watch have enjoyed similar feature expansion. For each increasingly sophisticated product, apportionment becomes more vital to prevent patent damages from appropriating the value of the product's non-accused

[1] No party's counsel authored this brief, and no one other than Apple and its counsel funded this brief. Google consents to this brief's filing, which is accompanied by a motion for leave; EcoFactor opposes. Fed. Cir. R. 35(g)(1).

technology. Without proper apportionment, a company could unfairly be forced to pay "damages" to others not only for its own innovations, but also for prior-art technology, non-patented features, other patented technologies, and other contributions (e.g., materials, manufacturing, marketing).

This Court has articulated sensible apportionment requirements designed to ensure that damages compensate only for an asserted patent's value. But in practice, patentees are too often able to circumvent these requirements given trial courts' reluctance to exclude unreliable damages opinions under *Daubert*. As Apple has observed, patentees' experts are increasingly allowed to present "comparable license" theories that bear little resemblance to real-world licensing negotiations and rely on hand-waving more than sound economic analysis. For example, Apple has encountered experts who merely assume apportionment is "built-in" to licenses, fail to account for the number of licensed or asserted patents, and convert small lump-sum payments into exorbitant running royalties without any basis for doing so. *Infra* pp. 6-13.

Absent proper enforcement of *Daubert*, jurors face unreliable, unapportioned, and prejudicial damages theories they are ill-equipped to evaluate. Their confusion is worsened by the limited trial time they have to assess complex technology and unfamiliar patent-law principles. This has undoubtedly contributed to a proliferation of excessive verdicts—including many that are later vacated, wasting court and party

resources—a problem Apple has faced repeatedly. *E.g.*, *California Inst. of Tech. v. Broadcom Corp.*, 25 F.4th 976 (Fed. Cir. 2022) ($837M award, vacated); *Smartflash LLC v. Apple Inc.*, 2015 WL 5840237 (E.D. Tex. Sept. 2, 2015) ($532M award, vacated); *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960 (Fed. Cir. 2022) ($145M and $85M awards, vacated).

The majority's opinion exacerbates the problem. It approves an expert's damages theory that violated this Court's comparability and apportionment requirements and lacked reliable support, reasoning that the jury could weigh the evidence and decide for itself whether to accept the expert's opinions. Op. 13-19. That is not how *Daubert* works. Rather, as the dissent explains, the expert's opinion should have been excluded given the "prejudicial impact of his unreliable testimony." Dissent 10-11. This case accordingly presents an ideal opportunity for the Court to articulate clearly trial courts' duty to apply *Daubert* when evaluating expert damages opinions.

## ARGUMENT

### I. ROBUST ENFORCEMENT OF *DAUBERT* IS NEEDED FOR PATENT DAMAGES OPINIONS.

"Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993). It is therefore crucial that trial courts weed out unreliable expert opinions *before* they reach the jury. *Id.*

*Daubert*'s gatekeeping function is particularly important for patent damages. As Apple has experienced in many cases, experts often present complicated damages theories that can mislead juries as to the patented technology's value by cloaking unreliable apportionment analysis in complex mathematical and economic terms. Lee & Lemley, *The Broken Balance: How 'Built-In Apportionment' and the Failure to Apply* Daubert *Have Distorted Patent Infringement Damages*, 37 Harv. J.L. & Tech., manuscript at 77-79 (forthcoming Sept. 2024), https://ssrn.com/abstract=4564279 (discussing expert's regression analysis misapplied "as a proxy for apportionment" against Apple).

This danger is heightened in cases involving sophisticated products. Jurors—most of whom are not engineers, economists, or lawyers—are not equipped to value individual features in multi-component products, and can be easily misled by unreliable expert testimony into awarding damages that overcompensate for the patented technology. Reinecke, *Does Patent Law Allow Plaintiffs Too Many Bites at the Apple?*, 99 J. Pat. & Trademark Off. Soc'y 360, 381 (2017) ("[J]uries often award excessive damages in lawsuits against multicomponent products because the[y] … have a hard time valuing the effort that goes into a multicomponent product beyond the [patented] technology[.]"); Storm, *Measuring the Inventor's Contribution*, 21 U.N.H. L. Rev. 167, 206 (2022) ("[J]uries are poorly positioned to apportion value correctly.").

