# United States Court of Appeals
# for the Federal Circuit

———————————

ECOFACTOR, INC.,
*Plaintiff-Appellee,*
v.
GOOGLE LLC,
*Defendant-Appellant.*

———————————

On Appeal from the United States District Court
for the Western District of Texas
Case No. 6:20-cv-00075-ADA
Hon. Alan D. Albright

———————————

## GOOGLE LLC'S NON-CONFIDENTIAL EN BANC OPENING BRIEF

———————————

VINCENT Y. LING
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue
 50th Floor
Los Angeles, CA 90071
Telephone: (213) 683-9573
Email: vincent.ling@mto.com

GINGER D. ANDERS
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
 Suite 500E
Washington, DC 20001
Telephone: (202) 220-1100
Email: ginger.anders@mto.com

(Additional counsel on inside cover)

Evan Mann
Munger, Tolles & Olson LLP
560 Mission Street
  27th Floor
San Francisco, CA 94105
Telephone: (415) 512-4000
Email: evan.mann@mto.com

Robert A. Van Nest
Leo L. Lam
Eugene M. Paige
R. Adam Lauridsen
Kristin E. Hucek
Stephanie J. Goldberg
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111
Telephone: (415) 391-5400
Email: rvannest@keker.com

*Counsel for Defendant-Appellant Google LLC*

November 12, 2024

# CLAIM LANGUAGE AT ISSUE

## U.S. Patent No. 8,738,327

1. A system for controlling the operational status of an HVAC system comprising:

>at least one thermostat associated with a structure that receives temperature measurements from inside the structure, the structure conditioned by at least one HVAC system, the thermostat having at least a first setting stored therein;

>one or more servers located remotely from the structure, the one or more servers configured to receive measurements of outside temperatures from at least one source other than the HVAC system,

>the one or more servers are further configured to communicate with the thermostat via a network, wherein the one or more servers receive inside temperatures from the thermostat and compares the inside temperatures of the structure and the outside temperatures over time to derive an estimation for the rate of change in inside temperature of the structure in response to outside temperature,

>the one or more servers are further configured to receive a demand reduction request and determine whether the structure is associated with demand rejection request, and

>based on the determination that the structure is associated with the demand reduction request, the one or more servers are further configured to send a signal to the thermostat to change the setting to a second setting to reduce electricity demand by the HVAC system.

5. The system as in claim **1** in which the estimation is a prediction about the future rate of change in temperature inside the structure.

# CERTIFICATE OF INTEREST

Counsel for Google LLC certifies the following:

1.  The full name of every party represented by me is:

    Google LLC

2.  The names of the real parties in interest represented by me are:

    None

3.  All parent corporations and any publicly held companies that own 10% or more of stock in the parties represented by me are:

    XXVI Holdings Inc. and Alphabet Inc.

4.  The names of all law firms and the partners or associates that appeared for the parties now represented by me before the originating court or that are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

    Keker, Van Nest & Peters LLP:
    >   Eric B. Hanson
    >   Jennifer A. Huber (now with the San Francisco City Attorney's Office)
    >   Matthias Andreas Kamber (now with Paul Hastings LLP)
    >   Patrick E. Murray (now with Gibson, Dunn & Crutcher LLP)
    >   Anna Porto (now in-house counsel with Mercury)
    >   Gregory D. Washington (now with Jenner & Block LLP)

    Potter Minton PC:
    >   Michael E. Jones
    >   Shaun William Hassett

    Allen & Overy LLP (now A&O Shearman):
    >   Shamita D. Etienne-Cummings (now with Paul Hastings LLP)
    >   James P. Gagen (now with Paul Hastings LLP)
    >   Eric Lancaster (now with Paul Hastings LLP)
    >   James Reed (now with Crowell & Moring LLP)
    >   Bijal V. Vakil

    White & Case LLP:
    >   Henry Yee-Der Huang

Michael J. Songer

5.     The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal is:

> In re *Ex Parte* Reexamination of U.S. Patent No. 8,738,327, 90/014,915
>     (U.S. PTO Dec. 3, 2021)
>
> *Google, LLC v. EcoFactor, Inc.*, 3:21-cv-01468
>     (N.D. Cal. Mar. 1, 2021)
>
> *Google, LLC v. EcoFactor, Inc.*, 4:21-cv-03220
>     (N.D. Cal. April 30, 2021)
>
> *EcoFactor, Inc. v. Google, LLC*, 5:22-cv-07661
>     (N.D. Cal. Dec. 5, 2022)
>
> *Google, LLC v. EcoFactor, Inc.*, 5:22-cv-00162
>     (N.D. Cal. Jan. 10, 2022)
>
> *EcoFactor, Inc. v. Google, LLC*, 4:24-cv-00175
>     (N.D. Cal. Jan. 9, 2024)

6.     Organizational Victims and Bankruptcy Cases: Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees) are not applicable because this is not a criminal or bankruptcy case.  See Fed. Cir. R. 47.4(a)(6).

None

DATED: November 12, 2024                By: */s/ Ginger D. Anders*
                                            Ginger D. Anders

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES ...............................................................1

JURISDICTIONAL STATEMENT ...................................................................1

STATEMENT OF THE ISSUES........................................................................1

INTRODUCTION ............................................................................................2

STATEMENT OF THE CASE...........................................................................4

SUMMARY OF THE ARGUMENT ................................................................13

ARGUMENT ..................................................................................................15

I.    Standard of Review.............................................................................15

II.   Federal Rule of Evidence 702 Plays a Critical Role in Ensuring That Damages for Patent Infringement Are Apportioned to the Value of the Patented Technology. ....................................................................16

    A.    Rule 702 requires district courts to serve as rigorous gatekeepers to ensure the reliability and relevance of expert testimony. ................................................................................16

    B.    Rule 702 principles are critical in ensuring that damages awards for patent infringement are properly apportioned. ...............................20

III.   The District Court Abused Its Discretion in Admitting Kennedy's Testimony Assigning a Royalty Rate to EcoFactor's Lump-Sum Licenses. ................................................................................23

    A.    Kennedy's extraction of the NRR royalty rate from the lump-sum licenses was unreliable. ...................................................24

    B.    The district court abused its discretion in admitting Kennedy's royalty-rate opinion and denying a new trial, and the panel erred in affirming...................................................................32

    C.    Kennedy's royalty-rate testimony illustrates the importance of rigorously enforcing Rule 702 in the patent-damages context. ..........39

IV.   Kennedy's Proposed Royalty Rate Should Have Also Been Excluded for Not Being Reliably Apportioned. .........................................................41

    A.    Courts must ensure the reliable application of comparable licenses to the hypothetical negotiation. ...............................................43

## TABLE OF CONTENTS
### (Continued)

Page

B.    Kennedy's superficial recitation of generic adjustments to the licenses was not reliably tied to the facts in this case. .......................46

C.    The district court abused its discretion in denying a new trial based on the admission of Kennedy's testimony applying the NRR rate to Google, and the panel erred in affirming. ......................54

CONCLUSION ...................................................................................................58

CERTIFICATE OF COMPLIANCE AND CONFIDENTIAL MATERIAL .........60

CERTIFICATE OF SERVICE .............................................................................61

### Confidential Material Omitted

The numerical royalty rate ("NRR") that EcoFactor advanced in confidential settlement agreements with third party licensees, which was presented during sealed fact and expert testimony at trial, has been omitted from pages iv, v, 2-4, 7-14, 23-31, 33-36, 38-43, 46-51, 53-55, and 57. The lump-sum amounts paid by third-party licensees, which was presented during sealed fact and expert testimony at trial, has been omitted from pages 7, 8, and 25. The amount of alleged past damages that EcoFactor sought, presented during sealed expert testimony, has been omitted from page 11. Results from confidential consumer surveys, which were presented during sealed fact and expert testimony at trial, has been omitted from page 57. The purported dollar amount under Kennedy's theory of Nest's profits, which was presented during sealed expert testimony, has been omitted from page 57.

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
    694 F.3d 1312 (Fed. Cir. 2012) .................................................................55, 56

*Apple Inc. v. Wi-LAN Inc.*,
    25 F.4th 960 (Fed. Cir. 2022) ............................................ 21, passim

*Aqua Shield v. Inter Pool Cover Team*,
    774 F.3d 766 (Fed. Cir. 2014) ...........................................................24

*Bracco Diagnostics Inc. v. Maia Pharm., Inc.*,
    839 F. App'x 479 (Fed. Cir. 2020) ...................................................27

*Brumfield v. IBG LLC*,
    97 F.4th 854 (Fed. Cir. 2024) ...........................................................17

*Burton v. E.I. du Pont de Nemours & Co.*,
    994 F.3d 791 (7th Cir. 2021) .............................................................38

*Carlson v. Bioremedi Therapeutic Sys., Inc.*,
    822 F.3d 194 (5th Cir. 2016) .............................................................33

*Certain Underwriters at Lloyd's, London v. Axon Pressure Prods.*
    *Inc.*, 951 F.3d 248 (5th Cir. 2020) ...............................................15, 16

*Commonwealth Scientific & Indus. Research Org. v. Cisco Sys., Inc.*,
    809 F.3d 1295 (Fed. Cir. 2015) ....................................................39, 44

*Cooper v. Travelers Indemnity Co. of Ill.*,
    113 F. App'x 198 (9th Cir. 2004) ......................................................30

*Cyntec Co. v. Chilisin Elecs. Corp.*,
    84 F.4th 979 (Fed. Cir. 2023) ...........................................................58

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993).............................................................. 2, passim

*EcoFactor, Inc. v. Google, LLC*,
    4:24-cv-00175 (N.D. Cal. Jan. 9, 2024) .......................................1, 53

*EcoFactor, Inc. v. Google, LLC*,
    5:22-cv-07661 (N.D. Cal. Jan. 10, 2022) ......................................................1, 53

*Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*,
    927 F.3d 1292 (Fed. Cir. 2019) ............................................................44

*Ericsson, Inc. v. D-Link Sys., Inc.*,
    773 F.3d 1201 (Fed. Cir. 2014) ............................................21, 49, 53

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp.*,
    879 F.3d 1332 (Fed. Cir. 2018) ............................................................42, 45

*Freshub, Inc. v. Amazon, Inc.*,
    93 F.4th 1244 (Fed. Cir. 2024) ............................................................15

*Garretson v. Clark*,
    111 U.S. 120 (1884)............................................................3, 6, 20, 22

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)............................................................18, 19, 36

*Georgia-Pac. Corp. v. U.S. Plywood Corp.*,
    318 F. Supp. 1116 (S.D.N.Y. 1970) ............................................................24

*Google, LLC v. EcoFactor, Inc.*,
    3:21-cv-01468 (N.D. Cal. Mar. 1, 2021) ............................................................1

*Google, LLC v. EcoFactor, Inc.*,
    4:21-cv-03220 (N.D. Cal. April 30, 2021) ............................................1, 53

*Google, LLC v. EcoFactor, Inc.*,
    5:22-cv-00162 (N.D. Cal. Jan. 11, 2022) ............................................................1

*Hanson v. Alpine Valley Ski Area, Inc.*,
    718 F.2d 1075 (Fed. Cir. 1983) ............................................................54

*Harris v. FedEx Corporate Servs., Inc.*,
    92 F.4th 286 (5th Cir. 2024) ............................................................30

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*i4i Ltd. P'ship v. Microsoft Corp.*,
  598 F.3d 831 (Fed. Cir. 2010) ............................................................56

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)................................................................ 13, passim

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  694 F.3d 51 (Fed. Cir. 2012) ............................................................21

*In re Lipitor Mktg., Sales Pracs. & Prod. Liab. Litig. (No II) MDL 2502*,
  892 F.3d 624 (4th Cir. 2018) ............................................................31

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009) ..........................................24, 40, 45

*MLC Intell. Prop., LLC v. Micron Tech., Inc.*,
  10 F.4th 1358 (Fed. Cir. 2021) ...........................................25, 30, 31

