# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

ECOFACTOR, INC.,

*Plaintiff-Appellee,*

*v.*

GOOGLE LLC,

*Defendant-Appellant.*

On Appeal from the United States District Court for the Western District of Texas,
No. 6:20-cv-00075-ADA, Judge Alan D. Albright

## BRIEF FOR *AMICUS CURIAE* APPLE INC. IN SUPPORT OF DEFENDANT-APPELLANT GOOGLE LLC

ARTHUR W. COVIELLO
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
(650) 858-6000

WILLIAM F. LEE
LAUREN B. FLETCHER
HARRY HANSON
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

*Attorneys for Amicus Curiae*
*Apple Inc.*

November 26, 2024

# CERTIFICATE OF INTEREST

Counsel for amicus curiae Apple Inc. certifies the following:

**1.     Represented Entities**.  Fed. Cir. R. 47.4(a)(1).  Provide the full names of all entities represented by undersigned counsel in this case.

Apple Inc.

**2.     Real Party in Interest**.  Fed. Cir. R. 47.4(a)(2).  Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

None.

**3.     Parent Corporations and Stockholders**.   Fed. Cir. R. 47.4(a)(3).  Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

None.

**4.     Legal Representatives**.  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

None.

**5.    Related Cases**.  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below)    ☐ No    ☒ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  Please do not duplicate information.  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6.    Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

None.

Dated:  November 26, 2024

/s/ William F. Lee
WILLIAM F. LEE
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF AUTHORITIES ...................................................................v

INTEREST OF *AMICUS CURIAE*........................................................1

INTRODUCTION ..................................................................................1

ARGUMENT .........................................................................................5

I.    APPORTIONMENT OF PATENT DAMAGES IS MORE IMPORTANT THAN EVER.................................................................5

II.   "COMPARABLE LICENSE" DAMAGES THEORIES MUST SATISFY THE APPORTIONMENT REQUIREMENT AND BEAR RESEMBLANCE TO REAL-WORLD LICENSING NEGOTIATIONS................................................11

      A.    Careful Apportionment Is Critical Because Real-World Licensing Negotiations Typically Cover Far More Than An Individual Licensed Patent. .............................................12

      B.    Experts Must Apply Reliable Methods That Align With The Real World When Converting Between Lump-Sum And Running-Royalty Structures. .......................................16

            1.    In the real world, lump-sum and running-royalty license structures reflect significant differences........................17

            2.    In litigation, comparable license analyses must—but often do not—account for the differences in real-world licensing structures.................................19

III.  UNRELIABLE DAMAGES THEORIES THAT RELY SOLELY ON UNCORROBORATED EVIDENCE SHOULD BE SHIELDED FROM THE JURY. ..........................................................................22

IV.   ROBUST ENFORCEMENT OF *DAUBERT* IS NEEDED FOR PATENT DAMAGES OPINIONS. .......................................................28

CONCLUSION ...................................................................................................31

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Apple Inc. v. Wi-LAN Inc.,*
  25 F.4th 960 (Fed. Cir. 2022) ....................................................................*passim*

*California Institute of Technology v. Broadcom Corp.,*
  25 F.4th 976 (Fed. Cir. 2022) ....................................................................10, 30

*Certain Underwriters at Lloyd's, London v. Axon Pressure Products Inc.,*
  951 F.3d 248 (5th Cir. 2020) ................................................................31

*Commonwealth Scientific & Industrial Research Organisation v.*
  *Cisco Systems, Inc.,*
  809 F.3d 1295 (Fed. Cir. 2015) ..........................................................30

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
  509 U.S. 579 (1993)..................................................................................28

*Dobson v. Hartford Carpet Co.,*
  114 U.S. 439 (1885)....................................................................................2

*Ericsson, Inc. v. D-Link Systems, Inc.,*
  773 F.3d 1201 (Fed. Cir. 2014) ..............................................................6, 9, 12

*Finalrod IP, LLC v. John Crane, Inc.,*
  838 F. App'x 562 (Fed. Cir. 2021) ....................................................31

*Garretson v. Clark,*
  111 U.S. 120 (1884)..................................................................................6, 7

*LaserDynamics, Inc. v. Quanta Computer, Inc.,*
  694 F.3d 51 (Fed. Cir. 2012) ................................................................8

*Lucent Technologies, Inc. v. Gateway, Inc.,*
  580 F.3d 1301 (Fed. Cir. 2009) ..........................................................16, 17, 18

*MLC Intellectual Property, LLC v. Micron Technology, Inc.,*
  10 F.4th 1358 (Fed. Cir. 2021) ..........................................................20, 27

*Multimedia Patent Trust v. Apple Inc.*,
  No. 10-CV-2618-H, 2012 WL 5873711 (S.D. Cal. Nov. 20, 2012) .................25

*Nease v. Ford Motor Co.*,
  848 F.3d 219 (4th Cir. 2017) ...............................................................29

*Omega Patents, LLC v. CalAmp Corp.*,
  13 F.4th 1361 (Fed. Cir. 2021) .....................................................15, 27

*Pfaff v. Wells Electronics, Inc.*,
  525 U.S. 55 (1998)..............................................................................5

*Provisur Technologies, Inc. v. Weber, Inc.*,
  119 F.4th 948 (Fed. Cir. 2024) ........................................................14

*ResQNet.com, Inc. v. Lansa, Inc.*,
  594 F.3d 860 (Fed. Cir. 2010) ...............................................9, 11, 16

*Seymour v. Osborne*,
  78 U.S. (11 Wall.) 516 (1871) .............................................................5

*Smartflash LLC v. Apple Inc.*,
  No. 6:13-cv-447-JRG, 2015 WL 5840237 (E.D. Tex. Sept. 2, 2015)...............10

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011) .........................................................15

*VirnetX, Inc. v. Cisco Systems, Inc.*,
  767 F.3d 1308 (Fed. Cir. 2014) .................................................7, 9, 25

*Weisgram v. Marley Co.*,
  528 U.S. 440 (2000)...........................................................................28

*Whitserve, LLC v. Computer Packages, Inc.*,
  694 F.3d 10 (Fed. Cir. 2012) .......................................................20, 27

*Wordtech Systems, Inc. v. Integrated Networks Solutions, Inc.*,
  609 F.3d 1308 (Fed. Cir. 2010) ....................................................11, 15

## STATUTES AND RULES

35 U.S.C. § 284 ..................................................................................6

Fed. R. App. P. 29(a)(4)(E) ..............................................................1

Fed. R. Evid. 702 ................................................................27, 30, 31

