No. 2023-1101

_____

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

_____

## ECOFACTOR, INC.,

*Plaintiff-Appellee,*

v.

## GOOGLE LLC,

*Defendant-Appellant.*

_____

On Appeal from the United States District Court for the Western District of Texas, Case No. 6:20-cv-00075-ADA, Hon. Alan D. Albright

## BRIEF OF *AMICUS CURIAE* UBER TECHNOLOGIES INC. IN SUPPORT OF NO PARTY

November 26, 2024

Christopher Storm
Uber Technologies Inc.
1717 Rhode Island Avenue NW, Suite 400
Washington, DC 20036
Telephone: (202) 922-7337
Email: cafc-amicus@uber.com

*Attorney for Amicus Curiae*
*Uber Technologies Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number** 23-1101

**Short Case Caption** EcoFactor, Inc. v. Google LLC

**Filing Party/Entity** Uber Technologies Inc. / Amicus Curiae

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 11/26/2024

Signature: /s/ Christopher Storm

Name: Christopher Storm

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Uber Technologies Inc. | None | None |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☐ No ☑ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ..................................................................i

TABLE OF AUTHORITIES ......................................................................v

INTEREST OF *AMICUS CURIAE* ........................................................1

INTRODUCTION ........................................................................................1

ARGUMENT .................................................................................................3

    I.    Reasonable Royalties Must Reflect Actual Losses, Not Infringer Gains. ...........................................................................3

        A.    Congress Redefined Available Compensation for Patent Infringement in 1946. ....................................3

        B.    Infringer Profit Evidence Should Be Used Sparingly, If Ever. ...............................................................9

        C.    Mr. Kennedy Used Google's Profit Data to Pursue Partial Profit Disgorgement Rather Than Damages. ........................................................................12

    II.    Patentees Cannot Use Comparable Licenses as a Proxy for an Established Royalty. ..................................................17

        A.    Comparable Licenses Should Be a Shield, not a Sword. ..............................................................................17

        B.    This Case Illustrates Why Patentees Should Not Use Allegedly Comparable Licenses as a Proxy for an Established Royalty. .........................................21

CONCLUSION .........................................................................................27

CERTIFICATE OF COMPLIANCE .....................................................30

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aro Manufacturing Co. v. Convertible Top Replacement Co.*,
377 U.S. 476 (1964) .................................................................. passim

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
240 F. Supp. 805 (D. Mass. 1965) ......................................... 8

*Asetek Danmark A/S v. CMI USA Inc.*,
852 F.3d 1352 (Fed. Cir. 2017) .............................................. 16

*Commonwealth Scientific and Industrial Research Organisation v.
Cisco Systems, Inc.*,
809 F.3d 1295 (Fed. Cir. 2015) .............................................. 21

*Coupe v. Royer*,
155 U.S. 565 (1895) .................................................................. 7

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) .................................................................. 2

*EcoFactor, Inc. v. Google LLC*,
104 F.4th 243 (Fed. Cir. 2024) .......................... 12, 14, 22, 23

*Garretson v. Clark*,
111 U.S. 120 (1884) ............................................................. 3, 21

*Gen. Motors Corp. v. Blackmore*,
53 F.2d 725 (6th Cir. 1931) ............................................. 17, 18

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012) .................................................. 20

*Lucent Technologies, Inc. v. Gateway, Inc,*
580 F.3d 1301 (2009) ...................................................... 19, 20, 21

*ResQNet.com, Inc. v. Lansa, Inc.*,
594 F.3d 860 (Fed. Cir. 2010) ............................................... 20

*Rude v. Westcott*,
130 U.S. 152 (1889) .......................................................... 17, 23

*Studiengesellschaft Kohle v. Dart Indus.*,
862 F.2d 1564 (Fed. Cir. 1988) ............................................. 18

*Trell v. Marlee Electronics Corp.*,
912 F.2d 1443 (Fed. Cir. 1990) ............................................. 21

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011) ...................................... 12, 19

*VirnetX, Inc. v. Cisco Sys., Inc.*,
767 F.3d 1308 (Fed. Cir. 2014) ............................................ 20

*Westcott v. Rude*,
19 F. 830 (D. Ind. 1884) ...................................................... 18

*Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co.*,
225 U.S. 604 (1912) .................................................. 3, 11, 24

## Statutes

Act of Aug. 1, 1946, Pub L. No. 79-587, 60 Stat. 778 ..................... passim

Act of February 18, 1922, ch. 58, 42 Stat. 389 ................................ 4, 5, 6

Act of July 8, 1870, ch. 230, 16 Stat. 198 ................................................ 7

Patent Act of 1952, ch. 950, 66 Stat. 792 .................................................. 6

## Legislative Hearings and Reports

*Recovery in Patent Infringement Suits: Hearing on H.R. 5231 and
H.R. 5311 Before the H. Comm. on Patents, 79th Cong.* (1946) .. passim

S. Rep. No. 82-1879 (1952) ....................................................................... 7

## Rules

Fed. R. Evid. 702 ..................................................................... 1, 27, 28

Fed. R. Evid. 702, Advisory Committee Note to 2000 Amendment ......... 2

## Briefing

Brief of Petitioner, *Aro Manufacturing Co. v. Convertible Top
Replacement Co.*, 377 U.S. 476 (Nov. 29, 1963) ...................................... 8

## Other Authorities

Christopher Storm, *A Series of Historical Accidents: Profits Versus Damages in Reasonable Royalty Calculations*, 31 Mich Tech. L. Rev. 73 (forthcoming 2024) .................................................... 4

