No. 2023-1101

# United States Court of Appeals for the Federal Circuit

ECOFACTOR, INC.,

*Plaintiff-Appellee,*

v.

GOOGLE LLC,

*Defendant-Appellant.*

Appeal from the United States District Court for the Western District of Texas
Case No. 6:20-cv-00075-ADA
Honorable Alan D. Albright

BRIEF OF SAS INSTITUTE INC., SYMMETRY, LLC, SAP AMERICA, INC., GARMIN INTERNATIONAL INC., VIZIO, INC., ACT | THE APP ASSOCIATION, TESLA, INC., SOFTWARE & INFORMATION INDUSTRY ASSOCIATION, AND RED HAT, INC. AS *AMICI CURIAE* IN SUPPORT OF GOOGLE LLC

November 26, 2024

Kristin L. Cleveland
John D. Vandenberg
KLARQUIST SPARKMAN, LLP
121 SW Salmon Street, Suite 1600
Portland, OR 97204
(503) 595-5300
*Counsel for Amici Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2023-1101 |
| **Short Case Caption** | EcoFactor, Inc. v. Google LLC |
| **Filing Party/Entity** | Amici Curiae |

> **Instructions:**
>
> 1. Complete each section of the form and select none or N/A if appropriate.
>
> 2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
>
> 3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
>
> 4. Please do not duplicate entries within Section 5.
>
> 5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.


Date: 11/26/2024                Signature:   /s/ Kristin L. Cleveland

                                Name:        Kristin L. Cleveland

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| SAS Institute Inc. | N/A | N/A |
| Symmetry, LLC | N/A | N/A |
| SAP America, Inc. | N/A | SAP SE |
| Garmin International Inc. | N/A | Garmin Ltd. |
| VIZIO, Inc. | N/A | VIZIO Holding Corp. |
| ACT | The App Association | N/A | N/A |
| Tesla, Inc. | N/A | N/A |
| Red Hat, Inc. | N/A | International Business Machines Corp. |
| Software & Information Industry Association (SIIA) | N/A | N/A |
| | | |
| | | |

☐　Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☐ No ☑ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ..................................................................i

TABLE OF AUTHORITIES ....................................................................v

I.    IDENTITY, INTEREST, AND AUTHORITY OF *AMICI CURIAE* ............1

II.    THE EN BANC COURT SHOULD CONSISTENTLY APPLY *DAUBERT* TO ENFORCE PREDICTABILITY IN PATENT CASES .........2

    A.    Gatekeeping Is Not Consistently Demanded by the Court ...................6

    B.    Gatekeeping For Assessing "Comparable" Licenses Should Require Reliable, *Quantitative* Analysis ..................8

    C.    Gatekeeping *Factfinding* Cannot Be Shifted to the Jury ...................11

III.    CONCLUSION...........................................................................14

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
   694 F.3d 1312 (Fed. Cir. 2012) .......................................................7, 11

*Apple Inc. v. Wi-LAN Inc.*,
   25 F.4th 960 (Fed. Cir. 2022) .........................................................7, 10

*Bio-Rad Labs., Inc. v. 10X Genomics Inc.*,
   967 F.3d 1353 (Fed. Cir. 2020) ............................................... 7, 11, 14

*Brumfield, Tr. for Ascent Tr. v. IBG LLC*,
   97 F.4th 854 (Fed. Cir. 2024) ..............................................................10

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) .................................................................... passim

*EcoFactor, Inc. v. Google LLC*,
   104 F.4th 243 (Fed. Cir.), *reh'g en banc granted,*
   *opinion vacated,* 115 F.4th 1380 (Fed. Cir. 2024) ...................... passim

*Ericsson, Inc. v. D-Link Sys., Inc.*,
   773 F.3d 1201 (Fed. Cir. 2014) .............................................................4

*Garretson v. Clark*,
   111 U.S. 120 (1884) ............................................................................10

*Hanson v. Alpine Valley Ski Area, Inc.*,
   718 F.2d 1075 (Fed. Cir. 1983) .............................................................5

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) .................................................................. 3, 4, 9, 10

