No. 2023-1101

IN THE

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔒𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

## FOR THE FEDERAL CIRCUIT

ECOFACTOR, INC.,

*Plaintiff-Appellee,*

v.

GOOGLE LLC,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of Texas
No. 6:20-cv-00075, Hon. Alan D. Albright

---

**BRIEF FOR INVENTORS DEFENSE ALLIANCE
AS AMICUS CURIAE IN SUPPORT OF NEITHER PARTY**

---

Swara Saraiya
MOLOLAMKEN LLP
430 Park Avenue, Floor 6
New York, NY 10022
(212) 607-8160

Jeffrey A. Lamken
  *Counsel of Record*
Lucas M. Walker
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
(202) 556-2000
jlamken@mololamken.com

*Counsel for Amicus Curiae Inventors Defense Alliance*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2023-1101 |
| **Short Case Caption** | EcoFactor, Inc. v. Google LLC |
| **Filing Party/Entity** | Inventors Defense Alliance |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 11/26/2024

Signature: /s/ Jeffrey A. Lamken

Name: Jeffrey A. Lamken

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Inventors Defense Alliance | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable    ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below)   ☐ No   ☑ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable    ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

Page

INTEREST OF AMICUS CURIAE ....................................................................1

INTRODUCTION .............................................................................................2

ARGUMENT .....................................................................................................7

I. Rule 702 Requires Reliability, Not Perfection—and Leaves
Resolution of Factual Disputes to Juries, Not Courts ..................................8

    A. Under Rule 702, District Courts Assess the Reliability of
Expert Opinions, Not Their Correctness.............................................8

    B. The District Court Properly Admitted EcoFactor's Expert
Testimony Assigning a Per-Unit Royalty Rate to the Johnson
License...............................................................................................10

        1. Mr. Kennedy's Assignment of a $X Per-Unit Rate to the
Johnson License Satisfied Rule 702 and *Daubert* ...................10

        2. Google's Suggestion that Mr. Kennedy Was Required To
Rely on Actual Sales Information Is Unfounded......................12

        3. Mr. Kennedy Permissibly Invoked the Johnson License's
Reference to the $X Per-Unit Rate ...........................................14

        4. Johnson's Email Confirming That It Applied the $X Per-
Unit Rate Further Supports Mr. Kennedy's Testimony—
Whether or Not Mr. Kennedy Considered the Email ...............16

        5. Mr. Kennedy Was Permitted To Rely on the Testimony
of EcoFactor's CEO.................................................................17

    C. EcoFactor's Expert Testimony Assigning a Per-Unit Royalty
Rate to the Schneider and Daikin Licenses Presents a Closer
Question.............................................................................................19

II. Other Issues Are Not Properly Before the En Banc Court...........................22

A.    This Court Limited En Banc Review to the Admissibility of Mr. Kennedy's Testimony Assigning a Per-Unit Royalty Rate to the Three Prior Lump-Sum Licenses ...................................................... 22

B.    Efforts by Google and Its Amici To Argue Issues Beyond the Scope of the En Banc Order Are "Inappropriate" and Should Be Rejected ................................................................................................ 24

CONCLUSION ....................................................................................... 29

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Apple Inc. v. Motorola, Inc.*,
   757 F.3d 1286 (Fed. Cir. 2014) ....................................................................9, 18

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)..........................................................................*passim*

*EcoFactor, Inc. v. Google LLC*,
   104 F.4th 243 (Fed. Cir. 2024) ...............................................................*passim*

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
   579 U.S. 93 (2016)..........................................................................23

*i4i Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010) ..................................................4, 10, 12

*Kirkendall v. Dep't of the Army*,
   479 F.3d 830 (Fed. Cir. 2007) (en banc) ...........................................6, 23, 24, 26

*LKQ Corp. v. GM Global Tech. Operations LLC*,
   71 F.4th 1383 (Fed. Cir. 2023) ...........................................................27

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009) ...............................................................3, 4, 13

*MLC Intellectual Property, LLC v. Micron Tech., Inc.*,
   10 F.4th 1358 (Fed. Cir. 2021) ...................................................................4

*In re Seagate Tech., LLC*,
   497 F.3d 1360 (Fed. Cir. 2007) (en banc) .........................................................23

*The Medicines Company v. Hospira, Inc.*,
   805 F.3d 1357 (Fed. Cir. 2015) ...................................................................27

*Whitserve, LLC v. Computer Packages, Inc.*,
   694 F.3d 10 (Fed. Cir. 2012) ...................................................................4

*WiFi One, LLC v. Broadcom Corp.*,
   851 F.3d 1241 (Fed. Cir. 2017) ...................................................................27

*Wordtech Systems, Inc. v. Integrated Networks Solutions, Inc.*,
  609 F.3d 1308 (Fed. Cir. 2010) ............................................................4

## RULES

Fed. Cir. R. 35(b)(2) (eff. Dec. 1, 2023).....................................................26

Fed. Cir. R. 40(c)(1) (eff. Dec. 1, 2024).....................................................26

Fed. R. App. P. 35(a) (eff. Dec. 1, 2023)....................................................26

Fed. R. App. P. 40(b)(2) (eff. Dec. 1, 2024)...............................................26

Fed. R. Civ. P. 26(a)(2)................................................................................16

Fed. R. Evid. 104(a).....................................................................................16

Fed. R. Evid. 602 .........................................................................................18

Fed. R. Evid. 702 ...................................................................................*passim*

Fed. R. Evid. 702(b)...............................................................................*passim*

Fed. R. Evid. 702(c).............................................................................4, 8, 11

Fed. R. Evid. 702(d)................................................................................4, 11

Fed. R. Evid. 703 .................................................................................16, 18

Fed. R. Evid. 705 .........................................................................................16

S. Ct. R. 37.1 ...............................................................................................27

## OTHER AUTHORITIES

30 Wright & Miller, *Federal Practice and Procedure* (2d ed.) ..............17

Fed. R. App. P. 29, advisory committee note to 1998 amendment ........27

Fed. R. Evid. 702, advisory committee note to 2000 amendment............9

Fed. R. Evid. 702, advisory committee note to 2023 amendment.........9, 10, 14

A nonpartisan, nonprofit advocacy organization, the Inventors Defense Alliance recognizes that intellectual property is critical to the U.S. economy and supports American inventors' access to justice. The IDA is led by patent experts, including former judicial and executive officials, legal scholars, and inventors.

