2023-1101

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

ECOFACTOR, INC.,
*Plaintiff-Appellee*

v.

GOOGLE LLC,
*Defendant-Appellant*

Appeal from the United States District Court for the
Western District of Texas in No. 6:20-cv-00075-ADA, Judge
Alan D. Albright.

**UNIFIED PATENTS, LLC'S *AMICUS CURIAE* BRIEF
IN SUPPORT OF GOOGLE AND REVERSAL EN BANC**

Jonathan Stroud
Michelle Aspen
Unified Patents, LLC
4445 Willard Avenue
Suite 600
Chevy Chase, MD 20815
(202) 805-8931

William G. Jenks
*Principal Attorney*
JENKS IP LAW PLLC
1610 Allen St.
Reno, NV 89509
(202) 412-7964

*Counsel for Amicus Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number** 2023-1101

**Short Case Caption** EcoFactor, Inc. v. Google LLC

**Filing Party/Entity** Unified Patents, LLC

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 11/26/2024

Signature: /s/ William G. Jenks

Name: William G. Jenks

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☐ None/Not Applicable |
| Unified Patents, LLC | | Parents: |
| | | UP HOLDCO INC. |
| | | Unified Patents Holdings, LLC |
| | | Unified Patents Acquisition, LLC |
| | | Unified Patents Management, LLC |
| | | |
| | | No such public companies |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable          ☐ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below)     ☐ No     ☑ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable          ☐ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# Table of Contents

INTEREST OF *AMICUS CURIAE*..........................................................................1

ARGUMENT ..........................................................................................................3

I.   This Court Must Ensure That District Courts Screen Damages Experts
     Under *Daubert* and Rule 702.......................................................................3

II.  The Expert Testimony Allowed Here Fails Under *Daubert* and
     Rule 702.........................................................................................................5

     A.   Settlements are of little value in determining a reasonable
          royalty...................................................................................................5

     B.   An analysis under Rule 702 shows that the District Court
          should have barred the testimony........................................................9

III. The Anchoring Effect Immunizes Outrageous Damage Demands
     Against Cross-Examination ..........................................................................11

     A.   The anchoring bias is an accepted, verified theory explaining
          human behavior that applies in litigation ...........................................11

     B.   Anchoring prevents cross-examination from curing
          inadmissible damages testimony.........................................................12

IV.  Failure of District Courts to Police Unreasonable Damages Testimony
     Warps the Patent System ..............................................................................16

     A.   Patent litigation is dominated by sophisticated repeat players
          with deep pockets ................................................................................16

     B.   Unregulated damages testimony leads to outsized verdicts................20

     C.   This Court cannot rely on appeals to cure the damage caused by
          too lax enforcement of *Daubert* and Rule 702 by District Courts......22

CONCLUSION ....................................................................................................27

# Table of Authorities

**Cases**

*AsymmetRx, Inc. v. Biocare Med., LLC*, 582 F.3d 1314 (Fed. Cir. 2009)................9

*Cornely v. Marckwald*, 131 U.S. 159 (1889)..............................................5

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ........................ passim

*Faulkner v. Gibbs*, 199 F.2d 635 (9th Cir. 1952) ......................................6

*Fonar Corp. v. Gen. Elec. Co.*, 107 F.3d 1543 (Fed. Cir. 1997)...........................22

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011) ..................................22

*KMS Fusion, Inc. v. United States*, 36 Fed. Cl. 68 (1996) .......................................7

*Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137 (1999)............................ 3, 4, 15

*LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51 (Fed. Cir. 2012)........6

*Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*,
    925 F.3d 1225 (Fed. Cir. 2019)...................................................................9

*Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152 (6th Cir. 1978) ...........6

*ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860 (Fed. Cir. 2010)...........................6

*Rude v. Westcott*, 130 U.S. 152 (1889) ......................................... 5, 6, 10

*T.H.R. Enterprises, Inc. v. United States*, 160 Fed. Cl. 236 (2022) ........................7

*Unified Patents, LLC. v. Uniloc USA, Inc., et al.*,
    IPR2018-00199 (PTAB May 31, 2019)..............................................................2

*Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011) ...... 13, 14, 22

*Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*,
    944 F.2d 870 (Fed. Cir. 1991)...................................................................9

*Waterman v. Mackenzie*, 138 U.S. 252 (1891) ......................................10

**Other Authorities**

1 Kings 3:16-28 ................................................................................................ 16

AIPLA Report of the Economic Survey 2023 ......................................................... 10

Amos Tversky and Daniel Kahneman, *Judgment under uncertainty: Heuristics and biases*, 185 Science 1124 (1974) ......................................................................... 13

Antonin Scalia & Bryan A. Garner,
   *Reading Law: The Interpretation of Legal Texts* (2012) ...................................... 8

Burford Capital, *Investor Presentation* (Oct. 2024),
   https://s201.q4cdn.com/169052615/files/doc_presentations/2024/Oct/01/2024-
   10-02-burford-capital-investor-presentation-final.pdf ......................................... 18

Chang, Yun-chien, Chen, Kong-Pin, Lin, Chang-Ching, *Anchoring Effect in Real
   Litigation: An Empirical Study* (Jan. 27, 2016), University of Chicago Coase-
   Sandor Institute for Law & Economics Research Paper No. 744,
   SSRN: https://ssrn.com/abstract=2726903 ................................................. 11, 12

