**No. 2023-1101**

# United States Court of Appeals for the Federal Circuit

ECOFACTOR, INC.,

*Plaintiff-Appellee,*

v.

GOOGLE LLC,

*Defendant-Appellant.*

On Appeal from the United States District Court for the Western District of Texas, Case No. 6:20-cv-00075-ADA, Hon. Alan D. Albright

**BRIEF FOR *AMICI CURIAE* INTEL CORPORATION, DELL INC., MOTOROLA MOBILITY LLC, AND WESTERN DIGITAL CORPORATION IN SUPPORT OF APPELLANT GOOGLE LLC**

Meredith Zinanni
KIRKLAND & ELLIS LLP
333 W. Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000
mzinanni@kirkland.com

John C. O'Quinn
Jason M. Wilcox
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004
(202) 389-5000
john.oquinn@kirkland.com
jason.wilcox@kirkland.com

*Attorneys for Amici Curiae*

November 26, 2024

# <u>CERTIFICATE OF INTEREST</u>

Counsel for *amici curiae* Intel Corporation, Dell Inc., Motorola Mobility LLC, and Western Digital Corporation certifies the following:

**1. The full name of every party or *amicus* represented by me is:**

Intel Corporation, Dell Inc., Motorola Mobility LLC, and Western Digital Corporation

**2. The names of the real party in interest represented by me is:**

Not applicable

**3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or *amici curiae* represented by me are:**

Denali Intermediate Inc., which is wholly owned by Dell Technologies Inc., a publicly traded company. No other publicly held corporation owns 10% or more of the stock of Dell Inc.

Motorola Mobility Holdings LLC and Lenovo Group Limited are parent corporations of Motorola Mobility LLC. Legends Holding Corporation owns more than 10% of the stock of Lenovo Group Limited.

**4. The names of all law firms and the partners or associates that appeared for the party or *amici* now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:**

None

**5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:**

Not applicable (amicus brief)

**6. Organizational Victims and Bankruptcy Cases. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).**

None

November 26, 2024        /s/ *John C. O'Quinn*
                                     John C. O'Quinn

# TABLE OF CONTENTS

INTEREST OF AMICI CURIAE ............................................ 1

INTRODUCTION ............................................................. 2

ARGUMENT ..................................................................... 5

I.    Recent Amendments to Federal Rule of Evidence 702 Highlight the Perennial Importance of the Judicial Gatekeeping Role .......................................................... 5

II.   140 Years of Supreme Court Precedent Mandate Meaningful Apportionment of Patent Damages ................................. 14

III.  Not Enforcing Apportionment Principles Has Real-World Consequences By Artificially Inflating Consumer Prices While Stifling Innovation .............................................. 18

      A.   Failing To Enforce Apportionment Principles Opens The Floodgates To Royalty Stacking, Risking Defendants Paying Repeatedly For The Full Value Of An Accused Technology ......................................... 18

      B.   Failing To Enforce Apportionment Principles Upends Real-World Licensing Negotiations—Including for Standards—And Harms Consumers ............................ 23

CONCLUSION ..................................................................... 26

**Note: All emphasis added unless otherwise noted.**

# TABLE OF AUTHORITIES

**Cases**

*Allison v. McGhan Med. Corp.*,
   184 F.3d 1300 (11th Cir. 1999)............................................................. 13

*AstraZeneca AB v. Apotex Corp.*,
   782 F.3d 1324 (Fed. Cir. 2015) ............................................................ 23

*AX Wireless LLC v. Dell Inc. et al.*,
   No. 2:22-cv-00277 (E.D. Tex.) .................................................. 28, 29, 30

*Blake v. Robertson*,
   94 U.S. 728 (1876) .............................................................................. 20

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
   489 U.S. 141 (1989) ............................................................................ 34

*Daubert v. Merrell Dow Pharma., Inc.*,
   509 U.S. 579 (1993) ................................................................ 2, 6, 13, 24

*Ericsson, Inc. v. D-Link Sys., Inc.*,
   773 F.3d 1201 (Fed. Cir. 2014) .................................................. 18, 20, 33

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Group LLC*,
   879 F.3d 1332 (Fed. Cir. 2018) ............................................................ 22

*Garretson v. Clark*,
   111 U.S. 120 (1884) .................................................................. 19, 20, 22

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) ............................................................................ 12

*Guzik Tech. Enterprises, Inc. v. Western Digital Corporation et al.*,
   No. 5:11-cv-03786 (N.D. Cal.) .......................................................... 9, 10

*Harris v. FedEx Corp. Svcs., Inc.*,
   92 F.4th 286 (5th Cir. 2024) ................................................................ 17

