No. 2023-1101

# United States Court of Appeals for the Federal Circuit

_____

ECOFACTOR, INC.,
*Plaintiff-Appellee,*

v.

GOOGLE, LLC,
*Defendant-Appellant*

_____

On Appeal from the United States District Court for the
Western District of Texas, No. 6:20-cv-00075, Judge Alan D. Albright

---

## BRIEF *AMICUS CURIAE* OF ASKELADDEN L.L.C. IN SUPPORT OF DEFENDANT-APPELLANT AND REVERSAL

---

CARTER G. PHILLIPS
JOSHUA J. FOUGERE
KIMBERLY R. QUICK
SIDLEY AUSTIN LLP
1501 K STREET, NW
WASHINGTON, D.C. 20005
TEL.: (202) 736-8000
FAX: (202) 736-8711

*Counsel for Amicus Curiae*

November 26, 2024

# CERTIFICATE OF INTEREST

Counsel for *amicus curiae* Askeladden L.L.C. certifies the following:

1. The full name of every entity represented in this case by me is Askeladden L.L.C.

2. Askeladden L.L.C. is the real party in interest.

3. Askeladden L.L.C.'s parent company is The Clearing House Payments Company L.L.C. No publicly held company owns 10 percent or more of the stock of Askeladden L.L.C.

4. The names of all law firms and the partners or associates who appeared for Askeladden L.L.C. in the trial court or are expected to appear in this Court are Carter G. Phillips, Joshua J. Fougere, and Kimberly R. Quick of Sidley Austin LLP.

5. This Court resolved an earlier appeal from the same civil action in *EcoFactor, Inc. v. Google LLC*, No. 2023-1101. The Court's opinion was issued June 3, 2024, and is reported at 104 F.4th 243. The panel consisted of Circuit Judges Lourie, Prost, and Reyna.

6. I am not aware of any case that will directly affect or be directly affected by this Court's decision in the pending case.

*/s/ Carter G. Phillips*
Carter G. Phillips

November 26, 2024

# TABLE OF CONTENTS

Certificate of Interest............................................................................. i

Interest of *Amicus Curiae* ................................................................... 1

Introduction and Summary of Argument......................................... 3

Argument .................................................................................................. 4

    I.    THE UNAPPORTIONED DAMAGES TESTIMONY EXTRAPOLATED FROM A LUMP SUM SHOULD HAVE BEEN EXCLUDED. ................................................................. 4

        A.    Plaintiff's Expert Did Not Properly Extract A Royalty Rate From Lump Sum Licenses. ..................................................... 6

        B.    Plaintiff's Expert Did Not Properly Apportion the Damages Calculation.............................................................................. 8

    II.    FAILURE TO POLICE RULE 702 RISKS DISTORTING EFFECTS THROUGHOUT PATENT LITIGATION...................... 9

Conclusion................................................................................................ 13

Certificate of Compliance

Certificate of Service

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple, Inc., v. Wi-LAN, Inc.,*
 25 F.4th 960 (Fed. Cir. 2022)....................................................... 8

*Barefoot v. Estelle,*
 463 U.S. 880 (1983) .................................................................... 5

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,*
 489 U.S. 141 (1989) .................................................................... 9

*Daubert v. Merrell Dow Pharms., Inc.,*
 509 U.S. 579 (1993) .............................................................. 4, 13

*Ericsson, Inc. v. D-Link Sys., Inc.,*
 773 F.3d 1201 (Fed. Cir. 2014) ................................................. 8

*Garretson v. Clark,*
 111 U.S. 120 (1884) .................................................................... 8

*Kumho Tire Co. v. Carmichael,*
 526 U.S. 137 (1999) .................................................................... 5

*Lucent Techs., Inc. v. Gateway, Inc.,*
 580 F.3d 1301 (Fed. Cir. 2009) ................................................. 6

*MCL Intell. Prop., LLC v. Micron Tech., Inc.,*
 10 F.4th 1358 (Fed. Cir. 2021)................................................... 7

