No. 23-1101

# United States Court of Appeals
# for the Federal Circuit

## ECOFACTOR, INC.,

*Plaintiff-Appellee,*

*v.*

## GOOGLE LLC,

*Defendant-Appellant.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS IN NO. 6:20-CV-00075-ADA, JUDGE ALAN D. ALBRIGHT

**BRIEF OF AMICI CURIAE SAMSUNG ELECTRONICS CO., LTD. AND SAMSUNG ELECTRONICS AMERICA, INC., IN SUPPORT OF APPELLANT AND REVERSAL**

Lauren A. Degnan
Michael J. McKeon
Michael J. Ballanco
FISH & RICHARDSON P.C.
1000 Maine Avenue, S.W.
Suite 1000
Washington, DC 20024
Tel: (202) 783-5070
degnan@fr.com

Matthias A. Kamber
PAUL HASTINGS LLP
101 California Street, 48th Floor
San Francisco, CA 94111
Tel. (415) 856-7000
matthiaskamber@paulhastings.com

Igor V. Timofeyev
PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC 20036
Tel. (202) 551-1700
igortimofeyev@paulhastings.com

November 26, 2024

*Attorneys for Amici Curiae*

## CERTIFICATE OF INTEREST

Counsel for Amici Samsung Electronics Co., Ltd. ("Samsung") certifies the following:

1.  Provide the full names of all entities represented by undersigned counsel in this case.

    **Samsung Electronics Co., Ltd.; Samsung Electronics America, Inc.**

2.  Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

    **None**

3.  Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

    **For Samsung Electronics Co., Ltd.: N/A**

    **For Samsung Electronics America, Inc.: Samsung Electronics Co., Ltd.**

4.  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

    **None**

5.  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

    **N/A**

6.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

    **N/A**

Dated: November 26, 2024      */s/ Lauren A. Degnan*
                              Lauren A. Degnan

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ............................................................... i

TABLE OF AUTHORITIES ................................................................ iv

INTEREST OF *AMICI CURIAE* ........................................................ 1

INTRODUCTION ................................................................................ 2

ARGUMENT ....................................................................................... 5

I.     As a Leading Technology Company, Samsung Wants an Appropriate Balance Between Protecting Patent Rights and Not Inhibiting Innovation .........................................................................5

II.    Samsung's Experience Illustrates the Importance of Empowering District Courts to Enforce the Law of Apportionment Rigorously ...............................................................7

III.   Rule 702 and *Daubert* Require Vigilant Gatekeeping ..................12

     A.    Neither Cross-Examination nor Jury Instructions Are an Adequate Safeguard from the Anchoring Effects that High, Unapportioned Damages Numbers Have on Juries .................13

          1.    The Anchoring Effect................................................. 13

          2.    Cross-Examination and Jury Instructions Are Ineffective Against Anchoring................................. 15

          3.    Vigilance Under *Daubert* Is the Answer ................. 19

     B.    Strict Adherence to the Legal Requirements for Damages Is Required at the *Daubert* Phase Under Rule 702 .............................20

IV.   The *En Banc* Court Should Provide Guidance on Commonly Experienced Damages Issues.........................................................22

     A.    Apportionment Requirements Should Be Strictly Enforced at the *Daubert* Phase.........................................22

B.    Courts Should Scrutinize Expert Opinions that Rely on Generic "Upward/Downward" Pressure ...............................................24

C.    Survey and Regression Analyses Are Not Reliable Where They Measure More Than the Incremental Value of the Patented Invention.................................................................................26

D.    Unsupported, Self-Serving Statements Are Not Sufficiently Reliable Under *Daubert* .................................................27

CONCLUSION .................................................................................. 28

CERTIFICATE OF SERVICE AND FILING ....................................... 30

CERTIFICATE OF COMPLIANCE ................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple, Inc. v. Samsung Elecs. Co.*,
    No. 11-cv-01846 (N.D. Cal.) ...............................................................12

*Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*,
    809 F.3d 1295 (Fed. Cir. 2015) .........................................................23

*Daubert v. Merrell Down Pharms., Inc.*,
    509 U.S. 579 (1993)...................................................................*passim*

*EcoFactor, Inc. v. Google LLC*,
    104 F.4th 243 (Fed. Cir. 2024) ..............................................*passim*

*Ericsson, Inc. v. D-Link Sys., Inc.*,
    773 F.3d 1201 (Fed. Cir. 2014) .........................................................22

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*,
    879 F.3d 1332 (2018)...........................................................................23

*G+ Commc'ns, LLC v. Samsung Elecs. Co.*,
    No: 2:22-cv-00078 (E.D. Tex.).........................................................11

*Garretson v. Clark*,
    111 U.S. 120 (1884)............................................................................22

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)............................................................................21

*Lee v. Weisman*,
    505 U.S. 577 (1992)............................................................................19

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009) .........................................................22

*Miller v. Ala.*,
    567 U.S. 460 (2012)............................................................................19

*MLC Intell. Prop., LLC v. Micron Tech., Inc.*,
 10 F.4th 1358 (Fed. Cir. 2021) ...................................................19, 27

*Mojo Mobility Inc. v. Samsung Elecs. Co.*,
 No. 2:22-cv-398 (E.D. Tex.)...........................................10, 11, 17, 26

*Netlist, Inc. v. Samsung Elecs. Co.*,
 No. 2:21-cv-00463 (E.D. Tex.)................................................9, 17, 26

*Odyssey Wireless, Inc. v. Samsung Elecs. Am., Inc.*,
 No. 15-cv-01738, 2016 WL 7644790 (S.D. Cal. Sept. 14, 2016) ......................11

