No. 23-1101

# In the United States Court of Appeals for the Federal Circuit

ECOFACTOR, INC.,
*Appellants*,
v.
GOOGLE LLC,
*Appellee*.

Appeal from the United States District Court for the Western District of Texas (No. 6:20-cv-0075-ADA)
(The Hon. Alan D. Albright)

## BRIEF FOR PROFESSOR MICHAEL RISCH AND THE GROUP OF INTERESTED PRACTITIONERS AS AMICUS CURIAE IN SUPPORT OF ECOFACTOR

AISHA MAHMOOD HALEY
AUSTIN CURRY
HAMAD M. HAMAD
JAMES F. SMITH
CALDWELL CASSADY & CURRY P.C.
212 N. Pearl St., Suite 1200
Dallas, Texas 75201
(214) 888-4848
ahaley@caldwellcc.com

*Counsel for Prof. Risch and The Group of Interested Practitioners*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 23-1101

**Short Case Caption** EcoFactor v. Google

**Filing Party/Entity** Counsel for Professor Risch and The Group of Interested Practitioners

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 01/24/2025

Signature: /s/ Aisha Mahmood Haley

Name: Aisha Mahmood Haley

FORM 9. Certificate of Interest

Form 9 (p. 2)
March 2023

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br>☑ None/Not Applicable |
| Professor Michael Risch | | |
| Group of Interested Practitioners: | | |
| Aisha Mahmood Haley<br>Caldwell Cassady & Curry P.C. | | |
| Austin Curry<br>Caldwell Cassady & Curry P.C. | | |
| Brad W. Caldwell<br>Caldwell Cassady & Curry P.C. | | |
| Jason D. Cassady<br>Caldwell Cassady & Curry P.C. | | |
| Hamad M. Hamad<br>Caldwell Cassady & Curry P.C. | | |
| James F. Smith<br>Caldwell Cassady & Curry P.C. | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☐ No ☑ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

**TABLE OF CONTENTS**

STATEMENT OF INTEREST ....................1

SUMMARY OF ARGUMENT ....................4

ARGUMENT ....................6

I. Historically, Juries Had Broad Access To The Record In Evaluating Patent Damages ....................6

II. The En Banc Court Should Decline To Expand The Role Of *Daubert* And Rule 702 Beyond Questions Of Reliability And Into Questions Of The Merits' Correctness ....................9

A. The Majority Sets Forth The Relevant Facts To The Analysis ....................10

B. Mr. Kennedy's Opinions Satisfied *Daubert* Because They Were Reliable, And Google And The Dissent's Fixation On Their Perceived Correctness Of Mr. Kennedy's Conclusions Is Beyond The Inquiry ....................12

III. The Dissent's Reasoning Represents A Departure From Well-Traveled Damages Precedent And Threatens To Erode The Jury Trial Right In The Seventh Amendment ....................15

A. Google's Search Of Bright Line Rules Against "Self-Serving, Unilateral" Evidence Is Misguided ....................16

B. The Dissent's Factual Criticism Of Mr. Habib's Testimony Ignores The Realities Of Civil Litigation And Highlights The Importance Of The Abuse-Of-Discretion Standard ....................18

C. Adoption Of The Dissent's Reasoning Would Usurp The Role Of The Jury In Violation Of The Seventh Amendment ....................20

D. Vacating A Jury Verdict For An Expert's Reliance On Evidence That The Parties Do Not Contest Provides Substantial Evidence For The Jury's Verdict Is An Unacceptable End-Run Around The Right To Trial By Jury ....................23

IV. The Amendment To Rule 703 Does Not Warrant A Different Result ....................25

CONCLUSION ....................28

## TABLE OF AUTHORITIES

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*
694 F.3d 1312 (Fed. Cir. 2012) .......... 23

*Apple Inc. v. Motorola, Inc.*
757 F.3d 1286 (Fed. Cir. 2014) .......... 29

*Bayer Healthcare LLC v. Baxalta Inc.*
989 F.3d 964 (Fed. Cir. 2021) .......... 26

*C&F Packing Co. v. IBP, Inc.*
224 F.3d 1296 (Fed. Cir. 2000) .......... 24

*Connell v. Sears, Roebuck & Co.*
722 F.2d 1542 (Fed. Cir. 1983) .......... 25

*Daubert v. Merrell Dow Pharms., Inc.*
509 U.S. 579 (1993) .......... passim

*Dowagiac Mfg. Co. v. Minnesota Moline Plow Co.*
235 U.S. 641 (1915) .......... 9, 10

*EcoFactor v. Google*
No. 23-1101 (Fed. Cir. Nov. 12, 2024) .......... 18

*EcoFactor, Inc. v. Google LLC*
104 F.4th 243 (Fed. Cir. 2024) .......... passim

*Fannie Mae v. LaRuffa*
702 F. App'x 505 (9th Cir. 2017) .......... 17

*Faulkner v. Gibbs*
199 F.2d 635 (9th Cir. 1952) .......... 19

*Fuji Photo Film Co. v. Jazz Photo Corp.*
394 F.3d 1368 (Fed. Cir. 2005) .......... 26

*Georgia-Pac. Corp. v. U.S. Plywood Corp.*
318 F. Supp. 1116 (S.D.N.Y. 1970) .............................................................. 19, 20