It is no fix to say that reliability concerns "go to weight" and can be addressed via cross-examination. *E.g.*, *Wi-LAN*, No. 2020-2011, Dkt. 44-1 at Appx754. In Apple's experience, patent trials are complicated: juries are usually tasked with deciding infringement and invalidity across multiple patents, claims, and products before reaching damages. And courts typically impose strict time limits for trial (sometimes 12-15 hours per side), often leaving defendants with insufficient time to fully put patentees' overreaching damages demands in context.

Regardless of any cross-examination, unreliable expert testimony skews the jury's consideration of damages. Practically speaking, a jury is almost certain to award more when presented with an unreliable, unapportioned $100M claim than with a reliable, apportioned $5M one. Zeng, Lucent v. Gateway*: Putting the "Reasonable" Back into Reasonable Royalties*, 26 Berkeley Tech. L.J. 329, 333-334 (2011) ("[E]xperts vary widely in their estimations of reasonable royalties, which juries tend to address by splitting the difference. This … causes experts to become even more extreme[.]"). Indeed, Apple has observed that juries often adopt the patentee's exact damages number because they assume the expert did the math correctly. *E.g.*, *Caltech*, 25 F.4th at 985; *Wi-LAN*, 25 F.4th at 966. These practicalities underscore why trial courts "must be proactive to ensure that [expert damages] testimony … is sufficiently reliable." *Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015).

The majority's opinion here undermines these core *Daubert* principles. The district court failed to perform any gatekeeping and provided "no explanation" for denying *Daubert* (Dissent 2 n.3), which itself is an abuse of discretion. *Finalrod IP, LLC v. John Crane, Inc.*, 838 F. App'x 562, 563 (Fed. Cir. 2021) (citing *Certain Underwriters at Lloyd's, London v. Axon Pressure Prods. Inc.*, 951 F.3d 248, 269-270 (5th Cir. 2020)). The majority's affirmance of that decision unfortunately signals to trial courts that they need not abide by *Daubert*'s reliability standard when it comes to patent damages. Unless corrected, the result will not only lead to additional excessive verdicts that harm rather than promote innovation, but unnecessarily consume judicial resources.

## II. EXPERTS MUST RELIABLY EXPLAIN HOW THEIR DAMAGES THEORIES SATISFY THE COMPARABILITY AND APPORTIONMENT REQUIREMENTS.

Comparable licenses may help determine reasonable royalties, but only if experts use them reliably. *Wi-LAN*, 25 F.4th at 971-974. Experts must apply comparable agreements in a way that apportions the value attributable only to the patented technology at issue. That requires experts to at least "account for" differences between the agreements and the hypothetical license. *Id.* The majority's opinion departs from these bedrock principles and requires correction.

### A. Comparable Licenses Covering Multiple Patents Must Be Apportioned When Valuing Fewer Patents.

Reasonable-royalty damages seek to value only the asserted patent(s). Yet, in Apple's real-world experience, that is not how licenses are typically negotiated. Graham, *Final Report of the Berkeley Center for Law & Technology Patent Damages Workshop*, 25 Tex. Intell. Prop. L.J. 115, 128-129, 130 (2017) (describing "large gap between … business reality … and the patent-by-patent nature of patent litigation"). Parties routinely negotiate licenses that cover numerous patents (sometimes hundreds or thousands), other IP rights, and cross-licenses. *Id.* And patent licenses are often included in broader agreements that also encompass business transactions (e.g., sale of a business or assets), establishment of business relationships, and litigation settlements. Lee & Lemley, *supra*, at 37-39.