*Moore v. Ashland Chem. Inc.*,
  151 F.3d 269 (5th Cir. 1998) ............................................................42

*Nease v. Ford Motor Co.*,
  848 F.3d 219 (4th Cir. 2017) ............................................................37

*Omega Pats., LLC v. CalAmp Corp.*,
  13 F.4th 1361 (Fed. Cir. 2021) ....................................21, 29, 43, 50

*In re Onglyza & Kombiglyze Prod. Liab. Litig.*,
  93 F.4th 339 (6th Cir. 2024) .......................................................17, 31

*Pavo Solutions LLC v. Kingston Tech. Co.*,
  35 F.4th 1367 (Fed. Cir. 2022) ........................................................44

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
  711 F.3d 1348 (Fed. Cir. 2013) ................................................ 17, passim

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Prism Techs. LLC v. Sprint Spectrum L.P.*,
   849 F.3d 1360 (Fed. Cir. 2017) .........................................54

*Raskin v. Wyatt Co.*,
   125 F.3d 55 (2d Cir. 1997) ................................................46

*ResQNet.com, Inc. v. Lansa, Inc.*,
   594 F.3d 860 (Fed. Cir. 2010) ....................................24, 54

*SanDisk Corp. v. Kingston Tech. Co.*,
   695 F.3d 1348 (Fed. Cir. 2012) ..........................................5

*Sardis v. Overhead Door Corp.*,
   10 F.4th 268 (4th Cir. 2021) ......................................17, 37

*Seymour v. McCormick*,
   57 U.S. 480 (1853).............................................................20

*Summit 6, LLC v. Samsung Elecs. Co.*,
   802 F.3d 1283 (Fed. Cir. 2015) ........................................45

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011) .......................... 22, passim

*United States v. Arthur*,
   51 F.4th 560 (5th Cir. 2022) .............................................19

*Vectura Ltd. v. GlaxoSmithKline LLC*,
   981 F.3d 1030 (Fed. Cir. 2020) ........................................44

*VirnetX, Inc. v. Cisco Sys., Inc.*,
   767 F.3d 1308 (Fed. Cir. 2014) ....................................6, 21

*VLSI Tech. LLC v. Intel Corp.*,
   87 F.4th 1332 (Fed. Cir. 2023) .......................... 24, passim

*Westport Ins. Corp. v. Penn. Nat'l Mutual Cas. Ins. Co.*,
   117 F.4th 653 (5th Cir. 2024) ...........................................15

ix

*Whitserve, LLC v. Computer Packages, Inc.*,
    694 F.3d 10 (Fed. Cir. 2012) ................................................................. 6, passim

*Wordtech Sys., Inc v. Integrated Networks Sols., Inc.*,
    609 F.3d 1308 (Fed. Cir. 2010) ...........................................................43

*In re Zurn Pex Plumbing Prods. Liability Litig.*,
    644 F.3d 604 (8th Cir. 2011) ...............................................................37

**FEDERAL STATUTES**

28 U.S.C. § 1295(a)(1)..........................................................................1

28 U.S.C. § 1331..................................................................................1

28 U.S.C. § 1338(a) .............................................................................1

35 U.S.C. § 284 ...................................................................................6

**RULES - OTHER**

Fed. R. Evid. 104(a).............................................................................19

Fed. R. Evid. 702 ......................................................................... 1, passim

**LEGISLATIVE MATERIALS**

Amendments to the Federal Rules of Evidence, H. Doc. 118-33..........16, 17, 19, 20

## STATEMENT OF RELATED CASES

No appeal in or from the district court below was previously taken. The following actions may directly affect or be directly affected by this appeal:

In re *Ex Parte* Reexamination of U.S. Patent No. 8,738,327, 90/014,915 (U.S. PTO Dec. 3, 2021)

*Google, LLC v. EcoFactor, Inc.*, 3:21-cv-01468 (N.D. Cal. Mar. 1, 2021)

*Google, LLC v. EcoFactor, Inc.*, 4:21-cv-03220 (N.D. Cal. April 30, 2021)

*EcoFactor, Inc. v. Google, LLC*, 5:22-cv-07661 (N.D. Cal. Jan. 10, 2022)

*Google, LLC v. EcoFactor, Inc.*, 5:22-cv-00162 (N.D. Cal. Jan. 11, 2022)

*EcoFactor, Inc. v. Google, LLC*, 4:24-cv-00175 (N.D. Cal. Jan. 9, 2024)

Google is unaware of any other pending case that will directly affect or be directly affected by this appeal.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) and entered final judgment. Appx1-2. Google timely appealed. Appx2280-2281. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

In its rehearing order, the Court stated that the parties' *en banc* briefs "shall be limited to addressing the district court's adherence to Federal Rule of Evidence

702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), in its allowance of testimony from EcoFactor's damages expert assigning a per-unit royalty rate to the three licenses in evidence in this case." ECF 76 at 2-3. For reasons explained below, Google interprets the order to encompass the reliability under Rule 702 of both EcoFactor's expert's assertion that the amounts paid under the licenses were based on a NRR royalty rate and his ultimate conclusion that the NRR rate was the royalty the parties would have agreed to in the hypothetical negotiation. *See* note 11, *infra*.

## INTRODUCTION

In this case, plaintiff EcoFactor's damages expert, Mr. David Kennedy, was permitted to testify that EcoFactor should be awarded a reasonable royalty that was based on little more than EcoFactor's own self-serving, made-for-litigation recitals in three settlement agreements. Those agreements granted several companies licenses to EcoFactor's portfolio of over 30 patents in exchange for modest lump-sum payments. Two agreements expressly stated in their operative clauses that the lump-sum amounts did not reflect application of any royalty rate. But the licenses also contained a non-operative "whereas" clause that recited EcoFactor's unilateral "belie[f]" that each lump-sum payment was "based on" a per-unit royalty rate of NRR. Based on those whereas clauses—and without examining any licensee sales data or projections that could have verified or falsified EcoFactor's purported royalty

rate—Kennedy opined that the licenses reflected the parties' agreement on a ███ royalty rate. Kennedy then concluded that Google should be required to pay damages at the *same* ███ rate—even though the licenses covered numerous patents beyond the single one Google was found to infringe—after applying generic, unquantified "upward" and "downward" adjustments that would be present in every case involving a comparison to portfolio licenses. The jury's substantial damages award against Google was thus based entirely on a royalty rate that was manufactured by the patentee rather than based on the market value of the patented invention.

This case starkly illustrates the importance of enforcing the bedrock requirement, found in Federal Rule of Evidence 702, that an expert's conclusions must be reliable before they can be admitted over a *Daubert* challenge. Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Rule 702 has a particularly critical role to play in the context of patent damages. Damages for patent infringement must "in every case" be apportioned to the value of the patented improvement. *Garretson v. Clark*, 111 U.S. 120, 121 (1884). Expert testimony that, like Kennedy's, attributes a particular royalty to previous licenses for the patents, and then uses that royalty to calculate damages for infringement, must be subject to rigorous reliability testing, as Rule 702 and *Daubert* command, in order to ensure that juries are able to reach properly apportioned damages awards.

The district court failed to perform that gatekeeping function here. Kennedy's testimony that the three proffered licenses reflected the parties' agreement to apply a ██NRR██ royalty rate was unquestionably not supported by "sufficient facts," Fed. R. Evid. 702(b), given that he relied entirely on *EcoFactor's* own unverifiable assertions without any evidence whatsoever that the agreed-upon lump sums were calculated using the ██NRR██ rate. And Kennedy's reliance solely on his client's unsupported assertions amounted to nothing more than untestable speculation rather than a reliable methodology. Fed. R. Evid. 702(c). Kennedy's ultimate opinion that the ██NRR██ rate should apply to Google without modification fares no better: in asserting that the same rate should apply despite the numerous differences between the settlement licenses and the hypothetical negotiation, Kennedy failed to tether his analysis to the facts of this case, Fed. R. Evid. 702(d), and failed to heed this Court's apportionment precedents, Fed. R. Evid. 702(a). This Court should therefore hold that the district court abused its discretion in admitting Kennedy's testimony, and it should reaffirm that courts must rigorously scrutinize expert testimony challenged under Rule 702 to ensure that jury awards conform to the Court's longstanding apportionment principles.

## STATEMENT OF THE CASE

1.     In January 2020, EcoFactor sued Google alleging that Google's Nest thermostats infringe several patents related to purported improvements to smart

thermostat technology. Appx129. Leading up to trial, EcoFactor asserted three patents: U.S. Patent Nos. 8,738,327 ("'327 patent"); 8,412,488 ("'488 patent"); and 10,534,382 ("'382 patent").[1]

The '327 and '488 patents are related and share a specification. The '327 patent claims a networked HVAC system or method for controlling such a system, wherein a server receives internal temperature measurements from a structure associated with the HVAC system and outside temperature measurements from another source. Appx102. The server uses those temperatures to estimate the structure's rate of temperature change. Appx102. The '327 claims further recite that the server, in response to a "demand reduction request," commands the HVAC system to reduce electricity demand. Appx102. The '488 patent claims a system and method for "monitoring" the status of an HVAC system. Appx84. The '488 patent recites a processor that compares an inside temperature measurement to the rate of temperature change to determine whether the HVAC system is on or off. Appx84. The patents' shared specification discloses that the claimed inventions may be implemented by "conventional" HVAC, computing, and networking components. Appx80 at 1:29-46; Appx82 at 5:19-67.

---

[1] EcoFactor initially asserted, but withdrew, a fourth patent, U.S. Patent No. 8,180,492, which is not at issue on appeal. *See SanDisk Corp. v. Kingston Tech. Co.*, 695 F.3d 1348, 1353 (Fed. Cir. 2012) (withdrawal of claims constructively amends complaint and is equivalent to voluntary dismissal).

The '382 patent recites an HVAC system with a processor configured to determine whether or not a structure is occupied and to control the HVAC system accordingly. Appx120. The claimed invention may be carried out by the same "conventional" components as discussed above. Appx117-119 at 1:24-40, 4:24-5:42.

In addition to suing Google, EcoFactor also filed over twenty district court and ITC complaints against a number of other companies. For example, EcoFactor brought actions against Daikin Industries, Ltd. ("Daikin"); Schneider Electric USA, Inc. ("Schneider"); and Johnson Controls Inc. ("JCI"). Appx10389; Appx10400; Appx10411.

2.    In every patent infringement suit, the patentee bears the burden of establishing damages from infringement. *Garretson*, 111 U.S. at 121; 35 U.S.C. § 284. One way to do so is to use the hypothetical-negotiation framework to determine the reasonable royalty to which the patentee and the defendant would have agreed in arms-length negotiations before the infringement began. *Whitserve, LLC v. Computer Packages, Inc*., 694 F.3d 10, 26 (Fed. Cir. 2012). In all events, a "patentee must take care to seek only those damages attributable to the infringing features"—that is, to seek damages apportioned to the incremental value of the patented technology. *VirnetX, Inc. v. Cisco Sys., Inc*., 767 F.3d 1308, 1326 (Fed. Cir. 2014).

To support its damages case, EcoFactor offered Kennedy's expert testimony. Using the hypothetical-negotiation framework, Kennedy opined that Google and EcoFactor would have agreed to a royalty rate of NRR per unit. Appx1244; Appx1277-1278; Appx5780.

Kennedy's analysis was founded on three settlement license agreements that EcoFactor executed with Daikin, Schneider, and JCI between 2020 and 2021, during the pendency of this litigation against Google. Kennedy offered those agreements as comparable licenses whose payments provided a guide to the royalty to which Google and EcoFactor would have agreed in the hypothetical negotiation.