## DOCKETED CASES

*Apple Inc. v. Wi-LAN Inc.*,
   No. 2020-2011 (Fed. Cir.) ...............................................21, 24, 29

*California Institute of Technology v. Broadcom Limited*,
   No. 2020-2222 (Fed. Cir.) ............................................................20

*VirnetX Inc. v. Apple Inc.*,
   No. 2021-1672 (Fed. Cir.) .......................................................21, 24

*VirnetX, Inc. v. Cisco Systems, Inc.*,
   No. 2013-1489 (Fed. Cir.) ............................................................25

## OTHER AUTHORITIES

Apple Inc., *A Statement on FRAND Licensing of SEPs*,
   https://www.apple.com/legal/intellectual-property/frand/ ................14

Bernstein, David E. & Eric G. Lasker, *Defending* Daubert, 57 Wm. &
   Mary L. Rev. 1 (2015) ...................................................................31

Cauley, Richard, *Winning the Patent Damages Case* (2009)..................18

Chao, Bernard, *The Case for Contribution in Patent Law*, 80 U. Cin.
   L. Rev. 97 (2011) ............................................................................8

Graham, Stuart, et al., *Final Report of the Berkeley Center for Law &
   Technology Patent Damages Workshop*, 25 Tex. Intell. Prop. L.J.
   115 (2017) .....................................................................................14

Federal Trade Commission, *The Evolving IP Marketplace* (2011) ...........5

Hovenkamp, Erik & Jonathan Masur, *How Patent Damages Skew
   Licensing Markets*, 36 Rev. Litig. 379 (2017)...................................26

Jarosz, John C. & Michael J. Chapman, *The Hypothetical Negotiation and Reasonable Royalty Damages*, 16 Stan. Tech. L. Rev. 769 (2013)................................................................................7

Keele, Layne S., *Res'Q'ing Patent Infringement Damages After ResQnet*, 20 Tex. Intell. Prop. L.J. 181 (2012)....................................23

Kidder, Douglas, et al., *Lump Sums, Running Royalties and Real Options*, 50 Les Nouvelles 217 (2015)........................................16, 18

Lee, William F. & A. Douglas Melamed, *Breaking the Vicious Cycle of Patent Damages*, 101 Cornell L. Rev. 385 (2016).........................................23

Lee, William F. & Mark A. Lemley, *The Broken Balance: How "Built-In Apportionment" and the Failure to Apply* Daubert *Have Distorted Patent Infringement Damages*, 37 Harv. J. Law & Tech. 255 (2024)................................................................................*passim*

Lemley, Mark A., *Software Patents and the Return of Functional Claiming*, 2013 Wis. L. Rev. 905 (2013)............................................9

Lemley, Mark A., *The Surprising Resilience of the Patent System*, 95 Tex. L. Rev. 1 (2016)........................................................ 9-10

Love, Brian J. & Christian Helmers, *Are Non-Practising Entities Opportunistic?*, Oxford Economic Papers (2024), https://doi.org/10.1093/oep/gpae026 ................................................8

Masur, Jonathan, *The Use and Misuse of Patent Licenses*, 110 Nw. U. L. Rev. 115 (2015)................................................................27

Reinecke, Jason D., *Does Patent Law Allow Plaintiffs Too Many Bites at the Apple?*, 99 J. Pat. & Trademark Off. Soc'y 360 (2017)..........................28

Seaman, Christopher B., *Reconsidering the* Georgia-Pacific *Standard for Reasonable Royalty Patent Damages*, 5 BYU L. Rev. 1661 (2010).................29

Siegel, Emily R., *Fortress' Billions Quietly Power America's Biggest Legal Fights* (Oct. 16, 2024), https://news.bloomberglaw.com/ business-and-practice/fortress-billions-quietly-power-americas-biggest-legal-fights ................................................................6

Snyder, Jesse D.H., *Arriving at Simplicity Amid Increasing Complexity*, 31 Santa Clara High Tech. L.J. 583 (2015)..............................17, 18

Storm, Christopher S., *Measuring the Inventor's Contribution*, 21 U.N.H. L. Rev. 167 (2022) ............................................................10, 12, 26, 29

Wilson, Kelce S., *The Four Classes of Patent Licensing*, 54 Les Nouvelles 27 (2019)...............................................................................................9

Zeng, Bo, Lucent v. Gateway*: Putting the "Reasonable" Back into Reasonable Royalties*, 26 Berkeley Tech. L.J. 329 (2011) ................................30

## INTEREST OF *AMICUS CURIAE*[1]

Apple is a leading U.S. technology innovator that has revolutionized computing and mobile communications through category-defining products like iPhone, iPad, MacBook, and Apple Watch. Apple invests significantly in research and development, owns tens of thousands of patents, and has extensive real-world experience negotiating patent license agreements as both licensor and licensee. As a significant participant in the U.S. IP ecosystem, Apple has a robust interest in ensuring that patent damages experts present reliable testimony that resembles real-world licensing practices and focus their opinions on a patented technology's actual footprint in an accused device.

## INTRODUCTION

U.S. patent damages are askew. As Apple has seen, damages demands in the United States now routinely exceed hundreds of millions or even billions of dollars. Indeed, juries have been enticed to award more than a billion dollars as a "reasonable royalty" for infringement of a single patent, covering a single feature, in a product having thousands of features. These excessive demands and awards are by no means "reasonable" and run counter to the patent system's purpose of promoting innovation.

---

[1] This brief is filed pursuant to ECF 76. No party's counsel authored this brief in whole or part, and nobody other than Apple and its counsel funded this brief. Fed. R. App. P. 29(a)(4)(E).

The principle of apportionment—the "true rule" of patent damages—is designed to ensure that damages are appropriately balanced. *Dobson v. Hartford Carpet Co.*, 114 U.S. 439, 445 (1885). Proper enforcement of apportionment, particularly as products increase in complexity, is essential to ensuring that damages reflect only the value of the patented invention. But real-world patent licenses often value far more than just that. For example, in determining the appropriate lump-sum amount for a real-world license, Apple routinely considers factors other than just the value of an *individual* patent covered by the license, such as the number and merits of *other* licensed patents, the value of patent "peace" and freedom to operate, and/or other conveyed benefits. In litigation, however, patentees and their experts are increasingly allowed to ignore these other benefits and present unreliable damages theories—including unreliable "comparable license" opinions—that bear little resemblance to real-world licensing, sidestep apportionment, and vastly overstate the asserted patent's value.