Christopher Storm, *Measuring the Inventor's Contribution*, 21 U.N.H. L. Rev. 167 (2022) ............................................. 10, 13

Daniel Brean, *Ending Unreasonable Royalties: Why Nominal Damages Are Adequate to Compensate Patent Assertion Entities for Infringement*, 39 Vt. L. Rev. 867 (2015) ......................................... 28

Erik Hovenkamp & Jonathan Masur, *How Patent Damages Skew Licensing Markets*, 36 Rev. Litig. 379 (2017) ........................... 13, 23, 26

John Cambell et al., *Countering the Plaintiff's Anchor*, 101 Iowa L. Rev. 543 (2016) ...................................................... 12

Lecture Notes of Giles S. Rich on H.R. 9133 (Oct. 3, 1950) (on file with the Library of Congress, Giles S. Rich Papers, Box 666) .............. 7

Mark Lemley, *Distinguishing Lost Profits from Reasonable Royalties*, 51 Wm. & Mary L. Rev. 655 (2009) ....................... 9

Michael Kanellos, *EcoFactor Says it Beats Nest in Home Energy Management*, Forbes, Aug. 27, 2014, https://www.forbes.com/sites/michaelkanellos/2014/08/27/ecofactor-says-it-beats-nest-in-home-energy-management/ .......................... 16

Note, *Recovery in Patent Infringement Suits*, 60 Colum. L. Rev. 840 (1960) ........................................................ 10

Oskar Liivak, *When Nominal is Reasonable: Damages for the Unpracticed Patent*, 56 B.C. L. Rev. 1031 (2015) ................................ 29

P.J. Federico, *Commentary on the New Patent Act*, 75 J. Pat. & Trademark Off. Soc'y 161 (1993) ......................................... 7

Richard F. Cauley, *Winning the Patent Damages Case* (2009) .............. 20

Robert A. White & John F. Lynch, *Winning the Last Battle—The Recovery of Actual Damages for Patent Infringement* (1970) (on file with the Library of Congress, Giles S. Rich Papers, Box 611) ...... 11

Russell Parr, *Royalty Rates for Licensing Intellectual Property* (2007)..................................................................................19

William F. Lee & Mark A. Lemley, *The Broken Balance: How "Built-In Apportionment" and the Failure to Apply* Daubert *Have Distorted Patent Infringement Damages*, 37 Harv. J.L. & Tech. 255 (2024)..............................................................................25

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus Curiae* Uber Technologies Inc. is reimagining how the world moves. In less than two decades, Uber grew from a small startup into a global leader in transportation technology. Uber achieved this growth thanks to teams of innovators from every corner of the company. As a company built on its patented inventions, unpatented innovation, and relentless execution, Uber has an interest in balanced reasonable royalty calculations that make plaintiffs whole for their actual injuries without otherwise disgorging defendants' achievements.

## INTRODUCTION

Federal Rule of Evidence 702 requires experts to base their testimony on sufficient facts or data, to employ reliable principles and methods, and to apply those methods reliably to the facts of the case. Fed. R. Evid. 702 (b)-(d). For facts to be deemed sufficient or methods to be considered reliable, an expert's testimony must "'fit' the facts of the case."

---

[1] This brief was prepared and funded solely by Uber and its counsel. No party or party's counsel authored this brief in whole or in part, and no person other than Uber and its counsel contributed money intended to fund preparing or submitting this brief. This brief is filed pursuant to the Court's order dated September 25, 2024.

Fed. R. Evid. 702, Advisory Committee Note to 2000 Amendment. "'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993).

Uber files this brief to offer historical research on the statutory purpose of reasonable royalty calculations: to estimate actual damages. For expert testimony to "fit" the purpose of a reasonable royalty calculation, Uber submits that such testimony must be based on facts or data sufficient to describe the patentee's actual injuries and must apply principles and methods that assess such injuries without regard to infringer profits or gains. Uber also offers this brief to provide real-world perspectives on patent license negotiations based on Uber's extensive experience as both a startup and public company in acquiring patent rights, resolving disputes, and negotiating technology transactions. Uber offers these views to encourage reasonable royalty calculations based on facts and data, not legal presumptions or inferences.

In this case, Mr. Kennedy based his opinion on Google's profit evidence and past settlement agreements, neither of which were sufficient to measure any actual harm Google caused EcoFactor to suffer.

Mr. Kennedy then applied principles and methods to yield a compensation award that reflected Google's gains, not EcoFactor's losses. Part I will summarize research on the statutory purpose of reasonable royalty analyses and apply this research to Mr. Kennedy's use of Google profit data. Part II will address Mr. Kennedy's use of three EcoFactor settlement agreements.

## ARGUMENT

### I. Reasonable Royalties Must Reflect Actual Losses, Not Infringer Gains.

#### A. Congress Redefined Available Compensation for Patent Infringement in 1946.

Historically, the apportionment doctrine existed in the common law of patents, allowing courts some discretion when enforcing the doctrine. *Compare, e.g.*, *Garretson v. Clark*, 111 U.S. 120, 121 (1884) (requiring patentees to prove apportionment in "every case"), *with Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co.*, 225 U.S. 604, 622 (1912) (explaining that the apportionment burden will fall on defendants in "many cases").