*MLC Intell. Prop., LLC v. Micron Tech., Inc.*,
   10 F.4th 1358 (Fed. Cir. 2021) ................................................. 2, 6, 7, 8

*Omega Pats., LLC v. CalAmp Corp.*,
    13 F.4th 1361 (Fed. Cir. 2021) ........................................................... 7, 10, 11, 12

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000) ........................................................................13

*ResQNet.com, Inc. v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2010) ...............................................................5

*U.S. v. Amaral*,
    488 F.2d 1148 (9th Cir. 1973) ...............................................................3

*Vectura Ltd. v. Glaxosmithkline LLC*,
    981 F.3d 1030 (Fed. Cir. 2020) ............................................................12

*VLSI Tech. LLC v. Intel Corp.*,
    87 F.4th 1332 (Fed. Cir. 2023) ...........................................................10

*Whitserve, LLC v. Comput. Packages, Inc.*,
    694 F.3d 10 (Fed. Cir. 2012) ...................................................... 5, 6, 10

*Wordtech Sys., Inc v. Integrated Networks Sols., Inc.*,
    609 F.3d 1308 (Fed. Cir. 2010) ..............................................................6

**Other Authorities**

Christopher S. Storm, *Measuring the Inventor's Contribution*,
    21 U.N.H.L. Rev. 167 (2022) ...............................................................5

David E. Bernstein, *Expert Witnesses, Adversarial Bias, and the
    (Partial) Failure of the Daubert Revolution*,
    93 Iowa L. Rev. 451 (2008)...............................................................3–4

Feng Chen, *et al.*, *Chilling Effects of Patent Trolls*,
    52 Research Policy, Issue 3 (April 2023)...........................................2

Mark A. Lemley & Carl Shapiro, *Patent Holdup and Royalty Stacking*,
    85 Tex. L. Rev. 1991 (2007) ...............................................................5

W. William Hodes, *Navigating Some Deep and Troubled Jurisprudential Waters: Lawyer-Expert Witnesses and the Twin Dangers of Disguised Testimony and Disguised Advocacy*,
6 St. Mary's J. Legal Mal. & Ethics 180 (2016) .....................................................4

William F. Lee & Mark A. Lemley, *The Broken Balance: How "Built-In Apportionment" and the Failure to Apply Daubert have Distorted Patent Infringement Damages*,
37 Harvard J. of Law & Tech. 255 (2024) ...........................................................2

**Rules**

Fed. R. Evid. 104 .............................................................................................. 12, 13

Fed. R. Evid. 702 ............................................................................................... passim

Advisory Committee Note to 1972 Proposed Rule 104(a) ......................................13

Advisory Committee Note to 2000 Proposed Am. to Fed. R. Evid. 702 .................3

# I.     IDENTITY, INTEREST, AND AUTHORITY OF *AMICI CURIAE*

*Amici curiae* are SAS Institute Inc., Symmetry, LLC, SAP America, Inc., Garmin International Inc., VIZIO, Inc., ACT | The App Association, Tesla, Inc., Software & Information Industry Association, and Red Hat, Inc. *Amici* represent a diverse collection of market-leading technology innovators and patent owners that develop, manufacture, use, and sell complex products and services, including computers, monitors, software services, IT infrastructure, and automobiles, as well as organizations that represent such innovators. Most *amici* face patent licensing solicitations and patent infringement actions from non-practicing entities targeting a small slice of the technology embedded in their products or services. Economic literature explains that such litigation (or the threat thereof) can shift resources away from innovation, particularly where there are risks of disproportionate damage awards. Because *amici* face patent licensing solicitations and patent infringement actions, they have an interest in courts *predictably* enforcing their gatekeeping duty to ensure that only reliable and non-speculative evidence be admitted to support damages awards in patent cases.[1]

---

[1]     No party or party's counsel authored this brief in whole or in part. No party, party's counsel, or any person other than *amici* or their counsel contributed money that was intended to fund preparing or submitting this brief. *Amici* submit this brief in accordance with the Court's Docket No. 76, ordering that briefs of *amici curiae* may be filed without consent and leave of the Court.