Innovators create enormous value for the American economy. But they can face significant obstacles enforcing their intellectual-property rights against deep-pocketed adversaries. All too often, small businesses, startups, and entrepreneurs are the victims of patent infringement by large companies. One of the IDA's chief objectives is to level the playing field by ensuring that patent owners have access to the resources needed to vindicate their rights—including capital to fund the steep legal bills associated with patent enforcement.

The IDA has a strong interest in the proper application of standards for admissibility of patent damages experts. The potential compensation patentees may obtain through a damages verdict is crucial to ensuring that patentees can pursue their rights and obtain the funding necessary to do so. It is thus essential that admissibility thresholds for damages experts properly reflect the standard set by Rule 702 and *Daubert*. Overly rigid admissibility standards are not merely

---

[1] No one, other than amicus and its counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief, in whole or part. The Court has authorized amicus briefs in this case without consent or leave of Court.

inconsistent with governing law. They also create needless unpredictability about whether damages testimony will be admitted at trial and whether jury verdicts will be upheld on appeal. All that increases litigation expenses, sows uncertainty, and impedes innovators' access to the resources they need to vindicate their intellectual-property rights.

But Rule 702 and *Daubert* reflect a balance. While neither sets a high bar for admissibility, that does not mean all expert testimony passes muster. Despite the balance the rules and precedent draw, the parties before this Court stake out stark, black-and-white positions: Google argues that *none* of the expert testimony at issue was admissible, while EcoFactor maintains that *all* of it was admissible. The IDA believes the correct answer lies somewhere in the middle: The expert testimony assigning a per-unit rate to EcoFactor's prior license with Johnson was plainly admissible, while the expert testimony assigning a per-unit rate to the other two licenses likely was not. Thus, while the Court should reject demands to ratchet up admissibility standards, it may be that some of the expert testimony at issue here was inadmissible under existing standards.

## INTRODUCTION

This Court granted en banc review on a single, narrow but recurring issue in patent cases: the admissibility of "testimony from [a] damages expert assigning a

per-unit royalty rate to [prior lump-sum] licenses" for purposes of the expert's reasonable-royalty analysis.   ECF #76 at 2-3.

Not every patent case presents that issue.   Patent damages can take many forms, including "the patentee's lost profits" or a "reasonable royalty." *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).   Reasonable royalties also can be calculated in many ways.   Experts might use an "analytical method" that evaluates the benefit of the invention and allocates the resulting "projections of profit for the infringing product" " 'between the patent owner and the infringer.' " *Id.*   Or experts may employ a "hypothetical negotiation" that estimates "the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Id.*   The hypothetical-negotiation approach, in turn, may consider any number of factors, including prior "comparable licenses" covering similar technology. *See id.* at 1325-26.   Prior licenses may take various forms, including (1) "lump sum" payments, and (2) "running royalties" assessed as either (a) "per-unit" charges or (b) a "percentage" of revenues from licensed products. *See id.* at 1326-27, 1330.   And the royalty the plaintiff seeks from the defendant may take any of those forms—even if prior licenses followed another approach. *See id.*

This case thus involves just one of myriad scenarios that may arise in connection with patent damages: A plaintiff whose expert seeks to rely on prior

*lump-sum* licenses to support a proposed *per-unit running royalty* under the hypothetical-negotiation approach. While discrete, that situation recurs with some frequency and has been addressed by this Court on several occasions. *See Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 30 (Fed. Cir. 2012); *MLC Intellectual Property, LLC v. Micron Technology, Inc.*, 10 F.4th 1358, 1368 (Fed. Cir. 2021); *cf. Lucent*, 580 F.3d at 1329-31 (prior per-unit and percentage running-royalty licenses offered to support lump-sum reasonable royalty); *Wordtech Systems, Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1319-20 (Fed. Cir. 2010) (similar). In that situation, this Court requires some explanation of "how those [lump-sum] payments could be converted to a [per-unit] royalty rate" that provides a starting point for the expert's analysis. *Whitserve*, 694 F.3d at 30.

Under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), such expert testimony is admissible where the proponent shows the testimony is "reliable" and "based on sufficient facts or data." Fed. R. Evid. 702(b)-(d). An expert thus cannot simply assign a corresponding per-unit rate by whim or blatant manipulation. "*Daubert* and Rule 702," however, are only "safeguards against unreliable or irrelevant opinions, *not guarantees of correctness*." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 854 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011) (emphasis added). The proper inquiry, then, is not whether the district court agrees with the expert's conclusions. It is not even whether the

4

court agrees with the *facts* underlying those conclusions.  It is simply whether a reasonable mind considering the relevant facts and data *could reach* the expert's conclusions.  Once that threshold is cleared, the district court's gatekeeping role is complete, and remaining "[q]uestions about what facts are *most* relevant or reliable to calculating a reasonable royalty are for the jury."  *Id.* at 856 (emphasis added). *Daubert* makes that clear: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof"—not overzealous exclusion at the threshold—"are the traditional and appropriate means of attacking shaky but admissible evidence."  509 U.S. at 596.