Christopher De Los Santos, *Textron wins $279 million ruling in drone lawsuit in
   Waco's federal court* Waco Tribune-Herald, Apr. 21, 2023 .............................. 26

Corporate Verdicts Go Thermonuclear, Texas,
   https://marathonstrategies.com/corporate-verdicts-go-thermonuclear-texas/ ..... 25

Dani Kass, *The Top Patent Damages Awards of 2023* IPLaw 360 (Dec. 19, 2023),
   https://www.law360.com/articles/1779258 ....................................................... 25

Daniel Kahneman, *Thinking Fast and Slow* (2011) ........................................ 11, 13

Emily R. Siegel, *Fortress' Billions Quietly Power America's Biggest Legal Fights*
   (Bloomberg Law Oct. 16, 2024),  https://news.bloomberglaw.com/business-and-
   practice/fortress-billions-quietly-power-americas-biggest-legal-fights .............. 19

Emily R. Siegel, *Susman Godfrey Funding Deal for Patent Cases Revealed in
   Lawsuit* (Bloomberg Law Dec. 21, 2023)
   https://news.bloomberglaw.com/business-and-practice/susman-godfrey-funding-
   deal-for-patent-cases-revealed-in-lawsuit ......................................................... 18

Jonathan Stroud & Sam Korte, *Insuring Judgments and the Disclosure Gap*,
   73 Am. Univ. L. Rev. 1057 (2024) .............................................................. 2, 23

Josh Kosman, *Softbank unit launches $400M 'patent troll' fund*,
N.Y. Post (May 21, 2018) ....................................................................19

Natalie Posgate, *IP Experts Examine* VLSI v. Intel *Trial: 'Waco Jurors are not Afraid to Award Large Damages,'* The Texas Lawbook (March 8, 2022),
https://texaslawbook.net/ip-experts-examine-vlsi-v-intel-trial-waco-jurors-are-not-afraid-to-award-large-damages/ ...................................................26

P. Slovic and S. Lichtenstein, *Comparison of Bayesian and Regression Approaches to the Study of Information Processing in Judgment*, 6 Organizational Behavior & Human Performance 649 (1971)......................................................11

P.G. Wodehouse, *Mike and Psmith* (Meredith Press 1909) ......................................3

Richard Lloyd, *Fortress's latest patent fund could top $900 million*, IAM (Apr. 9, 2021), https://www.iam-media.com/index.php/finance/fortresss-latest-patent-fund-could-top-900-million ......................................................19

Sean Keller and Jonathan Stroud, *Litigation Funding Disclosure and Patent Litigation*, 33 Fed. Cir. Bar. J. 77 (2023)......................................................1

Stephen Davidson & Stephen Kyriacou, *Litigation Risk Insurance: A Tool that Should Be in Every Lawyer's Toolkit*, AON, https://www.aon.com/m-and-a-transaction/litigation-risk-insurance.jsp......................................................24

Tommy Witherspoon, *Waco jury: Intel must pay $2 billion for patent infringement*, Waco Tribune-Herald, Mar. 2, 2021......................................................26

Unified Patents, *Litigation Annual Report*,
https://portal.unifiedpatents.com/litigation/annual-report ......................................................2

Unified Patents, *Patent Dispute Report: 2023 in Review*,
https://www.unifiedpatents.com/insights/2024/1/8/patent-dispute-report-2023-in-review ......................................................1

Unified Patents, *Patent Dispute Report: 2024 Mid-Year Report*,
https://www.unifiedpatents.com/insights/2024/7/22/patent-dispute-report-2024-mid-year-report ...................................................... 16, 17, 18, 24

Westfleet Advisors, *2023 Litigation Finance Market Report* (2023),
https://www.westfleetadvisors.com/wp-content/uploads/2024/03/WestfleetInsider2023-Litigation-Finance-Market-Report.pdf......................................................17

**Rules**

Fed. R. App. P. 29 ..................................................................................1

Fed. R. Civ. P. 26(a)(1)(A)(iv) ............................................................23

Fed. R. Evid. 702 ....................................................................... passim

## INTEREST OF *AMICUS CURIAE*[1]

Unified Patents, LLC is a membership organization dedicated to deterring non-practicing entities ("NPEs"), particularly patent assertion entities ("PAEs") and litigation investment entities ("LIEs"), from extracting nuisance settlements from operating companies based on patents that are likely invalid. Unified's 3,000-plus members are Fortune 500 companies, start-ups, automakers, industry groups, cable companies, banks, credit card companies, technology companies, open-source software developers, manufacturers, and others dedicated to reducing the drain on the U.S. economy of now-routine baseless litigations asserting infringement of patents of dubious validity.

Unified and its counsel study the business models, financial backings, and practices of PAEs and LIEs. *See, e.g.*, Unified Patents, *Patent Dispute Report: 2023 in Review, https://www.unifiedpatents.com/insights/2024/1/8/patent-dispute-report-2023-in-review*; *see also* Sean Keller and Jonathan Stroud, *Litigation Funding Disclosure and Patent Litigation*, 33 Fed. Cir. Bar. J. 77 (2023) ("Keller

---

[1] The Court has granted leave to file briefs *amicus curiae*. ECF 76 at 3. No party's counsel authored this brief in whole or in part; no party or party counsel contributed money that was intended to fund preparing or submitting the brief; no person—other than the *amicus curiae*, its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief. *See* Fed. R. App. P. 29(a)(2), (a)(4).