*In re Onglyza (Saxagliptin) and Kombiglyze (Saxagliptin and Metformin) Products Liability Litigation,*
   93 F.4th 339 (6th Cir. 2024) .................................... 6

*Intel Corp. v. Future Link Sys.*, LLC,
   No. 14-cv-377 (D. Del.) ........................................ 26

*Knight v. Kirby Inland Marine Inc.*
   482 F.3d 347 (5th Cir. 2007) .................................. 15

*Kumho Tire Co. v. Carmichael,*
   526 U.S. 137 (1999) .............................................. 14

*Lattimore v. Hardsocg Mfg. Co.,*
   121 F. 986 (8th Cir. 1903) ..................................... 21

*Mentor Graphics Corp. v. EVE-USA, Inc.,*
   851 F.3d 1275 (Fed. Cir. 2017) .............................. 21

*Quanta Computer, Inc. v. LG Elecs., Inc.,*
   553 U.S. 617 (2008) .............................................. 25

*Sardis v. Overhead Door Corp.,*
   10 F.4th 268 (4th Cir. 2021) .................................. 18

*Seymour v. McCormick,*
   57 U.S. 480 (1853) ............................................... 19

*Uniloc USA, Inc. v. Microsoft Corp.,*
   632 F.3d 1292 (Fed. Cir. 2011) .............................. 20

*Vervain LLC v. Western Digital Corporation et al.,*
   No. 6:21-cv-00488 (W.D. Tex.) .............................. 11

*VideoLabs, Inc. v. Dell Techs. Inc. et al.,*
   No. 6:21-cv-00456 (W.D. Tex.) ................ 27, 28, 30

*VirnetX, Inc. v. Cisco Sys., Inc.,*
   767 F.3d 1308 (Fed. Cir. 2014) .............................. 22

*VLSI Tech. LLC v. Intel Corp.,*
   87 F.4th 1332 (Fed. Cir. 2023) .............................. 16

*Westberry v. Gislaved Gummi AB*,
  178 F.3d 257 (4th Cir. 1999)................................................. 14

*Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co.*,
  225 U.S. 604 (1912)............................................................ 21

*Westinghouse v. New York Brake Co.*,
  140 F. 545 (2d Cir. 1905) .................................................... 21

**Statutes**

35 U.S.C. § 284................................................................... 18

**Other Authorities**

Advisory Comm. on Evid. Rules,
  2023 Notes to Fed. R. Evid. 702 ..................................... 8, 10

Advisory Comm. on Evid. Rules,
  *Minutes of the Meeting of Nov. 13, 2020*, Agenda Book 15 (Apr. 30,
  2021) ............................................................................... 9

Advisory Comm. on Evid. Rules,
  *Report to the Standing Committee* (May 15, 2022) ............. 11

FTC, *The Evolving IP Marketplace* (2011) ............................ 32

*Intel Settles Patent Row That Future Link Valued At $10B*,
  Law360 (Aug. 18, 2017) ............................................... 25, 27

Love, *Patentee Overcompensation and the Entire Market Value Rule*,
  60 Stan. L. Rev. 263 (2007) ............................................. 33

Michel, *Bargaining for RAND Royalties in the Shadow of Patent
  Remedies Law*,
  77 Antitrust L.J. 889 (2011) ............................................. 32

Nakane and Orita, *Data analysis: essentiality report on Wi-Fi 6 patents
  2021* (Nov. 15, 2021) ...................................................... 28

William F. Lee & Mark. A Lemley, *The Broken Balance: How 'Built-In
  Apportionment' And The Failure To Apply* Daubert *Have Distorted*

*Patent Infringement Damages,*
37 Harv. J. of Law & Tech. 255, 305-319 (2024) ................................. 16

**Rules**

Federal Rule of Evidence 702 ......................................... passim

## INTEREST OF AMICI CURIAE[1]

*Amici* are leading United States innovative companies. Intel Corporation ("Intel") is a global leader in the design and manufacturing of semiconductor products, including hardware and software products for networking, telecommunications, cloud computing, artificial intelligence, autonomous driving, and other applications. Dell Technologies ("Dell") is led by its purpose to create technologies that drive human progress. Dell's innovative products range from cutting-edge desktop, laptop, and notebook computers to artificial intelligence and general-purpose servers, monitors, storage, and network security products. Motorola Mobility LLC ("Motorola Mobility") and its affiliates manufacture one of the world's widest portfolios of connected products and data center solutions, and collectively run more than 40 research and development laboratories and employ over three thousand R&D professionals. Western Digital Corporation ("Western Digital") is one of the world's leading manufactur-

---

[1] No counsel for any party authored this brief in whole or in part, and no person or entity other than *amici* and their counsel made a monetary contribution intended to fund the preparation or submission of this brief. Pursuant to the Court's Order (Dkt. 23), this brief may be filed without consent and leave of court.

ers of data-storage devices and solutions and is a leading technology innovator.