*Omega Pats., LLC v. CalAmp Corp.,*
 13 F.4th 1361 (Fed. Cir. 2021)................................................... 8

*Prism Techs. LLC v. Sprint Spectrum L.P.,*
 849 F.3d 1360 (Fed. Cir. 2017) ............................................... 11

*Rude v. Westcott,*
 130 U.S. 152 (1889) .................................................................. 12

*Whitserve, LLC v. Comput. Packages, Inc.*,
694 F.3d 10 (Fed. Cir. 2012) ................................................................. 6

**Other Authorities**

FED. R. EVID. 702; COMM. ON RULES PRAC. & PROC. JUD. CONF.
U.S., REPORT TO THE STANDING COMM. ADVISORY COMM. ON
EVID. RULES (2022) ................................................................................. 5

FTC, *The Evolving IP Marketplace* (2011) ............................................. 11

Hovenkamp & Masur, *How Patent Damages Skew Licensing
Markets*, 36 Rev. Litig. 379 (2017) ................................................ 10, 11

Lee & Lemley, *The Broken Balance: How 'Built-In
Apportionment' and the Failure to Apply* Daubert *Have
Distorted Patent Infringement Damages*, 37 Harv. J.L. &
Tech. 255 (2024) ................................................................................... 10

# INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* Askeladden L.L.C. is a wholly owned subsidiary of The Clearing House Payments Company L.L.C. The Clearing House is a banking association and payments company that is owned by the world's largest commercial banks and dates back to 1853. The Clearing House owns and operates core payments system infrastructure in the United States, clearing and settling more than $2 trillion in payments each business day. As the country's oldest banking trade association, The Clearing House also provides informed advocacy and thought leadership on critical payments-related issues.

Independent of the business and activities of The Clearing House, Askeladden founded the Patent Quality Initiative as an education, information, and advocacy effort to improve the understanding, use, and reliability of patents in financial services and elsewhere. Through the Patent Quality Initiative, Askeladden strives to improve the patent system by, among other things, promoting improved patent holder behavior while

[1] No party's counsel authored this brief in whole or part; no party nor party's counsel contributed money intended to fund preparing or submitting it; and no person—other than *amicus*, its members, or its counsel—contributed money intended to fund preparing or submitting it. This brief is authorized pursuant to the Court's order granting rehearing *en banc*. Dkt. No. 76.

also supporting effective intellectual property practices and improved innovation rights. As a frequent participant in the patent system and thought leader on patent issues, Askeladden often looks for meaningful opportunities to provide its views to key decision-makers on important issues related to patent law.

This Court's decision to review *en banc* the proper scope of expert testimony on patent damages provides such an opportunity. The financial services industry is a frequent target of lawsuits asserting low-quality patents and seeking inflated damages payouts. At the same time, the financial services industry regularly seeks patent protection to support and advance innovation. As regular participants in the patent system, Askeladden and the financial services industry have an interest in ensuring that damages are properly apportioned to reflect only the actual value of patented inventions. That is especially true given the high volume of transactions in the payments ecosystem: when a royalty rate is multiplied by millions or billions of transactions to get a damages number, the need for a reliable and properly apportioned royalty rate is critical.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The exploding size of damages awards for patent infringement is a problem. These days, nine-figure verdicts are not uncommon, and eight-figure awards—tens of millions of dollars—seem to hardly raise an eyebrow. While some of those awards are surely based on sound and reliable expert testimony, many of them are not. Loose applications of Rule 702 and *Daubert* have allowed damages to balloon in ways that are unconnected to the invention, unconnected to the alleged infringement, and unconnected to the marketplace. The system needs a reset.

The expert testimony in this case reveals two ways in which district courts have drifted far from Rule 702's confines. First, generating a reasonable royalty rate from lump-sum royalty payments is fraught with risk and requires vigilance to ensure both that the royalty rate hews closely to the facts of the case and that the methodology is reliable. EcoFactor's expert did not do that. Second, damages must be apportioned to capture only the incremental value of the patented technology, particularly as products become increasingly sophisticated. EcoFactor's expert did not do that either. The expert testimony was not based on sufficient facts or data, was not reliable, and should have been excluded.