*Omega Pats., LLC v. CalAmp Corp.*,
 13 F.4th 1361 (Fed. Cir. 2021) ........................................................10

*Rosales-Mireles v. U.S.*,
 585 U.S. 129 (2018).........................................................................19

*VirnetX, Inc. v. Cisco Sys., Inc.*,
 767 F.3d 1308 (Fed. Cir. 2014) ......................................................23

*Whitserve, LLC v. Computer Packages, Inc.*,
 694 F.3d 10 (Fed. Cir. 2012) ...........................................................10

**Rules**

Fed. R. Evid. 702 ..............................................................*passim*

**Other Authorities**

Amos Tversky & Daniel Kahneman, *Judgment Under Uncertainty:*
 *Heuristics and Biases*, 185 Science 1124 (1974) .........................................13, 14

Bernard Chao, *Saliency, Anchors & Frames: A Multicomponent*
 *Damages Experiment*, 26 Mich. Telecomm. & Tech. L. Rev. 1, 35
 (2019) .........................................................................................18, 26

Gretchen B. Chapman & Brian H. Bornstein, *The More You Ask for,*
 *the More You Get: Anchoring in Personal Injury Verdicts*, 10
 Applied Cognitive Psych. 519 (1996) .............................................14, 15, 16, 17

Gretchen B. Chapman and Eric J. Johnson, *Anchoring, Activation, and the Construction of Values*, 79 Organizational Behavior and Human Decision Processes 115 (1999) ............................................................. 18

James Bessen & Michael J. Meurer, *Patent Failure* 124 (2008) ............................ 6

John Campbell, et al., *Countering the Plaintiff's Anchor: Jury Simulations to Evaluate Damages Arguments*, 101 Iowa L. Rev. 543 (2016) ................................................................................................. 8, 16

Michael J. Meurer, *Current Issues in Patent Law and Policy*, 39 Harv. J.L. & Pub. Pol'y 71 (2016) .................................................................................. 6

William F. Lee & Mark A. Lemley, *The Broken Balance: How "Built-In Apportionment" and the Failure to Apply* Daubert *Have Distorted Patent Infringement Damages*, 37 Harv. J.L. & Tech. 255 (2024) ................................................................................................. *passim*

# INTEREST OF *AMICI CURIAE*[1]

Samsung Electronics Co., Ltd. is one of the world's leading technological innovators, producing world-class memory chips, semiconductors, and a host of major appliances and consumer electronics, including mobile devices, computers, and televisions. Samsung Electronics America, Inc., a wholly-owned subsidiary of Samsung Electronics Co., Ltd., is responsible for commercializing, marketing, selling, distributing, and servicing Samsung's consumer electronics in the United States. While having its own significant patent portfolio, owned by Samsung Electronics Co., Ltd., both Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc., are frequently approached with proposals to license other companies' patents and is a target of patent infringement lawsuits. As a repeat participant in patent litigation, Samsung has a vested interest in ensuring that juries are able to render damages verdicts that are based on reliable expert evidence and adhere to the requirements of the law of apportionment. Samsung submits this *amici* brief because this case presents an ideal opportunity for this Court to reaffirm—and strengthen—the district courts' duty to scrutinize damages theories at the *Daubert* phase, and to ensure that only legally permissible and factually

[1] No counsel for a party authored this brief, in whole or in part, no party or a party's counsel made a monetary contribution intended to fund the preparation or submission of this brief, and no person other than *amici* or their counsel made such a monetary contribution.

supported damages theories are presented to the jury.

## INTRODUCTION

Samsung Electronics Co., Ltd. ("SEC") is one of the world's leading technological companies, producing a range of world-class memory chips, semiconductors, and consumer appliances and electronics, including mobile devices, computers, and televisions.  Samsung Electronics America, Inc. ("SEA"), a wholly-owned subsidiary of SEC, is responsible for commercializing, marketing, selling, distributing, and servicing Samsung's consumer electronics products in the United States.[2]  The foundation of Samsung's growth and performance is technological innovation.  Samsung's investment in advanced research and development is reflected in SEC's patent portfolio, which is one of the world's largest.  At the same time, as a result of its market position, Samsung frequently faces accusations of patent infringement from non-practicing or patent assertion entities and associated demands for licensing, often leading to litigation.  Those licensing demands and resulting litigation effectively function as a tax on innovation—a sunk cost that burdens not only pioneering companies like Samsung but, ultimately, consumers.

Historically, the district courts' ability to weed out methodologically faulty damages theories—particularly those that fail to account accurately for the value of

---

[2] Herein, "Samsung" refers to SEC and SEA, collectively.

the asserted invention—has guarded against damages verdicts that lack proper foundation. A critical tool in a district court's toolkit is apportionment—a legal principle requiring that damages be limited to the value of only the patented invention, excluding the value of other, unrelated features or technology. Apportionment seeks to ensure that, when juries find infringement, the verdicts they render compensate patent holders for the innovative aspects of their invention, but not for aspects that were in the public domain or were the contribution of others.

Even the most sophisticated juries, however, struggle to determine whether expert testimony presented to them accurately apportions the value of the patented invention. Jurors ordinarily lack the expertise to assess the reliability of complex damages methodologies, or to apportion damages in a way that accurately reflects just the patented aspects of the allegedly infringing products, as the law requires. This problem is exacerbated by "anchoring"—a psychological phenomenon where decisions are influenced by a faulty (or irrelevant) reference point, such as an artificially high damages figure presented by a plaintiff's expert. As a result, when methodologically flawed damages theories are presented to jurors, they often return verdicts that are entirely divorced from the actual value of the asserted technology. Plaintiffs know and take advantage of this fact.