*Hayden v. Suffolk Mfg Co*
11 F. Cas. 900 (C.C.D. Mass. 1862) ..................................................................9, 10

*Hunt Bros. Fruit-Packing Co. v. Cassiday*
64 F. 585 (9th Cir. 1894)..........................................................................................22

*i4i Ltd. P'ship v. Microsoft Corp.*
598 F.3d 831 (Fed. Cir. 2010).............................................................................. 23, 29

*In re Paoli R.R. Yard PCB Litig.*
35 F.3d 717 (3d Cir. 1994)............................................................................ 15, 28

*Info-Hold, Inc. v. Muzak LLC*
783 F.3d 1365 (Fed. Cir. 2015)...........................................................................26

*Kim v. Am. Honda Motor Co., Inc.*
86 F.4th 150 (5th Cir. 2023)..................................................................................17

*Kumho Tire Co. v. Carmichael*
526 U.S. 137 (1999)................................................................................ 12, 17

*Markman v. Westview Instruments, Inc.*
517 U.S. 370 (1996)..................................................................................................8

*Micro Chemical, Inc. v. Lextron, Inc.*
317 F.3d 1387 (Fed. Cir. 2003)................................................................... 22, 24

*Pavo Sols LLC v. Kingston Tech. Co.*
35 F.4th 1367 (Fed. Cir. 2022)...................................................... 14, 20, 30

*Pipitone v. Biomatrix, Inc.*
288 F.3d 239 (5th Cir. 2002)...................................................................................24

*Sinclair Ref. Co. v. Jenkins Petroleum Process Co.*
289 U.S. 689 (1933)...........................................................................................10, 11

*SmithKline Diagnostics, Inc. v. Helena Lab'ys Corp.*
926 F.2d 1161 (Fed. Cir. 1991) ....................26

*Suffolk v. Hayden*
70 U.S. 315 (1865) ....................9, 10

*Summit 6, LLC v. Samsung Elecs. Co.*
802 F.3d 1283 (Fed. Cir. 2015) .................... 23, 29

*U.S. v. Downing*
753 F.2d 1224 (3d Cir. 1985) ....................16

*United States v. Smith*
444 F. App'x 160 (9th Cir. 2011) ....................17

*ZF Meritor, LLC v. Eaton Corp.*
696 F.3d 254 (3d Cir. 2012) ....................16

**Statutes**

35 U.S.C. § 284 ....................11

**Other Authorities**

*(Un)reasonable Royalties*
98 B.U. L. REV. 187 (2018) ....................9

42 Stat. 389 (1922) ....................9

**Rules**

Fed. Cir. R. 47.4(a)(5) ....................2

Fed. Cir. R. 47.5(b) ....................2

Fed. R. Civ. P. 61 ....................27

Fed. R. Evid. 104 ....................28

Fed. R. Evid. 104(a) .................... 16, 28

Fed. R. Evid. 403 ....................25

Fed. R. Evid. 702 .................... passim

Fed. R. Evid. 703 ..........................................................................................27

## STATEMENT OF INTEREST

This brief is respectfully offered to the *en banc* court on behalf of Professor Michael Risch and the Group of Interested Practitioners of the Patent Plaintiffs' Trial Bar (collectively, "the Group"). No party, party's counsel, or any person other than the members of the Group authored this brief in whole or in part. No party, party's counsel, or any person other than the members of the Group contributed money that was intended to fund preparing or submitting this brief. This brief is authorized to be filed without leave per the Court's Precedential Order in this case dated September 25, 2024.

The Group comprises prominent academic Michael Risch, and six patent and intellectual property trial attorneys (the "Practitioners"), identified in the Statement of Interest, who represent clients in intellectual property matters covering a wide range of technologies and industries.

Michael Risch, vice dean and professor of law at Villanova University, is a leading academic on intellectual property and internet law, with an emphasis on patents, trade secrets and information access. His articles have appeared in the Stanford Law Review, Duke Law Journal, Iowa Law Review, Indiana Law Journal, Florida Law Review, George Mason Law Review, Harvard Journal of Law & Technology and Stanford Technology Law Review, among other journals, and his work has been cited by the U.S. Supreme Court.

Austin Curry has practiced patent law for 17 years. Mr. Curry has been Board Certified in Patent Litigation by the National Board of Trial Advocacy since 2022 and has also served as Chair of the National Board of Trial Advocacy Patent Litigation Specialty Program Commission. Mr. Curry has had extensive trial experience on some of the largest and most complex patent cases and has collected scores of individual and firm-level awards from numerous publications over the course of his career.

Brad Caldwell is one of the nation's leading trial lawyers focusing on patent infringement and complex commercial litigation for plaintiffs and defendants. His successes before judges, juries, and arbitration panels include cases from semiconductors to oilfield services. Mr. Caldwell has received a host of awards over the years, has been named a "Titan of the Plaintiffs Bar" by Law360 twice, and "Litigator of the Week" by The American Lawyer magazine two separate times.

Jason D. Cassady has been trying patent jury trials for over 20 years. He has served as trial counsel or lead trial counsel in multiple federal trials, including courtroom victories in patent cases involving such diverse technologies as secure computer networking, integrated circuits, video game controllers, and computer operating systems.