The amount paid for a license thus often includes value beyond the patents themselves. For example, companies may agree to broad portfolio licenses or cross-licenses to avoid transaction costs from negotiating prices for individual patents. Storm, *supra*, at 202-204, 207 ("License negotiations are influenced by a variety of factors having nothing to do with the value of the asserted patent.").

When relying on comparable agreements to value individual patents, it is therefore essential that experts apportion out value attributable to other patents and benefits. It is not enough for an expert to *acknowledge* that a comparable license covers more patents than the hypothetical license or to say the expert *considered* that

difference. *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1380-1381 (Fed. Cir. 2021). The expert must actually "account for" the difference—that is, provide a reliable analysis showing the steps taken to apportion out the value attributable to non-asserted patents and other benefits, and how those steps quantitatively affect the expert's opinion. *Wi-LAN*, 25 F.4th at 971.

Despite these requirements, Apple often encounters experts (including EcoFactor's particular expert, repeatedly) who present comparable-license theories that fail to account, for example, for the number of patents licensed or asserted, thereby stripping the apportionment requirement of meaning. For instance:

- In *Wi-LAN*, the patentee's expert manufactured an $85M damages claim by using comparable agreements covering *thousands* of patents and assuming the two asserted patents were "key," without addressing the extent to which other licensed patents contributed to the royalty rate. 25 F.4th at 971-973.
- In *VirnetX*, the patentee's expert devised a $502M claim by pointing to comparable agreements covering *dozens* of patents, assuming built-in apportionment, and claiming the *same* rate applied *regardless* of how many patents were infringed. No. 2021-1672 (Fed. Cir.), Dkt. 23 at 10-11, 33-37.
- In *Multimedia Patent Trust*, the patentee's expert created a $196M claim from comparable agreements covering U.S. and foreign patents beyond the three asserted, doing nothing to apportion out this extraneous value because he

thought the patentee's self-serving "licensing practice" did not require it. 2012 WL 5873711, at *3, *7 (S.D. Cal. Nov. 20, 2012).

EcoFactor's expert employed similar techniques to avoid apportionment. He improperly assumed apportionment was "built-in," though the comparable licenses covered several non-asserted patents. EcoFactor Response Br. 15. He then "failed to account for the impact of the specific remaining patents in EcoFactor's portfolio, other than by referencing a generic 'downward pressure'" on the royalty rate (which he said was negated by some unquantified "upward pressure"). Dissent 9; *see* Op. 16-17. EcoFactor's expert further testified that the *same* rate applied *regardless* of the number of patents infringed. Google Principal Br. 37.

As the dissent explains, this "patent/claim-independent approach" evades apportionment and cannot reliably value the asserted patent(s). Dissent 9. Rehearing is warranted to make clear—consistent with earlier precedent—that experts must actually subtract unapportioned value, especially when relying on comparable licenses covering multiple patents. A quantitative requirement would also safeguard against arbitrary, nebulous "downward"/"upward" adjustments made by experts.

### B. Experts Must Apply Reliable Methods When Converting Between Lump Sums And Running Royalties.

When using comparable agreements, experts must also carefully consider the payment structure. A "lump sum" provides a one-time payment for unlimited use

of the licensed technology. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1326-1327 (Fed. Cir. 2009). A "running royalty" involves payments for ongoing use of the technology, such as a percentage of apportioned revenues from licensed-product sales or a per-unit amount for each licensed product sold. *Id.* As this Court has recognized, "[s]ignificant differences exist between a running royalty license and a lump-sum license." *Id.* at 1326.