The Daikin license, dated April 2020, settled two district-court suits and an ITC investigation. Appx10389. EcoFactor granted Daikin a license to its entire current and future patent portfolio, including the patents asserted against Daikin. Appx10390. Those asserted patents included the '327, '488, and '382 patents, along with four other patents. Appx10398. In return, Daikin agreed to a one-time, lump-sum payment of dollar amount. Appx10391 ¶3.1. The parties agreed that "[s]uch amount is not based upon sales and does not reflect or constitute a royalty." Appx10391 ¶3.1. Despite that language, EcoFactor stated, in a unilateral "whereas" clause inserted before the agreement's operative provisions, that "[EcoFactor] has agreed to the payment ... based on what Ecofactor believes is a reasonable royalty

calculation of NRR per-unit for estimated past and Daikin's projected future sales of products accused of infringement in the Litigation." Appx10389.

The Schneider agreement, dated June 2020, also settled two district-court suits and an ITC investigation. Appx10400. Schneider received a license to EcoFactor's current and future patent portfolio, Appx10401, which included the seven patents EcoFactor asserted against it, including the '327, '488, and '382 patents, Appx10409. Schneider, too, paid for the license with a lump sum; this time for dollar amount. Appx10402 ¶3.1. Again, the parties explicitly agreed that "[s]uch amount is not based upon sales and does not reflect or constitute a royalty." Appx10402 ¶3.1. EcoFactor again included a whereas clause before the operative provisions, stating it believed that the payment was based on a NRR-per-unit royalty. That clause reiterated, though, that "nothing in this clause should be interpreted as agreement by Schneider that NRR per unit is a reasonable royalty." Appx10400.

The JCI agreement, dated July 2021, settled a district court case and an ITC investigation. Appx10411. EcoFactor granted JCI a license to its entire current and future patent portfolio. Appx10412. Four patents were asserted against JCI, but the '327, '488, and '382 patents were not among them.[2] Appx10411. JCI agreed to pay a dollar amount lump sum for its license. Appx10413. Again, EcoFactor included a

---

[2] One of the patents asserted against JCI was U.S. Patent No. 8,886,488, which is not the same '488 patent asserted against Google in this litigation. Appx10411.

whereas clause before the operative provisions, stating its belief that the lump sum was based on a ███ royalty rate.  Appx10411.

In his expert report, Kennedy relied on the whereas clauses to assert that the lump-sum amounts in each agreement were derived using the ███-per-unit royalty.  Appx1259.  After applying adjustments to account for the portfolio nature of the licenses and the assumption of validity and infringement applicable in the hypothetical negotiation, Kennedy asserted that the *same* royalty rate of ███ would be apportioned to the value of the specific patents asserted against Google.  Appx1277-1278.  Kennedy further opined that his opinion would be unchanged if Google were found liable on fewer than all three asserted patents.  Appx1278.

3.    Google moved to exclude Kennedy's testimony as unreliable under Rule 702 and *Daubert*.  Google argued that Kennedy's opinion was inadmissible because it was not based on sufficient facts and did not use a reliable methodology.  SAppx156-157.  Google also moved to exclude reference to the ███ rate, asserting that the rate should be redacted from the licenses if they were offered into evidence.  SAppx184-186.

The district court denied both motions without reasoning.  The court observed only that Google could cross-examine Kennedy.  SAppx266-267; Appx2254.

4.      EcoFactor proceeded to trial on claim 5 of the '327 patent and claims 2 and 12 of the '382 patent.[3]

At trial, Kennedy testified that the settlement licenses each applied a per-unit royalty rate of ██NRR██, based primarily on the unilateral whereas clauses stating EcoFactor's purported belief to that effect.  Appx5763-5764; Appx5769; Appx5772-5773.  Kennedy also relied on the testimony of EcoFactor's CEO, Mr. Shayan Habib, who asserted that the ██NRR██ rate reflected what the licensees were "willing to accept." Appx5671.  Habib conceded, however, that the rate stated in the whereas clauses had no impact on the licensees' actual payment obligations.  Appx5697.  Habib further testified that he had not actually seen any sales data for the licensees, or any documentation showing how the lump sums were determined—in fact, no one at EcoFactor had.  Appx5691; Appx5695; Appx5697.

Kennedy also acknowledged that he had not seen any data on past or projected sales for Daikin, Schneider, or JCI.  Appx5794; Appx5797; Appx5801; Appx5805-5806.  Nor had he seen any calculations or documentation showing how the lump sums for any of the licensees was determined.  Appx5794; Appx5797; Appx5801; Appx5805-5806.  He therefore admitted that he was unable to, and did not, verify whether the license parties had in fact used, or agreed to use, the ██NRR██ rate to

---

[3]  The district court held that the asserted claims of the '488 patent were invalid for indefiniteness.  Appx1; Appx2254.

calculate the lump sums. Appx5667-5670; Appx5794; Appx5796; Appx5797; Appx5805; Appx5811-5812.

Kennedy then explained that he had used the ███NRR███ rate as the foundation of his analysis of the *Georgia-Pacific* factors, which are often used to assess the royalty amount that the patentee and the defendant would agree to in a hypothetical negotiation. Appx5741; Appx5747. Kennedy reasoned that Google would argue for a lower rate (what he referred to as "downward pressure") because the settlement licenses were all portfolio licenses. Appx5779-5780. But EcoFactor would counter that the rate should be higher ("upward pressure"), given that the patents are assumed valid and infringed in the hypothetical negotiation. Appx5780. Ultimately, Kennedy opined that "after weighing all the positives and negatives," the parties "would agree to ███NRR███ per unit." Appx5780. Applying that rate to the number of alleged infringing units, he calculated that Google owed ███dollar amount███ in past damages. Appx5740.

5. The jury found that Google had infringed only one claim of the '327 patent and had not infringed any claims of the '382 patent. Appx45. The jury found that Google owed EcoFactor $20,019,300 in lump-sum damages.

Google moved for a new trial on damages. Appx157. Again, Google argued that Kennedy's testimony regarding the ███NRR███ rate should have been excluded as unreliable and that admission of the rate itself was prejudicial. SAppx839-849.

The district court denied Google's motion from the bench with no explanation of its reasoning. Appx6688.

6.    A divided panel of this Court affirmed.

a.    As relevant here, the majority held that the district court did not abuse its discretion in denying Google's motion for a new trial based on the admission of Kennedy's testimony.

The panel first rejected Google's argument that the district court should have excluded Kennedy's testimony that the three lump-sum licenses reflected the parties' agreement to use a per-unit royalty rate of ███. The panel explained that Kennedy had based his testimony on "admissible evidence"—namely, the whereas clauses and Habib's testimony. Op. 11. Therefore, the panel stated, the "jury was entitled to hear the expert testimony" and "decide for itself what to accept or reject." Op. 12. In particular, "how much weight should be given to the provisions in the license agreements, including whether they are 'self-serving' as Google claims," was a question for the jury. Op. 13-14.

The panel next rejected Google's challenge to the reliability of Kennedy's opinion that Google should pay ███ per unit—the identical royalty rate purportedly used in the three licenses. The panel opined that whether Kennedy had reliably accounted for the portfolio nature of the licenses was a "factual issue[] best addressed by cross examination and not by exclusion." Op. 18.

b.      Judge Prost dissented.  She would have held that the district court abused its discretion in admitting Kennedy's testimony as to the NRR royalty rate and its application to the hypothetical negotiation.  Dissent 2.  In her view, Kennedy's opinion that the lump-sum licenses applied the NRR rate was unsupported, given that "[t]he self-serving [whereas] recitals reflect only EcoFactor's transparent attempt to manufacture a royalty rate using its 'belief.'" Dissent 4-5.  Moreover, Kennedy's opinion applying the NRR rate to Google was unreliable because "it includes the value of other patents," as Kennedy had failed to adequately consider the value of the specific additional patents included in each license.  Dissent 6.

7.      Google petitioned for rehearing *en banc*.  On September 25, 2024, this Court granted the petition.

## SUMMARY OF THE ARGUMENT

Federal Rule of Evidence 702 "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert*, 509 U.S. at 597.  Because Rule 702 establishes prerequisites to the *admissibility* of expert testimony, a district court may not reject a *Daubert* challenge on the ground that reliability questions go to weight and not admissibility, but must instead find by a preponderance of the evidence that the testimony complies with Rule 702.  That "gatekeeping" requirement, *Kumho Tire Co. v. Carmichael*,

526 U.S. 137, 138 (1999), is especially important in the context of damages for patent infringement. The patentee bears the burden of establishing damages attributable to the value of the particular infringing features, and to do so, it will almost always introduce expert testimony on complex economic and technical issues. Rigorous enforcement of Rule 702 is critical in ensuring that damages awards are properly apportioned and that they conform to the legal principles announced by this Court.

The district court's admission of Kennedy's opinion that Google should pay damages reflecting a per-unit royalty of NRR failed to comply with Rule 702 in two primary respects. First, Kennedy's opinion that EcoFactor's proffered lump-sum licenses reflected the licensees' agreement to apply a NRR royalty rate was not based on a sufficient factual foundation, and it did not reflect a reliable methodology. Fed. R. Evid. 702. In concluding that the licensees agreed to that rate, Kennedy ignored operative license provisions that disclaimed the use of any royalty rate and relied instead on EcoFactor's (and Habib's) unilateral, self-serving assertions that the licenses' lump-sum amounts reflected the NRR royalty rate. No reasonable expert would rely solely on such unverified, and unverifiable, assertions, and Kennedy's resulting opinion was based on nothing more than speculation.

Second, Kennedy's conclusion that Google should be required to pay damages at the same manufactured NRR rate—even though the lump-sum settlement licenses

covered numerous additional patents—did not reliably apportion for the value of the '327 patent found to be infringed (or even, for that matter, the two asserted patents tried against Google) or the settlement nature of the licenses. Rather than analyzing and accounting for the value of the specific additional patents covered in the licenses or the licensees' willingness to pay to avoid the costs of litigation, Kennedy applied generic, vague "upward" and "downward" adjustments that would be present in every case involving a portfolio license and that, in his view, conveniently happened to cancel each other out. That testimony was not tethered to the facts of the case, and it left the jury with no way of assessing the value of the additional patents covered in the licenses and adjusting the royalty accordingly. This Court has repeatedly held similar testimony to be unreliable and inadmissible. The district court abused its discretion in admitting Kennedy's testimony.

## ARGUMENT

### I. Standard of Review

This Court reviews denials of motions for a new trial under regional circuit law, here the Fifth Circuit. *Freshub, Inc. v. Amazon, Inc.*, 93 F.4th 1244, 1249 (Fed. Cir. 2024). The Fifth Circuit reviews the denial of a motion for a new trial and the admission of expert testimony under Rule 702 for abuse of discretion. *Id.*; *Westport Ins. Corp. v. Penn. Nat'l Mutual Cas. Ins. Co.*, 117 F.4th 653, 665 (5th Cir. 2024); *Certain Underwriters at Lloyd's, London v. Axon Pressure Prods. Inc.*, 951 F.3d

248, 256 (5th Cir. 2020). "A district court abuses its discretion if it bases its decision on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Id.*

## II. Federal Rule of Evidence 702 Plays a Critical Role in Ensuring That Damages for Patent Infringement Are Apportioned to the Value of the Patented Technology.

### A. Rule 702 requires district courts to serve as rigorous gatekeepers to ensure the reliability and relevance of expert testimony.