Apple has also encountered damages experts who turn small lump-sum payments from prior license agreements into exorbitant running-royalty damages demands without any basis for doing so. From its own extensive patent licensing experience, Apple knows that—in the real world—lump-sum and running-royalty payment structures reflect different business imperatives and are not interchangeable. For example, where the licensee is a company with

straightforward, low-volume products, parties may agree on a reasonable per-unit royalty knowing that the total amount will be limited due to the small number of licensed products sold.  But where the licensee sells multi-feature, expanded-volume products, parties customarily negotiate lump-sum licenses because they provide predictability and certainty and are much easier to administer.  Yet, too often, patentees' damages experts fail to account for the significant differences inherent in different royalty structures, resulting in unreliable opinions that systematically overvalue patented technology.

Apple has also seen how some patentees—like EcoFactor in this case—manufacture "evidence" to try to justify their extreme damages demands.  One frequent tactic is for patentees to enter small-dollar license agreements with small industry players for the sole purpose of creating "comparable" licenses they can use to manufacture huge damages demands against medium and large players in litigation.  Another tactic is for patentees to have their executives provide uncorroborated, unreliable testimony concerning purported "licensing practices" that are, in reality, invented or created specifically for litigation.  The patentees' damages experts then rely on this manufactured evidence as purported support for their unreliable opinions.

*Daubert* was designed to guard against these types of problems.  But all too often, as Apple has seen, trial courts are reluctant to exclude unreliable damages

opinions in patent cases. When they do provide a reason for denying *Daubert*, they often state (incorrectly) that challenges to unreliable damages theories go to weight rather than admissibility. Without proper enforcement of *Daubert*, juries are routinely asked to evaluate unreliable, unapportioned, and prejudicial damages theories, resulting in inflated damages awards.

EcoFactor's damages case suffers from each of these flaws. Its expert was permitted to introduce a reasonable-royalty damages opinion that violated this Court's apportionment rules, failed to account for the substantial differences between lump-sum and running-royalty agreements, and relied upon uncorroborated "evidence" manufactured by the patentee. To ensure judicial efficiency and integrity, the jury should have been shielded from these unreliable opinions.

This Court's intervention is needed not only to correct what happened in this case but also to establish guidelines to help ensure that patent damages awards are based on reliable expert opinions that comply with the apportionment requirement and value only the patented technology. Apple therefore urges the Court to: (1) make clear that damages experts who rely on comparable licenses must consider the realities of real-world licensing negotiations and meaningfully account for the differences between the comparable licenses and their view of the hypothetical negotiation, including the differences inherent in lump-sum versus running-royalty payment structures, in their apportionment analyses; (2) require the exclusion of

unreliable damages theories that rely solely on uncorroborated, made-for-litigation evidence; and (3) require district courts to engage with experts' damages opinions at the *Daubert* stage to weed out unreliable damages theories before they reach the jury.

## ARGUMENT

## I. APPORTIONMENT OF PATENT DAMAGES IS MORE IMPORTANT THAN EVER.

Patents are intended to encourage innovation: in exchange for disclosing their inventive ideas to the public, inventors obtain a period of exclusivity for making, using, selling, and licensing their inventions. *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 63 (1998). This carefully-crafted bargain serves "to promote the progress of science and the useful arts" and compensate "inventors for their labor, toil, and expense in making the inventions and reducing the[m] to practice for the public benefit[.]" *Seymour v. Osborne*, 78 U.S. (11 Wall.) 516, 533-534 (1871).

But if patentees are allowed to recover damages that exceed the value of their patented inventions, innovation suffers. Fed. Trade Comm'n, *The Evolving IP Marketplace* 148 (2011) ("Overcompensation raises costs to other innovators … and can deter innovation."). Companies will be "disincentivize[d]" from creating and selling new products, or updating current products, if they can be sued and forced to pay for technology the patentee did not actually invent. Lee & Lemley, *The Broken Balance: How "Built-In Apportionment" and the Failure to Apply* Daubert *Have*

*Distorted Patent Infringement Damages*, 37 Harv. J. Law & Tech. 255, 266-272 (2024).  This problem has been exacerbated recently by private equity firms and hedge funds that finance patent litigation with extreme damages claims in hopes of generating profits for their investors.  *E.g.*, Siegel, *Fortress' Billions Quietly Power America's Biggest Legal Fights* (Oct. 16, 2024), https://news.bloomberglaw.com/business-and-practice/fortress-billions-quietly-power-americas-biggest-legal-fights.

In the 1800s, the Supreme Court developed the principle of "apportionment" to ensure that the patent system works as intended.  *Garretson v. Clark*, 111 U.S. 120, 121 (1884).  Apportionment requires that patent damages reflect the true value of the patentee's invention, "and no more."  *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226, 1233 (Fed. Cir. 2014).  Apportionment is also reflected in the Patent Act, which requires damages to be tied to "the invention," and not to other technology and features the patentee did not invent.  35 U.S.C. § 284 (damages shall be "adequate to compensate *for the infringement*, but in no event less than a reasonable royalty for the use made *of the invention*").[2]

Apportionment is required "in every case," regardless of the methodology used to calculate damages.  *Garretson*, 111 U.S. at 121.  This includes theories based

---

[2] Emphases are added unless otherwise noted.

on "comparable licenses," where the patentee must "account for" differences between prior licenses and the hypothetical negotiation so that the proposed royalty reflects only the patented technology, without capturing other value included in the comparable agreements. *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 971 (Fed. Cir. 2022). Apportionment likewise applies to any other proposed damages theory, including those that start from the "smallest saleable unit," which places limits on the royalty base in order to cabin damages to the accused technology. *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014).[3] In all cases, patentees must present apportionment evidence that is "reliable and tangible." *Garretson*, 111 U.S. at 121.