In 1946, statute replaced common law as the foremost authority on apportionment and reasonable royalty calculations. That year, Congress

recognized that apportionment was "impossible" but recognized that the *Westinghouse* exception to apportionment permitted patentees to recover "in very many cases enormously more than that to which he is really entitled." *Recovery in Patent Infringement Suits: Hearing on H.R. 5231 and H.R. 5311 Before the H. Comm. on Patents, 79th Cong.* 2-4 (1946) [hereinafter *House Hearing*]; *see also id.* at 7-8 (describing *Westinghouse* as manifestly unjust).

In response, Congress eliminated all profit disgorgement and limited financial awards, including reasonable royalties, to the value of damages suffered. Act of Aug. 1, 1946, Pub L. No. 79-587, 60 Stat. 778; *see also* Christopher Storm, *A Series of Historical Accidents: Profits Versus Damages in Reasonable Royalty Calculations*, 31 Mich Tech. L. Rev. 73, 86-100 (forthcoming 2024) (presenting archival research on the statutory and legislative history of Section 284). The 1946 amendment eliminated infringer profit awards by removing "profits" from the total amount of available compensation previously available under the 1922 act[2] and by removing "profits" from reasonable royalty estimations of

---

[2] *Compare* Act of Aug. 1, 1946, Pub. L. No. 79-587, 60 Stat. 778, 778 (providing "the complainant shall be entitled to recover general damages

such compensation.[3]

Congress understood these textual changes would limit statutory compensation to legal damages only. For example, Assistant Commissioner of Patents Condor Henry explained to the House Committee on Patents how the 1946 amendment language should be interpreted:

> Damages, in a legal sense, means the compensation which the law will award for an injury done. Whoever wrote the bill did it cleverly, because it pins right down to the point that the compensation shall be, for what? For making, using, or selling the invention. The author of the bill made the words "damages" and "compensation" almost synonymous—that the *damages will be the compensation* for infringing the rights inherent in the patent itself. That is what the bill is concerned with, in my judgment.

*House Hearing* at 11 (emphasis added). Representative Fritz Lanham immediately confirmed Henry's interpretation, remarking "I do not see

---

which shall be due compensation for making, using, or selling the invention"), *with* Act of February 18, 1922, ch. 58, § 8, 42 Stat. 389, 392 (providing "the complainant shall be entitled to recover, in addition to the profits to be accounted for by the defendant, the damages the complainant has sustained thereby").

[3] *Compare* Act of Aug. 1, 1946, Pub. L. No. 79-587, 60 Stat. 778, 778 (providing "not less than a reasonable royalty therefor," with the word "therefor" referring back to "general damages which shall be due compensation for making, using, or selling the invention"), *with* Act of February 18, 1922, ch. 58, § 8, 42 Stat. 389, 392 (providing "a reasonable sum as profits or general damages for the infringement").

how it could be made any clearer." *Id.* As for reasonable royalties, Congress saw the 1946 amendment as making reasonable royalty estimations procedurally available in every case for those patentees interested in a faster, but lower recovery.[4]

The 1946 amendment remains good law. Although the Patent Act of 1952 rearranged the 1946 text, the 1952 Act preserved the 1946 amendment's key changes to the 1922 Act: recovery of "damages" only, availability of reasonable royalty estimations in every case, and elimination of "profits" from both the total available recovery as well as from reasonable royalty estimations of such value.[5] Drafters of the 1952

---

[4] *See, e.g., House Hearing* at 4 (describing how, under the 1922 Act, "[t]estimony to show a reasonable royalty as a basis for granting damages does not become admissible until a showing is made that profits cannot be ascertained"); *id.* at 13 ("[Y]ou could go right in and show what would be a reasonable royalty. That starts you on a basis for a settlement. Then if there are special damages to which you are entitled you can go in and show the special circumstances attending the case which would entitle you to an increase on some basis. Then, finally comes the exemplary damages."); *id.* at 11 ("What I was concerned with was to be sure it was full and adequate compensation and not merely a reasonable royalty. I do not think it means that."); *id.* at 17-21 (considering and rejecting a proposal to limit all compensation to a reasonable royalty only).

[5] *Compare* Patent Act of 1952, ch. 950, § 284, 66 Stat. 792 (providing "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer"), *with* Act of Aug. 1, 1946, Pub. L. No. 79-587, 60 Stat. 778, 778

Act also confirmed that the recodification effort merely consolidated two prior patent remedies provisions, R.S. 4919 and R.S. 4921, without identifying any substantive changes.[6] Non-substantive consolidation of these two sections was possible because R.S. 4919 never permitted infringer profit awards.[7]

In 1964, Justice Brennan confirmed in *Aro Manufacturing Co. v. Convertible Top Replacement Co.* that Section 284 limits reasonable royalty amounts to damages only:

---

(providing "general damages which shall be due compensation for making, using, or selling the invention, not less than a reasonable royalty therefor").

[6] *See, e.g.*, S. Rep. No. 82-1879 (1952) ("This section consolidates the provisions relating to damages in R. S. 4919 and 4921, with some changes in language."); P.J. Federico, *Commentary on the New Patent Act*, 75 J. Pat. & Trademark Off. Soc'y 161, 216 (1993) ("Section 284 relates to the damages which may be recovered by a patentee and consolidates in two sections of the old statute with some changes in language."); Lecture Notes of Giles S. Rich on H.R. 9133, at 17 (Oct. 3, 1950) (on file with the Library of Congress, Giles S. Rich Papers, Box 666) ("You will recall that the 1946 Amendment of R.S. 4921 took profits, as such, out of the law and they are still out.").