## II. THE EN BANC COURT SHOULD CONSISTENTLY APPLY *DAUBERT* TO ENFORCE PREDICTABILITY IN PATENT CASES

The trial judge plays a key role in enforcing predictability in patent litigation by gatekeeping expert testimony. Fed. R. Evid. 702; *MLC Intell. Prop., LLC v. Micron Tech., Inc.*, 10 F.4th 1358, 1367 (Fed. Cir. 2021).

Patent damages awards must be predictable.

Where there is uncertainty, litigation is over-incentivized because a patent has the potential to become a lottery ticket. With the right expert, the right jury, and lax gatekeeping, an oversized payday can result, even where the patent covers only an insignificant sliver of a profitable product.[2] Oversized and unpredictable damages awards incentivize litigation and stifle innovation.[3]

The patent damages "reasonable royalty" determination is a complex, multi-variable analysis, for which patent owners generally rely on expert testimony. If the district court fails to perform its gatekeeping duty, the jury will hear speculative theories, shielded by the imprimatur of "expert" testimony. Such testimony,

---

[2]    *See* William F. Lee & Mark A. Lemley, *The Broken Balance: How "Built-In Apportionment" and the Failure to Apply Daubert have Distorted Patent Infringement Damages*, 37 Harvard J. of Law & Tech. 255, 262–64 (2024), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4564279.

[3]    Lee & Lemley, *supra* note 2, at 258; *see generally* Docket No. 52 at 4–5 (*citing*, *inter alia*, Feng Chen, et al., *Chilling Effects of Patent Trolls*, 52 Research Policy, Issue 3 (April 2023), available at https://doi.org/10.1016/j.respol.2022.104702).

reinforced in closing arguments by a skilled trial lawyer, can make a speculative damages theory sound plausible.

Most jurors rely on experts in their everyday lives, often without question (e.g., medical professionals). And nearly all jurors respect and defer to the trial judge. So, when a lengthy voir dire of a witness's qualifications and experience is followed by a proffer of the witness as an "expert" and the trial judge accepts that proffer, there is every likelihood that the average juror will be open to deferring to that witness's opinions without question.[4] Indeed, the Advisory Committee on Evidence Rules expressly recognized the concern that juries can be "overwhelmed by the so-called 'experts.'"[5] Rule 702 and the *Daubert/Kumho Tire* precedent should

---

[4]     *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993) ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.") (internal quotations omitted); *U.S. v. Amaral*, 488 F.2d 1148, 1152 (9th Cir. 1973) ("Scientific or expert testimony particularly courts the [danger of misleading the jury] because of its aura of special reliability and trustworthiness.").

[5]     Advisory Committee Note to 2000 Proposed Am. to Fed. R. Evid. 702 ("The use of the term 'expert' in the Rule does not, however, mean that a jury should actually be informed that a qualified witness is testifying as an 'expert.' Indeed, there is much to be said for a practice that prohibits the use of the term 'expert' by both the parties and the court at trial. Such a practice 'ensures that trial courts do not inadvertently put their stamp of authority' on a witness's opinion, and protects against the jury's being 'overwhelmed by the so-called 'experts'.'") (internal citations omitted). Here, the trial transcript reflects EcoFactor's voir dire and proffer, concluding with the district court judge stating that Mr. Kennedy will "be admitted as an expert." Transcript of Trial at 597:18–601:22, *EcoFactor, Inc. v. Google LLC*, No. 6:20-cv-00075 (W.D. Tex. Feb. 2, 2022), ECF No. 235. *Cf.* David E. Bernstein,

ensure that unreliable expert testimony not be allowed to do so.[6]

Similarly, this Court has recognized that the failure to exclude unreliable "expert" testimony risks skewing the jury's ability to properly assess damages. *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1228 (Fed. Cir. 2014) ("district courts must assess the extent to which the proffered testimony, evidence, and arguments would skew unfairly the jury's ability to apportion the damages to account only for the value attributable to the infringing features."). Once the cat is out of the bag, no cautionary jury instruction outlining rules of "apportionment," or "sufficient comparability" can adequately cure the admission of speculative testimony.

This risk of overvaluing a patent is amplified in cases in which an expert relies on "comparable" licenses of the patent owner, to support a "reasonable royalty" rate.