Here, EcoFactor's damages expert, Mr. Kennedy, invoked three of Eco-Factor's prior lump-sum licenses to support his proposed per-unit royalty in this case.  As the starting point for his analysis, Mr. Kennedy assigned each of the three prior *lump-sum* licenses a *per-unit* rate of $X per unit.[2]  As discussed below, that testimony easily satisfied Rule 702 and *Daubert* with respect to one of those licenses: The Johnson license specifically referred to the $X/unit rate; EcoFactor's CEO testified to that rate at trial; and an email from Johnson confirmed that it used the $X/unit rate to calculate the lump sum.  That plainly was sufficient for a reasonable mind to assign an $X per-unit rate to the lump-sum Johnson license.

---

[2] The per-unit rate is confidential.  Like the panel, this brief refers to that rate as "$X."  *EcoFactor, Inc. v. Google LLC*, 104 F.4th 243, 251 & n.4 (Fed. Cir. 2024).

Google's objections to that conclusion are fodder for cross-examination and presentation of contrary evidence, not exclusion of Mr. Kennedy's testimony.

The other two licenses—issued to Schneider and Daikin—present closer questions. Unlike the Johnson license, those licenses include operative clauses stating that the lump sum does *not* reflect a per-unit royalty or the licensee's sales. Given the contracting parties' *disclaimer* of a per-unit royalty in the license itself, and the apparent absence of any contradictory evidence, it is hard to view those licenses as reflecting an implicit per-unit rate. Consequently, there may *not* be sufficient facts and data to support assigning a $X per-unit rate to the Schneider and Daikin licenses.

That is enough to resolve the sole question on which this Court granted en banc review. The Court specifically "limited" its en banc review to Mr. Kennedy's "assign[ment of] a per-unit royalty rate to the three licenses in evidence." ECF #76 at 2-3. Google's en banc brief nonetheless asks the Court to go further and address other aspects of Mr. Kennedy's analysis. But this Court has made clear that it is "inappropriate" for parties to "reargue" in their en banc briefs issues on which the Court "did not grant rehearing." *Kirkendall v. Dep't of the Army*, 479 F.3d 830, 835 n.2 (Fed. Cir. 2007) (en banc). Rightly so: By identifying the specific questions the Court will consider en banc, this Court's en banc orders give potentially interested persons crucial notice of the decision's potential scope and effect. If parties (or their amici) could inject issues beyond the scope of the en banc order, that notice would

be thwarted—especially where, as here, those issues have far broader implications for patent law. Attempts by Google or its amici to stray beyond the narrow issue identified in the en banc order should be rejected.

## **ARGUMENT**

This Court granted en banc review on a single, narrow question: whether the district court permissibly admitted Mr. Kennedy's expert testimony assigning a per-unit royalty rate to three prior lump-sum licenses. ECF #76 at 2-3. In deciding that question, the Court should be guided by sound principles: Rule 702 and *Daubert* allow courts to assess whether expert testimony is *reliable*, not whether it is *correct*; and disputes about facts underlying expert opinions are properly resolved by juries, not courts.

Those principles support the admission of some, though perhaps not all, of Mr. Kennedy's testimony assigning a per-unit rate to the prior licenses. However this Court resolves the question on which it granted rehearing, the Court should decline invitations from Google and its amici to expand these en banc proceedings to issues beyond the scope of the Court's en banc order. This Court's precedents forbid such efforts to inappropriately expand the questions before the Court, with good reason.

## I. RULE 702 REQUIRES RELIABILITY, NOT PERFECTION—AND LEAVES RESOLUTION OF FACTUAL DISPUTES TO JURIES, NOT COURTS

### A. Under Rule 702, District Courts Assess the Reliability of Expert Opinions, Not Their Correctness

Under Rule 702, expert testimony is admissible where "the proponent demonstrates to the court that it is more likely than not that" (among other things) the expert's testimony is "based on sufficient facts or data" and "the product of reliable principles and methods." Fed. R. Evid. 702(b)-(c). While Rule 702 makes the district court the gatekeeper for expert testimony, it also limits the court's role to ensure it does not improperly intrude on the jury's constitutionally protected fact-finding role.

For example, while Rule 702 directs the district court to apply a preponderance-of-the-evidence ("more likely than not") standard, that standard applies only to *whether the Rule's admissibility requirements are satisfied*. It thus tasks the district court with deciding whether the expert's testimony is likely *reliable*, but not whether that testimony—or the facts underlying it—is likely *correct*. The Rules Advisory Committee has made that clear:

> "[P]roponents 'do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are *correct*, they only have to demonstrate by a preponderance of the evidence that their opinions are *reliable*. . . . The evidentiary requirement of reliability is lower than the merits standard of correctness.'"

Fed. R. Evid. 702, advisory committee note to 2023 amendment (quoting Fed. R. Evid. 702, advisory committee note to 2000 amendment) (emphasis added).

The Advisory Committee has likewise explained that, where expert opinions are "based on contested sets of facts," underlying factual disputes generally should be resolved by the jury at trial, not by the court at the threshold. Fed. R. Evid. 702, advisory committee note to 2023 amendment. "[B]y deciding the disputed facts, *the jury* can decide which side's experts to credit." *Id.* (emphasis added). Amicus Lawyers for Civil Justice thus errs when it accuses this Court of having failed to "adhere to the requirements of Rule 702" in ruling that " 'the soundness of the factual underpinnings of the expert's analysis . . . [is a] factual matter[ ] to be determined by the trier of fact.' " LCJ Pet.-Stage Br. 9 (ECF #69) (quoting *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286 (Fed. Cir. 2014)). As the Advisory Committee has made clear, that is exactly the approach Rule 702 calls for.