& Stroud"); Jonathan Stroud & Sam Korte, *Insuring Judgments and the Disclosure Gap*, 73 Am. Univ. L. Rev. 1057 (2024) ("Stroud & Korte").

Unified monitors ownership data, secondary-market patent sales, demand letters, post-issuance proceedings, and patent litigation. *See, e.g.*, Unified Patents, *Litigation Annual Report*, https://portal.unifiedpatents.com/litigation/annual-report.

Unified also files post-issuance administrative challenges with the Patent Office against PAE patents it believes are unpatentable or invalid. This includes both international and domestic administrative challenges. Thus, Unified seeks to deter the assertion of poor-quality patents. In 2023, Unified was the most frequent reexamination requester by far. Unified acts and litigates independently from its members. *See, e.g.*, *Unified Patents, LLC. v. Uniloc USA, Inc., et al.*, IPR2018-00199, Paper No. 33, 10 (PTAB May 31, 2019) (Unified members not real parties in interest to petitions filed by Unified); *id.* (collecting PTAB decisions).

# ARGUMENT

> He was rigidly truthful, where the issue concerned only himself. Where it was a case of saving a friend, he was prepared to act in a manner reminiscent of an American expert witness.

P.G. Wodehouse, *Mike and Psmith* 96 (Meredith Press 1909).

## I.   This Court Must Ensure That District Courts Screen Damages Experts Under *Daubert* and Rule 702

By its terms, Rule 702 applies to the testimony of all witnesses who are "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. But here, both the District Court and the panel majority failed to apply that rule to the damages testimony presented. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993) (The Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."); *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (The "trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge.").

Modern Rule 702 was adopted following *Daubert* and *Kumho Tire* and enumerates standards that are "broad enough to require consideration of any or all of the specific *Daubert* factors where appropriate." Fed. R. Evid. 702, Committee Notes, 2000 Amendment. In patent cases, Rule 702 is clear enough to be applied to expert evidence of a reasonable royalty. As the dissent recognized, the key is

that the evidence—presented in whatever form—must be relevant and reliable. Dissent, Slip Op. at 10-11 (citing *Kumho Tire*, 526 U.S. at 149). Too often, District Courts, and the majority here, look only for some linkage to the case before allowing the testimony to go to the jury.

The en banc Court should first require District Courts to analyze expert testimony under Rule 702 and only admit damages testimony that is relevant and reliable. This Court may then use this case as an ideal vehicle for demonstrating the minimum proper analysis. The Court should make clear that:

- Settlements and other payments made under threat of litigation are not reliable evidence of a reasonable royalty.

- Rational apportionment is required when prior licenses involve more than the patent in suit.

- Inoperative clauses in license agreements cannot trump operative clauses.

- Belief is not data. Nor is it fact. A party's belief cannot establish a royalty.

This approach will ensure that District Courts bar unreliable testimony that anchors juries to unreasonable damages valuation. It will also limit the incentives for repeat players to manufacture "evidence" of established royalties.

## II.     The Expert Testimony Allowed Here Fails Under *Daubert* and Rule 702

Here, the "fact in issue" the jury had to resolve was what reasonable royalty the patentee should receive for the infringement.  *See* 35 U.S.C. § 284.  To determine what royalty is reasonable, the Federal Circuit has frequently allowed the use of comparable licenses.

Unfortunately, while the law gave the correct starting point, the expert testified to something quite different.  *See* Dissent at 10-11 ("[T]his law ensures that an expert asks the right questions….[The expert here ] failed to ask the right questions at multiple junctures.").

### A.     Settlements are of little value in determining a reasonable royalty

In this case, the expert examined three purported licenses that were, in fact, settlements of prior litigations.  For many years, litigation settlements could not be used to measure the value of the patented invention:

> It is clear that a payment of any sum in settlement of a claim for an alleged infringement cannot be taken as a standard to measure the value of the improvements patented, in determining the damages sustained by the owners of the patent in other cases of infringement. Many considerations other than the value of the improvements patented may induce the payment in such cases.

*Rude v. Westcott*, 130 U.S. 152, 164 (1889); *see also Cornely v. Marckwald*, 131 U.S. 159, 160–61 (1889) (ten settlements at nearly the same rate insufficient to show established royalty under *Rude*); *LaserDynamics, Inc. v. Quanta Computer,*

*Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012) ("The notion that license fees that are tainted by the coercive environment of patent litigation are unsuitable to prove a reasonable royalty is a logical extension of *Georgia-Pacific*."); *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1164 (6th Cir. 1978) (Markey, J., by designation) ("A royalty, if any, resulting from settlement of an infringement suit between Panduit and a third party, should not be considered evidence of an 'established' royalty and thus a measure of adequate damages here."); *Faulkner v. Gibbs*, 199 F.2d 635, 638 (9th Cir. 1952) ("Royalties paid under threat of suit or in settlement of claims for past infringement cannot be taken as a standard to measure the value of the patent.").