Together, *amici* devote billions of dollars annually to research and development and hold thousands of patents. As significant patent holders and frequent patent litigation defendants, they share a robust interest in ensuring that patentees are compensated only for the actual value of their inventions, and that only reliable expert damages testimony is presented to juries.

## INTRODUCTION

Both innovation and the public interest are served when courts rigorously enforce the foundational apportionment requirement that a patentee be compensated for the value added by its patented invention—and not more. That nearly century-and-a-half old principle is more important than ever, as modern, technologically advanced products routinely implicate thousands of patents. The repercussions of not enforcing apportionment principles are pernicious, as defendants may be subjected to multiple lawsuits each seeking the full value of an accused technology for patents covering only incremental improvements to that technology.

Under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow*

*Pharma., Inc.*, 509 U.S. 579, 589 (1993), courts have a duty to ensure that damages experts apply these apportionment principles and do not present tenuous theories to juries. This duty includes closely scrutinizing expert testimony to ensure *both* that the expert used an accepted apportionment methodology *and* that the expert applied that methodology in a reliable way. If the expert did not, the testimony must be excluded before it reaches the jury. A court cannot delegate to the jury the responsibility to decide whether a damages expert's opinions are the product of reliable principles and methods supported by sufficient data.

The district court lost sight of these important principles when it admitted Dr. Kennedy's opinions assigning a per-unit royalty rate to the three licenses in evidence in this case. Those opinions rest on his client's unverifiable assertions that the lump-sum payments were calculated using that per-unit royalty. Dr. Kennedy then offered little more than his say-so that the same purported per-unit royalty for a portfolio-wide license in each of those agreements miraculously matched the apportioned value of the specific patents asserted against Google. Rule 702 exists to weed out precisely this kind of unreliable expert opinion. Yet the district

court admitted Dr. Kennedy's testimony without explaining how his opinions satisfy Rule 702's requirements.  By admitting this testimony, the district court misapplied Rule 702 and this Court's apportionment cases and abdicated its obligation to rigorously enforce the admissibility requirements for expert testimony.

Absent correction by this Court, the district court's approach could improperly become a roadmap for plaintiffs in future cases with significant negative consequences.  And unsure whether a damages award will be limited to the incremental value of the asserted technology, parties will lack valuable common ground to guide settlement discussions.  The resulting settlements will reflect the risk of a large, unapportioned damages award rather than the economic value of the asserted patents. Those settlements may in turn incorrectly become the basis for future damages demands, further distancing future damages awards from economic reality.  The real-world examples discussed at pp. 19-22 demonstrate the problems that arise when district courts do not enforce well-established apportionment principles.

The district court's approach will distort efforts to voluntarily settle

patent disputes in other ways as well. Defendants will worry, for example, that small lump-sum settlements that make economic sense today will be wrongly used to justify inflated per-unit royalties in the future. Without proper scrutiny of damages expert testimony under Rule 702, defendants will also worry about plaintiffs holding out for larger settlements due to the threat of plaintiffs' inflated damages testimony reaching the jury. The ultimate loser will be consumers who face higher prices for reasons having nothing to do with the technological value of patents those products allegedly practice.

That is not the damages regime that Congress intended or that this Court's apportionment cases contemplate. This Court should instead reiterate that district courts must rigorously assess damages opinions under Rule 702 and reaffirm the important apportionment principles that anchor damages awards to a patent's technological contribution.

## ARGUMENT

### I. RECENT AMENDMENTS TO FEDERAL RULE OF EVIDENCE 702 HIGHLIGHT THE PERENNIAL IMPORTANCE OF THE JUDICIAL GATEKEEPING ROLE

The district court's admission of Dr. Kennedy's testimony rests on a fundamental misunderstanding of its gatekeeping role under Federal Rule of Evidence 702. *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S.

579, 589 (1993)  Under that rule, an expert witness may testify only if the proponent proves by a preponderance of the evidence that the expert's "testimony is based on sufficient facts or data," is "the product of reliable principles and methods," and "reflects a reliable application" of that method.  Fed. R. Evid. 702.  Courts cannot delegate to the jury the responsibility to ensure expert testimony meets these requirements.  Rather, "district courts may allow juries to evaluate and weigh *only* relevant and reliable expert testimony."  *In re Onglyza (Saxagliptin) and Kombiglyze (Saxagliptin and Metformin) Products Liability Litigation*, 93 F.4th 339, 347-48 (6th Cir. 2024).