The distortions from failing to enforce Rule 702 ripple across many aspects of patent law. The prospect of a massive payday causes license rates to be gerrymandered so that they can sweep in more patents, serve as "comparable" licenses for more cases in court, and increase royalty rates. That incentivizes more litigation, which itself becomes harder to settle if patentees think they can get an expert in front of a jury who will testify to unapportioned and exaggerated royalty rates. These perverse incentives have an especially severe impact on industries like financial services, where the volume of transactions can be colossal. When the royalty base is a big number, any amount of improper inflation in the royalty rate carries enormous consequences for damages. The Court should use this *en banc* review to reinforce the safeguards of Rule 702, realign the incentives for innovation, and reverse.

## ARGUMENT

## I. THE UNAPPORTIONED DAMAGES TESTIMONY EXTRA-POLATED FROM A LUMP SUM SHOULD HAVE BEEN EXCLUDED.

"'Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.'" *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993). Indeed, it is "widely acknowledged" that expert testimony may "impres[s] lay jurors[, who] tend to assume it is more

accurate and objective than lay testimony." *Barefoot v. Estelle*, 463 U.S.

880, 926–27 & n.8 (1983) (Blackmun, J., dissenting). The Federal Rules of

Evidence, therefore, demand that expert testimony be carefully scrutinized

*before* it reaches the jury. To that end, Rule 702 "imposes a special

obligation upon a trial judge to 'ensure that any and all scientific testimony

… is not only relevant, but reliable.'" *Kumho Tire Co. v. Carmichael*, 526

U.S. 137, 147 (1999).

Rule 702 was amended in 2023 because courts were not properly

following its strictures. The changes were meant to "clarify and

emphasize" the admissibility requirements. FED. R. EVID. 702; COMM. ON

RULES PRAC. & PROC. JUD. CONF. U.S., REPORT TO THE STANDING COMM.

ADVISORY COMM. ON EVID. RULES, at 2 (2022). "[M]any courts ha[d] held

that the critical questions of the sufficiency of an expert's basis, and the

application of the expert's methodology, are questions of weight and not

admissibility." *Id.* That was "incorrect." *Id.*

These principles impose important limitations on patent damages,

two of which are at issue here: (A) using lump sum royalties to calculate a

royalty rate, and (B) apportioning damages to exclude the value of non-

patented features. The district court erred on both issues.

### A. Plaintiff's Expert Did Not Properly Extract A Royalty Rate From Lump Sum Licenses.

As this Court has recognized, "[s]ignificant differences exist between a running royalty license and a lump-sum license." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1326 (Fed. Cir. 2009). Of course, a "lump sum" is a one-time fixed payment for unlimited use of a licensed technology, while a "running royalty" involves payments proportional to each sale, profit, or use of the licensed product. *Id.* But the economic differences also impact incentives and risks. For instance, a licensee who wishes to raise cash quickly, or a licensor who seeks certainty and hopes to avoid the expense of tracking usage, might want a lump-sum agreement. *Id.* Alternatively, a company that produces straightforward, low-volume products or wants a steady cash flow may prefer a running royalty into the future.

Given these differences, this Court has cautioned that "lump sum payments … should not support running royalty rates without testimony explaining how they apply to the facts of the case." *Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 30 (Fed. Cir. 2012). There has to be "some basis for comparison … in the evidence presented to the jury." *Lucent*, 580 F.3d at 1330. When the expert does "not provide mathematical

analysis to derive the … royalty rate from the lump-sum payments in the [various] licenses," and when the proposed rate is "incompatible with the … agreement as a whole," the testimony should be excluded.  *MCL Intell. Prop., LLC v. Micron Tech., Inc.*, 10 F.4th 1358, 1368 (Fed. Cir. 2021). Absent sound methodology, the royalty rate becomes too divorced from the facts of the case and too unreliable.