This case is an ideal vehicle for this Court to provide much-needed guidance on the proper application of the apportionment standards and to emphasize the importance of the district court's gatekeeping function in keeping methodologically unreliable—or downright faulty—damages theories from reaching the jury. District courts hesitate to exclude unreliable apportionment theories, believing that doing so detracts from the jury's traditional factfinding role. But a rigorous application of the *Daubert* standards is not an encroachment on the jury's domain.

On the contrary, the district court's gatekeeping function—reflected in Federal Rule of Evidence 702—***enables*** the jury to perform its factfinding role properly, knowing that "the reasoning or methodology underlying the [expert] testimony is scientifically valid and . . . properly can be applied to the facts in issue." *Daubert v. Merrell Down Pharms., Inc.*, 509 U.S. 579, 592-93 (1993). The jury should not be forced to speculate whether the expert theory presented to it accurately apportions the damages, or to assess that theory's validity on the basis of cross-examination. Rule 702 "assign[s] ***to the trial judge*** the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597.[3] This Court should charge district courts to be more vigilant in ensuring compliance with the law of apportionment; otherwise, juries

---

[3] All emphasis is added unless noted otherwise.

will return irrational damages verdicts that not only penalize innovation, but also undermine public confidence in the jury system itself.

## ARGUMENT

I.    **As a Leading Technology Company, Samsung Wants an Appropriate Balance Between Protecting Patent Rights and Not Inhibiting Innovation**

As one of the world's leading technology companies, Samsung has a strong interest in ensuring that damages awarded in patent infringement litigation appropriately compensate patentholders for the value of their inventions without discouraging continued innovation. A district court's proper exercise of its gatekeeping role in ensuring that expert damages theories accurately apportion damages is essential to achieving this balance.

Technological innovation is at the core of Samsung's mission, and critical to its business success. In 2023 alone, SEC and its subsidiaries invested approximately $20 billion in research and development, which is consistent with its typical yearly investment. *See* 2023 Samsung Elec. Co., Ltd. and Its Subsidiaries, Consolidated Financial Statements (2022-2023) at 62.[4]

Samsung has received widespread industry acclaim for its innovation. For example, in connection with the upcoming 2025 Consumer Electronic Show

---

[4] https://images.samsung.com/is/content/samsung/assets/global/ir/docs/2023_con_quarter04_all.pdf

("CES")—one of the worlds' largest electronic technology trade shows—SEC has been honored with four of the prestigious "Best of Innovation" awards. *See Samsung's AI-Powered Innovations Honored by Consumer Technology Association*, Samsung Newsroom U.S. (Nov. 14, 2024).[5] At the 2023 CES, Samsung received 46 Innovation Awards honors.[6]

Unfortunately, Samsung's success makes it a frequent target of non-practicing and patent assertion entities that make licensing demands, file patent infringement lawsuits, or often both—regardless of the merit of their claims. Those lawsuits effectively impose a tax on Samsung's technological innovation. As economists who have studied this phenomenon have observed, "even after controlling for a wide range of variables, the more a firm spends on R&D, all else being equal, the ***more*** likely it is to be sued for infringement." James Bessen & Michael J. Meurer, *Patent Failure* 124 (2008). Overall, "patent litigation is a real problem for innovators" and "it does impose a cost on investment in innovation." *Id.* at 127; *see also* Michael J. Meurer, *Current Issues in Patent Law and Policy*, 39 Harv. J.L. & Pub. Pol'y 71, 71-72 (2016) ("[T]he patent system actually ***taxes*** innovators in most industries[.]" (emphasis in original)).

---

[5] https://news.samsung.com/us/samsung-ai-powered-innovations-honored-by-consumer-technology-association-ces2025/

[6] https://news.samsung.com/global/samsung-wins-46-ces-2023-innovation-awards-from-the-consumer-technology-association.

This problem is exacerbated by damages verdicts that exceed the value of the patented invention. These "excessive patent damages . . . impose ongoing costs on innovating activity," both "directly by making innovating companies pay too much in patent litigation, but also indirectly by creating damages benchmarks that increase the costs paid by other users in the future." William F. Lee & Mark A. Lemley, *The Broken Balance: How "Built-In Apportionment" and the Failure to Apply* Daubert *Have Distorted Patent Infringement Damages*, 37 Harv. J.L. & Tech. 255, 258 (2024). The principle of apportionment is one of the most important tools that courts have to guard against the danger of excessive damages. And apportionment has become particularly critical given the complexity of today's technology, where many products or methods "often consist of hundreds or thousands of features and components." *Id.* at 259-60. "A failure to properly apportion damages means that companies that make innovative products will pay two (or more) times for the right to use the same technology." *Id.* at 260.

## II. Samsung's Experience Illustrates the Importance of Empowering District Courts to Enforce the Law of Apportionment Rigorously

The optimal time in the legal process to guard against excessive damages verdicts that fail to apportion properly is at the pre-trial, dispositive motions phase, when district courts address *Daubert* challenges to proffered expert evidence. Otherwise, unsupported or methodologically unsound damages theories are put before the jury, often leading to verdicts that fail to apportion damages accurately.

7

Not only does this phenomenon result in an unreliable jury verdict in a particular case, it also has a significant chilling effect on innovation. The prospect of a grossly inflated verdict far removed from the actual value of a reasonable royalty—as happened to Google in this case—gives the patent owner significant leverage to extract a proportionally inflated settlement. That is, non-practicing and patent assertion entities are able to trade on the real-world risk of an excessive damages award such that the terms of a negotiated settlement reflect neither the value of the patented invention nor the merits of any allegedly infringing use. "Although jury trials are rare, they still drive nearly all legal outcomes because rational litigants negotiate in their shadow." John Campbell, et al., *Countering the Plaintiff's Anchor: Jury Simulations to Evaluate Damages Arguments*, 101 Iowa L. Rev. 543, 545 (2016). This pressure to settle further exacerbates the "tax on innovation" by "forc[ing] technology companies to operate in fear of being on the other side of these demands and being forced to pay excessive damages that capture far more than the value of the asserted patents." Lee & Lemley, *supra*, at 322.