Hamad Hamad has almost 15 years of experience trying high-stakes, technically complex patent infringement jury trials. Since 2015, he has been selected to the annual Texas Super Lawyers Rising Stars list of the state's best young attorneys every year, and in 2022, *D Magazine* named him one of Dallas's top young lawyers.

Aisha Mahmood Haley has practiced patent law for nearly a decade. Ms. Haley has served as a judicial law clerk for the U.S. Court of Appeals for the Federal Circuit and in the U.S. District Court for the Eastern District of Texas. Ms. Haley has held key positions on multiple trial and appellate teams in patent cases, including penning multiple briefs before the Federal Circuit and district courts around the country.

James Smith has practiced patent law for 8 years. Mr. Smith has served as a judicial law clerk for the U.S. Court of Appeals for the Federal Circuit. Mr. Smith has served on trial and appellate teams in multiple complex patent cases.

While the Practitioners have represented both plaintiffs and defendants in patent and intellectual property litigation cases, the Practitioners primarily represent plaintiffs and present this brief to ensure adequate representation of the perspective of plaintiffs and the plaintiffs' bar in patent cases.

## SUMMARY OF ARGUMENT

The *en banc* court does not write on a blank slate: our jurisprudence springs from centuries of legal tradition. Historically, juries were given wide latitude to hear the entire record and decide damages issues. Juries were entrusted with the entire factual record and instructed on the law in evaluating patent damages.

Over the last thirty years, *Daubert* and the Federal Rules of Evidence have stationed courts as gatekeepers, demanding that experts offer reliable and relevant opinions to punch their tickets to testify before a jury. This gatekeeping role coexists with the right to trial by jury. To respect the Seventh Amendment in answering the question of whether the district erred by allowing the challenged expert testimony, the *en banc* court separate issues of weight, which are resolved by the jury, from issues of reliability, which are resolved by the judge. The historical province of the jury in ascertaining damages must at least be mapped out broadly so that the boundaries of the Seventh Amendment are not inadvertently overstepped when a court scrutinizes reliability.

To avoid evaluating the correctness of the of the expert's conclusions (which would be an impermissible usurpation of Seventh Amendment territory), questions of reliability of an expert's principles and methodology can be answered in part by assessing whether the principles and methodology are generally accepted in the relevant field. Prior to *Daubert*, some lower courts disallowed expert testimony

*unless* the proffering party could show that the methodology was generally accepted in the field—using that as a necessary precondition to the admissibility of the expert testimony. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 585 (1993). The *Daubert* Court concluded that this framework—that expert testimony was inadmissible unless the proffering party made a showing that it was generally accepted in the field—was superseded by the adoption of Rule 702. *Id.* at 587. Allowing for more flexibility, the *Daubert* Court then provided the lower courts with guidance for deciding whether expert testimony—whether employing novel and unconventional principles and methodologies or whether employing those generally accepted in a field—might be reliable and admissible. *See id.* at 593 ("Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test. But some general observations are appropriate . . .").

In the case at bar, the challenged methodology—assigning a royalty rate to a license—is a generally accepted exercise for licensing professionals, economists, and intellectual property valuation experts. *See id.* at 594 ("Widespread acceptance can be an important factor in ruling particular evidence admissible . . . ."). This is not some novel, experimental science. And the defendant's criticisms of the challenged testimony (both at trial and on appeal) are not highly scientific in nature or beyond the comprehension of the jury. The facts might have made for a hard case, but the question of reliability should have a clear, easy answer: the task of

inferring a royalty rate from a license is broadly accepted in the licensing and economics disciplines, and the district court was therefore well within its discretion in admitting the challenged testimony.

The panel dissent's criticisms of the patentee's "self-serving" damages facts and Google's arguments that Mr. Kennedy's reliance on the licenses and Mr. Habib led to "implausible" conclusions are not only at odds with the hypothetical negotiation framework itself, but the dissent and Google's substitution of their judgment for that of the jury itself highlights the perils of appellate factfinding, as discussed below in more detail. And at bottom, adopting Google's views would extract classic fact questions from the province of the jury and rest them in the bench, eroding at the Seventh Amendment right to a jury.

## ARGUMENT

### I. Historically, juries had broad access to the record in evaluating patent damages

"[T]here is no dispute that infringement cases today must be tried to a jury, as their predecessors were more than two centuries ago." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 377 (1996). Juries have been entrusted with determining damages attendant to patent infringement—including the reasonable royalty measure of damages—for over a hundred years.

The courts developed the reasonable royalty as a measure of damages because the other available remedies were too burdensome (via the apportionment

requirement of the "plaintiff's damages" and "defendant's profits" remedies and via the exacting requirements of "established royalty" remedy) or too small (*i.e.*, the nominal damages remedy). The alternative remedy of the reasonable royalty was first suggested by *Suffolk v. Hayden*, 70 U.S. 315, 317 (1865) (discussed below). The reasonable royalty was endorsed explicitly in *Dowagiac Mfg. Co. v. Minnesota Moline Plow Co.*, 235 U.S. 641 (1915), and Congress included the reasonable royalty as a remedy in the patent statutes in 1922, *see* 42 Stat. 389, 392 (1922) (recognizing court authority to award "a reasonable sum as profits or general damages for the infringement"). *See also* Michael Risch, *(Un)reasonable Royalties*, 98 B.U. L. REV. 187 (2018) (providing a detailed history of the development of the reasonable royalty).