Consistent with this precedent, in Apple's experience, different royalty structures reflect different business imperatives and are not interchangeable. For example, a company with straightforward, low-volume products may pay a per-unit royalty where there is effectively a cap on the total amount given the small number of licensed products sold. By contrast, a company with multi-feature, high-volume products customarily negotiates lump-sum licenses—e.g., to provide predictability, to avoid tracking units implementing the licensed technology, or where the parties do not know which future products will include the technology. *Id.*

When a damages theory involves converting between different royalty structures, it is therefore extremely important for the expert to explain how the parties to the comparable agreement reached the agreed-upon structure and payment, and how that supports a *different* royalty structure in the hypothetical negotiation. *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 30 (Fed. Cir. 2012) ("[L]ump sum[s] … should not support running royalty rates without testimony

explaining how they apply to the facts[.]"); *MLC Intell. Prop., LLC v. Micron Tech., Inc.*, 10 F.4th 1358, 1368 (Fed. Cir. 2021) (deriving running royalty from lump sum was "incompatible with the … [prior] agreement").

In Apple's experience, however, this often does not happen. Patentees' experts routinely manufacture running-royalty rates from licenses not involving Apple and then apply those rates to Apple's significant accused-product sales. The resulting damages demands are untethered to the asserted patents' value, do not reflect actual business negotiations, and effectively punish companies for their own products' success based on their own innovations. For instance:

- In *Caltech*, the patentee's expert transformed a $5M lump-sum settlement into an $837M claim. He converted the lump-sum amount to a $1.13 per-unit royalty, upwardly adjusted to $1.40 per-unit (based on excluded evidence), and then multiplied by the large number of Apple sales (despite no evidence Apple would agree to a per-unit royalty structure). No. 2020-2222 (Fed. Cir.), Dkt. 30 at 56-59.
- In *VirnetX*, the patentee's expert devised a $502M claim by converting six settlements to per-unit rates (though they were not negotiated that way). He then heavily weighted the settlements with small companies like Avaya and Aastra that involved low overall payments (but had imputed rates up to $2.26 per-unit), while minimizing the large-volume license with Microsoft (which

had an imputed rate of just $0.19 per-unit). No. 2021-1672 (Fed. Cir.), Dkt. 23 at 10-11, 38-39, 46-47.

- In *Wi-LAN*, the patentee's expert cherry-picked royalty rates to create an $85M claim: he treated Wi-LAN's $0.50 per-unit licenses with three small, niche-market companies (Unnecto, Verto, and Doro) as comparable, while ignoring Wi-LAN's lump-sum agreements with large, well-known companies (e.g., Motorola, LG). No. 2020-2011 (Fed. Cir.), Dkt. 17 at 18-23, 50, 73-75.

Unsurprisingly, EcoFactor's expert employed similar tactics. He converted three small lump-sum payments to a per-unit running royalty without "establish[ing] that these lump-sum payments were calculated using any royalty rate, let alone the specific $X rate." Dissent 4-5. Worse, the expert's per-unit rate was derived from the patentee's self-created, self-serving evidence and contradicted by two of the licenses themselves. *Id.* 2-6.

This Court should not condone such "royalty gamesmanship." Hovenkamp & Masur, *How Patent Damages Skew Licensing Markets*, 36 Rev. Litig. 379, 409 (2017) ("When one party has an incentive to strategically inflate or alter the terms of [a comparable] license, the license can no longer … provide accurate estimations of a patent's value."). Rehearing is necessary to make clear that experts must actually demonstrate how comparable agreements with royalty structures and terms

that differ from the hypothetical license provide fair and reasonable estimates of only a patented technology's value.

## CONCLUSION

Apple requests that the Court grant rehearing en banc.

Respectfully submitted,

/s/ William F. Lee

WILLIAM F. LEE
LAUREN B. FLETCHER
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

*Attorneys for Amicus Curiae Apple Inc.*

ARTHUR W. COVIELLO
WILMER CUTLER PICKERING
HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
(650) 858-6000

July 31, 2024

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because:

1. The filing has been prepared using a proportionally-spaced typeface and includes 2,596 words.

2. The filing has been prepared using Microsoft Word for Office 365 in 14-point Times New Roman font. As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ William F. Lee
WILLIAM F. LEE
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

July 31, 2024