Rule 702 requires trial court judges to assume "a gatekeeping role" to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589, 597. Specifically, Rule 702 states that an expert witness "may testify in the form of an opinion" only if "the proponent demonstrates to the court that it is more likely than not that" (a) the expert's technical or other specialized knowledge "will help the trier of fact to understand the evidence or to determine a fact in issue;" (b) "the testimony is based on sufficient facts or data;" (c) "the testimony is the product of reliable principles and methods;" and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702 (2023).[4] "[T]he trial judge *must* ensure" that

_____

[4] Rule 702 was amended in 2023. Although the trial in this case occurred in 2022, the 2023 amendments did not alter Rule 702's substance. The amendments added the "more likely than not" language and slightly rephrased Rule 702(d) to require that "the expert's opinion reflects a reliable application" of his methodology (where the previous language required that "the expert has reliably applied" the methodology). Amendments to the Federal Rules of Evidence, H. Doc. 118-33

Rule 702's preconditions are satisfied before admitting expert testimony over a *Daubert* challenge. *Daubert*, 509 U.S. at 589.[5]

Several of Rule 702's requirements are particularly relevant here. First, the district court must assure itself that the expert's testimony is "based on sufficient facts or data." Fed. R. Evid. 702(b). "Sufficient facts or data" are facts or data that provide the expert's opinion with a *reliable* factual foundation on which to base his opinion. *Kumho Tire*, 526 U.S. at 149. "Thus, while an expert's data need not be admissible, the data cannot be derived from a manifestly unreliable source." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1373 (Fed. Cir. 2013), *abrogation in other part recognized by Brumfield v. IBG LLC*, 97 F.4th 854 (Fed. Cir. 2024); *Daubert*, 509 U.S. at 590 ("Proposed testimony must be supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known."). Because "an analysis of the sufficiency of the expert's basis cannot be divorced from the ultimate reliability of the expert's opinion," Fed. R. Evid. 702 adv. comm. note (2000 amendment), the court must assess whether the expert's opinion is founded on reliable information, and exclude opinions based on unreliable

---

at 18. Those amendments were made to "clarify" that some courts had been applying the existing Rule 702 "incorrect[ly]" in ways discussed further below. *Id*. at 19; p. 19-20, *infra*; *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 283-84 (4th Cir. 2021) (amendment "confirms" "existing law"); *In re Onglyza & Kombiglyze Prod. Liab. Litig.*, 93 F.4th 339, 348 n.7 (6th Cir. 2024).

[5] Emphases are added throughout unless otherwise noted.

information.  *See Power Integrations*, 711 F.3d at 1373-74 (district court abused discretion in admitting expert opinion based on an unverified estimate of sales found on the Internet).

Second, the testimony must be the "product of reliable principles and methods." Fed. R. Evid. 702(c).  A "key question to be answered in determining whether a theory or technique is [reliable] will be whether it can be (and has been) tested." *Daubert*, 509 U.S. at 593.  One distinguishing feature of reliable methodologies is the ability to "test[] them to see *if they can be falsified*." *Id*.  The court therefore must ask whether the expert's opinion is the product of verifiable analysis, or whether it is "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). The latter must be excluded.

Third, the expert's opinion must reflect a "reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(d).  In other words, the expert's "particular method of analyzing the data thereby obtained, to draw a *conclusion* regarding the particular matter to which the expert testimony was directly relevant," must be reliable. *Kumho Tire*, 526 U.S. at 154 (emphasis revised).  A district court therefore must scrutinize an expert's reasoning process to ensure that the conclusions drawn were sufficiently supported by the expert's data, and "may

conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 144, 146.

2.    In 2023, Rule 702 was amended to address courts' failures to properly apply Rule 702 as a "gatekeeping" rule of *admissibility*. *Daubert*, 509 U.S. at 589; *see* note 4, *supra*. Rule 104(a), which states that "[t]he court must decide any preliminary question about whether ... evidence is admissible," *requires* the court to satisfy itself of the reliability of expert testimony when that testimony has been challenged. Fed. R. Evid. 104(a). The court therefore may not deny challenges to the reliability of expert testimony on the ground that the jury can evaluate the testimony's reliability for itself. As the 2023 Advisory Committee Note explained, "many courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. *These rulings are an incorrect application of Rule 702 and 104(a)*." Amendments to the Federal Rules of Evidence, H. Doc. 118-33 (hereinafter, "Amendments") at 19. The 2023 amendments address such errors by making more explicit what was already required by Rules 702 and 104(a): the "proponent" of the expert testimony must "demonstrate to the court that it is more likely than not" that Rule 702's various admissibility requirements are satisfied. Amendments at 25 (amendment "clarifies" this point); *United States v. Arthur*, 51 F.4th 560, 571 (5th Cir. 2022) (even before amendment, preponderance standard

applied).  Only after that finding has been made will an "attack by the opponent ... go only to the weight of the evidence."  Amendments at 20.

In addition, the amendment to Rule 702(d), *see* note 4, *supra*, is intended to "emphasize[]" the need for "gatekeeping" to ensure that the expert's opinion "stays within the bounds of what can be concluded from a reliable application of the expert's basis in methodology." *Id*. at 21.  That amendment, too, merely reaffirmed existing law. *See Kumho Tire*, 526 U.S. at 152.

## B. Rule 702 principles are critical in ensuring that damages awards for patent infringement are properly apportioned.

Rule 702's purpose is to ensure that expert testimony "help[s] the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).  As a result, rigorous enforcement of Rule 702 plays a critical role in ensuring that juries reach verdicts that are both faithful to the governing legal standards and accurate as a matter of fact.  That role is particularly important in the context of patent litigation and, as relevant in this case, damages for patent infringement.

The cardinal principle governing the damages inquiry in this case, as in all patent infringement cases, is that the damages award must be apportioned— limited—to the value of the patented invention.  *Garretson*, 111 U.S. at 121; *Seymour v. McCormick*, 57 U.S. 480 (1853).  The "ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product," and must exclude the value added by other elements and technologies

not covered by the asserted patent. *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).

That apportionment principle has become even more important in recent years, as technologically advanced products accused of infringement may contain hundreds or thousands of components or features and potentially implicate as many patents. *See, e.g.*, *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 66 (Fed. Cir. 2012) ("This is especially true for electronic devices[.]"). The patentee, who bears the burden of proving damages, must therefore present testimony that "'take[s] care to seek only those damages attributable to the infringing features.'" *Omega Pats., LLC v. CalAmp Corp.*, 13 F.4th 1361, 1376 (Fed. Cir. 2021) (quoting *VirnetX*, 767 F.3d at 1326).

One way for a patentee to prove damages is to use economically and technologically comparable licenses as a guide to what the parties to the suit would have agreed was a reasonable royalty in a hypothetical negotiation over the infringed patents. *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 971 (Fed. Cir. 2022). When a patentee relies on comparable licenses, it must "account for differences in the technologies and economic circumstances of the contracting parties" as between the comparable licenses and the hypothetical negotiation. *Id.*

Proper apportionment therefore turns on juries' accurate resolution of a host of complex technical and economic issues. When a patentee seeks to establish an

apportioned royalty by using comparable licenses, the validity of the apportionment analysis turns on reliably analyzing those licenses' terms; ascertaining what, if anything, the licenses reveal about the value of the patented invention at issue; and accounting for any differences between the comparable licenses and the hypothetical negotiation. Because jurors would have trouble performing that analysis on their own, parties often present the testimony of experts with specialized economic and financial knowledge.

Adherence to Rule 702's terms and *Daubert*'s principles is therefore indispensable to ensuring that "in every case," damages are apportioned to the value of the patented technology. *Garretson*, 111 U.S. at 121. Admitting unreliable expert testimony that lacks a sound economic foundation, or a reasoned basis in the evidence in the case, leaves the jury without a valid basis on which to apportion damages to the patented invention. Even worse, it risks confusing or misleading the jurors, tethering their deliberations to an unreliable anchor number and making it impossible to assess the invention's value relative to other components. *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011) (improper expert testimony on a large figure "cannot help but skew the damages horizon for the jury"). District courts therefore must rigorously enforce Rule 702—including the principles reaffirmed by the 2023 amendments—in order to ensure that expert testimony rests

on a sound economic foundation. The district court and the panel of this Court failed to do that in this case, for the reasons discussed below.

## III. The District Court Abused Its Discretion in Admitting Kennedy's Testimony Assigning a Royalty Rate to EcoFactor's Lump-Sum Licenses.

Kennedy's opinion that EcoFactor's three proffered lump-sum licenses reflected the parties' agreement to apply a NRR royalty rate failed the most fundamental requirements of reliability: it was not based on a sufficient factual foundation, and it used an unreliable methodology. Fed. R. Evid. 702. In concluding that the licensees *agreed* to that rate, Kennedy relied solely on EcoFactor's unilateral assertions that the licenses' lump-sum amounts were based on the NRR royalty rate—despite the self-evident point that one party's stated "belief" is hardly indicative of the parties' agreement; despite the fact that *operative* provisions in two of the licenses disclaimed any agreement on the NRR rate; and despite Kennedy's inability to test EcoFactor's unilateral assertions using sales data. Kennedy thus relied on nothing more than his client's self-serving say-so in testifying to the jury that the licenses used the NRR rate. It is black-letter law, however, that an expert's damages analysis must be based on sufficient, *verifiable* data, and that relying instead on a party's untested assertions renders an expert's conclusions unreliable. *See Power Integrations*, 711 F.3d at 1372, 1374.

### A. Kennedy's extraction of the ▮NRR▮ royalty rate from the lump-sum licenses was unreliable.

At trial, EcoFactor sought to prove its damages by establishing that in the hypothetical negotiation, Google and EcoFactor would have agreed upon a per-unit royalty rate of ▮NRR▮. That rate was derived without alteration from the three purportedly comparable licenses, each reflecting a litigation settlement. "[P]rices paid in actual licenses may have a proper role to play in valuing the patented technology at issue in a case," *VLSI Tech. LLC v. Intel Corp.*, 87 F.4th 1332, 1346 (Fed. Cir. 2023), but that is because the *agreement* between the patentee and licensee as to a royalty for the patented technology may be assumed to reflect market actors' valuation of that technology.[6] *See, e.g.*, *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 771 n.1 (Fed. Cir. 2014); *Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) ("royalties received by the patentee" in previous licenses "of the patent in suit" may "tend[] to prove an established royalty"). The agreed-upon royalty refers not only to the payment amount but also the structure of the payments; lump-sum and royalty-rate structures have "[s]ignificant differences." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1326-27 (Fed. Cir. 2009).

---

[6] Where, as here, the licenses arise from litigation-driven settlements, the parties and the factfinder must also account for the value paid to avoid high litigation costs. *See ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010); pp. 53-54, *infra*.

The agreement reflected in each of EcoFactor's proffered licenses was that each licensee would pay a lump-sum amount—not a running royalty—for the right to use the licensed patents. Nonetheless, EcoFactor sought to establish that the proffered licenses in fact used the **NRR** rate so that EcoFactor could use that assertion to support its theory that Google should pay **NRR** per unit as a running royalty for infringing the '327 patent. EcoFactor accordingly offered Kennedy's testimony to establish that the lump-sum payment agreed to in each license was calculated using the **NRR** rate. As this Court has recognized, Kennedy was required to provide a reliable "basis to infer" that **NRR** was the "rate for running royalty" applied in the lump-sum agreements. *MLC Intell. Prop., LLC v. Micron Tech., Inc.*, 10 F.4th 1358, 1368 (Fed. Cir. 2021). He did not.

1. Kennedy testified that each of the three licenses granted the licensees rights to technology similar to the asserted patents for a royalty rate of **NRR** per unit. Appx5763-5764; Appx5769; Appx5772-5773; Appx10389; Appx10400; Appx10411. Each license, however, required the licensee to pay a relatively modest lump-sum amount, not a running royalty: Daikin paid **dollar amount**, Appx10391; Schneider, **dollar amount**, Appx 10402; and JCI, **dollar amount**, Appx 10413.

Kennedy's proffered **NRR**-per-unit rate did not appear in any of the agreed-upon payment terms in the three licenses, nor was it derived from the actual agreed-upon lump-sum amounts. Instead, Kennedy took the **NRR** rate from a unilateral

"whereas" clause found in each agreement. Appx5763-5764; Appx5769; Appx5772-5773. The prologue to the Daikin license states (in language nearly identical to that in the Schneider and JCI licenses): "WHEREAS, Ecofactor represents that it has agreed to the payment set forth in this Agreement based on what Ecofactor believes is a reasonable royalty calculation of NRR per-unit for estimated past and [licensee's] projected future sales." Appx10389; *see* Appx10400; Appx10411. On its face, that clause states *EcoFactor's* own purported "*belie[f]*" that each license's lump-sum payment was "based on" a NRR royalty rate. Appx10389; *see* Appx10400; Appx10411. But nothing in the whereas clauses, or the licenses as a whole, suggested that the *licensees* shared EcoFactor's belief that their lump-sum payments were premised on the NRR rate, or that they had actually agreed to pay NRR per unit (or an equivalent lump-sum amount) for the licensed technology.