While "deeply rooted," apportionment has become more important as products have become more sophisticated. Jarosz & Chapman, *The Hypothetical Negotiation and Reasonable Royalty Damages*, 16 Stan. Tech. L. Rev. 769, 815 n.215 (2013). Early on, apportionment often involved analyzing simple products, such as separating the value of a mechanism for securing a mop-head from the value of the rest of the mop. *E.g.*, *Garretson*, 111 U.S. at 121. The landscape today is

---

[3] In appropriate cases, starting with the smallest saleable unit and apportioning from there "produce[s] a royalty base much more closely tied to the claimed invention than the entire market value of the accused products." *VirnetX*, 767 F.3d at 1327. The smallest saleable unit framework also, when applied appropriately, "helps protect against arbitrariness or error in the jury's selection of a royalty base." Lee & Lemley, *supra*, at 326-327.

considerably more complex. Technology advances allow companies to continually integrate more functionality into a single device to benefit consumers. Take, for instance, Apple's products. Apple's original iPod played music, and subsequent generations added features like cameras and Wi-Fi. Similarly, iPhone was a revolutionary product with many complex features in the iPod alongside many other phone and internet technologies—and subsequently hundreds of features were added, including Siri, Touch ID, Face ID, and Apple Pay. Apple's iPad and Apple Watch have enjoyed similar feature expansion. For each increasingly sophisticated product, apportionment becomes more vital to prevent patent damages from appropriating the value of the product's many non-accused features. *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) ("Where small elements of multi-component products are accused of infringement, calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components[.]").[4]

---

[4] "[O]pportunistic" patentees often sue the manufacturer of the multi-component end-user product (e.g., the smartphone), rather than the maker of the smallest saleable unit (e.g., a processor in the smartphone). Love & Helmers, *Are Non-Practising Entities Opportunistic?*, Oxford Economic Papers 6 (2024), https://doi.org/10.1093/oep/gpae026; *see* Chao, *The Case for Contribution in Patent Law*, 80 U. Cin. L. Rev. 97, 115 (2011) ("Typically, patentees will sue the multi-component product manufacturer because patentees believe that they can obtain a larger award based on the higher selling price of the [end-user product].").

Further, increasingly complex products may implicate an increasing number of patents. For instance, "industry experts have estimated that 250,000 patents go into a modern smartphone." Lemley, *Software Patents and the Return of Functional Claiming*, 2013 Wis. L. Rev. 905, 929 (2013); *see* Wilson, *The Four Classes of Patent Licensing*, 54 Les Nouvelles 27 (2019). If the contribution from each patent were valued at a $0.01 per-unit royalty, the "royalty stack" ($2,500) for patent licenses alone would be greater than the price of the phone itself—an untenable result.

This Court has articulated sensible apportionment requirements designed to ensure that damages compensate only for an asserted patent's value. *E.g.*, *Ericsson*, 773 F.3d at 1226 ("[T]he ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more."); *VirnetX*, 767 F.3d at 1327-1238 ("[W]here the smallest salable unit is … a multi-component product containing several non-infringing features[,] … the patentee must do more to estimate what portion of the value of that product is attributable to the patented technology."); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) ("[A] reasonable royalty analysis requires … carefully [tying] proof of damages to the claimed invention's footprint in the market place.").

In recent years, however, there have been important shifts in courts' treatment of apportionment. Lemley, *The Surprising Resilience of the Patent System*, 95 Tex.

L. Rev. 1, 11 (2016).  For example, patentees' experts are increasingly allowed to present unreliable "comparable license" theories that merely *assume* apportionment is "built in" to prior licenses.  Lee & Lemley, *supra*, at 288-302; Storm, *Measuring the Inventor's Contribution*, 21 U.N.H. L. Rev. 167, 207 (2022) (explaining significant flaws in "built-in apportionment").  And patentees are too often able to avoid any real apportionment due to trial courts' reluctance to exclude unreliable, unapportioned damages opinions at *Daubert*.  These trends have undoubtedly contributed to a proliferation of excessive damages demands and verdicts— including many that are later vacated, wasting significant resources—a problem that Apple has faced repeatedly.  *E.g.*, *California Inst. of Tech. v. Broadcom Corp.*, 25 F.4th 976 (Fed. Cir. 2022) ($837M award, vacated); *Smartflash LLC v. Apple Inc.*, 2015 WL 5840237 (E.D. Tex. Sept. 2, 2015) ($532M award, vacated); *Wi-LAN*, 25 F.4th 960 ($145M and $85M awards, vacated).

Given the complexity of today's multi-featured technology products and patentees' inflated damages demands, careful enforcement of apportionment is more important than ever.  Without proper apportionment, a company could be forced to pay "damages" not only for its own innovations, but also for other patented technologies, prior-art technology, and other contributions (e.g., materials, manufacturing, marketing).  Such an outcome would "not support compensation for

infringement" but unfairly "punish[] beyond the reach of the statute." *ResQNet.com*, 594 F.3d at 869.

## II. "COMPARABLE LICENSE" DAMAGES THEORIES MUST SATISFY THE APPORTIONMENT REQUIREMENT AND BEAR RESEMBLANCE TO REAL-WORLD LICENSING NEGOTIATIONS.

Patentees should not be allowed, as EcoFactor was in this case, to avoid apportionment by presenting unreliable "comparable license" damages theories. Comparable licenses may help to determine a reasonable royalty, but only if experts use them reliably. *Wi-LAN*, 25 F.4th at 971-974. The "comparable license" concept is straightforward: just as one might look at the prices of comparable homes in deciding on a purchase price for a particular house, parties negotiating a patent license might look to the terms of comparable licenses before deciding what to pay to license a particular patent. So, if a prior real-world license agreement covers the same or similar patents and arose in the same or similar economic circumstances as the hypothetical negotiation, that agreement's payment terms may help to show the value of the patent(s) at issue. *Wordtech Sys., Inc. v. Integrated Networks Sols., Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010).

To be reliable, a comparable license theory must, among other things, meaningfully account for the differences between the prior licenses and the hypothetical negotiation to reach an amount that apportions value to only the asserted patent(s). And where an expert seeks to extract a running-royalty rate from

a lump-sum payment, this means accounting for the inherent substantive differences between those payment structures.

**A.**   **Careful Apportionment Is Critical Because Real-World Licensing Negotiations Typically Cover Far More Than An Individual Licensed Patent.**

Experts must meaningfully "account for" differences between comparable licenses and the license resulting from the hypothetical negotiation to ensure that damages are limited to the value of only the asserted patent(s). *Wi-LAN*, 25 F.4th at 971. Indeed, this Court has appropriately recognized that prior licenses—which may or may not have arisen from litigation—are rarely "perfectly analogous" to the license that the parties in an infringement action would have agreed to in that case's hypothetical negotiation. *Ericsson*, 773 F.3d at 1227. Whereas reasonable-royalty damages must be apportioned down to value only the asserted patent(s), that is not— in Apple's real-world experience—the only value typically negotiated into a patent license by willing licensees and licensors. *E.g.*, Storm, *supra*, at 202-204, 207 (license negotiations may be influenced by a "variety of factors" beyond asserted patent's value). These differences can be appropriately accounted for with apportionment, but underscore why it is critical that apportionment actually occur.