[7] *See* Act of July 8, 1870, ch. 230, § 59, 16 Stat. 198, 207 ("That damages for the infringement of any patent may be recovered by action on the case . . . ."); *Coupe v. Royer*, 155 U.S. 565, 582 (1895) (explaining that plaintiffs in actions at law under R.S. 4919 can only "recover, as damages, compensation for the pecuniary loss he has suffered from the infringement, without regard to the question whether the defendant has gained or lost by his unlawful acts—the measure of recovery in such cases being, not what the defendant has gained, but what plaintiff has lost").

It is presumably the language "in no event less than a reasonable royalty" that has led to the assumption noted above. But that assumption ignores the fact—clear from the language, the legislative history, and the prior law—that *the statute allows the award of a reasonable royalty, or of any other recovery, only if such amount constitutes "damages" for the infringement*. It also ignores the important distinction between "damages" and "profits," and the relevance of this distinction to the 1946 amendment of the statute.

377 U.S. 476, 504-05 (1964) (plurality) (emphasis added); *id.* at 505 & n.20 (recognizing that the 1952 act did not substantively change the 1946 amendment). *Aro* also confirmed "damages" means actual damages at law, which must be calculated "without regard" to infringer gains or profits. *Id.* at 507.

In *Aro*, Convertible Top Replacement Co. (CTR) was a patent assertion entity created solely to sue Aro for a five-percent reasonable royalty.[8] Justice Brennan recognized, however, that Congress changed what value patentees could recover from infringers through litigation. *See id.* at 505 (permitting reasonable royalty awards "only if such *amount*

---

[8] *See Aro*, 377 U.S. at 504 & n.19 (summarizing CTR's royalty demands and expectations); *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 240 F. Supp. 805, 806 (D. Mass. 1965) (describing CTR as a "dummy" corporation); Brief of Petitioner at 7, *Aro Manufacturing Co. v. Convertible Top Replacement Co.*, 377 U.S. 476 (Nov. 29, 1963) (explaining how CTR was formed, acquired rights in the patent-in-suit, and commenced litigation all in the same month).

constitutes 'damages'" (emphasis added)). According to Justice Brennan, patentees were no longer entitled to compensation for what an infringer "makes" or has "gained"; instead, reasonable royalty amounts can only reflect what the patentee "loses." *Id.* at 505, 507. Thus, CTR was wrong to assume entitlement to a reasonable royalty award merely because Aro's repair business benefited by acts of contributory infringement. *Id.* at 502. Rather, CTR could only recover compensation in the form of a reasonable royalty if the amount constituted actual, uncompensated damages. *Id.* at 513.

### B. Infringer Profit Evidence Should Be Used Sparingly, If Ever.

In most cases, patentee damages cannot be reliably apportioned or otherwise deduced from infringer profit evidence, even in reasonable royalty estimations. Infringer profits inherently reflect considerable value unattributable to the patentee, such as the value gained from the infringer's other inventions *and* the value contributed by the infringer's marketers, testers, builders, advertisers, sellers, and other non-inventor innovators. *See generally* Mark Lemley, *Distinguishing Lost Profits from Reasonable Royalties*, 51 Wm. & Mary L. Rev. 655, 663 (2009) ("Even if there are no other relevant patents, the defendant's know-how,

materials, and marketing efforts almost always contribute some value, and usually the most significant part of the value of an infringing product."); Christopher Storm, *Measuring the Inventor's Contribution*, 21 U.N.H. L. Rev. 167, 172-88, 205-06 (2022) (reviewing technology commercialization "roles" from business strategy literature to separate the patentee's value contribution from the value accused infringers must contribute to launch new technology products successfully). Conjuring patent value by apportioning an infringer's profits, revenues, or other measures of success is like guessing the size of a box based on the size of its warehouse.

To the extent that Section 284 still permits consideration of infringer profits when assessing reasonable royalty damages,[9] plaintiffs invoking infringer profit data should be held to an especially exacting apportionment standard to prevent misuse of such data. The legislative

---

[9] *Compare Aro*, 377 U.S. at 507 (requiring reasonable royalties to be determined "without regard to the question whether the defendant has gained or lost by his unlawful actions"), with Note, *Recovery in Patent Infringement Suits*, 60 Colum. L. Rev. 840, 843 (1960) (concluding that "profits are recoverable as an element of damages [under the 1946 amendment] when both the patentee and the infringer have offered the patented device for sale, the per unit cost of both parties is similar, and it appears probable that but for the competition presented by the infringer, his sales would have been made by the patentee").

history of the 1946 amendment confirms that the apportionment doctrine still applies in cases "where profits are claimed as an element of general damages."[10] Congress also passed the 1946 amendment, in part, to abrogate the *Westinghouse* rule that shifted the apportionment burden to infringers. *See House Hearing*, supra, at 2-4, 7-8. If a plaintiff chooses to introduce evidence of infringer profits or other measures of infringer success in a reasonable royalty analysis, that choice necessarily includes the obligation to apportion such profits carefully and to use such evidence solely in pursuit of damages only. Any rule to the contrary would encourage plaintiffs to misuse infringer profit evidence to recover value that Congress rendered unavailable.

---

[10] *See, e.g.*, *House Hearing* at 7 (describing the bill as "making it unnecessary to have proceedings before masters and eliminating the element of profits except as an element of general damages"); *id.* at 10 ("I am not one who believes that this bill would prevent proceedings before masters where profits are claimed as an element of general damages."); *id.* at 12 (interpreting the bill as encouraging judicial control over future accountings). The legislative history does not clearly state whether references to profits "as an element of general damages" refers to infringer profits or patentee lost profits. *See, e.g.*, Robert A. White & John F. Lynch, *Winning the Last Battle—The Recovery of Actual Damages for Patent Infringement* 56 (1970) (on file with the Library of Congress, Giles S. Rich Papers, Box 611) (noting, in the margins of an article borrowed by Judge Rich in 1985 from Judge Nies, "whose?" next to an underline of the word "profits" used in this context).