---

*Expert Witnesses, Adversarial Bias, and the (Partial) Failure of the Daubert Revolution*, 93 Iowa L. Rev. 451, 455 (2008) ("jurors may be particularly likely to assume that an expert witness, particularly a scientist, is an unbiased participant in the proceedings").

[6] W. William Hodes, *Navigating Some Deep and Troubled Jurisprudential Waters: Lawyer-Expert Witnesses and the Twin Dangers of Disguised Testimony and Disguised Advocacy*, 6 St. Mary's J. Legal Mal. & Ethics 180, 185 (2016), available at https://commons.stmarytx.edu/lmej/vol6/iss2/1/ ("ensuring expert witnesses, and the lawyers presenting their testimony, do not provide *illegitimate* help to jurors -- such as by cowing awestruck jurors into giving expert opinions more weight than they deserve -- is also an indispensable feature of the American adversary system and of adversary ethics.") (emphasis in original). *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (reiterating the importance of the gatekeeping role of judges).

These licenses are often lump-sum settlement agreements based on the cost of litigation and the risk of disproportionate damages, not either party's assessment of the value of a patent for a particular operating company.[7] These licenses then serve as a false benchmark in subsequent lawsuits, inappropriately amplifying the alleged value of the patented technology.[8] Indeed, if allowed to stand, the logic of the panel opinion would encourage future litigants to add nonbinding "whereas" clauses or other self-serving language about the nature of the royalty rate for the purpose of creating "admissible evidence" for future litigation, even when there is no non-hearsay evidence that the licensor paid such a rate.[9]

---

[7] Christopher S. Storm, *Measuring the Inventor's Contribution*, 21 U.N.H.L. Rev. 167, 207 (2022) (noting licenses are influenced by factors "having nothing to do with the value of the asserted patent"); *see ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010) (*citing Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078–79 (Fed. Cir. 1983) ("[S]ince the offers were made after the infringement had begun and litigation was threatened or probable, their terms should not be considered evidence of an 'established royalty,' since license fees negotiated in the face of a threat of high litigation costs may be strongly influenced by a desire to avoid full litigation.").)

[8] Mark A. Lemley & Carl Shapiro, *Patent Holdup and Royalty Stacking*, 85 Tex. L. Rev. 1991, 1996–99, 2021 (2007) ("[R]eliance on private license deals involves a degree of circularity because the royalty rates in those deals are themselves set as a function of what patentees could get if they went to court.").

[9] Lee & Lemley, *supra* note 2, at 299; *cf. Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 29–30 (Fed. Cir. 2012) (noting the "evidentiary value [of proposed licenses] is limited, however, by, *inter alia,* the fact that patentees could artificially inflate the royalty rate by making outrageous offers").

*Amici* encourage the en banc Court to clarify that, when evaluating expert testimony regarding allegedly comparable licenses, the trial judge must act as a gatekeeper. That means the trial judge should ensure that experts provide reliable, *quantitative* analyses, which may require the judge to engage in gatekeeping *factfinding*, rather than leaving that responsibility to the jury.

### A.    Gatekeeping Is Not Consistently Demanded by the Court

The *Daubert* standard is clear: the district court judge must assess whether the proposed testimony is relevant, "based on sufficient facts," and "is the product of reliable principles and methods." Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93 (1993). However, this Court's guidance has not consistently applied the standard when assessing the admissibility of testimony regarding "comparable" licenses.

This Court's decisions in *MLC*, *Whitserve*, and *Wordtech* all require an expert to show *how* a royalty rate is derived from a lump sum. *MLC*, 10 F.4th at 1368 (affirming exclusion where expert "did not provide mathematical analysis to derive the 0.25% royalty rate from the lump-sum"); *Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 30–33 (Fed. Cir. 2012) (excluding testimony where expert did not explain how lump sum could be converted to a rate*); Wordtech Sys., Inc v. Integrated Networks Sols., Inc*., 609 F.3d 1308, 1320–21 (Fed. Cir. 2010) (excluding lump sum licenses where the license failed to describe "how the parties calculated each lump

sum, the licensees' intended products, or how many products each licensee expected to produce"). Similarly, *Apple*, *MLC*, and *Omega* require an expert "account for" other patents in a portfolio when a "comparable" license is to a portfolio, and hold that not doing so would improperly "excuse" the patentee from apportionment. *EcoFactor, Inc. v. Google LLC*, 104 F.4th 243, 260–61 (Fed. Cir.), *reh'g en banc granted, opinion vacated,* 115 F.4th 1380 (Fed. Cir. 2024).