The requirement that expert testimony be "based on sufficient facts or data," Fed. R. Evid. 702(b), reinforces the point. That simply requires facts or data sufficient for a reasonable mind to reach the expert's conclusion, not facts or data that convince the district court the expert is correct. What facts or data are "sufficient," moreover, necessarily depends on the conclusions and methodology at issue. For example, when assigning a particular per-unit rate to a prior lump-sum license, it can be "sufficient" to point to evidence that the licensing parties in fact used that rate to

determine the lump sum.  But if the expert takes a different approach to assigning a per-unit rate—such as dividing the lump sum by the number of licensed items sold—different facts or data (*e.g.*, sales projections at the time of the negotiation) may be needed to hit the "sufficien[cy]" mark.

Importantly, Rule 702 "does not require perfection" or ask "the court to nitpick an expert's opinion."  Fed. R. Evid. 702, advisory committee note to 2023 amendment.  So long as the facts or data supporting an expert's testimony "meet the minimum standards of relevance [and] reliability," it does not matter for admissibility purposes whether those facts or data are "imperfect," or whether "more (or different) data might have resulted in a 'better' or more 'accurate' estimate."  *i4i*, 598 F.3d at 855-56.  As the Supreme Court explained in *Daubert*, expert testimony can be "shaky but [still] admissible."  509 U.S. at 596.  "Vigorous cross-examination," not exclusion, is the proper vehicle for challenging such testimony.  *Id.*

### B.  The District Court Properly Admitted EcoFactor's Expert Testimony Assigning a Per-Unit Royalty Rate to the Johnson License

#### 1.  *Mr. Kennedy's Assignment of a $X Per-Unit Rate to the Johnson License Satisfied Rule 702 and Daubert*

The district court properly allowed Mr. Kennedy to testify that EcoFactor's license with Johnson Controls reflected an $X per-unit royalty.  As Mr. Kennedy noted, that rate was "'specifically spelled out in the license agreement[].'"  *EcoFactor, Inc. v. Google LLC*, 104 F.4th 243, 252 (Fed. Cir. 2024) (quoting Appx5764

(628:2-3), Appx10411). In particular, the agreement "provided in a 'whereas clause' that the licensee would pay EcoFactor a lump sum amount 'set forth in this Agreement *based on* what EcoFactor believes is a reasonable royalty calculation of *[$X] per-unit* for . . . estimated past and [ ] projected future sales of products accused of infringement.'" *Id.* (quoting Appx10411) (emphasis by the panel). That conclusion was supported by testimony from EcoFactor's CEO, Shayan Habib, who signed the agreement on behalf of EcoFactor and testified about his understanding that the $X per-unit rate was used to calculate the lump sum. 104 F.4th at 252-53. Perhaps most notably, Johnson itself stated, in an email chain admitted at trial, that it was "'applying the [$X rate] to the time period' identified by EcoFactor." *Id.* at 253 (quoting Appx10798).

That evidence plainly constituted "sufficient facts or data" to support Mr. Kennedy's assignment of a $X per-unit rate to the Johnson license. Fed. R. Evid. 702(b). And assigning a per-unit rate to a prior license based on such considerations—the terms of the license, testimony from an executive who oversaw negotiations and signed the license, and the licensee's statement that it applied the stated rate—is a sufficiently "reliable" way of tackling the question. Fed. R. Evid 702(c)-(d). Certainly the district court did not clearly err or abuse its discretion in so finding.

2.   *Google's Suggestion that Mr. Kennedy Was Required To Rely on Actual Sales Information Is Unfounded*

Google suggests that Mr. Kennedy could not reliably assign a per-unit rate to prior lump-sum licenses unless he divided the total lump sum by the licensee's actual or projected sales of covered products.  Google En Banc Br. 27-29 (ECF #84).  It faults Mr. Kennedy for not "verifying the rate using actual sales information," and asserts that "the absence of sales data *precludes* converting the lump-sum amounts to *any* per-unit rates."  *Id.* at 27-28 & n.7 (emphasis added); *see id.* at 29-30 ("Kennedy did not possess any actual or estimated sales data that would have enabled him to verify whether the lump-sum payment amounts were calculated using the [$X] rate"); *id.* at 31-32 (Kennedy "provided no mathematical analysis supporting the [$X] royalty rate").

Nothing in Rule 702 or *Daubert* required Mr. Kennedy to follow Google's preferred approach.  An expert *could* assign a per-unit rate to a prior lump-sum license by dividing the lump sum by projected sales.  But that is hardly the only permissible way to do so.  Here, Mr. Kennedy relied on evidence that the parties to the prior license *actually used* the $X per-unit rate to determine the lump-sum amount.  If anything, that would seem to be even *more* reliable than the post-hoc analysis—potentially based on actual sales the parties never anticipated—Google envisions.  At the very least, it "meet[s] the minimum standards of relevance [and] reliability" set by Rule 702 and *Daubert*.  *i4i*, 598 F.3d at 855-56.  Complaints that

EcoFactor's "expert could have used other data in his calculations" are no basis for excluding his testimony. *Id.* at 855.

Google insists that "basic arithmetic shows that the license parties did not calculate the round lump-sum amounts based on the [$X] rate" because, if they had, the "lump-sum amounts would have been more granular, down to the cent." Google En Banc Br. 28 n.7. That defies common sense. When negotiating licenses, especially those covering future sales, licensing parties necessarily operate against a backdrop of uncertainty and use *estimates* of expected sales. Given the uncertainty, licensing parties commonly agree to a round number for the final lump-sum amount. That does not mean they did not use the identified per-unit rate to determine the lump sum. It simply means they did not insist on artificial precision, "down to the cent," for a lump-sum royalty that necessarily rests on approximation. That is entirely consistent with this Court's precedent, which recognizes that "any reasonable royalty analysis 'necessarily involves an element of approximation and uncertainty.'" *Lucent*, 580 F.3d at 1325.