Despite *Rude* and its progeny in the case law of this and other Courts, this Court has allowed reliance on settlement agreements in "certain limited circumstances." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d at 77 (citing *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 870-872 (Fed. Cir. 2010)). But in a litigation system dominated by repeat litigants (*see* Section IV.A, below), those limited circumstances have become the norm, as settlements in one case are crafted to become licenses in the next.

The facts of this case amply demonstrate the reason for the rule in *Rude*. The settlements here cannot and do not reflect a comparable reasonable royalty rate. Each settlement required a lump-sum payment from an accused infringer.

That lump-sum payment entitled the defendants to "patent peace" in perpetuity. "Each license is to 'all patents and patent applications (along with patents issuing thereon) . . . that are now, or *ever come to be*, assigned to, owned by, or controlled by EcoFactor.'" Dissent (citing Appx10390; Appx10401; Appx10412) (emphasis added). Thus, the lump sum ended each pending case and precluded EcoFactor from ever bringing another—even decades in the future—against the defendant.

Two of the three settlements cite the patent in issue, along with six other patents that had been asserted in the related litigation. The third never even mentions the patent in issue (it was not part of the litigation) but recited "four others that covered the same interrelated smart thermostat technologies." Slip Op. at 16 (citing Appx10411; Appx1276).

None of the settlements identified any royalty rate in any operative clause, although each contained a whereas clause that stated, "*EcoFactor represents* that" it agrees to the payment "based on *what [it] believes* is a reasonable royalty calculation of [$X] per-unit" for EcoFactor's estimate of past and future sales of the accused products. Dissent at 3 (citing Appx10400) (first emphasis added). This is not reliable evidence. "Whereas clauses are not contractual; they are recitations laying out the background understandings of the parties." *T.H.R. Enterprises, Inc. v. United States*, 160 Fed. Cl. 236, 240 (2022) (citing *KMS Fusion, Inc. v. United States*, 36 Fed. Cl. 68, 77 (1996)). They may not be used to

create ambiguity where the words of the contract have one permissible meaning. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 218 (2012).

Whereas clauses of the type here—representing *one party's beliefs*—are irrelevant and unreliable. They are readily agreed to in order to end litigation *because* they do no actual work. That alone should discredit the expert's testimony here. But two of the three settlements expressly confirmed that the lump-sum payment was "*not based upon sales and does not reflect or constitute a royalty*." Dissent at 3 (citing Appx10402) (emphasis added by Dissent). The body of the third did not explicitly rebuke the idea that a lump-sum payment that provided patent peace in perpetuity against the patentee's entire present and future portfolio was not a per-unit royalty for any single patent. But the irrationality of extrapolating from a contracted-for lump sum to an established royalty based solely on the licensor's belief recited in a self-serving inoperative clause is obvious.

These settlements were not probative of the value of the patented invention. They should never have been admitted as comparable licences. But even if the rate identified in these settlements could be used as a waystone—a dubious proposition given the self-serving nonbinding nature of the whereas clause, the lack of sales data, the express refutation of the clause, and no accounting for ending the threat of

litigation in perpetuity—the expert offered no cognizable rationale for making it the endpoint.

**B.    An analysis under Rule 702 shows that the District Court should have barred the testimony**

Appellant provides an exemplary analysis applying each section of Rule 702 to the facts of this case.  *See, e.g.*, Google Opening Brief at 16-20.  Amicus endeavors not to repeat that analysis with which it entirely agrees.  Instead, it presents additional points bolstering that analysis.

Allowing EcoFactor to rely on whereas clauses alone also contradicts this Court's holdings that what a contract represents in its nonbinding terms cannot trump what it does in substance.  For example, a contract may be titled "patent assignment," but if it fails to convey the rights of ownership and exclusivity consistent with an assignment, the Courts treat it as a mere license.  *Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1229 (Fed. Cir. 2019) (quoting *AsymmetRx, Inc. v. Biocare Med., LLC*, 582 F.3d 1314, 1319 (Fed. Cir. 2009)) (citing in turn *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.,* 944 F.2d 870, 874 (Fed. Cir. 1991)).  This inquiry depends on the substance of what was granted rather than formalities or magic words—the effect of an agreement "does not depend upon the name by which it calls itself" but upon its substantive provisions.  *Id.* (citing *Waterman v. Mackenzie*, 138 U.S. 252, 256

(1891)).  Likewise, magic words stating EcoFactor's "belief" that the settlements represented "per-unit" licenses cannot trump the operative contract provisions.

Finally, the value derived from these settlements—patent peace in perpetuity—isn't related to the value of any single patent.  Each settlement resolved a Section 337 action before the International Trade Commission (ITC).  *See* Google Opening Brief at 7, 8, 8 (citing Appx10389, Appx10400, Appx10411).  Consider the amount paid in light of the cost of *successfully* defending a multi-patent action at the ITC.  According to the AIPLA Report of the Economic Survey 2023, the median litigation cost of an ITC action through appeal with $1-10 million at risk was $4,000,000.  *Id.* at 63.  Thus, the *Rude* Court's recognition that the "expense of litigation will always be a motive for a settlement" is even more pertinent today.  *Rude*, 130 U.S. at 164.

Here, the District Court and the panel majority failed to properly consider the testimony presented under the standards of Rule 702 and *Daubert*.  This en banc Court should repair that failure.