The district court violated this mandate by admitting Dr. Kennedy's testimony without any analysis or explanation.  It is not enough for a court to say, as the district court did here, that the other party can cross-examine the expert.  This not only delegates responsibility to identify unreliable expert testimony to the jury, but also flips the burden of proof.  Expert testimony does not come with a presumption of reliability, and it is not the burden of the party challenging an expert to prove the expert's testimony is flawed.  Rule 702 places the burden on "the propo-

nent" of the expert testimony "to demonstrate to the court" that the testimony satisfies the rule's requirements. For that reason, courts must rigorously analyze whether expert opinions rest on a reliable foundation and conform to the legal principles announced by this Court *before* allowing a jury to hear those opinions—an analysis the district court did not do here.

The district court may have mistakenly believed that whether Dr. Kennedy's opinions are supported by sufficient facts or reliably derive a per-unit royalty from the three licenses go merely to the weight his opinions deserve. Because "many courts" shared this same view, the Advisory Committee recently amended Rule 702 to clarify that this view is "an incorrect application of Rules 702 and 104(a)." Fed. R. Evid. 702, 2023 Adv. Comm. Notes. Recent amendments to Rule 702 clarify that "the sufficiency of an expert's basis" for his opinions and "the application of the expert's methodology" are questions of admissibility rather than weight. *Id.*

Those amendments reinforce what was already required by Rule 702 at the time of trial in this case. *First*, the 2023 amendments add the words "more likely than not" to the first sentence of the rule. Fed. R.

Evid. 702; Fed. R. Evid. 702, 2023 Advisory Comm. Notes.  The Advisory

Committee added those words "to clarify and emphasize" that the propo-

nent of expert testimony must establish by a preponderance of the evi-

dence that the proffered testimony meets *all* "the admissibility require-

ments set forth in the rule."  Fed. R. Evid. 702, 2023 Advisory Comm.

Notes.  Although this preponderance standard applies generally to ad-

missibility questions, the Advisory Committee noticed that many "judges

did not apply the preponderance standard of admissibility to the require-

ments of sufficiency of basis and reliable application of principles and

methods."  Advisory Comm. on Evid. Rules, *Minutes of the Meeting of

Nov. 13, 2020*, Advisory Comm. on Evid. Rules Agenda Book 15, 17 (Apr.

30, 2021), available at https://tinyurl.com/ycxvurnv.  Instead, like the dis-

trict court here, many courts held "that such issues were ones of weight

for the jury."  *Id.*  For example, Western Digital challenged the basis for

a damages expert's opinion that assumed without analysis that there was

no price elasticity in the demand for the accused product under a lost

profits theory.  *Guzik Tech. Enterprises, Inc. v. Western Digital Corpora-

tion et al.*, No. 5:11-cv-03786 (N.D. Cal.) ("*Guzik*"), D.I. 316-3 at 9-13.  The

plaintiff argued in response that complaints about the "facts or data" the

expert relied upon in forming his opinion "is a topic for cross-examination," not exclusion. *Guzik*, D.I. 363-3 at 7-8. Western Digital's motion to exclude was denied without comment. *Guzik*, D.I. 448 at 25. The 2023 amendments sought to put an end to that mistaken practice.

*Second*, the 2023 amendments changed the language in Rule 702(d) that "the expert has reliably applied" his chosen methodology to require that "the expert's opinion reflects a reliable application" of his methodology. Fed. R. Evid. 702, 2023 Advisory Comm. Notes; *see also* Fed. R. Evid. 702(d) . This amendment was again meant to clarify Rule 702's existing requirements. Fed. R. Evid. 702, 2023 Advisory Comm. Notes. The Advisory Committee sought to make clear that an admissible "expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." *Id.*

Too many decisions, as the Advisory Committee recognized, consider only whether an expert applied a reliable methodology without scrutinizing whether the expert reached a reliable conclusion. *See* Advisory Comm. on Evid. Rules, *Report to the Standing Committee* at 6 (May 15, 2022) ("2022 Advisory Committee Report"), available at https://ti-

nyurl.com/4vmtdkhx. For example, in a recent case against Western Digital, the defendants moved to exclude the technical expert's "overprovisioning" model and the damages expert's related opinions relying on that model. *Vervain LLC v. Western Digital Corporation et al.*, No. 6:21-cv-00488 (W.D. Tex.) ("*Vervain*"), D.I. 115. The plaintiff argued in response that the reliability inquiry focuses on "the principles and methodology an expert uses in forming her opinions rather than the expert's conclusions." *Vervain*, D.I. 131 at 11 (internal quotation omitted); *see also id.* at 14, 21 (arguing cross-examination, not exclusion, is appropriate remedy for disagreeing with expert's conclusions). The defendant's motion was denied without opinion. *Vervain*, D.I. 179 at 2.