That is what happened here.  EcoFactor's expert derived his royalty rate from three lump-sum agreements.  Of the three prior lump sum licenses, two contained clauses explaining that the lump sum payment "is *not* based upon sales and does *not* reflect or constitute a royalty."  Dkt. No. 18, *EcoFactor* Dissent at 3 (emphasis added).  The third merely contained a "whereas" clause that was untethered to "any underlying financial information or sales data."  *Id*. at 4.  The expert's calculations primarily relied on "self-serving recitals [that] reflect only EcoFactor's transparent attempt to manufacture a royalty rate using its 'belief.'"  *Id*. at 4-5.  Rule 702 demands better than self-serving data unconnected to the facts and methodologically unsound calculations.

**B.** **Plaintiff's Expert Did Not Properly Apportion the Damages Calculation.**

Apportionment in patent damages should be a settled concept. More than a century ago, the Supreme Court recognized that patentees "must in every case give evidence tending to separate or apportion the defendant's profits and patentee's damages between the patented feature and the unpatented features." *Garretson v. Clark*, 111 U.S. 120, 121 (1884). Adapted for today's complex and "multi-component products," "the governing rule is that the ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).

That governing rule continues to govern when experts use allegedly comparable license agreements to estimate a reasonable royalty. The damages expert still must, for example, "account for differences in the technologies and economic circumstances of the contracting parties." *Apple, Inc., v. Wi-LAN, Inc.*, 25 F.4th 960, 971 (Fed. Cir. 2022) (cleaned up). A failure to do so leaves the opinion "untethered to the facts of th[e] case." *Id.* at 971–74; *see also, e.g.*, *Omega Pats., LLC v. CalAmp Corp.*, 13 F.4th 1361, 1380–81 (Fed. Cir. 2021) (excluding testimony that failed to account for

"'distinguishing facts' between the proffered licenses and a hypothetical negotiation over a single-patent license").

EcoFactor's expert did none of this. He based his hypothetical negotiation on licenses that indisputably included several non-asserted patents. He did not attempt to determine the impact that specific patents in EcoFactor's portfolio could have on the hypothetical negotiation. And his "circumstance-agnostic" testimony about the licensing strategy—namely that *sometimes*, patentees throw in additional patents for free or discounted prices—falls far short of the required apportionment analysis. Dkt. No. 18, *EcoFactor* Dissent at 8. That means that it was not based on sufficient facts or data and was not based on reliable methods. It should have been excluded and a new trial ordered.

## II. FAILURE TO POLICE RULE 702 CREATES DISTORTING EFFECTS THROUGHOUT PATENT LITIGATION.

"The federal patent system … embodies a carefully crafted bargain for encouraging the creation and disclosure of new, useful, and nonobvious advances in technology and design." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 150–51 (1989). Rigorously policing the boundaries of Rule 702 for patent damages is essential to maintaining that bargain. "[I]f patentees are permitted to recover damages on the value of

technology they did *not* invent, the balance is disrupted: patentees can obtain an unjustified windfall; product companies can be required to pay for technology not covered by the patents-in-suit; and the incentives for innovation that builds on previously patented technology, as most innovation does, can be diminished rather than enhanced." Lee & Lemley, *The Broken Balance: How 'Built-In Apportionment' and the Failure to Apply* Daubert *Have Distorted Patent Infringement Damages*, 37 Harv. J.L. & Tech. 255, 258 (2024).

The distortion risks from over-inflated patent damages are widespread and significant.

At one end of the process, excessive damages unmoored from the patented invention distort the licensing market. Everyone knows that experts often look to existing licenses as a factor in devising reasonable royalty rates. If experts can rely on licenses without meaningful oversight under Rule 702, then patentees are incentivized to inflate license values on the front end. They may bundle other goods, assets, or patents to inflate the perceived value. Hovenkamp & Masur, *How Patent Damages Skew Licensing Markets*, 36 Rev. Litig. 379, 409 (2017). Or they might "engineer the sequence of licenses … negotiate[d], with the highest-value licenses

negotiated first (and before any trial occurs)." *Id.* at 407. Or they might simply structure an agreement to make the license appear more lucrative and comparable than it actually is. *Id.* at 408. Whatever the path, "[w]hen one party has an incentive to strategically inflate or alter the terms of [a] license, the license can no longer … provide accurate estimations of a patent's value." *Id.* at 409.