Samsung's recent experiences demonstrate that, when district courts are not rigorously policing experts for compliance with apportionment requirements,

impermissible damages theories can be presented to the jury.[7]

For example, in *Netlist, Inc. v. Samsung Electronics Co.*, No. 2:21-cv-00463 (E.D. Tex.), the plaintiff's damages expert—the same expert as in this case (Mr. David Kennedy)—provided the jury with a damages calculation that was not apportioned. Mr. Kennedy based his calculations on a comparison between the accused products and alleged noninfringing alternatives. *Netlist*, No. 2:21-cv-00463, Dkt. 608 at 43 (July 23, 2024). After calculating the alleged revenue that Samsung would have lost had it adopted the noninfringing alternatives, Mr. Kennedy opined that Samsung would have agreed to a royalty of ***100% of that revenue***, and misleadingly labeled that amount as the "Fully Apportioned Rate." *Id.* at 45.[8] Samsung challenged Mr. Kennedy's analysis under *Daubert* for failure to apportion properly (among other errors). Dkt. 244 (Feb. 10, 2023). The district

---

[7] These cases may reach this Court in the future via the normal appellate process. Samsung describes them here merely to illustrate the way in which many plaintiffs' experts seek to evade the law of apportionment.

[8] Mr. Kennedy's calculation relied, in part, on the opinion of a regression expert who concluded there was a relationship between speed and price. Samsung challenged the reliability and admissibility of the regression expert's analysis, but the district court ruled at the pre-trial conference that "vigorous cross-examination" would be a sufficient safeguard. *Netlist*, No. 2:21-cv-00463, Dkt. 427 at 21:12-18 (Apr. 3, 2023). The regression expert, however, never testified at trial, and so his opinions could not be probed with cross-examination. As commentators have observed, flawed regression analyses are a recurring problem: "in recent years, courts have repeatedly permitted parties to introduce deeply flawed regressions and conjoint survey analyses and have left it to the jury to decide their probative value and whether the expert did any real apportionment." Lee & Lemley, *supra*, at 264.

court, however, denied the vast majority of the *Daubert* challenges (including on apportionment) with virtually no explanation, letting the expert's flawed analysis be presented to the jury. Dkt. 432 at 4 (Apr. 5, 2023); Dkt. 426 at 218:5-6 (Apr. 3, 2023). The jury ultimately awarded the plaintiff $303.15 million in damages—75% of the requested amount. Dkt. 479 (Apr. 21, 2023).

In *Mojo Mobility Inc. v. Samsung Electronics Co.*, No. 2:22-cv-398 (E.D. Tex.), an unapportioned damages calculation also reached the jury. There, the plaintiff's damages expert based his calculations on a proposed licensing rate that the plaintiff had **unsuccessfully** sought from various companies for other, **unasserted** patents. Though no one had ever agreed to that rate, plaintiff's damages expert opined that Samsung would have agreed not only to the proposed licensing rate but to that same rate's application no matter which, or how many, patent(s) were licensed.[9] As the damages expert explained at trial, the proposed per-unit rate still would have left Samsung with excess profits attributable to wireless charging—notwithstanding that there was no dispute that the patented

---

[9] Again, this is not an infrequent problem: "courts have increasingly allowed patentees to use the total consideration paid for a license that includes more than the licensed technology to calculate damages," and "have done so without the apportionment safeguards insisted upon in prior case." Lee & Lemley, *supra*, at 287. Here, the problem was even more pronounced given the absence of *any* existing licenses; relying on licensing offers and a policy related to different patents was not a proper starting point. *See Omega Pats., LLC v. CalAmp Corp.*, 13 F.4th 1361, 1379 (Fed. Cir. 2021); *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 30 (Fed. Cir. 2012).

technology did not cover wireless charging writ large and that plaintiff's damages expert offered no testimony apportioning value to the asserted patents. Samsung challenged the damages expert's opinions under *Daubert*—again, to no avail. *Mojo*, No. 2:22-cv-398, Dkt. 101 (May 6, 2024). The district court allowed that damages theory to go to the jury, reasoning that the challenges went to weight, not admissibility. Dkt. 250 at 34 (July 23, 2024), *report and recommendation adopted*, Dkt. 285 (Sept. 24, 2024). The jury ultimately awarded the plaintiff about $192 million in damages, taking a "split the baby" approach on calculating damages and adopting the exact midpoint of the per-unit rates presented by the parties' damages experts ($0.07/unit and $1.97/unit, respectively) multiplied by the undisputed number of units. Dkt. 297 (Sept. 13, 2024).

These cases are not outliers. Samsung's experience in various district courts indicates that district judges hesitate to exclude unsound damages theories— particularly those that fail to apply apportionment properly—from reaching the jury. *See, e.g.*, *G+ Commc'ns, LLC v. Samsung Elecs. Co.*, No: 2:22-cv-00078 (E.D. Tex.), Dkt. 518 at 134:12-21 (Dec. 5, 2023) (denying, without explanation on merits, Samsung's motion to exclude expert testimony for failure to apportion); *Odyssey Wireless, Inc. v. Samsung Elecs. Am., Inc.*, No. 15-cv-01738, 2016 WL 7644790, at *14 (S.D. Cal. Sept. 14, 2016) (denying summarily Samsung's motion to exclude because "Defendants' disagreement with the considerations underlying

[the expert's] apportionment analysis go to the weight to be afforded the testimony and not its admissibility" (citation omitted)); *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-cv-01846, Dkt. 1157 at 10-13 (N.D. Cal. June 30, 2012) (denying Samsung's motion to exclude expert testimony because criticisms of expert analyses "largely go to weight, not admissibility"); *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-cv-01846, Dkt. 3645 at 28-32 (N.D. Cal. April 2, 2018) (adopting court's earlier analysis from *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-cv-01846).