Given the history of the reasonable royalty—and the background principles that grounded its creation—it is no surprise that juries were necessarily given wide latitude in determining reasonable royalty awards. Take *Hayden v. Suffolk Manufacturing Co*., a jury trial from October of 1862. There, the lower court instructed the jury to calculate damages for patent infringement broadly—charging the jury to "take the whole evidence, so far as it is applicable to that question," and "give it such weight as it deserves in estimating the damage to the plaintiff." *Hayden v. Suffolk Mfg Co*, 11 F. Cas. 900, 907 (C.C.D. Mass. 1862). At trial, there were no previous sales or licenses to speak of, but an expert did testify as to the

uses and advantages of the patented technology over old modes. *Suffolk*, 70 U.S. at 317. The jury returned a damages award of $1,774, and the defendants sought review from the Supreme Court. Recognizing that the question of damages "is always attended with difficulty and embarrassment both to the court and jury," the Court accepted the jury's use of "general evidence" where an "established patent or license fee" was unavailable and affirmed the jury verdict. *Id.* at 320.

As damages law matured and the Court recognized the "reasonable royalty" as an acceptable measure of patent value, the determination of royalties remained within the province of the jury and based on general evidence about a patent. *See generally Dowagiac*, 235 U.S. 641. The *Dowagiac* Court specifically observed that, in the absence of an established royalty, "it was permissible to show the value by proving what would have been a reasonable royalty, considering the nature of the invention, its utility and advantages, and the extent of the use involved." *Id*. at 648. Justice Cardozo echoed this in *Sinclar v. Jenkins*, observing that general evidence is often necessary due to the limitations of available evidence:

> A patent is a thing unique. There can be no contemporaneous sales to express the market value of an invention that derives from its novelty its patentable quality. But the absence of market value does not mean that the offender shall go quit of liability altogether. The law will make the best appraisal that it can, summoning to its service whatever aids it can command. At times the only evidence available may be that supplied by testimony of experts as to the state of the art, the character of the

> improvement, and the probable increase of efficiency or saving of expense.

*Sinclair Ref. Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 697–98 (1933).

However the reliability question before this Court is answered, it must be answered in a way that recognizes that juries can determine reasonable royalty awards based on general evidence about a patent's nature, its utility, and its advantages, and that expert testimony on reasonable royalty damages is optional. *See also* 35 U.S.C. § 284 (providing that the court "may"—not must—"receive expert testimony as an aid to the determination of damages"). Anything inconsistent would be a significant departure from the underpinnings of the reasonable royalty construct and its origins.

## II. The *en banc* Court should decline to expand the role of *Daubert* and Rule 702 beyond questions of reliability and into questions of the merits' correctness

The question before the *en banc* Court is one of evidentiary gatekeeping: did the district court adequately perform its gatekeeping rule under Rule 702 and *Daubert* in permitting Mr. Kennedy to testify to a per-unit royalty rate from the three licenses in the record? To answer that question, a review of *Daubert* itself is instructive.

*Daubert* affirmed that "under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. That inquiry is "a flexible one." *Id.* at 594. And, as to

not invade the province of the ultimate factfinder, "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595. In other words, *Daubert* exists to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

As the Supreme Court has made plain, the question for the bench is not whether Mr. Kennedy's opinions are correct but instead, whether his calculation of royalty rates from the licenses in question reflects the same level of intellectual rigor as the practice of economists, intellectual property valuation experts, or licensing professionals.

The panel majority answered that question in the affirmative, and its reasoning is both correct and unremarkable under Supreme Court and Federal Circuit jurisprudence.

### A. The majority sets forth the relevant facts to the analysis

The majority and dissent appear to agree on a basic nucleus of facts:[1] Mr. Kennedy, EcoFactor's damages expert, relied upon three license agreements, each

---

[1] Due to the extreme level of sealing of the appendix by the parties, the only available information regarding Mr. Kennedy's trial testimony and the text of the agreements is that set forth in the panel opinion and party briefs.

of which contained a recital that the royalty paid under the agreement was "*based on* what EcoFactor believes is a reasonable royalty calculation of *[$X] per unit* for estimated past and [ ] projected future sales of products accused of infringement in the Litigation." *EcoFactor, Inc. v. Google LLC*, 104 F.4th 243, 252 (Fed. Cir. 2024) (quoting J.A. 10389). Mr. Habib, EcoFactor's CEO and signatory to each contract, testified that the lump sums paid under the agreements were based on the $X royalty rate. *Id.* While Mr. Habib recognized that he could not himself see the royalty base numbers because it contained confidential licensee information, "he understood that EcoFactor calculated each of the three licenses' lump sums using the $X royalty rate and the past and future projected sales for each licensee." *Id.* Although he did not have access to the underlying sales data, Mr. Habib also testified that the royalty calculations generally comported with his understanding of the market—with seven years in the industry—and the size of the licensees relative to that market. *Id.* at 252–53. EcoFactor also introduced into the trial record an email chain in which the parties discussed applying the $X royalty rate in the agreement. *Id.* at 253. Based on the record, the majority held that "the 'jury was entitled to hear the expert testimony' from Mr. Kennedy concerning the $X royalty rate and "decide for itself what to accept or reject." *Id.* (quoting *Pavo Sols LLC v. Kingston Tech. Co.*, 35 F.4th 1367, 1379 (Fed. Cir. 2022)).