Indeed, the licenses themselves refute any inference that the license parties actually applied the NRR rate to determine the lump-sum payments. The Schneider license provides—within the same whereas clause reciting EcoFactor's belief—that "nothing in this clause should be interpreted as agreement by Schneider that NRR per unit is a reasonable royalty." Appx10400. And the body of the agreement—in binding language agreed to by EcoFactor—states unequivocally that the lump-sum amount "is *not based upon sales* and *does not reflect* or constitute *a royalty*."

Appx10402. The Daikin license contains identical language in its payment provision. Appx10391. Thus, those two licenses' operative clauses squarely contradict EcoFactor's purported "belief" that the lump-sum amount is "based" on a "royalty" assessed against licensees' sales—and thus the whereas clauses cannot override those clear terms. *Cf. Bracco Diagnostics Inc. v. Maia Pharm., Inc.*, 839 F. App'x 479, 487 (Fed. Cir. 2020) ("we do not rely on a self-serving 'whereas' clause to override the clear import of" a stipulation). Although the third license, to JCI, does not contain an explicit refutation of the ███ rate, neither does it contain any evidence whatsoever that the parties actually used that rate. And given that the other two licenses contained agreed-upon terms rejecting EcoFactor's represented unilateral belief concerning the ███ rate, there is substantial reason to question the veracity of EcoFactor's professed belief about the ███ rate in the JCI license. Yet Kennedy ignored those agreed-upon terms, choosing to rely solely on favorable-to-EcoFactor "whereas" recitals and Habib's testimony to the same effect.

Even worse, Kennedy made no effort to determine whether the agreed-upon lump-sum payments applied the ███ rate. Kennedy testified that he had never seen any sales data for Daikin or any calculation showing how the lump-sum was determined. Appx5794. Same for Schneider. Appx5797; Appx5801-5802. And for JCI. Appx5804-5806. Instead of verifying the rate using actual sales information, Kennedy relied on the self-serving, conclusory contentions of

EcoFactor's CEO, Habib. *See, e.g.*, Appx5794. But like Kennedy, Habib had never seen any of the licensees' sales information or any documentation showing how the lump-sum payments were calculated. Appx5691; Appx5695; Appx5697-5698. Nor did he believe that *anyone* at EcoFactor had such information. Appx5691; Appx5695; Appx5697-5698. Thus, no record evidence shows that the parties to the licenses ever actually agreed upon the ██NRR██ rate or applied it to the licensees' sales.[7]

    2.    Kennedy's testimony that the three licenses reflected agreements to apply a ██NRR██ royalty rate for the licensed technology is unreliable and inadmissible under Rule 702 and *Daubert*.

    a.    Kennedy's testimony failed the most basic requirement of reliability: that the expert's opinion be "based on sufficient facts or data." Fed. R. Evid. 702(b). An expert's opinion must be based on evidence that may be independently examined so as to verify, or falsify, an expert's conclusions. *See* p. 18, *supra*; *Daubert*, 509 U.S. at 593 ("a key question" is "whether [expert opinion] can be (and has been) tested").

---

[7] Although the absence of sales data precludes converting the lump-sum amounts to any per-unit rates, basic arithmetic shows that the license parties did not calculate the round lump-sum amounts based on a ██NRR██ rate. Had the ██NRR██ rate been multiplied by a whole number of sales units, the resulting lump-sum amounts would have been more granular, down to the cent.

Kennedy's opinion that the ██NRR██ royalty rate was applied in the settlement licenses was based on nothing more than the licenses' whereas clauses and Habib's testimony. But as noted above, neither of those sources established that the licensees had *agreed* to apply a ██NRR██ rate; rather, each established only that EcoFactor purportedly *believed* that the licenses reflected that royalty rate. And as this Court has recognized, a patentee's belief as to the value its patent should command is not probative of what licensing parties actually agree to.[8] *See Omega*, 13 F.4th at 1379 (unilateral licensing policy not probative); *Whitserve*, 694 F.3d at 30 (patentee offers not very probative, as "patentees could artificially inflate the royalty rate by making outrageous offers"). Indeed, it is implausible that multiple differently situated companies in real-world negotiations to settle different sets of lawsuits asserting different patents would have all landed on an identical ██NRR██ rate, down to the cent.

Kennedy therefore needed additional "facts or data," Fed. R. Evid. 702(b), to support his conclusion that the licensees had in fact agreed to the ██NRR██ royalty rate. But Kennedy did not possess any actual or estimated sales data that would have

---

[8] Thus, although Habib testified to a "baseline policy" of licensing EcoFactor's entire portfolio for a ██NRR██ rate, Appx5671-5673, that asserted "policy" does not add anything to the whereas clauses. Both reflect the patentee's unilateral view of what the royalty rate should be, rather than an actual agreement among two counterparties. *See Omega*, 13 F.4th at 1379. The same goes for Habib's assertion that he believed the ██NRR██ rate was "reasonable" in light of his "general understanding of the space" and his "understanding of EcoFactor." Appx5670-71.

enabled him to verify whether the lump-sum payment amounts were calculated using the NRR rate. Kennedy's conclusion that the licensees agreed to the NRR rate therefore was not based on "sufficient facts or data" to support that conclusion. Fed. R. Evid. 702(b).

b. For much the same reasons, Kennedy's testimony about the royalty rate was not "the product of reliable principles and methods." Fed. R. Evid. 702(c). One reliable method of determining whether the parties to a license have agreed on a particular term would be to examine the license itself. Here, of course, examining the licenses revealed the *absence* of any agreement on the NRR rate. Failing that, another reliable method might be to "provide mathematical analysis to derive" the royalty rate from the lump sum. *MLC*, 10 F.4th at 1368. But Kennedy was unable to do that either. His method thus reduced to relying on EcoFactor's unilateral, unverifiable assertions of an agreement—while ignoring other, agreed-upon terms in the licenses that contradicted the existence of any agreement. Because unverified client representations are simply not "the type of data on which experts in economics would reasonably rely," *Cooper v. Travelers Indemnity Co. of Ill.*, 113 F. App'x 198, 201 (9th Cir. 2004), "an expert cannot forgo her own independent analysis and rely exclusively on what an interested party tells them," *Harris v. FedEx Corporate Servs., Inc.*, 92 F.4th 286, 303 (5th Cir. 2024). Nor may an expert ignore evidence that conflicts with his conclusion in favor of results-driven analysis or cherry-

picking. *See In re Onglyza*, 93 F.4th at 347 ; *In re Lipitor Mktg., Sales Pracs. & Prod. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 634 (4th Cir. 2018). Kennedy's testimony violated both principles. In effect, his opinion reduced to nothing more than his own "subjective belief or unsupported speculation," based on his client EcoFactor's own unilateral assertion that the parties to the licenses in fact agreed to the **NRR** rate. *Daubert*, 509 U.S. at 590.

      c.    Indeed, this Court held in *MLC* that royalty-rate testimony strongly resembling Kennedy's was "not 'based on sufficient facts or data' and [was] not 'the product of reliable principles and methods.'" 10 F.4th at 1367 (quoting Rule 702(b), (c)). Like Kennedy, the *MLC* plaintiff's expert, Mr. Milani, sought to translate a lump-sum payment amount in a comparable license to a running royalty rate. *Id.* at 1363-64. Ignoring the lump-sum amount, and declining to use sales data to calculate a royalty rate from the lump-sum, Milani instead asserted that a most-favored-customer provision triggered by a 0.25% rate should be treated as the royalty rate reflected in the agreement. *Id.* at 1365. This Court held that Milani's testimony was unreliable because he did not attempt to "provide mathematical analysis to derive" that rate "from the lump-sum payments," and the most-favored-customer clause did not support any inference that the licensing parties had agreed upon the 0.25% rate as payment for the licensed patents. *Id.* at 1368. The same deficiencies pervade Kennedy's analysis: he provided no mathematical analysis supporting the **NRR**

royalty rate, and the whereas clauses do not reasonably imply that that rate was actually applied (in fact, they are contradicted by the payment terms stating that the lump-sums are "not based on sales"). Appx5691; Appx5695; Appx5697-5698. Like the testimony in *MLC*, Kennedy's testimony must be excluded.

**B.    The district court abused its discretion in admitting Kennedy's royalty-rate opinion and denying a new trial, and the panel erred in affirming.**

1.    The district court abused its discretion in admitting Kennedy's testimony despite its reliance on unverifiable, self-serving assertions, and in denying a new trial based on that error.

As an initial matter, the discretion that a district court enjoys in the Rule 702 analysis is "discretion in choosing the manner of testing expert reliability"—"not discretion to abandon the gatekeeping function." *Kumho Tire*, 526 U.S. at 158-59 (Scalia, J., concurring). That is, the district court has "latitude in deciding *how* to test an expert's reliability," and its "ultimate conclusion" whether expert testimony is reliable or not is reviewed deferentially in view of the trial court's closeness to the evidence. *Id*. at 152 (emphasis in original). But the district court must always "ensure the reliability and relevancy of expert testimony" when that testimony is challenged, and once the court concludes that testimony is unreliable, it has no discretion to admit it anyway. *Id*.; *see also id*. at 159 (Scalia, J., concurring) ("[I]t is not discretion to perform the [gatekeeping] function inadequately. Rather, it is

discretion to choose among reasonable means of excluding ... science that is junky.").

Here, the district court abused its discretion by admitting Kennedy's testimony that the three licenses used the **NRR** royalty rate, despite the fact that Kennedy's conclusion was based on insufficient facts and an unreliable method. *See Power Integrations*, 711 F.3d at 1372, 1374 (finding abuse of discretion where court admitted expert testimony that was "based on insufficient data"). In admitting the testimony, and in refusing to grant a new trial based on that error, the district court did not explain its reasoning, other than to state that Google could cross-examine Kennedy. SAppx266; Appx2254; Appx6687-6689; *cf. Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 201 (5th Cir. 2016) ("At a minimum, a district court must create a record of its *Daubert* inquiry and articulate its basis for admitting expert testimony." (cleaned up)). To the extent that the district court's reference to cross-examination reflected a view that cross-examination would substitute for the reliability inquiry, that view was erroneous for the reasons stated below in connection with the panel's more explicit reasoning.

It is beyond dispute that the erroneous admission of the **NRR** royalty rate was prejudicial. *See VLSI*, 87 F.4th at 1348 (error is prejudicial unless court can conclude that it "could not have changed the result"). The licenses' purported royalty rate was the foundation of EcoFactor's entire damages theory—and Kennedy's testimony

was integral to convincing the jury of that rate. Without Kennedy's expert imprimatur, the evidence of the rate would have been vanishingly thin, amounting to no more than inoperative "whereas" clauses contained in licenses that disavowed any actual agreement on a royalty rate, plus transparently unsupported, self-serving lay testimony from EcoFactor's CEO.[9] It does not matter that, as the panel observed, Op. 13, the jury awarded EcoFactor less than Kennedy's proposed damages. As this Court has recognized, Kennedy's inflated damages number likely anchored the jury's compromise. *See Uniloc*, 632 F.3d at 1320. And EcoFactor presented no evidence that could have given the jury a reasonable basis to discount Kennedy's rate. The jury's arbitrary choice of some lower number could only have been based on speculation, and thus deeply prejudicial to Google.

2. The panel's reasons for nonetheless affirming the district court's admission of Kennedy's testimony were mistaken.

First, the panel applied the wrong legal standard, asserting that challenges to the sufficiency of Kennedy's exclusive reliance on the whereas clauses and Habib's testimony went to weight rather than admissibility: "how much weight should be given to the provisions in the license agreements, including whether they are 'self-

---

[9] Indeed, had Kennedy's testimony been excluded, the district court's admission of the purported **NRR** rate itself, SAppx184-186, SAppx845-846, would have also been an abuse of discretion.

serving' as Google claims, ... is a question for the jury." Op. 13-14. That is the very failure to apply Rule 702's standards that the Advisory Committee described as an "incorrect application" of the rule. Amendment at 19; *see* pp. 19-20, *supra*. Because reliability is a *threshold* question of admissibility, Rule 702 obligated the district court to evaluate, and the panel to review, whether Kennedy's testimony that the three licenses applied the NRR royalty rate was based on sufficient facts or data and reliable methodology.