Perhaps it would be helpful to provide a window into how Apple typically conducts licensing negotiations. In just the last five years, Apple has closed almost 250 patent licenses with a diverse range of parties—including non-practicing

entities, start-ups, small and medium businesses, as well as actual or potential competitors—across a diverse range of technologies. Over 70% of these licenses were negotiated without pending litigation and provide license rights to, or other protections against, over one million patents and applications; the rest occurred where litigation had been filed and cover nearly 100,000 patents and applications. Each license is negotiated on a case-by-case basis, and the unique facts of the particular negotiation drive how the payment is ultimately determined.

For example, Apple may consider: the size and merits of the patent portfolio(s), the products and number and type of product features allegedly implicated by the patents, any comparable licenses,[5] the risks of litigation, the value of patent "peace" or freedom to operate, and the value of other benefits conveyed by the agreement, among other factors. For licenses involving standard-essential patents ("SEPs") where patent holders have voluntarily agreed to license on fair, reasonable, and non-discriminatory ("FRAND") terms, Apple will similarly consider in arriving at a lump sum: the merits of the SEPs, the appropriate apportioned royalty base, and the appropriate royalty rate, including the rates paid

---

[5] In appropriate circumstances, Apple may start by dividing the total amount paid for a portfolio license by the number of patents in the portfolio, giving equal weight to each licensed patent.

by others for comparable technologies.[6]  In cases involving multi-component products, considering the "smallest saleable unit" is necessary to properly apportion value as it places a practical and appropriate limit on the relevant royalty base. *Provisur Techs., Inc. v. Weber, Inc.*, 119 F.4th 948, 957 (Fed. Cir. 2024) ("For elements of multi-component products accused of infringement, the royalty base should be based on the smallest salable patent-practicing unit.").

Beyond Apple to the broader industry, patent license agreements routinely cover a bundle of intellectual property rights, often including "portfolios" of dozens or more patents, other types of intellectual property, and cross-licenses.  Graham, et al., *Final Report of the Berkeley Center for Law & Technology Patent Damages Workshop*, 25 Tex. Intell. Prop. L.J. 115, 130 (2017).  License agreements also typically involve different parties, different products, and different economic circumstances as compared to the hypothetical negotiation.  Lee & Lemley, *supra*, at 283-287.  And patent licenses are often incorporated into broader agreements that also encompass business transactions (e.g., the sale of a business or assets) or the establishment of business relationships.  Indeed, many companies obtain patent licenses under threat of litigation or through litigation settlement agreements, where

---

[6] Apple has published the core principles guiding its approach to FRAND licensing of patents essential to collaboratively developed industry standards.  *See* https://www.apple.com/legal/intellectual-property/frand/.

the company gets not *only* a license to the asserted patent(s), but also the value of patent "peace," avoiding the cost and business disruption of litigation. *Id.* at 283.

Comparable licenses can be helpful evidence in determining the proper damages amount. The key is that they must be used correctly, and the realities discussed above underscore the need for proper apportionment in litigation. *Wi-LAN*, 25 F.4th at 971; *see Wordtech*, 609 F.3d at 1320 ("[C]omparisons of past patent licenses to the infringement must account for the technological and economic differences between them." (citation omitted)). It is not enough for an expert merely to *acknowledge* the differences between a comparable license and the hypothetical license, or to say that the expert *considered* that such differences exist. *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1380-1381 (Fed. Cir. 2021).

To achieve this essential goal of apportionment, experts must provide a reliable analysis *showing* that damages stemming from the use of any prior license agreements are apportioned to the value of the patented technology, and should be precluded from offering generic *ipse dixit* testimony that apportionment is "built in" or otherwise accounted for. *Omega*, 13 F.4th at 1381 ("[G]eneric testimony simply does not 'account[] for the technological and economic differences between th[e] licenses' and a hypothetical negotiation over a single, specific patent." (citation omitted)); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011) (requiring expert to provide "basis in fact to associate the royalty rates used in prior

licenses to the particular hypothetical negotiation"); *ResQNet*, 594 F.3d at 869 (requiring "vigilance" when calculating damages by "considering past licenses to technologies other than the patent in suit" (emphasis omitted)).

B.   **Experts Must Apply Reliable Methods That Align With The Real World When Converting Between Lump-Sum And Running-Royalty Structures.**

The realities of licensing negotiations affect not only each agreement's terms, but also its payment structure.  A "lump sum" structure provides payment for unlimited use of the licensed technology.  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1326-1327 (Fed. Cir. 2009).  A "running royalty" involves payments for ongoing use of the technology, such as a percentage of apportioned revenues from licensed product sales or a per-unit amount for each licensed product sold.  *Id.*

As this Court has recognized, "[s]ignificant differences exist between a running royalty license and a lump-sum license" in the real world.  *Lucent*, 580 F.3d at 1326.  In litigation, however, patentees' experts often ignore those differences and convert from one structure to the other without any reliable basis.  Kidder, et al., *Lump Sums, Running Royalties and Real Options*, 50 Les Nouvelles 217, 217 (2015) ("[I]n patent litigation, experts and courts often miss the salient differences between running royalties and lump sum royalties and imply that it is straightforward to translate between the two.").  This Court should make clear that experts who rely on comparable licenses must "account for" any substantive differences between the

comparable agreements and the hypothetical license—including differences in payment structures—to ensure that damages are properly apportioned.

> **1. In the real world, lump-sum and running-royalty license structures reflect significant differences.**

In real-world licensing negotiations, lump-sum and running-royalty payment structures "involve[] different considerations" and are not interchangeable. *Lucent*, 580 F.3d at 1326; *see* Snyder, *Arriving at Simplicity Amid Increasing Complexity*, 31 Santa Clara High Tech. L.J. 583, 586 (2015) ("The varied payment structures carry significant and fundamental differences."). Where the licensee makes or sells straightforward, low-volume products, the parties may agree on a running royalty, as the total payment amount will be small given the small number of licensed products sold. Or such parties may prefer a running royalty because the timing and amount of royalty payments will align more closely with relevant product sales, which may be difficult for the licensee to predict in advance, particularly for smaller companies that may not ultimately succeed in the market. *Lucent*, 580 F.3d at 1326 (for running-royalty structure, "[r]oyalties are dependent on the level of sales or usage by the licensee, which the licensee can often control"). And, because sales volumes are low, the administrative burdens of monitoring ongoing licensing payments are also generally low.