### C. Mr. Kennedy Used Google's Profit Data to Pursue Partial Profit Disgorgement Rather Than Damages.

Mr. Kennedy's opinion prejudiced Google[11] without demonstrating probative value to a jury charged with assessing EcoFactor's damages rather than disgorging Google's profits. According to Mr. Kennedy, the value of Google's profits would place "upward pressure on the negotiated rate at the hypothetical negotiation." *EcoFactor, Inc. v. Google LLC*, 104 F.4th 243, 255 (Fed. Cir. 2024). Google's profits cannot place upward pressure on reasonable royalty negotiations at law, however, because EcoFactor has no lawful claim to Google's gains under Section 284, as discussed above.

As for a licensee's position in a hypothetical negotiation, reasonable purchasers do not voluntarily pay more merely because they have the capacity to do so. A company's profits belong to its shareholders, not its

---

[11] *See, e.g.*, *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011) ("The disclosure that a company has made $19 billion dollars in revenue from an infringing product cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue."); John Cambell et al., *Countering the Plaintiff's Anchor*, 101 Iowa L. Rev. 543, 545 (2016) ("Numerous studies establish that the jury's damages decision is strongly affected by the number suggested by the plaintiff's attorney, independent of the strength of the actual evidence (a psychological effect known as 'anchoring').").

suppliers. Shareholders expect companies to manage their supply chains by minimizing fixed costs, avoiding variable costs that hinder profitability at scale, and paying rates to sellers that benchmark favorably when compared to other purchasers. Absent judicial influence, reasonable licensees would not abandon these purchasing principles simply because a particular supplier happens to be selling patent licenses. *See generally* Erik Hovenkamp & Jonathan Masur, *How Patent Damages Skew Licensing Markets*, 36 Rev. Litig. 379, 379-80 (2017) ("Private dealings vastly outnumbered litigated disputes, but they all occur in the proverbial 'shadow of litigation.'"); *Storm*, *Measuring*, *supra*, at 202-04 (proposing that patent license negotiations would resemble typical commercial transactions but for post-*Aro* legal opinions that normalized royalty calculations based on infringer profits and proxies thereof).

Additionally, the public record suggests that Mr. Kennedy failed to apportion Google's profits down to value attributable to EcoFactor's invention. For example, Mr. Kennedy claimed "the infringed technology at issue in this case attributed to Z% for the profits of the infringed

products." *EcoFactor*, 104 F.4th at 255. This seemingly innocuous statement captures Google's contributions in at least three ways.

First, Mr. Kennedy allocated the value of Google's profits according to consumer survey data. *Id.* Most value contributions that drive per-unit profits, however, are invisible to consumers. Customers would never know (or care), for example, if Google achieved higher profit margins thanks to a sophisticated supply chain organization that knows how to identify contract manufacturers with the lowest defect rates or how to negotiate better prices with those manufacturers. Mr. Kennedy should never have included such value contributions in the size of the pie before slicing it into pieces purportedly corresponding to the survey attributes.

Second, Mr. Kennedy claimed the value of Google's "technology," i.e., the value Google created by transforming a paper invention into real-world working technology. But the "infringed technology" itself is not solely attributable to the patent. Technology is not an automatic or inevitable result of conceiving a patentable invention. To the contrary, building reliable, effective, and affordable technology at scale requires skill, effort, and investment that deserves both recognition and apportionment.

Third, Mr. Kennedy's profit-attribution calculation captures Google's bundling value, i.e., the extra value that exists when a product is worth more than the sum of its parts. In this case, Google added value to the technology-at-issue by bundling it with non-infringing technology and with non-technology value drivers, such as Nest's superior brand, design, and distribution channels. Even in the absence of the 1946 amendment, EcoFactor has not shown why it deserves to be compensated for these fruits of Google's labor.

Mr. Kennedy's decision to invoke Google profits, without fully apportioning out Google's own contributions to those profits, was unnecessary and counterproductive. Instead, Mr. Kennedy could have analyzed the harm Nest's infringement caused to EcoFactor's competing thermostat business. *See generally* Michael Kanellos, *EcoFactor Says it Beats Nest in Home Energy Management*, Forbes, Aug. 27, 2014, https://www.forbes.com/sites/michaelkanellos/2014/08/27/ecofactor-says-it-beats-nest-in-home-energy-management/ (summarizing the early competitive relationship and business-model differences between EcoFactor and Nest). Mr. Kennedy could have analyzed EcoFactor's compete-versus-license decision at the time of first infringement, which

may have supported an even higher royalty demand than the amount ultimately awarded at trial. *Cf. Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352, 1363 (Fed. Cir. 2017) ("Negotiating for a per-unit payment equal to [the patentee's] per-unit profit can be a logical approach for a patent owner that is uncertain of how many sales might be lost by granting the license at issue or is just using its own experience to place a value on the right to use the technology at issue."). Mr. Kennedy also could have supported EcoFactor's demand for damages based on Nest's unit volumes by quantifying how each incremental Nest sale caused additional harm to EcoFactor's business. He even could have explored the competitive dynamic between Nest and EcoFactor to explain why infringement of one patent causes the same pecuniary harm to EcoFactor as infringement of the entire portfolio.