However, the panel majority decision cited to and relied on a different line of cases that appear to tolerate more lax gatekeeping.[10] *See Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1374–76 (Fed. Cir. 2020); *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312 (Fed. Cir. 2012). Based on this precedent, the panel majority permitted the expert's testimony because it was based on "admissible evidence" and the expert "accounted for" differences in the licenses by referring to vague, qualitative "pressures," *EcoFactor*, 104 F.4th at 255, that are

---

[10]    Albeit some of the opinions lack sufficient detail to fully assess whether those experts performed reliable, quantitative analyses to determine a royalty rate or adjust the rate to account for differences between the "comparable" licenses and the hypothetical negotiation licenses. *See EcoFactor, Inc. v. Google LLC*, 104 F.4th 243, 261 (Fed. Cir.), *reh'g en banc granted, opinion vacated,* 115 F.4th 1380 (Fed. Cir. 2024) (dissent noting that majority relies on party's *characterization* of ActiveVideo expert's work). Likewise, the parties in those cases may have waived certain arguments. *See*, *e.g*., *Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1374 (Fed. Cir. 2020) (noting appellant had not "sufficiently developed" certain arguments in its opening brief, and that its trial court *Daubert* motion "was directed to [the expert's] overall testimony, not to the exclusion of any one agreement").

common to many (if not all) cases with serially licensed patents, thereby failing the gatekeeping requirement.

### B. Gatekeeping For Assessing "Comparable" Licenses Should Require Reliable, *Quantitative* Analysis

The Court should rule *en banc* that trial judges cannot allow an expert to use vague "qualitative notions" or unquantified "upward" and "downward" "pressures" to account for the differences between an allegedly "comparable" license and the expert's proposed reasonable royalty rate. Rather, trial judges should consistently require an expert to quantify *how* a proffered reasonable royalty rate is derived from a "comparable" license, *and* quantitatively adjust for any differences between that "comparable" license and the hypothetical negotiation, including any adjustments needed to account for the apportionment mandate. Even if an expert opines that the rate is unchanged from the "comparable" license, they should show *how* any differences are accounted for and show (with math, not unquantified "up" and "down" arrows) how upward and downward adjustments are quantitatively equal. These quantitative analyses must use reliable methods and be based on sufficient facts that are tied to the case. *MLC*, 10 F.4th at 1367.

Here, the expert was allowed to testify that a particular per unit royalty rate was shown by the three "comparable" agreements without explaining *how* to reliably convert the lump sum amounts of those licenses or showing any licensor paid that rate. The expert admitted he did not do the math. Rather, Kennedy simply parroted

nonbinding hearsay assertions in the agreement preambles and his client's self-described "general" licensing policy that the lump sums were calculated based on a particular per unit royalty rate. *EcoFactor*, 104 F.4th at 252. The "expert" in such a case is not providing any real evidentiary value, but only adding the imprimatur of "expertise" to repeat and reinforce the self-serving statements. If experts opine on a conversion from a lump-sum to a per unit rate, they must demonstrate to the trial judge *how* the conversion was done, both describing the method and doing the math. Only then can the trial judge analyze whether the conversion resulted from a reliable method and is based on sufficient facts, as is required by Fed. R. Evid. 702 and *Daubert/Kumho Tire*.

Likewise, Kennedy failed to make any "adjustments" to the rate for admitted differences between the "comparable" licenses and the hypothetical negotiation; rather, he hand-waved that the "upward" and "downward" "pressures" offset, such that he just used the $X rate. *EcoFactor*, 104 F.4th at 256. But the "comparable" licenses differed from the hypothetical negotiation in at least two important ways: they licensed a patent portfolio (rather than the one patent claim at issue) and they licensed different products (and nothing in the panel opinion suggests Google's accused product had an identical feature set to those different products). Rule 702 and *Daubert/Kumho Tire* require quantitative adjustment, as this Court has noted, particularly when admitting expert testimony lacking such adjustments would allow

the patentee to evade the apportionment mandate[11]. *See Omega Pats., LLC v. CalAmp Corp.*, 13 F.4th 1361, 1376–77 (Fed. Cir. 2021); *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 971–74 (Fed. Cir. 2022).