Google's demand that damages experts use "actual sales information" when converting prior lump-sum licenses to per-unit rates, Google En Banc Br. 27-30 & n.7, would impair accuracy and impose needless burdens on patent owners. When negotiating licenses, licensees may be reluctant to divulge specific sales numbers and projections to licensors (who might be their competitors), especially if that could

lead to the figures being disclosed to other entities the licensor later sues for infringement (who also could be the licensee's competitors). Even where licensees do share sales figures, they may insist that access be limited to the licensor's outside counsel, as Johnson appears to have done here. *See* EcoFactor Response/Reply Br. 6-7, 18 n.7 (ECF #10). Either way, it can be prohibitive for the licensor to obtain sales data for its damages expert to use in a later infringement action. Those problems can be mitigated—for licensee and licensor alike—by agreeing to calculate the lump sum using a per-unit rate, but without divulging specific sales data. Nothing supports reading Rule 702 or *Daubert* to frustrate that commonsense approach.[3]

### 3. *Mr. Kennedy Permissibly Invoked the Johnson License's Reference to the $X Per-Unit Rate*

That leaves Google to insist that the lump sum in the Johnson license was not *in fact* based on the $X per-unit rate. But such factual disputes are not proper grounds for exclusion. Where "experts come to different conclusions based on contested sets of facts," the Rules of Evidence do "not necessarily require exclusion of either side's experts. Rather, by deciding the disputed facts, *the jury* can decide which side's expert to credit. . . . 'The evidentiary requirement of reliability is lower than the merits standard of correctness.'" Fed. R. Evid. 702, advisory committee

---

[3] Knowing a lump sum, and the per-unit royalty used to calculate it, of course gives a general sense of total estimated sales. But it does not reveal other potentially sensitive information, such as breakdowns between *past* and *projected* sales, or between different *models* of covered products.

note to 2023 amendment (emphasis added). So long as there are "sufficient facts or data" to support the factual underpinnings of an expert's testimony, disputes over the *correctness* of those facts are properly resolved by juries, not courts. Fed. R. Evid. 702(b). Here, a jury plainly could agree with Mr. Kennedy's assignment of a $X per-unit rate to the Johnson license. Google does not come close to showing otherwise.

For example, Google criticizes Mr. Kennedy's reliance on the clause in the Johnson license where Ecofactor "'agreed to the payment set forth in this Agreement based on what Ecofactor believes is a reasonable royalty calculation of [$X] per-unit for estimated past and . . . projected future sales.'" Google En Banc Br. 26; *see* Appx10411. In Google's view, that clause cannot support Mr. Kennedy's testimony because it merely expresses *EcoFactor's belief* that the lump sum was based on an $X per-unit rate. Google En Banc Br. 26. That interpretation is doubtful; on its face, the clause appears to express EcoFactor's belief about the royalty's "reasonable-[ness]," not its basis. But even on Google's reading, the clause is hardly irrelevant. When one contracting party states in the license itself that it understands the lump sum to be based on a particular per-unit rate, and the other party says nothing to the contrary, that tends to support a conclusion that the lump sum was in fact based on that rate. If Google thinks that conclusion is "shaky," the proper way to challenge it

is by "[v]igorous cross-examination" and "presentation of contrary evidence"—not exclusion. *Daubert*, 509 U.S. at 596.

> 4. *Johnson's Email Confirming That It Applied the $X Per-Unit Rate Further Supports Mr. Kennedy's Testimony—Whether or Not Mr. Kennedy Considered the Email*

EcoFactor also introduced at trial an email where *Johnson itself* said it was "'applying the [$X rate].'" 104 F.4th at 253 (quoting Appx10798). That amply supports Mr. Kennedy's assignment of the $X per-unit rate to the Johnson license. Yet Google's en banc brief never mentions it.

The panel dissent dismissed the email because "Mr. Kennedy never discussed this email" at trial. 104 F.4th at 259 (Prost, J., dissenting in part). But whether an expert's "testimony is based on sufficient facts or data," Fed. R. Evid. 702(b), is not determined solely by what he discusses before the jury at trial. An expert is permitted to state his opinion at trial "without first testifying to the underlying facts or data." Fed. R. Evid. 705. Indeed, an expert is sometimes forbidden to "disclose [supporting facts or data] to the jury." Fed. R. Evid. 703. When deciding the *admissibility* of an expert's testimony, a district court properly considers *all* the facts and data the expert considered, as reflected in his expert report—whether or not he discusses them all at trial. *See* Fed. R. Evid. 104(a); Fed. R. Civ. P. 26(a)(2). And while Mr. Kennedy's expert report is sealed, it appears from EcoFactor's response brief and briefing below that his report did invoke the email in question. *See* ECF

#10 at 18 n.3; *EcoFactor, Inc. v. Google LLC*, No. 6:20-cv-00075 (W.D. Tex.), Dkt. 137 at 3, 9.

Even if Mr. Kennedy had not considered the email, that would not be fatal. An expert can "*assume* the facts [underlying his testimony] to be true" where there is otherwise "evidence in the record that would support each of those facts." 30 Wright & Miller, *Federal Practice and Procedure* § 6665 (2d ed.) (emphasis added). In that situation, "[t]he judge does not determine if those facts are true; rather the judge simply decides whether a reasonable jury could find them based on the evidentiary record." *Id.* Here, the email stating that Johnson "'appl[ied the [$X rate]'" was admitted at trial. 104 F.4th at 253 (quoting Appx10798). Given that, a reasonable jury plainly could find that Johnson in fact applied that rate.