## III. The Anchoring Effect Immunizes Outrageous Damage Demands Against Cross-Examination

> an *anchoring effect* . . . occurs when people consider a particular value for an unknown quantity before estimating that quantity. What happens is one of the most reliable and robust results of experimental psychology: the estimates stay close to the number that people considered—hence the image of an anchor.

Daniel Kahneman, *Thinking Fast and Slow* 119 (2011).

### A. The anchoring bias is an accepted, verified theory explaining human behavior that applies in litigation

In any negotiation or litigation, the first number that a person (including a juror) hears becomes an anchor, and all subsequent resolution after that is essentially an adjustment on that number. Thus, hearing an outrageous number creates a cognitive bias prejudicing the defendant by causing the jury to fixate on a higher award.

Multiple studies confirm that the anchoring effect occurs in litigation when considering damages. *See, e.g.*, Chang, Yun-chien, Chen, Kong-Pin, Lin, Chang-Ching, *Anchoring Effect in Real Litigation: An Empirical Study* (Jan. 27, 2016), University of Chicago Coase-Sandor Institute for Law & Economics Research Paper No. 744, SSRN: https://ssrn.com/abstract=2726903.

Chang et al. collected numerous studies showing jurors are subject to the anchoring effect. *Id.* at 1 (finding an "abundance of evidence, albeit predominantly experimental, on how anchoring influences the decisions of both the judge and the

jury").  They also analyzed real-world data from land valuation cases in Taiwan that are decided by three-judge panels and found "strong evidence for the anchoring effect:"

> After controlling for the correlation between the plaintiff's claim and the judgment that is caused by the variation in land values and other (observable and unobservable) attributes, we still find the judge's ruling to be strongly and positively related to the plaintiff's claim.

Chang at 4.

Interestingly, for the most experienced judges—those above the median level of experience—the plaintiffs' claim had no significant effect on the judgment.  *Id.* at 5.  The authors' work "provide[d] evidence for the anchoring effect in real litigation" and identified the judge's experience "as a powerful debiaser."  *Id.* at 5.  But few, if any, jurors have heard more patent damages cases than the median judge.

## B.     Anchoring prevents cross-examination from curing inadmissible damages testimony

The District Court's gatekeeper role is particularly vital with damages experts.  Because their testimony often comes down to a single number—the need for judicial gatekeeping of damages experts may be even greater than with engineering or scientific experts.

In patent litigation, the patentee has the burden of proof on infringement and damages.  The first damages number the jury hears is very often from the

patentee's expert witness. Whatever that first value, it anchors the jury, and all subsequent testimony—including on cross—can only serve to adjust that number. Such adjustments "are typically insufficient." *See* Amos Tversky and Daniel Kahneman, *Judgment under uncertainty: Heuristics and biases*, 185 Science 1124 (1974), reprinted in Kahneman at 419. Jurors are people, and:

> people make estimates by starting from an initial value that is adjusted to yield the final answer. The initial value, or starting point, may be suggested by the formulation of the problem, or it may be the result of a partial computation. In either case, adjustments are typically insufficient. That is, different starting points yield different estimates, which are biased toward the initial values.

*Id.* at 427 (citing P. Slovic and S. Lichtenstein, *Comparison of Bayesian and Regression Approaches to the Study of Information Processing in Judgment*, 6 Organizational Behavior & Human Performance 649 (1971)).

This Court tacitly recognized the anchoring principle in *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011). The lower Court had found a patent claiming a software registration system infringed by Microsoft's Office products, including, e.g., Word. The District Court had allowed damages testimony applying a 25% "rule of thumb" to licensing damages. It also allowed the expert to testify to the entire market value rule as a "check" on his $500+ million estimate. *Id.* at 1311. This testimony included a figure of $19 billion—the

total revenue from the infringing products.  The District Court later granted a new trial on damages.

The Federal Circuit—reviewing de novo and considering all evidence in the light most favorable to the patentee—affirmed the new trial grant.  This Court was particularly troubled by the potential that the $19 billion figure would prejudice the jury.

> The disclosure that a company has made $19 billion dollars in revenue from an infringing product cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue.

*Uniloc*, 632 F.3d at 1320.

Neither cross-examination by Microsoft nor an explicit jury instruction from the lower Court to disregard Microsoft's total revenue could cure the prejudice caused by the jury hearing this giant number.  This Court and the District Court knew—without resort to any theory—that once the jury heard that number, the damages would be skewed:  "[t]he $19 billion cat was never put back into the bag even by Microsoft's cross-examination of Mr. Gemini and re-direct of Mr. Napper, and in spite of a final instruction that the jury may not award damages based on Microsoft's entire revenue from all the accused products in the case."  *Id.* at 1320 (quoting with approval the District Court).

The fiscal details of this case are hidden from the public.  But from context, it is clear that the $20+ million royalty awarded by the jury for the infringement of

14

one patent far exceeded the lump sum paid by past accused infringers for a license to EcoFactor's entire portfolio in perpetuity. And that the expert was permitted to present a number far in excess of any reasonable calculation. Under Rule 702, as explained, that testimony was inadmissible. In light of the anchoring effect, it was incurable.