This approach—ignoring the expert's conclusion when assessing reliability—again impermissibly delegates the district court's gatekeeping responsibilities to the jury. The Supreme Court has previously held that "conclusions and methodology are not entirely distinct." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). For that reason, courts must carefully evaluate how an expert used his chosen methodology to reach his conclusion. Rule 702(d) thus "empowers" courts to "pass judgment on the conclusion that the expert has drawn from the methodology." 2022 Advisory

Committee Report at 6  Nothing in the Rule permits courts to skip this step or to dismiss it as a topic for cross-examination.

These judicial gatekeeping responsibilities provide important protections for litigants.  Expert evidence "can be both powerful and quite misleading." *Daubert*, 509 U.S. at 595.  Rigorously enforcing Rule 702's requirements ensures such misleading expert evidence does not reach the jury.  Jurors are well suited to make credibility determinations, but often lack the tools to identify and disregard misleading expert testimony on their own.  *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1310 (11th Cir. 1999) (jurors "would likely be even less equipped than the judge to make reliability and relevance determinations and more likely than the judge to be awestruck by the expert's mystique"); *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) ("given the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead than to enlighten should be excluded").

Almost by definition, a juror will ordinarily lack the expertise necessary to meaningfully evaluate the reliability of the methods underlying an opinion offered under Rule 702.  Fed. R. Evid. 702 (expert testimony admissible if, among other requirements, "expert's scientific, technical,

or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue"); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) ("the expert's testimony often will rest upon an experience confessedly foreign in kind to [the jury's] own" (internal citation omitted)). Jurors likewise typically lack the tools to assess whether an expert's conclusions go beyond what the record and the expert's chosen method can reliably support. Fed. R. Evid. 702, 2023 Advisory Comm. Notes; *see also Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 354-55 (5th Cir. 2007) ("the expert's testimony must be reliable at each and every step or else it is inadmissible"). District courts, aided by somewhat more time and the parties' deeper analyses and arguments, can carefully ensure the expert testimony satisfies all requirements of Rule 702 before allowing the jury to consider that testimony.

Rule 702's safeguards are especially important in patent damages cases. Calculating a reasonable royalty for today's technology-heavy products requires reliably separating the value of the patented technology from the thousands of other valuable technologies in complex processors, storage devices, and computers. Experts increasingly use elaborate regressions or conjoint studies to isolate this value. *See, e.g.*, *VLSI Tech.*

*LLC v. Intel Corp.*, 87 F.4th 1332, 1346-1349 (Fed. Cir. 2023). Those methods are widely accepted, but it is easy for an expert to misapply these math-intensive techniques in ways that lead to unreliable royalty numbers. *See* William F. Lee & Mark. A Lemley, *The Broken Balance: How 'Built-In Apportionment' And The Failure To Apply* Daubert *Have Distorted Patent Infringement Damages*, 37 Harv. J. of Law & Tech. 255, 305-319 (2024). Jurors generally lack the time and evidentiary record to determine whether experts are using regressions or conjoint analyses in a reliable way. And it is impossible for a jury to pressure test the reliability of a regression or conjoint study in the middle of trial through the largely oral presentation of complex mathematical calculations. In view of the time constraints of trial, the jurors may not have access to the underlying calculations at all. And without a reliable royalty calculation, a jury cannot assess whether an expert reliably derived a running royalty from a lump-sum license.

This Court should use this case to clarify the role of district courts in scrutinizing patent damages opinions and the standards district courts must apply under Rule 702. Other courts of appeals have recently reminded district courts of that important responsibility, recognizing the

widespread misapplication of Rule 702 in the district courts.  *See, e.g.*, *In re Onglyza*, 93 F.4th at 348 n.7; *Harris v. FedEx Corp. Svcs., Inc.*, 92 F.4th 286, 303 (5th Cir. 2024); *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 283-84 (4th Cir. 2021).  The district court's largely non-existent Rule 702 analysis in this case illustrates the need for such guidance in patent cases as well.