The specter of massive damages awards also creates trickle-down harm to innovation itself. When damages are allowed to exceed an invention's actual value, the incentives warp parties further away from licenses and towards litigation. More specifically, if patent holders can gain more in damages at trial than they can through licensing, the Federal Trade Commission warns, "the result will be excessive litigation that diverts funds from innovative and productive activities." FTC, *The Evolving IP Marketplace* (2011), at 146.

Once in litigation, the skewed incentives continue to compound if one party believes that it has a realistic shot at securing an inflated royalty rate and an inflated damages awards. As this Court has recognized, "the litigation costs still to come at the time of settlement may loom large in parties' decision to settle." *Prism Techs. LLC v. Sprint Spectrum L.P.*, 849

F.3d 1360, 1370 (Fed. Cir. 2017); *see also Rude v. Westcott*, 130 U.S. 152, 164 (1889) ("The avoidance of the risk and expense of litigation will always be a potential motive for a settlement."). But if the patent holder's expected value from a jury verdict is astronomical and overblown—because courts are not properly policing damages experts under Rule 702—that disincentivizes settlement without trial.

The domino effect from all of this is predictable. License fees are bloated to try to increase royalty rates and thus potential damages. The inability to take a reasonable license pushes parties into litigation. Litigation becomes less likely to settle when the parties have fundamentally divergent views about what the litigation is worth—and when negotiations are not properly anchored to the value of the technology actually at issue. And the incentives for innovation built upon previously patented technology are improperly distorted.

These concerns are particularly acute for Askeladden and the financial services industry. The methodology that the district court approved—extracting running royalty rates from lump-sum agreements absent analysis or apportionment—unquestionably yields royalty rates that are larger than they should be. In the financial services industry, any

royalty rate may then be multiplied by huge volumes of transactions to calculate damages. As a matter of basic math, that means that even small differences in the royalty rates—pennies or fractions of a percent—could translate to big swings in damages amounts.

The way to address these concerns is to ensure that district courts apply Rule 702 the way it is supposed to be applied. Any "'[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it,'" *Daubert*, 509 U.S. at 595, but that is especially true for patent damages. Most jurors lack the expertise to value the individual features in complicated, multifaceted products and understandably look to experts to determine damages. That is why a district court's obligation to ensure that experts adhere to sound methods and honest data is so important. Rigorous, up-front attention by the trial court to Rule 702 helps reduce the risk juries will be misled by unsupported or unreliable expert testimony—and all of the negative consequences that can follow.

## CONCLUSION

Having taken this case *en banc*, it now presents an important opportunity to recalibrate district courts' approach to Rule 702 for patent damages in a decision that will provide valuable guidance and will

reverberate going forward.  The Court should embrace that opportunity and reverse.

November 26, 2024                    Respectfully submitted,

                                     /s/ Carter G. Phillips
                                     CARTER G. PHILLIPS
                                     JOSHUA J. FOUGERE
                                     KIMBERLY R. QUICK
                                     SIDLEY AUSTIN LLP
                                     1501 K Street, NW
                                     Washington, D.C. 20005
                                     Tel.: (202) 736-8000
                                     Fax: (202) 736-8711

                                     *Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

Under Federal Rule of Appellate Procedure 32(g) and Federal Circuit Rule 32(b), I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure Rule 29(a)(5) and Federal Circuit Rule 29(b) because it totals 2,603 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

*/s/ Carter G. Phillips*
Carter G. Phillips

November 26, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on November 26, 2024, I caused the foregoing brief to be served on all registered counsel through the Court's CM/ECF system.

*/s/ Carter G. Phillips*
Carter G. Phillips