These examples illustrate a pattern where district courts allow non-apportioned damages theories to go to the jury, which no doubt contribute to the inflated (and arbitrary) damages awards. *See* Lee & Lemley, *supra*, at 264 ("[C]ourts fail[] to properly apply *Daubert*" when they put the "critical apportionment requirement . . . to the jury without first performing the required gatekeeping function[.]"). In addition to undermining public trust in the jury system, "[e]xcessive patent damages . . . can impose extra social costs because they can deter innovation and increase the cost of products to consumers." *Id.* at 258.

## III.    Rule 702 and *Daubert* Require Vigilant Gatekeeping

This Court should reaffirm the importance of the district courts' gatekeeping function and provide much-needed guidance to the district courts about the proper discharge of this function. The alternative methods on which the district courts rely, such as cross-examination or jury instructions, are not adequate safeguards.

**A.    Neither Cross-Examination nor Jury Instructions Are an
        Adequate Safeguard from the Anchoring Effects that High,
        Unapportioned Damages Numbers Have on Juries**

In each of the Samsung cases discussed in detail above, Samsung filed

*Daubert* motions seeking exclusion of unreliable expert testimony; the district

courts, however, ruled that the experts' opinions could be addressed via cross-

examination.  But cross-examination is ill-equipped to combat unchecked damages

theories because of the anchoring effects that such theories have on juries.  Nor can

jury instructions cure the prejudice introduced when a district court fails to

discharge its gatekeeper duty.

**1.    The Anchoring Effect**

"Anchoring" is a psychological phenomenon in which decisions are

influenced by a reference point that may be irrelevant.  This concept was first

described by Amos Tversky and Daniel Kahneman (the future Nobel laureate and

author of the bestselling *Thinking Fast and Slow* (2011)):

> In many situations, people make estimates by starting from an initial
> value that is adjusted to yield the final answer.  The initial value, or
> starting point, may be suggested by the formulation of the problem, or
> it may be the result of a partial computation.  In either case, adjustments
> are typically insufficient.    That is, ***different starting points yield
> different estimates, which are biased toward the initial values.***  We
> call this phenomenon anchoring.

Amos Tversky & Daniel Kahneman, *Judgment Under Uncertainty: Heuristics and*

*Biases*, 185 Science 1124, 1128 (1974).

In their early research, Tversky and Kahneman asked participants to observe a roulette wheel that was predetermined to stop on either 10 or 65, after which the participants were asked to estimate the percentage of African countries in the United Nations. Although the number on the roulette wheel bears no relevance to the question, participants whose wheel stopped on 10 guessed lower values (25% on average) than participants whose wheel stopped at 65 who guessed higher values (45% on average). In another experiment, participants were asked to compute the product of the numbers 1 through 8, either as $1 \times 2 \times 3 \times 4 \times 5 \times 6 \times 7 \times 8$ or reversed as $8 \times 7 \times 6 \times 5 \times 4 \times 3 \times 2 \times 1$. But because participants were given only 5 seconds to do so, they had to make an estimate after only a few multiplications. The median estimate was lower if the sequence started with smaller numbers (512) than when it started with the larger numbers (2,250). *Id.*

Anchoring is a heuristic technique: a mental shortcut that people use to make decisions quickly and efficiently. That human behavior, studies have shown, likewise extends to the jury room. "Anchoring, a bias found in numerous settings, also occurs in civil liability cases when the plaintiff requests a specific amount of compensation . . . ." Gretchen B. Chapman & Brian H. Bornstein, *The More You Ask for, the More You Get: Anchoring in Personal Injury Verdicts*, 10 Applied Cognitive Psych. 519, 538 (1996) ("Chapman"). In fact, studies going back to 1959, like the Chicago Jury Project, show that jurors used the plaintiff's damages

demand as "a jumping-off place." *Id.* at 522 (citing Dale W. Broeder, *The University of Chicago Jury Project*, 38 Neb. L. Rev. 744, 760 (1959)). Other studies have also shown that "damages awards were systematically affected by damages requests" and that "juror decision making is influenced by monetary anchors." *Id.* (discussing studies).

### 2. Cross-Examination and Jury Instructions Are Ineffective Against Anchoring

In denying *Daubert* motions and allowing expert testimony, many district courts treat "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" as the antidote to "absurd and irrational pseudoscientific assertions." *Daubert*, 509 U.S. at 595-96. The evidence suggests those remedies are insufficient.

Research into jury decision-making has confirmed that, as a damages demand increases, so too does the award. For example, one study found that "the amount requested [] serves as an anchor that affects compensation awards; this effect is linear, even with the extreme amounts used in this study." Chapman & Bornstein, *supra*, at 527; *see also id.* at 526 ("As the anchor amount increased, compensation increased. The overall effect of [an] anchor was significant . . . as was the linear contrast."). Notably, the experiment used damages demands of $100, $20,000, $5 million, and $1 billion, yet even the extreme endpoints produced

anchoring effects.  *Id.* at 523.  The study concluded that "[t]he anchoring effects

represent biases rather than the use of relevant information."  *Id.* at 534.