While the majority opinion primarily conducted a proper reliability analysis of Mr. Kennedy's testimony, in response to the dissent's foray into assessing the correctness of the merits and Google's arguments, however, the majority did engage on weight of the evidence introduced at trial. The majority rejected Google's argument that there was no evidence that the parties to the three license agreements "actually applied the $X royalty rate." *Id.* at 253. Disagreeing with Google's argument and the factual determination proposed by the dissent, the majority cited the Schneider license agreement—in which Schneider had inserted a clause expressly disagreeing that the $X royalty rate was "a reasonable royalty." *Id.* In the majority's view, Schneider's inclusion of its position regarding reasonableness of the $X rate was evidence that the agreement did in fact apply the $X rate.

### B. Mr. Kennedy's opinions satisfied *Daubert* because they were reliable, and Google and the dissent's fixation on their perceived correctness of Mr. Kennedy's conclusions is beyond the inquiry

The admissibility of Mr. Kennedy's expert testimony did not require an assessment of the correctness of his conclusions. *See Daubert*, 509 U.S. at 595 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."); *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994) (explaining that *Daubert* "does not mean that plaintiffs have to prove their case twice—they do not have to demonstrate to the judge by a

preponderance of the evidence that the assessments of their experts are *correct,* they only have to demonstrate by a preponderance of evidence that their opinions are reliable. . . . The evidentiary requirement of reliability is lower than the merits standard of correctness."); *see also infra* § IV.

The *Daubert* question at issue is the opinion's reliability: the district court had to consider whether Mr. Kennedy reliably performed the task of calculating a royalty rate from the licenses.

The fact that there might have been conflicting testimony or evidence is not, in and of itself, a basis on which to exclude Mr. Kennedy's testimony so long as it was relevant and reliable. In such instances, it is up to the jury—not the trial judge—to determine which side's expert and evidence to credit. *See* Rule 702 advisory committee's notes to 2000 amendments ("When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.").[2]

[2] *See also ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 290 (3d Cir. 2012) ("Here, the District Court properly rejected Eaton's argument that DeRamus's testimony should have been excluded on the basis that it was contradicted by other facts. Eaton's argument on this point really amounts to nothing more than a complaint that DeRamus did not adopt Eaton's view of the case. The District Court correctly noted that, although some of DeRamus's testimony may have been contradicted by other evidence, including the testimony of Eaton's expert, the existence of conflicting

Here, the interpretation and calculation of royalty rates from license agreements is a common and routine task and has widespread acceptance as a technique in the relevant communities for licensing professionals, intellectual property valuation experts, or economists. *See Daubert*, 509 U.S. at 594 ("Widespread acceptance can be an important factor in ruling particular evidence admissible . . . ."). If the methodology were more exotic, perhaps more skepticism would be warranted. *See id.* (explaining that "a known technique which has been able to attract only minimal support within the community may properly be viewed with skepticism") (citing *U.S. v. Downing*, 753 F.2d 1224, 1238 (3d Cir. 1985)). But the methodology at issue here is well within the bailiwick of licensing professionals and economists. *See Kumho Tire*, 526 U.S. at 151–52. To be sure, a field of expertise or a discipline itself must also be reliable for its generally accepted principles to pass muster. But again here, what is at issue arises out of longstanding and established disciplines of economics, valuation, and licensing—not disciplines like "astrology or necromancy" that lack reliability in and of themselves. *See id.* at 151.

---

evidence was not a basis on which to exclude DeRamus's testimony. The respective credibility of Plaintiffs' and Eaton's experts was a question for the jury to decide."); Fed. R. Evid. 702 advisory committee notes to 2023 amendments ("It will often occur that experts come to different conclusions based on contested sets of facts. Where that is so, the Rule 104(a) standard does not necessarily require exclusion of either side's experts. Rather, by deciding the disputed facts, the jury can decide which side's experts to credit.").

Accordingly, the district court did not err in admitting Mr. Kennedy's opinion when he used widely accepted methodologies. *See United States v. Smith*, 444 F. App'x 160, 161 (9th Cir. 2011) ("The court properly determined that the facts and data underlying the diagnosis were 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.' Finding that the expert's methodology was reliable, the district court properly focused on the acceptance of those methods in the field and whether others could duplicate the results.") (internal citations omitted); *Fannie Mae v. LaRuffa*, 702 F. App'x 505, 507 (9th Cir. 2017) ("But Johnson is a highly qualified appraisal expert who used acceptable methodologies to reach his $5.1 million estimate. The district court did not err by crediting Johnson's expert testimony."); *Kim v. Am. Honda Motor Co., Inc.*, 86 F.4th 150, 163 (5th Cir. 2023) ("At bottom, Hannemann had decades of experience in automotive engineering and applied that expertise to opine that the alternative designs would have reduced the likelihood of injury in this accident and would not be cost prohibitive, testimony meeting FRE 702 and *Daubert*.").