Instead of asking those questions, the panel affirmed the admission of Kennedy's testimony because it was "based ... on ... admissible evidence"—namely, the whereas clauses and Habib's testimony. Op. 11. The panel expressly treated that standard as the threshold for submitting expert testimony to the jury, recounting the evidence and stating that "based on this context, the jury was entitled to hear the expert testimony." Op. 12. But a mere basis in some admissible evidence does not show that expert testimony is based on sufficient facts or that the expert's conclusions are derived by reliable methods. *See Kumho Tire*, 526 U.S. at 156-57; Fed. R. Evid. 702(d). Rather, the gatekeeping court must ask not merely whether the expert opinion is based on *some* evidence in the record, but instead whether that evidence was the *type* of evidence on which a reasonable expert would rely and whether its unverifiability rendered his conclusions unreliable. Op. 12; *cf. Power Integrations*, 711 F.3d at 1373. The panel failed to perform that analysis.

The panel's more specific discussion of Kennedy's reliance on the whereas clauses underscores its failure to test the reliability of his testimony. The panel characterized Google as arguing that there was "no evidence" that the parties to the license agreement "actually applied" the NRR royalty rate. The panel rejected that argument, relying solely on the whereas clauses—which, again, expressly asserted only EcoFactor's purported "belie[f]" that the lump-sum amounts were "based on" the NRR royalty rate. The panel then dismissed language in the Schneider license stating that "nothing in this clause should be interpreted as agreement by Schneider that the NRR rate is a reasonable royalty," Appx10400, on the ground that "[a]rguably, this provision, when read in context, *could also mean* that the $X royalty rate was applied by EcoFactor and Schneider." Op. 13. Even accepting the panel's reading of this provision,[10] that interpretation enabled the panel to conclude only that the Schneider provision *did not definitively rebut* the whereas clause's unilateral statement of EcoFactor's belief that the NRR royalty rate was being applied. That did not address the "analytical gap" remaining between the whereas clauses and the conclusion that the licensees had actually agreed to apply the NRR rate for the licensed patents. *Joiner*, 522 U.S. at 146. EcoFactor, as the proponent of Kennedy's testimony, had the burden of proving its reliability by a preponderance

---

[10] The panel's strained reading is difficult to reconcile with the provision's plain language.

of the evidence before it was admissible—and nothing in the panel's analysis suggested that EcoFactor had in fact carried that burden.

Second, the panel gave two pragmatic reasons for permitting the jury to hear Kennedy's testimony. The panel asserted that the jury heard "extensive cross-examination" of Kennedy on the royalty rate issue and could "decide for itself what to accept or reject." Op. 12-13. But *Daubert* itself rejects that reasoning. 509 U.S. at 596 (cross-examination is an "appropriate safeguard[] where the basis of [expert] testimony meets the standards of Rule 702"). "'The main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony.'" *Nease v. Ford Motor Co.*, 848 F.3d 219, 231 (4th Cir. 2017) (quoting *In re Zurn Pex Plumbing Prods. Liability Litig.*, 644 F.3d 604, 613 (8th Cir. 2011)). *Daubert* thus recognizes the danger that dubious, unreliable testimony may still seem credible to a jury. In other words, although juries may be adept at credibility determinations, "credibility is entirely distinct from reliability and relevancy." *Sardis*, 10 F.4th at 282. "[E]ven a thorough and extensive examination does not ensure the reliability or relevance of an expert's testimony." *Id.* (cleaned up).

The reason is simple: although cross-examination can point out flaws in an expert's reasoning or support, the expert has been qualified as an *expert* in the field, and lay jurors may well be reluctant to second-guess an expert who professes to be unconcerned by the issues identified on cross-examination. *See Nease*, 848 F.3d at

37

231.  Indeed, this case shows why cross-examination alone is insufficient.  Cross-examination could and did expose that neither Kennedy nor Habib possessed facts necessary to determine whether the **NRR** rate was actually applied to reach the lump-sum in each license.  Appx5691; Appx5694-5698; Appx5810-5812.  That lack of verifiability rendered Kennedy's opinion unreliable under Rule 702.  But the jury nonetheless could have found Kennedy *credible*—that is, the jury may have credited Kennedy's testimony that he *believed* that the **NRR** rate was applied, and the jury may have been swayed by that professed belief in light of Kennedy's expert qualification.  But the critical point for *Daubert* purposes is that even if Kennedy genuinely believed that the **NRR** rate was applied, that belief lacked a sufficient basis to constitute reliable and admissible *expert* testimony.

Relatedly, the panel expressed concern that "if the standard for admissibility is raised too high, then the trial judge no longer acts as a gatekeeper but assumes the role of the jury."  Op. 19.  Although that concern might be implicated if the trial court purported to determine whether the expert's conclusion was *correct*, it is not implicated here.  *See Burton v. E.I. du Pont de Nemours & Co.*, 994 F.3d 791, 826 (7th Cir. 2021) ("[T]he key to the gate is not the ultimate correctness of the expert's conclusions but rather the soundness and care with which the expert arrived at her opinion." (cleaned up)).  Although the question of whether the licenses used the **NRR** rate might have been for the jury, the question of whether Kennedy had a

38

sufficient basis to opine as an expert that the licenses used the ██NRR██ rate was unquestionably for the court.

### C. Kennedy's royalty-rate testimony illustrates the importance of rigorously enforcing Rule 702 in the patent-damages context.

EcoFactor's assertion of the ██NRR██ royalty rate provides a stark illustration of the importance of rigorous *Daubert* gatekeeping in ensuring that juries are assisted by reliable patent-damages testimony—rather than confused or misled by unreliable and inflated damages theories.

This Court has recognized "the great financial incentive parties have to exploit the inherent imprecision in patent valuation." *Commonwealth Scientific & Indus. Research Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015). The Court has also recognized that, given the use of comparable licenses to guide the damages inquiry, patentees may have an incentive to structure their licensing practices in a way that yields advantageous comparable licenses for future litigation. For instance, the Court has explained that *proposed* licenses are of limited probative value in the damages inquiry because "patentees could artificially inflate the royalty rate" obtained as damages for infringement "by making outrageous offers" in earlier licensing negotiations. *Whitserve*, 694 F.3d at 30.

As particularly relevant here, another method by which patentees may distort patent valuation is by taking a license involving a relatively modest lump-sum payment and attempting to translate it to a disproportionately large per-unit royalty

rate that can then be applied in litigation against other companies. *See, e.g.*, Brief of Appellants at 56-59, *Cal. Inst. of Tech. v. Broadcom Ltd.*, 20-2222 (Fed. Cir. Feb. 17, 2021), ECF 30 (expert imputing a $1.13 royalty rate from a $5 million lump-sum settlement, adjusting to a $1.40 royalty rate, then applying to a larger number of Apple sales to reach $837 million proposed damages). The Court has cautioned that "[s]ignificant differences exist between a running royalty license and a lump-sum license," such that converting from one structure to the other requires careful analysis and may not always be supportable. *Lucent*, 580 F.3d at 1325-27. Accordingly, courts must be vigilant in excluding expert testimony that does not reliably translate lump-sum payments to royalty rates. Here, the unilateral recitals of the ▮▮▮ royalty rate in EcoFactor's lump-sum licenses had no evident purpose other than influencing future litigation, given that the whereas clauses had no operative effect in the licenses themselves. There was thus no assurance that the asserted rate reflected the license parties' assessment of the actual value of the patents licensed in the agreements rather than EcoFactor's effort to inflate the royalty in later suits against other companies. And Kennedy exacerbated that problem by parroting EcoFactor's desired rate, taking it at face value rather than attempting to convert the lump-sum payments to royalty rates.

Rigorously policing EcoFactor's expert testimony on the licenses' royalty rate was therefore critical in ensuring a reliable damages analysis. Especially given the

obvious potential for a patentee to use unilateral whereas clauses to inflate subsequent damages awards, it was imperative for the court to require Kennedy to support his testimony endorsing the NRR rate with adequate verification that the rate was actually reflective of the agreement between the license parties. Permitting Kennedy to testify that the NRR rate was actually used in the licenses despite the contrary evidence, and despite his inability to verify the rate, created a substantial risk of distorting the apportionment analysis by anchoring it to a royalty rate that had nothing to do with the market value of the licensed patents.

Making matters worse, Kennedy's testimony likely had the effect of legitimizing the NRR rate for the jury, making the jurors less likely to dwell on the whereas clauses' unilateral, evidently self-serving nature. Rule 702 and *Daubert* require that expert testimony be admitted only if it will assist the jury in the determination at hand. *See* Fed. R. Evid. 702(a). But here Kennedy's testimony could only obscure the jury's assessment. That testimony never should have been admitted.

## IV. Kennedy's Proposed Royalty Rate Should Have Also Been Excluded for Not Being Reliably Apportioned.

The admission of Kennedy's proposed royalty rate from the proffered EcoFactor licenses did not comply with Rule 702 and *Daubert* for a second reason. Kennedy's bottom-line conclusion—that Google should pay EcoFactor the *same* NRR royalty purportedly derived from the licenses, regardless of which patents

were included in the hypothetical negotiation—was unreliable because it was untethered to the facts of this case and irreconcilable with this Court's apportionment precedents. Kennedy failed to account for the value of the 30+ specific additional patents and global settlements addressed by the licenses, instead asserting that Google should pay the same royalty—despite having been found to infringe only a single claim of the '327 patent—based on generic assertions that did not attempt to account for the facts of this case.

This Court has repeatedly held that similar failures render an expert's damages testimony unreliable. *Wi-LAN*, 25 F.4th at 971-72 (affirming exclusion of Kennedy's unsupported opinion that the values of portfolio licenses were largely attributable to two "key patents"); *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp.*, 879 F.3d 1332, 1350 (Fed. Cir. 2018) (holding expert testimony inadmissible for failure to apportion with "sound economic reasoning"); *Uniloc*, 632 F.3d at 1318 (holding expert testimony inadmissible for relying on "an arbitrary, general rule, unrelated to the facts of th[e] case"). The district court therefore abused its discretion by admitting Kennedy's opinion that EcoFactor was entitled to the NRR rate in this case.[11] *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 278 n.10

---

[11] The Court's *en banc* rehearing order, which states that briefing shall be limited to the admissibility of testimony of "EcoFactor's damages expert assigning a per-unit royalty rate to the three licenses in evidence in this case," ECF 76 at 2-3, is somewhat ambiguous as applied to the parties' arguments in this case. Before the panel and in its response to Google's rehearing petition, EcoFactor argued that Kennedy properly

(5th Cir. 1998) ("Under *Daubert*, 'any step that renders the analysis unreliable ... renders the expert's testimony inadmissible.'" (emphases removed)).