By contrast, where the licensee is a medium or large company with multi-feature, expanded-volume products and services, the parties "tend to license using

lump-sums." Kidder, *supra*, at 219-220. A lump-sum structure is more predictable than a running-royalty structure, as it gives clear expectations of what both parties will get from the agreement at the outset. Cauley, *Winning the Patent Damages Case* 47 (2009). The structure is not subject to licensees' whims, such as whether to sell a product or implement a patent-covered feature. *See Lucent*, 580 F.3d at 1326. And lump-sum licenses can be more efficient: for example, licensees know the total amount they will pay up front, while licensors have certainty regarding the revenue they will receive. Licensors may also benefit from receiving an immediate payment, or guaranteed fixed-installment payments, rather than having to wait to see if product sales are realized. Snyder, *supra*, at 586-587.

Lump-sum agreements are also far easier to administer: unlike running-royalty licenses, lump-sum agreements do not require monitoring the licensee's usage of the licensed technology across evolving products. *Lucent*, 580 F.3d at 1326 (explaining that a "lump-sum license removes any risk that the licensee using the patented invention will underreport … and therefore underpay, as can occur with a running royalty agreement" and "generally avoids ongoing administrative burdens of monitoring usage of the invention"); Snyder, *supra*, at 587.[7] Tracking the royalty

---

[7] These administrative burdens can be enormous, requiring audit programs to monitor compliance related to numerous products, complex supply chains, resold and refurbished products, prototype products, sales in different jurisdictions, etc.

across different product lines, product versions, software updates, and feature sets can be complicated. And, unlike running-royalty agreements, lump-sum agreements generally do not require the parties to share internal sales data or product plans year after year.

Finally, lump-sum agreements reflect the economic reality that an individual patent's value is not unlimited. There is generally a total dollar amount beyond which a licensee would not pay more (e.g., the cost of designing-around the patent or not implementing a feature). This is yet another reason why lump sums are utilized far more often than running royalties, especially where expanded-volume, multi-feature products or services are involved.

> 2. **In litigation, comparable license analyses must—but often do not—account for the differences in real-world licensing structures.**

Given the significant differences between lump-sum and running-royalty agreements, one cannot simply be used as a proxy for the other in determining a reasonable royalty. As with any comparable license analysis, those differences must be "accounted for." *Wi-LAN*, 25 F.4th at 971.

Accordingly, when an expert relies on a lump-sum agreement to support a running-royalty damages calculation (or vice-versa), it is essential for the expert to demonstrate *why* that change in structure is appropriate, particularly considering that the parties to the comparable agreement specifically opted for a lump sum over a

running royalty (or vice-versa). The expert should likewise explain how the difference in structure—which, as discussed above, reflects substantively different business imperatives—affects the payment *amount* as well. *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 30 (Fed. Cir. 2012) ("[L]ump sum[s] … should not support running royalty rates without testimony explaining how they apply to the facts[.]"); *MLC Intell. Prop., LLC v. Micron Tech., Inc.*, 10 F.4th 1358, 1368 (Fed. Cir. 2021) (deriving running royalty from lump sum was "incompatible with the … [prior] agreement").

In Apple's litigation experience, however, this often does not happen. Patentees' experts routinely manufacture running-royalty rates from licenses not involving Apple and then apply those rates to Apple's typically larger accused-product sales, resulting in damages demands that far exceed the value of the asserted patent(s). For instance:

- In *Caltech*, the patentee's expert transformed a $5M lump-sum settlement into an $837M damages claim. He converted the lump-sum amount to a $1.13 per-unit royalty, upwardly adjusted to $1.40 per-unit (based on excluded evidence), and then multiplied by the large number of Apple sales (despite no evidence that Apple would agree to a per-unit royalty structure). No. 2020-2222, ECF 30 at 56-59.

- In *VirnetX*, the patentee's expert devised a $502M claim by converting six settlements to per-unit rates (though none were negotiated that way). He then heavily weighted the settlements with companies like Avaya and Aastra that involved low overall payments (but had imputed rates up to $2.26 per-unit), while minimizing the large-volume license with Microsoft (which had an imputed rate of $0.19 per-unit). No. 2021-1672, ECF 23 at 10-11, 38-39, 46-47.

- In *Wi-LAN*, the patentee's expert cherry-picked royalty rates to create an $85M claim: he treated Wi-LAN's $0.50 per-unit licenses with three small, niche-market companies (Unnecto, Verto, and Doro) as comparable, while ignoring Wi-LAN's lump-sum agreements with large, well-known companies (e.g., Motorola, LG). No. 2020-2011, ECF 17 at 18-23, 50, 73-75.

EcoFactor's damages expert committed similar errors. He converted three small lump-sum payments to a per-unit running royalty without demonstrating that the lump-sum payments were calculated using any royalty rate, much less the per-unit rate he applied. *See* ECF 9 ("Google Panel Principal Br.") at 16-19, 34. Further, the expert's derived per-unit royalty applied to *several* licensed patents and was not limited to the single patent infringed: he assumed apportionment was "built-in" even though the comparable licenses covered several non-asserted patents, and then did nothing to account for the impact of the other patents in EcoFactor's portfolio, other

than by referencing a generic "downward pressure" on the royalty rate (which he said was negated by some unquantified "upward pressure"). *See* ECF 10 ("EcoFactor Panel Response Br.") at 5, 15. This approach is flatly inconsistent with real-world licensing, and cannot reliably value the one patent found infringed.

Such efforts to avoid apportionment cannot be allowed. This Court should require that, if experts rely on comparable licenses to determine damages, they do the work to show how any agreements with royalty structures and terms that differ from the hypothetical license provide fair and reasonable estimates of a patented technology's value, and nothing more.

### III. UNRELIABLE DAMAGES THEORIES THAT RELY SOLELY ON UNCORROBORATED EVIDENCE SHOULD BE SHIELDED FROM THE JURY.

Patentees also should not be permitted, as EcoFactor did here, to avoid apportionment based solely on uncorroborated damages "evidence" manufactured for litigation. As Apple has observed, patentees frequently resort to manufacturing "facts" to support their experts' unreliable damages theories. This troubling trend has surfaced, in particular, in many cases where experts rely on comparable license theories.

One way that patentees (often non-practicing entities) manufacture damages evidence is by entering into patent license agreements for the sole purpose of creating licenses that they can later claim are "comparable" for calculating damages in ongoing or future litigation. For example, a patentee may sue, or threaten to sue,

a small industry player that is willing to enter into a license agreement with a high running-royalty rate because, given the small volume of product sales at issue, paying that rate results in a low amount that is less than the cost of litigation. Or a patentee may agree to a small-dollar, lump-sum settlement, but structure the terms or recitals to appear to have a high per-unit royalty applied against a small number of sales. Lee & Melamed, *Breaking the Vicious Cycle of Patent Damages*, 101 Cornell L. Rev. 385, 418 (2016) ("[K]nowing that their licenses will influence royalty awards in future litigation, [patentees] have an incentive to structure their agreements in ways that exaggerate the apparent cost of the licenses to the licensees.").