The public record suggests, however, that Mr. Kennedy failed to base his opinion on any such facts or data sufficient to describe EcoFactor's actual injuries. Instead, his opinion invoked Google's profits without applying reliable principles or methods to connect Google's gains back to EcoFactor's losses, thereby anchoring the jury to profit value unavailable under the 1946 amendment.

## II.	Patentees Cannot Use Comparable Licenses as a Proxy for an Established Royalty.

### A.	Comparable Licenses Should Be a Shield, not a Sword.

When a patentee successfully establishes a widespread market for its invention without resorting to litigation, courts recognize that a new entrant's failure to pay the license rate established by the market constitutes an actual injury at law. *See Rude v. Westcott*, 130 U.S. 152, 165 (1889). The bar for proving an established royalty is intentionally high to protect defendants:

> Like sales of ordinary goods, [sales of licenses] must be common, that is, of frequent occurrence, to establish such a market price for the article that it may be assumed to express, with reference to all similar articles, their salable value at the place designated. In order that a royalty may be accepted as a measure of damages against an infringer, *who is a stranger to the license establishing it*, it must be paid or secured before the infringement complained of; it must be paid by such a number of persons as to indicate a general acquiescence in its reasonableness by those who have occasion to use the invention; and it must be uniform at the places where the licenses are issued.

*Id.* (emphasis added); *see also Gen. Motors Corp. v. Blackmore*, 53 F.2d 725, 730 (6th Cir. 1931) (characterizing plaintiff's settlements with third parties as *res inter alios acta* and rejecting a reasonable royalty based on such settlements where there was no "privity shown between the present defendant and the defendants in the other actions"); *Westcott v. Rude*, 19

F. 830, 833 (C.C.D. Ind. 1884) ("It is, as it appears to me, entirely inadmissible, at law or in equity, that a patentee may, by inserting in his licenses a stipulation for a certain royalty . . . acquire a right to demand the entire sum of an infringer.").

If a plaintiff cannot meet the high bar for proving an established royalty, then the plaintiff cannot use its past licenses or settlements as a sword, even though the defendant can use those same agreements as a shield. *See Blackmore*, 53 F.2d at 729 ("*The settlements might possibly have been offered by defendant* as some evidence in the nature of admissions by plaintiffs upon the subject of reasonable royalty, to be given only such weight as might seem reasonable in view of surrounding circumstances; *but neither they nor the recoveries in other actions were properly received as evidence in support of plaintiffs' case.*" (emphasis added)); *see also Studiengesellschaft Kohle v. Dart Indus.*, 862 F.2d 1564, 1572 (Fed. Cir. 1988) (allowing evidence of one plaintiff settlement at 2.15% to prove that a reasonable royalty of 4% was clearly erroneous).

Today, however, plaintiffs use "comparable licenses" to reap the litigation benefits of an established royalty in cases where the plaintiff

cannot prove an established royalty at law or even offer licenses "tending to prove an established royalty" under *Georgia-Pacific* factor one.

The modern trend accelerated after *Lucent Technologies, Inc. v. Gateway, Inc.*, which endorsed the use by plaintiffs of comparable licenses as a "proxy" for establishing a market royalty. 580 F.3d 1301, 1325-26 (2009). Instead of citing statute or judicial precedent for its proxy theory, *Lucent* cited books by two damages experts. The first, by Russell Parr, declares (without citation) that "comparable license agreement royalty terms [may be used] as a *proxy* for a subject case."[12] Next, *Lucent* cited Richard Cauley's chapter on established royalties under *Georgia-Pacific* factor one in the Court's factor two analysis—as if both factors are interchangeable. *Lucent*, 580 F.3d at 1326 (citing Richard F. Cauley, *Winning the Patent Damages Case* 47 (2009)). Incidentally, Cauley's

---

[12] Russell Parr, *Royalty Rates for Licensing Intellectual Property* 61 (2007) (emphasis added). Parr's book generally lacks legal citations and advocates positions contrary to this Court's precedent, such as the impermissible Twenty-Five Percent Rule. *Compare id.* at 31 ("present[ing] the definitive discussion, explaining and proving the broad validity of the famous Twenty-Five Percent Rule for deriving royalty rates"), *with Uniloc*, 632 F.3d at 1315. Despite Parr's unfettered views on royalty calculations, he still cautions against relying on past license agreements that "granted [licenses to patents] as a group, with one royalty rate specified as compensation for all the property." Parr, *supra*, at 65.

chapter on *Georgia-Pacific* factor two accurately describes comparability analyses under factor two as "the flip side of the first *Georgia-Pacific* factor. Instead of measuring the price at which the seller/patentholder is willing to charge for the patent rights at issue, this factor measures the willingness and ability of the customer—the accused infringer—to pay for those patent rights." Cauley, *supra*, at 60.

Nonetheless, subsequent cases have relied almost exclusively on *Lucent* and its progeny to support the view that plaintiffs can use past licenses in lieu of an established royalty so long as the licenses are sufficiently "comparable."[13] Within six years, the *Lucent* "proxy" theory

---

[13] *See, e.g.*, *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014) (quoting *Lucent*'s discussion of "licenses relied on by the patentee"); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012) (referencing *Lucent* in the opinion's discussion of patentees that allege "a loose or vague comparability" when relying on comparable licenses); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869-70 (Fed. Cir. 2010) (citing *Lucent* as requiring "district courts performing reasonable royalty calculations to exercise vigilance when considering past licenses to technologies other than the patent in suit").