Precedent suggesting that "mathematical precision" is not required in calculating patent damages does not negate the requirements of *Daubert*, *Kumho Tire*, and Rule 702, nor the need for an expert to do a *quantitative* analysis when adjusting for differences between the "comparable" license and the hypothetical negotiation. *Whitserve, LLC*, 694 F.3d at 31 (expert must show why "and generally to what extent" factors impact "the royalty calculation"). A realtor cannot justify pricing a one-bedroom condo in Georgetown based on a nine-bedroom home in Arlington, because a Georgetown address provides unquantified "upward pressure," and fewer bedrooms provide "downward pressure." Rather, while a realtor may not be able to provide "mathematical precision," the realtor will use reliable "comps" (e.g., a two-bedroom condo in Georgetown or a one-bedroom in Shaw) to recommend an offer or asking price, making specific quantitative adjustments to account for differences between the comps and the property for sale. Likewise, no

---

[11]    *Garretson v. Clark*, 111 U.S. 120, 121 (1884) ("in every case," the patentee must "give evidence tending to separate or apportion … between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative."); *VLSI Tech. LLC v. Intel Corp.*, 87 F.4th 1332, 1345 (Fed. Cir. 2023); *see also Brumfield, Tr. for Ascent Tr. v. IBG LLC*, 97 F.4th 854, 876–77 (Fed. Cir. 2024).

reliable economic theory suggests that vague reference to unquantified "pressures" is sufficient to establish a particular royalty from a "comparable" license.

Trial judges performing their gatekeeping duties, and requiring experts to do the math and show their work, will enhance predictability.

## C.    Gatekeeping *Factfinding* Cannot Be Shifted to the Jury

The admissibility of Kennedy's opinions under the Rule 702 criteria depended in part on assumptions of historical fact, namely 1) that the parties to the portfolio licenses had agreed to and applied a running $X/unit rate; and 2) that they had "settled on a royalty rate and royalty base combination embodying the value of the asserted patent" such that "principles of apportionment were effectively baked into the purportedly comparable license." *Omega,* 13 F.4th at 1377. If those factual assumptions were unsupported, then Kennedy's opinions were inadmissible for not being "based on sufficient facts or data," nor "the product of reliable principles and methods," nor "a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.

The majority opinion, however, citing a number of panel precedents[12], mistakenly shifted to the jury the preliminary factfinding required of the trial judge

---

[12]     *EcoFactor,* 104 F.4th at 255 (citing *Bio-Rad*, 967 F.3d at 1374 (holding that the "'degree of comparability' was appropriately left for the jury to decide"); *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012).)

under Rules 104(a) and 702: "The degree of comparability of license agreements is a 'factual issue[] best addressed by cross examination and not by exclusion,'" *EcoFactor*, 104 F.4th at 255, and "if there were any failures to control for certain variables in comparability, these factual issues were for the jury to decide," *id*. at 256. That was legal error. *Daubert* assigns such preliminary factual issues to the trial judge in determining admissibility under Rules 104(a) and 702. *See Daubert*, 509 U.S. at 592–93.

The Court should correct this error and rule *en banc* that trial judges must exclude any damages theory that relies upon a conversion from a lump-sum royalty to a running royalty, unless the trial judge finds under Rule 104(a) that more likely than not, there are sufficient facts to support a reliable method of conversion. Likewise, trial judges must exclude any damages theory that relies on built-in-apportionment, absent a finding under Rule 104(a) that more likely than not the prior license agreements' negotiators "settled on a royalty rate and royalty base combination embodying the value of the asserted patent" and "that 'principles of apportionment were effectively baked into' the purportedly comparable license." *Omega,* 13 F.4th at 1377 (citing *Vectura Ltd. v. Glaxosmithkline LLC*, 981 F.3d 1030, 1040–41 (Fed. Cir. 2020)). That these are facts an astute juror might also consider when weighing such testimony should it be admitted does not relieve the trial judge of their preliminary factfinding duty.