5.    *Mr. Kennedy Was Permitted To Rely on the Testimony of EcoFactor's CEO*

Mr. Kennedy was also permitted to rely on the testimony of EcoFactor's CEO, Mr. Habib, regarding the Johnson license's use of the $X per-unit rate. Mr. Habib was involved in negotiating the license, signed it on behalf of EcoFactor, and expressed his understanding that the lump sum was calculated using the $X per-unit rate. 104 F.4th at 252-53. Testimony from executives involved in negotiating prior licenses is highly probative of how those licenses' royalties were determined. The notion that damages experts cannot rely on such testimony is unfathomable. It should be soundly rejected.

Google attacks Mr. Habib's testimony as "self-serving." Google En Banc Br. 27, 34. Similarly, Google's amicus US*MADE asserts that expert testimony based on supposedly "biased" and "self-interested data" from a party's CEO is inherently "not reliable" and must be "excluded." US*MADE Pet.-Stage Br. 3-6 (ECF #51). But whether potential self-interest or bias undermines a witness's testimony is a classic *credibility* question properly left to the jury. The Federal Rules of Evidence do "not predicate admissibility on the source of the facts or data or, in particular, on whether the source is employed by either of the parties." *Apple*, 757 F.3d at 1320-22 (holding that exclusion of Apple's damages expert because the expert relied on an Apple-employed source was "unreasonable and contrary to Rules 702 and 703 and controlling precedent"). If a jury could permissibly credit Mr. Habib's testimony, so could Mr. Kennedy.

Google also insists Mr. Habib's testimony was "unsupported." Google En Banc Br. 34. Of course, if Mr. Habib lacked sufficient information to support his testimony, neither the jury nor Mr. Kennedy could reasonably credit that testimony. *Cf.* Fed. R. Evid. 602. But Mr. Habib testified to a simple question of historical fact: whether the Johnson license's lump sum was determined using the $X per-unit rate. Given his role in negotiating the license, Mr. Habib was well-positioned to speak to that question. Even if he never saw Johnson's "sales information," Google En Banc Br. 28, that would not prevent him from knowing whether EcoFactor's attorneys—

who apparently "did access such data in calculating the lump sums"—relied on the $X per-unit rate, EcoFactor Response/Reply Br. 18 n.3.

Google's position defies how licensing works in the real world. Licensor executives like Mr. Habib often lack personal access to licensees' sales data. But that does not mean those executives cannot competently speak to other aspects of the license, including whether negotiators under their direction were tasked with using a particular per-unit rate to determine a lump-sum royalty. Nor does it mean that damages experts cannot rely on those executives to inform their own testimony. Google's contrary position would raise arbitrary barriers to expert testimony and needlessly hinder patent owners' ability to vindicate their rights in court. It asks this Court to replace the current standard with one that lacks any basis in Rule 702 or *Daubert*, and would be virtually impossible for patent owners to meet. The Court should reject that plea.

### C. EcoFactor's Expert Testimony Assigning a Per-Unit Royalty Rate to the Schneider and Daikin Licenses Presents a Closer Question

The Schneider and Daikin licenses present a closer question. Like the Johnson license, those licenses included EcoFactor's representation that the "lump sum amount 'set forth in this Agreement [is] based on what EcoFactor believes is a reasonable royalty calculation of [$X] per unit.'" 104 F.4th at 252 (quoting Appx10389, Appx10400) (emphasis omitted). *Unlike* the Johnson license, however, the Schneider and Daikin licenses each included an operative clause—agreed to by

both licensing parties—stating that the license's lump-sum payment "'is *not* based upon sales and does *not* reflect or constitute a royalty.'" *Id.* at 258 (Prost, J., dissenting in part) (quoting Appx10402, Appx10391) (emphasis altered). And *unlike* with the Johnson license, the parties do not invoke contemporaneous emails or documents showing that the licensee used the $X per-unit rate to calculate the lump sum.

In those circumstances, Mr. Kennedy's assignment of a $X per-unit rate to the Schneider and Daikin licenses may indeed be unreliable and unsupported by sufficient facts or data. Whereas nothing in the Johnson license contradicted its recitation of the $X per-unit rate (and other evidence reinforced that rate), in the Schneider and Daikin licenses the parties appear to have *expressly and jointly disclaimed* applying a per-unit royalty rate to estimated sales. Mr. Kennedy thus could not rely on the license terms themselves to assign a $X per-unit rate to the Schneider and Daikin licenses based on the face of the licenses alone.[4]

To be clear, such a disclaimer does not necessarily foreclose assigning a per-unit rate to a lump-sum license. Even where a license purports not to rely on a stated per-unit rate, a party might be able to produce evidence showing that the lump-sum amount was *in fact* calculated using that per-unit rate. For example, a licensee might

---

[4] The panel majority suggested that the disclaimer "does not mean the parties did not *use* the $X royalty rate discussed in the agreements to arrive at the lump sum amount." 104 F.4th at 254 n.6 (emphasis added). But the disclaimer's statement that the lump sum "does not reflect" a per-unit royalty and "is not based upon sales" appears to say precisely that.

insist on including a disclaimer like the one in the Schneider and Daikin licenses (perhaps in an effort to avoid having a per-unit rate used against it in other litigation). But if contemporaneous emails, historical and forecasted sales, or other evidence indicates that the license's lump-sum royalty *actually was* determined by applying a particular per-unit rate, that would provide a sufficient and reliable basis for an expert to disregard the disclaimer and assign that per-unit rate to the license.

Whether such evidence exists in this case is not apparent from the publicly available record. Because Mr. Kennedy's expert report and Mr. Kennedy's and Mr. Habib's testimony are sealed, the IDA does not know what, if anything, they had to say about the Schneider and Daikin disclaimers. It is conceivable that Mr. Kennedy's report or testimony identifies evidence that the Schneider or Daikin lump sums were based on the $X per-unit rate *despite* the disclaimers. Likewise, it is conceivable that Mr. Habib could adequately explain his reasons for believing the Schneider and Daikin licenses' lump sums were based on the $X per-unit rate, *despite* having agreed to the contrary disclaimers when he signed those licenses. If so, Mr. Kennedy's testimony assigning the $X per-unit rate to those two licenses was sufficiently supported and reliable, and thus properly admitted. If not, that testimony should have been excluded. The IDA takes no position on that question.