Rule 702 outlines the District Court's obligation to protect the jury from tactics that trigger cognitive biases, like anchoring. Allowing an expert to present a baseless damages theory violates a trial judge's "special obligation" to ensure that all expert testimony "is not only relevant but reliable." *Kumho Tire*, 526 U.S. 147 (quoting *Daubert*, 509 U.S. at 589).

Here, the majority's reliance on cross-examination, slip op. at 13, does nothing to cure that failure. Cross-examination and contrary evidence generally cannot cure expert testimony that is prejudicial or exceeds the bounds of reasonable and reliable. Cross-examination and other "conventional devices" for testing evidence "are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702." *Daubert*, 509 U.S. at 596. But where expert testimony fails to meet that standard, it should be excluded before the jury is exposed to a party's wishful thinking.

Nor can the anchoring effects be explained away by the panel majority's split-the-baby reasoning. *See* Slip Op. at 13 ("Ultimately, the jury returned a

verdict … which represents significantly less than Mr. Kennedy's proposed damages amount."); *see also* 1 Kings 3:16-28. The final award cannot show whether the expert's testimony was admissible.

Further, that the jurors did not settle on the first number they heard does not prove a lack of prejudice, much less make sound the expert's unsound methodology. Rather, the initial figure acts as an anchor so that additional evidence only adjusts away from that anchor, and the eventual number the jury awards is higher than if it had started with only reasonable and reliable testimony.

## IV. Failure of District Courts to Police Unreasonable Damages Testimony Warps the Patent System

### A. Patent litigation is dominated by sophisticated repeat players with deep pockets

While some NPEs are inventor or small company-based, the majority of NPE suits, year over year, are filed by PAEs, professionalized groups whose primary activity is acquiring and licensing patents. In the first half of 2024, PAEs brought 635 NPE suits, while the smaller NPEs brought 290. *See* Unified Patents, *Patent Dispute Report: 2024 Mid-Year Report* Fig. 3, https://www.unifiedpatents.com/insights/2024/7/22/patent-dispute-report-2024-mid-year-report.

In the same time frame, the top four patent plaintiffs were all NPEs, and they brought over 300 cases between them. *See 2024 Mid-Year Report* Fig. 9. Only one operating company was among the top 10 patent plaintiffs. *Id.*

Litigation investment entities often finance the assertion campaigns of these NPEs. Over 200 NPE cases were known to be being financed by litigation investment firms at the midpoint of 2024. *See id.*, Fig. 7. Third-party litigation funding is a growing and ever-present source of funds for patent litigation. Over the past three years, at least roughly $3 billion /year of known capital has been newly committed to overall litigation funding in the United States. *See* Westfleet Advisors, *2023 Litigation Finance Market Report* 3 (2023) ("Westfleet Report"), https://www.westfleetadvisors.com/wp-content/uploads/2024/03/WestfleetInsider2023-Litigation-Finance-Market-Report.pdf.

Patent litigation is the single largest category of newly funded matters, taking about 20% of new commitments each year. *Id.* at 6. Thus, third-party funders pump at least $600 million a year into patent litigation. Burford Capital, the largest public litigation funder, now reports to their investors that as of June 2024, their biggest single investment in deployed capital by subject matter is funding IP suits, garnering 25% of their deployed capital—over a billion dollars. *See* Burford Capital, *Investor Presentation* 5 (Oct. 2024),

https://s201.q4cdn.com/169052615/files/doc_presentations/2024/Oct/01/2024-10-02-burford-capital-investor-presentation-final.pdf. These funders have no interest in innovation; they are purely here for return on investment. And poorly policed damages testimony is an able vehicle for ROI.

The average funding these entities provide is about $8 million—though public disclosures have shown upwards of $50 million being provided—all of which is dwarfed by the potential windfall. *See* Westfleet Report at 5. And money is readily available for larger litigation campaigns—attacking multiple operating companies. *See* Emily R. Siegel, *Susman Godfrey Funding Deal for Patent Cases Revealed in Lawsuit* (Bloomberg Law Dec. 21, 2023), https://news.bloomberglaw.com/business-and-practice/susman-godfrey-funding-deal-for-patent-cases-revealed-in-lawsuit (Longford Capital agreement commits $23 million, and forecasts up to $56 million, for an enforcement campaign run by Susman Godfrey that included 12 suits in various small towns across Texas.).

These entities have deep pockets and an appetite for risk. The potential of participating in a billion-dollar verdict is attractive to them despite the costs. For example, Fortress—the entity collectively facing the most petitions at the PTAB—is a hedge fund with about $50 billion under management. *See 2024 Mid-Year Report*, Fig. 13; https://www.fortress.com/what-we-do. It started its first Intellectual Property Fund in 2017 and raised $400 million to invest specifically in

patent acquisition and assertions.  Josh Kosman, *Softbank unit launches $400M 'patent troll' fund*, N.Y. Post (May 21, 2018).  Fortress was acquired by and appears to have drawn funding for these endeavors from the Softbank Group of Japan.  *See id*.  Fortress's initial $400 million fund eventually grew, with subsequent investment, to $900 million.  *See* Richard Lloyd, *Fortress's latest patent fund could top $900 million*, IAM (Apr. 9, 2021), https://www.iam-media.com/index.php/finance/fortresss-latest-patent-fund-could-top-900-million.