## II.    140 YEARS OF SUPREME COURT PRECEDENT MANDATE MEANINGFUL APPORTIONMENT OF PATENT DAMAGES

Under Rule 702, a damages expert's opinion is not admissible unless the proponent of the testimony can demonstrate that it is more likely than not that the opinion testimony is "the product of reliable principles and methods," and an opinion that does not apply the legal requirements for calculating damages *cannot* be reliable.  *See* Fed. R. Evid. 702.  The patent statute states a patentee shall be awarded "damages adequate to compensate for the infringement."  35 U.S.C. § 284; *see also Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) ("the value to be measured is only the value of the infringing features of an accused product" for purposes of assessing damages under § 284).  This requirement that damages must be "adequate to compensate for the infringement," but not more, reflects the legal requirement of apportionment that

must be considered for a damages opinion to be reliable.

Apportionment is rooted in longstanding Supreme Court precedent. One hundred and forty years ago, the Supreme Court held that a patentee "must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features." *Garretson v. Clark*, 111 U.S. 120, 121 (1884). Even then, apportionment principles were not new. *See Seymour v. McCormick*, 57 U.S. 480, 491 (1853) (trial court committed "very grave error" in instructing jury regarding damages that "the same rule is to govern, whether the patent covers an entire machine or an improvement on a machine," because the patent-in-suit was for only an "improvement of small importance when compared with the whole machine"); *see also Blake v. Robertson*, 94 U.S. 728, 733-34 (1876). This simple, yet critical, concept—that patentees should only be rewarded for the incremental value of their invention—has been the cornerstone of patent damages law since *Garretson*. *Accord Ericsson*, 773 F.3d at 1232 ("patents often claim only small portions of multi-component products and we have precedent which covers apportionment of damages in those situations" (citing *Garretson*)); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318

(Fed. Cir. 2011) (applying apportionment principles "derived from Supreme Court precedent" in *Garretson* to vacate $388 million award and order new trial on damages); *Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co.*, 225 U.S. 604, 614-15 (1912) (if infringing product contains multiple components but "plaintiff's patent only created a part of the profits, he is only entitled to recover that part of the net gains" (citing *Garretson*)); *Lattimore v. Hardsocg Mfg. Co.*, 121 F. 986, 987-988 (8th Cir. 1903) (similar); *Westinghouse v. New York Brake Co.*, 140 F. 545, 549 (2d Cir. 1905) (same).

Apportionment remains the law to this day. *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1283 n.3 (Fed. Cir. 2017) ("While these pre-§ 284 cases apply to a different damages regime, nonetheless, we find the basic principle of apportionment which they espouse applies in all of patent damages."), *cert. dismissed*, 139 S. Ct. 44 (2018); *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014) (patentee "must take care to seek only those damages attributable to the infringing features" (citing *Garretson*)). Too often, however, courts pay lip service to the principles of apportionment but do not apply them faithfully. For example,

in recent cases, the Federal Circuit has permitted royalties to be calculated from revenues for the entire accused product, even where the incremental benefit claimed by the patent was directed to only a specific component or narrow feature. *E.g., Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Group LLC*, 879 F.3d 1332, 1348-49 (Fed. Cir. 2018) (permitting royalty calculated using sales of entire lawn mowers, rather than the "flow control baffles" claimed by the asserted patents); *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1339-1340 (Fed. Cir. 2015) (permitting damages calculated on entire pharmaceutical, rather than the "subcoating" claimed in the patents).

The district court and panel here went even further in failing to enforce apportionment principles. The panel majority found that Ecofactor did not need to apportion the royalty rate in three Ecofactor licenses—covering Ecofactor's *entire portfolio*—despite the fact Ecofactor asserted Google infringed a single patent. Op. at 15. In reaching its decision, the panel majority held that "further apportionment may not be required because the comparable license has built-in apportionment" (whatever that means). *Id.* But as the dissent persuasively explained, that "ignores the

key failure" of patentee's expert on the factual record: he "failed to account for the impact of the *specific* remaining patents" covered by the allegedly comparable license agreements at issue despite Ecolab's admission it "use[d] the same $X rate" in its licenses "regardless of the number of patents." Dissent at 9. This type of "circumstance-agnostic analysis is insufficient" under apportionment principles reflected in binding Supreme Court precedent. *Id.* at 8. And under these facts and Rule 702, it is not an answer to say that the question is merely one of weight, leaving it for cross-examination to test the strength of the expert's opinions. *See* Op. at 19. Faithfully applying Rule 702 and *Daubert* standards would protect against damages awards that fail to apportion damages to reflect the value contributed by the patent(s) and not other, unpatented features.