Another study reached a similar conclusion.  An experiment involving

individual juror analysis and jury simulation of a medical malpractice case

concluded that "anchoring significantly affected damages."  Campbell, *supra*, at

561.  The experiment also tested different defense responses: (1) not providing any

damages counter, (2) providing a damages counter, or (3) arguing that plaintiff's

proposal undermined its credibility.  *Id.* at 555.  The "different defense responses

***had little overall effect*** on damages."  *Id.* at 561.  The researchers concluded that

"anchoring works" because "[a]lthough the plaintiff who shoots for the stars may

take a credibility hit that reduces his chances of winning, the effect is outweighed

by the higher damages award he gets if he wins."  *Id.* at 567.  Furthermore, "three

promising strategies for defendants all fail to overcome this effect."  *Id.*

High anchor values for damages can also skew the liability determination.

For example, one experiment demonstrated that, "[a]s anchor value increased,

evidence was evaluated more favorably toward the plaintiff."  Chapman &

Bornstein, *supra*, at 525 (collecting results in Table 1 showing that "subjects'

causality estimates increased with anchor value").  And although "plaintiffs asking

for extremely high amounts of compensation are perceived less favorably, in that

they are viewed as relatively more selfish and less generous[,] . . . the amount

requested nonetheless provides an anchor for estimates of the probability that the defendant caused the plaintiff's injury." *Id.* at 526-27.

Although the jury is instructed on the need for apportionment, a lay jury simply does not have the tools to identify an analysis that ignores this requirement. *See* Lee & Lemley, *supra*, at 305 ("*Daubert* is fundamentally about reducing the likelihood that juries will be misled by specious testimony by purported experts. It necessarily rests on the premise that jury instructions are ***not*** sufficient for that purpose." (emphasis in original)). For instance, in the exemplary *Netlist* case mentioned above, the plaintiff's damages expert misleadingly coined his 100% revenue rule the "Fully Apportioned Rate," thus paying lip service to the apportionment requirement when the analysis itself failed to do so. Similarly, in *Mojo*, the plaintiff's damages expert testified that the royalty rate sought by Mojo would still leave Samsung with some excess profits, further suggesting that this credited Samsung for its own contributions; however, taking less than all of the purported value is not apportionment and bears no relationship to the relative contribution of any particular patent(s). The result is juror confusion.

In short, once the jury is exposed to a defective damages analysis, the adversarial process's other tools—vigorous cross-examination and jury instructions—are no panacea: anchoring effects are so strong that they are almost impossible to eliminate through questioning, countervailing evidentiary

presentation, or judicial instruction. As one study observed, "emphasizing the uninformative nature of anchors will not eliminate the bias." Gretchen B. Chapman and Eric J. Johnson, *Anchoring, Activation, and the Construction of Values*, 79 Organizational Behavior and Human Decision Processes 115, 149 (1999). Along similar lines—and particularly relevant here—exposing the anchor to jurors afterwards had little effect in experiments related to valuing the relative contribution of a single patent to a smartphone, ostensibly including hundreds of patented technologies, if not more. *See* Bernard Chao*, Saliency, Anchors & Frames: A Multicomponent Damages Experiment*, 26 Mich. Telecomm. & Tech. L. Rev. 1, 35 (2019) (explaining that when mock jurors were told that a damages request had been inflated "to take advantage of anchoring, damages verdicts were not significantly reduced").[10]

_____

[10] In this study, the mock jurors were asked to award damages based on the value of a single feature in a cell phone having thousands of features. Chao, *supra*, at 15-17, 22. The study confirmed the hypothesis that anchoring and "saliency bias"—the fact that individuals are more likely to focus on items that are more prominent (e.g., the patented features that are the focus of a trial) and ignore those that are less so (e.g., all the other features and functions that make up a product)—causes juries to overvalue an infringing feature. *See id.* at 10 ("In patent infringement cases involving multicomponent electronic products (e.g. a smartphone or a television), the majority of the trial time naturally focuses on the accused infringing feature. This is true even though a multicomponent product is likely to have thousands, if not hundreds of thousands, of other features.").

### 3.  Vigilance Under *Daubert* Is the Answer

This backdrop of human psychology incentivizes the introduction of dubious damages theories to drive high damages awards.  Recognizing that these cognitive biases are at work, courts—including this Court—should endorse legal rules that will help prevent juries from ascribing value to patents based on anchoring as opposed to the relative contribution of the technology.  Doing so would further the apportionment mandate.

Put another way, a judge's gatekeeping role in screening out extravagant or unsupported damages theories is essential to compensate for such cognitive biases and not allow them to lead the jury to misattribute value to patents.  *See, e.g.*, *Lee v. Weisman*, 505 U.S. 577, 593-94 (1992) (relying on psychological research into human behavior when analyzing impact of legal rules); *Miller v. Ala.*, 567 U.S. 460, 471-72 & n.5 (2012) (observing that "science and social science" supported a rule established in the Supreme Court's precedents); *Rosales-Mireles v. U.S.*, 585 U.S. 129, 144 (2018) (considering psychological research when assessing the impact of judicial procedures).

By holding experts to the rigorous standards of *Daubert*, district courts can and should police excessive damages theories to avoid the outsized effects such theories can have on not just damages but also liability outcomes.  *See MLC Intell. Prop., LLC v. Micron Tech., Inc.*, 10 F.4th 1358, 1373 (Fed. Cir. 2021) (affirming

district court's exclusion of expert under *Daubert* for failure to properly apportion damages); *see also* Lee & Lemley, *supra*, at 306 ("It has long been recognized that unreliable and irrelevant evidence clouds and distorts the jury's decision making.").