## III. The dissent's reasoning represents a departure from well-traveled damages precedent and threatens to erode the jury trial right in the Seventh Amendment

Google urges that the *en banc* court adopt the dissent's reasoning. Brief of Google LLC, *EcoFactor v. Google*, No. 23-1101 (Fed. Cir. Nov. 12, 2024)

("Google Br.") at 28 (asking the *en banc* court to hold that Mr. Kennedy's testimony failed *Daubert* because, in Google's view, "it is implausible that multiple differently situated companies in real-world negotiations to settle different sets of lawsuits asserting different patents would have all landed on an identical NRR rate, down to the cent."). These arguments echo the panel dissent, which disagreed with Mr. Kennedy's reliance on "Ecofactor's self-serving, unilateral 'recitals' of its 'beliefs' in the license agreements." *EcoFactor*, 104 F.4th at 257 (Prost, J., dissenting). The dissent further rejected Mr. Habib's testimony as offering nothing more than his "unsupported 'understanding,'" and accused EcoFactor of a "transparent attempt to manufacture a royalty rate using its 'belief.'" *Id.* at 259.

### A. Google's search of bright line rules against "self-serving, unilateral" evidence is misguided

The dissent and Google's analysis suffers from two flaws. The first is that its rejection of a patentee's beliefs as nothing more than "self-serving" statements is at odds with the hypothetical negotiation construct itself and certainly does not warrant creation of a bright line rule regarding reliability in damages opinions. The hypothetical negotiation's primary inquiry is "what the parties would have agreed upon, if both were reasonably trying to reach an agreement." *Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1121 (S.D.N.Y. 1970) (citing *Faulkner v. Gibbs*, 199 F.2d 635, 639 (9th Cir. 1952), *modified sub nom. Georgia-Pac. Corp. v. U.S. Plywood-Champion Papers, Inc.*, 446 F.2d 295 (2d Cir. 1971)).

The hypothetical negotiation analysis "requires consideration not only of the amount that a willing licensee would have paid for the patent license but also of the amount that a willing licensor would have accepted." *Id.* "Where a willing licensor and a willing licensee are negotiating for a royalty, the hypothetical negotiations would not occur in a vacuum of pure logic." "In applying the formulation, the Court must take into account the realities of the bargaining table and subject the proofs to a dissective scrutiny." *Id.* at 1122.

Google focuses on how—in its view—multiple different companies would not have come to the same licensing rate, but the would-be infringer's perspective is not dispositive in the hypothetical negotiation construct; it is fundamentally a willing licensor, willing licensee model. The royalty the patentee *understood* its licenses to reflect would certainly inform the rate at which would willing to license additional parties. An expert should be permitted to consult sources of proof regarding what the parties *would have accepted*. And one of the single most probative sources of information about what the patentee would have accepted at a hypothetical negotiation is perhaps what the patentee *understood itself to have accepted* in previous negotiations.

On the facts here, the patentee negotiated licenses with three parties and contemporaneously affixed in those agreements a statement reflective of its then-understanding of the rate it had received in exchange for a license. The patentee's

views of the rates were well-known enough at the time of negotiation for one licensee to contest the reasonableness of that rate in its own insertion into one of the licenses. In the hypothetical negotiation construct, the patentee would be aware of those rates. *Georgia-Pacific*, 318 F. Supp. At 1121 (the negotiations do not "occur in vacuum of pure logic").

Indeed, this Court recently permitted third-party fact-witness testimony about a license to inform the damages conclusion. *See Pavo Sols.*, 35 F.4th at 1379. There is no reason to wholesale disregard fact-witness testimony from one of the signatories of a license *as a matter of methodology* simply because that signatory is the patentee. It cannot be unreliable for Mr. Kennedy to have relied upon rates that the patentee in the hypothetical negotiation would have understood to be consistent across its portfolio of three licenses for the patented technology.

### B. The dissent's factual criticism of Mr. Habib's testimony ignores the realities of civil litigation and highlights the importance of the abuse-of-discretion standard

The second flaw in the dissent and Google's argument is their delving into the credibility and merits of individual pieces of evidence. Take, for example, the dissent's assignment of criticism to Mr. Habib's testimony as conclusory. *See also* Google Br. 27–28 (criticizing reliance on "the self-serving, conclusory contentions of EcoFactor's CEO, Habib").

A close review of the circumstances reveals the pitfalls of the dissent's conspicuous appellate factfinding. It is a common fact of litigation that a corporate officer like Mr. Habib would not be provided privileged access to sales data of a defendant. The three licenses were litigation licenses, and, to whatever extent sales information was provided to EcoFactor under a protective order, for example, it may have been deemed attorneys-eyes only or otherwise confidential—off limits to Mr. Habib. The dissent criticizes Mr. Habib for lacking percipient knowledge of the unit numbers as if he could have demanded access to confidential data to ground his views. This is particularly troubling given that Mr. Habib *did* put the numbers in context based on his understanding from nonprivileged sources—his own knowledge of the licensees' size and the relevant market. In substituting its judgment for that of the jury, the dissent criticizes a fact witness for not considering facts likely inaccessible to him.