### A. Courts must ensure the reliable application of comparable licenses to the hypothetical negotiation.

It is well-established that comparable licenses can be used as a guide to estimate a reasonable royalty that the parties would agree to in a hypothetical negotiation. But in order to perform that analysis reliably under Rule 702, experts must "'account[] for the technological and economic differences between th[e] licenses' and a hypothetical negotiation over a single, specific patent." *Omega*, 13 F.4th at 1381; *see also Uniloc*, 632 F.3d at 1318; *Wordtech Sys., Inc v. Integrated Networks Sols., Inc.*, 609 F.3d 1308 (Fed. Cir. 2010). Even where the Court has referred to apportionment as being to some extent "built in" to a comparable license, it has treated the comparable license as a starting point rather than an endpoint, and

---

assigned the ██NRR██ royalty rate to the licenses, and that he properly testified that that rate primarily reflected the value of the '327 patent, such that no further apportionment was necessary. *See* ECF 11 at 15, 20; ECF 72 at 1, 4-6. So framed, both steps in Kennedy's analysis pertain to the licenses' use of the ██NRR██ royalty rate (*i.e.*, whether they used that rate, and what value that rate reflected in the licenses). Kennedy himself, however, appeared to frame his analysis as starting with the rate purportedly reflected in the licenses and then adjusting for differences to reach a ██NRR██ royalty for the hypothetical negotiation. Appx5767; Appx5770-5779; Appx1276-1278. For avoidance of doubt, Google addresses the reliability of Kennedy's ultimate conclusion that the ██NRR██ rate should be applied to the hypothetical negotiation, however that conclusion is characterized. Kennedy's unreliable apportionment analysis provides an independent basis under Rule 702 and *Daubert* to exclude his opinions applying his assigned royalty rate to the hypothetical negotiation.

ensured that the expert "appropriately accounted for differences between the circumstances." *Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*, 927 F.3d 1292, 1299, 1300-01 (Fed. Cir. 2019). Put another way, whether or not the "built-in" apportionment label is used, the proponent of the testimony must *always* account for differences between the proffered licenses and the hypothetical negotiation— whether at the stage of determining whether the licenses are so closely comparable that no further apportionment is necessary, or at the stage of adjusting a license's royalty for purposes of the hypothetical negotiation.[12]

The process of accounting for differences between the comparable licenses and the hypothetical negotiation often involves application of specialized economic and technical knowledge, and "necessarily involves an element of approximation

---

[12] Cases that have held apportionment to be fully "built in" to licenses such that no further adjustments were necessary are the exception, not the rule, and serve as a useful contrast. In *Commonwealth Scientific*, the parties' informal negotiations "centered on a license rate" for the same patent "'and no more.'" 809 F.3d at 1303. In *Vectura Ltd. v. GlaxoSmithKline LLC*, 981 F.3d 1030 (Fed. Cir. 2020), the defendant's own expert admitted that the license was "a very close comparable, much closer than you ever find in a patent case." *Id.* at 1040. And in *Pavo Solutions LLC v. Kingston Technology Co.*, 35 F.4th 1367 (Fed. Cir. 2022), comparability was undisputed, and the license "plainly reflected the value that the contracting parties settled on for the patent" at issue. *Id.* at 1380. This case is easily distinguishable; even Kennedy did not contend that the licenses were so overwhelmingly similar to the hypothetical negotiation that they were already apportioned to the value of the '327 patent. Rather, Kennedy proposed adjustments to purportedly account for differences in the licenses, but those generic adjustments canceled each other out, achieving the same result as fully "built-in" apportionment despite the licenses' evident differences.

and uncertainty." *Lucent*, 580 F.3d at 1325. But still, the courts must ensure that the expert's analysis, even if qualitative, is supported by "sound economic reasoning" that is "adequately tie[d] ... to the facts of th[e] case." *Exmark*, 879 F.3d at 1349-50. In the language of Rule 702 and *Daubert*, the patentee's expert testimony must reflect a "reliable *application*" of the methodology of using comparable licenses to guide apportionment, Fed. R Evid. 702(d), and the expert's proposed royalty must have a sufficiently reliable basis in the evidence in the case. *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015) ("[A] reasonable or scientifically valid methodology is nonetheless unreliable where the data used is not sufficiently tied to the facts of the case."). And "while mathematical precision is not required," an expert must provide "some explanation of both why and generally to what extent" differences in the licenses "impact[] the royalty calculation." *Whitserve*, 694 F.3d at 31-32. Otherwise, the damages award would be based on "speculati[on]." *Id*. at 32.

In addition, an expert's damages analysis must be consistent with the legal principles governing apportionment based on comparable licenses. *See VLSI*, 87 F.4th at 1345 (court abuses its discretion in admitting testimony that "depart[s] from an economically sound methodology under the legal principles governing royalty damages, overall and as applied"). Expert testimony that relies on facts that this Court has held are legally irrelevant or insufficient to support a damages award lacks

"fit" to the inquiry at hand and is therefore irrelevant and unreliable under Rule 702. *Daubert*, 509 U.S. at 591-92; *see* Fed. R. Evid. 702(a); *Raskin v. Wyatt Co.*, 125 F.3d 55, 68 (2d Cir. 1997) (expert testimony that disregarded legal framework did not make the determination at issue "more or less likely").

### B. Kennedy's superficial recitation of generic adjustments to the licenses was not reliably tied to the facts in this case.

Kennedy's conclusion that the **NRR** royalty rate should be applied in the hypothetical negotiation was based on an unreliable apportionment analysis. The proffered licenses all had glaring differences from the hypothetical negotiation, most notably that all of the licenses (i) conveyed dramatically different rights, including a license to EcoFactor's worldwide portfolio of 30+ patents, plus any future patents and applications, *see* Appx10401 ¶1.4; Appx10390 ¶1.4; Appx10412 ¶1.4; and (ii) settled active litigation in which EcoFactor had asserted different subsets of patents, *see* Appx1244-1247; Appx1275; Appx5764-5765; Appx10398; Appx10409; Appx10411. Kennedy acknowledged these differences to ostensibly adjust for the hypothetical negotiation—but he did not actually account for them using any sound economic reasoning tied to the facts of the case. His apportionment opinions therefore were not reliable under Rule 702 and *Daubert*.

1. Most significantly, Kennedy's assertion that EcoFactor was entitled to the **NRR** rate in the hypothetical negotiation did not account for the value of numerous other patents, and was therefore untethered to the facts of this case.

Appx5767-5768; Appx1259.  The Schneider and Daikin licenses list seven patents, including the '327 patent, as ones that EcoFactor asserted against each of those entities.  Appx10398; Appx10409.  And the JCI license lists a different subset of four patents, which did *not* include the '327 patent, as ones that EcoFactor asserted against that entity.  Appx10411.  Each license also includes dozens of non-asserted patents.  Kennedy therefore needed to assess the value of the non-asserted patents and the asserted patents other than the '327 patent to determine how his royalty rate from the portfolio licenses should be adjusted.  But he did not.

a.      Kennedy testified that for portfolio licenses, "in the real world, ...  the focus is … on the asserted patents," and "the rest of the patents are thrown in usually either for nothing or very little additional value."  Appx5767-5768.   Under Kennedy's own logic, then, the six additional asserted patents in the Schneider and Daikin licenses accounted for a significant portion of those licenses' purported NRR royalty rate—value that should have been excluded from the hypothetical negotiation.   Similarly, because the JCI license did not include the '327 patent asserted against Google, under Kennedy's logic that license must have assigned little or no value to the '327 patent.  Kennedy's own assessment of the licenses indicated that the royalty rate for the hypothetical negotiation involving only the '327 patent should reflect a substantial discount from those licenses.  Underscoring that point, EcoFactor itself acknowledged that there were technological distinctions among the

patents. For instance, EcoFactor characterized the '327 patent as primarily directed to the "Demand Reduction" feature of smart thermostats (and overlapping with the "Performance Monitoring" feature), whereas some of EcoFactor's other patents in the licenses were primarily directed to the "Occupancy Detection" feature (*e.g.*, the '382 patent) and "Performance Monitoring" feature (*e.g.*, the '488 patent). *See* Appx1196; SAppx21-24; SAppx479-481; SAppx607; SAppx692-694, SAppx697-701; Appx5579-5580. Thus, even under this broad-stroke theory categorizing EcoFactor's patents by feature, there was no dispute that the '327 patent in the hypothetical negotiation covered different features than some of the licenses' other patents, including asserted patents. *See* Appx10398; Appx10409; Appx10411. Under Kennedy's analysis, then, the value of the other asserted patents should have been excluded from the hypothetical negotiation.

Yet Kennedy testified that in the hypothetical negotiation involving only the '327 patent, EcoFactor was entitled to the *very same* ▮NRR▮ royalty rate purportedly used in the licenses. Kennedy's only attempt to account for the presence of the numerous additional patents in the portfolio licenses was to state that those additional patents would "put downward pressure" on the royalty that would result from the hypothetical negotiation. Appx5771; *see* Appx1276. Kennedy did not offer any additional specificity about the extent of that "downward pressure"—other than to assert that, conveniently, the downward pressure would be equivalent to, and

thus canceled out by, the unspecific upward pressure exerted by the hypothetical negotiation's assumption that the '327 patent was valid and infringed. In other words, Kennedy's "downward pressure" opinion was not based on any analysis of the specific additional asserted and non-asserted patents in the three licenses. Kennedy did not determine the value of those patents based on the incremental improvements they covered, and then analyze how much the licenses' purported rate of ██NRR██ should be discounted. Instead, he simply asserted that there would be some vague downward pressure.

That lack of specificity rendered Kennedy's opinion unreliable in several related respects. First, Kennedy's failure to address the value of the specific additional patents is irreconcilable with this Court's apportionment precedents, which establish that apportionment is a *patent-specific* inquiry that examines the "*incremental* value that the patented invention adds to the end product." *Ericsson*, 773 F.3d at 1226. Expert testimony that "depart[s] from an economically sound methodology under the legal principles governing royalty damages, overall and as applied," is unreliable and cannot be admitted. *VLSI*, 87 F.4th at 1345.[13] Kennedy's

---

[13] To the extent that Kennedy relied on EcoFactor's own "policy" of licensing at ██NRR██ regardless of which patents were being licensed, Appx5774; Appx5671-5673, that too was legally erroneous. A patentee may not support a particular royalty rate merely by pointing to an "internal 'policy'" of always licensing patents for the same amount "without regard to comparability." *Omega*, 13 F.4th at 1379.

bottom-line opinion that the ███ royalty rate applies for any subset of EcoFactor's patents therefore was based on "pure conjecture" rather than the necessary patent-specific analysis. *Whitserve*, 694 F.3d at 30; *Omega*, 13 F.4th at 1381.[14]

Second, Kennedy's opinion was not tethered to the facts of the case—that is, it did not represent a reasonable application of the comparable-license methodology to the evidence. Fed. R. Evid. 702(d). At a high level, translating a portfolio license's royalty to a hypothetical negotiation involving one or a few patents will generally require *some* sort of downward adjustment. Even Kennedy agreed on that point. But because Kennedy failed to assess the value of the specific additional patents, his "downward pressure" testimony reduced to a generic proposition that would be true in every case involving a portfolio license. That notion of generic downward pressure—which can be asserted in any case regardless of the facts—is no better than the "25% of profits" rule of thumb that this Court held was unreliable in *Uniloc*. 632 F.3d at 1313.