Patentees then use the artificially inflated terms from these purportedly "comparable" licenses in negotiations or litigations against medium and large industry players, where they can seek much larger total royalties or damages amounts. Keele, *Res'Q'ing Patent Infringement Damages After* ResQnet, 20 Tex. Intell. Prop. L.J. 181, 228 (2012) (recognizing "mischief" of patentees "settl[ing] for a lower dollar amount in exchange for structuring [the] settlement to reflect a high effective royalty rate that the[y] can use in pursuing other larger defendants").

These tactics have forced Apple to fend off large damages demands that avoid apportionment altogether. For instance:

- In *VirnetX*, the patentee generated five settlement agreements with companies having limited potential exposure (Aastra, Avaya, Mitel, NEC, Siemens). Those companies agreed to pay royalties calculated as unapportioned percentages of total sales revenues because, given the small sales volumes at stake, the overall royalty payments were less than the cost of litigation. In litigation against Apple, the patentee's expert then treated those settlements as "comparable licenses" with high per-unit royalty rates (up to $2.26 per-unit) to support a $502M damages claim. No. 2021-1672, ECF 23 at 10-11, 38-40, 46-47.

- In *Wi-LAN*, the patentee entered into licenses with three small, niche-market companies (Unnecto, Verto, and Doro), where the total royalties paid were below the cost of litigation. In litigation against Apple, the patentee's expert treated those settlements as "comparable licenses" with $0.50 per-unit royalty rates to support an $85M damages claim. No. 2020-2011, ECF 17 at 18-23, 50, 73-75.

Another way that patentees (again, often non-practicing entities) manufacture damages evidence is to have their employees provide uncorroborated, unreliable testimony about the patentee's alleged "licensing practices." Such testimony often lacks any supporting documentary evidence, is based entirely on license agreements manufactured solely for litigation (as discussed above), and/or fails to apply

acceptable methodologies for determining a reasonable royalty. For example, a patentee's assertion that it typically does not consider apportionment when negotiating licenses is not a reliable basis to circumvent the apportionment requirement or claim that apportionment is "built in."

Patentees' experts then rely on this manufactured evidence to support or confirm their damages opinions, as Apple has seen in litigation. For instance:

- In *Multimedia Patent Trust*, the patentee's expert created a $196M damages claim from "comparable" agreements covering U.S. and foreign patents beyond the three asserted, doing nothing to apportion out this extraneous value because he thought the patentee's self-serving "licensing practice" did not require it. 2012 WL 5873711, at *3, *7 (S.D. Cal. Nov. 20, 2012).

- In *VirnetX*, the patentee's CEO testified that VirnetX had a "policy of seeking to license its patents for at least 1–2% of the entire value of products sold," *see VirnetX*, 767 F.3d at 1325, and that he thought those rates were "fair and reasonable amount[s] to ask for." No. 2013-1489, ECF 64-2, at Appx1245-1247. The patentee's expert used that testimony to help support a $708M damages claim. *VirnetX*, 767 F.3d at 1325; No. 2013-1489, ECF 64-2, at Appx1595, Appx1613-1614.

EcoFactor employed similar tactics here. Its expert converted three lump-sum agreements to a per-unit rate that rested on EcoFactor's self-serving, unilateral

"recitals" of its "beliefs" in the prior license agreements. *See* Google Panel Principal Br. 16-19. Those recitals, however, were directly refuted by affirmative statements in two of the same agreements, and uncorroborated by any other evidence (such as sales data). *Id.* at 16-18, 32. EcoFactor's expert also relied on testimony from EcoFactor's CEO that he "believed" the licenses used the specific per-unit rate, even though he had no basis for any such understanding (e.g., he had not seen any underlying financial information). *See* EcoFactor Panel Response Br. 6-7; Google Panel Principal Br. 18-19. EcoFactor's CEO further testified—again, without corroboration, and without any showing of what *Google* would accept—that the per-unit rate was EcoFactor's baseline policy for licensing, regardless of the number of patents. *See* Google Panel Principal Br. 18, 38.

Patentees should not be allowed, as EcoFactor did here, to "game the comparable license loophole" by using manufactured, uncorroborated evidence to avoid apportionment. Lee & Lemley, *supra*, at 263-264. Such evidence does not help to reliably determine the asserted patent's value. Hovenkamp & Masur, *How Patent Damages Skew Licensing Markets*, 36 Rev. Litig. 379, 409 (2017) ("When one party has an incentive to strategically inflate or alter the terms of [a comparable] license, the license can no longer … provide accurate estimations of a patent's value."); Storm, *supra*, at 207 (describing how patentees "avoid apportioning value in future cases if they successfully forced past licensees to sign agreements that did

not appropriately apportion value"); *see Omega*, 13 F.4th at 1379 (comparable license analysis using baseline royalty-rate "policy" unreliable).

Moreover, "evidence" manufactured by a patentee for the sole purpose of supporting its unapportioned litigation demand does not reflect a royalty that *both* the licensor and licensee would willingly agree to in the hypothetical negotiation. Masur, *The Use and Misuse of Patent Licenses*, 110 Nw. U. L. Rev. 115, 138 (2015) ("[F]or a license to be reliable evidence, a court must believe that the parties are operating in good faith and at arm's length to value the patent[.]").  Admitting such manufactured evidence cannot help but skew the damages horizon for the jury. *Whitserve*, 694 F.3d at 30 ("evidentiary value" of *proposed* license "limited," as "patentees could artificially inflate the royalty rate by making outrageous offers").

Patent trials should not be tainted by uncorroborated evidence that eventually leads to unapportioned damages awards.  It is critical that a damages expert evaluate the underlying economics of prior agreements, and not give undue reliance to "recitals" or uncorroborated testimony that do not reflect those underlying economics.  And courts should take particular care at *Daubert* in analyzing the reliability of damages opinions that depend on uncorroborated evidence manufactured for litigation, and exclude opinions that are unreliable.  *See* Fed. R. Evid. 702 (expert testimony must be "based on *sufficient* facts or data"); *MLC*, 10 F.4th at 1367.