One notable exception is *ResQNet.com*, which cited a 1990 decision as providing "the same instructive rule" as *Lucent*. *ResQNet.com*, 594 F.3d at 871 (citing *Trell v. Marlee Electronics Corp.*, 912 F.2d 1443 (Fed. Cir. 1990)). In *Trell*, the district court erred in concluding that one patentee license agreement constituted proof of an established royalty. *Trell*, 912 F.2d at 1446. *Trell* also discussed additional evidence in the record that

became so entrenched that *Commonwealth Scientific and Industrial Research Organisation v. Cisco Systems, Inc.* refused to require all damages calculations to begin with the smallest salable patent-practicing unit ("SSPPU") because such a rule "conflicts with our prior approvals of a methodology that values the asserted patent based on comparable licenses." 809 F.3d 1295, 1303 (Fed. Cir. 2015) (citing post-*Lucent* cases). Instead of embracing the SSPPU as a tool for enforcing the apportionment doctrine "in every case" under *Garretson v. Clark*, *Cisco* announced a new "built in apportionment" doctrine that exempts comparable license analyses from apportionment requirements. *Id.*

### B. This Case Illustrates Why Patentees Should Not Use Allegedly Comparable Licenses as a Proxy for an Established Royalty.

The *Lucent* "proxy" theory presents at least three issues in this case. First, comparable license analyses fail to protect defendants against license terms accepted by a few idiosyncratic or disparate strangers. In negotiations as well as in life, parties pick their battles. In each

---

negated reliance on the single license agreement in a reasonable royalty analysis, *id.* at 1446-47, but *Trell* never said that the district court could have used the single license agreement as a proxy for an established royalty if it also considered the additional evidence.

EcoFactor settlement agreement, the licensees had no immediate interest in negotiating the "whereas" clauses since such clauses did not impact the price, license scope, or other key deal terms. In fact, the "whereas" clauses did not even require the licensees to share EcoFactor's purported "belief." If EcoFactor had expressed a belief that the world is flat, the impact on the licensees would have been no different.

EcoFactor's settlement agreements show how different negotiation styles can lead to different contract terms. Johnson Controls, for example, appears to have taken a pragmatic approach by ignoring EcoFactor's inconsequential statements. *See EcoFactor*, 104 F.4th at 258 (Prost, J., dissenting) (noting how Johnson did not refute EcoFactor's "belief that, again, was EcoFactor's alone"). A pragmatic approach makes sense if the goal is to expedite settlement and minimize costs by avoiding unnecessary disputes and redlines. Daikin and Schneider, on the other hand, were not content to let EcoFactor walk away with its false beliefs unchecked. Instead, both licensees required additional language expressing the view of both parties that the lump-sum payment was not "based upon sales" and does not "reflect or constitute" a royalty. *Id.* This additional language appears to rebut the "whereas" clauses, which

recited EcoFator's belief that the lump sum amount was "based on . . . past and projected future sales" and that the amount "is a reasonable royalty calculation." *Id.*

The panel majority scrutinized each settlement agreement but failed to address the most important question: should a damages award really depend on how aggressively non-parties negotiated otherwise insignificant settlement language? The answer should be no. EcoFactor's three "whereas" clauses are insufficient evidence to prove "general acquiescence" by the market of an $X/unit royalty, both under *Rude* and Rule 702(b).

Second, Mr. Kennedy's opinion encouraged the jury to go "looking under the lamppost" at EcoFactor's past settlements, a place not "likely to provide apt measures of damages."[14] Although Rule 702 required Mr. Kennedy to base his testimony on "facts or data," his opinion mostly rests on unproven presumptions and inferences. For $X/unit to reflect EcoFactor's statutorily permissible damages (*supra*, § I.A–B), Mr.

---

[14] Hovenkamp & Masur, *supra*, at 413 & n.61 ("A drunkard is searching for his keys underneath a lamppost. A police officer asks, 'are you sure this is where you lost your keys?' The drunkard replies, 'No, but it's easier to look here.'").

Kennedy must have assumed, *inter alia*, that: (1) Google actually injured EcoFactor; (2) each additional Google sale caused incrementally more harm to EcoFactor; (3) Google caused the same harm per unit regardless of the number of patents infringed; (4) Google caused the same harm per unit as EcoFactor's other licensees, irrespective of differences in the accused products or each company's competitive relationship with EcoFactor; (5) the "whereas" clauses reflected the actual financial compensation paid by all three licensees to make EcoFactor whole for its injuries; and (6) all three licensees "built in apportionment" by negotiating over the harm caused by their infringement, and no more. Even if some of these assumptions are excusable individually, the sheer number of unproven assumptions required suggests that comparable licenses are not a reliable data source for measuring a defendant's damages.

The built-in apportionment assumption is particularly problematic. Not only does the theory exempt plaintiffs from apportionment obligations contrary to Congress's rejection of *Westinghouse*, but assuming built-in-apportionment is counterfactual in most cases. *See generally* William F. Lee & Mark A. Lemley, *The Broken Balance: How*

*"Built-In Apportionment" and the Failure to Apply* Daubert *Have Distorted Patent Infringement Damages*, 37 Harv. J.L. & Tech. 255, 323 (2024). In this case, all three licensees allegedly paid a small lump sum to settle pending litigation, strongly suggesting that final settlement amounts were driven by litigation costs (a one-time expense) instead of the value of EcoFactor's losses or some other value associated with the asserted patents.