The majority opinion (and earlier panels on which it relied) erred by conflating this Rule 104(a) gatekeeping factfinding (for the trial judge) with adjudicative factfinding (for the jury). For example, it quoted the following statement of law applicable to adjudicative factfinding: "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a trial judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (addressing a trial judge's role on a Rule 50 motion for judgment) (internal citation omitted). *EcoFactor*, 104 F.4th at 257. But a trial judge's preliminary gatekeeping under Rules 104(a) and 702 necessarily requires these same factfinding functions.

Juries are not the only triers of fact in a jury trial. To ensure fair trials, free of speculation wrapped in the cloak of expertise, trial judges often must engage in preliminary factfinding to fulfill their *Daubert* gatekeeping role. *See generally* Fed. R. Evid. 104(a) ("The court must decide any preliminary questions about whether ... evidence is admissible."); Advisory Committee Note to 1972 Proposed Rule 104(a) ("To the extent that these inquiries are factual, the judge acts as a trier of fact."); *Daubert*, 509 U.S. at 592–93 ("the trial judge must determine at the outset, pursuant to Rule 104(a)" whether the expert's proposed testimony complies with Rule 702). When the trial judge then admits the expert's testimony, an astute juror might also consider the same criteria listed in Rule 702 as affecting the weight the juror gives

the testimony, but that possible overlap does not relieve the trial judge of their gatekeeping duty.

*Amici* and other businesses defending a patent-infringement action depend on the trial judge shielding the jury from illegitimate "expert" opinions inflating plaintiff damages demands. Here, the majority relieved the trial judge of that obligation. Neither the trial judge nor the panel majority opinion found the requisite historical facts to justify admission of *expert* testimony of a particular royalty rate (of $X/unit), such as that the parties to the portfolio license agreements likely had *agreed* to that rate. Rather, the Court allowed an individual who was credentialed and "admitted as an expert," to parrot self-serving, hearsay assertions made by EcoFactor during the litigation and included in nonbinding clauses of the agreement, perhaps at the urging of litigation counsel.

## III.   CONCLUSION

The panel dissent notes that, "[i]n recent years, our court has made some progress in clarifying important questions related to damages for patent infringement." *EcoFactor*, 104 F.4th at 257. *Amici* have welcomed that progress as it has enhanced predictability. But the progress has been uneven with cases such as *Bio-Rad*, 967 F.3d 1353, undermining predictability. The Court should clarify that at the gatekeeping stage, a trial judge must ensure that proffered testimony regarding "comparable" licenses be reliable and based on sufficient facts by ensuring that a

quantitative analysis be performed and that trial judges do not shift any gatekeeping factfinding duties to juries.

November 26, 2024

Respectfully submitted,

/s/ *Kristin L. Cleveland*
Kristin L. Cleveland
John D. Vandenberg
KLARQUIST SPARKMAN, LLP
121 SW Salmon Street, Suite 1600
Portland, OR 97204
(503) 595-5300
john.vandenberg@klarquist.com
kristin.cleveland@klarquist.com

*Counsel for Amici Curiae SAS Institute Inc., Symmetry, LLC, SAP America, Inc., Garmin International Inc., VIZIO, Inc., ACT | The App Association, Tesla, Inc., Software & Information Industry Association, and Red Hat, Inc.*

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☒ the filing has been prepared using a proportionally-spaced typeface and includes 3658 words, excluding items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

This brief complies with the typeface and style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E), 32(a)(5), and 32(a)(6) because this document has been prepared using Microsoft Office Word 365 and is set in Times New Roman font in a size equivalent to 14 points or larger.

November 26, 2024

/s/ *Kristin L. Cleveland*
Kristin L. Cleveland

*Counsel for Amici Curiae SAS Institute Inc., Symmetry, LLC, SAP America, Inc., Garmin International Inc., VIZIO, Inc., ACT | The App Association, Tesla, Inc., Software & Information Industry Association, and Red Hat, Inc.*