The IDA likewise takes no position on whether any error in admitting Mr. Kennedy's testimony on the Schneider and Daikin licenses was harmless. The IDA

simply observes that, although Google asserts prejudice, Google En Banc Br. 35, it does not address the panel's observations that "the Johnson license agreement alone would suffice," and that this Court's damages precedent "does not demand 'absolute precision'" but rather tolerates "some degree of approximation and uncertainty," 104 F.4th at 254 n.6.

## II. OTHER ISSUES ARE NOT PROPERLY BEFORE THE EN BANC COURT

### A. This Court Limited En Banc Review to the Admissibility of Mr. Kennedy's Testimony Assigning a Per-Unit Royalty Rate to the Three Prior Lump-Sum Licenses

In seeking rehearing en banc, Google and its amici asked this Court to address a host of issues. In addition to challenging Mr. Kennedy's assignment of a $X per-unit royalty rate to the three prior lump-sum licenses, *see* Google Reh'g Pet. 16-21 (ECF #28), Google's rehearing petition also argued that Mr. Kennedy failed to apportion and account for differences between the prior licenses and this case, *see id.* at 6-16. Google's petition-stage amici went further still, urging the Court to reconsider vast swathes of its patent damages precedent. *See* ECF #58 at 4, 9-13 (Dell and Intel); ECF #60 at 3-9 (Apple). Cisco, for example, urged sweeping rules that would drastically restrict consideration of "settlement licenses" and "internal profit data" in damages analysis. ECF #59 at 5-6, 7-8.

This Court declined to take any of those additional issues en banc. The order granting rehearing expressly "limited" further briefing—and thus the scope of en

banc review—to a single, narrow issue: "the district court's adherence to Federal Rule of Evidence 702 and *Daubert* . . . in its allowance of testimony from Eco-Factor's damages expert *assigning a per-unit royalty rate to the three licenses in evidence* in this case." ECF #76 at 2-3 (emphasis added). "As a general rule, the scope of [this Court's] *en banc* review is limited to the issues set out in the *en banc* order." *Kirkendall*, 479 F.3d at 835 n.2 (en banc).

The other issues Google and its amici raised at the petition stage—such as apportionment—thus are not properly before the en banc Court. Because the en banc order "do[es] not encompass" such questions, the Court should "not address" them. *In re Seagate Tech., LLC*, 497 F.3d 1360, 1366 n.2 (Fed. Cir. 2007) (en banc), *abrogated on other grounds by Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93 (2016); *see Kirkendall*, 479 F.3d at 835 n.2.[5] As this Court has recognized, it is "inappropriate" for litigants to go beyond the en banc order by "reargu[ing]" issues on which the Court "did not grant rehearing." *Kirkendall*, 479 F.3d at 835 n.2.

---

[5] In *Kirkendall*, the en banc Court addressed an argument outside the scope of the en banc order solely "because [it] call[ed] into question [the Court's] jurisdiction over" the issues on which it granted en banc review. 479 F.3d at 835 n.2. Nothing like that exists here. Even in *Kirkendall*, the Court made clear it was "inappropriate for [a party] to reargue" an issue outside the scope of the en banc order. *Id.*

**B.    Efforts by Google and Its Amici To Argue Issues Beyond the Scope of the En Banc Order Are "Inappropriate" and Should Be Rejected**

Despite the clear terms of this Court's en banc order, Google devotes 18 pages of its en banc brief to an issue on which the Court did *not* grant further review: whether, *after* assigning a per-unit royalty rate to the three prior licenses, Mr. Kennedy *then* properly apportioned and accounted for differences between those prior licenses and the hypothetical license at issue here. *See* Google En Banc Br. 41-58. Google's effort to "reargue" an issue on which the Court "did not grant rehearing" is "inappropriate" and should not be entertained. *Kirkendall*, 479 F.3d at 835 n.2.

1.    Recognizing that problem, Google protests that the Court's en banc order is "ambiguous" and that "Google interprets the order" to encompass Mr. Kennedy's analysis *after* assigning a per-unit rate to the three prior licenses. Google En Banc Br. 2, 42 n.11. That is not a credible reading of the en banc order. By its terms, the en banc order is "limited" to a particular issue: the admissibility of Mr. Kennedy's testimony "assigning *a per-unit royalty rate to the three licenses in evidence* in this case"—that is, his testimony assigning a $X per-unit rate to EcoFactor's lump-sum licenses to Johnson, Schneider, and Daikin. ECF #76 at 2-3 (emphasis added). The order does not extend to any *other* aspect of Mr. Kennedy's damages analysis, such as accounting for differences between those licenses and this case, or apportioning the rates from those licenses down to the inventions asserted here.

Google's en banc petition and the panel proceedings make that especially clear. In its petition, Google asked this Court to review what it described as two "independent" issues, ECF #28 at 16: (I) Mr. Kennedy's alleged "failure to apportion" and "account for" differences between prior licenses and this case, *id.* at 6-16, and (II) Mr. Kennedy's allegedly inadequate basis for testifying that "the lump sum licenses were calculated using the [$X per unit] royalty rate," *id.* at 16-21. Google's description of the panel decision likewise identified those as separate issues. *Id.* at 5. The panel majority treated them separately, in different sections of its opinion. *See* 104 F.4th at 252-54 (Section III.A, addressing Mr. Kennedy's assignment of the $X per-unit rate to the three prior licenses); *id.* at 254-56 (Section III.B, addressing whether Mr. Kennedy adequately apportioned and accounted for differences). So did the panel dissent. *See id.* at 257, 257-60, 260-62 (Prost, J., dissenting in part) (addressing whether Mr. Kennedy reliably "calculated an $X royalty rate from the Schneider, Daikin, and Johnson lump-sum licenses" in Section I, and whether his proposed royalty in this case "reflect[s] the value of the [asserted] '327 patent" in Section II) (footnote omitted).