The majority owner of Fortress is now Mubadala Capital, which "is the wholly owned asset management subsidiary of Mubadala Investment Company, a leading global sovereign investor headquartered in Abu Dhabi, UAE."  *See* https://www.fortress.com/media/2024-05-15-fortress-management-and-mubadala-complete-acquisition-of-fortress-investment-group.  It now has three funds and some $3 to $6 billion committed.  Emily R. Siegel, *Fortress' Billions Quietly Power America's Biggest Legal Fights* (Bloomberg Law Oct. 16, 2024), https://news.bloomberglaw.com/business-and-practice/fortress-billions-quietly-power-americas-biggest-legal-fights.

Fortress is but one of many financers of patent litigation.  Prominent funders financing patent litigation include GLS Capital, Longford Capital Management, Parabellum Capital, Burford Capital, and Omni Bridgeway.  All are top-rated by

Chambers and Partners.  *See* https://chambers.com/legal-rankings/litigation-funding-intellectual-property-usa-nationwide-58:3213:12788:1.

For PAEs and litigation financers, patent litigation is their business.  These entities require financial windfall.  If the Courts allow it, they will happily push the boundaries to ever-more tenuous damages theories.  Damage to the system or litigants is none of their concern.

**B.  Unregulated damages testimony leads to outsized verdicts**

When a District Court allows unreliable damages testimony, it isn't possible to cure the resulting anchoring effect on the jury.  The unreasonable testimony warps any damages award to well beyond the value of the patent.

The District Court's failure as gatekeeper, and this Court's sanctioning of that failure, creates perverse incentives for patent asserters.  Here, for example, the District Court allowed an expert—relying on a statement of the patentee's "belief" in an inoperative contract clause gained through the threat of litigation—to turn lump-sum global settlements into proof of an established royalty for a single patent.  Unless corrected, sophisticated repeat players will shape future litigation settlements as high per-unit royalty licenses.

It is no difficult matter to get belief clauses placed in the front of a settlement.  Nor would it be complicated to offer small defendants (particularly competitors of larger defendants) a settlement on favorable lump-sum terms with

the caveat that the settlement will be cast as a license with an "agreed upon" per-unit royalty. Then, with little cost to the first licensees, the licensor can wield the number against the real target. That the per-unit number was not tied to the prior defendant's production is of no import, at least if the current holding is allowed to stand

The panel's ruling also motivates plaintiffs to subject defendants to serial suits and seek the same fictitious "royalty" repeatedly. Here, settlements ending multi-patent litigation and covering EcoFactor's present and future portfolios were used to set the royalty rate for a single patent. Rather than divide the value derived from so many patents, the expert testified that the royalty rate for one patent would be the same.

This framework allows EcoFactor to double dip, that is, sue Google again over one of the remaining patents or on all the remaining patents, one by one, and get the same royalty rate over and over again. This is no mere parade of horribles. As Appellant points out, it's happening here. Google Opening Brief at 53 n.16.

One may safely assume that the expert in those cases will testify that the "downward pressure" on the royalty from already having a full-price license to another patent in the settlement agreement would be exactly balanced by some new "upward pressure" to arrive at the same rate. And they would succeed so long as no deeper calculation or evidence is required.

### C.   This Court cannot rely on appeals to cure the damage caused by too lax enforcement of *Daubert* and Rule 702 by District Courts

Widespread harm can occur before this Court corrects a lower court's failure to enforce *Daubert*. Lag effects from persuasive precedent, judgment preservation insurance, and juror numbness cause exorbitant damages to have sweeping effects even when they are later reversed on appeal.

### 1.   District Courts rely on one another as persuasive precedent

If one District Court allows unsound expert testimony, other District Courts likely will as well until this Court corrects the issue. For example, in *Uniloc*, this Court rejected the admissibility of the 25% rule, undoing a jury verdict of $388,000,000. *Uniloc*, 632 F.3d at 1315. But that ruling did not undo the harm done by the rule. As the *Uniloc* Court noted, *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 839 (Fed. Cir. 2010), *aff'd,* 564 U.S. 91 (2011) ($240 million in damages) and *Fonar Corp. v. Gen. Elec. Co.*, 107 F.3d 1543, 1547 (Fed. Cir. 1997) ($70 million in reasonable royalty), among other appellate cases, were decided under the 25% rule and survived appeal. The Court also noted 10 District Court decisions applying the 25% rule. Thus, the appealability of a "fundamentally flawed tool for determining a baseline royalty rate" did not prevent the rule from being applied across a dozen reported cases before this Court held it inadmissible. *Uniloc*, 632 F.3d at *1315*.

## 2. The system is further warped by judgment preservation insurance (JPI)

When the risk pays off with a trial verdict, the patent holder or litigation finance team can protect itself against appellate reversal with JPI or further litigation funding. *See* Stroud & Korte. The availability of JPI and appellate funding incentivizes plaintiffs to seek unreasonably large judgments, *even knowing they may likely be found unreasonable on appeal*, because the patentee will still benefit, receiving a portion of the verdict upon reversal.

JPI is a virtually unregulated insurance product that avoids disclosure under the current Federal rules. The Federal Rules of Civil Procedure require the affirmative disclosure of insurance policies to facilitate settlement and to "enable counsel for both sides to make the same realistic appraisal of the case." *See* Fed. R. Civ. P. 26(a)(1)(A)(iv). But the Federal Rules of Appellate Procedure have no similar disclosure requirement.