## III. NOT ENFORCING APPORTIONMENT PRINCIPLES HAS REAL-WORLD CONSEQUENCES BY ARTIFICIALLY INFLATING CONSUMER PRICES WHILE STIFLING INNOVATION

### A. Failing To Enforce Apportionment Principles Opens The Floodgates To Royalty Stacking, Risking Defendants Paying Repeatedly For The Full Value Of An Accused Technology

Apportionment is always important, but it is particularly so today,

when technology-heavy products frequently consist of hundreds or thousands of features and components—each of which may be covered by a patent. *E.g., Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 635 (2008) ("each Intel microprocessor and chipset practices thousands of individual patents"). Failing to properly enforce apportionment principles leads to outsized royalty damages awards, coerced eve-of-trial settlements, and licensing uncertainty—which can be marshalled by plaintiffs to demand higher licenses and even greater damages awards. This feedback loop means creators of complex, multi-component products, such as *amici*, are increasingly vulnerable to opportunistic threats.

For example, in a 2014 case, Intel faced a $10 billion damages claim—several times larger than the largest patent verdict ever awarded—based on patents related only to discrete aspects of circuit architecture. *See* Simpson, *Intel Settles Patent Row That Future Link Valued At $10B*, Law360 (Aug. 18, 2017); *Intel Corp. v. Future Link Sys., LLC*, No. 14-cv-377 (D. Del.) ("*Intel*"), D.I. 541 at 3-5 (asserting accused products "contain numerous other technologies" than those accused of infringement). One expert, opining regarding six patents, began with four allegedly comparable licenses, made no adjustments to the royalty rate

based on differences between those licenses and the hypothetical negotiation, and made no reference to apportionment (asserting it was "embedded" in the licenses' royalty rate). *Intel*, D.I. 621 at 3; *Id.*, D.I. 541 at 8-9.  Another expert, opining regarding the remaining patents, "did not conduct a technical apportionment analysis" by Future Link's own admission.  *Id.*, D.I. 621 at 4; *Id.*, D.I. 541 at 12-16.  The district court allowed both experts' testimony under Rule 702, asserting that the issues could be addressed by cross-examination.  *Id.*, D.I. 621 at 3-4, 5-6.  Had the case not settled, trial would have proceeded with the parties presenting the jury with damages goalposts nearly $10 billion apart.  *See* Simpson (Intel assessed patents were worth $10 million).  Thus, absent proper apportionment, litigation uncertainty can be bootstrapped into a windfall for a plaintiff, particularly when it comes to application of apportionment principles to today's world of high-tech, multi-feature products.

Recent Dell cases also demonstrate the broad implications apportionment has on standards-related litigation.  In one case, Dell faced a plaintiff who asserted that playing standard video files, together with audio, infringed three patents.  *VideoLabs, Inc. v. Dell Techs. Inc. et al.*, No. 6:21-cv-00456 (W.D. Tex.) ("*VideoLabs*").  Thousands of other patents

were purportedly essential to the standard. *VideoLabs*, D.I. 223 at 1. Yet the plaintiff's expert opined that the full value of the standard was captured by the three patents-in-suit, without ever conducting a technical or economic analysis of **any** of the other patents declared essential to the standard. *Id.* at 1, 12. Instead, he opined that those patents had "very little value, if any" because the standard could not be commercially practiced without, in his opinion, infringing the patents-in-suit. *Id.* at 14-15.

In another case, Dell faced a plaintiff asserting eight patents related to Wi-Fi technology. *AX Wireless LLC v. Dell Inc. et al.*, No. 2:22-cv-00277 (E.D. Tex.) ("*AX Wireless*"). By one estimate published in 2021, the top 20 companies contributing to the Wi-Fi standard have at least 640 families of self-declared standard essential patents, likely consisting of thousands of patents and relating to a variety of technologies that may or may not be practiced by the Wi-Fi standard. *See* Nakane and Orita, *Data analysis: essentiality report on Wi-Fi 6 patents 2021* (Nov. 15, 2021), available at https://tinyurl.com/22mfu3vk. The plaintiff's damages expert derived a per-device royalty rate by averaging royalty rates for five portfolios of patents essential to the Wi-Fi standard, each allegedly con-

taining hundreds of patents covering myriad aspects of the Wi-Fi standard. *AX Wireless*, D.I. 212 at 3-5. At no point did he adjust the per-device royalty rate to account for the differences between the eight patents AX Wireless asserted and the hundreds of patents in the portfolios. *Id.* Indeed, for two of the patent portfolios, the plaintiff's damages expert adjusted the royalty rate *upwards* "to purportedly 'adjust[] to the incremental benefits attributable to' the asserted patents," even though he admitted that "other patents in the standards also provide these benefits." *Id.* at 3-4. In other words, the plaintiff's damages expert made no effort to apportion his per-device royalty rate to derive the incremental value of the eight asserted patents separate from the royalty rates for patent portfolios comprising hundreds of patents covering various technologies unrelated to any standard.