**B.      Strict Adherence to the Legal Requirements for Damages Is Required at the *Daubert* Phase Under Rule 702**

With cross-examination and jury instructions ill-suited to protect the jury from legally flawed damages theories, this Court should reaffirm that district courts must adhere rigorously to their gatekeeping function in applying the relevant law on damages, apportionment, and entire market value rule at the *Daubert* stage. *See EcoFactor, Inc. v. Google LLC*, 104 F.4th 243, 257 n.3 (Fed. Cir. 2024) (Prost, J., dissenting-in-part). In other words, "district courts should do the hard work at the *Daubert* stage of ensuring that apportionment is effective and reliable." Lee & Lemley, *supra*, at 256.

Here, as in other cases, the district court did not adhere to Rule 702 or *Daubert* in allowing the expert's opinion to go to the jury, and this case is the ideal opportunity for this Court to provide district courts with much-needed guidance on the proper exercise of their gatekeeping role. This guidance is critical because "district courts vary widely in their application of *Daubert* and Rule 702, and many courts appear to believe that damages issues are less technical and something that can be decided by a jury without the court performing any gatekeeping function."

Lee & Lemley, *supra*, at 320.

The recently revised Federal Rule of Evidence 702 supports attentive gatekeeping. When the advisory committee amended Rule 702 in 2023, it emphasized that the ***preponderance of evidence*** standard attaches to Rule 702 evaluations. The advisory committee noted that "many courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility," which is "an incorrect application of Rules 702 and 104(a)." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. To ensure uniformity, the "Committee concluded that emphasizing the preponderance standard in Rule 702 specifically ***was made necessary by the courts that have failed to apply correctly the reliability requirements of that rule***." *Id.*

This case is an opportunity to further the objective of the recent revisions to Rule 702. Enforcing *Daubert*, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-58 (1999), and other related law with respect to damages theories will best facilitate this goal because district courts can scrutinize an expert's full report to determine whether it is "more likely than not," that the theory "will help the trier of fact to understand the evidence or to determine a fact in issue," "is based on sufficient facts or data," "is the product of reliable principles and methods," and "reflects a reliable application of the principles and methods to the facts of the

case." Fed. R. Evid. 702.

## IV. The *En Banc* Court Should Provide Guidance on Commonly Experienced Damages Issues

In *EcoFactor*, the district court strayed from the principles of apportionment and the scriptures of *Daubert* and Rule 702. The *en banc* Court should use this case to provide guidance on common patent damages issues that district courts face in their roles as gatekeeper.

### A. Apportionment Requirements Should Be Strictly Enforced at the *Daubert* Phase

It is settled black-letter law that damages "must be based on the incremental value that the patented invention adds to the end product." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014). Accordingly, the Supreme Court has consistently required that the patentee "must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features," and must do so with evidence that is "reliable and tangible, and not conjectural or speculative." *Garretson v. Clark*, 111 U.S. 120, 121 (1884); *see also Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1336 (Fed. Cir. 2009). Commentators note that, "[w]hen damages are properly apportioned, inventors obtain the value of what they created—and a product company need not fear disproportionate damages claims or verdicts that capture the value of other features and technologies, including

22

technologies invented by the product company itself." Lee & Lemley, *supra*, at 259; *see also Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1348 (2018) ("When a patent covers the infringing product as a whole, and the claims recite both conventional elements and unconventional elements, the court must determine how to account for the relative value of the patentee's invention in comparison to the value of the conventional elements recited in the claim, standing alone.").

This "obligation to apportion damages only to the patented features does not end with the identification of the smallest salable unit if that unit still contains significant unpatented features." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014). Prior licenses used in a damages calculation must also be "comparable" and the damages model using such licenses must "account[] for differences in the technologies and economic circumstances of the contracting parties." *Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1303 (Fed. Cir. 2015) (quoting *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211 (Fed. Cir. 2010)). "Where the licenses employed are sufficiently comparable, this method is typically reliable because the parties are constrained by the market's actual valuation of the patent." *Id.* at 1303 (footnote omitted). By contrast, the law of apportionment would preclude indiscriminate use of "agreements covering hundreds of patents, different products, or rights beyond

patent rights" where a patentee asserts "just a small subset of the licensed patents." Lee & Lemley, *supra*, at 263.

While license agreements that are truly comparable to a hypothetical license for the asserted patent can be useful, the use of such licenses must adhere strictly to the principle of apportionment that values only the incremental contribution of the patented technology and does not allow the jury to anchor on large royalty rates in prior licenses that are not probative. The *en banc* Court should reinforce that district courts, in their role as gatekeeper, should exclude an expert's damages theory that fails to perform such apportionment at the *Daubert* phase, including when such a theory is based on prior licenses. To help facilitate this review, experts should be required to show their work, detailing in their reports their assumptions, calculations, and attempts to apportion so that district courts can thoroughly examine the reliability of the analysis. The expert's apportionment must be directed squarely to the asserted patent's technological advance, and the expert must explain how he avoided crediting the patented technology with other unpatented value and/or otherwise isolated the unpatented contributions of value.

## B. Courts Should Scrutinize Expert Opinions that Rely on Generic "Upward/Downward" Pressure

The *en banc* Court should caution against a damages expert's generic qualitative assertions of "upward" or "downward" pressure on proposed damages

amounts. Such assertions provide an easy way for plaintiffs' damages experts to evade scrutiny of their damages theories for lack of proper apportionment.

For example, in *EcoFactor*, the damages expert asserted that the presence of other, non-asserted patents in the prior licenses would place a generic "downward pressure" on the royalty rate for the asserted patent—without accounting for "what effect the ***specific*** non-asserted patents in EcoFactor's portfolio would have on the hypothetical negotiation." 104 F.4th at 260 (Prost, J., dissenting-in-part) (emphasis in original). The expert thus failed to grapple meaningfully with the impact this downward pressure has on the royalty rate, and instead cavalierly negated it with a generic "upward pressure" that the assumption of infringement and validity would have on the royalty rate. *Id.* at 256.