That pointed criticism to a single piece of evidence is not a methodological, reliability-based criticism; it is a criticism of Mr. Kennedy's conclusions. Indeed, the dissent's criticisms for Mr. Habib are reminiscent of those raised by the defendants in *Micro Chemical, Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003). There, "the defendants argue[d] that [Micro's damages expert] based his opinion on inaccurate facts because he relied on the statements of others and did not undertake an independent investigation of the feedlot industry or personally

review the parties' financial records." *Id.* But this Court held that the trial court did not err in permitting the expert to testify, noting that the defendants had the opportunity to cross the expert and present a competing theory based on their own view of disputed facts. *Id.* After all, when "the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony." *Id.*

Mr. Habib's testimony is perhaps even less concerning than that in *Micro Chemical*, given that Mr. Habib is a fact witness and the individual criticized for inadequate investigation in *Micro Chemical* was an expert. *See also Hunt Bros. Fruit-Packing Co. v. Cassiday*, 64 F. 585, 587 (9th Cir. 1894) (holding that a patentee's testified-to opinion regarding the rate attributable to license that was based "to some extent upon figures and estimates" provided a permissible basis on which to calculate damages).

Google and the dissent's concerns are ones about fact findings. One party heralding something as "implausible" does not make it so. But creating a bright line rule where questions of witness credibility about facts are reframed as ones of methodology shifts the factfinding role of the jury into one for the bench.

### C. Adoption of the dissent's reasoning would usurp the role of the jury in violation of the Seventh Amendment

The dissent and Google effectively sidestep the standard of review on appeal to reach into factual issues reserved for the jury. The district court's admission of

Mr. Kennedy's testimony is reviewed on appeal for abuse of discretion. And the opinion the dissent now maligns was subject to the crucible of cross examination before a jury—a traditional and appropriate means for challenging evidence. *See, e.g.*, *Daubert*, 509 U.S. at 596; *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011).

That Google may have reached a different conclusion than the jury or believe Mr. Kennedy to be incorrect does not warrant his opinion's exclusion under Rule 702. *See, e.g.*, *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015) ("But the question of whether the expert is credible or the opinion is correct is generally a question for the fact finder, not the court."); *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) ("Verizon points out various weaknesses in the damages assessment by ActiveVideo's expert. At their core, however, Verizon's disagreements are with the conclusions reached by ActiveVideo's expert and the factual assumptions and considerations underlying those conclusions, not his methodology. These disagreements go to the weight to be afforded the testimony and not its admissibility.").

As the advisory committee notes to Rule 702 counsel, "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system," and Google had every opportunity to test Mr. Kennedy's opinion before the jury.

And a *Daubert* standard that requires parsing the merits at the dissent's level of granularity threatens to diminish the right to trial by jury. *See Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002) ("Thus, while exercising its role as a gate-keeper, a trial court must take care not to transform a *Daubert* hearing into a trial on the merits."). The dissent takes on the role of factfinder, usurping the jury's quintessential role. *See C&F Packing Co. v. IBP, Inc.*, 224 F.3d 1296, 1304 (Fed. Cir. 2000) ("In setting damages, the jury's function is to weigh contradictory evidence, to judge the credibility of the witnesses, and to resolve factual disputes."); *Micro Chemical*, 317 F.3d 1392 ("[I]t is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony.").

As the majority aptly cautioned after its discussion of apportionment, "[i]f the standard for admissibility is raised too high, then the trial judge no longer acts as a gatekeeper but assumes the role of the jury." *EcoFactor*, 104 F.4th at 257. "The court, though it remains ultimately responsible for upholding the law applicable to the facts found, cannot substitute its view for that of the jury when to do so would be an effective denial of the right to trial by jury." *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1546 (Fed. Cir. 1983).

### D. Vacating a jury verdict for an expert's reliance on evidence that the parties do not contest provides substantial evidence for the jury's verdict is an unacceptable end-run around the right to trial by jury

It is particularly offensive to the Seventh Amendment to use the gatekeeping tool of *Daubert* to reverse a jury verdict based on the expert's purported reliance on faulty factual evidence where there is no question that the jury's verdict—even without the expert opinion—rests on substantial evidence.

In *EcoFactor*, it is neither the parties' nor the dissent's view that the evidence Mr. Kennedy should have relied upon was improperly admitted into evidence or otherwise violates Rule 403. By all accounts, the evidence apart from Mr. Kennedy's testimony—the license agreements and Mr. Habib's testimony—would be before the jury and its admission was not challenged on appeal. In this appeal, Google has not challenged that the jury's damages verdict lacked sufficient evidentiary basis, with or without Mr. Kennedy's testimony. *See EcoFactor*, 104 F.4th at 259 ("The question here is not whether any document in the record supports the jury's damages award." (Prost, J. dissenting)).

No party contests that the jury would have been entitled to weigh the evidence in the record and reach its own conclusion on patent damages. Nor could they. It is well-settled law that a jury is not obligated to accept one party or another's expert opinion, and a party is not obligated to present damages through an expert at all. *See, e.g.*, *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 985

(Fed. Cir. 2021) ("A party need not present expert testimony on damages or, as a corollary, on every aspect of damages, such as a single royalty rate."); *Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1378 (Fed. Cir. 2005) ("This court has previously recognized that the jury is not bound to accept a rate proffered by one party's expert but rather may choose an intermediate royalty rate."); *SmithKline Diagnostics, Inc. v. Helena Lab'ys Corp.*, 926 F.2d 1161, 1168 (Fed. Cir. 1991) ("On the contrary, the determination of a reasonable royalty must be based upon the entirety of the evidence and the court is free to, indeed, must reject the royalty figures proffered by the litigants, as the district court did in this case, where the record as a whole leads the court to a different figure."); *see also Info-Hold, Inc. v. Muzak LLC*, 783 F.3d 1365, 1372 (Fed. Cir. 2015) ("There was other record evidence which the district court could use as a basis for determining a reasonable royalty, even after the exclusion of Mr. White's report and testimony.").