Finally, Kennedy's "downward pressure" opinion did not assist the factfinder in determining the appropriate discount in the hypothetical negotiation. Without any

---

[14] Kennedy's vague testimony about directional "downward" and "upward" pressures was also an improperly "superficial recitation" of upward and downward pressures. *Whitserve*, 694 F.3d at 31. In *Whitserve*, the patentee's expert opined about *Georgia-Pacific* factors' upward, downward, or neutral impacts on the royalty, but improperly failed to "explain how much each factor affected the rate." *Id*. So too here.

explanation of the extent or basis of the discount, beyond the apples-to-oranges assertion that the portfolio-related "downward pressure" equated to the assumed-validity-and-infringement "upward pressure," Kennedy provided the factfinder with no way to assess his view of how much the Google royalty ought to be discounted from the licenses. That conveniently made it more likely that the jury would throw up its hands, accept Kennedy's handwaving assertion that the downward and upward pressures were in equipoise, and simply award EcoFactor the ██NRR██ rate. Indeed, it was impossible for the factfinder even to determine whether the extent of the "downward pressure" had any relation whatsoever to the value of the licenses' additional asserted and non-asserted patents. As a result, Kennedy's opinion did not assist the jury to determine the relevant fact in issue—the appropriate discount. Fed. R. Evid. 702(a).

b.      This Court has held that a district court abused its discretion upholding a verdict based on analogous testimony from Kennedy. *Wi-LAN*, 25 F.4th at 973. In *Wi-LAN*, Kennedy similarly testified that the royalty rate of a portfolio license was attributable to a few "key patents," with the rest of the portfolio thrown in for a 5-35% increase in the royalty rate. *Id*. at 972. Kennedy opined that the two patents that would be the subject of the hypothetical negotiation were the "key patents" in three portfolio licenses—and thus no further apportionment was necessary. In one of the licenses (the Vertu license), one of the hypothetical-negotiation patents was

listed as an "Asserted Patent," but—similar to the Daikin and Schneider licenses here, which list six asserted patents besides the '327 patent—there were five other asserted patents not implicated in the hypothetical negotiation. The Court held that Kennedy's use of the Vertu license was unreliable because he failed to address the extent to which other patents listed as Asserted Patents contributed to the license's royalty rate. *Id.* at 972-73. As the Court put it, "Mr. Kennedy's silence on ... equally situated patents is troubling and makes his opinion unreliable." *Id.* at 973-74. In addition, although Kennedy opined that the absence of the other asserted patents and the non-asserted patents from the hypothetical negotiation would have resulted in a 25% discount in the hypothetical negotiation, he failed to explain why the exclusion of so many patents would net such a small discount.[15] *Id.*

Kennedy's opinion here suffers from similar fatal flaws: he did not account for the specific "equally situated" asserted patents or the non-asserted patents included in the licenses, and he provided no evidence-based justification for his "downward pressure" testimony. Indeed, because Kennedy failed to account for the other licensed patents besides the '327 patent (or even the '327 and '382 patents asserted at trial), and because his adjustments were entirely generic, his testimony

---

[15] The panel distinguished *Wi-LAN* on the ground that there, the hypothetical negotiation patents were not listed as Asserted Patents in any of the licenses, Op. 18, but that was mistaken. *See Wi-LAN*, 25 F.4th at 973.

boiled down to a clearly invalid and unsupported proposition: that regardless of what patents were the key patents in each license and regardless of how many other patents were included, the royalty rate should always be the same—NRR.[16]

2. Kennedy's apportionment analysis was divorced from the facts of this case for an additional reason: he failed to properly account for the fact that the licenses were settlement licenses. Kennedy stated that the settlement context of the licenses justified an unspecified *upward* adjustment because the parties to a settlement would not know whether the patents involved were valid or infringed, while the parties to the hypothetical negotiation would assume validity and infringement. Appx5765; Appx5780. But Kennedy did not consider whether that effect might be (at minimum) offset by each licensee's willingness to pay to avoid

---

[16] The reliability of Kennedy's one-size-fits-all royalty testimony is further undermined by EcoFactor's position in other lawsuits against Google, where it is pursuing additional damages for infringement of other subsets of its patents, even though the entire value of EcoFactor's portfolio is supposedly captured already by damages for the '327 patent alone. *See, e.g.*, Complaint, *EcoFactor, Inc. v. Google, LLC*, 5:22-cv-07661 (N.D. Cal. Jan. 10, 2022); Complaint, *EcoFactor, Inc. v. Google, LLC*, 4:24-cv-00175 (N.D. Cal. Jan. 9, 2024); Counterclaims, *Google, LLC v. EcoFactor, Inc.*, 4:21-cv-03220, No. 17 (N.D. Cal. July 13, 2021). As a practical matter, permitting such testimony on a one-size-fits-all royalty without rigorous gatekeeping encourages patentees to (i) take a scattershot approach in asserting numerous patents per case, on the theory that they need only prevail on one to obtain their full damages ask, and also (ii) pursue piecemeal litigation to demand more than the combined value of their portfolio. These tactics present problems akin to royalty stacking, where royalties that are set too high for specific features of the same accused product "will 'stack' on top of each other and may become excessive in the aggregate." *Ericsson*, 773 F.3d at 1209.

the costs of litigation. This Court has recognized that "'license fees negotiated in the face of a threat of high litigation costs may be strongly influenced by a desire to avoid full litigation,'" thereby "skew[ing] the results of the hypothetical negotiation." *ResQNet.com*, 594 F.3d at 872 (quoting *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078-79 (Fed. Cir. 1983)); *Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1370 (Fed. Cir. 2017) ("[T]he litigation costs still to come at the time of settlement may loom large in parties' decisions to settle."). Kennedy also did not reliably consider how the relative size or exposure risk of the licensees or the stage of litigation at which each one settled would impact the amount they were willing to pay as compared to Google at the hypothetical negotiation. Those considerations could influence whether the license parties might agree to a higher payment than in the hypothetical negotiation. Because Kennedy ignored this Court's instruction that the settlement context can *inflate* the agreed-upon royalty, Kennedy's categorical assertion that the settlement context of the licenses would warrant an upward adjustment was untethered to the facts of this case. *Wi-LAN*, 25 F.4th at 973.

    **C.**    **The district court abused its discretion in denying a new trial based on the admission of Kennedy's testimony applying the ▮▮▮ rate to Google, and the panel erred in affirming.**

    1.    For the reasons discussed above, Kennedy's conclusion that Google and EcoFactor would have agreed to the ▮▮▮ rate in the hypothetical negotiation

did not represent a "reliable application" of the comparable-license methodology to the facts of this case. Fed. R. Evid. 702(c), (d); *VLSI*, 87 F.4th at 1345. The district court therefore abused its discretion in admitting the testimony and in denying a new trial.

It is impossible to conclude that the error "could not have changed the result," *VLSI*, 87 F.4th at 1348, given that Kennedy's opinion provided the sole affirmative basis for EcoFactor's assertion that it was entitled to a ██NRR██-per-unit royalty from Google, *see* pp. 33-34, *supra*; and Kennedy's testimony anchored the jury's analysis in a "fundamentally flawed" starting point, *Uniloc*, 632 F.3d at 1317; *see* p. 22, *supra*.

2. The panel's reasons for affirming the testimony's admission were also mistaken. The panel stated that Kennedy had "sufficiently account[ed]" for differences in the three licenses and the hypothetical negotiation, and that "if there were any failures to control for certain variables in comparability, these factual issues were for the jury to decide." Op. 18 (citing *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012)). The Court has sometimes opined that the "degree of comparability" of licenses is "[a] factual issue[] best addressed by cross examination and not by exclusion." *ActiveVideo*, 694 F.3d at 1333. At best, as Judge Prost's dissent pointed out, such decisions are distinguishable because they "presuppose[] that 'the methodology is sound' and that

'the evidence relied upon [is] sufficiently related to the case at hand.'"  Dissent 9 (quoting *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011)).  At worst, such decisions illustrate why Rule 702 was recently amended: courts were too often misapplying *Daubert* by allowing expert testimony on the basis that it is subject to cross-examination.

This case is an example of the latter.  The problem with Kennedy's apportionment testimony is not that he reached the wrong result or should have weighed his considerations differently.  The problem is that he failed to tie the primary points of his analysis to the facts of the case.  Even if "degree of comparability" is ultimately a factual issue, an expert may not testify to comparability based on generic assertions that are not tied to the specific patents in the licenses—and may not purport to account for differences in the licenses without actually engaging with the specific patents-at-issue and other relevant aspects of the licenses.  That failure to tether expert conclusions to evidence is precisely what this Court held was unreliable in *Wi-LAN* and *Uniloc*.  *Wi-LAN*, 25 F.4th at 973 (Kennedy's opinions about which patents were "key" to portfolio licenses were "untethered to the facts of th[e] case"); *Uniloc*, 632 F.3d at 1316 ("The bottom line of *Kumho Tire* and *Joiner* is that one major determinant of whether an expert should be excluded under *Daubert* is whether he has justified the application of a general theory to the facts of the case.").

Finally, the panel suggested that even apart from Kennedy's analysis of the licenses, he "separately grounded his apportionment opinion" on Google survey data. Op. 17. But Kennedy used that data only to provide a check on his use of the **NRR** royalty rate for the hypothetical negotiation—not as an independent basis on which to adopt that rate. Appx1277. Kennedy reviewed a 2019 survey of prospective customers—specifically, individuals who did not own Nest thermostats—that polled the importance of seven broad attributes. Appx5757; Appx6430. He then added together the percent importance for certain of the attributes (*e.g.*, "survey response") that were purportedly relevant to the technology accused at trial, and applied the summed percentage against his theory of Nest's profits to determine that dollar amount of Nest's profits were related to those broad attributes. Appx5757; Appx10295. Kennedy did not explain how this profits analysis supported any particular royalty rate, although the implication is that because a **NRR** rate leaves Google with some profits, it must be reasonable. Kennedy's survey opinion therefore cannot be viewed as an independent ground supporting the **NRR** royalty rate—or any rate. Given that the **NRR** rate was itself unreliable, that it would leave Google with some profits does not legitimize it. *See Whitserve*, 694 F.3d at 32-33.

Moreover, Kennedy's survey reasoning itself has obvious flaws that render it just as insubstantial and unreliable as his primary opinions. In particular, there was

no evidence reliably tying the survey's generalized categories to the incremental improvements claimed in the '327 patent (or '382 patent) specifically. The coarse survey results do not reveal the importance of the seven polled attributes to a product with dozens or hundreds of features, and there are any number of ways to achieve those broad attributes besides the specific invention claimed in the '327 patent. *See Cyntec Co. v. Chilisin Elecs. Corp.*, 84 F.4th 979, 990 (Fed. Cir. 2023) (declining to accept expert's purported corroboration when the corroboration itself was flawed).

*     *     *

The district court clearly abused its discretion in failing to exclude Kennedy's proposed royalty rate, both because it was not reliably extracted from prior licenses and because it was not reliably apportioned for the incremental value of the asserted patents. This Court should take this opportunity to clarify that courts must fulfill their gatekeeping duties under Rule 702 and *Daubert* by holding the proponent of expert damages testimony to its burden of demonstrating that it is more likely than not that the testimony is reliable in all the respects that the law requires.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should hold that the district court abused its discretion in admitting Kennedy's damages testimony and in denying a new trial on damages based on the inadmissibility of that testimony; vacate the district court's denial of a new trial on damages; and remand for a new trial on damages.

Respectfully submitted,

DATED: November 12, 2024          MUNGER, TOLLES & OLSON LLP

                                   */s/ Ginger D. Anders*

VINCENT Y. LING                    GINGER D. ANDERS
MUNGER, TOLLES & OLSON LLP         MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue                601 Massachusetts Avenue NW
  50th Floor                         Suite 500E
Los Angeles, CA 90071              Washington, DC 20001
Telephone: (213) 683-9573          Telephone: (202) 220-1100
Email: vincent.ling@mto.com        Email: ginger.anders@mto.com

EVAN MANN                          ROBERT A. VAN NEST
MUNGER, TOLLES & OLSON LLP         LEO L. LAM
560 Mission Street                 EUGENE M. PAIGE
  27th Floor                       R. ADAM LAURIDSEN
San Francisco, CA 94105            KRISTIN E. HUCEK
Telephone: (415) 512-4000          STEPHANIE J. GOLDBERG
Email: evan.mann@mto.com           KEKER, VAN NEST & PETERS LLP
                                   633 Battery Street
                                   San Francisco, CA 94111
                                   Telephone: (415) 391-5400
                                   Email: rvannest@keker.com

*Counsel for Defendant-Appellant Google LLC*

## CERTIFICATE OF COMPLIANCE AND CONFIDENTIAL MATERIAL

1.      This brief complies with the type-volume limitation of Federal Circuit Rule 32(b)(1), because it contains 13,983 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

3.      This brief complies with the requirements of Federal Circuit Rule 25.1(d)(1) because it contains 8 unique words or numbers marked confidential.

DATED: November 12, 2024          MUNGER, TOLLES & OLSON LLP

By:  */s/ Ginger D. Anders*
          Ginger D. Anders
          *Counsel for Google LLC*

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system on November 12, 2024.

I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

DATED: November 12, 2024        MUNGER, TOLLES & OLSON LLP

                                By:  */s/ Ginger D. Anders*
                                     Ginger D. Anders
                                     *Counsel for Google LLC*