## IV. ROBUST ENFORCEMENT OF *DAUBERT* IS NEEDED FOR PATENT DAMAGES OPINIONS.

"Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993). *Daubert* therefore requires trial courts to weed out unreliable expert opinions *before* they reach the jury. *Id.*; *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000) (*Daubert* establishes "exacting standards of reliability" for admissibility of expert testimony).

*Daubert*'s gatekeeping function is particularly important for patent damages. As Apple has experienced, experts often present complicated damages theories that can mislead juries as to the patented technology's value by cloaking unreliable apportionment analysis in complex mathematical and economic terms. *E.g.*, Lee & Lemley, *supra*, at 313-315 (discussing expert's regression analysis being misapplied "as a proxy for apportionment" against Apple).

This danger is heightened in cases involving complex products. Jurors—most of whom are not engineers, economists, or lawyers—may find it difficult to value individual features in multi-component products, and can be misled by unreliable expert testimony into awarding damages that overcompensate for the patented technology. Reinecke, *Does Patent Law Allow Plaintiffs Too Many Bites at the Apple?*, 99 J. Pat. & Trademark Off. Soc'y 360, 381 (2017) ("[J]uries often award excessive damages in lawsuits against multicomponent products because the[y] …

have a hard time valuing the effort that goes into a multicomponent product beyond the [patented] technology[.]"); Storm, *supra*, at 206-207 (due to the realities of trial, "juries are poorly positioned to apportion value correctly" and often "come away with an inflated sense of the relative value of that invention").

It is no fix to say, as many district courts do, that reliability concerns "go to weight" and can be addressed via cross-examination. *E.g.*, *Wi-LAN*, No. 2020-2011, ECF 44-1 at Appx754; *see Nease v. Ford Motor Co.*, 848 F.3d 219, 230 (4th Cir. 2017) (finding "[district] court abandoned its gatekeeping function" by "simply dismiss[ing]" arguments about reliability as "going to the weight, not admissibility, of testimony"). Patent trials are inherently complicated: dedicated juries often must decide infringement and invalidity across multiple patents, claims, and products before reaching damages. The technology at issue is often complex. And district courts typically impose strict time limits (sometimes 12-15 hours per side), often leaving defendants with insufficient time to fully put patentees' overreaching damages demands in context. Seaman, *Reconsidering the* Georgia-Pacific *Standard for Reasonable Royalty Patent Damages*, 5 BYU L. Rev. 1661, 1697-1698 (2010) ("[I]t would be virtually impossible [for defendants] to explain [at trial] the importance of all the other, noninfringing components and features contained in complex products[.]").

Regardless of any cross-examination, unreliable expert testimony skews the jury's consideration of damages. Practically speaking, a jury is almost certain to award more when presented with an unreliable, unapportioned $100M damages claim than with a reliable, apportioned $5M one. Zeng, Lucent v. Gateway: *Putting the "Reasonable" Back into Reasonable Royalties*, 26 Berkeley Tech. L.J. 329, 333-334 (2011) ("[E]xperts vary widely in their estimations of reasonable royalties, which juries tend to address by splitting the difference."). Apple has observed that juries often write down verbatim and adopt the patentee's damages number, inherently assuming the expert did the math correctly. *E.g.*, *Caltech*, 25 F.4th at 985; *Wi-LAN*, 25 F.4th at 966. These practicalities demonstrate why trial courts "must be proactive to ensure that [expert damages] testimony … is sufficiently reliable." *Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015).

The recent amendments to Federal Rule of Evidence 702 underscore that district courts must be hands-on at *Daubert*. In December 2023, Rule 702 was amended to clarify that the proponent of expert testimony must demonstrate "that it is more likely than not" that the rule's admissibility requirements are satisfied. Fed. R. Evid. 702. The amendments were made because "many courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility." Fed. R. Evid.

702 advisory committee's note. As the Advisory Committee made clear, "[t]hese rulings are an incorrect application of Rules 702[.]" *Id.*; *see* Bernstein & Lasker, *Defending* Daubert, 57 Wm. & Mary L. Rev. 1, 11 (2015) ("[C]ourts … have been far more lenient about admitting expert testimony than any reasonable reading of the Rule would allow.").

The district court's decision in this case commits the very errors the Judicial Conference condemned. The district court failed to perform *any* gatekeeping and provided *no explanation* for denying *Daubert* (Appx2254, Appx6687-6689)—an increasingly common practice and itself an abuse of discretion. *Finalrod IP, LLC v. John Crane, Inc.*, 838 F. App'x 562, 563 (Fed. Cir. 2021) (citing *Certain Underwriters at Lloyd's, London v. Axon Pressure Prods. Inc.*, 951 F.3d 248, 269-270 (5th Cir. 2020)). At a minimum, district courts should provide some reasoned explanation for their *Daubert* rulings. Requiring courts to engage in meaningful *Daubert* analysis of expert damages opinions *before* they reach the jury will help to avoid excessive verdicts that harm innovation.

## CONCLUSION

Apple respectfully requests that the Court establish guidelines to help ensure that patent damages are based on reliable expert opinions that comply with the apportionment requirement and value only the patented technology. In particular, Apple urges the Court to: (1) make clear that damages experts who rely on

"comparable licenses" must consider the realities of real-world licensing negotiations and meaningfully account for the differences between the comparable licenses and the hypothetical negotiation, including the differences inherent in lump-sum versus running-royalty payment structures, in their apportionment analyses; (2) require the exclusion of unreliable damages theories that rely solely on uncorroborated evidence; and (3) require district courts to engage with experts' damages opinions at the *Daubert* stage to weed out unreliable theories before they reach the jury.

                                                      Respectfully submitted,

                                                      /s/ William F. Lee

ARTHUR W. COVIELLO                                    WILLIAM F. LEE
WILMER CUTLER PICKERING                               LAUREN B. FLETCHER
  HALE AND DORR LLP                                   HARRY HANSON
2600 El Camino Real, Suite 400                        WILMER CUTLER PICKERING
Palo Alto, CA  94306                                    HALE AND DORR LLP
(650) 858-6000                                        60 State Street
                                                      Boston, MA  02109
                                                      (617) 526-6000

                                                      *Attorneys for Amicus Curiae*
                                                      *Apple Inc.*

November 26, 2024

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATIONS**

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because:

1.      The filing has been prepared using a proportionally-spaced typeface and includes 6,967 words.

2.      The filing has been prepared using Microsoft Word for Office 365 in 14-point Times New Roman font.  As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ William F. Lee
WILLIAM F. LEE
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

November 26, 2024