Finally, comparable license analyses preempt inquiry into the patentee's suffered injuries. Not only do the 1946 amendment and *Aro* require a damages-based reasonable royalty calculation, but the parties, the courts, and the public deserve to know how the defendant actually hurt the plaintiff. In an established royalty case, observers can appreciate the effort undertaken by the plaintiff to establish a licensing business without judicial intervention and how the defendant's failure to pay the established royalty can harm that business. In reasonable royalty cases relying on *ad hoc* settlement agreement licenses, however, there is no established licensing business, and courts are not responsible for helping plaintiffs to establish one. *See Aro*, 377 U.S. at 502 (permitting

only "nominal damages" for non-practicing entities with no established royalties and no uncompensated injuries).

Without proof of actual harm, courts and observers cannot evaluate whether a proposed royalty calculation truly reflects the difference between the plaintiff's pecuniary condition after the defendant's unlicensed infringement versus what that condition would have been if the defendant never practiced the claimed invention. *See id.* at 507. In this case, EcoFactor's settlement agreements may indicate a willingness on its part to license for that amount and thus might be used as a ceiling. These agreements do not, however, reflect Google's actions, how they worsened EcoFactor's pecuniary condition, or even how they impacted EcoFactor's compete-versus-license decision. Accordingly, EcoFactor's past settlement agreements "should generally be considered irrelevant or at most treated as a very weak guide when fashioning a remedy." *See* Hovenkamp & Masur, *supra*, at 413 ("To avoid the problems created by the licensing-based damages standard, we offer a simple proposal: courts should be extremely careful when using existing licenses to gauge damages, and in most cases they should ignore licenses entirely.").

# CONCLUSION

Experts cannot apply reliable measurement principles and methods without clearly identifying what value is being measured. Under the 1946 amendment, experts are expected to estimate reasonable royalties based on the value of the patentee's damages only.[15] The public record suggests, however, that Mr. Kennedy ignored his client's own damages in pursuit of compensation based on Google's profits and EcoFactor's past settlement agreements, neither of which can be made a measure of EcoFactor's losses. Like the litigants in *Aro*, it appears that Mr. Kennedy incorrectly assumed that Section 284 permits calculating reasonable royalties irrespective of actual, uncompensated harm.

*Aro* provides a guide for rectifying Mr. Kennedy's mistakes for the benefit of both parties. In *Aro*, the Supreme Court remanded for fact

---

[15] *Compare* Act of Aug. 1, 1946, Pub. L. No. 79-587, 60 Stat. 778, 778 ("The court is hereby authorized to receive expert or opinion evidence upon which to determine in conjunction with any other evidence in the record, due compensation for making, using, or selling the invention . . . ." (emphasis added)), *with* Act of February 18, 1922, ch. 58, § 8, 42 Stat. 389, 392 ("If . . . such damages or profits are not susceptible of calculation and determination with reasonable certainty, the court may, on evidence tending to establish the same, in its discretion, receive opinion or expert testimony . . . ." (emphasis added)); *see also House Hearing* at 11 (explaining that "damages" are the due compensation for making, using, or selling the invention).

discovery on CTR's actual, uncompensated damages to determine whether CTR was entitled to anything more than nominal damages. *Aro*, 377 U.S. at 513-14. In that spirit, Amicus respectfully submits that this Court should remand for discovery and findings of fact so the district court judge can determine whether proffered expert testimony is based on facts or data sufficient to describe EcoFactor's actual injuries and whether such testimony reliably applies principles and methods to yield a reasonable royalty estimation reflecting such injuries, without regard to Google's profits or gains. This will provide EcoFactor with a fresh opportunity to seek compensation for all its uncompensated injuries, without regard to Google gains or profits.

If, however, EcoFactor fails to prove any uncompensated harm, then nominal damages would be appropriate. *Id.* at 504 ("We are, indeed, doubtful that CTR can properly be allowed recovery of anything more than nominal damages from Aro."); *see also* Daniel Brean, *Ending Unreasonable Royalties: Why Nominal Damages Are Adequate to Compensate Patent Assertion Entities for Infringement*, 39 Vt. L. Rev. 867, 868 (2015) ("In some cases, such as those brought by PAEs, a nominal royalty is reasonable."); Oskar Liivak, *When Nominal is*

*Reasonable: Damages for the Unpracticed Patent*, 56 B.C. L. Rev. 1031, 1034 (2015) ("Without cognizable harm—which a patent troll will be unable to provide—nominal damages are reasonable.").

Dated: <u>November 26, 2024</u>     Respectfully submitted,

/s/ Christopher Storm

Christopher Storm
Uber Technologies Inc.
1717 Rhode Island Avenue NW, Suite 400
Washington, DC 20036
Telephone: (202) 922-7337
Email: cafc-amicus@uber.com

*Attorney for Amicus Curiae*
*Uber Technologies Inc.*

# CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Federal Circuit Rule 32(b)(1) because it contains 6,104 words, including footnotes and excluding the parts of the brief exempted by Federal Circuit Rule 32(b)(2) and Rule 32(f) of the Federal Rules of Appellate Procedure.

2.    This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Word in 14-point Century Schoolbook font.


Dated: <u>November 26, 2024</u>    <u>/s/ Christopher Storm</u>

                                         Christopher Storm
                                         Uber Technologies Inc.
                                         1717 Rhode Island Avenue NW, Suite 400
                                         Washington, DC 20036
                                         Telephone: (202) 922-7337
                                         Email: cafc-amicus@uber.com