Tellingly, Google's petition presented its challenge to Mr. Kennedy's assignment of a $X per-unit rate to the three prior licenses as the "second" issue on which it sought rehearing, ECF #28 at 16—even though the assignment of that rate logically precedes Mr. Kennedy's subsequent apportionment analysis. It could not

be clearer that Google understood the two issues as distinct and "independent." *Id.* Nor could it be clearer that the en banc Court "limited" its review to only *one* of those two issues—Mr. Kennedy's assignment of a $X per-unit rate to the prior lump-sum licenses. ECF #76 at 2-3. The Court should reject Google's "inappropriate" attempt to circumvent that limit. *Kirkendall*, 479 F.3d at 835 n.2.

The Court likewise should decline to consider any issues beyond the scope of the en banc order that Google's amici might attempt to raise. Because this brief is being filed the same day that amicus briefs supporting Google are due, *see* ECF #76 at 3, the IDA does not know the extent to which Google's amici may disregard this Court's en banc order. Insofar as amici argue issues other than the one identified in en banc order, those efforts are equally "inappropriate" under *Kirkendall*. 479 F.3d at 835 n.2. Should any amici press arguments that Google itself has not raised, those arguments are even further outside the proper bounds of this proceeding.

2.     Adherence to the limits set by this Court's en banc order is sound judicial practice. By its nature, en banc review involves issues with importance far beyond the parties to a particular dispute. *See* Fed. R. App. P. 40(b)(2) (eff. Dec. 1, 2024; previously Fed. R. App. P. 35(a)) (en banc consideration generally reserved for "question[s] of exceptional importance" or to "secure or maintain uniformity of the court's decisions" across cases); Fed. Cir. R. 40(c)(1) (eff. Dec. 1, 2024; previously Fed. Cir. R. 35(b)(2)). The Court's consideration of issues meriting en

banc review is thus facilitated by robust participation from others who may be affected by the Court's decision and who can offer perspectives beyond those of the parties. *See* Fed. R. App. P. 29, advisory committee note to 1998 amendment; *cf.* S. Ct. R. 37.1.

This Court's en banc orders thus routinely solicit amicus participation, providing that "briefs of amici curiae may be filed without consent and leave of the court." ECF #76 at 3; *accord LKQ Corp. v. GM Global Tech. Operations LLC*, 71 F.4th 1383 (Fed. Cir. 2023) (Mem.); *WiFi One, LLC v. Broadcom Corp.*, 851 F.3d 1241 (Fed. Cir. 2017) (Mem.); *The Medicines Company v. Hospira, Inc.*, 805 F.3d 1357 (Fed. Cir. 2015) (Mem.). And by "limit[ing]" en banc review to identified issues, ECF #76 at 2, the Court gives prospective amici fair notice of what is at stake in an en banc proceeding, allowing them to intelligently decide whether to participate and, if so, what issue(s) they must address.

If litigants could inject issues beyond those in the en banc order, that notice would be thwarted—and with it, amici's ability to meaningfully contribute to this Court's decisional process. That problem is especially severe for entities, like the IDA, whose views do not fully align with those of either party. Amici "supporting neither [party's] position" must file their briefs 14 days after the en banc petitioner's opening brief, at the same time as amici "supporting [petitioner's] position." ECF #76 at 3. Amici supporting neither party thus have little time to respond to

extraneous issues injected by the petitioner—and essentially no time at all to respond to extraneous issues injected by petitioner's amici. Worse, entities might elect *not* to participate as amici because the issue identified in the en banc order does not sufficiently affect them—only to discover, after it is too late to retain counsel and participate, that a petitioner or amici have smuggled in other issues that *do* profoundly affect them.

This case vividly illustrates the point. Although the issue on which this Court granted en banc review—an expert's assignment of a per-unit royalty rate to prior lump-sum licenses—arises with some frequency, the issue is necessarily limited to cases where a party seeks to rely on prior lump-sum licenses. But other issues pressed at the petition stage (and in Google's en banc brief) have far greater implications for far more cases. For example, what experts must do to account for differences between prior licenses and the hypothetical negotiation (*e.g.*, for different numbers of asserted patents), *see* Google En Banc Br. 41-58, affects virtually all cases where parties rely on prior licenses of *any* kind. And some arguments pressed by petition-stage amici could sweep further still. *See* p. 22, *supra*. There is no reason to think this Court's damages precedent requires the radical overhaul those amici desire. In all events, this en banc proceeding—which the Court expressly limited to a single, narrow issue—is not remotely the forum for doing so.

## CONCLUSION

The Court should resolve the question on which it granted en banc review—concerning the assignment of a $X per-unit rate to the three prior lump-sum licenses—consistent with the views expressed in this brief. Consistent with its precedents, the Court should decline to consider any issues beyond the scope of its en banc order.

November 26, 2024

Respectfully submitted,

/s/ Jeffrey A. Lamken

Jeffrey A. Lamken
   *Counsel of Record*
Lucas M. Walker
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
(202) 556-2000
jlamken@mololamken.com

Swara Saraiya
MOLOLAMKEN LLP
430 Park Avenue
New York, NY 10022
(212) 607-8160

*Counsel for Amicus Curiae Inventors Defense Alliance*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:**  2023-1101

**Short Case Caption:**  EcoFactor, Inc. v. Google LLC

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes  6,995  words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 11/26/2024

Signature:  /s/Jeffrey A. Lamken

Name:  Jeffrey A. Lamken