The likely result is that settlements are put off or delayed, and cannot fall below an artificial threshold for profitability. One party knows its hard floor for settlement; the other party is unaware that there may even be a floor. In other words, why settle an appeal for a reasonable royalty when you are insured for a percentage of a verdict that resulted from unreasonable damages testimony? Why settle at all if there's a chance your unreliable damages theory is allowed by the appellate court, as happened here?

It is also possible that a hidden third party (i.e., the insurer or funder) will

control the appeal or subsequent proceedings, given that they have accepted the

responsibility for a loss or reduction in the award.  While some have argued that

"most" litigation risk insurance policies don't allow insurers to take control of

litigation strategy,[2] the lack of any disclosure to date makes this impossible verify.

Nor is it plausible that judgment preservation insurance is the one claim where

insurers put millions of dollars at risk without any measure of controlling

outcomes.

### 3. Giant judgments inspire more giant judgments, regardless of potential appeal

It's unfortunate that many of the nation's infringement cases take place in

small Texas towns with little attachment to the production of technology.  *See*

*2024 Mid-Year Report* (Figure 4, reproduced below).  The Eastern and Western

Districts of Texas are the top two venues for patent suits in the nation.  In the first

half of this year, they hosted 40% of the nation's patent suits, including nearly 65%

of suits by NPEs.  *Compare id.* Fig. 4 *with* Fig. 3.

---

[2] *See* Stephen Davidson & Stephen Kyriacou, *Litigation Risk Insurance: A Tool that Should Be in Every Lawyer's Toolkit*, AON, https://www.aon.com/m-and-a-transaction/litigation-risk-insurance.jsp ("Unlike other types of insurance, most litigation risk insurance policies do not permit insurers to take over or control the litigation, meaning that the insured retains decision-making power and continues to litigate the insured case with its chosen counsel.").



2024: Patent Litigation Venues

In 2023, four of the five biggest patent verdicts came out of Waco and Marshall, Texas.  *See* Dani Kass, *The Top Patent Damages Awards of 2023* IPLaw 360 (Dec. 19, 2023),  https://www.law360.com/articles/1779258.  Indeed, from 2009 to 2022, Texas was the top state for so-called "nuclear" verdicts.  *See* Corporate Verdicts Go Thermonuclear, Texas, https://marathonstrategies.com/corporate-verdicts-go-thermonuclear-texas/.  In that time frame, the Eastern District awarded $10,000,000,000 in intellectual property cases.  The Western District (quiescent before 2019) awarded over $3.6 billion in intellectual property verdicts.

In these towns, the local paper reports verdicts. *See, e.g.*, Christopher De Los Santos, *Textron wins $279 million ruling in drone lawsuit in Waco's federal court* Waco Tribune-Herald, Apr. 21, 2023; Tommy Witherspoon, *Waco jury: Intel must pay $2 billion for patent infringement*, Waco Tribune-Herald, Mar. 2, 2021. Such judgments become ingrained in the community, at best numbing the citizens to the numbers and, at worst, exciting them over the next big number.

The town itself may become accustomed to giant judgments—despite some decisions being overturned. *See, e.g.*, Natalie Posgate, *IP Experts Examine* VLSI v. Intel *Trial: 'Waco Jurors are not Afraid to Award Large Damages,'* The Texas Lawbook (Mar. 8, 2022), https://texaslawbook.net/ip-experts-examine-vlsi-v-intel-trial-waco-jurors-are-not-afraid-to-award-large-damages/.

The damage caused by unreliable damages testimony propagating through the system—allowing widespread rules-of-thumb, incentivizing bizarre behavior, and creating outsized judgments—can only be halted by the en banc Court instructing District Courts to fulfill their gatekeeping role mandated by Rule 702 and *Daubert*.

# CONCLUSION

The en banc Court should make clear to the District Courts how to apply Rule 702 to damages testimony.  In doing so, it must necessarily reverse the panel decision and the underlying District Court decision here.

Respectfully submitted,

By                      */s/ William G. Jenks*
                                William G. Jenks
                                wjenks@jenksiplaw.com
                                JENKS IP LAW PLLC
                                1610 Allen St.
                                Reno, NV 89509
                                (202) 412-7964

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REQUIREMENTS,
AND TYPE STYLE REQUIREMENTS**

1.      This brief complies with the type-volume limitation of Fed. Cir.

R. 35(g)(3).  It contains 5,476 words, excluding the parts of the brief exempted by

Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2).

2.      This amicus brief complies with the typeface requirements of

Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6)

because it has been prepared in a proportionally spaced typeface using Microsoft

Word 2019 in Times New Roman 14-point font.


*/s/ William G. Jenks*
William G. Jenks

## CERTIFICATE OF SERVICE

I hereby certify that, on Nov. 26, 2024, I caused to be electronically filed the foregoing UNIFIED PATENTS, LLC'S *AMICUS CURIAE* BRIEF IN SUPPORT GOOGLE AND REVERSAL EN BANC using the Court's CM/ECF filing system.

I certify that all counsel of record in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. *See* Fed. R. App. P. 25(d); Fed. Cir. R. 25(e).


*/s/ William G. Jenks*
William G. Jenks