If the logic espoused by the plaintiffs' damages experts in *Video-Labs* and *AX Wireless* were accepted, it would embolden any patentee with a declared standard-essential patent to follow their example. It would quickly become the norm for purported standard-essential patent holders to improperly claim that its patent is entitled to a royalty rate representing the entire value of the standard, or at least a royalty rate

representing hundreds of standard essential patents that may or may not cover the same aspect of the technology standard. Implementers of standards thus may face serial lawsuits, each wrongly seeking damages measured by the value of the standard, not the asserted patent. This would leave defendants exposed to future lawsuits seeking overlapping, duplicative damages for alleged infringement of other patents covering the same technologies or potentially essential to the same standard.

B. **Failing To Enforce Apportionment Principles Upends Real-World Licensing Negotiations—Including for Standards—And Harms Consumers**

The potential for windfall damages or favorable settlement agreements shown by these cases demonstrate why it is enticing for plaintiffs to seek judgments in the hundreds of millions or even billions of dollars based on patents directed toward nominal features of complex, high-tech products. But the public pays a price for the uncertainty created without the predictable application of apportionment principles. Without knowing that a damages award will be limited to the incremental value of the patented technology, the parties' settlement negotiations lack an anchoring value for the technology actually at issue and are riddled with uncer-

tainty.  This inevitably leads to some settlements where the parties as-

sign the same technology significantly varied values—not based on the

footprint of the invention, but on the risk of unapportioned awards.  In

those circumstances, such risk-based settlements—not any technological

apportionment—may become the basis for future damages awards,

whether or not they have any relation to the actual value contributed by

the patented invention.  That approach is unmoored from the core appor-

tionment principles the Supreme Court imposed 140 years ago.

Further, the uncertainty and risk of overcompensation caused by

failing to enforce apportionment principles inevitably raises consumer

prices for reasons having nothing to do with the technological value of

patents, and imposes other social costs by discouraging innovation, in-

vestment, and the manufacture of complex products.  As the Federal

Trade Commission observed, "[p]atent damages that … overcompensate

patentees for infringement compared to the market can have detrimental

effects on innovation and competition."  FTC, *The Evolving IP Market-

place* (2011), at 148; *see also* Michel, *Bargaining for RAND Royalties in

the Shadow of Patent Remedies Law*, 77 Antitrust L.J. 889, 895 (2011)

("inflated damage awards can discourage innovation by raising the costs

of product development and increasing the risks of investment for other innovators and manufacturers"). And as another commentator explained, "[w]hen patentees are compensated for more than their invention is worth … there is a corresponding disincentive for potential infringers to engage in beneficial commercial activity." Love, *Patentee Overcompensation and the Entire Market Value Rule*, 60 Stan. L. Rev. 263, 279 (2007). The costs of not just overcompensation, but also uncertainty and the risk from unpredictable (and exorbitant) jury awards, are ultimately born by consumers.

The threat is particularly acute in the realm of standard-essential patents. Thousands of patents are often declared essential for technology standards. *Ericsson*, 773 F.3d at 1209 (standards may implicate "hundreds, if not thousands," of patents). *Amici* and similarly-situated companies often face challenges seeking to obtain a license to these patents. If *amici* entered into license agreements with each licensor at their respective asking prices, they would pay multiple times the actual value of the standard. The reasoning in the panel majority's opinion would validate licensors' arguments, putting *amici* and other licensees at risk of overcompensating for the value contributed by a standard. Consumers,

in the end, would be forced to pay multiple times what a particular standardized technology is worth.

Patent damages should be predictable—not a lottery.  For 140 years, meaningful application of apportionment principles has been critical to the "carefully crafted bargain for encouraging" innovation enacted by Congress.  *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 150-151 (1989).  This Court should clarify apportionment law and reaffirm the critical gatekeeping role district courts must serve to enforce that law under Rule 702.

## CONCLUSION

The Court should vacate the district court's denial of a new trial on damages and remand for a new damages trial where the record is limited to evidence that complies with apportionment principles.

November 26, 2024

Respectfully submitted,

/s/ *John C. O'Quinn*

John C. O'Quinn
Jason M. Wilcox
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004
(202) 389-5000
john.oquinn@kirkland.com
jason.wilcox@kirkland.com

Meredith Zinanni
KIRKLAND & ELLIS LLP
333 W. Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000
mzinanni@kirkland.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE WITH
## TYPE-VOLUME LIMITATION

This brief complies with the type-volume limitations of the Rules of Appellate Procedure and the Rules of this Court. According to the word processing system used to prepare it, the brief contains 4,931 words.

*/s/ John C. O'Quinn*
John C. O'Quinn