Requiring experts to show their work is paramount to allowing a district court to perform its role as gatekeeper. As it stands, this type of back-of-the-envelope calculation does not satisfy the legal command to specifically apportion damages to the value of the asserted patent. If there are multiple patents in a prior license, the expert must determine the relative value of the patent(s)-in-suit as compared to the others so that only the value of the patent(s)-in-suit is recovered.

### C. Survey and Regression Analyses Are Not Reliable Where They Measure More Than the Incremental Value of the Patented Invention

Surveys and regressions that measure value beyond the patented technology contribute to the pervasive anchoring effect. Whether used as a purported confirmation of the reasonableness of an expert's damages calculation, *see EcoFactor*, 104 F.4th at 255-56, or as a primary basis for a damages calculation, *see supra* at Sec. II (discussing *Mojo* and *Netlist* cases), district courts must ensure that surveys and/or regression analyses used to model damages apply reasonable and supported baseline assumptions. If they do not, the entire damages calculation based on or in some way anchored to those surveys or regressions will itself be skewed. Consequently, any survey, regression, or other model must be narrowly tailored to measure **only** the incremental value of the invention. Models that capture more are unreliable and should be excluded at the *Daubert* stage.[11] District courts should not permit flawed surveys, regression, or conjoint analyses to be presented to the jury, and leave it to the jury to decide their probative value. That is an impermissible end-run around the apportionment requirements.

---

[11] Conjoint survey analyses present a particular problem for ensuring apportionment. *See* Lee & Lemley, *supra*, at 255, 264; *see also supra* note 8. A conjoint survey "involves asking survey respondents to value products with different combinations of features and then calculate what the individual features are worth." Chao*, supra*, at 35 n.95. For example, the conjoint-based survey in *Mojo* purported to measure the value of wireless charging generally, yet the damages expert then treated that as the value of the (narrower) asserted patents.

## D. Unsupported, Self-Serving Statements Are Not Sufficiently Reliable Under *Daubert*

The Court should confirm that self-serving statements and recitals in prior licenses (and elsewhere) cannot meet *Daubert*'s reliability requirement. In *EcoFactor*, the plaintiff's damages expert derived a royalty rate based upon "self-serving, unilateral 'recitals' in prior litigation settlement agreements of the patentee's 'belief[]'" of what is a reasonable royalty. 104 F.4th at 257 (Prost, J., dissenting-in-part). Those recitals were divorced from the actual payment terms of the licenses. Indeed, the "recitals [were] not only directly refuted by two of those same agreements; they also have no other support (e.g., sales data or other background testimony) to back them up." *Id.*

This issue is not unique to *EcoFactor*. In other cases, damages experts have likewise improperly relied upon license terms that have nothing to do with the actual amount of the agreed-upon license, including purported early licensee discounts or unilateral provisions the licensor claims represent additional value not captured in the actual payment terms (e.g., cross-licenses, technology transfer/development, and other business terms). This Court has already held that it is improper to ignore the actual payment terms of a license in favor of a separate self-serving recital when determining the relevant royalty rate. *See, e.g.*, *MLC Intell. Prop.*, 10 F.4th at 1368-69. The *en banc* Court should reaffirm that a damages expert's royalty calculation may not be based on the licensor's unilateral,

unsupported assertions in prior licensing as to what it believes to be the appropriate royalty rate.

## CONCLUSION

This Court should hold that the district court abused its discretion in allowing EcoFactor's unreliable damages testimony, vacate the district court's denial of a new trial on damages, and provide the district court with specific guidance on a proper exercise of its gatekeeping function under *Daubert* and Federal Rule of Evidence 702.

Dated: November 26, 2024         Respectfully submitted,

 */s/ Lauren A. Degnan*
Lauren A. Degnan
Michael J. McKeon
Michael J. Ballanco
FISH & RICHARDSON P.C.
1000 Maine Avenue, S.W.
Suite 1000
Washington, DC 20024
Telephone: (202) 783-5070

Matthias A. Kamber
PAUL HASTINGS LLP
101 California Street, 48th Floor
San Francisco, CA 94111
Tel. (415) 856-7000
matthiaskamber@paulhastings.com

Igor V. Timofeyev
PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC 20036

Tel. (202) 551-1700
igortimofeyev@paulhastings.com

***Attorneys for Amici Curiae***
***Samsung Electronics Co., Ltd. and***
***Samsung Electronics America, Inc.***

## CERTIFICATE OF SERVICE AND FILING

I certify that on November 26, 2024, I electronically filed the foregoing

**BRIEF OF AMICI CURIAE SAMSUNG ELECTRONICS CO., LTD. AND**

**SAMSUNG ELECTRONICS AMERICA, INC.** using the Court's CM/ECF

filing system. All counsel of record were electronically served by and through the

Court's CM/ECF filing system per Fed. R. App. P. 25 and Fed. Cir. R. 25(e).

*/s/ Lauren A. Degnan*
Lauren A. Degnan

## CERTIFICATE OF COMPLIANCE

The **BRIEF OF AMICI CURIAE SAMSUNG ELECTRONICS CO., LTD. AND SAMSUNG ELECTRONICS AMERICA, INC.** is submitted in accordance with the type-volume limitation of Fed. Cir. R. 32(b). The BRIEF contains 6,384 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2). This BRIEF has been prepared in a proportionally spaced typeface using Microsoft® Word for Microsoft 365 in Times New Roman, 14 Point.

Dated: November 26, 2024                          */s/ Lauren A. Degnan*
                                                                       Lauren A. Degnan