A jury could have relied upon the same factual predicates that Mr. Kennedy relied upon in his opinion and reached the same conclusion without incurring the risk of a new trial for want of reliability in the jury's analytic methods. Against this landscape, it is hard to see how the admission of Mr. Kennedy's opinion could amount to more than harmless error, and harmless error does not alone have the power to unseat a jury verdict. Fed. R. Civ. P. 61.

Google certainly has not explained how the admission of Mr. Kennedy's testimony affects its substantial rights more acutely than the unoffensive, uncontested admission of the underlying evidence. The *en banc* court should hesitate to adopt a view of *Daubert* that provides an escape hatch from jury findings that otherwise rest on solid ground. The Seventh Amendment should not be set aside so easily.

## IV. The amendment to Rule 703 does not warrant a different result.

Finally, some amici have suggested that the amendments to Rule 702 call into question the holdings of previous Federal Circuit cases, including those on which the majority relied. That is an unreasonable reading of the 2023 amendments and their accompanying advisory committee notes.

Newly amended Rule 702 now simply expressly recites a preponderance of the evidence standard for the evaluation of the relevance and reliability of an expert's opinion. *See* Fed. R. Evid. 702 ("A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that *it is more likely than not that* . . ." (emphasis added)). The advisory committee notes explain that the rule was "amended to clarify and emphasize" the preponderance standard applies to the admissibility requirements in the Rule. But even before the 2023 amendments, Rule 104(a)'s preponderance standard for admissibility already

applied to the admissibility of expert testimony. The Supreme Court explicitly said so in *Daubert.* 509 U.S. at 592–93 ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, *pursuant to Rule 104(a)*, whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." (emphasis added and footnotes omitted)).

Prior Federal Circuit cases (including those relied on by the majority) that relied on and applied *Daubert* did not do so with a carveout specifically as to Rule 104(a)'s application to expert testimony. Likewise, Sister Circuit Courts of Appeal have long recognized that Rule 104 has applied to the admissibility of expert testimony *and also* that its application did not create a perversely heightened standard for the plaintiff that puts in the extra effort to submit expert testimony. *See, e.g.*, *In re Paoli*, 35 F.3d at 744 ("This does not mean that plaintiffs have to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are *correct,* they only have to demonstrate by a preponderance of evidence that their opinions are reliable. . . . The evidentiary requirement of reliability is lower than the merits standard of correctness.").

What has not changed, however, is the role of the jury or factfinder as compared to the bench. As even the 2023 notes emphasize, "[i]t will often occur

that experts come to different conclusions based on contested sets of facts," and, "by deciding the disputed facts, the jury can decide which side's experts to credit." Fed. R. Evid. 702 advisory committee's note to 2023 amendments. As before, the standard imposed by Rule 702 is not one of correctness but reliability. *Id.* ("[P]roponents 'do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable . . . . The evidentiary requirement of reliability is lower than the merits standard of correctness."' (citing Fed. R. Evid. 702 advisory committee's note to 2000 amendment)).

The Federal Circuit has properly made the distinction between assessments of reliability versus assessments of correctness in the weight of its precedent. *E.g.*, *Summit 6*, 802 F.3d at 1295 ("the question of whether the expert is credible or the opinion is correct is generally a question for the fact finder, not the court" (citation omitted)); *i4i*, 598 F.3d at 854 (same); *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1314 (Fed. Cir. 2014) ("A judge must be cautious not to overstep its gatekeeping role and weigh facts, evaluate the correctness of conclusions, impose its own preferred methodology, or judge credibility, including the credibility of one expert over another. These tasks are solely reserved for the fact finder."), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015);

*Pavo Sols.*, 35 F.4th at 1379 (jury entitled to hear sound expert testimony and "decide for itself what to accept or reject").

## CONCLUSION

The Group respectfully requests that the Court decline to depart from well-traveled precedent.

Dated: January 24, 2025

Respectfully submitted,

/s/ Aisha Mahmood Haley

Aisha Mahmood Haley
Austin Curry
Hamad M. Hamad
James F. Smith
CALDWELL CASSADY & CURRY P.C.
212 N. Pearl St., Suite 1200
Dallas, Texas 75201
(214) 888-4848
ahaley@caldwellcc.com
acurry@caldwellcc.com
hhamad@caldwellcc.com
jsmith@caldwellcc.com

*Counsel for Amicus Curiae, Prof. Risch and The Group of Interested Practitioners*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 23-1101

**Short Case Caption:** EcoFactor v. Google

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 6,622 words.

☐ the filing has been prepared using a monospaced typeface and includes ____________ lines of text.

☐ the filing contains ____________ pages / ____________ words / ____________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ____________).

Date: 01/24/2025

Signature: /s/ Aisha Mahmood Haley

Name: Aisha Mahmood Haley

Save for Filing